ALLEN & OVERY LLP

1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 610-6300
Facsimile: (212) 610-6399
Ken Coleman
Amélie Baudot

*Counsel for Ernst & Young Inc. as the Monitor
and Foreign Representative*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 15 |
| Metcalf & Mansfield Alternative Investments II Corp., | Case No. 09-_____ (___) |
| Debtor in Foreign Proceeding. | |
| In re | Chapter 15 |
| Metcalf & Mansfield Alternative Investments III Corp., | Case No. 09-_____ (___) |
| Debtor in Foreign Proceeding. | |
| In re | Chapter 15 |
| Metcalf & Mansfield Alternative Investments V Corp., | Case No. 09-_____ (___) |
| Debtor in Foreign Proceeding. | |
| In re | Chapter 15 |
| Metcalf & Mansfield Alternative Investments XI Corp., | Case No. 09-_____ (___) |
| Debtor in Foreign Proceeding. | |

| | |
|---|---|
| In re<br><br>Metcalf & Mansfield Alternative Investments XII Corp.,<br><br>Debtor in Foreign Proceeding. | Chapter 15<br><br>Case No. 09-_____ (___) |
| In re<br><br>6932819 Canada Inc.,<br><br>Debtor in Foreign Proceeding. | Chapter 15<br><br>Case No. 09-_____ (___) |
| In re<br><br>4446372 Canada Inc.,<br><br>Debtor in Foreign Proceeding.. | Chapter 15<br><br>Case No. 09-_____ (___)<br><br>Joint Administration Requested |

### VERIFIED PETITION FOR RECOGNITION OF FOREIGN PROCEEDINGS AND ENFORCEMENT OF CANADIAN ORDERS RELATING TO THE RESTRUCTURING OF THE CANADIAN ASSET-BACKED COMMERCIAL PAPER MARKET

Ernst & Young Inc. is the court-appointed monitor (the "**Monitor**") and authorized foreign representative of Metcalfe & Mansfield Alternative Investments II Corp., ("**Metcalfe II**"), Metcalfe & Mansfield Alternative Investments III Corp. ("**Metcalfe III**"), Metcalfe & Mansfield Alternative Investments V Corp. ("**Metcalfe V**"), Metcalfe & Mansfield Alternative Investments XI Corp. ("**Metcalfe XI**"), Metcalfe & Mansfield Alternative Investments XII Corp. ("**Metcalfe XII**"), 6932819 Canada Inc. ("**6932819**") and 4446372 Canada Inc., ("**4446372**" and together with Metcalfe II, Metcalfe III, Metcalfe V, Metcalfe XI, Metcalfe XII, and 6932819, the "**Issuer Trustees**"). The Issuer Trustees are the trustees of the

third-party (non-bank sponsored) conduit trusts, (the "**Conduits**")[1] and the debtors in proceedings (the "**Canadian Proceedings**") under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**") pending before the Ontario Superior Court of Justice (Commercial List) (the "**Ontario Court**").[2]

The Monitor has commenced these chapter 15 cases ancillary to the Canadian Proceedings and respectfully files these Verified Petitions For Recognition of the Canadian Proceedings (together, the "**Chapter 15 Petitions**") with the documentation required by sections 1504 and 1515 of title 11 of the United States Code (the "**Bankruptcy Code**") seeking the entry of orders:

(i) substantially in the form annexed hereto as <u>Exhibit A</u> (the "**Proposed Recognition Order**") recognizing the Canadian Proceedings as "foreign main proceedings" and enforcing in the United States the Amended Sanction Order (the " **Sanction Order** ") and the Plan Implementation Order (the "**Implementation Order**" and together with the Sanction Order, the "**Canadian Orders**") relating to the Third Amended Plan of Compromise and Arrangement (the "**Plan**") for the comprehensive restructuring of third-party (non-bank sponsored) Asset-Backed Commercial Paper ("**ABCP**"); and

(ii) granting such other and further relief as is appropriate under the circumstances.

In support of the Chapter 15 Petitions, the Monitor respectfully states as follows:

---

[1]    The Conduits are listed in Schedule A.
[2]    The Canadian Proceedings are the only foreign proceedings with respect to the Issuer Trustees that are known to the Monitor.

## PRELIMINARY STATEMENT

1.    The Canadian Proceedings were initiated by the Pan-Canadian Investors Committee for the Third-Party Structured Asset-Backed Commercial Paper (the "**Investors Committee**")[3] in order to effect the restructuring of all outstanding ABCP obligations (totaling approximately CAN$32 billion).    The ABCP restructuring is the largest restructuring in Canadian history and has successfully prevented devastating losses to investors and other market participants.

2.    The Investors Committee, with the Monitor's assistance, proposed a Plan that provides a fair and equitable solution to the ABCP crisis while preserving value for investors and providing transparency to the market.    To achieve a common solution for all investors while respecting the separate and relative rights of each, the Plan was designed so that each investor's recovery remains a function of the value of the assets that underlie its ABCP.

3.    The Plan provides that ABCP noteholders (the "**Noteholders**") receive replacement notes with maturities that are tied to the underlying assets, which addresses the timing mismatch that was a source of market instability, as discussed in greater detail below.    In order to make this possible, key market participants agreed to increase their own risk by, among other things, widening margin triggers and providing margin funding at substantially less than market rates.    In exchange for these important concessions, these key participants benefited from an injunction and a comprehensive release of claims.

4.    The Ontario Court has sanctioned the Plan and it is now being implemented.    In order to eliminate the risk of litigation here by any Noteholders in contravention of the Plan, the Canadian Orders and the Plan should be recognized and enforced in the United States.    The Monitor thus requests the assistance of this Court to promote the

---

[3]    The Investors Committee are the applicants in the Canadian Proceedings. The members of the Investors Committee are listed in Schedule B.

finality of this unique and complex restructuring, which was the largest in Canadian corporate history and one whose success played an important role in preserving the stability of the Canadian economy.

5. Filed contemporaneously herewith is the declaration of Ken Coleman annexed to which are certain key documents as Exhibits A through H:

A. Initial Order
B. The Plan
C. Sanction Order
D. Implementation Order
E. Monitor's Report dated March 17, 2008 (the "**First Monitor's Report**")
F. Monitor's Report dated January 2, 2009 (the "**Eighteenth Monitor's Report**")
G. Monitor's Report dated August 18, 2009 (the "**Twenty-Fifth Monitor's Report**")
H. Affidavit of Purdy Crawford sworn to on March 17, 2008 (the "**Crawford Affidavit**")

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and section 1501 of the Bankruptcy Code. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

7. Venue is proper in this District pursuant to 28 U.S.C. § 1410(3). As beneficiaries of the relief requested herein are located in this District, venue in this District is consistent with "the interests of justice and the convenience of the parties," and the Issuer Trustees in the foreign proceeding do not have places of business or principal assets in this or any other District.

8. The statutory predicates for the relief requested herein are sections 1504, 1507, 1515, 1516, 1517, 1520, 1521 and 105(a) of the Bankruptcy Code.

## BACKGROUND

9.      On March 17, 2008, the Investors Committee applied for and obtained protection under the CCAA for the Issuer Trustees and Conduits pursuant to the Initial Order of the Ontario Court (the "**Initial Order**").[4]  Pursuant to the Initial Order, Ernst & Young Inc. was appointed as Monitor in the Canadian Proceedings. The Initial Order provided that the Investors Committee could propose meetings of Noteholders to consider and vote on the Plan.  On April 25, 2008, over 96% of Noteholders voted in favor of the Plan.  By the Sanction Order dated June 5, 2008, the Plan was approved by the Ontario Court.

10.     Certain investors appealed the Sanction Order and hearings were held on June 25 and 26, 2008, before the Ontario Court of Appeal.  The appeal was dismissed by unanimous decision.  The objecting investors then sought leave to appeal the decision to the Supreme Court of Canada, which was denied on September 19, 2008 by the Supreme Court of Canada.

11.     The Plan became effective following the Ontario Court's Implementation Order dated January 12, 2009.  The Monitor has commenced these chapter 15 cases to promote the finality of the restructuring and the fair and efficient administration of the Canadian Orders and the Plan.

---

[4]      Pursuant to section 1515(b) of the Bankruptcy Code, the Initial Order is attached as Exhibit A to the Coleman Declaration.

*ABCP Market Collapse*

12.     The Canadian ABCP market is explained fully in the Monitor's Report and the Crawford Affidavit.

13.     There are 47 series of ABCP affected by the Plan.  The money paid by investors to acquire ABCP was used to purchase a portfolio of financial assets that would support and collateralize repayment of each series of ABCP.

14.     The assets that "backed" ABCP were sold to the Conduits by various financial institutions (the "**Asset Providers**")[5]  These assets can be divided into two general categories: exclusively "traditional" securitized assets such as residential and commercial mortgages, credit card receivables and auto-loans, and collateralized debt obligations ("**CDOs**"), which are not specific to one type of debt but are a type of asset-backed security and structured credit product.  Most of the CDOs were synthetic thus gaining credit exposure to a portfolio of fixed income assets (without owning those assets) through the use of credit default swaps.  From these two categories, the Plan also creates a third category of assets, known as "ineligible" assets, that are deemed ineligible for pooling in the new vehicles created by the Plan by reason of their exposure to U.S. sub-prime mortgages as described more fully below.

15.     The assets that backed the ABCP were generally long or medium term assets while the ABCP itself were short-term obligations of the Issuer Trustees, thus resulting in an inherent timing mismatch between the cash generated by the underlying long term assets and the cash needed to repay maturing ABCP.  Before mid-August 2007, the timing mismatch was addressed by reinvesting or "rolling" existing ABCP at maturity. New ABCP was continually being sold thus generating funds to repay maturing ABCP where investors required payment.

---

[5]     The Asset Providers include: Bank of America, N.A., Canadian Imperial Bank of Commerce, Citbank, N.A., Deutsche Bank AG, HSBC Bank USA, National Association, Merrill Lynch International, Royal Bank of Canada, Royal Bank of Scotland, Swiss Re Financial Products Corporation, UBS AG and Wachovia Bank N.A. and their respective affiliates.

The Issuer Trustees also entered into back-up liquidity arrangements with third-party lenders ("**Liquidity Providers**") who agreed to provide funds to repay maturing ABCP in certain circumstances.  *See* Monitor's Report ¶ 6.

16.    Certain of the Asset Providers also entered into derivative contracts with the Conduits.  In fact, the vast majority of underlying assets were derivative contracts in the form of credit default swaps.  A credit default swap is a contract under which one party (the "**Protection Buyer**") seeks to protect itself against a defined credit event or pool of credit events.  The Protection Buyer pays fees to another party (the "**Protection Seller**") who undertakes to pay the Protection Buyer if a credit event occurs.  A number of the Conduits assumed the role of Protection Seller under credit default swaps with an Asset Provider acting as Protection Buyer.  *See* Crawford Affidavit ¶¶ 38-43.

17.    Of the CAN$26 billion in credit default swaps underlying the ABCP, approximately CAN$17.4 billion were "Leveraged Super Senior" ("**LSS**") swaps.  These swaps are leveraged because the amount of credit protection sold is greater than the amount of collateral posted as security.  The LSS swaps contain triggering events that entitle the Protection Buyer to make margin calls for additional collateral from the Protection Seller to ensure that the Protection Buyer continues to have sufficient security.  Most of the triggers in the LSS swaps were mark-to-market triggers based on the market value of the swap.  The mark-to-market triggers required the Protection Seller to post additional collateral based on an increase in the amount the Protection Buyer would have to pay a third party to enter into a replacement swap that would preserve the economic value of the current swap for the Protection Buyer.  *See* Monitor's Report ¶¶ 15-17.

18.    The majority of the financial assets held by each Conduit that entered into LSS swaps were pledged to the Asset Providers as security.  Therefore, if a secured swap was declared to be in default, the Asset Provider had the right to terminate the swap and satisfy any termination payment by enforcing its security through seizing and liquidating the collateral.  Thus, when market conditions were sufficiently depressed, the Noteholders were at risk of significant losses because the value of the assets that supported their notes would first be used to meet any shortfalls incurred by the Asset Providers.

19.    The ABCP market froze during the week of August 13, 2007.  The crisis was largely triggered by market sentiment, as news spread of defaults on U.S. sub-prime mortgages.  Investors in Canadian ABCP lost confidence because of a perceived lack of transparency in the market.  Noteholders and potential new investors feared that the assets backing the ABCP might include substantial exposure to sub-prime mortgages or other overvalued assets.  Investors thus stopped buying new ABCP, and Noteholders stopped "rolling" their existing ABCP.  As ABCP became due, the Conduits were unable to fund repayments through new issuances or replacement notes.  The trustees of some Conduits made requests to Liquidity Providers, who took the position that the conditions for funding had not been met.  With no new investment, no reinvestment, and no liquidity funding available, coupled with the timing mismatch between the short-term ABCP and the longer-term underlying assets, payments due on the ABCP could not be made.  *See* Crawford Affidavit ¶¶ 45 – 49.

20.    On August 14, 2007, in response to this crisis and in order to prevent the destruction of value that a forced liquidation of the underlying assets would cause, representatives of the largest Noteholders and six of the Asset Providers signed an agreement establishing a 60-day standstill period (the "**Montréal Accord**").  During this period, the

relevant stakeholders focused on the restructuring and set up the foundation for the Plan. The Montréal Accord provided that all outstanding ABCP would be converted into floating rate term notes maturing at the same time as the corresponding assets. It also allowed for the modification of the margin provisions under the LSS swaps to reduce the risk of margin calls. Shortly after signing the Montréal Accord, the Investors Committee led the restructuring process with the help of the Monitor and J.P. Morgan, as financial advisor. *See* Crawford Affidavit ¶ 50.

### The Foreign Debtors

21.    The Issuer Trustees are either the original or replacement trustees of the Conduits, which issued the ABCP pursuant to trust indentures and through commercial paper placement agents such as financial institutions and broker-dealers, and were therefore liable for amounts owing thereunder. The Issuer Trustees had an obligation to, among other things, administer the trust and maintain proper records. Each Issuer Trustee was also the legal owner of the assets held for each series in the Conduit of which it is the trustee, and was the debtor (to the extent of the assets held in the Conduit) with respect to the ABCP issued by that Conduit. Since mid-August 2007, the Issuer Trustees had insufficient liquidity to make payments on the maturing ABCP. Each remained unable to meet its liabilities to the investors represented on the Investors Committee and to the other holders of each series of ABCP as those obligations became due.

### The Investors Committee

22.    The investors represented on the Investors Committee are the applicants in the Canadian Proceedings. They put forward and (along with the Monitor) obtained approval of the Plan, which they had developed as holders of CAN$21 billion (representing approximately

65%) of ABCP across all conduits and as real creditors of the Issuer Trustees.  The Investors Committee commenced the Canadian Proceedings in their own right because the extent of their exposure to the market made them the logical party to invest the resources necessary to stabilize the market and work through a highly complex restructuring.

### *Status of the Canadian Proceedings*

23.     As described above, the investors represented on the Investors Committee applied for and obtained protection under the CCAA for the Issuer Trustees and their respective Conduits pursuant to the Initial Order on March 17, 2008.  The Plan was approved by the Ontario Court by the Sanction Order and implementation commenced following the Implementation Order.  On January 21, 2009 (the "**Plan Implementation Date**"), the Plan Notes were allocated and distributed to Noteholders pursuant to the Plan and assets of the Conduits were transferred to newly created Master Asset Vehicles ("**MAVs**"), all as described in greater detail below.  In addition, on the Plan Implementation Date approximately CAN $1.03 billion was distributed to Noteholders on account of interest, and a further CAN $1.18 billion was transferred to trust accounts set up pursuant to the Plan and the Implementation Order, to be held in those trust accounts pending the completion of reconciliations as to the nature of those monies. Those reconciliations have now been completed, and in May 2009 approximately CAN $437.9 million of the funds held in trust were transferred to the MAVs as additional collateral and approximately CAN $366.4 million was distributed to Noteholders on account of interest.  The Ontario Court has granted the Monitor's request to make a final distribution of the trust monies to the Noteholders on account of interest and substantially complete the administration of the Canadian Proceedings.  Once the Plan is fully implemented, the Monitor will be discharged of its duties as more fully described in the Twenty Fifth Monitor's Report.

*Center of Main Interest*

24.     The Issuer Trustees are each corporations organized under provincial Canadian law and administered in Canada.  Consequently, Canada is the presumptive center of main interest for each Issuer Trustee pursuant to section 1516 of the Bankruptcy Code.

25.     This presumption is amply supported by each of the Issuer Trustee's contacts with Canada.  Each ABCP program, pursuant to which each Issuer Trustee would issue a series or class of ABCP on behalf of a Conduit, was initiated and directed by the institutions that acted as sponsors of the programs in Canada.  The Conduits, which held the assets of which the Issuer Trustees are each the legal owner, were formed under provincial Canadian law and are located in Canada.  Furthermore, third party creditors, principally the Noteholders, recognized that key governance and decision-making related to the Issuer Trustees took place in Canada and would understand that Canada is the center of operations for each debtor.  Beyond doubt, the center of main interest for each Issuer Trustee is in Canada.

*The Plan*

26.     Notwithstanding the fact that each Issuer Trustee is a separate legal entity and each series of notes is backed only by the assets relating to that series, the ABCP market suffered from common problems and required a common solution.  Accordingly, the Monitor, the Investors Committee and other key market participants, believed that one comprehensive Plan best addressed the needs of the ABCP market as a whole.  The Plan not only provides for market-wide transparency in the assets underlying the restructured notes, but also a greater

opportunity for investors to realize payment of what was due to them under the ABCP.  The following is a summary of the key provisions of the Plan.

*Restructured Margin Call Triggers*

27.     The risks caused by mark-to-market triggers in the LSS swaps are, under the Plan, reduced as the Asset Providers agreed to restructure the LSS transactions concurrently with Plan implementation.  Specifically, the Asset Providers agreed to change the triggers under the LSS swaps from mark-to-market triggers to more remote spread loss triggers which will reduce the likelihood of margin calls and any consequential forced liquidation of assets to fund termination payments.  The spread loss triggers, under the Plan, are based on six uniform and verifiable indices of spreads and losses.  The change in the triggers also increases transparency, predictability and certainty.  *See* Crawford Affidavit ¶¶ 79-81.

*The Master Asset Vehicles*

28.     While the change in the triggers reduced the risk for Noteholders, it increases the risk borne by the Asset Providers.  The Asset Providers thus required further collateral, beyond the existing assets in the Conduits, to be available through margin funding facilities.  In order to address this need for additional security, the Plan transfers all of the assets of the ABCP series backed by synthetic assets into two MAVs ("**MAV1**" and "**MAV2**").  The pooling of assets into those two MAVs provides for cross-collateralization thus making collateral calls less likely.  The collateral also includes non-levered synthetic assets.  Under the Plan, all of

the assets of the ABCP series backed solely by traditional assets were transferred to a third MAV ("**MAV3**").[6]

29.    In MAV1, additional margin funding is provided by the Noteholders participating in that vehicle themselves, through "self-funding." This involves the assumption of additional risk by these Noteholders.  Some may be required to post collateral and there may be some impact on their capital.  MAV2 is supported by a third-party margin funding facility, in effect a standby line of credit.[7]  The Asset Providers as well as several Canadian banks agreed to provide a large portion of the funding needed for this margin funding facility at a favorable interest rate.

30.    The Noteholders participating in MAV1 or MAV2 have transferred ABCP (other than the ABCP for which the underlying assets are traditional assets) to the applicable MAV in exchange for a combination of Class A-1 Notes, Class A-2 Notes, Class B Notes, Class C Notes, and ineligible asset tracking notes (collectively referred to as the "**Plan Notes**"). The different categories of Plan Notes were designed to permit the highest possible credit ratings in the Class A-1 Notes.

31.    All Noteholders had the option of participating in MAV1, provided that they met certain financial criteria or posted collateral, as required by the Asset Providers. Investors in MAV1 agreed to self-fund for their entire holdings. An investor could also participate as a margin funding lender in MAV2 for part of its holdings, again subject to certain criteria.

---

[6]    Where the underlying assets consist exclusively of traditional assets, the ABCP was restructured by pooling these assets into MAV3 and providing Noteholders with traditional asset tracking notes tied exclusively to the applicable traditional assets on a series by series basis. These notes bear interest at the rate per annum equal to the rate of return generated by the traditional assets. A total of 11 Series with an aggregate principal amount of  CA$3.4 billion were supported exclusively by traditional assets.

[7]    Where the underlying assets include ineligible assets, these assets were segregated within each of MAV1 and MAV2 and Noteholders received corresponding Plan Notes that track the performance of each individual applicable asset.  These Plan Notes are floating rate note with interest rates based on returns generated by the corresponding ineligible assets.

32.     Noteholders have exchanged or have been deemed to have exchanged the affected ABCP owned by them for Plan Notes.  The Plan Notes were distributed to Noteholders through the existing securities structure.  *See* Crawford Affidavit ¶¶ 81-86.

*Matching Assets and Liabilities*

33.     Under the Plan, all ABCP was replaced by Plan Notes that have maturities and interest rates appropriately tied to the underlying assets.  *See* Crawford Affidavit ¶ 78.

*Classification of Creditors*

34.     The Plan had a single class of creditors for voting purposes, being all investors in ABCP, and treated all ABCP holders equitably by accounting for the differing risks and corresponding interests across all of the ABCP.  *See* Crawford Affidavit ¶¶ 120-122.

*Claims Procedure*

35.     The total principal amount and maturity values of the ABCP for all series were known as a result of procedures undertaken by the Monitor.  In addition, the Plan provided for the exchange of all ABCP for Plan Notes, and for all Noteholders to receive their Plan Notes through the established mechanisms in Canada for distribution of securities to beneficial holders of record.  Therefore, in order to be eligible to vote and to have their vote properly accounted for at the Noteholder meeting conducted on April 25, 2008, investors were only required to confirm the amount of their particular holdings by submitting a voter confirmation form (in the event they had previously disclosed their holdings to the Monitor) or a voter identification form to the Monitor, and to vote in person or by proxy at the meeting.  This simplified process replaced the need for a proof of claims process in respect of the ABCP debt.  The Plan, therefore, did not

require any claims process other than the simple voter confirmation process. *See* Crawford Affidavit ¶¶ 123-127, First Monitor's Report ¶¶ 72-78, Eighteenth Monitor's Report ¶¶ 27-29.

*A Global Release*

36.    The Plan and the Sanction Order provide each participant in the Canadian ABCP market, including the Asset Providers, the Sponsors, the Issuer Trustees, the Conduits, and the Investors Committee, (collectively, the "**Released Parties**") with a release that protects them from liability and actions on account of any and all past, present and future claims, rights, interests, actions, rights of indemnity, liabilities, demands, duties, injuries, damages, expenses, fees or causes of action of whatsoever kind or nature in any way related to the third party ABCP market in Canada.[8] The Plan is the result of extensive negotiations with the Released Parties and includes the releases as part of the overall restructuring.

37.    These comprehensive releases were included because the Asset Providers, whose participation was absolutely vital to the restructuring, made them a condition for their participation.  They required comprehensive releases in return for their agreement to: (i) enter into the new LSS swaps whose terms are more favorable to the investors; (ii) provide margin funding facility support at rates significantly below the cost another third party would charge for such funding in the marketplace; and (iii) disclose information concerning the synthetic assets to create transparency, facilitate the restructuring and assist investors in assessing the Plan.  The entire restructuring was premised on these key concessions that served to shift the risk from the investors to the Asset Providers in order to protect more fully the investors from the negative effects of volatile credit markets.

---

[8]    The release does not include certain claims based on express fraudulent misrepresentations as described more fully in the Sanction Order and the First Monitor's Report.

38.     In addition, the Asset Providers required assurances that no claims would remain after Plan implementation that could lead to claims against them for contribution and indemnity.  Indemnity or contribution claims would undermine the finality and certainty that the releases are intended to give.  Therefore, they required a release of all parties who might be sued by the investors, because such parties might then claim against the Asset Providers.  *See* Crawford Affidavit ¶¶ 107-113.

39.     The Plan specifies that the releases provided therein (a) do not stay, release, discharge, bar, enjoin or otherwise interfere with any powers or remedies of, or proceedings or investigations by, any regulatory or self-regulatory body having jurisdiction (pursuant to any applicable statute, regulation, rule or, in the case of the Investment Industry Regulatory Organization of Canada, contract) over any party that would otherwise be released concerning such party's involvement in the creation, issue, sale or rating of any Affected ABCP, provided that (b) the releases would be effective to release and enjoin the making of any order or award to compensate or make restitution to an aggrieved person or company or to pay general or punitive damages to any other person or company.  In addition, the Plan provided an exception from the releases with respect to particularized claims ("**Excepted Claims**") against a specific party by a Noteholder that suffered damages as a direct result of purchasing specific ABCP in reliance on express fraudulent misrepresentations by that party, provided the Noteholder served and filed an initial pleading in a proceeding to pursue the Excepted Claim by a specified date that was approximately ten weeks after the date of the Sanction Order.  No pleadings for Excepted Claims were served or filed within the specified time period.  *See* Plan ¶¶ 10.1-10.4

40.     The Monitor respectfully submits that the global releases are appropriate and necessary in the context of this restructuring. The Monitor further notes that as described

above the issue of the validity of the global releases in the Sanction Order was considered by the Ontario Court, the Ontario Court of Appeal (which denied an appeal by certain holders of ABCP), and by the Supreme Court of Canadian (which refused a request for leave to appeal).

<u>*An Injunction against Proceedings against Non-Debtors*</u>

41.    In addition to the global release, the Plan and the Sanction Order also provide for an injunction against proceedings against the Released Parties who were integrally involved in the financial management of the Conduits or whose support was essential to the Plan. The comprehensive restructuring of the ABCP market involved a variety of parties whose interests are so intertwined with the Issuer Trustees that it would have been impossible to grant an injunction affecting the Issuer Trustees without extending that injunction to certain non-debtors including the Investors Committee, the Asset Providers, and the Liquidity Providers. The injunction provided under the Plan was subject to the same exceptions for regulatory proceedings and Excepted Claims described above with respect to the global releases. *See* Plan ¶ 10. 2.

**The Sanction Order**

42.    In addition to approving and sanctioning all of the elements of the Plan described above, the Sanction Order authorized the Monitor and the Investors Committee to do all things necessary or appropriate to implement the Canadian Orders and the Plan. Specifically, the Sanction Order: (i) directs and authorizes the distributions contemplated by the Plan, and (ii) declares that the compromises, releases and injunctions effected by the Plan are approved and itself provides for a global release of the Released Parties in a form consistent with the Plan.

*The Implementation Order*

43.     The Implementation Order approves the procedures, transfers and distributions for the implementation of the Plan that are briefly set out above and described more fully in the Eighteenth Monitor's Report.

## <u>RELIEF SOUGHT</u>

44.     By these Chapter 15 Petitions, the Monitor seeks the following relief:

(A)     recognition pursuant to section 1517 of the Bankruptcy Code of the Canadian Proceedings as "foreign main proceedings" as defined in section 1502(4) of the Bankruptcy Code;

(B)     all relief afforded foreign main proceedings automatically upon recognition pursuant to section 1520 of the Bankruptcy Code;

(C)     enforcement of the Canadian Orders pursuant to sections 1520, 1521 and 1507 of the Bankruptcy Code; and

(D)     such other and further relief as is appropriate under the circumstances pursuant to sections 1521, 1507 and 105(a) of the Bankruptcy Code.

## BASES FOR SUCH RELIEF

45.     For the reasons more fully discussed in the Memorandum of Law filed in support of this Petition, the Canadian Proceedings are entitled to recognition under section 1517 of the Bankruptcy Code because:

(A)     the Canadian Proceedings are (i) foreign proceedings within the meaning of section 101(23) of the Bankruptcy Code, and (ii) foreign main proceedings within the meaning of section 1502(4) of the Bankruptcy Code because the Canadian Proceedings are pending in the location of each Issuer Trustee's center of main interest;

(B)     the Monitor is a foreign representative within the meaning of section 101(24) of the Bankruptcy Code; and

(C)     the Chapter 15 Petitions meet the requirements of section 1515 of the Bankruptcy Code.

46.     Moreover, recognizing the Canadian Proceedings would not be manifestly contrary to the public policy of the United States as prohibited by section 1506 of the Bankruptcy Code.  In fact, granting recognition will promote the U.S. public policy of respecting foreign proceedings as articulated in, *inter alia*, sections 1501(a) and 1508 of the Bankruptcy Code, and further cooperation between courts to the maximum extent possible, as mandated by section 1525(a) of the Bankruptcy Code.  Thus, the conditions for mandatory recognition of the Canadian Proceedings under section 1517 of the Bankruptcy Code have been satisfied.

## *Enforcement of the Canadian Orders*

47.     In addition to recognition as a foreign main proceeding, the Monitor seeks enforcement of the Canadian Orders in the United States.   The Ontario Court specifically requested this Court's assistance in carrying out the Sanction Order and the Implementation Order and empowers the Monitor to request that assistance through the following provision:

> This Court requests the aid, recognition and assistance of other courts in Canada in accordance with Section 17 of the CCAA and requests that the Federal Court of Canada, the Parliament of Canada, the United States of America, that states and other subdivisions of the United States of America including, without limitation, the U.S. District Court, and other nations and states act in aid, recognition and assistance of, and be complementary to, this Court in carrying out the terms of this Order and any other Order in this proceeding.  Each of the Applicants and the Monitor shall be at liberty, and is hereby authorized and empowered, to make suck further applications, motions or proceedings to or before such other court and judicial, regulatory and administrative bodies, and take such other steps, in Canada or the United States of America, as may be necessary or advisable to give effect to this Order.

Sanction Order ¶ 31; Implementation Order ¶ 50

48.     The Twenty-Fifth Monitor's Report also expresses the need to have the Canadian Proceedings recognized pursuant to chapter 15 of the Bankruptcy Code in order to give effect to the Canadian Orders and the Plan in the United States. *See* Twenty Fifth Monitor's Report ¶¶ 17-18.

49.     The Monitor submits that the relief requested herein is authorized pursuant to section 1507(b) of the Bankruptcy Code because enforcement of the Canadian Orders in the United States is consistent with the principles of comity.

50.     Furthermore, section 1525(a) of the Bankruptcy Code provides, "consistent with section 1501, the court shall cooperate to the maximum extent possible with a

foreign court or a foreign representative." 11 U.S.C. §§ 1525(a) and 1501. The Monitor believes that enforcement of the Canadian Orders is necessary to give more complete effect to such orders in the United States. Thus, in addition to the reasons set forth above, this Court should enter the Proposed Order pursuant to sections 1501 and 1525 of the Bankruptcy Code, and under well-established principles of international comity.

[*Intentionally left blank*]

**WHEREFORE**, the Monitor respectfully requests that this Court grant these Chapter 15 Petitions and enter (i) the Proposed Recognition Order recognizing the Canadian Proceedings as a "foreign main proceeding" and enforcing the Canadian Orders, and grant such other and further relief as may be appropriate under the circumstances.

Dated: New York, New York
      November 10, 2009

ALLEN & OVERY LLP

By:     /s/ Ken Coleman
        Ken Coleman
        Amélie Baudot
        1221 Avenue of the Americas
        New York, New York  10020
        Telephone (212) 610-6300
        Facsimile (212) 610-6399
        Ken.Coleman@allenovery.com
        Amelie.Baudot@allenovery.com

        *Counsel for the Monitor and*
        *Foreign Representative*

**SCHEDULE A**

| **Issuer Trustee** | **Conduit** |
|---|---|
| Metcalfe & Mansfield Alternative Investments II Corp. | Silverstone Trust |
| Metcalfe & Mansfield Alternative Investments III Corp. | Whitehall Trust |
| Metcalfe & Mansfield Alternative Investments V Corp. | Apsley Trust |
| Metcalfe & Mansfield Alternative Investments XI Corp. | MMAI-I Trust |
| Metcalfe & Mansfield Alternative Investments XII Corp. | Ironstone Trust |
| 6932819 Canada Inc. | Apollo Trust, Aurora Trust, Aria Trust, Comet Trust, Encore Trust, Gemini Trust, Opus Trust, Planet Trust, Rocket Trust, Slate Trust, and Symphony Trust |
| 4446372 Canada Inc. | Newshore Candian Trust, Selkrik Funding Trust, Structured Asset Trust, and Structured Investment Trust III |

**SCHEDULE B**

**Investors Committee**

ATB Financial
Caisse de Dépôt et Placement du Québec
Canaccord Capital Corporation
Canada Mortgage and Housing Corporation
Canada Post Corporation
Credit Union Central Alberta Limited
Credit Union Central of British Columbia
Credit Union Central of Canada
Credit Union Central of Ontario
Credit Union Central of Saskatchewan
Desjardins Group
Magna International Inc.
National Bank Financial Inc./National Bank of Canada
NAV Canada
Northwater Capital Management Inc.
Public Sector Pension Investment Board
The Governors of the University of Alberta