# THIRD AMENDED PLAN OF COMPROMISE AND ARRANGEMENT

**PURSUANT TO THE**
***COMPANIES' CREDITORS ARRANGEMENT ACT* (CANADA)**

**INVOLVING:**

**METCALFE & MANSFIELD ALTERNATIVE INVESTMENTS II CORP.,
METCALFE & MANSFIELD ALTERNATIVE INVESTMENTS III CORP.,
METCALFE & MANSFIELD ALTERNATIVE INVESTMENTS V CORP.,
METCALFE & MANSFIELD ALTERNATIVE INVESTMENTS XI CORP.,
METCALFE & MANSFIELD ALTERNATIVE INVESTMENTS XII CORP.,
4446372 CANADA INC. AND 6932819 CANADA INC.**

**Trustees of the Following Conduits:**

**APOLLO TRUST
APSLEY TRUST
ARIA TRUST
AURORA TRUST
COMET TRUST
ENCORE TRUST
GEMINI TRUST
IRONSTONE TRUST
MMAI-I TRUST
NEWSHORE CANADIAN TRUST
OPUS TRUST
PLANET TRUST
ROCKET TRUST
SELKIRK FUNDING TRUST
SILVERSTONE TRUST
SLATE TRUST
STRUCTURED ASSET TRUST
STRUCTURED INVESTMENT TRUST III
SYMPHONY TRUST
WHITEHALL TRUST**

_____

January 12, 2009
_____

# TABLE OF CONTENTS

**Page No.**

**ARTICLE 1 INTERPRETATION** ........................................................................ **1**
1.1    Definitions .................................................................................... 1
1.2    Certain Rules of Interpretation ......................................................... 17
1.3    Schedules ..................................................................................... 18

**ARTICLE 2 PURPOSE AND EFFECT OF THE PLAN** ............................... **19**
2.1    Purpose ........................................................................................ 19
2.2    Affected Persons ............................................................................ 19

**ARTICLE 3 CLASSIFICATION OF CREDITORS** ..................................... **19**
3.1    Class of Creditors .......................................................................... 19
3.2    Noteholder Identification Procedure ................................................. 19
3.3    Unaffected Claims .......................................................................... 20

**ARTICLE 4 TREATMENT OF CREDITORS** ............................................... **20**
4.1    Treatment of Claims ....................................................................... 20
4.2    Treatment of Affected ABCP ........................................................... 20
4.3    Voting Rights of Noteholders ........................................................... 20
4.4    Unaffected Creditors ...................................................................... 20
4.5    Different Capacities ........................................................................ 21
4.6    Approved Agreements ..................................................................... 21

**ARTICLE 5 RESTRUCTURING** ..................................................................... **21**
5.1    Restructuring of ABCP .................................................................... 21
5.2    Restructuring Transactions Effected by the Plan ................................. 21
5.3    Ordering of Certain Steps or Transactions .......................................... 26

**ARTICLE 6 DISTRIBUTIONS** ........................................................................ **30**
6.1    Election to Participate in MAV1 or MAV2 .......................................... 30
6.2    Distributions of Plan Notes .............................................................. 31
6.3    Payment of Professional and Administrative Expenses .......................... 34
6.4    Restructuring Expenses ................................................................... 34
6.5    CCAA Charges .............................................................................. 35
6.6    Interest ......................................................................................... 35
6.7    Distributions of Plan Notes — Procedure ........................................... 35

**ARTICLE 7 SANCTION ORDER** ................................................................... **36**
7.1    Application for Sanction Order .......................................................... 36
7.2    Effect of Sanction Order .................................................................. 36
7.3    Monitor ........................................................................................ 37

**ARTICLE 8 CONDITIONS PRECEDENT** ..................................................... **37**
8.1    Conditions Precedent to Implementation of Plan .................................. 37
8.2    Waiver .......................................................................................... 38
8.3    Monitor's Certificate ...................................................................... 39
8.4    Termination of Plan for Failure to Become Effective ............................ 39

- ii -

**ARTICLE 9 EFFECT OF PLAN**................................................................................ **39**
9.1   Effect of Plan Generally ........................................................................ 39
9.2   Consents, Waivers and Agreements........................................................ 39
9.3   Exculpation ............................................................................................ 40
9.4   Crown Claims ........................................................................................ 40

**ARTICLE 10 RELEASES AND INJUNCTIONS** ................................................ **40**
10.1   Release of the Released Parties ............................................................. 40
10.2   Injunction ............................................................................................. 41
10.3   .............................................................................................................. 42
10.4   .............................................................................................................. 42

**ARTICLE 11 GENERAL PROVISIONS** ............................................................. **46**
11.1   Plan Amendment.................................................................................... 46
11.2   Exclusion from Plan .............................................................................. 47
11.3   Severability ........................................................................................... 47
11.4   Termination ........................................................................................... 47
11.5   Covenant of the Plan Participants ......................................................... 48
11.6   Paramountcy .......................................................................................... 48
11.7   Responsibilities of the Monitor............................................................. 48
11.8   Deeming Provisions .............................................................................. 48
11.9   Notices................................................................................................... 48
11.10  Successors and Assigns ......................................................................... 50
11.11  Further Assurances ................................................................................ 50
11.12  Governing Law ...................................................................................... 50

# THIRD AMENDED PLAN OF COMPROMISE
# AND ARRANGEMENT

### PURSUANT TO THE
### *COMPANIES' CREDITORS ARRANGEMENT ACT* (CANADA)

### ARTICLE 1
### INTERPRETATION

1.1     **Definitions**

In this Plan:

"**ABCP**" means asset-backed commercial paper;

"**ABCP Conduits**" means, collectively, the Conduits that are subject to the Plan, namely the following: Apollo Trust, Apsley Trust, Aria Trust, Aurora Trust, Comet Trust, Encore Trust, Gemini Trust, Ironstone Trust, MMAI-I Trust, Newshore Canadian Trust, Opus Trust, Planet Trust, Rocket Trust, Selkirk Funding Trust, Silverstone Trust, Slate Trust, Structured Asset Trust, Structured Investment Trust III, Symphony Trust and Whitehall Trust, unless excluded pursuant to Section 11.2;

"**ABCP Dealers**" means any dealer, broker, financial institution or intermediary that sold, directly or indirectly, any of the Affected ABCP to one or more Noteholders or that rendered advice with respect to the purchase and sale of Affected ABCP or that purchased any of the Affected ABCP on behalf of its clients;

"**ABCP Market Claims**" has the meaning set out in Section 10.1;

"**ABCP program**" means any series or class of ABCP issued by an issuer trustee on behalf of a Conduit;

"**ABCP Sponsors**" means, collectively, the Sponsors of the ABCP Conduits (and, where applicable such Sponsors' affiliates), namely, Coventree Capital Inc., National Bank Financial Inc., Nereus Financial Inc., Newshore Financial Services Inc., Quanto Financial Corporation and Securitus Capital Corp.;

"**Additional Modifications and Individual Solutions of CDS Term Sheet**" means that certain term sheet attached hereto as Schedule "M" setting forth the material terms of certain specific, additional agreements for the restructuring of the Credit Default Swaps listed therein among the parties thereto;

"**Administrative Agents**" means, collectively, the entities that administer the ABCP Conduits and their respective assets as agents for the Respondents;

- 2 -

"**Administration and Management Agreements**" means the agreements between each of the MAVs and the Administrator relating to the administration of the MAVs, in the forms attached as Schedule "J";

"**Administrator**" means BlackRock (Institutional) Canada Ltd., in its capacity as administrator and asset manager under the Administration and Management Agreements, and its successors and permitted assigns in such capacity;

"**Affected ABCP**" means the asset-backed commercial paper debt obligations of the CCAA Parties relating to the ABCP Conduits outstanding as of the Record Date, together with, where applicable, their Extendible Notes, Floating Rate Notes, Liquidity Notes and Subordinated ABCP, of the Series identified on Schedule "A", unless excluded pursuant to Section 11.2;

"**Affected ABCP Credit Default Swaps**" means the Credit Default Swaps associated with certain of the Affected ABCP, as listed in Appendix A to the Information Statement;

"**affiliate**" has the meaning ascribed to it in the National Instrument 45-106 – *Prospectus and Registration Exemptions* of the Canadian Securities Administrators;

"**Ancillary Transaction Documents**" means any and all documents not otherwise identified as Approved Agreements but that are delivered on implementation of this Plan and listed in the certificate to be filed by the Monitor pursuant to Section 8.3 of this Plan;

"**Applicants**" means, collectively, Alberta Treasury Branches operating as ATB Financial, Caisse de Dépôt et Placement du Québec, Canaccord Capital Corporation, Canada Mortgage and Housing Corporation, Canada Post Corporation, Credit Union Central Alberta Limited, Credit Union Central of British Columbia, Credit Union Central of Canada, Credit Union Central of Ontario, Credit Union Central of Saskatchewan, Desjardins Group, Magna International Inc., National Bank of Canada/National Bank Financial Inc., NAV Canada, Northwater Capital Management Inc., Public Sector Pension Investment Board and The Governors of University of Alberta;

"**Approved Agreements**" means, collectively, the following documents: (i) the Declarations of Trust; (ii) the Administration and Management Agreements; (iii) the Newshore AMA; (iv) the Tao AMA; (v) the Margin Funding Facility Agreements; (vi) the Omnibus Agreements; (vii) the CIBC Omnibus Agreements; (viii) the Master Security Agreements; (ix) the CDS Restructuring Documents; (x) the CMO Co-Ownership Agreement and MCAP Co-Ownership Agreement; (xi) the RACSAs; (xii) the Additional Modifications and Individual Solutions of CDS Term Sheet; (xiii) the GD Swap Restructuring Agreements; (xiv) the Trust Indentures; (xv) the Master Release Agreement; (xvi) the Existing Indemnity and Tax Claims Protocol; (xvii) the Transition Services Agreements; and (xviii) the Senior Funding Term Sheet; and, for the purposes of Sections 9.3, 10.1 and 10.2 only, the Ancillary Transaction Documents and the Traditional Asset Agreements;

"**asset-backed commercial paper**" means commercial paper secured by financial assets, such as pools of mortgages or credit card receivables;

- 3 -

"**Asset Originators**" means the entities that provide, or issue, as the case may be, the assets pursuant to the securitization documents entered into in connection with Traditional Asset programs;

"**Asset Providers**" means, collectively, the dealer banks, commercial banks and other entities which have entered into Credit Default Swaps with and/or have sold Collateralized Debt Obligation assets to one or more of the ABCP Conduits directly or indirectly through satellite trusts, including: Bank of America, N.A.; Canadian Imperial Bank of Commerce; Citibank, N.A.; Deutsche Bank AG; HSBC Bank USA, National Association; Merrill Lynch International; Royal Bank of Canada; Royal Bank of Scotland; Swiss Re Financial Products Corporation; UBS AG and Wachovia Bank N.A. and their respective affiliates;

"**BNY**" means BNY Trust Company of Canada;

"**BlackRock**" means collectively, BlackRock Financial Management, Inc. and BlackRock (Institutional) Canada Ltd.;

"**Business Day**" means a day other than a Saturday or Sunday on which banks are generally open for business in Toronto, Ontario, Montreal, Quebec, New York, New York and London, United Kingdom;

"**Canadian Banks**" means, collectively, Bank of Montréal, Canadian Imperial Bank of Commerce, National Bank of Canada, Royal Bank of Canada, The Bank of Nova Scotia and The Toronto-Dominion Bank;

"**Canada Trust**" means The Canada Trust Company;

"**CCAA**" means the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended;

"**CCAA Court**" means the Superior Court of Justice (Ontario);

"**CCAA Charge**" means a Charge created by the Initial CCAA Order;

"**CCAA Parties**" means, collectively, the Respondents and the ABCP Conduits;

"**CCAA Proceedings**" means the within proceedings under the CCAA commenced by the Applicants;

"**CDS**" means Credit Default Swap;

"**CDS Clearing**" means CDS Clearing and Depository Services Inc.;

"**CDS Restructuring Documents**" means each of the new swap documents for the restructured Credit Default Swaps (ISDA Master Agreement, ISDA Schedules and Standard Terms Supplements), the forms of which are set out in Schedule "L", and novation confirmations, all to be entered into on the Plan Implementation Date in order to implement the terms of the restructuring of the Affected ABCP Credit Default Swaps as

- 4 -

described in the Information Statement (see section entitled "*Restructuring of Credit Default Swaps*") and further modified in accordance with the Senior Funding Term Sheet;

"**Charge**" means a valid and enforceable security interest, lien, charge, pledge, encumbrance, mortgage, hypothec, adverse claim, title retention agreement or trust agreement of any nature or kind (but excluding any statutory deemed trust or lien for any taxes or levies), on the property of the ABCP Conduits;

"**CIBC Omnibus Agreements**" means the omnibus agreements among, *inter alios*, Canadian Imperial Bank of Commerce, as an Asset Provider, and each of MAV1 and MAV2, in the forms attached as Schedule "O";

"**CMO Co-Ownership Agreement**" means the agreement to be entered into between, *inter alios*, MAV1 and MAV2, concerning their respective interests in the CMO Programme, in the form attached as Schedule "K"

"**CMO Programme**" means the securitization program established under an Amended and Restated Commercial Mortgage Purchase Agreement with The Toronto-Dominion Bank as servicer;

"**CMO Related Asset Creditor Security Agreements**" means the security agreements relating to the CMO Programme between each of MAV1 and MAV2, respectively, and the collateral agent on behalf of the secured parties named therein, in the forms attached as Schedule "R";

"**Collateralized Debt Obligation**" means an investment collateralized or referenced to a portfolio of debt;

"**commercial paper**" means a form of corporate or asset-backed note maturing less than one year from its date of issuance, typically issued at a discount, though sometimes on an interest-bearing basis;

"**Computershare**" means Computershare Trust Company of Canada;

"**Conduit**" means a special purpose entity used in an ABCP program that purchased assets and funded these purchases either through term securitizations or through the issuance of commercial paper;

"**Continuing Satellite Trusts**" means the following Satellite Trusts: Constellation Certificate Trust (Schooner) Series 2004-1, Constellation Certificate Trust (Rouses Point) Series 2005-1, Constellation Certificate Trust (Rock Island) Series 2004-1, Constellation Certificate Trust (Rock Island III) Series 2005-1, Constellation Certificate Trust (Rock Island VII) Series 2005-1, Constellation Certificate Trust (Rock Island VIII) Series 2006-1, Constellation Certificate Trust (CCIC) Series 2003-1, QSPE-AMC/R Trust, QSPE-XCD Trust, Constellation Certificate Trust (MLFA7) Series 2004-1, Constellation Certificate Trust (MLFA CAN-12) Series 2004-1, Constellation Certificate Trust (STATIC 2006-A) Series 2006-1, Constellation Certificate Trust (TMT 11SL) Series 2005-1, Constellation Certificate Trust (TMT 13SL) Series 2005-1, Constellation Certificate Trust (TMT 2HE) Series 2005-1, Constellation Certificate Trust (STST)

- 5 -

Series 2003-1, Constellation Certificate Trust (SLR) Series 2002-1, Constellation Certificate Trust (SLR-A2) Series 2003-1, Constellation Certificate Trust (MLFA) Series 2003-1, Constellation Certificate Trust (RALIQS2) Series 2006-1, Constellation Certificate Trust (ACA) Series 2003-1, Constellation Certificate Trust (Onyx) Series 2005-1, Constellation Certificate Trust (Dekania) Series 2003-1, Securcor-RIO Trust, Constellation Credit Linked Trust (Synremic II) 2006-1, Constellation Credit Linked Trust (Cayman 13) Series 2005-1, Constellation Certificate Trust (ALT 2005-48-T1) Series 2005-1, Constellation Certificate Trust (ALT 2005 65CB) Series 2005-1, Constellation Certificate Trust (RAST 2005-A15) Series 2006-1, Constellation Certificate Trust (RAST 2005-A15) Series 2006-2, Constellation Certificate Trust (TMT 21HE) Series 2004-1, Constellation Certificate Trust (TMT 19HE) Series 2004-1, Constellation Certificate Trust (CCG1) Series 2004-1, Nemertes Credit Linked Certificate Trust (SCT-LSS) Series 2005, Newcov SIV Trust, Newcov Trust (SLR) Series 2002-1, Newcov Trust (FX) Series 2002-1, Constellation Certificate Trust (Solar CCG3) Series 2003-IO, Constellation Certificate Trust (Solar CCG3) Series 2003-AAA, Constellation Certificate Trust (MLCC) Series 2003-B, Constellation Credit Linked Trust (SYNREMIC) 2005-1 and Constellation Certificate Trust (Targeted) Series 2008-1;

"**Coventree**" means Coventree Inc. and any affiliates and predecessors thereof;

"**CRA**" means the Canada Revenue Agency;

"**Credit Default Swap**" means a form of credit protection, in which one party agrees to compensate the other in the event of a default by a specified entity or in respect of a security for a fee;

"**DBRS**" means DBRS Limited, a rating agency;

"**Declarations of Trust**" means, collectively, the MAV1 Declaration of Trust, the MAV2 Declaration of Trust and the MAV3 Declaration of Trust;

"**Depositary**" means CIBC Mellon Trust Company;

"**Effective Time**" means the first moment in time on the Plan Implementation Date;

"**Exclusively Traditional Assets**" means the Traditional Assets that secure a Series of Affected ABCP where that Series of Affected ABCP is secured exclusively by Traditional Assets;

"**Existing Indemnity Claims**" has the meaning specified in the Existing Indemnity and Tax Claims Protocol;

"**Existing Indemnity and Tax Claims Protocol**" means the protocol in the form attached as Schedule "T" that governs how the obligation to satisfy (i) Existing Indemnity Claims and (ii) Existing Tax Claims will be allocated among the MAVs ;

"**Existing Issuer Trustee Trust Agreement**" has the meaning specified in the Existing Indemnity and Tax Claims Protocol;

- 6 -

"**Existing Note Indenture Trustees**" means, collectively, the note indenture trustees under the trust indentures entered into in respect of the ABCP Conduits, namely BNY (as successor to the Trust Company of Bank of Montréal), CIBC Mellon Trust Company, Computershare (as note indenture trustee or as agent for Canada Trust, as the case may be) and Natcan Trust Company with regard to the ABCP Conduits;

"**Existing Tax Claims**" has the meaning specified in the Existing Indemnity and Tax Claims Protocol;

"**Extendible Notes**" means ABCP with an initial scheduled maturity, but which may, at the option of the issuer, be extended on the scheduled maturity for some fixed period to a final maturity;

"**Face Amount**" means the principal or face amount of ABCP due at maturity;

"**Financial Services Agents**" means, collectively, the entities that provide or cause to be provided financial, originating, structuring and/or analytical services to the ABCP Conduits as agents for the Respondents, including Securitus Capital Corp. (in that capacity for both Selkirk Funding Trust and its Satellite Trust);

"**Floating Rate Note**" means a medium or long term debt instrument with a variable interest rate, adjusted periodically and tied to a money-market index;

"**Form of Election**" means the form of election (printed on yellow paper) included with the Information Statement pursuant to which a Noteholder elects to participate in either MAV1 or MAV2;

"**GD Swaps**" means the Credit Default Swaps between (i) MMAI-I Trust and Global Diversified Investment Grade Income Trust and Global Diversified Investment Grade Private Trust, and (ii) Silverstone Trust and Global Diversified Investment Grade Income Trust II;

"**GD Swap Restructuring Agreements**" means the definitive documentation in the form attached as Schedule "N" for the restructuring of the GD Swaps;

"**Hybrid Assets**" means a combination of LSS Assets and Traditional Assets;

"**IA Tracking Notes**" means the notes to be issued by MAV1 and MAV2 on the Plan Implementation Date pursuant to the IA Tracking Note Trust Indentures;

"**IA Tracking Note Trust Indentures**" means, collectively, the MAV1 IA Tracking Note Indenture and the MAV2 IA Tracking Note Indenture;

"**Ineligible Assets**" means the assets which have been deemed ineligible for pooling in the MAVs in connection with the Plan by reason of their exposure to U.S. sub-prime mortgages or otherwise;

"**Information Statement**" means the Information Statement approved by the Meeting Order including the Appendices and Exhibits thereto;

- 7 -

"**Initial CCAA Order**" means the initial order of the CCAA Court dated March 17, 2008, pursuant to which, among other things, the CCAA Court granted a stay of proceedings with respect to the CCAA Parties, as same may be further amended from time to time;

"**Investors Committee**" means the Pan-Canadian Investors Committee for Third-Party Structured Asset-Backed Commercial Paper comprised of representatives of the following investors: Alberta Treasury Branches operating as ATB Financial, Caisse de Dépôt et Placement du Québec, Canaccord Capital Corporation, Canada Mortgage and Housing Corporation, Canada Post Corporation, Credit Union Central Alberta Limited, Credit Union Central of British Columbia, Credit Union Central of Canada, Credit Union Central of Ontario, Credit Union Central of Saskatchewan, Desjardins Group, Magna International Inc., National Bank Financial Group, NAV Canada, Northwater Capital Management Inc., Public Sector Pension Investment Board and The Governors of the University of Alberta;

"**ISDA**" means the International Swaps and Derivatives Association, Inc.;

"**Issuing and Paying Agents**" means, collectively, the entities that serve as issuing and paying agents for the Respondents and are responsible for the mechanics of delivering ABCP to investors in the ABCP Conduits and making payments thereon;

"**JPMorgan**" means, collectively, JPMorgan Securities Inc. and JPMorgan Securities Canada Inc., the financial advisor to the Investors Committee;

"**JPMorgan Report**" means the JPMorgan Report on Restructuring attached to the Information Statement as Exhibit "D";

"**Leveraged Super Senior**" means a leveraged form of Synthetic CDO where the amount of notional risk is greater than the amount of collateral securing the swap;

"**Liquidity Agreement**" means an agreement between an ABCP Conduit or Satellite Trust and a Liquidity Provider that establishes a liquidity facility for an ABCP program;

"**Liquidity Notes**" means the liquidity pledge bonds issued by Structured Asset Trust and Planet Trust, respectively, which form part of the Affected ABCP;

"**Liquidity Providers**" means the parties that agreed to provide liquidity funding under the terms of Liquidity Agreements in respect of ABCP programs of Affected ABCP, including: ABN AMRO Bank N.V., Canada Branch; Bank of America, N.A., Canada Branch; Canadian Imperial Bank of Commerce; Citibank Canada; Citibank, N.A.; Danske Bank A/S; Deutsche Bank AG; HSBC Bank Canada; HSBC Bank USA, National Association, Toronto Branch; Merrill Lynch Capital Services, Inc.; Merrill Lynch International; Royal Bank of Canada; Swiss Re Financial Products Corporation; The Bank of Nova Scotia; The Royal Bank of Scotland plc and UBS AG;

"**LSS**" means Leveraged Super Senior;

"**LSS Assets**" means assets that are used to support Leveraged Super Senior structures;

- 8 -

"**Margin Funding Facility Agreements**" means, collectively, the MAV1 Margin Funding Facility Agreement and the MAV2 Margin Funding Facility Agreement;

"**Master Release Agreement**" means the agreement to be effective on the Plan Implementation Date pursuant to which certain Plan Participants and certain other parties agree to release one another from any and all ABCP Market Claims, subject to the terms and conditions set forth therein, in the form attached as Schedule "S";

"**Master Security Agreements**" means, collectively, the MAV1 Master Security Agreement and the MAV2 Master Security Agreement;

"**MAV1**" means the New Issuer Trustee in its capacity as trustee of Master Asset Vehicle I, a trust established under the laws of the Province of Ontario by the MAV1 Declaration of Trust;

"**MAV1 Class A-1 Note**" means a note to be issued by MAV1 pursuant to the terms of the MAV1 Trust Indenture;

"**MAV1 Class A-2 Note**" means a note to be issued by MAV1 pursuant to the terms of the MAV1 Trust Indenture;

"**MAV1 Class B Note**" means a note to be issued by MAV1 pursuant to the terms of the MAV1 Trust Indenture;

"**MAV1 Class C Note**" means a note to be issued by MAV1 pursuant to the terms of the MAV1 Trust Indenture;

"**MAV1 Declaration of Trust**" means the declaration of trust to be entered into prior to the Plan Implementation Date providing for the establishment of Master Asset Vehicle I as a trust under the laws of the Province of Ontario, in the form attached as Schedule "F";

"**MAV1 Eligible**" means Affected ABCP backed by Synthetic and Hybrid Assets and in respect of which the Noteholder has elected to participate in MAV1 and has met the eligibility requirements set out in the Information Statement or this Plan;

"**MAV1 IA Tracking Note**" means an IA Tracking Note to be issued by MAV1 pursuant to the terms of the MAV1 IA Tracking Note Indenture;

"**MAV1 IA Tracking Note Indenture**" means the trust indenture to be dated as of the Plan Implementation Date between MAV1 and the New Indenture Trustee governing the MAV1 IA Tracking Notes, in the form attached as Schedule "D";

"**MAV1 Margin Funding Facility**" means the secured margin funding facility to be established in connection with MAV1 on the Plan Implementation Date pursuant to the MAV1 Margin Funding Facility Agreement to be used, if necessary, to fund collateral calls, termination payments, settlement amounts and other unpaid amounts under ISDA agreements and the related credit support arrangements to the extent not otherwise satisfied through available collateral;

- 9 -

"**MAV1 Margin Funding Facility Agreement**" means the agreement to be entered into as of the Plan Implementation Date creating the MAV1 Margin Funding Facility, in the form attached as Schedule "G";

"**MAV1 Master Security Agreement**" means the security agreement to be entered into by MAV1 as of the Plan Implementation Date, in the form attached as Schedule "I";

"**MAV1 MFF Lenders**" means, collectively, the lenders that are party to the MAV1 Margin Funding Facility Agreement;

"**MAV1 Notes**" means, collectively, the MAV1 Class A-1 Notes, the MAV1 Class A-2 Notes, the MAV1 Class B Notes and the MAV1 Class C Notes and "**MAV1 Note**" refers to any one of them;

"**MAV1 Omnibus Agreement**" means the agreement between, *inter alios*, the parties to the MAV1 Margin Funding Facility Agreement and certain of the Asset Providers concerning certain intercreditor matters, to be entered into as of the Plan Implementation Date, in the form attached as Schedule "H";

"**MAV1 Senior Facility**" means the senior credit support facility (in a form to be settled on or before the Plan Implementation Date) in the amount of $1,772,346,712.00 provided to MAV1 pursuant to the terms and conditions set out in the Senior Funding Term Sheet;

"**MAV1 Trust Indenture**" means the trust indenture to be dated as of the Plan Implementation Date between MAV1 and the New Indenture Trustee governing, among other things, the MAV1 Notes, in the form attached as Schedule "B";

"**MAVs**" means, collectively, MAV1 and MAV2 and MAV3;

"**MAV2**" means the New Issuer Trustee in its capacity as trustee of Master Asset Vehicle II, a trust established under the laws of the Province of Ontario by the MAV2 Declaration of Trust;

"**MAV2 Class A-1 Note**" means a note to be issued by MAV2 pursuant to the terms of the MAV2 Trust Indenture;

"**MAV2 Class A-2 Note**" means a note to be issued by MAV2 pursuant to the terms of the MAV2 Trust Indenture;

"**MAV2 Class B Note**" means a note to be issued by MAV2 pursuant to the terms of the MAV2 Trust Indenture;

"**MAV2 Class C Note**" means a note to be issued by MAV2 pursuant to the terms of the MAV2 Trust Indenture;

"**MAV2 Declaration of Trust**" means the declaration of trust to be entered into prior to the Plan Implementation Date providing for the establishment of Master Asset Vehicle II as a trust under the laws of the Province of Ontario, in the form attached as Schedule "F";

- 10 -

"**MAV2 IA Tracking Note**" means an IA Tracking Note to be issued by MAV2 pursuant to the terms of the MAV2 IA Tracking Note Indenture;

"**MAV2 IA Tracking Note Indenture**" means the trust indenture to be dated as of the Plan Implementation Date between MAV2 and the New Indenture Trustee governing the MAV2 IA Tracking Notes, in the form attached as Schedule "D";

"**MAV2 Margin Funding Facility**" means the secured margin funding facility to be established in connection with MAV2 on the Plan Implementation Date pursuant to the MAV2 Margin Funding Facility Agreement to be used, if necessary, to fund collateral calls, termination payments, settlement amounts and other unpaid amounts under ISDA agreements and the related credit support arrangements to the extent not otherwise satisfied through available collateral;

"**MAV2 Margin Funding Facility Agreement**" means the agreement to be entered into as of the Plan Implementation Date creating the MAV2 Margin Funding Facility, in the form attached as Schedule "G";

"**MAV2 Master Security Agreement**" means the security agreement to be entered into by MAV2 as of the Plan Implementation Date, in the form attached as Schedule "I";

"**MAV2 MFF Lenders**" means, collectively, the lenders that are party to the MAV2 Margin Funding Facility Agreement;

"**MAV2 Notes**" means, collectively, the MAV2 Class A-1 Notes, MAV2 Class A-2 Notes, MAV2 Class B Notes and MAV2 Class C Notes and "**MAV2 Note**" refers to one of them;

"**MAV2 Omnibus Agreement**" means the agreement between, *inter alios*, the parties to the MAV2 Margin Funding Facility Agreement and certain of the Asset Providers concerning certain intercreditor matters, to be entered into as of the Plan Implementation Date, in the form attached as Schedule "H";

"**MAV2 Senior Facility**" means the senior credit support facility (in a form to be settled on or before the Plan Implementation Date) in the amount of $1,677,653,288.00 provided to MAV2 pursuant to the terms and conditions set out in the Senior Funding Term Sheet;

"**MAV2 Trust Indenture**" means the trust indenture to be dated as of the Plan Implementation Date between MAV2 and the New Indenture Trustee governing, among other things, the MAV2 Notes, in the form attached as Schedule "C";

"**MAV3**" means the New Issuer Trustee in its capacity as trustee of Master Asset Vehicle III, a trust vehicle to be established under the laws of the Province of Ontario by the MAV3 Declaration of Trust;

"**MAV3 Declaration of Trust**" means the declaration of trust to be entered into prior to the Plan Implementation Date providing for the establishment of Master Asset Vehicle III as a trust under the laws of the Province of Ontario, in the form attached as Schedule "F";

- 11 -

"**MAV3 IA Tracking Notes**" means the notes to be issued by MAV3 pursuant to the terms of the MAV3 Tracking Note Trust Indenture for each separate Ineligible Asset within a Series of Affected ABCP that is backed by Exclusively Traditional Assets;

"**MAV3 Notes**" means, collectively, the TA Tracking Notes, the MAV3 IA Tracking Notes and the SN Tracking Notes, and "**MAV3 Note**" refers to one of such TA Tracking Notes, MAV3 IA Tracking Notes or SN Tracking Notes;

"**MAV3 Tracking Note Trust Indenture**" means the Traditional and Ineligible Asset Tracking Note Trust Indenture of MAV3 to be dated as of the Plan Implementation Date between MAV3 and the New Indenture Trustee governing the MAV3 Notes, in the form attached as Schedule "E";

"**MAVs**" means, collectively, MAV1, MAV2 and MAV3 and "**MAV**" refers to one of them;

"**MCAP Co-Ownership Agreement**" means the agreement to be entered into between, *inter alios*, MAV1 and MAV2, concerning their respective interests in the MCAP Programme, in the form attached as Schedule "K";

"**MCAP Programme**" means the securitization programme established by the Third Amended and Restated Commercial Mortgage Purchase Agreement with MCAP Commercial LP as servicer;

"**MCAP Related Asset Creditor Security Agreements**" means the security agreements relating to the MCAP Programme between each of MAV1 and MAV2, respectively, and the collateral agent on behalf of the secured parties named therein, in the forms attached as Schedule "R";

"**Meeting**" means a meeting or meetings of the Noteholders to consider and vote on the Plan held pursuant to the Meeting Order and includes any meeting or meetings resulting from the adjournment thereof;

"**Meeting Order**" means the Order of the CCAA Court dated March 17, 2008, directing the calling and holding of the Meeting;

"**MFF Lenders**" means, collectively, the MAV1 MFF Lenders and the MAV2 MFF Lenders;

"**Monitor**" means Ernst & Young Inc., in its capacity as monitor of the CCAA Parties appointed pursuant to the Initial CCAA Order;

"**Montreal Trust**" means Montreal Trust Company of Canada;

"**National PR**" means National Public Relations Inc.;

"**New Indenture Trustee**" means the indenture trustee under the Trust Indentures;

"**New Issuer Trustee**" means the issuer trustee under the Declarations of Trust;

- 12 -

"**New Satellite Trustee**" means the replacement trustee of the Continuing Satellite Trusts effective as of the Plan Implementation Date and as contemplated in Section 5.3 of this Plan;

"**Newshore AMA**" means the administration agreement between MAV3 and Newshore Financial Services Inc. to be entered into as of the Plan Implementation Date, in the form attached as Schedule "P";

"**Noteholder**" means a holder of Affected ABCP on the Record Date, including any holder of a beneficial interest in Affected ABCP;

"**Noteholder Claim**" means the Face Amount of the Noteholder's holdings of Affected ABCP on the Record Date;

"**Noteholder Settlement Claim**" means, with respect to a Noteholder's holdings of Affected ABCP, the discount value, in the case of a note issued on a discount basis, and the principal amount in the case of an interest bearing note;

"**Omnibus Agreements**" means, collectively, the MAV1 Omnibus Agreement and the MAV2 Omnibus Agreement;

"**Order**" means an order of the CCAA Court in the CCAA Proceedings;

"**Original Issuer Trustees**" means BNY, Computershare, Metcalfe & Mansfield Alternative Investments Corp. and Montreal Trust, as former issuer trustees of certain of the ABCP Conduits, and includes Computershare as agent or attorney for Montreal Trust in such capacity, and "**Original Issuer Trustee**" means any one of them;

"**Participant**" means a participant in the depository system of CDS Clearing;

"**Person**" means any individual, partnership, limited partnership, limited liability company, joint venture, trust, trustee, corporation, unincorporated organization, government, agency, regulatory body or instrumentality thereof, legal personal representative or litigation guardian, or any other entity howsoever designated or constituted;

"**Plan**" means this plan of compromise or arrangement and the Schedules hereto, as same may be amended hereafter in accordance with Section 11.1 herein;

"**Plan Implementation Date**" means the Business Day on which the conditions precedent to implementation of this Plan as set out in Article 8 hereof have been satisfied, fulfilled or waived, as applicable, and the Monitor has completed and filed its certificate in accordance with Section 8.3 of this Plan;

"**Plan Notes**" means, collectively, the MAV1 Notes, the MAV2 Notes, the IA Tracking Notes and the MAV3 Notes;

- 13 -

"**Plan Participants**" means, the Asset Providers, the ABCP Sponsors, the Respondents, the MFF Lenders, the Investors Committee, the Administrative Agents, the Financial Services Agents, BlackRock and the Applicants;

"**program**" or "**programme**" means a transaction where a Conduit or Satellite Trust purchases assets;

"**Proven Voting Claim**" means a Noteholder Claim in respect of which a Voter Identification Form or Voter Confirmation Form has been properly submitted and (a) not objected to by the Monitor or (b) objected to by the Monitor and subsequently (i) finally determined or (ii) accepted for voting purposes in accordance with the provisions of this Plan and the Meeting Order;

"**PSF Notes**" means the PSF notes issued to National Bank Financial Inc. by Ironstone Trust, MMAI-I Trust and Silverstone Trust and subsequently sold to third parties as described in the Information Statement;

"**RACSAs**" means the CMO Related Asset Creditor Security Agreements and the MCAP Related Asset Creditor Security Agreements;

"**Record Date**" means February 29, 2008;

"**Relative Contribution Analysis**" means the methodology used by JPMorgan for determining the amount and type of Plan Notes to be issued to Noteholders in exchange for each Series of Affected ABCP based upon JPMorgan's indicative asset valuations;

"**Released Parties**" means, collectively, the Respondents, the ABCP Conduits, the ABCP Sponsors, the Selkirk Sub-Trust Parties, the Satellite Trust Parties, the Asset Providers, the Canadian Banks, the Original Issuer Trustees, the Existing Note Indenture Trustees, the Margin Funding Lenders, the Liquidity Providers, the ABCP Dealers, the Asset Originators, the Noteholders, DBRS, the Applicants, Administrative Agents, the Financial Services Agents, the Issuing and Paying Agents, The Canadian Depository for Securities Limited, CDS Clearing, the members of the Investors Committee, Purdy Crawford, Ernst & Young Inc., in its capacities as consultant to the Investors Committee prior to its appointment as Monitor and as the Monitor, JPMorgan, National PR, BlackRock, the New Indenture Trustee, the New Issuer Trustee and Goodmans LLP as well as their respective affiliates, and their respective present and former officers, directors, employees, associated individuals, auditors, financial advisors, legal counsel, other professionals, sureties, insurers, indemnitees, agents and assigns, as applicable;

"**Respondents**" means, collectively, Metcalfe & Mansfield Alternative Investments II Corp., Metcalfe & Mansfield Alternative Investments III Corp., Metcalfe & Mansfield Alternative Investments V Corp., Metcalfe & Mansfield Alternative Investments XI Corp., Metcalfe & Mansfield Alternative Investments XII Corp., 4446372 Canada Inc. and 6932819 Canada Inc.;

"**Sanction Order**" means the Order dated June 5, 2008, as amended on June 18, 2008;

- 14 -

"**Satellite Trust**" means a trust created pursuant to a base trust agreement or a declaration of trust in respect of which any of the ABCP Conduits, alone or together with other ABCP Conduits, holds all or substantially all of the beneficial ownership interests or debt interests;

"**Satellite Trust Parties**" means the Satellite Trusts, their trustees, their administrative agents, their financial services agents and their settlors;

"**Satellite Trust Promissory Note**" has the meaning given to that term in Section 5.2(c) herein;

"**Selkirk Sub-Trust Parties**" means, collectively, Coastal Mountain Base Trust Series 2006-1, its issuer trustee 2115921 Ontario Inc. and its financial services agent, Securitus Capital Corp.;

"**Senior Funding Facilities**" means the MAV1 Senior Facility and the MAV2 Senior Facility;

"**Senior Funding Term Sheet**" means the agreement entitled "Summary of Terms and Conditions for Senior Funding Facilities for MAV1 and MAV2" attached as Schedule "V" and the accompanying cover letter, which terms and conditions shall be set forth in definitive documentation to be entered into on the Plan Implementation Date;

"**Series**" means, collectively, all of the series of Affected ABCP or any one such Series;

"**settlement amount**" means the discount value, in the case of a note issued on a discount basis, and the principal amount in the case of an interest bearing note**;**

"**SN Tracking Notes**" means the notes to be issued pursuant to the MAV3 Tracking Note Trust Indenture to Noteholders who hold Subordinated ABCP;

"**Specified Satellite Trusts**" means the following Satellite Trusts: Constellation Credit Linked Trust (CB LSS-2) Series 2006-1, Constellation Credit Linked Trust (CB LSS) Series 2005-1, Constellation Credit Linked Trust (Super Senior 2) Series 2005-1, Constellation Credit Linked Trust (Shamrock) Series 2005-1, Constellation Credit Linked Trust (CDXLS 1) Series 2006-1, Constellation Credit Linked Trust (PML-M2) Series 2006-1, Constellation Credit Linked Trust (ML LSS) Series 2006-1, Constellation Credit Linked Trust (ML6 L/S) Series 2006-1, Constellation Credit Linked Trust (Banff) Series 2006-1, Constellation Credit Linked Trust (Galibier) Series 2006-1, Constellation Credit Linked Trust (Super Senior 3) Series 2005-1, Constellation Credit Linked Trust (Super Senior 4) Series 2005-1, Constellation Credit Linked Trust (iTraxx 1) Series 2006-1, Constellation Credit Linked Trust (IML-CDS-2) Series 2006-1, Constellation Credit Linked Trust (IML-CDS) Series 2005-1, Constellation Credit Linked Trust (Integrity) Series 2005-1, Constellation Credit Linked Trust (Integrity) Series 2005-2, Constellation Credit Linked Trust (ML LSS-2) Series 2006-1, Constellation Credit Linked Trust (Stamford) Series 2006-1, Constellation Credit Linked Trust (MPL-CDN) Series 2006-1, Constellation Credit Linked Trust (MPL-US) Series 2006-1, Nemertes Credit Linked Certificate Trust (MT-LSS) Series 2005, Nemertes Credit Linked Certificate Trust

- 15 -

(Commerce-LSS) Series 2005, Nemertes Credit Linked Certificate Trust (CADBANA) Series 2005-1, Nemertes Credit Linked Certificate Trust (EC Super Senior) Series 2005-1, Nemertes Credit Linked Certificate Trust (LSS II) Series 2005, Nemertes Credit Linked Certificate Trust (ML-LSS II) Series 2006, Nemertes Credit Linked Certificate Trust (Morningside) Series 2005, Nemertes Credit Linked Certificate Trust (BCO-LSS) Series 2006, Nemertes Credit Linked Certificate Trust (Citi-LSS) Series 2006, Nemertes Credit Linked Certificate Trust (Commerce-LSS II) Series 2006, Nemertes Credit Linked Certificate Trust (ML-LSS) Series 2006, Nemertes Credit Linked Certificate Trust (ML-LSS IV) Series 2006, Coastal Mountain Base Trust Series 2006-1, STarts (Canada) Trust 2004-2 and STarts (Canada) Trust$^{TM}$ 2005-2;

"**Sponsor**" means, generally, the entity that initiates the establishment of an ABCP program, and the respective Conduit and issuer trustee thereof;

"**Starts Note**" means a credit-linked note held by an ABCP Conduit in a Starts Trust;

"**Starts Trusts**" means STarts (Canada) Trust 2004-2 and STarts (Canada) Trust$^{TM}$ 2005-2;

"**Subordinated ABCP**" means the Series of subordinated notes of certain of the ABCP Conduits that were issued to provide credit enhancement for particular Traditional Assets, being Series B and C of Aurora Trust and Series B and D of Rocket Trust;

"**Supplemental Commitments**" means, collectively, the additional commitments to provide margin funding under the MAV1 Margin Funding Facility (and in the case of National Bank of Canada, the MAV1 Margin Funding Facility and the MAV2 Margin Funding Facility) in the aggregate of $1.0 billion provided by the MAV1 MFF Lenders pursuant to the terms and conditions set out in the Senior Funding Term Sheet;

"**swap**" means a financial agreement under which two parties agree to exchange defined payment streams;

"**Synthetic CDO**" means a credit derivative, such as a credit default swap, credit linked note or forward contract, that synthetically creates the same economic risks and rewards of owning a CDO;

"**Synthetic and Hybrid Assets**" means those assets, whether leveraged or unleveraged, securing directly or indirectly a Series of Affected ABCP and which assets are comprised either (a) exclusively of LSS Assets or (b) a combination of LSS Assets and Traditional Assets and including where relevant any unlevered CDS, and in either case, do not include any assets that have been determined to constitute Ineligible Assets;

"**TA Tracking Notes**" means the notes (other than the SN Tracking Notes) to be issued in respect of MAV3 pursuant to the MAV3 Tracking Note Trust Indenture to Noteholders holding Affected ABCP that funded the purchase of Exclusively Traditional Assets (excluding those backed by Ineligible Assets);

- 16 -

"**Tao AMA**" means the administration agreement between, *inter alios*, Tao Admin Corp. and the MAVs to be entered into as of the Plan Implementation Date, in the form attached as Schedule "Q";

"**Targeted Assets**" means all of the right, title and interest to the assets forming part of the program governed by the Amended and Restated Master Program Agreement dated March 4, 2005 among Targeted Corporate Consulting Ltd., Targeted Strategies Limited, Concentra Financial Services Association, operating as CUCORP Financial Services, Canadian Western Bank and Rocket Trust, as amended;

"**Targeted Certificate**" has the meaning given to that term in Section 5.3 herein;

"**Targeted Trust**" means Constellation Certificate Trust (Targeted) Series 2008-1;

"**Tax Act**" means the *Income Tax Act* (Canada), as amended;

"**Third-Party ABCP**" means ABCP issued by Conduits whose Sponsors do not provide liquidity facilities and, for greater certainty, includes the Affected ABCP;

"**TRACSA**" means the Targeted Related Asset Creditor Security Agreement to be entered into on the Plan Implementation Date;

"**Traditional Assets**" means those assets directly or indirectly held by the ABCP Conduits in non-synthetic securitization structures;

"**Traditional Asset Agreements**" means any and all note indentures, co-ownership agreements, custodial agreements and ancillary documents (including reports and opinions) pursuant to which the underlying Traditional Assets of an ABCP Conduit or Satellite Trust were issued, and all amendments and/or restatements of any of the foregoing;

"**Transferred Synthetic and Hybrid Assets**" means the Synthetic and Hybrid Assets securing directly or indirectly the Series of Affected ABCP listed in Schedule "A" which will be transferred to MAV1 and MAV2;

"**Transition Services Agreements**" means the agreements to be entered into on the Plan Implementation Date with each ABCP Sponsor with respect to the termination and wind-up of the ABCP Conduits and Specified Satellite Trusts, applicable to such ABCP Sponsor, in the form attached as Schedule "U";

"**Trust Indentures**" means, collectively, the MAV1 Trust Indenture, the MAV2 Trust Indenture, the IA Tracking Note Trust Indentures, and the MAV3 Tracking Note Trust Indenture;

"**Unaffected Claims**" has the meaning given to that term in Section 3.3 herein;

"**Unaffected Creditors**" means all Persons holding Unaffected Claims, to the extent of their Unaffected Claims and "**Unaffected Creditor**" means any one of them;

- 17 -

"**Unconfirmed Votes**" means, with regard to the votes at the Meeting, those votes for which the Monitor has been unable to obtain satisfactory third-party confirmation of holdings of Affected ABCP;

"**Unconfirmed Voting Claim**" means a Noteholder Claim in respect of which the Noteholder's vote is an Unconfirmed Vote;

"**U.S. Dollars**" or "**USD$**" means dollars denominated in lawful currency of the United States of America;

"**Voter Confirmation Form**" means the form (printed on pink paper) that a Noteholder whose holdings of Affected ABCP have previously been confirmed by Ernst & Young Inc. must properly complete and deliver to the Monitor in order to be eligible to vote at the Meeting, which form will be mailed directly to such Noteholders by the Monitor, separately from the Information Statement;

"**Voter Identification Form**" means the form included with the Information Statement (printed on blue paper) that Noteholders whose holdings of Affected ABCP have not previously been confirmed by Ernst & Young Inc. must properly complete and deliver in order to be eligible to vote at the Meeting; and

"**Website**" means the website established by the Monitor for purposes of the Plan and having the follow web address: www.ey.com/ca/commercialpaper.

## 1.2    Certain Rules of Interpretation

In this Plan and the Schedules hereto:

    (i)    the division of this Plan into articles, sections, subsections and clauses and the insertion of headings and a table of contents are for convenience of reference only and shall not affect the construction or interpretation of this Plan. The terms "this Plan", "hereof", "hereunder", "herein" and similar expressions refer to this Plan and not to any particular article, section, subsection or clause and include any plan supplemental hereto. Unless otherwise indicated, any reference in this Plan to an article, section, subsection, clause or schedule refers to the specified article, section, subsection, clause or schedule of or to this Plan;

    (ii)    the use of words in the singular or plural, or with a particular gender, shall not limit the scope or exclude the application of any provision of this Plan or a schedule hereto to such Person (or Persons) or circumstances as the context otherwise permits;

    (iii)    the words "includes" and "including" and similar terms of inclusion shall not, unless expressly modified by the words "only" or "solely", be construed as terms of limitation, but rather shall mean "includes without limitation" and "including without limitation", so that references to included matters shall be regarded as illustrative without being either characterizing or exhaustive;

- 18 -

(iv)     unless otherwise specified, all references to time herein and in any
document issued pursuant hereto mean local time in Toronto, Ontario and
any reference to an event occurring on a Business Day shall mean prior to
5:00 p.m. on such Business Day. Unless otherwise specified, the time
period within or following which any payment is to be made or act is to be
done shall be calculated by excluding the day on which the period
commences and including the day on which the period ends and by
extending the period to the next succeeding Business Day if the last day of
the period is not a Business Day. Whenever any payment to be made or
action to be taken under this Plan is required to be made or to be taken on
a day other than a Business Day, such payment shall be made or action
taken on the next succeeding Business Day; and

(v)      unless otherwise provided, any reference to a statute, or other enactment
of parliament or a legislature includes all regulations made thereunder, all
enactments to or re-enactments of such statute or regulations in force from
time to time, and, if applicable, any statute or regulation that supplements
or supersedes such statute or regulation.

**1.3     Schedules**

The following Schedules are attached to and form part of this Plan:

| | | |
|---|---|---|
| Schedule "A" | – | List by Series of Affected ABCP |
| Schedule "B" | – | MAV1 Trust Indenture |
| Schedule "C" | – | MAV2 Trust Indenture |
| Schedule "D" | – | MAV1 IA Tracking Note Indenture and MAV2 IA Tracking Note Indenture |
| Schedule "E" | – | MAV3 Tracking Note Trust Indenture |
| Schedule "F" | – | MAV1 Declaration of Trust , MAV2 Declaration of Trust and MAV3 Declaration of Trust |
| Schedule "G" | – | MAV1 Margin Funding Facility Agreement and MAV2 Margin Funding Facility Agreement |
| Schedule "H" | – | MAV1 Omnibus Agreement and MAV2 Omnibus Agreement |
| Schedule "I" | – | Master Security Agreements |
| Schedule "J" | – | MAV1 Administration and Management Agreement, MAV2 Administration and Management Agreement and MAV3 Administration and Management Agreement |
| Schedule "K" | – | CMO Co-Ownership Agreement and MCAP Co-Ownership Agreement |
| Schedule "L" | – | CDS Restructuring Documents |

- 19 -

| | | |
|---|---|---|
| Schedule "M" | – | Additional Modifications and Individual Solutions of CDS Term Sheet |
| Schedule "N" | – | GD Swap Restructuring Agreements |
| Schedule "O" | – | CIBC Omnibus Agreements |
| Schedule "P" | – | Newshore AMA |
| Schedule "Q" | – | Tao AMA |
| Schedule "R" | – | RACSAs |
| Schedule "S" | – | Master Release Agreement |
| Schedule "T" | – | Existing Indemnity and Tax Claims Protocol |
| Schedule "U" | – | Transition Services Agreement |
| Schedule "V" | – | Senior Funding Term Sheet |

## ARTICLE 2
## PURPOSE AND EFFECT OF THE PLAN

**2.1    Purpose**

The purpose of this Plan is to effect a comprehensive restructuring of all Affected ABCP, including the distribution to Noteholders of Plan Notes, which is intended to provide Noteholders with the opportunity to receive repayment of their original investment over time.

**2.2    Affected Persons**

This Plan will be implemented under the CCAA and be binding on all Noteholders and other Persons in accordance with its terms, on the Plan Implementation Date.

## ARTICLE 3
## CLASSIFICATION OF CREDITORS

**3.1    Class of Creditors**

The sole class for the purpose of considering and voting on this Plan shall be the class consisting of Noteholders.

**3.2    Noteholder Identification Procedure**

Noteholders shall confirm or identify their respective Noteholder Claims for voting purposes, vote in respect of the Plan, and receive the distributions provided for under and pursuant to this Plan in accordance with the Meeting Order, the Sanction Order and this Plan.

- 20 -

**3.3    Unaffected Claims**

This Plan does not compromise, release or otherwise affect any rights or claims:

(a)    arising from ABCP that is not Affected ABCP, including any ABCP of a CCAA Party that is excluded pursuant to Section 11.2;

(b)    for fees and expenses incurred in the provision of goods and services in the administration and management of the ABCP Conduits or relating to the CCAA Proceedings and authorized pursuant to paragraph 6 of the Initial Order;

(c)    of the Monitor and its counsel, counsel to the CCAA Parties, counsel to the Investors Committee or that otherwise are secured by the CCAA Charges; or

(d)    that fall within Section 18.2 of the CCAA.

All of the foregoing rights and claims set out in this Section 3.3, inclusive, are collectively referred to as the "**Unaffected Claims**" and any one of them is an "**Unaffected Claim**".

## ARTICLE 4
## TREATMENT OF CREDITORS

**4.1    Treatment of Claims**

On the Plan Implementation Date, the claims affected by this Plan, including ABCP Market Claims will be compromised, released and otherwise affected in accordance with the terms of this Plan.

**4.2    Treatment of Affected ABCP**

For purposes of distributions pursuant to this Plan, Affected ABCP shall be divided by series and Noteholders shall receive distributions as set out in Sections 6.2 and 6.6 based upon (i) the type of assets underlying each series of Affected ABCP, as set out in Schedule "A" and (ii) certain elections by and eligibility of Noteholders as provided for in Section 6.1.

**4.3    Voting Rights of Noteholders**

Subject to this Plan and the Meeting Order, each Noteholder having a Proven Voting Claim shall be entitled to one vote in the Noteholders' Class in an amount equal to such Noteholder's Proven Voting Claim. Furthermore, votes in respect of Unconfirmed Voting Claims will be recorded by the Monitor, subject to further determination in accordance with the Meeting Order. The procedure for determining the validity and quantum of the Noteholder Claims for voting purposes shall be governed by the Meeting Order.

**4.4    Unaffected Creditors**

Notwithstanding anything to the contrary herein, each Person who has an Unaffected Claim shall not be entitled to vote or to receive any distribution under this Plan in respect of such

- 21 -

Unaffected Claim. All Unaffected Claims shall be unaffected by the CCAA Proceedings and principal and interest shall continue to accrue notwithstanding the CCAA Proceedings.

**4.5    Different Capacities**

Noteholders whose Noteholder Claims are affected by this Plan may be affected in more than one capacity. Unless expressly provided herein to the contrary, each such Noteholder shall be entitled to participate hereunder in each such capacity. Any action taken by a Noteholder in any one capacity shall not affect the Noteholder in any other capacity, unless expressly agreed by the Noteholder in writing or unless the Noteholder Claims in question overlap or are otherwise duplicative (in which case, the Noteholder shall elect in which capacity to be so affected).

**4.6    Approved Agreements**

Each of the Approved Agreements is a fundamental part of this Plan, and where it is entered into by a Plan Participant it is done: (i) in consideration of the distributions and other benefits provided pursuant to this Plan; and (ii) for the reasons noted in this Plan and in such agreements. The Noteholders, in approving this Plan, also approve each of the Approved Agreements, and the terms, provisions and releases contemplated therein. The entry of the Sanction Order shall constitute the CCAA Court's approval, as of the Plan Implementation Date, of the Approved Agreements and the terms, provisions and releases contained therein and the CCAA Court's authorization and direction to the CCAA Parties to execute and deliver the Approved Agreements.

**ARTICLE 5
RESTRUCTURING**

**5.1    Restructuring of ABCP**

Pursuant to the transactions contemplated herein, Affected ABCP will be exchanged for long-term Plan Notes designed to generally match the maturities of the underlying assets. MAV1, MAV2 and MAV3 will be created to acquire the assets of the ABCP Conduits, assume the Affected ABCP and other related obligations and issue the Plan Notes in exchange for the Affected ABCP.

**5.2    Restructuring Transactions Effected by the Plan**

In addition to the compromises, arrangements, releases and distributions described in this Plan, and in addition to or in conjunction with the transactions contemplated under the Approved Agreements, the following transfers, conveyances, actions and transactions shall be effected or deemed to be effected by this Plan, subject to Section 5.3, on the Plan Implementation Date in the following order (except that the transactions described in (c), (d) and (e) below shall occur at the same time) or such order as may be determined by the Investors Committee with the approval of the Monitor and consent of the Plan Participants. Any such re-ordering of the following steps shall be deemed not to be a material amendment to this Plan.

- 22 -

(a)     ***Formation of New Master Asset Vehicles***

The MAVs will be formed under the laws of the Province of Ontario pursuant to the Declarations of Trust prior to the Plan Implementation Date.

(b)     ***Cash Payments from ABCP Conduits***

Cash payments will be made from the ABCP Conduits in accordance with Section 6.6.

(c)     ***Transfer of Synthetic and Hybrid Assets and Ineligible Assets***

Each of the Specified Satellite Trusts (other than the Starts Trusts) will redeem all outstanding certificates issued by it and will satisfy the redemption price by issuing to the holder two demand non-interest bearing promissory notes (each, a "Satellite Trust Promissory Note") having an aggregate principal amount equal to the adjusted cost base (as defined in subsection 107(1) of the Tax Act) of the certificate immediately prior to it being redeemed.

### MAV1

Each ABCP Conduit with a Series of Affected ABCP that is supported by Synthetic and Hybrid Assets will assign, transfer and convey to MAV1 that portion of its Synthetic and Hybrid Assets and Ineligible Assets (or where the Synthetic and Hybrid Assets and Ineligible Assets are owned by a Satellite Trust other than a Specified Satellite Trust, that portion of the ABCP Conduit's interest in the Satellite Trust) determined by the percentage of the outstanding settlement amount of each Series of Affected ABCP held by Noteholders validly participating in MAV1 as determined pursuant to Section 6.1. The Synthetic and Hybrid Assets transferred will reflect the percentage of ownership in each such asset transferred to MAV1. The purchase price for such assets will be satisfied by MAV1 assuming (i) the same proportionate amount of the respective ABCP Conduit's obligations incurred by the Conduits to fund or refinance the acquisition and ownership of such assets and preserving the rank and priority of repayment of such obligations, and (ii) the same proportionate amount of the Affected ABCP of each ABCP Conduit held by Noteholders participating in MAV1.

Where an ABCP Conduit transfers assets to MAV1 pursuant to the foregoing and thereby transfers to MAV1 a Satellite Trust Promissory Note and/or the relevant percentage of a Starts Note, as applicable, of a Specified Satellite Trust, that Specified Satellite Trust will assign, transfer and convey to MAV1 the same proportion of its Synthetic and Hybrid Assets as that transferred by the ABCP Conduit holding its Satellite Trust Promissory Note and/or the relevant percentage of its Starts Note, as applicable.  MAV1 will satisfy the purchase price for the transferred assets by assuming the same proportionate amount of the respective Specified Satellite Trust's obligations (i) incurred by it to fund or refinance the acquisition and ownership of such assets and preserving the rank and priority of

- 23 -

repayment of such obligations, and (ii) under the Satellite Trust Promissory Note issued by it as described above and/or the relevant percentage of the Starts Note, as applicable.

**MAV2**

Each ABCP Conduit with a Series of Affected ABCP that is supported by Synthetic and Hybrid Assets will assign, transfer and convey to MAV2 a portion of its Synthetic and Hybrid Assets and Ineligible Assets (or where the Synthetic and Hybrid Assets and Ineligible Assets are owned by a Satellite Trust other than a Specified Satellite Trust, a portion of the ABCP Conduit's interest in the Satellite Trust), such portion being based upon the percentage of the outstanding settlement amount of its Affected ABCP held by Noteholders participating in MAV2. The Synthetic and Hybrid Assets transferred will reflect a percentage of ownership in each such asset transferred to MAV2. The purchase price for such assets will be satisfied by MAV2 assuming (i) the same proportionate amount of the respective ABCP Conduit's obligations incurred by the Conduits to fund or refinance the acquisition and ownership of such assets and preserving the rank and priority of repayment of such obligations and (ii) a proportionate amount of the Affected ABCP of each ABCP Conduit held by Noteholders participating in MAV2.

Where an ABCP Conduit transfers assets to MAV2 pursuant to the foregoing and thereby transfers to MAV2 a Satellite Trust Promissory Note and/or the relevant percentage of a Starts Note, as applicable, of a Specified Satellite Trust, that Specified Satellite Trust will assign, transfer and convey to MAV2 the same proportion of its Synthetic and Hybrid Assets as that transferred by the ABCP Conduit holding its Satellite Trust Promissory Note and/or the relevant percentage of its Starts Note, as applicable.  MAV2 will satisfy the purchase price for the transferred assets by assuming the same proportionate amount of the respective Specified Satellite Trust's obligations (i) incurred by it to fund or refinance the acquisition and ownership of such assets and preserving the rank and priority of repayment of such obligations, and (ii) under the Satellite Trust Promissory Note issued by it as described above and/or the relevant percentage of the Starts Note, as applicable.

(d)     *Transfer of Ineligible Assets*

Each ABCP Conduit with a Series of Affected ABCP that is supported, in whole or in part, by Ineligible Assets, and each Specified Satellite Trust owning Ineligible Assets, will assign, transfer and convey to MAV1, MAV2 and/or MAV3, as applicable, a portion of the Ineligible Assets based upon the percentage of the outstanding settlement amount of Affected ABCP that funded the acquisition of the Ineligible Assets held by Noteholders participating in MAV1, MAV2 or MAV3, as applicable. The purchase price for the respective Ineligible Assets will be satisfied by MAV1, MAV2 and MAV3, respectively assuming (i) the same proportionate amount of the respective ABCP Conduit's or Specified Satellite Trust's obligations incurred by the Conduits or Specified Satellite Trusts

- 24 -

to fund or refinance the acquisition and ownership of such assets and preserving the rank and priority of repayment of such obligations and (ii) the same proportionate amount of the Affected ABCP of the ABCP Conduits (or Satellite Trust Promissory Note in the case of a Specified Satellite Trust) that funded the acquisition of Ineligible Assets transferred to MAV1, MAV2 or MAV3, as applicable.

Upon completion of the transfers set out in Section 5.2(c) and this Section 5.2(d) the Satellite Trust Promissory Notes and the Starts Notes will be cancelled.

(e)    *Transfer of Exclusively Traditional Assets*

Each ABCP Conduit with a Series of Affected ABCP that is supported in whole by Exclusively Traditional Assets will assign, transfer and convey its Exclusively Traditional Assets (or where the Exclusively Traditional Assets are owned by a Satellite Trust other than a Specified Satellite Trust, the ABCP Conduit's interest in that Satellite Trust) to MAV3 pursuant to standard form conveyance documents. The purchase price for the Exclusively Traditional Assets will be satisfied by MAV3 assuming (i) the ABCP Conduit's obligations incurred by the Conduits to fund or refinance the acquisition and ownership of such assets and preserving the rank and priority of repayment of such obligations and (ii) the Affected ABCP of the ABCP Conduits that funded the acquisition of the Exclusively Traditional Assets.

(f)    *Restructuring of Credit Default Swaps*

All existing CDS contracts entered into between the ABCP Conduits or applicable Satellite Trusts, as the case may be and the Asset Providers will be terminated or novated without any payments, including swap termination payments, being made under such CDS contracts (provided, however, that accrued and unpaid payments unrelated to the termination survive the termination) and will be replaced by, and MAV1 and MAV2 will enter into, the CDS Restructuring Documents, except as otherwise provided in the Additional Modifications and Individual Solutions of CDS Term Sheet.

(g)    *Pooling*

All of the Synthetic and Hybrid Assets transferred to MAV1 will be pooled for purposes of funding the return on the MAV1 Notes.

All of the Synthetic and Hybrid Assets transferred to MAV2 will be pooled for purposes of funding the return on the MAV2 Notes.

(h)    *Exchange of Affected ABCP*

The terms of all of the Affected ABCP, as assumed by each of the MAVs, as applicable, will be amended or deemed to be amended to provide to Noteholders the right to exchange their Affected ABCP for Plan Notes. Noteholders holding Affected ABCP will exchange or be deemed to exchange such Affected ABCP for

- 25 -

Plan Notes as set out in Article 6 of this Plan. The rights and obligations of the Noteholders and the ABCP Conduits in respect of the Affected ABCP will cease as of the Plan Implementation Date.

(i)    ***Termination of Liquidity Arrangements***

All of the Liquidity Agreements (except the two Liquidity Agreements referenced in Section 5.3, Step 18) in place for the benefit of one or more Series of Affected ABCP (excluding, for greater certainty, those which have terminated or expired in accordance with their terms) will be cancelled with no additional payments being made by or on behalf of any of the parties thereto.

(j)    ***Remittance of Reserve Amounts***

Any amounts held by or on behalf of an ABCP Conduit as of the Plan Implementation Date in one or more reserve accounts for the account and benefit of an ABCP Sponsor (as confirmed by the Monitor) in connection with credit enhancement funding shall be remitted to the applicable ABCP Sponsor on or immediately before the Plan Implementation Date.

(k)    ***Liquidation of ABCP Conduits***

Subsequent to the transfer of their respective assets to the MAVs in payment for their outstanding Affected ABCP (i) each of the ABCP Conduits and Specified Satellite Trusts will be terminated in accordance with the terms of its governing documents or as may otherwise be approved by the Court and (ii) each of the Respondents will be wound up following the termination of the Existing Issuer Trustee Trust Agreement. The rights of indemnity existing in favour of and granted by the Respondents and the Original Issuer Trustees shall survive the releases contained herein and rank against the property of the MAVs in accordance with the priority of payments set out in the Trust Indentures, the CIBC Omnibus Agreements and the Omnibus Agreements and in proportion to the outstanding Affected ABCP on a Series by Series basis.  The Existing Issuer Trustee Trust Agreement shall be settled and funded in the amount of $5.5 million.  Any Existing Indemnity Claims shall be satisfied pursuant to the terms of the Existing Indemnity and Tax Claims Protocol and, thereafter, the Existing Issuer Trustee Trust Agreement.

(l)    ***Collateral Posting***

Collateral posting across the Synthetic and Hybrid Assets transferred to MAV1 and MAV2 will be effected as described under "*Intercreditor Arrangements*" in the Information Statement or as otherwise described in the Omnibus Agreements, the CIBC Omnibus Agreements and the Master Security Agreements.

(m)    ***Margin Funding Facilities***

Certain parties, including certain Asset Providers, the Canadian Banks and, potentially, certain Noteholders participating in MAV2, will provide margin call

- 26 -

support pursuant to the terms of the MAV2 Margin Funding Facility Agreement. If there is a deficiency in the MAV2 margin funding requirements that is not addressed through other means, the amounts accumulated in ABCP Sponsors' accounts will be retained in MAV2 as collateral to address the deficiency. Noteholders participating in MAV1 will provide margin call support pursuant to the terms of the MAV1 Margin Funding Facility Agreement. In addition, certain parties will provide senior credit support (in a form to be settled on or before the Plan Implementation Date) to MAV1 and MAV2 in the form of the Senior Funding Facilities and the MAV1 MFF Lenders will provide the Supplemental Commitments.

(n)     ***Appointment of Administrator***

On the Plan Implementation Date the MAVs will appoint the Administrator to act as administrator and asset manager on behalf of each MAV pursuant to the terms of the Administration and Management Agreements. In addition, Newshore Financial Services Inc. will be appointed under the Newshore AMA and Tao Admin Corp. will be appointed under the Tao AMA.

**5.3     Ordering of Certain Steps or Transactions**

Notwithstanding the provisions of Section 5.2 hereof, the following steps or transactions shall occur and shall be deemed to occur in the order they appear below:

**Closing Steps**

*One day prior to the Plan Implementation Date:*

The applicable declarations of trust, settlement deeds and series supplements supplemental to base trust agreements of (i) each of Aria Trust, Encore Trust, Symphony Trust, Newshore Canadian Trust and Opus Trust, (ii) those ABCP Conduits that exclude from their class of beneficiaries "charities which are trusts", and (iii) the Specified Satellite Trusts will be amended to exclude references, if any, to specific beneficiaries and so that the class of beneficiaries of the trusts will include "any one or more registered charities within the meaning of subsection 248(1) of the Tax Act", together with related amendments.

*On the Plan Implementation Date:*

Step 1

The Targeted Trust will be formed under the laws of the Province of Ontario pursuant to the base trust agreement dated October 10, 2002 between Coventree Capital Group Inc. (now known as Coventree Inc.) and BNY Trust Company of Canada and the beneficiaries of the Targeted Trust will include one or more registered charities within the meaning of subsection 248(1) of the Tax Act. Rocket Trust will transfer the Targeted Assets to the Targeted Trust in exchange for the Constellation Certificate Trust (Targeted) Certificate, Series 2008-1, issued by the Targeted Trust (the "Targeted Certificate").

- 27 -

Step 2

Each Specified Satellite Trust and ABCP Conduit will pay all of its unpaid expenses to the extent cash is available to it to do so.

Step 3

Each Specified Satellite Trust will distribute to the ABCP Conduit that owns a certificate in the Specified Satellite Trust, as applicable, any cash or accrued income entitlements of the Specified Satellite Trust to the extent such cash or accrued income entitlements is, or is derived from, net income earned by the Specified Satellite Trust, up to the time immediately before the redemption of the certificates, as described in Step 4 below, and to the extent such cash or accrued income entitlements was not previously allocated or distributed by the Specified Satellite Trust.

Step 4

Each Specified Satellite Trust (other than the Starts Trusts) will redeem and cancel all outstanding certificates issued by it and will satisfy the redemption price by issuing to the applicable ABCP Conduit the Satellite Trust Promissory Notes, as referenced in Section 5.2(c).

Step 5

Each ABCP Conduit will (a) deposit its cash that is, or is derived from, income and (b) undertake to deposit or cause to deposit the cash received on account of its accrued income entitlements and Quebec Sales Tax refunds, if any, upon receipt of such amounts after the Plan Implementation Date (including the cash and cash received on account of the accrued income entitlements received from a Specified Satellite Trust pursuant to Step 3 above) with the Monitor (or CDS Clearing, with respect to the payment of interest only), in satisfaction of the obligations of the ABCP Conduit including (i) any Noteholders' entitlement to receive interest on the Affected ABCP for the period ending on the Plan Implementation Date, as referenced in Section 6.6, (ii) certain parties' entitlement to receive payment of expenses, as referenced in Sections 6.3, 6.4 and 6.5, (iii) certain Asset Providers' rights to receive accrued payments under the terminated or novated swap agreements, and (iv) certain other payments required in connection with the implementation of the Plan. Each ABCP Conduit will deposit with the Monitor its cash on account of principal received on or after September 1, 2008 to the Plan Implementation Date, for reconciliation.

Step 6

Each Specified Satellite Trust or ABCP Conduit, as applicable, will terminate certain swap and related agreements, as referenced in Section 5.2(f), custodial agreements and guarantees. Each Liquidity Provider holding a class "L" and/or class "C" certificate in a Continuing Satellite Trust will surrender such certificates for cancellation.

Step 7

U.S. Bank Trust National Association will resign and be replaced by the New Satellite Trustee as the trustee of Constellation Certificate Trust (MLCC) Series 2003-B.

- 28 -

Step 8

Coventree will sell certain residual certificates it holds in the Continuing Satellite Trusts to the applicable ABCP Conduits and will surrender the remainder of certain other residual certificates it holds in the Continuing Satellite Trusts for cancellation. Coventree, and the applicable ABCP Conduits and Continuing Satellite Trusts will settle all obligations under all basis reserve agreements, including amounts returned to Coventree for other reserves. The applicable ABCP Conduits will also surrender certain certificates they hold in the Continuing Satellite Trusts for cancellation, and exchange certain other Canadian dollar certificates of the Continuing Satellite Trusts for certificates reflecting the U.S. dollar value of the underlying assets of such Continuing Satellite Trusts.

Step 9

The applicable base trust agreements, series supplements supplemental to base trust agreements and declarations of trust for each of the Continuing Satellite Trusts will be amended and restated.

Step 10

Each of the Specified Satellite Trusts will transfer all of its assets to MAV1 and MAV2 (other than as specified in the steps above), and MAV1 and MAV2 will assume certain obligations of all of the Specified Satellite Trusts (other than as specified in the steps above), including the obligations of the Specified Satellite Trusts under the Satellite Trust Promissory Notes and the Starts Notes, as applicable, and as referenced in Sections 5.2(c) and (d), as applicable.

Simultaneously, each of the ABCP Conduits will transfer all of its assets (other than as specified in the steps above), including its certificates or other applicable interests in the Traditional Assets (including the Targeted Certificate), the Satellite Trust Promissory Notes, and the Starts Notes, to MAV1, MAV2 and MAV3, as applicable, and MAV1, MAV2 and MAV3, as applicable, will assume certain obligations of all of the ABCP Conduits (other than as specified in the steps above), including the obligations under the Affected ABCP, as applicable, and as referenced in Sections 5.2(c), (d) and (e), as applicable. Simultaneously, the Specified Satellite Trust or the ABCP Conduit, as applicable, the MAVs and certain Asset Providers will novate certain swap and related agreements, as referenced in Section 5.2(f), to the MAVs. Other interest rate, rate cap and cross currency swaps to which the ABCP Conduits or Specified Satellite Trusts are a party will be similarly novated. Simultaneously, the original collateral and other posted support will be deemed to be delivered and/or transferred (a) from the Asset Providers to the Specified Satellite Trust or the ABCP Conduit, as applicable, (b) from the Specified Satellite Trust or the ABCP Conduit, as applicable, to the MAVs, and (c) in the case of other posted support, from the MAVs to the Asset Providers. Original collateral will be pledged by the MAVs to the Asset Providers as described in Step 12.

Step 11

The Satellite Trust Promissory Notes and the Starts Notes will be cancelled by operation of law.

- 29 -

### Step 12

The MAVs and the Asset Providers will enter into the CDS Restructuring Documents (except as otherwise provided in the Additional Modification and Individual Solutions of CDS Term Sheet), as referenced in Section 5.2(f), the guarantees, and (together with the custodians) the custodial and control agreements. The MAVs will pledge the pooled original collateral to certain Asset Providers, pursuant to the Master Security Agreements, as referenced in Section 5.2(l). The pledge of collateral to Canadian Imperial Bank of Commerce will occur pursuant to the credit support annex referred in the CIBC Omnibus Agreements.

### Step 13

The applicable parties will enter into the CMO Co-Ownership Agreement, the MCAP Co-Ownership Agreement and the RACSAs.

### Step 14

The principal amount of Structured Asset Trust, Series E-1 will be reduced to 77% of its principal amount.

### Step 15

Noteholders will exchange or will be deemed to exchange the Affected ABCP owned by them, and assumed by each of the MAVs in Step 10 above, for Plan Notes of the MAVs, as referenced in Section 5.2(h). The entitlement of the Noteholders to receive interest on their Affected ABCP in excess of the amounts determined by the Monitor under Section 6.6 will be extinguished.

### Step 16

1462888 Ontario Inc., 1614723 Ontario Inc. and BNY Trust Company of Canada will resign and be replaced by the New Satellite Trustee as the trustee of all of the Continuing Satellite Trusts (excluding Constellation Certificate Trust (MLCC) Series 2003-B, which was addressed in Step 7 above).

### Step 17

The applicable parties will enter into the TRACSA.

### Step 18

The applicable parties shall enter into the following two agreements: (i) Amended and Restated Liquidity Loan Agreement, dated as of the Plan Implementation date between CIBC Mellon Global Services Securities Company, in its capacity as trustee of Constellation Certificate Trust (SLR –A2) Series 2003-1 and, each of the Lenders (as defined therein) and, the Bank of Nova Scotia, as agent, and (ii) Amended and Restated Liquidity Loan Agreement, dated as of the Plan Implementation date between CIBC Mellon Global Services Securities Company, in its capacity as trustee of Constellation Certificate Trust (CCG1) Series 2004-1 and, each of the Lenders (as defined therein) and, the Bank of Nova Scotia, as agent.

- 30 -

Step 19

All administration agreements, financial arrangement agreements, and supplements thereto, between a Satellite Trust and Coventree will be terminated.

Step 20

The program agreements relating to certain Traditional Assets, including any applicable mortgage purchase agreements, loan and security agreements and liquidity loan agreements will be amended and/or restated.

Step 21

The New Satellite Trustee, in its capacity as the trustee of the applicable Continuing Satellite Trusts, will deliver the officer's certificates that are required in connection with the Margin Funding Facility Agreements.

*After the Plan Implementation Date (but otherwise in no particular order):*

Step 22

The declarations of trust of each of the MAVs will be amended to exclude from its class of beneficiaries those registered charities that, at any particular time, own Plan Notes of any of the MAVs.

Step 23

After the exchange of Affected ABCP for Plan Notes, MAV1 and MAV2 will distribute cash to holders of the Class 14 Notes issued under the IA Tracking Note Trust Indentures (the "Class 14 Notes") and the remaining Class 14 Notes will be cancelled.

Step 24

The Monitor will receive and reconcile all amounts received from the ABCP Conduits, the Satellite Trusts, the MAVs and the Asset Providers, and will distribute the required amounts to the Noteholders, the parties entitled under Sections 6.3 and 6.4, the Asset Providers, the MAVs and all other applicable Persons.

Step 25

The ABCP Conduits and Specified Satellite Trusts will be terminated as soon as practicable.

## ARTICLE 6
## DISTRIBUTIONS

**6.1    Election to Participate in MAV1 or MAV2**

Except with respect to their holdings of Series of Affected ABCP that are backed by Exclusively Traditional Assets or Series of Subordinated ABCP, Noteholders will participate in either MAV1 or MAV2. In order to be eligible to participate in MAV1, Noteholders must satisfy the "*MAV1 Eligibility Criteria*" set forth in the Information Statement (see section entitled

- 31 -

"*Eligibility and Election to Participate in MAV1*"). Any Noteholder that fails to properly complete and deliver the Form of Election or that does not qualify or properly elect to participate in MAV1 will participate in MAV2.  A Noteholder, other than National Bank of Canada and National Bank Financial Inc., must make the election in respect to the entirety of its holdings of eligible Affected ABCP whether or not such holdings include more than a single Series of Affected ABCP.  Notwithstanding the foregoing and the *MAV1 Eligibility Criteria*, the collective holdings of Affected ABCP of the following Desjardins entities shall be MAV1 Eligible and the entities shall be eligible to be MAV1 MFF Lenders: Caisse Centrale Desjardins, 9186-3027 Québec Inc., 9186-4108 Québec Inc., 9186-4116 Québec Inc., 9186-4132 Québec Inc., 9186-8034 Québec Inc., Desjardins Credit Union, Fédération des caisses Desjardins du Québec, Régime de rentes du Mouvement Desjardins, Desjardins Sécurité financière compagnie d'assurance vie, Fonds de sécurité Desjardins, Fondation Desjardins, Desjardins gestion d'actifs Inc., Valeurs mobilières Desjardins Inc., La Personnelle Assurances générales Inc., Certas compagnie d'assurances auto et habitation, Desjardins assurances générales Inc., Certas direct compagnie d'assurances, La Personnelle compagnie d'assurances, Desjardins Global Asset Management Inc. solely in its capacity of Manager of MM Trust, Desjardins Global Asset Management Inc. solely in its capacity of Manager of MM Trust II, Desjardins Global Asset Management Inc. solely in its capacity of Portfolio Adviser of Fonds Obligataire Desjardins.

In the case of MAV2, the MAV2 Margin Funding Facility will be established on the Plan Implementation Date and funded by a group of third-party lenders and potentially, certain Noteholders who desire to participate in the MAV2 Margin Funding Facility to an extent less than their pro rata share of such facility. The size and composition of the asset pools within MAV1 and MAV2 will be determined based on the number of Noteholders that participate in each MAV (and their respective holdings of Affected ABCP) and, therefore, will not be known until after the Meeting. This information will be posted on the Website and communicated to those Noteholders who have elected to participate in MAV1 at least 5 Business Days before the Plan Implementation Date.

**6.2    Distributions of Plan Notes**

For purposes of distributing the Plan Notes, the various issuances of Affected ABCP may be consolidated by CUSIP into the Series referenced in Schedule "A", which consolidation would occur prior to the issuance of the Plan Notes.  The entry of the Sanction Order shall constitute the CCAA Court's approval of such consolidation and the CCAA Court's authorization and direction to the Respondents and any of their respective agents to execute and deliver a direction to CDS Clearing to effect such consolidation, if and when directed to do so by the Monitor.

Each Noteholder shall be entitled to a distribution under this Plan as follows:

(a)    **MAV1 Notes and MAV1 IA Tracking Notes**

Each Noteholder with a Noteholder Settlement Claim that is in whole or in part MAV1 Eligible shall, in full and final satisfaction of that portion of its Noteholder Settlement Claim, exchange and be deemed to exchange such Affected ABCP for:

- 32 -

   (i)     a MAV1 Class A-1 Note;

   (ii)    a MAV1 Class A-2 Note;

   (iii)   a MAV1 Class B Note; and

   (iv)   a MAV1 Class C Note.

The aggregate principal amount of MAV1 Notes issued by MAV1 to a Noteholder will equal the aggregate settlement amount of Affected ABCP transferred by such Noteholder to MAV1 less the aggregate principal amount of any IA Tracking Notes issued by MAV1 to such Noteholder. The principal amount of a MAV1 Class A-1 Note issued to a Noteholder by MAV1 will reflect the Noteholder's aggregated indirect relative contribution to the aggregated value of the Transferred Synthetic and Hybrid Assets (excluding Ineligible Assets) transferred to MAV1, as determined by JPMorgan pursuant to the Relative Contribution Analysis; with the balance of the settlement amount of the Affected ABCP exchanged being represented by a combination of MAV1 Class A-2 Notes, MAV1 Class B Notes, MAV1 Class C Notes and, if applicable, MAV1 IA Tracking Notes, the amounts of which will be determined according to the formula set forth in the Information Statement (see section entitled "*Allocation of Plan Notes in Exchange for Affected ABCP*").

MAV1 IA Tracking Notes will be issued by MAV1 for each underlying Ineligible Asset transferred to MAV1, with a separate class of MAV1 IA Tracking Notes being issued by MAV1 for each individual Ineligible Asset transferred to MAV1. The aggregate principal amount of MAV1 IA Tracking Notes issued will equal the aggregate settlement amount of the Affected ABCP assumed by MAV1 that funded a particular Ineligible Asset acquired by MAV1.

(b)    **MAV2 Notes and MAV2 IA Tracking Notes**

Each Noteholder with a Noteholder Settlement Claim arising from Synthetic and Hybrid Assets that is not MAV1 Eligible, including any Noteholder Settlement Claim that would otherwise be MAV1 Eligible but the Noteholder does not qualify or properly elect to participate in MAV1, shall, in full and final satisfaction of that portion of its Noteholder Settlement Claim, exchange and be deemed to exchange such Affected ABCP for:

   (i)     a MAV2 Class A-1 Note;

   (ii)    a MAV2 Class A-2 Note;

   (iii)   a MAV2 Class B Note; and

   (iv)   a MAV2 Class C Note.

The aggregate principal amount of MAV2 Notes issued by MAV2 to a Noteholder will equal the aggregate settlement amount of Affected ABCP

- 33 -

transferred by such Noteholder to MAV2 less the aggregate principal amount of any IA Tracking Notes issued by MAV2 to such Noteholder. The principal amount of a MAV2 Class A-1 Note issued to a Noteholder by MAV2 will reflect the Noteholder's aggregated indirect relative contribution to the aggregated value of the Transferred Synthetic and Hybrid Assets (excluding Ineligible Assets) transferred to MAV2, as determined by JPMorgan pursuant to the Relative Contribution Analysis; with the balance of the settlement amount of the Affected ABCP exchanged being represented by a combination of MAV2 Class A-2 Notes, the MAV2 Class B Notes, MAV2 Class C Notes and, if applicable, MAV2 IA Tracking Notes, the amounts of which will be determined according to the formula set forth in the Information Statement (see section entitled "*Allocation of Plan Notes in Exchange for Affected ABCP*").

MAV2 IA Tracking Notes will be issued by MAV2 for each underlying Ineligible Asset transferred to MAV2, with a separate class of MAV2 IA Tracking Notes being issued by MAV2 for each individual Ineligible Asset transferred to MAV2. The aggregate principal amount of MAV2 IA Tracking Notes issued will equal the aggregate settlement amount of the Affected ABCP assumed by MAV2 that funded a particular Ineligible Asset acquired by MAV2.

(c)    **TA Tracking Notes**

Noteholders holding a Series of Affected ABCP backed by Exclusively Traditional Assets shall, in full and final satisfaction of that portion of its Noteholder Settlement Claim, exchange and be deemed to exchange such Affected ABCP of such Series for a TA Tracking Note issued by MAV3 in an aggregate principal amount equal to the aggregate settlement amount of such Affected ABCP assumed by MAV3, less the aggregate settlement amount of such Affected ABCP that funded an Ineligible Asset exchanged pursuant to Section 6.2(e). Each class of TA Tracking Notes will be secured by the specific Exclusively Traditional Assets that previously secured the Series of Affected ABCP assumed by MAV3 (other than Ineligible Assets that secure MAV3 IA Tracking Notes). Each class of TA Tracking Notes will have a maturity date equal to one year plus the longest maturity of the related Exclusively Traditional Assets, as set out in the Information Statement (see section entitled "*The TA Tracking Notes and the SN Tracking Notes*").

(d)    **SN Tracking Notes**

Noteholders holding a Series of Subordinated ABCP shall, in full and final satisfaction of that portion of their Noteholder Settlement Claim, exchange and be deemed to exchange such Affected ABCP for an SN Tracking Note in an aggregate principal amount equal to the aggregate settlement amount of such Subordinated ABCP assumed by MAV3. Each SN Tracking Note will be secured by the particular Traditional Asset program entitlement that previously supported the Subordinated ABCP assumed by MAV3. Each SN Tracking Note will have a maturity date equal to one year plus the longest maturity of the related Traditional

- 34 -

Asset program, as set out in the Information Statement (see section entitled "*The TA Tracking Notes and the SN Tracking Notes*").

(e)     **MAV3 IA Tracking Notes**

Noteholders holding a Series of Affected ABCP backed by Exclusively Traditional Assets that are also Ineligible Assets shall, in full and final satisfaction of that portion of its Noteholder Settlement Claim, exchange such Affected ABCP of such Series for one or more MAV3 IA Tracking Notes issued by MAV3 in an aggregate principal amount equal to the aggregate settlement amount of the Affected ABCP assumed by MAV3 that funded a particular Ineligible Asset acquired by MAV3. One class of MAV3 IA Tracking Notes will be issued for each Ineligible Asset that previously secured the Affected ABCP (provided that in the case of Ironstone Trust, 5 classes of MAV3 IA Tracking Notes will be issued in exchange for the two Series of Affected ABCP thereof). Each MAV3 IA Tracking Note will have a maturity date equal to one year plus the longest maturity of the related Ineligible Asset, as set out in the Information Statement (see section entitled "*The MAV3 Notes*").

**6.3     Payment of Professional and Administrative Expenses**

On the Plan Implementation Date, all outstanding fees and disbursements payable under any Order, including those subject to a CCAA Charge, shall be fully paid or a reserve for such amount fully funded as determined by the Monitor. Parties entitled to be paid hereunder shall have 60 days from the Plan Implementation Date, or such later date as may be agreed with the Monitor, to submit final invoices to the Monitor for payment. Any reserve shall be administered by the Monitor.

**6.4     Restructuring Expenses**

On the Plan Implementation Date, pro-rata payments shall be made from each of the ABCP Conduits excluding the Subordinated ABCP (on a series by series basis based on the total Face Amount of each series of Affected ABCP other than the Subordinated ABCP) to fund the payment of, and/or a reserve for, the reimbursement to the Investors Committee for the total amount of fees and disbursements and compensation, paid or owed by the Investors Committee to the following advisors in connection with the restructuring from and after August 16, 2007 to the Plan Implementation Date, and where applicable to beyond the Plan Implementation Date: Purdy Crawford, JPMorgan, Goodmans LLP, Ernst & Young Inc. and its counsel (until appointed Monitor by the Court), Broadridge Financial Solutions Inc., CIBC Mellon Trust Company, Torys LLP, McCarthy Tetrault LLP, BCF LLP, Skadden, Arps, Slate, Meagher & Flom LLP, Osler, Hoskin & Harcourt LLP, John D. Ground and his counsel, DBRS and their counsel, BlackRock, CDS Clearing and National PR and additionally, in respect of fees, disbursements and compensation prior to March 1, 2008, PricewaterhouseCoopers Inc. in its capacity as financial advisors to the Ad Hoc Committee of Non-Bank Sponsored Asset-Backed Commercial Paper and Miller Thomson LLP as its counsel. Any reserve shall be administered by the Monitor and said advisors will have 60 days from the Plan Implementation Date, or such later date as may be agreed with the Monitor, to submit final invoices for payment.

- 35 -

## 6.5    CCAA Charges

Subject to Section 7.2(i), upon payment of or the funding of a reserve sufficient to pay all the expenses referred to in 6.3 and 6.4 that are subject to a CCAA Charge, such funding or reserve to be administered by the Monitor, such CCAA Charge shall be and be deemed to be discharged.

## 6.6    Interest

The Monitor will review the amounts accumulated in the ABCP Sponsors' accounts and the amount of such monies required to be pledged as collateral for the MAVs (including collateral required to supplement margin funding commitments as a consequence of Noteholder elections to participate in MAV1) or for the payment of administrative, restructuring and other applicable costs to estimate surplus funds available by Series. Those surplus funds will be used for the payment of interest to Noteholders on or after the Plan Implementation Date. The amount payable to Noteholders on account of interest (the "Interest Entitlement") on Affected ABCP as of the Plan Implementation Date shall be determined by the Monitor and shall be limited to and calculated in reference to, those surplus funds. The amount of surplus funds available for the payment of interest shall be communicated to the Noteholders immediately following its determination. Any right of Noteholders to receive interest in excess of the Interest Entitlement will be extinguished.

## 6.7    Distributions of Plan Notes — Procedure

Registered Noteholders (whose names appear on the registers maintained by the Issuing and Paying Agents) and participants ("Institutional Participants") in the clearing and depository systems maintained by CDS Clearing in respect of Affected ABCP for which CDS Clearing is the registered holder (collectively, "Depositing Holders") will be required to properly complete and deliver tender and transmittal documentation, together with all physical certificates held by such Depositing Holder (if any), to the Depositary (either directly or indirectly using the automated CDSX on-line system), as directed by the Monitor and the Depositary. Following the Plan Implementation Date, upon receipt of all properly completed required documentation, the Depositary will deliver (or instruct the New Indenture Trustee to deliver) to such Depositing Holders the Plan Notes to which each is entitled in accordance with this Plan, which Plan Notes may be delivered directly by way of physical certificates or by way of a confirmation of a global deposit position with CDS Clearing, as appropriate. Certain holders of Plan Notes may be required to continue to hold physical certificates. Depositing Holders who fail to deliver the required documentation within two (2) years of the Plan Implementation Date may be barred, at the option of the applicable MAVs, from receiving distributions of Plan Notes in respect of such Affected ABCP. No Plan Note will be issued in an amount less than one dollar ($1). All amounts will be rounded down to the nearest whole dollar. The transmittal documentation (including any letter of transmittal) will include instructions as to the calculation of entitlements to Plan Notes, including for the purposes of allocating to beneficial holders on behalf of whom a Depositing Holder may hold Affected ABCP.

- 36 -

## ARTICLE 7
## SANCTION ORDER

**7.1    Application for Sanction Order**

The application for the Sanction Order shall be brought by the Investor Committee as soon as reasonably practicable following the approval of this Plan by the requisite majorities of Noteholders voting at the Meeting. On the Plan Implementation Date, subject to the satisfaction of the conditions contained in Article 8 herein, this Plan will be binding upon all Noteholders and all other Persons in accordance with its terms.

**7.2    Effect of Sanction Order**

In addition to sanctioning this Plan, and subject to the discretion of the CCAA Court, the Sanction Order shall, among other things and without limitation:

(a)    direct and authorize the distributions contemplated under this Plan;

(b)    declare that the compromises, releases and injunctions effected hereby are approved, binding and effective as of the Plan Implementation Date upon all Noteholders, the Monitor and all other Persons affected by this Plan and shall inure to the benefit of all such Persons;

(c)    provide that no Person who is a party to any obligation or agreement with the CCAA Parties shall, following the Plan Implementation Date, accelerate, terminate, rescind, refuse to perform or repudiate its obligations thereunder, or enforce or exercise any right (including any right of set-off, dilution or other remedy) or make any demand under or in respect of any such obligation or agreement, by reason:

    (i)    of any event(s) that occurred on or prior to the Plan Implementation Date that would have entitled any other Person thereto to enforce those rights or remedies (including defaults or events of default arising as a result of the insolvency of the CCAA Parties);

    (ii)   of the fact that relief under the CCAA has been sought or obtained in respect of the CCAA Parties, that the CCAA Proceedings have been commenced or completed, or that the within restructuring has been implemented in respect of the CCAA Parties; or

    (iii)  of any compromises or arrangements effected pursuant to this Plan;

(d)    confirm the effect of the Meeting Order;

(e)    authorize and direct the execution and delivery of the Approved Agreements by the CCAA Parties;

- 37 -

(f)     form the basis for an exemption from the registration requirements of the *United States Securities Act* of 1933, as amended, in respect of certain securities to be issued pursuant to the Plan;

(g)     provide for a release of the Released Parties in a form consistent with Section 10.1;

(h)     provide that the Monitor shall be discharged and released on the Plan Implementation Date, save and except with respect to any remaining duties or powers required to implement and give effect to the terms of this Plan; and

(i)     provide that the Monitor shall continue to hold the benefit of a CCAA Charge, as provided in the Initial CCAA Order, until the Monitor has completed its duties under this Plan and the fees and disbursements of the Monitor and its counsel have been fully paid.

**7.3    Monitor**

On the Plan Implementation Date, and subject to the Sanction Order and any other Orders, the Monitor shall be discharged and released and shall have no further obligations or responsibilities, except only with respect to any remaining duties or power required to implement and give effect to the terms of this Plan.

**ARTICLE 8
CONDITIONS PRECEDENT**

**8.1    Conditions Precedent to Implementation of Plan**

The implementation of this Plan shall be conditional upon the fulfillment or waiver of the following conditions on or before the Plan Implementation Date:

(a)     ***Approval by Noteholders***

The Plan shall have been approved pursuant to the CCAA by the Noteholders' Class;

(b)     ***Granting of Sanction Order***

The Sanction Order shall have been granted by the CCAA Court in a form acceptable to the Plan Participants;

(c)     ***Expiry of Appeal Periods***

The appeal periods and any periods for leave to appeal with respect to the Sanction Order shall have expired without an appeal or application for leave to appeal of such Order having been commenced or, in the event of an appeal or application for leave to appeal, a final determination denying leave to appeal or dismissing such appeal and affirming the sanctioning of this Plan and recognizing

- 38 -

the sanctioning of this Plan, as the case may be, shall have been made by the applicable appellate court, with no further right of appeal;

(d)    ***Approved Agreements***

Each of the Approved Agreements and all related agreements and other documents shall have become effective in a form acceptable to the Plan Participants, and all conditions to closing shall have been satisfied or waived in accordance with their respective terms, subject only to the occurrence of the Plan Implementation Date;

(e)    ***Repayment of PSF Notes***

Payment shall have been made to the holders of the PSF Notes by the respective issuing Conduits, in the amount of the principal and accrued interest outstanding on their PSF Notes;

(f)    ***Disengagement of GD Swaps***

The GD Swap Restructuring Agreements shall have become effective and the restructuring of the GD Swaps contemplated thereby shall have been implemented in accordance with their terms;

(g)    ***Issuance of Plan Notes***

The authorization and issuance of Plan Notes contemplated under this Plan, including all necessary corporate filings and related matters, subject only to the occurrence of the Plan Implementation Date;

(h)    ***Tax Ruling***

An advance income tax ruling satisfactory to the Investors Committee shall have been obtained from the Canada Revenue Agency;

(i)    ***Completion of Necessary Documentation***

The execution and delivery by all relevant Persons of all agreements, settlements, resolutions, indentures, releases, documents and other instruments that are necessary to be executed and delivered to implement and give effect to all material terms and provisions of this Plan.

Any waiver in whole or in part, of conditions in this Section 8.1 must be in accordance with Section 8.2.

**8.2    Waiver**

Any waiver of conditions in Section 8.1 shall be in writing. The Investors Committee, with the prior written consent of the Monitor and the Plan Participants, shall have the right to

- 39 -

waive one or more of the above conditions precedent in whole or in part, except the conditions set out in Section 8.1(a) or 8.1(b).

**8.3    Monitor's Certificate**

Upon the satisfaction or waiver of the conditions set out in Section 8.1 hereof, the Monitor shall file with the CCAA Court in the CCAA Proceedings a certificate that states that all conditions precedent set out in Section 8.1 of this Plan have been satisfied or waived and that the Plan Implementation Date has occurred.

**8.4    Termination of Plan for Failure to Become Effective**

If the Plan Implementation Date shall not have occurred on or before 60 days following the date of the Sanction Order, or such later date as the Investors Committee, the Monitor and the Plan Participants may agree in writing, then, subject to further Order of the CCAA Court, this Plan shall automatically terminate and be of no further force or effect; provided that this Plan shall not automatically terminate pursuant to this section if the sole basis for the non-occurrence of the Plan Implementation Date is the pendency of any appeal or application for leave to appeal with respect to the Sanction Order.

**ARTICLE 9**
**EFFECT OF PLAN**

**9.1    Effect of Plan Generally**

The Plan (including, without limitation, the releases and injunctions contained in the Plan), upon being sanctioned and approved by the CCAA Court pursuant to the Sanction Order, shall be binding on the Plan Implementation Date on the Noteholders and all other Persons (and each of their respective heirs, executors, administrators, guardians, legal personal representatives, successors and assigns) irrespective of the jurisdiction in which such Noteholders and other Persons reside, or in which the claims arose.

**9.2    Consents, Waivers and Agreements**

On the Plan Implementation Date, each Noteholder shall be deemed to have consented and agreed to all of the provisions of this Plan and the Approved Agreements in their entirety. In particular, each Noteholder shall be deemed:

(a)    to have executed and delivered to the Monitor and to the Plan Participants all consents, releases or agreements required to implement and carry out this Plan in its entirety; and

(b)    to have agreed that, if there is any conflict between the provisions, express or implied, of any agreement or other arrangement, written or oral, existing between such Noteholder and the Plan Participants at the Plan Implementation Date (other than those entered into by the Plan Participants in writing on or after the date hereof) and the provisions of this Plan, the provisions of this Plan take precedence

- 40 -

and priority and the provisions of such agreement or other arrangement shall be deemed to be amended accordingly.

**9.3      Exculpation**

The Plan Participants, the Original Issuer Trustees, the Administrative Agents, the Financial Services Agents, the Selkirk Sub-Trust Parties, the Issuing and Paying Agents, the Existing Note Indenture Trustees, DBRS, JPMorgan, National PR, Goodmans LLP, Ernst & Young Inc., in its capacity as consultant to the Investors Committee prior to its appointment as Monitor and as the Monitor and BlackRock (including in each case, their respective affiliates, directors, officers, employees, associated individuals, agents and representatives) and any of their respective professional advisors, shall have no liability or obligation to any Person for their role, or any act or omission, in connection with the standstill that has been observed since August 15, 2007 (the "Standstill"), the CCAA Proceedings, activities undertaken in preparation for or anticipation of the CCAA Proceedings, the Plan, the pursuit of sanctioning of the Plan, the consummation and implementation of the Plan or the administration of the Plan or the property to be distributed under the Plan; provided, however, that this Section 9.3 shall not limit the obligations of any Person under the Plan or specifically assumed or undertaken pursuant to the Approved Agreements.

**9.4      Crown Claims**

Any claims of the federal and provincial Crowns of a kind that could be subject to a demand under subsection 224(1.2) of the *Tax Act* or any substantially similar provision in Canada of provincial legislation or in respect of which the federal or provincial Crown has a lien on or security interest in the property of the CCAA Parties or recourse for non-payment against directors or officers of the CCAA Parties, outstanding under the provisions of said subsection 224(1.2) or substantially similar provincial legislation, or any other such claims of the federal or provincial Crown shall be paid on or before the Plan Implementation Date.

**ARTICLE 10**
**RELEASES AND INJUNCTIONS**

**10.1      Release of the Released Parties**

For good and valuable consideration, every Person (regardless of whether or not such Person is a Noteholder), including each of the Released Parties on the Person's own behalf and on behalf of the Person's respective affiliates, present and former officers, directors, employees, associated individuals, auditors, financial advisors, legal counsel, other professionals, sureties, insurers, indemnitees, agents, dependents, heirs, representatives and assigns, as applicable, hereby fully, finally, irrevocably and unconditionally releases and forever discharges each of the Released Parties of and from any and all past, present and future claims, rights, interests, actions, rights of indemnity, liabilities, demands, duties, injuries, damages, expenses, fees (including attorneys' fees and liens), costs, compensation, or causes of action of whatsoever kind or nature whether foreseen or unforeseen, known or unknown, asserted or unasserted, contingent or actual, liquidated or unliquidated, whether in tort or contract, whether statutory, at common law or in equity, based on, in connection with, arising out of, or in any way related to, in whole or in part, directly or indirectly: any act, inaction or omission existing or taking place on or prior to the Plan

- 41 -

Implementation Date relating to or otherwise in connection with the Third-Party ABCP market in Canada, the ABCP Conduits, the Affected ABCP, the business and affairs of any of the Released Parties relating to or otherwise in connection with the Affected ABCP, Affected ABCP Credit Default Swaps, the LSS Assets, Hybrid Assets and Traditional Assets, including without limitation any of such assets that are Ineligible Assets, the CCAA Proceedings, the activities undertaken or not undertaken as a result of the Standstill, in anticipation of or preparation for the restructuring of the Affected ABCP and/or the CCAA Proceedings, the Information Statement, the Meeting or the Plan (collectively, the "ABCP Market Claims"); and each Person shall not make or continue any claims or proceedings whatsoever based on, in connection with, arising out of, or in any way related to, in whole or in part, directly or indirectly, the substance of the facts giving rise to any matter herein released (including, without limitation, any action, cross-claim, counter-claim, third party action or application) against any Person who claims or might reasonably be expected to claim in any manner or forum against one or more of the Released Parties, including, without limitation, by way of contribution or indemnity, in common law, or in equity, breach of trust or breach of fiduciary duty or under the provisions of any statute or regulation, and that in the event that any of the Released Parties are added to such claim or proceeding, it will immediately discontinue any such claim or proceeding. Notwithstanding the foregoing, nothing herein shall release or discharge a Released Party from its obligations, if any, under the Plan or any Approved Agreements. This Section 10.1 does not apply to Unaffected Claims.

**10.2    Injunction**

All Persons (regardless of whether or not such Persons are Noteholders), along with their respective affiliates, present and former officers, directors, employees, associated individuals, auditors, financial advisors, legal counsel, other professionals, sureties, insurers, indemnitees, agents, dependents, heirs, representatives and assigns, as applicable, are permanently and forever barred, estopped, stayed and enjoined, on and after the Effective Time, with respect to ABCP Market Claims, from (i) commencing, conducting or continuing in any manner, directly or indirectly, any action, suits, demands or other proceedings of any nature or kind whatsoever (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against the Released Parties; (ii) enforcing, levying, attaching, collecting or otherwise recovering or enforcing by any manner or means, directly or indirectly, any judgment, award, decree or order against the Released Parties or their property; (iii) commencing, conducting or continuing in any manner, directly or indirectly, any action, suits or demands, including without limitation, by way of contribution or indemnity or other relief, in common law, or in equity, breach of trust or breach of fiduciary duty or under the provisions of any statute or regulation, or other proceedings of any nature or kind whatsoever (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against any Person who makes such a claim or might reasonably be expected to make such a claim, in any manner or forum, against one or more of the Released Parties; (iv) creating, perfecting, asserting or otherwise enforcing, directly or indirectly, any lien or encumbrance of any kind; or (v) taking any actions to interfere with the implementation or consummation of this Plan. This Section 10.2 does not apply to Unaffected Claims or to the enforcement of any obligations under the Plan or any Approved Agreements.

- 42 -

**10.3**

Notwithstanding sections 10.1 and 10.2, nothing in this Plan shall: (i) release, enjoin or compromise claims against directors of the Respondents that are described in Section 5.1(2) of the CCAA; or (ii) stay, release, discharge, bar, enjoin or otherwise interfere with any powers or remedies of, or proceedings or investigations by, any regulatory or self-regulatory body having jurisdiction (pursuant to any applicable statute, regulation, rule or, in the case of the Investment Industry Regulatory Organization of Canada, contract) over any Released Party concerning such Released Party's involvement in the creation, issue, sale or rating of any Affected ABCP, provided that sections 10.1 and 10.2 would be effective to release and enjoin the making of any order or award to compensate or make restitution to an aggrieved person or company or to pay general or punitive damages to any other person or company.

**10.4**

Without derogating from Section 9.3, Sections 10.1 and 10.2 do not apply to an Excepted Claim (and only an Excepted Claim as strictly defined herein) by a Potential Plaintiff (as hereinafter defined) against a Potential Defendant (as hereinafter defined) for Damages (as hereinafter defined), provided that:

(a)     for the purposes of this Section 10.4, a "Potential Plaintiff" shall mean a Noteholder other than:

(i)     ABCP Dealers, including any ABCP Dealer that is an institution represented by a member of the Investors Committee, the Asset Providers, and the Canadian Banks, together with, in all cases, all subsidiaries thereof and affiliates thereof, both upstream and downstream;

(ii)     the following Noteholders that are institutions represented by members of the Investors Committee: Alberta Treasury Branches operating as ATB Financial, Caisse de Dépôt et Placement du Québec, Canada Mortgage and Housing Corporation, Canada Post Corporation, Credit Union Central of Alberta Limited, Credit Union Central of British Columbia, Credit Union Central of Canada, Credit Union Central of Ontario, Credit Union Central of Saskatchewan, Desjardins Group, Magna International Inc., NAV Canada, Northwater Capital Management Inc., Public Sector Pension Investment Board, and The Governors of the University of Alberta in respect of all Affected ABCP under the direct or indirect (including through affiliates) ownership, administration, management or control of the foregoing Noteholders, including but not limited to the Affected ABCP such Noteholders indicated to the Monitor for the purposes of voting on the Plan (collectively, the "Noteholders' Affected ABCP"), and all other Persons, including all subsidiaries and affiliates of the foregoing Noteholders both upstream and downstream, in respect of the Noteholders' Affected ABCP; and

(iii)     any clients or former clients of Canaccord Capital Corporation and Credential Securities Inc. that receive the payments contemplated by the

- 43 -

publicly-announced "Canaccord Relief Program" or the "Credential Relief Program" (together, the "Programs"), provided that any client or former client of Canaccord Capital Corporation or Credential Securities Inc. that elected to participate in the Programs who does not receive payment of the purchase price to be paid by Canaccord Capital Corporation or Credential Securities Inc. before the end of the 20th business day after the completion of the distribution of Plan Notes shall be eligible and permitted to be a "Potential Plaintiff" for the purposes of this Section 10.4 and the nine week time period referenced in Section 10.4(f)(ii) shall commence as of that date;

(b)     for the purposes of this Section 10.4 and an Excepted Claim, "Potential Defendant" shall mean the ABCP Dealer that sold the specific Affected ABCP which is the subject of the Excepted Claim;

(c)     for the purposes of this Section 10.4, "Excepted Claim" shall mean a claim that contains all of the allegations required by Section 10.4(d) hereof and is based on allegations that the Potential Plaintiff suffered damages (or, if civil law applies to an Excepted Claim, prejudice) as a direct result of purchasing specific Affected ABCP in reliance on express fraudulent misrepresentations relevant to such specific Affected ABCP made directly by an authorized representative of the Potential Defendant to the Potential Plaintiff at the time such specific Affected ABCP held by the Potential Plaintiff was purchased from the Potential Defendant, that the representative made with the intention of inducing the Potential Plaintiff to purchase such specific Affected ABCP and that the representative knew to be false, and to be successful in such claim, each element of the Excepted Claim as set forth in this Section 10.4(c) and the particulars required by Section 10.4(d) must be proven; provided that, for greater certainty, nothing in this Section 10.4(c) is intended to create a new cause of action;

(d)     for the purposes of this Section 10.4, the initial pleadings of an Excepted Claim shall set out particulars of the following elements:

(i)     the allegation that an authorized representative of a Potential Defendant made one or more express fraudulent misrepresentations directly to the Potential Plaintiff at the time of the sale of such specific Affected ABCP purchased by the Potential Plaintiff from the Potential Defendant with the intention to induce the Potential Plaintiff to purchase such specific Affected ABCP;

(ii)     the allegation that the representations of the Potential Defendant's authorized representative was knowingly false to the knowledge of the representative where the Potential Plaintiff identifies:

1.     the name of the authorized representative of the Potential Defendant, including position if known;

2.     the person or persons to whom the representation was made, including position with the Potential Plaintiff;

- 44 -

      3.      the date or dates of the purchase of such specific Affected ABCP;

      4.      the text of the representation said to be materially untrue and whether oral or in writing;

      5.      the action taken by the Potential Plaintiff in reliance on the representation;

(iii)  the allegation that the Potential Plaintiff placed reliance on the representation and the basis on which it is alleged that the reliance was reasonable; and

(iv)  the detriment alleged to be suffered by the Potential Plaintiff;

(e)    the Potential Defendant may move before the CCAA Court for a determination that the claim of the Potential Plaintiff, as pled, does not constitute an Excepted Claim, and the determination of the CCAA Court shall be binding on the parties;

(f)    the Sanction Order shall provide that, notwithstanding any motion or application for leave to appeal or appeal from the Sanction Order, the Monitor shall notify all Potential Plaintiffs of their rights under this Section 10.4 within five Business Days following the date of the Sanction Order and a Potential Plaintiff shall only have the right to pursue an Excepted Claim if:

(i)      the Potential Plaintiff expressly waives the application of Sections 10.1 and 10.2 as it applies to any defences or counterclaims against the Potential Plaintiff that the Potential Defendant may wish to assert;

(ii)     subject to Section 10.4(a)(iii), the Potential Plaintiff serves and files an initial pleading in a proceeding to pursue the Excepted Claim containing the particulars required by Section 10.4(d) within nine weeks of the date of delivery of notice by the Monitor;

(iii)    the Potential Plaintiff affords to the Potential Defendant the opportunity, which the Potential Defendant may exercise within 10 days of service of the Potential Plaintiff's initial pleading, to offer to purchase the Potential Plaintiff's Plan Notes issued on account of the specific Affected ABCP that is the subject of the Excepted Claim free and clear of any encumbrances (the "Subject Plan Notes"), and if the Subject Plan Notes are purchased by the Potential Defendant, then the Potential Plaintiff shall post cash or a letter of credit acceptable to the Potential Defendant as security in an amount equal to the estimated legal costs on a full indemnity basis (as may be determined by the Court in which the proceeding is commenced) of the Potential Defendant with respect to the Excepted Claim;

(iv)    if the Subject Plan Notes are not sold pursuant to (iii) above, the Potential Plaintiff shall post upon receipt its unencumbered Subject Plan Notes as security for costs relating to the proceeding provided that the Potential

- 45 -

Plaintiff shall not be required to post any Subject Plan Notes (and if Subject Plan Notes have been posted, the Potential Plaintiff shall be entitled to release and possession of such notes) upon posting cash or a letter of credit acceptable to the Potential Defendant as security in an amount equal to the estimated legal costs on a full indemnity basis (as may be determined by the Court in which the proceeding is commenced) of the Potential Defendant with respect to the Excepted Claim; and

(v) a Potential Plaintiff which has continued to hold or has received, as the case may be, the unencumbered Subject Plan Notes, after posting cash or a letter of credit as security for costs in accordance with Section 10.4(f)(iv), shall be entitled to encumber or dispose of any or all of such Subject Plan Notes;

(g) except as provided in this Section 10.4, Sections 10.1 and 10.2 shall remain in full force and effect, and for greater certainty,

(i) a Potential Plaintiff may not commence any claim other than an Excepted Claim;

(ii) a Potential Plaintiff may pursue an Excepted Claim only as provided by, and in accordance with the time limits set out in, this Section 10.4, and any Excepted Claim that is not pursued as provided by, and in accordance with the time limits set out in, this Section 10.4 is subject to Sections 10.1 and 10.2 and therefore is forever released and barred;

(iii) no claim other than an Excepted Claim shall be advanced by any Potential Plaintiff, even if such claim arises from the same set of facts that allegedly give rise to the Excepted Claim, and the Excepted Claim may not be expanded by the Potential Plaintiff through the discovery process provided that adding further factual particulars in respect of the Excepted Claim through the discovery process shall not be an expansion of the Excepted Claim; and

(iv) a Potential Defendant may not under any circumstances seek contribution, indemnity or other relief over in respect of an Excepted Claim from another Released Party (other than the Potential Plaintiff, as contemplated by Section 10.4(f)(i)) where a Potential Plaintiff pursues an Excepted Claim against that Potential Defendant in accordance with this Section 10.4;

(h) a Potential Plaintiff who proves each element of an Excepted Claim and proves the particulars thereof set forth in Section 10.4(d) shall be entitled to no more than damages ("Damages") equal to the difference between (i) the principal amount of the specific Affected ABCP, together with interest thereon, and (ii) the value of the consideration, including the Subject Plan Notes and any amounts distributed to the Potential Plaintiff on the Subject Plan Notes, previously distributed on account of such specific Affected ABCP through the implementation of the Plan.

- 46 -

The value of the consideration in (ii) with respect to Subject Plan Notes that have been disposed of by the Potential Plaintiff shall be the greatest of (x) the proceeds of disposition of such Subject Plan Notes together with any amounts previously distributed thereon, (y) the value of such Subject Plan Notes at the date of judgment on the Excepted Claim, together with any amounts previously distributed thereon, and (z) to the extent that the Potential Defendant purchases Plan Notes in a bona fide arm's length purchase at fair market value of the same class as the Subject Plan Notes within a reasonable period of time prior to the date Damages are assessed in respect of the Excepted Claim ("Purchased Plan Notes"), the purchase price paid by the Potential Defendant for the Purchased Plan Notes together with any amounts previously distributed on such Subject Plan Notes plus, to the extent that the Purchased Plan Notes are less in principal amount than the Subject Plan Notes, the value of the balance of Subject Plan Notes that the Potential Plaintiff disposed of computed as the greater of (x) and (y) in respect of such balance.  Where the Potential Plaintiff is entitled to receive Damages, both the Potential Plaintiff and the Potential Defendant shall have the option of requiring the unsuccessful Potential Defendant to purchase, or requiring the Potential Plaintiff to sell to the Potential Defendant, as the case may be, the balance of the Potential Plaintiff's Subject Plan Notes as the Potential Plaintiff shall then hold and which were issued on account of the specific Affected ABCP for which Damages are payable, free and clear of any encumbrances, for the amount set out in (i) in respect of the specific Affected ABCP on account of which such Subject Plan Notes were issued, less any amounts previously distributed to the Potential Plaintiff as contemplated by (ii) in respect of the specific Affected ABCP on account of which such Subject Plan Notes were issued and on those Subject Plan Notes; and

(i)     the successful litigant will be entitled to legal costs on a full indemnity basis with respect to Excepted Claim(s).

## ARTICLE 11
## GENERAL PROVISIONS

**11.1    Plan Amendment**

The Investors Committee reserves the exclusive right to amend this Plan, in a written document filed with the CCAA Court, at any time prior to the Plan Implementation Date, with the prior written consent of the Asset Providers and MFF Lenders, provided that:

(a)     prior to or during the Meetings, any such amendment must be communicated to the Noteholders in such manner as may be agreed by the Monitor, or as may be ordered by the CCAA Court;

(b)     after the Meeting, an amendment may be made if it concerns a matter which, in the opinion of and the Monitor, acting reasonably, or as declared by the CCAA Court, is of an administrative nature required to better give effect to the implementation of this Plan and/or to the Sanction Order and is not materially prejudicial to the interests of the Noteholders or the Plan Participants;

- 47 -

(c)    after the Meeting, any other amendment may only be made if approved by the CCAA Court;

(d)    any amendment that materially alters the effect of Section 10.1 or Section 10.2 of this Plan or the terms of any of the Approved Agreements must be approved by any Plan Participants affected by the proposed amendment, modification or supplement; and

(e)    any supplementary plan or plans of compromise or arrangement filed by the Investors Committee with the CCAA Court and, if required by this Section 11.1, approved by the CCAA Court, shall, for all purposes be a part of and incorporated in this Plan.

**11.2    Exclusion from Plan**

With the consent of firstly the Plan Participants and thereafter, the Monitor at any time prior to the Plan Implementation Date, the Investors Committee may exclude any of the CCAA Parties under this Plan and proceed with this Plan, which will thereafter be applicable to any remaining CCAA Parties only. Without delay after obtaining the consent of the Plan Participants and the Monitor, the Investors Committee will: (i) file a notice regarding the exclusion of the CCAA Party with the Court; (ii) request that the Monitor post the notice on the Website; and (iii) send a copy of the notice by regular pre-paid mail to all known Noteholders holding ABCP of the excluded CCAA Party. If a CCAA Party is so excluded, this Plan will be read and interpreted in all respects as if such CCAA Party and all Claims against such CCAA Party are unaffected by this Plan.

**11.3    Severability**

In the event that any provision in this Plan is held by the CCAA Court to be invalid, void or unenforceable, this Plan shall be null and void in all respects, with effect in accordance with Section 11.4 hereof.

**11.4    Termination**

At any time prior to the Plan Implementation Date, the Investors Committee may, subject to further order of the CCAA Court, determine not to proceed with this Plan notwithstanding any prior approvals given at the Meeting or the obtaining of the Sanction Order. If the conditions precedent to implementation of this Plan are not satisfied or waived, if the Investors Committee determines not to proceed with this Plan, if the CCAA Court holds any provision of this Plan to be invalid, void or unenforceable or if the Sanction Order is not issued by the CCAA Court: (a) this Plan shall be null and void in all respects; (b) any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (c) nothing contained in this Plan, and no act taken in preparation of the consummation of this Plan, shall: (i) constitute or be deemed to constitute a waiver or release of any Noteholder Claims or any defences thereto by or against any of the CCAA Parties or any other Person; (ii) prejudice in any manner the rights of any of the Noteholders, the CCAA Parties or any other Person in any further proceedings involving one or more of the CCAA Parties; or (iii) constitute an admission of any sort by any of the Noteholders, the CCAA Parties or any other Person.

- 48 -

**11.5    Covenant of the Plan Participants**

Each Plan Participant hereby covenants and agrees, and is deemed to covenant and agree to execute and deliver, on or after the Effective Time, all such agreements, instruments and documents and to take all such further actions as any of the other Plan Participants may reasonably deem necessary from time to time (at the requesting Plan Participant's expense) to carry out the intent and purposes of this Plan and the Approved Agreements and to consummate the transactions contemplated hereby.

**11.6    Paramountcy**

From and after the Plan Implementation Date, any conflict between: (a) this Plan; and (b) any information statement or summary in respect of this Plan, or the covenants, warranties, representations, terms, conditions, provisions or obligations, express or implied, of any contract, mortgage, security agreement, indenture, loan agreement, commitment letter, document or agreement, written or oral, and any and all amendments and supplements thereto existing between any of the CCAA Parties and any Noteholder or other Person as at the Plan Implementation Date will be deemed to be governed by the terms, conditions and provisions of this Plan and the Sanction Order, which shall take precedence and priority.

**11.7    Responsibilities of the Monitor**

The Monitor is acting in its capacity as Monitor in the CCAA Proceedings, and the Monitor will not be responsible or liable for any obligations of the CCAA Parties hereunder. The Monitor will have only those powers granted to it by this Plan, by the CCAA and by any Order of the CCAA Court in the CCAA Proceedings, including the Initial CCAA Order.

**11.8    Deeming Provisions**

In this Plan, the deeming provisions are not rebuttable and are conclusive and irrevocable.

**11.9    Notices**

Any notice or communication to be delivered hereunder shall be in writing and shall reference this Plan and may, subject as hereinafter provided, be made or given by personal delivery or by fax addressed to the respective parties as follows:

(i)    if to the Investors Committee:

Purdy Crawford, C.C., Q.C.

Attention:    Chair
Fax:          (416) 862-6666

- 49 -

with a copy to:

Goodmans LLP
250 Yonge Street, Suite 2400
Toronto, ON M5B 2M6

| | |
|---|---|
| Attention: | Stephen H. Halperin, Esq. |
| Fax: | (416) 979-1234 |

(ii)    if to a Noteholder:

to the known address (including fax number or email address) for such Noteholder or, if a Noteholder has filed a Voter Identification Form in accordance with the Meeting Order, the address for such Noteholder specified therein;

(iii)    if to the Monitor:

Ernst & Young Inc.
222 Bay Street
Toronto-Dominion Centre
Toronto, ON M5J 1J7

| | |
|---|---|
| Attention: | Mike P. Dean |
| Fax: | 416.943.3300 |

with a copy to:

Borden Ladner Gervais LLP
Scotia Plaza
40 King Street W.
Toronto, ON M5H 3Y4

| | |
|---|---|
| Attention: | Craig J. Hill / Marc Duchesne |
| Fax: | 416.361.7301 |

or to such other address as any party may from time to time notify the others in accordance with this Section 11.9. All such notices and communications that are delivered shall be deemed to have been received on the date of delivery. Any such notices and communications that are faxed shall be deemed to be received on the date faxed if sent before 5:00 p.m. Eastern Time on a Business Day and otherwise shall be deemed to be received on the Business Day next following the day upon which such fax was sent. Any notice or other communication sent by mail shall be deemed to have been received on the fifth Business Day after the date of mailing. The unintentional failure to give a notice contemplated hereunder shall not invalidate any action taken by any Person pursuant to this Plan.

- 50 -

**11.10    Successors and Assigns**

The rights, benefits and obligations of any Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, trustee, administrator, successor or assign of such Person.

**11.11    Further Assurances**

Notwithstanding that the transactions and events set out in this Plan shall be deemed to occur without any additional act or formality other than as set out herein, each of the Persons affected hereby shall make, do and execute or cause to be made, done or executed all such further acts, deeds, agreements, transfers, assurances, instruments, documents or discharges as may be reasonably required by the Investors Committee, the Monitor or the Administrator in order to implement and give effect to this Plan.

**11.12    Governing Law**

This Plan shall be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein, without regard to any conflict of law provision that would require the application of the law of any other jurisdiction. In the event of any dispute or issue in connection with, or related to, the interpretation, application or effect of this Plan, such dispute or issue shall be subject to the exclusive jurisdiction of the CCAA Court.

Dated at Toronto, Ontario, as of this 12th day of January, 2009.

**Schedule "A"**

**List by Series of Affected ABCP**

| | |
|---|---|
| Apollo Trust | Series A |
| | Series E |
| | Series H |
| Apsley Trust | Series A |
| Aria Trust | Series A |
| | Series E |
| Aurora Trust | Series A |
| | Series B |
| | Series C |
| | Series E |
| | Series F |
| Comet Trust | Series A |
| | Series E |
| | Series F |
| Encore Trust | Series A |
| | Series E |
| Gemini Trust | Series A |
| | Series E |
| | Series F |
| Ironstone Trust | Series A |
| | Series B |
| MMAI-I Trust | Series A |

- 2 -

| | |
|---|---|
| Newshore Canadian Trust | Series A |
| | Series 01-1 |
| Opus Trust | Series A |
| | Series E |
| Planet Trust | Series A |
| | Series E |
| | Series F |
| | Series L8 |
| Rocket Trust | Series A |
| | Series B |
| | Series D |
| | Series E |
| | Series F |
| Selkirk Funding Trust | Series A |
| Silverstone Trust | Series A |
| Slate Trust | Series A-1 |
| | Series E-1 |
| Structured Asset Trust | Series A-1 |
| | Series E-1 |
| | Series L-1 |
| Structured Investment Trust III | Series A |
| | Series E |
| Symphony Trust | Series A |
| | Series E |
| Whitehall Trust | Series A |