**POSTING VERSION: SUBJECT TO MINOR REVISIONS / SCHEDULES SUBJECT TO UPDATING
MAV2 OMNIBUS**

# OMNIBUS AGREEMENT

**JANUARY [●], 2009**

**The parties listed as Unlevered CDS Counterparties in Schedule C
as Unlevered CDS Counterparties**

**The parties listed as LSS CDS Counterparties in Schedule C
as LSS CDS Counterparties**

**The parties listed as Lenders in Schedule C
as Lenders**

**BNY TRUST COMPANY OF CANADA
as Collateral Agent, Administrative Agent and Indenture Trustee**

**BLACKROCK (INSTITUTIONAL) CANADA LTD.
as Administrator, as Valuation Agent and as Spread/Loss Trigger Calculation Agent**

**and**

**CIBC MELLON GLOBAL SECURITIES SERVICES COMPANY
in its capacity as Issuer Trustee of
MASTER ASSET VEHICLE II
as the MAV**

# TABLE OF CONTENTS

| Clause | | | Page |
|---|---|---|---|
| 1. | | Interpretation | 2 |
| | 1.1 | General Interpretation | 2 |
| 2. | | Index Spread Reporting; Collateral Calls | 4 |
| | 2.1 | Index Spread Reporting | 4 |
| | 2.2 | Dealer Reporting | 4 |
| | 2.3 | Valuation Agent Reporting | 5 |
| | 2.4 | Reporting on Early Warning Exposure Reporting Dates | 6 |
| | 2.5 | Reporting on Exposure Reporting Dates | 7 |
| | 2.6 | Draw Notices in respect of Funding Shortfalls | 8 |
| | 2.7 | MFF Return Amounts | 9 |
| | 2.8 | Terminal Unwind Event | 11 |
| | 2.9 | Avoiding Terminal Unwind Events | 12 |
| | 2.10 | Indemnification by LSS CDS Counterparty in respect of Draw Notices | 16 |
| | 2.11 | Extension of Renewable Draw Request Period | 17 |
| | 2.12 | Timing of Advances | 18 |
| | 2.13 | Term Loan Advances | 18 |
| | 2.14 | Reconciliation of amounts under the Credit Facility | 19 |
| 3. | | Changes in Commitment Amounts | 19 |
| | 3.1 | Additional Commitments | 19 |
| | 3.2 | Providing Additional Commitments | 19 |
| | 3.3 | Reducing Additional Commitments | 20 |
| | 3.4 | Reducing Commitments and Repayment of Term Loans in Proportion to the Reserve Account | 20 |
| 4. | | Liquidation, Reinvestment and Rights to Collateral | 21 |
| | 4.1 | Dealer Default under a Swap Agreement | 21 |
| | 4.2 | Dealer Non-Funding Event | 22 |
| | 4.3 | Non-Dealer Lender Default | 25 |
| | 4.4 | Cash Settlement Amounts | 28 |
| | 4.5 | Original Collateral Default | 31 |
| | 4.6 | Early Termination of all of the Transactions under a Dealer's Swap Agreement | 32 |
| | 4.7 | Early Termination of some (but not all) of the Transactions under a Dealer's Swap Agreement | 35 |
| | 4.8 | Release of Collateral | 38 |
| | 4.9 | Liquidation of Collateral | 39 |
| | 4.10 | Overlapping Liquidations | 45 |
| | 4.11 | Post-swap Enforcement Liquidation | 46 |
| | 4.12 | Reinvestment of Matured Original Collateral | 46 |
| | 4.13 | Mechanics of Investing Matured Original Collateral | 47 |
| | 4.14 | Accounts | 49 |
| | 4.15 | Dealers' Further Assurances | 51 |
| | 4.16 | Use of Posted Lender's Credit Support to Satisfy Advances | 51 |
| | 4.17 | Certain provisions relating to Merrill Lynch | 52 |
| | 4.18 | Substitution of Original Collateral by Dealers | 52 |
| | 4.19 | References to "Collateral" for purposes of Liquidation | 53 |
| 5. | | Dispute Resolution | 53 |

| | 5.1 | Dispute Resolution Procedures | 53 |
| 6. | | Application of Proceeds | 60 |
| | 6.1 | Application of Proceeds from the Liquidation of Original Collateral | 60 |
| | 6.2 | Application of Proceeds from the Liquidation of CA-Held Collateral Upon a Terminal Unwind Event | 61 |
| | 6.3 | Application of Proceeds in the Ordinary Course | 66 |
| | 6.4 | Application of Proceeds on Occurrence of a Partial Terminal Unwind Event | 73 |
| | 6.5 | Limited Recourse and Non-Petition | 76 |
| | 6.6 | Limitation of Liability | 77 |
| | 6.7 | Holdback Amounts and Allocations | 78 |
| | 6.8 | Delayed Settlements | 82 |
| | 6.9 | Breakage Costs | 82 |
| 7. | | Appointment of Agents | 82 |
| | 7.1 | The Collateral Agent | 82 |
| | 7.2 | The Spread/Loss Trigger Calculation Agent | 89 |
| | 7.3 | The Valuation Agent | 93 |
| | 7.4 | Indemnification of Agents with respect to Actions | 96 |
| | 7.5 | Certain Matters regarding the Administrator and Service Providers | 98 |
| | 7.6 | Provisions Applicable to BlackRock Canada and its Affiliates | 98 |
| | 7.7 | Grievances and Disputes | 103 |
| | 7.8 | The Index Spread Determination Agent | 103 |
| | 7.9 | Rating Agency Fees | 105 |
| 8. | | Certain Matters Concerning Secured Creditors | 105 |
| | 8.1 | Remedies Cumulative | 105 |
| | 8.2 | Specific Performance Enforcement Events | 105 |
| | 8.3 | Appointment of Provisional Agent | 106 |
| | 8.4 | Liability of the Secured Creditors *inter se* | 107 |
| | 8.5 | Secured Creditor Credit Decisions | 107 |
| | 8.6 | No Liens; Payments in Error; Payments Rescinded | 107 |
| | 8.7 | Replacement of Issuer Trustee | 108 |
| | 8.8 | Consents | 108 |
| 9. | | Representations and Warranties | 108 |
| | 9.1 | Representations and Warranties of the MAV | 108 |
| | 9.2 | Representations, Warranties and Covenants of other Parties | 112 |
| | 9.3 | The Issuer Trustee | 112 |
| 10. | | Covenants of the MAV | 113 |
| | 10.1 | Affirmative Covenants | 113 |
| | 10.2 | Negative Covenants | 116 |
| 11. | | Amendments | 118 |
| | 11.1 | General Provision | 118 |
| | 11.2 | Correction of Manifest Errors | 119 |
| | 11.3 | Amendments to Transaction Documents to comply with Applicable Law | 120 |
| | 11.4 | Other Amendments requiring the Consent of Affected Secured Creditors | 120 |
| | 11.5 | Certain Amendments to Traditional Asset Documents | 122 |
| | 11.6 | Termination or Novation of Transactions under Swap Agreements | 122 |
| | 11.7 | Consent of Lender Guarantors | 122 |
| | 11.8 | Supplemental Agreements to Prevail | 122 |
| 12. | | Miscellaneous | 122 |
| | 12.1 | Third-Party Rights | 122 |
| | 12.2 | Successors and Assigns | 123 |

12.3      Communications and Notices ........................................................................ 123
12.4      Language ........................................................................................................ 124
12.5      Counterparts, Etc. .......................................................................................... 125
12.6      Paramountcy .................................................................................................. 125
12.7      Governing Law and Jurisdiction ................................................................... 125
12.8      Severability .................................................................................................... 125

**Schedule**

A.      Master Definitions ............................................................................................ 126
B.      Notice Details ................................................................................................... 127
C.      List of Parties .................................................................................................. 139
D.      Deleveraging Notice ......................................................................................... 140
E.      Initial Available Collateral Amounts ............................................................... 141
F.      Matrix Portfolios .............................................................................................. 142
G.      Selected Matrix Portfolio for each LSS CDS .................................................. 144
H.      Ineligible Assets ............................................................................................... 146
I.      Unlevered CDSs and related Wrap Swaps ....................................................... 148
J.      LSS CDSs and related Wrap Swaps .................................................................. 149
K.      Satellite Trusts ................................................................................................. 159
L.      Form of Valuation Report ................................................................................ 164
M.      Form of Index Spread Report .......................................................................... 165
N.      Forms of Mid-Market Quotation Notices ........................................................ 167
O.      Form of Collateral Sufficiency Notice ............................................................. 168
P.      Allocated Collateral ......................................................................................... 170
Q.      Form of Sale Report ......................................................................................... 179
R.      Existing Interest Rate Hedges .......................................................................... 181
S.      Indicative Examples of Section 4.2 Mechanics ................................................ 182
T.      Procedures for Borrowing pursuant to Additional Loans ................................ 196
U.      List of Securities Accounts .............................................................................. 203
V.      Security Registrations ...................................................................................... 206
W.      Traditional Assets ............................................................................................ 246

Signatories ................................................................................................................... 253

**THIS AGREEMENT** is dated January [●], 2009.

**BETWEEN**:

(1)     The parties listed as Unlevered CDS Counterparties in Schedule C (*List of Parties*) hereto (in such capacity each, an **Unlevered CDS Counterparty**);

(2)     The parties listed as LSS CDS Counterparties in Schedule C (*List of Parties*) hereto (in such capacity each, a **LSS CDS Counterparty** and, collectively with the Unlevered CDS Counterparties (without duplication), the **Dealers**);

(3)     The parties listed as Lenders in Schedule C (*List of Parties*) hereto, as margin funding facility lenders (each, a **Lender**);

(4)     **BNY TRUST COMPANY OF CANADA**, as collateral agent for the Secured Creditors (in such capacity, the **Collateral Agent**), as administrative agent pursuant to the Margin Funding Facility Agreement (in such capacity, the **Administrative Agent**) and as Indenture Trustee (in such capacity, the **Indenture Trustee**);

(5)     **BLACKROCK (INSTITUTIONAL) CANADA LTD.**, as administrator and asset manager (in such capacities, the **Administrator**), as valuation agent (in such capacity, the **Valuation Agent**) and as spread/loss trigger calculation agent (in such capacity, the **Spread/Loss Trigger Calculation Agent**); and

(6)     **CIBC MELLON GLOBAL SECURITIES SERVICES COMPANY**, in its capacity as the Issuer Trustee of **MASTER ASSET VEHICLE II**.

**BACKGROUND**:

The parties enter into this Agreement in connection with the Plan.

**WHEREAS**:

(A)     The Dealers are each entering into certain Swap Agreements with the MAV, which will include, in respect of: (i) Unlevered CDS Counterparties, one or more Unlevered CDSs; and (ii) LSS CDS Counterparties, one or more LSS CDSs, and which, in both cases, may also include one or more related Wrap Swaps.

(B)     The Lenders have agreed to make certain margin funding facilities available to the MAV pursuant to the provisions of the Margin Funding Facility Agreement.

(C)     The MAV is assuming obligations in respect of asset-backed commercial paper in consideration for its acquisition of certain items of Collateral, the rights in respect of which asset-backed commercial paper will be exchanged by the holders thereof for the Notes issued by the MAV pursuant to the Note Indenture.

(D)     The Service Providers have agreed to provide certain services required by the MAV pursuant to the provisions of the Transaction Documents.

(E)     The MAV shall execute and deliver the Master Security Agreement as security for the payment and performance of the MAV's obligations to: (i) each Dealer under the Swap Agreement to which the relevant Dealer is a party; (ii) each Lender under the Margin Funding Facility Agreement; (iii) the Indenture Trustee as trustee for the Noteholders under the Note Indenture; and (iv) the Service Providers under the relevant Transaction Documents.

(F)     The relative priorities and entitlements to the Collateral of the Secured Creditors are as set out in this Agreement.

In consideration of the foregoing and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, it is hereby agreed as follows:

## 1.     INTERPRETATION

### 1.1     General Interpretation

(a)     Any terms used herein but not otherwise defined in this Agreement shall have the meanings ascribed thereto in Schedule A (*Master Definitions*) hereto.

(b)     In this Agreement, unless the contrary intention appears, a reference to:

(i)     an amendment includes a supplement, novation, restatement or re-enactment and amended will be construed accordingly;

(ii)     Section, Subsection, Clause, Subclause, or Paragraph is a reference to a Section, Subsection, Clause, Subclause or Paragraph of this Agreement;

(iii)     **Schedule**, unless specified otherwise, shall mean a Schedule hereto, each of which is incorporated herein in its entirety and forms an integral part of this Agreement;

(iv)     a law is a reference to that law as amended or re-enacted from time to time and to any successor law;

(v)     law includes any law, statute, regulation, regulatory requirement, rule, ordinance, ruling, decision, treaty, directive, order, guideline, regulation, policy, writ, judgment, injunction or request of any court or other governmental, inter-governmental or supranational body, officer or official, fiscal or monetary authority, or other ministry or public entity (and their interpretation, administration and application), whether or not having the force of law;

(vi)     any time of day, unless specified otherwise, means that time in Toronto, Canada;

(vii)     any payment hereunder that is stated to be due on a day which is not a Business Day, shall be construed as a payment due to be made on the next succeeding Business Day, and such extension of time shall be included in the computation of interest or fees, as the case may be;

(viii)     accounting terms not specifically defined in this Agreement shall be construed in accordance with GAAP;

(ix)     dollars, unless otherwise specifically indicated, is to Canadian Dollars;

(x)      an agreement, instrument or other document includes such agreement, instrument or other document as the same may have been or may from time to time be amended, modified, extended, renewed, restated, replaced or supplemented (in the case of any such agreement, instrument or other document that is a Transaction Document, to the extent that such amendment, modification, extension, renewal, restatement or supplement is implemented in compliance with the provisions of this Agreement); and includes all schedules and exhibits attached to it; and

(xi)      a Person includes the successors and permitted assigns of such Person and a reference to a Person in a particular capacity includes the successors and permitted assigns of such Person in such capacity.

(c)      In this Agreement:

(i)      the words **includes** and **including** are not limiting;

(ii)      the word **or** is not exclusive;

(iii)      the headings are for convenience only, do not constitute part of this Agreement and are not to be used in construing it;

(iv)      any reference to gender includes all genders and words importing only the singular number include the plural and vice versa;

(v)      each of the phrases the aggregate of, the total of, the sum of, or a phrase of similar meaning means the aggregate (or total or sum), without duplication, of; and

(vi)      in the computation of periods of time from a specified date to a later specified date, unless otherwise expressly stated, the word **from** means **from and including** and the words **to** and **until** each mean **to but excluding**.

(d)      The provision of a table of contents, the division of this Agreement into Sections and the insertion of headings are for convenience of reference only and shall not affect the interpretation of this Agreement.

(e)      Master Asset Vehicle II shall act at all times through the Issuer Trustee, the Administrator (or a Delegee of the Administrator) or any other agent (or permitted delegee of such agent), attorney or representative that may be or has been appointed and any reference in this Agreement to an action by Master Asset Vehicle II shall mean an action by any such Person.  Any execution of any documents by Master Asset Vehicle II provided for or contemplated hereunder or under any other Transaction Document shall be effected by the execution of such documents by a Responsible Officer of the Issuer Trustee or of the Administrator.  Each party hereto shall be entitled to assume that any Responsible Officer of the Issuer Trustee or the Administrator executing documents on behalf of Master Asset Vehicle II is authorised to do so unless such party has actual knowledge to the contrary.

## 2.    INDEX SPREAD REPORTING; COLLATERAL CALLS

### 2.1    Index Spread Reporting

On each Business Day up to and including the day of the occurrence of a Second Spread/Loss Trigger Event:

(a)    at or before 10:00 am on such Business Day, the Spread/Loss Trigger Calculation Agent will deliver notice (which may be by Website Posting) to the Deal Parties of the following, each as of such Business Day: (i) the Index Spread in respect of each Matrix Portfolio; (ii) the Trigger Spread in respect of each Matrix Portfolio; and (iii) in percentage terms, the relation of each such Index Spread to the relevant Trigger Spread;

(b)    if the Spread/Loss Trigger Calculation Agent does not deliver the information specified pursuant to Section 2.1(a) by 10:00 am on any Business Day, any LSS CDS Counterparty may, using a report substantially in the form of Schedule M (*Form of Index Spread Report*), deliver (which may be by Website Posting) an Index Spread Report by 11:00 am on such day to the Deal Parties and each such notice shall have the same effect as if it had been delivered by the Spread/Loss Trigger Calculation Agent.  If more than one LSS CDS Counterparty delivers an Index Spread Report, the relevant Index Spread for such date in respect of each Matrix Portfolio shall be deemed to be the highest Index Spread in respect of such Matrix Portfolio in any Index Spread Report delivered by a LSS CDS Counterparty pursuant to this provision, upon which the Administrator and the Spread/Loss Trigger Calculation Agent may conclusively rely, provided that if the Spread/Loss Trigger Calculation Agent delivers the information specified pursuant to Section 2.1(a) by 11:00 am, such information shall govern.

### 2.2    Dealer Reporting

(a)    Each Dealer will notify the Administrator and the Valuation Agent as soon as reasonably practicable after the occurrence of (and in no event later than three Business Days after) any change in the nature or amount of its Other Posted Support due to the payment by the MAV of any Termination Payment, Unpaid Amount or Cash Settlement Amount, in each case from such Other Posted Support, and each of the Administrator and the Valuation Agent shall be entitled conclusively to rely on any such notice from a Dealer as being determinative; provided that in respect of any calculation or determination to be made by it on a given Business Day with respect to Other Posted Support of a Dealer (or any calculation or determination that involves such Other Posted Support), each of the Administrator and the Valuation Agent shall be entitled to disregard any such notice not received by it by the close of business on the preceding Business Day and shall be entitled conclusively to rely instead on the most recent such notice provided by the relevant Dealer and to use such most recent notice for such calculations and determinations on such Business Day.

(b)    Each Dealer undertakes that pursuant to the relevant OC Control Agreement, the Administrator shall have "read-only" access to the records of the relevant OC Custodian for the purposes of monitoring the nature and amount of the Original Collateral of such Dealer.  The Administrator shall make such information available to the Valuation Agent.  For the purposes of any calculation or determination to be made by it on a given Business Day with respect to Original Collateral of a Dealer, or any calculation or determination that involves such Original Collateral (except to the extent expressly provided otherwise in Section 2.2(a) above with respect to Other Posted Support), each of the Administrator and the Valuation Agent shall be entitled

conclusively to rely on the records of the relevant OC Custodian available to the Administrator as of the close of business on the preceding Business Day, except to the extent that the Administrator receives, by the close of business on such preceding Business Day, a notice provided by such Dealer of any change in the nature or amount of its Original Collateral due to: (i) any reinvestment of such Original Collateral; or (ii) the payment of any Termination Payment, Unpaid Amount or Cash Settlement Amount which, in each case, is not reflected in the records of the relevant OC Custodian, and in such case, each of the Administrator and the Valuation Agent shall be entitled conclusively to rely on any such notice from a Dealer as being determinative with respect to any such change.

(c)     The Valuation Agent and each Dealer will, on or before the 10th Business Day of each month, reconcile their records with respect to such Dealer's Other Posted Support and, to the extent that the "read-only" access described in Section 2.2(b) is no longer available, such Dealer's other Original Collateral, and will consult with each other in good faith to resolve any discrepancies between such records.

(d)     Each LSS CDS Counterparty (other than a Breaching Dealer) has the right (but not the obligation) on any Non-Reporting Day, using a notice, substantially in the form set forth in the relevant Part of Schedule N (*Forms of Mid-Market Quotation Notices*) (or such other form as is agreed by the Valuation Agent, with at least five Business Days' notice or less, at the discretion of the Valuation Agent), to deliver (which may be by Website Posting) to the Deal Parties, notice of the Mid-Market Quotation in respect of each of its LSS CDSs, on which the Valuation Agent may conclusively rely, as of such date by 11:00 am on such date.  If an LSS CDS Counterparty does deliver such notice on a Non-Reporting Day then such notice shall be regarded as effective notification of the Mid-Market Quotations stated therein (which shall be used for the purposes of determining the relevant Transaction Required Collateral Amounts) in respect of such date: (i) for the purpose of determining whether a Deemed Second Spread/Loss Trigger Event has occurred with respect to such LSS CDS Counterparty; and (ii) for all other purposes only if each other LSS CDS Counterparty has also delivered notice to the Deal Parties of each of the Mid-Market Quotations in respect of their LSS CDSs for such Non-Reporting Date.

(e)     Notwithstanding any obligation in this Section 2 (*Index Spread Reporting; Collateral Calls*) for a LSS CDS Counterparty, in respect of any LSS CDS, to deliver notice of the Mid-Market Quotation, where a LSS CDS Counterparty determines, in its sole discretion, that the Exposure in respect of a LSS CDS is equal to the Replacement Cost thereof, such LSS CDS Counterparty shall, instead of notifying the Deal Parties of the Mid-Market Quotation, specify the relevant Replacement Cost.  Unless specified otherwise in a Mid-Market Quotation Report, the Administrator and the Valuation Agent, respectively, shall be entitled conclusively to assume that the figure(s) specified therein is the Mid-Market Quotation in respect of the LSS CDSs to which such notice relates.

## 2.3     Valuation Agent Reporting

(a)     The Valuation Agent will on the Closing Date and on or before the tenth Business Day of each month, deliver notice (which may be by Website Posting) to the Deal Parties of the Market Value of each item of CA-Held Collateral as of the last Business Day of the immediately preceding calendar month.

(b) The Valuation Agent has the right (but not the obligation) on any Non-Reporting Day, using a report substantially in the form of Schedule L (*Form of Valuation Report*), to deliver notice (which may be by Website Posting) to the Deal Parties of the Value of the Posted Collateral as of the end of the Business Day immediately prior to such date.  If the Valuation Agent does deliver a Valuation Report on a Non-Reporting Day then such notice shall be regarded as effective notification of the Value of Posted Collateral and of each item of Posted Collateral stated therein in respect of such date.

## 2.4 Reporting on Early Warning Exposure Reporting Dates

On each Early Warning Exposure Reporting Date:

(a) the Valuation Agent will by 11:00 am on such date, using a report substantially in the form of Schedule L (*Form of Valuation Report*), deliver notice (which may be by Website Posting) to the Deal Parties of the Value of the Posted Collateral as of the end of the Business Day immediately prior to such date; provided that, if the Valuation Agent does not deliver a Valuation Report by 11:00 am on such date, the Value of the Posted Collateral shall be deemed to be equal to the lowest Value of Posted Collateral specified on any of the last three Valuation Reports delivered (and each item of Posted Collateral shall have the corresponding Value specified therein) or, if at least two Valuation Reports have not previously been delivered, the respective Value of each item of Posted Collateral required to be determined on the basis of its Market Value shall be deemed to be zero;

(b) each LSS CDS Counterparty (other than a Breaching Dealer) will by 11:00 am on such date, deliver to the Deal Parties notice, on which they may conclusively rely, of the Mid-Market Quotation (which shall be used for the purposes of determining the relevant Transaction Required Collateral Amounts) in respect of each of its LSS CDSs as of such date by delivering a notice (which may be by Website Posting), substantially in the form set forth in the relevant Part of Schedule N (*Forms of Mid-Market Quotation Notices*) or such other form as is agreed by the relevant LSS CDS Counterparty and the Valuation Agent, with at least five Business Days' notice or less, at the discretion of the Valuation Agent, from time to time (such agreement of the Valuation Agent not to be unreasonably withheld or delayed) (each such notice, a **Mid-Market Quotation Report**);

(c) the Mid-Market Quotation (or Replacement Cost, if applicable) in respect of each LSS CDS of each LSS Counterparty (other than a Breaching Dealer) for such date shall be the relevant Mid-Market Quotation (or Replacement Cost, if applicable) specified by the LSS CDS Counterparty in its Mid-Market Quotation Report on such date, and the Valuation Agent shall calculate the Exposures (but only when the Mid-Market Quotation, and not the Replacement Cost, is the basis thereof), Transaction Required Collateral Amounts and the Required Collateral Amount of each LSS CDS Counterparty accordingly; provided that, if: (i) the Valuation Agent does not receive a Mid-Market Quotation Report from the relevant LSS CDS Counterparty in the applicable form by 11:00 am on such date; or (ii) such LSS CDS Counterparty has not delivered a Mid-Market Quotation Report for each of the immediately preceding two Early Warning Exposure Reporting Dates (if any), the Valuation Agent will deem the Required Collateral Amount of such LSS CDS Counterparty to be equal to the lowest of the last three Required Collateral Amounts determined by the Valuation Agent in respect of such LSS CDS Counterparty pursuant to this Section 2.4(c) (including any Required Collateral Amount determined on such date), or if such LSS CDS Counterparty has not delivered at least three Mid-Market Quotation Reports (including any Mid-

Market Quotation Report delivered on such date), its Required Collateral Amount in respect of such date shall be deemed to be zero;

(d)    the Administrator, on behalf of the MAV, will, using a notice substantially in the form of Schedule O (*Form of Collateral Sufficiency Notice*), deliver notice (which may be by Website Posting) to the Deal Parties by 4:00 pm of the Exposure and Transaction Required Collateral Amount of each LSS CDS and the Required Collateral Amount of each LSS CDS Counterparty, the aggregate Required Collateral Amounts and the Value of the Posted Collateral in respect of such date; and

(e)    if the Administrator does not notify parties pursuant to Section 2.4(d) of the aggregate Required Collateral Amounts and the Value of the Posted Collateral by 4:00 pm on such day, then any LSS CDS Counterparty may do so after 4:00 pm and before 5:00 pm on such day, upon which the Deal Parties may conclusively rely, provided, that if the Administrator does provide such notice during that period, the Administrator's notice shall govern.

**2.5    Reporting on Exposure Reporting Dates**

On each Exposure Reporting Date:

(a)    the Valuation Agent will by 11:00 am on such date, using a report substantially in the form of Schedule L (*Form of Valuation Report*), deliver notice (which may be by Website Posting) to the Deal Parties of the Value of the Posted Collateral as of the end of the Business Day immediately prior to such date; provided that, if the Valuation Agent does not deliver a Valuation Report by 11:00 am on such date, the Value of the Posted Collateral shall be deemed to be equal to the lowest Value of Posted Collateral specified on any of the last three Valuation Reports delivered (and each item of Posted Collateral shall have the corresponding Value specified therein) or, if at least two Valuation Reports have not previously been delivered, the respective Value of each item of Posted Collateral required to be determined on the basis of its Market Value shall be deemed to be zero;

(b)    each LSS CDS Counterparty (other than a Breaching Dealer) will by 11:00 am on such date, deliver to the Deal Parties a Mid-Market Quotation Report on which they may conclusively rely, in respect of each of its LSS CDSs as of such date;

(c)    the Mid-Market Quotation (or Replacement Cost, if applicable) in respect of each LSS CDS of each LSS CDS Counterparty (other than a Breaching Dealer) for such date shall be the relevant Mid-Market Quotation (or Replacement Cost, if applicable) specified by the LSS CDS Counterparty in its Mid-Market Quotation Report on such date and the Valuation Agent shall calculate the Exposures (but only when the Mid-Market Quotation, and not the Replacement Cost, is the basis thereof), Transaction Required Collateral Amounts and the Required Collateral Amount of each LSS CDS Counterparty accordingly; provided that, if: (i) the Valuation Agent does not receive a Mid-Market Quotation Report from the relevant LSS CDS Counterparty in the applicable form by 11:00 am on such date; or (ii) such LSS CDS Counterparty has not delivered a Mid-Market Quotation Report for each of the immediately preceding two Early Warning Exposure Reporting Dates or Exposure Reporting Dates (if any), the Valuation Agent will deem the Required Collateral Amount of such LSS CDS Counterparty to be equal to the lowest of the last three Required Collateral Amounts determined by the Valuation Agent in respect of such LSS CDS Counterparty pursuant to Section 2.4(c) and this Section 2.5(c) (including any Required Collateral Amount determined on such date), or if such LSS CDS Counterparty has not

delivered at least three Mid-Market Quotation Reports (including any Mid-Market Quotation Report delivered on such date), its Required Collateral Amount in respect of such date shall be deemed to be zero;

(d)    the Administrator, on behalf of the MAV, will by 4:00 pm on such date, using a notice substantially in the form of Schedule O (*Form of Collateral Sufficiency Notice*), deliver notice (which may be by Website Posting) to the Deal Parties of: (i) if a Second Spread/Loss Trigger Event has not occurred prior to such date but a First Spread/Loss Trigger Event has occurred, the Initial Available Collateral Marked Amount in respect of each First Trigger Event Dealer, the Transaction Required Collateral Amount in respect of each Affected LSS CDS and whether or not a Deemed Second Spread/Loss Trigger Event has occurred; (ii) the aggregate of the Required Collateral Amounts as of such date, each LSS CDS Counterparty's Exposure(s) and Transaction Required Collateral Amount(s) as of such date and the Value of the Posted Collateral as of the end of the Business Day immediately prior to such date; and (iii) if a Second Spread/Loss Trigger Event has occurred, whether or not a Potential Unwind Event has occurred and, if so, the applicable Collateral Call Amount which would be required to be Posted by 5:00 pm on the related Terminal Unwind Event Date (for the avoidance of doubt, separate Potential Unwind Events may occur on consecutive Exposure Reporting Dates and, accordingly, as many as three separate Potential Unwind Events (each beginning on a separate date) may exist at any one time); and

(e)    if the Administrator fails to deliver the Collateral Sufficiency Notice required pursuant to Section 2.5(d) by 4:00 pm on such date and provided that, based on the Mid-Market Quotation Reports received pursuant to Section 2.5(c) and the Required Collateral Amounts determined pursuant thereto, either: (i) a Second Spread/Loss Trigger Event has not occurred prior to such date and the Initial Available Collateral Marked Amount in respect of any First Trigger Event Dealer is less than the aggregate of the Transaction Required Collateral Amounts of all Affected LSS CDSs of such First Trigger Event Dealer; or (ii) a Second Spread/Loss Trigger Event has occurred and the aggregate of the Required Collateral Amounts exceeds the Value of the Posted Collateral reported (or deemed to be reported) on such date, then, in each case, any LSS CDS Counterparty (acting on the instruction of the Majority Secured Creditors) may deliver to the Deal Parties a Collateral Sufficiency Notice (on which the Deal Parties may conclusively rely) specifying the occurrence (or not) of: (x) a Deemed Second Spread/Loss Trigger Event and/or (y) a Potential Unwind Event and the applicable Collateral Call Amount and each Lender's Proportionate MFF Share in respect of such Collateral Call Amount, as the case may be, after 4:00 pm and before 5:00 pm on such date. If more than one such notice is received from a LSS CDS Counterparty, only the first such notice received by the Administrator shall be effective, provided that if the Administrator does provide such notice during that period, the Administrator's notice shall govern.

## 2.6    Draw Notices in respect of Funding Shortfalls

On the date of the occurrence of a Second Spread/Loss Trigger Event and on each Business Day thereafter, other than any date on which a Potential Unwind Event has occurred (in which case, the provisions of Sections 2.8 (*Terminal Unwind Event*) and 2.9 (*Avoiding Terminal Unwind Events*) shall apply):

(a)    if the sum of the Required Collateral Amounts for such date of all LSS CDS Counterparties that are not Breaching Dealers exceeds the aggregate Value of the Posted Collateral reported (or deemed to be reported) on such date (excluding any Undrawn Commitments) (the amount of

such excess, the **Funding Shortfall**) and such Funding Shortfall exceeds the Minimum Delivery Amount (or the aggregate of all Undrawn Commitments is less than the Minimum Delivery Amount) (such event, a **Draw Event**), the Administrator, on behalf of the MAV, will deliver a Draw Notice (which may be by Website Posting) to the Deal Parties by 4:00 pm on such date, requesting an Advance, in an amount equal to such Funding Shortfall, to be made by each Lender according to its respective Proportionate MFF Share of such Funding Shortfall (or which may be satisfied by any Lender entitled to do so by the delivery of an Acknowledgment in respect of the creation of a Qualifying Non-Funded Amount, or by a combination of Advance and Qualifying Non-Funded Amount, equal in the aggregate to its Proportionate MFF Share of such Funding Shortfall);

(b)    if the Administrator fails to deliver a Draw Notice to the Administrative Agent when it is required to do so under Section 2.6(a), any LSS CDS Counterparty (other than a Breaching Dealer) may deliver a Draw Notice in respect of such Funding Shortfall to the Deal Parties (on which the Deal Parties may conclusively rely) by 5:00 pm on such date, requesting an Advance to be made by each Lender according to its respective Proportionate MFF Share of such Funding Shortfall (or which may be satisfied by any Lender entitled to do so by the delivery of an Acknowledgment in respect of the creation of a Qualifying Non-Funded Amount, or by a combination of Advance and Qualifying Non-Funded Amount, equal in the aggregate to its Proportionate MFF Share of such Funding Shortfall).  If more than one LSS CDS Counterparty sends such a notice, the Draw Notice requesting the largest Advance received by the Administrative Agent between 4:00 pm and 5:00 pm on such day shall be deemed to be effective, provided that if a Draw Notice is delivered to the Administrative Agent by the Administrator, on behalf of the MAV, during that period (which may be by Website Posting), the Administrator's notice shall govern.

## 2.7    MFF Return Amounts

(a)    If, on any Business Day following the making of any Advance (or delivery of an Acknowledgement in respect of the creation of a Qualifying Non-Funded Amount or creation of a Dealer Non-Funded Amount pursuant to Subclause (a) of the definition of Dealer Non-Funding Event), any amount is re-calculated or adjusted in accordance with the provisions of Section 5 (*Dispute Resolution*) and, consequently, the quantum of any amount requested in a Draw Notice or otherwise required to be advanced pursuant to this Agreement is reduced (the amount of such reduction, a **Dispute Return Amount**), the Administrator, on behalf of the MAV, will deliver written notice (which may be by Website Posting) to the Deal Parties of the Dispute Return Amount by 5:00 pm on the date on which the Administrator receives notice of such recalculation (or by 11:00 am on the next Business Day if the Administrator receives notice of such recalculation after 2:00 pm on the relevant date of recalculation).  Pursuant to such notice, and based upon information provided by the Administrative Agent as to such Lender's allocation, the Collateral Agent shall, with respect to an amount in aggregate having a Value as of such date equal to such Dispute Return Amount, by 5:00 pm on the Business Day following the relevant date of recalculation, on a *pro rata* basis among the relevant Lenders which provided the disputed Advance, Qualifying Non-Funded Amount or Dealer Non-Funded Amount, as the case may be: (i) reduce any Qualifying Non-Funded Amount or Dealer Non-Funded Amount; (ii) return to the Administrative Agent (on behalf of all relevant Lenders other than any Dissenting Lenders or Breaching Non-Dealer Lenders) Cash or Cash Equivalents; and (iii) in respect of Dissenting Lenders, deposit Cash or Cash Equivalents in the relevant Draw Account.  For each such Lender, Advances, Qualifying Non-Funded Amounts and Dealer Non-Funded Amounts shall be returned or cancelled, as applicable, in the same proportion and form

as they were provided or delivered pursuant to the applicable Draw Notice or as otherwise required or deemed to be advanced pursuant to this Agreement.

(b)    If, on any Business Day following the making of any Advance (or delivery of an Acknowledgement in respect of the creation of a Qualifying Non-Funded Amount or the creation of a Dealer Non-Funded Amount pursuant to Subclause (a) of the definition of Dealer Non-Funding Event), except during any period from and including a Determination Date to and including the related Payment Date or Distribution Date, as the case may be, the sum of the Required Collateral Amounts of all Non-breaching Dealers, based on the amounts specified in the Collateral Sufficiency Notice received on such date, is less than the aggregate Value of all Posted Collateral in respect of such date (after giving effect to reductions in the Posted Collateral required to fund payments of any Cash Settlement Amounts, Termination Payments or Unpaid Amounts on such date and excluding, for the purposes of this calculation, the aggregate of any Undrawn Commitments as of such date) (the amount equal to the lesser of: (x) such shortfall; and (y) the aggregate of: (A) all MFF Collateral; (B) the outstanding principal amount of any Additional Loans issued in respect of a Potential Unwind Event; and (C) the aggregate of all Dealer Non-Funded Amounts representing amounts in respect of which one or more Non-Funding MFF Dealers failed to provide an Advance (any such amount, an **MTM Return Amount** and each such MTM Return Amount and Dispute Return Amount, an **MFF Return Amount**), then, provided that such MTM Return Amount exceeds the Minimum Delivery Amount, the Administrator will deliver written notice (which may be by Website Posting) to the Deal Parties of the MTM Return Amount by 4:00 pm on such date. Pursuant to such notice, and based upon information provided by the Administrative Agent as to the amounts to be returned or reduced in respect of each Lender, the Collateral Agent shall, with respect to an amount in aggregate equal to such MTM Return Amount, by 5:00 pm on the immediately following Business Day:

(i)    at any time before a Potential Unwind Event has occurred, return or reduce with respect to each Lender, as applicable, its Proportionate MFF Share of such MTM Return Amount by: (A) reducing any Qualifying Non-Funded Amount (other than those of any Breaching Dealers or Breaching Non-Dealer Lenders); (B) returning Cash or Cash Equivalents to the Administrative Agent (on behalf of all Lenders other than any Dissenting Lenders, Breaching Dealers or Breaching Non-Dealer Lenders); (C) reducing any Dealer Non-Funded Amounts representing amounts in respect of which one or more Non-Funding MFF Dealers (other than Breaching Dealers) failed to provide an Advance; and (D) in respect of Dissenting Lenders (other than Breaching Dealers), depositing Cash or Cash Equivalents in the relevant Draw Account in accordance with the order of priority specified in Section 2.7(c) below, with the specific application of such return and/or reduction to be determined separately for each Lender; and

(ii)    at any time after a Potential Unwind Event has occurred and an MTM Return Amount is required to be made:

(A)    first, on a *pro rata* basis as between the Persons specified in (I) and (II): (I) pay to Additional Loan Funders an amount up to the outstanding principal amount of Additional Loans; and (II) in respect of the Lenders (other than Breaching Non-Dealer Lenders and Breaching Dealers) who have provided Additional Commitments, return or reduce with respect to each such Lender, as applicable, in an amount equal to its Proportionate MFF Share of such MTM Return Amount in accordance with Section 2.7(c), Advances, Qualifying Non-Funded

Amounts and Dealer Non-Funded Amounts provided in respect of Additional Commitments, provided that the claims of Additional Loan Funders who provided Additional Loans or such Lenders who provided Additional Commitments (as the case may be) in respect of a later Collateral Call Amount shall be satisfied before the claims of such Persons in respect of Additional Loans or Additional Commitments (as the case may be) provided in respect of an earlier Collateral Call Amount, but on a *pro rata* basis amongst such Persons in respect of Additional Loans or Additional Commitments provided in respect of the same Collateral Call Amount; and

(B)    second, return or reduce Advances, Qualifying Non-Funded Amounts and Dealer Non-Funded Amounts in respect of each Lender (other than Breaching Non-Dealer Lenders and Breaching Dealers) in an amount equal to its Proportionate MFF Share of the remainder (if any), in accordance with Section 2.7(c).

(c)    Such reductions, returns and deposits to be made to Lenders in respect of an MTM Return Amount pursuant to Section 2.7(b) will be made by the Collateral Agent to the Administrative Agent in favour of all such Lenders (except for any Breaching Dealer or Breaching Non-Dealer Lenders) in proportion to the amounts that have been drawn from each such Lender, either by its having funded an Advance or its having created a Qualifying Non-Funded Amount or created a Dealer Non-Funded Amount pursuant to Subclause (a) of the definition of Dealer Non-Funding Event and, with respect to each such single Lender, as to any amounts to be returned or reduced pursuant to Section 2.7(b) above, the Administrative Agent shall apply such amounts in the following order of priority:

(i)    first, (A) where such Lender has not previously provided any Additional Commitments, to repay outstanding Advances of such Lender or (B) where such Lender has previously provided an Additional Commitment, to repay Advances outstanding beyond the amount of its Lender's Commitment immediately prior to the date on which it first provided an Additional Commitment;

(ii)    second, to cancel or reduce outstanding Qualifying Non-Funded Amounts and/or Dealer Non-Funded Amounts; and

(iii)    third, to repay any remaining outstanding Advances.

(d)    If the Administrator fails to deliver notice when required to do so pursuant to Sections 2.7(a) or 2.7(b), then the Administrative Agent shall promptly deliver written notice to the Deal Parties, on which they may conclusively rely, of the MFF Return Amount, requesting that the Collateral Agent undertake the required obligations.

## 2.8    Terminal Unwind Event

Subject to Section 2.9 (*Avoiding Terminal Unwind Events*), a **Terminal Unwind Event** will occur if the Administrator has provided notice pursuant to Section 2.5(d) (or a LSS CDS Counterparty has provided notice pursuant to Section 2.5(e)) that a Potential Unwind Event has occurred and the MAV has failed, by 5:00 pm on the related Terminal Unwind Event Date, to Post Collateral with a Value, as of the date of such transfer, at least equal to the Collateral Call Amount in respect of such Potential Unwind Event, whether or not any dispute is occurring pursuant to Section 5 (*Dispute Resolution*).

**2.9**     **Avoiding Terminal Unwind Events**

(a)     Upon a Potential Unwind Event, the MAV shall attempt, in accordance with the procedures set forth in Schedule T (*Procedures for Borrowing pursuant to Additional Loans*), to cure such Potential Unwind Event by procuring that loans (the **Additional Loans**) are made to it pursuant to the terms of an additional margin funding facility agreement which is in form and substance satisfactory to all Lenders and the Administrator (each such agreement, an **Additional Margin Funding Facility Agreement**).  The incurrence of Additional Loans is also subject to the MAV having received *bona fide* firm offers for the making of such Additional Loans and subject to the prior written consent of all Lenders.  The proceeds of the borrowing under any such Additional Loans shall be deposited in a segregated sub-account of the Collateral Account.  In the event that the Administrator, as agent for the MAV, has followed the procedures set forth in Schedule T (*Procedures for Borrowing pursuant to Additional Loans*) and receives no *bona fide* firm offers for the making of Additional Loans, neither the MAV nor the Administrator shall have any further obligation or any liability under this Section 2.9(a).

(b)     In respect of each Potential Unwind Event which is not otherwise cured pursuant to Section 2.9(a), each Lender (other than a Lender that is a Breaching Dealer or a Breaching Non-Dealer Lender) which was not an Unwinding Lender in respect of a previous Partial Terminal Unwind Event, may provide an Additional Commitment in an aggregate amount equal to its Proportionate MFF Share (determined immediately prior to the relevant Potential Unwind Event) of the excess of: (x) the Collateral Call Amount in respect of such Potential Unwind Event; over (y) the aggregate amount of Additional Loans provided in respect of such Potential Unwind Event pursuant to Section 2.9(a) (the amount of such excess, the **Deleveraging Collateral Call Amount**).  Each Lender shall deliver a notice (each, a **Deleveraging Notice**) signed by a duly authorised officer of such Lender and substantially in the form of Schedule D (*Deleveraging Notice*) to the Deal Parties by 10:00 am on the applicable Terminal Unwind Event Date: (A) certifying whether or not it irrevocably agrees to provide an Additional Commitment in an amount equal to its Proportionate MFF Share (determined immediately prior to the relevant Potential Unwind Event) of the relevant Deleveraging Collateral Call Amount; (B) if it agrees to provide an Additional Commitment, specifying its then-current long-term credit ratings from each of DBRS, Fitch, Moody's and S&P; and (C) if it agrees to provide an Additional Commitment, specifying the form in which it will provide such Additional Commitment, which shall be in accordance with the following:

(i)     if such Lender has not previously provided an Additional Commitment pursuant to this Section 2.9 (*Avoiding Terminal Unwind Events*), by 5:00 pm on the applicable Terminal Unwind Event Date and in accordance with its Deleveraging Notice, it may provide such Additional Commitment by:

(A)     converting its outstanding Qualifying Non-Funded Amounts, if any, into Advances in accordance with Section [3.2(a)(ii)] of the Margin Funding Facility Agreement in an amount equal to the aggregate of such Qualifying Non-Funded Amounts;

(B)     making an Advance in respect of its remaining Undrawn Commitment (determined prior to the provision of any Additional Commitment in respect of such Potential Unwind Event);

(C)     making an Advance (or creating a Qualifying Non-Funded Amount, if applicable) in an amount equal to the lesser of (I) its Proportionate MFF Share (determined immediately prior to the relevant Potential Unwind Event) of such Deleveraging Collateral Call Amount and (II) its Maximum Unfunded Commitment; and

(D)     making an Advance in an amount equal to the excess (if any) of (I) its Proportionate MFF Share (determined immediately prior to the relevant Potential Unwind Event) of such Deleveraging Collateral Call Amount over (II) its Maximum Unfunded Commitment; or

(ii)    in respect of a Class A Lender, if such Class A Lender has not previously provided an Additional Commitment pursuant to this Section 2.9 (*Avoiding Terminal Unwind Events*), by 5:00 pm on the applicable Terminal Unwind Event Date and in accordance with its Deleveraging Notice, it may provide such Additional Commitment by:

(A)     making an Advance or creating a Qualifying Non-Funded Amount in respect of its Undrawn Commitment (determined immediately prior to the relevant Potential Unwind Event);

(B)     creating a Qualifying Non-Funded Amount in an amount equal to the lesser of (I) its Proportionate MFF Share (determined immediately prior to the relevant Potential Unwind Event) of such Deleveraging Collateral Call Amount and (II) its Maximum Unfunded Commitment minus the sum of all its Qualifying Non-Funded Amounts then outstanding (including any created pursuant to Section 2.9(b)(ii)(A) above, if any); and

(C)     making an Advance in an amount equal to the excess (if any) of (I) its Proportionate MFF Share (determined immediately prior to the relevant Potential Unwind Event) of such Deleveraging Collateral Call Amount over (II) the aggregate of all its Qualifying Non-Funded Amounts created pursuant to Section 2.9(b)(ii)(B) above; or

(iii)   if such Lender is a Qualified Lender and has previously provided an Additional Commitment in connection with prior Potential Unwind Events pursuant to this Section 2.9 (*Avoiding Terminal Unwind Events*), by 5:00 pm on the applicable Terminal Unwind Event Date and in accordance with its Deleveraging Notice, it may provide an Additional Commitment by:

(A)     creating a Qualifying Non-Funded Amount, if applicable, in an amount equal to the lesser of: (I) its Proportionate MFF Share (determined immediately prior to the relevant Potential Unwind Event) of such Deleveraging Collateral Call Amount and (II) its Maximum Unfunded Commitment minus the aggregate of all Qualifying Non-Funded Amounts of such Lender then outstanding (determined immediately prior to the relevant Potential Unwind Event); and

(B)     making an Advance in an amount equal to the excess (if any) of (I) its Proportionate MFF Share (determined immediately prior to the relevant Potential Unwind Event) of such Deleveraging Collateral Call Amount over (II)

the aggregate of Qualifying Non-Funded Amounts created pursuant to Section 2.9(b)(iii)(A) above; or

(iv)     if such Lender is not a Qualified Lender and has previously provided an Additional Commitment in connection with prior Potential Unwind Events pursuant to this Section 2.9 (*Avoiding Terminal Unwind Events*), by 5:00 pm on the applicable Terminal Unwind Event Date and in accordance with its Deleveraging Notice, it may provide an Additional Commitment by:

(A)     converting its outstanding Qualifying Non-Funded Amounts, if any, into Advances in accordance with Section 3.2(a)(ii) of the Margin Funding Facility Agreement in an amount equal to the aggregate of such Qualifying Non-Funded Amounts;

(B)     making an Advance in respect of its remaining Undrawn Commitment (determined immediately prior to the provision of any Additional Commitment in respect of such Potential Unwind Event); and

(C)     making an Advance in respect of its Proportionate MFF Share (determined immediately prior to the relevant Potential Unwind Event) of the Deleveraging Collateral Call Amount,

provided that, in respect of this Section 2.9, if a Lender is a Lender/Dealer and fails to satisfy any obligation to: (x) provide any Advance or (y) convert any Qualifying Non-Funded Amount, a Dealer Non-Funded Amount will be created in an amount equal to the amount of such Advance or Qualifying Non-Funded Amount, as applicable (and in the case where any Qualifying Non-Funded Amount is converted into a Dealer Non-Funded Amount, such Qualifying Non-Funded Amount shall be returned and cancelled).

(c)     If, in respect of a Potential Unwind Event which is not otherwise cured pursuant to Section 2.9(a), one or more Lenders provide Additional Commitments but one or more other Lenders do not provide (or are deemed not to have provided) Additional Commitments in accordance with Section 2.9(b) (each such Lender, a **Non-Participating Lender**), no Terminal Unwind Event will occur but rather a Partial Terminal Unwind Event will be deemed to occur on the applicable Terminal Unwind Event Date in respect of each such Non-Participating Lender.

(d)     In respect of each Potential Unwind Event, the Collateral Agent will deliver notice (which may be by Website Posting) to the Deal Parties by 2:00 pm on the relevant Terminal Unwind Event Date specifying which Lenders have delivered a Deleveraging Notice indicating that they will provide an Additional Commitment and which Lenders have either delivered a Deleveraging Notice indicating that they will not provide an Additional Commitment or have not delivered a Deleveraging Notice pursuant to Section 2.9(b) by the time required (in which case they shall be deemed to have declined to provide an Additional Commitment) and accordingly whether a Terminal Unwind Event has occurred or whether a Partial Terminal Unwind Event has occurred in respect of any Lender.

(e)     If a Lender delivers a Deleveraging Notice and takes the steps required in either: (w) Section 2.9(b)(i); (x) Section 2.9(b)(ii); (y) Section 2.9(b)(iii); or (z) Section 2.9(b)(iv), as applicable, by 5:00 pm on the applicable Terminal Unwind Event Date, then no Terminal

Unwind Event or Partial Terminal Unwind Event shall occur with respect to such Lender and such Potential Unwind Event.

(f)    If a Lender delivers a Deleveraging Notice agreeing to provide an Additional Commitment but does not provide the Additional Commitments specified therein by 5:00 pm on the applicable Terminal Unwind Event Date: (i) the Collateral Agent will deliver notice to the Deal Parties by 10:00 am on the Business Day following the relevant Terminal Unwind Event Date stating that a Partial Terminal Unwind Event has occurred in respect of such Lender; (ii) the relevant Lender hereby indemnifies and will hold the MAV harmless from and against any claim or loss suffered by, imposed upon or asserted against the MAV as a result of or arising out of its failure to provide Additional Commitments in accordance with its Deleveraging Notice; and (iii) the Termination Payment payable in respect of such Dealer's Swap Agreement shall be as determined by the relevant Dealer in accordance with such Dealer's Swap Agreement.

(g)    In connection with the occurrence of a Partial Terminal Unwind Event pursuant to Section 2.9(c):

(i)    each Non-Participating Lender shall be required to make an Advance in Cash by 5:00 pm on the Terminal Unwind Event Date by depositing in the MFF Account an amount equal to its Undrawn Commitment as of the date of the relevant Potential Unwind Event and converting all of its outstanding Qualifying Non-Funded Amounts into Cash;

(ii)    each Dealer will be deemed to designate the applicable Terminal Unwind Event Date (or, in the case of a Partial Terminal Unwind Event pursuant to Section 2.9(f), the Business Day following the applicable Terminal Unwind Event Date) as an Early Termination Date in respect of a portion of the notional amount of each outstanding LSS CDS, Unlevered CDS and Wrap Swap to which it is a party equal to the percentage equivalent of: (A) one, minus (B) a fraction equal to: (I) the aggregate amount of the Additional Commitments provided by the Lenders and the principal amount of the Additional Loans issued in respect of such Potential Unwind Event, divided by (II) the aggregate amount of Additional Commitments and/or Additional Loans that would have been necessary to cure such Potential Unwind Event (the **AC Unwind Percentage**) (the **AC Unwound Swaps**);

(iii)    a portion of each item of Collateral (excluding (A) all MFF Collateral and (B) any amounts standing to the credit of the Draw Accounts of all Lenders and the Collection Account) equal to the AC Unwind Percentage, together with each Non-Participating Lender's contributions to MFF Collateral which remain MFF Collateral on the date of the relevant Partial Terminal Unwind Event and any amount standing to the credit of each Non-Participating Lender's Draw Account (the **AC Unwound Collateral**) shall be liquidated pursuant to the liquidation procedure set forth in Section 4.9 (*Liquidation of Collateral*) and, on the relevant Distribution Date, subject to Section 6.7 (*Holdback Amounts and Allocations*) and in accordance with the relevant Distribution Date Report, the Collateral Agent shall distribute: (x) first, an allocated portion of any amount standing to the credit of the Collection Account on the date of the relevant Partial Terminal Unwind Event, in the order of priority and as more specifically described in Section 6.3 (*Application of Proceeds in the Ordinary Course*) provided that: (I) in the case of each claim thereunder, solely to the extent of the AC Unwind Percentage thereof (except as otherwise provided in Section 6.3 with respect to Sections 6.3(a) and 6.3(o) (*Application of Proceeds in the Ordinary Course*)); and (II) no Lender (in its capacity as

Lender) other than the relevant Non-Participating Lender and its Affiliates shall have any claim to such amounts; and (y) second, the relevant Sale Collateral Proceeds pursuant to Section 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*);

(iv)   the Non-Participating Lenders' recourse for the payment or repayment of any outstanding amounts under the Margin Funding Facility Agreement shall be limited to: (A) the proceeds of liquidation of the AC Unwound Collateral distributed pursuant to Section 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*) and any amounts available for distribution to it pursuant to Section 6.3 (*Application of Proceeds in the Ordinary Course*) in connection with the relevant Distribution Date; and (B) any amounts which become available for distribution pursuant to Sections 6.2(s) or 6.3(s);

(v)   any Person not specified in Section 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*), including any Lender (in its capacity as Lender) who did provide an Additional Commitment, shall have no claim to any proceeds of liquidation of the AC Unwound Collateral;

(vi)   any claims of a Dealer or any other Person (including the relevant Unwinding Lender) identified in Section 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*) with respect to the AC Unwound Swaps or AC Unwound Collateral not satisfied in full after distribution of the proceeds of liquidation of the AC Unwound Collateral pursuant to the terms of Section 6.1 (*Application of Proceeds from the Liquidation of Original Collateral*) and Section 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*), shall be payable only pursuant to Sections 6.2(s) and 6.3(s) provided, however, that an indemnity claim not paid on such date shall remain payable on future dates in accordance with the priorities stated in Sections 6.2, 6.3 and/or 6.4, as applicable; and

(vii)   from and including the Terminal Unwind Event Date in respect of a Non-Participating Lender and at all times thereafter: (A) the Lender's Commitment of such Non-Participating Lender shall be reduced to zero; and (B) the AC Unwound Collateral shall be disregarded for the purposes of determining the Value of Posted Collateral unless and until the proceeds of any AC Unwound Collateral are deposited in the Collateral Account pursuant to Section 6.4(b)(x).

(h)   In connection with the occurrence of a Terminal Unwind Event, each Lender shall be required to make an Advance in Cash by 5:00 pm on the Terminal Unwind Event Date by depositing in the MFF Account an amount equal to its Undrawn Commitment as of the date of the relevant Potential Unwind Event and converting all of its outstanding Qualifying Non-Funded Amounts into Cash.

## 2.10   Indemnification by LSS CDS Counterparty in respect of Draw Notices

If the Administrator fails to deliver a Draw Notice pursuant to Sections 2.6(a), 2.11(c), 4.4(b)(ii)(D), 4.6(b)(ii)(D) or 4.7(b)(ii)(D), the MAV hereby, upon the occurrence of such event, in each case, expressly authorises any LSS CDS Counterparty to deliver such Draw Notice on behalf of, and in the name of, the MAV; provided that if, following a dispute under Section 5.1(f) of any amount set out in a Draw Notice delivered by a LSS CDS Counterparty pursuant to Section 2.6(b) the MAV is required to

pay a Dispute Return Amount, the LSS CDS Counterparty that delivered such Draw Notice shall pay to the MAV, in respect of the period beginning on (and including) the date such Advance is made pursuant to the relevant Draw Notice and ending on (but excluding) the date such Dispute Return Amount is repaid pursuant to Section 2.7 (*MFF Return Amounts*), any Interest Costs incurred by the MAV under the Credit Facility in respect of such Dispute Return Amount; provided further however that, regardless of the outcome of a dispute pursuant to Section 5.1(f), where the failure of the Administrator to deliver a Draw Notice is due to fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of its obligations and duties on the part of the Administrator, such indemnity shall not apply.

**2.11    Extension of Renewable Draw Request Period**

(a)    The Administrator, acting on behalf of the MAV, shall, by written notice delivered to the Administrative Agent (each, an **Extension Request**) (copied to the Deal Parties) not earlier than 45 days and not later than 30 days prior to the expiration of the then applicable Renewable Draw Request Period, request, pursuant to Section [2.5] (*Extension of Renewable Draw Request Period*) of the Margin Funding Facility Agreement, that the last day of the then applicable Renewable Draw Request Period be extended to the date that is the earlier of: (i) 364 days following the date on which the Renewable Draw Request Period would otherwise expire; and (ii) the MFF Maturity Date (each, an **Extension**).

(b)    If the Administrator fails to deliver an Extension Request pursuant to Section 2.11(a) on or before the 35th day prior to the expiration of the then applicable Renewable Draw Request Period, then any LSS CDS Counterparty may deliver an Extension Request to the Administrative Agent (copied to the Deal Parties) at any time on or before the 30th day prior to the expiration of such Renewable Draw Request Period.

(c)    Upon the occurrence of a Dissenting Lender Draw Event (which, for the avoidance of doubt, may only occur with respect to a 364 Day Lender), the Administrator, acting on behalf of the MAV, shall deliver a Draw Notice to the Administrative Agent (copied to the Deal Parties) prior to 10:00 am on the last day of the Renewable Draw Request Period (or on the immediately preceding Business Day if the last day of the Renewable Draw Request Period is not a Business Day) requesting a Term Loan Advance from each Dissenting Lender.

(d)    If the Administrator fails to deliver a Draw Notice pursuant to Section 2.11(c) prior to 10:00 am on the last day of the Renewable Draw Request Period (or on the immediately preceding Business Day if the last day of the Renewable Draw Request Period is not a Business Day), then any LSS CDS Counterparty may deliver a Draw Notice to the Administrative Agent (copied to the Deal Parties) prior to 10:00 am on the immediately following Business Day.

(e)    If neither the Administrator nor a LSS CDS Counterparty delivers a Draw Notice to a Dissenting Lender requesting that such Dissenting Lender make a Term Loan Advance in the amount required by Section 2.11(c) or 2.11(d), then: (i) for the purposes of determining whether additional draws should be made under the Credit Facility and for determining Potential Unwind Events, the amount of any Term Loan Advance not made by such Dissenting Lender (a **Failed Term Loan**) shall be deemed to have funded each future Advance (each a **Failed Extension Advance**) from the notional balance of its Failed Term Loan (which shall be deemed to be reduced accordingly) in an amount equal to the lesser of: (A) the aggregate notional balance of its Failed Term Loan; and (B) its share (based upon its Lender's Commitment immediately prior to the Dissenting Lender Draw Event) of such future Advance requested in a Draw Notice; (ii) the amount represented by a Failed Extension Advance shall be regarded as Collateral Posted by

the MAV for the benefit of the Secured Creditors; (iii) any obligations owed to the LSS CDS Counterparties to be satisfied pursuant to Sections 4.4 (*Cash Settlement Amounts*), 4.6 (*Early Termination of all of the Transactions under a Dealer's Swap Agreement*), 4.7 (*Early Termination of some (but not all) of the Transactions under a Dealer's Swap Agreement*), 6.2 (*Application of Proceeds from the Liquidation of CA-Held Collateral on the occurrence of a Terminal Unwind Event*) or 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*) shall be deemed to be satisfied first by and to the extent of Failed Extension Advances; and (iv) to the extent that any Failed Extension Advances are owed to a LSS CDS Counterparty and this Agreement or any other Transaction Document provides that Collateral is to be released or other action taken under this Agreement or any other Transaction Document only upon the termination, maturity or full satisfaction of all obligations owed to such LSS CDS Counterparty, the obligations of such LSS CDS Counterparty shall be deemed to be fully satisfied if the only remaining amounts owed to such LSS CDS Counterparty in respect of such obligations are with respect to Failed Extension Advances.

## 2.12    Timing of Advances

Where the Administrator, on behalf of the MAV, or a LSS CDS Counterparty, as the case may be, has requested an Advance (or, if applicable, the creation of a Qualifying Non-Funded Amount) or an Advance (or, if applicable, the creation of a Qualifying Non-Funded Amount) is otherwise required to be made on any Business Day pursuant to the provisions of this Agreement and the Margin Funding Facility Agreement, a Lender will be deemed to have made such Advance (or, if applicable, created a Qualifying Non-Funded Amount) by the applicable required time on such date if: (a) an amount of Cash (or Cash Equivalents, if applicable) equal to the required Advance is received in the MFF Account by such required time (or by 5:00 pm if no such time is specified) on such date; (b) evidence of irrevocable wiring instructions (in the case of the transfer of Cash) or securities settlement instructions in respect of the amounts of Cash or Cash Equivalents referred to in Subclause (a) is provided by the relevant Lender to the Administrator, the Collateral Agent and each LSS CDS Counterparty by such required time (or by 5:00 pm if no such time is specified) on such date, provided that, notwithstanding any other provision of this Agreement, if the requisite amount of Cash or Cash Equivalents is not received from a Non-Dealer Lender before the expiry of the relevant grace period (if any) for providing the Advance to which such instructions relate, a Non-Dealer Lender Default shall occur with respect to such Non-Dealer Lender; or (c) if applicable, an Acknowledgement of a Qualifying Non-Funded Amount (substantially in the form of Schedule 2 (*Form of Acknowledgement of a Qualifying Non-Funded Amount*) of the Margin Funding Facility Agreement) is delivered to the Collateral Agent by a Lender, duly executed by an authorised officer thereof, by such required time on such date in accordance with Section 12.3 (*Communications and Notices*) with copies to the Administrative Agent and the Administrator, provided that, if delivered by fax or by electronic mail, the original version shall be concurrently sent by mail to the Collateral Agent by the relevant Lender, and provided further that non-receipt of the original version of any such Acknowledgement of a Qualifying Non-Funded Amount shall not affect the validity or effectiveness thereof.

## 2.13    Term Loan Advances

Where a Lender has made a Term Loan Advance pursuant to this Agreement and the Margin Funding Facility Agreement, such Term Loan Advance shall be deposited into the relevant Lender's Draw Account and held as Collateral pursuant to the terms of the Master Security Agreement.  Term Loan Advances shall not be subject to distribution pursuant to Section 6 (*Application of Proceeds*) until such amounts (or any portion thereof) are converted into Advances and transferred into the MFF Account. From and including the date on which a Lender provides a Term Loan Advance, it shall be deemed to

have consented to any Advances requested to be made by it pursuant to the terms of this Agreement or the Margin Funding Facility Agreement being satisfied from such Draw Account until such Draw Account is exhausted.

**2.14    Reconciliation of amounts under the Credit Facility**

(a)    On or before the tenth Business Day of each month, the Collateral Agent, the Administrator and the Administrative Agent will reconcile their records with respect to each Lender's Commitment, the Commitment, aggregate Undrawn Commitments, Maximum Unfunded Commitment, aggregate Additional Commitments, aggregate Qualifying Non-Funded Amounts outstanding, aggregate Dealer Non-Funded Amounts outstanding, Term Loans outstanding, Failed Term Loans outstanding and aggregate Advances outstanding of all Lenders as of the last Business Day of the prior calendar month, and will consult with each other in good faith to resolve any discrepancies between such records.

(b)    The Administrative Agent agrees to provide information concerning Proportionate MFF Shares, outstanding Advances, Qualifying Non-Funded Amounts, Dealer Non-Funded Amounts, Term Loans and Failed Term Loans, as applicable, with respect to each Lender and such related information (including as specified in Section 2.12(a)) as reasonably requested from time to time by the Administrator, the Collateral Agent or any LSS CDS Counterparty. Without limiting the foregoing, the Administrative Agent shall, upon receiving notice of the occurrence of a Potential Unwind Event, promptly (and, in any case, within one Business Day) provide such information as of the time immediately prior to such Potential Unwind Event to each such Person.

**3.    CHANGES IN COMMITMENT AMOUNTS**

**3.1    Additional Commitments**

(a)    A Qualified Lender that provides Qualifying Non-Funded Amounts and which subsequently ceases to be a Qualified Lender, must by 5:00 pm on the third Business Day following the relevant credit ratings event, make an Advance in an aggregate amount equal to the sum of its Qualifying Non-Funded Amounts.

(b)    A Lender that provides Additional Unfunded Commitments pursuant to Section 2.9 (*Avoiding Terminal Unwind Events*) and subsequently it (or its Lender Guarantor) is subject to a credit ratings downgrade event or is placed on Credit Watch such that the Lender has an Unfunded Commitment greater than its Maximum Unfunded Commitment must, by 5:00 pm on the third Business Day following such event, make an Advance in an amount equal to the amount by which: (i) its Unfunded Commitment; exceeds (ii) its Maximum Unfunded Commitment.

(c)    If a Lender does not make an Advance required by Section 3.1(a) or Section 3.1(b), as applicable, it shall be a Non-Funding MFF Dealer or a Breaching Non-Dealer Lender (as applicable) pursuant to Section 4.2 (*Dealer Non-Funding Event*) or Section 4.3 (*Non-Dealer Lender Default*), respectively.

**3.2    Providing Additional Commitments**

A Lender's Commitment will be deemed to be increased to the amount set forth in any Deleveraging Notice as of the date of effective delivery of such notice and the Collateral Agent and the Administrative Agent shall update their records accordingly.

**3.3     Reducing Additional Commitments**

If a Lender has previously provided an Additional Commitment and, on any Business Day thereafter, based upon the information contained in the Collateral Sufficiency Notices delivered by the Administrator (or by a LSS CDS Counterparty entitled to do so):

(a)     no Potential Unwind Event has been in existence for the ten most recent Business Days; and

(b)     (i) the Value of Posted Collateral is greater than (ii) the Highest Required Collateral Amount (the amount, if any, by which (i) exceeds (ii), the **AC Reduction Amount**),

then the Collateral Agent shall, on such date, by notice to the Deal Parties, as of the immediately following Business Day, reduce the Lender's Commitment of such Lender by an amount equal to the lesser of: (x) its Proportionate MFF Share determined as of such date of such AC Reduction Amount; and (y) the aggregate of the Additional Commitments provided by such Lender (as previously reduced by the operation of this Section 3.3 (*Reducing Additional Commitments*), and the Administrative Agent and the Collateral Agent shall update their records accordingly.

**3.4     Reducing Commitments and Repayment of Term Loans in Proportion to the Reserve Account**

(a)     From and including the date on which a payment is deposited in the Reserve Account pursuant to Section 6.3(l) or pursuant to the CIBC Omnibus, with respect to each Lender (other than any Lender/Dealer which has delivered, and not revoked, a Commitment Standstill Notice): (i) its Lender's Commitment; and (ii) to the extent that there are amounts representing a portion of a Term Loan standing to the credit of its Draw Account, the Term Loan of such Dissenting Lender, shall in each case, be reduced by the sum of:

    (i)     an amount equal to the product of: (x) the Proportionate MFF Share of each such Lender (based on the Lender's Commitment of each such Lender immediately prior to the date of deposit of the relevant payment in the Reserve Account); and (y) the amount of such payment deposited into the Reserve Account; plus

    (ii)     with respect to Non-Dealer Lenders only, on a *pro rata* basis, (based on the Lender's Commitment of each such Non-Dealer Lender immediately prior to the date of deposit of the relevant payment in the Reserve Account) an amount equal to the product of: (x) the sum of the Proportionate MFF Shares of each Lender/Dealer which has delivered, and not revoked, a Commitment Standstill Notice; and (y) the amount of such payment into the Reserve Account.

(b)     The Collateral Agent shall effect such reduction in each relevant Lender's Commitment or Term Loan, as the case may be, by delivering notice to the Deal Parties on the date on which a payment is received in the Reserve Account pursuant to Section 3.4(a) and transferring the amount by which a Term Loan is reduced to the Administrative Agent's Account for repayment of such amount to the relevant Dissenting Lender.  After effecting such reduction, the Collateral Agent and the Administrative Agent shall update their records accordingly.

## 4.    LIQUIDATION, REINVESTMENT AND RIGHTS TO COLLATERAL

### 4.1    Dealer Default under a Swap Agreement

If either: (i) an Event of Default in respect of which a Dealer is the Defaulting Party occurs; or (ii) an Additional Termination Event in respect of which a Dealer is the sole Affected Party occurs (any such Dealer, a **Breaching Dealer**), then:

(a)    upon receiving notice, or upon a Responsible Officer of the Administrator obtaining actual knowledge of such Event of Default or Additional Termination Event, the Administrator, on behalf of the MAV, shall notify the Deal Parties as soon as practicable and in any event within one Business Day of obtaining such knowledge or notice (such date, the **Breaching Dealer Notice Date**);

(b)    the Administrator, on behalf of the MAV, may in its discretion with notice to the Rating Agency (provided that the relevant Event of Default or Additional Termination Event is still continuing), designate an Early Termination Date in respect of all Transactions under the Swap Agreement with such Breaching Dealer;

(c)    whether or not the Administrator on behalf of the MAV has designated an Early Termination Date in respect of all Transactions under the relevant Swap Agreement: (i) if the Breaching Dealer or one of its Affiliates is a Lender, such Breaching Dealer (or such Affiliate, as the case may be) shall be required, within three Business Days of the Breaching Dealer Notice Date, to make an Advance in an amount equal to its Undrawn Commitment and convert all of its Qualifying Non-Funded Amounts into Advances in an amount equal to the sum of all such Qualifying Non-Funded Amounts on such date; and (ii) the Breaching Dealer's right to receive any MFF Fee shall terminate from and including the Breaching Dealer Notice Date;

(d)    the Breaching Dealer shall not be entitled to exercise Set-off in respect of any amounts owed by it under its Swap Agreement against any amounts due to such Breaching Dealer pursuant to any other Transaction Document;

(e)    Termination Payments owed to such Breaching Dealer under its Swap Agreement shall be subordinated and paid in accordance with the terms of Sections 6.2(w) and 6.3(w), as applicable, provided that any Unpaid Amounts shall remain payable pursuant to Section 6.2(c) and 6.4(b)(iii), as applicable;

(f)    amounts outstanding in respect of any Advances made by the Breaching Dealer to the MAV pursuant to the Margin Facility Funding Agreement shall be paid or repaid to the Breaching Dealer only as provided in Section 6.2(t) or Section 6.3(t);

(g)    if the Administrator on behalf of the MAV has designated an Early Termination Date in respect of all Transactions under the relevant Swap Agreement on or after the Breaching Dealer Notice Date, after the liquidation of the Original Collateral of such Breaching Dealer pursuant to the provisions of Section 4.9 (*Liquidation of Collateral*) to the extent necessary to pay any Unpaid Amounts owed to the Breaching Dealer, the Breaching Dealer shall deliver or procure the delivery of all of its remaining Original Collateral to the Collateral Agent for deposit into the Collateral Account and such Original Collateral shall be released from the Dealer's Security Interest in its Original Collateral and shall constitute CA-Held Collateral and the Collateral Agent and the Administrator shall update their records accordingly; and

(h)    from and including the applicable Breaching Dealer Notice Date, its Initial Available Collateral Amount and Required Collateral Amount shall each be deemed to be equal to zero and the amount of all Advances that it was required to but did not make shall be treated for the purposes of this Agreement as if it were a Defaulted Pre-Funded Advance and each future Advance required from such Breaching Dealer shall be treated as a Defaulted Advance.

**4.2    Dealer Non-Funding Event**

If a Lender/Dealer (other than a Breaching Dealer, as to which Section 4.1 (*Dealer Default under a Swap Agreement*) shall apply): (a) fails to make, when due, all or any portion of an Advance (or create a Qualifying Non-Funded Amount, if applicable) required to be made by it pursuant to the terms of this Agreement and the Margin Funding Facility Agreement and such failure continues for three Business Days (other than a failure to make an Advance due following the occurrence of a Terminal Unwind Event for which no grace period will apply); or (b) becomes a Downgraded Lender and does not take the remedial action required by Section [3.4] (*Downgraded Lenders*) of the Margin Funding Facility Agreement (either such event, a **Dealer Non-Funding Event** and such affected Lender/Dealer, a **Non-Funding MFF Dealer**), then:

(a)    upon receiving notice, or upon a Responsible Officer of the Administrator obtaining actual knowledge, of a Dealer Non-Funding Event, the Administrator, on behalf of the MAV, shall notify the Deal Parties as soon as practicable and in any event within one Business Day of obtaining such knowledge or notice; provided that, if the Administrator fails to notify such Persons of the occurrence of a Dealer Non-Funding Event within such time period, any LSS CDS Counterparty may send such notice on its behalf;

(b)    if any Sale Collateral Proceeds are to be distributed pursuant to Sections 4.4 (*Cash Settlement Amounts*), 4.6 (*Early Termination of all of the Transactions under a Dealer's Swap Agreement*), 4.7 (*Early Termination of some (but not all) of the Transactions under a Dealer's Swap Agreement*), 6.1 (*Application of Proceeds from the Liquidation of Original Collateral*), 6.2 (*Application of Proceeds from the Liquidation of CA-Held Collateral Upon a Terminal Unwind Event*) or 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind*), during any period after a Dealer Non-Funding Event has occurred but before such event has been cured pursuant to Section 4.2(e), a portion of any such Termination Payments, Unpaid Amounts or Cash Settlement Amounts, as the case may be, owed to any Non-Funding MFF Dealer in an amount equal to the lesser of: (i) the Dealer Non-Funded Amount of such Non-Funding MFF Dealer; and (ii) the amount of such Termination Payments, Unpaid Amounts or Cash Settlement Amounts, as the case may be, shall be: (A) in the case of any payments pursuant to Sections 6.1 (*Application of Proceeds from the Liquidation of Original Collateral*), 6.2 (*Application of Proceeds from the Liquidation of CA-Held Collateral Upon a Terminal Unwind Event*) or 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind*), subordinated and paid in accordance with Sections 6.2(i) and 6.4(b)(ix), as applicable; and (B) in the case of any payments pursuant to Sections 4.4 (*Cash Settlement Amounts*), 4.6 (*Early Termination of all of the Transactions under a Dealer's Swap Agreement*) or 4.7 (*Early Termination of some (but not all) of the Transactions under a Dealer's Swap Agreement*), set-off against the aggregate amount of its Dealer Non-Funded Amount.

(c)    if, on the Business Day following the date of the Dealer Non-Funding Event and on each Wednesday (or, if such date is not a Business Day, the following Business Day) thereafter, and before the relevant Dealer Non-Funding Event has been cured pursuant to Section 4.2(e), in respect of a Non-Funding MFF Dealer:

(i)    its Dealer Non-Funded Amount exceeds its Collateral Entitlement Proportion of the Market Value of CA-Held Collateral in respect of such date (the amount of such excess, the **OC Transfer Amount**):

(A)    the Collateral Agent by 12:00 noon on such Business Day shall provide notice to the Non-Funding MFF Dealer and the Administrator of the OC Transfer Amount (or, if the Collateral Agent fails to provide such notice by 12:00 noon on such Business Day, any LSS CDS Counterparty may do so);

(B)    provided that the OC Transfer Amount is equal to or greater than: (i) at any time from and including a Terminal Unwind Event to and including the related Distribution Date, zero and (ii) at any other time, CAD5,000,000: (A) the Non-Funding MFF Dealer authorises its OC Custodian and the Administrator to procure the transfer to the Collateral Account of LSS CDS Original Collateral (beginning with the most liquid components thereof, as agreed between such Non-Funding MFF Dealer and the Administrator) with a Market Value equal to the lesser of: (1) the OC Transfer Amount; and (2) the total Market Value of its LSS CDS Original Collateral (such lesser amount, an **OC Dealer Transfer Amount**); and (B) to the extent the OC Transfer Amount is greater than the amount in (2), the Administrator shall give notice to the Non-Funding MFF Dealer and the Non-Funding MFF Dealer shall transfer to the MAV additional collateral, in each case, pursuant to the relevant Lender Credit Support Agreement, with a Market Value equal to such excess within three Business Days after receipt of such notice;

(C)    on the date of any such transfer of LSS CDS Original Collateral pursuant to this Section 4.2(c), the LSS CDS Original Collateral in respect of the OC Dealer Transfer Amount shall be released from its Dealer's Security Interest in its Original Collateral and all of such LSS CDS Original Collateral in respect of the OC Dealer Transfer Amount of such Non-Funding MFF Dealer shall be deposited by the Collateral Agent in the Collateral Account and shall constitute CA-Held Collateral; and

(D)    any LSS CDS Collateral comprising the OC Dealer Transfer Amount or additional Collateral transferred to the Collateral Account pursuant to this Section 4.2(c) shall be held by the Collateral Agent in a segregated sub-account of the Collateral Account (the **OC Transfer Sub-Account**) and the principal thereof shall not comprise Managed Assets or be available for liquidation to fund Cash Settlement Amounts, Termination Payments or Unpaid Amounts due to any Dealer other than the relevant Non-Funding MFF Dealer unless and until the aggregate amount of other CA-Held Collateral (other than the MFF Collateral) is insufficient; and

(ii)    at any time after LSS CDS Collateral comprising the OC Dealer Transfer Amount has been transferred and/or any other collateral has been Posted to the MAV by the Non-Funding MFF Dealer, in each case, pursuant to Section 4.2(c)(i), its Dealer Non-Funded Amount is less than its Collateral Entitlement Proportion of the Market Value of CA-Held Collateral in respect of such date:

(A)     the Collateral Agent shall by 12:00 noon on the following Business Day provide notice to the Non-Funding MFF Dealer and the Administrator of the amount of such deficit; provided that, if the Collateral Agent fails to provide such notice to the relevant Non-Funding MFF Dealer, the Non-Funding MFF Dealer may send notice to the Collateral Agent by 1:00 pm on such Business Day; and

(B)     upon a request from the relevant Non-Funding MFF Dealer, the Collateral Agent shall transfer CA-Held Collateral from the OC Transfer Sub-Account of the relevant Non-Funding MFF Dealer to such Non-Funding MFF Dealer with a Market Value equal to the lesser of: (w) such deficit; and (x) the aggregate Market Value of the LSS CDS Original Collateral then standing to the credit of the OC Transfer Sub-Account; provided that such amount is equal to or greater than the lesser of: (i) (A) at any time from and including a Terminal Unwind Event to and including the related Distribution Date or where the relevant Dealer Non-Funded Amount is reduced pursuant to Section 5.1 (*Procedures*), zero and (B) at any other time, CAD25,000,000 and (ii) the amount in (x) above, within three Business Days after receipt of such notice.

(d)     if a Non-Funding MFF Dealer: (i) fails to Post sufficient additional collateral pursuant to its Lender Credit Support Agreement; or (ii) fails to instruct or revokes its instruction to its OC Custodian or fails to authorise the Administrator to procure any transfer, in each case, as required by Section 4.2(c)(i) and such failure continues for three Business Days after notice to such Non-Funding MFF Dealer, an Additional Termination Event will be deemed to have occurred pursuant to Part [1(n)(iii)] of the Swap Agreement of such Non-Funding MFF-Dealer and such Non-Funding MFF Dealer will be a Breaching Dealer;

(e)     if, on any Business Day after a Dealer Non-Funding Event has occurred with respect to it, a Non-Funding MFF Dealer elects, by delivering written notice (each such notice, a **MFF Non-Funding Cure Notice**) to the Deal Parties, to cure such Dealer Non-Funding Event:

(i)     such Non-Funding MFF Dealer shall: (A) if it is not (or if it has ceased to be) a Downgraded Lender, make an Advance or Term Loan Advance (or create a Qualifying Non-Funded Amount, if applicable) in an amount equal to its Dealer Non-Funded Amount created pursuant to Subclause (a) of the definition of Dealer Non-Funding Event as of the date of the MFF Non-Funding Cure Notice; or (B) if it is a Downgraded Lender, take the remedial action required by Section [3.4] (*Downgraded Lenders*) of the Margin Funding Facility Agreement;

(ii)     upon receipt of the relevant Advance in the MFF Account or receipt of a Qualifying Non-Funded Amount, if applicable, or receipt of the relevant Term Loan Advance in the Draw Account and, if applicable, the posting of the relevant amounts pursuant to Section 4.2(e)(i)(B), the Dealer Non-Funding Event shall be deemed no longer to be occurring in respect of the Non-Funding MFF Dealer and the following shall occur: (A) the relevant Dealer shall no longer be regarded as a Non-Funding MFF Dealer; (B) its Dealer Non-Funded Amount shall be reduced to zero; and (C) the Collateral Agent shall return to the LSS CDS Counterparty from the OC Transfer Sub-Account any Collateral transferred to it pursuant to Section 4.2(c); and

(f)     the MAV will retain the right to issue legal proceedings against any Non-Opting Lender/Dealer that becomes a Non-Funding MFF Dealer for an amount equal to the amount that the MAV

would have needed to receive in order to ensure that the MAV and each Secured Creditor (including the relevant Non-Opting Lender/Dealer) receives the same amount of funds it would have received had such Non-Opting Lender/Dealer funded any Advance or Term Loan Advance, as the case may be, when originally due.

(g)    The steps described in this Section 4.2 (*Dealer Non-Funding Event*) are illustrated in the worked example at Schedule S (*Indicative Examples of Section 4.2 Mechanics*).

## 4.3    Non-Dealer Lender Default

If: (a) a Non-Dealer Lender becomes a Downgraded Lender and does not take the remedial action required by Section [3.4] (*Downgraded Lenders*) of the Margin Funding Facility Agreement; (b) a Non-Dealer Lender fails to make, when due, all or any portion of an Advance (or create a Qualifying Non-Funded Amount, if applicable) required to be made by it pursuant to the terms of this Agreement and the Margin Funding Facility Agreement and such failure continues for three Business Days (other than a failure to make an Advance due following the occurrence of a Terminal Unwind Event for which no grace period will apply), and such failure is not remedied in accordance with Section 4.16 (*Use of Posted Lender's Credit Support to Satisfy Advances*); or (c) an Insolvency Event occurs with respect to a Non-Dealer Lender (or its Lender Guarantor) (any such occurrence, a **Non-Dealer Lender Default**) or a Non-Dealer Lender Default is deemed to have occurred with respect to a Non-Dealer Lender pursuant to any other provision of this Agreement (any such affected party, a **Breaching Non-Dealer Lender**), then the following provisions shall apply:

(a)    as soon as reasonably practicable, and in any event within one Business Day of receiving notice, or of a Responsible Officer of the Administrator obtaining actual knowledge, of a Non-Dealer Lender Default, the Administrator, on behalf of the MAV, shall notify the Deal Parties; provided that, if the Administrator fails to notify such Persons of the occurrence of a Non-Dealer Lender Default within such time period, any LSS CDS Counterparty may send such notice (the date of any such notice, the **Breaching Non-Dealer Notice Date**);

(b)    such Breaching Non-Dealer Lender shall be required to make an Advance in Cash in an amount equal to its Undrawn Commitment immediately prior to the Breaching Non-Dealer Notice Date, convert all of its outstanding Qualifying Non-Funded Amounts into an Advance and deposit such amounts in the MFF Account by 5:00 pm on the Breaching Non-Dealer Notice Date;

(c)    if the Breaching Non-Dealer Lender fails to make an Advance in the amount required by Section 4.3(b) by 5:00 pm on the Breaching Non-Dealer Notice Date (the amount of such Advance not made by such Breaching Non-Dealer Lender, less the proceeds of any Posted Lender's Credit Support of the relevant Breaching Non-Dealer Lender realised upon by the MAV pursuant to the Lender Credit Support Agreement, a **Defaulted Pre-Funded Advance**): (i) it shall be liable to the MAV for the amount of such Defaulted Pre-Funded Advance; (ii) the MAV, if directed by the Majority Secured Creditors (or, if applicable, the relevant LSS CDS Counterparty to whom a claim is assigned by the MAV), shall pursue a litigation claim against such Breaching Non-Dealer Lender for such amount and the MAV hereby assigns to each LSS CDS Counterparty its right to issue proceedings against the Breaching Non-Dealer Lender in respect of any portion of any Termination Payments and Unpaid Amounts at any time not paid to such LSS CDS Counterparty, up to a maximum amount equal to the Defaulted Advances of such Breaching Non-Dealer Lender, together with any legal costs associated with such legal proceedings and any damages claimed in respect of any interest amounts lost as a result of such

Non-Dealer Lender Default from and including the Breaching Non-Dealer Notice Date to the date of any judgment; and (iii) the provisions of Sections 4.3(d) to 4.3(g) shall apply;

(d)    subject to Section 4.3(f) below: (i) for the purposes of determining whether additional draws should be made under the Margin Funding Facility Agreement and for determining Potential Unwind Events, a Breaching Non-Dealer Lender or a Breaching Dealer shall be deemed to have funded each future Advance (each a **Defaulted Advance**) from the notional balance of its Defaulted Pre-Funded Advance (which shall be deemed to be reduced accordingly) in an amount equal to the lesser of: (A) the aggregate notional balance of its Defaulted Pre-Funded Advance; and (B) its Proportionate MFF Share (based upon its Lender's Commitment immediately prior to the relevant Breaching Non-Dealer Notice Date) of such future Advance requested in a Draw Notice; (ii) the amount represented by Defaulted Advances shall be regarded as Collateral Posted by the MAV for the benefit of the Secured Creditors; (iii) any obligations owed to the LSS CDS Counterparties to be satisfied pursuant to Sections 4.4 (*Cash Settlement Amounts*), 4.6 (*Early Termination of all of the Transactions under a Dealer's Swap Agreement*), 4.7 (*Early Termination of some (but not all) of the Transactions under a Dealer's Swap Agreement*), 6.2 (*Application of Proceeds from the Liquidation of CA-Held Collateral on the occurrence of a Terminal Unwind Event*) or 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*) shall be deemed to be satisfied first by and to the extent of such Defaulted Advance; and (iv) to the extent that any Defaulted Advances are owed to a LSS CDS Counterparty and this Agreement or any other Transaction Document provides that Collateral is to be released or other action taken under this Agreement or any other Transaction Document only upon the termination, maturity or full satisfaction of all obligations owed to such LSS CDS Counterparty, the obligations of such LSS CDS Counterparty shall be deemed to be fully satisfied if the only remaining amounts owed to such LSS CDS Counterparty in respect of such obligations are with respect to Defaulted Advances;

(e)    from and after the Breaching Non-Dealer Notice Date: (i) all principal and interest in respect of Advances and other amounts owing to the Breaching Non-Dealer Lender under the Margin Funding Facility Agreement shall be subordinated and paid in accordance with Section 6.2(t) or Section 6.3(t); and (ii) the Breaching Non-Dealer Lender shall not be entitled to Set-off against its liabilities for such amounts any other amounts due to the Breaching Non-Dealer Lender from the MAV;

(f)    in the event that a Non-Dealer Lender has previously increased its Lender's Commitment pursuant to Section 2.9 (*Avoiding Terminal Unwind Events*), and such Breaching Non-Dealer Lender has an Unfunded Commitment, the Majority Secured Creditors will, in their sole discretion, determine, within five Business Days of the Breaching Non-Dealer Notice Date, whether:

   (i)    to declare a Partial Terminal Unwind Event and designate an Early Termination Date in respect of a portion of the notional amount of each outstanding LSS CDS, Unlevered CDS and Wrap Swap to which it is a party equal to the Proportionate MFF Share of such Breaching Non-Dealer Lender (determined immediately prior to the Breaching Non-Dealer Notice Date) (such portion, the **Non-Dealer Unwind Percentage**) (the **Non-Dealer Unwound Swaps**); or

   (ii)    not to declare a Partial Terminal Unwind Event at such time and instead to direct the MAV to issue proceedings against the Breaching Non-Dealer Lender for the amount of

the Unfunded Commitment of such Breaching Non-Dealer Lender immediately prior to the Breaching Non-Dealer Notice Date.

Until the Majority Secured Creditors declare a Partial Terminal Unwind Event pursuant to Section 4.3(f)(i) above, the provisions of Section 4.3(d) shall continue to apply to such Breaching Non-Dealer Lender in respect of all required and future Advances.

(g)     if the Majority Secured Creditors elect to pursue a Partial Terminal Unwind pursuant to Section 4.3(f)(i) above:

(i)     pursuant to its Swap Agreement, each Dealer will designate, within five Business Days of the Breaching Non-Dealer Notice Date, an Early Termination Date in respect of the Non-Dealer Unwound Swaps;

(ii)     a portion of each item of Collateral (excluding: (A) all MFF Collateral and (B) any amount standing to the credit of the Draw Accounts of all Lenders and the Collection Account) equal to the Non-Dealer Unwind Percentage, together with the Breaching Non-Dealer Lender's contributions to MFF Collateral which remain MFF Collateral date of the relevant Partial Terminal Unwind Event Date and any amount standing to the credit of the Breaching Non-Dealer Lender's Draw Account (the **Non-Dealer Unwound Collateral**) shall be liquidated pursuant to the liquidation procedure set forth in Section 4.9 (*Liquidation of Collateral*) and, on the relevant Distribution Date, subject to Section 6.7 (*Holdback Amounts and Allocations*) and in accordance with the relevant Distribution Date Report, the Collateral Agent shall distribute: (x) first, an allocated portion of any amount standing to the credit of the Collection Account on the date of the relevant Partial Terminal Unwind Event Date, in the order of priority and as more specifically described in Section 6.3 (*Application of Proceeds in the Ordinary Course*) provided that: (I) in the case of each claim thereunder, solely to the extent of the Non-Dealer Unwind Percentage thereof (except as otherwise provided in Section 6.3 with respect to Sections 6.3(a) and 6.3(o) (*Application of Proceeds in the Ordinary Course*)); and (II) no Lender (in its capacity as Lender) other than the relevant Breaching Non-Dealer Lender and its Affiliates shall have any claim to such amounts; and (y) second, the relevant Sale Collateral Proceeds pursuant to Section 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*);

(iii)     recourse of the LSS CDS Counterparties in respect of any Termination Payments and Unpaid Amounts payable in connection with the Non-Dealer Unwound Swaps shall be limited to the Sale Collateral Proceeds of the Non-Dealer Unwound Collateral distributed pursuant to Section 6.1 (*Application of Proceeds from the Liquidation of Original Collateral*) and Section 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*) and, in the event that the aggregate of all Termination Payments and Unpaid Amounts payable to all LSS CDS Counterparties in respect of the Non-Dealer Unwound Swaps following a Partial Terminal Unwind Event is greater than the Sale Collateral Proceeds of the Non-Dealer Unwound Collateral, the MAV hereby assigns to each LSS CDS Counterparty with unsatisfied claims its right to issue proceedings against the Breaching Non-Dealer Lender in respect of the portion of the Termination Payments and Unpaid Amounts not paid, up to a maximum amount equal to the Defaulted Advances of such Breaching Non-Dealer Lender, together with any legal costs associated with such legal proceedings and any damages claimed in respect of any interest amounts lost as a result of such Non-Dealer Lender Default from and

including the Breaching Non-Dealer Notice Date to the date of any judgment, and any LSS CDS Counterparty which commences any such proceedings shall forthwith on demand indemnify the MAV for any liability to any third-party or costs and related expenses which the MAV may incur as a result of such LSS CDS Counterparty pursuing such proceedings;

(iv)    payments of all principal in respect of Advances and interest (including in respect of MFF Fees and Breakage Costs) shall be subordinated and payable to such Breaching Non-Dealer Lender only as provided in Sections 6.2(t) and 6.3(t);

(v)    from and including the Breaching Non-Dealer Notice Date and at all times thereafter: (A) the Lender's Commitment of such Breaching Non-Dealer Lender shall be reduced to zero and the Administrative Agent shall update its records accordingly; and (B) the relevant Non-Dealer Unwound Collateral shall be disregarded for the purposes of determining the Value of Posted Collateral, unless and until the proceeds of any Non-Dealer Unwound Collateral are deposited in the Collateral Account pursuant to Section 6.4(b)(x); and

(vi)    any claims (other than the right to pursue legal proceedings described in Section 4.3(g)(iii)) of a Dealer or any other Person (including the relevant Unwinding Lender) identified in Section 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*) with respect to Non-Dealer Unwound Collateral or the Non-Dealer Unwound Swaps not satisfied in full after distribution of the proceeds of liquidation of the Non-Dealer Unwound Collateral pursuant to the terms of Section 6.1 (*Application of Proceeds from the Liquidation of Original Collateral*) and Section 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*), shall be payable only pursuant to Sections 6.2(s) and 6.3(s) provided, however, that an indemnity claim not paid on such date shall remain payable on future dates in accordance with the priorities stated in Sections 6.2, 6.3 and/or 6.4, as applicable.

**4.4    Cash Settlement Amounts**

(a)    With respect to Cash Settlement Amounts due under an Unlevered CDS, such amounts shall be satisfied exclusively by delivery by the relevant Custodian to the Non-breaching Dealer of Allocated Collateral in respect of the Unlevered CDS under which such Cash Settlement Amount is due and payable with a Value equal to such Cash Settlement Amount until such Allocated Collateral in respect of the relevant Unlevered CDS is exhausted and upon exhaustion of such Allocated Collateral, any then-remaining Cash Settlement Amounts under the relevant Unlevered CDS shall be extinguished.

(b)    With respect to a Cash Settlement Amount due under a LSS CDS, such amount shall be satisfied:

(i)    first, by delivery of any LSS CDS Original Collateral of the relevant LSS CDS Counterparty, selected by such LSS CDS Counterparty in its sole discretion, until the LSS CDS Original Collateral is exhausted.

For the purposes of this Section 4.4(b)(i), the LSS CDS Counterparty shall select for delivery LSS CDS Original Collateral with a Value (treating any amounts attributed to accrued but unpaid interest thereon as additional Original Collateral) equal to: (A) the

Cash Settlement Amount; or (B) if applicable, the lowest integral multiple of the authorised denomination of the relevant item of LSS CDS Original Collateral sufficient to satisfy such Cash Settlement Amount, in which case, the LSS CDS Counterparty shall owe the MAV an amount equal to the excess (if any) of the amount in (B) over the Cash Settlement Amount, and such amount shall be held by the relevant LSS CDS Counterparty as Other Posted Support and applied by such LSS CDS Counterparty to the next amount owed to it by the MAV in respect of any LSS CDS or: (x) to the extent that sufficient amounts are never owed, upon the termination of all the LSS CDSs of the relevant LSS CDS Counterparty or (y) if the Dealer becomes a Breaching Dealer, on the Breaching Dealer Notice Date, such excess amount shall be paid to the MAV, together with interest at the Default Rate from the date of such excess delivery of Collateral to the LSS CDS Counterparty; and

(ii)     second, if following delivery or payment of available amounts pursuant to Section 4.4(b)(i), all or any portion of a Cash Settlement Amount owing to a LSS CDS Counterparty under a LSS CDS remains unpaid:

(A)     first, a portion of any such Cash Settlement Amount not paid shall be deemed to be satisfied without payment of any amount from the MAV to the relevant LSS CDS Counterparty in an amount equal to the sum of its Collateral Entitlement Proportion of: (i) Failed Extension Advances which are available to reduce a LSS CDS Counterparty's claims under its Swap Agreement pursuant to Section 2.11(e); and (ii) any Defaulted Advances which are available to reduce a LSS CDS Counterparty's claims under its Swap Agreement pursuant to Sections 4.1(h) and 4.3(d) and the MAV hereby assigns to such LSS CDS Counterparty its right to issue proceedings against Breaching Non-Dealer Lenders in respect of any such portion of the Cash Settlement Amount deemed to be so satisfied pursuant to Section 4.3(d), together with any legal costs associated with legal proceedings and any damages claimed in respect of interest amounts lost as a result of delayed payment of such amounts from and including the Cash Settlement Date to the date of any judgment;

(B)     second, if any portion of the Cash Settlement Amount remains unpaid following delivery or payment of available amounts pursuant to Section 4.4(b)(i) and any deemed satisfaction of any portion of such unpaid amount pursuant to Section 4.4(b)(ii)(A), the Administrator shall determine in its reasonable judgement whether the MAV is expected to have sufficient funds to pay all amounts described in Section 6.3(a) that are payable on or prior to the next Payment Date (or, if the date on which the relevant Liquidation Period is expected to end will occur after the Determination Date relating to such next Payment Date, then the second following Payment Date) and, if not, it shall estimate in a commercially reasonable manner the amount of the expected shortfall (any such estimated amount (determined as of the date on which the relevant amount became payable pursuant to the terms of the relevant Swap Agreement, without reference to any delay in the payment or satisfaction of such amounts which would otherwise occur pursuant to the terms of the Omnibus Agreement), a **Senior Expense Shortfall**);

(C)     third, the Administrator, on behalf of the MAV, shall liquidate CA-Held Collateral (other than Undrawn Commitments and any amount standing to the

credit of the Draw Account of any Lender) pursuant to the liquidation procedure provided for in Section 4.9 (*Liquidation of Collateral*) such that the relevant Sale Collateral Proceeds thereof will be sufficient to pay the amount of the Cash Settlement Amount which remains unpaid to the relevant LSS CDS Counterparty and its Collateral Entitlement Proportion (determined as of the date on which the relevant Cash Settlement Amount became payable pursuant to the terms of the relevant Swap Agreement, without reference to any delay in the payment or satisfaction of such amounts which would otherwise occur pursuant to the terms of the Omnibus Agreement) of the Senior Expense Shortfall; provided that (subject to the adjustments permitted pursuant to Section 4.9 (*Liquidation of Collateral*) due to minimum denomination requirements or similar restrictions on transfer) the Value of the CA-Held Collateral to be liquidated shall not exceed, in aggregate, an amount equal to the relevant Collateral Entitlement Proportion thereof.   The Administrator, on behalf of the MAV, shall direct the following to occur no later than the fifth Business Day following the end of the relevant Liquidation Period (subject to the provisions of Section 6.8 (*Delayed Settlements*), in the following order of priority: (I) the deposit to the Collateral Account of the Sale Collateral Proceeds, if any, determined by the Administrator to be attributable to the liquidation, pursuant to Section 4.9 (*Liquidation of Collateral*) of CA-Held Collateral in excess of the relevant Collateral Entitlement Proportion thereof; (II) the deposit to the Expense Account of an amount equal to the relevant Collateral Entitlement Proportion of the Senior Expense Shortfall, if any; (III) if the relevant LSS CDS Counterparty is a Non-Funding MFF Dealer: (1) first, the distribution to it of the lesser of: (x) the unpaid portion of the Cash Settlement Amount; (y) the remaining balance of the Sale Collateral Proceeds; and (z) the excess of its Collateral Entitlement Proportion of the Market Value of all CA-Held Collateral as of such date over its Dealer Non-Funded Amount; and (2) second, the deposit of the remainder (in satisfaction of an equivalent portion of the remaining balance of the Cash Settlement Amount) in the MFF Account or, where such Non-Funding MFF Dealer is a Downgraded Lender, Posted by the relevant Non-Funding MFF Dealer to the MAV pursuant to its Lender Credit Support Agreement, which such remainder shall be deemed to be an Advance or Posted Lender's Credit Support, as the case may be, made by such Non-Funding MFF Dealer (or its Affiliate which is a Lender, as the case may be); (IV) if the relevant LSS CDS Counterparty is not a Non-Funding MFF Dealer, the distribution to it of the unpaid portion of the Cash Settlement Amount (or, if less, the remaining balance of the Sale Collateral Proceeds); and (V) the deposit to the Collateral Account of the remaining balance of the Sale Collateral Proceeds;

(D)     fourth, if any portion of the Cash Settlement Amount remains unpaid following delivery or payment of available amounts pursuant to Sections 4.4(b)(i) and 4.4(b)(ii)(C) (assuming for this purpose, with respect to trades made but not yet settled at the end of the relevant Liquidation Period, that the proceeds thereof had been available by the end of the Liquidation Period) and any deemed satisfaction of any portion of such unpaid amount pursuant to Section 4.4(b)(ii)(A), the Administrator shall deliver a Draw Notice (which may be by Website Posting) to the Administrative Agent (copied to each LSS CDS Counterparty, each Lender, the Collateral Agent and the Rating Agency) by

12:00 noon on the first Business Day following the end of the relevant Liquidation Period, requesting an Advance in respect of the amount of such Cash Settlement Amount remaining unpaid, up to a maximum amount, in respect of the relevant LSS CDS Counterparty, equal to its Collateral Entitlement Proportion of the aggregate Undrawn Commitments determined as of the date of the Draw Notice; and

(E)     if the Administrator fails to deliver a Draw Notice to the Administrative Agent pursuant to Section 4.4(b)(ii)(D) by 12:00 noon on the first Business Day following the end of the relevant Liquidation Period, the relevant LSS CDS Counterparty may deliver such Draw Notice to the Administrative Agent (copied to the Deal Parties) on behalf of the MAV on or after such date.

(iii)     The Initial Available Collateral Amount with respect to the relevant LSS CDS Counterparty shall be reduced by an amount equal to the amount of such Cash Settlement Amounts paid or deemed to be satisfied, in each case pursuant to this Section 4.4 (*Cash Settlement Amounts*) on or prior to the occurrence of a Second Spread/Loss Trigger Event.

(c)     If, in respect of a LSS CDS Counterparty (other than a Breaching Dealer), Cash Settlement Amounts remain unpaid following delivery or payment of available amounts or any deemed satisfaction of any claims pursuant to Section 4.4 (*Cash Settlement Amounts*) and if the Collateral Entitlement of such LSS CDS Counterparty is greater than zero:

(i)     on the first Business Day of any of February, May, August and November; (each such date, a **Collateral Entitlement Recalculation Date**), then the Administrator shall liquidate CA-Held Collateral and/or deliver a Draw Notice and cause the payment of any unpaid Cash Settlement Amounts to such LSS CDS Counterparty, all in accordance with the provisions of Sections 4.4(b)(ii)(C), 4.4(b)(ii)(D) and 4.4(b)(ii)(E) above, as applicable, provided that references to the Collateral Entitlement Proportion of such LSS CDS Counterparty shall be calculated as of the relevant Collateral Entitlement Recalculation Date; and

(ii)     not later than the second Business Day following receipt by the MAV of the proceeds of sale of any excess CA-Held Collateral which has been liquidated pursuant to Sections 4.8(b) or 4.8(c) but before any such sale proceeds are transferred to the Collection Account, the Collateral Agent (acting on the instruction of the Administrator) shall transfer to the relevant LSS CDS Counterparty a portion of such sale proceeds up to an amount equal to the lesser of: (i) the unpaid portion of the Cash Settlement Amounts owed to such LSS CDS Counterparty; and (ii) the relevant LSS CDS Counterparty's Collateral Entitlement Proportion of the proceeds of liquidation of such excess CA-Held Collateral.

## 4.5     Original Collateral Default

If all or any part of the Allocated Collateral ascribed to any LSS CDS or Unlevered CDS of any Dealer (other than Wrapped Collateral) becomes Defaulted Dealer Collateral and unless, within four Business Days after receipt by the Administrator of notice (copied to the Deal Parties) from the Dealer that such Allocated Collateral has become Defaulted Dealer Collateral: (x) with respect to any LSS CDS Original Collateral, the MAV transfers Substitute Original Collateral to the relevant LSS CDS Counterparty in

exchange for and having a Value equal to the face amount of such defaulted LSS CDS Original Collateral and which is acceptable to the relevant LSS CDS Counterparty, acting reasonably, in exchange for such Defaulted Dealer Collateral (such substitution to occur only: (i) with the prior written consent of the Required Lenders; and (ii) if the Rating Agency Condition is satisfied in respect thereof); or (y) with the consent of the Administrator, the relevant Dealer elects, with four Business Days' advance notice to the Administrator (copied to the Deal Parties) and with the prior written consent of the Required Lenders, for the Administrator to dispose of such Defaulted Dealer Collateral and to have the proceeds invested pursuant to the terms of Section 4.12 (*Reinvestment of Matured Original Collateral*) (it being understood that such liquidation and reinvestment may not occur within such four Business Day period), then such event shall be deemed to be an **Original Collateral Default** and the following provisions shall apply:

(a)      such Dealer may, within two Business Days following the expiry of the four Business Day period referred to above, designate an Early Termination Date in respect of: (i) the Unlevered CDS or LSS CDS (and any related Wrap Swaps) to which such Allocated Collateral is related in the case where all of such Allocated Collateral becomes Defaulted Dealer Collateral; or (ii) in the case of an Original Collateral Default with respect to part, but not all of the Allocated Collateral ascribed to an Unlevered CDS or LSS CDS, a fraction of the notional amount of such Transaction, the numerator of which is the Value of the relevant Defaulted Dealer Collateral and the denominator of which is the Value of all Allocated Collateral ascribed to such Transaction, and, in each case, such designation shall not cause an early termination of that Dealer's other Transactions with the MAV;

(b)      any Termination Payment and/or Unpaid Amount in respect of each Unlevered CDS or LSS CDS being terminated in whole or in part pursuant to Section 4.5(a), shall be satisfied exclusively and in full by delivery of an amount of such Defaulted Dealer Collateral in respect of such Unlevered CDS or LSS CDS, as the case may be, with a Value equal to such Termination Payment and/or Unpaid Amount and any remaining claim of the relevant Dealer to such amounts after delivery of such Defaulted Dealer Collateral shall be extinguished; and

(c)      after the amount payable to such LSS CDS Counterparty pursuant to Section 4.5(b) has been satisfied, the balance, if any, of the relevant Defaulted Dealer Collateral in respect of the Unlevered CDS or LSS CDS being terminated shall immediately be released from such Dealer's Security Interest in its Original Collateral and such LSS CDS Counterparty shall deliver such Defaulted Dealer Collateral or procure the delivery thereof to the Collateral Agent (for deposit in the Collateral Account) and shall constitute CA-Held Collateral.

**4.6      Early Termination of all of the Transactions under a Dealer's Swap Agreement**

If at any time, upon an early termination in whole of all (but not some) of the Transactions under the Swap Agreement of any Dealer, a Termination Payment or Unpaid Amount becomes due and payable by the MAV for a reason other than as a result of: (i) an Original Collateral Default, (ii) the occurrence of a Partial Terminal Unwind Event or a Terminal Unwind Event or (iii) a Dealer becoming a Breaching Dealer:

(a)      With respect to such amounts due under an Unlevered CDS and related Wrap Swaps, such amounts shall be satisfied exclusively by liquidation pursuant to Section 4.9 (*Liquidation of Collateral*) (or, if applicable, the terms of the relevant Wrap Swap) of the Allocated Collateral in respect of the Unlevered CDS under which such Termination Payment and/or Unpaid Amount is due and payable until such Allocated Collateral is exhausted, at which point any remaining

claim of the relevant Dealer to such Termination Payment and/or Unpaid Amount shall be extinguished.  The Non-breaching Dealer shall deliver or procure the delivery to the Collateral Agent (for deposit in the Collateral Account as CA-Held Collateral) any such Allocated Collateral (or proceeds thereof) remaining after being applied to pay Termination Payments and Unpaid Amounts in respect of the relevant Unlevered CDS (and related Wrap Swap, if any).

(b)    (i)    With respect to such amounts due under a LSS CDS and relevant Wrap Swaps, such amounts shall be satisfied by the liquidation pursuant to Section 4.9 (*Liquidation of Collateral*) (or, if applicable, the terms of the relevant Wrap Swap) of any LSS CDS Original Collateral of the relevant LSS CDS Counterparty, until such LSS CDS Original Collateral is exhausted or the Termination Payment and/or Unpaid Amount is satisfied in full.

(ii)    if the Sale Collateral Proceeds of the LSS CDS Original Collateral of the relevant LSS CDS Counterparty are insufficient to satisfy such amounts due under the relevant LSS CDS:

(A)    first, a portion of any Termination Payment or Unpaid Amount not paid pursuant to Section 4.6(b)(i) shall be deemed to be satisfied without payment of any amount from the MAV to the relevant LSS CDS Counterparty in an amount equal to the sum of its Collateral Entitlement Proportion of: (i) Failed Extension Advances which are available to reduce a LSS CDS Counterparty's claims under its Swap Agreement pursuant to Section 2.11(e); and (ii) any Defaulted Advances which have not previously been applied to reduce a LSS CDS Counterparty's claims under its Swap Agreement pursuant to Sections 4.1(h) and 4.3(d) and the MAV hereby assigns to such LSS CDS Counterparty its right to issue proceedings against Breaching Non-Dealer Lenders in respect of any such portion of the Termination Payment or Unpaid Amount deemed to be so satisfied pursuant to Section 4.3(d), together with any legal costs associated with legal proceedings and any damages claimed in respect of interest amounts lost as a result of delayed payment of such amounts from and including the relevant Early Termination Date to the date of any judgment;

(B)    second, if any portion of any Termination Payment or Unpaid Amount remains unpaid following delivery or payment of available amounts pursuant to Section 4.6(b)(i) and any deemed satisfaction of any portion of such unpaid amount pursuant to Section 4.6(b)(ii)(A), the Administrator shall determine in its reasonable judgement whether, as described in Section 4.4(b)(ii)(B), a Senior Expense Shortfall is expected to exist and the amount thereof;

(C)    third, the Administrator shall liquidate CA-Held Collateral (other than Undrawn Commitments and any amount standing to the credit of the Draw Account of any Lender) pursuant to the liquidation procedure provided for in Section 4.9 (*Liquidation of Collateral*) such that the Sale Collateral Proceeds thereof will be sufficient to pay the portion of the Termination Payment or Unpaid Amount remaining unpaid to the relevant LSS CDS Counterparty and its Collateral Entitlement Proportion (determined as of the date on which the relevant Termination Payment or Unpaid Amount became payable pursuant to the terms of the relevant Swap Agreement, without reference to any delay in the payment or satisfaction of such amounts pursuant to the terms of the Omnibus

Agreement) of the Senior Expense Shortfall, if any, provided that (subject to the adjustments permitted pursuant to Section 4.9 (*Liquidation of Collateral*) due to minimum denomination requirements or similar restrictions on transfer) the Value of the CA-Held Collateral to be liquidated shall not exceed, in aggregate, an amount equal to the relevant Collateral Entitlement Proportion thereof. The Administrator shall direct the following to occur no later than the fifth Business Day following the end of the relevant Liquidation Period (subject to the provisions of Section 6.8 (*Delayed Settlements*), in the following order of priority: (I) the deposit to the Collateral Account of the Sale Collateral Proceeds, if any, determined by the Administrator to be attributable to the liquidation, pursuant to Section 4.9 (*Liquidation of Collateral*) of CA-Held Collateral in excess of the relevant Collateral Entitlement Proportion thereof; (II) the deposit to the Expense Account of an amount equal to the relevant Collateral Entitlement Proportion of the Senior Expense Shortfall, if any; (III) if the relevant LSS CDS Counterparty is a Non-Funding MFF Dealer: (1) first, the distribution to it of the lesser of: (x) the unpaid portion of the Termination Payment or Unpaid Amount; (y) the remaining balance of the Sale Collateral Proceeds; and (z) the excess of its Collateral Entitlement Proportion of the Market Value of all CA-Held Collateral as of such date over its Dealer Non-Funded Amount; and (2) second, the remainder to be deposited (in satisfaction of an equivalent portion of the remaining balance of the Termination Payment or Unpaid Amount) into the MFF Account or, where such Non-Funding MFF Dealer is a Downgraded Lender, to be transferred by the relevant Non-Funding MFF Dealer to the MAV pursuant to the Lender Credit Support Agreement of such Non-Funding MFF Dealer, which such remainder shall be deemed to be an Advance or Posted Lender's Credit Support, as the case may be, of such Non-Funding MFF Dealer; (IV) if the relevant LSS CDS Counterparty is not a Non-Funding MFF Dealer, the distribution to the relevant LSS CDS Counterparty of the unpaid portion of the Termination Payment or Unpaid Amount (or, if less, the remaining balance of the Sale Collateral Proceeds); and (V) the deposit to the Collateral Account of the remaining balance of the Sale Collateral Proceeds;

(D)    fourth, if any portion of the Termination Payment or Unpaid Amount remains unpaid following delivery or payment of available amounts pursuant to Sections 4.6(b)(ii)(B) or 4.6(b)(ii)(C) (assuming for this purpose, with respect to trades made but not yet settled at the end of the relevant Liquidation Period, that the proceeds thereof had been available by the end of the Liquidation Period) and any deemed satisfaction of any portion of such unpaid amount pursuant to Section 4.6(b)(ii)(A), the Administrator, on behalf of the MAV, shall deliver a Draw Notice (which may be by Website Posting) to the Administrative Agent (copied to each LSS CDS Counterparty, each Lender, the Collateral Agent and the Rating Agency) by 12:00 noon on the first Business Day following the end of the relevant Liquidation Period, requesting an Advance in respect of the amount of such Termination Payment or Unpaid Amount remaining unpaid, up to a maximum amount, in respect of the relevant LSS CDS Counterparty, equal to its Collateral Entitlement Proportion of the aggregate Undrawn Commitments determined as of the date of the Draw Notice; and

(iii)    if the Administrator fails to deliver a Draw Notice to the Administrative Agent pursuant to Section 4.6(b)(ii)(D) by 12:00 noon on the first Business Day following the end of the

relevant Liquidation Period, the relevant LSS CDS Counterparty may deliver such Draw Notice to the Administrative Agent (copied to the Deal Parties) on behalf of the MAV on or after such date.

(c)     Once all Termination Payments and Unpaid Amounts due to the relevant LSS CDS Counterparty under its LSS CDSs have been satisfied, such LSS CDS Counterparty shall deliver any remaining LSS CDS Original Collateral (or any Sale Collateral Proceeds thereof) to the Collateral Account to be held as CA-Held Collateral, free and clear of such Dealer's Security Interest in its Original Collateral.

(d)     The Initial Available Collateral Amount with respect to any LSS CDS Counterparty whose Swap Agreement is terminated pursuant to this Section 4.6 (*Early Termination of all of the Transactions under a Dealer's Swap Agreement*) shall be reduced to zero on the date on which all payments due to such LSS CDS Counterparty in respect of its LSS CDSs (and related Wrap Swaps) have been satisfied in full pursuant to the terms of this Agreement.

## 4.7    Early Termination of some (but not all) of the Transactions under a Dealer's Swap Agreement

If at any time, upon an early termination of some (but not all) of the Transactions under the Swap Agreement of any Dealer, a Termination Payment or Unpaid Amount becomes due and payable by the MAV for a reason other than as a result of: (i) an Original Collateral Default; (ii) the occurrence of a Partial Terminal Unwind Event or a Terminal Unwind Event; (iii) a Dealer becoming a Breaching Dealer; or (iv) the partial termination of an Unlevered CDS in connection with the liquidation of CA-Held Collateral pursuant to Sections 4.4 (*Cash Settlement Amounts*), 4.6 (*Early Termination of all of the Transactions under a Dealer's Swap Agreement*) or this Section 4.7 (*Early Termination of some (but not all) of the Transactions under a Dealer's Swap Agreement*):

(a)     With respect to Termination Payments or Unpaid Amounts due under an Unlevered CDS and related Wrap Swaps, such amounts shall be satisfied exclusively by delivery by the relevant Custodian to the Non-breaching Dealer of Allocated Collateral in respect of the Unlevered CDS under which such Termination Payments and/or Unpaid Amounts are due and payable until such Allocated Collateral is exhausted, at which point any remaining claim of the relevant Dealer to such Termination Payment and/or Unpaid Amount shall be extinguished.  The Non-breaching Dealer shall deliver or procure the delivery to the Collateral Agent (for deposit to the Collateral Account) of any such Allocated Collateral (or proceeds thereof) remaining after being applied to pay Termination Payments and Unpaid Amounts in respect of the relevant Unlevered CDS (and related Wrap Swap, if any) and any such Allocated Collateral shall constitute CA-Held Collateral.

(b)     With respect to such Termination Payment and/or Unpaid Amounts due under a terminated LSS CDS, such amounts shall be satisfied:

(i)     first, by delivery of any LSS CDS Original Collateral of the relevant LSS CDS Counterparty, selected by such LSS CDS Counterparty in its sole discretion until such LSS CDS Original Collateral is exhausted or the Termination Payment and/or Unpaid Amount is satisfied in full.

For the purposes of this Section 4.7(b)(i), the LSS CDS Counterparty shall select for delivery LSS CDS Original Collateral with a Value (treating any amounts attributed to accrued but unpaid interest thereon as additional Original Collateral) equal to: (A) the

Termination Payment and/or Unpaid Amount; or (B) if applicable, the lowest integral multiple of the authorised denomination of the relevant item of Collateral sufficient to satisfy such Termination Payment and/or Unpaid Amount, in which case, the LSS CDS Counterparty shall owe the MAV an amount equal to the excess (if any) of the amount in (B) over the Termination Payment and/or Unpaid Amount, and such amount shall be held by the relevant Dealer as Other Posted Support and applied by such LSS CDS Counterparty to the next amount owed to it by the MAV in respect of any LSS CDS or: (x) to the extent that sufficient amounts are never owed, upon the termination of all the LSS CDSs of the relevant LSS CDS Counterparty; or (y) if the Dealer becomes a Breaching Dealer, on the Breaching Dealer Notice Date, such excess amount shall be paid to the MAV, together with interest at the Default Rate from the date of such excess delivery of Collateral to the LSS CDS Counterparty;

(ii)     second, if the Original Collateral of the relevant LSS CDS Counterparty is insufficient to satisfy such amounts due under the relevant LSS CDS:

(A)     first, a portion of any Termination Payment or Unpaid Amount not paid pursuant to Section 4.7(b)(i) shall be deemed to be satisfied without payment of any amount from the MAV to the relevant LSS CDS Counterparty in an amount equal to its Collateral Entitlement Proportion of: (i) Failed Extension Advances which are available to reduce a LSS CDS Counterparty's claims under its Swap Agreement pursuant to Section 2.11(e); and (ii) the sum of any Defaulted Advances which are available to reduce a LSS CDS Counterparty's claims under its Swap Agreement pursuant to Sections 4.1(h) and 4.3(d) and the MAV hereby assigns to such LSS CDS Counterparty its right to issue proceedings against Breaching Non-Dealer Lenders in respect of any such portion of the Termination Payment or Unpaid Amount deemed to be so satisfied pursuant to Section 4.3(d), together with any legal costs associated with legal proceedings and any damages claimed in respect of interest amounts lost as a result of delayed payment of such amounts from and including the relevant Early Termination Date to the date of any judgment;

(B)     second, if any portion of any Termination Payment or Unpaid Amount remains unpaid following delivery of available amounts pursuant to Section 4.7(b)(i) and any deemed satisfaction of any portion of such unpaid amount pursuant to Section 4.7(b)(ii)(A), the Administrator shall determine in its reasonable judgement whether, as described in Section 4.4(b)(ii)(B), a Senior Expense Shortfall is expected to exist and the amount thereof;

(C)     third, the Administrator shall liquidate CA-Held Collateral (other than Undrawn Commitments and any amount standing to the credit of the Draw Account of any Lender) pursuant to the liquidation procedure provided for in Section 4.9 (*Liquidation of Collateral*) such that the Sale Collateral Proceeds thereof will be sufficient to pay the portion of the Termination Payment or Unpaid Amount remaining unpaid to the relevant LSS CDS Counterparty and its Collateral Entitlement Proportion (determined as of the date on which the relevant Termination Payment or Unpaid Amount became payable pursuant to the terms of the relevant Swap Agreement, without reference to any delay in the payment or satisfaction of such amounts pursuant to the terms of the Omnibus Agreement) of the Senior Expense Shortfall, if any; provided that (subject to the

adjustments permitted pursuant to Section 4.9 (*Liquidation of Collateral*) due to minimum denomination requirements or similar restrictions on transfer) the Value of the CA-Held Collateral to be liquidated shall not exceed, in aggregate, an amount equal to the relevant Collateral Entitlement Proportion thereof.  The Administrator shall direct the following to occur no later than the fifth Business Day following the end of the relevant Liquidation Period (subject to the provisions of Section 6.8 (*Delayed Settlements*), in the following order of priority: (I) the deposit to the Collateral Account of the Sale Collateral Proceeds, if any, determined by the Administrator to be attributable to the liquidation, pursuant to Section 4.9 (*Liquidation of Collateral*) of CA-Held Collateral in excess of the relevant Collateral Entitlement Proportion thereof; (II) the deposit to the Expense Account of an amount equal to the relevant Collateral Entitlement Proportion of the Senior Expense Shortfall, if any; (III) if the relevant LSS CDS Counterparty is a Non-Funding MFF Dealer: (1) first, the distribution to it of the lesser of: (x) the unpaid portion of the Termination Payment or Unpaid Amount; (y) the remaining balance of the Sale Collateral Proceeds; and (z) the excess of its Collateral Entitlement Proportion of the Market Value of all CA-Held Collateral as of such date over its Dealer Non-Funded Amount; and (2) second, the deposit of the remainder (in satisfaction of an equivalent portion of the remaining balance of the Termination Payment or Unpaid Amount) in the MFF Account or, where such Non-Funding MFF Dealer is a Downgraded Lender, the transfer by the relevant Non-Funding MFF Dealer to the MAV pursuant to its Lender Credit Support Agreement, which such remainder shall be deemed to be an Advance or Posted Lender's Credit Support, as the case may be, made by such Non-Funding MFF Dealer; (IV) if the relevant LSS CDS Counterparty is not a Non-Funding MFF Dealer, the distribution to it of the unpaid portion of the Termination Payment or Unpaid Amount (or, if less, the remaining balance of the Sale Collateral Proceeds); and (V) the deposit to the Collateral Account of the remaining balance of the Sale Collateral Proceeds;

(D)     fourth, if any portion of the Termination Payment or Unpaid Amount remains unpaid following delivery or payment of available amounts pursuant to Sections 4.7(b)(i) or 4.7(b)(ii)(C) (assuming for this purpose, with respect to trades made but not yet settled at the end of the relevant Liquidation Period, that proceeds thereof had been available by the end of the Liquidation Period) and any deemed satisfaction of any portion of such unpaid amount pursuant to Section 4.7(b)(ii)(A), the Administrator shall deliver a Draw Notice (which may be by Website Posting) by 12:00 noon on the first Business Day following the end of the relevant Liquidation Period to the Administrative Agent (copied to each LSS CDS Counterparty, each Lender, the Collateral Agent and the Rating Agency) requesting an Advance in respect of the amount of such Termination Payment or Unpaid Amount remaining unpaid, up to a maximum amount in respect of the relevant LSS CDS Counterparty, equal to its Collateral Entitlement Proportion of the aggregate Undrawn Commitments determined as of the date of the Draw Notice; and

(E)     if the Administrator fails to deliver a Draw Notice to the Administrative Agent pursuant to Section 4.7(b)(ii)(D) by 12:00 noon on the first Business Day following the end of the relevant Liquidation Period, the relevant LSS CDS

Counterparty may deliver such Draw Notice to the Administrative Agent (copied to the Deal Parties) on behalf of the MAV on or after the relevant date; and

(iii)   the Initial Available Collateral Amount with respect to the relevant LSS CDS Counterparty shall be reduced by an amount equal to any portion of Termination Payments and Unpaid Amounts paid or deemed to be satisfied, in each case, pursuant to this Section 4.7 (*Early Termination of some (but not all) of the Transactions under a Dealer's Swap Agreement*).

(c)   If, in respect of a LSS CDS Counterparty (other than a Breaching Dealer), Termination Payments and Unpaid Amounts remain unpaid following delivery or payment of available amounts or any deemed satisfaction of any claims pursuant to Section 4.7 (*Early Termination of some (but not all) of the Transactions under a Dealer's Swap Agreement*) and if the Collateral Entitlement of such LSS CDS Counterparty is greater than zero:

(i)   on any Collateral Entitlement Recalculation Date, then the Administrator shall liquidate CA-Held Collateral and/or deliver a Draw Notice and cause the payment of any unpaid Termination Payments and Unpaid Amounts to such LSS CDS Counterparty, all in accordance with the provisions of Sections 4.7(b)(b)(ii)(b)(ii)(C), 4.7(b)(ii)(D) and 4.7(b)(ii)(E) above, as applicable, provided that references to the Collateral Entitlement Proportion of such LSS CDS Counterparty shall be calculated as of the relevant Collateral Entitlement Recalculation Date; and

(ii)   not later than the second Business Day following receipt by the MAV of the proceeds of sale of any excess CA-Held Collateral which is liquidated pursuant to Sections 4.8(b) or 4.8(c) but before any such sale proceeds are transferred to the Collection Account, then the Collateral Agent (acting on the instruction of the Administrator) shall transfer to the relevant LSS CDS Counterparty a portion of such sale proceeds up to an amount equal to the lesser of: (i) the unpaid portion of the sum of the Termination Payments and Unpaid Amounts owed to such LSS CDS Counterparty; and (ii) the relevant LSS CDS Counterparty's Collateral Entitlement Proportion of the proceeds of liquidation of such excess CA-Held Collateral.

## 4.8    Release of Collateral

(a)   As soon as possible after any of its Original Collateral becomes Released Collateral, the relevant Dealer shall transfer or procure the transfer of such Released Collateral to the Collateral Account whereafter, subject to Section 4.8(b), it shall constitute CA-Held Collateral to secure the remaining Secured Liabilities and shall not be available for distribution pursuant to Section 6.3 (*Application of Proceeds in the Ordinary Course*) (except to the extent that such Released Collateral constitutes Income Distributions).

(b)   If:

(i)   on any Business Day on or after December 23, 2012: (A) none of the Index Spreads of any of the Matrix Portfolios are within 50 per cent. of the relevant Trigger Spread; and (B) the Administrator does not have notice that any event is continuing which would, with the giving of notice or the lapse of time or both, constitute a Termination Event or an Event of Default for which the MAV would be an Affected Party or the Defaulting

Party under any LSS CDS, Unlevered CDS or Wrap Swap outstanding with any Dealer; or

(ii)    all LSS CDSs and any related Wrap Swaps have been terminated and all amounts due thereunder have been paid in full (other than any amounts owed to Breaching Dealers) pursuant to the provisions of this Agreement,

then (x) all Released Collateral shall be liquidated by the Administrator, pursuant to the liquidation procedure in Section 4.9 (*Liquidation of Collateral*); and (y) in the case of Subclause (ii) above only, the Administrator may (in its discretion) liquidate other CA-Held Collateral (or any item thereof) and, subject to Sections 4.4(c) and 4.7(c), the relevant Sale Collateral Proceeds (as well as any amounts attributed to accrued but unpaid interest) of such liquidation shall, on the Payment Date for the Due Period during which the relevant Liquidation Period ends, be distributed pursuant to Section 6.3 (*Application of Proceeds in the Ordinary Course*). During any period between the Business Day following the date on which the Sale Collateral Proceeds of such Released Collateral are received by the MAV and the Payment Date on which the resulting Sale Collateral Proceeds are distributed pursuant to Section 6.3 (*Application of Proceeds in the Ordinary Course*), the Administrator shall invest such Sale Collateral Proceeds according to the Eligibility Criteria applicable to Assets in the Collection Account.

(c)    If on any date: (i) prior to the occurrence of a Second Spread/Loss Trigger Event; or (ii) following the occurrence of a Second Spread/Loss Trigger Event if no Advances remain outstanding, in each case, according to the next Valuation Report delivered following the sale of a Par Sale Asset pursuant to the Administration Agreement: (i) the Market Value of all CA-Held Collateral (excluding: (A) Released Collateral which has not been distributed pursuant to Section 6 (*Application of Proceeds*); (B) Undrawn Commitments; (C) MFF Collateral; (D) Dealer Non-Funded Amounts; and (E) any funds standing to the credit of the Collection Account, Reserve Account, all OC Transfer Sub-Accounts and Draw Accounts) immediately following such sale exceeds (ii) the aggregate of the Initial Available Collateral Amounts less the aggregate of all Original Collateral and Lender's Commitments as of the Closing Date, an amount of such CA-Held Collateral, as selected by the Administrator (in its discretion, prioritising relatively more liquid items of Collateral) with a Market Value equal to the amount of such excess shall be liquidated by the Administrator and, subject to Sections 4.4(c) and 4.7(c), the proceeds thereof shall be transferred to the Collection Account whereupon it will constitute an Income Distribution.

## 4.9    Liquidation of Collateral

(a)    The following provisions shall apply with respect to the liquidation of any CA-Held Collateral or Original Collateral pursuant to the following Sections:

(i)    Section 2.8 (*Terminal Unwind Event*);

(ii)    Section 2.9 (*Avoiding Terminal Unwind Events*);

(iii)    Section 4.1 (*Dealer Default under a Swap Agreement*);

(iv)    Section 4.3 (*Non-Dealer Lender Default*);

(v)      Section 4.4 (*Cash Settlement Amounts*);

(vi)     Section 4.6 (*Early Termination of all of the Transactions under a Dealer's Swap Agreement*);

(vii)    Section 4.7 (*Early Termination of some (but not all) of the Transactions under a Dealer's Swap Agreement*);

(viii)   Section 4.8 (*Release of Collateral*) with respect to Released Collateral pursuant to Section 4.8(b)(x) only; and

(ix)     Section 4.11 (*Post-swap Enforcement Liquidation*),

and for the purpose of effecting distributions pursuant to Sections 6.1 (*Application of Proceeds from the Liquidation of Original Collateral*), 6.2 (*Application of Proceeds from the Liquidation of CA-Held Collateral Upon a Terminal Unwind Event*), or 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind*) of this Agreement, but shall not apply to: (x) Other Posted Support; (y) the disposition of Wrapped Collateral where the terms of any Wrap Swaps related to such Wrapped Collateral provide for delivery of such Wrapped Collateral to the relevant Dealer upon an early termination of the relevant Wrap Swap; or (z) the sale or liquidation of Collateral by the Administrator, on behalf of the MAV, in any other circumstances.

(b)      Where the Administrator, on behalf of the MAV, is required to liquidate less than all of the CA-Held Collateral, pursuant to Sections 4.4 (*Cash Settlement Amounts*), 4.6 (*Early Termination of all of the Transactions under a Dealer's Swap Agreement*) or 4.7 (*Early Termination of some (but not all) of the Transactions under a Dealer's Swap Agreement*):

(i)      Except in the case of Sections 4.4(c) and 4.7(c) where Released Collateral is required to be liquidated, and subject to Section 4.9(b)(ii), if the relevant Swap Liquidation Claim (or the remaining balance thereof) following: (i) the prior application of Original Collateral and/or (ii) a prior equal percentage slice liquidation (referred to in Subclause (z) below) or proportionate share liquidation (referred to in Subclause (y) below), as applicable, of CA-Held Collateral in respect of the relevant Swap Liquidation Claim) to be paid from the Sale Collateral Proceeds is: (x) equal to or less than CAD75,000,000, the Administrator, on behalf of the MAV, may liquidate such CA-Held Collateral as it may select, in its reasonable judgement, from any Category I Investments, Category II Investments or Category III Investments (or any combination thereof); (y) greater than CAD75,000,000 but less than CAD500,000,000, the Administrator shall exercise commercially reasonable efforts to liquidate Category I Investments, Category II Investments and Category III Investments, respectively, in amounts as nearly proportionate as practicable, based upon the respective aggregate Value of each such category taken as a whole as of the Business Day immediately prior to the commencement of such liquidation; or (z) equal to or greater than CAD500,000,000, the Administrator shall liquidate an equal percentage of each item of Collateral.  For the purposes of Subclauses (y) and (z) of this Section 4.9(b)(i), the parties acknowledge and agree that: (A) it may not be feasible to liquidate the exact proportionate amount in each case, due to applicable minimum denominations or similar restrictions on transfer and that the Administrator is authorised to make such adjustments as in its discretion it deems necessary or appropriate; and (B) Traditional Assets, the Synthetic CLN and Unlevered CDSs shall be considered to be Category III Investments and Qualifying Non-Funded Amounts shall be considered to be Category I Investments;

(ii)    if the Administrator, on behalf of the MAV, is required or elects to liquidate MFF Collateral in the form of Cash or Cash Equivalents then the Administrator shall notify each Lender that it is required to: (x) convert its proportionate share of its outstanding Qualifying Non-Funded Amounts into Cash; and/or (y) make an Advance in an amount equal to its proportionate share of outstanding Dealer Non-Funded Amounts created pursuant to Subclause (a) of the definition of Dealer Non-Funding Event, in each case, by depositing immediately available funds for value in the MFF Account by the third Business Day following such notice to the Lender from the Administrator, provided that: (A) a Lender shall not be required to convert its Qualifying Non-Funded Amounts into Cash or make such an Advance in respect of its Dealer Non-Funded Amounts if there are sufficient amounts of Cash or Cash Equivalents standing to the credit of the MFF Account which the Administrator determines are attributable to Advances previously provided by such Lender; and (B) the relevant Cash Settlement Amount, Termination Payment and/or Unpaid Amount payable to the relevant Dealer shall be deemed to be satisfied by any of such Qualifying Non-Funded Amounts which a Non-Dealer Lender fails to convert into Cash but only to the extent of its *pro rata* share of any such amounts in accordance with the provisions of Section 4.3 (*Non-Dealer Lender Default*);

(iii)    where any item of Sale Collateral is to be delivered in kind pursuant to Sections 4.4 (*Cash Settlement Amounts*) or 4.7 (*Early Termination of some (but not all) of the Transactions under a Dealer's Swap Agreement*), such item of Sale Collateral shall be deemed to have a value equal to the lesser of: (A) 10 per cent. of its outstanding notional amount (taking into account amortisations and reductions for Credit Events settled prior to the date of such delivery and excluding any original issue discount); and (B) if applicable, 50 per cent. of the Market Value thereof; and

(iv)    where an Unlevered CDS is to be liquidated in part pursuant to this Section 4.9 (*Liquidation of Collateral*), the relevant Sale Collateral Proceeds shall first be applied to satisfy any Termination Payment or Unpaid Amount owing to the relevant Dealer pursuant to the terms of the relevant Swap Agreement (and such Dealer's claim to any resulting Termination Payment or Unpaid Amount shall be limited to the relevant Sale Collateral Proceeds).

(c)    Where the Administrator, on behalf of the MAV, is required to or elects to liquidate all or any portion of any item of Original Collateral or CA-Held Collateral in respect of which there is: (i) a Managed Asset Swap, the Administrator shall concurrently terminate or procure a novation of an equal portion of such Managed Asset Swap and any close-out amount to be determined in respect of such swap transactions shall also be obtained, as nearly as commercially reasonable, at the same time as the sale of the relevant item of Collateral to which such swap transaction relates; and (ii) an Existing Interest Rate Hedge, the Administrator shall use commercially reasonable efforts concurrently to terminate or procure a novation of an equal portion of such Existing Interest Rate Hedge and any close-out amount to be determined in respect of such swap transactions shall also be obtained, as nearly as commercially reasonable, at the same time as the sale of the relevant item of Collateral to which such swap transaction relates.

(d)    Where any provision of this Agreement calls for the liquidation of Other Posted Support, the relevant portion of such Other Posted Support shall be retained by the relevant Dealer and the amount so retained shall be set-off against the relevant claim of the Dealer.

(e)    The Administrator shall solicit, in good faith and on an arm's length basis, firm bids from Quoting Parties for the purchase of the relevant item or each grouping of Sale Collateral (which bids must be binding upon the relevant Quoting Party, actionable for: (i) in the case of Sale Collateral comprising Dealer Option Investments, two hours; and (ii) in the case of any other item of Sale Collateral, one hour,

in each case, after the time specified for receipt thereof in the relevant solicittation notice and which are subject only to agreement by the Administrator within such time period) on one or more dates falling within the Liquidation Period. The Administrator must solicit firm bids from all Dealers and all Lenders (or, in each case, an Affiliate designated by each Dealer or Lender), and at least three other Quoting Parties (not including Dealers, Lenders or their respective Affiliates), by providing, no later than the Business Day immediately prior to the day of the proposed auction (at the same time of day as the proposed auction), the details specified in Sections 4.9(q)(ii) and 4.9(q)(iii) below and any other information regarding the relevant item or grouping of Sale Collateral as would normally be provided to bidders pursuant to the normal business practices of the Administrator in connection with the sale of assets similar to the relevant item or grouping of Sale Collateral. In respect of any item of Sale Collateral, the Administrator shall provide the same information to all Quoting Parties at the same time.

(f)    The Administrator (or its Affiliate) may be a Quoting Party in any auction. None of the Dealers or Lenders is required to provide bids for any Sale Collateral, however, and the Administrator, on behalf of the MAV, may proceed to liquidate the Sale Collateral even if no bids are received from any Dealer or Lender.

(g)    Subject to the liquidation procedures in this Section 4.9 (*Liquidation of Collateral*), solicitation for bids in respect of the Sale Collateral shall occur in accordance with the normal business practice of the Administrator for the sale of obligations of substantially the same type as the Sale Collateral being offered by it and the Administrator shall use its reasonable efforts to obtain the best prices and execution for all orders placed with respect to the Sale Collateral. The Administrator may solicit bids in respect of the Sale Collateral in such grouping and number of items (which may be a single item) as it determines in its discretion. Subject to the objective of obtaining best prices and execution and to the liquidation procedures in this Section 4.9 (*Liquidation of Collateral*), the Administrator may aggregate sale orders of securities placed with respect to the Sale Collateral with similar sale orders being made simultaneously for itself along with other accounts managed by the Administrator or with accounts of Affiliates of the Administrator if, in the Administrator's reasonable judgement, such aggregation shall result in no material economic detriment to the MAV or any Secured Creditor. In the event that an agreement for the purchase of the Sale Collateral occurs as part of any aggregate sale order, the Administrator (and any of its Affiliates involved in such transactions) shall use reasonable efforts to allocate the executions in respect of such aggregate sales among the account of the MAV and any other accounts in an equitable manner.

(h)    The Administrator shall notify the Dealers, the Lenders, the MAV and the Collateral Agent of the highest firm bid price (which, if no firm bids are received shall be deemed to be zero) (the **Highest Bid**) for the purchase of any item of Sale Collateral in accordance with the above procedures promptly after receipt of all qualifying bids (if any) or if no qualifying bids are received in respect of the auction pursuant to Section 4.9(d) (such notice, a **Bid Notice**), provided that only Dealers and Lenders specified in Schedule C (*List of Parties*) on the Closing Date or, in each case, the permitted assignees (in whole but not in part) in respect of their entire interest in the relevant Swap Agreement to which they are a party or the Credit Facility, respectively (collectively, **Last Look Parties**), shall have the right to receive such Bid Notice.

(i)    Upon receipt of a Bid Notice in respect of Sale Collateral, each Last Look Party shall have the irrevocable right and option to provide within thirty minutes of receipt (or such longer period as the Administrator may specify) of the Bid Notice (such period, a **Last Look Period**) a firm bid price from itself or on behalf of any of their respective Affiliates in an amount greater than the Highest Bid in respect of such Sale Collateral, by delivering written notice to the Administrator, on which the Administrator may conclusively rely, specifying such higher firm bid price (each, a **Last Look Bid**)

which, in the case of Dealer Option Investments, must be actionable for at least one hour after the end of the Last Look Period and subject only to agreement by the Administrator within such time period.

(j)    No later than thirty minutes following the end of the Last Look Period, the Administrator shall deliver notice to Dealers which are Last Look Parties specifying the highest firm bid price received (the **Highest Last Bid**), which may be the Highest Bid or any higher Last Look Bid, for the purchase of any item of Sale Collateral constituting Dealer Option Investments (such notice, a **Highest Last Bid Notice**).  Upon receipt of a Highest Last Bid Notice in respect of Sale Collateral (or any item thereof) constituting Dealer Option Investments, each Dealer (or, if it elects, its Affiliate) shall have the irrevocable right and option (a **Dealer Final Look**) by delivering written notice to the Administrator, on which the Administrator may conclusively rely, within thirty minutes of receipt (or such longer period as the Administrator may specify) of the Highest Last Bid Notice to either: (i) purchase such Dealer Option Investments at a price equal to the Highest Last Bid in respect of such Sale Collateral; or (ii) elect that such item of Sale Collateral be delivered to such Dealer in satisfaction of any claim (up to the amount of the Highest Last Bid) due to it under Sections 4.4 (*Cash Settlement Amounts*), 4.6 (*Early Termination of all of the Transactions under a Dealer's Swap Agreement*), 4.7 (*Early Termination of some (but not all) of the Transactions under a Dealer's Swap Agreement*), 6.1 (*Application of Proceeds from the Liquidation of Original Collateral*), 6.2 (*Application of Proceeds from the Liquidation of CA-Held Collateral Upon a Terminal Unwind Event*), or 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*) of this Agreement and which would otherwise be satisfied by payment in Cash from the relevant Sale Collateral Proceeds.

(k)    If the Administrator receives a Last Look Bid, then a binding agreement of purchase and sale of the relevant item or items of Sale Collateral shall be deemed to have been formed between the MAV and the relevant Last Look Party (or its Affiliate, as the case may be) which specifies the highest Last Look Bid in respect of the relevant Sale Collateral, unless the relevant Sale Collateral is the subject of an effectively exercised Dealer Final Look.

(l)    Failure by any Last Look Party (or its Affiliate) to deliver a Last Look Bid shall be conclusively deemed to be an election by such Last Look Party (or its Affiliate, as the case may be) not to offer to purchase the Sale Collateral through a Last Look Bid, and the Administrator, on behalf of the MAV, shall instead sell the Sale Collateral to the Quoting Party which submitted the Highest Bid (such person, the **Purchaser**); provided that, if the Purchaser cannot take delivery for any reason, the Administrator shall instead sell the Sale Collateral to the Quoting Party who provided the next highest bid.

(m)    If, in respect of any item of Sale Collateral: (i) no firm bid prices and no Last Look Bids are received by the Administrator, the Administrator may arrange one or more additional auctions of such Sale Collateral on any Business Day during the Liquidation Period; (ii) two or more Quoting Parties provide an identical Highest Bid and no Last Look Bid is received (where solicited), the Administrator shall, to the extent practicable: (x) arrange one or more additional auctions of such Sale Collateral on the same Business Day (and the Administrator need only provide two hours' notice of such subsequent auctions) which shall involve solicitation of bids only from such Quoting Parties who provided the identical Highest Bids; or (y) agree with such Quoting Parties who provided the identical Highest Bids to split (as nearly as practicable) the relevant item of Sale Collateral and sell part of such item to each such Person; or (iii) two or more Last Look Parties provide an identical highest Last Look Bid, the Administrator shall split (as nearly as practicable) the relevant item of Sale Collateral and sell part of such item to each such Person.

(n)    If, in respect of any sale of Collateral in connection with the occurrence of a Terminal Unwind Event or a Partial Terminal Unwind Event, a binding offer to purchase any portion of the Sale Collateral pursuant

to these procedures is not received by 5:00 pm on the final day of the Liquidation Period, such Sale Collateral shall be delivered by the Collateral Agent on the relevant Distribution Date (subject to the provisions of Section 6.8 (*Delayed Settlements*) relating to the settlement of Traditional Assets) to the Person(s) with the most senior outstanding claim(s) at such time (which shall be the Indenture Trustee on behalf of the Noteholders if such Person(s) are Noteholders or any class thereof) (such claim(s), the **Senior Claims**) pursuant to the relevant priority of payments and after taking into account the payment of any liquidation proceeds received in connection with the liquidation of Collateral during the Liquidation Period pursuant to this Section 4.9 (*Liquidation of Collateral*).  For the purposes of this Section 4.9(n): (i) where the Senior Claims are in favour of more than one Person, each of which ranks *pro rata* and *pari passu* with the other, the Sale Collateral shall be divided among them *pro rata* in proportion to their relative claims, to the extent reasonably practicable; and (ii) for the purposes of determining the Senior Claim in respect of any item of Sale Collateral subject to an Existing Interest Rate Hedge, if the relevant Existing Interest Rate Hedge Provider has an outstanding claim at such time, it shall be deemed to have the most senior outstanding claim with respect to such item of Sale Collateral. In respect of any sale of Collateral in connection with the occurrence of a Terminal Unwind Event, following delivery of such Sale Collateral, such Senior Claims and any claims ranking junior in priority of payment to such Senior Claims shall be deemed to be fully satisfied (other than any amounts whose payment is delayed pursuant to Section 6.8 (*Delayed Settlements*)).

(o)     Each of the parties hereto acknowledges and agrees that: (i) the Administrator shall not be responsible for any inability to procure a Purchaser for the liquidation of any Sale Collateral for any reason, including the condition of financial markets, general economic conditions and international political events, nor for any determinations or judgements made in good faith hereunder in respect of the Sale Collateral or the creditworthiness of any Quoting Party; and (ii) the procedures specified in this Section 4.9 (*Liquidation of Collateral*), including the proportionality and percentage sale requirements, the set duration of the Liquidation Period, the timing of the bid processes, the Last Look bid rights and the distribution in kind requirements, may adversely affect the realisation value of Sale Collateral.

(p)     Subject, so long as the Administrator is BlackRock, to Section 7.6 (*Provisions Applicable to BlackRock Canada and its Affiliates*) and the equivalent provisions of the Administration Agreement:

        (i)      each party hereby agrees, subject to the provisions of this Agreement and Applicable Law, that in acting pursuant to this Section 4.9 (*Liquidation of Collateral*): (A) the Administrator shall not be subject to any fiduciary or other implied duties; (B) the Administrator shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby; and (C) except as expressly set forth herein, the Administrator shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any obligor of any Sale Collateral or any of its Affiliates that is communicated to or obtained by the Administrator or any of its Affiliates.  Nothing contained herein shall create or constitute any parties as members of any partnership, joint venture, association, syndicate, unincorporated business or other separate entity, nor shall be deemed to confer on any of them any express, implied, or apparent authority to incur any obligation or liability on behalf of any other such entity;

        (ii)     subject to Section 7.5 (*Certain Matters regarding the Administrator and Service Providers*), the Administrator may perform any and all of its duties and exercise its rights and powers directly or by or through any one or more agents, including its Affiliates, selected by the Administrator but the Administrator shall not be relieved of any of its duties hereunder regardless of the performance of any services provided by such agents and, except as provided otherwise in this

Agreement or in the Administration Agreement, the Administrator shall be solely responsible for the fees and expenses payable to any such agent; and

(iii)    the Administrator, on behalf of the MAV, may, in selling any Sale Collateral, conduct principal transactions with itself, any Dealer or Lender or any of their respective Affiliates subject to Applicable Law and provided that the Administrator has solicited bids for the purchase of the Sale Collateral pursuant to, and otherwise in compliance with, the procedures set forth herein and provided that, in conducting principal transactions with itself, the Administrator has matched or bettered the Highest Bid received in respect of such Sale Collateral or, if there are no bids received in respect of the Sale Collateral, has matched or bettered the value attributed thereto pursuant to Section 4.9(b)(iii). The Administrator, on behalf of the MAV, may also effect transactions where the Administrator procures another account advised by the Administrator or any of its Affiliates to be a Purchaser; provided that the Administrator has solicited bids pursuant to the procedures herein.

(q)    The Administrator shall render to the Deal Parties, in respect of the aggregate Sale Collateral for which the Administrator, on behalf of the MAV, is procuring a Purchaser at such time, a report (each such report, a **Sale Report**), substantially in the form provided in Schedule Q (*Form of Sale Report*) as soon as reasonably practicable following the end of the Liquidation Period with respect to such Sale Collateral, which shall contain the following information:

(i)    the relevant Section of this Agreement which gave rise to the relevant Liquidation Event;

(ii)    information necessary to identify the Sale Collateral, as determined by the Administrator, such as:

(A)    obligor(s) in respect of the Sale Collateral;

(B)    principal amount outstanding and currency of the Sale Collateral;

(C)    interest rate, interest payment dates and interest amounts payable on such dates in respect of the Sale Collateral; and

(D)    redemption date/maturity date (as applicable) of the Sale Collateral;

(iii)    any amounts owed in respect of such Sale Collateral under any Related Asset Creditor Security Agreement;

(iv)    identity of each Last Look Party providing a Last Look Bid; and

(v)    the final liquidation price and amount of the Sale Collateral Proceeds or the recipient of any item of Sale Collateral which is delivered in kind pursuant to Section 4.9(n).

## 4.10    Overlapping Liquidations

If a Liquidation Event occurs during any Liquidation Period that is still in progress pursuant to Section 4.9 (*Liquidation of Collateral*) (the **Earlier Liquidation**), the Administrator may, in its discretion, cease such Earlier Liquidation and may concurrently liquidate all Collateral required to be liquidated in respect of the relevant Liquidation Events during one combined liquidation process beginning on the first day of the Liquidation Period occurring in respect of the subsequently occurring Liquidation Event.

**4.11**    **Post-swap Enforcement Liquidation**

At any time that an Enforcement Event has occurred and is continuing when there are no Swap Liabilities in respect of any LSS CDS (other than in respect of Breaching Dealers) outstanding, and there are still Secured Margin Liabilities outstanding, the Administrator, on behalf of the MAV, shall, at the request of the Administrative Agent (at the direction of the Required Lenders), conduct or procure to be conducted the process for liquidation of any or all items of CA-Held Collateral in accordance with the provisions of Section 4.9 (*Liquidation of Collateral*) until the proceeds of such liquidation are sufficient to repay all Secured Margin Liabilities in full in accordance with the order of priorities set forth in Section 6.3 (*Application of Proceeds in the Ordinary Course*) or until the CA-Held Collateral is exhausted, as the case may be.

**4.12**    **Reinvestment of Matured Original Collateral**

(a)    A Non-breaching Dealer and the Administrator may agree in writing at any time to have proceeds of any Original Collateral of such Dealer (including for the avoidance of doubt, any Other Posted Support) and any Collateral held in the OC Transfer Sub-Account which matures according to its terms, and money or other property paid or delivered in each case on account of any return or repayment of principal or capital (including any termination payments pursuant to any Transaction under a Swap Agreement for which the MAV is the buyer of protection or the proceeds of any Defaulted Dealer Collateral disposed of pursuant to Section 4.5 (*Original Collateral Default*)), in whole or in part (collectively, **Matured Original Collateral**) of such Dealer (or any part thereof) reinvested by the Administrator in accordance with the concentration limits set out in Section [3(b)(i)] of the Eligibility Criteria and in accordance with Section [3(c)(xi)] of the Eligibility Criteria, no investment shall be made if such investment would be held by a custodian outside of Canada or the United States of America and any such investment will be:

(i)    consistent with the applicable provisions of Part 3 (*Dealer-Specific Swap Credit Support Provisions*) to Schedule B of the Master Security Agreement;

(ii)    consistent with the Eligibility Criteria; or

(iii)    as otherwise mutually agreed between the Administrator and the relevant Dealer (provided that the Administrator may only agree on an investment that would not comply with Sections 4.12(a)(i) or 4.12(a)(ii) with the prior consent of the Required Lenders (except, if Royal Bank of Canada is the relevant Dealer, Royal Bank of Canada in its capacity as Lender) and subject to satisfaction of the Rating Agency Condition).

(b)    A reinvestment agreement between a Non-breaching Dealer and the Administrator may take the form of a standing order in writing to the applicable Custodian from the Non-breaching Dealer and consented to in writing by the Administrator, which order may be revoked by the Non-breaching Dealer upon not less than five Business Days' notice to the Administrator and the applicable Custodian and, if such standing order is revoked, any Matured Original Collateral of that Non-breaching Dealer arising after the date of such revocation shall be subject to Section 4.13 (*Mechanics of Investing Matured Original Collateral*).

(c)    Any Matured Original Collateral to be reinvested pursuant to this Section 4.12(a) or 4.13 (*Mechanics of Investing Matured Original Collateral*) shall be held in the Dealer's OC Custodian's account or, by agreement between the Non-breaching Dealer and the Administrator,

in a segregated sub-account of the MAV maintained with a CA Custodian or, subject to the Administrator's and relevant Dealer's consent, another Permitted Custodian, in each case subject to an OC Control Agreement or a CA Control Agreement as applicable.

(d)    Any sales, terminations or novations, as the case may be, of any Dealer's Original Collateral or Transactions under a Swap Agreement shall, in each case, be subject to the prior consent of the relevant Non-breaching Dealer.  Original Collateral and Collateral held in the OC Transfer Sub-Account reinvested by the Administrator pursuant to this Section 4.12 (*Reinvestment of Matured Original Collateral*) shall not constitute Managed Assets.

## 4.13    Mechanics of Investing Matured Original Collateral

(a)    On or before the 25th calendar day (or if not a Business Day, the next Business Day) of each month, the Administrator shall circulate to the Dealers a report indicating all Dealers' Original Collateral which is scheduled to mature in the next following month (each such maturity date, a **Relevant Maturity Date**).

(b)    Where a Dealer terminates a Wrap Swap pursuant to Part 1(n)(ii) of its Swap Agreement or pursuant to Section 3(b)(iv) of the Administration Agreement (the proceeds of any such termination, **Wrap Swap Proceeds**) or is required to transfer Other Posted Support to the MAV pursuant to Part 5(l) of its Swap Agreement (such Other Posted Support, **Returned Other Posted Support**) or has Matured Original Collateral and, at the time thereof, the relevant Dealer has any Swap Agreements for which any obligations remain outstanding:

(i)    if such Matured Original Collateral or Returned Other Posted Support is subject to the terms of a Wrap Swap, such Matured Original Collateral or Returned Other Posted Support shall be reinvested pursuant to the directions of the relevant Dealer in accordance with the terms of the relevant Wrap Swap (provided that Returned Other Posted Support must be invested in something other than an obligation of the relevant Dealer);

(ii)    if 4.13(b)(i) above does not apply and such Matured Original Collateral, Wrap Swap Proceeds or Returned Other Posted Support does not relate to a LSS CDS originally entered into by the MAV with Citibank, N.A., then not later than three Business Days prior to the Relevant Maturity Date of an item of Original Collateral or as soon as practicable prior to or following the delivery of Wrap Swap Proceeds or Returned Other Posted Support, the relevant Dealer and the Administrator shall consult with each other in good faith mutually to agree on a reinvestment of such Matured Original Collateral, Wrap Swap Proceeds or Returned Other Posted Support, which shall:

(A)    be an investment that is in compliance (as of the trade date for such investment) with the concentration limits set out in Section [3(b)(i)] of the Eligibility Criteria (and, in the case of Wrap Swap Proceeds (other than Wrap Swap Proceeds arising on a consensual termination pursuant to Section 3(b)(iv) of the Administration Agreement) or Returned Other Posted Support, is not an investment in an obligation of the relevant Dealer), and

(B)    be an investment that is consistent with:

I.     the applicable provisions of Part 3 (*Dealer-Specific Swap Credit Support Provisions*) to Schedule B of the Master Security Agreement;

II.     the Eligibility Criteria;

III.     in the case of Wrap Swap Proceeds, the relevant eligibility criteria under the Wrap Swap that has been terminated; or

IV.     as otherwise mutually agreed between the Administrator and the relevant Dealer (provided that the Administrator may only agree on an investment that would not comply with Sections 4.13(b)(ii)(B)I), 4.13(b)(ii)(B)II) or 4.13(b)(ii)(B)III) with the prior consent of the Required Lenders and subject to satisfaction of the Rating Agency Condition),

provided that if the relevant Dealer and the Administrator fail to agree by the second Business Day following the date on which the relevant Original Collateral becomes Matured Original Collateral or the Wrap Swap Proceeds or Returned Other Posted Support are delivered, the Matured Original Collateral, Wrap Swap Proceeds or Returned Other Posted Support shall be reinvested by the Administrator in Category I Investments or Category II Investments in accordance with the Eligibility Criteria and provided further that until such proceeds are reinvested pursuant to this Section 4.13 (*Mechanics of Investing Matured Original Collateral*), such proceeds will continue to be held as Cash in the relevant account specified in Section 4.13(b)(iii);

(iii)    if Matured Original Collateral or Returned Other Posted Support relates to a LSS CDS originally entered into by the MAV with Citibank, N.A., then:

(A)     where such LSS CDS remains outstanding at the time of such repayment, such reinvestment, of Matured Original Collateral (but not Returned Other Posted Support) shall be made by the Administrator in accordance with the applicable provisions of Part 3 (*Dealer-Specific Swap Credit Support Provisions*) to Schedule B of the Master Security Agreement; or

(B)     in the case of a reinvestment of Returned Other Posted Support at any time or a reinvestment of Matured Original Collateral at a time when the relevant LSS CDS is no longer outstanding, but the relevant Dealer is party to an LSS CDS originally entered into by the MAV with Citibank, N.A. for which any obligations remain outstanding, then not later than three Business Days prior to the Relevant Maturity Date of such Matured Original Collateral or as soon as practicable prior to or following the delivery of such Returned Other Posted Support, the relevant Dealer and the Administrator shall consult with each other in good faith mutually to agree on a reinvestment of such Matured Original Collateral or Returned Other Posted Support in compliance with Sections 4.13(b)(ii)(A) and 4.13(b)(ii)(B); provided that if the relevant Dealer and the Administrator fail so to agree by the second Business Day following the date on which the relevant Original Collateral becomes Matured Original Collateral or the Returned Other Posted Support is delivered, then the Matured Original Collateral or Returned Other Posted Support shall be reinvested by the

Administrator in accordance with the Eligibility Criteria applicable to Category I Investments; provided further that until such proceeds are reinvested pursuant to this Section 4.13 (*Mechanics of Investing Matured Original Collateral*), such proceeds will continue to be held as Cash in the relevant account by the relevant OC Custodian or, if the relevant Dealer has not appointed an OC Custodian, in a segregated sub-account of the MAV maintained with a CA Custodian, until such time as an OC Custodian is appointed, in each case subject to an OC Control Agreement or a CA Control Agreement, as applicable.

(c)    Any sales, terminations or novations, as the case may be, of any Dealer's Original Collateral shall, in each case, be subject to the prior consent of the relevant Non-breaching Dealer. Original Collateral and Collateral held in the OC Transfer Sub-Account reinvested by the Administrator pursuant to this Section 4.13 (*Mechanics of Investing Matured Original Collateral*) shall not constitute Managed Assets.

**4.14    Accounts**

(a)    **The Collection Account**

All Income Distributions shall be, when received, deposited by the Collateral Agent in the Collection Account, and all Cash, investments and other property in the Collection Account and proceeds thereof shall be transferred from, or retained in the Collection Account and distributed only in accordance with the terms of Section 6.3 (*Application of Proceeds in the Ordinary Course*).

(b)    **The Collateral Account**

All CA-Held Collateral in the Collateral Account shall be held subject to the Security Interests and pursuant to the terms of this Agreement and the Master Security Agreement.

(c)    **The Reserve Account**

(i)    The Reserve Account and all amounts credited thereto shall form part of the CA-Held Collateral.

(ii)    On each Payment Date, such amounts as are provided in Section 6.3(l) shall be deposited by the Collateral Agent into the Reserve Account from the Collection Account; provided that the total amount on deposit in the Reserve Account at any time shall not exceed the aggregate of all Undrawn Commitments at such time (not including the Unfunded Commitment of any Lender which has delivered (and has not revoked) a Commitment Standstill Notice), without taking into account any reductions of such Unfunded Commitments pursuant to Section 3.4 (*Reducing Commitments and Repayment of Term Loans in Proportion to the Reserve Account*).

(iii)    From and including the date on which a payment is deposited in the Reserve Account pursuant to Section 4.14(c)(i), the Lender's Commitment of each Lender shall be reduced in accordance with Section 3.4(a).

(iv)    The Collateral Agent shall hold all Collateral in the Reserve Account subject to the Collateral Agent's Security Interest and pursuant to the terms of this Agreement and the Master Security Agreement.

(d)    **The MFF Account**

All Cash, Cash Equivalents and other amounts or securities received from the Lenders in the form of an Advance shall be credited by the Collateral Agent to the MFF Account and shall constitute CA-Held Collateral.  All amounts and securities held in the MFF Account are subject to the Collateral Agent's Security Interest and pursuant to the terms of this Agreement and the Master Security Agreement.

(e)    **The Draw Account**

All amounts or securities received from a Lender in respect of a Term Loan Advance shall be credited to the Draw Account of such relevant Lender.  The Collateral Agent shall hold all CA-Held Collateral in the Draw Account subject to the Collateral Agent's Security Interest and pursuant to the terms of this Agreement, the Margin Funding Facility Agreement and the Master Security Agreement.

(f)    **The Expense Account**

(i)    All amounts to be reserved from time to time in respect of a Senior Expense Shortfall following the liquidation of CA-Held Collateral pursuant to Sections 4.4(b)(ii)(C), 4.6(b)(ii)(C) or 4.7(b)(ii)(C) shall be deposited in a sub-account of the Collection Account designated as a Senior Expense Shortfall expense account (the **Expense Account**).  The Collateral Agent shall hold all CA-Held Collateral in the Expense Account subject to the Collateral Agent's Security Interest and pursuant to the terms of this Agreement and the Master Security Agreement.

(ii)    On or following each Determination Date (but before the immediately succeeding Payment Date), the Collateral Agent shall transfer from the Expense Account to the Collection Account any balance standing to the credit of the Expense Account (such amount, the **Transferred Senior Expense Shortfall**).

(g)    **Co-Owned Traditional Assets**

All distributions to which the MAV is entitled in respect of the Co-Owned Traditional Assets shall be deposited into the MAV2 Trust Distribution Account (as defined in the relevant Securitisation Agreement) in accordance with the terms of each Securitisation Agreement. The liquidation procedure set forth at Section 4.9 (*Liquidation of Collateral*) shall apply to such distributions once deposited in the MAV2 Trust Distribution Account (as defined in the relevant Securitisation Agreement).

(h)    **Accounts to be Eligible Deposit Accounts**

Within 10 Business Days of an Account referred to in subsections (a), (b), (c), (d), (e) or (f) ceasing to be an Eligible Deposit Account, the Administrator, on behalf of the MAV, shall (together with the relevant Custodian and in accordance with the relevant Control Agreement, if applicable) establish a replacement Account which is an Eligible Deposit Account and shall

transfer or procure the transfer of any cash and/or any securities deposited therein to such replacement Account.

### 4.15    Dealers' Further Assurances

(a)    Where a Dealer is required pursuant to the terms of its Swap Agreement, the Master Security Agreement or this Agreement to transfer or procure the transfer of its Original Collateral (or any portion thereof) to the Collateral Agent (for deposit in the Collateral Account):

   (i)    such Dealer will perform all acts, execute and deliver all agreements, documents and instruments and take such other steps as are reasonably requested by the Collateral Agent in order to effect such transfer and release of the relevant Dealer's Security Interest in its Original Collateral including: (a) executing, recording and filing financing or other statements, and where it is a Breaching Dealer, paying all taxes, fees and other charges payable in connection therewith; and (b) executing and delivering any certificates, endorsements, instructions, agreements, documents and instruments that may be required under the STA or the PPSA or any similar foreign law or regulation;

   (ii)    such Dealer shall transfer or procure the transfer of its Other Posted Support (or any portion thereof) to the Collateral Agent for deposit into the Collateral Account;

   (iii)    if the relevant Dealer fails to transfer or procure the transfer of any such item of Original Collateral within three Business Days of a date on which it is required to do so then the Collateral Agent shall be entitled to deliver a notice of exclusive control to the relevant OC Custodian pursuant to the relevant OC Control Agreement (with a copy to the relevant Dealer) in respect of the account(s) in which such Original Collateral is held; and

   (iv)    pursuant to the relevant Control Agreement, the relevant Dealer authorises its OC Custodian to comply with such instructions of the Administrator as are necessary in order to effect the same, including providing written notice to its OC Custodian to comply with instructions of the Administrator with respect to such transfer in accordance with the terms of this Agreement.

(b)    Where any item of Original Collateral is to be liquidated by the Administrator pursuant to the provisions of this Agreement, the relevant Dealer authorises the Administrator to conduct such liquidation and shall accordingly comply with such instructions of the Administrator as are necessary in order to effect the same, including providing written notice to its OC Custodian to comply with instructions of the Administrator with respect to such liquidation.

### 4.16    Use of Posted Lender's Credit Support to Satisfy Advances

(a)    If a Non-Dealer Lender fails to make, when due and after any relevant grace period has expired, an Advance (or any portion thereof), the Administrator on behalf of the MAV shall be entitled to, without prior notice to such Non-Dealer Lender or any other person, direct the Collateral Agent to apply any Posted Lender's Credit Support of the relevant Non-Dealer Lender towards the satisfaction of any such amounts due from the Non-Dealer Lender in respect of such Advance.  In such event, the Collateral Agent (acting on instruction of the Administrator) shall transfer such Posted Lender's Credit Support to the MFF Account. To the extent such Posted Lender's Credit Support is comprised of Cash or Cash Equivalents, the Value thereof shall be

applied to satisfy the requested Advance or relevant portion thereof. To the extent such Posted Lender's Credit Support (or any portion thereof) does not comprise Cash or Cash Equivalents, the Administrator shall liquidate or procure the liquidation of such Posted Lender's Credit Support (or relevant portion thereof) and the realisation proceeds thereof shall be applied by the Collateral Agent to satisfy the requested Advance or returned by the Collateral Agent to or for the account of the relevant Lender. If the realisation proceeds of such Posted Lender's Credit Support are less than the amount of the Advance required, the relevant Non-Dealer Lender shall remain liable for such deficit and the provisions of Section 4.3 (*Non-Dealer Lender Default*) shall apply. The Administrator shall deliver notice to a Lender as soon as reasonably practicable after any such transfer of its Posted Lender's Credit Support pursuant to the terms of this Section.

(b)    Where a Lender has provided Posted Lender's Credit Support in the form of Cash or Cash Equivalents pursuant to its Lender Credit Support Agreement, it may, in respect of any Advance, by delivery of an irrevocable notice and authorisation to the MAV, no later than the time such Advance is due and before the expiry of any relevant grace period, direct the MAV to transfer Cash or Cash Equivalents constituting its Posted Lender's Credit Support with a Value equal to the amount of such Advance (or any portion thereof) to the MFF Account and the relevant Lender's obligation to make the relevant Advance (or the relevant portion thereof) shall be satisfied by such irrevocable direction.

## 4.17    Certain provisions relating to Merrill Lynch

(a)    The Initial Available Collateral Amount specified in respect of MLI in Schedule [E] (*Initial Available Collateral Amounts*) shall also apply in respect of MLCS and such amount shall be reduced in accordance with the definition thereof pursuant to the payment of Termination Payments, Unpaid Amounts and Cash Settlements paid to either MLI or MLCS.

(b)    The Transaction Required Collateral Amounts in respect of LSS CDSs to which MLCS is the counterparty shall be aggregated with the Transaction Required Collateral Amounts in respect of LSS CDSs to which MLI is the counterparty for the purposes of calculating the Required Collateral Amount in respect of MLI; and MLI and MLCS shall be deemed to be one entity for the purposes of determining Collateral Entitlements, Collateral Entitlement Proportions, Initial Available Collateral Amounts, Initial Available Collateral Marked Amounts, Initial Collateral Proportion and OC Claim Proportion.

(c)    If MLI is a Non-Funding MFF Dealer or a Breaching Dealer, any Dealer Non-Funded Amount or Defaulted Advance created by MLCS shall be applied, where relevant, to the payment of Cash Settlement Amounts, Termination Payments and Unpaid Amounts owed to either MLI or MLCS (whichever such claims arise first) for the purposes of Sections 4.4 (*Cash Settlement Amounts*), 4.6 (*Early Termination of all of the Transactions under a Dealer's Swap Agreement*), 4.7 (*Early Termination of some (but not all) of the Transactions under a Dealer's Swap Agreement*), 6.1 (*Application of Proceeds from the Liquidation of Original Collateral*), 6.2 (*Application of Proceeds from the Liquidation of CA-Held Collateral Upon a Terminal Unwind Event*) and 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*).

## 4.18    Substitution of Original Collateral by Dealers

Except as otherwise provided in this Agreement, the Master Security Agreement or in the Swap Agreements, the Dealers shall not have any right of substitution with respect to their Original Collateral.

**4.19    References to "Collateral" for purposes of Liquidation**

For the purposes of this Agreement, references to the liquidation of Collateral (in whole or in part), unless the context requires otherwise, shall be deemed to exclude the MAV's security interest over rights in respect of the Transaction Documents.

**5.    DISPUTE RESOLUTION**

**5.1    Dispute Resolution Procedures**

(a)    If any LSS CDS Counterparty, any Lender, the Administrator or the MAV believes, in good faith, that: (A) a Transaction Required Collateral Amount; or (B) the Value of Collateral, reported pursuant to Section 2 (*Index Spread Reporting; Collateral Calls*) does not accurately represent such Transaction Required Collateral Amount or Value of Collateral, as applicable, and an accurate reporting of such Transaction Required Collateral Amount or Value of Collateral would affect the determination of: (i) a Draw Event; (ii) payment of an MTM Return Amount; (iii) a Potential Unwind Event; (iv) a Deemed Second Spread/Loss Trigger Event; or (v) the Collateral Entitlement Proportion of any LSS CDS Counterparty in respect of the calculation of the payment of any Cash Settlement Amount, Termination Payment or Unpaid Amount to such LSS CDS Counterparty (any such disputing party, a **Disputing Party**), the Disputing Party will notify the Deal Parties of its dispute not later than 6:00 pm on the relevant date on which such Disputing Party is notified of the determination it elects to dispute (such date in respect of this Section 5.1(a), the **Dispute Notice Date**) (or by 10:00 am on the Business Day following the Dispute Notice Date if the Collateral Agent or Valuation Agent, as the case may be, determines in its reasonable judgement that it shall have sufficient time to solicit and obtain the relevant quotations required pursuant to this Section 5.1(a)).  Following such notification by the Disputing Party: (1) any Advances requested on the basis of such disputed calculation shall be paid into the MFF Account (or, in the case of an Acknowledgement of a Qualifying Non-Funded Amount, if applicable, delivered) and any MFF Return Amounts shall be paid to Lenders out of the MFF Account, in each case, in accordance with the Margin Funding Facility Agreement when required by this Agreement without regard to such dispute; (2) the Collateral Agent shall notify the Rating Agency of the existence of a dispute and (3):

(i)    in the case of a dispute involving a Transaction Required Collateral Amount, the Administrator will recalculate the relevant Exposure by seeking, on the Dispute Notice Date (if the Administrator determines that it is feasible to do so) or otherwise on the Business Day following the Dispute Notice Date, five Disputed Transaction Quotations from: (x) Reference Market Makers; and (y) at least one, but no more than two Non-Dealer Lenders and taking the arithmetic means of all mid-market quotations and all firm quotations so obtained, provided that: (A) if five Disputed Transaction Quotations are not received for a particular Transaction, then fewer than five Disputed Transaction Quotations may be used for that Transaction (provided that, if fewer than five Disputed Transaction Quotations are obtained, at least 50 per cent. of such Disputed Transaction Quotations must be obtained from Reference Market-Makers); and (B) if (x) no Disputed Transaction Quotations are received for a particular Transaction or (y) fewer than five Disputed Transaction Quotations are obtained and fewer than 50 per cent. of such Disputed Transaction Quotations are from Reference Market-Makers, then the Administrator shall seek quotations again on the next following Business Day in accordance with the provisions of this paragraph.  If, on such next following Business Day: (x) no Disputed Transaction Quotations are received or (y) fewer than five

Disputed Transaction Quotations are obtained and fewer than 50 per cent. of such Disputed Transaction Quotations are from Reference Market-Makers, the LSS CDS Counterparty's original calculations will be used for that Transaction Required Collateral Amount; and

(ii)     in the case of a dispute involving the Value of any Collateral (except any Collateral which is to be valued at its par amount according to the terms of this Agreement, which shall not be subject to dispute), the Valuation Agent will recalculate the Value of the relevant Collateral by seeking on the Dispute Notice Date (if the Administrator determines that it is feasible to do so) or otherwise on the Business Day following the Dispute Notice Date, five actual quotations from: (x) Reference Market-Makers and (y) at least one, but no more than two Non-Dealer Lenders who submit a firm bid in respect of the relevant Collateral (which bid must be capable of being accepted by the MAV), and taking the highest of those obtained; provided that if five quotations are not received for a particular transaction, then fewer than five quotations may be used for that Collateral; and if no quotations are received for a particular item of Collateral, then the Valuation Agent shall seek quotations again on the next following Business Day in accordance with the provisions of this paragraph.  If no quotations are received on such next following Business Day, the Valuation Agent's original calculations will be used in respect of that item of Collateral.

(iii)    Following a recalculation pursuant to this Section 5.1(a), the Administrator or the Valuation Agent, as the case may be, will notify each party and the Rating Agency not later than 3:00 pm on the date of determination (or by 6:00 pm on the Dispute Notice Date if such revised figure is determined on the Dispute Notice Date) of the revised Transaction Required Collateral Amount or Value of Collateral, as applicable, and will adjust the Collateral Entitlement Proportion of each LSS CDS Counterparty with effect from and including the relevant Dispute Notice Date.  If the recalculation results in an Advance or an MFF Return Amount becoming payable, the Administrator on behalf of the MAV will request the appropriate Advance (or creation of a Qualifying Non-Funded Amount, if applicable) or the Collateral Agent will pay an MFF Return Amount as provided in Section 2.7 (*MFF Return Amounts*), as the case may be, by 11:00 am on the Business Day following the date on which notice of the determination of the revised Transaction Required Collateral Amount or Value of Collateral, as applicable, was given.

(b)   If any Spread Disputing Party believes, in good faith, that the Index Spread notified to it on any date does not represent the relevant mid-market CDS spread for an applicable Index CDS Transaction on such date, then such Spread Disputing Party will notify the Spread/Loss Trigger Calculation Agent and the Rating Agency of its dispute not later than 6:00 pm on the date on which it is notified of such Index Spread (in respect of this Section 5.1(b), the **Dispute Notice Date**) and shall state in such notice whether it believes that the Index Spread is: (x) above 50 per cent. but below 70 per cent. of its corresponding Trigger Spread; (y) equal to or greater than 70 per cent. but below 100 per cent. of its corresponding Trigger Spread; or (z) at or above 100 per cent. of its corresponding Trigger Spread.

**(i)      100 per cent. procedure**

(A)    If the Spread Disputing Party has stated that it believes that: (x) the relevant Index Spread is at or above 100 per cent. of its corresponding Trigger Spread

(in the case where the relevant Index Spread specified in the relevant Index Spread Report is below or 100 per cent. of its corresponding Trigger Spread); or (y) such Index Spread is below 100 per cent. of its corresponding Trigger Spread (in cases where the relevant Index Spread specified in the relevant Index Spread Report is at or above 100 per cent. of its corresponding Trigger Spread), the Spread/Loss Trigger Calculation Agent shall by 11:00 am on the Business Day following the Dispute Notice Date (the **First Polling Date**) recalculate the relevant Index Spread in respect of the Dispute Notice Date by seeking from Reference Market-Makers at least six pairs of bid and offer quotations for an Index CDS Transaction with a notional amount of U.S.$25,000,000 referencing the relevant Matrix Portfolio and, where four or more quotations are obtained for the First Polling Date, taking the arithmetic mean of those obtained, without regard to the Disputed Spread Quotations having the highest and lowest values.

(B)     Where four or more Disputed Spread Quotations are not available in respect of the relevant Matrix Portfolio pursuant to Section 5.1(b)(i)(A) above, then: (I) by 12:00 noon on the First Polling Date, the Spread/Loss Trigger Calculation Agent will request the Index Spread Determination Agent to provide a determination of the Index Spread by 12:00 noon on the next Business Day; and (II) the Spread/Loss Trigger Calculation Agent shall seek Disputed Spread Quotations by 11:00 a.m. on the second Business Day following the Dispute Notice Date (the **Second Polling Date**) for the Second Polling Date in accordance with the provisions of Section 5.1(b)(i)(A) above except that it shall seek at least six Disputed Spread Quotations from Reference Market-Makers and Disputed Spread Quotations from all Non-Dealer Lenders and all LSS CDS Counterparties, respectively, for the Second Polling Date.

(C)     The Spread/Loss Trigger Calculation Agent shall recalculate the relevant Index Spread in respect of the Dispute Notice Date by: (I) if four or more Disputed Spread Quotations are obtained from Reference Market-Makers on the Second Polling Date, taking the arithmetic mean of those obtained from such Reference Market-Makers, without regard to the Disputed Spread Quotations having the highest and lowest values, and such figure shall be the recalculated Index Spread in respect of the Dispute Notice Date; (II) if only three Disputed Spread Quotations are obtained from Reference Market-Makers on the Second Polling Date, taking the arithmetic mean of those obtained from such Reference Market-Makers, and such figure shall be the recalculated Index Spread in respect of the Dispute Notice Date; and (III) if only two Disputed Spread Quotations are obtained from Reference Market-Makers and both a Dealer Group Quotation and a Lender Group Quotation are obtained on the Second Polling Date, taking the arithmetic mean of the Dealer Group Quotation and the Lender Group Quotation (which derived figure shall constitute a single Disputed Spread Quotation) and then taking the arithmetic mean of such derived Disputed Spread Quotation and the two Disputed Spread Quotations from Reference Market-Makers, and such figure shall be the recalculated Index Spread in respect of the Dispute Notice Date.

(D)     If only two Disputed Spread Quotations from Reference Market-Makers are available but no LSS CDS Counterparty contributes a quotation to create a Dealer Group Quotation, then the Spread/Loss Trigger Calculation Agent shall

take the arithmetic mean of (I) the Lender Group Quotation, and (II) the two Disputed Spread Quotations from Reference Market-Makers, and such figure shall be the recalculated Index Spread in respect of the Dispute Notice Date.

(E)    If only two Disputed Spread Quotations from Reference Market-Makers are available but no Non-Dealer Lender contributes a quotation to create a Lender Group Quotation, then the Spread/Loss Trigger Calculation Agent shall take the arithmetic mean of (I) the Dealer Group Quotation and (II) the two Disputed Spread Quotations from Reference Market-Makers and such figure shall be the recalculated Index Spread in respect of the Dispute Notice Date.

(F)    If two Disputed Spread Quotations from Reference Market-Makers are not available or if only two Disputed Spread Quotations from Reference Market-Makers are available but neither: (I) a Dealer Group Quotation; nor (II) a Lender Group Quotation in respect of the relevant Matrix Portfolio is available, as of 12:00 noon on the Second Polling Date, then the relevant Index Spread in respect of the Dispute Notice Date as determined by the Index Spread Determination Agent using a composite Index Spread composed of quotations received from parties other than LSS CDS Counterparties and Non-Dealer Lenders in respect of the close of business on the First Polling Date and calculated pursuant to the Index Spread Determination Agreement shall be the recalculated Index Spread in respect of the Dispute Notice Date.

(G)    If the Index Spread Determination Agent is not able to provide a composite quotation pursuant to Section 5.1(b)(i)(F) above and the terms of the Index Spread Determination Agreement, it will instead provide a quotation in accordance with its evaluated pricing methodology pursuant to the terms of the Index Spread Determination Agreement in respect of the close of business on the First Polling Date, and such quotation shall be the recalculated Index Spread in respect of the Dispute Notice Date.

(H)    If the Index Spread Determination Agent fails to provide a quotation pursuant to Sections 5.1(b)(i)(F) or 5.1(b)(i)(G) above, the dispute shall be determined by the Dealer Group Quotation provided by the LSS CDS Counterparties on the Second Polling Date.

(I)    If the Index Spread Determination Agent fails to provide a quotation pursuant to Sections 5.1(b)(i)(F) or 5.1(b)(i)(G) above, and the LSS CDS Counterparties do not provide a Dealer Group Quotation on the Second Polling Date, the Index Spread in respect of the Dispute Notice Date shall be deemed to be equal to the most recently determined Index Spread which was not subject to a dispute or the dispute in respect of which was resolved pursuant to the procedures in this Section 5.1(b) (without regard to this Section 5.1(b)(i)(I)).

(ii)    **Over 50 per cent. but below 100 per cent. procedure**

(A)    If: (x) the Index Spread specified in the Index Spread Report is at or below 50 per cent. of its corresponding Trigger Spread and the Spread Disputing Party has stated that it believes that the relevant Index Spread is above 50 per cent. but below 100 per cent. of its corresponding Trigger Spread; or (y) the Index

Spread specified in the Index Spread Report is above 50 per cent. but below 100 per cent. of its corresponding Trigger Spread and the Spread Disputing Party has stated that it believes that the relevant Index Spread is at or below 50 per cent. of its corresponding Trigger Spread, then the Spread/Loss Trigger Calculation Agent shall instruct the Index Spread Determination Agent by 12:00 noon on the First Polling Date to recalculate the relevant Index Spread and notify the Spread/Loss Trigger Calculation Agent and the Spread Disputing Party of such determination on or prior to 12:00 noon on the Second Polling Date.  The recalculated Index Spread in respect of the Dispute Notice Date shall be the relevant Index Spread in respect of the Dispute Notice Date as determined by the Index Spread Determination Agent using a composite Index Spread composed of quotations received from parties other than LSS CDS Counterparties and Non-Dealer Lenders in respect of the close of business on the Dispute Notice Date and calculated pursuant to the Index Spread Determination Agreement.

(B)     If the Index Spread Determination Agent is not able to provide a composite quotation pursuant to Section 5.1(b)(ii)(A) above and the terms of the Index Spread Determination Agreement, it will instead provide a quotation in accordance with its evaluated pricing methodology pursuant to the terms of the Index Spread Determination Agreement in respect of the close of business on the Dispute Notice Date, and such quotation shall be the recalculated Index Spread in respect of the Dispute Notice Date.

(C)     If the Index Spread Determination Agent fails to provide a quotation pursuant to 5.1(b)(ii)(A) or 5.1(b)(ii)(B) above by 12:00 noon on the Second Polling Date, then the Spread/Loss Trigger Calculation Agent shall by 1:00 pm on such date seek at least six Disputed Spread Quotations from Reference Market-Makers and Disputed Spread Quotations from all Non-Dealer Lenders and all LSS CDS Counterparties, respectively, for the Second Polling Date and where four or more Disputed Spread Quotations are obtained from Reference Market Makers, the recalculated Index Spread in respect of the Dispute Notice Date shall be the arithmetic mean of those obtained, without regard to the Disputed Spread Quotations having the highest and lowest values.

(D)     Where four or more Disputed Spread Quotations from Reference Market-Makers are not available in respect of the relevant Matrix Portfolio pursuant to Section 5.1(b)(ii)(C) above, then the Spread/Loss Trigger Calculation Agent shall recalculate the relevant Index Spread in respect of the Dispute Notice Date by: (I) if only three Disputed Spread Quotations are obtained from Reference Market-Makers on the Second Polling Date, taking the arithmetic mean of those obtained from such Reference Market-Makers, and such figure shall be the recalculated Index Spread in respect of the Dispute Notice Date; and (II) if only two Disputed Spread Quotations are obtained from Reference Market-Makers and both a Dealer Group Quotation and a Lender Group Quotation are obtained on the Second Polling Date, taking the arithmetic mean of the Dealer Group Quotation and the Lender Group Quotation (which derived figure shall constitute a single Disputed Spread Quotation) and then taking the arithmetic mean of such derived Disputed Spread Quotation and the two Disputed Spread

Quotations from Reference Market-Makers, and such figure shall be the recalculated Index Spread in respect of the Dispute Notice Date.

(E)    If only two Disputed Spread Quotations from Reference Market-Makers are available but no LSS CDS Counterparty contributes a quotation to create a Dealer Group Quotation, then the Spread/Loss Trigger Calculation Agent shall take the arithmetic mean of (I) the Lender Group Quotation, and (II) the two Disputed Spread Quotations from Reference Market-Makers, and such figure shall be the recalculated Index Spread in respect of the Dispute Notice Date.

(F)    If only two Disputed Spread Quotations from Reference Market-Makers are available but no Non-Dealer Lender contributes a quotation to create a Lender Group Quotation, then the Spread/Loss Trigger Calculation Agent shall take the arithmetic mean of (I) the Dealer Group Quotation and (II) the two Disputed Spread Quotations from Reference Market-Makers and such figure shall be the recalculated Index Spread in respect of the Dispute Notice Date.

(G)    If two Disputed Spread Quotations from Reference Market-Makers are not available or if only two Disputed Spread Quotations from Reference Market-Makers are available but neither: (I) a Dealer Group Quotation; nor (II) a Lender Group Quotation in respect of the relevant Matrix Portfolio is available, as of 2:00 pm on the Second Polling Date, the dispute shall be determined by the Dealer Group Quotation provided by the LSS CDS Counterparties on the Second Polling Date.

(H)    If the LSS CDS Counterparties do not provide a Dealer Group Quotation on the Second Polling Date, the Index Spread in respect of the Dispute Notice Date shall be deemed to be equal to the most recently determined Index Spread which was not subject to a dispute or the dispute in respect of which was resolved pursuant to the procedures in this Section 5.1(b) (without regard to this Section 5.1(b)(ii)(H)).

(iii)    Following a recalculation pursuant to this Section 5.1(b), the Spread/Loss Trigger Calculation Agent will notify each party and the Rating Agency within two hours of determination of the revised Index Spread.

(c)    If, following a recalculation pursuant to Sections 5.1(a) or 5.1(b) in respect of any Business Day, such recalculation is of a level sufficient to trigger a First Spread/Loss Trigger Event and/or Second Spread/Loss Trigger Event, if applicable, then the Administrator will deliver by 4:00 pm a Collateral Sufficiency Notice (or a revised Collateral Sufficiency Notice, as the case may be) to each Dealer, each Lender, the Administrative Agent, the Rating Agency and the Collateral Agent, stating that the relevant First Spread/Loss Trigger Event and/or Second Spread/Loss Trigger Event, if applicable, is deemed to have occurred on the relevant Dispute Notice Date, and the relevant First Spread/Loss Trigger Event and/or Second Spread/Loss Trigger Event, if applicable shall be deemed to have occurred as of such date.  If, following the deemed occurrence of a Second Spread/Loss Trigger Event, a Potential Unwind Event would have occurred on such date, the Administrator will so notify each Dealer, each Lender, the Administrative Agent, the Rating Agency and the Collateral Agent, and a Potential Unwind Event shall be deemed to have occurred on the relevant Dispute Notice Date.

(d)    Notwithstanding the timeline set forth for the dispute resolution procedures in Sections 5.1(a) and 5.1(b): (i) any LSS CDS Counterparty, any Lender, the Administrator or the MAV may notify the Collateral Agent of a dispute in respect of a particular day's Transaction Required Collateral Amount or Value of Collateral, as the case may be, one Business Day later than the relevant Dispute Notice Date stated in Section 5.1(a); provided that, in respect of disputes initiated at such later time and where the first attempt does not occur on the Business Day following the Dispute Notice Date, quotations will not be sought on the Business Day following the first attempt, even if no quotations are available on the first such date and accordingly such dispute shall be settled on or before the second Business Day following the Dispute Notice Date; and (ii) at any time on the relevant Dispute Notice Date or on the Business Day thereafter, in each case, before the Spread/Loss Trigger Calculation Agent, the Administrator or the Valuation Agent (as the case may be) seeks quotations or instructs the Index Spread Determination Agent, as the case may be, in respect of the relevant disputed calculation, the relevant Disputing Party or Spread Disputing Party and the Spread/Loss Trigger Calculation Agent, Administrator or the Valuation Agent (as the case may be) may consult with each other and, if: (x) the Spread/Loss Trigger Calculation Agent, the Administrator or the Valuation Agent (as the case may be) determines that its original determination was in error, the Spread/Loss Trigger Calculation Agent, the Administrator or the Valuation Agent (as the case may be) may correct such error, in which case the corrected determination shall apply; or (y) the relevant Disputing Party or the Spread Disputing Party (as the case may be) may withdraw its dispute and agree to revert to the original calculation.  Notice of any such resolution shall be provided by the Spread/Loss Trigger Calculation Agent, the Administrator or the Valuation Agent (as the case may be) to the Collateral Agent, the Valuation Agent, each LSS CDS Counterparty, each Lender, the Administrative Agent and, as the case may be, the Spread/Loss Trigger Calculation Agent, the Administrator or the Valuation Agent as soon as reasonably practicable thereafter (and, in any event, within one Business Day).

(e)    Notwithstanding Section 2 (*Index Spread Reporting; Collateral Calls*), if a Transaction Required Collateral Amount, Value or Index Spread is obtained pursuant to Sections 5.1(a) or 5.1(b), as applicable, on any day, such Transaction Required Collateral Amount, Value or Index Spread shall apply in respect of the relevant Dispute Notice Date, rather than any such applicable figure submitted pursuant to the relevant provision of Section 2 (*Index Spread Reporting; Collateral Calls*).

(f)    If, on any Business Day, a LSS CDS Counterparty has delivered a Draw Notice pursuant to Section 2.6(b), and the Administrator (as directed by the Administrative Agent or any Lender) disputes the determination by such LSS CDS Counterparty to deliver such Draw Notice on such date on the basis that the Required Collateral Amounts and the Value of the Posted Collateral determined in respect of the date of the Draw Notice were (without regard to any adjustments thereto pursuant to Section 5.1(e)) such that a Draw Notice should not have been delivered, then: (1) the Administrator, the Administrative Agent and the relevant LSS CDS Counterparty will consult with each other in an attempt to resolve the dispute in good faith by 12:00 noon on the Business Day following such dispute notification; (2) if the disputing parties fail to resolve the dispute by such time, they shall appoint a mutually acceptable independent third party who, acting in good faith and in a commercially reasonable manner, shall make the determination which shall be binding on the disputing parties; (3) regardless of the existence of a dispute, any Advances (or Qualifying Non-Funded Amounts, if applicable) required to be made, shall be made (or created, as the case may be) on the basis of such disputed calculation and shall be paid or delivered, as the case may be, into the MFF Account in accordance with this Agreement and the Margin Funding Facility Agreement; and (4) if it is determined that a Draw Notice should

not have been delivered, the Collateral Agent shall pay a Dispute Return Amount in accordance with Section 2.7(a).

(g)     If for any reason the Administrator or the Valuation Agent, as the case may be, does not fulfil any of the obligations assigned to it in this Section 5 (*Dispute Resolution*) within two hours of the designated time at which such action is to take place, the Majority Secured Creditors may appoint a dealer from the Reference Market-Maker List to fulfil such obligations.

(h)     Each party hereto agrees that it will undertake the actions set forth in this Section 5 (*Dispute Resolution*) regardless of whether it believes that the relevant Disputing Party or Spread Disputing Party is disputing such Transaction Required Collateral Amount, Value of Collateral or Index Spread in good faith.

## 6.     APPLICATION OF PROCEEDS

### 6.1     Application of Proceeds from the Liquidation of Original Collateral

(a)     Following the occurrence of a Terminal Unwind Event or a Partial Terminal Unwind Event, each Dealer shall, pursuant to the terms of its Swap Agreement, determine the Termination Payment and, if applicable, Unpaid Amounts owed to it in respect of each of its LSS CDSs, Unlevered CDSs and Wrap Swaps (or the relevant portion thereof being terminated).   The Dealer will determine such amounts separately for each LSS CDS, Unlevered CDS and Existing Interest Rate Swap (in each case, together with any Wrap Swaps related thereto), pursuant to the terms of the relevant Swap Agreement.

(b)     (i)     Following the occurrence of a Terminal Unwind Event or a Partial Terminal Unwind Event, in respect of each Unlevered CDS (and any related Wrap Swap), the Administrator shall conduct or cause to be conducted the liquidation process pursuant to Section 4.9 (*Liquidation of Collateral*), in respect of the relevant Allocated Collateral or Allocated Unwound Collateral, as the case may be, and shall direct the payment to the relevant Non-breaching Dealer of the Sale Collateral Proceeds thereof, to the extent necessary to satisfy any Termination Payment and Unpaid Amounts owed to such Non-breaching Dealer in respect of the relevant Unlevered CDS (and any related Wrap Swap);

(ii)     If the Sale Collateral Proceeds of the Allocated Collateral or Allocated Unwound Collateral in respect of an Unlevered CDS exceed the amounts owing to the relevant Non-breaching Dealer in respect of any Termination Payments and Unpaid Amounts in respect of such Unlevered CDS (and any related Wrap Swap) then, after directing the payment to the relevant Non-breaching Dealer of the amount necessary to pay any Termination Payments and Unpaid Amounts in respect of such Unlevered CDS, the Administrator shall direct the delivery to the Collateral Agent of the remaining balance, if any, of the Sale Collateral Proceeds, to be held in a sub-account of the Collateral Account (which sub-account shall be designated as corresponding to the relevant Terminal Unwind Event or Partial Terminal Unwind Event, as applicable), pending their application in accordance with Section 6.2 (*Application of Proceeds from the Liquidation of CA-Held Collateral Upon a Terminal Unwind Event*).

(iii)     If the Sale Collateral Proceeds of the Allocated Collateral or Allocated Unwound Collateral, as the case may be, in respect of an Unlevered CDS are insufficient to satisfy

all amounts owing to the relevant Non-breaching Dealer in respect of any Termination Payments and Unpaid Amounts in respect of such Unlevered CDS (and any related Wrap Swap), the relevant Non-breaching Dealer shall have no recourse to the CA-Held Collateral, the Allocated Collateral in respect of any other Unlevered CDS of such Non-breaching Dealer or to its LSS CDS Original Collateral, or to any other assets of the MAV to satisfy the remaining unpaid claims, and any such remaining claims in respect of such Unlevered CDS (and any related Wrap Swap) shall be extinguished; provided that if any item of relevant Sale Collateral in respect of such Unlevered CDS or related Wrap Swap remains unsold at the conclusion of the relevant liquidation process pursuant to Section 4.9 (*Liquidation of Collateral*), such item of Sale Collateral shall be delivered to the relevant Non-breaching Dealer.

(c)    (i)    Following the occurrence of a Terminal Unwind Event or a Partial Terminal Unwind Event, in respect of each Non-breaching Dealer, the Administrator shall also conduct or cause to be conducted the liquidation process pursuant to Section 4.9 (*Liquidation of Collateral*) in respect of the Allocated Collateral or Allocated Unwound Collateral, as applicable, in respect of all of each such Non-breaching Dealer's LSS CDSs (and any related Wrap Swaps) and shall direct the payment to the relevant Non-breaching Dealer of a portion of the Sale Collateral Proceeds thereof equal to such Non-breaching Dealer's OC Claim Proportion (less, in the case of any Non-Funding MFF Dealer, any Dealer Non-Funded Amounts outstanding in respect of such Dealer), to the extent necessary to satisfy any Termination Payments and Unpaid Amounts owed to such Non-breaching Dealer in respect of the relevant LSS CDS and related Wrap Swap(s) and, if applicable, in respect of any Existing Interest Rate Hedges. If any item of Sale Collateral in respect of such LSS CDS or related Wrap Swap or Existing Interest Rate Hedge remains unsold at the conclusion of the liquidation process pursuant to Section 4.9 (*Liquidation of Collateral*), such item of Sale Collateral shall be delivered to the Collateral Agent for application in accordance with (i) in the case of a Terminal Unwind Event, Section 6.2 (*Application of Proceeds from the Liquidation of CA-Held Collateral Upon a Terminal Unwind Event*); and (ii) in the case of a Partial Terminal Unwind Event, Section 6.4(b).

(ii)    The Administrator shall then deliver to the Collateral Agent the remaining balance, if any, of the Sale Collateral Proceeds of such Allocated Collateral or Allocated Unwound Collateral, as applicable, to be held in a sub-account of the Collateral Account (which sub-account shall be designated as corresponding to the relevant Terminal Unwind Event or Partial Terminal Unwind Event, as applicable) pending their application in accordance with: (i) in the case of a Terminal Unwind Event, Section 6.2 (*Application of Proceeds from the Liquidation of CA-Held Collateral Upon a Terminal Unwind Event*); and (ii) in the case of a Partial Terminal Unwind Event, Section 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*).

## 6.2    Application of Proceeds from the Liquidation of CA-Held Collateral Upon a Terminal Unwind Event

Following the occurrence of a Terminal Unwind Event, the Administrator shall conduct or cause to be conducted the liquidation process pursuant to Section 4.9 (*Liquidation of Collateral*), in respect of each item of CA-Held Collateral.

If, on any Distribution Date, amounts otherwise available for distribution pursuant to this Section 6.2 (*Application of Proceeds from the Liquidation of CA-Held Collateral Upon a Terminal Unwind Event*) are required for the purposes described in Section [5.1(24)(a), 5.1(24)(b) or 5.1(24)(c)] of the Ineligible Asset Note Indenture or Section [4.1(a), 4.1(i), 4.2(a) or 4.2(i)] of the CIBC Omnibus Agreement, such amounts may be withdrawn from the Collateral Account for such purposes, provided that any such withdrawals shall be for application under such other agreements at a priority similar to Sections 6.2(a) and 6.2(n) respectively, as applicable, and shall be subject to the priorities set forth below.

Subject to Section 6.7 (*Holdback Amounts and Allocations*), on the Distribution Date for such Terminal Unwind Event, after distributing amounts available for distribution in accordance with Section 6.3 (*Application of Proceeds in the Ordinary Course*) pursuant to Section 2.9 (*Avoiding Terminal Unwind Events*) or 4.3 (*Non-Dealer Lender Default*), as applicable, the Collateral Agent shall distribute the amounts, as specified in the relevant Distribution Date Report, consisting of: (i) the Sale Collateral Proceeds of the CA-Held Collateral; (ii) any amounts received pursuant to Section 6.1 (*Application of Proceeds from the Liquidation of Original Collateral*) in respect of the relevant Terminal Unwind Event; and (iii) any other monies or other proceeds then credited to the Collateral Account and available for such purpose, based upon the Distribution Date Report for such Distribution Date, in the following order of priority, with funds being distributed *pro rata* in proportion to the claims represented by each Subclause, except as otherwise specifically provided below and, in each case, to the extent that such claims have not been extinguished pursuant to Sections 2.9(g) or 4.3(g) or paid pursuant to Section 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*), it being understood that for each of the claims specified at Sections 6.2(a) and 6.2(n), the "allocated amount" is the sum, without duplication, of: (x) the full amount of each item which is attributable to the relevant Terminal Unwind Event; and (y) the relevant Unwind Percentage of the amount of each item allocated in accordance with Section 6.7 (*Holdbacks Amounts and Allocations*) otherwise than as described in clause (x):

(a)     First, to: (i) the payment of the allocated amount of all Taxes exigible for which a Governmental Authority is given priority over the Secured Creditors under the laws of Canada or any province thereof; and then to (ii) the Indenture Trustee, the Issuer Trustee, the Collateral Agent, the Administrator and the other Administrator Indemnified Parties, in respect of the allocated amount of fees, expenses and reimbursements (including, solely in the case of the Administrator and the other Administrator Indemnified Parties, any indemnified claims under the terms of Section 7.6 (*Provisions Applicable to BlackRock Canada and its Affiliates*) and, without duplication, under the Administration Agreement (but excluding tax indemnities) in respect of the allocated amount of any indemnity amounts owing and not previously paid, up to a maximum aggregate amount (after taking into account any amounts previously paid in respect of such indemnified claims under Section 6.3(a) and Section 6.4(a) and (without duplication of amounts distributed for such purpose under Section 6.3(a) and Section 6.4(a)) at the senior capped level under the Ineligible Asset Note Indenture and the CIBC Omnibus Agreement) of CAD[19,832,315] in respect of such indemnified claims); and then to (iii) other Service Providers in respect of the allocated amount of fees, expenses and reimbursements (excluding in respect of indemnities) and to the payment of the allocated amount of Other Administrative Expenses; in the case of each of Subclauses (ii) and (iii), with funds being distributed *pro rata* in proportion to the claims represented by each such respective Subclause;

(b)     Second, on a *pro rata* basis, to: (i) each Existing Interest Rate Hedge Provider, any Termination Payment and/or Unpaid Amount owed to such Existing Interest Rate Hedge Provider not yet paid in full; and (ii) the Collateral Agent for the benefit of each Managed Asset Swap Provider in respect of any amounts owed to it in respect of termination payments in respect of Senior Managed Asset Swaps; provided that, in each case, such Existing Interest Rate Hedge Provider

or Managed Asset Swap Provider is not a defaulting party or the sole affected party in respect of an early termination of the relevant Existing Interest Rate Hedge or Senior Managed Asset Swap;

(c)     Third, to each LSS CDS Counterparty, an amount, subject to a minimum of zero, equal to the lesser of:

(i)     in respect of any LSS CDS, any Unpaid Amounts (including, for greater certainty, any Cash Settlement Amounts not yet paid together with interest thereon at the Default Rate to the date of payment) owed to it in respect of its Swap Agreement, to the extent not paid pursuant to Section 6.1 (*Application of Proceeds from the Liquidation of Original Collateral*), minus, in the case of any payment to a Non-Funding MFF Dealer, the amount of its Dealer Non-Funded Amount; and

(ii)    an amount equal to the Collateral Entitlement of the relevant LSS CDS Counterparty, less the Value of the Original Collateral of such LSS CDS Counterparty liquidated in Section 6.1 (*Application of Proceeds from the Liquidation of Original Collateral*),

minus, in the case of any payment to a LSS CDS Counterparty, an amount equal to its Collateral Entitlement Proportion of the sum of any Failed Extension Advances or Defaulted Advances which have not previously been applied to reduce such LSS CDS Counterparty's claims under its Swap Agreement pursuant to Sections 2.11(e), 4.1(h) and 4.3(d), as the case may be;

(d)     Fourth, to each LSS CDS Counterparty that is not a Breaching Dealer, an amount, subject to a minimum of zero, equal to the lesser of:

(i)     any portion of Termination Payments owed to it in respect of its Swap Agreement, to the extent not paid pursuant to Section 6.1 (*Application of Proceeds from the Liquidation of Original Collateral*) less, in respect of any Non-Funding MFF Dealer, the amount of its Dealer Non-Funded Amount (having reduced such Dealer-Non Funded Amount by the amount of any reduction of claims owed to such Non-Funding MFF Dealer pursuant to Section 6.2(c)(i) above); and

(ii)    an amount equal to the Collateral Entitlement of the relevant LSS CDS Counterparty less the Value of the Original Collateral of such LSS CDS Counterparty liquidated in Section 6.1 (*Application of Proceeds from the Liquidation of Original Collateral*),

minus, in the case of any payment to a LSS CDS Counterparty, an amount equal to its Collateral Entitlement Proportion of the sum of any Failed Extension Advances or Defaulted Advances which have not previously been applied to reduce such LSS CDS Counterparty's claims under its Swap Agreement pursuant to Sections 2.11(e), 4.1(h) and 4.3(d), as the case may be;

(e)     Fifth, to each LSS CDS Counterparty that is not a Breaching Dealer, an amount equal to the greater of: (i) any unpaid portion of any Termination Payment and/or Unpaid Amount owed to such LSS CDS Counterparty not yet paid in full (less, in respect of any Non-Funding MFF Dealer, an amount equal to its Dealer Non-Funded Amount and less an amount equal to its Collateral Entitlement Proportion of the sum of any Failed Extension Advances or Defaulted Advances which have not previously been applied to reduce such LSS CDS Counterparty's claims under its Swap Agreement pursuant to Sections 2.11(e), 4.1(h) and 4.3(d)); and (ii) zero;

(f)    Sixth, to the Collateral Agent for the benefit of each Managed Asset Swap Provider in respect of any amounts owed to it in respect of any unpaid termination payments in respect of any Subordinated Managed Asset Swaps; provided that such Managed Asset Swap Provider is not a defaulting party or the sole Affected Party in respect of an early termination of the relevant Subordinated Managed Asset Swap;

(g)    Seventh, to (i) Additional Loan Funders, in an amount equal to all interest accrued and unpaid, if any, on the Additional Loans; and (ii) the Lenders who have provided Additional Commitments (other than Breaching Non-Dealer Lenders or Breaching Dealers), amounts outstanding in respect of interest, Breakage Costs and MFF Fees, rateably (based on the amount of Additional Commitment of each Lender); provided that the claims of Additional Loan Funders or Lenders who provided Additional Loans or Additional Commitments (as the case may be) in respect of a later Collateral Call Amount shall be satisfied before the claims of such Persons in respect of Additional Loans or Additional Commitments (as the case may be) issued or provided in respect of an earlier Collateral Call Amount, but on a *pro rata* basis amongst such Persons in respect of Additional Loans issued and Additional Commitments provided in respect of the same Collateral Call Amount;

(h)    Eighth, to (i) Additional Loan Funders, in an amount equal to the aggregate outstanding principal amount of the Additional Loans until the aggregate principal amount has been paid in full; and (ii) the Lenders (other than Breaching Dealers or Breaching Non-Dealer Lenders) who have provided Additional Commitments, amounts outstanding in respect of principal in respect of Advances, rateably (based on the amount of Additional Commitment of each Lender); provided that the claims of Additional Loan Funders or Lenders who provided Additional Loans or Additional Commitments (as the case may be) in respect of a later Collateral Call Amount shall be satisfied before the claims of such Persons in respect of Additional Loans or Additional Commitments (as the case may be) provided in respect of an earlier Collateral Call Amount, but on a *pro rata* basis amongst such Persons in respect of Additional Loans issued and Additional Commitments provided in respect of the same Collateral Call Amount;

(i)    Ninth, (i) to the Lenders (other than Breaching Non-Dealer Lenders or Breaching Dealers), amounts outstanding to such Lenders for principal in respect of Advances, interest, Breakage Costs and MFF Fees, in accordance with the Margin Funding Facility Agreement, to the extent not paid pursuant to items *Seventh* or *Eighth* above, rateably; and (ii) to any Non-Funding MFF Dealer that is not a Breaching Dealer, an amount equal to any Termination Payments or Unpaid Amounts owed to such Non-Funding MFF Dealer and not yet paid less, in the case of any payment to any Lender/Dealer, an amount equal to its Collateral Entitlement Proportion of the sum of any Failed Extension Advances or Defaulted Advances which have not previously been applied to reduce such Lender/Dealer's claims under its Swap Agreement pursuant to Sections 2.11(e), 4.1(h) and or 4.3(d);

(j)    Tenth, to the Indenture Trustee on behalf of the holders of the Class A-1 Notes, on a *pro rata* basis, in respect of all interest accrued and unpaid, if any, on such Class A-1 Notes;

(k)    Eleventh, to the Indenture Trustee on behalf of the holders of the Class A-1 Notes, on a *pro rata* basis, in respect of the aggregate outstanding principal amount of such Class A-1 Notes, until the aggregate outstanding principal amount of such Class A-1 Notes has been paid in full;

(l)    Twelfth, to the Indenture Trustee on behalf of the holders of the Class A-2 Notes, on a *pro rata* basis, in respect of all interest accrued and unpaid, if any, on such Class A-2 Notes;

(m)    Thirteenth, to the Indenture Trustee on behalf of the holders of the Class A-2 Notes, on a *pro rata* basis, in respect of the aggregate outstanding principal amount of such Class A-2 Notes, until the aggregate outstanding principal amount of such Class A-2 Notes has been paid in full;

(n)    Fourteenth, to: (i) the Existing Note Indenture Trustees and Existing Issuer Trustees (and the Reserve Account Trustee under the Existing Issuer Trustee Trust Agreement under its right of subrogation pursuant to the Existing Indemnity and Tax Claims Protocol) of the Existing Conduits in respect of the Existing Indemnity Claims, in accordance with the Existing Indemnity and Tax Claims Protocol (including any claims against the MAV by MAV1 or MAV3 in respect of Existing Indemnity Claims pursuant to the Existing Indemnity and Tax Claims Protocol), in each case, in respect of the allocated amount of any indemnity amounts owing and not previously paid; and to the Indenture Trustee, the Collateral Agent and the Issuer Trustee, in each case in respect of the allocated amount of any indemnity amounts owing and not previously paid; and to the Administrator and other Administrator Indemnified Parties in respect of any indemnity claims under Section 7.6 (*Provisions Applicable to BlackRock Canada and its Affiliates*) and, without duplication, under the Administration Agreement and the Tao Administration Agreement, in each case, in respect of the allocated amount of any indemnity amounts owing and not previously paid; and each Lender in respect of its indemnities, fees and expenses as provided for in the Margin Funding Facility Agreement (including in respect of amounts owing pursuant to Section 9.4(f) of the Margin Funding Facility Agreement); and then (ii) to other Service Providers, in each case, in respect of the allocated amount of any indemnity amounts owing (including pursuant to Section 7 (*Appointment of Agents*)) and not previously paid; and to any Taxes not payable pursuant to Section 6.2(a), 6.3(a) or 6.4(b)(i); and (X) including for each referenced party in Subclauses (i) and (ii), any amounts payable to their respective Affiliates under the terms of the relevant indemnity and (Y) with funds being distributed *pro rata* in proportion to the claims represented by each of Subclauses (i) and (ii), respectively;

(o)    Fifteenth, to the Indenture Trustee on behalf of the holders of the Class B Notes, on a *pro rata* basis, in respect of all interest accrued and unpaid, if any, on such Class B Notes;

(p)    Sixteenth, to the Indenture Trustee on behalf of the holders of the Class B Notes, on a *pro rata* basis, in respect of the aggregate outstanding principal amount of such Class B Notes, until the aggregate outstanding principal amount of such Class B Notes has been paid in full;

(q)    Seventeenth, to the Indenture Trustee on behalf of the holders of the Class C Notes, on a *pro rata* basis, on account of the aggregate outstanding principal amount of such Class C Notes, until the aggregate principal amount of such Class C Notes has been repaid in full;

(r)    Eighteenth, to the Collateral Agent for the benefit of each Existing Interest Rate Hedge Provider and Managed Asset Swap Provider (where such Existing Interest Rate Hedge Provider or Managed Asset Swap Provider is a defaulting party or the sole Affected Party in respect of the early termination of the relevant Existing Interest Rate Hedge or Senior Managed Asset Swap) in respect of any amounts owed to it in respect of termination payments in respect of such Existing Interest Rate Hedge or Managed Asset Swap, but solely in, the case of Senior Managed Asset Swaps

(s)    Nineteenth, if a Partial Terminal Unwind Event has previously occurred (other than with respect to a Breaching Non-Dealer Lender), to the Persons specified in Section 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*) at Sections 6.4(b)(i) to 6.4(b)(ix),

in accordance with the order of priority therein, all amounts outstanding to such Persons in respect of claims relating to such Partial Terminal Unwind Event which have not been previously satisfied by the distribution of amounts under Section 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*) or Section 6.3(s); and in the event that more than one Partial Terminal Unwind Event has previously occurred, the claims relating to the most recent Partial Terminal Unwind Event shall be satisfied first and so on in reverse chronological order until the claims of initial Partial Terminal Unwind Event;

(t)     Twentieth, to each Breaching Dealer and Breaching Non-Dealer Lender, on a *pro rata* basis, amounts outstanding to such Persons in respect of principal in respect of Advances, interest, Breakage Costs and MFF Fees in accordance with the Margin Funding Facility Agreement;

(u)     Twenty-first, to the Collateral Agent for the benefit of each Managed Asset Swap Provider (where such Managed Asset Swap Provider is a defaulting party or the sole Affected Party in respect of the early termination of the relevant Subordinated Managed Asset Swap) in respect of any amounts owed to it in respect of any unpaid termination payments in respect of Subordinated Managed Asset Swaps;

(v)     Twenty-second, to the Indenture Trustee on behalf of the holders Class C Notes, in respect of all interest accrued and unpaid, if any, on the Class C Notes on a *pro rata* basis among the holders of the Class C Notes;

(w)     Twenty-third, to each Breaching Dealer, any Termination Payment outstanding to such Breaching Dealer minus, in respect of each LSS CDS Counterparty, an amount equal to its Collateral Entitlement Proportion of the sum of any Failed Extension Advances or Defaulted Advances which have not previously been applied to reduce a such Breaching Dealer's claims under its Swap Agreement pursuant to Sections 2.11(e), 4.1(h) or 4.3(d); and

(x)     Twenty-third, to the MAV, amounts prescribed for the charitable beneficiary thereof.

## 6.3    Application of Proceeds in the Ordinary Course

On each Payment Date, Income Distributions in respect of Original Collateral and CA-Held Collateral credited to the Collection Account during the Due Period ending on the Determination Date for such Payment Date and, subject to Sections 4.4(c) and 4.7(c), any proceeds from the liquidation of Released Collateral released pursuant to Section 4.8 (*Release of Collateral*) and credited to the Collection Account during such Due Period will be distributed by the Collateral Agent in the order of priority specified in this Section 6.3 (*Application of Proceeds in the Ordinary Course*), based upon the Payment Date Report in respect of such Payment Date, *pro rata* in proportion to the claims represented by each Subclause, except as otherwise specifically provided below.

If any amount below is payable on a date other than a Payment Date (or a Distribution Date, to which the provisions of Section 6.7 (*Holdback Amounts and Allocations*) shall apply) or if any amount in the Collection Account is required to be applied pursuant to Section 5.1(24)(a), 5.1(24)(b) or 5.1(24)(c) of the Ineligible Asset Note Indenture, or pursuant to Section 4.1(a), 4.1(i), 4.2(a) or 4.2(i)of the CIBC Omnibus Agreement (which amounts in each case shall be for application under such other agreements at a priority similar to Sections 6.3(a) and 6.3(o) respectively, as applicable), on a date other than a Payment Date or a Distribution Date, prior to such payment being made, an amount will be reserved in the Collection Account equal to the amount estimated by the Administrator in its commercially reasonable judgement, based upon amounts then known and/or reasonably expected to be or become

payable during the remainder of the relevant Due Period and on the Payment Date for such Due Period, in respect of the aggregate amount of items *pari passu* or more senior in priority than such obligation, calculated on a *pro forma* basis, and if, due to such reservation of funds, there are insufficient funds available in the Collection Account to make such payment, such payment will be made only on the following Payment Date (and then only if funds are available pursuant to this Section 6.3 (*Application of Proceeds in the Ordinary Course*)).

If on any date (including on a Payment Date or Distribution Date) pursuant to Section 5.1(24)(a), 5.1(24)(b) or 5.1(24)(c) of the Ineligible Asset Note Indenture or Section 4.1(a), 4.1(i), 4.2(a) or 4.2(i)of the CIBC Omnibus Agreement amounts in the Collection Account are required for the purposes described in such sections, such amounts may be withdrawn from the Collection Account for such purposes, provided that any such withdrawals shall be for application under such other agreements at a priority similar to Sections 6.3(a) and 6.3(o) respectively, as applicable, and shall be subject to the priorities set forth below.

In the event of non-payment on any Payment Date of any amounts referred to in this Section 6.3 (*Application of Proceeds in the Ordinary Course*), such amounts shall remain due and shall be payable on each subsequent Payment Date in the order of priority provided for in this Section 6.3 (*Application of Proceeds in the Ordinary Course*), subject to any intervening Partial Terminal Unwind Event and the satisfaction of any such claims pursuant to Section 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*).

All amounts credited to the Collection Account which can be attributed by the Monitor to income accrued on Collateral (which amounts shall be set forth in a report of the Monitor to the court) in respect of the period up to and including the Closing Date shall be delivered by the Collateral Agent to the Monitor, on instructions from the Monitor, in accordance with the Plan.

Subject to Section 6.7 (*Holdback Amounts and Allocations*), on a Distribution Date in respect of a Terminal Unwind Event, all amounts credited to the Collection Account as of such date, and on a Distribution Date in respect of a Partial Terminal Unwind Event, an allocated portion of any amount standing to the credit of the Collection Account on the date of the relevant Partial Terminal Unwind Event, will be distributed by the Collateral Agent in the order of priority specified below, based upon the Distribution Date Report in respect of such Distribution Date. Such allocated portion of Income Distributions in the case of a Partial Terminal Unwind Event shall be determined by the Administrator based upon the date within such Due Period on which the Partial Terminal Unwind Event occurs, the relevant Unwind Percentage, and the allocation principles set forth in Section 6.7 (*Holdback Amounts and Allocations*), including whether any such amounts relate directly to the liquidation of Collateral in connection with such Partial Terminal Unwind Event. In connection with a Partial Terminal Unwind Event, for each of the claims specified at Sections 6.3(a) and 6.3(o) below, the **"allocated amount"** is the sum, without duplication, of: (x) the full amount of each item which is attributable to the relevant Partial Terminal Unwind Event; and (y) the relevant Unwind Percentage of the amount of each item allocated in accordance with Section 6.7 (*Holdback Amounts and Allocations*) other than as described in clause (x).

(a)     First, to: (i) the payment of the allocated amount of all Taxes exigible for which a Governmental Authority is given priority over the Secured Creditors under the laws of Canada or any province thereof; and then to (ii) the Indenture Trustee, the Issuer Trustee, the Collateral Agent, the Administrator and other Administrator Indemnified Parties in respect of an amount equal to the allocated amount of fees, expenses and reimbursements (including, solely in the case of the Administrator and other Administrator Indemnified Parties, any indemnified claims under the

terms of Section 7.6 (*Provisions Applicable to BlackRock Canada and its Affiliates*) of this Agreement and, without duplication, under the Administration Agreement and the Tao Administration Agreement (but excluding tax indemnities), in each case, in respect of the allocated amount of any indemnity amounts owing and not previously paid, up to a maximum aggregate amount (after taking into account any amounts previously paid in respect of such indemnified claims under this Section 6.3(a), Section 6.4(a) and (without duplication of amounts distributed for such purpose under this Section 6.3(a) or Section 6.4(a)) at the senior capped level under the Ineligible Asset Note Indenture and the CIBC Omnibus Agreement) of CAD[19,832,315] million in respect of such indemnified claims and with no more than 10 per cent. of such maximum amount being paid in any quarterly period); and then to (iii) other Service Providers in respect of the allocated amount of fees, expenses and reimbursements (excluding in respect of indemnities) and to the payment of the allocated amount of Other Administrative Expenses, in the case of each of Subclauses (ii) and (iii), with funds being distributed *pro rata* in proportion to the claims represented by such respective Subclause;

(b)   Second, an amount equal to any Transferred Senior Expense Shortfall which has not previously been returned to the Collateral Account pursuant to this Section 6.3 (*Application of Proceeds in the Ordinary Course*) to: (i) LSS CDS Counterparties in respect of any Cash Settlement Amounts, Termination Payments and Unpaid Amounts not satisfied pursuant to Sections 4.4 (*Cash Settlement Amounts*), 4.6 (*Early Termination of all of the Transactions under a Dealer's Swap Agreement*) or 4.7 (*Early Termination of some (but not all) of the Transactions under a Dealer's Swap Agreement*), as applicable; and then to (ii) the Collateral Account to be held as CA-Held Collateral;

(c)   Third, on a *pro rata* basis, to: (i) each Existing Interest Rate Hedge Provider, in respect of any amounts owed to it (other than termination payments) in respect of Existing Interest Rate Hedges; and (ii) the Collateral Agent for the benefit of each Managed Asset Swap Provider in respect of any amounts owed to it (other than termination payments) in respect of Senior Managed Asset Swaps, in each case, provided that such Existing Interest Rate Hedge Provider or Managed Asset Swap Provider is not a defaulting party or the sole Affected Party in respect of an early termination of the relevant Existing Interest Rate Hedge or Senior Managed Asset Swap;

(d)   Fourth, *pro rata* to: (i) each Dealer that is not a Breaching Dealer, any amounts owed to such Dealer under its Swap Agreement, other than amounts relating to Cash Settlement Amounts, Termination Payments and Unpaid Amounts; and (ii) to the Collateral Agent for the benefit of Portfolio Managers, any amounts owed to such Portfolio Managers by the MAV under a Portfolio Management Agreement;

(e)   Fifth, to the Collateral Agent for the benefit of each Managed Asset Swap Provider in respect of any other amounts owed to it (other than termination payments) in respect of any Subordinated Managed Asset Swaps; provided that such Managed Asset Swap Provider is not a defaulting party or the sole Affected Party in respect of an early termination of the relevant Subordinated Managed Asset Swap;

(f)   Sixth, to (i) Additional Loan Funders, in an amount equal to all interest accrued and unpaid, if any, on the Additional Loans; and (ii) the Lenders who have provided Additional Commitments (other than Breaching Non-Dealer Lenders and Breaching Dealers), amounts outstanding in respect of interest, Breakage Costs and MFF Fees, rateably (based on the amount of Additional Commitment of each such Lender); provided that the claims of Additional Loan Funders or

Lenders who provided Additional Loans or Additional Commitments (as the case may be) in respect of a later Collateral Call Amount shall be satisfied before the claims of such Persons in respect of Additional Loans or Additional Commitments (as the case may be provided in respect of an earlier Collateral Call Amount, but on a *pro rata* basis amongst such Persons in respect of Additional Loans and Additional Commitments provided in respect of the same Collateral Call Amount;

(g)     Seventh, to (i) Additional Loan Funders, in an amount equal to the aggregate outstanding principal amount of the Additional Loans until the aggregate principal amount has been paid in full; and (ii) Lenders (other than Breaching Non-Dealer Lenders and Breaching Dealers), in an amount equal to the aggregate of all Advances, Qualifying Non-Funded Amounts or Dealer Non-Funded Amounts outstanding which were provided in respect of Additional Commitments only, such that each Lender (other than Breaching Non-Dealer Lenders and Breaching Dealers) receives an amount equal to the product of (X) the amount available for distribution pursuant to this Section 6.3(g) and (Y) a fraction equal to (I) such Lender's Commitment or amount of its Term Loan, as the case may be, divided by (II) the aggregate of all Lender's Commitments and Term Loans of such Lenders, provided that any such amount paid to or in respect of any individual Lender shall be paid in the following manner and order of priority:

    (i)     if such Lender has any such Dealer Non-Funded Amounts outstanding as of the relevant Determination Date, (A) an amount up to the aggregate of such Dealer Non-Funded Amounts as of the relevant Determination Date will be paid to the Collateral Account; and (B) an equal amount of Dealer Non-Funded Amounts will be cancelled;

    (ii)     if such Lender has any such Advances outstanding as of the relevant Determination Date which were provided in respect of Additional Commitments: (A) first, an amount up to the aggregate of such Advances which exceeds its contribution of Advances standing to the credit of the MFF Account will be repaid to such Lender; and (B) second, an amount equal to any other such Advances owing to such Lender shall be repaid to such Lender and an equal amount shall be transferred from the MFF Account to the Collateral Account; and

    (iii)     if such Lender has any such Qualifying Non-Funded Amounts outstanding as of the relevant Determination Date: (A) an amount up to the aggregate of such Qualifying Non-Funded Amounts will be paid to the Collateral Account; and (B) an equal amount of Qualifying Non-Funded Amounts will be cancelled,

provided that the claims of Additional Loan Funders or Lenders which provided Additional Commitments in respect of a later Collateral Call Amount shall be satisfied before the claims of such Persons in respect of Additional Loans or Additional Commitments provided in respect of an earlier Collateral Call Amount, but on a *pro rata* basis amongst such Persons in respect of Additional Loans or Additional Commitments provided in respect of the same Collateral Call Amount;

(h)     Eighth, to the Lenders (other than Breaching Non-Dealer Lenders and Breaching Dealers), amounts outstanding to such Lenders for interest, Breakage Costs and MFF Fees, *pro rata*, then due and payable in accordance with the Margin Funding Facility Agreement;

(i)     Ninth, to the Indenture Trustee on behalf of the holders of the Class A-1 Notes, on a *pro rata* basis, in respect of all interest accrued and unpaid, if any, on the Class A-1 Notes;

(j) Tenth, to the Indenture Trustee on behalf of the holders of the Class A-2 Notes, on a *pro rata* basis, in respect of all interest accrued and unpaid, if any, on the Class A-2 Notes;

(k) Eleventh, an amount equal to the aggregate of all Advances, Qualifying Non-Funded Amounts or Dealer Non-Funded Amounts outstanding as of the relevant Determination Date, such that each Lender (other than Breaching Non-Dealer Lenders and Breaching Dealers) receives an amount in repayment of Advances outstanding or a reduction of Qualifying Non-Funded Amounts or Dealer Non-Funded Amounts outstanding, which in the aggregate is equal to the product of (X) the amount available for distribution pursuant to this Section 6.3(k) and (Y) a fraction equal to (I) such Lender's Commitment or amount of its Term Loan, as the case may be, divided by (II) the aggregate of all Lender's Commitments and Term Loans of such Lenders, provided that any such amount paid to or in respect of any individual Lender shall be paid in the following manner and order of priority:

 (i) (A) first, if such Lender has any Advances outstanding as of the relevant Determination Date, an amount up to the amount by which the aggregate of such Advances exceeds its contribution of Advances standing to the credit of the MFF Account will be repaid to such Lender; and (B) then, an amount equal to the remaining Advances owing to such Lender as of the relevant Determination Date shall be repaid to such Lender and an equal amount shall be transferred from the MFF Account to the Collateral Account;

 (ii) second, if such Lender has any Dealer Non-Funded Amounts outstanding as of the relevant Determination Date: (A) an amount up to the aggregate of such Dealer Non-Funded Amounts will be paid to the Collateral Account; and (B) an equal amount of Dealer Non-Funded Amounts will be cancelled; and

 (iii) third, if such Lender has any Qualifying Non-Funded Amounts outstanding as of the relevant Determination Date: (A) an amount up to the aggregate of such Qualifying Non-Funded Amounts will be paid to the Collateral Account; and (B) an equal amount of Qualifying Non-Funded Amounts will be cancelled;

(l) Twelfth, to the Reserve Account, an amount equal to: the sum of (A) the aggregate of all Unfunded Commitments as of the relevant Determination Date (not including the Unfunded Commitment of any Lender/Dealer which has delivered a Commitment Standstill Notice) and (B) the balance standing to the credit of the Draw Accounts of all Dissenting Lenders;

(m) Thirteenth, to the Indenture Trustee on behalf of the holders of the Class A-1 Notes, on a *pro rata* basis, in respect of the aggregate outstanding principal amount of the Class A-1 Notes, until the aggregate outstanding principal amount of the Class A-1 Notes has been paid in full;

(n) Fourteenth, to the Indenture Trustee on behalf of the holders of the Class A-2 Notes, on a *pro rata* basis, in respect of the aggregate outstanding principal amount of the Class A-2 Notes, until the aggregate outstanding principal amount of the Class A-2 Notes has been paid in full;

(o) Fifteenth, to: (i) each Lender in respect of its indemnity, as provided for in the Margin Funding Facility Agreement (including in respect of amounts owing pursuant to Section 9.4(f) of the Margin Funding Facility Agreement), the Existing Note Indenture Trustees and Existing Issuer Trustees (and the Reserve Account Trustee under the Existing Issuer Trustee Trust Agreement under its right of subrogation pursuant to the Existing Indemnity and Tax Claims Protocol) of the Existing Conduits in respect of the Existing Indemnity Claims in respect of amounts then

payable in accordance with the Existing Indemnity and Tax Claims Protocol (including any claims against the MAV by MAV1 or MAV3 in respect of Existing Indemnity Claims pursuant to the Existing Indemnity and Tax Claims Protocol), in each case, in respect of the allocated amount of any indemnity amounts owing and not previously paid; and to the Indenture Trustee, the Issuer Trustee and the Collateral Agent, in each case, in respect of any indemnity amounts owing and not previously paid; and to the Administrator and other Administrator Indemnified Parties, for any indemnity claims under Section 7.6 (*Provisions Applicable to BlackRock Canada and its Affiliates*) and without duplication, under the Administration Agreement and Tao Administration Agreement, in each case in respect of the allocated amount of any indemnity amounts owing and not previously paid; and then (ii) to other Service Providers in respect of the allocated amount of any indemnity amounts owing (including pursuant to Section 7 (*Appointment of Agents*)) and not previously paid; and to any Taxes not payable pursuant to Sections 6.3(a) or 6.4(b)(i); and (A) including for each referenced party in Subclauses (i) and (ii), any amounts payable to their respective Affiliates under the terms of the relevant indemnity and (B) with funds being distributed *pro rata* in proportion to the claims represented by each of Subclauses (i) and (ii), respectively;

(p)    Sixteenth, to the Indenture Trustee on behalf of the holders of the Class B Notes, on a *pro rata* basis, in respect of all interest accrued and unpaid, if any, on the Class B Notes;

(q)    Seventeenth, to the Indenture Trustee on behalf of the holders of the Class B Notes, on a *pro rata* basis, in respect of the aggregate outstanding principal amount of the Class B Notes, until the aggregate outstanding principal amount of the Class B Notes has been paid in full;

(r)    Eighteenth, to the Indenture Trustee on behalf of the holders of the Class C Notes, on a *pro rata* basis, in respect of the aggregate outstanding principal amount of the Class C Notes, until the aggregate outstanding principal amount of the Class C Notes has been paid in full;

(s)    Nineteenth, if a Partial Terminal Unwind Event has previously occurred (other than with respect to a Breaching Non-Dealer Lender), to the Persons specified in Section 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*) at Sections 6.4(b)(i) to 6.4(b)(ix), in accordance with the order of priority therein, all amounts outstanding to such Persons in respect of claims relating to such Partial Terminal Unwind Event which have not been previously satisfied by the distribution of amounts under Section 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*) or this Section 6.3(s); and in the event that more than one Partial Terminal Unwind Event has previously occurred, the claims relating to the most recent Partial Terminal Unwind Event shall be satisfied first and so on in reverse chronological order until the claims of initial Partial Terminal Unwind Event;

(t)    Twentieth, amounts outstanding to Breaching Dealers and Breaching Non-Dealer Lenders for principal in respect of Advances, interest, Breakage Costs and MFF Fees in accordance with the Margin Funding Facility Agreement, *pro rata* in respect of each such Lender in accordance with its relative Proportionate MFF Share, such amount to be applied in the following manner in respect of each such Lender:

(i)    first, to such Lender, amounts outstanding to such Lenders in respect of interest and MFF Fees;

(ii)    second: (A) first, if such Lender has any Advances outstanding as of the relevant Determination Date, an amount up to the amount by which the aggregate of such

Advances exceeds its contribution of Advances standing to the credit of the MFF Account will be repaid to such Lender; and (B) then, an amount equal to any other Advances outstanding as of the relevant Determination Date owing to such Lender shall be repaid to such Lender and an equal amount shall be transferred from the MFF Account to the Collateral Account;

(iii)    third, if such Lender has any Dealer Non-Funded Amounts outstanding as of the relevant Determination Date: (A) an amount up to the aggregate of such Dealer Non-Funded Amounts will be paid to the Collateral Account; and (B) an equal amount of Dealer Non-Funded Amounts will be cancelled; and

(iv)    fourth, if such Lender has any Qualifying Non-Funded Amounts outstanding as of the relevant Determination Date: (A) an amount up to the aggregate of such Qualifying Non-Funded Amounts will be paid to the Collateral Account; and (B) the outstanding Qualifying Non-Funded Amounts will be reduced by an equal amount;

(u)    Twenty-first, to the Indenture Trustee on behalf of the holders of the Class C Notes, on a *pro rata* basis, in respect of all interest accrued and unpaid, if any, on the Class C Notes;

(v)    Twenty-second, to the Collateral Agent for the benefit of each Managed Asset Swap Provider (where such Managed Asset Swap Provider is a defaulting party or the sole Affected Party in respect of an early termination of the relevant Senior Managed Asset Swap) in respect of any amounts owed to it (other than termination payments) in respect of Senior Managed Asset Swaps;

(w)    Twenty-third, to each Breaching Dealer, any Termination Payments owing to such Breaching Dealer in respect of its Swap Agreement minus, in respect of each LSS CDS Counterparty, an amount equal to its Collateral Entitlement Proportion of the sum of any Failed Extension Advances or Defaulted Advances which have not previously been applied to reduce a LSS CDS Counterparty's claims under its Swap Agreement pursuant to Sections 2.11(e), 4.1(h) or 4.3(d);

(x)    Twenty-fourth, on a *pro rata* basis, to: (i) each Existing Interest Rate Hedge Provider, any in respect of any amounts owed to it (other than termination payments) in respect of Existing Interest Rate Hedges; and (ii) the Collateral Agent for the benefit of each Managed Asset Swap Provider, where such Existing Interest Rate Hedge Provider or Managed Asset Swap Provider is a defaulting party or the sole Affected Party in respect of an early termination of the relevant Existing Interest Rate Hedge or Subordinated Managed Asset Swap) in respect of any other amounts owed to it (other than termination payments) in respect of any Existing Interest Rate Hedge or Subordinated Managed Asset Swaps;

(y)    Twenty-fifth, CAD100 to the Issuer Trustee for the account of the charitable beneficiary; and

(z)    Twenty-sixthany amounts remaining: (i) to be held in the Collection Account for distribution in the above order of priority on the succeeding Payment Date (or for distribution prior thereto as permitted or required pursuant to this Agreement); or (ii) on the final Payment Date, to the charitable beneficiary.

**6.4      Application of Proceeds on Occurrence of a Partial Terminal Unwind Event**

Upon the occurrence of a Partial Terminal Unwind Event pursuant to Section 2.9 (*Avoiding Terminal Unwind Events*) or Section 4.3 (*Non-Dealer Lender Default*), as applicable, the Sale Collateral Proceeds of the liquidation of the relevant Unwound Collateral shall, subject to Section 6.7 (*Holdback Amounts and Allocations*), be applied by the Collateral Agent, in accordance with the relevant Distribution Date Report, as provided below.

If, on any Distribution Date, amounts otherwise available for distribution pursuant to this Section 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*) are available for the purposes described in Section [5.1(24)(a) or 5.1(24)(b)] of the Ineligible Asset Note Indenture or Section [4.1(a) or 4.2(a)] of the CIBC Omnibus Agreement, such amounts may be withdrawn from the Collateral Account for such purposes, provided that any such withdrawals shall be for application under such other agreements at a priority similar to Section 6.4(b)(i) below and shall be subject to the priorities set forth below:

(a)      First, proceeds arising from the liquidation of Original Collateral shall be applied in accordance with Section 6.1 (*Application of Proceeds from the Liquidation of Original Collateral*); and

(b)      Second, proceeds arising from the liquidation of CA-Held Collateral and any remaining amounts representing proceeds of Original Collateral after satisfaction of claims pursuant to Section 6.1 (*Application of Proceeds from the Liquidation of Original Collateral*) (other than claims representing payments under Unlevered LSS CDSs where the Allocated Unwound Collateral in respect of the relevant Unlevered CDS has been exhausted) shall be applied to creditors of the MAV in the following order of priority, with funds being distributed *pro rata* in proportion to the claims represented by each Subclause, except as otherwise stated, it being understood that for each of the claims specified at Section 6.4(b)(i), the "allocated amount" is the sum, without duplication, of: (x) the full amount of each item which is attributable to the relevant Terminal Unwind Event; and (y) the relevant Unwind Percentage of the amount of each item allocated in accordance with Section 6.7 (*Holdbacks Amounts and Allocations*) otherwise than as described in clause (x):

(i)      First, to (i) the payment of the allocated amount of all Taxes exigible for which a Governmental Authority is given priority over the Secured Creditors under the laws of Canada, or any province thereof, and then to (ii) the Indenture Trustee, the Collateral Agent, the Issuer Trustee, the Administrator and other Administrator Indemnified Parties, in respect of the allocated amount of fees, expenses and reimbursements (including, solely in the case of the Administrator and the other Administrator Indemnified Parties, any indemnified claims under the terms of the Administration Agreement (but excluding tax indemnities), in respect of the allocated amount of any indemnity amounts owing and not previously paid, up to a maximum aggregate amount (after taking into account any amounts previously paid in respect of such indemnified claims under this Section 6.4(b)(i) and Section 6.3(a) and (without duplication of amounts distributed for such purpose under Sections 6.4(b)(i) or 6.3(a)) at the senior capped level under the Ineligible Asset Note Indenture and the CIBC Omnibus Agreement) of CAD[19,832,315] in respect of such indemnified claims), and then to (iii) other Service Providers in respect of the allocated amount of fees, expenses and reimbursements (excluding in respect of indemnities) and to the payment of the allocated amount of Other Administrative Expenses, in the case of each of Subclauses

(ii) and (iii), with funds being distributed *pro rata* in proportion to the claims represented by each such respective Subclause;

(ii)    Second, on a *pro rata* basis, to: (i) each Existing Interest Rate Hedge Provider, any Termination Payment and/or Unpaid Amount owed to such Existing Interest Rate Hedge Provider not yet paid in full; and (ii) to the Collateral Agent for the benefit of each Managed Asset Swap Provider in respect of any amounts owed to it in respect of termination payments in respect of the Unwind Percentage of Senior Managed Asset Swaps, in each case, that such Existing Interest Rate Hedge Provider or Managed Asset Swap Provider is not a defaulting party or the sole Affected Party in respect of an early termination of the relevant Existing Interest Rate Hedge or Senior Managed Asset Swap;

(iii)    Third, to each LSS CDS Counterparty, an amount, subject to a minimum of zero, equal to the lesser of:

(A)    any Unpaid Amounts (including any Cash Settlement Amounts not yet paid together with interest thereon at the Default Rate to the date of payment) owed to it in respect of the Unwound Swaps, to the extent not paid pursuant to Section 6.1 (*Application of Proceeds from the Liquidation of Original Collateral*) above minus, in the case of any payment to a Non-Funding MFF Dealer, the amount of its Dealer Non-Funded Amount; and

(B)    an amount equal to the Unwind Percentage of the Collateral Entitlement of the relevant LSS CDS Counterparty, less the Value of the Original Collateral of such LSS CDS Counterparty liquidated in Section 6.1 (*Application of Proceeds from the Liquidation of Original Collateral*)

minus, in the case of any payment to a LSS CDS Counterparty, an amount equal to the Unwind Percentage of its Collateral Entitlement Proportion of the sum of any Failed Extension Advances or Defaulted Advances which have not previously been applied to reduce such LSS CDS Counterparty's claims under its Swap Agreement pursuant to Sections 2.11(e), 4.1(h) or 4.3(d), as the case may be;

(iv)    Fourth, to each LSS CDS Counterparty that is not a Breaching Dealer, an amount, subject to a minimum of zero, equal to the lesser of:

(A)    any portion of Termination Payments owed to it in respect of the Unwound Swaps to the extent not paid pursuant to Section 6.1 (*Application of Proceeds from the Liquidation of Original Collateral*), less, in respect of any Non-Funding MFF Dealer, an amount equal to the Unwind Percentage of its Dealer Non-Funded Amount (having reduced such Dealer Non-Funded Amount by the amount of any reduction of claims owed to such Non-Funding MFF Dealer pursuant to Section 6.4(b)(iii) above); and

(B)    the Unwind Percentage of the Collateral Entitlement of the relevant LSS CDS Counterparty less the Value of the Original Collateral of such LSS CDS Counterparty liquidated in Section 6.1 (*Application of Proceeds from the Liquidation of Original Collateral*),

minus, in the case of any payment to a LSS CDS Counterparty, an amount equal to the Unwind Percentage of its Collateral Entitlement Proportion of the sum of any Failed Extension Advances or Defaulted Advances which have not previously been applied to reduce such LSS CDS Counterparty's claims under its Swap Agreement pursuant to Sections 2.11(e), 4.1(h) and 4.3(d), as the case may be;

(v)     Fifth, to each LSS CDS Counterparty that is not a Breaching Dealer, an amount equal to the greater of: (i) any unpaid portion of Termination Payments and/or Unpaid Amounts owed to it in respect of the Unwound Swaps not yet paid in full together with interest thereon at the Default Rate to the date of payment (less an amount equal to the Unwind Percentage of the Dealer Non-Funded Amount of any Non-Funding MFF Dealer and minus an amount equal to the Unwind Percentage of its Collateral Entitlement Proportion of the sum of any Failed Extension Advances or Defaulted Advances, in each case, which have not previously been applied to reduce such LSS CDS Counterparty's claims under its Swap Agreement pursuant to Sections 2.11(e), 4.1(h) or 4.3(d)); and (ii) zero;

(vi)    Sixth, to the Collateral Agent for the benefit of each Managed Asset Swap Provider in respect of any amounts owed to it in respect of any unpaid termination payments in respect of the Unwind Percentage of any Subordinated Managed Asset Swaps; provided that such Managed Asset Swap Provider is not a defaulting party or the sole Affected Party in respect of an early termination of the relevant Subordinated Managed Asset Swap;

(vii)   Seventh, to (A) Unwinding Lenders which are Additional Loan Funders, in an amount equal to all interest accrued and unpaid, if any, on the Additional Loans; and (B) the Unwinding Lenders who are not Breaching Dealers or Breaching Non-Dealer Lenders and who have previously provided Additional Commitments, amounts outstanding in respect of interest, Breakage Costs and MFF Fees, rateably (based on the amount of Additional Commitment of each Unwinding Lender); provided that the claims of Additional Loan Funders or Unwinding Lenders who provided Additional Loans or Additional Commitments (as the case may be) in respect of a later Collateral Call Amount shall be satisfied before the claims of such Persons in respect of Additional Loans or Additional Commitments (as the case may be) provided in respect of an earlier Collateral Call Amount, but on a *pro rata* basis amongst such Persons in respect of Additional Loans and Additional Commitments provided in respect of the same Collateral Call Amount;

(viii)  Eighth, to (A) Additional Loan Funders, in an amount equal to the Unwind Percentage of the aggregate outstanding principal amount of the Additional Loans until the aggregate principal amount has been paid in full; and (B) the Unwinding Lenders who are not Breaching Dealers or Breaching Non-Dealer Lenders and who have previously provided Additional Commitments, amounts outstanding in respect of principal in respect of Advances, rateably (based on the amount of Additional Commitment of each Unwinding Lender); provided that the claims of Additional Loan Funders or Unwinding Lenders who provided Additional Loans or Additional Commitments (as the case may be) in respect of a later Collateral Call Amount shall be satisfied before the claims of such Persons in respect of Additional Loans or Additional Commitments (as the case may be) provided in respect of an earlier Collateral Call Amount, but on a *pro rata* basis

amongst such Persons in respect of Additional Loans and Additional Commitments provided in respect of the same Collateral Call Amount;

(ix)    Ninth, (A) to the Unwinding Lenders (other than Breaching Non-Dealer Lenders and Breaching Dealers), amounts outstanding to such Unwinding Lenders for principal in respect of Advances, interest, Breakage Costs and MFF Fees in accordance with the Margin Funding Facility Agreement, to the extent not paid pursuant to items *Seventh* or *Eighth* above, rateably; and (B) to any Non-Funding MFF Dealer that is not a Breaching Dealer, an amount equal to any Termination Payments or Unpaid Amounts owed to such Non-Funding MFF Dealer and not yet paid under 6.4(b)(v) less, in the case of any payment to any Lender/Dealer, an amount equal to the Unwind Percentage of its Collateral Entitlement Proportion of the sum of any Failed Extension Advances or Defaulted Advances which have not previously been applied to reduce such Lender/Dealer's claims under its Swap Agreement pursuant to Sections 2.11(e), 4.1(h) or 4.3(d); and

(x)    Tenth, any remaining amounts to the Collateral Account to be held as CA-Held Collateral.

## 6.5    Limited Recourse and Non-Petition

(a)    Except as otherwise expressly provided in this Agreement, the Existing Indemnity and Tax Claims Protocol, the CIBC Omnibus Agreement, the Ineligible Asset Note Indenture or any other Transaction Document, the Secured Creditors shall have recourse (to the extent entitled so to do hereunder) only to the Collateral pursuant to the relevant order of priorities specified in this Agreement.    Once the Collateral (and any other funds available to a Secured Creditor pursuant to this Agreement, the Existing Indemnity and Tax Claims Protocol, the CIBC Omnibus Agreement, the Ineligible Asset Note Indenture or any other Transaction Document) has been exhausted, none of the Secured Creditors (being entitled so to do) shall be obliged or permitted to take any further steps against the MAV to recover any further sums in respect of the Transaction Documents, the Collateral or any other such funds available to a Secured Creditor pursuant to this Agreement, the Existing Indemnity and Tax Claims Protocol, the CIBC Omnibus Agreement, the Ineligible Asset Note Indenture or any other Transaction Document. The obligations of the MAV are solely the obligations of Master Asset Vehicle II.  No recourse for the payment of any obligation of the MAV shall be had against the Issuer Trustee, the beneficiaries or any incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Issuer Trustee or any predecessor or successor of the Issuer Trustee; provided that this shall not apply if such limitation on recourse would be in breach of any Applicable Law.

(b)    Notwithstanding any prior termination of this Agreement, no Secured Creditor shall, prior to the date which is one year and one day (or such longer period as is applicable under the bankruptcy, insolvency or similar law of any relevant jurisdiction) after the later of: (i) the final distribution of proceeds of the Collateral; (ii) the final distribution of proceeds of the CIBC Collateral; and (iii) the final distribution of proceeds of property securing the Ineligible Asset Tracking Notes, acquiesce, petition or otherwise invoke or cause the MAV to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the MAV under any bankruptcy, insolvency or similar law or, except as provided in the Transaction Documents, appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other

similar official of the MAV or any substantial part of its property, or ordering the winding up or liquidation of the affairs of the MAV.

## 6.6    Limitation of Liability

(a)    It is expressly understood and agreed by the Secured Creditors that: (i) this Agreement is executed and delivered by the Issuer Trustee, not individually or personally but in its capacity as trustee of Master Asset Vehicle II in the exercise of the powers and authority conferred and vested in it; (ii) each of the representations, warranties, undertakings, covenants, indemnities, agreements and other obligations herein made on the part of the MAV is made and intended not as personal representations, undertakings, covenants, indemnities, agreements and other obligations by the Issuer Trustee but is made and intended for the purpose of binding only the property and assets of Master Asset Vehicle II; (iii) nothing herein contained shall be construed as creating any liability on the Issuer Trustee in its personal capacity, the beneficiaries or any incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Issuer Trustee or any predecessor or successor of the Issuer Trustee to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto; (iv) under no circumstances shall the Issuer Trustee in its personal capacity, the beneficiaries or any incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Issuer Trustee or any predecessor or successor of the Issuer Trustee be personally liable for the payment of any indebtedness or expenses of Master Asset Vehicle II or be liable for the breach or failure of any representation, warranty, undertaking, covenant, indemnity, agreement or other obligation made or undertaken by the MAV under this Agreement or any other Transaction Document, other than in respect of its own fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of its obligations and duties; (v) except as otherwise specifically provided in the Transaction Documents, no property or assets of the Issuer Trustee, whether owned beneficially by it in its personal capacity or otherwise than in its capacity as issuer trustee of Master Asset Vehicle II, will be subject to levy, execution or other enforcement procedures with regard to any of the representations, warranties, covenants, undertakings, indemnities, agreements and other obligations of the Issuer Trustee or the MAV under such written instrument; and (vi) no recourse may be had or taken, directly or indirectly against the Issuer Trustee in its personal capacity, the beneficiaries or any incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Issuer Trustee or any predecessor or successor of the Issuer Trustee with regard to the representations, warranties, undertakings, covenants, indemnities, agreements and other obligations of the MAV or the Issuer Trustee or any beneficiary, incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Issuer Trustee or any predecessor or successor of the Issuer Trustee under such written instrument other than in respect of such Person's own fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of its obligations and duties.

(b)    It is the intention of the parties hereto that the limitation of liability conferred by Section 6.6(a) on the beneficiaries, incorporators, Affiliates, shareholders, directors, officers, representatives, employees, managers, members, advisors, agents or successors and assigns of the Issuer Trustee and of any beneficiaries of the MAV shall be enforceable by each such Person as fully and effectively as if it is a party to this Agreement or any Transaction Document and notwithstanding any law that otherwise might deprive it of the benefit of Section 6.6(a) due to lack of privity or want of consideration.

**6.7**      **Holdback Amounts and Allocations**

(a)      **Holdbacks of Certain Taxes, Fees and Expenses**

     (i)      In connection with distributions to be made on or in connection with any Payment Date or Distribution Date, the Administrator shall be permitted to cause the hold back of funds otherwise payable or distributable by the MAV on such date on account of certain taxes, fees and expenses payable or to become payable by the MAV under the Transaction Documents, the CIBC Omnibus Agreement, the Ineligible Asset Note Indenture and the Traditional Asset Documents of the type and corresponding level of priority described in Sections 6.2(a), 6.3(a) and 6.4(b)(i) (but excluding any indemnity-related amounts contemplated by such Sections) all in accordance with the provisions of this Section 6.7 (*Holdback Amounts and Allocations*) and exercising its commercially reasonably judgement.

     (ii)      In order to give effect to the holdbacks contemplated by Section 6.7(a)(i), the Administrator shall provide information to the Collateral Agent for purposes of preparing the Payment Date Report or Distribution Date Report, as applicable, identifying (as of the related Determination Date) amounts to be held back on account of taxes, fees and expenses payable subsequent to the related Distribution Date or Payment Date.

     (iii)      Any holdbacks taken pursuant to Section 6.7(a)(i) shall respect the priority of payments provided for in Section 6.2 (*Application of Proceeds from the Liquidation of CA-Held Collateral Upon a Terminal Unwind Event*), Section 6.3 (*Application of Proceeds in the Ordinary Course*) and/or Section 6.4 (*Application of Proceeds on Occurrence of Partial Terminal Unwind Event*), as applicable, such that a holdback may only be taken should there be sufficient funds available therefor at the priority level appropriate for such taxes, fees and expenses and any limits imposed upon the quantum distributable at such priority level are not exceeded.

     (iv)      In connection with any holdback contemplated pursuant to Section 6.7(a)(i), amounts may be held back: (i) on account of taxes identified in a Notice of Assessment or Notice of Reassessment received by the MAV (or, based on communications with the relevant revenue or governmental authority, expected to be received by the MAV) and known by the Administrator to be or become due and payable by the MAV to the relevant revenue or governmental authority within the three month period following the Payment Date or Distribution Date, as applicable; or (ii) on account of fees and expenses of sum certain or of sum capable of reasonable estimation by reference to a contractual provision or an estimate or quote received by the MAV and known by the Administrator to be or become due and payable by the MAV to parties contractually engaged by the MAV on or before the applicable Payment Date or Distribution Date within the three month period following the Payment Date or Distribution Date, as applicable.

     (v)      In determining whether it is appropriate to effect a holdback on account of certain taxes, fees and expenses payable or to become payable by the MAV (and in determining the sum to be so held back) in accordance with Section 6.7(a)(i), the Administrator shall, exercising its commercially reasonable judgement, take into account the reasonably expected timing of receipt by the MAV of Income Distributions and other amounts

available or to become available for payment of such taxes, fees and expenses in the Due Period in which the Payment Date or Distribution Date, as applicable, occurs.

(vi)     Any funds held back pursuant to Section 6.7(a)(i) shall be deposited with the Collateral Agent in a segregated account of the MAV, may be invested in Cash Equivalents having a maturity of 30 days or less and shall not be available for payments or distribution except as provided in Section 6.7(a)(vii).

(vii)    All amounts held back and deposited in a segregated account pursuant to Sections 6.7(a)(i) and 6.7(a)(vi) shall be held in trust for the creditors of the MAV entitled thereto and the Collateral Agent shall disburse such amounts when the relevant tax, fee or expense is due and payable based upon information provided by the Administrator and the Accounting Agent, and the Collateral Agent shall prepare a supplemental Payment Date Report or Distribution Date Report reflecting such disbursement.

(viii)   When determining the proportion of taxes, fees and expenses to be payable by the MAV or to be allocated among creditors of the MAV (including for purposes of determining any holdback to be effected pursuant to Section 6.7(a)(i)), the Administrator shall, exercising its commercially reasonable judgement, assess whether the amount payable or to become payable by the MAV is an amount properly attributable or related to one or more distinct assets, counterparties, circumstance or events (including for example a Terminal Unwind Event) or is an amount associated with a circumstance or event of general application to the MAV, its assets and/or its counterparties.  The Administrator agrees to apportion, exercising its commercially reasonable judgement, the amount generally in accordance with the relative principal balance of the MAV's liabilities to or with which such amount is properly attributable, related or associated or, if the amount is associated with a circumstance or event of general application to the MAV, its assets and/or its counterparties, *pro rata* among all such liabilities of the MAV.

(b)      **Holdbacks of Certain Indemnity Amounts**

(i)      In connection with distributions to be made on or in connection with a Distribution Date contemplated by Section 6.2 (*Application of Proceeds from the Liquidation of CA-Held Collateral Upon a Terminal Unwind Event*) or Section 6.4 (*Application of Proceeds on Occurrence of Partial Terminal Unwind Event*), the Administrator shall be permitted to cause to be held back funds otherwise payable or distributable by the MAV on such date on account of indemnity amounts payable or to become payable to or by the MAV under the Transaction Documents, the CIBC Omnibus Agreement and the Traditional Asset Documents of the type described and corresponding level of priority in Section 6.2(a) and 6.2(n), Section 6.3(a) and 6.3(o) and Section 6.4(b)(i), all in accordance with the provisions of this Section 6.7 (*Holdback Amounts and Allocations*) and exercising its commercially reasonably judgement.

(ii)     In order to give effect to the holdbacks contemplated by Section 6.7(b)(i), the Administrator shall provide information to the Collateral Agent for purposes of preparing the Distribution Date Report, identifying (as of the related Determination Date) amounts to be held back on account of indemnity amounts payable or potentially payable subsequent to the related Distribution Date as well as the anticipated date of final determination of any such obligation to pay.

(iii)    Any holdbacks taken pursuant to Section 6.7(b)(i) shall respect the priority of payments provided for in Section 6.2 (*Application of Proceeds from the Liquidation of CA-Held Collateral Upon a Terminal Unwind Event*), Section 6.3 (*Application of Proceeds in the Ordinary Course*) and/or Section 6.4 (*Application of Proceeds on Occurrence of Partial Terminal Unwind Event*), as applicable, such that a holdback may only be taken should there be sufficient funds available therefor at the priority level appropriate for such indemnity amounts and any limits imposed upon the quantum distributable at such priority level are not exceeded.

(iv)    In connection with any holdback contemplated pursuant to Section 6.7(b)(i), amounts may be held back on account of pending or threatened claims if the auditors of the MAV have confirmed that, in accordance with GAAP: (i) it would be necessary to record a reserve in respect of a contingent liability in audited financial statements of the MAV prepared as of such Distribution Date; and (ii) the holdback proposed is less than or equal to the amount necessary to record as a contingent liability.

(v)    In determining whether it is appropriate to effect a holdback on account of indemnity amounts payable or potentially payable by the MAV (and, subject always to the determination of the auditors of the MAV contemplated by Section 6.7(b)(iv), in determining the sum to be so held back) in accordance with Section 6.7(b)(i), the Administrator shall, exercising its commercially reasonable judgement, take into account the reasonably expected timing of receipt by the MAV of Income Distributions and other amounts available or to become available for payment of such indemnity amounts in the Due Period in which the Distribution Date occurs.

(vi)    Any funds held back pursuant to Section 6.7(b)(i) shall be deposited with the Collateral Agent in a segregated account of the MAV, may be invested in Cash Equivalents and shall not be available for payments or distribution except as provided in Section 6.7(b)(vii).

(vii)    Without limiting the foregoing, all amounts held back and deposited in a segregated account pursuant to Sections 6.7(b)(i) and 6.7(b)(vi) shall be held in trust for the creditors of the MAV entitled thereto and the Collateral Agent shall disburse each such amount based upon information provided by the Administrator and the Accounting Agent when the relevant claim is finally settled or adjudicated and the related indemnity amount (if any) is definitively determined and becomes due and payable, provided that any amount so held back and not disbursed in satisfaction of an indemnity amount payable by the MAV on the earlier of: (i) the final settlement or adjudication of the relevant claim (where no indemnity amount (or an indemnity amount less than the amount held back) is concluded or found to be payable by the MAV); and (ii) two years from the Distribution Date on which the amount was so held back, shall be disbursed to those creditors or former creditors of the MAV that have not or did not receive payment in full of the MAV's obligations to them and, but for the holdback effected pursuant to Section 6.7(b)(i), would have received all or any portion of the amount so held back (all in accordance with the applicable priority of payments).  The Collateral Agent shall prepare a supplemental Distribution Date Report reflecting each such disbursement, based upon the foregoing information.

(viii)    Determination of the proportion of indemnity amounts to be payable by the MAV or to be allocated among creditors of the MAV (including for purposes of determining any

holdback to be effected pursuant to Section 6.7(b)(i), shall comply with the Indemnity Allocation Principles.

(c)    **Allocation of Amounts; Borrowing to/from Silos**

(i)    The parties acknowledge that the terms of the Ineligible Asset Note Indenture and the CIBC Omnibus Agreement contemplate that, to the extent funds available for distribution thereunder are insufficient to satisfy that proportion of taxes, fees, expenses and/or indemnity amounts allocated to the relevant Ineligible Asset Tracking Note class or classes or to satisfy the CIBC Percentage, as the case may be, then recourse may be had (at the corresponding level of priority) to funds available for distribution on a Payment Date or Distribution Date under this Agreement.    Similarly, the parties acknowledge that the terms of the Ineligible Asset Note Indenture contemplate that, to the extent funds available for distribution thereunder are insufficient to satisfy that proportion of taxes, fees, expenses and/or indemnity amounts allocated to the relevant Ineligible Asset Tracking Note class or classes, then recourse may be had (at the corresponding level of priority) to funds available for distribution on a "Payment Date" under the CIBC Omnibus Agreement.

(ii)    In the event that funds become available for distribution under the Ineligible Tracking Note Indenture or the CIBC Omnibus Agreement on account of taxes, fees, expenses and/or indemnity amounts in relation to which a deficiency was previously suffered and recourse was had to funds available for distribution under this Agreement or under the CIBC Omnibus Agreement, such available funds shall first be used to reimburse the Collection Account and/or the Collateral Account (as the case may be) from which funds were originally distributed to satisfy the deficiency or, if applicable, the Collection Account and/or the Collateral Account (as the case may be) and the "Collection Account" under the CIBC Omnibus Agreement on a *pro rata* basis (to the extent not previously reimbursed) and second be used to reimburse, if applicable, other Ineligible Asset Tracking Notes classes, all in accordance with the provisions of the CIBC Omnibus Agreement and the Ineligible Asset Note Indenture, as the case may be.

(iii)    The Administrator Indemnified Parties and Tao Admin Corp. may agree among themselves with respect to the allocation and sharing of amounts which they are determined to be entitled to receive in respect of indemnified claims and shall advise the MAV and the Collateral Agent of the terms of any such agreements entered into.

(d)    **Payment Date Reports; Distribution Date Reports**

The allocated amount of fees, expenses and indemnities to be paid on any Payment Date or Distribution Date shall be reflected in the relevant Payment Date Report or Distribution Date Report.    Each such report also shall reflect: (i) amounts reserved for payment of expenses and other amounts on a future date where the amount and the approximate date of payment are known at the time the Payment Date Report or Distribution Date Report is prepared; and (ii) amounts reserved for payment of expenses and other amounts where the final amount owing and the payment date thereof have not been finally determined (including, in each case, amounts for payments to be made pursuant to the CIBC Omnibus Agreement or the Ineligible Asset Note Indenture). In the case of amounts described in Subclause (i) of the preceding sentence, such amounts will be released for payment by the Collateral Agent when due; in the case of amounts described in Subclause (ii) of the preceding sentence, such amounts will be released for payment

by the Collateral Agent when definitively determined and due and payable, based upon information provided by the Administrator and the Accounting Agent, and reflected in a supplemental Payment Date Report or Distribution Date Report, as applicable, prepared by the Collateral Agent.  In the case of any payment in respect of fees, expenses or indemnities to be made as provided in this Agreement on a date other than a Payment Date or Distribution Date, and which was not already contemplated by a previously prepared Payment Date Report or Distribution Date Report (provided that sufficient funds are available for the payment thereof determined as described herein), funds for the payment thereof will be released for payment by the Collateral Agent when due and payable, based upon information provided by the Administrator and the Accounting Agent, and reflected in a supplemental payment report prepared by the Collateral Agent.

## 6.8    Delayed Settlements

Where an item of Sale Collateral constitutes a Traditional Asset and such asset (or portion thereof) has been liquidated pursuant to Section 4.9 (*Liquidation of Collateral*) but the settlement of the relevant trade and receipt of the relevant Sale Collateral Proceeds in respect thereof has not yet occurred prior to or on the relevant Determination Date, the Administrator may determine, in which case the relevant Distribution Date Report (if applicable) shall specify, that such Sale Collateral Proceeds will be distributed by the Collateral Agent to the relevant creditor(s) of the MAV pursuant to Section 6 (*Application of Proceeds*) (or to a Dealer pursuant to Sections 4.4 (*Cash Settlement Amounts*), 4.6 (*Early Termination of all of the Transactions under a Dealer's Swap Agreement*) or 4.7 (*Early Termination of some (but not all) of the Transactions under a Dealer's Swap Agreement*)) at a date later than the otherwise applicable Distribution Date (or other date on which a payment is due to the relevant Dealer), provided that such date shall not be later than the second Business Day after receipt by the MAV of such Sale Collateral Proceeds.

## 6.9    Breakage Costs

Following the repayment of a BA Rate Advance applicable to it or following the receipt by a Lender of a Payment Date Report, such Lender shall within two Business Days send notice of any Breakage Costs incurred (together with details of the calculation thereof) as a result of the repayment to it of any BA Rate Advance other than on the last day of an Interest Period with respect thereto.  On receipt of such notice and confirmation of the calculation of such amounts by the Administrator, such Breakage Costs shall be payable: (a) in respect of a BA Rate Advance repaid pursuant to Section 2.7(b), on the immediately following Payment Date (or, if the notice from the Lender is received after the Determination Date in respect of the current Due Period, on the second following Payment Date); and (b) in all other cases, on the second following Payment Date.

## 7.    APPOINTMENT OF AGENTS

For the purposes of this Section 7 (*Appointment of Agents*), all references to "Secured Creditors" shall exclude the Unlevered CDS Counterparties.

## 7.1    The Collateral Agent

### (a)    Authorisation and Action

(i)    Each Secured Creditor (other than the Collateral Agent) irrevocably appoints and authorises the Collateral Agent to take such action as agent on its behalf and to exercise such powers as are delegated to it by the terms of this Agreement and the other

Transaction Documents to which the Collateral Agent is a party, together with all powers reasonably incidental thereto.

(ii)     The MAV irrevocably appoints and authorises the Collateral Agent, and any officer thereof, with full power of substitution, as its true and lawful attorney in fact with full irrevocable power and authority in the name of the MAV or in its own name, in its discretion, upon the occurrence and during the continuance of any MSA Enforcement Event for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents which may be necessary or desirable to accomplish the purposes hereof, and, without limiting the generality of the foregoing, the MAV hereby gives the Collateral Agent the power and right on behalf of the MAV, without further notice to or assent by the MAV, to the extent permitted by Applicable Law, to do any of the following:

(A)     to ask for, demand, sue for, collect and receive all and any moneys due or becoming due with respect to the Collateral;

(B)     to receive, take, endorse, assign and deliver any and all cheques, notes, drafts, acceptances, other negotiable and non-negotiable instruments, chattel paper and other documents taken or received by the Collateral Agent in connection herewith; and

(C)     to commence, file, prosecute, defend, settle, compromise or adjust any claim or proceeding with respect to the Collateral.

(iii)     At any time, if the Collateral Agent receives notice of any matter that would reasonably require the MAV to take any steps contemplated by Section 10.1(i) (*Additional Security Perfection and Protection of Security Interests*), the Collateral Agent may (acting in its own discretion, after consultation with its Counsel, if it deems it appropriate) and shall, if directed by the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) and the Required Lenders, take such actions to register, file, signify, publish, perfect, maintain and protect the Security Interests and the MAV and the Administrator, on behalf of the MAV, shall co-operate with the Collateral Agent to take any action that the Collateral Agent (or the Majority Secured Creditors and Required Lenders, as the case may be) determines to be appropriate to comply with the MAV's obligations pursuant to Section 10.1(i) (*Additional Security Perfection and Protection of Security Interests*).   The MAV acknowledges and agrees that the registrations and filings set forth at Schedule [V] (*Security Registrations*), together with each Control Agreement, are sufficient to establish the validity, perfection and priority of the Liens constituted by the Security Documents in compliance with the MAV's obligations under Section 10.1(i) (*Additional Security Perfection and Protection of Security Interests*) on the Closing Date.

(iv)     The Collateral Agent acknowledges that, with respect to the Managed Assets, the MAV has appointed the Administrator to perform (or supervise and arrange the performance of) certain duties and functions specified in Section 3 of the Administration Agreement and the Collateral Agent agrees to comply with the written directions of the Administrator in respect of any action or inaction in respect of the Managed Assets which relates to or is reasonably incidental to the performance of such duties and

functions, including, in each case, as expressly provided for in this Agreement and any other Transaction Document to which the Collateral Agent is a party.

(v)    In each year, on or before the anniversary of the Closing Date, the Collateral Agent shall procure and deliver to the MAV, each Dealer and each Lender: (A) opinions of Counsel that indicate all registrations and filings that are necessary or desirable to perfect, and preserve the priority of, the Security Interests in Canada or any province thereof; and (B) memoranda of advice from Counsel in the United States of America, England and Wales, Switzerland and Germany (substantially in the same form as that provided on the Closing Date) in respect of certain security interest matters arising under the laws of those jurisdictions. Following delivery of such opinions and memoranda, the Collateral Agent shall take such specific actions (if any), as determined by the Collateral Agent in its sole discretion, upon advice from its Counsel, or as specifically directed by the Majority Security Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) and Required Lenders, in each case, which are determined by the Collateral Agent or such Majority Secured Creditors and Required Lenders, as the case may be, to be reasonably necessary or desirable to perfect, and preserve the priority of, the Security Interests following any change in law reflected in such opinion or memoranda.

(vi)    As to any matters not expressly provided for by this Agreement or the Transaction Documents, the Collateral Agent shall act or refrain from acting (and shall be fully protected in so doing) upon the joint instructions of (x) the Majority Secured Creditors (other than, for these purposes, before an MSA Enforcement Event, Royal Bank of Canada in its capacity as LSS CDS Counterparty) and (y) before the occurrence of an MSA Enforcement Event, the Required Lenders, which in each case shall be made in good faith, and such instructions shall be binding upon all Secured Creditors. The Collateral Agent shall not be required to take any action which: (A) would expose it to personal liability; (B) is contrary to this Agreement or any Applicable Law, rule, regulation, judgment or order; (C) would require it to become registered to do business in any jurisdiction or under any legislative or regulatory regime in which, or under which, it is not already registered to do business; (D) would require it to be registered to carry on any business which it does not currently carry on; (E) would subject it to taxation (except in relation to income tax on its own fees); or (F) would require the Collateral Agent to make distributions out of its own funds.

(vii)    The Collateral Agent shall have no duties or obligations other than as expressly set out in this Agreement and each other Transaction Document to which it is a party and there shall not be construed against the Collateral Agent any implied duties (including fiduciary duties), obligations or covenants. The Collateral Agent may execute or perform, and may assign or delegate in accordance with the Transaction Documents the execution and performance of, any of its powers, rights, discretions and duties under the Transaction Documents through or to any Persons designated by it. References in any Transaction Document to the Collateral Agent shall include references to any such Persons so designated by it. The Collateral Agent shall be liable for all actions taken or omitted to be taken by its agents or Persons to whom the Collateral Agent has delegated the execution or performance of any of its powers, rights, discretions or duties in such capacity, as if such actions or omissions had been carried out by the Collateral Agent. None of the other Service Providers, the Administrator, nor any other agent of the MAV

is an agent of the Collateral Agent nor a Person for whom it is responsible, nor a delegate or designate of the Collateral Agent. Without limiting the foregoing, the Collateral Agent, acting in such capacity, expressly does not assume the responsibilities of any other Service Provider in relation to any Transaction Document, notwithstanding that it or an Affiliate or an associated or related party may be appointed in another capacity under such document.

(b)    **No Liability**

Neither the Collateral Agent nor its shareholders, directors, officers, representatives, employees or agents shall be liable to any Secured Creditor nor to the MAV nor to any agent of the MAV for any action taken or omitted to be taken by it or them in accordance with this Agreement and the other Transaction Documents except for its or their own fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of its or their obligations and duties. Without limiting the generality of the foregoing, the Collateral Agent: (i) may treat each Secured Creditor and its successors and permitted assigns and each other party entitled to payment of amounts outstanding under Section 6 (*Application of Proceeds*) of this Agreement as the payee of proceeds of liquidation of the Collateral in accordance with Section 6 (*Application of Proceeds*) of this Agreement; (ii) may rely conclusively and act or refrain from acting in reliance on any information supplied by the Administrator, the Administrative Agent, the Valuation Agent, the Spread/Loss Trigger Calculation Agent or other authorised representative of the MAV; (iii) may consult with Counsel, independent accountants and other experts selected by it, by the MAV or by one or more Secured Creditors and shall not be liable for any action taken or omitted to be taken by it in accordance with their advice; (iv) makes no warranty or representation to the Secured Creditors and shall not be responsible to any Secured Creditor for the form, substance, accuracy or completeness of this Agreement or any Transaction Document or any other documents or information made available to the Secured Creditors (other than those prepared and provided by the Collateral Agent); (v) has no duty to inspect the property or assets (including books and records) of the MAV or any other Person; (vi) has no duty to monitor or observe whether an Enforcement Event has occurred or whether any of the terms or conditions of this Agreement or the Transaction Documents have been complied with; (vii) is not responsible to any Secured Creditor for the execution, enforceability, genuineness, sufficiency or value of this Agreement or any of the Transaction Documents; and (viii) shall incur no liability by relying or acting upon any notice, certificate or other instrument reasonably believed by it to be genuine and signed or sent by the proper Person, including the Valuation Agent, the Spread/Loss Trigger Calculation Agent, the Administrator, each of the Secured Creditors (other than itself) and the MAV.

(c)    **Required Information**

(i)    Each Secured Creditor (including the Indenture Trustee on behalf of the Noteholders) and the MAV agrees to provide or cause to be provided to the Collateral Agent with timely information each of them is required to provide under this Agreement for purposes of determining whether the Collateral Agent should act or refrain from acting pursuant to this Agreement or any other Transaction Document. If any such Secured Creditor or the MAV fails to provide such information to the Collateral Agent, the Collateral Agent shall have no responsibility to act or to refrain from acting nor to enquire into circumstances related to such information, and the Collateral Agent has the right (but not the obligation) to seek instructions, further information and clarification in respect of its responsibilities.

(ii)     The Collateral Agent agrees that if an Insolvency Event shall occur with respect to it, it shall give written notice thereof to the Deal Parties as soon as reasonably practicable after receiving notice of such event or upon a Responsible Officer of the Collateral Agent obtaining actual knowledge thereof.

(d)     **Holding of Collateral**

(i)     All CA-Held Collateral that is investment property shall be held by one or more CA Custodians in one or more securities accounts pursuant to a CA Control Agreement and, to the extent not provided for in a CA Control Agreement, a Custody Agreement or, if represented by a certificate, held by the Collateral Agent directly.

(ii)     The Original Collateral of a Dealer shall be held by an OC Custodian pursuant to an OC Control Agreement, except with respect to any Other Posted Support, which shall be held as permitted by the Master Security Agreement, in each case, except as provided otherwise pursuant to the Administration Agreement or this Agreement.

(iii)     Any Sale Collateral Proceeds shall be applied to the amounts outstanding to each Secured Creditor and other parties entitled to payment of amounts outstanding in accordance with the applicable provisions of this Agreement (whether such Collateral is held by or for the benefit of the MAV or any one or more of the Secured Creditors and without regard to any priority to which the Secured Creditor may otherwise be entitled under Applicable Law).

(e)     **Indemnification of the Collateral Agent**

The MAV (the **Indemnifying Party**) hereby indemnifies and holds harmless the Collateral Agent, its Affiliates, stockholders, directors, officers, representatives, employees and agents or any partner, member, stockholder, director, manager, officer, representative, employee or agent of any Affiliate (each such party, an **Indemnified Party**) from and against any and all losses, and shall reimburse each such Indemnified Party for all reasonable fees and expenses (including reasonable fees and expenses of Counsel) (collectively, the **Expenses**, and any and all such losses and Expenses, collectively the **Liabilities**) as such Expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, **Actions**) in connection with its appointment hereunder or caused by, or arising out of or in connection with: (i) the MAV's issuance of the Notes; (ii) the transactions contemplated by or actions taken pursuant to this Agreement or the other Transaction Documents; and/or (iii) any action taken by, or any failure to act by, such Indemnified Party, provided, that no Indemnified Party shall be indemnified for any Liabilities it incurs as a result of any acts or omissions by any Indemnified Party arising by reason of its fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of its obligations and duties.

(f)     **Indemnification of the MAV**

The Collateral Agent (the **Indemnifying Party**) shall indemnify the MAV (the **Indemnified Party**) against any and all Liabilities and Expenses which the MAV may incur or which may be made against the MAV as a result of the Indemnifying Party's fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of the Indemnifying Party's obligations and duties or that of its officers, directors or employees.

(g)      **Resignation and Removal of the Collateral Agent; Successor Collateral Agents**

(i)      Subject to Section 7.1(g)(iii), the Collateral Agent may resign at any time by giving at least thirty days' written notice to each Dealer, each Lender, the Indenture Trustee, the MAV, the Rating Agency and the Administrator.

(ii)     Subject to Section 7.1(g)(iii), the Collateral Agent may be removed at any time by the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) with the consent of the Administrator, on behalf of the MAV, and the Required Lenders:

   (A)   upon at least thirty days' notice to the Collateral Agent, provided that the Rating Agency Condition is satisfied; or

   (B)   immediately upon receipt of notice by the Collateral Agent (copied to the Rating Agency), if (I) the Collateral Agent shall default in the performance of any of its duties under a Transaction Document which reasonably could be expected to have a Material Adverse Effect and, after notice of such default, the Collateral Agent (or, in its discretion, the Administrator) shall not cure such default within five Business Days (or, if such default cannot be cured in such time, shall not give within five Business Days such assurance of cure as shall be reasonably satisfactory to the Majority Secured Creditors) or (II) an Insolvency Event occurs with respect to the Collateral Agent.

(iii)    No resignation or removal of the Collateral Agent pursuant to this Section 7.1(g) (*Resignation and Removal of the Collateral Agent; Successor Collateral Agents*) shall be effective until (A) a successor Collateral Agent shall have been appointed; and (B) such successor Collateral Agent shall have agreed in writing to be bound by the terms of this Agreement in substantially the same manner as the Collateral Agent is bound hereunder or on such terms as are otherwise agreed to by the parties to this Agreement (other than the Collateral Agent), or their successors and in respect of which the Rating Agency Condition is satisfied.

(iv)     Upon notice of any resignation or removal, the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) have the right to appoint a successor Collateral Agent, which such successor shall be: (A) satisfactory to the Administrator and the Required Lenders, each acting in their reasonable judgement; and (B) subject to satisfaction of the Rating Agency Condition.  If no successor Collateral Agent is appointed or has accepted the appointment within thirty days after the retiring Collateral Agent's notice of resignation or removal, as the case may be, then: (A) except in the case of a removal pursuant to Section 7.1(g)(ii)(B), the retiring Collateral Agent may, subject to satisfaction of the Rating Agency Condition, on behalf of the Secured Creditors, appoint a successor Collateral Agent; or (B) the retiring Collateral Agent, the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) or the Required Lenders may apply to an Ontario court for the appointment of a successor (provided that the expense of any such court application shall be for the account of the MAV pursuant to Section

7.1(e) (*Indemnification of the Collateral Agent*)).  Upon the acceptance of the appointment by a successor Collateral Agent, the successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Collateral Agent and the retiring Collateral Agent shall be discharged from its duties and obligations under this Agreement.

(v)     After any retiring Collateral Agent's resignation or removal, as the case may be, the provisions of this Section 7.1 (*The Collateral Agent*) shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Collateral Agent or as to any matter relating to the time when it was Collateral Agent.

(vi)    If the Collateral Agent or a successor Collateral Agent is one of the Secured Creditors in any other capacity, such Collateral Agent shall have the same rights and powers under this Agreement with respect to the Secured Liabilities as any other Secured Creditor; provided that it shall not be deemed to be a Secured Creditor for the purposes of this Section 7.1 (*The Collateral Agent*).

(h)     **Fondé de pouvoir**

(i)     Without prejudice to the foregoing, each Secured Creditor hereby irrevocably appoints and authorises the Collateral Agent to act as the person holding the power of attorney (*fondé de pouvoir*) (in such capacity, the **Attorney**) of the Secured Creditors as contemplated under Article 2692 of the Civil Code of Québec, and to enter into, to take and to hold on their behalf, and for their benefit, any hypothec and to exercise such powers and duties which are conferred upon the Attorney under any hypothec. Moreover, without prejudice to such appointment and authorisation to act as the person holding the power of attorney as aforesaid, each Secured Creditor hereby irrevocably appoints and authorises the Collateral Agent (in such capacity, the **Quebec Agent**) to act as agent and custodian for and on behalf of the Secured Creditors to hold and to be the sole registered holder of any bond which may be issued under any such hypothec, the whole notwithstanding Section 32 of the Act respecting the special powers of legal persons (Québec) or any other applicable law.  In this respect: (i) the Quebec Agent shall keep a record indicating the names and addresses of each Secured Creditor, and the *pro rata* portion of the obligations and indebtedness secured by any pledge of any such bond and owing to each Secured Creditor; and (ii) each Secured Creditor will be entitled to the benefits of any charged property covered by any hypothec and will participate in the proceeds of realisation of any such charged property, the whole in accordance with the terms hereof.

(ii)    Each of the Attorney and the Quebec Agent shall: (i) have the sole and exclusive right and authority to exercise, except as may be otherwise specifically restricted by the terms hereof, all rights and remedies given to the Attorney and the Quebec Agent (as applicable) pursuant to any hypothec, bond, pledge, applicable laws or otherwise; (ii) benefit from and be subject to all provisions hereof with respect to the Collateral Agent *mutatis mutandis*, including all such provisions with respect to the liability or responsibility to and any indemnification by the Secured Creditors; and (iii) be entitled to delegate from time to time any of its powers or duties under any hypothec, bond, or pledge on such terms and conditions as it may determine from time to time.  Any person who becomes a Secured Creditor shall be deemed, upon becoming a Secured Creditor: (x) to have consented to and confirmed the appointment of the Attorney as the person

holding the power of attorney as aforesaid and to have ratified all actions taken by the Attorney in such capacity; and (y) to have consented to and confirmed the appointment of the Quebec Agent as the agent and custodian as aforesaid and to have ratified all actions taken by the Quebec Agent in such capacity.

(iii)    The execution by the Attorney or the Quebec Agent, prior to the date hereof, of any document creating or evidencing any hypothec, bond or pledge for the benefit of any of the Secured Creditors is hereby ratified and confirmed.

## 7.2    The Spread/Loss Trigger Calculation Agent

(a)    **Authorisation and Action**

(i)    Each Secured Creditor (other than the Spread/Loss Trigger Calculation Agent) irrevocably appoints and authorises the Spread/Loss Trigger Calculation Agent to exercise such powers as are delegated to it by the terms of this Agreement, together with all powers reasonably incidental thereto. The Spread/Loss Trigger Calculation Agent shall not be required to take any action which: (A) would expose it to personal liability; (B) is contrary to this Agreement, any other Transaction Document to which it is a party or any Applicable Law, rule, regulation, judgment or order; (C) would require it to become registered to do business in any jurisdiction in which it is not already registered to do business; or (D) would subject it to taxation (except in relation to income tax on any fees).

(ii)    The Spread/Loss Trigger Calculation Agent shall have no duties or obligations other than as set out in this Agreement and there shall not be construed against the Spread/Loss Trigger Calculation Agent any implied duties (including fiduciary duties), obligations or covenants. The Spread/Loss Trigger Calculation Agent may execute or perform, and may assign or delegate, in accordance with this Agreement, the execution and performance of, any of its powers, rights, discretions and duties under this Agreement through or to any Persons designated by it, provided that any Delegee which is not an Affiliate of the Spread Loss/Trigger Calculation Agent shall be subject to the prior approval of the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) and the Required Lenders. References in any Transaction Document to the Spread/Loss Trigger Calculation Agent shall include references to any such Persons so designated by it. The Spread/Loss Trigger Calculation Agent shall be fully liable for all actions taken or omitted to be taken by its agents or Persons to whom the Spread/Loss Trigger Calculation Agent has delegated the execution or performance of any of its powers, rights, discretions or duties.

(iii)    BlackRock Canada is hereby appointed as the initial Spread/Loss Trigger Calculation Agent and accepts such appointment. So long as BlackRock Canada or an Affiliate serves as the Spread/Loss Trigger Calculation Agent, Sections 7.2(b) (*No Liability*), 7.2(d) (*Indemnification of the Spread/Loss Trigger Calculation Agent*), 7.2(e) (*Indemnification of the MAV*) and 7.2(f)(iii) shall not apply and Section 7.6 (*Provisions Applicable to BlackRock Canada and its Affiliates*) shall apply instead.

(b)    **No Liability**

Neither the Spread/Loss Trigger Calculation Agent nor its directors, officers, agents or employees shall be liable to any Secured Creditor for any action taken or omitted to be taken by it or them in connection with this Agreement and the other Transaction Documents except for its or their own fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of its or their obligations and duties. Without limiting the generality of the foregoing, the Spread/Loss Trigger Calculation Agent shall incur no liability by acting upon any notice, certificate or other instrument believed by it to be genuine.

(c)     **Required Information**

The Spread/Loss Trigger Calculation Agent agrees that if an Insolvency Event shall occur with respect to it, it shall give written notice thereof to the Deal Parties as soon as reasonably practicable after receiving notice of such event or upon a Responsible Officer of the Spread/Loss Trigger Calculation Agent obtaining actual knowledge thereof.

(d)     **Indemnification of the Spread/Loss Trigger Calculation Agent**

The MAV (the **Indemnifying Party**) shall indemnify and hold harmless the Spread/Loss Trigger Calculation Agent, its Affiliates, stockholders, directors, officers and employees or any partner, member, stockholder, director, manager, officer or employee of any Affiliate (each such party, an **Indemnified Party**) from and against any and all Liabilities, and shall reimburse each such Indemnified Party for all Expenses as such Expenses are incurred in investigating, preparing, pursuing or defending any Actions, caused by, or arising out of or in connection with: (i) the MAV's issuance of the Notes; (ii) the transactions contemplated by the Information Statement, this Agreement or the other Transaction Documents; and/or (iii) any action taken by, or any failure to act by, such Indemnified Party, provided, that no Indemnified Party shall be indemnified for any Liabilities it incurs as a result of any acts or omissions by any Indemnified Party arising by reason of its own fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of its obligations and duties.

(e)     **Indemnification of the MAV**

The Spread/Loss Trigger Calculation Agent (the **Indemnifying Party**) shall indemnify the MAV (the **Indemnified Party**) against any and all Liabilities and Expenses which the MAV may incur or which may be made against the MAV as a result of the Indemnifying Party's fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of the Indemnifying Party's obligations and duties or that of its officers, directors or employees.

(f)     **Successor Spread/Loss Trigger Calculation Agents**

(i)      BlackRock Canada or an Affiliate shall serve as Spread/Loss Trigger Calculation Agent so long as it or an Affiliate serves as the Administrator, unless and until it or such Affiliate resigns as Spread/Loss Trigger Calculation Agent.

(ii)     Subject to Section 7.2(f)(iv), the Spread/Loss Trigger Calculation Agent may resign at any time by giving at least thirty days' written notice to each Dealer, each Lender, the MAV, the Collateral Agent, the Indenture Trustee, the Rating Agency and the Administrator.

(iii)     Subject to Section 7.2(f)(iv), the Spread/Loss Trigger Calculation Agent may be removed at any time by the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) with the consent of the Required Lenders: (A) upon at least thirty days' notice to the Spread/Loss Trigger Calculation Agent (copied to the Rating Agency) (or, in the case of Subclauses (I) to (IV), immediately upon notice to the Spread/Loss Trigger Calculation Agent), (B) subject to satisfaction of the Rating Agency Condition, and (C) following any one of the following events:

 (A)     any violation or breach by the Spread/Loss Trigger Calculation Agent of any provision of this Agreement or other Transaction Document to which it is a party, which violation or breach: (A) constitutes gross negligence, bad faith, fraud, wilful misconduct or a reckless disregard by it of its duties under this Agreement or such other Transaction Document; or (B) could reasonably be regarded as having a Material Adverse Effect on: (x) the CA-Held Collateral, any LSS CDS Counterparty, any Unlevered CDS Counterparty, any Lender or the Noteholders taken as a whole; or (y) the Original Collateral of any Dealer;

 (B)     if the Spread/Loss Trigger Calculation Agent violates or breaches any provision of this Agreement and fails to cure such violation or breach, if capable of being cured, within 30 days of its becoming aware of, or of receiving notice from the MAV, the Collateral Agent, any Dealer or any Lender of such violation or breach;

 (C)     the occurrence of an act by the Spread/Loss Trigger Calculation Agent that constitutes fraud, dishonesty or criminal activity in the performance of its obligations under this Agreement, or the indictment of the Spread/Loss Trigger Calculation Agent for, or the indictment of any of its executive officers having responsibility over the management of the Spread/Loss Trigger Calculation Agent (without having been suspended or removed from management duties) for a criminal offence materially related to its primary business; and

 (D)     an Insolvency Event occurs with respect to the Spread/Loss Trigger Calculation Agent.

(iv)     No resignation or removal of the Spread/Loss Trigger Calculation Agent pursuant to this Section 7.2(f) (*Successor Spread/Loss Trigger Calculation Agents*) shall be effective until (A) a successor Spread/Loss Trigger Calculation Agent shall have been appointed; and (B) such successor Spread/Loss Trigger Calculation Agent shall have agreed in writing to be bound by the terms of this Agreement in the same manner as the Spread/Loss Trigger Calculation Agent is bound hereunder.

(v)     Upon notice of any resignation or removal, the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) have the right to appoint a successor Spread/Loss Trigger Calculation Agent, which successor shall be: (A) satisfactory to the Administrator and the Required Lenders, each acting in their reasonable judgement; and (B) subject to the satisfaction of the Rating Agency Condition. If no successor Spread/Loss Trigger Calculation Agent is appointed or has

accepted the appointment within 90 days after the retiring Spread/Loss Trigger Calculation Agent's notice of resignation or removal (or within 60 days following a removal under Sections 7.2(f)(iii)(A), 7.2(f)(iii)(B), 7.2(f)(iii)(C) or 7.2(f)(iii)(D)), as the case may be, then: (A) except in the case of a removal pursuant to Sections 7.2(f)(iii)(A), 7.2(f)(iii)(B), 7.2(f)(iii)(C) or 7.2(f)(iii)(D), the retiring Spread/Loss Trigger Calculation Agent, on behalf of the Secured Creditors; or (B) in the case of a removal pursuant to Sections 7.2(f)(iii)(A), 7.2(f)(iii)(B), 7.2(f)(iii)(C) or 7.2(f)(iii)(D), the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty), may, in each case upon satisfaction of the Rating Agency Condition, appoint a successor Spread/Loss Trigger Calculation Agent and the retiring Spread/Loss Trigger Calculation Agent's rights and obligations under this Agreement shall be assigned to such successor on or after such 90th day (or 60th day, as the case may be) so long as such assignment (x) shall not result in the MAV or the relevant pool of Managed Assets, including the Restructured Swaps and Eligible Investments, being required to obtain any registration, licence or permit under applicable laws of the United States of America and Canada, and (y) such successor (a) is legally qualified and has the capacity to act as Spread/Loss Trigger Calculation Agent, and (b) is not objected to in writing by the Required Lenders or the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty), acting in accordance with this Agreement, within 30 days following such appointment by the Spread/Loss Trigger Calculation Agent and notice thereof to the Indenture Trustee, or (B) in lieu of such an appointment by the Spread/Loss Trigger Calculation Agent or if the successor appointed by the Spread/Loss Trigger Calculation Agent is disapproved, the Spread/Loss Trigger Calculation Agent or any Secured Creditor may petition any court of competent jurisdiction for the appointment of a successor, which appointment shall not be subject to any Secured Creditor's consent, approval or non-objection.

(vi)     Upon the acceptance of the appointment by a successor Spread/Loss Trigger Calculation Agent, the successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Spread/Loss Trigger Calculation Agent and the retiring Spread/Loss Trigger Calculation Agent shall be discharged from its duties and obligations under this Agreement.

(vii)    After any retiring Spread/Loss Trigger Calculation Agent's resignation or removal, as the case may be, the provisions of this Section 7.2 (*The Spread/Loss Trigger Calculation Agent*) shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Spread/Loss Trigger Calculation Agent.

(viii)   If the Spread/Loss Trigger Calculation Agent or a successor Spread/Loss Trigger Calculation Agent is one of the Secured Creditors in any other capacity, such Spread/Loss Trigger Calculation Agent shall have the same rights and powers under this Agreement with respect to the Secured Liabilities as any other Secured Creditor; provided that it shall not be deemed to be a Secured Creditor for the purposes of this Section 7.2 (*The Spread/Loss Trigger Calculation Agent*).

**7.3**  **The Valuation Agent**

(a)  **Authorisation and Action**

(i)  Each Secured Creditor (other than the Valuation Agent) irrevocably appoints and authorises the Valuation Agent to exercise such powers as are delegated to it by the terms of this Agreement and each Dealer CSA and each Lender's Credit Support Agreement, together with all powers reasonably incidental thereto.  The Valuation Agent shall not be required to take any action which: (A) would expose it to personal liability; (B) is contrary to this Agreement, any Dealer CSA, any Lender's Credit Support Agreement or any Applicable Law, rule, regulation, judgment or order; (C) would require it to become registered to do business in any jurisdiction in which it is not already registered to do business; or (D) would subject it to taxation (except in relation to income tax on any fees).

(ii)  The Valuation Agent shall have no duties or obligations other than as set out in this Agreement, each Dealer CSA and each Lender's Credit Support Agreement and there shall not be construed against the Valuation Agent any implied duties (including fiduciary duties), obligations or covenants.  The Valuation Agent may execute or perform (and may assign or delegate in accordance with this Agreement, the execution and performance of) any of its powers, rights, discretions and duties under this Agreement, each Dealer CSA and each Lender's Credit Support Agreement through or to any Persons designated by it provided that any Delegee which is not an Affiliate of the Valuation Agent shall be subject to the prior approval of the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) and the Required Lenders.  References in this Agreement, the Administration Agreement, any Dealer CSA and any Lender's Credit Support Agreement to the Valuation Agent shall include references to any such Persons so designated by it.  The Valuation Agent shall be fully liable for all actions taken or omitted to be taken by its agents or Persons to whom the Valuation Agent has delegated the execution or performance of any of its powers, rights, discretions or duties.

(iii)  BlackRock Canada is hereby appointed as the initial Valuation Agent and accepts such appointment.  So long as BlackRock Canada or an Affiliate serves as the Valuation Agent, Sections 7.3(b) (*No Liability*), 7.3(d) (*Indemnification of the Valuation Agent*), 7.3(e) (*Indemnification of the MAV*) and 7.3(f)(iii) shall not apply and Section 7.6 (*Provisions Applicable to BlackRock Canada and its Affiliates*) shall apply instead.

(b)  **No Liability**

Neither the Valuation Agent nor its directors, officers, agents or employees shall be liable to any Secured Creditor for any action taken or omitted to be taken by it or them in connection with this Agreement and the other Transaction Documents except for its or their own fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of its or their obligations and duties.  Without limiting the generality of the foregoing, the Valuation Agent shall incur no liability by acting upon any notice, certificate or other instrument believed by it to be genuine.

(c)        **Required Information**

The Valuation Agent agrees that if an Insolvency Event shall occur with respect to it, it shall give written notice thereof to the MAV, each Dealer and the Administrator as soon as reasonably practicable after receiving notice of such event or upon a Responsible Officer of the Valuation Agent obtaining actual knowledge thereof.

(d)        **Indemnification of the Valuation Agent**

The MAV (the **Indemnifying Party**) shall indemnify and hold harmless the Valuation Agent, its Affiliates, stockholders, directors, officers and employees or any partner, member, stockholder, director, manager, officer or employee of any Affiliate (each such party, an **Indemnified Party**) from and against any and all Liabilities, and shall reimburse each such Indemnified Party for Expenses, as such Expenses are incurred in investigating, preparing, pursuing or defending any Actions, caused by, or arising out of or in connection with: (i) the MAV's issuance of the Notes; (ii) the transactions contemplated by the Information Statement, this Agreement or the other Transaction Documents; and/or (iii) any action taken by, or any failure to act by, such Indemnified Party, provided, that no Indemnified Party shall be indemnified for any Liabilities it incurs as a result of any acts or omissions by any Indemnified Party arising by reason of its own fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of its obligations and duties.

(e)        **Indemnification of the MAV**

The Valuation Agent (the **Indemnifying Party**) shall indemnify the MAV (the **Indemnified Party**) against any and all Liabilities and Expenses which the MAV may incur or which may be made against the MAV as a result of the Indemnifying Party's fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of the Indemnifying Party's obligations and duties or that of its officers, directors or employees.

(f)        **Successor Valuation Agents**

(i)        BlackRock Canada or an Affiliate shall serve as Valuation Agent so long as it or an Affiliate serves as the Administrator, unless and until it or such Affiliate resigns as Valuation Agent.

(ii)       Subject to Section 7.3(f)(iv), the Valuation Agent may resign at any time by giving at least sixty days' written notice to each Dealer, each Lender, the Indenture Trustee, the MAV, the Collateral Agent, the Rating Agency and the Administrator.

(iii)      Subject to Section 7.3(f)(iv), the Valuation Agent may be removed at any time by the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) with the consent of the Required Lenders: (A) upon at least thirty days' notice to the Valuation Agent (copied to the Rating Agency) (or, in the case of Subclauses (I) to (IV), immediately upon notice to the Spread/Loss Trigger Calculation Agent), (B) subject to satisfaction of the Rating Agency Condition, and (C) following any one of the following events:

(A)     any violation or breach by the Valuation Agent of any provision of this
Agreement or other Transaction Document to which it is a party, which
violation or breach: (A) constitutes gross negligence, bad faith, fraud, wilful
misconduct or a reckless disregard by it of its duties under this Agreement or
such other Transaction Document; or (B) could reasonably be regarded as
having a Material Adverse Effect on: (x) the CA-Held Collateral, any LSS CDS
Counterparty, any Unlevered CDS Counterparty, any Lender or the Noteholders
taken as a whole; or (y) the Original Collateral of any Dealer;

(B)     if the Valuation Agent violates or breaches any provision of this Agreement and
fails to cure such violation or breach, if capable of being cured, within 30 days
of its becoming aware of, or of receiving notice from the MAV, the Collateral
Agent, any Dealer or any Lender of such violation or breach;

(C)     the occurrence of an act by the Valuation Agent that constitutes fraud,
dishonesty or criminal activity in the performance of its obligations under this
Agreement, or the indictment of the Valuation Agent for, or the indictment of
any of its executive officers having responsibility over the management of the
Valuation Agent (without having been suspended or removed from management
duties) for a criminal offence materially related to its primary business; and

(D)     an Insolvency Event occurs with respect to the Valuation Agent.

(iv)    No resignation or removal of the Valuation Agent pursuant to this Section 7.3(f)
(*Successor Valuation Agents*) shall be effective until (A) a successor Valuation Agent
shall have been appointed; and (B) such successor Valuation Agent shall have agreed in
writing to be bound by the terms of this Agreement in the same manner as the Valuation
Agent is bound hereunder.

(v)     Upon notice of any resignation or removal, the Majority Secured Creditors (other than
for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a
Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) have the right
to appoint a successor Valuation Agent, which such successor shall be: (A) satisfactory
to the Administrator and the Required Lenders, each acting in their reasonable
judgement; and (B) subject to the satisfaction of the Rating Agency Condition.  If no
successor Valuation Agent is appointed or has accepted the appointment within 90 days
after the retiring Valuation Agent's notice of resignation or removal (or within 60 days
following a removal under Sections 7.3(f)(iii)(A), 7.3(f)(iii)(B), 7.3(f)(iii)(C) or
7.3(f)(iii)(D)), as the case may be, then: (A) except in the case of a removal pursuant to
Sections 7.3(f)(iii)(A), 7.3(f)(iii)(B), 7.3(f)(iii)(C) or 7.3(f)(iii)(D), the retiring
Valuation Agent, on behalf of the Secured Creditors; or (B) in the case of a removal
pursuant to Sections 7.3(f)(iii)(A), 7.3(f)(iii)(B), 7.3(f)(iii)(C) or 7.3(f)(iii)(D), the
Majority Secured Creditors (other than for these purposes where Royal Bank of Canada
is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as
LSS CDS Counterparty), may, in each case upon satisfaction of the Rating Agency
Condition, appoint a successor Valuation Agent and the retiring Valuation Agent's
rights and obligations under this Agreement shall be assigned to such successor on or
after such 90th day (or 60th day, as the case may be) so long as such assignment (x)
shall not result in the MAV or the relevant pool of Managed Assets, including the
Restructured Swaps and Eligible Investments, being required to obtain any registration,

licence or permit under applicable laws of the United States of America and Canada, and (y) such successor (a) is legally qualified and has the capacity to act as Valuation Agent, and (b) is not objected to in writing by the Required Lenders or the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty), acting in accordance with this Agreement, within 30 days following such appointment by the Valuation Agent and notice thereof to the Noteholders, or (B) in lieu of such an appointment by the Valuation Agent or if the successor appointed by the Valuation Agent is disapproved, the Valuation Agent or any Secured Creditor may petition any court of competent jurisdiction for the appointment of a successor, which appointment shall not be subject to any Secured Creditor's consent, approval or non-objection.

(vi)     Upon the acceptance of the appointment by a successor Valuation Agent, the successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Valuation Agent and the retiring Valuation Agent shall be discharged from its duties and obligations under this Agreement.

(vii)    After any retiring Valuation Agent's resignation or removal, as the case may be, the provisions of this Section 7.3 (*The Valuation Agent*) shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Valuation Agent.

(viii)   If the Valuation Agent or a successor Valuation Agent is one of the Secured Creditors in any other capacity, such Valuation Agent shall have the same rights and powers under this Agreement with respect to the Secured Liabilities as any other Secured Creditor; provided that it shall not be deemed to be a Secured Creditor for the purposes of this Section 7.3 (*The Valuation Agent*).

## 7.4     Indemnification of Agents with respect to Actions

(a)      Notwithstanding anything contained herein to the contrary, the obligations of the relevant indemnifying party under this Section 7 (*Appointment of Agents*) shall survive termination of this Agreement and, for the relevant agents, such Person's removal or resignation. With respect to any Action with respect to BlackRock Canada or any of its Affiliates as the Administrator, Spread/Loss Trigger Calculation Agent or Valuation Agent, Sections 7.4(b), 7.4(c) and 7.4(d) below shall not apply and Section 7.6 (*Provisions Applicable to BlackRock Canada and its Affiliates*) shall apply instead.

(b)      With respect to any Action made or threatened against an Indemnified Party, or compulsory process or request or other notice of any liability served upon an Indemnified Party, for which such Indemnified Party is or may be entitled to indemnification under this Section 7 (*Appointment of Agents*), such Indemnified Party shall (or with respect to Indemnified Parties that are directors, officers, stockholders, agents or employees, shall cause such Indemnified Party to):

(i)      give written notice to the Indemnifying Party of such Action within 10 days after such Indemnified Party's receipt of actual notice that such Action is made or threatened, which notice to the Indemnifying Party shall specify in reasonable detail the nature of the Action made or threatened and the amount of the Action made or threatened; provided, that the failure of any Indemnified Party to provide such notice to the

Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Section 7 (*Appointment of Agents*) unless the Indemnifying Party is materially prejudiced or otherwise forfeits rights or defences by reason of such failure;

(ii)    at the Indemnifying Party's expense, provide the Indemnifying Party such information and cooperation with respect to such Action as the Indemnifying Party may reasonably require, including, but not limited to, making appropriate personnel available to the Indemnifying Party at such reasonable times as the Indemnifying Party may request;

(iii)    at the Indemnifying Party's expense, cooperate and take all such steps as the Indemnifying Party may reasonably request to preserve and protect any defence to such Action;

(iv)    in the event that proceedings are commenced with respect to such Action, upon reasonable prior notice, afford to the Indemnifying Party the right, which the Indemnifying Party may exercise in its sole discretion and at its expense, to participate in the investigation, defence and settlement of such Action;

(v)    neither incur any material expense to defend against nor release or settle any such Action or make any admission with respect thereto (other than routine or incontestable admissions or factual admissions the failure to make which would expose such Indemnified Party to unindemnified liability) nor permit a default judgment nor consent to the entry of any judgment in respect thereof, in each case without the prior written consent of the Indemnifying Party; and

(vi)    upon reasonable prior notice, afford to the Indemnifying Party the right, in its sole discretion and at its sole expense, to assume the defence of such Action, including, but not limited to, the right to designate Counsel reasonably acceptable to the Indemnified Party and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of such Action; provided, that if the Indemnifying Party assumes the defence of such Action, it shall not be liable for any fees and expenses of Counsel for any Indemnified Party incurred thereafter in connection with such Action except that if such Indemnified Party reasonably determines that counsel designated by the Indemnifying Party has a conflict of interest between the Indemnifying Party and the Indemnified Party, such Indemnifying Party shall pay the reasonable fees and disbursements of one counsel (in addition to any local counsel) separate from its own counsel for all Indemnified Parties in connection with any one action or separate, but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; provided, further, that prior to entering into any final settlement or compromise, such Indemnifying Party shall seek the written consent of the Indemnified Party and shall not enter into any such final settlement or compromise without the written consent of such Indemnified Party, which consent shall not be unreasonably withheld, as to the terms of settlement or compromise, unless such settlement or compromise includes a release of such Indemnified Party from all Liabilities arising out of such Action and does not impose any liability or obligation on such Indemnified Party or make any findings adverse to such Indemnified Party. If an Indemnified Party does not consent to the settlement or compromise within a reasonable time under the circumstances, the Indemnifying Party shall not thereafter be obligated to indemnify the Indemnified Party for any amount in excess of such proposed settlement or compromise.

(c)    In the event that any Indemnified Party waives its right to indemnification hereunder, the Indemnifying Party shall not be entitled to appoint Counsel to represent such Indemnified Party nor shall the Indemnifying Party reimburse such Indemnified Party for any costs of counsel to such Indemnified Party.

(d)    Nothing in this Agreement is intended to, or shall, constitute a waiver of any legal rights or remedies that the holders of the Notes and the MAV may otherwise have under any Applicable Law.

## 7.5    Certain Matters regarding the Administrator and Service Providers

In addition to any consent or notice requirements provided for in Section [19] (*Assignments; Delegation*) of the Administration Agreement, the Administrator agrees that no assignment of its rights, duties and obligations under any Transaction Document or subcontracting by a Direct Service Provider of any services to be provided under the Administration Agreement to any Delegee which is not an Affiliate of the Administrator shall be effective unless the prior written consent of the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) and Required Lenders is obtained and the Rating Agency Condition is satisfied.  The Deal Parties acknowledge that such consent is given with respect to Tao Admin Corp. and the MAV acknowledges that the Rating Agency Condition has been satisfied.

## 7.6    Provisions Applicable to BlackRock Canada and its Affiliates

Consistent with the Administration Agreement, this Section 7.6 (*Provisions Applicable to BlackRock Canada and its Affiliates*) shall apply with respect to BlackRock Canada and its Affiliates (including any Affiliate which is a Delegee) as Administrator, Spread/Loss Trigger Calculation Agent, Valuation Agent or any other capacity under the Transaction Documents.

(a)    (i)    BlackRock shall, subject to and in accordance with the terms and conditions hereof and of the other Transaction Documents and AMA Transaction Documents, perform its obligations hereunder and exercise its discretion with reasonable care and in good faith, and, without  limiting the foregoing, in its capacity as Administrator, using a degree of skill, diligence and attention no less than that which (A) BlackRock (1) exercises with respect to comparable assets that it manages for itself and its Affiliates and (2) exercises with respect to comparable assets that it manages for others, and, in either case, in a manner similar to practices and procedures followed by reasonable and prudent institutional managers of assets of the nature and character of the Managed Assets and Swap Agreements and (B) in respect of its administrative duties, including with respect to any delegation under Section 19 of the Administration Agreement, a reasonably prudent person would exercise in comparable circumstances in the administration of vehicles similar to the MAV, except as expressly restricted or provided otherwise in this Agreement or the other Transaction Documents or AMA Transaction Documents. To the extent consistent with the foregoing, the Administrator may follow BlackRock's customary standards, policies and procedures in performing its duties under the Transaction Documents or AMA Transaction Documents and hereunder.  In performing its duties and functions hereunder, the Administrator shall act in a manner consistent with the provisions of the Transaction Documents or AMA Transaction Documents.

(ii)     The Spread/Loss Trigger Calculation Agent and the Valuation Agent shall each, subject to and in accordance with the terms and conditions hereof and of the other Transaction Documents or AMA Transaction Documents, perform its obligations hereunder, including, but not limited to, all calculations, valuations and determinations in good faith and in a commercially reasonable manner.

(b)     Without limitation of the foregoing and notwithstanding anything in this Agreement or any other Transaction Documents or AMA Transaction Document to the contrary, the Administrator, Spread/Loss Trigger Calculation Agent, Valuation Agent, their respective Affiliates and their respective directors, officers, agents or employees (i) shall not be liable for losses, delays, failure, errors, interruption or loss of data occurring directly or indirectly by reason of circumstances beyond its reasonable control, including acts of God; action or inaction of civil or military authority; public enemy; war; terrorism; riot; fire; flood; sabotage; epidemics; labour disputes; civil commotion; interruption, loss or malfunction of utilities, transportation, computer or communications capabilities; insurrection; elements of nature; or non-performance by a third party except for one of its Affiliates or a Delegee; (ii) shall not be under any duty or obligation to inquire into nor shall it be liable for the validity or invalidity, authority or lack thereof, or truthfulness or accuracy or lack thereof, of any instruction, direction, notice, instrument or other information reasonably believed by it to be genuine; (iii) may rely conclusively and act or refrain from acting in reliance on any information supplied by the Collateral Agent, the Administrative Agent, Index Spread Determination Agent or any other authorised representative of the MAV or the administrative agent or the collateral agent in respect of the MAV1 Credit Facility; (iv) shall not be liable for any damages arising out of any action or omission to act by any prior service provider of the MAV or any Satellite Trust or predecessor in interest thereof (including any party provided a release in connection with the approval of the Plan) or for any failure to discover any such error or omission; (v) shall not be liable for any indebtedness of the MAV, or any other payment obligation of the MAV; and (vi) may consult with Counsel, independent accountants and other experts selected by it, by the MAV or by one or more Secured Creditors and shall not be liable for any action taken or omitted to be taken by it in accordance with their advice. The Administrator, Spread/Loss Trigger Calculation Agent, Valuation Agent and each of their Affiliates and Delegees may rely on the information provided in the Monitor's Reports (including the Monitor's Implementation Report) and in the Schedules to the various AMA Transaction Documents (for example, lists of assets), and shall incur no liability as a result of such reliance, including, in the event that any such information may be incorrect or incomplete.  As set out in the Plan Implementation Order, the Administrator, the Spread/Loss Trigger Calculation Agent, the Valuation Agent, their Affiliates and Delegees shall incur no liability as a result of any such reliance, including, without limitation, in the event that any such information may be incorrect or incomplete as a result of: the failure of any Person (including any sponsor or financial institution) to (i) produce information required in order to provide advice or (ii) any inaccuracies or deficiencies in any such information provided to the Administrator, Spread/Loss Trigger Calculation Agent, Valuation Agent, their Affiliates and Delegees.

(c)     None of the Administrator, the Spread/Loss Trigger Calculation Agent, the Valuation Agent nor any of their Affiliates, Delegees or any stockholder, director, officer, employee, partner, member or manager of the Administrator, Spread/Loss Trigger Calculation Agent, Valuation Agent, any of their Affiliates or Delegees will be liable for any error of judgement or mistake of law or for any loss suffered by the MAV, any Noteholder, any other party to the AMA Transaction Documents or otherwise in connection with their performance of the Administration Agreement or of their duties in any capacity under any other AMA Transaction Document, except a loss

resulting from acts or omissions constituting fraud, wilful misconduct, bad faith or gross negligence on the part of the Administrator, the Spread/Loss Trigger Calculation Agent, the Valuation Agent or any of their Affiliates or Delegees in the performance by any of them of their duties or from reckless disregard by any of them of the duties under this Agreement or of the duties in any capacity under any other AMA Transaction Document; provided that, notwithstanding anything in this Agreement or any other AMA Transaction Document to the contrary (other than the exception set out in the immediately following sentence), the total aggregate amount of all such losses for which the Administrator, the Spread/Loss Trigger Calculation Agent, the Valuation Agent and their Affiliates and Delegees shall be liable in connection with the AMA Transaction Documents (for this purpose, such term includes all documents included in the definitions of such term in the Administration Agreement, and the administration agreement for each of MAV1 and MAV3), the Excluded Underlying Documents (for this purpose, such term includes all documents included in the definitions of such term in the Administration Agreement and the administration agreement for each of MAV1 and MAV3), the letter agreements, dated the date hereof, between BlackRock Canada and the MAV, BlackRock Canada and MAV1, and BlackRock Canada and MAV3 and the letter agreements regarding BlackRock Financial's guarantee of BlackRock Canada's performance, dated the date hereof, between BlackRock Financial and the MAV, BlackRock Financial and MAV1 and BlackRock Financial and MAV3 (such aggregate amount, the **Administrator Liability Cap Amount**) shall in no event exceed CAD30,000,000, excluding any losses arising from the fraud or wilful misconduct of the Administrator or its Affiliates.  The limitation on the aggregate amount of all losses for which the Administrator, Spread/Loss Trigger Calculation Agent, Valuation Agent, their Affiliates and Delegees shall be liable set forth in the proviso to the immediately preceding sentence shall not apply in respect of any loss suffered by the MAV arising solely by virtue of BlackRock Canada's failure to comply with its duties and obligations set out in Section 3(k) of the Administration Agreement during the period commencing on the date which is four months after the Closing Date and ending on the date which is 12 months after the Closing Date where such failure results from the fraud, wilful misconduct, bad faith or gross negligence of BlackRock Canada, or reckless disregard of its obligations under Section 3(k) thereof.

(d)      The MAV (in such case, the **MAV Indemnifying Party**) shall indemnify and hold harmless the Administrator, the Spread/Loss Trigger Calculation Agent, the Valuation Agent, their Affiliates and Delegees and any stockholder, director, officer, employee, partner, member or manager of the Administrator, the Spread/Loss Trigger Calculation Agent, the Valuation Agent and any of their Affiliates and Delegees (such parties collectively in such case, the **BlackRock Indemnified Parties**) from and against any and all losses, and shall reimburse each such BlackRock Indemnified Party for all reasonable fees and expenses (including reasonable fees and expenses of counsel) (collectively, the **BlackRock Expenses**, and any and all such losses and BlackRock Expenses, collectively the **BlackRock Liabilities**) as such BlackRock Expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, **BlackRock Actions**), caused by, or arising out of or in connection with, (i) the MAV's issuance of the Notes and any other notes issued by the MAV, (ii) the transactions and agreements contemplated by the Information Statement, the Administration Agreement or the other AMA Transaction Documents or the Excluded Underlying Documents, including acting as Valuation Agent, Spread/Loss Trigger Calculation Agent or Administrator or in a similar capacity in respect of any satellite or other trust under any Included Underlying Document in accordance with Section 3(h) of the Administration Agreement and acting to oversee the administrator appointed under any Excluded Underlying Document and any other capacity under any AMA Transaction

Document or Excluded Underlying Document, (iii) any untrue statement of a material fact or omission of any material fact required to be stated in the Information Statement or necessary to make the statements in the Information Statement, in light of the circumstances under which they were made, not misleading, except with respect to information provided by the Administrator or BlackRock in writing for use therein describing the Administrator or BlackRock or their respective businesses, and/or (iv) any action taken by, or any failure to act by, such BlackRock Indemnified Party (in each case, regardless of the capacities in which such BlackRock Indemnified Party is engaged); provided, that no BlackRock Indemnified Party shall be indemnified for any BlackRock Liabilities it incurs as a result of any acts or omissions by any BlackRock Indemnified Party arising by reason of its (A) fraud, (B) wilful misconduct, (C) bad faith, (D) gross negligence or (E) reckless disregard of its obligations and duties.

(e)    Notwithstanding anything contained herein to the contrary, the obligations of the MAV Indemnifying Party under this Section 7.6 (*Provisions Applicable to BlackRock Canada and its Affiliates*) shall be payable solely out of the respective assets of the MAV Indemnifying Party in accordance with the AMA Transaction Documents and shall survive termination of the Administration Agreement; provided that the Administrator shall be entitled to allocate such obligations of the MAV Indemnifying Party under this Section 7.6 (*Provisions Applicable to BlackRock Canada and its Affiliates*)  in accordance with the Indemnity Allocation Principles.

(f)    With respect to any BlackRock Action made or threatened against a BlackRock Indemnified Party, or compulsory process or request or other notice of any liability served upon a BlackRock Indemnified Party, for which such BlackRock Indemnified Party is or may be entitled to indemnification under this Section 7.6 (*Provisions Applicable to BlackRock Canada and its Affiliates*), such BlackRock Indemnified Party shall (or with respect to BlackRock Indemnified Parties that are stockholders, directors, officers, employees, partners, members or managers of the Administrator, the Spread/Loss Trigger Loss Calculation Agent, the Valuation Agent or any of their Affiliates or Delegees, the Administrator, the Spread/Loss Trigger Loss Calculation Agent or the Valuation Agent, as applicable, shall cause such BlackRock Indemnified Party to):

(i)    give written notice to the MAV Indemnifying Party of such BlackRock Action within 10 Business Days after such BlackRock Indemnified Party's receipt of actual notice that such BlackRock Action is made or threatened, which notice to the MAV Indemnifying Party shall specify in reasonable detail the nature of the Action made or threatened and the amount of the BlackRock Action made or threatened; provided, that the failure of any BlackRock Indemnified Party to provide such notice to the MAV Indemnifying Party shall not relieve the MAV Indemnifying Party of its obligations under this Section 7.6 (*Provisions Applicable to BlackRock Canada and its Affiliates*) unless the MAV Indemnifying Party is materially prejudiced or otherwise forfeits rights or defences by reason of such failure;

(ii)    at the MAV Indemnifying Party's reasonable third-party expense (for greater clarity, with respect to costs related to indemnified claims), provide the MAV Indemnifying Party such information and cooperation with respect to such BlackRock Action as the MAV Indemnifying Party may reasonably require, including, but not limited to, making appropriate personnel available to the MAV Indemnifying Party at such reasonable times as the MAV Indemnifying Party may request, provided that to the extent that the BlackRock Indemnified Party is subsequently determined not to have been entitled to indemnification hereunder, the BlackRock Indemnified Party shall repay to the MAV Indemnifying Party any such expense borne by the MAV Indemnifying Party;

(iii)    at the MAV Indemnifying Party's reasonable third-party expense (for greater clarity, with respect to costs related to indemnified claims), cooperate and take all such commercially reasonable steps as the MAV Indemnifying Party may reasonably request to preserve and protect any defense to such BlackRock Action;

(iv)    in the event suit is brought with respect to such BlackRock Action, upon reasonable prior notice, afford to the MAV Indemnifying Party the right, which the MAV Indemnifying Party may exercise in its sole discretion and at its expense, to participate in the investigation, defence and settlement of such BlackRock Action;

(v)    neither release or settle any such BlackRock Action or make any admission with respect thereto (other than routine or incontestable admissions or factual admissions the failure to make which would expose such BlackRock Indemnified Party to unindemnified liability) nor permit a default judgment nor consent to the entry of any judgment in respect thereof, in each case without the prior written consent of the MAV Indemnifying Party so long as the MAV Indemnifying Party shall have advised such BlackRock Indemnified Party that such BlackRock Indemnified Party is entitled to be indemnified hereunder with respect to such BlackRock Action; and

(vi)    upon reasonable prior notice, afford to the MAV Indemnifying Party the right, in its sole discretion and at its sole expense, to assume the defence of such BlackRock Action, including, but not limited to, the right to designate counsel reasonably acceptable to the BlackRock Indemnified Party and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of such BlackRock Action; provided, that if the MAV Indemnifying Party assumes the defence of such BlackRock Action, it shall not be liable for any fees and expenses of counsel for any BlackRock Indemnified Party incurred thereafter in connection with such BlackRock Action except that if such BlackRock Indemnified Party reasonably determines that counsel designated by the MAV Indemnifying Party has a conflict of interest between the MAV Indemnifying Party and the BlackRock Indemnified Party, such MAV Indemnifying Party shall pay the reasonable fees and disbursements of one counsel (in addition to any local counsel) separate from its own counsel for all BlackRock Indemnified Parties in connection with any one action or separate, but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; provided, further, that prior to entering into any final settlement or compromise, such MAV Indemnifying Party shall seek the written consent of the BlackRock Indemnified Party and shall not enter into any such final settlement or compromise without the written consent of such BlackRock Indemnified Party, which consent shall not be unreasonably withheld, as to the terms of settlement or compromise, unless such settlement or compromise includes a release of such BlackRock Indemnified Party from all BlackRock Liabilities arising out of such BlackRock Action and does not impose any liability or obligation on such BlackRock Indemnified Party or make any findings adverse to such BlackRock Indemnified Party If a BlackRock Indemnified Party does not consent to the settlement or compromise within a reasonable time under the circumstances, the MAV Indemnifying Party shall not thereafter be obligated to indemnify the BlackRock Indemnified Party for any amount in excess of such proposed settlement or compromise.

(g)    In the event that any BlackRock Indemnified Party waives its right to indemnification hereunder, the MAV Indemnifying Party shall not be entitled to appoint counsel to represent

such BlackRock Indemnified Party nor shall the MAV Indemnifying Party reimburse such BlackRock Indemnified Party for any costs of counsel to such BlackRock Indemnified Party.

(h)     Nothing in this Agreement is intended to, or shall, constitute a waiver of any legal rights or remedies that the holders of the Notes and the MAV may otherwise have under any applicable law, except as may be otherwise restricted in the AMA Transaction Documents.

(i)     For as long as BlackRock Canada or an Affiliate is the Administrator, then for the purposes of any provision in any Transaction Document which requires the consent of the BlackRock Indemnified Parties or the Administrator Indemnified Parties or the consent of Secured Creditors generally, the consent of the Administrator shall be deemed to be the consent of all BlackRock Indemnified Parties or Administrator Indemnified Parties, as applicable, that in each case are Affiliates of the Adminstrator or any stockholder, director, officer, employee, partner, member or manager thereof.

## 7.7    Grievances and Disputes

The Administrator, the Spread/Loss Trigger Calculation Agent, the Valuation Agent and the other parties hereto agree that it is in their mutual interest to resolve grievances and disputes by agreement.  If a grievance or dispute arises under or in relation to this Agreement, the parties will make all reasonable efforts to resolve the grievance or dispute by mutual agreement.   Except as provided in Section 5 (*Dispute Resolution*) of this Agreement, if a grievance or dispute cannot be resolved informally by mutual agreement among the relevant parties at the lowest possible level, the grievance or dispute shall be referred up the respective chain of command of each party in an attempt to resolve the matter.  This will be done in an expeditious manner. The Administrator, the Spread/Loss Trigger Calculation Agent, the Valuation Agent, the other Service Providers and the other parties hereto shall continue performance of the respective services required by this Agreement pending resolution of any grievance or dispute. The parties agree to take all reasonable steps to resolve grievances and disputes among themselves before commencing legal proceedings.

## 7.8    The Index Spread Determination Agent

(a)     **Appointment**

Each Secured Creditor (other than the Index Spread Determination Agent) irrevocably authorises the MAV to enter into the Index Spread Determination Agreement.

(b)     **Successor Index Spread Determination Agents**

(i)     The Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) and the Required Lenders may deliver notice to the MAV (copied to the Administrator and the Rating Agency) at any time, requesting that the Index Spread Determination Agent be removed following any one of the following events:

(A)     any material breach by the Index Spread Determination Agent of any provision of the Index Spread Determination Agreement, if not remedied within thirty days after receipt by the Index Spread Determination Agent of written notice thereof;

(B)     any material amendment to the terms of the Index Spread Determination Agreement without the prior written consent of the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) and the Required Lenders;

(C)     any material change to the procedures used by the Index Spread Determination Agent to calculate the Index Spread in respect of any Matrix Portfolio to which the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) and the Required Lenders do not consent; and

(D)     upon the Index Spread Determination Agent's making of an assignment for the benefit of its creditors, the filing by the Index Spread Determination Agent or its creditors of a voluntary or involuntary petition under any bankruptcy or insolvency law, under the reorganisation or arrangement provisions of the U.S. Bankruptcy Code or under the provisions of any law of like import,

and, in each case, following receipt of such notice by the MAV, the Administrator shall terminate or procure that the appointment of the Index Spread Determination Agent be terminated pursuant to the terms of the Index Spread Determination Agreement.

(ii)     The Administrator, on behalf of the MAV, shall promptly (and in any event, within two Business Days of receipt thereof) deliver any notice of resignation of the Index Spread Determination Agent received by it to the Deal Parties.

(iii)     Upon the resignation or removal of the Index Spread Determination Agent, the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) and the Required Lenders have the right to appoint a successor Index Spread Determination Agent, which successor shall be: (A) satisfactory to the Administrator, acting in its reasonable judgement; and (B) subject to the satisfaction of the Rating Agency Condition.  If no successor Index Spread Determination Agent is appointed or has accepted the appointment within 60 days after the date of notice to the MAV or to the Index Spread Determination Agent, as the case may be, of the retiring Index Spread Determination Agent's resignation or removal, as applicable, then the Administrator, on behalf of the MAV shall petition any court of competent jurisdiction for the appointment of a successor, which appointment shall not be subject to any Secured Creditor's consent, approval or non-objection.

(iv)     Upon the acceptance of the appointment by a successor Index Spread Determination Agent, the successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Index Spread Determination Agent and the retiring Index Spread Determination Agent shall be discharged from its duties and obligations under this Agreement.

(v)     If the Index Spread Determination Agent or a successor Index Spread Determination Agent is one of the Secured Creditors in any other capacity, such Index Spread Determination Agent shall have the same rights and powers under this Agreement with

respect to the Secured Liabilities as any other Secured Creditor; provided that it shall not be deemed to be a Secured Creditor for the purposes of this Section 7.8(b)(v) (*The Index Spread Determination Agent*).

(c)    **Amendments to the Index Spread Determination Agreement**

The Index Spread Determination Agreement may not be amended by the MAV without the prior written consent of the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty), the Administrator and the Required Lenders and the Administrator shall provide the Rating Agency with 10 Business Days' prior written notice of any amendment to the Index Spread Determination Agreement.

(d)    **Notices from the Index Spread Determination Agent**

The Administrator, on behalf of the MAV, shall promptly (and in any event, within two Business Days of receipt thereof) deliver to each Lender and each Dealer a copy of any notice received by the MAV from the Index Spread Determination Agent, including any such notice relating to any change(s) to the procedures used by the Index Spread Determination Agent to calculate the Index Spread or of the Index Spread Determination Agent ceasing to provide an index spread level quotation for any of the Matrix Portfolios.

## 7.9    Rating Agency Fees

From and after the Closing Date, all fees charged by any Rating Agency in respect of the credit ratings provided by the Rating Agency in connection with the transactions under the Transaction Documents, including fees in connection with the satisfaction of any Rating Agency Condition, shall be for the sole account of and shall be payable by the MAV.

## 8.    CERTAIN MATTERS CONCERNING SECURED CREDITORS

## 8.1    Remedies Cumulative

The rights and remedies of the Secured Creditors under any Transaction Document are cumulative and are in addition to, and not in substitution for, any rights or remedies provided by law or by equity; and any single or partial exercise by any of the Secured Creditors of any right or remedy for a default or breach of any term, covenant, condition or agreement contained in any Transaction Document shall not be deemed to be a waiver of or to alter, affect or prejudice any other right or remedy or other rights or remedies to which each Secured Creditor may be lawfully entitled for such default or breach.  Subject to Section 6.5 (*Limited Recourse and Non-Petition*), each and every Secured Creditor shall be entitled to such remedy as can be given either at law or in equity.

## 8.2    Specific Performance Enforcement Events

If a Specific Performance Enforcement Event occurs and is continuing, the Collateral Agent, the Majority Secured Creditors, the Required Lenders or the Indenture Trustee may, in each case, acting in their sole discretion: (a) to the extent such Specific Performance Enforcement Event has occurred as a result of a failure by the MAV to comply with any representation and warranty under Section 9.1 (*Representations and Warranties of the MAV*) or any positive covenant under Section 10.1 (*Affirmative Covenants*) seek specific performance of a correction of the representation or warranty or compliance

with the covenant; and (b) to the extent that such Specific Performance Enforcement Event has occurred as a result of the breach by the MAV of a negative covenant or the taking of any action by the MAV which it was not permitted to take, in each case, under Section 10.2 (*Negative Covenants*), seek injunctive relief to stop the taking of such action or specific performance of a reversal or correction of such action.

## 8.3    Appointment of Provisional Agent

(a)    If, in circumstances where it is required to do so: (i) the Collateral Agent fails to make any repayment, return or cancellation in respect of any MFF Return Amount in accordance with Section 2.7 (*MFF Return Amounts*); (ii) the Administrator fails to conduct the process for the liquidation of Collateral or procure the conduct of such process, in each case in accordance with Section 4.9 (*Liquidation of Collateral*); and/or (iii) the Collateral Agent fails to procure the application of the Sale Collateral Proceeds or make a distribution in kind in the circumstances contemplated by Section 4.9 (*Liquidation of Collateral*) to pay the amount required to be paid by it to any Dealer, Lender or the Indenture Trustee (on the account of the Noteholders) (such Person in this Section 8.3(a), an **Affected Creditor**) pursuant to Sections 6.1 (*Application of Proceeds from the Liquidation of Original Collateral*), Section 6.2 (*Application of Proceeds from the Liquidation of CA-Held Collateral Upon a Terminal Unwind Event*) or Section 6.4 (*Application of Proceeds on Occurrence of a Partial Terminal Unwind Event*), as applicable, to the extent that funds or property for distribution in kind are available for such purpose in accordance with such provisions or would have been so available but for a misapplication thereof by the Collateral Agent, and such failure continues or such misapplication remains unremedied for a period of three Business Days after any Dealer, Lender or the Indenture Trustee delivers written notice of such failure to the MAV (copied to the Administrator and the Collateral Agent),

(i)    where the Affected Creditor is a Dealer, such Dealer;

(ii)    where the Affected Creditor(s) is one or more of the Lenders, the Administrative Agent on behalf of the Required Lenders; and

(iii)    where the Affected Creditor(s) is the Indenture Trustee (on account of the Noteholders), the Indenture Trustee,

may give written notice to the MAV (the date of such notice, the **Instruction Date**) requiring it promptly to appoint a Provisional Agent to conduct the liquidation process and/or correct the misapplication of funds and/or make the relevant distributions to the Affected Creditor(s) which the Administrator has failed to conduct or procure to be conducted or to correct or procure to be corrected or to make or to procure to be made, as the case may be, in accordance with the provisions of the Omnibus Agreement.

(b)    Where the MAV fails to comply with or observe any covenant set forth in Sections 10.1(a), 10.1(e), or 10.2(b) and such failure: (x) is not remedied on or before the 30th Business Day after written notice of such failure is delivered to the Administrator, on behalf of the MAV, and to the Collateral Agent; and (y) has a Material Adverse Effect on the rights and obligations of a Noteholder or any Lender (such Person in this Section 8.3(b), an **Affected Creditor**) under the Transaction Documents, the Indenture Trustee (on the instruction of the Controlling Class, where the Affected Creditor is a Noteholder) or the Administrative Agent on behalf of the Required Lenders (where the Affected Creditor is a Lender), as the case may be, may give

written notice to the MAV (the date of such notice, the **Instruction Date**) requiring the MAV promptly to appoint a Provisional Agent to procure compliance by the MAV with the relevant covenant with which the MAV has failed to so comply.

(c)      The Issuer Trustee shall deliver notice of the appointment of a Provisional Agent to all Deal Parties and the Indenture Trustee and the compensation and fees of any Provisional Agent shall be solely for the account of the MAV, and paid pursuant to the order of priorities set forth at Section 6 (*Application of Proceeds*).

**8.4      Liability of the Secured Creditors *inter se***

Each of the Secured Creditors agrees with each of the other Secured Creditors that, except as otherwise expressly provided in this Agreement, and except for the obligations of the Service Providers pursuant to the Transaction Documents, none of the Secured Creditors has or shall have any duty or obligation, or shall in any way be liable, to any of the other Secured Creditors in respect of this Agreement or the Transaction Documents or any action taken or omitted to be taken in connection with them.

**8.5      Secured Creditor Credit Decisions**

Each Secured Creditor acknowledges that it has, independently and without reliance upon any other party hereto, made its own analysis and decision to enter into this Agreement and the other Transaction Documents. Each Secured Creditor also acknowledges that it will, independently and without reliance upon any other party hereto and based on such documents and information as it shall deem appropriate at the time, continue to make its own decisions in taking or not taking action under this Agreement and the other Transaction Documents.

**8.6      No Liens; Payments in Error; Payments Rescinded**

(a)      Each Secured Creditor agrees with each other Secured Creditor that it will not, without the prior consent of the other Secured Creditors and except as contemplated by the Transaction Documents, take or obtain any Lien on any property of the MAV to secure the obligations of the MAV under the Transaction Documents, except in respect of the Security Documents.

(b)      If any Secured Creditor obtains any payment (whether voluntary, involuntary or through the exercise of any right of Set-off or realisation against the Collateral) with respect to or in connection with any Transaction Document or receives any amount in excess of the amount to which it was entitled (other than amounts paid in accordance with the Transaction Documents), the Secured Creditor shall account to and pay over to the Collateral Agent, as it may direct for deposit into the relevant account of the MAV such excess payment to be applied for the benefit of the Secured Creditors and other parties entitled to payment of amounts outstanding under Section 6 (*Application of Proceeds*) of this Agreement, in accordance with the terms of this Agreement.

(c)      If, at any time for any reason (including the bankruptcy, insolvency, receivership, reorganisation, dissolution or liquidation of the MAV or the appointment of any receiver, liquidator, intervenor or conservator of, or agent or similar official for, the MAV or any of its Assets), any payment received by, or on behalf of, any Secured Creditor in respect of the Secured Liabilities or any part thereof is rescinded or avoided or must otherwise be restored or returned by such Secured Creditor, such payment will not be considered to have been made for purposes of the Transaction Documents, and this Agreement and the Master Security Agreement

will continue to be effective or will be reinstated, if necessary, as if that payment had not been made.

(d)    All payments required to be made by or to the MAV under any Transaction Document shall, subject to any netting provisions set forth therein and except as provided otherwise in this Agreement, be calculated without reference to any Set-off or counterclaim and shall be made free and clear of and without any deduction for or on account of any Set-off or counterclaim.

## 8.7    Replacement of Issuer Trustee

Any replacement of the Issuer Trustee in its role as trustee of the MAV or any assignment, novation or transfer of any of its obligations under the Declaration of Trust shall be subject to the prior written consent of the Majority Secured Creditors and any purported assignment, novation or transfer without such consent shall be void *ab initio*.

## 8.8    Consents

Each party hereto (an **Acting Party**) acknowledges and agrees with each of the other parties hereto (each an **Other Party**) that whenever the consent of an Other Party (whether alone or together with others) is required for any action to be taken by the Acting Party under a Transaction Document, the Acting Party shall not take such action until the required consent of the Other Party or Other Parties has been obtained.

## 9.    REPRESENTATIONS AND WARRANTIES

## 9.1    Representations and Warranties of the MAV

The MAV represents and warrants on the Closing Date and on each date thereafter (except in respect of Section 9.1(q) (*Solvency*) which shall be made only on the Closing Date), to each other party to this Agreement, and acknowledges and confirms that each such party is relying thereon without independent inquiry, that:

(a)    **The MAV**

Master Asset Vehicle II has been duly formed as a trust under the laws of the Province of Ontario and the MAV has all necessary power and authority to hold, pursuant to the Declaration of Trust and pursuant to Applicable Law, the property and assets of Master Asset Vehicle II and the MAV is duly qualified, licensed or registered to carry on business in Ontario and in each other jurisdiction where the failure to be so qualified, licensed or registered to carry on the activities of the MAV would have a reasonable possibility of having a Material Adverse Effect. The Issuer Trustee is the sole trustee of Master Asset Vehicle II and no event has occurred which would materially affect the existence of Master Asset Vehicle II.

(b)    **Conflict With Other Instruments**

The MAV is not in violation of any provincial or federal legislation or in default under the Declaration of Trust or in the performance or observance of any material obligation, material agreement, material covenant or material condition contained in any material contract, indenture, agreement, note, or other instrument to which it is a party or by which it or its property may be bound; and the creation, issue and sale of the Notes, the execution and delivery of the Transaction Documents and the borrowing of money pursuant thereto, the granting of the

Liens created pursuant to the Master Security Agreement and the other Transaction Documents and the consummation of the transactions contemplated by the Transaction Documents have been duly authorised by all necessary action on the part of the MAV and the Issuer Trustee and will not conflict with or constitute a breach of, or a default under the Declaration of Trust, any material contract, indenture, note or other agreement or instrument by which the MAV is bound or to which any of its property is subject, nor will any of the foregoing actions result in the imposition of any Liens on any of its property, whether now or hereafter owned or acquired, other than Permitted Liens or result in any violation of any Applicable Law.

(c)     **Governmental Approvals, etc.**

No consent, approval, authorisation, order, registration or qualification of or with any court or any Governmental Authority is required for the execution and delivery by the MAV of the Transaction Documents to which it is a party or the consummation of the transactions contemplated by such Transaction Documents, other than the Sanction Order and the Plan Implementation Order.

(d)     **No Actions**

There is no legal or governmental action, suit or proceeding before or by any Governmental Authority or any arbitrator of any kind, now pending or, to the MAV's knowledge, threatened against or affecting the MAV at law or in equity or to which any property of the MAV is subject, which would have any reasonable possibility of having a Material Adverse Effect, and the MAV is not in default with respect to any judgment, order, writ, injunction, decree, award, rule or regulation of any Governmental Authority or arbitrator, which such default, either separately or in the aggregate, would have any reasonable possibility of having a Material Adverse Effect.

(e)     **Authorisation**

The execution and delivery of each of the Transaction Documents to which the MAV is a party by the MAV and the performance by the MAV of its obligations thereunder have been duly authorised by all necessary trust and corporate or other action and no Authorisation, under any Applicable Law, and no registration, qualification, designation, declaration or filing with any Governmental Authority is or was necessary to permit the same, except as are in full force and effect, unamended, at the date hereof.

(f)     **Execution and Binding Obligation**

This Agreement and the other Transaction Documents to which the MAV is a party have been duly executed and delivered by the MAV and, assuming the due authorisation, execution and delivery of this Agreement and such other Transaction Documents, as the case may be, by the other parties thereto (including in the case of the Notes, the certification thereof by the Indenture Trustee), constitute legal, valid and binding obligations of the MAV, enforceable against the MAV in accordance with their respective terms, subject only to any limitation under Applicable Law relating to (i) bankruptcy, insolvency, reorganisation, moratorium or creditors' rights generally; and (ii) the discretion that a court may exercise in the granting of equitable remedies.

(g)     **Ownership of Assets**

The MAV is the beneficial owner of all of right, title and interest in its Assets, free and clear of all Liens (other than Permitted Liens).  All of the Assets required to be transferred to the MAV pursuant to the Plan have been so transferred to the MAV on the Closing Date.

(h)     **Transaction Documents**

Each of the Transaction Documents to which the MAV is a party has been duly executed and delivered by the MAV, as a matter of corporate and trust law in compliance with: (i) the Declaration of Trust; (ii) the laws of the Issuer Trustee's jurisdiction of incorporation, namely the Province of Nova Scotia, and; (iii) the provisions of the Issuer Trustee's memorandum and articles of association.

(i)     **Compliance with Laws**

The MAV is in compliance with all Canadian and U.S. laws, non-compliance with which could reasonably be expected to have a Material Adverse Effect.

(j)     **Capital Interest in the MAV**

Other than with respect to the charitable beneficiary referred to in Section 6 (*Application of Proceeds*), the MAV has not issued any Capital Interests and there are no Capital Interests in Master Asset Vehicle II outstanding.  No Person has an agreement or option or any other right or privilege (whether by law, pre-emptive or contractual) capable of becoming an agreement or option, including convertible securities, warrants or convertible obligations of any nature, for the purchase, subscription, allotment or issuance of any Capital Interests of the MAV or of Master Asset Vehicle II.

(k)     **Satellite Trusts**

Schedule K (*Satellite Trusts*) lists all Satellite Trusts in which the MAV holds Capital Interests and the outstanding Capital Interests of each such Satellite Trust and the registered and beneficial owners thereof.  Except as set forth on Schedule K (*Satellite Trusts*), the MAV is not the registered or beneficial owner of any Capital Interests of any Person.  True and complete copies of the constating documents of each such Satellite Trust and all amendments thereto have been made available to each of the Parties hereto by the MAV.

(l)     **Validity, Priority and Perfection of Security**

The pledge, assignment and delivery to and control by the Collateral Agent or the relevant Dealer (with respect to its Original Collateral (other than any Other Posted Support)) of the Collateral pursuant to the Security Documents creates a valid and perfected security interest in the Collateral and the proceeds of it with the respective priorities of payment contemplated by this Agreement and the Security Documents, subject to Permitted Liens.  The Collateral and the proceeds thereof are not subject to any prior Lien or any agreement purporting to grant to any third party a Lien on or control of the Collateral, other than the Permitted Liens and, in the case of the Collateral, the Dealer's Security Interest in its Original Collateral.  The Collateral Agent or the relevant Dealer (with respect to its Original Collateral (other than any Other Posted Support)) is entitled to all of the rights, priorities and benefits afforded by the PPSA to perfected security interests in respect of the Collateral.

(m)    **No Restriction**

Except in respect of the Sanction Order and other court documents implementing the Plan, the MAV is not subject to any judgment, order, writ, injunction, decree, award, rule or regulation which has any reasonable possibility of having a Material Adverse Effect.

(n)    **Investment Property and Instruments**

(i)    Schedule [U] (*List of Securities Accounts*) lists all securities accounts of the MAV (other than those relating to Excluded Assets) on the Closing Date.

(ii)    To the best of the knowledge of the MAV, on the Closing Date, no Person has or will have any written or oral option, warrant, right, call, commitment, conversion right, right of exchange or other agreement or any right or privilege (whether by law, pre-emptive or contractual) capable of becoming an option, warrant, right, call, commitment, conversion right, right of exchange or other agreement to acquire any right or interest in any of the Securities and Instruments which comprise Collateral on the Closing Date.

(iii)    The MAV does not know of any claim to or interest in any Collateral, including any adverse claims in respect of any Collateral consisting of investment property, except for the Permitted Liens. If any Person asserts any Lien or adverse claim against any investment property that forms part of the Collateral, the MAV will promptly notify the Collateral Agent and the relevant Dealer (with respect to its Original Collateral).

(iv)    The MAV will notify the Collateral Agent and the relevant Dealer (with respect to its Original Collateral) promptly upon becoming aware of any change in an "issuer's jurisdiction" in respect of any uncertificated Securities that are Collateral or any change in a "securities intermediary's jurisdiction" in respect of any security entitlements, financial assets or securities accounts that are Collateral.

(o)    **Tax Residency**

The Issuer Trustee is not a non-resident of Canada for purposes of the Income Tax Act (Canada).

(p)    **Continuous Perfection**

The MAV's only place of business and its chief executive office is in Ontario and its jurisdiction of formation is Ontario.

(q)    **Solvency**

Both before and after giving effect to the transactions to be entered into or completed pursuant to the Transaction Documents on the Closing Date it, and each of the Satellite Trusts, is and will be Solvent.

(r)    **No Default**

No Specific Performance Enforcement Event, MSA Enforcement Event, Potential Enforcement Event or Enforcement Event has occurred and is continuing.

**9.2      Representations, Warranties and Covenants of other Parties**

Each party to this Agreement represents and warrants on the Closing Date to each other party to this Agreement, and acknowledges and confirms that each such other party is relying thereon without independent inquiry, that:

(a)      **Status**

  (i)      it is duly organised, validly existing and in good standing under the laws of its jurisdiction of incorporation, amalgamation, continuance or organisation; and

  (ii)      it has the power to own its assets and carry on its business as it is being conducted by it on the Closing Date.

(b)      **Powers and Authority**

  It has the power to enter into and perform its obligations under, and has taken all necessary action to authorise the entry into and performance of its obligations under, the Transaction Documents to which it is or will be a party and the transactions contemplated by such Transaction Documents.

(c)      **Legal Validity**

  Each Transaction Document to which it is a party has been duly executed and delivered by it and is a legally binding, valid and enforceable obligation, except as enforceability may be limited by:

  (i)      bankruptcy, insolvency, reorganisation, moratorium or similar laws of general applicability affecting the enforcement of creditors' rights; or

  (ii)      the application of general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

**9.3      The Issuer Trustee**

(a)      The Issuer Trustee represents and warrants on the Closing Date to each other party to this Agreement, and acknowledges and confirms that each such other party is relying thereon without independent inquiry, that it has the corporate power to hold the Assets of Master Asset Vehicle II and to enter into and perform its obligations under the Declaration of Trust and each of the Transaction Documents to which the MAV is a party.  All necessary action has been taken in accordance with the Declaration of Trust to authorise the execution, delivery and performance by the Issuer Trustee, in its capacity as trustee of Master Asset Vehicle II, of its obligations under each of the Transaction Documents to which it is a party.

(b)      The Issuer Trustee agrees to co-operate with the Administrator, as requested, to effect the consummation of the transactions contemplated by the Transaction Documents.

## 10.    COVENANTS OF THE MAV

### 10.1    Affirmative Covenants

So long as any Secured Liabilities remain outstanding, the MAV will:

(a)    **Maintain Existence**

Preserve and maintain the existence of Master Asset Vehicle II and take all actions within its power to cause, subject to and in cooperation with the Issuer Trustee and the issuer trustee of the relevant Satellite Trust, to the extent necessary, to be preserved and maintained the existence of the Satellite Trusts, in each case, as trusts under the laws of Ontario.  The Issuer Trustee will preserve and maintain its corporate existence and be at all times qualified, licensed or registered to carry on business in Ontario and each other jurisdiction in which the MAV carries on business except to the extent that failure to do so would not have any reasonable possibility of having a Material Adverse Effect.

(b)    **Observance of Covenants**

Observe and perform and take all actions within its power to cause, subject to and in cooperation with the Issuer Trustee and the issuer trustee of the relevant Satellite Trust, to the extent necessary, the Satellite Trusts to observe and perform, in all material respects, the covenants, agreements, terms and conditions to be observed and performed by it under this Agreement and the other Transaction Documents to which it and each of the Satellite Trusts, as applicable, is a party.

(c)    **Consents**

Maintain and take all actions within its power as a holder of an interest in a note or a certificate issued by a Satellite Trust to cause such Satellite Trust to maintain all consents required, if any, to carry out the transactions contemplated in the Transaction Documents to which it is a party.

(d)    **Compliance with Laws, etc.**

Obtain and maintain and take or cause, subject to and in cooperation with the Issuer Trustee and the issuer trustee of the relevant Satellite Trust, to the extent necessary, to be obtained, maintained and taken, all actions within its power to cause each Satellite Trust to obtain and maintain in effect all Authorisations under any applicable laws of Canada and the United States of America and any registration, qualification, designation, declaration or filing with any Governmental Authority which may be necessary to or required for the MAV or such Satellite Trust to satisfy and perform its obligations under the Transaction Documents to which it is a party and will, and will take, or will cause to be taken, all actions within its power to cause each Satellite Trust to, comply with the requirements of all applicable laws of Canada and the United States of America, non-compliance with which would have a reasonable possibility of having a Material Adverse Effect.

(e)    **Protect Liens**

Except for the filing of financing change statements and the making of other filings by the Collateral Agent and each Dealer (with respect to its Original Collateral (other than Other Posted Support)) as secured parties, at all times take, or will cause to be taken, all action and

supply, or cause to be supplied, the Collateral Agent and each Dealer (with respect to its Original Collateral (other than Other Posted Support)) with all information reasonably requested by the Collateral Agent or such Dealer to maintain the validity, perfection and priority of the Liens constituted by the Security Documents.

(f)      **Payment of Taxes**

Pay and discharge, or cause to be paid and discharged, and take, or cause to be taken, all actions within its power to cause each Satellite Trust to pay and discharge before the same shall become delinquent, all material Taxes, assessments and governmental charges or levies imposed upon it or upon its respective Assets for which a Governmental Authority is given priority over the Secured Creditors, except any such Taxes which are being contested in good faith and by proper proceedings.

(g)      **Cure Defects**

Promptly cure or cause to be cured (i) any material defects in the execution and delivery by it or (to the extent that it is within its power) any Satellite Trust of this Agreement or any of the other Transaction Documents to which it, or any such Satellite Trust is a party, or any of the other agreements, instruments or documents contemplated hereby or thereby or by the Plan to which it, or any such Satellite Trust is a party, or executed pursuant hereto or thereto or, (ii) any material defects in the validity or enforceability against the MAV or (to the extent that it is within its power) any Satellite Trust of any of the Transaction Documents to which it is a party or the other documents referred to in (i) above and, at its expense, execute and deliver or cause to be executed and delivered all such agreements, instruments and other documents as the Administrator, the Administrative Agent or the Collateral Agent, each acting reasonably, may consider necessary or desirable for the foregoing purposes.

(h)      **Further Assurances**

At its own cost and expense, upon request of the Administrator, the Administrative Agent or Collateral Agent, duly execute and deliver or cause to be duly executed and delivered to such Person such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of the Administrator, the Administrative Agent or Collateral Agent, as the case may be, to carry out more effectually the provisions and purposes of the Transaction Documents.

(i)      **Additional Security Perfection and Protection of Security Interests**

Grant to the Collateral Agent and the relevant Dealer (with respect to its Original Collateral (other than Other Posted Support)) security interests, assignments, mortgages, charges, hypothecs and pledges in such property and undertaking of the MAV constituting Collateral that is not subject to a valid and perfected security interest with the priority contemplated by this Agreement (subject only to Permitted Liens), in each relevant jurisdiction as determined by the Collateral Agent (acting on the instructions of the Majority Secured Creditors) or the relevant Dealer (with respect to its Original Collateral (other than Other Posted Support)).  The MAV will perform all acts, execute and deliver all agreements, documents and instruments and take such other steps as are reasonably requested by the Collateral Agent or the relevant Dealer (with respect to its Original Collateral (other than Other Posted Support)) at any time to register, file, signify, publish, perfect, maintain and protect the Security Interests including: (i) executing,

recording and filing financing or other statements, and paying all taxes, fees and other charges payable; (ii) placing notations on its books of account to disclose the Security Interests; (iii) delivering acknowledgements, confirmations and subordinations that may be necessary to ensure that each of the Security Interests constitutes a valid and perfected security interest with the priority contemplated by this Agreement (subject only to Permitted Liens); and (iv) executing and delivering any certificates, endorsements, instructions, agreements, documents and instruments that may be required under the STA.

(j)     **Notices**

Promptly notify, or cause to be notified, each Dealer, each Lender, the Collateral Agent and the Rating Agency following: (i) becoming aware of a Lien on any of the Collateral other than Permitted Liens; and (ii) any change in: (A) the name of the Issuer Trustee or the MAV; (B) the province in which the chief executive office or the chief place of business of the Issuer Trustee or the MAV is located; or (C) the governing law of the Declaration of Trust, and, in each case, the MAV will take, or cause to be taken, all necessary action to ensure the due registration of all requisite financing statements, financing change statements, applications for registration or other documents to properly maintain, preserve, protect and perfect the liens granted pursuant to the Security Documents.

(k)     **Assets of Satellite Trusts**

Notwithstanding any other provision of this Agreement, the Administration Agreement, the Tao Administration Agreement and unless the Majority Secured Creditors otherwise agree, do all things within its power as a holder of an interest in a note or a certificate issued by a Satellite Trust to ensure that all assets of such Satellite Trust are held by the trustee of such Satellite Trust, a custodian appointed pursuant to the terms of the relevant Traditional Asset Documents or a Satellite Trust Custodian appointed by the trustee of such Satellite Trust.

(l)     **Keeping of Books**

Keep or cause to be kept full, proper and accurate proper books or records or accounts for itself and take all actions within its power to cause, subject to and in cooperation with the Issuer Trustee and the issuer trustee of the relevant Satellite Trust, to the extent necessary, each Satellite Trust to keep or cause to be kept, in each case, in accordance with GAAP, free of material inaccuracies or discrepancies of any kind and provide access to such books, records and accounts to the Collateral Agent, any Dealer or Lender, upon reasonable request therefor.

(m)     **Financial Statements**

Provide, or cause to be provided, to the Lenders (either by physical delivery or electronic access) within 180 days after the end of each fiscal year audited financial statements of Master Asset Vehicle II for the fiscal year, including the balance sheet, statements of income, retained earnings and changes in financial position of Master Asset Vehicle II (which shall also reflect the financial results of the Satellite Trusts) and within 60 days after the end of each fiscal quarter, other than the fiscal quarter ending on the fiscal year end of Master Asset Vehicle II unaudited financial statements of Master Asset Vehicle II for such fiscal quarter consisting of a balance sheet and statements of income, retained earnings and changes in financial position for Master Asset Vehicle II  (which shall also reflect the financial results of the Satellite Trusts). The financial statements shall be audited by a nationally recognised accounting firm.

**10.2    Negative Covenants**

So long as any Secured Liabilities remain outstanding, the MAV will not:

(a)    **Debt**

Create, incur, assume or suffer to exist or cause or permit any Satellite Trust to create, incur, assume or suffer to exist, any Debt, other than Permitted Debt.

(b)    **Liens**

Create or suffer to exist any Lien on any Collateral or permit any Satellite Trust to create or suffer to exist any Lien on any of its Assets, except for Permitted Liens.  The MAV will not grant control over any Collateral to any Person other than the Collateral Agent or the relevant Dealer (with respect to its Original Collateral).

(c)    **Enforceability of Documents**

Take any action or permit any Satellite Trust to take any action which would result in its respective rights or obligations under any Transaction Document or Traditional Asset Document to which it is a party being no longer valid, binding or enforceable in accordance with the terms of such document.

(d)    **Mergers, etc.**

Other than as permitted pursuant to the Transaction Documents, the Traditional Asset Documents, the Ineligible Asset Documents or the CIBC Documents, enter into or permit any Satellite Trust to enter into any transaction or series of transactions (whether by way of reconstruction, reorganisation, consolidation, amalgamation, winding-up, merger, transfer, sale, lease or otherwise) whereby all or any substantial part of its respective undertaking or Assets would become the property of any other Person or alter its capital structure or enter into any arrangement or reorganisation having a similar effect; provided that any successor to the Issuer Trustee pursuant to the Declaration of Trust (including any Person into which the Issuer Trustee is amalgamated or with which it is consolidated or to which all or substantially all of its trust and custodial business is sold or is otherwise transferred) or the trustee (including any Person into which the Issuer Trustee is amalgamated or with which it is consolidated or to which all or substantially all of its trust and custodial business is sold or is otherwise transferred) of the Satellite Trust will be deemed for all purposes of the Transaction Documents to be the Issuer Trustee or the trustee of such Satellite Trust, as applicable, and the succession of any such successor Issuer Trustee as the trustee of the MAV or any succession of any successor issuer trustee in respect of a Satellite Trust will not be treated as a breach of this covenant by the MAV.

(e)    **Related Party Transactions**

Other than as permitted pursuant to the Eligibility Criteria, the Transaction Documents or the Traditional Asset Documents, directly or indirectly: (i) purchase, acquire, lease or license or permit any Satellite Trust to purchase, acquire, lease or license, any material property, right or service from; or (ii) sell, transfer, lease or license or permit any Satellite Trust to sell, transfer, lease or license, any Assets or right to purchase, acquire, lease or license any Asset, right or

service from, or sell, transfer, lease or license any material property or right to, any Person not at Arm's Length with the MAV or such Satellite Trust except at prices and on terms not less favourable to the MAV or such Satellite Trust than those which would have been obtained in an Arm's Length transaction with an Arm's Length Person.

(f)    **Restricted Activities**

Engage or permit any Satellite Trust to engage in any activity or do anything whatsoever, except:

(i)    issuing the Notes and the Ineligible Asset Tracking Notes;

(ii)    acquiring, owning and disposing of the Collateral and exercising its rights and performing its obligations in respect thereof, in each case in accordance with the provisions of the Transaction Documents;

(iii)    entering into and performing its obligations under the Transaction Documents, the Traditional Asset Documents, the Ineligible Asset Documents and the CIBC Documents;

(iv)    enforcing any of its rights under and with respect to the Transaction Documents, the Satellite Trusts, the Traditional Asset Documents, the CIBC Documents, the Notes, the Ineligible Asset Tracking Notes or the Collateral; and

(v)    performing any act incidental to or necessary in connection with any of the above.

(g)    **Restrictive Agreements**

Enter into or permit any Satellite Trust to enter into any agreement prohibiting the ability of the MAV or such Satellite Trust to amend or otherwise modify any Transaction Document.

(h)    **Subsidiaries**

Create or permit any Satellite Trust to create any Subsidiary unless the Majority Secured Creditors and the Required Lenders consent, the Rating Agency Condition is satisfied and the MAV extends the Security Interests accordingly.

(i)    **Investments**

Other than as permitted pursuant to the Transaction Documents, the Traditional Asset Documents, the Ineligible Asset Documents or the CIBC Documents, make or permit any Satellite Trust to make any Investments.

(j)    **Amendments**

Allow any amendments to the Declaration of Trust other than as may be required to comply with the representations and covenants in this Agreement or to comply with Applicable Law.

(k)    **Hedging**

Other than as permitted pursuant to the Transaction Documents, the Traditional Asset Documents, the Ineligible Asset Documents or the CIBC Documents, enter into or permit any Satellite Trust to enter into any hedging agreement, provided that any Satellite Trust that is a party to a securitisation program shall be permitted to modify or enter into any new hedging transaction that is required by the Rating Agency from time to time.

(l)    **Assignments**

Other than as permitted pursuant to the Transaction Documents or the Traditional Asset Documents, assign or transfer or permit any Satellite Trust to assign or transfer any of its rights or obligations under any Transaction Document or Traditional Asset Document without the prior written consent of each Dealer, each Lender and the Indenture Trustee.

(m)    **Restriction on Dispositions**

Sell, assign, convey, exchange, lease, release or abandon, or otherwise dispose of, any Collateral or permit any Satellite Trust to sell, assign, convey, exchange, lease, release or abandon, or otherwise dispose of, any of such Satellite Trust's Assets, except as expressly required or permitted in this Agreement, the Administration Agreement, the Tao Administration Agreement or the Security Documents, provided further that the Security Interests remain perfected in accordance with the Security Documents (except those released in connection with the sale, conveyance or other disposition thereof permitted pursuant to the Transaction Documents) and the Collateral remains free and clear of any Liens, except for Permitted Liens.

(n)    **Capital Interests**

Issue any Capital Interests other than with respect to the charitable beneficiary referred to in Section 6 (*Application of Proceeds*).

## 11.    AMENDMENTS

### 11.1    General Provision

(a)    Except as provided in Sections 11.2 (*Correction of Manifest Errors*), 11.3 (*Amendments to Transaction Documents to comply with Applicable Law*), 11.4 (*Other Amendments requiring the Consent of Affected Secured Creditors*), 11.5 (*Certain Amendments to Traditional Asset Documents*) and, with respect to only novations and terminations of Swap Agreements, 11.6 (*Termination or Novation of Swap Agreements*) no party hereto shall modify, amend, supplement, restate, replace or waive or permit any modification, amendment, supplement, restatement, replacement or waiver to any Transaction Document (each, an **amendment or waiver**) without the consent of each of the parties hereto (except for the Indenture Trustee, other than in circumstances in which its consent is required in connection with an amendment or waiver to a Trust Document (as defined in the Note Indenture) in the circumstances set forth in the Note Indenture) and the satisfaction of the Rating Agency Condition. Any amendments or waivers to or of a Transaction Document adopted in contravention of this Section 11 (*Amendments*) shall be void.

(b)    The Administrator may effect any amendment or waiver permitted under this Section 11 (*Amendments*).

(c)     The Administrator shall promptly notify the other parties to this Agreement and the Rating Agency of any proposed amendment or waiver or any amendment or waiver effected by it under this Section 11 (*Amendments*).   Any such amendment or waiver effected pursuant to this Section 11 (*Amendments*) shall be binding on each of the parties hereto.

(d)     In connection with any proposed amendment or waiver, the Administrator shall be entitled to receive (and shall be fully protected in relying upon) an opinion of Counsel (which may be supported as to factual matters by any relevant certificates and other documents necessary or advisable in the judgement of Counsel delivering such opinion) reasonably requested by the Administrator or delivered to it by the party or parties requesting the amendment or waiver, as applicable, stating that the execution of such amendment or waiver is authorised and permitted by this Agreement (before giving effect to such amendment or waiver) and that all requirements under this Agreement have been, or will be upon execution of such amendment or waiver, satisfied.  The Administrator may, in connection with such amendment or waiver, conclusively rely upon an opinion of Counsel (which may be supported as to factual matters by any relevant certificates and other documents necessary or advisable in the judgement of Counsel delivering such opinion) as to whether or not any Secured Creditor would or would not be adversely affected by the relevant amendment or waiver.

## 11.2    Correction of Manifest Errors

(a)     Any Secured Creditor may deliver a written request to the Administrator for the amendment or waiver of any provision in any Transaction Document if such amendment or waiver is of a formal, minor or technical nature or is to cure any ambiguity, correct typographical, clerical and other manifest or (to the reasonable satisfaction of the Administrator, acting in good faith) proven errors or to correct inconsistencies in such Transaction Document, together with details of the proposed amendment or waiver.

(b)     Upon receipt of such request, the Administrator shall as soon as practicable, and in any event within five Business Days, send notice of the proposed amendment or waiver to each other party to this Agreement and the Rating Agency.

(c)     Any party, acting in good faith, may object to the proposed amendment or waiver by doing so in writing, detailing grounds for such objection.  If no objection is received by the Administrator by the tenth Business Day after notice of the proposed amendment or waiver is sent pursuant to Section 11.2(b), the proposed amendment or waiver shall be deemed to be acceptable to all parties, the Rating Agency and the Administrator (unless it, acting in good faith, reasonably objects to the amendment or waiver) shall, without the further consent of any other party, effect such amendment or waiver.

(d)     If an objection is received by the Administrator and the Administrator deems it appropriate in its sole discretion to do so, the Administrator may apply to the Ontario Superior Court of Justice for directions in respect of the proposed amendment or waiver and any objection thereto including whether such amendment or waiver should or should not be effected, on such notice to Secured Creditors and the Rating Agency as such court may direct.

(e)     The fact that an objection is received pursuant to Section 11.2(c) shall not prejudice the right of any party to propose or effect an amendment or waiver pursuant to Section 11.4 (*Other Amendments requiring the Consent of Affected Secured Creditors*).

**11.3    Amendments to Transaction Documents to comply with Applicable Law**

(a)    If so directed by the Majority Secured Creditors (which such direction shall be irrevocable) and upon satisfaction of the Rating Agency Condition, the Administrator shall (and at the reasonable request of any other party or at its own initiative, the Administrator may) effect an amendment or waiver of any provision of a Transaction Document without the consent of any other party thereto in order to make any additions to, deletion from or alterations of the provisions of such Transaction Document that, in the opinion of Counsel, are necessary in order to incorporate, reflect or comply with any Applicable Law.

(b)    If so directed by the Required Lenders (which such direction shall be irrevocable) and upon satisfaction of the Rating Agency Condition, the Administrator shall (and at the reasonable request of any other party or at its own initiative, the Administrator may) effect an amendment or waiver of any provision of the Margin Funding Facility Agreement without the consent of any other party thereto in order to make any additions to, deletion from or alterations of the provisions of the Margin Funding Facility Agreement that, in the opinion of Counsel, are necessary in order to incorporate, reflect or comply with any Applicable Law.

(c)    The Administrator shall as soon as practicable, and in any event within five Business Days of effecting an amendment or waiver, send notice of any such amendment or waiver effected pursuant to this Section 11.3 (*Amendments to Transaction Documents to comply with Applicable Law*) to each other party to this Agreement and the Rating Agency.

**11.4    Other Amendments requiring the Consent of Affected Secured Creditors**

(a)    With the consent of: (i) the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty); (ii) the Required Lenders; and (iii) the Administrator (on behalf of the MAV and in its own capacity); and upon satisfaction of the Rating Agency Condition, provided that in respect of the Margin Funding Facility Agreement, the Rating Agency Condition shall apply as set forth in Section 11.4(c), any party may direct the Administrator to amend or waive any provision of a Transaction Document for any one or more or all of the following purposes:

(i)    to make any amendment or waiver to such Transaction Document, other than amendments or waivers made pursuant to Section 11.2 (*Correction of Manifest Errors*) or Section 11.3 (*Amendments to Transaction Documents to comply with Applicable Law*);

(ii)    to sanction any modification, abrogation, alteration, compromise or arrangement of the rights of the Secured Creditors *inter se* or any of their rights with respect to the MAV or the Collateral;

(iii)    to direct or authorise the Collateral Agent, Administrative Agent, Spread/Loss Trigger Calculation Agent, Valuation Agent or Administrator to exercise or refrain from exercising any power, right, remedy or authority given to any of them pursuant to any Transaction Document in any manner specified in such direction or authorisation; and/or

(iv)    to waive and direct the Administrator, the Collateral Agent or the Administrative Agent to waive any breach, omission or default on the part of the MAV in complying with any provision of any Transaction Document or any MSA Enforcement Event, Enforcement Event or Specific Performance Enforcement Event or to annul and to direct the Administrator, the Spread/Loss Trigger Calculation Agent, the Collateral Agent or the Administrative Agent, as the case may be, to annul any declaration or demand made by the Collateral Agent, the Administrator, the Spread/Loss Trigger Calculation Agent or Administrative Agent pursuant to a Transaction Document, either unconditionally or upon any conditions specified in such direction,

provided that: (i) in each case, if any Secured Creditor (other than a Breaching Dealer or a Breaching Non-Dealer Lender) would be adversely affected by such amendment or waiver, then the consent of such Secured Creditor must be obtained; (ii) for the avoidance of doubt, if any such amendment would: (A) change the conditions precedent to the making of any Advance or the delivery of an Acknowledgement of a Qualifying Non-Funded Amount under the Margin Funding Facility Agreement; (B) amend Section 2.9 (*Avoiding Terminal Unwind Events*) in any manner that would restrict the ability of a Lender to provide an Additional Commitment; (C) reduce any interest rate or fee payable pursuant to the Margin Funding Facility Agreement; (D) extend the MFF Maturity Date; (E) extend the date referred to in the first line of Section 4.8(b) of the Omnibus Agreement; or (F) change the definition of "Required Lenders", then the consent of each of the Lenders must be obtained; and (iii) any amendment or waiver of any provision of the Administration Agreement or the Tao Administration Agreement shall require the consent of the Administrator.

(b)    For the purposes of determining consent of Noteholders pursuant to this Section 11.4 (*Other Amendments requiring the Consent of Affected Secured Creditors*), such consent shall be obtained in accordance with the provisions of the Note Indenture.

(c)    Satisfaction of the Rating Agency Condition shall not be required in respect of any amendment or waiver to the Margin Funding Facility Agreement except for an amendment or waiver which:

(i)    increases interest rates on Advances or MFF Fees;

(ii)    decreases the Commitment; or

(iii)    restricts in any way the availability of Advances or Acknowledgements of Qualifying Non-Funded Amounts to the MAV,

provided that for so long as a Rating Agency provides a rating: (A) to one or more Classes of Notes, any amendment or waiver to the Margin Funding Facility Agreement (other than those specified at Subclauses (i), (ii) and (iii) above) for which confirmation of the satisfaction of the Rating Agency Condition has not been obtained shall not be considered effective for the purposes of determining whether or not a Potential Unwind Event has occurred; and (B) in respect of the Credit Facility, then such Rating Agency may, at its option, withdraw or downgrade such rating following any amendment or waiver to the Margin Funding Facility Agreement for which confirmation of the satisfaction of the Rating Agency Condition has not been obtained.

**11.5    Certain Amendments to Traditional Asset Documents**

The Administrator, on behalf of the MAV, shall be entitled (in its commercially reasonable judgement) to amend or waive any provision of any Traditional Asset Document, provided that, in respect of any proposed amendment to any provision of any Traditional Asset Document which specifies the procedure by which such or any other Traditional Asset Document may be amended or waived, the Administrator shall require the prior written consent of the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) and the Required Lenders and satisfaction of the Rating Agency Condition.

**11.6    Termination or Novation of Transactions under Swap Agreements**

With the consent of the relevant Dealer (and in addition to the rights of the MAV under Section 6 of the relevant Swap Agreement), the Administrator (on behalf of the MAV) may procure the novation of, or may terminate, any Transaction under the Swap Agreement of such Dealer provided that such novation or termination is in accordance with and pursuant to the terms of this Agreement or the Administration Agreement.

**11.7    Consent of Lender Guarantors**

Where the consent of any Lender is required to amend or waive any provision of a Transaction Document pursuant to this Section 11 (*Amendments*) and such Lender provides its consent, such Lender shall also procure the written consent of its Lender Guarantor (where applicable) to such amendment or waiver and shall deliver written evidence of the Lender Guarantor's consent to the Administrator, provided that the Lender acknowledges that failure to do so shall not invalidate the consent of the relevant Lender and shall have no effect on the validity or enforceability of any Lender Guarantee.

**11.8    Supplemental Agreements to Prevail**

Where any of the provisions of any Transaction Document are amended or waived in accordance with the provisions of this Section 11 (*Amendments*), such Transaction Document shall be read as so amended or waived.  Subject to Section 12.6 (*Paramountcy*), in the event of a conflict or inconsistency between any provision of such Transaction Document as so amended or waived and any other provisions of such Transaction Document or any other Transaction Document, all such other provisions of the Transaction Documents shall be deemed to have been so amended or waived to the extent necessary to remove all such conflict or inconsistency.

**12.    MISCELLANEOUS**

**12.1    Third-Party Rights**

Except as provided in Section 6.6(b), the parties to this Agreement intend that this Agreement and the Master Security Agreement will not benefit or create any right or cause of action in favour of any Person, other than the Secured Creditors and the MAV.  Except for the Secured Creditors and the MAV, no Person shall be entitled to rely on the provisions of this Agreement or the Master Security Agreement in any action, suit, proceeding, hearing or other forum.  The parties to this Agreement reserve their right to vary or rescind, at any time and in any way whatsoever, the rights granted by or under any Transaction Document to Secured Creditors without notice to or consent of any Secured Creditor that is not a party to this Agreement, provided that no such variance or rescission shall affect the MAV's

obligations under any Transaction Document with respect to Existing Indemnity Claims pursuant to the Existing Indemnity and Tax Claims Protocol.

**12.2    Successors and Assigns**

This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and permitted assigns.

**12.3    Communications and Notices**

(a)      Unless expressly stated otherwise and subject to Sections 12.3(b), 12.3(c), 12.3(d) and 12.3(e), the procedure for delivering and effectiveness of all communications and notices pursuant to each Transaction Document shall be governed by the following provisions:

    (i)      all communications and notices pursuant to each Transaction Document shall be by fax or letter delivered by hand or by electronic mail; provided that any communication or notice to the Administrator shall in all cases include a communication by electronic mail to CMAV@blackrock.com.  Each such communication or notice shall be made to the relevant party at the fax number(s) or address(es) or electronic address(es) and, in the case of a communication or notice by fax or letter, marked for the attention of, or (in the case of a communication by electronic mail) made to such person(s) or department(s) from time to time specified in writing by the recipient party to the others for such purpose.  The initial fax number(s), address(es), electronic address(es) and person(s) or department(s) so specified by each party are set out in Schedule B (*Notice Details*) hereto.  All communications or notices delivered verbally by telephone shall only be binding if followed immediately by a confirmation in writing by fax, electronic mail or letter; and

    (ii)      a communication or notice shall be deemed received (if by fax) when an acknowledgement of receipt is received, (if by electronic mail) when made or (if by letter) when delivered, in each case in the manner required by this Section 12.3 (*Communications and Notices*).  However, if a communication is received after 5:00 pm on any Business Day or on a day which is not a Business Day, it shall be deemed to be received and become effective at the opening of business on the next day which is a Business Day.  Subject to Section 5 (*Dispute Resolution*), every communication or notice shall be irrevocable save in respect of any manifest error in it.

(b)      All notices and communications to the MAV shall be deemed given if delivered to the Administrator and shall not be deemed given if not delivered to the Administrator.  All notices and communications to the Administrator shall be deemed to be also given to the MAV.

(c)      Where expressly permitted in a Transaction Document (but not otherwise) and, in the case of any Person other than the Administrator, where the Administrator has so agreed, a Person shall be deemed to have delivered an effective communication or notice by the time required pursuant to the provisions of such Transaction Document if such Person: (i) posts an accessible copy of the information required to be provided by it in such communication or notice (in the relevant form required) to the Website by such required time; and (ii) concurrently notifies the Persons to whom such communication or notice is addressed by e-mail that such information is available on such Website and enclosing a copy of such information (such method of delivery, a **Website Posting**).

(d)    Each of the following communications or notices to the Administrator shall be, with respect to the Administrator, Confirmed Notices:

(i)    any Draw Notice delivered by a LSS CDS Counterparty;

(ii)    any Collateral Sufficiency Notice delivered by a LSS CDS Counterparty;

(iii)    notice of the occurrence of an Event of Default in respect of which a Dealer is the Defaulting Party or a Termination Event in respect of which a Dealer is the Affected Party pursuant to a Swap Agreement;

(iv)    notice under Section 4.5 (*Original Collateral Default*) from a Dealer notifying the Administrator of any election; and

(v)    notice of a Non-Dealer Lender Default;

(vi)    notices of the existence of any dispute pursuant to Section 5.1 (*Dispute Resolution Procedures*) and 2.7 (*MFF Return Amounts*);

(vii)    any Deleveraging Notice, any notice of a Potential Unwind Event delivered by the Collateral Agent under 2.9(d) and any notice of a Partial Terminal Unwind Event delivered by the Collateral Agent under 2.9(f);

(viii)    any notice delivered by the Administrative Agent pursuant to Section 4.11 (*Post-swap Enforcement Liquidation*);

(ix)    any notice delivered by a Dealer seeking approval of an Eligible Guarantor pursuant to the definition of "Eligible Guarantor";

(x)    any notice delivered by a Dealer seeking approval of an Eligible Swap Counterparty pursuant to the definition of "Eligible Swap Counterparty";

(xi)    any notice of any Enforcement Event;

(xii)    any notice of any MSA Enforcement Event; and

(xiii)    any notice of any Specific Performance Enforcement Event set forth in clauses (b), (c) and (d) in the definition of "Specific Performance Enforcement Event".

(e)    This Section 12.3 (*Communications and Notices*) shall not apply to notices or communications pursuant to any Transaction under a Swap Agreement.  The effectiveness and procedure for delivery of notices in respect of Transactions under a Swap Agreement shall be governed by the provisions of the relevant Swap Agreement.

## 12.4    Language

The parties hereto confirm that it is their wish that this Agreement, as well as any other documents relating to this Agreement, including notices, schedules and exhibits, have been and shall be drawn up in the English language only.  *Les parties aux présentes confirment leur volonté que cette convention, de même que tous les documents, y compris tous avis, annexes s'y rattachant, soient rédigés en anglais seulement.*

**12.5    Counterparts, Etc.**

This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  The Transaction Documents, the CIBC Documents, the Ineligible Asset Documents, the Traditional Asset Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.

**12.6    Paramountcy**

In the event of any inconsistency between the terms of any other Transaction Document and the provisions of this Agreement, the parties agree that the provisions of this Agreement shall prevail.

**12.7    Governing Law and Jurisdiction**

This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein, except that (i) Section 7.6 (*Provisions Applicable to BlackRock Canada and its Affiliates*) will be governed by and interpreted and enforced in accordance with the laws of the State of New York (without reference to choice of law doctrine) and (ii) Section 7.1(h) (*Fondé de pouvoir*) will be governed by and interpreted and enforced in accordance with the laws of the Province of Québec (without reference to conflict of laws rules of such province).

Except as otherwise specifically provided herein, each party hereto submits to the non-exclusive jurisdiction of the courts of the Province of Ontario for resolution of disputes arising under or relating to this Agreement.

**12.8    Severability**

In case any provision in this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

**SCHEDULE A**

**MASTER DEFINITIONS**

[*TO BE INSERTED*]

## SCHEDULE B

## NOTICE DETAILS

**MASTER ASSET VEHICLE II**

All notices and communications to the MAV shall be deemed given if delivered to the Administrator.

**BLACKROCK (INSTITUTIONAL) CANADA LTD.**
(in its capacities as **Administrator**, as **Valuation Agent** and as **Spread/Loss Trigger Calculation Agent**)

| | |
|---|---|
| Address: | TD Company Trust Tower |
| | Suite 2684 |
| | 161 Bay Street |
| | Toronto M5J2S1 |
| | Canada |
| | |
| Attention: | Murray McLean, Managing Director |
| Telephone no: | (416) 572 2016 |
| Fax no: | (416) 572 2201 |
| | |
| With mandatory copies to: | BlackRock Financial Management Inc. |
| | (in its capacity as **Delegee**) |

40 East 52nd Street
New York, NY 10022
United States

Attention: Ila Eckhoff, Director
Telephone: (212) 810 3268
Fax: (212) 810 3257
Email:   ila.eckhoff@blackrock.com

and

Email:   CMAV@blackrock.com

and

Attention: Angela Chiu, Vice President
Tel: (212) 810 3666
Fax: (212) 810 3210
Email: angela.chiu@blackrock.com

and

Attention: Arthur Rublin, Managing Director
Tel: (212) 810 5946
Fax: (212) 810 5116

Email: arthur.rublin@blackrock.com

and

100 Bellevue Parkway
Wilmington, DE 19809
United States
Attention: Dan Kalish, Director
Tel: (302) 797 6140
Fax: (302) 797 2455
Email: daniel.kalish@blackrock.com

Agent for service of process:                   Not applicable

**CIBC MELLON GLOBAL SECURITIES SERVICES COMPANY**
(in its capacity as **Issuer Trustee** of Master Asset Vehicle II)

Address:                                        320 Bay Street
                                                P.O. Box 1
                                                Toronto, Ontario
                                                M5H 4A6
Telephone no:                                   (416) 643 5000
Fax no:                                         (416) 643 6360
Email:                                          mavtrustee@cibcmellon.com
Attention:                                      Senior Vice President, Client Relationship Management

Agent for service of process:                   Not applicable

**BNY TRUST COMPANY OF CANADA**
(in its capacity as **Administrative Agent**, as **Indenture Trustee** and as **Collateral Agent**)

Address:                                        Suite 1101
                                                4 King Street West
                                                Toronto, Ontario
                                                M5H 1B6
Telephone no:                                   (416) 933 8500
Fax no:                                         (416) 360 1711 or (416) 360 1727
Attention:                                      Senior Trust Officer

Agent for service of process:                   Not applicable

**DEUTSCHE BANK A.G.**
(in its capacity as **LSS CDS Counterparty**, as **Unlevered CDS Counterparty** and as **Lender/Dealer**)

For purposes of all notices:

Address:                                        Deutsche Bank AG, London Branch
                                                Floor 03
                                                Winchester House, 1 Great Winchester Street

|                          |                                                              |
|--------------------------|--------------------------------------------------------------|
|                          | London, United Kingdom                                       |
| Telephone no:            | +44(20)754-58478                                             |
| Email:                   | john.pipilis@db.com                                          |
| Attention:               | John Pipilis                                                 |

With a mandatory copy to:

Deutsche Bank AG, New York Branch
60 Wall Street
New York, NY 10005
Attn: Mr. Ken Brougher / Ms. Julia Robinson
Telephone: +1(212)250-5672
E-mail: ken.brougher@db.com / julia.robinson@db.com

With a mandatory copy to:

London Derivatives Documentation
Telephone: +44 207 547 1815
Facsimile: +44 207 545 1913
Email: SD.CC@db.com

With copies to the following addresses in respect of any notice designating a Potential Unwind Event, a Terminal Unwind Event or a Partial Terminal Unwind Event:

Deutsche Bank AG, Head Office
Theodor-Heuss-Allee
60486 Frankfurt
Germany
Attention: Legal Department
Facsimile: +49 69 910 36097

Deutsche Bank AG, New York Branch
60 Wall Street
New York, NY 10005
Attn: Legal Department – General Counsel
Telephone: +1(212) 250-8200
Facsimile: +1(212) 797-4568

Deutsche Bank AG, New York Branch
60 Wall Street
New York, NY 10005
Attention: Ernest Goodrich, Jr. / Christian Artmann
Telephone: +1(212) 250-7636 / +1(212) 250-7471
E-mail: chip.goodrich@db.com / christian.artmann@db.com

Agent for service of process:

Deutsche Bank AG, Canada Branch
199 Bay Street, Suite 4700
Commerce Court West, Box 263
Toronto, Ontario M5L 1E9

|               |                  |
|---------------|------------------|
| Telephone no: | (416) 682 8422   |
| Fax no:       | (416) 915 7288   |
| Attention:    | Paul M. Jurist   |

**MERRILL LYNCH INTERNATIONAL**
(in its capacity as **LSS CDS Counterparty**, as **Unlevered CDS Counterparty** and as **Lender/Dealer**)

| | |
|---|---|
| Address: | Merrill Lynch International |
| | Merrill Lynch Financial Centre |
| | 2 King Edward Street |
| | London, EC1A 1HQ |
| | United Kingdom |
| Telephone no: | +44 20 7995 7126 |
| Fax no: | +44 20 7995 0616 |
| Attention: | Manager, Fixed Income Settlements |
| | |
| With copies to: | Merrill Lynch & Co., Inc. |
| | Merrill Lynch World Headquarters |
| | 4 World Financial Center, 7th Floor, |
| | New York, New York 10080 |
| | Attention: Global Credit Derivatives |
| | Telephone: (212) 449 9001 |
| | Fax: (212) 449 3247 |
| | |
| | GMI Counsel |
| | Merrill Lynch World Headquarters |
| | 4 World Financial Centre, 12th Floor |
| | New York, NY 10080 |
| | Attention: Swap Group |
| | Fax: (212) 449 6993 |
| | |
| Agent for service of process: | Merrill Lynch Canada Inc. |
| | 181 Bay Street, Suite 400 |
| | Toronto, Ontario |
| | M5J 2V8 |
| | Canada |
| Telephone no: | (416) 369 2818 |
| Fax no: | (416) 369 8705 |
| Attention: | Mark Dickerson, Office of General Counsel |

**MERRILL LYNCH CAPITAL SERVICES, INC.**
(in its capacity as **LSS CDS Counterparty**)

| | |
|---|---|
| Address: | Merrill Lynch World Headquarters |
| | 2 World Financial Center, 6th Floor |
| | New York, New York 10281 |
| Telephone no: | (212) 236 8709 |
| Fax no: | (917) 778 0836 |
| Attention: | Swap Group |
| | |
| With a copy to: | GMI Counsel |
| | Merrill Lynch World Headquarters |
| | 4 World Financial Centre, 12th Floor |

|                          |                                                     |
|--------------------------|-----------------------------------------------------|
|                          | New York, NY 10080                                  |
|                          | Attention: Swaps Legal                              |
|                          | Fax: (212) 449 6993                                 |
| Agent for service of process: | Merrill Lynch Canada Inc.                      |
|                          | 181 Bay Street, Suite 400                           |
|                          | Toronto, Ontario M5J 2V8                            |
| Telephone no:            | (416) 369 2818                                      |
| Fax no:                  | (416) 369 8705                                      |
| Attention:               | Mark Dickerson, Office of General Counsel           |

## SWISS RE FINANCIAL PRODUCTS CORPORATION
(in its capacity as **LSS CDS Counterparty** and as **Lender/Dealer**)

|                          |                                                     |
|--------------------------|-----------------------------------------------------|
| Address:                 | Swiss Re Financial Products Corporation             |
|                          | 55 East 52nd Street                                 |
|                          | New York, New York 10055                            |
| Telephone no:            | (212) 317 5043 / (212) 317 5436                     |
| Fax no:                  | (917) 368-4440                                      |
| Attention:               | Legal                                               |
|                          |                                                     |
| Agent for service of process: | 152928 Canada Inc.                             |
|                          | c/o Stikeman Elliott LLP                            |
|                          | 5300 Commerce Court West                            |
|                          | 199 Bay Street                                      |
|                          | Toronto, Ontario  M5L 1B9                           |
| Telephone no:            | 416 869 5500                                        |
| Fax no:                  | 416 947 0866                                        |
| Attention:               | President and William A. Scott                      |

## HSBC BANK USA, NATIONAL ASSOCIATION
(in its capacity as **LSS CDS Counterparty** and as **Unlevered CDS Counterparty**)

|                          |                                                     |
|--------------------------|-----------------------------------------------------|
| Address:                 | HSBC Bank USA, National Association                 |
|                          | 452 Fifth Avenue                                    |
|                          | New York, NY 10018                                  |
| Telephone no:            | (212) 525 5529                                      |
| Fax no:                  | (212) 525 0673                                      |
| Email:                   | operations.scp@us.hsbc.com                          |
| Attention:               | Derivatives Operations                              |
|                          |                                                     |
| With copies to:          | Attention: Legal Department/General Counsel         |
|                          | Fax: (212) 525 6994                                 |
|                          |                                                     |
|                          | Attention: Global Structured Credit Products        |
|                          | Myles Bae/Wallace Kim                               |
|                          | Telephone: (212) 525 3197                           |
|                          | Fax: (646) 366 6114                                 |
|                          | Email: myles.m.bae@us.hsbc.com / wallace.kim@us.hsbc.com |

| | |
|---|---|
| Agent for service of process: | HSBC Bank USA, National Association, Toronto Branch |
| | 70 York Street, 4th Floor |
| | Toronto, Ontario |
| | M5J 1S9 |
| | Canada |
| Telephone no: | (416) 868 8456 |
| Fax no: | (416) 868 3817 |
| Attention: | Gabriella King, Global Corporate Banking, Financial Institutions Group |

**HSBC BANK USA, NATIONAL ASSOCIATION, TORONTO BRANCH**
(in its capacity as **Lender/Dealer**)

| | |
|---|---|
| Address: | 70 York Street, 4th Floor |
| | Toronto, Ontario |
| | M5J 1S9 |
| | Canada |
| Telephone no: | (416) 868 8456 |
| Fax no: | (416) 868 3817 |
| Attention: | Gabriella King, Global Corporate Banking, Financial Institutions Group |
| With a copy to: | 452 5th Avenue |
| | New York |
| | NY 10018 |
| | Attention: Legal Department / General Counsel |
| | Fax: (212) 525 6994 |
| Agent for service of process: | Not applicable |

**CITIBANK, N.A.**
(in its capacity as **LSS CDS Counterparty** and as **Lender/Dealer**)

| | |
|---|---|
| Address: | Legal Department, Derivatives Product Group |
| | 388 Greenwich Street, 17th Floor |
| | New York, New York, 10013 |
| Telephone no: | (212) 816-5984 |
| Fax no: | (646) 291 1959 |
| Attention: | Senior Deputy General Counsel, Citi Markets and Banking |
| With a copy to: | Shearman & Sterling LLP |
| | Shearman & Sterling LLP |
| | 599 Lexington Avenue |
| | New York, NY 10022 |
| | Attention: Douglas P. Bartner, Partner |
| | E-mail: dbartner@shearman.com |
| | Telephone: (212) 848 8190 |
| | Facsimile: (646) 848 8190 |
| Agent for service of process: | Citibank Canada |

|  |  |
|---|---|
|  | 123 Front Street West, 17th Floor |
|  | Toronto, Ontario |
|  | M5J 2M3 |
|  | Canada |
| Telephone no: | (416) 947 5500 |
| Fax no: | (416) 947 4123 |
| Attention: | Vice President, Legal Department |

**UBS AG**
(in its capacity as **LSS CDS Counterparty**)

| Address: | UBS AG, Stamford Branch |
|---|---|
|  | 677 Washington Boulevard |
|  | Stamford, CT 06901 |
| Telephone no: | [●] |
| Fax no: | (203) 719 0608 |
| Attention: | Legal Department |

| With a copy to: | Attention: Documentation |
|---|---|
|  | Fax: (203) 719 5627 |

| Agent for service of process: | UBS AG, Canada Branch |
|---|---|
|  | 161 Bay Street |
|  | BCE Place, Suite 4100 |
|  | Toronto, Ontario |
|  | M5J 2S1 |
| Telephone no: | [●] |
| Fax no: | [●] |
| Attention: | [●] |

**CANADIAN IMPERIAL BANK OF COMMERCE**
(in its capacity as **Non-Dealer Lender**)

| Address: | 199 Bay Street |
|---|---|
|  | 6th Floor |
|  | Toronto |
|  | ON M5L 1A2 |
|  | Canada |
| Telephone no: | (416) 214 8653 |
| Fax no: | (416) 214 8749 |
| Email: | Mark.conzelman@cibc.ca |
| Attention: | Mark Conzelman, SVP, Risk Management |

| With copies to: | Attention: Robert J. Richardson, VP Legal |
|---|---|
|  | Telephone: (416) 304 2788 |
|  | Fax: (416) 304 4573 |
|  | Email: Robert.richardson@cibc.com |

22 Front Street

|  | 5th Floor |
|---|---|
|  | Toronto |
|  | Ontario M5J 2W5 |
|  | Canada |
|  | Attention: Greg Holmes, VP Investment Account Processing, Global Operations |
|  | Telephone: (416) 594 8764 |
|  | Fax: (416) 594 8764 |
|  | Email: Greg.Holmes@cibc.ca |

Agent for service of process:                 Not applicable

**ROYAL BANK OF CANADA**
**(in its capacity as LSS CDS Counterparty, as Lender/Dealer)**

| Address: | 2nd Floor, Royal Bank Plaza |
|---|---|
|  | 200 Bay Street |
|  | Toronto, Ontario |
|  | Canada  M5J 2W7 |
| Email: | notices@rbccm.com |
| Fax no: | (416) 842 4839 |
| Attention: | Managing Director, GRM Trading Credit Risk (Re:  Montreal Accord) |

| In addition, in respect of Draw Notices under the Margin Funding Facility Agreement, with a copy to: | Global Loans Administration |
|---|---|
|  | 20 King St. W., 7th Floor |
|  | Toronto, Ontario M5H 1C4 |
|  |  |
|  | Attention: |
|  | Andrea Maksay |
|  | Telephone: (416) 974 1033 |
|  | Fax: (416) 974 8119 |
|  |  |
|  | Iivi Sillaste |
|  | Telephone: (416) 955 7719 |
|  | Fax: (416) 974 8119 |

Agent for service of process:                 Not applicable.

**BANK OF AMERICA, N.A.**
**(in its capacity as Unlevered CDS Counterparty)**

| Address: | Bank of America, N.A. |
|---|---|
|  | 5 Canada Square |
|  | London, E14 5AQ |
|  | United Kingdom |
|  | Mail Code: 473 691 01 04 |
| Telephone no: | +44 207 174 5123 |
| Fax no: | +1 000 174 6415 |
| Attention: | Greg Mulligan, Managing Director |

With a copy to:                          Bank of America, N.A.
                                         One Bryant Park
                                         NY1-100-18-07
                                         New York, NY 10036

                                         Attention: Legal Department
                                         Fax: (212) 457 3751

                                         Attention: Client Integration Group
                                         Fax: (212) 548 8622

Agent for service of process:            Bank of America, N.A.
                                         Simcoe Place
                                         200 Front Street W, Mail Stop 102-604-27-17
                                         Toronto, ON
                                         Canada M5V 3L2
Telephone no:                            (416) 349 5424
Fax no:                                  (416) 349 4295
Attention:                               Rossana Torosantucci, Compliance Executive

**BANK OF MONTREAL**
(in its capacity as **Non-Dealer Lender**)

Address:                                 BMO Financial Group
                                         Enterprise Risk and Portfolio Management
                                         1 First Canadian Place, 5th Floor
                                         100 King Street West
                                         Toronto, Ontario M5X 1H3
Telephone no:                            (416) 867 4072
With a copy to:                          (416) 867 6988
Fax no:                                  (416) 867 5785
Email:                                   zoltan.szoldatits@bmo.com
Attention:                               Mr. Zoltan Szoldatits, Managing Director

With a copy to:                          Global Financing Services
                                         Bank Of Montreal
                                         1 First Canadian Place, 5th Floor
                                         100 King Street West
                                         Toronto, Ontario M5X 1H3
                                         Attention: Ms. Claudette Ho, Deal Specialist
                                         Telephone: (416) 867 6988
                                         Fax: (416) 867 5785
                                         Email: claudette.ho@bmo.com

Agent for service of process:            Not applicable

**NATIONAL BANK OF CANADA**
(in its capacity as **Non-Dealer Lender**)

Address:

Telephone no:

Fax no:

Email:

Attention:

With a copy to:

Telephone no:

Fax no:

Email:

Attention:

Agent for service of process:

**THE BANK OF NOVA SCOTIA**
(in its capacity as **Non-Dealer Lender**)

Address:                                    The Bank of Nova Scotia
                                            Global Wholesale Services
                                            Loan Administration and Agency Services
                                            720 King Street West, 2nd Floor
                                            Toronto, Ontario M5V 2T3

Telephone no:                               (416) 645-6887 / (416) 649-4049

Fax no:                                     (416) 866-5991

Email:                                      Christina_Wen@scotiacapital.com
                                            Rachelle_Duncan@scotiacapital.com

Attention:                                  Christina Wen / Rachelle Duncan

With a copy to:                             The Bank of Nova Scotia

Capital Markets Group
Scotia Plaza, 68th Floor
40 King Street West, Box 4085, Station "A"
Toronto, Ontario M5W 2X6

Telephone no:                          (416) 863-5931

Fax no:                                (416) 866-5228

Email:                                 structured_credit@scotiacapital.com

Attention:                             Structured Product Trading

Agent for service of process:          Not applicable

**THE TORONTO-DOMINION BANK**
(in its capacity as **Non-Dealer Lender**)

Address:                               66 Wellington Street West
                                       9th Floor
                                       Toronto, ON
                                       Canada  M5K 1A2
Telephone no:                          (416) 307 9715
Fax no:                                (416) 944 5164
Email:                                 paul.cunha@tdsecurities.com
                                       sundeep.bhakoo@tdsecurities.com
                                       paul.cunha@tdsecurities.com
Attention:                             Paul Cunha, Vice President & Director

With copies to:

                                       66 Wellington Street West
                                       9th Floor
                                       Toronto, ON
                                       Canada  M5K 1A2
                                       Attention: Sundeep Bhakoo, Vice President
                                       Telephone: (416) 308 7628
                                       Fax: (416) 944 5164
                                       Email: Sundeep.Bhakoo@tdsecurities.com

                                       77 King St West
                                       18th Floor
                                       Toronto
                                       ON M5K 1A2
                                       Canada
                                       Attention: Deborah-Lynne Brito, Vice President
                                       Telephone: (416) 307 9197
                                       Fax: (416) 982 8619

Agent for service of process:          Not applicable

**DBRS LIMITED**
(in its capacity as **Rating Agency**)

| | |
|---|---|
| Address: | 181 University Avenue |
| | Suite 700 |
| | Toronto, Ontario |
| | M5H 3M7 |
| Telephone no: | (416) 593 5577 |
| Fax no: | (416) 593 5904 |
| Attention: | Head of Securitisation |
| | |
| Agent for service of process: | Not applicable |

## SCHEDULE C

## LIST OF PARTIES

**1.**       **LSS CDS Counterparties**

Citibank, N.A.
Deutsche Bank AG
HSBC Bank USA, National Association
Merrill Lynch Capital Services, Inc.
Merrill Lynch International
Swiss Re Financial Products Corporation
Royal Bank of Canada
UBS AG

**2.**       **Unlevered CDS Counterparties**

Bank of America, N.A.
Deutsche Bank AG
HSBC Bank USA, National Association
Merrill Lynch International

**3.**       **Lenders**

(a)       **Lender/Dealers**

Citibank, N.A.
Deutsche Bank AG
HSBC Bank USA, National Association, Toronto Branch
Merrill Lynch International
Swiss Re Financial Products Corporation
Royal Bank of Canada

(b)       **Non-Dealer Lenders**

Bank of Montreal
Canadian Imperial Bank of Commerce
National Bank of Canada
The Bank of Nova Scotia
The Toronto-Dominion Bank

## SCHEDULE D

## DELEVERAGING NOTICE

From:  [*Insert name of Lender*] (the Lender)

To:     **BNY TRUST COMPANY OF CANADA** (as Administrative Agent and as Collateral Agent)

          **EACH RATING AGENCY** engaged by the MAV (as Rating Agency)

          **BLACKROCK (INSTITUTIONAL) CANADA LTD.** (as Administrator)

Dated:  [*Insert date*]

Dear Sirs,

**Deleveraging Notice – Increase in Lender's Commitment**

Reference is made to the Omnibus Agreement dated as of [●], 2009 between, *inter alios*, the Collateral Agent, the Administrative Agent, the Valuation Agent, the Lenders, the Unlevered CDS Counterparties and the LSS CDS Counterparties specified therein, as amended, restated, supplemented or novated from time to time (the **Omnibus Agreement**).  Capitalised terms used but not otherwise defined herein shall have the meanings ascribed thereto in Schedule A (*Master Definitions*) of the Omnibus Agreement.

I hereby certify that the long term credit ratings of [*insert name of relevant Lender*] are currently as follows: [●] by DBRS; [●] by Fitch; [●] by Moody's; and [●] by S&P.  Accordingly, we are [not] a Qualified Lender as of the date of this notice.

Pursuant to Section 2.9(b) of the Omnibus Agreement, we hereby give notice of an increase in our Lender's Commitment and irrevocably agree to provide the Additional Commitment set out below.

| | |
|---|---|
| Effective Date: | [*Insert date of effective delivery of this notice*] |
| Additional Commitment (Aggregate amount in CAD): | [*Insert amount equal to Lender's Proportionate MFF Share of the Collateral Call Amount*] |
| Form of Additional Commitment: | Advances in Cash or Cash Equivalents: [●] |
| | Qualifying Non-Funded Amounts: [●] |
| Revised Lender's Commitment (CAD): | [*Insert aggregate amount of Lender's Commitment*] |

Yours faithfully,

_____

For and on behalf of [**NAME OF LENDER**]
Name: [**NAME OF SIGNATORY**]
Title: [**TITLE OF SIGNATORY**]

## SCHEDULE E

### INITIAL AVAILABLE COLLATERAL AMOUNTS

#### (ALL AMOUNTS IN CAD)

| LSS CDS Counterparty | Matured Traditional Assets | Traditional Assets | Cash | Lender's Commitment | Matured Unlevered CDS Original Collateral | Unlevered CDS Original Collateral | LSS CDS Original Collateral | Initial Available Collateral Amount (CAD) |
|---|---|---|---|---|---|---|---|---|
| Deutsche Bank AG | 409,497,796 | 568,078,629 | 290,136,238 | 2,752,987,223 | 52,211,450 | 524,159,640 | 4,175,002,862 | 6,019,086,616 |
| Merrill Lynch International | 114,818,100 | 159,282,197 | 81,350,600 | 771,903,450 | 14,639,443 | 146,967,858 | 735,423,753 | 1,252,481,950 |
| Swiss Re Financial Products Corporation | 70,096,186 | 97,241,415 | 49,664,354 | 471,245,282 | 8,937,346 | 89,723,539 | 341,557,073 | 657,219,915 |
| HSBC Bank USA, National Association | 77,945,622 | 108,130,600 | 55,225,815 | 524,015,769 | 9,938,158 | 99,770,865 | 567,852,599 | 918,863,659 |
| Citibank, N.A. | 36,419,256 | 50,522,863 | 25,803,670 | 244,840,750 | 4,643,498 | 46,616,867 | 343,090,127 | 507,096,282 |
| UBS AG | 35,471,276 | 49,207,771 | 25,132,010 | 238,467,632 | 4,522,629 | 45,403,447 | 253,961,305 | 413,698,438 |
| Royal Bank of Canada | 10,641,324 | 14,762,250 | 7,539,561 | 71,539,895 | 1,356,781 | 13,620,959 | 68,741,027 | 116,661,903 |
| TOTAL | 754,889,561 | 1,047,225,726 | 534,852,249 | 5,075,000,000 | 96,249,306 | 966,263,175 | 6,485,628,746 | 9,885,108,763 |

## SCHEDULE F

## MATRIX PORTFOLIOS

**CDX7 10Y**

| Losses | 20-Dec-07 | 20-Dec-08 | 20-Dec-09 | 20-Dec-10 | 20-Dec-11 | 20-Dec-12 | 20-Dec-13 | 20-Dec-14 | 20-Dec-15 | 20-Dec-16 |
|---|---|---|---|---|---|---|---|---|---|---|
| 0% | 3.720% | 4.340% | 5.510% | 6.860% | 8.960% | 9.455% | 10.889% | 14.862% | 15.936% | 17.422% |
| 2% | 3.453% | 4.030% | 5.110% | 6.343% | 8.752% | 9.136% | 10.778% | 14.763% | 15.820% | 17.299% |
| 4% | 3.187% | 3.720% | 4.710% | 5.827% | 7.577% | 8.879% | 10.645% | 14.067% | 14.568% | 15.939% |
| 6% | 3.170% | 3.660% | 4.310% | 5.240% | 6.641% | 7.880% | 9.696% | 12.861% | 13.370% | 14.642% |
| 8% | 2.230% | 2.980% | 4.180% | 4.900% | 5.608% | 6.792% | 7.418% | 10.684% | 12.887% | 14.042% |
| 10% | 2.050% | 2.310% | 3.870% | 4.360% | 4.610% | 5.920% | 6.819% | 10.588% | 12.726% | 13.945% |
| 12% | 1.715% | 2.292% | 3.058% | 3.440% | 3.617% | 4.776% | 6.080% | 9.917% | 11.982% | 13.137% |
| 12.1% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% |

**CDX7 7Y**

| Losses | 20-Dec-07 | 20-Dec-08 | 20-Dec-09 | 20-Dec-10 | 20-Dec-11 | 20-Dec-12 | 20-Dec-13 |
|---|---|---|---|---|---|---|---|
| 0% | 3.060% | 4.110% | 6.290% | 7.840% | 9.081% | 9.498% | 9.992% |
| 2% | 2.860% | 3.960% | 6.090% | 7.590% | 8.880% | 9.193% | 9.895% |
| 4% | 2.760% | 3.810% | 5.890% | 7.390% | 7.748% | 8.937% | 9.774% |
| 6% | 2.570% | 3.510% | 5.440% | 6.640% | 6.853% | 7.933% | 8.914% |
| 8% | 1.830% | 2.560% | 4.740% | 5.390% | 5.520% | 6.702% | 6.853% |
| 10% | 1.540% | 1.826% | 3.946% | 4.580% | 4.560% | 5.664% | 6.250% |
| 12% | 1.300% | 1.543% | 2.926% | 3.328% | 3.220% | 4.169% | 5.106% |
| 12.1% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% |

**CDX7 5Y**

| Losses | 20-Dec-07 | 20-Dec-08 | 20-Dec-09 | 20-Dec-10 | 20-Dec-11 |
|---|---|---|---|---|---|
| 0% | 3.959% | 4.585% | 5.878% | 9.029% | 9.378% |
| 2% | 3.646% | 4.181% | 5.356% | 8.819% | 9.056% |
| 4% | 3.333% | 3.777% | 4.835% | 7.633% | 8.796% |
| 6% | 3.323% | 3.737% | 4.676% | 6.687% | 7.787% |
| 8% | 2.677% | 3.636% | 4.626% | 5.290% | 6.486% |
| 10% | 2.576% | 3.535% | 4.525% | 5.189% | 6.385% |
| 10.1% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% |

**CDX5 10Y**

| | Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Losses | 20-Dec-07 | 20-Dec-08 | 20-Dec-09 | 20-Dec-10 | 20-Dec-11 | 20-Dec-12 | 20-Dec-13 | 20-Dec-14 | 20-Dec-15 |
| 0% | 3.750% | 4.370% | 6.490% | 7.840% | 10.210% | 10.555% | 11.789% | 12.662% | 13.036% |
| 2% | 3.483% | 4.060% | 6.090% | 7.323% | 10.002% | 10.236% | 11.678% | 12.563% | 12.920% |
| 4% | 3.217% | 3.750% | 5.690% | 6.807% | 8.827% | 9.979% | 11.545% | 11.867% | 11.668% |
| 6% | 2.950% | 3.440% | 5.290% | 6.290% | 7.891% | 8.980% | 10.596% | 10.661% | 10.470% |
| 8% | 2.000% | 2.750% | 5.000% | 5.850% | 6.508% | 7.692% | 8.318% | 8.484% | 9.987% |
| 10% | 1.820% | 2.080% | 4.740% | 5.260% | 5.510% | 6.820% | 7.719% | 8.388% | 9.826% |
| 12% | 1.485% | 2.062% | 3.928% | 4.340% | 4.517% | 5.676% | 6.980% | 7.717% | 9.082% |
| 12.1% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% |

**CDX5 7Y**

| | Date | | | | | |
|---|---|---|---|---|---|---|
| Losses | 20-Dec-07 | 20-Dec-08 | 20-Dec-09 | 20-Dec-10 | 20-Dec-11 | 20-Dec-12 |
| 0% | 4.600% | 5.470% | 5.990% | 7.110% | 10.310% | 10.655% |
| 2% | 4.333% | 5.160% | 5.590% | 6.593% | 10.102% | 10.336% |
| 4% | 4.067% | 4.850% | 5.190% | 6.077% | 8.927% | 10.079% |
| 6% | 3.800% | 4.440% | 4.690% | 5.560% | 7.991% | 9.080% |
| 8% | 2.800% | 3.700% | 4.790% | 5.330% | 6.608% | 7.792% |
| 10% | 2.620% | 3.030% | 4.610% | 4.880% | 5.610% | 6.920% |
| 12% | 2.285% | 3.012% | 3.598% | 3.960% | 4.417% | 5.576% |
| 12.1% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% |

**iTraxx S6 10Y**

| | Date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Losses | 20-Dec-07 | 20-Dec-08 | 20-Dec-09 | 20-Dec-10 | 20-Dec-11 | 20-Dec-12 | 20-Dec-13 | 20-Dec-14 | 20-Dec-15 | 20-Dec-16 |
| 0% | 2.82% | 3.37% | 4.43% | 5.02% | 5.61% | 9.48% | 10.78% | 11.84% | 12.236% | 13.273% |
| 2% | 2.25% | 3.11% | 4.08% | 4.60% | 5.48% | 9.14% | 10.66% | 11.74% | 12.114% | 13.143% |
| 4% | 1.79% | 2.86% | 3.73% | 4.34% | 4.86% | 9.02% | 10.67% | 11.01% | 10.797% | 11.714% |
| 6% | 1.64% | 2.61% | 3.38% | 3.93% | 4.25% | 7.97% | 9.67% | 9.74% | 9.538% | 10.350% |
| 8% | 1.60% | 2.50% | 3.35% | 3.81% | 4.21% | 6.62% | 7.27% | 7.45% | 9.030% | 9.718% |
| 10% | 1.60% | 1.87% | 3.30% | 3.71% | 4.11% | 5.70% | 6.64% | 7.35% | 8.860% | 9.617% |
| 12% | 1.25% | 1.85% | 2.66% | 3.09% | 3.28% | 4.50% | 5.87% | 6.64% | 8.078% | 8.767% |
| 12.1% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% | 0.000% |

## SCHEDULE G

## SELECTED MATRIX PORTFOLIO FOR EACH LSS CDS

| E&Y ID | Asset Program #[1] | JPM ID | Dealer | Dealer Matrix Assignment |
|---|---|---|---|---|
| Planet #2 | Coventree #48 | 1 | Deutsche Bank AG | CDX7 7Y |
| Aurora #10 | Coventree #29 | 2 | Deutsche Bank AG | CDX7 7Y |
| Aurora #9 | Coventree #28 | 3 | Deutsche Bank AG | CDX7 7Y |
| Aurora #4 | Coventree #23 | 4 | Deutsche Bank AG | CDX5 10Y |
| Comet #4 | Coventree #36 | 5 | Deutsche Bank AG | CDX7 7Y |
| Comet #5 | Coventree #37 | 6 | Deutsche Bank AG | CDX7 7Y |
| Planet #3 | Coventree #49 | 7 | Deutsche Bank AG | CDX7 7Y |
| Comet #3 | Coventree #35 | 8a | Deutsche Bank AG | Itraxx S6 10Y |
| Planet #6 | Coventree #35 | 8b | Deutsche Bank AG | Itraxx S6 10Y |
| SIT III #11 | Coventree #88 | 9 | Deutsche Bank AG | CDX7 5Y |
| SIT III #5 | Coventree #82 | 10 | Deutsche Bank AG | CDX7 7Y |
| Aria #1 | Newshore #1b | 11 | Deutsche Bank AG | CDX7 7Y |
| Aria #2c | Newshore #2c | 12 | Deutsche Bank AG | CDX7 5Y |
| Aria #3a | Aria #3b | 13 | Deutsche Bank AG | CDX7 7Y |
| Encore #14 | Newshore #5 | 15 | Deutsche Bank AG | Itraxx S6 10Y |
| Opus #2a | Newshore #2a | 16 | Deutsche Bank AG | CDX7 5Y |
| Opus #4 | Newshore #4 | 17 | Deutsche Bank AG | Itraxx S6 10Y |
| Symphony #33 | Newshore #1a | 18 | Deutsche Bank AG | CDX7 7Y |
| Symphony #34a | Newshore #2b | 19 | Deutsche Bank AG | CDX7 5Y |
| Symphony #35a | Newshore #3a | 20 | Deutsche Bank AG | CDX7 5Y |
| Aurora #1 | Coventree #20 | 21 | Swiss Re Financial Products Corporation | CDX7 10Y |
| Aurora #5 | Coventree #24 | 22 | Swiss Re Financial Products Corporation | CDX7 10Y |
|  | Securitus #1 | 23 | Swiss Re Financial Products Corporation | CDX7 10Y |
| Opus #6 | Newshore #6 | 24 | Merrill Lynch International | CDX7 10Y |
| Aurora #6 | Coventree #25 | 25 | Merrill Lynch International | CDX7 10Y |
| SAT #5 | Coventree #77 | 26 | Merrill Lynch International | CDX7 10Y |
| SIT III #6 | Coventree #83 | 27 | Merrill Lynch International | CDX7 10Y |
|  | Newshore #7 | 28 | Merrill Lynch International | CDX7 10Y |
| Opus #9b | Newshore #9b | 29 | Merrill Lynch Capital Services, Inc. | CDX7 10Y |
| Symphony #39 | Newshore #9c | 30 | Merrill Lynch Capital Services, Inc. | CDX7 10Y |
| Aria #6 | Newshore #9d | 31 | Merrill Lynch Capital Services, Inc. | CDX7 10Y |
| Encore #18 | Newshore #9a | 32 | Merrill Lynch Capital Services, Inc. | CDX7 10Y |
| Aurora #7 | Coventree #26 | 33 | Merrill Lynch International | CDX7 10Y |
| SAT #6 | Coventree #78 | 34 | Merrill Lynch International | CDX7 5Y |

---

[1]    All Asset Program #s are those found in the Information for Noteholders prepared by The Pan-Canadian Investors Committee for Third-Party Structured Asset-Backed Commercial Paper dated March 20, 2008.

| E&Y ID | Asset Program #[1] | JPM ID | Dealer | Dealer Matrix Assignment |
|---|---|---|---|---|
| Planet #7 | Coventree #52 | 35 | Merrill Lynch International | CDX7 5Y |
| Encore #17a | Newshore #8 | 36 | Merrill Lynch International | CDX7 7Y |
| | | 39-42a[2] | UBS AG | CDX7 5Y |
| | | 39-42b[2] | UBS AG | CDX7 7Y |
| | | 39-42c[2] | UBS AG | CDX7 10Y |
| Symphony #38 | Newshore #14 | 46 | HSBC Bank USA, National Association | CDX7 7Y |
| Symphony #36 | Newshore #12 | 47b | HSBC Bank USA, National Association | CDX7 7Y |
| Symphony #37 | Newshore #13 | 47c | HSBC Bank USA, National Association | CDX7 7Y |
| Opus #15b | Newshore #15b | 48 | HSBC Bank USA, National Association | CDX7 7Y |
| Encore #15a | Newshore #15a[3] | 49 | HSBC Bank USA, National Association | CDX7 7Y |
| Encore #16a | Newshore #15b[3] | 49 | HSBC Bank USA, National Association | CDX7 7Y |
| Aurora #14 | Coventree #31 | 50 | HSBC Bank USA, National Association | CDX7 7Y |
| Apsley #1 | Quanto #1 | 52 | Deutsche Bank AG | CDX7 7Y |
| Apsley #2 | Quanto #2 | 53 | Deutsche Bank AG | CDX7 7Y |
| Apsley #3 | Quanto #3 | 54 | Deutsche Bank AG | CDX5 10Y |
| Apsley #5 | Quanto #5 | 56 | Deutsche Bank AG | CDX7 10Y |
| Apsley #6 | Quanto #6 | 57 | Deutsche Bank AG | CDX7 10Y |
| Whitehall #1 | Quanto #10 | 59 | Deutsche Bank AG | CDX7 7Y |
| Whitehall #2 | Quanto #11 | 60 | Deutsche Bank AG | CDX7 7Y |
| Whitehall #3 | Quanto #12 | 61 | Deutsche Bank AG | CDX7 7Y |
| Whitehall #4 | Quanto #13 | 62 | Deutsche Bank AG | CDX7 7Y |
| Whitehall #5 | Quanto #14 | 63 | Deutsche Bank AG | CDX7 7Y |
| SAT #1 | Coventree #73 | 68 | HSBC Bank USA, National Association | CDX7 7Y |
| SAT #2 | Coventree #74 | 72 | Citibank, N.A. | Itraxx S6 10Y |
| Aurora #2, Planet #15 | Coventree #21 | 73 | Citibank, N.A. | Itraxx S6 10Y |
| Aurora #3 | Coventree #22 | 74 | Citibank, N.A. | Itraxx S6 10Y |
| Silverstone | NBF #5 | 78 | Deutsche Bank AG | CDX7 7Y |
| Rocket #3 | Coventree #59 | 81 | Royal Bank of Canada | CDX7 7Y |
| | Coventree #60 | 82a[4] | Royal Bank of Canada | CDX7 7Y |

---

[2] JPM ID Trades 39-42 are to be restructured into three trades. Determine Deal Matrix Assignment prior to finalizing schedules. Omnibus Agreement Term Sheet showed Deal Matrix Assignment for all four trades individually.

[3] Only JPM ID 49 was listed in the draft Omnibus Agreement Term Sheet dated 3/11/08. Confirm both Newshore #15a and Newshore #15b will track CDX7 7Y.

[4] This trade represents the top half of the Long Notional Amount of JPM ID 82 and will not have any Allocated Collateral. The bottom half of JPM ID 82 will be fully-funded and will be an Ineligible Asset.

# SCHEDULE H

## INELIGIBLE ASSETS

| E&Y ID | Asset Program #[5] | JPM ID | Swap Counterparty | Collateral Description | ISIN / CUSIP (if applicable) | Certificated / Uncertificated | Restrictions on Transfer | Held by Custodian or Swap Counterparty | Securities Account # (if applicable) |
|---|---|---|---|---|---|---|---|---|---|
| Aria #4 | Newshore #17 | 14 | Deutsche Bank AG | Credit Linked Notes with Bayerische Landesbank FRN as collateral in Structured Notes. | 98899A956 for the CLN and XS0187252662 for the FRN as Collateral (Bayerische Landesbank FRN) | information not available | information not available | State Street Trust Company Canada; Collateral of Notes held at BNY Trust Company of Canada | BIC Code: SBOSCTATXXXX Canadian Sort Code://CC032700001 Beneficiary: State Street Trust Company Canada, for further credit to: Aria Trust Series A Account No.:XDZ1 |
| Planet #4 | Coventree #50 | 43 | UBS AG | Longport 2005-A1S/543136AA3 | 543136AA3 | information not available | information not available | Dealer | 37140994 |
| Planet #5 | Coventree #51 | 44 | UBS AG | TABS 2005-2A A1/87337LAA2 | 87337LAA2 | information not available | information not available | Dealer | 37174070 |
| Apsley #4 | Quanto #4 | 55 | Deutsche Bank AG | Toyota Kreditbank GmbH CAD 500,000,000 3-Year Senior Unsecured floating rate note due May 20, 2009 | XS0252344568 | information not available | information not available | RBC Dexia | T12314061 |
| Apsely #7 | Quanto #7 | 58 | Deutsche Bank AG | Yukon Trust Series 2006-1 Floating Rate Portfolio Credit Linked Secured Note due December 15, 2023 | CA37184WBA68 | information not available | information not available | BNY Trust Company of Canada | Nesbitt Account Number: 375-23967 |
| Rocket #4 | Coventree #60 | 82a[6] | Royal Bank of Canada | TABS 2005-2 Oakville Ltd Class A-1 Regs | XS0220656374 | information not available | information not available | Royal Bank of Canada | Coventree (USD) (can also use deal name) |
| SIT III #10 | Coventree #87 | 88 | RBS Global Banking and Markets | Nemertes Credit Linked Trust (SCT-LSS) Certificate, Series 2005 | US530361AE45, US15134DAA63 | information not available | information not available | RBS Global Banking & Markets | TBD |
| Aurora #12 | Coventree #30 | 106 | Citibank, N.A. | Constellation Trust (Static 2006-A) Certificate, Series 2006-1/ START 2006-A | 85768VAJ3 | information not available | information not available | National Bank of Canada | 0CC323B |

---

[5]    All Asset Program #s are those found in the Information for Noteholders prepared by The Pan-Canadian Investors Committee for Third-Party Structured Asset-Backed Commercial Paper dated March 20, 2008.

[6]    This is the collateral previously used to support JPM Trade ID 82.

| E&Y ID | Asset Program #[5] | JPM ID | Swap Counterparty | Collateral Description | ISIN / CUSIP (if applicable) | Certificated / Uncertificated | Restrictions on Transfer | Held by Custodian or Swap Counterparty | Securities Account # (if applicable) |
|---|---|---|---|---|---|---|---|---|---|
| Planet #1 | Coventree #47 | 141 | Citibank, N.A. | Grenadier Class A-1 USD 60,000,000 Floating Senior Subordinate Secured Notes | G41173AA6 | information not available | information not available | National Bank of Canada | 0CC2HWB |
| Planet #9 | Coventree #54 | 143 | Citibank, N.A. | Series 2005-69 USD 50,000,000 Class C Secured Floating Rate Portfolio Linked Notes | G2335PBU2 | information not available | information not available | Euroclear S.A./N.V. | 99603 |
| Planet #10 | Coventree #55 | 144 | Citibank, N.A. | Trust Mortgage Asset-Backed Pass-Through Certificate, Series 2006-QS2, Class 1-A-17 with principal amount USD $100,000,000 | 761118UY2 | information not available | information not available | National Bank of Canada | 0CC31VB |
| Planet #13 | Coventree #57 | 147 | Citibank, N.A. | A Class A-1 Mortgage Pass-Through Certificate USD $100,000,000 | 589929K56 | information not available | information not available | US Bank Corporate Trust | 77128200 |
| Planet #8 | Coventree #53 | 142 | Wachovia Bank, N.A. | Total Return Swap with Wachovia | 92217LCL1 | information not available | information not available | Bank of New York | Transaction has terminated and remaining collateral is held as cash by the MAV |

**SCHEDULE I**

**UNLEVERED CDSs AND RELATED WRAP SWAPS**

| E&Y ID | Asset Program #[7] | JPM ID | Type of Unlevered CDS / Wrap Swap | Unlevered CDS Counterparty | Historical Contracting Trust | Initial Long Notional Amount (or equivalent) as Shown on Historical Swap Confirmation | MAV Percentage Allocation |
|---|---|---|---|---|---|---|---|
| SIT III #4 | Coventree #81 | 51 | Credit Default Swap | HSBC Bank USA, National Association | STarts (Canada) Trust™ 2004-2 | 125,000,000 USD101,543,460.60 | |
| SIT III #4 | Coventree #81 | 51 | Currency/Interest Rate Swap | HSBC Bank USA, National Association | STarts (Canada) Trust™ 2004-2 | 125,000,000 | |
| SIT III #4 | Coventree #81 | 51 | Total Return Swap | HSBC Bank USA, National Association | STarts (Canada) Trust™ 2004-2 | USD101,543,460 | |
| SIT III #2 | Coventree #79 | 69 | Credit Default Swap | Bank of America, N.A. | Nemertes Credit Linked Certificate Trust (CADBANA) Series 2005-1 | USD161,900,000 | |
| SIT III #2 | Coventree #79 | 69 | Cross-Currency Rate Swap | Bank of America, N.A. | Nemertes Credit Linked Certificate Trust (CADBANA) Series 2005-1 | 200,000,000 | |
| MMAI-I | NBF #2 | 75 | Credit Default Swap | Deutsche Bank AG | MMAI-I Trust | 466,700,000 | |
| MMAI-I | NBF #3 | 76 | Credit Default Swap | Deutsche Bank AG | MMAI-I Trust | 466,700,000 | |
| MMAI-I | NBF #4 | 77 | Credit Default Swap | Deutsche Bank AG | MMAI-I Trust | 466,600,000 | |
| SIT III #7 | Coventree #84 | 185 | Credit Default Swap | Merrill Lynch International | Nemertes Credit Linked Certificate Trust (Morningside) Series 2005 | 124,500,000 USD100,000,000 | [Could not determine] |
| SIT III #7 | Coventree #84 | 185 | Rate Swap | Merrill Lynch International | Nemertes Credit Linked Certificate Trust (Morningside) Series 2005 | 124,500,000 USD100,000,000 | |

---

[7]    All Asset Program #s are those found in the Information for Noteholders prepared by The Pan-Canadian Investors Committee for Third-Party Structured Asset-Backed Commercial Paper dated March 20, 2008

# SCHEDULE J

## LSS CDSs AND RELATED WRAP SWAPS

| E&Y ID | Asset Program #[8] | JPM ID | Type of LSS CDS / Wrap Swap | LSS CDS Counterparty | Historical Contracting Trust | Initial Long Notional Amount (or equivalent) as Shown on Historical Swap Confirmation | Leverage (# of times)[9] | MAV Percentage Allocation | Funded Amount as Shown on Historical Swap Confirmation | Initial Funded Notional Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| Planet #2 | Coventree #48 | 1 | Credit Default Swap | Deutsche Bank AG | Constellation Credit Linked Trust (IML-CDS) Series 2005-1 | 279,125,000 | 2.5 | | 111,650,000.00 | 53,044,798 |
| Aurora #10 | Coventree #29 | 2 | Credit Default Swap | Deutsche Bank AG | Constellation Credit Linked Trust (Super Senior 2) Series 2005-1 | 4,000,000,000 | 10 | | 400,000,000.00 | 207,258,492 |
| Aurora #9 | Coventree #28 | 3 | Credit Default Swap | Deutsche Bank AG | Constellation Credit Linked Trust (Shamrock) Series 2005-1 | 1,330,000,000 | 10 | | 133,000,000.00 | 29,804,577 |
| Aurora #4 | Coventree #23 | 4 | Credit Default Swap | Deutsche Bank AG | Constellation Credit Linked Trust (CD XLS) Series 2006-1 | 3,125,000,000 | 25 | | 125,000,000.00 | 64,768,279 |
| Aurora #4 | Coventree #23 | 4 | Credit Default Swap[10] | Deutsche Bank AG | Constellation Credit Linked Trust (CD XLS) Series 2006-1 | 446,428,600 | Not applicable | | Linked to Trade 4 | |
| Comet #4 | Coventree #36 | 5 | Credit Default Swap | Deutsche Bank AG | Constellation Credit Linked Trust (Super Senior 3) Series 2005-1 | 4,000,000,000 | 10 | | 400,000,000.00 | 169,406,550 |
| Comet #5 | Coventree #37 | 6 | Credit Default Swap | Deutsche Bank AG | Constellation Credit Linked Trust (Super Senior 4) Series 2005-1 | 3,670,000,000 | 10 | | 367,000,000.00 | 155,430,510 |

---

[8]    All Asset Program #s are those found in the Information for Noteholders prepared by The Pan-Canadian Investors Committee for Third-Party Structured Asset-Backed Commercial Paper dated March 20, 2008

[9]    Based on the amount of Allocated Collateral.

[10]    Denotes a "short" whereby the LSS CDS Counterparty acts as Floating Rate Payer.

| E&Y ID | Asset Program #[8] | JPM ID | Type of LSS CDS / Wrap Swap | LSS CDS Counterparty | Historical Contracting Trust | Initial Long Notional Amount (or equivalent) as Shown on Historical Swap Confirmation | Leverage (# of times)[9] | MAV Percentage Allocation | Funded Amount as Shown on Historical Swap Confirmation | Initial Funded Notional Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| Planet #3 | Coventree #49 | 7 | Credit Default Swap | Deutsche Bank AG | Constellation Credit Linked Trust (IML-CDS-2) Series 2005-1 | 375,000,000 | 2.5 | | 150,000,000.00 | 76,521,636 |
| Comet #3 | Coventree #35 | 8a | Credit Default Swap | Deutsche Bank AG | Constellation Credit Linked Trust (iTraxx Index 1) Series 2006-1 | 3,100,000,000 | 15.5 | | 200,000,000.00 | 84,703,275 |
| Planet #6 | Coventree #35 | 8b | Credit Default Swap | Deutsche Bank AG | Constellation Credit Linked Trust (iTraxx Index 1) Series 2006-1 | 3,100,000,000 | 15.5 | | 199,923,665.00 | 122,387,888 |
| SIT III #11 | Coventree #88 | 9 | Credit Default Swap | Deutsche Bank AG | Nemertes Credit Linked Certificate Trust (EC Super Senior) Series 2005-1 | 2,000,000,000 | 10 | | 200,000,000.00 | 125,675,893 |
| SIT III #5 | Coventree #82 | 10 | Credit Default Swap | Deutsche Bank AG | Nemertes Credit Linked Certificate Trust (LSS II) Series 2005-1 | 4,000,000,000 | 10 | | 400,000,000.00 | 251,351,786 |
| Aria #1 | Newshore #1b | 11 | Credit Default Swap | Deutsche Bank AG | Aria Trust in respect of Series 2005-2 Notes | 1,875,000,000 | 10 | | 187,500,000.00 | 60,208,550 |
| Aria #2c | Newshore #2c | 12 | Credit Default Swap | Deutsche Bank AG | Aria Trust in respect of Series 2005-2 Notes | 6,000,000,000 | 40 | | 150,000,000.00 | 69,548,257 |
| Aria #2c | Newshore #2c | 12 | Credit Default Swap[10] | Deutsche Bank AG | Aria Trust in respect of Series 2005-2 Notes | 1,500,000,000 | Not applicable | | Linked to Trade 12 | |
| Aria #3a | Newshore #3b | 13 | Credit Default Swap | Deutsche Bank AG | Aria Trust in respect of Series 2005-2 Notes | 1,275,000,000 | 8.5 | | 149,940,000.00 | 69,548,257 |
| Aria #3a | Newshore #3b | 13 | Credit Default Swap[10] | Deutsche Bank AG | Aria Trust in respect of Series 2005-2 Notes | 255,000,000 | Not applicable | | Linked to Trade 13 | |
| Encore #14 | Newshore #5 | 15 | Credit Default Swap | Deutsche Bank AG | Encore Trust, in respect of Series 2006-2 Notes | 4,560,000,000 | 16 | | 285,000,000.00 | 55,444,133 |

| E&Y ID | Asset Program #[8] | JPM ID | Type of LSS CDS / Wrap Swap | LSS CDS Counterparty | Historical Contracting Trust | Initial Long Notional Amount (or equivalent) as Shown on Historical Swap Confirmation | Leverage (# of times)[9] | MAV Percentage Allocation | Funded Amount as Shown on Historical Swap Confirmation | Initial Funded Notional Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| Opus #2a | Newshore #2a | 16 | Credit Default Swap | Deutsche Bank AG | Opus Trust in respect of 2005-2 Notes | 8,000,000,000 | 40 | | 200,000,000.00 | 62,382,373 |
| Opus #2a | Newshore #2a | 16 | Credit Default Swap[10] | Deutsche Bank AG | Opus Trust in respect of 2005-2 Notes | 2,000,000,000 | Not applicable | | Linked to Trade 16 | |
| Opus #4 | Newshore #4 | 17 | Credit Default Swap | Deutsche Bank AG | Opus Trust in respect of 2005-2 Notes | 3,200,000,000 | 16 | | 200,000,000.00 | 62,382,373 |
| Symphony #33 | Newshore #1a | 18 | Credit Default Swap | Deutsche Bank AG | Symphony Trust, in respect of 2005-2 Notes | 1,875,000,000 | 10 | | 187,500,000.00 | 67,658,504 |
| Symphony #34a | Newshore #2b | 19 | Credit Default Swap | Deutsche Bank AG | Symphony Trust, in respect of 2005-2 Notes | 6,000,000,000 | 40 | | 150,000,000.00 | 54,126,804 |
| Symphony #34a | Newshore #2b | 19 | Credit Default Swap[10] | Deutsche Bank AG | Symphony Trust, in respect of 2005-2 Notes | 1,500,000,000 | Not applicable | | Linked to Trade 19 | |
| Symphony #35a | Newshore #3a | 20 | Credit Default Swap | Deutsche Bank AG | Symphony Trust, in respect of 2005-2 Notes | 1,487,500,000 | 8.5 | | 174,930,000.00 | 63,147,937 |
| Symphony #35a | Newshore #3a | 20 | Credit Default Swap[10] | Deutsche Bank AG | Symphony Trust, in respect of 2005-2 Notes | 297,500,000 | Not applicable | | Linked to Trade 20 | |
| Aurora #1 | Coventree #20 | 21 | Credit Default Swap | Swiss Re Financial Products Corporation | Constellation Credit Linked Trust (Banff) Series 2006-1 | 5,000,000,000 | 16.7 | | 292,159,027.00 | 129,327,224 |
| Aurora #1 | Coventree #20 | 21 | Par and Basis Swap | Swiss Re Financial Products Corporation | Constellation Credit Linked Trust (Banff) Series 2006-1 | 300,000,000 | Not applicable | | Not applicable | |
| Aurora #5 | Coventree #24 | 22 | Credit Default Swap | Swiss Re Financial Products Corporation | Constellation Credit Linked Trust (Galibier) Series 2006-1 | 4,000,000,000 | 20 | | 182,838,796.00 | 94,737,233 |
| Aurora #5 | Coventree #24 | 22 | Par and Basis Swap | Swiss Re Financial Products Corporation | Constellation Credit Linked Trust (Galibier) Series 2006-1 | 200,000,000 | Not applicable | | Not applicable | |

| E&Y ID | Asset Program #[8] | JPM ID | Type of LSS CDS / Wrap Swap | LSS CDS Counterparty | Historical Contracting Trust | Initial Long Notional Amount (or equivalent) as Shown on Historical Swap Confirmation | Leverage (# of times)[9] | MAV Percentage Allocation | Funded Amount as Shown on Historical Swap Confirmation | Initial Funded Notional Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| Opus #6 | Newshore #6 | 24 | Credit Default Swap | Merrill Lynch International | Opus Trust in respect of Series 2006-4 Notes | 1,216,320,000 | 12 | | 101,360,000.00 | 29,473,871 |
| Opus #6 | Newshore #6 | 24 | Total Return Swap | Merrill Lynch International | Opus Trust in respect of Series 2006-4 Notes | 101,360,000 | Not applicable | | Not applicable | |
| Aurora #6 | Coventree #25 | 25 | Credit Default Swap | Merrill Lynch International | Constellation Credit Linked Trust (ML LSS) Series 2006-1 | 1,500,000,000 | 6 | | 250,000,000.00 | 69,185,038 |
| Aurora #6 | Coventree #25 | 25 | Total Return Swap | Merrill Lynch International | Constellation Credit Linked Trust (ML LSS) Series 2006-1 | 250,000,000 | Not applicable | | Not applicable | |
| SAT #5 | Coventree #77 | 26 | Credit Default Swap | Merrill Lynch International | Nemertes Credit Linked Certificate Trust (ML – LSS) Series 2006 | 1,750,000,000 | 7 | | 250,000,000.00 | 74,612,116 |
| SAT #5 | Coventree #77 | 26 | Total Return Swap | Merrill Lynch International | Nemertes Credit Linked Certificate Trust (ML – LSS) Series 2006 | 250,000,000 | Not applicable | | Not applicable | |
| SIT III #6 | Coventree #83 | 27 | Credit Default Swap | Merrill Lynch International | Nemertes Credit Linked Certificate Trust (ML – LSS II) Series 2006 | 1,750,000,000 | 7 | | 250,000,000.00 | 104,204,569 |
| SIT III #6 | Coventree #83 | 27 | Total Return Swap | Merrill Lynch International | Nemertes Credit Linked Certificate Trust (ML – LSS II) Series 2006 | 250,000,000 | Not applicable | | Not applicable | |
| Aria #5a | Newshore #7 | 28 | Credit Default Swap | Merrill Lynch International | Aria Trust in respect of Series 2006-4 Notes | 8,000,000,000 | 33.3 | | 240,000,000.00 | 111,277,211 |
| Aria #5a | Newshore #7 | 28 | Credit Default Swap[10] | Merrill Lynch International | Aria Trust in respect of Series 2006-4 Notes | 1,600,000,000 | Not applicable | | Linked to Trade 28 | |
| Aria #5a | Newshore #7 | 28 | Total Return Swap | Merrill Lynch International | Aria Trust in respect of Series 2006-4 Notes | 200,000,000 | Not applicable | | Not applicable | |

| E&Y ID | Asset Program #[8] | JPM ID | Type of LSS CDS / Wrap Swap | LSS CDS Counterparty | Historical Contracting Trust | Initial Long Notional Amount (or equivalent) as Shown on Historical Swap Confirmation | Leverage (# of times)[9] | MAV Percentage Allocation | Funded Amount as Shown on Historical Swap Confirmation | Initial Funded Notional Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| Opus #9b | Newshore #9b | 29 | Credit Default Swap | Merrill Lynch Capital Services, Inc. | Opus Trust in respect of Series 2007-4 Notes | 625,000,000 | 5 | | 125,000,000.00 | 38,988,983 |
| Opus #9b | Newshore #9b | 29 | Total Return Swap | Merrill Lynch International | Opus Trust in respect of Series 2007-4 Notes | 125,000,000 | Not applicable | | Not applicable | |
| Symphony #39 | Newshore #9c | 30 | Credit Default Swap | Merrill Lynch Capital Services, Inc. | Symphony Trust in respect of Series 2007-4 Notes | 625,000,000 | 5 | | 125,000,000.00 | 45,105,670 |
| Symphony #39 | Newshore #9c | 30 | Total Return Swap | Merrill Lynch International | Symphony Trust in respect of Series 2007-4 Notes | 125,000,000 | Not applicable | | Not applicable | |
| Aria #6 | Newshore #9d | 31 | Credit Default Swap | Merrill Lynch Capital Services, Inc. | Aria Trust in respect of Series 2007-4 Notes | 625,000,000 | 5 | | 125,000,000.00 | 57,956,881 |
| Aria #6 | Newshore #9d | 31 | Total Return Swap | Merrill Lynch International | Aria Trust in respect of Series 2007-4 Notes | 125,000,000 | Not applicable | | Not applicable | |
| Encore #18 | Newshore #9a | 32 | Credit Default Swap | Merrill Lynch Capital Services, Inc. | Encore Trust in respect of Series 2007-4 Notes | 625,000,000 | 5 | | 125,000,000.00 | 24,317,602 |
| Encore #18 | Newshore #9a | 32 | Total Return Swap | Merrill Lynch International | Encore Trust in respect of Series 2007-4 Notes | 125,000,000 | Not applicable | | Not applicable | |
| Aurora #7 | Coventree #26 | 33 | Credit Default Swap | Merrill Lynch International | Constellation Credit Linked Trust (ML6 L/S) Series 2006-1 | 1,250,000,000 | 9.3 | | 135,000,000.00 | 40,123,814 |
| Aurora #7 | Coventree #26 | 33 | Credit Default Swap[5] | Merrill Lynch International | Constellation Credit Linked Trust (ML6 L/S) Series 2006-1 | 250,000,000 | | | Linked to Trade 33 | |
| Aurora #7 | Coventree #26 | 33 | Total Return Swap | Merrill Lynch International | Constellation Credit Linked Trust (ML6 L/S) Series 2006-1 | 135,000,000 | Not applicable | | Not applicable | |
| SAT #6 | Coventree #78 | 34 | Credit Default Swap | Merrill Lynch International | Nemertes Credit Linked Certificate Trust (ML – LSS IV) Series 2006 | 1,125,000,000 | 7.5 | | 150,000,000.00 | 22,311,668 |

| E&Y ID | Asset Program #[8] | JPM ID | Type of LSS CDS / Wrap Swap | LSS CDS Counterparty | Historical Contracting Trust | Initial Long Notional Amount (or equivalent) as Shown on Historical Swap Confirmation | Leverage (# of times)[9] | MAV Percentage Allocation | Funded Amount as Shown on Historical Swap Confirmation | Initial Funded Notional Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| SAT #6 | Coventree #78 | 34 | Total Return Swap | Merrill Lynch International | Nemertes Credit Linked Certificate Trust (ML – LSS IV) Series 2006 | 150,000,000 | Not applicable | | Not applicable | |
| Planet #7 | Coventree #52 | 35 | Credit Default Swap | Merrill Lynch International | Constellation Credit Linked Trust (ML-LSS-2) Series 2006-1 | 2,000,000,000 | 7.55 | | 265,000,000.00 | 81,035,773 |
| Planet #7 | Coventree #52 | 35 | Total Return Swap | Merrill Lynch International | Constellation Credit Linked Trust (ML-LSS-2) Series 2006-1 | 265,000,000 | Not applicable | | Not applicable | |
| Encore #17a | Newshore #8 | 36 | Credit Default Swap | Merrill Lynch International | Encore Trust, in respect of Series 2006-4 Notes | 2,750,000,000 | 22 | | 125,000,000.00 | 36,830,559 |
| Encore #17a | Newshore #8 | 36 | Credit Default Swap[10] | Merrill Lynch International | Encore Trust, in respect of Series 2006-4 Notes | 1,050,000,000 | Not applicable | | Linked to Trade 36 | |
| Encore #17a | Newshore #8 | 36 | Total Return Swap | Merrill Lynch International | Encore Trust, in respect of Series 2006-4 Notes | 125,000,000 | Not applicable | | Not applicable | |
| Symphony #38 | Newshore #14 | 46 | Credit Default Swap | HSBC Bank USA, National Association | Symphony Trust, in respect of 2005-1 Notes | 2,500,000,000 | 20 | | 125,000,000.00 | 59,683,089 |
| Symphony #38 | Newshore #14 | 46 | Total Return Swap | HSBC Bank USA, National Association | Symphony Trust, in respect of 2005-1 Notes | USD109,000,000 | Not applicable | | Not applicable | |
| Symphony #38 | Newshore #14 | 46 | Currency/ Interest Rate Swap | HSBC Bank USA, National Association | Symphony Trust, in respect of 2005-1 Notes | 125,000,000 | Not applicable | | Not applicable | |
| Symphony #36 | Newshore #12 | 47b | Credit Default Swap | HSBC Bank USA, National Association | Symphony Trust, in respect of 2005-1 Notes | 900,000,000 | 6 | | 150,000,000.00 | 58,014,115 |
| Symphony #36 | Newshore #12 | 47b | Currency/ Interest Rate Swap | HSBC Bank USA, National Association | Symphony Trust, in respect of 2005-1 Notes | 150,000,000 | Not applicable | | Not applicable | |
| Symphony #36 | Newshore #12 | 47b | Total Return Swap | HSBC Bank USA, National Association | Symphony Trust, in respect of 2005-1 Notes | USD123,379,000 | Not applicable | | Not applicable | |

| E&Y ID | Asset Program #[8] | JPM ID | Type of LSS CDS / Wrap Swap | LSS CDS Counterparty | Historical Contracting Trust | Initial Long Notional Amount (or equivalent) as Shown on Historical Swap Confirmation | Leverage (# of times)[9] | MAV Percentage Allocation | Funded Amount as Shown on Historical Swap Confirmation | Initial Funded Notional Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| Symphony #37 | Newshore #13 | 47c | Credit Default Swap | HSBC Bank USA, National Association | Symphony Trust, in respect of 2005-1 Notes | 1,800,000,000 | 6 | | 300,000,000.00 | 116,028,231 |
| Symphony #37 | Newshore #13 | 47c | Currency/ Interest Rate Swap | HSBC Bank USA, National Association | Symphony Trust, in respect of 2005-1 Notes | 300,000,000 | Not applicable | | Not applicable | |
| Symphony #37 | Newshore #13 | 47c | Total Return Swap | HSBC Bank USA, National Association | Symphony Trust, in respect of 2005-1 Notes | USD248,865,000 | Not applicable | | Not applicable | |
| Opus #15b | Newshore #15b | 48 | Credit Default Swap | HSBC Bank USA, National Association | Opus Trust, in respect of Series 2006-1 Notes | 2,400,000,000 | 8 | | 300,000,000.00 | 93,573,560 |
| Opus #15b | Newshore #15b | 48 | Credit Default Swap[10] | HSBC Bank USA, National Association | Opus Trust, in respect of Series 2006-1 Notes | 360,000,000 (NOTE that this is a short trade) | Not applicable | | Linked to Trade 48 | |
| Opus #15b | Newshore #15b | 48 | Currency/ Interest Rate Swap | HSBC Bank USA, National Association | Opus Trust, in respect of Series 2006-1 Notes | 300,000,000 | Not applicable | | Not applicable | |
| Opus #15b | Newshore #15b | 48 | Total Return Swap | HSBC Bank USA, National Association | Opus Trust, in respect of Series 2006-1 Notes | USD273,973,000 | Not applicable | | Not applicable | |
| Encore #15a | Newshore #15a | 49 | Credit Default Swap | HSBC Bank USA, National Association | Encore Trust, in respect of Series 2006-1 Notes | 1,600,000,000 | 8 | | 100,000,000.00 | 24,459,265 |
| Encore #15a | Newshore #15a | 49 | Credit Default Swap[10] | HSBC Bank USA, National Association | Encore Trust, in respect of Series 2006-1 Notes | 240,000,000 (NOTE that this is a short trade) | Not applicable | | Linked to Trade 49 | |
| Encore #15a | Newshore #15a | 49 | Currency/ Interest Rate Swap | HSBC Bank USA, National Association | Encore Trust, in respect of Series 2006-1 Notes | 200,000,000 | Not applicable | | Not applicable | |
| Encore #15a | Newshore #15a | 49 | Total Return Swap | HSBC Bank USA, National Association | Encore Trust, in respect of Series 2006-1 Notes | USD179,840,000 | Not applicable | | Not applicable | |
| Aurora #14 | Coventree #31 | 50 | Credit Default Swap | HSBC Bank USA, National Association | Starts (Canada) Trust 2005-2 | 1,500,000,000 | 20 | | 75,000,000.00 | 33,347,499 |
| Aurora #14 | Coventree #31 | 50 | Currency/ Interest Rate Swap | HSBC Bank USA, National Association | Starts (Canada) Trust 2005-2 | 75,000,000 | Not applicable | | Not applicable | |

| E&Y ID | Asset Program #[8] | JPM ID | Type of LSS CDS / Wrap Swap | LSS CDS Counterparty | Historical Contracting Trust | Initial Long Notional Amount (or equivalent) as Shown on Historical Swap Confirmation | Leverage (# of times)[9] | MAV Percentage Allocation | Funded Amount as Shown on Historical Swap Confirmation | Initial Funded Notional Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| Aurora #14 | Coventree #31 | 50 | Total Return Swap | HSBC Bank USA, National Association | Starts (Canada) Trust 2005-2 | USD63,667,000 | Not applicable | | Not applicable | |
| Apsley #1 | Quanto #1 | 52 | Credit Default Swap | Deutsche Bank AG | Apsley Trust | 5,000,000,000 | 10 | | 500,000,000.00 | 187,879,891 |
| Apsley #2 | Quanto #2 | 53 | Credit Default Swap | Deutsche Bank AG | Apsley Trust | 2,500,000,000 | 10 | | 250,000,000.00 | 93,939,945 |
| Apsley #3 | Quanto #3 | 54 | Credit Default Swap | Deutsche Bank AG | Apsley Trust | 6,250,000,000 | 25 | | 250,000,000.00 | 93,939,945 |
| Apsley #3 | Quanto #3 | 54 | Credit Default Swap[10] | Deutsche Bank AG | Apsley Trust | 892,857,142.86 | Not applicable | | Linked to Trade 54 | |
| Apsley #5 | Quanto #5 | 56 | Credit Default Swap | Deutsche Bank AG | Apsley Trust | 2,500,000,000 | 10 | | 250,000,000.00 | 93,939,945 |
| Apsley #6 | Quanto #6 | 57 | Credit Default Swap | Deutsche Bank AG | Apsley Trust | 2,500,000,000 | 10 | | 250,000,000.00 | 93,939,945 |
| Whitehall #1 | Quanto #10 | 59 | Credit Default Swap | Deutsche Bank AG | Whitehall Trust | 7,500,000,000 | 10 | | 750,000,000.00 | 280,025,219 |
| Whitehall #2 | Quanto #11 | 60 | Credit Default Swap | Deutsche Bank AG | Whitehall Trust | 7,500,000,000 | 10 | | 750,000,000.00 | 280,025,219 |
| Whitehall #3 | Quanto #12 | 61 | Credit Default Swap | Deutsche Bank AG | Whitehall Trust | 5,000,000,000 | 10 | | 500,000,000.00 | 186,683,479 |
| Whitehall #4 | Quanto #13 | 62 | Credit Default Swap | Deutsche Bank AG | Whitehall Trust | 2,500,000,000 | 10 | | 250,000,000.00 | 93,341,740 |
| Whitehall #5 | Quanto #14 | 63 | Credit Default Swap | Deutsche Bank AG | Whitehall Trust | 2,500,000,000 | 10 | | 250,000,000.00 | 93,341,740 |
| SAT #1 | Coventree #73 | 68 | Credit Default Swap | HSBC Bank USA, National Association | Nemertes Credit Linked Certificate Trust (BCO – LSS) Series 2006 | 4,500,000,000 | 15 | | 300,000,000 | 158,287,518 |
| SAT #2 | Coventree #74 | 72 | Credit Default Swap | Citibank, N.A. | Nemertes Credit Linked Certificate Trust (Citi - LSS) Series 2006 | 3,750,000,000 | 13.6 | | 275,000,000.00 | 108,271,529 |
| Aurora #2, Planet #15 | Coventree #21 | 73 | Credit Default Swap | Citibank, N.A. | Constellation Credit Linked Trust (CB LSS-2) Series 2006-1 | 3,750,000,000 | 13.6 | | 250,000,000.00 | 125,860,912 |

| E&Y ID | Asset Program #[8] | JPM ID | Type of LSS CDS / Wrap Swap | LSS CDS Counterparty | Historical Contracting Trust | Initial Long Notional Amount (or equivalent) as Shown on Historical Swap Confirmation | Leverage (# of times)[9] | MAV Percentage Allocation | Funded Amount as Shown on Historical Swap Confirmation | Initial Funded Notional Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| Aurora #3 | Coventree #22 | 74 | Credit Default Swap | Citibank, N.A. | Constellation Credit Linked Trust (CB LSS) Series 2005-1 | 2,000,000,000 | 10 | | 200,000,000.00 | 100,688,730 |
| Silverstone | NBF #5 | 78 | Credit Default Swap | Deutsche Bank AG | Silverstone Trust | 20,000,000,000 | 10 | | 2,000,000,000.00 | 773,144,922 |
| Rocket #3 | Coventree #59 | 81 | Credit Default Swap | Royal Bank of Canada | Constellation Credit Linked Trust (MPL – CDN) Series 2006-1 | 200,000,000 | 2 | | 100,000,000.00 | 68,741,027 |
| Not applicable | Not applicable | 247 | Credit Default Swap | Merrill Lynch Capital Services, Inc. | Comet Trust | 185,000,000 | Not applicable | | 0.00 | 0 |

**The following LSS CDSs reflect trades that were restructured as set out in the Information Statement, "Additional Modifications to Certain Restructured Credit Default Swaps":**

| E&Y ID | Asset Program #[11] | JPM ID | Type of LSS CDS / Wrap Swap | LSS CDS Counterparty | | Long Notional Amount | Leverage (# of times) | MAV Percentage Allocation |
|---|---|---|---|---|---|---|---|---|
| Not applicable | Securitus #1 | 23 | Credit Default Swap | Swiss Re Financial Products Corporation | Coastal Mountain Base Trust Series 2006-1 | 1,500,000,000 | 20 | |
| Not applicable | Securitus #1 | 23 | Total Return Swap | Swiss Re Financial Products Corporation | Coastal Mountain Base Trust Series 2006-1 | 150,000,000 | Not applicable | |
| | | 39-42a | Credit Default Swap | UBS AG[12] | Not applicable | 1,750,000,000 | 25.6 | |
| | | 39-42b | Credit Default Swap | UBS AG | Not applicable | 18,200,000,000 | 25.6 | |
| | | 39-42c | Credit Default Swap | UBS AG | Not applicable | 4,350,000,000 | 25.6 | |
| | Coventree #60 | 82b[13] | Credit Default Swap | Royal Bank of Canada | Constellation Credit Linked Trust (MPL – US) Series 2006-1 | USD139,699,835 | Not applicable | |

---

[11] All Asset Program #s are those found in the Information for Noteholders prepared by The Pan-Canadian Investors Committee for Third-Party Structured Asset-Backed Commercial Paper dated March 20, 2008.

[12] The four UBS LSS CDSs have been restructured into three LSS CDSs. The Original Collateral in respect of UBS' trades has been allocated among the three remaining trades in proportion to their respective Long Notional Amounts.

[13] This trade represents the top half of the Long Notional Amount of JPM ID 82 and will not have any Allocated Collateral. The bottom half of JPM ID 82 will be fully-funded and will be an Ineligible Asset.

## SCHEDULE K

## SATELLITE TRUSTS[14]

| Satellite Trust | Outstanding Capital Interest of the Satellite Trust | Beneficial Owner | Traditional Asset par amount (if applicable) |
|---|---|---|---|
| Constellation Certificate Trust (Schooner) Series 2004-1, by its trustee CIBC Mellon Global Securities Services Company | Constellation Certificate Trust (Schooner) Certificate, Series 2004-1, Class A, representing 48.1728615846425% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle I | |
| | Constellation Certificate Trust (Schooner) Certificate, Series 2004-1, Class A, representing 51.8271384153575% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle II | |
| Constellation Certificate Trust (Rouses Point) Series 2005-1, by its trustee CIBC Mellon Global Securities Services Company | Constellation Trust (Rouses Point) Certificate, Series 2005-1, Class A, representing 77.5905430858478% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle I | |
| | Constellation Trust (Rouses Point) Certificate, Series 2005-1, Class A, representing 22.4094569141522% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle II | |
| | Constellation Trust (Rouses Point) Certificate, Series 2005-1, Class C, representing 77.5905430858478% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle I | |
| | Constellation Trust (Rouses Point) Certificate, Series 2005-1, Class C, representing 22.4094569141522% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle II | |
| Constellation Certificate Trust (MLFA7) Series 2004-1, by its trustee CIBC Mellon Global | Constellation Certificate Trust (MLFA7) Certificate, Series 2004-1, Class A, representing 77.5905430858478% of | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle I | |

---

[14]        Information to be provided by E&Y

| Satellite Trust | Outstanding Capital Interest of the Satellite Trust | Beneficial Owner | Traditional Asset par amount (if applicable) |
|---|---|---|---|
| Securities Services Company | such class | | |
| | Constellation Certificate Trust (MLFA7) Certificate, Series 2004-1, Class A, representing 22.4094569141522% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle II | |
| Constellation Certificate Trust (MLFA CAN-12) Series 2004-1, by its trustee CIBC Mellon Global Securities Services Company | Constellation Certificate Trust (MLFA CAN-12) Certificate, Series 2004-1, Class A, representing 77.5905430858478% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle I | |
| | Constellation Certificate Trust (MLFA CAN-12) Certificate, Series 2004-1, Class A, representing 22.4094569141522% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle II | |
| Constellation Certificate Trust (Dekania) Series 2003-1, by its trustee CIBC Mellon Global Securities Services Company | Constellation Certificate Trust (Dekania) Certificate, Series 2003-1, Class A-2, representing 66.9241738390443% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle I | |
| | Constellation Certificate Trust (Dekania) Certificate, Series 2003-1, Class A-2, representing 33.0758261609557% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle II | |
| | Constellation Certificate Trust (Dekania) Certificate, Series 2003-1, Class B, representing 37.1620352517879% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle I | |
| | Constellation Certificate Trust (Dekania) Certificate, Series 2003-1, Class B, representing 62.8379647482121% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle II | |
| Constellation Certificate Trust (Solar CCG3) Series 2003-AAA, by its trustee CIBC Mellon Global Securities Services Company | Constellation Certificate Trust (Solar CCG3) Certificate, Series 2003-AAA, Class A, representing 16.0704393483736% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle I | |

| Satellite Trust | Outstanding Capital Interest of the Satellite Trust | Beneficial Owner | Traditional Asset par amount (if applicable) |
|---|---|---|---|
| | Constellation Certificate Trust (Solar CCG3) Certificate, Series 2003-AAA, Class A, representing 75.9870934125780% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle I | |
| | Constellation Certificate Trust (Solar CCG3) Certificate, Series 2003-AAA, Class A, representing 7.9424672390484% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle II | |
| | Constellation Certificate Trust (Solar CCG3) Certificate, Series 2003-AAA, Class D, representing 82.6343300000000% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle I | |
| | Constellation Certificate Trust (Solar CCG3) Certificate, Series 2003-AAA, Class D, representing 17.3656700000000% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle II | |
| Constellation Credit Linked Trust (Cayman 13) Series 2005-1, by its trustee CIBC Mellon Global Securities Services Company | Constellation Credit Linked Trust (Cayman 13) Certificate, Series 2005-1, representing 62.7084442103880% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle I | |
| | Constellation Credit Linked Trust (Cayman 13) Certificate, Series 2005-1, representing 30.6881715551919% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle I | |
| | Constellation Credit Linked Trust (Cayman 13) Certificate, Series 2005-1, representing 5.4566623194387% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle II | |
| | Constellation Credit Linked Trust (Cayman 13) Certificate, Series 2005-1, representing 1.1467219149814% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle II | |

| Satellite Trust | Outstanding Capital Interest of the Satellite Trust | Beneficial Owner | Traditional Asset par amount (if applicable) |
|---|---|---|---|
| Constellation Credit Linked Trust (SYNREMIC II) Series 2006-1, by its trustee CIBC Mellon Global Securities Services Company | Constellation Credit Linked Trust (SYNREMIC II) Certificate, Series 2006-1, representing 52.5902753079378% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle I | |
| | Constellation Credit Linked Trust (SYNREMIC II) Certificate, Series 2006-1, representing 25.7365560748104% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle I | |
| | Constellation Credit Linked Trust (SYNREMIC II) Certificate, Series 2006-1, representing 17.9094776766363% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle II | |
| | Constellation Credit Linked Trust (SYNREMIC II) Certificate, Series 2006-1, representing 3.7636909406155% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle II | |
| QSPE-AMC/R Trust, by its trustee CIBC Mellon Global Securities Services Company[15] | Floating Rate Asset-Backed Senior Note issued by QSPE-AMC/R Trust, representing 67.1420947069245% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle I | |
| | Floating Rate Asset-Backed Senior Note issued by QSPE-AMC/R Trust, representing 32.8579052930755% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle II | |
| QSPE–XCD Trust[16], by its trustee CIBC Mellon Global Securities Services Company | AAA Floating Rate Asset-Backed Note issued by QSPE – XCD Trust, representing 64.7164779261456% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle I | |

---

[15]  The Floating Rate Asset-Backed Note is a debt instrument and is not a Capital Interest but the QSPE is considered a Satellite Trust for the purpose of the Transaction Documents.

[16]  The percentages identified represent each MAV's percentage interest in the Rocket Trust Series E and Rocket Trust Series F funded portions of the AAA Floating Rate Asset-Backed Note issued by QSPE-XCD Trust on April 20, 2007 with a principal amount of $1,024,181,478.10 as of that date (the "**Note**"). The remaining principal amount of the Note was funded by Gemini Trust via a participation agreement between Gemini Trust and Rocket Trust dated November 25, 2004. That participation interest has been transferred by Gemini Trust on the date hereof to Master Asset Vehicle III.

| Satellite Trust | Outstanding Capital Interest of the Satellite Trust | Beneficial Owner | Traditional Asset par amount (if applicable) |
|---|---|---|---|
| | AAA Floating Rate Asset-Backed Note issued by QSPE – XCD Trust, representing 31.6708603132008% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle II | |
| | AAA Floating Rate Asset-Backed Note issued by QSPE – XCD Trust, representing 2.9852988410823% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle I | |
| | AAA Floating Rate Asset-Backed Note issued by QSPE – XCD Trust, representing 0.6273629195713% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle II | |
| Securcor-RIO Trust, by its trustee CIBC Mellon Global Securities Services Company | Floating Rate Asset-Backed Note issued by Securcor-RIO Trust, representing 67.1420947069245% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle I | |
| | Floating Rate Asset-Backed Note issued by Securcor-RIO Trust, representing 32.8579052930755% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle II | |
| Constellation Certificate Trust (Targeted) Series 2008-1, by its trustee CIBC Mellon Global Securities Services Company | Constellation Certificate Trust (Targeted) Certificate, Series 2008-1, representing 67.1420947069245% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle I | |
| | Constellation Certificate Trust (Targeted) Certificate, Series 2008-1, representing 32.8579052930755% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle II | |
| | Constellation Credit Linked Trust (SYNREMIC) 2005-1 Certificate, Series 2005-1, representing 67.1420947069245% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle I | |
| | Constellation Credit Linked Trust (SYNREMIC) 2005-1 Certificate, Series 2005-1, representing 32.8579052930755% of such class | CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle II | |

# SCHEDULE L

## FORM OF VALUATION REPORT

| Position Description | CUSIP | JPM Trade ID | Original Face | Current Face | Maturity | Ratings (Mdy/ S&P/ Fitch) | Coupon (%) | Currency | FX Rate | Local Value (M) | Full Value (M) | % Mkt Value | WAL (yrs) | Eff Dur | Eff Conv | Mark Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Additional Collateral** | | | | | | | | | | | | | | | | |
| Synthetics | | | | | | | | | | | | | | | | |
|    Unlevered Synthetics | | | | | | | | | | | | | | | | |
| Traditional Assets | | | | | | | | | | | | | | | | |
|    By Type | | | | | | | | | | | | | | | | |
| Other Securities | | | | | | | | | | | | | | | | |
|    Cash | | | | | | | | | | | | | | | | |
| Total Additional Collateral | | | | | | | | | | | | | | | | |
| **Original Collateral** | | | | | | | | | | | | | | | | |
|    By Dealer | | | | | | | | | | | | | | | | |
| Total Original Collateral | | | | | | | | | | | | | | | | |
| **Total Collateral** | | | | | | | | | | | | | | | | |

**SCHEDULE M**

**FORM OF INDEX SPREAD REPORT**

From:    [*RELEVANT LSS CDS COUNTERPARTY*]

To:    **THE DEALERS** listed at Schedule C to the Omnibus Agreement

   **THE LENDERS** listed at Schedule C to the Omnibus Agreement

   **BNY TRUST COMPANY OF CANADA** (as Administrative Agent and as Collateral Agent)

   **BLACKROCK (INSTITUTIONAL) CANADA LTD.** (as Administrator and as Spread/Loss Trigger Calculation Agent)

   **EACH RATING AGENCY** engaged by the MAV (as Rating Agency)

Dated:    [*Insert date*]

Dear Sirs,

**Index Spread Report**

Reference is made to the Omnibus Agreement dated as of [●], 2009 between, *inter alios*, the Collateral Agent, the Administrative Agent, the Valuation Agent, the Lenders, the Unlevered CDS Counterparties and the LSS CDS Counterparties specified therein, as amended, restated, supplemented or novated from time to time (the **Omnibus Agreement**). Capitalised terms used but not otherwise defined herein shall have the meanings ascribed thereto in Schedule A (*Master Definitions*) of the Omnibus Agreement.

Pursuant to, and in accordance with the terms of Section 2.1 (*Index Spread Reporting*) of the Omnibus Agreement, we hereby report the following information in respect of each Matrix Portfolio, which is correct and accurate as of [*Insert relevant Business Day up to and including the day of the occurrence of a Second Spread/Loss Trigger Event*].

| Matrix Portfolio | Trigger Spread | Index Spread | First Spread/Loss Trigger Event | Second Spread/Loss Trigger Event |
|---|---|---|---|---|
| CDX7 10Y | [●] | [●] | [*Occurred/Not Occurred*] | [*Occurred/Not Occurred*] |
| CDX7 7Y | [●] | [●] | [*Occurred/Not Occurred*] | [*Occurred/Not Occurred*] |
| CDX7 5Y | [●] | [●] | [*Occurred/Not Occurred*] | [*Occurred/Not Occurred*] |
| CDX5 10Y | [●] | [●] | [*Occurred/Not Occurred*] | [*Occurred/Not Occurred*] |
| CDX5 7Y | [●] | [●] | [*Occurred/Not Occurred*] | [*Occurred/Not Occurred*] |
| iTraxx S6 10Y | [●] | [●] | [*Occurred/Not Occurred*] | [*Occurred/Not Occurred*] |

Please note that today [is / is not] an [Early Warning Exposure Reporting Date][Exposure Reporting Date].

Yours faithfully,

_____

For and on behalf of [**RELEVANT LSS CDS COUNTERPARTY**]
Name: [**NAME OF SIGNATORY**]
Title: [**TITLE OF SIGNATORY**]

**SCHEDULE N**

**FORMS OF MID-MARKET QUOTATION NOTICES**

[*EACH DEALER WHICH CANNOT REPORT TO THE BLACKROCK WEBSITE WILL HAVE ITS OWN
FORM OF PRE-AGREED NOTICE ATTACHED HERE*]

## SCHEDULE O

## FORM OF COLLATERAL SUFFICIENCY NOTICE

From:   **BLACKROCK (INSTITUTIONAL) CANADA LTD.** (as Administrator)

To:     **THE DEALERS** listed at Schedule C to the Omnibus Agreement

       **THE LENDERS** listed at Schedule C to the Omnibus Agreement

       **BNY TRUST COMPANY OF CANADA** (as Administrative Agent and as Collateral Agent)

       **EACH RATING AGENCY** engaged by the MAV (as Rating Agency)

Dated:  [***Insert date***]

Dear Sirs,

**Collateral Sufficiency Notice**

Reference is made to the Omnibus Agreement dated as of [●], 2009 between, *inter alios*, the Collateral Agent, the Administrative Agent, the Valuation Agent, the Lenders, the Unlevered CDS Counterparties and the LSS CDS Counterparties specified therein, as amended, restated, supplemented or novated from time to time (the **Omnibus Agreement**).   Capitalised terms used but not otherwise defined herein shall have the meanings ascribed thereto in Schedule A (*Master Definitions*) of the Omnibus Agreement.

Pursuant to, and in accordance with the terms of Section [2.4(d) (*Reporting on Early Warning Exposure Reporting Dates*)][2.5(d) (*Reporting on Exposure Reporting Dates*)] of the Omnibus Agreement, we hereby give notice of the aggregate Required Collateral Amounts and the Value of the Posted Collateral, as set out below.

[In respect of notices under Section 2.4(d), the information below:]

| | |
|---|---|
| Exposure (CAD) | [***Insert amount in respect of each LSS CDS***] |
| Transaction Required Collateral Amount (CAD): | [***Insert amount in respect of each LSS CDS***] |
| Required Collateral Amounts (CAD): | [***Insert in respect of each LSS CDS Counterparty***] |
| Aggregate of Required Collateral Amounts (CAD): | [***Insert in aggregate***] |
| Value of the Posted Collateral (CAD): | [***Insert in aggregate***] |

[In respect of notices under Section 2.5(d), in addition to the information for Section 2.4(d), the information below:]

| | |
|---|---|
| Initial Available Collateral Marked Amount (CAD): | [***Insert amount in respect of each First Trigger Event Dealer***] |
| Transaction Required Collateral Amount (CAD): | [***Insert amount in respect of each Affected LSS CDS***] |

Deemed Second Spread/Loss Trigger Event:        [*Occurred/Not Occurred*]

Potential Unwind Event:                          [*Occurred/Not Occurred*]

Collateral Call Amount (CAD):                    [*Insert only if a Potential Unwind Event has occurred*]

   Yours faithfully,

_____

For    and    on    behalf    of    [**BLACKROCK
(INSTITUTIONAL) CANADA LTD.**]
Name: [**NAME OF SIGNATORY**]
Title: [**TITLE OF SIGNATORY**]

# SCHEDULE P

## ALLOCATED COLLATERAL[17]

### (all amounts in CAD unless otherwise indicated)

**A.     LSS CDS Original Collateral**

| JPM Trade ID | E&Y ID | Dealer | Trade Name | Collateral Description | ISIN/CUSIP (if applicable) | Collateral Value | Collateral Total for Trade | Subject to Wrap Swaps? | Wrap Swap Par Amount | Unwrapped Swap Par Amount | MAVI %age Allocation | MAVII %age Allocation | MAVII Trade Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Coventree – Program #48 Planet – Series A, F | Deutsche Bank AG, acting through its London Branch | CCLT (IML-CDS) 2005-1 | Short-Term Rolling Collateral Maturity Date: Variable | Multiple | $111,650,000 | $111,650,000 | No | Not applicable | $111,650,000 | 52.5151108505144% | 47.4848891494856% | $53,016,878.74 |
| 2 | Coventree – Program #29 Aurora – Series A | Deutsche Bank AG, acting through its London Branch | CCLT (Super Senior 2) 2005-1 | Short-Term Rolling Collateral Maturity Date: Variable | Multiple | $400,000,000 | $400,000,000 | No | Not applicable | $400,000,000 | 48.1728615846425% | 51.8271384153575% | $207,308,553.66 |
| 3 | Coventree – Program #28 Aurora – Series E | Deutsche Bank AG, acting through its London Branch | CCLT (Shamrock) 2005-1 | LandesBank Baden CAD $ Floating MTN under information memorandum dated November 13, 2003 Maturity Date: 06/20/2009 | XS0189857641 | $133,000,000 | $133,000,000 | No | Not applicable | $133,000,000 | 77.5905430858478% | 22.4094569141522% | $29,804,577.70 |
| 4 | Coventree – Program #23 Aurora – Series A | Deutsche Bank AG, acting through its London Branch | CCLT (CDXLS 1) 2006-1 (Long / Short) | Short-Term Rolling Collateral Maturity Date: Variable | Multiple | $125,000,000 | $125,000,000 | No | Not applicable | $125,000,000 | 48.1728615846425% | 51.8271384153575% | $64,783,923.02 |
| 5 | Coventree – Program #36 Comet – Series A | Deutsche Bank AG, acting through its London Branch | CCLT (Super Senior 3) 2005-1 | Short-Term Rolling Collateral Maturity Date: Variable | Multiple | $400,000,000 | $400,000,000 | No | Not applicable | $400,000,000 | 57.6483694683607% | 42.3516305316393% | $169,406,522.13 |
| 6 | Coventree – Program #37 Comet – Series A | Deutsche Bank AG, acting through its London Branch | CCLT (Super Senior 4) 2005-1 | Short-Term Rolling Collateral Maturity Date: Variable | Multiple | $367,000,000 | $367,000,000 | No | Not applicable | $367,000,000 | 57.6483694683607% | 42.3516305316393% | $155,430,484.05 |
| 7 | Coventree – Program #49 Planet – Series A, F | Deutsche Bank AG, acting through its London Branch | CCLT (IML-CDS-2) 2005-1 | Short-Term Rolling Collateral Maturity Date: Variable | Multiple | $150,000,000 | $150,000,000 | No | Not applicable | $150,000,000 | 49.0124266826307% | 50.9875733173693% | $76,481,359.98 |
| 8a,b | Coventree – Program #35 Comet – Series A Planet – Series A | Deutsche Bank AG, acting through its London Branch | CCLT (iTraxx 1) 2006-1 | Short-Term Rolling Collateral Maturity Date: Variable | Multiple | $399,923,665 | $399,923,665 | No | Not applicable | $399,923,665 | 48.2334381517396% | 51.7665618482604% | $207,026,731.39 |
| 9 | Nereus – Program #88 SIT III – Series A | Deutsche Bank AG, acting through its London Branch | NCLCT (EC Super Senior) 2005-1 | Credit Card Receivables Backed Class A FRN, Series 2005-1 of CARDS II Trust Maturity Date: 03/22/2010 | 14161GAK6 | $200,000,000 | $200,000,000 | No | Not applicable | $200,000,000 | 37.1620352517879% | 62.8379647482121% | $125,675,929.50 |
| 10 | Nereus – Program #82 SIT III – Series A | Deutsche Bank AG, acting through its London Branch | NCLCT (LSS II) 2005 | Credit Card Receivables Backed Class A FRN Series 2005-2 of CARDS II Trust Maturity Date: 09/20/2012 | 1416GAN0 | $400,000,000 | $400,000,000 | No | Not applicable | $400,000,000 | 37.1620352517879% | 62.8379647482121% | $251,351,858.99 |

---

[17]  Intended to be updated until Plan Implementation Date.

| JPM Trade ID | E&Y ID | Dealer | Trade Name | Collateral Description | ISIN/CUSIP (if applicable) | Collateral Value | Collateral Total for Trade | Subject to Wrap Swaps? | Wrap Swap Par Amount | Unwrapped Swap Par Amount | MAVI %age Allocation | MAVII %age Allocation | MAVII Trade Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | Newshore – Program #1b Aria – Series E | Deutsche Bank AG, acting through its London Branch | Aria  DB1 – LSS | Golden Credit Cards Trust 2006-1 Maturity Date: 02/15/2011 | 380881AW2 | $187,500,000 | $187,500,000 | Yes IRS | $187,500,000 | Not applicable | 67.8887730631988% | 32.1112269368012% | $60,208,550.51 |
| 12 | Newshore – Program #2c Aria – Series A | Deutsche Bank AG, acting through its London Branch | Aria DB2 (Long / Short) | Short-Term Investments Maturity Date: Variable | Multiple | $150,000,000 | $150,000,000 | No | Not applicable | $150,000,000 | 53.6348771537847% | 46.3651228462153% | $69,547,684.27 |
| 13 | Newshore – Program #3b Aria – Series A | Deutsche Bank AG, acting through its London Branch | Aria DB3 (Long / Short) | Short-Term Investments Maturity Date: Variable | Multiple | $150,000,000 | $150,000,000 | No | Not applicable | $150,000,000 | 53.6348771537847% | 46.3651228462153% | $69,547,684.27 |
| 15 | Newshore – Program #5 Encore – Series A | Deutsche Bank AG, acting through its London Branch | Encore DB5 – LSS | Short-Term Investments Maturity Date: Variable | Multiple | $285,000,000 | $285,000,000 | No | Not applicable | $285,000,000 | 80.5246141254770% | 19.4753858745230% | $55,504,849.74 |
| 16 | Newshore – Program #2a Opus – Series A | Deutsche Bank AG, acting through its London Branch | Opus DB2_Long-(Short) – LSS (Long / Short) | Short-Term Investments Maturity Date: Variable | Multiple | $200,000,000 | $200,000,000 | No | Not applicable | $200,000,000 | 68.8087842505404% | 31.1912157494596% | $62,382,431.50 |
| 17 | Newshore – Program #4 Opus – Series A | Deutsche Bank AG, acting through its London Branch | Opus DB4 | Short-Term Investments Maturity Date: Variable | Multiple | $200,000,000 | $200,000,000 | No | Not applicable | $200,000,000 | 68.8087842505404% | 31.1912157494596% | $62,382,431.50 |
| 18 | Newshore – Program #1a Symphony – Series A | Deutsche Bank AG, acting through its London Branch | Symphony DB1 | Short-Term Investments Maturity Date: Variable | Multiple | $187,500,000 | $187,500,000 | No | Not applicable | $187,500,000 | 63.9144626671764% | 36.0855373328236% | $67,660,382.50 |
| 19 | Newshore – Program #2b Symphony – Series A | Deutsche Bank AG, acting through its London Branch | Symphony DB2_Long-Short (Long / Short) | Short-Term Investments Maturity Date: Variable | Multiple | $150,000,000 | $150,000,000 | No | Not applicable | $150,000,000 | 63.9144626671764% | 36.0855373328236% | $54,128,306.00 |
| 20 | Newshore – Program #3a Symphony – Series A | Deutsche Bank AG, acting through its London Branch | Symphony DB3_Long-Short (Long / Short) | Short-Term Investments Maturity Date: Variable | Multiple | $175,000,000 | $175,000,000 | No | Not applicable | $175,000,000 | 63.9144626671764% | 36.0855373328236% | $63,149,690.33 |
| 21 | Coventree – Program #20 Aurora – Series A, E | Swiss Re Financial Products Corporation | CCLT (Banff) 2006-1 | Short-Term Investments Maturity Date: Variable | Multiple | $292,159,027 | $292,159,027 | Yes Par and Basis Swaps | $300,000,000 | Not applicable | 55.7246601213702% | 44.2753398786298% | $129,354,402.19 |
| 22 | Coventree – Program #24 Aurora – Series A | Swiss Re Financial Products Corporation | CCLT (Galibier) 2006-1 | Short-Term Investments Maturity Date: Variable | Multiple | $182,838,796 | $182,838,796 | Yes Par and Basis Swaps | $200,000,000 | Not applicable | 48.1728615846425% | 51.8271384153575% | $94,760,115.88 |
| 23 | Securitus – Program #1 Selkirk – Series A | Swiss Re Financial Products Corporation | Coastal Mountain Base Trust Series 2006-1 | USD Short-Term and Long-Term Investments Maturity Date: Variable | Multiple | $150,000,000 | $150,000,000 | Yes Par and Basis Swaps | $150,000,000 | Not applicable | 21.6715885203920% | 78.3284114796080% | $117,492,617.22 |
| 24 | Newshore – Program #6 Opus – Series E | Merrill Lynch International | Opus ML1 | USD Short-Term Investments Maturity Date: Not applicable | Not applicable | USD $90,000,000 | USD $90,000,000 | Yes TRS | $101,360,000 | Not applicable | 70.9148559439254% | 29.0851440560746% | $29,480,702.02 (USD $26,176,629.65) |

| JPM Trade ID | E&Y ID | Dealer | Trade Name | Collateral Description | ISIN/CUSIP (if applicable) | Collateral Value | Collateral Total for Trade | Subject to Wrap Swaps? | Wrap Swap Par Amount | Unwrapped Swap Par Amount | MAVI %age Allocation | MAVII %age Allocation | MAVII Trade Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25 | Coventree – Program #25 Aurora – Series E, F | Merrill Lynch International | CCLT (ML-LSS) Series 2006-1 | USD Short-Term Investments Maturity Date: Not applicable | Not applicable | USD $220,000,000 | USD $220,000,000 | Yes TRS | $250,000,000 | Not applicable | 72.3259846663235% | 27.6740153336765% | $69,185,038.33 (USD $60,882,833.73) |
| 26 | Nereus – Program #77 SAT – Series A, E | Merrill Lynch International | NCLCT (ML-LSS) 2006 | USD Short-Term Investments Maturity Date: Not applicable | Not applicable | USD $220,000,000 | USD $220,000,000 | Yes TRS | $250,000,000 | Not applicable | 70.1551983244780% | 29.8448016755220% | $74,612,004.19 (USD $65,658,563.69) |
| 27 | Nereus – Program #83 SIT III – Series A, E | Merrill Lynch International | NCLCT (ML-LSS II) 2006 | Floating Rate Bond – MC Funding Ltd / MC Funding 2006-1 LLC (MCFND 2006-1A A1) maturing 12/20/2020 USD Short-Term Investments – Time Deposits/BNY Cash Reserve Fund (Maturity Date: Not applicable) | Floating Rate Bond: 552686AA5 | USD $42,998,901 USD $177,001,099 | USD $220,000,000 | Yes TRS | $250,000,000 | Not applicable | 58.3181633118893% | 41.6818366881107% | $20,366,740.56 (USD $17,922,731.69) $83,837,851.16 (USD $73,777,309.02) $104,204,591.72 (USD $91,700,040.71) |
| 28 | Newshore – Program #7 Aria – Series A | Merrill Lynch International | Aria ML2_Long – (Short) (Long / Short) | USD Short-Term Investments (Maturity Date: Not applicable) CAD Short-Term Investments (Maturity Date: Not applicable)[18] | Not applicable | USD $175,000,000 $40,000,000 | $240,000,000 | Yes TRS | $200,000,000 | Not applicable | 53.6348771537847% | 46.3651228462153% | $92,730,245.69 (USD $81,138,964.98) $18,546,049.14 $111,276,294.83 |
| 29 | Newshore – Program #9b Opus – Series A | Merrill Lynch Capital Services, Inc. | Opus  ML4 | USD Short-Term Investments Maturity Date: Not applicable | Not applicable | USD $110,000,000 | USD $110,000,000 | Yes TRS (With Merrill Lynch International) | $125,000,000 | Not applicable | 68.8087842505404% | 31.1912157494596% | $38,989,019.69 (USD $34,310,337.32) |
| 30 | Newshore – Program #9c Symphony – Series A | Merrill Lynch Capital Services, Inc. | Symphony ML4 | USD Short-Term Investments Maturity Date: Not applicable | Not applicable | USD $110,000,000 | USD $110,000,000 | Yes TRS (With Merrill Lynch International) | $125,000,000 | Not applicable | 63.9144626671764% | 36.0855373328236% | $45,106,921.67 (USD $39,694,091.07) |
| 31 | Newshore – Program #9d Aria – Series A | Merrill Lynch Capital Services, Inc. | Aria  ML4 | USD Short-Term Investments Maturity Date: Not applicable | Not applicable | USD $110,000,000 | USD $110,000,000 | Yes TRS (With Merrill Lynch International) | $125,000,000 | Not applicable | 53.6348771537847% | 46.3651228462153% | $57,956,403.56 (USD $51,001,635.13) |

---

[18] The CAD $40,000,000 is additional collateral that was posted to Merrill Lynch International and is not part of the applicable Wrap Swap notional amount.

| JPM Trade ID | E&Y ID | Dealer | Trade Name | Collateral Description | ISIN/CUSIP (if applicable) | Collateral Value | Collateral Total for Trade | Subject to Wrap Swaps? | Wrap Swap Par Amount | Unwrapped Swap Par Amount | MAVI %age Allocation | MAVII %age Allocation | MAVII Trade Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 32 | Newshore – Program #9a Encore – Series A | Merrill Lynch Capital Services, Inc. | Encore  ML4 – LSS | USD Short-Term Investments Maturity Date: Not applicable | Not applicable | USD $110,000,000 | USD $110,000,000 | Yes TRS (With Merrill Lynch International) | $125,000,000 | Not applicable | 80.5246141254770% | 19.4753858745230% | $24,344,232.34 (USD $21,422,924.46) |
| 33 | Coventree – Program #26 Aurora – Series E, F | Merrill Lynch International | CCLT (ML6 L/S) 2006-1 (Long / Short) | Floating Rate Bond – Grayson CLO Ltd (GCLO 2006-1A A1A) Maturity Date: 11/1/2021 | Floating Rate Bond: 389669AA0 | USD $120,000,000 | USD $120,000,000 | Yes TRS | $135,000,000 | Not applicable | 70.2786563920640% | 29.7213436079360% | $40,123,813.87 (USD $35,665,612.33) |
| 34 | Nereus – Program #78 SAT – Series E | Merrill Lynch International | NCLCT (ML-LSS IV) 2006 | Floating Rate Bond – Grayson CLO Ltd (GCLO 2006-1A A1A) Maturity Date: 11/1/2021 | Floating Rate Bond: 389669AA0 | USD $131,250,000 | USD $131,250,000 | Yes TRS | $150,000,000 | Not applicable | 85.1255419678272% | 14.8744580321728% | $22,311,687.05 (USD $19,522,726.17) |
| 35 | Coventree – Program #52 Planet – Series E, F | Merrill Lynch International | CCLT (ML LSS-2) 2006-1 | Floating Rate Bond – Grayson CLO Ltd (GCLO 2006-1A A1A) Maturity Date: 11/1/2021 | Floating Rate Bond: 389669AA0 | USD $235,000,000 | USD $235,000,000 | Yes TRS | $265,000,000 | Not applicable | 69.4204626059089% | 30.5795373940911% | $81,035,774.09 (USD $71,861,912.88) |
| 36 | Newshore – Program #8 Encore – Series E | Merrill Lynch International | Encore ML3_Long (Short) – LSS (Long / Short) | USD Short-Term Investments Maturity Date: Not applicable | Not applicable | USD $110,000,000 | USD $110,000,000 | Yes TRS | $125,000,000 | Not applicable | 70.5355525161144% | 29.4644474838856% | $36,830,559.35 (USD $32,410,892.23) |
| UBS1 | New UBS1 | UBS AG, London Branch | CDX7 5y 15-30% | Bas Maturity Date: Variable | Multiple | $54,012,345.68 | $68,415,637.86[19] | No | Not applicable | $68,415,637.86[20] | 73.2654573441738% | 26.7345426558261% | $14,439,953.60 |
| UBS2 | New UBS2 | UBS AG, London Branch | CDX7 7y 15-30% | BAs Maturity Date: Variable | Multiple | $561,728,395.06 | $711,522,633.74[21] | No | Not applicable | $711,522,633.74[22] | 73.2654573441738% | 26.7345426558261% | $150,175,517.39 |
| UBS3 | New UBS3 | UBS AG, London Branch | CDX7 10y 15-30% | BAs Maturity Date: Variable | Multiple | $134,259,259.26 | $170,061,728.40[23] | No | Not applicable | $170,061,728.40[24] | 73.2654573441738% | 26.7345426558261% | $35,893,598.94 |
| 46 | Newshore – Program #14 Symphony – Series E | HSBC Bank USA, National Association | Symphony  HS7 | BEAR STEARNS 2005 TC2 MTG Maturity Date: 8/25/2035<br><br>GS MTG SECS CORP 2005 11 ASSET BKD  CFT CL 3A5 Maturity Date: 10/25/2035<br>RESIDENTIAL ASSET SE C MTG PASS 2005 KS8 CL A4 Maturity Date: 8/25/2035 | 073879D96,<br><br>362341QK8<br><br>76110W3Q7 | USD $14,414,000<br><br>USD $30,986,000<br><br>USD $63,600,000 | USD $109,000,000 | Yes FXS IRS TRS | $125,000,000 | Not applicable | 52.2535289544038% | 47.7464710455962% | $7,892,404.06 (USD $6,882,176.34)<br><br>$16,966,423.76 (USD $14,794,721.52)<br>$34,824,260.99 (USD $30,366,755.59)<br>$59,683,088.81 (USD $52,043,653.44) |

---

[19] See Other Posted Support Chart below.
[20] See Other Posted Support Chart below.
[21] See Other Posted Support Chart below.
[22] See Other Posted Support Chart below.
[23] See Other Posted Support Chart below.
[24] See Other Posted Support Chart below.

| JPM Trade ID | E&Y ID | Dealer | Trade Name | Collateral Description | ISIN/CUSIP (if applicable) | Collateral Value | Collateral Total for Trade | Subject to Wrap Swaps? | Wrap Swap Par Amount | Unwrapped Swap Par Amount | MAVI %age Allocation | MAVII %age Allocation | MAVII Trade Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 47b | Newshore – Program #12 Symphony – Series A, E | HSBC Bank USA, National Association | Symphony  HS5 | ALESCO PREFERRED FDG VI LTD SER 6A CL A1 144A Maturity Date: 3/23/2035 | 01448XAA3 | USD $23,379,554 | USD $123,379,554 | Yes FXS IRS TRS | $150,000,000 | Not applicable | 63.9144626671764% | 36.0855373328236% | $10,256,931.66 (USD $8,436,637.69) |
| | | | | Tropic CDO V Ltd. NT CL A 1L2 FLTG 144A 3C7 Maturity Date: 7/15/2036 | 89708BAB9 | USD $100,000,000 | | | | | | | $43,871,374.34 (USD $36,085,537.33) |
| | | | | | | | | | | | | | $54,128,306.00 (USD $44,522,175.02) |
| 47c | Newshore – Program #13 Symphony – Series A | HSBC Bank USA, National Association | Symphony  HS6 | AMMC CLOIII/ AMC CLO III NT CL A Maturity Date: 7/25/2016 | 00173TAA5 | USD $50,000,000 | USD $248,865,163.38 | Yes FXS IRS TRS | $300,000,000 | Not applicable | 60.0274847629189% | 39.9725152370811% | $24,092,875.05 (USD $19,986,257.62) |
| | | | | SAIL 2005-6 A9 Class A9 Notes Due 2035 Maturity Date: 7/25/2035 | 86358ETZ9 | USD $90,567,938.38 | | | | | | | $43,640,840.46 (USD $36,202,282.97) |
| | | | | STRUCTURED ASSET SECS CORP 2005 WF2 MTG Maturity Date: 5/25/2035 | 86359DDA2 | USD $27,668,225 | | | | | | | $13,332,141.76 (USD $11,059,685.45) |
| | | | | PARK PLACE SECURITIES INC  2005 WCW2 Maturity Date: 7/25/2035 | 70069FLF2 | USD $61,629,000 | | | | | | | $29,696,395.93 (USD $24,634,661.42) |
| | | | | CITIGROUP MORTGAGE LOAN TRUST INC. Series 2005-HE3 Class A2D Maturity Date: 9/25/2035 | 17307GWQ7 | USD $19,000,000 | | | | | | | $9,155,292.52 (USD $7,594,777.89) |
| | | | | | | | | | | | | | $119,917,545.71 (USD $99,477,665.35) |
| 48 | Newshore – Program #15b Opus – Series A | HSBC Bank USA, National Association | Opus  HS8_Long-(Short) (Long / Short) | Preferred Term Securities XXII LTD 97,955,809.75 USD Maturity Date: 9/22/2034 | Preferred: 74042MAA4 Stone Tower: 86176NAB2 | USD $98,973,000 | USD $273,973,000 | Yes FXS IRS TRS | $300,000,000 | Not applicable | 68.8087842505404% | 31.1912157494596% | $33,803,566.74 (USD $30,870,881.97) |
| | | | | Stone Tower CR FDG I LTD 2006 SNR SND TRM NT 175M USD Maturity Date: 6/25/2016 | | USD $175,000,000 | | | | | | | $59,770,080.51 (USD $54,584,627.56) |
| | | | | | | | | | | | | | $93,573,647.25 (USD $85,455,509.53) |
| 49 | Newshore – Program #15a 49a – Encore – Series A | HSBC Bank USA, National Association | Encore  HS8_A_Long-(Short) – LSS (Long / Short) | National Collegiate Student Loan Trust 2005 3 Maturity Date: 10/25/2033 | National 63543TAE8 | USD $89,920,000 | USD $179,840,000 | Yes FXS IRS TRS | $100,000,000 | Not applicable | 80.5246141254770% | 19.4753858745230% | $19,475,385.87 (USD $17,512,266.97) |

| JPM Trade ID | E&Y ID | Dealer | Trade Name | Collateral Description | ISIN/CUSIP (if applicable) | Collateral Value | Collateral Total for Trade | Subject to Wrap Swaps? | Wrap Swap Par Amount | Unwrapped Swap Par Amount | MAVI %age Allocation | MAVII %age Allocation | MAVII Trade Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 49b – Encore – Series E | | | National Collegiate Student Loan Trust 2005 3 Maturity Date: 10/25/2033 ARGENT SECS INC 2005 W4 Maturity Date: 2/25/2036 | 63543TAE8<br><br>040104PT2 | USD $10,080,000<br><br>USD $79,840,000 | | | $100,000,000 | | 70.5355525161144% | 29.4644474838856% | $3,302,954.08 (USD $2,970,016.31) $26,161,493.40 (USD $23,524,414.87) $48,939,833.35 (USD $44,006,698.15) |
| 50 | Coventree – Program #31 Aurora – Series A, E | HSBC Bank USA, National Association | Aurora Trust (2000-07STAR03TO) or HSBC LSS (Also known as Aurora Trust (STARTS (Canada) Trust 2005-2)) | Residential Assets Mortgage Products 2005-RS7 A3 Maturity Date: 7/25/2035 | 76112BWV8 | USD $63,667,000 | USD $63,667,000 | Yes IRS TRS | $75,000,000 | Not applicable | 55.5272819599438% | 44.4727180400562% | $33,354,538.53 (USD $28,314,445.39) |
| 52 | Quanto – Program #1 Apsley | Deutsche Bank AG, acting through its London Branch | Apsley – Tranche_1 CAD | Rabobank Nederland CAD 500,000,000 floating rate notes due March 20, 2016 (Series 1534A/Tranche 1) | XS0241629582 | $500,000,000 | $500,000,000 | No | Not applicable | $500,000,000 | 62.4240354623177% | 37.5759645376823% | $187,879,822.69 |
| 53 | Quanto – Program #2 Apsley | Deutsche Bank AG, acting through its London Branch | Apsley – Tranche_2 CAD | Rabobank Nederland CAD 250,000,000 floating rate notes due March 20, 2016 (Series 1534A/Tranche 1) | XS0241629582 | $250,000,000 | $250,000,000 | No | Not applicable | $250,000,000 | 62.4240354623177% | 37.5759645376823% | $93,939,911.34 |
| 54 | Quanto – Program #3 Apsley | Deutsche Bank AG, acting through its London Branch | Apsley – Tranche_3_Long-Short CAD (Long / Short) | Rabobank Nederland CAD 250,000,000 senior unsecured floating rate notes due December 20, 2015 | XS0249134650 | $250,000,000 | $250,000,000 | No | Not applicable | $250,000,000 | 62.4240354623177% | 37.5759645376823% | $93,939,911.34 |
| 56 | Quanto – Program #5 Apsley | Deutsche Bank AG, acting through its London Branch | Apsley – Tranche_5 CAD | Rabobank Nederland CAD 250,000,000 floating rate notes due June 20, 2016 (Series 1607A/Tranche 1) | XS0257732411 | $250,000,000 | $250,000,000 | No | Not applicable | $250,000,000 | 62.4240354623177% | 37.5759645376823% | $93,939,911.34 |
| 57 | Quanto – Program #6 Apsley | Deutsche Bank AG, acting through its London Branch | Apsley – Tranche_6 CAD | Rabobank Nederland CAD 250,000,000 floating rate notes due June 20, 2016 (Series 1612A /Tranche 1) | XS0258872554 | $250,000,000 | $250,000,000 | No | Not applicable | $250,000,000 | 62.4240354623177% | 37.5759645376823% | $93,939,911.34 |
| 59 | Quanto – Program #10 Whitehall | Deutsche Bank AG, acting through its London Branch | Whitehall – Tranche_1 CAD | Rabobank Nederland CAD 750,000,000 floating rate notes due December 20, 2015 | XS0228612809 | $750,000,000 | $750,000,000 | No | Not applicable | $750,000,000 | 62.6632732163548% | 37.3367267836452% | $280,025,450.88 |
| 60 | Quanto – Program #11 Whitehall | Deutsche Bank AG, acting through its London Branch | Whitehall – Tranche_2 CAD | Rabobank Nederland CAD 750,000,000 floating rate notes due December 20, 2015 | XS0229817654 | $750,000,000 | $750,000,000 | No | Not applicable | $750,000,000 | 62.6632732163548% | 37.3367267836452% | $280,025,450.88 |

| JPM Trade ID | E&Y ID | Dealer | Trade Name | Collateral Description | ISIN/CUSIP (if applicable) | Collateral Value | Collateral Total for Trade | Subject to Wrap Swaps? | Wrap Swap Par Amount | Unwrapped Swap Par Amount | MAVI %age Allocation | MAVII %age Allocation | MAVII Trade Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 61 | Quanto – Program #12 Whitehall | Deutsche Bank AG, acting through its London Branch | Whitehall – Tranche_3 CAD | Rabobank Nederland CAD 500,000,000 floating rate notes due December 20, 2015 | XS0232464494 | $500,000,000 | $500,000,000 | No | Not applicable | $500,000,000 | 62.6632732163548% | 37.3367267836452% | $186,683,633.92 |
| 62 | Quanto – Program #13 Whitehall | Deutsche Bank AG, acting through its London Branch | Whitehall – Tranche_4 CAD | Rabobank Nederland CAD 250,000,000 floating rate notes due December 20, 2015 | XS0232464494 | $250,000,000 | $250,000,000 | No | Not applicable | $250,000,000 | 62.6632732163548% | 37.3367267836452% | $93,341,816.96 |
| 63 | Quanto – Program #14 Whitehall | Deutsche Bank AG, acting through its London Branch | Whitehall – Tranche_5 CAD | Rabobank Nederland CAD 250,000,000 floating rate notes due December 20, 2015 | XS0235279956 | $250,000,000 | $250,000,000 | No | Not applicable | $250,000,000 | 62.6632732163548% | 37.3367267836452% | $93,341,816.96 |
| 68 | Nereus – Program #73 SAT – Series A, L1 | HSBC Bank USA, National Association | CDO NCLCT (BCO-LSS) 2006 & L1 | BA's, BDN's and Short-Term Investments | Multiple | $198,000,000 | $300,000,000 | No | Not applicable | $300,000,000 | 47.2375443247666% | 52.7624556752334% | $104,469,662.24 |
|  |  |  |  | GCO EDUCATION LN FDG FLRT 27AU Maturity Date: August 27, 2046 | 36156YAA9 | $102,000,000 |  |  |  |  |  |  | $53,817,704.79 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | $158,287,367.03 |
| 78 | NBF – Program #5 Silverstone – Series A | Deutsche Bank AG, Canada Branch | Silverstone – Tranche_1 CAD | Bayerische Landesbank FRN for CAD 2,000,000,000 Maturity Date: 03/20/2015 | XS0211764278 | $2,000,000,000 | $2,000,000,000 | IRS | $2,000,000,000 | Not applicable | 61.3427600394300% | 38.6572399605700% | $773,144,799.21 |
| 81 | Coventree – Program #59 Rocket – Series A | ROYAL BANK OF CANADA | CCLT (MPL-CDN) 2006-1 | Cards II Trust Floating Rate Notes Class A | CA14161ZADO2 | $100,000,000 | $100,000,000 | No | Not applicable | $100,000,000 | 31.2590241709029% | 68.7409758290971% | $68,740,975.83 |

**B.     Unlevered CDS Original Collateral**

| JPM ID | E&Y ID | Dealer | Trade Name | Collateral Description | ISIN/CUSIP (if applicable) | Collateral /Asset Value | Collateral Total for Deal | Subject to TRS? | TRS Par Amount | Unwrapped Swap Par Amount | MAVI %age Allocation | MAVII %age Allocation | MAVII Trade Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 51 | Nereus – Program #81 SIT III – Series A, E | HSBC Bank USA, National Association | SIT III (2000-07STAR02TO) (Also known as SIT III (STARTS (Canada) Trust 2004-2)) | Alesco Preferred Funding VI, Ltd., Class A-1 Maturity Date: 3/23/2035 | 01448XAA3 | USD $101,543,460 | USD $101,543,460 | Yes TRS IRS | $125,000,000 | Not applicable | 54.086937699869% | 45.9130623001310% | $57,391,327.88 (USD $46,621,712.06) |
| 69, 69b | Coventree – Program #79 SIT III – Series A | Bank of America, N.A. | NCLCT (CADBANA) 2005-1 | MBNA Credit Card Master Trust Floating Rate Asset Back Certificate, Series 2001-B Class A (expected final maturity date 3/15/2011) MBNA Credit Card Master Trust Series Class A (2004-2) notes, (expected final maturity 2/15/2011) | 55264TCK5  55262TGA5 | USD $35,000,000  USD $126,900,000 | USD $161,900,000 | Yes FXS | $200,000,000 | Not applicable | 37.1620352517879% | 62.8379647482121% | $27,168,977.96 (USD $21,993,287.66)  $98,506,951.54 (USD $79,741,377.27)  $125,675,929.50 (USD $101,734,664.93) |
| 75 | NBF – Program #2 MMAI-I – Series A | Deutsche Bank AG, acting through its London Branch | MMAI-I Trust AAA-1 (E&Y)  MMAI-Tranche_1 CAD | Bayerische Landesbank FRN for CAD 1,400,000,000 Maturity Date: 09/02/2014 | XS0199571877 | $466,700,000 | $466,700,000 | No | Not applicable | $466,700,000 | 56.2511219053415% | 43.7488780946585% | $204,176,014.07 |
| 76 | NBF – Program #3 MMAI-I – Series A | Deutsche Bank AG, acting through its London Branch | MMAI-I Trust AAA-2 (E&Y)  MMAI-Tranche_2 CAD | Bayerische Landesbank FRN for CAD 1,400,000,000 Maturity Date: 09/02/2014 | XS0199571877 | $466,700,000 | $466,700,000 | No | Not applicable | $466,700,000 | 56.2511219053415% | 43.7488780946585% | $204,176,014.07 |
| 77 | NBF – Program #4 MMAI-I – Series A | Deutsche Bank AG, acting through its London Branch | MMAI-I Trust AAA-3 (E&Y)  MMAI-Tranche_3 CAD | Bayerische Landesbank FRN for CAD 1,400,000,000 Maturity Date: 09/02/2014 | XS0199571877 | $466,600,000 | $466,600,000 | No | Not applicable | $466,600,000 | 56.2511219053415% | 43.7488780946585% | $204,132,265.19 |
| 185 | Nereus – Program #84 SIT III – Series E | Merrill Lynch International | NCLCT (Morningside) 2005 | USD Short-Term Investments Maturity Date: Not applicable | Not applicable | USD $100,000,000 | USD $100,000,000 | Yes TRS | $124,500,000 | Not applicable | 79.4742913719907% | 20.5257086280093% | $25,554,507.24 (USD $20,525,708.63) |

**C.**     **Other Posted Support**

| JPM ID | E&Y ID | Dealer | Trade Name | Holder of Other Posted Support | Cash Amount | Cash Total for Deal | Subject to TRS? | TRS Par Amount | ISIN/CUSIP (if applicable) | Unwrapped Swap Par Amount | MAVI %age Allocation | MAVII %age Allocation | MAVII Trade Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UBS1 | New UBS1 | UBS AG, London Branch | CDX7 5y 15-30% | UBS | $14,403,292.18 | $14,403,292.18 | No | Not applicable | Not applicable | $14,403,292.18 | 73.2654573441738% | 26.7345426558261% | $3,850,654.29 |
| UBS2 | New UBS2 | UBS AG, London Branch | CDX7 7y 15-30% | UBS | $149,794,238.68 | $149,794,238.68 | No | Not applicable | Not applicable | $149,794,238.68 | 73.2654573441738% | 26.7345426558261% | $40,046,804.64 |
| UBS3 | New UBS3 | UBS AG, London Branch | CDX7 10y 15-30% | UBS | $35,802,469.14 | $35,802,469.14 | No | Not applicable | Not applicable | $35,802,469.14 | 73.2654573441738% | 26.7345426558261% | $9,571,626.38 |
| 72 | Coventree – Program #74 SAT – Series A, E | Citibank Canada | NCLCT (Citi-LSS) 2006 | Citibank Canada[25] | $225,000,000 | $275,000,000 | No | Not applicable | Not applicable | $275,000,000 | 60.6286160059830% | 39.3713839940170% | $88,585,613.99 |
|  |  |  |  | Citibank N.A., Canadian Branch | $50,000,000 |  |  |  |  |  |  |  | $19,685,692.00 |
|  |  |  |  |  |  |  |  |  |  |  |  |  | $108,271,305.99 |
| 73 & 151 | Coventree – Program #21 Aurora – Series A, E Planet – Series E | Citibank, N.A. | CCLT (CB LSS-2) 2006-1 | Citibank N.A., Canadian Branch | $275,000,000 | $275,000,000 | No | Not applicable | Not applicable | $275,000,000 | 51.2146936760065% | 48.7853063239935% | $134,159,592.39 |
| 74 | Coventree – Program #22 Aurora – Series A, E | Citibank, N.A. | CCLT (CB LSS) 2005-1 | Citibank N.A., Canadian Branch | $200,000,000 | $200,000,000 | No | Not applicable | Not applicable | $200,000,000 | 49.6437456597028% | 50.3562543402972% | $100,712,508.68 |

---

[25] On closing, the trade with Citibank Canada will be novated to Citibank, N.A. and the portion of the cash deposits now with Citibank Canada will be deposited with Citibank, N.A., Canadian Branch

## SCHEDULE Q

## FORM OF SALE REPORT

From:  **BLACKROCK (INSTITUTIONAL) CANADA LTD.** (as Administrator)

To:  **THE DEALERS** listed at Schedule C to the Omnibus Agreement

**THE LENDERS** listed at Schedule C to the Omnibus Agreement

**BNY TRUST COMPANY OF CANADA** (as Collateral Agent)

**EACH RATING AGENCY** engaged by the MAV (as Rating Agency)

Dated:  [**Insert date**]

Dear Sirs,

**Sale Report in respect of the Sale Collateral**

Reference is made to the Omnibus Agreement dated as of [●], 2009 between, *inter alios*, the Collateral Agent, the Administrative Agent, the Valuation Agent, the Lenders, the Unlevered CDS Counterparties and the LSS CDS Counterparties specified therein, as amended, restated, supplemented or novated from time to time (the **Omnibus Agreement**).  Capitalised terms used but not otherwise defined herein shall have the meanings ascribed thereto in Schedule A (*Master Definitions*) of the Omnibus Agreement.

Pursuant to, and in accordance with the terms of Section 4.9 (*Liquidation of Collateral*) of the Omnibus Agreement, we hereby render this report in order to set out the following information with respect to the Sale Collateral:

1.      Description of the Sale Collateral

     (a)      Obligor(s):                                   [**Insert in respect of the Sale Collateral**]

     (b)      Principal amount outstanding:         [**Insert principal amount outstanding**]

     (c)      Currency:                                    [**Insert currency**]

     (d)      Interest rate:                               [**Insert rate**]

     (e)      Interest payment dates:                  [**Insert dates**]

     (f)      Interest amounts payable:               [**Insert amount payable on interest payment dates**]

     (g)      Redemption date/maturity date         [**Insert as applicable**]
         (as applicable):

2.      Amounts owed:                              [**Insert amount owed under any Related Asset Creditor Security Agreement**]

3.    Lender or Dealer providing a Last Look Bid:    [*Insert identity of each Lender and Dealer*]

4.    Final liquidation price and amount:    [*Insert in respect of the Sale Collateral Proceeds*]

5.    Section of the Omnibus Agreement giving rise to the Liquidation Event:    [*Insert relevant Section of the Omnibus Agreement*]

Yours faithfully,

_____

For    and    on    behalf    of    [**BLACKROCK (INSTITUTIONAL) CANADA LTD.**]
Name: [**NAME OF SIGNATORY**]
Title: [**TITLE OF SIGNATORY**]

## SCHEDULE R

## EXISTING INTEREST RATE HEDGES

| Reference No. / JPM Trade Identifier | Existing Interest Rate Hedge Provider | Existing Conduit | Termination Date |
|---|---|---|---|
| 07CS49552, 3425759 | Merrill Lynch Capital Services, Inc. | Aria Trust, Series E | April 30, 2009 |
| 04CS25603, 1793706, ATSE | Merrill Lynch Capital Services, Inc. | Aria Trust, Series 2004-1 | April 15, 2019 |
| 04CS25602, 1793705, ATSE | Merrill Lynch Capital Services, Inc. | Aria Trust, Series 2004-1 | October 15, 2012 |
| 04CS32782, 1803335, ATSE | Merrill Lynch Capital Services, Inc. | Aria Trust, Series 2004-1 | May 23, 2019 |
| 04CS32783 | Merrill Lynch Capital Services, Inc. | Aria Trust, Series 2004-1 | December 23, 2012 |
| 06CS87835, 2902463 | Merrill Lynch Capital Services, Inc. | Encore Trust, Series E | March 11, 2009 |
| 11 | Deutsche Bank AG | Aria Trust, Series 2005-2 | February 15, 2011 |
| 78 | Deutsche Bank AG | Silverstone Trust, Tranche_1 CAD | March 20, 2015 |

**SCHEDULE S**

**INDICATIVE EXAMPLES OF SECTION 4.2 MECHANICS**

The provisions of Section 4.2 (*Dealer Non-Funding Event*) are illustrated below in worked examples of possible scenarios. This Schedule S (*Indicative Examples of Section 4.2 Mechanics*) is illustrative only and should be read subject to, and only as an aid to understanding, the provisions of such section. All section references herein are to section of the Omnibus Agreement.

1.      Assume that, on the Closing Date:

Dealer A has an Initial Available Collateral Amount of **100**, **50** of which is Original Collateral.

Dealer B has an Initial Available Collateral Amount of **60**, **30** of which is Original Collateral.

Dealer C has an Initial Available Collateral Amount of **40**, **20** of which is Original Collateral.

2.      Assume the Initial CA-Held Collateral Value is **100**, **60** of which is in the form of MFF Commitments, which are extended **20** by Dealer A, **15** by Dealer B, **5** by Dealer C and **20** by the Schedule I Banks.

3.      Assume that on Day X a Second Spread/Loss Trigger Event occurs and the Dealers submit the following Required Collateral Amounts:

- Dealer A's Required Collateral Amount was **125**;

- Dealer B's Required Collateral Amount was **55**; and

- Dealer C's Required Collateral Amount was **20**.

Because the aggregate of the Required Collateral Amounts (**200**) on Day X does not exceed the Value of the Posted Collateral as of Day X-1, a Potential Unwind Event does not occur on Day X.

4.      Assume that, on Day X+1, the Dealers submitted the following Required Collateral Amounts:

- Dealer A's Required Collateral Amount was **140**;

- Dealer B's Required Collateral Amount was **60**; and

- Dealer C's Required Collateral Amount was **20**.

Because the aggregate of the Required Collateral Amounts (**220**) on Day X+1 exceeds the Value of the Posted Collateral as of Day X, a Potential Unwind Event occurs on Day X+1.

5.      Assume that the Dealers calculate their Termination Payments as follows:

- The Termination Payment owed to Dealer A is **150**.

- The Termination Payment owed to Dealer B is **50**.

- The Termination Payment owed to Dealer C is **20**.

Each Dealer's Collateral Entitlement in respect of the Terminal Unwind Event triggered by the Potential Unwind Event on Day X+1 is determined on the basis of the Required Collateral Amounts submitted on Day X, as follows:

- Dealer A's Collateral Entitlement therefore is **125**;

- Dealer B's Collateral Entitlement is **55**; and

- Dealer C's Collateral Entitlement is **20**.

| Summary | |
|---|---|
| Posted Collateral, as of Day X (previous business day) | 200 |
| Original Collateral | 100 |
| CA-Held Collateral (including Undrawn Commitments) | 100 |
| Lender Commitments | 60 |

Consider each of the following scenarios:

Scenario A. Each Dealer/Lender funds its Commitment under the MFF.

Scenario B. Each of Dealer A and Dealer C fails to fund their respective Lender's Commitments.

Scenario C. Each Dealer/Lender funds its Commitment under the MFF and collateral is liquidated at less than par.

Scenario D. Each of Dealer A and Dealer C fails to fund its Lender's Commitment and collateral is liquidated at less than par.

Scenario E. Each Dealer/Lender funds its Commitment under the MFF and aggregate Termination Payment claims are less than total collateral liquidation proceeds.

Scenario F. Dealer A fails to fund its Lender's Commitment and aggregate Termination Payment claims are less than total collateral liquidation proceeds

**SCENARIO A. EACH DEALER/LENDER FUNDS ITS COMMITMENT UNDER THE MFF.**

| Before liquidation | |
|---|---|
| Posted Collateral, as of Day X (previous business day) | 200 |
| Original Collateral | 100 |
| CA-Held Collateral (including Undrawn Commitments) | 100 |
| Lender Commitments | 60 |

Assuming that all Collateral is liquidated at par,

| Liquidation Summary | Dealer A | Dealer B | Dealer C | Total |
|---|---|---|---|---|
| Termination Payment owed | 150 | 50 | 20 | 220 |
| Collateral Entitlement | 125 | 55 | 20 | 200 |
| MFF Advance* / DNFA | 20 / 0 | 15 / 0 | 5 / 0 | 60 / 0 |
| *Liquidation proceeds* | - | - | - | 200 |
| Original Collateral less DNFA, 6.1 | 50 | 30 | 20 | 100 |

| Liquidation Summary | Dealer A | Dealer B | Dealer C | Total |
|---|---|---|---|---|
| CA-Held Collateral test, 6.2(d) | 75 | 20 | 0 | 95 |
| unpaid Termination less DNFA, 6.2(e) | 5 | 0 | 0 | 5 |
| Repayment, 6.2(i) | 0 | 0 | 0 | 0 |
| total proceeds paid | 130 | 50 | 20 | 200 |
| Subordinated amount | 0 | 0 | 0 | 0 |
| Extinguished claim | 40 | 15 | 5 | 60 |

\* Total MFF Advance includes 20 from the Schedule I Banks.

1.    Results for Dealer A:

- Advances **20** pursuant to the MFF Agreement.

- Receives a Termination Payment of **50** from Original Collateral pursuant to Section 6.1.

- Receives a Termination Payment of **75** pursuant to Section 6.2(d)(ii) Dealer A's 6.2(d)(i) amount is 100, its remaining Termination Payment. Dealer A's 6.2(d)(ii) amount is 75, its Collateral Entitlement (125) minus (50), the Value of Original Collateral liquidated in Section 6.1.

- Receives a Termination Payment of **5** pursuant to Section 6.2(e), as that is the full amount of liquidation proceeds of the CA-Held Collateral remaining after payments to all Dealers pursuant to Section 6.2(d) (that is, $5 = 200 – 125 – 50 - 20$).

- Receives a repayment of **0** pursuant to Section 6.2(i), as the liquidation proceeds are insufficient.

End result: Dealer A's claim to **40** is unsatisfied and extinguished (**20** (MFF Advance) + **20** (unsatisfied Termination Payment))

2.    Results for Dealer B:

- Advances **15** pursuant to the MFF Agreement.

- Receives a Termination Payment of **30** from Original Collateral pursuant to Section 6.1.

- Receives a Termination Payment of **20** pursuant to Section 6.2(d)(i) Dealer B's 6.2(d)(i) amount is 20, its remaining Termination Payment. Dealer B's 6.2(d)(ii) amount is 25, its Collateral Entitlement (55) minus (30), the Value of Original Collateral liquidated in Section 6.1.

- Receives a Termination Payment of **0** pursuant to Section 6.2(e), as no payment is owed.

- Receives a repayment of **0** pursuant to Section 6.2(i), as liquidation proceeds are insufficient.

End result: Dealer B's claim to **15** is unsatisfied and extinguished (**15** (MFF Advance) + **0** (unsatisfied Termination Payment))

3.    Results for Dealer C:

- Advances **5** pursuant to the MFF Agreement.

- Receives a Termination Payment of **20** from Original Collateral pursuant to Section 6.1.

- Receives a Termination Payment of **0** pursuant to Section 6.2(d)(i), as no payment is owed.

- Receives a Termination Payment of **0** pursuant to Section 6.2(e), as no payment is owed.

- Receives a repayment of **0** pursuant to Section 6.2(i), as liquidation proceeds are insufficient.

End result: Dealer C's claim to **5** is unsatisfied and extinguished (**5** (MFF Advance) + **0** (unsatisfied Termination Payment))

## SCENARIO B. EACH OF DEALER A AND DEALER C FAILS TO FUND THEIR RESPECTIVE LENDER'S COMMITMENTS.

| Before liquidation | |
|---|---|
| Posted Collateral, as of Day X (previous business day) | 200 |
| Original Collateral | 100 |
| CA-Held Collateral (including Undrawn Commitments) | 100 |
| Lender Commitments | 60 |

Assuming again that all Collateral is liquidated at par,

| Liquidation Summary | Dealer A | Dealer B | Dealer C | Total |
|---|---|---|---|---|
| Termination Payment owed | 150 | 50 | 20 | 220 |
| Collateral Entitlement | 125 | 55 | 20 | 200 |
| MFF Advance* / DNFA | 0 / 20 | 15 / 0 | 0 / 5 | 15 / 25 |
| *Liquidation proceeds* | - | - | - | 175 |
| Original Collateral less DNFA, 6.1 | 30 | 30 | 15 | 75 |
| CA-Held Collateral test, 6.2(d) | 75 | 20 | 0 | 95 |
| unpaid Termination less DNFA, 6.2(e) | 5 | 0 | 0 | 5 |
| Repayment, 6.2(i) | 0 | 0 | 0 | 0 |
| total proceeds paid | 110 | 50 | 15 | 175 |
| Subordinated amount | 20 | 0 | 5 | 25 |
| Extinguished claim | 40 | 15 | 5 | 60 |

* Total MFF Advance includes 20 from the Schedule I Banks.

1. Results for Dealer A:

- Advances **0** pursuant to the MFF Agreement.

- Receives a Termination Payment of **30** from Original Collateral pursuant to Section 6.1. The amount of liquidation proceeds from Original Collateral that would otherwise go to Dealer A (50) is reduced by its Dealer Non-Funded Amount (20) pursuant to Section 6.1(c).

- Pursuant to the final sentence of Section 6.1, delivers Original Collateral of 20 to the CA-Held Collateral to be distributed pursuant to Section 6.2.

- Receives a Termination Payment of **75** pursuant to Section 6.2(d)(ii). Dealer A's 6.2(d)(i) amount is 100, its remaining Termination Payment (120) minus its Dealer Non-Funded Amount (20). Dealer A's 6.2(d)(ii) amount is 75, its Collateral Entitlement (125) minus (50), the Value of Original Collateral liquidated in Section 6.1.

- Receives a Termination Payment of **5** pursuant to Section 6.2(e), which is the remainder of the liquidation proceeds, as no other Dealer's have a claim at this level of the waterfall. Dealer A's claim at this stage of the waterfall is 25, its remaining Termination Payment (45) minus its Dealer Non-Funded Amount (20) but only 5 in proceeds remain.

- Receives a repayment of **0** pursuant to Section 6.2(i), as the liquidation proceeds are insufficient.

End result: Dealer A's claim to **40** is unsatisfied and extinguished (**0** (MFF Advance) + **40** (unsatisfied Termination Payment)), a total of **20** of its Termination Payment having been subordinated to Section 6.2(i).

2.     Results for Dealer B:

- Advances **15** pursuant to the MFF Agreement.

- Receives a Termination Payment of **30** from Original Collateral pursuant to Section 6.1.

- Receives a Termination Payment of **20** pursuant to Section 6.2(d)(i). Dealer B's 6.2(d)(i) amount is 20, its remaining Termination Payment. Dealer B's 6.2(d)(ii) amount is 25, its Collateral Entitlement (55) minus (30), the Value of Original Collateral liquidated in Section 6.1.

- Receives a Termination Payment of **0** pursuant to Section 6.2(e), as no payment is owed.

- Receives a repayment of **0** pursuant to Section 6.2(i), as liquidation proceeds are insufficient.

End result: Dealer B's claim to **15** is unsatisfied and extinguished (**15** (MFF Advance) + **0** (unsatisfied Termination Payment))

3.     Results for Dealer C:

- Advances **0** pursuant to the MFF Agreement.

- Receives a Termination Payment of **15** from Original Collateral pursuant to Section 6.1. The amount of liquidation proceeds from Original Collateral that would otherwise go to Dealer C (20) is reduced by its Dealer Non-Funded Amount (5) pursuant to Section 6.1(c).

- Pursuant to the final sentence of Section 6.1, delivers Original Collateral of 5 to the CA-Held Collateral to be distributed pursuant to Section 6.2.

- Receives a Termination Payment of **0** pursuant to Section 6.2(d)(i). Because the Non-Funded Amount of 5 is subordinated, the unpaid portion of Dealer A's Termination Payment (5) is reduced to 0 for purposes of this section of the waterfall.

- Receives a Termination Payment of **0** pursuant to Section 6.2(e). Due to the subordination of the Non-Funded Amount of 5, the unpaid portion of Dealer A's Termination Payment (5) is reduced to 0 for purposes of this section of the waterfall.

- Receives a repayment of **0** pursuant to Section 6.2(i), as the liquidation proceeds are insufficient.

End result: Dealer C's claim to **5** is unsatisfied and extinguished (**0** (MFF Advance) + **5** (unsatisfied Termination Payment)), a total of **5** of its Termination Payment having been subordinated to Section 6.2(i).

## SCENARIO C. EACH DEALER/LENDER FUNDS ITS COMMITMENT UNDER THE MFF AND COLLATERAL IS LIQUIDATED AT LESS THAN PAR.

| Before liquidation | |
|---|---|
| Posted Collateral, as of Day X (previous business day) | 200 |
| Original Collateral | 100 |
| CA-Held Collateral (including Undrawn Commitments) | 100 |
| Lender Commitments | 60 |

Assume that:

- All Dealers fund their MFF draws.

- the Original Collateral of Party A (initial Value of 50) is liquidated at 90% of par, while the Original Collateral of Party B and Party C (total initial Value of 50) is liquidated at par.

- The CA-Held Collateral other than MFF Commitments (initial Value of 40) is liquated at 25% of par.

- The MFF Collateral of 60 provided by the Schedule I Banks and Dealer B is liquidated at par.

| Liquidation Summary | Dealer A | Dealer B | Dealer C | Total |
|---|---|---|---|---|
| Termination Payment owed | 150 | 50 | 20 | 220 |
| Collateral Entitlement | 125 | 55 | 20 | 200 |
| MFF Advance* / DNFA | 20 / 0 | 15 / 0 | 5 / 0 | 60 / 0 |
| *Liquidation proceeds* | - | - | - | 165 |
| Original Collateral less DNFA, 6.1 | 45 | 30 | 20 | 95 |
| CA-Held Collateral test, 6.2(d) | 55.3 | 14.7 | 0 | 70 |
| unpaid Termination less DNFA, 6.2(e) | 0 | 0 | 0 | 0 |
| Repayment, 6.2(i) | 0 | 0 | 0 | 0 |
| total proceeds paid | 100.3 | 44.7 | 20 | 165 |
| Subordinated amount | 0 | 0 | 0 | 0 |
| Extinguished claim | 70 | 20 | 5 | 95 |

* Total MFF Advance includes 20 from the Schedule I Banks.

1. Results for Dealer A:

- Advances **20** pursuant to the MFF Agreement.

- receives a Termination Payment of **45** from Original Collateral pursuant to Section 6.1 (Dealer A's OC Claim Proportion is equal to 1, as its Collateral Entitlement is greater than the Value of its Original Collateral).

- Receives a Termination Payment of **55.3** pursuant to Section 6.2(d)(ii). Dealer A's 6.2(d)(i) amount is 105, its remaining Termination Payment. Dealer A's 6.2(d)(ii) amount is 55. Dealer A's total claim under 6.2(d)(ii) is 75, its Collateral Entitlement (125) minus (50), the Value of Original Collateral liquidated in Section 6.1 (here, Value means the face amount of 50, not the

actual proceeds of 45). But at this stage of the waterfall, there are total claims of 95 against only 70 in remaining proceeds, so Dealer A gets only 73.7% (i.e. 70 divided by 95) out of its 75 claim under 6.2(d)(ii), 55.3. This is the same result as multiplying the remaining proceeds (70) by 79.0% (i.e. 75 divided by 95, Dealer A's portion of claims).

- Receives a Termination Payment of **0** pursuant to Section 6.2(e), as liquidation proceeds are insufficient.

- Receives a repayment of **0** pursuant to Section 6.2(i), as the liquidation proceeds are insufficient.

End result: Dealer A's claim to **70** is unsatisfied and extinguished (**20** (MFF Advance) + **50** (unsatisfied Termination Payment))

2.    Results for Dealer B:

- Advances **15** pursuant to the MFF Agreement.

- Receives a Termination Payment of **30** from Original Collateral pursuant to Section 6.1 (Dealer B's OC Claim Proportion is equal to 1, as its Collateral Entitlement is greater than the Value of its Original Collateral).

- Receives a Termination Payment of **14.7** pursuant to Section 6.2(d)(i). Dealer B's total claim amount under 6.2(d)(i) is 20, its remaining Termination Payment. Dealer B's 6.2(d)(ii) amount is 25, its Collateral Entitlement (55) minus (30), the Value of Original Collateral liquidated in Section 6.1. But at this stage of the waterfall, there are total claims of 95 against only 70 remaining in proceeds, so Dealer B gets only 73.7% (i.e. 70 divided by 95) out of its 20 claim under 6.2(d)(i), 14.7. This is the same result as multiplying the remaining proceeds (70) by 21.0% (i.e. 20 divided by 95, Dealer B's portion of claims).

- Receives a Termination Payment of **0** pursuant to Section 6.2(e), as liquidation proceeds are insufficient.

- Receives a repayment of **0** pursuant to Section 6.2(i), as liquidation proceeds are insufficient.

End result: Dealer B's claim to **20** is unsatisfied and extinguished (**15** (MFF Advance) + **5** (unsatisfied Termination Payment))

3.    Results for Dealer C:

- Advances **5** pursuant to the MFF Agreement.

- Receives a Termination Payment of **20** from Original Collateral pursuant to Section 6.1 (Dealer C's OC Claim Proportion is equal to 1, as its Collateral Entitlement is greater than the Value of its Original Collateral).

- Receives a Termination Payment of **0** pursuant to Section 6.2(d) as no payment is owed.

- Receives a Termination Payment of **0** pursuant to Section 6.2(e), as no payment is owed.

- Receives a repayment of **0** pursuant to Section 6.2(i), as liquidation proceeds are insufficient.

End result: Dealer C's claim to **5** is unsatisfied and extinguished (**5** (MFF Advance) + **0** (unsatisfied Termination Payment))

## SCENARIO D. EACH OF DEALER A AND DEALER C FAILS TO FUND ITS LENDER'S COMMITMENT AND COLLATERAL IS LIQUIDATED AT LESS THAN PAR.

| Before liquidation | |
|---|---|
| Posted Collateral, as of Day X (previous business day) | 200 |
| Original Collateral | 100 |
| CA-Held Collateral (including Undrawn Commitments) | 100 |
| Lender Commitments | 60 |

Assume that:

- The Original Collateral of Party A (initial Value of 50) is liquidated at 90% of par.

- The Original Collateral of Party B and Party C (total initial Value of 50) is liquidated at par.

- The CA-Held Collateral other than MFF Commitments (initial Value of 40) is liquidated at 25% of par.

- The MFF Collateral of 35 provided by the Schedule I Banks and Dealer B is liquidated at par.

| Liquidation Summary | Dealer A | Dealer B | Dealer C | Total |
|---|---|---|---|---|
| Termination Payment owed | 150 | 50 | 20 | 220 |
| Collateral Entitlement | 125 | 55 | 20 | 200 |
| MFF Advance* / DNFA | 0 / 20 | 15 / 0 | 0 / 5 | 35 / 25 |
| *Liquidation proceeds* | - | - | - | 140 |
| Original Collateral less DNFA, 6.1 | 25 | 30 | 15 | 70 |
| CA-Held Collateral test, 6.2(d) | 55.3 | 14.7 | 0 | 70 |
| unpaid Termination less DNFA, 6.2(e) | 0 | 0 | 0 | 0 |
| Repayment, 6.2(i) | 0 | 0 | 0 | 0 |
| total proceeds paid | 80.3 | 44.7 | 15 | 140 |
| Subordinated amount | 20 | 0 | 5 | 0 |
| Extinguished claim | 70 | 20 | 5 | 95 |

\* Total MFF Advance includes 20 from the Schedule I Banks.

1.    Results for Dealer A:

- Advances **0** pursuant to the MFF Agreement.

- Receives a Termination Payment of **25** from Original Collateral pursuant to Section 6.1. The amount of liquidation proceeds from Original Collateral that would otherwise go to Dealer A (45, per above, assuming liquidation at 90% par) is reduced by the Dealer Non-Funded Amount (20), pursuant to Section 6.1(c). Dealer A's OC Claim Proportion is equal to 1, as its Collateral Entitlement is greater than the Value of its Original Collateral.

- Pursuant to the final sentence of Section 6.1, delivers Original Collateral of 20 to the CA-Held Collateral to be distributed pursuant to Section 6.2.

- Receives a Termination Payment of **55.3** pursuant to Section 6.2(d)(ii). Dealer A's 6.2(d)(i) amount is 105, its remaining Termination Payment (125) minus its Dealer Non-Funded Amount (20). Dealer A's 6.2(d)(ii) amount is 55. Dealer A's total claim under 6.2(d)(ii) is 75, its Collateral Entitlement (125) minus (50), the Value of Original Collateral liquidated in Section 6.1 (here, Value means the face amount of 50, not the actual proceeds of 45). But at this stage of the waterfall, there are total claims of 95 against only 70 in remaining proceeds, so Dealer A gets only 73.7% (i.e. 70 divided by 95) out of its 75 claim under Section 6.2(d)(ii), 55.3. This is the same result as multiplying the remaining proceeds (70) by 79.0% (i.e. 75 divided by 95, Dealer A's portion of claims).

- Receives a Termination Payment of **0** pursuant to Section 6.2(e), as there are no further liquidation proceeds.

- Receives a repayment of **0** pursuant to Section 6.2(i), as the liquidation proceeds are insufficient.

End result: Dealer A's claim to **70** is unsatisfied and extinguished (**0** (MFF Advance) + **70** (unsatisfied Termination Payment)), a total of **20** of its Termination Payment having been subordinated to Section 6.2(i).

2.    Results for Dealer B:

- Advances **15** pursuant to the MFF Agreement.

- Receives a Termination Payment of **30** from Original Collateral pursuant to Section 6.1.

- Receives a Termination Payment of **14.7** pursuant to Section 6.2(d)(i). Dealer B's total claim amount under 6.2(d)(i) is 20, its remaining Termination Payment. Dealer B's 6.2(d)(ii) amount is 25, its Collateral Entitlement (55) minus (30), the Value of Original Collateral liquidated in Section 6.1. But at this stage of the waterfall, there are total claims of 95 against only 70 remaining in proceeds, so Dealer B gets only 73.7% (i.e. 70 divided by 95) out of its 20 claim under 6.2(d)(i), 14.7. This is the same result as multiplying the remaining proceeds (70) by 21.0% (i.e. 20 divided by 95, Dealer B's portion of claims).

- Receives a Termination Payment of **0** pursuant to Section 6.2(e), as liquidation proceeds are insufficient.

- Receives a repayment of **0** pursuant to Section 6.2(i), as liquidation proceeds are insufficient.

End result: Dealer B's claim to **20** is unsatisfied and extinguished (**15** (MFF Advance) + **5** (unsatisfied Termination Payment))

3.    Results for Dealer C:

- Advances **0** pursuant to the MFF Agreement.

- Receives a Termination Payment of **15** from Original Collateral pursuant to Section 6.1 (The amount of liquidation proceeds from Original Collateral that would otherwise go to Dealer C is reduced by the Non-Funded Amount of 5 pursuant to Section 6.1(c). Dealer C's OC Claim Proportion is equal to 1, as its Collateral Entitlement is greater than the Value of its Original Collateral.).

- Pursuant to the final sentence of Section 6.1, delivers Original Collateral of 5 to the CA-Held Collateral to be distributed pursuant to Section 6.2.

- Receives a Termination Payment of **0** pursuant to Section 6.2(d)(i). Dealer C's 6.2(d)(i) amount is 0, the remaining Termination Payment (5) minus its Dealer Non-Funded Amount (5). Dealer C's 6.2(d)(ii) amount is 5, its Collateral Entitlement (20) minus (15), the Value of Original Collateral liquidated in Section 6.1.

- Receives a Termination Payment of **0** pursuant to Section 6.2(e) because liquidation proceeds are insufficient.

- Receives a repayment of **0** pursuant to Section 6.2(i), as the liquidation proceeds are insufficient.

End result: Dealer C's claim to **5** is unsatisfied and extinguished (**0** (MFF Advance) + **5** (unsatisfied Termination Payment)), a total of **5** of its Termination Payment having been subordinated to Section 6.2(i).

## SCENARIO E. EACH DEALER/LENDER FUNDS ITS COMMITMENT UNDER THE MFF AND AGGREGATE TERMINATION PAYMENT CLAIMS ARE LESS THAN TOTAL COLLATERAL LIQUIDATION PROCEEDS.

| Before liquidation | |
|---|---|
| Posted Collateral, as of Day X (previous business day) | 200 |
| Original Collateral | 100 |
| CA-Held Collateral (including Undrawn Commitments) | 100 |
| Lender Commitments | 60 |

Assume that:

- The Termination Payment owed to Dealer A is **110**. The Termination Payment owed to Dealer B is **50**. The Termination Payment owed to Dealer C is **20**.

- All Collateral is liquidated at par.

| Liquidation Summary | Dealer A | Dealer B | Dealer C | Total |
|---|---|---|---|---|
| Termination Payment owed | 110 | 50 | 20 | 180 |
| Collateral Entitlement | 125 | 55 | 20 | 200 |
| MFF Advance* / DNFA | 20 / 0 | 15 / 0 | 5 / 0 | 60 / 0 |
| *Liquidation proceeds* | - | - | - | 200 |
| Original Collateral less DNFA, 6.1 | 50 | 30 | 20 | 100 |
| CA-Held Collateral test, 6.2(d) | 60 | 20 | 0 | 80 |
| unpaid Termination less DNFA, 6.2(e) | 0 | 0 | 0 | 0 |
| Repayment, 6.2(i) | 6.7 | 5 | 1.7 | 13.4 |
| total proceeds paid* | 116.7 | 55 | 21.7 | 200 |
| Subordinated amount | 0 | 0 | 0 | 0 |
| Extinguished claim | 13.3 | 10 | 3.3 | 26.6 |

* Total MFF Advance includes 20 from the Schedule I Banks. Total proceeds paid include 6.7 for Schedule I Banks.

1.  Results for Dealer A:

- Advances **20** pursuant to the MFF Agreement.

- Receives a Termination Payment of **50** from Original Collateral pursuant to Section 6.1.

- Receives a Termination Payment of **60** pursuant to Section 6.2(d)(i). Dealer A's 6.2(d)(i) amount is 60, the remaining Termination Payment. Dealer A's 6.2(d)(ii) amount is 75, its Collateral Entitlement (125) minus (50), the Value of Original Collateral liquidated in Section 6.1 .

- Receives a Termination Payment of **0** pursuant to Section 6.2(e), as no amount is owed.

- Receives a repayment of **6.7** pursuant to Section 6.2(i), which is its *pro rata* share of the Collateral available at this level of the waterfall (20); its claim being the amount of its MFF Advance (20) and total claims at this level of the waterfall being 60 (40 Dealer-Lenders, 20 Schedule I Banks).

End result: Dealer A's claim to **13.3** is unsatisfied and extinguished (**13.3** (net MFF Advance) + **0** (unsatisfied Termination Payment))

2.  Results for Dealer B:

- Advances **15** pursuant to the MFF Agreement.

- Receives a Termination Payment of **30** from Original Collateral pursuant to Section 6.1.

- Receives a Termination Payment of **20** pursuant to Section 6.2(d)(i). Dealer B's 6.2(d)(i) amount is 20, its remaining Termination Payment. Dealer B's 6.2(d) (ii) amount is 25, its Collateral Entitlement (55) minus (30), the Value of Original Collateral liquidated in Section 6.1 .

- Receives a Termination Payment of **0** pursuant to Section 6.2(e), as no payment is owed.

- Receives a repayment of **5** pursuant to Section 6.2(i), which is its *pro rata* share of the Collateral available at this level of the waterfall (20); its claim being the amount of its MFF Advance (15) and total claims at this level of the waterfall being 60 (40 Dealer-Lenders, 20 Schedule I Banks).

End result: Dealer B's claim to **10** is unsatisfied and extinguished (**10** (net MFF Advance) + **0** (unsatisfied Termination Payment))

3.  Results for Dealer C:

- Advances **5** pursuant to the MFF Agreement.

- Receives a Termination Payment of **20** from Original Collateral pursuant to Section 6.1.

- Receives a Termination Payment of **0** pursuant to Section 6.2(d), as no payment is owed.

- Receives a Termination Payment of **0** pursuant to Section 6.2(e), as no payment is owed.

- Receives a repayment of **1.7** pursuant to Section 6.2(i), which is its *pro rata* share of the Collateral available at this level of the waterfall (20); its claim being the amount of its MFF Advance (5) and total claims at this level of the waterfall being 60 (40 Dealer-Lenders, 20 Schedule I Banks). The remaining 6.7 of Collateral goes to the Schedule I Banks as their *pro rata* share.

End result: Dealer C's claim to **3.3** is unsatisfied and extinguished (**3.3** (net MFF Advance) + **0** (unsatisfied Termination Payment))

**SCENARIO F. DEALER A FAILS TO FUND ITS LENDER'S COMMITMENT AND AGGREGATE TERMINATION PAYMENT CLAIMS ARE LESS THAN TOTAL COLLATERAL LIQUIDATION PROCEEDS.**

| Before liquidation | |
|---|---|
| Posted Collateral, as of Day X (previous business day) | 200 |
| Original Collateral | 100 |
| CA-Held Collateral (including Undrawn Commitments) | 100 |
| Lender Commitments | 60 |

Assume that:

- The Termination Payment owed to Dealer A is **110**. The Termination Payment owed to Dealer B is **50**. The Termination Payment owed to Dealer C is **20**.

- Dealer A, as Lender, Advances **0**. Dealer B, as Lender, Advances **15**. Dealer C, as Lender, Advances **5**. Non-Dealer Lenders Advance **20**.

- All Collateral is liquidated at par.

| Liquidation Summary | Dealer A | Dealer B | Dealer C | Total |
|---|---|---|---|---|
| Termination Payment owed | 110 | 50 | 20 | 180 |
| Collateral Entitlement | 125 | 55 | 20 | 200 |
| MFF Advance* / DNFA | 0 / 20 | 15 / 0 | 5 / 0 | 40 / 20 |
| *Liquidation proceeds* | - | - | - | 180 |
| Original Collateral less DNFA, 6.1 | 30 | 30 | 20 | 80 |
| CA-Held Collateral test, 6.2(d) | 60 | 20 | 0 | 80 |
| unpaid Termination less DNFA, 6.2(e) | 0 | 0 | 0 | 0 |
| Repayment, 6.2(i) | 6.7 | 5 | 1.7 | 13.4 |
| total proceeds paid* | 96.7 | 55 | 21.7 | 180 |
| Subordinated amount | 20 | 0 | 0 | 20 |
| Extinguished claim | 13.3 | 10 | 3.3 | 26.6 |

\* Total MFF Advance includes 20 from the Schedule I Banks. Total proceeds paid include 6.7 for Schedule I Banks.

1. Results for Dealer A:

- Advances **0** pursuant to the MFF Agreement.

- Receives a Termination Payment of **30** from Original Collateral pursuant to Section 6.1 (The amount of liquidation proceeds from Original Collateral that would otherwise go to Dealer A (50) is reduced by the Non-Funded Amount of 20 pursuant to Section 6.1(c).).

- Pursuant to the final sentence of Section 6.1, delivers Original Collateral of 20 to the CA-Held Collateral to be distributed pursuant to Section 6.2.

- Receives a Termination Payment of **60** pursuant to Section 6.2(d)(i). Dealer A's 6.2(d)(i) amount is 60, its remaining Termination Payment (80) minus its Dealer Non-Funded Amount (20). Dealer A's 6.2(d) (ii) amount is 75, its Collateral Entitlement (125) minus (50), the Value of Original Collateral liquidated in Section 6.1.

- Receives a Termination Payment of **0** pursuant to Section 6.2(e) as no payment is due (Dealer A's Termination Payment claim of 20 is reduced to zero pursuant to Section 6.2(e)).

- Receives a repayment of **6.7** pursuant to Section 6.2(i), which is its *pro rata* share of the Collateral available at this level of the waterfall (20); its claim being the subordinated portion of its unpaid Termination Payment (20) and total claims at this level of the waterfall being 60.

End result: Dealer A's claim to **13.3** is unsatisfied and extinguished (**13.33** (net MFF Advance) + **0** (unsatisfied Termination Payment)), a total of **20** of its Termination Payment having been subordinated to Section 6.2(i), but **6.7** having been repaid at that level.

2.    Results for Dealer B:

- Advances **15** pursuant to the MFF Agreement.

- Receives a Termination Payment of **30** from Original Collateral pursuant to Section 6.1 of the Omnibus Agreement.

- Receives a Termination Payment of **20** pursuant to Section 6.2(d)(i). Dealer B's 6.2(d)(i) amount is 20, the remaining Termination Payment. Dealer B's 6.2(d) (ii) amount is 25, its Collateral Entitlement (55), minus (30), the Value of Original Collateral liquidated in Section 6.1.

- Receives a Termination Payment of **0** pursuant to Section 6.2(e), as no payment is owed.

- Receives a repayment of **5** pursuant to Section 6.2(i), which is its *pro rata* share of the Collateral available at this level of the waterfall (20); its claim being the amount it advances on its MFF (15) and total claims at this level of the waterfall being 60.

End result: Dealer B's claim to **10** is unsatisfied and extinguished (**10** (MFF Advance not repaid) + **0** (unsatisfied Termination Payment)).

3.    Results for Dealer C:

- Advances **5** pursuant to the MFF Agreement.

- Receives a Termination Payment of **20** from Original Collateral pursuant to Section 6.1 of the Omnibus Agreement.

- Receives a Termination Payment of **0** pursuant to Section 6.2(d)(i) of the Omnibus Agreement, as no payments is owed.

- Receives a Termination Payment of **0** pursuant to Section 6.2(e) , as no payment is owed.

- Receives a repayment of **1.7** pursuant to Section 6.2(i), which is its *pro rata* share of the Collateral available at this level of the waterfall (20); its claim being the amount it advances on its MFF (5) and total claims at this level of the waterfall being 60. The remaining 6.7 of Collateral goes to the Schedule I Banks as their *pro rata* share.

End result: Dealer C's claim to **3.3** is unsatisfied and extinguished (**3.3** (net MFF Advance not repaid) + 0 (unsatisfied Termination Payment))

## SCHEDULE T

## PROCEDURES FOR BORROWING PURSUANT TO ADDITIONAL LOANS

Any potential borrowing pursuant to Additional Loans pursuant to Section 2.9(a) of this Agreement shall be effected in accordance with the following provisions.

1.    **NOTICE**

By 12:00 noon on any Business Day on which a Potential Unwind Event occurs if such Potential Unwind Event occurs on an Exposure Reporting Date, or by 12:00 noon on the Business Day after a Potential Unwind Event occurs if such Potential Unwind Event occurs on a day that is not an Exposure Reporting Date, the Administrator, as agent for the MAV, shall deliver a notice, substantially in the form of Exhibit A attached to this Schedule T (*Procedures for Borrowing pursuant to Additional Loans*) (the **Funding Request**) to each "Lender" (each a **MAV1 Lender**) then identified in Schedule [5] (*Lenders' Commitments*) of the margin funding facility agreement dated as of the Closing Date and made between, *inter alios*, CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle I and the lenders identified therein.

2.    **OFFER TO LOAN**

(a)    Within 24 hours of delivery of the Funding Request, any MAV1 Lender wishing to advance an Additional Loan must make a written, *bona fide* firm offer capable of being accepted by the MAV (an **Offer**) to advance such Additional Loan.  Such offer shall include: (a) the initial principal amount of the Additional Loan that such MAV1 Lender is willing to advance (the **Offer Amount**); (ii) the annual interest rate that the MAV1 Lender requires on the principal amount of its prospective Additional Loan (stated as a spread to the BA Rate) (the **Additional Loan Interest Rate**); and (iii) an executed letter of representations, and shall be substantially in the form attached hereto as Exhibit B.

(b)    By [5:00 pm] on the day (or if such day is not a Business Day, the Business Day following the day) on which the 24-hour period referenced in Section 2(a) above expires (the time of such expiration, the **Expiry Time**), the Administrator, acting on behalf of the MAV, shall provide to the MAV1 Lenders and the Rating Agency either: (a) if no Offers to advance Additional Loans have been received by the Administrator by that time, a notice stating that a Funding Request has been distributed in accordance with this Schedule T (*Procedures for Borrowing pursuant to Additional Loans*) and that no Offers to advance Additional Loans have been received as of the Expiry Time; or (b) otherwise, copies of all Offers to advance Additional Loans that have been received and a summary of the allocation of the principal amount of the Additional Loans between such received Offers resulting from the application to such Offers of the allocation procedures outlined in Section 2(c) below.  No Additional Loans shall be made unless, by [5:00 pm] on the following Business Day: (i) at least one Offer to advance an Additional Loan has been received; (ii) the consent of the MAV1 Lenders to such borrowing has been obtained; and (iii) the Rating Agency Condition has been satisfied.  As soon as reasonably practicable thereafter, and in any event no later than [5:30 pm] on that same day, the Administrator shall notify each MAV1 Lender that has submitted an Offer to advance an Additional Loan: (a) whether such Offer has been accepted in whole or in part; and (b) of the initial principal amount of the Additional Loan that such MAV1 Lender is committed to advance.

(c)    The initial principal amount of Additional Loans advanced shall not exceed the Collateral Call Amount associated with the Potential Unwind Event.  In the event that the aggregate sum of all Offer Amounts

exceeds the Collateral Call Amount, Additional Loans shall be allocated to the Offers with the lowest Additional Loan Interest Rates and, as between Offers offering identical Additional Loan Interest Rates, the initial principal amount shall be allocated *pro rata* between such Offers.

(d)     If the Collateral Agent does not receive a Fed reference number from any MAV1 Lender by 9:00 am on the Terminal Unwind Event Date related to the Potential Unwind Event referenced in Section 2.9(a), evidencing that such MAV1 Lender has sent a wire transfer to the Collateral Account of funds in an amount equal to the initial principal amount of the Additional Loan that such MAV1 Lender is committed to advance, then the Administrator shall assume that such Additional Loan offered by such MAV1 Lender will not be funded.

(e)     Before 10:00 am on the relevant Terminal Unwind Event Date, the Administrator shall notify the Deal Parties and the Rating Agency whether any Additional Loans are to be advanced and, if so, the amount of such Additional Loans.

**3.     NOTICES**

All notices and consents required under this Schedule T (*Procedures for Borrowing pursuant to Additional Loans*) must be sent by fax or electronic mail.

# EXHIBIT A

(to Schedule T (*Procedures for Borrowing pursuant to Additional Loans*))

## [*LETTERHEAD OF ADMINISTRATOR*]

[*Date*]

[*Address of MAV1 Lender*]

**Re:  Borrowing pursuant to Additional Loans**

Reference is hereby made to the Omnibus Agreement (the **Omnibus Agreement**), dated as of January [●], 2009 between, *inter alios,* (a) the Unlevered CDS Counterparties referenced therein; (b) the LSS CDS Counterparties referenced therein; (c) the Lenders referenced therein; (d) BNY Trust Company of Canada, as the Collateral Agent and the Administrative Agent; (e) Blackrock (Institutional) Canada Ltd., as the Valuation Agent, the Spread/Loss Trigger Calculation Agent, and the Administrator; (f) CIBC Mellon Global Security Services Company in its capacity as the Issuer Trustee for Master Asset Vehicle II, as the MAV (the **MAV**); and (g) BNY Trust Company of Canada, as the Indenture Trustee, as amended, modified, restated, replaced or supplemented from time to time, together with any schedules, exhibits, supplements and attachments thereto and all documents incorporated therein by reference.  All capitalised terms undefined herein shall have the meaning ascribed to them in the Omnibus Agreement.

Please be advised that in connection with a Potential Unwind Event, the MAV requires additional funding, and is considering borrowing Additional Loans pursuant to Section 2.9(a) of the Omnibus Agreement in order to meet such additional funding requirements.  In our capacity as agent for the MAV, we are notifying you of the opportunity to submit an offer to advance such Additional Loans.  The Additional Loans shall be advanced at par value.  Please advise us if you are interested in providing a portion of this additional funding through the advance of an Additional Loan, by submitting to us, via fax or electronic mail, a *bona fide* offer to advance an Additional Loan capable of being accepted by the MAV and substantially in the form of Annex A attached hereto, by [*a date and time 24 hours after the transmission of this notice*].  Such offer must state both (i) the initial principal amount of the Additional Loan that you are willing to advance and (ii) the interest rate (as a spread to the BA Rate) for such Additional Loan.

Please be advised that any such offer to advance an Additional Loan may be rejected by the MAV in whole or in part.  If the Additional Loans are accepted, the Additional Margin Funding Facility Agreement shall be executed, delivered and the Collateral Agent must receive a Fed reference number from the relevant MAV1 Lender(s) by 9:00 am on [*the Terminal Unwind Event Date*].

Very truly yours,

BlackRock (Institutional) Canada Ltd.
as Administrator

By: _____

Name:

Title:

# EXHIBIT B

(to Schedule T (*Procedures for Borrowing pursuant to Additional Loans*))

[***to be attached as Annex A to any Funding Request***]

BlackRock (Institutional) Canada Ltd.
[***insert address***]

Ladies and Gentlemen:

We hereby notify you that we have received and reviewed your letter, dated [●] (as amended by any amendment or supplement thereto delivered to us, the **Funding Request**), relating to the Additional Loans (as defined therein) to be received by Master Asset Vehicle II (the **MAV**) and that, based on such review, we submit our firm offer to advance an Additional Loan in the following principal amount (the **Loan**) with the following interest rate on such principal amount:

Principal Amount/Purchase Price:    CAD _____

Interest Rate:                          BA Rate + _____ per cent. per annum

Capitalised terms used but not defined herein shall have the meanings assigned to them or incorporated by reference in the Funding Request.

(a)      In connection with this offer, we make the following representations, warranties and covenants to the MAV and BlackRock (Institutional) Canada Ltd. (the **Administrator**) and their respective Counsel, and consent to their reliance upon the accuracy and truth thereof:

(b)      **Accredited Investor**.  We are acting as principal and are an "accredited investor" as defined in National Instrument 45-106, Prospectus and Registration Exemptions, as amended.

(c)      **Qualified Institutional Buyer and Qualified Purchaser**.  If we are a U.S. Person, then we are a "Qualified Institutional Buyer" as defined in Rule 144A under the United States Securities Act of 1933, as amended, and a "Qualified Purchaser" as defined in Section 2(A)(51) of the United States Investment Company Act of 1940 purchasing for its own account.

(d)      **Not Securities**.  We understand that the Additional Loans are not securities and that no Additional Loans are being offered in a transaction involving any public offering in Canada within the meaning of applicable laws.  If in the future we decide to assign or pledge the Loan, such Loan may be assigned or pledged only in accordance with the terms of the Loan and applicable laws.

(e)      **No General Solicitation**.  We will not, at any time, offer to buy or offer to sell the Loan by any form of general solicitation or advertising, including, but not limited to, any advertisement, article, notice or other communication published in any newspaper, magazine or similar medium or broadcast over television or radio or seminar or meeting whose attendees have been invited by general solicitations or advertising.

(f)     **Investment Decision; No Reliance**.  In connection with the advance of the Loan, we acknowledge and agree that information regarding the MAV has been made available to us online at www.[●] (the **MAV Website**), including the Omnibus Agreement, the Indenture, and the other Transaction Documents, as well as the most recent reports of the Administrator relating to the MAV and that we have based our decision to advance the Loan upon the information contained therein and are not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the MAV or the Administrator, or any of their respective Affiliates other than any available at the MAV Website.

(g)     **Investment Intent**.  We are not advancing the Loan with a view to the resale, distribution or other disposition thereof in violation of applicable laws.

(h)     **Non-Petition**.  We acknowledge and agree to be bound by the terms of Section 6.5 (*Limited Recourse and Non-Petition*) of the Omnibus Agreement.

(i)     **Due Authorisation; Capability**.  We have the power and authority to enter into each agreement required to be executed and delivered by or on behalf of us in connection with our advance of the Loan and to perform our obligations thereunder and consummate the transactions contemplated thereby, and the person signing any such documents on our behalf has been duly authorised to execute and deliver such documents and each other document required to be executed and delivered by us in connection with our advance of the Loan.  Such execution, delivery and compliance by us does not conflict with, or constitute a default under, any instruments governing us, any applicable law, regulation or order, or any material agreement to which we are a party or by which we are bound.

(j)     **Reliance**.  We understand that the information provided by us will be relied upon by each of the MAV, the Administrator, their respective counsel and others for the purpose of determining our eligibility to advance the Loan.  We agree to provide, if requested, any additional information that may reasonably be required to determine our eligibility to advance the Loan.  We acknowledge that each representation, warranty or agreement by us contained herein is made for the benefit of the MAV, the Administrator, the Indenture Trustee, their respective affiliates and the benefit of the Holders of Notes issued by the MAV. If any of the acknowledgments, representations or agreements made by us hereunder in connection with our advance of the Loan are no longer accurate, we will promptly notify the MAV and the Administrator.

(k)     **Indemnity**.  We agree to indemnify and hold harmless each of the MAV, the Administrator and their respective affiliates from and against any loss, damage or liability due to or arising out of our breach of any representation, warranty or agreement contained in this letter or in any other document provided by us to the MAV or the Administrator in connection with our advance of the Loan.

(l)     **Applicable Law**. This letter shall be governed by, and construed in accordance with, the laws of the Province of Ontario. We irrevocably waive all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this letter or the transactions contemplated hereby.

(m)    **Miscellaneous**.  All communications provided for or permitted hereunder shall be in writing and shall be deemed to have been duly given if personally delivered, sent by overnight courier or mailed by registered mail, postage prepaid and return receipt requested, or transmitted by facsimile or electronic mail, if to us, addressed to us at the address set forth in the Information Statement attached hereto as Exhibit A, or to such other address as we may designate in writing to the MAV, and if to the MAV, to their respective addresses as set forth in Schedule B (*Notice Details*) to the Omnibus Agreement, or to such other address as the MAV or Administrator may designate in writing to us.

No amendment, supplement or other modification or waiver of any provision of this letter shall in any event be effective unless the same shall be in writing and signed by the MAV, the Administrator and us and such amendment, supplement or other modification or waiver shall not require the consent or approval of any other person.

This letter shall not be assignable by us without the prior written consent of the MAV and the Administrator.

The representations, warranties and agreements made by us in this letter shall survive the advance of the Loan and any investigation made by the MAV or the Administrator.

We understand that the MAV, the Administrator and their respective counsel will rely upon the accuracy of the foregoing representations, and we hereby consent to such reliance.

IN WITNESS WHEREOF, the undersigned has executed this letter as of the date first written above.

[**_PURCHASER_**]

By:_____

Name:
Title:

**ANNEX A**

**INFORMATION STATEMENT**

1. Full Name of Purchaser:

2. Legal form of entity: (corporation, trust, partnership, etc.):

3. Jurisdiction of organisation:

4. Address for Notices:

       Attention:

5. Telephone Number:

6. Telecopier Number:

7. Electronic Mail Address:

8. Permanent Address: for securities law purposes (if different from above)

       Attention:

9. Canada Business Number or Social Insurance Number (if any):

10. Payment Instructions:

11. Instructions for delivery of Loan:

## SCHEDULE U

### LIST OF SECURITIES ACCOUNTS

**1.    ORIGINAL COLLATERAL ACCOUNTS**

| Dealer (and trade description, if applicable) | Securities Account number |
|---|---|
| 1.    Bank of America (NCLT (CADBANA) 2005-1) | [●] |
| 2.    Swiss Re Financial Products Corporation (CCLT (Banff) 2006-1) | [●] |
| 3.    Swiss Re Financial Products Corporation (CCLT (Galibier) 2006-1) | [●] |
| 4.    Swiss Re Financial Products Corporation (Coastal Mountain Base Trust Series 2006-1) | [●] |
| 5.    Merrill Lynch International and Merrill Lynch Capital Services Inc. | [●] |
| 6.    UBS AG, London Branch | [●] |
| 7.    HSBC Bank USA (Symphony  HS5) | [●] |
| 8.    HSBC Bank USA (Symphony  HS6) | [●] |
| 9.    HSBC Bank USA (Symphony  HS7) | [●] |
| 10.    HSBC Bank USA (Opus  HS8_Long-(Short)) | [●] |
| 11.    HSBC Bank USA (Encore   HS8A_Long (Short) -LSS and HS8B_Long (Short) -LSS) | [●] |
| 12.    HSBC Bank USA (HSBC LSS) | [●] |
| 13.    HSBC Bank USA (NCLCT (BCO-LSS) 2006) | [●] |
| 14.    HSBC Bank USA (HSBC STARTS (CANADA) Trust 2004-2) | [●] |
| 15.    Deutsche Bank AG Wrapped Collateral | [●] |
| 16.    Deutsche Bank AG Unwrapped Collateral | [●] |

2.    **OTHER COLLATERAL ACCOUNTS**

| Account Number | Account Short Name |
|---|---|
| MVGF1001002 | CMAV2-CITI COLL |
| MVGF1002002 | CMAV2-DB COLL |
| MVGF1003002 | CMAV2-HSBC COLL |
| MVGF1004002 | CMAV2-MLI COLL |
| MVGF1005002 | CMAV2-SR COLL |
| MVGF1006002 | CMAV2-RBC COLL |
| MVGF1007002 | CMAV2-UBS COLL |
| MVGF1008002 | CMAV2-BA COLL |
| MVGF1009002 | CMAV2-MLCS COLL |

| General Account | |
|---|---|
| Account Number | Account Short Name |
| MVGF2001002 | CMAV2 |

| Securities Accounts referenced in Omnibus Agreement | |
|---|---|
| Account Number | Account Short Name |
| Collateral Account | |
| MVGF2002002 | CMAV2 -ADD COLL-REIN |
| Collection Account | |
| MVGF2003002 | CMAV2 - COLLECTIONS |
| Expense Account | |
| MVGF2006002 | CMAV2-SR EXPSE SHORT |
| MVGF2007002 | CMAV2-EX LIQUIDATION |
| OC Transfer Sub-Account | |
| MVGF2012002 | CMAV2-OC TRANSFER |
| MAV2 Trust Distribution Account[26] | |
| MVGF2002002 | CMAV2 -ADD COLL-REIN |

| Securities Accounts referenced in Margin Funding Facility Agreement | |
|---|---|
| Account Number | Account Short Name |
| Reserve Account | |
| MVGF2005002 | CMAV2 - MFF RESERVE |
| MFF Account | |
| MVGF2008002 | CMAV2-MFF |
| Draw Account | |
| MVGF2009002 | CMAV2-MFF DRAW |

---

[26] As defined in the relevant Securitisation Agreement.

| Lender Credit Support Agreement Securities Accounts | |
|---|---|
| **Account Number** | **Account Short Name** |
| MVFF3001002 | CMAV1-CAIS DJDN COLL |
| MVGF3001002 | CMAV2-BMO COLL |
| MVGF3002002 | CMAV2-CIBC COLL |
| MVGF3003002 | CMAV2-NATIONAL COLL |
| MVGF3004002 | CMAV2-BNS COLL |
| MVGF3005002 | CMAV2-TD COLL |

## SCHEDULE V

## SECURITY REGISTRATIONS

**A.    New Registrations**

| Debtor/Address | Secured Party/Address | Jurisdiction | Document granting security interest/ General Collateral Description[27] | Length | Status |
|---|---|---|---|---|---|
| Master Asset Vehicle II Véhicule d'Actifs Cadre II<br><br>Master Asset Vehicle II Véhicule d'Actifs Cadre II Trust<br><br>Véhicule d'Actifs Cadre II Master Asset Vehicle II<br><br>Véhicule d'Actifs Cadre II Master Asset Vehicle II Trust<br><br>Master Asset Vehicle II<br><br>Master Asset Vehicle II Trust<br><br>Véhicule d'Actifs Cadre II<br><br>Véhicule d'Actifs Cadre II Trust<br><br>Address for Debtor:<br><br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6 | Bank of America, N.A.<br>Sears Tower<br>233 South Wacker Drive, Suite 2800<br>Chicago, IL 60606-6306 | Ontario | Master Security Agreement<br><br>"All Original Collateral as defined in the Master Security Agreement dated on or around ____ granted by the debtor in favour of the secured party, as such agreement may be amended, restated, supplemented or otherwise modified from time to time" | Infinity | |

---

[27] Or equivalent per jurisdiction.  In Ontario, the registrations in favour of the Dealers will also check off "Accounts, Other" and the "Collateral Agent" registrations will have "Inventory, Equipment, Accounts, Other, Motor Vehicles" checked off

| Debtor/Address | Secured Party/Address | Jurisdiction | Document granting security interest/ General Collateral Description[27] | Length | Status |
|---|---|---|---|---|---|
| Same as above | Citibank, N.A. 390 Greenwich Street 4th Floor NY, NY 10013 Citibank, N.A. Canadian Branch 123 Front Street West, Suite 1000, Toronto, M5J 2M3 | Ontario | Master Security Agreement "All Original Collateral as defined in the Master Security Agreement dated on or around ____ granted by the debtor in favour of the secured party, as such agreement may be amended, restated, supplemented or otherwise modified from time to time" | Infinity | |
| Same as above | Deutsche Bank AG, London Branch Winchester House One Great Winchester Street London EC2N 2DB Deutsche Bank AG, Canada Branch 199 Bay Street, Suite 4700 Commerce Court West PO Box 263 Toronto, ON M5L 1E9 | Ontario | Master Security Agreement "All Original Collateral as defined in the Master Security Agreement dated on or around ____ granted by the debtor in favour of the secured party, as such agreement may be amended, restated, supplemented or otherwise modified from time to time" | Infinity | |
| Same as above | HSBC Bank USA, National Association 452 Fifth Avenue New York, New York 10018 | Ontario | Master Security Agreement "All Original Collateral as defined in the Master Security Agreement dated on or around ____ granted by the debtor in favour of the secured party, as such agreement may be amended, restated, supplemented or otherwise modified from time to time" | Infinity | |

| Debtor/Address | Secured Party/Address | Jurisdiction | Document granting security interest/ General Collateral Description[27] | Length | Status |
|---|---|---|---|---|---|
| Same as above | Merrill Lynch International Merrill Lynch Financial Centre 2 King Edward Street London EC1A 1HQ England | Ontario | Master Security Agreement "All Original Collateral as defined in the Master Security Agreement dated on or around _____ granted by the debtor in favour of the secured party, as such agreement may be amended, restated, supplemented or otherwise modified from time to time" | Infinity | |
| Same as above | Merrill Lynch Capital Services, Inc. 4 World Financial Center New York, NY  10080 USA | Ontario | Master Security Agreement "All Original Collateral as defined in the Master Security Agreement dated on or around _____ granted by the debtor in favour of the secured party, as such agreement may be amended, restated, supplemented or otherwise modified from time to time" | Infinity | |
| Same as above | Swiss Re Financial Products Corporation 55 East 52nd Street New York, NY 10055 Attn: Legal Department | Ontario DC NY | Master Security Agreement "All Original Collateral as defined in the Master Security Agreement dated on or around _____ granted by the debtor in favour of the secured party, as such agreement may be amended, restated, supplemented or otherwise modified from time to time" | Infinity | |
| Same as above | UBS AG UBS AG, Stamford Branch 677 Washington Boulevard Stamford, CT 06901 | Ontario | Master Security Agreement "All Original Collateral as defined in the Master Security Agreement dated on or around _____ granted by the debtor in favour of the secured party, as such agreement may be amended, restated, supplemented or otherwise modified from time to time" | Infinity | |

| Debtor/Address | Secured Party/Address | Jurisdiction | Document granting security interest/ General Collateral Description[27] | Length | Status |
|---|---|---|---|---|---|
| Same as above | Canadian Imperial Bank of Commerce<br>Canadian Imperial Bank of Commerce<br>Commerce Court West,<br>11th Floor<br>Toronto, Ontario M5L 1A2 | Ontario | Separate Credit Support Annex<br><br>"All Posted Collateral as defined in the Credit Support Annex dated on or around ____ granted by the debtor in favour of the secured party, as such agreement may be amended, restated, supplemented or otherwise modified from time to time" | 8 years | |

| Debtor/Address | Secured Party/Address | Jurisdiction | Document granting security interest/ General Collateral Description[27] | Length | Status |
|---|---|---|---|---|---|
| Same as above | Royal Bank of Canada 2nd Floor Royal Bank Plaza 200 Bay Street Toronto, Ontario M5J 2W7 | Ontario | Master Security Agreement<br><br>"All Original Collateral as defined in the Master Security Agreement dated on or around _____ granted by the debtor in favour of the secured party, as such agreement may be amended, restated, supplemented or otherwise modified from time to time" | Infinity | |
| Same as above | BNY Trust Company of Canada, as Collateral Agent 4 King Street West, Suite 1101 Toronto, Ontario M5H 1B6 | All Canadian Provinces[28] except Quebec *(see below for Quebec regn)* | Master Security Agreement<br><br>"All present and after-acquired personal property of the debtor excluding the Excluded Assets as that term is defined in Schedule A to the Omnibus Agreement dated on or around _____, 2009 made among, *inter alios*, the Unlevered CDS Counterparties, the LSS CDS Counterparties, the Lenders, BNY Trust Company of Canada, as Collateral Agent, Administrative Agent and Indenture Trustee, Blackrock (Institutional) Canada Ltd., as Administrator, as Valuation Agent and as Spread/Loss Trigger Calculation Agent, and CIBC Mellon Global Securities Services Company in its capacity as Issuer Trustee of the Debtor, as such agreement may be amended, restated, supplemented or otherwise modified from time to time" | Infinity | |

---

[28] Yukon Registrations can only be made for 25 years – please diarize for renewal accordingly

| Debtor/Address | Secured Party/Address | Jurisdiction | Document granting security interest/ General Collateral Description[27] | Length | Status |
|---|---|---|---|---|---|
| Same as above | BNY Trust Company of Canada, as Collateral Agent 4 King Street West, Suite 1101 Toronto, Ontario M5H 1B6 | D.C. | Master Security Agreement "All present and after-acquired personal property of the debtor excluding the Excluded Assets as that term is defined in Schedule A to the Omnibus Agreement dated on or around _____, 2009 made among, *inter alios*, the Unlevered CDS Counterparties, the LSS CDS Counterparties, the Lenders, BNY Trust Company of Canada, as Collateral Agent, Administrative Agent and Indenture Trustee, Blackrock (Institutional) Canada Ltd., as Administrator, as Valuation Agent and as Spread/Loss Trigger Calculation Agent, and CIBC Mellon Global Securities Services Company in its capacity as Issuer Trustee of the Debtor, as such agreement may be amended, restated, supplemented or otherwise modified from time to time" | 5 years[29] | |

---

[29] D.C. registrations can only be made for 5 years – please diarize for renewal accordingly.

| Debtor/Address | Secured Party/Address | Jurisdiction | Document granting security interest/ General Collateral Description[27] | Length | Status |
|---|---|---|---|---|---|
| Same as above | BNY Trust Company of Canada, as Collateral Agent 4 King Street West, Suite 1101 Toronto, Ontario M5H 1B6 | PQ | Hypothec re Master Security Agreement<br><br>"All present and after-acquired personal property of the debtor excluding the Excluded Assets as that term is defined in Schedule A to the Omnibus Agreement dated on or around _____, 2009 made among, *inter alios*, the Unlevered CDS Counterparties, the LSS CDS Counterparties, the Lenders, BNY Trust Company of Canada, as Collateral Agent, Administrative Agent and Indenture Trustee, Blackrock (Institutional) Canada Ltd., as Administrator, as Valuation Agent and as Spread/Loss Trigger Calculation Agent, and CIBC Mellon Global Securities Services Company in its capacity as Issuer Trustee of the Debtor, as such agreement may be amended, restated, supplemented or otherwise modified from time to time" | 10 years[30] | |

---

[30] Please note that one can only file in Quebec for 10 years.  The secured party must diarize in order to renew all new registrations in 2018

**B.** **New Registrations re Specified Creditors relating to specific pools of Traditional Assets that are not covered by the Master Security Agreement**

| Debtor/Address | Secured Party/Address | Jurisdiction | Document granting security interest/ General Collateral Description | Length | Status |
|---|---|---|---|---|---|
| Master Asset Vehicle II Véhicule d'Actifs Cadre II<br><br>Master Asset Vehicle II Véhicule d'Actifs Cadre II Trust<br><br>Véhicule d'Actifs Cadre II Master Asset Vehicle II<br><br>Véhicule d'Actifs Cadre II Master Asset Vehicle II Trust<br><br>Master Asset Vehicle II<br><br>Master Asset Vehicle II Trust<br><br>Véhicule d'Actifs Cadre II<br><br>Véhicule d'Actifs Cadre II Trust<br><br>Address for Debtor:<br><br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6 | BNY Trust Company of Canada, as Collateral Agent<br>4 King Street West, Suite 1101<br>Toronto, Ontario<br>M5H 1B6 | ON | "The Debtor's Proportionate Interest in the Collateral as defined in the MCAP Related Asset Creditor Security Agreement, dated on or around _____, between, *inter alia*, BNY Trust Company of Canada and Master Asset Vehicle II Véhicule d'Actifs Cadre II, as such agreement may be amended, restated, supplemented or otherwise modified from time to time" | Infinity | |
| Same as above | BNY Trust Company of Canada, as Collateral Agent<br>4 King Street West, Suite 1101<br>Toronto, Ontario<br>M5H 1B6 | ON | "The Debtor's Proportionate Interest in the Collateral as defined in the CMO Related Asset Creditor Security Agreement, dated on or around _____, between, *inter alia*, BNY Trust Company of Canada and Master Asset Vehicle II Véhicule d'Actifs Cadre II, as such agreement may be amended, restated, supplemented or otherwise modified from time to time" | Infinity | |

**C.**  **Registrations relating to Sales of Receivables (Traditional Assets) to Custodian (or Constellation Certificate Trust (Targeted) Series 2008-1, as Applicable) for MAVII plus MAVI and MAVII on their own behalf as Secured Parties**

    **(a)**  **Registrations to be assigned (to Custodian for MAVII plus MAVI and MAVII on their own behalf): where conduit is the secured party**

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Assigned To/Status |
|---|---|---|---|---|
| a)  1.    Aurora Trust | The Toronto-Dominion Bank<br><br>La Banque Toronto-Dominion | 605009979-20040428 1711 1462 1193 (10 years)<br>**MD: Apr. 15, 2014** | ON | Assignor:  Aurora Trust<br>Assignees:<br>1) CIBC Mellon Trust Company, as Custodian on behalf of Master Asset Vehicle I Véhicule d'Actifs Cadre I and Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>320 Bay Street, P.O. Box 1, Toronto, Ontario<br>M5H 4A6<br><br>2) Master Asset Vehicle I Véhicule d'Actifs Cadre I<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>3) Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>**\*\*To be renewed by 1 year – post-closing** |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Assigned To/Status |
|---|---|---|---|---|
| b) 2.        Rocket Trust | MCAP Commercial LP<br><br>MCAP Financial Corporation | 602731989-20040128 1256 1862 9832 (10 years)<br>**MD: May 10, 2014** | ON | Assignor: Rocket Trust<br>Assignees:<br>1) CIBC Mellon Trust Company, as Custodian on behalf of Master Asset Vehicle I Véhicule d'Actifs Cadre I and Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>320 Bay Street, P.O. Box 1, Toronto, Ontario<br>M5H 4A6<br><br>2) Master Asset Vehicle I Véhicule d'Actifs Cadre I<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>3) Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>**\*\*To be renewed by 1 year – post-closing** |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Assigned To/Status |
|---|---|---|---|---|
| c) 3.    Rocket Trust | MCAP Commercial LP<br><br>MCAP Financial Corporation | 507271B<br>Date of Regn:<br>January 28, 2004<br>Date of Expiry:<br>January 28, 2014<br>**MD: May 10, 2014** | BC | Assignor: Rocket Trust<br>Assignees:<br>1) CIBC Mellon Trust Company, as Custodian on behalf of Master Asset Vehicle I Véhicule d'Actifs Cadre I and Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>320 Bay Street, P.O. Box 1, Toronto, Ontario<br>M5H 4A6<br><br>2) Master Asset Vehicle I Véhicule d'Actifs Cadre I<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>3) Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>**\*\*To be renewed by 1 year – post-closing** |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Assigned To/Status |
|---|---|---|---|---|
| d)  4.  Rocket Trust<br><br>Rocket Trust Trust | MCAP Commercial LP<br><br>MCAP Financial Corporation | 04013009289<br>Date of Regn:<br>January 30, 2004<br>Date of Expiry:<br>January 30, 2014<br>**MD: May 10, 2014** | AB | Assignors: Rocket Trust and Rocket Trust Trust<br>Assignees:<br>1) CIBC Mellon Trust Company, as Custodian on behalf of Master Asset Vehicle I Véhicule d'Actifs Cadre I and Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>320 Bay Street, P.O. Box 1, Toronto, Ontario<br>M5H 4A6<br><br>2) Master Asset Vehicle I Véhicule d'Actifs Cadre I<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>3) Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>**\*\*To be renewed by 1 year – post-closing** |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Assigned To/Status |
|---|---|---|---|---|
| e) 5.    Rocket Trust | MCAP Commercial LP<br><br>MCAP Financial Corporation | 120407388<br>Date of Regn:<br>January 30, 2004<br>Date of Expiry:<br>January 30, 2014<br>**MD: May 10, 2014** | SK | Assignor: Rocket Trust<br>Assignees:<br>1) CIBC Mellon Trust Company, as Custodian on behalf of Master Asset Vehicle I Véhicule d'Actifs Cadre I and Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>320 Bay Street, P.O. Box 1, Toronto, Ontario<br>M5H 4A6<br><br>2) Master Asset Vehicle I Véhicule d'Actifs Cadre I<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>3) Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>**\*\*To be renewed by 1 year – post-closing** |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Assigned To/Status |
|---|---|---|---|---|
| f) 6. Rocket Trust | MCAP Commercial LP<br><br>MCAP Financial Corporation | 200401527400<br>Date of Regn:<br>January 29, 2004<br>Date of Expiry:<br>January 29, 2014<br>**MD: May 10, 2014** | MB | Assignor: Rocket Trust<br>Assignees:<br>1) CIBC Mellon Trust Company, as Custodian on behalf of Master Asset Vehicle I Véhicule d'Actifs Cadre I and Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>320 Bay Street, P.O. Box 1, Toronto, Ontario<br>M5H 4A6<br><br>2) Master Asset Vehicle I Véhicule d'Actifs Cadre I<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>3) Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>**\*\*To be renewed by 1 year – post-closing** |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Assigned To/Status |
|---|---|---|---|---|
| g)  7.      Rocket Trust | MCAP Commercial LP<br><br>MCAP Financial Corporation | 7782688<br>Date of Regn:<br>January 28, 2004<br>Date of Expiry:<br>January 28, 2014<br>**MD: May 10, 2014** | NS | Assignor: Rocket Trust<br>Assignees:<br>1) CIBC Mellon Trust Company, as Custodian on behalf of Master Asset Vehicle I Véhicule d'Actifs Cadre I and Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>320 Bay Street, P.O. Box 1, Toronto, Ontario<br>M5H 4A6<br><br>2) Master Asset Vehicle I Véhicule d'Actifs Cadre I<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>3) Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>**\*\*To be renewed by 1 year – post-closing** |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Assigned To/Status |
|---|---|---|---|---|
| h)  8.    Rocket Trust | MCAP Commercial LP<br><br>MCAP Financial Corporation | 10597722<br>Date of Regn:<br>January 29, 2004<br>Date of Expiry:<br>January 29, 2014<br>**MD: May 10, 2014** | NB | Assignor: Rocket Trust<br>Assignees:<br>1) CIBC Mellon Trust Company, as Custodian on behalf of Master Asset Vehicle I Véhicule d'Actifs Cadre I and Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>320 Bay Street, P.O. Box 1, Toronto, Ontario<br>M5H 4A6<br><br>2) Master Asset Vehicle I Véhicule d'Actifs Cadre I<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>3) Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>**\*\*To be renewed by 1 year – post-closing** |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Assigned To/Status |
|---|---|---|---|---|
| i) 9. Rocket Trust | MCAP Commercial LP<br><br>MCAP Financial Corporation | 1090982<br>Date of Regn:<br>January 30, 2004<br>Date of Expiry:<br>January 30, 2014<br>**MD: May 10, 2014** | PEI | Assignor: Rocket Trust<br>Assignees:<br>1) CIBC Mellon Trust Company, as Custodian on behalf of Master Asset Vehicle I Véhicule d'Actifs Cadre I and Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>320 Bay Street, P.O. Box 1, Toronto, Ontario<br>M5H 4A6<br><br>2) Master Asset Vehicle I Véhicule d'Actifs Cadre I<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>3) Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>**\*\*To be renewed by 1 year – post-closing** |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Assigned To/Status |
|---|---|---|---|---|
| j)  10.    Rocket Trust | MCAP Commercial LP<br><br>MCAP Financial Corporation | 3162865<br>Date of Regn:<br>January 29, 2004<br>Date of Expiry:<br>January 29, 2014<br>**MD: May 10, 2014** | Nfld | Assignor: Rocket Trust<br>Assignees:<br>1) CIBC Mellon Trust Company, as Custodian on behalf of Master Asset Vehicle I Véhicule d'Actifs Cadre I and Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>320 Bay Street, P.O. Box 1, Toronto, Ontario<br>M5H 4A6<br><br>2) Master Asset Vehicle I Véhicule d'Actifs Cadre I<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>3) Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>**\*\*To be renewed by 1 year – post-closing** |

**(b)      Registrations to be assigned to Constellation Certificate Trust (Targeted) Series 2008-1: where conduit is the secured party**

| Secured Party(ies) | | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Assigned To/Status |
|---|---|---|---|---|---|
| k) | 1. Rocket Trust | Canadian Western Bank Banque Canadienne de L'Ouest Canadian Western Bank Banque Canadienne de L'Ouest | 613044801-20050302 0910 1590 5038 (10 years) **MD: Jul. 8, 2015** | ON | Assignor: Rocket Trust Assignee: Constellation Certificate Trust (Targeted) Series 2008-1 c/o BNY Trust Company of Canada 4 King Street West, Suite 1101 Toronto, Ontario M5H 1B6<br><br>Amendment then required to change the address of the Assignee to: c/o CIBC Mellon Global Securities Services Company 320 Bay Street, P.O. Box 1, Toronto, Ontario M5H 4A6 **\*\*To be renewed by 1 year – post-closing** |
| l) | 2. Rocket Trust | Concentra Financial Services Association Associate de Services Financiers Concentra Concentra Financial Services Association Associate de Services Financiers Concentra | 637136406-20070710 1659 1862 9562 (19 years) | ON | Assignor: Rocket Trust Assignee: Constellation Certificate Trust (Targeted) Series 2008-1 c/o BNY Trust Company of Canada 4 King Street West, Suite 1101 Toronto, Ontario M5H 1B6<br><br>Amendment then required to change the address of the Assignee to: c/o CIBC Mellon Global Securities Services Company 320 Bay Street, P.O. Box 1, Toronto, Ontario M5H 4A6 |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Assigned To/Status |
|---|---|---|---|---|
| m) 3. Rocket Trust | Saskatchewan Co-Operative Financial Services Limited<br><br>CUCORP Financial Services<br><br>Concentra Financial Services Association<br><br>Associate de Services Financiers Concentra<br><br>Concentra Financial Services Association Associate de Services Financiers Concentra | 881420571-20020509 1128 9065 9515 (17 years) | ON | Assignor: Rocket Trust<br>Assignee: Constellation Certificate Trust (Targeted) Series 2008-1<br>c/o BNY Trust Company of Canada<br>4 King Street West, Suite 1101<br>Toronto, Ontario<br>M5H 1B6<br><br>Amendment then required to change the address of the Assignee to:<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6 |
| n) 4. Rocket Trust | Canadian Western Bank<br><br>Banque Canadienne de L'Ouest<br><br>Canadian Western Bank Banque Canadienne de L'Ouest | 213724C<br>Date of Regn: March 2, 2005<br>Date of Expiry: March 2, 2021 | BC | Assignor: Rocket Trust<br>Assignee: Constellation Certificate Trust (Targeted) Series 2008-1<br>c/o BNY Trust Company of Canada<br>4 King Street West, Suite 1101<br>Toronto, Ontario<br>M5H 1B6<br><br>Amendment then required to change the address of the Assignee to:<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6 |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Assigned To/Status |
|---|---|---|---|---|
| o) 5. Rocket Trust  Rocket Trust Trust | Saskatchewan Co-Operative Financial Services Limited  Cucorp Financial Services  Concentra Financial Services Association  Association de Services Financiers Concentra  Concentra Financial Services Association Association de Services Financiers Concentra | 310518A Date of Regn: April 2, 2002 Date of Expiry: April 2, 2019 | BC | Assignors: Rocket Trust and Rocket Trust Trust Assignee: Constellation Certificate Trust (Targeted) Series 2008-1 c/o BNY Trust Company of Canada 4 King Street West, Suite 1101 Toronto, Ontario M5H 1B6  Amendment then required to change the address of the Assignee to: c/o CIBC Mellon Global Securities Services Company 320 Bay Street, P.O. Box 1, Toronto, Ontario M5H 4A6 |
| p) 6. Rocket Trust | Concentra Financial Services Association  Association de Services Financiers Concentra  Concentra Financial Services Association Association de Services Financiers Concentra | 786311D Date of Regn: July 10, 2007 Date of Expiry: July 10, 2026 | BC | Assignor: Rocket Trust Assignee: Constellation Certificate Trust (Targeted) Series 2008-1 c/o BNY Trust Company of Canada 4 King Street West, Suite 1101 Toronto, Ontario M5H 1B6  Amendment then required to change the address of the Assignee to: c/o CIBC Mellon Global Securities Services Company 320 Bay Street, P.O. Box 1, Toronto, Ontario M5H 4A6 |

| | Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Assigned To/Status |
|---|---|---|---|---|---|
| q) | 7. Rocket Trust | Canadian Western Bank Banque Canadienne de L'Ouest Canadian Western Bank Banque Canadienne de L'Ouest | 05030207525 Date of Regn: March 2, 2005 Date of Expiry: March 2, 2021 | AB | Assignor: Rocket Trust Assignee: Constellation Certificate Trust (Targeted) Series 2008-1 c/o BNY Trust Company of Canada 4 King Street West, Suite 1101 Toronto, Ontario M5H 1B6 <br><br> Amendment then required to change the address of the Assignee to: c/o CIBC Mellon Global Securities Services Company 320 Bay Street, P.O. Box 1, Toronto, Ontario M5H 4A6 |
| r) | 8. Rocket Trust Rocket Trust Trust | Concentra Financial Services Association Association de Services Financiers Concentra Concentra Financial Services Association Association de Services Financiers Concentra | 07071028372 **(latest Regn # is: 07071040336)** Date of Regn: July 10, 2007 Date of Expiry: July 10, 2026 | AB | Assignors: Rocket Trust and Rocket Trust Trust Assignee: Constellation Certificate Trust (Targeted) Series 2008-1 c/o BNY Trust Company of Canada 4 King Street West, Suite 1101 Toronto, Ontario M5H 1B6 <br><br> Amendment then required to change the address of the Assignee to: c/o CIBC Mellon Global Securities Services Company 320 Bay Street, P.O. Box 1, Toronto, Ontario M5H 4A6 |

| | Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Assigned To/Status |
|---|---|---|---|---|---|
| s) | 9. Rocket Trust Rocket Trust Trust | Saskatchewan Co-Operative Financial Services Limited Cucorp Financial Services Concentra Financial Services Association Associate de Services Financiers Concentra Concentra Financial Services Association Associate de Services Financiers Concentra | 02031922673 **(latest Regn # is: 05021604631)** Date of Regn: March 19, 2002 Date of Expiry: March 19, 2019 | AB | Assignors: Rocket Trust and Rocket Trust Trust Assignee: Constellation Certificate Trust (Targeted) Series 2008-1 c/o BNY Trust Company of Canada 4 King Street West, Suite 1101 Toronto, Ontario M5H 1B6 Amendment then required to change the address of the Assignee to: c/o CIBC Mellon Global Securities Services Company 320 Bay Street, P.O. Box 1, Toronto, Ontario M5H 4A6 |
| t) | 10. Rocket Trust | Canadian Western Bank Banque Canadienne de L'Ouest Canadian Western Bank Banque Canadienne de L'Ouest | 121786133 Date of Regn: March 2, 2005 Date of Expiry: March 2, 2021 | SK | Assignor: Rocket Trust Assignee: Constellation Certificate Trust (Targeted) Series 2008-1 c/o BNY Trust Company of Canada 4 King Street West, Suite 1101 Toronto, Ontario M5H 1B6 Amendment then required to change the address of the Assignee to: c/o CIBC Mellon Global Securities Services Company 320 Bay Street, P.O. Box 1, Toronto, Ontario M5H 4A6 |

| | Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Assigned To/Status |
|---|---|---|---|---|---|
| u) | 11. Rocket Trust<br><br>Rocket Trust Trust | Saskatchewan Cooperative Financial Services Limited<br><br>Cucorp Financial Services<br><br>Concentra Financial Services Association<br><br>Associate de Services Financiers Concentra<br><br>Concentra Financial Services Association Associate de Services Financiers Concentra | 117839827 Date of Regn: March 28, 2002 Date of Expiry: March 28, 2019 | SK | Assignors: Rocket Trust and Rocket Trust Trust<br>Assignee: Constellation Certificate Trust (Targeted) Series 2008-1<br>c/o BNY Trust Company of Canada<br>4 King Street West, Suite 1101<br>Toronto, Ontario<br>M5H 1B6<br><br>Amendment then required to change the address of the Assignee to:<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6 |
| v) | 12. Rocket Trust<br><br>Rocket Trust Trust | Concentra Financial Services Association<br><br>Association de Services Financiers Concentra<br><br>Concentra Financial Services Association Association de Services Financiers Concentra | 300195030 Date of Regn: July 10, 2007 Date of Expiry: July 10, 2026 | SK | Assignors: Rocket Trust and Rocket Trust Trust<br>Assignee: Constellation Certificate Trust (Targeted) Series 2008-1<br>c/o BNY Trust Company of Canada<br>4 King Street West, Suite 1101<br>Toronto, Ontario<br>M5H 1B6<br><br>Amendment then required to change the address of the Assignee to:<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6 |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Assigned To/Status |
|---|---|---|---|---|
| w) 13. Rocket Trust | Canadian Western Bank<br><br>Banque Canadienne de L'Ouest<br><br>Canadian Western Bank Banque Canadienne de L'Ouest | 200503352108<br>Date of Regn:<br>March 2, 2005<br>Date of Expiry:<br>March 2, 2021 | MB | Assignor: Rocket Trust<br>Assignee: Constellation Certificate Trust (Targeted) Series 2008-1<br>c/o BNY Trust Company of Canada<br>4 King Street West, Suite 1101<br>Toronto, Ontario<br>M5H 1B6<br><br>Amendment then required to change the address of the Assignee to:<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6 |
| x) 14. Rocket Trust | Concentra Financial Services Association<br><br>Associate de Services Financiers Concentra<br><br>Concentra Financial Services Association Associate de Services Financiers Concentra | 200712568100<br>Date of Regn:<br>July 10, 2007<br>Date of Expiry:<br>July 11, 2026 | MB | Assignor: Rocket Trust<br>Assignee: Constellation Certificate Trust (Targeted) Series 2008-1<br>c/o BNY Trust Company of Canada<br>4 King Street West, Suite 1101<br>Toronto, Ontario<br>M5H 1B6<br><br>Amendment then required to change the address of the Assignee to:<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6 |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Assigned To/Status |
|---|---|---|---|---|
| y)  15.<br>Rocket Trust<br><br>Rocket Trust Trust | Saskatchewan Co-Operative Financial Services Limited<br><br>Cucorp Financial Services<br><br>Concentra Financial Services Association<br><br>Associate de Services Financiers Concentra<br><br>Concentra Financial Services Association Associate de Services Financiers Concentra | 200206352808<br>Date of Regn:<br>March 28, 2002<br>Date of Expiry:<br>March 28, 2019 | MB | Assignors: Rocket Trust and Rocket Trust Trust<br>Assignee: Constellation Certificate Trust (Targeted) Series 2008-1<br>c/o BNY Trust Company of Canada<br>4 King Street West, Suite 1101<br>Toronto, Ontario<br>M5H 1B6<br><br>Amendment then required to change the address of the Assignee to:<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6 |

**(c)      New Registrations to be made re Sales of Receivables**

| Debtor/Address | Secured Party/Address | Jurisdiction | Document granting security interest/ General Collateral Description | Length | Status |
|---|---|---|---|---|---|
| 1.  Aurora Trust<br><br>Aurora Trust Trust c/o 6932819 Canada Inc. 66 Wellington St. W., Suite 3700 Toronto, Ontario M5K 1N6 | 1) CIBC Mellon Trust Company, as Custodian on behalf of Master Asset Vehicle I Véhicule d'Actifs Cadre I and Master Asset Vehicle II Véhicule d'Actifs Cadre II 320 Bay Street, P.O. Box 1, Toronto, Ontario M5H 4A6<br><br>2) Master Asset Vehicle I Véhicule d'Actifs Cadre I c/o CIBC Mellon Global Securities Services Company 320 Bay Street, P.O. Box 1, Toronto, Ontario M5H 4A6<br><br>3) Master Asset Vehicle II Véhicule d'Actifs Cadre II c/o CIBC Mellon Global Securities Services Company 320 Bay Street, P.O. Box 1, Toronto, Ontario M5H 4A6 | Ontario | Sale of Receivables<br><br>"A Sale of Receivables pursuant to a Transfer Agreement dated on or around _____" | Infinity | |

| Debtor/Address | Secured Party/Address | Jurisdiction | Document granting security interest/ General Collateral Description | Length | Status |
|---|---|---|---|---|---|
| z)  2.         Rocket Trust<br><br>Rocket Trust Trust<br>c/o 6932819 Canada Inc.<br>66 Wellington St. W., Suite 3700<br>Toronto, Ontario<br>M5K 1N6 | 1) CIBC Mellon Trust Company, as Custodian on behalf of Master Asset Vehicle I Véhicule d'Actifs Cadre I and Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>320 Bay Street, P.O. Box 1, Toronto, Ontario<br>M5H 4A6<br><br>2) Master Asset Vehicle I Véhicule d'Actifs Cadre I<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1, Toronto, Ontario<br>M5H 4A6<br><br>3) Master Asset Vehicle II Véhicule d'Actifs Cadre II<br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1, Toronto, Ontario<br>M5H 4A6 | Ontario | Sale of Receivables<br><br>"A Sale of Receivables pursuant to a Transfer Agreement dated on or around _____" | Infinity | |

| Debtor/Address | Secured Party/Address | Jurisdiction | Document granting security interest/ General Collateral Description | Length | Status |
|---|---|---|---|---|---|
| aa) 3.        Rocket Trust<br><br>Rocket Trust Trust<br>c/o 6932819 Canada Inc.<br>66 Wellington St. W., Suite 3700 Toronto, Ontario M5K 1N6 | Constellation Certificate Trust (Targeted) Series 2008-1<br>c/o BNY Trust Company of Canada<br>4 King Street West, Suite 1101<br>Toronto, Ontario<br>M5H 1B6<br><br><u>Amendment then required to change the address of the Assignee to:</u><br>c/o CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6 | Ontario | Sale of Receivables<br><br>"A Sale of Receivables pursuant to a Transfer Agreement dated on or around _____" | | |

**D.**    **Existing QSPE Registrations**

    (a)    Registrations to be assigned to BNY Trust Company of Canada, as Security Agent on behalf of the QSPE Creditors: where conduit is the secured party

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Action/Status |
|---|---|---|---|---|
| a)   1.     Rocket Trust | QSPE-AMC/R Trust<br><br>QSPE-AMC/R Trust Trust | 872193501- 20010507 1642 9065 0408 (20 years) | ON | *Closing Assignment*<br>Assignor: Rocket Trust<br>Assignee: BNY Trust Company of Canada, as Security Agent on behalf of the QSPE Creditors<br>4 King Street West, Suite 1101<br>Toronto, Ontario<br>M5H 1B6 |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Action/Status |
|---|---|---|---|---|
| b) 2. Rocket Trust<br><br>Rocket Trust, Trust<br><br>Rocket Trust as represented by 6932819 Canada Inc. and 6932819 Canada Inc. in its capacity as Trustee of Rocket Trust | QSPE-AMC/R Trust<br><br>QSPE-AMC/R Trust, Trust<br><br>1462888 Ontario Inc.<br><br>1462888 Ontario Inc., in its capacity as Trustee of QSPE-AMC/R Trust | 01050924453<br>**(latest Regn # is:<br>08063032658)**<br>Date of Regn:<br>May 9, 2001<br>Date of Expiry:<br>May 9, 2021 | AB | *Pre-closing Assignment*<br>1. Assignors:The Trust Company of Bank of Montreal and The Trust Company of Bank of Montreal, in its capacity as Trustee of Rocket Trust<br>Assignee: BNY Trust Company of Canada, in its capacity as Trustee of Rocket Trust *(pursuant to 2003 assignment)*<br>**\*Complete**<br><br>*Pre-closing Assignment*<br>2. Assignor: BNY Trust Company of Canada, in its capacity as Trustee of Rocket Trust<br>Assignee: 6932819 Canada Inc. in its capacity as Trustee of Rocket Trust *(pursuant to Mar. 2008 assignment)*<br>**\*Complete**<br><br>*Closing Assignment*<br>3. Assignors: Rocket Trust, Rocket Trust, Trust, Rocket Trust as represented by 6932819 Canada Inc. and 6932819 Canada Inc. in its capacity as Trustee of Rocket Trust<br>Assignee: BNY Trust Company of Canada, as Security Agent on behalf of the QSPE Creditors<br>4 King Street West, Suite 1101<br>Toronto, Ontario<br>M5H 1B6<br><br>*Transfer:*<br>Transferors: 1462888 Ontario Inc. and 1462888 Ontario Inc., in its capacity as Trustee of QSPE-AMC/R Trust<br>Transferee: CIBC Mellon Global Securities Services Company, as Trustee for QSPE-AMC/R Trust<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6 |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Action/Status |
|---|---|---|---|---|
| c) 3.    6932819 Canada Inc. in its capacity as Trustee of Rocket Trust<br><br>Rocket Trust | QSPE-AMC/R Trust | 948745<br>Date of Regn:<br>May 9, 2001<br>Date of Expiry:<br>May 9, 2021 | Nfld | *Pre-closing Assignment*<br>1.  Assignor: The Trust Company of Bank of Montreal<br>Assignee: BNY Trust Company of Canada in its capacity as Trustee of Rocket Trust *(pursuant to 2003 assignment)*<br>**\*Complete**<br><br>*Pre-closing Assignment*<br>2.  Assignor: BNY Trust Company of Canada in its capacity as Trustee of Rocket Trust<br>Assignee: 6932819 Canada Inc. in its capacity as Trustee of Rocket Trust *(pursuant to Mar. 2008 assignment)*<br>**\*Complete**<br><br>*Closing Assignment*<br>3. Assignees: Rocket Trust and 6932819 Canada Inc. in its capacity as Trustee of Rocket Trust<br>Assignee: BNY Trust Company of Canada, as Security Agent on behalf of the QSPE Creditors<br>4 King Street West, Suite 1101<br>Toronto, Ontario<br>M5H 1B6 |
| d) 4.    Rocket Trust | QSPE-XCD Trust<br><br>QSPE-XCD Trust Trust | 881420949- 20020509 1128 9065 9552 (10 years)<br><br>**MD: Aug, 2012** | ON | *Closing Assignment*<br>Assignor: Rocket Trust<br>Assignee: BNY Trust Company of Canada, as Security Agent on behalf of the QSPE Creditors<br>4 King Street West, Suite 1101<br>Toronto, Ontario<br>M5H 1B6<br><br>**\*\*To be renewed by 1 year – post-closing** |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Action/Status |
|---|---|---|---|---|
| e) 5.     Rocket Trust | QSPE-XCD Trust<br><br>QSPE-XCD Trust Trust<br><br>1462888 Ontario Inc | Reg No.: 379443A<br>Reg Date: May 7, 2002<br>Exp Date: May 7, 2012<br><br>**MD: Aug, 2012** | BC | *Closing Assignment*<br>Assignor: Rocket Trust<br>Assignee: BNY Trust Company of Canada, as Security Agent on behalf of the QSPE Creditors<br>4 King Street West, Suite 1101<br>Toronto, Ontario<br>M5H 1B6<br><br>*Transfer*:<br>Transferor: 1462888 Ontario Inc<br>Transferee: CIBC Mellon Global Securities Services Company, as Trustee for QSPE-XCD Trust<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>**\*\*To be renewed by 1 year – post-closing** |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Action/Status |
|---|---|---|---|---|
| f)  6.        Rocket Trust<br><br>Rocket Trust, Trust<br><br>6932819 Canada Inc. in its capacity as Trustee of Rocket Trust | QSPE-XCD Trust<br><br>QSPE-XCD Trust, Trust<br><br>1462888 Ontario Inc., in its capacity as Trustee of QSPE-XCD Trust | 02050728910<br>**(latest Regn # is: 08063032706)**<br>Date of Regn:<br>May 7, 2002<br>Date of Expiry:<br>May 7, 2012<br><br>**MD: Aug, 2012** | AB | *Pre-closing Assignment*<br>1.  Assignors:  The Trust Company of Bank of Montreal, in its capacity as Trustee of Rocket Trust, Societe de Fiducie Banque de Montreal, in its capacity as Trustee of Rocket Trust and The Trust Company of Bank of Montreal Societe de Fiducie Banque de Montreal, in its capacity as Trustee of Rocket Trust<br>Assignee: BNY Trust Company of Canada in its capacity as Trustee of Rocket Trust *(pursuant to 2003 assignment)*<br>**\*Complete**<br><br>*Pre-closing Assignment*<br>2.  Assignor: BNY Trust Company of Canada in its capacity as Trustee of Rocket Trust<br>Assignee:  6932819 Canada Inc. in its capacity as Trustee of Rocket Trust *(pursuant to Mar. 2008 assignment)*<br>**\*Complete**<br><br>*Closing Assignment*<br>3.  Assignors: Rocket Trust, Rocket Trust, Trust and 6932819 Canada Inc. in its capacity as Trustee of Rocket Trust<br>Assignee: BNY Trust Company of Canada, as Security Agent on behalf of the QSPE Creditors<br>4 King Street West, Suite 1101<br>Toronto, Ontario<br>M5H 1B6<br><br>*Transfer*:<br>Transferor: 1462888 Ontario Inc., in its capacity as Trustee of QSPE-XCD Trust<br>Transferee: CIBC Mellon Global Securities Services Company, as Trustee for QSPE-XCD Trust<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>**\*\*To be renewed by 1 year – post-closing** |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Action/Status |
|---|---|---|---|---|
| g) 7. Rocket Trust | QSPE-XCD Trust<br><br>QSPE-XCD Trust Trust | 118032834<br>Date of Regn:<br>May 8, 2002<br>Date of Expiry:<br>May 8, 2012<br><br>**MD: Aug, 2012** | SK | *Closing Assignment*<br>Assignor: Rocket Trust<br>Assignee: BNY Trust Company of Canada, as Security Agent on behalf of the QSPE Creditors<br>4 King Street West, Suite 1101<br>Toronto, Ontario<br>M5H 1B6<br><br>**\*\*To be renewed by 1 year – post-closing** |
| h) 8. Rocket Trust | QSPE-XCD Trust<br><br>1462888 Ontario Inc. | 200209789000<br>Date of Regn:<br>May 9, 2002<br>Date of Expiry:<br>May 10, 2012<br><br>**MD: Aug, 2012** | MB | *Closing Assignment*<br>Assignor: Rocket Trust<br>Assignee: CIBC Mellon Trust Company, as Security Agent on behalf of the QSPE Creditors<br>320 Bay Street, P.O. Box 1, Toronto, Ontario<br>M5H 4A6<br><br>*Transfer*:<br>Transferor: 1462888 Ontario Inc.<br>Transferee: CIBC Mellon Global Securities Services Company, as Trustee for QSPE-XCD Trust<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6<br><br>**\*\*To be renewed by 1 year – post-closing** |
| i) 9. Rocket Trust | QSPE-XCD Trust | Reg No.: 5377576<br>Reg Date: May 8, 2002<br>Exp Date: May 8, 2012<br><br>**MD: Aug, 2012** | NS | *Closing Assignment*<br>Assignor: Rocket Trust<br>Assignee: BNY Trust Company of Canada, as Security Agent on behalf of the QSPE Creditors<br>4 King Street West, Suite 1101<br>Toronto, Ontario<br>M5H 1B6<br><br>**\*\*To be renewed by 1 year – post-closing** |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Action/Status |
|---|---|---|---|---|
| j) 10.  Rocket Trust | QSPE-XCD Trust | Reg No.: 8310464 Reg Date: May 8, 2002 Exp Date: May 8, 2012 **MD: Aug, 2012** | NB | *Closing Assignment* Assignor: Rocket Trust Assignee: BNY Trust Company of Canada, as Security Agent on behalf of the QSPE Creditors 4 King Street West, Suite 1101 Toronto, Ontario M5H 1B6 **\*\*To be renewed by 1 year – post-closing** |
| k) 11.  Rocket Trust | QSPE-XCD Trust | 736116 Date of Regn: May 8, 2002 Date of Expiry: May 8, 2012 **MD: Aug, 2012** | PEI | *Closing Assignment* Assignor: Rocket Trust Assignee: BNY Trust Company of Canada, as Security Agent on behalf of the QSPE Creditors 4 King Street West, Suite 1101 Toronto, Ontario M5H 1B6 **\*\*To be renewed by 1 year – post-closing** |
| l) 12.  Rocket Trust | QSPE-XCD Trust | 1800910 Date of Regn: May 8, 2002 Date of Expiry: May 8, 2012 **MD: Aug, 2012** | Nfld | *Closing Assignment* Assignor: Rocket Trust Assignee: BNY Trust Company of Canada, as Security Agent on behalf of the QSPE Creditors 4 King Street West, Suite 1101 Toronto, Ontario M5H 1B6 **\*\*To be renewed by 1 year – post-closing** |

**(b)     Quebec**

| PARTIES | REGISTRATION NUMBER | ACTION | STATUS |
|---|---|---|---|
| **Holder(s):**<br>6932819 Canada Inc. in its capacity as Trustee of Rocket Trust<br><br>Rocket Trust<br>**Grantor(s):**<br>1462888 Ontario Inc., as trustee of QSPE-AMC/R Trust<br>QSPE-AMC/R Trust, represented by 1462888 Ontario Inc., as trustee | Conventional hypothec without delivery<br># 01-0157330-0001<br>Date: May 10, 2001 at 2:20 p.m.<br>Expiry: May 10, 2011 | 3 assignments/1 transfer<br><br>*Pre-closing Assignment*<br>1. Assignors: The Trust Company of Bank of Montreal, as trustee of Rocket Trust and Rocket Trust, represented by The Trust Company of Bank of Montreal, as Trustee Assignees: Rocket Trust as represented by BNY Trust Company of Canada and BNY Trust Company of Canada as Trustee for Rocket Trust *(pursuant to 2003 assignment)*<br>**\*Complete**<br><br>*Pre-closing Assignment*<br>2. Assignors: Rocket Trust as represented by BNY Trust Company of Canada and BNY Trust Company of Canada as Trustee for Rocket Trust<br>Assignees: Rocket Trust and 6932819 Canada Inc. in its capacity as Trustee of Rocket Trust *(pursuant to Mar. 2008 assignment)*<br>**\*Complete**<br><br>*Closing Assignment*<br>3. Assignors: Rocket Trust and 6932819 Canada Inc. in its capacity as Trustee of Rocket Trust<br>Assignee: BNY Trust Company of Canada, as Security Agent on behalf of the QSPE Creditors<br>4 King Street West, Suite 1101<br>Toronto, Ontario<br>M5H 1B6<br><br>*Transfer:*<br>Replace 1462888 with:<br>CIBC Mellon Global Securities Services Company<br>320 Bay Street, P.O. Box 1,<br>Toronto, Ontario<br>M5H 4A6 | |

| Ancillary Registrations & Comments: |
|---|
| By an assignment of a hypothecary claim registered on July 4, 2008 under number 08-0388500-0001, the Holder assigns all of its right, title and interest to Rocket Trust, represented by BNY Trust Company of Canada and BNY Trust Company of Canada in its capacity as Trustee of Rocket Trust. |
| By an assignment of a hypothecary claim registered on July 4, 2008 under number 08-0388504-0001, the Holder assigns all of its right, title and interest to Rocket Trust, represented by 6932819 Canada Inc. and 6932819 Canada Inc. in its capacity as Trustee of Rocket Trust. |

(c)    **New Registration against Securcor-Rio Trust in favour of BNY Trust Company of Canada, as Security Agent on behalf of the Creditors (as assignee of Rocket Trust)**

| Debtor/Address | Secured Party/Address | Jurisdiction | Document granting security interest/ General Collateral Description | Length | Status |
|---|---|---|---|---|---|
| m) 1.    Securcor-Rio Trust<br><br>Securcor-Rio Trust Trust<br><br>Munich Re Centre, 18th Floor, 390 Bay Street, Toronto, Ontario, M5H 2Y2 | BNY Trust Company of Canada, as Security Agent on behalf of the Creditors 4 King Street West, Suite 1101 Toronto, Ontario M5H 1B6 | Ontario | All present and after-acquired personal property of the debtor | 5 years | |

**E.**    **Registrations to be Left Unamended**

| | Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Document Granting Security | Status |
|---|---|---|---|---|---|---|
| n) | Xceed Mortgage Trust | QSPE-XCD Trust<br><br>QSPE-XCD Trust Trust<br><br>1462888 Ontario Inc. | 633238029- 20070306 0856 1590 0876 (10 years) | ON | | To Be Left Unamended *(except perhaps to change name of trustee from "1462888 Ontario Inc." to "CIBC Mellon Global Securities Services Company" – Counsel to Xceed Mortgage to advise)* |
| o) | Xceed Mortgage Trust | QSPE-XCD Trust<br><br>QSPE-XCD Trust Trust<br><br>1462888 Ontario Inc. | 619670277- 20051013 1547 1590 5607 (10 years) | ON | | To Be Left Unamended *(except perhaps to change name of trustee from "1462888 Ontario Inc." to "CIBC Mellon Global Securities Services Company" – Counsel to Xceed Mortgage to advise)* |
| p) | AM Trust<br><br>AM Trust, Trust<br><br>AM Corporation<br><br>AM Corporation, in its capacity as Trustee of AM Trust | QSPE-AMC Trust<br><br>QSPE-AMC Trust, Trust<br><br>1462888 Ontario Inc.<br><br>1462888 Ontario Inc., in its capacity as Trustee of QSPE-AMC Trust | 01040927178<br>Date of Regn:<br>Apr. 9, 2001<br>Date of Expiry:<br>Apr. 9, 2021 | AB | | To Be Left Unamended *(except perhaps to change name of trust to "QSPE-AMC/R" pursuant to 2006 transfer and to change name of trustee from "1462888 Ontario Inc." to "CIBC Mellon Global Securities Services Company" – Counsel to Alter Moneta to advise)* |
| q) | Alter Moneta Trust<br><br>Alter Moneta Trust, Trust<br><br>Alter Moneta Limited | QSPE-AMC Trust<br><br>QSPE-AMC Trust, Trust<br><br>1462888 Ontario Inc.<br><br>1462888 Ontario Inc., in its capacity as Trustee of QSPE-AMC | 01040927350<br>Date of Regn:<br>Apr. 9, 2001<br>Date of Expiry:<br>Apr. 9, 2021 | AB | | To Be Left Unamended *(except perhaps to change name of trust to "QSPE-AMC/R" pursuant to 2006 transfer and to change name of trustee from "1462888 Ontario Inc." to "CIBC Mellon Global Securities Services Company" – Counsel to Alter Moneta to advise)* |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Jurisdiction | Document Granting Security | Status |
|---|---|---|---|---|---|
| Alter Moneta Limited, in its capacity as Trustee of Alter Moneta Trust | Trust | | | | |
| r) The Toronto-Dominion Bank | Constellation Certificate Trust (Schooner) Series 2004-1 (1462888 Ontario Inc., as Trustee of) | 610762491 - 20041122 1453 1530 7896 (5 years) | ON | | To Be Left Unamended |

## SCHEDULE W

## TRADITIONAL ASSETS

## PART I:

### Co-Owned Traditional Assets

| Asset | MAV I Proportionate Interest | MAV II Proportionate Interest | Traditional Asset par amount |
|---|---|---|---|
| Third amended and restated commercial mortgage purchase agreement between MCAP Commercial LP, Master Asset Vehicle I, Master Asset Vehicle II, Master Asset Vehicle III and CIBC Mellon Global Securities Services Company, dated the date hereof (the **MCAP MPA**) | 67.1420947069245% | 32.8579052930755% | Not applicable |
| Nominee agreement between MCAP Commercial LP, MCAP Financial Corporation and Rocket (subsequently assigned to Master Asset Vehicle I and Master Asset Vehicle II) dated February 10, 2004 (the **Nominee Agreement**) | 67.1420947069245% | 32.8579052930755% | Not applicable |
| The Purchased Assets (as defined under the MCAP MPA) | 67.1420947069245% | 32.8579052930755% | [●] |
| The program accounts (the Cash Collateral Accounts and the Collections Accounts, but excluding the A Note Lender Distribution Account, the AA Note Lender Distribution Account, the MAV1 Trust Distribution Account and the MAV2 Trust Distribution Account, all as defined in the MCAP MPA) | 67.1420947069245% | 32.8579052930755% | [●] |

| Asset | MAV I Proportionate Interest | MAV II Proportionate Interest | Traditional Asset par amount |
|---|---|---|---|
| Amended and Restated Mortgage Purchase Agreement dated the date hereof between The Toronto-Dominion Bank, Master Asset Vehicle I, Master Asset Vehicle II, Master Asset Vehicle III and CIBC Mellon Global Securities Services Company (the **CMO MPA**) | 77.5905430858478% | 22.4094569141522% | Not applicable |
| The Purchased Assets (as defined in the CMO MPA) | 77.5905430858478% | 22.4094569141522% | [●] |
| The Custodial Services Agreement dated April 30, 2004 between Commercial Mortgage Operations Company of Canada (subsequently assigned to The Toronto-Dominion Bank) and The Canada Trust Company (subsequently assigned to Computershare Trust Company of Canada), as amended by an amending agreement dated the date hereof between Master Asset Vehicle I, Master Asset Vehicle II, Computershare Trust Company of Canada and CIBC Mellon Global Securities Services Company (collectively, the **Custodial Services Agreement**) | 77.5905430858478% | 22.4094569141522% | Not applicable |
| The program accounts (the Cash Collateral Accounts and the Collection Accounts, but excluding the A Note Lender Distribution Account, the AA Note Lender Distribution Account, the BBB Note Lender Distribution Account, the MAV1 Trust Distribution Account and the | 77.5905430858478% | 22.4094569141522% | [●] |

| Asset | MAV I Proportionate Interest | MAV II Proportionate Interest | Traditional Asset par amount |
|---|---|---|---|
| MAV2 Trust Distribution Account, all as defined in the CMO MPA) | | | |
| The MCAP Co-Ownership Agreement dated as of ●, 2009 between, *inter alios*, the MAV, CIBC Mellon Global Securities Services Company in its capacity as trustee of Master Asset Vehicle II and the Co-Owners Custodian, as such agreement may be amended, modified, restated, replaced or supplemented from time to time and together with any schedules, exhibits, supplements and attachments thereto and all documents incorporated therein by reference | 67.1420947069245% | 32.8579052930755% | Not applicable |
| The CMO Co-Ownership Agreement dated as of ●, 2009 between, *inter alios*, the MAV, CIBC Mellon Global Securities Services Company in its capacity as trustee of Master Asset Vehicle II and the Co-Owners Custodian, as such agreement may be amended, modified, restated, replaced or supplemented from time to time and together with any schedules, exhibits, supplements and attachments thereto and all documents incorporated therein by reference | 77.5905430858478% | 22.4094569141522% | Not applicable |

## PART II:

### Traditional Assets Held Directly by the MAV

| Name of Issuer | Traditional Asset | MAV I Percentage Interest | MAV II Percentage Interest | Traditional Asset par amount |
|---|---|---|---|---|
| CCG Commercial Pool I, Inc. | Class AAA/US Senior Secured United States Dollar Floating Rate Notes | 57.6483694683607% | 42.3516305316393% | [●] |
| CCG Commercial Pool II, Inc. | Class AAA CAN Notes | 57.6483694683607% | 42.3516305316393% | [●] |
| CCG Commercial Pool II, Inc. | Class AAA US Notes | 57.6483694683607% | 42.3516305316393% | [●] |
| CCG Commercial Pool II, Inc. | Class AAA CAN Notes | 57.6483694683607% | 42.3516305316393% | [●] |
| Pioneer Trust/TCW Oak Canyon Funding | Pioneer Trust/TCW Oak Canyon Funding CAD Tranche B1 Floating Rate Credit Linked Secured Note | 79.4742913719907% | 20.5257086280093% | [●] |
| Merrill Lynch Financial Assets Inc. | Class A-2 Commercial Mortgage Pass-Through Certificate, Series 2003-Canada 10, CUSIP 59022BDG7 | 67.8887730631988% | 32.1112269368012% | [●] |
| Merrill Lynch Financial Assets Inc. | Class A-2 Commercial Mortgage Pass-Through Certificate, Series 2004-Canada 14, CUSIP 59022BFG5 | 67.8887730631988% | 32.1112269368012% | [●] |

| Name of Issuer | Traditional Asset | MAV I Percentage Interest | MAV II Percentage Interest | Traditional Asset par amount |
|---|---|---|---|---|
| Schooner Trust | Class A-2 Commercial Mortgage Pass-Through Certificate, Series 2004-CF2, CUSIP 80802TAS7 | 67.8887730631988% | 32.1112269368012% | [●] |
| Alesco Preferred Funding II, Ltd., and Alesco Preferred Funding II, Inc. | Class A-1 First Priority Senior Secured Floating Rate Note, CUSIP 01589AA1 | 67.8887730631988% | 32.1112269368012% | [●] |
| Alesco Preferred Funding III, Ltd., and Alesco Preferred Funding III, Inc. | Class A-1 First Priority Senior Secured Floating Rate Note, CUSIP 01448MAA7 | 67.8887730631988% | 32.1112269368012% | [●] |
| Dekania CDO II, Ltd., and Dekania CDO II, Inc. | Class A-1 First Priority Senior Secured Floating Rate Note, CUSIP 2488RAA9 | 67.8887730631988% | 32.1112269368012% | [●] |
| ACE Canada | Series 2005-1 Medium Term Note | | | [●] |
| | Series 2005-1 Medium Term Note | | | [●] |
| | Amended and restated note purchase agreement between Encore Trust and ACE Canada | 80.5246141254770% | 19.4753858745230% | [●] |
| Merrill Lynch Financial Assets | Class A-3 Commercial Mortgage Pass-Through | 70.5355525161144% | 29.4644474838856% | [●] |

| Name of Issuer | Traditional Asset | MAV I Percentage Interest | MAV II Percentage Interest | Traditional Asset par amount |
|---|---|---|---|---|
| Inc. | Certificate, Series 2006-Canada 19, CUSIP 59022BKG9 | | | |
| Merrill Lynch Financial Assets Inc. | Class A-3 Commercial Mortgage Pass-Through Certificate, Series 2006-Canada 20, CUSIP 59022BLG8 | 70.5355525161144% | 29.4644474838856% | [●] |
| Schooner Trust | Class A-2 Commercial Mortgage Pass-Through Certificate, Series 2006-5, CUSIP 80802TEU8 | 70.9148559439254% | 29.0851440560746% | [●] |
| Schooner Trust | Class A-2 Commercial Mortgage Pass-Through Certificate, Series 2006-6, CUSIP 80802TGK8 | 70.9148559439254% | 29.0851440560746% | [●] |
| ACE Canada | Series 2005-1 Medium Term Note | | | [●] |
| | Series 2005-1 Medium Term Note | | | [●] |
| | Amended and restated note purchase agreement between Opus Trust and ACE Canada | 68.8087842505404% | 31.1912157494596% | [●] |
| Real Estate Asset Liquidity Trust | Class A-2 Commercial Mortgage Pass-Through Certificate, Series 2005-2, CUSIP 75585RCK9 | 52.2535289544038% | 47.7464710455962% | [●] |
| Merrill Lynch | Class A-3 Commercial | 52.2535289544038% | 47.7464710455962% | [●] |

| Name of Issuer | Traditional Asset | MAV I Percentage Interest | MAV II Percentage Interest | Traditional Asset par amount |
|---|---|---|---|---|
| Financial Assets Inc. | Mortgage Pass-Through Certificate, Series 2006-Canada 18, CUSIP 59022BJH9 | | | |
| Schooner Trust | Class A-2 Commercial Mortgage Pass-Through Certificate, Series 2005-4, CUSIP 80802TDJ4 | 52.2535289544038% | 47.7464710455962% | [●] |

## SIGNATORIES

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective authorised officers as of the date first above written.

[*SIGNATURE BLOCKS TO BE CONFIRMED*]

**MASTER ASSET VEHICLE II**

**CIBC MELLON GLOBAL SECURITIES SERVICES COMPANY** acting in its capacity as trustee of Master Asset Vehicle II, without personal liability

By: _____

    Name:
    Title:

By: _____

    Name:
    Title:

**BNY TRUST COMPANY OF CANADA** acting in its capacity as Indenture Trustee, as Administrative Agent and as Collateral Agent

By: _____

    Name:
    Title:

By: _____

    Name:
    Title:

**BLACKROCK (INSTITUTIONAL) CANADA LTD.** acting in its capacity as Administrator, as Valuation Agent and as Spread/Loss Trigger Calculation Agent

By: _____

    Name:
    Title:

By: _____

    Name:
    Title:

**CITIBANK, N.A.** acting in its capacity as LSS CDS Counterparty and as Lender/Dealer

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

**DEUTSCHE BANK AG** acting in its capacity as LSS CDS Counterparty, as Unlevered CDS Counterparty and as Lender/Dealer

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

**BANK OF AMERICA, N.A.** acting in its capacity as Unlevered CDS Counterparty

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

**HSBC BANK USA, NATIONAL ASSOCIATION** acting in its capacity as LSS CDS Counterparty and as Unlevered CDS Counterparty

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

**MERRILL LYNCH CAPITAL SERVICES, INC.** acting in its capacity as LSS CDS Counterparty

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**MERRILL LYNCH INTERNATIONAL** acting in its capacity as LSS CDS Counterparty, as Unlevered CDS Counterparty and as Lender/Dealer

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**SWISS RE FINANCIAL PRODUCTS CORPORATION** acting in its capacity as LSS CDS Counterparty and as Lender/Dealer

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**ROYAL BANK OF CANADA** acting in its capacity as LSS CDS Counterparty, as Unlevered CDS Counterparty and as Lender/Dealer

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**UBS AG** acting in its capacity as LSS CDS Counterparty

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**HSBC BANK USA, NATIONAL ASSOCIATION, TORONTO BRANCH** acting in its capacity as Lender/Dealer

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**BANK OF MONTREAL** acting in its capacity as Non-Dealer Lender

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**CANADIAN IMPERIAL BANK OF COMMERCE** acting in its capacity as Non-Dealer Lender

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**NATIONAL BANK OF CANADA** acting in its capacity as Non-Dealer Lender

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**THE BANK OF NOVA SCOTIA** acting in its capacity as Non-Dealer Lender

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**THE TORONTO-DOMINION BANK** acting in its capacity as Non-Dealer Lender

By: _____
    Name:
    Title:

By: _____
    Name:
    Title: