**POSTING VERSION: Subject to minor revisions / Schedules subject to updating**

## MASTER SECURITY AGREEMENT

[DATE]

**CIBC MELLON GLOBAL SECURITIES SERVICES COMPANY**
**in its capacity as trustee of Master Asset Vehicle I**
**as MAV**

**and**

**Unlevered CDS Counterparties**
**as Unlevered CDS Counterparties**

**LSS CDS Counterparties**
**as LSS CDS Counterparties**

**BNY TRUST  COMPANY OF CANADA**
**as Collateral Agent**

TABLE OF CONTENTS

1. INTERPRETATION ...................................................................................................................... 2
2. SECURITY INTERESTS AND OTHER CREDIT SUPPORT ............................................................ 3
3. CARE AND CUSTODY OF COLLATERAL ................................................................................... 10
4. CERTAIN RIGHTS AND REMEDIES ........................................................................................... 13
5. MSA EXPENSES ....................................................................................................................... 20
6. NOTICES ................................................................................................................................. 20
7. COLLATERAL AGENT .............................................................................................................. 20
8. MISCELLANEOUS .................................................................................................................... 21

**THIS AGREEMENT** (this "**Agreement**") is dated as of January [●], 2009.

**BETWEEN**:

(1)     **CIBC Mellon Global Securities Services Company** in its capacity as trustee of **MASTER ASSET VEHICLE I,** as pledgor (the "**MAV**"); and

(2)     Each Unlevered CDS Counterparty and each LSS CDS Counterparty specified on Schedule E to this Agreement, as Dealers and each of their respective successors and permitted assigns (each, a "**Dealer**"); and

(3)      **BNY Trust Company of Canada**, as collateral agent (in its capacity as collateral agent or any successor to the trust and custody business thereof or any permitted assigns thereof in such capacity appointed pursuant to the Omnibus Agreement, the "**Collateral Agent**");

**BACKGROUND**:

The parties have entered into this Agreement in connection with the Transaction Documents.

**WHEREAS**:

(A)     The Dealers are each entering into a Swap Agreement with the MAV in respect of: (i) where such Dealer is an Unlevered CDS Counterparty, one or more Unlevered CDSs; and (ii) where such Dealer is a LSS CDS Counterparty, one or more LSS CDSs, and, with respect to some of the Unlevered CDSs and some of the LSS CDSs, the relevant Dealer is also entering into one or more Wrap Swaps and Existing Interest Rate Hedges with the MAV.  In accordance with the Plan, the MAV is to execute and deliver this Agreement in favour of each Dealer and in favour of the Collateral Agent, for the benefit of the Secured Creditors (including each Dealer) as security for the payment and performance of the MAV's obligations to each Secured Creditor.

(B)     In accordance with the Plan, pursuant to transfer and assumption agreements (each a "**Transfer Agreement**") between certain of the Existing Conduits or satellite trusts of the Existing Conduits as transferors (each a "**Transferor**") and the MAV, as transferee, each Transferor has transferred to the MAV the MAV's percentage interest, as determined in accordance with the Plan, of such Transferors' rights in and to certain assets of the relevant Transferors, including (i) those assets (collectively, the "**Transferor Collateral**") previously Posted to the relevant Dealer by the applicable Transferor as security for the payment and performance of the applicable Transferor's liabilities under certain swap agreements (including, as the case may be, credit default swaps, total return swaps, interest rate swaps and cross-currency swaps), including related security and other credit support agreements (the "**Former Swap Agreements**") entered into between such Transferors and certain of the Dealers and (ii) all rights of such Transferors to be repaid by the relevant Dealer cash previously Posted by such Transferors to such Dealer as other posted support under any Former Swap Agreements (the "**Transferor Other Posted Support**").

(C)     In accordance with the Plan, pursuant to an acknowledgement and direction agreement among the applicable Transferors, the MAV and the applicable Dealers, all of the Transferor Collateral and Transferor Other Posted Support has been deemed to have been returned or repaid by the relevant Dealer to the relevant Transferor and delivered by such Transferor to the MAV.

(D)     The Lenders have agreed to make certain margin funding facilities available to the MAV on the terms and subject to the conditions contained in the Margin Funding Facility Agreement. It is a condition precedent to the execution and delivery of the Margin Funding Facility Agreement and the Omnibus Agreement by the Lenders that the MAV execute and deliver this Agreement in favour of the Collateral Agent for the benefit of the Secured Creditors (including the Lenders) as security for, among other things, the payment and performance of the MAV's obligations to each Lender under the Margin Funding Facility Agreement.

(E)     The MAV is assuming secured obligations in respect of asset backed commercial paper and floating rate notes in consideration for its acquisition of certain items of Collateral, the rights in respect of which asset backed commercial paper and floating rate notes will be exchanged by the holders thereof for the Notes and the MAV is executing and delivering this Agreement in favour of the Collateral Agent for the benefit of the Secured Creditors (including the Indenture Trustee and the Noteholders) as security for, among other things, the payment and performance of the MAV's obligations to the Indenture Trustee and the Noteholders under the Note Indenture and the Notes.

(F)     Each of the Service Providers has agreed to provide certain services required by the MAV pursuant to the relevant terms and conditions of the Transaction Documents and the MAV is executing and delivering this Agreement in favour of the Collateral Agent, for the benefit of the Secured Creditors (including the Service Providers) as security for, among other things, the payment and performance of the MAV's obligations to the Service Providers under the relevant Transaction Documents.

(G)     Pursuant to the Omnibus Agreement, each of the Dealers and each of the other Secured Creditors, has appointed the Collateral Agent as their agent to hold the Collateral Agent's Security Interest on their respective behalf.

        In consideration of the foregoing and other good and valuable consideration, the receipt and adequacy of which are acknowledged, it is hereby agreed as follows:

1.      **INTERPRETATION**

**1.1     General Interpretation**

(1)     *Definitions Schedule*.  All capitalized terms used but not otherwise defined in this Agreement (including the recitals set forth above) shall have the meanings ascribed thereto in Schedule A (*Master Definitions*) to the omnibus agreement dated as of [●], 2008 between, *inter alios*, the Dealers, the Collateral Agent and the MAV (the **"Omnibus Agreement"**).

(2)  *Interpretation*.  Section 1 (*Interpretation*) of the Omnibus Agreement shall apply to this Agreement, *mutatis mutandis*.

(3)  ***Proceeds.***  No reference to proceeds in this Agreement, solely by virtue of such reference, authorizes any sale, transfer or other disposition of Collateral by the MAV.

(4)  ***Permitted Lien.***  Any reference in this Agreement to any Permitted Lien, solely by virtue of such reference, is not intended to and does not and will not subordinate the Security Interests granted by the MAV in Section 2 to any such Permitted Lien or give priority to any Person over a Dealer, the Collateral Agent or any other Secured Creditor.

## 2.    SECURITY INTERESTS AND OTHER CREDIT SUPPORT

### 2.1    Security Interest in favour of the Dealers

(1)  ***Original Collateral.***  The MAV hereby grants to each Dealer a continuing security interest in and lien on, and assigns, mortgages, charges, hypothecates and pledges to each Dealer the following (in respect of each Dealer, its "**Original Collateral**"):

    (a)  the Assets of the MAV described under the name of such Dealer in Part 1 of Schedule A to this Agreement as LSS CDS Original Collateral (such LSS CDS Original Collateral and the Short Termination Payments (as defined in Section 2.1(1)(c)) and the Replacements (as defined in Section 2.1(1)(d)) of any of them and the Proceeds (as defined in Section 2.1(1)(e)) derived from any of them, the "**LSS CDS Original Collateral**");

    (b)  the Assets of the MAV described under the name of such Dealer in Part 2 of Schedule A to this Agreement as Unlevered CDS Original Collateral for the Unlevered CDS of such Dealer specified in such Part 2 (in respect of each such Dealer and each such Unlevered CDS, the Assets so specified for such Unlevered CDS, the Replacements (as defined in Section 2.1(1)(d)) thereof and the Proceeds (as defined in Section 2.1(1)(e)) derived from any of them, are referred to collectively as such Dealer's "**Unlevered CDS Original Collateral**" for such Unlevered CDS);

    (c)  any termination payment that is or becomes payable to the MAV pursuant to the Swap Agreement with such Dealer where the MAV is the buyer of credit default protection (collectively, the "**Short Termination Payments**");

    (d)  all substitutions for, replacements of and increases and additions to the Assets described in Sections 2.1(1)(a), 2.1(1)(b) and 2.1(1)(c) (the "**Replacements**"); and

    (e)  all proceeds, other than Income Distributions, in any form derived directly or indirectly from the holding of or from any redemption of, repayment of or other dealing with, all or any part of the Assets described in Sections 2.1(1)(a), 2.1(1)(b) and 2.1(1)(c) including the proceeds of such proceeds (the "**Proceeds**").

(2)    *Other Posted Support.*  Pursuant to the credit support provisions set out under the
name of each Dealer in Schedule B (in respect of each Dealer its "**Swap Credit Support
Provisions**"), the MAV may from time to time, subject to the provisions of Section 4.12
of the Omnibus Agreement, transfer to certain of the Dealers CAD or USD ("**Other
Eligible Support**") as credit support for the payment and performance of certain Swap
Liabilities of the MAV to such Dealer.  All Transferor Other Posted Support that was
deemed to have been delivered to the MAV by a Transferor is hereby deemed to have
been delivered by the MAV to the Dealer that was deemed to have repaid it to such
Transferor, and is hereby deemed to be Other Eligible Support that has been Posted by
the MAV, as of the date of this Agreement, to such Dealer pursuant to such Dealer's
Swap Credit Support Provisions in respect of those Swap Liabilities specified in the
relevant Swap Credit Support Provisions.  All such Other Eligible Support that is so
deemed to have been Posted by the MAV with a Dealer or is hereafter Posted with
such Dealer by the MAV pursuant to such Dealer's Swap Credit Support Provisions or
the Omnibus Agreement, is referred to as such Dealer's "**Other Posted Support**".  Each
Dealer represents and warrants to the other parties to this Agreement that the only
Other Posted Support that is held by such Dealer on the date of this Agreement is set
out on Part 3 of Schedule A.  The MAV grants each Dealer the right to Set-off (i) against
any Other Posted Support Posted in respect of an Unlevered CDS, only the Unlevered
CDS Liabilities (as defined in Section 2.1(5)) owing to such Dealer in respect of such
Unlevered CDS; and (ii) against any Other Posted Support Posted in respect of any LSS
CDS, all LSS CDS Liabilities (as defined in Section 2.1(4)) owing to such Dealer;
provided that a Breaching Dealer shall not be entitled to Set-off any amount owed by it
on account of Other Posted Support against any amounts due to such Breaching Dealer
pursuant to any Transaction Document.  The parties hereto acknowledge that all Other
Posted Support of a Dealer (i) has been, or if provided after the date of this Agreement
will be, transferred absolutely to such Dealer; (ii) creates, or when transferred will
create, a debtor/creditor relationship between such Dealer and the MAV; and (iii) does
not, and when so transferred will not, constitute assets of the MAV; and the parties
hereto further agree that the MAV's only interest in such Other Posted Support is the
right to repayment of such Other Posted Support ("**MAV's Right to Other Posted
Support**"), all subject to any rights of such Dealer under the Swap Agreement between
such Dealer and the MAV, including any netting or Set-off right.

(3)    *References.*  Notwithstanding anything to the contrary contained in this Agreement, to
the extent that a Dealer has received or the MAV has transferred, or is deemed to have
transferred, Other Posted Support to a Dealer, all references in this Agreement or in
any other Transaction Document to that Dealer as the Secured Creditor with respect to
that Other Posted Support will be to that Dealer as the transferee of such Other Posted
Support and any reference in any other Transaction Document to Original Collateral,
LSS CDS Original Collateral or Unlevered CDS Original Collateral of such Dealer shall,
unless the context otherwise requires, include Other Posted Support of such Dealer;
provided however that such references are for convenience of reference only and will
not subject such Other Posted Support or such Dealer as the transferee of such Other
Posted Support to provisions of law generally relating to security interests and secured
parties or to the provisions of Section 2.7 or other provisions relating to the custody of
Original Collateral.

(4)    *LSS CDS Liabilities.*  The security interest in, lien on  and assignment, mortgage, charge, hypothecation and pledge of, the LSS CDS Original Collateral granted to each Dealer pursuant to Section 2.1 (in respect of each Dealer, its "**Security Interest in its LSS CDS Original Collateral**") secures the payment and performance of all debts, liabilities and obligations, present or future, direct or indirect, absolute or contingent, matured or unmatured, at any time or from time to time due or accruing and owing by or otherwise payable by the MAV to such Dealer in any currency, under, in connection with or pursuant to its LSS CDSs, the related Wrap Swaps and, if applicable, the Existing Interest Rate Hedges relating to LSS CDS Original Collateral for such LSS CDSs (in respect of any Dealer or Dealers "**LSS CDS Liabilities**").

(5)    *Unlevered CDS Liabilities.*  The security interest in, lien on  and assignment, mortgage, charge, hypothecation and pledge of, the Unlevered CDS Original Collateral granted to each Dealer pursuant to Section 2.1 in respect of an Unlevered CDS (in respect of such Dealer and such Unlevered CDS, its "**Security Interest in its Unlevered CDS Original Collateral**" for such Unlvered CDS) secures the payment and performance of all debts, liabilities and obligations, present or future, direct or indirect, absolute or contingent, matured or unmatured, at any time or from time to time due or accruing and owing by or otherwise payable by the MAV to such Dealer in any currency, under, in connection with or pursuant to such Unlevered CDS, the related Wrap Swaps and, if applicable, the Existing Interest Rate Hedges relating to the Unlevered CDS Original Collateral for such Unlevered CDS (in respect of such Dealer and such Unlevered CDS, the "**Unlevered CDS Liabilities**" owing to such Dealer in respect of such Unlevered CDS).

(6)    *Swap Liabilities.*  The LSS CDS Liabilities and Unlevered CDS Liabilities owing to a Dealer, are sometimes referred to collectively as the "**Swap Liabilities**" owing to such Dealer, and each Dealer's Security Interest in its LSS CDS Original Collateral and its Security Interest in its Unlevered CDS Original Collateral are referred to collectively as such Dealer's "**Dealer's Security Interest in its Original Collateral**".

**2.2    Security Interest in favour of the Collateral Agent**

(1)    *Collateral.* The MAV hereby grants to the Collateral Agent, for the benefit of the Secured Creditors, a security interest in and lien on, and assigns,  mortgages, charges, hypothecates and pledges to the Collateral Agent, for the benefit of the Secured Creditors all of the property and undertaking of the MAV now owned or hereafter acquired and all of the property and undertaking in which the MAV now has or hereafter acquires any interest (excluding, in each case, Excluded Assets, but including, for the avoidance of doubt, any and all Posted Lender's Credit Support, Posted Credit Support, Original Collateral and the MAV's Right to Other Posted Support) (collectively, the "**Collateral**")  including all of the MAV's:

(a)    present and after-acquired personal property;

(b)    equipment, furniture, fixtures, plant, vehicles and other goods of every kind and description and all licences and other rights and all related records, files, charts, plans, drawings, specifications, manuals and documents;

(c)     accounts due or accruing and all related agreements, books, accounts, invoices, letters, documents and papers recording, evidencing or relating to them;

(d)     money, documents of title, chattel paper, financial assets and investment property;

(e)     securities accounts, including the securities accounts and all of the credit balances, securities entitlements, other financial assets and items or property (or their value) standing to the credit of the MAV from time to time in such securities accounts;

(f)     all Instruments, Securities and other investment property of the MAV;

(g)     intangibles, including all security interests, goodwill, choses in action, Contracts, contract rights, licenses and other contractual benefits;

(h)     all substitutions for, replacements of and increases, additions and, where applicable, accessions to the property described in Section 2.2(1)(a) through Section 2.2(1)(g) inclusive; and

(i)     all proceeds in any form derived directly or indirectly from any dealing with all or any part of the property described in Section 2.2(1)(a) through Section 2.2(1)(h) inclusive, including the proceeds of such proceeds;

excluding, in each case, Excluded Assets.

(2)     *Collateral Agent's Security Interest.*   The security interest in, lien on and assignment, mortgage, charge, hypothecation and pledge of the Collateral granted to the Collateral Agent pursuant to Section 2.2(1) (the "**Collateral Agent's Security Interest**", and together with each Dealer's Security Interests in its Original Collateral, the "**Security Interests**", which terms shall include all supplemental or other security interests created under any supplemental or other security documents entered into with the Collateral Agent, or, in the case of Original Collateral, the relevant Dealer, more effectively to grant security on the Collateral or any part of the Collateral) secures the payment and performance of:

(a)      all debts, liabilities and obligations, present or future, direct or indirect, absolute or contingent, matured or unmatured, at any time or from time to time due or accruing and owing by or otherwise payable by the MAV to the Secured Creditors, or any one or more of them, in any currency, under, in connection with or pursuant to the Transaction Documents to which the MAV is a party or pursuant to any other document that gives rise to an entitlement referenced in Sections 6.2 or 6.3 of the Omnibus Agreement, and whether incurred by the MAV alone or jointly with another or others and whether as principal, guarantor or surety (collectively, and together with the MSA Expenses, the "**Secured Liabilities**", which term for the avoidance of doubt includes, the LSS CDS Liabilities, the Secured Margin Liabilities, the Secured Notes Liabilities and the Secured Service Liabilities); and

(b)    without limiting the foregoing Section 2.2(2)(a), all expenses, costs and charges incurred by or on behalf of the Secured Creditors in connection with this Agreement and the other Transaction Documents to which the MAV is a party, the Security Interests or the Collateral, including all legal fees, court costs, receiver's or agent's remuneration and other expenses of taking possession of, repairing, protecting, insuring, preparing for disposition, realizing, collecting, selling, transferring, delivering or obtaining payment for the Collateral, and of taking, defending or participating in any action or proceeding in connection with any of the foregoing matters or otherwise in connection with the Secured Creditors' interest in any Collateral, whether or not directly relating to the enforcement of this Agreement or any other Transaction Document (collectively, the "**MSA Expenses**").

(3)    *Priorities.*  Except to the extent otherwise provided in the Omnibus Agreement, each Dealer's Security Interest in its Original Collateral ranks ahead of and prior to Collateral Agent's Security Interest in such Original Collateral.

**2.3    General**

(1)    *Continuing Security*.   With respect to the Security Interests created under this Agreement:

(a)    each Dealer's Security Interest in its LSS CDS Original Collateral is continuing security for the irrevocable and indefeasible payment in full of all LSS CDS Liabilities to such Dealer, regardless of any intermediate payment to such Dealer;

(b)    in respect of each Unlevered CDS, each Dealer's Security Interest in its Unlevered CDS Original Collateral for such Unlevered CDS is continuing security for the irrevocable and indefeasible payment in full of all Unlevered CDS Liabilities to such Dealer in respect of such Unlevered CDS and its related Wrap Swaps, regardless of any intermediate payment to such Dealer; and

(c)    the Collateral Agent's Security Interest in the Collateral is continuing security for the irrevocable and indefeasible payment in full of the Secured Liabilities, regardless of any intermediate payment to any Secured Creditor.

(2)    *Payment Rescinded*.   If, at any time for any reason (including the bankruptcy, insolvency, receivership, reorganization, dissolution or liquidation of the MAV or the appointment of any receiver, liquidator, intervenor or conservator of, or agent or similar official for, the MAV or any of its Assets), any payment received by, or on behalf of, any Secured Creditor in respect of the Secured Liabilities or any part thereof is rescinded or avoided or must otherwise be restored or returned by such Secured Creditor, such payment will not be considered to have been made for purposes of this Agreement, and this Agreement will continue to be effective or will be reinstated, if necessary, as if that payment had not been made.

(3)     ***Related Asset Creditor Security Agreements.*** The Collateral Agent and the Dealers
acknowledge that the Co-Owned Traditional Assets (which for greater certainty do not
include the MAV1 Trust Distribution Account or the MAV2 Trust Distribution
Account (as those terms are defined in each of (a) the Third Amended and Restated
Commercial Mortgage Purchase Agreement dated on or about the date of this
Agreement between MCAP Commercial LP, the MAV, MAV2, MAV3 and CIBC
Mellon Trust Company in its capacity as custodian and (b) the Amended and Restated
Mortgage Purchase Agreement between The Toronto-Dominion Bank, the MAV,
MAV2, MAV3 and CIBC Mellon Trust Company in its capacity as custodian) or any
monies or investment property therein from time to time) are Excluded Assets for
purposes of this Agreement and that no security interest created by this Agreement
extends thereto.  The Collateral Agent and the Dealers agree that all parties to each
Related Asset Creditor Security Agreement may rely on the acknowledgement
contained in this Section 2.3(3).

**2.4     Scope of Security Interests**

(1)     ***Obtain Consents***.  The Security Interests to the extent they extend to or apply to any
contracts or contract rights or other contractual benefits (collectively the "**Contracts**")
are subject to the limitations set forth in the Contracts and only extend to the MAV's
interest in such Contracts.  The MAV will use all commercially reasonable efforts to
obtain the consent of each other party to any and all agreements, rights, licenses or
permits of the MAV that by their terms prohibit or restrict the ability of the MAV to
assign its rights or benefits thereunder (each, a "**Restricted Asset**") to the assignment
of such Restricted Asset to the Collateral Agent in accordance with this Agreement.
The MAV will also use all commercially reasonable efforts to ensure that all
agreements entered into on and after the date of this Agreement expressly permit
assignments of the rights and benefits under such agreements to the Collateral Agent
as collateral security in accordance with the terms of this Agreement.

**2.5     Attachment**

(1)     ***Value Given***.  The MAV acknowledges that (a) value has been given, (b) it has rights in
the Collateral or the power to transfer rights in the Collateral to the Collateral Agent
and to each relevant Dealer, as applicable (other than after-acquired Collateral), (c) it
has not agreed to postpone the time of attachment of the Security Interests, and (d) it
has received a copy of this Agreement.

(2)     ***Collateral Agent***.  From time to time, at the request of the Collateral Agent, the MAV
will take all action (including entering into CA Control Agreements and where
applicable OC Control Agreements) the Collateral Agent may reasonably request to
ensure that for the purposes of the PPSA and the STA, the Collateral Agent has control
over all Securities, Instruments and other investment property of the MAV that at such
time constitutes Collateral, provided that, in the case of Collateral consisting of any
Dealer's Original Collateral or the MAV's Right to Other Posted Support, such control
shall be subject to the control granted to such Dealer in respect of such Dealer's
Original Collateral and such Dealer's Set-off rights in respect of its Other Posted
Support; and provided further that such action is in compliance with the provisions of
this Agreement.

(3)    ***Original Collateral***.  From time to time, at the request of any Dealer, the MAV will take all action (including entering into OC Control Agreements) with respect to such Dealer's Original Collateral as such Dealer may reasonably request to ensure that for purposes of the PPSA and the STA, such Dealer has control over all Securities, Instruments and other investment property of the MAV that at such time constitutes such Dealer's Original Collateral.

(4)    ***Dealing with Original Collateral.***  Subject to Section 4.4, each Dealer will deal with its Original Collateral in accordance with (i) the relevant Swap Agreement; (ii) the relevant Swap Credit Support Provisions applicable to such Dealer; (iii) this Agreement, (iv) the Omnibus Agreement; and (v) the applicable OC  Control Agreement.

(5)    ***Further Assurances.***  The MAV will perform, or will cause to be performed, all acts, execute and deliver all agreements, documents and instruments and take such other steps as are requested by the Collateral Agent, acting on its own or as directed by the Majority Secured Creditors (or by a Dealer with respect to its Original Collateral), acting reasonably, at any time to register, file, signify, publish, perfect, maintain, protect, and enforce the Security Interests including: (i) executing, recording and filing financing or other statements, and paying all taxes, fees and other charges payable in connection therewith, (ii) delivering acknowledgements, confirmations and subordinations that may be necessary to ensure that each of the Security Interests constitutes a valid and perfected security interest with the priority contemplated by this Agreement and the Omnibus Agreement (subject only to Permitted Liens that have priority by operation of law or that is a Permitted Lien in favour of any CA Custodian), (iii) executing and delivering any certificates, endorsements, instructions, agreements, documents and instruments that may be required under the STA or the PPSA, and (iv) delivering opinions of counsel in respect of matters contemplated by this Section 2.5 consistent with those opinions delivered in connection with the Closing Date upon implementation of the Plan.  The documents and opinions contemplated by this Section 2.5 must be in form and substance satisfactory to the Collateral Agent, acting on the instructions, if any, of the Majority Secured Creditors (or to a Dealer with respect to its Original Collateral), acting reasonably.

**2.6**    **Accounts.**

Each account of the MAV in which any Collateral is held will be (A) a securities account with a securities intermediary that is a Permitted Custodian and (B) subject to a CA Control Agreement among the MAV, such Permitted Custodian and the Collateral Agent or, in the case of an account with an OC Custodian, an OC Control Agreement.

**2.7**    **No Re-Hypothecation.**

Each Dealer agrees that it will not re-hypothecate or pledge to any of its creditors, whether pursuant to section 17.1 of the PPSA or otherwise, or create or permit to exist any Lien on its Original Collateral or such Dealer's Security Interest in its Original Collateral.  The Collateral Agent agrees that it will not re-hypothecate or pledge to any

of its creditors, whether pursuant to section 17.1 of the PPSA or otherwise, or create or permit to exist any Lien on the Collateral or the Collateral Agent's Security Interest.

**3.    CARE AND CUSTODY OF COLLATERAL**

**3.1    Eligibility to Hold Collateral and Other Posted Support**

(1)    *Original Collateral and Other Posted Support.* All Original Collateral of a Dealer will at all times be held by a Permitted Custodian (in respect of such Dealer, its "**OC Custodian**") in an account in the name of the MAV pursuant and subject to a control agreement substantially in form of the applicable form of agreement set out in Schedule C among such Dealer, such Dealer's OC Custodian, the MAV and the Collateral Agent (each an "**OC Control Agreement**", which term shall include any other control agreement or custodial and control agreement entered into by a Dealer, an OC Custodian, the MAV and the Collateral Agent).  If a Dealer pursuant to its Swap Agreement is no longer permitted to hold Other Posted Support, then such Dealer will, on behalf of the MAV, deposit with its OC Custodian, as Original Collateral, CAD or USD, as applicable, in an amount equal to the amount of the Other Posted Support then held by it and all amounts so deposited will be invested in accordance with Section 4.12 of the Omnibus Agreement.  Upon such Dealer making such deposit it shall be deemed to have transferred to the MAV the amount so deposited.  Upon the occurrence of a MSA Enforcement Event and so long as a MSA Enforcement Event is continuing, each Dealer may, to the extent that it has not already done so, take exclusive control of all its Original Collateral and deal with it in accordance with the provisions of this Agreement, the Omnibus Agreement and the applicable OC Control Agreement.

(2)    *General.* Until a MSA Enforcement Event occurs, all cash and securities entitlements of the MAV forming part of the Collateral, other than Original Collateral held by an OC Custodian, may be held on behalf of the MAV; provided that it is all held at all times in a securities account with a Permitted Custodian selected by the MAV (the "**CA Custodian**") upon and subject to a control agreement between the CA Custodian, the MAV and the Collateral Agent substantially in the form of Schedule D (each a "**CA Control Agreement**").  Upon the occurrence of a MSA Enforcement Event and so long as a MSA Enforcement Event is continuing, the Collateral Agent may, in its discretion, and upon the direction of the Majority Secured Creditors will, take exclusive control of all Collateral other than Original Collateral held by an OC Custodian.  For greater certainty, the Collateral Agent acknowledges that if it takes exclusive control of any Collateral it will be obligated to deal with such Collateral in accordance with the provisions of this Agreement and the Omnibus Agreement.

(3)    *Failure to Satisfy Conditions.* If a CA Custodian ceases to be a Permitted Custodian or otherwise fails to satisfy any condition for holding of Collateral, then the MAV will, no later than 15 Business Days after the MAV becomes aware that such CA Custodian is no longer a Permitted Custodian, transfer or cause such custodian to transfer all Collateral held by it to a Permitted Custodian that has entered into a CA Control Agreement with the Collateral Agent. If an OC Custodian of any Dealer ceases to be a

Permitted Custodian or otherwise fails to satisfy any condition for holding of Collateral, then such Dealer will, no later than 15 Business Days after such Dealer becomes aware that such OC Custodian is no longer a Permitted Custodian, transfer or cause such custodian to transfer all Original Collateral held by it to a Permitted Custodian that has entered into an OC Control Agreement.

(4)     *Change in Custodian.* In the event that the MAV changes a CA Custodian or appoints an additional CA Custodian, the MAV shall give 10 Business Days prior notice to each Dealer, the Collateral Agent, the Administrative Agent and the Rating Agency of such change or appointment and shall take all necessary steps to ensure compliance with Section 3.   In the event that a Dealer changes an OC Custodian or appoints an additional OC Custodian, such Dealer shall give 10 Business Days prior notice to the MAV, the Collateral Agent, the Administrative Agent and the Rating Agency of such change or appointment and shall take all necessary steps to ensure compliance with Section 3.

(5)     *Liability.* Without in any way limiting a Custodian's liability, the relevant Dealer in the case of an OC Custodian, or the MAV in the case of a CA Custodian or a Co-Owners Custodian, will be liable for the acts and omissions of its Custodian to the extent that the relevant Dealer or the MAV would be liable at law for such acts or omissions including pursuant to Section 3.3 or Section 3.4 of this Agreement.

(6)     *MSA Enforcement Event.*   Upon the occurrence of any MSA Enforcement Event the MAV will, if so directed by the Collateral Agent upon the instructions of the Majority Secured Creditors, cause any and all Collateral (other than Original Collateral and Collateral that is already held by a CA Custodian subject to a CA Control Agreement), if any, held by or on behalf of the MAV to be delivered to the Collateral Agent together with any and all consents or other documents that may be necessary to effect the transfer of such Collateral to the Collateral Agent or any third party.

3.2     **Care of Collateral.**

The Collateral Agent and each Dealer will exercise reasonable care to ensure the safe custody of all Collateral held by or on behalf of it to the extent required by Applicable Law, and in any event the Collateral Agent and each Dealer will be deemed to exercise reasonable care if it exercises at least the same degree of care it would exercise with respect to its own property.  Except as specified in the preceding sentence and subject to Applicable Law, the Collateral Agent and the Dealers will have no duty with respect to Collateral held by or on behalf of them, including any duty to collect any distributions, or enforce or preserve any right pertaining thereto or any obligation to protect or preserve any such Collateral from loss of value and are released from any responsibility for any loss of value of any such Collateral (excluding any loss on account of its own gross negligence or wilful misconduct).

3.3     **Dealing with Original Collateral**.

Until a MSA Enforcement Event has occurred and a Dealer has, while such MSA Enforcement Event is continuing, exercised its rights under Section 4.1 of this Agreement in respect of its Original Collateral, the MAV and such Dealer will deal

with such Dealer's Original Collateral and Other Posted Support in accordance with such Dealer's Swap Agreement and Swap Credit Support Provisions and the applicable provisions of the Omnibus Agreement, the Administration Agreement and the Tao Administration Agreement; provided, however, that no Dealer shall, upon the occurrence and continuation of a MSA Enforcement Event, be obligated to exhaust its recourse against the MAV or any other Person or against any Original Collateral or Other Posted Support it may hold in respect of the Swap Liabilities to such Dealer before realizing upon or otherwise dealing with such Dealer's Original Collateral in accordance with this Agreement and the Omnibus Agreement. Subject to the relevant Dealer's Swap Agreement and Swap Credit Support Provisions and to the Omnibus Agreement, each Dealer, in respect of its Original Collateral only, may grant extensions or other indulgences, take and give up securities, accept compositions, grant releases and discharges and otherwise deal with the MAV and with other Persons, sureties or securities as it may see fit without prejudice to the Swap Liabilities to such Dealer or the rights of such Dealer in respect of its Original Collateral from time to time.

3.4    **Dealing with CA-Held Collateral**

Until a MSA Enforcement Event has occurred and the Collateral Agent has, while such MSA Enforcement Event is continuing, exercised its rights under Section 4.1 of this Agreement in respect of the CA-Held Collateral, the MAV will deal with the CA-Held Collateral in accordance with the applicable provisions of the Omnibus Agreement, the Administration Agreement and the Tao Administration Agreement; provided however that, neither the Collateral Agent nor any other Secured Creditor shall, upon the occurrence and continuance of a MSA Enforcement Event, be obliged to exhaust their recourse against the MAV or any other Person or against any other security they may hold in respect of the Secured Liabilities before realizing upon or otherwise dealing with the CA-Held Collateral from time to time in such manner as the Collateral Agent, acting on the instructions of the Majority Secured Creditors, may direct. Subject to the provisions of the Omnibus Agreement, the Collateral Agent may, and upon the direction of the Majority Secured Creditors will, grant extensions or other indulgences, take and give up securities, accept compositions, grant releases and discharges and otherwise deal with the MAV and with other Persons, sureties or securities as it may see fit without prejudice to the Secured Liabilities, the liability of the MAV or the rights of the Collateral Agent and the Secured Creditors in respect of the CA-Held Collateral from time to time.

**3.5    Distributions and Proceeds**

(1)    *Interest.*    Each Dealer shall pay interest to the MAV in respect of any Other Posted Support held by it, at the times, at the rates and calculated as provided in the applicable Swap Credit Support Provisions with respect to such Other Posted Support.

(2)    *Income Distributions.*    If the Collateral Agent or any Dealer receives any Income Distributions in respect of Collateral or pays to the MAV any interest in respect of Other Posted Support transferred to it from time to time, such distributions and interest shall be transferred into the Collection Account and dealt with as provided in the Omnibus Agreement and the Administration Agreement.

(3)     *Proceeds.*    All distributions on account of the Collateral, other than Income
Distributions, and all Proceeds of the Collateral, and any Other Posted Support
remaining after all amounts have been Set-off against Other Posted Support in
accordance with Section 2.1(2), shall be dealt with as provided in the Omnibus
Agreement.

**4.      CERTAIN RIGHTS AND REMEDIES**

**4.1     Secured Creditors' Rights and Remedies**

(1)     *MSA Remedies.* "**MSA Remedies**" means with respect to any or all of the Collateral
the following rights and remedies that may be exercised by a Person entitled to do so
in accordance with this Agreement:

(a)     entry into possession of such Collateral by any method permitted by law;

(b)     selling all or any part of such Collateral; provided that all such sales will, unless
otherwise required by law or equity, be effected in accordance with the
provisions of the Omnibus Agreement;

(c)     holding all or any part of such Collateral;

(d)     exercising and enforcing all rights and remedies of a holder of such Collateral
as if such Person were the absolute owner thereof (including, if necessary,
causing such Collateral to be registered in the name of such Person or its
nominee or custodian if not already done);

(e)     collection of any Proceeds arising in respect of such Collateral and distributing
such Proceeds in accordance with the Omnibus Agreement;

(f)     giving any instruction or order to any issuer or securities intermediary
pursuant to any control such Person has over such Collateral;

(g)     appointment by instrument in writing of a receiver (which term as used in this
Agreement includes a receiver and manager) or agent of all or any part of such
Collateral and removal or replacement from time to time of any receiver or
agent;

(h)     institution of proceedings in any court of competent jurisdiction for the
appointment of a receiver of all or any part of such Collateral that has not been
sold in accordance with the provisions of the Omnibus Agreement for any
reason, including because at the relevant time there was no public market for
some or all of such Collateral;

(i)     institution of proceedings in any court of competent jurisdiction for sale or
foreclosure of all or any part of such Collateral that has not been sold in
accordance with the provisions of the Omnibus Agreement for any reason,

including because at the relevant time there was no public market for some or
all of such Collateral;

(j)     filing of proofs of claim and other documents to establish claims to such
Collateral in any proceeding relating to the MAV;

(k)     the right to Set-off any Other Posted Support or other amounts payable by a
Dealer to the MAV against any amounts payable by the MAV to such Dealer;
and

(l)     all other rights and remedies or proceedings authorized or permitted under the
PPSA or otherwise available to a secured party under Applicable Law.

(2)     *Collateral.*   If an MSA Enforcement Event described in clauses (a) or (b) of the
definition thereof occurs in respect of one or more Dealers, then, so long as such MSA
Enforcement Event is continuing,

(a)     each affected Dealer, in respect of its Original Collateral may, or if such
Original Collateral is then held or controlled by the Collateral Agent, the
Collateral Agent, in accordance with the instructions of the relevant Dealer,
will, exercise all rights and remedies available to it and under this Agreement,
including one or more of the MSA Remedies, other than the MSA Remedies
described in Sections 4.1(1)(g) and (h), until sufficient Proceeds have been
realized from such Original Collateral to pay the amount required to be paid to
each affected Dealer in respect of the relevant Swap Liabilities in accordance
with the provisions of the Omnibus Agreement (and not paid by the MAV to
such Dealer); and

(b)     to the extent that the MAV has failed to conduct the process for the liquidation
of CA-Held Collateral or procure the conduct of such process as required by the
applicable section of the Omnibus Agreement and to pay the amount required
to be paid by it to such Dealer pursuant to the applicable sections of the
Omnibus Agreement, the Collateral Agent, in its discretion, may, and, if so
instructed by the affected Dealers, must, exercise any and all rights and
remedies available to it under this Agreement, including one or more of the
MSA Remedies in respect of each affected Dealer's Collateral Entitlement
Proportion of the CA-Held Collateral as the Collateral Agent may deem
appropriate, until sufficient Proceeds have been realized from such CA-Held
Collateral to pay to each affected Dealer the amount required to be paid to such
Dealer on account of the relevant LSS CDS Liabilities pursuant to the applicable
sections of the Omnibus Agreement (including any limitations arising under
the Omnibus Agreement based upon the Collateral Entitlement of each such
Dealer).  If there is more than one affected Dealer and they cannot agree on the
instructions to be given to the Collateral Agent pursuant to this Section
4.1(2)(b), then the Collateral Agent will act in accordance with the instructions
of the Majority Secured Creditors.

(3)     ***Other MSA Enforcement Events.***  Without limiting the rights of any Dealer under
Section 4.1(2), if a MSA Enforcement Event described in clauses (a), (c), (d) or (e) of the
definition thereof occurs, then so long as such MSA Enforcement Event is continuing,
the Collateral Agent, in its discretion may, and if the Majority Secured Creditors so
instruct, shall, exercise all rights and remedies available to it and under this
Agreement, including one or more of the MSA Remedies, as the Collateral Agent may
deem appropriate, or, if the Collateral Agent is acting on the instructions of the
Majority Secured Creditors, as such Majority Secured Creditors shall direct.

(4)     ***Instructing the Collateral Agent.***  If a MSA Enforcement Event described in clause (a),
(c), (d) or (e)has occurred and has continued for a period of 30 days at a time when any
LSS CDS Liabilities, other than those owed to a Breaching Dealer, remain outstanding,
and no affected Dealer has directed the Collateral Agent to exercise any of the MSA
Remedies when it would be entitled to do so, then, (i) if there are then any Secured
Margin Liabilities that have become due and payable to the Lenders in accordance
with the Omnibus Agreement and have not been so paid in accordance with the
Omnibus Agreement, the Required Lenders may direct the Collateral Agent to exercise
any and all MSA Remedies then available to it in order to make payment to the
Lenders of the amounts to be so paid to them in accordance with the Omnibus
Agreement; and (ii) if there are then no Secured Margin Liabilities outstanding, or if
such MSA Enforcement Event has been continuing for an additional period of 30 days
and neither any affected Dealer nor the Required Lenders (other than Royal Bank of
Canada to the extent that there are then any LSS CDS Liabilities owed to it) have
directed the Collateral Agent to exercise any of the MSA Remedies then available to it,
and there are then Secured Notes Liabilities that have become due and payable to any
Noteholders in accordance with the Omnibus Agreement and have not been so paid to
such Noteholders in accordance with the Omnibus Agreement, then the Indenture
Trustee may direct the Collateral Agent to exercise any and all of the MSA Remedies
then available to it.  For greater certainty, nothing in this Section 4.1(4) shall permit the
Collateral Agent to distribute any Proceeds from the liquidation of any Collateral
except in accordance with the Omnibus Agreement.

(5)     ***Proceeds.***  All proceeds of any realization of the Collateral pursuant to this Agreement
shall be distributed among the Secured Creditors in accordance with the applicable
Section of the Omnibus Agreement.

(6)     ***Refusal.***  Notwithstanding the foregoing, a MSA Enforcement Event shall not occur if
the reason for the failure of the MAV or the Administrator to comply with its
obligations to liquidate Collateral in accordance with the Omnibus Agreement or to
pay the Proceeds arising from such liquidations to any Dealer or other Secured
Creditor in accordance with applicable Section of the Omnibus Agreement arises,
through no fault of the MAV or the Administrator, from the refusal of the relevant
Dealer or the Collateral Agent to allow the MAV or the Administrator access to the
relevant Collateral for the purpose of such liquidation and payment.

(7)     ***Additional Rights***.  In addition to the remedies set forth in Sections 4.1(1) through (4),
inclusive, above and elsewhere in this Agreement, whenever a Dealer or the Collateral

Agent is entitled to exercise the MSA Remedies in order to realize on any Collateral, such Dealer (in respect of its Original Collateral and Other Posted Support) and the Collateral Agent (with respect to the CA-Held Collateral), may, subject always to the terms of the Omnibus Agreement:

(a)    redeem or discharge any prior Lien against any Collateral, procure the transfer of such security interest to itself, or settle and pass the accounts of the prior mortgagee, chargee or encumbrancer (any accounts so passed to be conclusive and binding on the MAV);

(b)    pay any liability secured by any Lien against any Collateral and the MAV will immediately on demand reimburse the Collateral Agent or such Dealer (if the Lien was against its Original Collateral) for all such payments;

(c)    in the case of any Dealer that holds any Other Posted Support in respect of any Unlevered CDS Liabilities, until such Dealer becomes a Breaching Dealer, Set-off the Value of all such Other Posted Support against such Unlevered CDS Liabilities;

(d)    in the case of any Dealer that holds any Other Posted Support in respect of its LSS CDS Liabilities, until such Dealer becomes a Breaching Dealer, Set-off the Value of all such Other Posted Support against such LSS CDS Liabilities; or

(e)    commence, continue or defend any judicial or administrative proceedings for the purpose of protecting, seizing, collecting, realizing or obtaining possession or payment of the Collateral, and give good and valid receipts and discharges in respect of the Collateral and compromise or give time for the payment or performance of all or any part of the accounts or any other obligation of any third party to the MAV.

(8)    *Standards of Sale.*  Without prejudice to the ability of the Collateral Agent or a Dealer (with respect to its Original Collateral) to dispose of Collateral in any manner which is commercially reasonable, the MAV acknowledges that:

(a)    Collateral may be disposed of in whole or in part;

(b)    Collateral may be disposed of by public auction, public tender or private contract, with or without advertising and without any other formality, provided that if commercially reasonable, each Secured Creditor shall be invited to participate in such sale;

(c)    any assignee of such Collateral may be the Collateral Agent or another Secured Creditor or a customer of any such Person;

(d)    any sale conducted by the Collateral Agent or a Dealer (with respect to its Original Collateral) will be in accordance with the provisions of the Omnibus Agreement unless otherwise required by Applicable Law and otherwise at such time and place, on such notice and in accordance with such procedures as the

Collateral Agent or such Dealer (with respect to its Original Collateral), in its sole discretion, may deem advantageous, subject to Applicable Law; and

(e)     the Collateral may be disposed of in any manner and on any terms necessary to avoid violation of Applicable Law (including compliance with such procedures as may restrict the number of prospective bidders and purchasers, require that the prospective bidders and purchasers have certain qualifications, and restrict the prospective bidders and purchasers to Persons who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of the Collateral) or in order to obtain any required approval of the disposition (or of the resulting purchase) by any Governmental Authority.

(9)     *Enforcement Action.*  Any Person that takes enforcement action under this Agreement following the occurrence of an MSA Enforcement Event shall be obligated do so in compliance with Applicable Law.  To the extent that any such enforcement action is not undertaken in accordance with Applicable Law, any Secured Creditor shall be entitled to enforce, for the benefit of all Secured Creditors, any rights or remedies available to the MAV to require the relevant Person to comply with Applicable Law in taking such enforcement action.

(10)    *Dealings with Third Parties.*  No Person dealing with the Collateral Agent, any Dealer (with respect to its Original Collateral) or an agent or receiver is required to determine (i) whether the Security Interests have become enforceable, (ii) whether the powers which the Collateral Agent, such Dealer or such agent or receiver, is purporting to exercise have become exercisable, (iii) whether any money remains due to the Collateral Agent or any of the other Secured Creditors by the MAV, (iv) the necessity or expediency of the stipulations and conditions subject to which any sale is made, (v) the propriety or regularity of any sale or other dealing with the Collateral by the Collateral Agent or such Dealer (with respect to its Original Collateral), or (vi) how any money paid to the Collateral Agent or any other Secured Creditor has been or will be applied.  Any *bona fide* purchaser of all or any part of the Collateral from the Collateral Agent, or from a Dealer (with respect to its Original Collateral), or from any receiver or agent, will hold the Collateral absolutely, free from any claim or right of whatever kind, including any equity of redemption, of the MAV, which the MAV specifically waives (to the fullest extent permitted by law) as against any such purchaser together with all rights of redemption, stay or appraisal which the MAV has or may have under any rule of law or statute now existing or hereafter adopted.

(11)    *Sale of Securities*.  Each party acknowledges and agrees that Collateral, in the form of Securities, may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, except as required by the Omnibus Agreement, the MAV hereby waives any right it may have  to prior notice of any sale of Collateral in the form of Securities by the Collateral Agent or the relevant Dealer (in respect of its Original Collateral), except any notice that is required under Applicable Law and cannot be waived.

(12)    ***Remedies Not Exclusive***.  Subject to the terms of the Omnibus Agreement, the remedies
under this Section 4.1 may be exercised from time to time separately or in combination
and are in addition to, and not in substitution for, any other rights of the Collateral
Agent and the other Secured Creditors however arising or created.  The Collateral
Agent and the other Secured Creditors are not bound to exercise any right or remedy,
and the exercise of rights and remedies is without prejudice to the rights of the
Collateral Agent and the other Secured Creditors in respect of the Secured Liabilities
including the right to claim for any deficiency.

(13)    ***Disclosure.***  The Collateral Agent may at any time and from time to time require the
MAV, by notice in writing, to disclose to the Collateral Agent and each Dealer, the
location or locations of all Collateral and the MAV agrees to promptly make such
disclosure when so required.

**4.2    Receiver's Powers**

(1)    ***Receiver Vested.***  Any receiver appointed by the Collateral Agent is vested with the
rights and remedies which could have been exercised by the Collateral Agent in
respect of the MAV or any CA-Held Collateral and such other powers and discretions
as are granted in the instrument of appointment and any supplemental instruments.
The identity of the receiver, its replacement and its remuneration are within the sole
and unfettered discretion of the Collateral Agent.

(2)    ***Agent of MAV***.  Any receiver appointed by the Collateral Agent will act as agent for the
Collateral Agent for the purposes of taking possession of and realizing on the CA-Held
Collateral, but otherwise and for all other purposes (except as provided below), as
agent for the MAV.  The receiver may sell, lease or otherwise dispose of Collateral as
agent for the MAV or as agent for the Collateral Agent as the Collateral Agent may
determine in its discretion.  The MAV agrees to ratify and confirm all actions of the
receiver acting as agent for the MAV, and to release and indemnify the receiver in
respect of all such actions.

(3)    ***No Liability***.  The Collateral Agent in appointing or refraining from appointing any
receiver, does not incur liability to the receiver, the MAV or otherwise and is not
responsible for any misconduct or negligence of such receiver.

**4.3    Appointment of Attorney**

The MAV hereby irrevocably constitutes and appoints the Collateral Agent (and any
officer or senior management employee of the Collateral Agent) and each Dealer (and
the respective officers of each Dealer) the true and lawful attorney of the MAV.  As the
attorney of the MAV, the Collateral Agent has the power to exercise for and in the
name of the MAV, with full power of substitution whenever a MSA Enforcement
Event has occurred and is continuing, any of the MAV's right (including the right of
disposal), title and interest in and to the Collateral including the execution,
endorsement, delivery and transfer of such Collateral to the Collateral Agent, its
nominees, custodians or transferees, and the Collateral Agent and its nominees,
custodians or transferees are hereby empowered to exercise all rights and powers and
to perform all acts of ownership with respect to such Collateral to the same extent as

the MAV might do. As attorney of the MAV, the Collateral Agent's powers in respect of Collateral may not be exercised in respect of any Original Collateral of any Dealer until all claims of such Dealer to such Original Collateral have been satisfied in full in accordance with the Omnibus Agreement. As attorney of the MAV, each Dealer has the same powers with respect to its Original Collateral as the Collateral Agent would have were such Collateral not Original Collateral, but for greater certainty has no powers with respect to any CA-Held Collateral. These powers of attorney are irrevocable, are coupled with an interest, have been given for valuable consideration (the receipt and adequacy of which is acknowledged) and survive, and do not terminate upon, the bankruptcy, dissolution, winding up or insolvency of the MAV or the Issuer Trustee. These powers of attorney extend to and are binding upon the MAV's successors and permitted assigns.

**4.4**    **Transfer of Original Collateral and Other Posted Support to Collateral Account**

(1)    ***Original Collateral.*** If a Dealer is required pursuant to the Omnibus Agreement or any other Transaction Document to deliver or cause to be delivered all or any portion of its Original Collateral to the Collateral Account or to the Collateral Agent, it shall do so.  If a Dealer fails to so deliver its Original Collateral to the Collateral Account or to the Collateral Agent as so required, the Collateral Agent may in its discretion, and will if so instructed by the Majority Secured Creditors (provided however that, for the purposes of this Section 4.4(1) such Dealer will be deemed not to be a LSS CDS Counterparty for the purposes of the definition of Majority Secured Creditors), give an exclusive control notice with respect to such Dealer's Original Collateral pursuant to the terms of the applicable OC Control Agreement.

(2)    ***Other Posted Support.*** If and to the extent that a Dealer is required pursuant to the Omnibus Agreement or any other Transaction Document to deliver or cause to be delivered any of its Original Collateral into the Collateral Account or to the Collateral Agent as contemplated by Section 4.4(1), it shall, for purposes of Section 4.4(1), treat all Other Posted Support, if any, then held by such Dealer as if such Other Posted Support were Original Collateral in the form of CAD or USD, as the case may be, ("**OPS Cash**") and will transfer to the Collateral Account or to the Collateral Agent an amount in CAD or USD, as applicable, equal to the amount of OPS Cash it would have been obligated to deliver or cause to be delivered to the Collateral Account or the Collateral Agent pursuant to Section 4.4(1) had such OPS Cash been Original Collateral.  If a Dealer fails to so transfer the required amount on account of OPS Cash into the Collateral Account, the MAV will take such action as the Majority Secured Creditors (provided however that, for the purposes of this Section 4.4(2) such Dealer will be deemed not to be a LSS CDS Counterparty for the purposes of the definition of Majority Secured Creditors) shall direct to require such payment by such Dealer into the Collateral Account or to the Collateral Agent and if no such direction is given, the MAV will take such action as the Collateral Agent may in its discretion direct to require such payment by such Dealer.

**4.5**    **Discharge**

The Security Interests will be discharged upon, but only upon, (i) full and indefeasible payment and performance of the Secured Liabilities, and (ii) the Collateral Agent and

the Secured Creditors having no obligations under any Transaction Document.  Upon
discharge of the Security Interest and at the request and expense of the MAV, the
Dealers and the Collateral Agent will execute and deliver to the MAV such releases,
discharges, financing statements and other documents or instruments as the MAV may
reasonably require and each of the Dealers and the Collateral Agent will redeliver to
the MAV, or as the MAV may otherwise direct, any Collateral in the possession of such
Dealer or the Collateral Agent, as the case may be.

**4.6**    **Monies Actually Received**

The MAV shall be entitled to be credited only with the actual proceeds arising from the
possession, sale, lease or other disposition of, or realization of the Security Interests on,
the Collateral when received by the Collateral Agent or a Dealer (with respect to its
Original Collateral) or any agent or receiver and such actual proceeds shall mean all
amounts received in cash by the Collateral Agent or such Dealer or any agent or
receiver upon such possession, sale, lease or other disposition of, or realization of the
Security Interests on, the Collateral.

**5.**    **MSA EXPENSES**

**5.1**    **Liquidation/Application of Collateral**

All reasonable MSA Expenses incurred by the Collateral Agent on behalf of a Secured
Creditor or by the MAV in connection with the liquidation and/or application of any
CA-Held Collateral under Section 4 or by a Dealer in connection with the liquidation
and/or application of any of its Original Collateral under Section 4 will be payable on
demand by the MAV; provided that payment thereof shall be subject to funds being
available for such purpose in accordance with the provisions of the Omnibus
Agreement.

**6.**    **NOTICES**

The parties agree that the procedure for delivering and effectiveness of all
communications and notices to such parties pursuant to this Agreement shall be
governed by the provisions of Section 12.3 (*Communications and Notices*) of the
Omnibus Agreement.

**7.**    **COLLATERAL AGENT**

7.1    **Appointment**

The Collateral Agent has been appointed pursuant to Section 7.1 of the Omnibus
Agreement and its liability under this Agreement is limited as provided in the
Omnibus Agreement.

**7.2**    **Instruction**

In exercising its rights and duties and performing its obligations under this Agreement
the Collateral Agent shall act honestly and in good faith with a view to the interests of

the relevant Secured Creditors and will exercise that degree of care, diligence and skill that a reasonable collateral agent would exercise in comparable circumstances; provided always that, the Collateral Agent is a party hereto in its capacity as agent for the Secured Creditors, and may act in accordance with the directions of the applicable Secured Creditors who at the time such directions are given constitute the Majority Secured Creditors, unless otherwise specified in this Agreement.

### 7.3    Responsibilities

BNY Trust Company of Canada has agreed to assume the obligations of the Collateral Agent subject to the terms and conditions of this Agreement, the Omnibus Agreement and each other Transaction Document to which it is a party in such capacity.  BNY Trust Company of Canada in such capacity expressly does not assume the responsibilities of any other Service Provider in relation to this Agreement or any Transaction Document, notwithstanding that it or an Affiliate or related party may be appointed in another capacity under such document.

### 8.    MISCELLANEOUS

### 8.1    Administrator

The MAV has authorized the Administrator to act as its attorney-in-fact in respect of all of its rights and obligations under this Agreement whether expressed as a right or an obligation of the MAV. Unless otherwise advised in writing by the MAV, the Collateral Agent and each Dealer may assume without enquiry that (i) the Administrator is acting on behalf of the MAV, and (ii) such action taken by the Administrator has been duly authorized and approved by all necessary action on the part of the Issuer Trustee pursuant to an effective delegation and such action will bind the Issuer Trustee and the MAV for all purposes hereof with the same effect as if undertaken by the MAV directly.  Until notified in writing by the Issuer Trustee of any change in the appointment of the Administrator as the administrator and attorney-in-fact of the MAV, the Collateral Agent and each Dealer shall be entitled to rely on the authority of the Administrator as the administrator and attorney-in-fact of the MAV. Where this Agreement provides for the Collateral Agent or any Dealer or Dealers to deliver any document, report, statement, notice or information to the MAV, the Collateral Agent and such Dealers shall discharge such obligation by delivering such document, report, statement, notice or information to the Administrator.

### 8.2    Limitation of Liability

It is expressly understood and agreed by the parties to this Agreement that: (a) this Agreement is executed and delivered by the Issuer Trustee, not individually or personally but in its capacity as trustee of Master Asset Vehicle I in the exercise of the powers and authority conferred and vested in it; (b) each of the representations, warranties, undertakings, covenants, indemnities, agreements and other obligations herein made on the part of the MAV is made and intended not as personal representations, undertakings, covenants, indemnities, agreements and other obligations by the Issuer Trustee but is made and intended for the purpose of binding

only the property and assets of Master Asset Vehicle I; and (c) nothing herein contained shall be construed as creating any liability on the Issuer Trustee in its personal capacity, the beneficiaries or any incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Issuer Trustee or any predecessor or successor of the Issuer Trustee to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto; (d) under no circumstances shall the Issuer Trustee in its personal capacity, the beneficiaries or any incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Issuer Trustee or any predecessor or successor of the Issuer Trustee be personally liable for the payment of any indebtedness or expenses of Master Asset Vehicle I or be liable for the breach or failure of any representation, warranty, undertaking, covenant, indemnity, agreement or other obligation made or undertaken by the MAV under this Agreement or any other Transaction Document, other than in respect of its own fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of its obligations and duties; (e) except as otherwise specifically provided in this Agreement, no property or asset of the Issuer Trustee, whether owned beneficially by it in its personal capacity or otherwise than in its capacity as trustee of Master Asset Vehicle I, will be subject to levy, execution or other enforcement procedures with regard to any of the representations, warranties, covenants, undertakings, indemnities, agreements and other obligations of the Issuer Trustee or the MAV under such written instrument; and (f) no recourse may be had or taken, directly or indirectly against the Issuer Trustee in its personal capacity, the beneficiaries or any incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Issuer Trustee or any predecessor or successor of the Issuer Trustee with regard to the representations, warranties, undertakings, covenants, indemnities, agreements and other obligations of the MAV or the Issuer Trustee or any beneficiary, incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Issuer Trustee under such written instrument other than in respect of such Person's own fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of its obligations and duties.

**8.3    Additional Terms of this Agreement**

(1)    *Further Protection.*  The MAV will promptly give notice to the Collateral Agent and each Dealer (with respect to its Original Collateral) of, and defend against, any suit, action, proceeding or Lien that involves Collateral Posted by the MAV or that could adversely affect the Security Interests, unless that suit, action, proceeding or Lien results from the exercise of the Collateral Agent's or a Dealer's rights under Section 4.

(2)    *Good Faith and Commercially Reasonable Manner.*  Performance of all obligations under this Agreement, including but not limited to, all calculations, valuations, determinations and opinions made or given by any party, will be made and given in good faith and in a commercially reasonable manner.

(3)    *No Merger, Survival of Representations and Warranties*. This Agreement does not operate by way of merger of any of the Secured Liabilities and no judgment recovered

by the Collateral Agent or any of the other Secured Creditors will operate by way of merger of, or in any way affect, the Security Interests.

(4)     *Successors and Assigns*.  This Agreement is binding on the MAV and its successors and permitted assigns, and enures to the benefit of the Collateral Agent, the Dealers, the other Secured Creditors and their respective successors (which, in the case of the Collateral Agent, includes any successor to the trust and custody business of the Collateral Agent provided that such successor is not the Issuer Trustee) and permitted assigns (including, for greater certainty with respect to the Collateral Agent, any successor Collateral Agent appointed in accordance with the Omnibus Agreement). The MAV may not assign, transfer or delegate any of its rights or obligations under this Agreement and no other party to this Agreement may assign, transfer or delegate any of its rights or obligations under this Agreement except in accordance with the Omnibus Agreement.

(5)     *Management of Assets.*  Nothing in this Agreement shall be construed to prevent (i) the administrator under the Tao Administration Agreement from dealing with any Assets under its administration in accordance with the relevant agreement; (ii) the Administrator, on behalf of the MAV, from buying and selling any Assets of the MAV or, on behalf of a Satellite Trust, any Assets of such Satellite Trust to the extent specifically permitted by both the Administration Agreement and the Omnibus Agreement, or (iii) a Custodian holding any Assets in an account in the name of MAV, subject to and in accordance with the provisions of an OC Control Agreement or CA Control Agreement, provided that the Security Interests granted herein remain perfected in accordance with this Agreement and the Assets of the MAV and each Satellite Trust remain free and clear of any Liens, except for Permitted Liens.

(6)     *Severability*.  If any term, provision, covenant or condition of this Agreement, or the application thereof to any party or any circumstance, is held to be unenforceable, invalid or illegal (in whole or in part) for any reason in any relevant jurisdiction, the remaining terms, provisions, covenants and conditions of this Agreement, as modified by the deletion from this Agreement of such unenforceable, invalid or illegal portion, will continue in full force and effect, and such unenforceability, invalidity or illegality will not otherwise affect the remaining terms, provisions, covenants and conditions of this Agreement, so long as (i) this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof, and (ii) the deletion of such portion of this Agreement will not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realisation of the benefits that would otherwise have been conferred upon the parties hereunder.  The parties will endeavour in good faith negotiations to replace the unenforceable, invalid or illegal provision with a valid provision, the economic effect of which comes as close as possible to that of such deleted provision.

(7)     *Amendment*.  The parties agree that this Agreement shall not be amended, modified, supplemented, restated, replaced or waived except pursuant to the provisions of Section 11 (*Amendments*) of the Omnibus Agreement.

(8)    *Waivers, etc.*

    (a)    No consent or waiver by the Collateral Agent or a Dealer (with respect to its Original Collateral) in respect of this Agreement is binding unless the applicable prior conditions or requirements set out in the Omnibus Agreement have been fulfilled, including any applicable consents thereto and notices thereof, and such consent or waiver is made in writing and signed by an authorized officer of the Collateral Agent and/or the relevant Dealer with respect to its Original Collateral, as applicable. Any consent or waiver given under this Agreement is effective only in the specific instance and for the specific purpose for which given. No waiver of any of the provisions of this Agreement constitutes a waiver of any other provision.

    (b)    A failure or delay on the part of the Collateral Agent or a Dealer (with respect to its Original Collateral) in exercising a right under this Agreement does not operate as a waiver of, or impair, any right of the Collateral Agent or such Dealer however arising. A single or partial exercise of a right on the part of the Collateral Agent or a Dealer (with respect to its Original Collateral) does not preclude any other or further exercise of that right or the exercise of any other right by such parties.

(9)    *Conflict.* In the event of any conflict between the provisions of this Agreement and the provisions of the Omnibus Agreement which cannot be resolved by both provisions being complied with, the provisions contained in the Omnibus Agreement will prevail to the extent of such conflict, and the provisions of this Agreement shall be deemed to be amended to the extent necessary to eliminate such conflict and to exercise the intentions set out in the relevant provisions of the Omnibus Agreement. In the event of any conflict between the provisions of this Agreement and the provisions of any other Transaction Document other than the Omnibus Agreement, the provisions of this Agreement shall prevail.

(10)    *Governing Law*

    (a)    This Agreement will be governed by, interpreted and enforced in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein.

    (b)    The parties to this Agreement irrevocably attorn and submit to the non-exclusive jurisdiction of any court of competent jurisdiction of the Province of Ontario sitting in Toronto, Ontario in any action or proceeding arising out of or relating to this Agreement. The parties to this Agreement irrevocably waive objection to the venue of any action or proceeding in such court or that such court provides an inconvenient forum. Nothing in this Section 8.3(10) limits the right of the Collateral Agent or a Dealer to bring proceedings against the MAV in the courts of any other jurisdiction.

    (c)    Each party to this Agreement hereby irrevocably consents to the service of any and all process in any such action or proceeding by the delivery of copies of

such process to such party as provided under Section 6.  Nothing in this Section 8.3(10) affects the right of the Collateral Agent or a Dealer to serve process in any manner permitted by law.

(11) ***WAIVER OF JURY TRIAL***.  EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING RELATING TO THIS AGREEMENT. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH PARTY WOULD NOT, IN THE EVENT OF SUCH A SUIT, ACTION OR PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

(12) ***English Language***.  The parties to this Agreement have agreed that this Agreement as well as any document or instrument relating to it be drawn up in English only but without prejudice to any such document or instrument which may from time to time be drawn up in French only or in both French and English.  *Les parties aux présentes ont convenu que la présente Convention ainsi que tous autres actes ou documents s'y rattachant soient rédigés en anglais seulement mais sans préjudice à tous tels actes ou documents qui pourraient à l'occasion être rédigés en français seulement ou à la fois en anglais et en français.*

(13) ***Counterparts***.  This Agreement may be executed in counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective authorised officers as of the date first above written.

**MASTER ASSET VEHICLE I**

**CIBC    MELLON    GLOBAL    SECURITIES SERVICES COMPANY** acting in its capacity as trustee of Master Asset Vehicle I, without personal liability

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**CITIBANK, N.A.** acting in its capacity as LSS CDS
Counterparty

By: _____
      Name:
      Title:


By: _____
      Name:
      Title:


**DEUTSCHE BANK AG** acting in its capacity as LSS
CDS Counterparty and as Unlevered CDS
Counterparty

By: _____
      Name:
      Title:


By: _____
      Name:
      Title:


**BANK OF AMERICA, N.A.** acting in its capacity as
Unlevered CDS Counterparty

By: _____
      Name:
      Title:


By: _____
      Name:
      Title:


**HSBC BANK USA, NATIONAL ASSOCIATION**
acting in its capacity as LSS CDS Counterparty and as
Unlevered CDS Counterparty

By: _____
      Name:
      Title:


By: _____
      Name:
      Title:

**MERRILL LYNCH CAPITAL SERVICES, INC.**
acting in its capacity as LSS CDS Counterparty

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**MERRILL LYNCH INTERNATIONAL** acting in
its capacity as LSS CDS Counterparty and as
Unlevered CDS Counterparty

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**SWISS    RE    FINANCIAL    PRODUCTS
CORPORATION** acting in its capacity as LSS CDS
Counterparty

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**ROYAL BANK OF CANADA** acting in its capacity
as LSS CDS Counterparty and as Unlevered CDS
Counterparty

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**UBS AG** acting in its capacity as LSS CDS Counterparty

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

**BNY TRUST COMPANY OF CANADA** acting in its capacity as Collateral Agent

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

- - 1 - -

**Schedule A to MSA (MAV I)**

**Original Collateral[1]**

The Dealer's Original Collateral consists of all Assets from time to time held in the Custodial Account (as defined in Schedule B to this Agreement), including the Assets listed as such below, and all Assets from time to time delivered by or on behalf of the Dealer to the Collateral Agent as such Dealer's Original Collateral, including those, if any described as such below.

## A. LSS CDS Original Collateral (all amounts in CAD unless otherwise indicated)

| JPM Trade ID | E&Y ID | Dealer | Trade Name | Collateral Description | ISIN/CUSIP (if applicable) | Collateral Value | Collateral Total for Trade | Subject to Wrap Swaps? | Wrap Swap Par Amount | MAVI %age Allocation | MAVII %age Allocation | MAVI Trade Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Coventree – Program #48 Planet - Series A , F | Deutsche Bank AG, acting through its London Branch | CCLT (IML-CDS) 2005-1 | Short-Term Rolling Collateral<br>Maturity Date: Variable | Multiple | $111,650,000 | $111,650,000 | No | N/A | 52.515110850 5144% | 47.484889149 4856% | $58,633,121.26 |
| 2 | Coventree - Program #29 Aurora – Series A | Deutsche Bank AG, acting through its London Branch | CCLT (Super Senior 2) 2005-1 | Short-Term Rolling Collateral<br>Maturity Date: Variable | Multiple | $400,000,000 | $400,000,000 | No | N/A | 48.172861584 6425% | 51.827138415 3575% | $192,691,446.34 |
| 3 | Coventree - Program #28 Aurora – Series E | Deutsche Bank AG, acting through its London Branch | CCLT (Shamrock) 2005-1 | LandesBank Baden CAD $ Floating MTN under information memorandum dated November 13, 2003<br>Maturity Date: 06/20/2009 | XS0189857641 | $133,000,000 | $133,000,000 | No | N/A | 77.590543085 8478% | 22.409456914 1522% | $103,195,422.30 |
| 4 | Coventree – Program #23 Aurora – Series A | Deutsche Bank AG, acting through its London Branch | CCLT (CDXLS 1) 2006-1 | Short-Term Rolling Collateral<br>(Long / Short) | Multiple | $125,000,000 | $125,000,000 | No | N/A | 48.172861584 6425% | 51.827138415 3575% | $60,216,076.98 |
| 5 | Coventree – Program #36 Comet – Series A | Deutsche Bank AG, acting through its London Branch | CCLT (Super Senior 3) 2005-1 | Short-Term Rolling Collateral<br>Maturity Date: Variable | Multiple | $400,000,000 | $400,000,000 | No | N/A | 57.648369468 3607% | 42.351630531 6393% | $230,593,477.87 |
| 6 | Coventree – Program #37 Comet – Series A | Deutsche Bank AG, acting through its London Branch | CCLT (Super Senior 4) 2005-1 | Short-Term Rolling Collateral<br>Maturity Date: Variable | Multiple | $367,000,000 | $367,000,000 | No | N/A | 57.648369468 3607% | 42.351630531 6393% | $211,569,515.95 |
| 7 | Coventree – Program #49 Planet - Series A, F | Deutsche Bank AG, acting through its London Branch | CCLT (IML-CDS-2) 2005-1 | Short-Term Rolling Collateral<br>Maturity Date: Variable | Multiple | $150,000,000 | $150,000,000 | No | N/A | 49.012426682 6307% | 50.987573317 3693% | $73,518,640.02 |
| 8a,b | Coventree – Program #35 Comet - Series A Planet - Series A | Deutsche Bank AG, acting through its London Branch | CCLT (iTraxx 1) 2006-1 | Short-Term Rolling Collateral<br>Maturity Date: Variable | Multiple | $399,923,665 | $399,923,665 | No | N/A | 48.233438151 7396% | 51.766561848 2604% | $192,896,933.61 |
| 9 | Nereus – Program #88 SIT III - Series A | Deutsche Bank AG, acting through its London Branch | NCLCT (EC Super Senior) 2005-1 | Credit Card Receivables Backed Class A FRN, Series 2005-1 of CARDS II Trust<br>Maturity Date: 03/22/2010 | 14161GAK6 | $200,000,000 | $200,000,000 | No | N/A | 37.162035251 7879% | 62.837964748 2121% | $74,324,070.50 |
| 10 | Nereus – Program #82 SIT III - Series A | Deutsche Bank AG, acting through its London Branch | NCLCT (LSS II) 2005 | Credit Card Receivables Backed Class A FRN Series 2005-2 of CARDS II Trust<br>Maturity Date: 09/20/2012 | 1416GAN0 | $400,000,000 | $400,000,000 | No | N/A | 37.162035251 7879% | 62.837964748 2121% | $148,648,141.01 |
| 11 | Newshore - Program #1b Aria – Series E | Deutsche Bank AG, acting through its London Branch | Aria  DB1 - LSS | Golden Credit Cards Trust 2006-1<br>Maturity Date: 02/15/2011 | 380881AW2 | $187,500,000 | $187,500,000 | Yes<br>IRS | $187,500,000 | 67.888773063 1988% | 32.111226936 8012% | $127,291,449.49 |
| 12 | Newshore – Program #2c Aria – Series A | Deutsche Bank AG, acting through its London Branch | Aria DB2 | Short-Term Investments<br>(Long / Short) | Multiple | $150,000,000 | $150,000,000 | No | N/A | 53.634877153 7847% | 46.365122846 2153% | $80,452,315.73 |
| 13 | Newshore – Program #3b Aria – Series A | Deutsche Bank AG, acting through its London Branch | Aria DB3 | Short-Term Investments<br>(Long / Short) | Multiple | $150,000,000 | $150,000,000 | No | N/A | 53.634877153 7847% | 46.365122846 2153% | $80,452,315.73 |
| 15 | Newshore – Program #5 Encore – Series A | Deutsche Bank AG, acting through its | Encore DB5 - LSS | Short-Term Investments<br>Maturity Date: Variable | Multiple | $285,000,000 | $285,000,000 | No | N/A | 80.524614125 4770% | 19.475385874 5230% | $229,495,150.26 |

---

[1] To be updated until the Closing Date

| JPM Trade ID | E&Y ID | Dealer | Trade Name | Collateral Description | ISIN/CUSIP (if applicable) | Collateral Value | Collateral Total for Trade | Subject to Wrap Swaps? | Wrap Swap Par Amount | MAVI %age Allocation | MAVII %age Allocation | MAVI Trade Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | London Branch | | | | | | | | | | |
| 16 | Newshore – Program #2a Opus – Series A | Deutsche Bank AG, acting through its London Branch | Opus DB2_Long-(Short) – LSS (Long / Short) | Short-Term Investments Maturity Date: Variable | Multiple | $200,000,000 | $200,000,000 | No | N/A | 68.8087842505404% | 31.1912157494596% | $137,617,568.50 |
| 17 | Newshore – Program #4 Opus – Series A | Deutsche Bank AG, acting through its London Branch | Opus DB4 | Short-Term Investments Maturity Date: Variable | Multiple | $200,000,000 | $200,000,000 | No | N/A | 68.8087842505404% | 31.1912157494596% | $137,617,568.50 |
| 18 | Newshore – Program #1a Symphony – Series A | Deutsche Bank AG, acting through its London Branch | Symphony DB1 | Short-Term Investments Maturity Date: Variable | Multiple | $187,500,000 | $187,500,000 | No | N/A | 63.9144626671764% | 36.0855373328236% | $119,839,617.50 |
| 19 | Newshore – Program #2b Symphony – Series A | Deutsche Bank AG, acting through its London Branch | Symphony DB2_Long-Short (Long / Short) | Short-Term Investments Maturity Date: Variable | Multiple | $150,000,000 | $150,000,000 | No | N/A | 63.9144626671764% | 36.0855373328236% | $95,871,694.00 |
| 20 | Newshore – Program #3a Symphony – Series A | Deutsche Bank AG, acting through its London Branch | Symphony DB3_Long-Short (Long / Short) | Short-Term Investments Maturity Date: Variable | Multiple | $175,000,000 | $175,000,000 | No | N/A | 63.9144626671764% | 36.0855373328236% | $111,850,309.67 |
| 21 | Coventree – Program #20 Aurora – Series A, E | Swiss Re Financial Products Corporation | CCLT (Banff) 2006-1 | Short-Term Investments Maturity Date: Variable | Multiple | $292,159,027 | $292,159,027 | Yes Par and Basis Swaps | $300,000,000 | 55.7246601213702% | 44.2753398786298% | $162,804,624.81 |
| 22 | Coventree – Program #24 Aurora – Series A | Swiss Re Financial Products Corporation | CCLT (Galibier) 2006-1 | Short-Term Investments Maturity Date: Variable | Multiple | $182,838,796 | $182,838,796 | Yes Par and Basis Swaps | $200,000,000 | 48.1728615846425% | 51.8271384153575% | $88,078,680.12 |
| 23 | Securitus – Program #1 Selkirk – Series A | Swiss Re Financial Products Corporation | Coastal Mountain Base Trust Series 2006-1 | USD Short-Term and Long-Term Investments Maturity Date: Variable | Multiple | $150,000,000 | $150,000,000 | Yes Par and Basis Swaps | $150,000,000 | 21.6715885203920% | 78.3284114796080% | $32,507,382.78 |
| 24 | Newshore - Program #6 Opus – Series E | Merrill Lynch International | Opus ML1 | USD Short-Term Investments Maturity Date: N/A | N/A | USD $90,000,000 | USD $90,000,000 | Yes TRS | $101,360,000 | 70.9148559439254% | 29.0851440560746% | $71,879,297.98 (USD $63,823,370.35) |
| 25 | Coventree - Program #25 Aurora – Series E, F | Merrill Lynch International | CCLT (ML-LSS) Series 2006-1 | USD Short-Term Investments Maturity Date: N/A | N/A | USD $220,000,000 | USD $220,000,000 | Yes TRS | $250,000,000 | 72.3259846663235% | 27.6740153336765% | $180,814,961.67 (USD $159,117,166.27) |
| 26 | Nereus – Program #77 SAT – Series A, E | Merrill Lynch International | NCLCT (ML-LSS) 2006 | USD Short-Term Investments Maturity Date: N/A | N/A | USD $220,000,000 | USD $220,000,000 | Yes TRS | $250,000,000 | 70.1551983244780% | 29.8448016755220% | $175,387,995.81 (USD $154,341,436.31) |
| 27 | Nereus – Program #83 SIT III – Series A, E | Merrill Lynch International | NCLCT (ML-LSS II) 2006 | Floating Rate Bond – MC Funding Ltd / MC Funding 2006-1 LLC (MCFND 2006-1A A1) maturing 12/20/2020  USD Short-Term Investments – Time Deposits/BNY Cash Reserve Fund (Maturity Date: N/A) | Floating Rate Bond: 552686AA5 | USD $42,998,901  USD $177,001,099 | USD $220,000,000 | Yes TRS | $250,000,000 | 58.3181633118893% | 41.6818366881107% | $28,495,646.94 (USD $25,076,169.31) $117,299,761.34 (USD $103,223,789.98) $145,795,408.28 (USD $128,299,959.29) |
| 28 | Newshore - Program #7 Aria – Series A | Merrill Lynch International | Aria ML2_Long – (Short) (Long / Short) | USD Short-Term Investments (Maturity Date: N/A)  CAD Short-Term Investments (Maturity Date: N/A)[2] | N/A | USD $175,000,000  $40,000,000 | $240,000,000 | Yes TRS | $200,000,000 | 53.6348771537847% | 46.3651228462153% | $107,269,754.31 (USD $93,861,035.02) $21,453,950.86 $128,723,705.17 |
| 29 | Newshore - Program #9b | Merrill Lynch International | Opus ML4 | USD Short-Term Investments | N/A | USD $110,000,000 | USD | Yes | $125,000,000 | 68.8087842505404 | 31.191215749 | $86,010,980.31 (USD |

[2] The CAD $40,000,000 is additional collateral that was posted to Merrill Lynch International and is not part of the applicable Wrap Swap notional amount.

| JPM Trade ID | E&Y ID | Dealer | Trade Name | Collateral Description | ISIN/CUSIP (if applicable) | Collateral Value | Collateral Total for Trade | Subject to Wrap Swaps? | Wrap Swap Par Amount | MAVI %age Allocation | MAVII %age Allocation | MAVI Trade Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Opus – Series A | Capital Services, Inc. | | Maturity Date: N/A | | | $110,000,000 | TRS (With Merrill Lynch International) | | 5404% | 4596% | $75,689,662.68) |
| 30 | Newshore - Program #9c Symphony – Series A | Merrill Lynch Capital Services, Inc. | Symphony ML4 | USD Short-Term Investments Maturity Date: N/A | N/A | USD $110,000,000 | USD $110,000,000 | Yes TRS (With Merrill Lynch International) | $125,000,000 | 63.914462667 1764% | 36.085537332 8236% | $79,893,078.33 (USD $70,305,908.93) |
| 31 | Newshore - Program #9d Aria – Series A | Merrill Lynch Capital Services, Inc. | Aria ML4 | USD Short-Term Investments Maturity Date: N/A | N/A | USD $110,000,000 | USD $110,000,000 | Yes TRS (With Merrill Lynch International) | $125,000,000 | 53.634877153 7847% | 46.365122846 2153% | $67,043,596.44 (USD $58,998,364.87) |
| 32 | Newshore - Program #9a Encore – Series A | Merrill Lynch Capital Services, Inc. | Encore ML4 - LSS | USD Short-Term Investments Maturity Date: N/A | N/A | USD $110,000,000 | USD $110,000,000 | Yes TRS (With Merrill Lynch International) | $125,000,000 | 80.524614125 4770% | 19.475385874 5230% | $100,655,767.66 (USD $88,577,075.54) |
| 33 | Coventree - Program #26 Aurora – Series E, F | Merrill Lynch International | CCLT (ML6 L/S) 2006-1 (Long / Short) | Floating Rate Bond – Grayson CLO Ltd (GCLO 2006-1A A1A) Maturity Date: 11/1/2021 | Floating Rate Bond: 389669AA0 | USD $120,000,000 | USD $120,000,000 | Yes TRS | $135,000,000 | 70.278656392 0640% | 29.721343607 9360% | $94,876,186.13 (USD $84,334,387.67) |
| 34 | Nereus – Program #78 SAT – Series E | Merrill Lynch International | NCLCT (ML-LSS IV) 2006 | Floating Rate Bond – Grayson CLO Ltd (GCLO 2006-1A A1A) Maturity Date: 11/1/2021 | Floating Rate Bond: 389669AA0 | USD $131,250,000 | USD $131,250,000 | Yes TRS | $150,000,000 | 85.125541967 8272% | 14.874458032 1728% | $127,688,312.95 (USD $111,727,273.83) |
| 35 | Coventree - Program #52 Planet – Series E, F | Merrill Lynch International | CCLT (ML LSS-2) 2006-1 | Floating Rate Bond – Grayson CLO Ltd (GCLO 2006-1A A1A) Maturity Date: 11/1/2021 | Floating Rate Bond: 389669AA0 | USD $235,000,000 | USD $235,000,000 | Yes TRS | $265,000,000 | 69.420462605 9089% | 30.579537394 0911% | $183,964,225.91 (USD $163,138,087.12) |
| 36 | Newshore - Program #8 Encore – Series E | Merrill Lynch International | Encore ML3_Long (Short) – LSS (Long / Short) | USD Short-Term Investments Maturity Date: N/A | N/A | USD $110,000,000 | USD $110,000,000 | Yes TRS | $125,000,000 | 70.535552516 1144% | 29.464447483 8856% | $88,169,440.65 (USD $77,589,107.77) |
| UBS1 | New UBS1 | UBS AG, London Branch | CDX7 5y 15-30% | Bas Maturity Date: Variable | Multiple | $54,012,345.68 | $68,415,637.86[3] | No | N/A | 73.265457344 1738% | 26.734542655 8261% | $39,572,392.08 |
| UBS2 | New UBS2 | UBS AG, London Branch | CDX7 7y 15-30% | BAs Maturity Date: Variable | Multiple | $561,728,395.06 | $711,522,633.74[4] | No | N/A | 73.265457344 1738% | 26.734542655 8261% | $411,552,877.67 |
| UBS3 | New UBS3 | UBS AG, London Branch | CDX7 10y 15-30% | BAs Maturity Date: Variable | Multiple | $134,259,259.26 | $170,061,728.40[5] | No | N/A | 73.265457344 1738% | 26.734542655 8261% | $98,365,660.32 |
| 46 | Newshore – Program #14 Symphony – Series E | HSBC Bank USA, National Association | Symphony HS7 | BEAR STEARNS 2005 TC2 MTG Maturity Date: 8/25/2035 | 073879D96, | USD $14,414,000 | USD $109,000,000 | Yes FXS IRS TRS | $125,000,000 | 52.253528954 4038% | 47.746471045 5962% | $8,637,412.46 (USD $7,531,823.66) |
| | | | | GS MTG SECS CORP 2005 11 ASSET BKD CFT CL 3A5 Maturity Date: 10/25/2035 | 362341QK8 | USD $30,986,000 | | | | | | $18,567,979.91 (USD $16,191,278.48) |

[3] See Other Posted Support Chart below.
[4] See Other Posted Support Chart below.
[5] See Other Posted Support Chart below.

- - 4 - -

| JPM Trade ID | E&Y ID | Dealer | Trade Name | Collateral Description | ISIN/CUSIP (if applicable) | Collateral Value | Collateral Total for Trade | Subject to Wrap Swaps? | Wrap Swap Par Amount | MAVI %age Allocation | MAVII %age Allocation | MAVI Trade Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | RESIDENTIAL ASSET SE C MTG PASS 2005 KS8 CL A4<br><br>Maturity Date: 8/25/2035 | 76110W3Q7 | USD $63,600,000 | | | | | | $38,111,518.82 (USD $33,233,244.41)<br><br>$65,316,911.19 (USD $56,956,346.56) |
| 47b | Newshore - Program #12 Symphony – Series A, E | HSBC Bank USA, National Association | Symphony HS5 | ALESCO PREFERRED FDG VI LTD SER 6A CL A1 144A<br><br>Maturity Date: 3/23/2035 | 01448XAA3 | USD $23,379,554 | USD $123,379,554 | Yes<br><br>FXS<br><br>IRS<br><br>TRS | $150,000,000 | 63.9144626671764% | 36.0855373828236% | $18,167,008.83 (USD $14,942,916.31) |
| | | | | Tropic CDO V Ltd. NT CL A 1L2 FLTG 144A 3C7<br><br>Maturity Date: 7/15/2036 | 89708BAB9 | USD $100,000,000 | | | | | | $77,704,685.17 (USD $63,914,462.67)<br><br>$95,871,694.00 (USD $78,857,378.98) |
| 47c | Newshore – Program #13 Symphony – Series A | HSBC Bank USA, National Association | Symphony HS6 | AMMC CLOIII/ AMC CLO III NT CL A<br><br>Maturity Date: 7/25/2016 | 00173TAA5 | USD $50,000,000 | USD $248,865,163.38 | Yes<br><br>FXS<br><br>IRS<br><br>TRS | $300,000,000 | 60.0274847629189% | 39.9725152530811% | $36,180,727.72 (USD $30,013,742.38) |
| | | | | SAIL 2005-6 A9 Class A9 Notes Due 2035<br><br>Maturity Date: 7/25/2035 | 86358ETZ9 | USD $90,567,938.38 | | | | | | $65,536,278.37 (USD $54,365,655.41) |
| | | | | STRUCTURED ASSET SECS CORP 2005 WF2 MTG<br><br>Maturity Date: 5/25/2035 | 86359DDA2 | USD $27,668,225 | | | | | | $20,021,130.30 (USD $16,608,539.55) |
| | | | | PARK PLACE SECURITIES INC  2005 WCW2<br><br>Maturity Date: 7/25/2035 | 70069FLF2 | USD $61,629,000 | | | | | | $44,595,641.37 (USD $36,994,338.58) |
| | | | | CITIGROUP MORTGAGE LOAN TRUST INC. Series 2005-HE3 Class A2D<br><br>Maturity Date: 9/25/2035 | 17307GWQ7 | USD $19,000,000 | | | | | | $13,748,676.53 (USD $11,405,222.11)<br><br>$180,082,454.29 (USD $149,387,498.03) |
| 48 | Newshore – Program #15b Opus – Series A | HSBC Bank USA, National Association | Opus HS8_Long-(Short) (Long / Short) | Preferred Term Securities XXII LTD 97,955,809.75 USD<br><br>Maturity Date: 9/22/2036 | Preferred: 74042MAA4<br><br>Stone Tower: 86176NAB2 | USD $98,973,000 | USD $273,973,000 | Yes<br><br>FXS<br><br>IRS<br><br>TRS | $300,000,000 | 68.8087842505404% | 31.1912157494596% | $74,571,711.12 (USD $68,102,118.04) |
| | | | | Stone Tower CR FDG I LTD 2006 SNR SND TRM NT 175M USD<br><br>Maturity Date: 6/25/2016 | | USD $175,000,000 | | | | | | $131,854,641.63 (USD $120,415,372.43)<br><br>$206,426,352.75 (USD |

5490155 v9

- - 5 - -

| JPM Trade ID | E&Y ID | Dealer | Trade Name | Collateral Description | ISIN/CUSIP (if applicable) | Collateral Value | Collateral Total for Trade | Subject to Wrap Swaps? | Wrap Swap Par Amount | MAVI %age Allocation | MAVII %age Allocation | MAVI Trade Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | $188,517,490.47) |
| 49 | Newshore - Program #15a<br><br>49a - Encore – Series A<br><br>49b - Encore – Series E | HSBC Bank USA, National Association | Encore HS8_A_Long-(Short) – LSS<br><br>(Long / Short) | National Collegiate Student Loan Trust 2005 3<br>Maturity Date: 10/25/2033 | National<br>63543TAE8 | USD $89,920,000 | USD $179,840,000 | Yes<br>FXS<br>IRS<br>TRS | $100,000,000 | 80.5246141254770% | 19.4753858745230% | $80,524,614.13 (USD $72,407,733.03) |
| | | | | National Collegiate Student Loan Trust 2005 3<br>Maturity Date: 10/25/2033 | 63543TAE8 | USD $10,080,000 | | | $100,000,000 | 70.5355525161144% | 29.4644478868856% | $7,907,010.34 (USD $7,109,983.69) |
| | | | | ARGENT SECS INC 2005 W4<br>Maturity Date: 2/25/2036 | 040104PT2 | USD $79,840,000 | | | | | | $62,628,542.18 (USD $56,315,585.13) |
| | | | | | | | | | | | | $151,060,166.65 (USD $135,833,301.85) |
| 50 | Coventree – Program #31<br>Aurora – Series A, E | HSBC Bank USA, National Association | Aurora Trust (2000-07STAR03TO)<br>or<br>HSBC LSS (Also known as Aurora Trust (STARTS (Canada) Trust 2005-2)) | Residential Assets Mortgage Products 2005-RS7 A3<br>Maturity Date: 7/25/2035 | 76112BWV8 | USD $63,667,000 | USD $63,667,000 | Yes<br>IRS<br>TRS | $75,000,000 | 55.5272819599438% | 44.4727180400562% | $41,645,461.47 (USD $35,352,554.61) |
| 52 | Quanto – Program #1<br>Apsley | Deutsche Bank AG, acting through its London Branch | Apsley – Tranche_1 CAD | Rabobank Nederland CAD 500,000,000 floating rate notes due March 20, 2016 (Series 1534A /Tranche 1) | XS0241629582 | $500,000,000 | $500,000,000 | No | N/A | 62.4240354623177% | 37.5759645376823% | $312,120,177.31 |
| 53 | Quanto – Program #2<br>Apsley | Deutsche Bank AG, acting through its London Branch | Apsley – Tranche_2 CAD | Rabobank Nederland CAD 250,000,000 floating rate notes due March 20, 2016 (Series 1534A /Tranche 1) | XS0241629582 | $250,000,000 | $250,000,000 | No | N/A | 62.4240354623177% | 37.5759645376823% | $156,060,088.66 |
| 54 | Quanto – Program #3<br>Apsley | Deutsche Bank AG, acting through its London Branch | Apsley – Tranche_3_Long-Short CAD<br><br>(Long / Short) | Rabobank Nederland CAD 250,000,000 senior unsecured floating rate notes due December 20, 2015 | XS0249134650 | $250,000,000 | $250,000,000 | No | N/A | 62.4240354623177% | 37.5759645376823% | $156,060,088.66 |
| 56 | Quanto – Program #5<br>Apsley | Deutsche Bank AG, acting through its London Branch | Apsley – Tranche_5 CAD | Rabobank Nederland CAD 250,000,000 floating rate notes due June 20, 2016 (Series 1607A /Tranche 1) | XS0257732411 | $250,000,000 | $250,000,000 | No | N/A | 62.4240354623177% | 37.5759645376823% | $156,060,088.66 |
| 57 | Quanto – Program #6<br>Apsley | Deutsche Bank AG, acting through its London Branch | Apsley – Tranche_6 CAD | Rabobank Nederland CAD 250,000,000 floating rate notes due June 20, 2016 (Series 1612A /Tranche 1) | XS0258872554 | $250,000,000 | $250,000,000 | No | N/A | 62.4240354623177% | 37.5759645376823% | $156,060,088.66 |
| 59 | Quanto – Program #10<br>Whitehall | Deutsche Bank AG, acting through its London Branch | Whitehall – Tranche_1 CAD | Rabobank Nederland CAD 750,000,000 floating rate notes due December 20, 2015 | XS0228612809 | $750,000,000 | $750,000,000 | No | N/A | 62.6632732163548% | 37.3367267836452% | $469,974,549.12 |
| 60 | Quanto – Program #11<br>Whitehall | Deutsche Bank AG, acting through its London Branch | Whitehall – Tranche_2 CAD | Rabobank Nederland CAD 750,000,000 floating rate notes due December 20, 2015 | XS0229817654 | $750,000,000 | $750,000,000 | No | N/A | 62.6632732163548% | 37.3367267836452% | $469,974,549.12 |
| 61 | Quanto – Program #12<br>Whitehall | Deutsche Bank AG, acting through its London Branch | Whitehall – Tranche_3 CAD | Rabobank Nederland CAD 500,000,000 floating rate notes due December 20, 2015 | XS0232464494 | $500,000,000 | $500,000,000 | No | N/A | 62.6632732163548% | 37.3367267836452% | $313,316,366.08 |
| 62 | Quanto – Program #13<br>Whitehall | Deutsche Bank AG, acting through its London Branch | Whitehall – Tranche_4 CAD | Rabobank Nederland CAD 250,000,000 floating rate notes due December 20, 2015 | XS0232464494 | $250,000,000 | $250,000,000 | No | N/A | 62.6632732163548% | 37.3367267836452% | $156,658,183.04 |
| 63 | Quanto – Program #14<br>Whitehall | Deutsche Bank AG, acting through its London Branch | Whitehall – Tranche_5 CAD | Rabobank Nederland CAD 250,000,000 floating rate notes due December 20, 2015 | XS0235279956 | $250,000,000 | $250,000,000 | No | N/A | 62.6632732163548% | 37.3367267836452% | $156,658,183.04 |
| 68 | Nereus - Program #73<br>SAT – Series A, L1 | HSBC Bank USA, National Association | CDO NCLCT (BCO-LSS) 2006 & | BA's, BDN's and Short-Term Investments | Multiple | $198,000,000 | $300,000,000 | No | N/A | 47.2375443247666% | 52.7624556752334% | $93,530,337.76 |

- - 6 - -

| JPM Trade ID | E&Y ID | Dealer | Trade Name | Collateral Description | ISIN/CUSIP (if applicable) | Collateral Value | Collateral Total for Trade | Subject to Wrap Swaps? | Wrap Swap Par Amount | MAVI %age Allocation | MAVII %age Allocation | MAVI Trade Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | L1 | GCO EDUCATION LN FDG FLRT 27AU  Maturity Date: August 27, 2046 | 36156YAA9 | $102,000,000 | | | | | | $48,182,295.21 |
| | | | | | | | | | | | | $141,712,632.97 |
| 78 | NBF – Program #5 Silverstone – Series A | Deutsche Bank AG, Canada Branch | Silverstone - Tranche_1 CAD | Bayerische Landesbank FRN for CAD 2,000,000,000 | XS0211764278 | $2,000,000,000 | $2,000,000,000 | IRS | $2,000,000,000 | 61.342760039 4300% | 38.657239960 5700% | $1,226,855,200.79 |
| 81 | Coventree – Program #59 Rocket – Series A | ROYAL BANK OF CANADA | CCLT (MPL-CDN) 2006-1 | Cards II Trust Floating Rate Notes Class A | CA14161ZADO2 | $100,000,000 | $100,000,000 | No | N/A | 31.259024170 9029% | 68.740975829 0971% | $31,259,024.17 |
| 82(b)[6] | Coventree – Program #60 Rocket – Series A | ROYAL BANK OF CANADA | CCLT (MPL-US) 2006-1 | N/A | N/A | N/A | N/A | No | N/A | 31.259024170 9029% | 68.740975829 0971% | N/A |

---

[6] Collateral for trade 81 is Allocated Collateral for JPM ID 81.  JPM ID 82(b), representing the top half of the notional amount of JPM ID 82, will have no Allocated Collateral, but will share the Original Collateral for JPM ID 81.  The full amount of collateral which served as credit support for JPM ID 82 will be allocated to JPM ID 82(a)

5490155 v9

- - 7 - -

**B.    Unlevered CDS Original Collateral**

| JPM ID | E&Y ID | Dealer | Trade Name | Collateral Description | ISIN/CUSIP (if applicable) | Collateral /Asset Value | Collateral Total for Deal | Subject to TRS? | TRS Par Amount | MAVI %age Allocation | MAVII %age Allocation | MAVI Trade Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 51 | Nereus - Program #81 SIT III – Series A, E | HSBC Bank USA, National Association | SIT III (2000-07STAR02TO) (Also known as SIT III (STARTS (Canada) Trust 2004-2)) | Alesco Preferred Funding VI, Ltd., Class A-1  Maturity Date: 3/23/2035 | 01448XAA3 | USD $101,543,460 | USD $101,543,460 | Yes  TRS  IRS | $125,000,000 | 54.086937699869% | 45.913062300131% | $67,608,672.12 (USD $54,921,747.94) |
| 69, 69b | Coventree - Program #79 SIT III – Series A | Bank of America, N.A. | NCLCT (CADBANA) 2005-1 | MBNA Credit Card Master Trust Floating Rate Asset Back Certificate, Series 2001-B Class A (expected final maturity date 3/15/2011) | 55264TCK5 | USD $35,000,000 | USD $161,900,000 | Yes  FXS | $200,000,000 | 37.1620352517879% | 62.8379647482121% | $16,067,587.82 (USD $13,006,712.34) |
| | | | | MBNA Credit Card Master Trust Series Class A (2004-2) notes, (expected final maturity 2/15/2011) | 55262TGA5 | USD $126,900,000 | | | | | | $58,256,482.68 (USD $47,158,622.73) |
| | | | | | | | | | | | | $74,324,070.50 (USD $60,165,335.07) |
| 75 | NBF - Program #2 MMAI-I – Series A | Deutsche Bank AG, acting through its London Branch | MMAI-I Trust AAA-1 (E&Y)  MMAI-Tranche_1 CAD | Bayerische Landesbank FRN for CAD 1,400,000,000  Maturity Date: 09/02/2014 | XS0199571877 | $466,700,000 | $466,700,000 | No | N/A | 56.2511219053415% | 43.7488780946585% | $262,523,985.93 |
| 76 | NBF - Program #3 MMAI-I – Series A | Deutsche Bank AG, acting through its London Branch | MMAI-I Trust AAA-2 (E&Y)  MMAI-Tranche_2 CAD | Bayerische Landesbank FRN for CAD 1,400,000,000  Maturity Date: 09/02/2014 | XS0199571877 | $466,700,000 | $466,700,000 | No | N/A | 56.2511219053415% | 43.7488780946585% | $262,523,985.93 |
| 77 | NBF - Program #4 MMAI-I – Series A | Deutsche Bank AG, acting through its London Branch | MMAI-I Trust AAA-3 (E&Y)  MMAI-Tranche_3 CAD | Bayerische Landesbank FRN for CAD 1,400,000,000  Maturity Date: 09/02/2014 | XS0199571877 | $466,600,000 | $466,600,000 | No | N/A | 56.2511219053415% | 43.7488780946585% | $262,467,734.81 |
| 185 | Nereus – Program #84 SIT III – Series E | Merrill Lynch International | NCLCT (Morningside) 2005 | USD Short-Term Investments  Maturity Date: N/A | N/A | USD $100,000,000 | USD $100,000,000 | Yes  TRS | $124,500,000 | 79.4742913719907% | 20.5257086280093% | $98,945,492.76 (USD $79,474,291.37) |

5490155 v9

- - 8 - -

## C.    Other Posted Support

| JPM ID | E&Y ID | Dealer | Trade Name | Holder of Other Posted Support | Cash Amount | Cash Total for Deal | Subject to TRS? | TRS Par Amount | ISIN/CUSIP (if applicable) | MAVI %age Allocation | MAVII %age Allocation | MAVI Trade Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UBS1 | New UBS1 | UBS AG, London Branch | CDX7 5y 15-30% | UBS | $14,403,292.18 | $14,403,292.18 | No | N/A | N/A | 73.2654573441738% | 26.7345426558261% | $10,552,637.89 |
| UBS2 | New UBS2 | UBS AG, London Branch | CDX7 7y 15-30% | UBS | $149,794,238.68 | $149,794,238.68 | No | N/A | N/A | 73.2654573441738% | 26.7345426558261% | $109,747,434.04 |
| UBS3 | New UBS3 | UBS AG, London Branch | CDX7 10y 15-30% | UBS | $35,802,469.14 | $35,802,469.14 | No | N/A | N/A | 73.2654573441738% | 26.7345426558261% | $26,230,842.76 |
| 72 | Coventree – Program #74 SAT – Series A, E | Citibank Canada | NCLCT (Citi-LSS) 2006 | Citibank Canada[7]  Citibank N.A., Canadian Branch | $225,000,000  $50,000,000 | $275,000,000 | No | N/A | N/A | 60.6286160059830% | 39.3713839940170% | $136,414,386.01  $30,314,308.00  $166,728,694.01 |
| 73 & 151 | Coventree - Program #21 Aurora – Series A, E Planet – Series E | Citibank, N.A. | CCLT (CB LSS-2) 2006-1 | Citibank N.A., Canadian Branch | $275,000,000 | $275,000,000 | No | N/A | N/A | 51.2146936760065% | 48.7853063239935% | $140,840,407.61 |
| 74 | Coventree – Program #22 Aurora - Series A, E | Citibank, N.A. | CCLT (CB LSS) 2005-1 | Citibank N.A., Canadian Branch | $200,000,000 | $200,000,000 | No | N/A | N/A | 49.6437456597028% | 50.3562543402972% | $99,287,491.32 |

---

[7] On closing, the trade with Citibank Canada will be novated to Citibank, N.A. and the portion of the cash deposits now with Citibank Canada will be deposited with Citibank, N.A., Canadian Branch

5490155 v9

## Schedule B to the MAV1 Master Security Agreement

## Swap Credit Support Provisions

## PART 1.        GENERAL INTERPRETATION; DEFINITIONS

1.1     Subject to Parts 1.2 and 1.3 below, all capitalized terms used but not otherwise defined herein shall have the meanings as set out in the Master Security Agreement, the Omnibus Agreement or Paragraph 12 of the form of 1994 ISDA Credit Support Annex (Bilateral Form-Subject to New York Law) (the "**Form CSA**").  Terms defined within this Schedule B with respect to any specific Dealer and (a) relevant Transaction(s) shall have such ascribed meanings only with respect to such Dealer and such Transaction(s) in respect of which such term is herein defined.  In the event of any inconsistency between a term defined in this Schedule B either generally or in respect of a specific Dealer and (a) relevant Transaction(s) and a term also defined in the Master Security Agreement, the Omnibus Agreement or the Form CSA, the meaning set out in this Schedule B shall govern for the relevant purpose.

1.2     As used throughout this Schedule B in respect of any Dealer and the relevant Transaction(s), "**OC Custodian**" shall include the meaning given to that term in Annex A to the Schedule to the Swap Agreement, "**Party B**" shall refer to MAV1, "**Proceeds**" shall have the meaning given to that term in the *Personal Property Security Act* (Ontario) and **"Total Return Swap Agreement"** shall mean the applicable total return swap agreement, as supplemented by the total return swap confirmation thereto (the "**Total Return Swap Confirmation**") dated as of the date of this Master Security Agreement between Party A and Party B, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the Omnibus Agreement.

1.3     As used throughout this Schedule B, each of the following terms shall have the meaning ascribed to it in Schedule A (*Master Definitions*) to the Omnibus Agreement unless otherwise indicated: "**Administrator**"; "**Affiliate**"; "**BA Rate**"; "**Business Day**"; "**CAD**"; "**Closing Date**"; "**Collateral Agent**"; "**Custodian**"; "**DBRS**"; "**Dealer**"; "**Dealer CSA**"; "**Eligibility Criteria**"; "**Fitch**"; "**Master Security Agreement**"; "**MAV1**"; "**Matured Original Collateral**"; "**Moody's**"; "**OC Control Agreement**"; "**Omnibus Agreement**"; "**Original Collateral**"; "**Posted Credit Support**"; "**Rating Agency**"; "**Rating Agency Condition**"; "**Required Ratings II**"; "**Returned Other Posted Support**"; "**S&P**"; "**Swap Agreement**", "**Transaction**"; "**USD**" and **"Wrap Swap**".

1.4     This Schedule B shall be subject in all respects to the provisions of the Omnibus Agreement and the obligations of each Dealer thereunder.  Except as set forth in respect of the defined terms in Part 1.1 above, to the extent of any conflict or inconsistency between this Schedule B and the provisions of the Omnibus Agreement, the Omnibus Agreement shall govern.  Further, this Schedule B shall not be construed to confer any rights on any Dealer that are not consistent with the Omnibus Agreement.

## PART 2.        ELIGIBILITY CRITERIA

2.1        The provisions of Part 3 (*Dealer-Specific Swap Credit Support Provisions*) of this Schedule B set forth the eligibility criteria for the reinvestment of proceeds from Matured Original Collateral or Returned Other Posted Support, as such eligibility criteria was documented in the historical Transactions of each Dealer.   Party A and Party B (as defined herein) shall use Part 3 of this Schedule B solely as a reference point from which to determine the eligibility criteria applicable to the reinvestment of proceeds of Matured Original Collateral or Returned Other Posted Support, however, ultimately the replacement and reinvestment of Matured Original Collateral or Returned Other Posted Support shall be made pursuant to the terms of Sections 4.11 (*Reinvestment of Matured Original Collateral*) and 4.12 (*Mechanics of Investing Matured Original Collateral*) of the Omnibus Agreement.

2.2        For the purpose of reinvesting the proceeds of Matured Original Collateral or Returned Other Posted Support pursuant to Section 4.12(b)(ii) of the Omnibus Agreement, the Eligible Collateral description and related provisions set out in Part 3 of this Schedule B are provisions upon which the Dealer and the Administrator may agree.  In the case of Citibank, N.A., Part 3 of this Schedule B sets forth the Eligible Collateral description and related provisions for the reinvestment of proceeds of Matured Original Collateral pursuant to Section 4.12(b)(iii) of the Omnibus Agreement.

2.3        In accordance with Section 4.12(b)(i) of the Omnibus Agreement, the provisions set forth in Part 3 of this Schedule B do not apply to the reinvestment of Matured Original Collateral of a Dealer's Total Return Swap Agreement ("**Matured TRS Collateral**").

2.4        For all purposes of the definition of "Swap Credit Support Provisions" in Section 2.1(2) of the Master Security Agreement, the provisions of Part 3 of this Schedule B shall be construed to include in all respects the provisions of Sections 4.11 (*Reinvestment of Matured Original Collateral*) and 4.12 (*Mechanics of Investing Matured Original Collateral*) of the Omnibus Agreement and Section 3 of the Eligibility Criteria and, as taken together with such provisions of this Part 2, shall collectively constitute the "Swap Credit Support Provisions" as so defined.

2.5        Each Dealer is entitled to retain any interest, dividends or other amounts paid, or deemed to have been paid, with respect to Other Eligible Support in the form of Cash held by a Dealer, if any (all of which may be retained by such Dealer). In return, each Dealer covenants and agrees that it shall transfer to Party B the Interest Amount on each Interest Payment Date as required pursuant to the provisions as set out in Part 3 of this Schedule B.

**PART 3.        DEALER-SPECIFIC SWAP CREDIT SUPPORT PROVISIONS**

3.1     The following Part 3 of this Schedule B reflects (i) the meaning of the term "Eligible
Collateral" as used throughout this Schedule B, (ii) the meaning of the term "Other
Eligible Support" as used in Section 2.1(2) of the Master Security Agreement, and (iii)
certain other provisions governing Eligible Collateral and Posted Credit Support, in
each case on a Dealer-specific and Transaction-specific basis.

**3.2     Dealer:         Bank of America**

**3.2.1    Transaction:   JPM ID#69, 69b – Nemertes Credit Linked Certificate Trust
(CADBANA) Series 2005-1**

(a)    Eligible Collateral

"**Eligible Collateral**" means (I) Collateral Certificates and (II) Eligible Investments.

(I) "**Collateral Certificates**" means:

> (A) USD 35,000,000.00 principal amount Floating Rate Asset Back Certificate, Series
> 2001-B, Class A, issued by the MBNA Certificate Issuer under the MBNA Certificate
> Agreement maturing on August 15, 2013 and purchased by Party B (an "**MBNA
> Certificate**"), or

> (B) USD 126,900,000.00 principal amount MBNA series Class A (2004-2) Notes,
> issued by the MBNA Note Issuer under the MBNA Note Agreement maturing on
> July 15, 2013 and purchased by Party B (an "**MBNA Note**").

(II) "**Eligible Investments**" means any of the following:

> (A)    USD denominated book-based securities, negotiable instruments or
> securities represented by instruments in bearer or registered form which
> evidence any of:  (i) direct obligations of, or obligations fully guaranteed as
> to the timely payment of principal and interest by, the United States of
> America or any agency or instrumentality of the United States of America,
> the obligations of which are expressly backed by the full faith and credit of
> the United States of America; (ii) direct obligations of, or obligations fully
> guaranteed as to the timely payment of principal and interest by, banks or
> trust companies chartered or licensed under the laws of the United States of
> America or any state thereof; provided that, at the time of the investment or
> contractual commitment to invest therein, the short-term debt rating of such
> bank or trust company shall be at least A-1 from S&P and P-1 from Moody's,
> or if DBRS rates such bank or trust company; at least R-1 (middle) by DBRS;
> (iii) commercial paper (other than extendible commercial paper) and any
> other asset-backed securities having, at the time of the investment or

- 4 -

contractual commitment to invest therein, a rating of at least A-1 from S&P and P-1 from Moody's, or if DBRS rates such security, a rating of at least R-1 (middle) by DBRS; (iv) demand and time deposits in certificates of deposit of, or bankers' acceptances accepted by, any bank or trust company referred to in (ii) above;  (v) any security rated by any two of S&P, Moody's or Fitch at AAA by S&P, Aaa by Moody's or the equivalent rating by Fitch, or if DBRS rates such security, a rating of AAA by DBRS;  in each case maturing not later than the Final Payment Date; or

(B)    any other USD denominated book-based securities, negotiable instruments or securities represented by instruments in bearer or registered form as may be agreed upon by Party A and Party B and approved in writing by DBRS.

(b)    Other Eligible Support

The following items will qualify as "**Other Eligible Support**":  Cash

"**Cash**" shall mean the lawful currency of Canada or the lawful currency of the United States of America.

(c)    Interest Rate

The "**Interest Rate**", with respect to Other Eligible Support in the form of Cash, for any given day, will be the rate set forth below in respect of the relevant eligible currency as indicated below:

| Eligible Currency | Interest Rate |
|---|---|
| USD | "Federal funds (effective)" for such day as reported for such date in Federal Reserve Publication H.15(519) or any successor publication as published by the Board of Governors of the Federal Reserve System; and |
| CAD | the average rate for CAD bankers acceptances which appears on the Reuters Screen CDOR Page as of 10:00 a.m. Toronto time on such date. |

(d)    Interest Period

The "**Interest Period**" means the period from (and including) the first day of each calendar month to (and including) the last day of each calendar month.

(e)    Interest Amount

The "**Interest Amount**" means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Other Eligible Support in the form of Cash held by Party A on that day, determined by Party A for each such day as follows:

(x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 365.

(f)      <u>Interest Payment Date</u>

The **"Interest Payment Date"** will be within three (3) Business Days after the last Business Day of each calendar month; provided that in the event that an Interest Payment Date does not fall on a Business Day then the Interest Payment Date shall be the next Business Day.

(g)      <u>Definitions</u>

For purposes of this Part 3.2.1 of Schedule B, the following definitions will apply:

"**Final Payment Date**" means March 20, 2011.

"**MBNA Certificate Agreement**" means, collectively, the pooling and servicing agreement dated August 4, 1994 between MBNA America Bank, National Association and the MBNA Certificate Issuer, as supplemented by the 2001-B supplement thereto between the same parties.

"**MBNA Certificate Issuer**" means The Bank of New York, as trustee of MBNA Master Credit Card Trust II, and its successors and assigns in such capacity.

"**MBNA Note Agreement**" means, collectively, the indenture between the MBNA Note Issuer and The Bank of New York, as indenture trustee, as supplemented by the supplement thereto between the same parties relating to the MBNA Note.

"**MBNA Note Issuer**" means MBNA Credit Card Master Note Trust and its successors and assigns in such capacity.

"**Party A**" means Bank of America, N.A.

### 3.3    Dealer:    Citibank, N.A.

**3.3.1    Transaction:  JPM ID#72 - NCLCT (Citi–LSS) 2006, JPM ID#73, 151 - CCLT (CB LSS-2) 2006-1, JPM ID#74 - CCLT (CB LSS) 2005-1**

(a)    Eligible Collateral

None.

(b)    Other Eligible Support

The following items will qualify as "**Other Eligible Support**":  Cash including without limitation cash held in the form of term deposits with Citibank, N.A. or Citibank N.A., Canadian Branch.

"**Cash**" shall mean the lawful currency of Canada.

(c)    Interest Rate

**[JPM ID#72 - NCLCT (Citi–LSS) 2006] [JPM ID#73,151 - CCLT (CB LSS-2) 2006-1]** "**Interest Rate**" means in respect of each Interest Period (as such term is defined below), the BA Rate in effect as of 10:00 am on the first Business Day of such Interest Period (interpolated for a period less than 30 days, as applicable).

**[JPM ID#74 - CCLT (CB LSS) 2005-1]** "**Interest Rate**" means in respect of each Interest Period, the BA Rate in effect as of 10:00 am on the first Business Day of such Interest Period (interpolated for a period less than 30 days, as applicable) minus 3.00 basis points (0.03%).

All interest in respect of Other Posted Support shall accrue from day to day and shall be calculated on the basis of actual day count in a year of 365 days.  For purposes of disclosure pursuant to the *Interest Act* (Canada), the yearly rate equivalent of any rate calculated on the basis of a period other than a calendar year may be determined by multiplying such rate by a fraction, the numerator of which is the actual number of days in the calendar year commencing on the first day of the period in which such annual rate of interest is to be ascertained and the denominator of which is 365.

(d)    Interest Period

The initial "**Interest Period**" means the period commencing on an actual day count basis from and including the date of the transfer of Other Posted Support to Party A to and excluding the next Interest Payment Date, and thereafter, with respect to any Interest Payment Date, the related Interest Period shall mean the period from and including the immediately preceding Interest Payment Date to but excluding such Interest Payment Date.

(e)      Interest Amount

The **"Interest Amount"** with respect to any Other Posted Support for the Interest Period is calculated as the Interest Rate, multiplied by the number of days in the Interest Period, divided by 365, and all multiplied by the amount of Other Posted Support.

(f)      Interest Payment Date

**[JPM ID#72 - NCLCT (Citi–LSS) 2006, JPM ID#73, 151 - CCLT (CB LSS-2) 2006-1, JPM ID#74 - CCLT (CB LSS) 2005-1]**  The "**Interest Payment Date**" means the 15th day of each calendar month commencing on the first 15th of the month after the Closing Date; provided that in the event that an Interest Payment Date does not fall on a Business Day, then the Interest Payment Date shall be the next Business Day.

(g)      Definitions

For purposes of this Part 3.3.1 of Schedule B, the following definitions will apply:

"**Party A**" shall mean: Citibank, N.A.

**3.4     Dealer:          Deutsche Bank AG**

**3.4.1    Transaction: JPM ID#1 - CCLT (IML-CDS) 2005-1, JPM ID#7 - CCLT
(IML-CDS-2) 2005-1, JPM ID#9 - NCLCT (EC Super Senior) 2005-1**

(a)     Eligible Collateral

"**Eligible Collateral**" means:

(A)     CAD denominated debt obligations of or guaranteed by the Government of
Canada or of a Canadian province having a long-term rating of at least "AA-" by
DBRS or a short-term rating of at least "R-1(middle)" by DBRS, in each case
having a remaining term to maturity of less than six months and in respect of
which no withholding tax is exigible by any governmental authority;

(B)     CAD denominated debt obligations of or guaranteed by a bank governed by the
*Bank Act* (Canada) having a long-term rating of at least "AA-" by DBRS or a
short-term rating of at least "R-1(middle)" by DBRS, in each case having a
remaining term to maturity of less than six months and in respect of which no
withholding tax is exigible by any governmental authority; or

(C)     Such other collateral as Party A and Party B may agree; provided that, such
collateral satisfies the Rating Agency Condition;

(D)     **[JPM 1 - CCLT (IML-CDS) 2005-1 only]** G-Squared Certificates;

"**G-Squared Certificates**" means the Class A-2 Certificates of G-SQUARED
TIERS Credit-Linked Trust, Series 2002-4;

(D)     **[JPM 9 - NCLCT (EC Super Senior) 2005-1 only]** Credit card receivables backed
Class A Floating Rate Notes, Series 2005-1 of CARDS II Trust due 03/10; or

(E)     **[JPM 9 - NCLCT (EC Super Senior) 2005-1 only]** Asset-backed securities (other
than asset-backed securities issued by vehicles sponsored by Coventree Capital
Group Inc. or Nereus Financial Inc.) having a short-term rating of "R-1 (high)" by
DBRS, in each case having a remaining term to maturity of less than six months
and in respect of which no withholding tax is exigible by any governmental
authority; provided that DBRS has confirmed in writing that such asset-backed
securities are not backed by corporate CDOs (synthetic or otherwise).

(b)     Other Eligible Support

The following item will qualify as "**Other Eligible Support**":  Cash

"**Cash**" shall mean the lawful currency of Canada.

(c)    <u>Interest Rate</u>

The "**Interest Rate**" will be, in respect of Other Eligible Support in the form of Cash, for any day, Deutsche Bank AG's overnight rate for CAD for such day which appears in the Bloomberg CD340/N Page.

(d)    <u>Interest Period</u>

The "**Interest Period**" means the period from (and including) the last Business Day on which an Interest Amount was transferred (or, if no Interest Amount has yet been transferred, the Business Day on which Other Eligible Support in the form of Cash was transferred to or received by Party A) to (but excluding) the Business Day on which the current Interest Amount is to be transferred.

(e)    <u>Interest Amount</u>

The "**Interest Amount**" means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Other Eligible Support in the form of Cash held by Party A on that day, determined by Party A for each such day as follows:

(x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 365.

(f)    <u>Interest Payment Date</u>

The "**Interest Payment Date**" means the third Business Day of each calendar month, with respect to Interest Amounts payable in respect of the immediately preceding month.

(g)    <u>Definitions</u>

For purposes of this Part 3.4.1 of this Schedule B, the following definitions will apply:

"**Party A**" means Deutsche Bank AG, acting through its London Branch.

**3.4.2    Transaction: JPM ID#2 - CCLT (Super Senior 2) 2005-1, JPM ID#3 - CCLT (Shamrock) 2005-1, JPM ID#4 – CCLT (CDXLS 1) 2006-1, JPM ID#5 - CCLT (Super Senior 3) 2005-1, JPM ID#6 – CCLT (Super Senior 4) 2005-1, JPM ID#8 - CCLT (iTraxx1) 2006-1, JPM ID#10 - NCLCT (LSS II) 2005**

(a)    <u>Eligible Collateral</u>

"**Eligible Collateral**" means:

(A)    CAD denominated debt obligations of or guaranteed by the Government of Canada or of a Canadian province having a long-term rating of at least

"AA(low)" by DBRS and a short-term rating of at least "R-1(high)" by DBRS, in each case having a remaining term to maturity of less than six months and in respect of which no withholding tax is exigible by any governmental authority;

(B)     CAD denominated debt obligations of or guaranteed by a bank governed by the *Bank Act* (Canada) having a long-term rating of at least "AA(low)" by DBRS and a short-term rating of at least "R-1(high)" by DBRS, in each case having a remaining term to maturity of less than six months and in respect of which no withholding tax is exigible by any governmental authority; or

(C)     Such other collateral as Party A and Party B may agree; provided that, such collateral satisfies the Rating Agency Condition;

(D)     **[JPM 3 - CCLT (Shamrock) 2005-1 only]** CAD133,000,000 EMTN issued on April 2, 2004 by Landesbank Baden – Württemberg under an information memorandum dated November 13, 2003 with a bullet maturity on June 20, 2009[1];

(D)     **[JPM 10 - NCLCT (LSS II) 2005 only]** Credit card receivables backed Class A Floating Rate Notes, Series 2005-2, of CARDS II Trust; or

(E)     **[JPM 10 - NCLCT (LSS II) 2005 only]**

Asset-backed securities (other than asset-backed securities issued by vehicles sponsored by Coventree Capital Group Inc. or Nereus Financial Inc.)  having a short-term rating of "R-1 (high)" by DBRS, in each case having a remaining term to maturity of less than six months and in respect of which no withholding tax is exigible by any governmental authority; provided that, DBRS has confirmed in writing that such asset-backed securities are not backed by corporate CDOs (synthetic or otherwise).

(b)     Other Eligible Support

The following item will qualify as "**Other Eligible Support**":  Cash

"**Cash**" shall mean the lawful currency of Canada.

(c)     Interest Rate

The "**Interest Rate**" will be, in respect of Other Eligible Support in the form of Cash, for any day, Deutsche Bank AG's overnight rate for CAD for such day which appears in the Bloomberg CD340/N Page.

(d)     Interest Period

The "**Interest Period**" means the period from (and including) the last Business Day on which an Interest Amount was transferred (or, if no Interest Amount has yet been transferred, the

---

[1] Principal amount to be adjusted to reflect the split between MAVs.

Business Day on which Other Eligible Support in the form of Cash was transferred to or received by Party A) to (but excluding) the Business Day on which the current Interest Amount is to be transferred.

(e)     Interest Amount

The "**Interest Amount**" means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Other Eligible Support in the form of Cash held by Party A on that day, determined by Party A for each such day as follows:

> (x) the amount of that Cash on that day; multiplied by

> (y) the Interest Rate in effect for that day; divided by

> (z) 365.

(f)     Interest Payment Date

The **"Interest Payment Date"** means the third Business Day of each calendar month, with respect to Interest Amounts payable in respect of the immediately preceding month.

(g)     Definitions

For purposes of this Part 3.4.2 of Schedule B, the following definitions will apply:

"**Party A**" means Deutsche Bank AG, acting through its London Branch.

**3.4.3    Transaction:  JPM ID#52 - Apsley – Tranche_1 CAD, JPM ID#53 - Apsley – Tranche_2 CAD, JPM ID#54 - Apsley – Tranche_3_Long–Short CAD, JPM ID#56 - Apsley – Tranche_5 CAD, JPM ID#57 - Apsley – Tranche_6 CAD, JPM ID#59 - Whitehall – Tranche_1 CAD, JPM ID#60 - Whitehall – Tranche_2 CAD, JPM ID#61 - Whitehall – Tranche_3 CAD, JPM ID#62 - Whitehall – Tranche_4 CAD, JPM ID#63 - Whitehall – Tranche_5 CAD, JPM ID#78 - Silverstone – Tranche_1 CAD**

(a)     Eligible Collateral

"**Eligible Collateral**" means:

(A)     **[JPM 52 –Apsley- Tranche 1 CAD, JPM 53 – Apsley – Tranche 2 CAD]**[2] Rabobank Nederland CAD 750,000,000 floating rate notes due March 20, 2016 (Series 1534A/Tranche 1);

(A)     **[JPM 54 - Apsley – Tranche_3_Long CAD]** Rabobank Nederland CAD

---

[2] Each of the provisions in (D) was located in the relevant form of Transaction Supplement.

250,000,000 Senior unsecured Floating Rate EMTN;

(A)     **[JPM 56 - Apsley – Tranche_5 CAD]** Rabobank Nederland CAD 250,000,000 floating rate notes due June 20, 2016 (Series 1607A/Tranche 1);

(A)     **[JPM 57 - Apsley – Tranche_6 CAD]** Rabobank Nederland CAD 250,000,000 floating rate notes due June 20, 2016 (Series 1612A/Tranche 1);

(A)     **[JPM 59- Whitehall – Tranche_1 CAD]** Rabobank Nederland CAD 750,000,000 floating rate notes due September 20, 2015 (Series 1442A/Tranche 1) and Rabobank Nederland CAD 750,000,000 floating rate notes due December 20, 2015 (Series 1451A/Tranche 1);

(A)     **[JPM 60 - Whitehall – Tranche_2 CAD]** Rabobank Nederland CAD 750,000,000 floating rate notes due September 20, 2015 (Series 1442A/Tranche 1) and Rabobank Nederland CAD 750,000,000 floating rate notes due December 20, 2015 (Series 1451A/Tranche 1);

(A)     **[JPM 61 - Whitehall – Tranche_3 CAD]** Rabobank Nederland CAD 500,000,000 floating rate notes due December 20, 2015 (Series 1479A/Tranche 1);

(A)     **[JPM 62 - Whitehall – Tranche_4 CAD]** Rabobank Nederland CAD 250,000,000 floating rate notes dues December 20, 2015 (Series 1479A/Tranche 2);

(A)     **[JPM 63 - Whitehall – Tranche_5 CAD, 78 - Silverstone – Tranche_1 CAD]** Rabobank Nederland CAD 250,000,000 floating rate notes due December 20, 2015 (Series 1504A/Tranche 1);

(A)     **[JPM 78 - Silverstone – Tranche_1 CAD]** The Floating Rate Medium Term Notes in the aggregate principal amount of CAD 2,000,000,000 issued by Bayerische Landesbank on February 7, 2005 and maturing March 20, 2015;

(B)     Other Eligible Collateral as defined below and approved by DBRS; or

(C)     **[JPM 52 - Apsley – Tranche_1 CAD, 53 - Apsley – Tranche_2 CAD, 54 - Apsley – Tranche_3_Long–Short CAD, 56 - Apsley – Tranche_5 CAD, 57 - Apsley – Tranche_6 CAD]** Other Eligible Collateral as agreed by the parties and approved by DBRS and which is subject to a Hedging Transaction.

(b)     Other Eligible Support

The following items will qualify as "**Other Eligible Support**": Cash

"**Cash**" shall mean the lawful currency of Canada.

(c)     Interest Rate

The "**Interest Rate**" will be, in respect of Other Eligible Support in the form of Cash, for any day, Deutsche Bank AG's overnight rate for CAD for such day which appears in the Bloomberg CD340/N Page.

(d)      <u>Interest Period</u>

The "**Interest Period**" means the period from (and including) the last Business Day on which an Interest Amount was transferred (or, if no Interest Amount has yet been transferred, the Business Day on which Other Eligible Support in the form of Cash was transferred to or received by Party A) to (but excluding) the Business Day on which the current Interest Amount is to be transferred.

(e)      <u>Interest Amount</u>

The "**Interest Amount**" means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Other Eligible Support in the form of Cash held by Party A on that day, determined by Party A for each such day as follows:

(x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 365.

(f)      <u>Interest Payment Date</u>

The **"Interest Payment Date"** means the third Business Day of each calendar month, with respect to Interest Amounts payable in respect of the immediately preceding month.

(g)      <u>Other Eligible Collateral</u>

**[JPM 52 - Apsley – Tranche_1 CAD, JPM 53 - Apsley – Tranche_2 CAD, JPM 54 - Apsley – Tranche_3_Long–Short CAD, JPM 56 - Apsley – Tranche_5 CAD, JPM 57 - Apsley – Tranche_6 CAD]** Other Eligible Collateral means negotiable instruments or securities represented by instruments in bearer or registered form which evidence:

1. CAD-denominated obligations issued or fully guaranteed as to both credit and timeliness by the Government of Canada and rated "R-1 (high)" by DBRS (or rated lower than "R-1 (high)" if such requirement is waived by DBRS), evidenced by a global certificate held by or on behalf of CDS and with a maximum remaining maturity at acquisition by Party B of 45 calendar days;

2. CAD-denominated unsecured debt obligations issued or fully guaranteed by any province of Canada, evidenced by a global certificate held by or on behalf of CDS and with a maximum remaining maturity at acquisition by Party B of 45 calendar days, provided that such securities are rated "R-1 (high)" by DBRS (or rated lower than "R-1 (high)" if such requirement is waived by DBRS, but in no case rated lower than "R-1 (middle)" (short term) or "AA (low)" (long term) by DBRS);

3. CAD-denominated deposits, bankers' acceptances and senior unsecured debentures (such instruments being evidenced by a global certificate held by or on behalf of CDS) issued or accepted by any of the entities identified in the list provided in Schedule "C" in sub-part (e) (*Definitions*) below (such a list being subject to review by Party A, Party B and DBRS from time to time), provided that such securities have a maximum remaining maturity at acquisition by Party B of 45 days and are rated at least "R-1 (high)" by DBRS (or rated lower than "R-1 (high)" if such requirement is waived by DBRS, but in no case rated lower than "R-1 (middle) (short term) or "AA (low)" (long term) by DBRS) or, in the case of deposits, bankers' acceptances and senior unsecured debentures issued or accepted by National Bank of Canada or, if fully and unconditionally guaranteed by National Bank of Canada, National Bank Financial, at least "R-1 (mid" (short term) or "A (high)" (long term) by DBRS;

4. CAD-denominated commercial paper of any Canadian asset-backed conduit and evidenced by a global certificate held by or on behalf of CDS, provided that such securities (i) have a maximum remaining maturity at acquisition by Party B of 45 days, (ii) do not have the support of a market disruption liquidity facility from Party A, (iii) are not backed by any corporate collateralized debt obligations (as confirmed in writing (which may be via email) by DBRS) and (iv) are rated at least "R-1 (high)" by DBRS (or rated lower than "R-1 (high)" if such requirement is waived by DBRS, but in no case rated lower than "R-1 (middle)" (short term) or "AA (low)" (long term) by DBRS;

Provided in all cases that:

(i) If any rating agency referred to above changes its name or is the subject of any amalgamation or merger, the required rating must be given by the applicable successor thereof;

(ii) If any rating agency referred to above ceases to exist or to rate Canadian debt

offerings, all of the above references to such agency shall be deemed deleted; and

(iii) If any rating agency referred to above changes the designation of its debt rating categories, the above references to such designations shall be deemed amended to refer to the then applicable equivalent of such original rating designation;

(iv) Party A shall not have given five Business Days' prior written notice to the OC Custodian and Party B that such instrument will be ineligible hereunder.

**[JPM 59 - Whitehall – Tranche_1 CAD, JPM 60 - Whitehall – Tranche_2 CAD, JPM 61 - Whitehall – Tranche_3 CAD, JPM 62 - Whitehall – Tranche_4 CAD, JPM 63 - Whitehall – Tranche_5 CAD, JPM 78 - Silverstone – Tranche_1 CAD]** "Other Eligible Collateral" means negotiable instruments or securities represented by instruments in bearer or registered form from which evidence:

1. CAD-denominated obligations issued or fully guaranteed as to both credit and timeliness by the Government of Canada, evidenced by a global certificate held by or on behalf of CDS and with a maximum remaining maturity at acquisition by Party B of 45 calendar days;

2. CAD-denominated unsecured debt obligations issued or fully guaranteed by any province of Canada, evidenced by a global certificate held by or on behalf of CDS and with a maximum remaining maturity at acquisition by Party B of 45 calendar days, provided that such securities are rated at least as follows by any two of the referenced rating agencies:

    (a) "R-1 (middle)" (short term) or "AA (low)" (long term) DBRS;

    (b) "P-1" (short term) or "Aa3" (long term) by Moody's; and

    (c) "A-1" (short term) or "AA-" (long term) by S&P;

3. CAD-denominated deposits, bankers' acceptances and senior unsecured debentures (such instruments being evidenced by a global certificate held by or on behalf of CDS) issued or accepted by any of the entities identified in the list provided in Schedule "C" in sub-part (f) (*Definitions*) below (such a list being subject to review by Party A, Party B and DBRS from time to time), provided that such securities have a maximum remaining maturity at acquisition by Party B of 45 days and are rated at least "R-1 (middle)" (short term) or "AA (low)" (long term) by DBRS or, in the case of deposits, bankers' acceptances and senior unsecured debentures issued or accepted by National Bank of Canada, or if fully and unconditionally guaranteed by National Bank of Canada, National Bank Financial, at least "R-1 (low)" (short term) or "A" (long term) by DBRS;

4. CAD-denominated commercial paper of any Canadian asset-backed conduit and evidenced by a global certificate held by or on behalf of CDS, provided that such securities (i) have a maximum remaining maturity at acquisition by Party B of 45 days, (ii) do not have the support of a market disruption liquidity facility from Party

A, (iii) are not backed by any corporate collateralized debt obligations (as confirmed in writing (which may be via email) by DBRS) and (iv) are rated at least "R-1 (middle)" (short term) or "AA (low)" (long term) by DBRS;

Provided in all cases that:

(i) If any rating agency referred to above changes its name or is the subject of any amalgamation or merger, the required rating must be given by the applicable successor thereof;

(ii) If any rating agency referred to above ceases to exist or to rate Canadian debt offerings, all of the above references to such agency shall be deemed deleted; and

(iii) If any rating agency referred to above changes the designation of its debt rating categories, the above references to such designations shall be deemed amended to refer to the then applicable equivalent of such original rating designation;

(iv) Party A shall not have given five Business Days' prior written notice to the OC Custodian and Party B that such instrument will be ineligible hereunder.

(h)    <u>Definitions</u>

For purposes of this Part 3.4.3 of Schedule B, the following definitions will apply:

**[JPM 52 - Apsley – Tranche_1 CAD, JPM 53 - Apsley – Tranche_2 CAD, JPM 54 - Apsley – Tranche_3_Long–Short CAD, JPM 56 - Apsley – Tranche_5 CAD, JPM 57 - Apsley – Tranche_6 CAD]** Schedule "C" Issuing Entities as referred to in Item #3 of Section 3.3.3(d) (*Other Eligible Collateral*) above: BMO Nesbitt Burns*, Bank of Montreal, BNP Paribas Canada, CIBC World Markets*, Canadian Imperial Bank of Commerce, Citibank Canada, HSBC Bank Canada, National Bank Financial*, National Bank of Canada, RBC Capital Markets*, Royal Bank of Canada, Scotia Capital*, The Bank of Nova Scotia, TD Securities*, The Toronto-Dominion Bank.

*provided that the obligations issued or accepted by such entities are fully and unconditionally guaranteed by their Schedule 1 bank parent.

**[JPM 59 - Whitehall – Tranche_1 CAD, JPM 60 - Whitehall – Tranche_2 CAD, JPM 61 - Whitehall – Tranche_3 CAD, JPM 62 - Whitehall – Tranche_4 CAD, JPM 63 - Whitehall – Tranche_5 CAD, JPM 78 - Silverstone – Tranche_1 CAD]** Schedule "C" Issuing Entities as referred to in Item #3 of Section 3.3.3(d) (*Other Eligible Collateral*) above: BNP Paribas Canada, CIBC World Markets*, Canadian Imperial Bank of Commerce, Citibank Canada, HSBC Bank Canada, National Bank Financial*, National Bank of Canada, RBC Capital Markets*, Royal Bank of Canada, Scotia Capital*, The Bank of Nova Scotia, TD Securities*, The Toronto-Dominion Bank.

*provided that the obligations issued or accepted by such entities are fully and unconditionally guaranteed by their Schedule 1 bank parent.

"**Custodial Account**" means the account established by the OC Custodian for the benefit of Party B and subject to an OC Control Agreement among, *inter alios,* Party A, Party B and the Collateral Agent as follows: **[NTD: To be completed once account details are finalized].**

**[JPM 52 - Apsley – Tranche_1 CAD, 53 - Apsley – Tranche_2 CAD, 54 - Apsley – Tranche_3_Long–Short CAD, 56 - Apsley – Tranche_5 CAD, CAD, 57 - Apsley – Tranche_6 CAD]** "**Hedging Transaction**" means any total return swap transactions and currency and/or interest rate swap transactions.

 "**Party A**" means Deutsche Bank AG, acting through its London Branch.

**3.4.4    Transaction:  JPM ID#11 - Aria DB1-LSS, JPM ID#12 - Aria DB2, JPM ID#13 - Aria DB3, JPM ID#15 – Encore DB5 – LSS, JPM ID#16 – Opus DB2 Long-(Short) LSS, JPM ID#17 - Opus DB4, JPM ID#18 - Symphony DB1, JPM ID#19 - Symphony DB2_Long-Short, JPM ID#20 - Symphony DB3_Long-Short**

(a) Eligible Collateral

"**Eligible Collateral**" means (I) Eligible Investments or (II) Substitute Collateral.

(I) "**Eligible Investments**" means:

**[JPM 11 - Aria DB1 LSS, JPM 18 - Symphony DB1]** Those securities and money market investments listed below, as may be amended by Party B and Party A from time to time with notice to the OC Custodian, or such other securities and investments as Party B and Party A may agree from time to time, with notice to the OC Custodian:

      (a)     CAD denominated debt obligations of or guaranteed by the Government of Canada or of a Canadian province having a long-term rating of at least "AA(low)" by DBRS or a short-term rating of at least "R-1(middle)" by DBRS, in each case having a remaining term to maturity of less than six months and in respect of which no withholding tax is exigible by any governmental authority;

      (b)     CAD denominated debt obligations of or guaranteed by a bank governed by the *Bank Act* (Canada) having a long-term rating of at least "AA(low)" by DBRS or a short-term rating of at least "R-1(middle)" by DBRS, in each case having a remaining term to maturity of less than six months and in respect of which no withholding tax is exigible by any governmental authority; and

      (c)     any other investment which has been approved by Party A and satisfies the Rating Agency Condition.

**[JPM 12 - Aria DB2, JPM 13 - Aria DB3, JPM 15 – Encore DB5 – LSS, JPM 16 – Opus DB2 Long-(Short) LSS, JPM 17 - Opus DB4, JPM 19 - Symphony DB2_Long Short, JPM 20 - Symphony DB3_Long Short]** Those securities and money market investments listed below, as may be amended by Party B and Party A from time to time with notice to the OC

Custodian, or such other securities and investments as Party B and Party A may agree from time to time, with notice to the OC Custodian:

(a)    CAD denominated debt obligations of or guaranteed by the Government of Canada or of a Canadian province having a long-term rating of at least "AA(low)" by DBRS or a short-term rating of at least "R-1(middle)" by DBRS, in each case having a remaining term to maturity of less than 35 days and in respect of which no withholding tax is exigible by any governmental authority;

(b)    CAD denominated debt obligations of or guaranteed by a bank governed by the Bank Act (Canada) having a long-term rating of at least "AA(low)" by DBRS or a short-term rating of at least "R-1(middle)" by DBRS, in each case having a remaining term to maturity of less than 35 days and in respect of which no withholding tax is exigible by any governmental authority; and

(c)    any other investment which has been approved by Party A and satisfies the Rating Agency Condition.

(II) "**Substitute Collateral**" means those securities and investments as may be agreed from time to time by Party B and Party A, subject to satisfaction of the Rating Agency Condition and with notice to the OC Custodian.

(b)    <u>Other Eligible Support</u>

The following items will qualify as "**Other Eligible Support**": Cash.

"**Cash**" shall mean the lawful currency of Canada.

(c)    <u>Interest Rate</u>

The "**Interest Rate**" will be, in respect of Other Eligible Support in the form of Cash, for any day, Deutsche Bank AG's overnight rate for CAD for such day which appears in the Bloomberg CD340/N Page.

(d)    <u>Interest Period</u>

The "**Interest Period**" means the period from (and including) the last Local Business Day on which an Interest Amount was transferred (or, if no Interest Amount has yet been transferred, the Local Business Day on which Other Posted Support in the form of Cash was transferred to or received by Party A) to (but excluding) the Local Business Day on which the current Interest Amount is to be transferred.

(e)    <u>Interest Amount</u>

The "**Interest Amount**" means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Other Posted Support in the form of Cash held by Party A on that day, determined by Party A for each such day as follows:

 (x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 365.

(f)　　Interest Payment Date

The **"Interest Payment Date"** means the third Business Day of each calendar month, with respect to Interest Amounts payable in respect of the immediately preceding month.

(g) Definitions

For purposes of this Part 3.4.4 of Schedule B, the following definitions will apply:

 "**Party A**" means Deutsche Bank AG, acting through its London Branch.

**3.4.5　Transaction: JPM ID#75 - MMAI-I – Tranche_1, JPM ID#76 - MMAI-I – Tranche_2, JPM ID#77 - MMAI-I – Tranche_3**

(a)　　Eligible Collateral

"**Eligible Collateral**" means (A) the 10-Year Floating Rate Medium Term Notes in the aggregate principal amount of CAD 1,400,000,000 issued by Bayerische Landesbank on September 2, 2004 or (B) such other collateral as Party A and Party B may agree and is approved by DBRS.

(b)　　Other Eligible Support

The following items qualify as "**Other Eligible Support**": Cash

"**Cash**" shall mean the lawful currency of Canada.

(c)　　Interest Rate

The "**Interest Rate**" will be, in respect of Other Eligible Support in the form of Cash, for any day, Deutsche Bank AG's overnight rate for CAD for such day which appears in the Bloomberg CD340/N Page.

(d)　　Interest Period

The "**Interest Period**" means the period from (and including) the last Business Day on which an Interest Amount was transferred (or, if no Interest Amount has yet been transferred, the Business Day on which Other Eligible Support in the form of Cash was transferred to or received by Party A) to (but excluding) the Business Day on which the current Interest Amount is to be transferred.

(e)　　Interest Amount

The "**Interest Amount**" means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Other Eligible Support in the form of Cash held by Party A on that day, determined by Party A for each such day as follows:

> (x) the amount of that Cash on that day; multiplied by

> (y) the Interest Rate in effect for that day; divided by

> (z) 365.

(f)      <u>Interest Payment Date</u>

The **"Interest Payment Date"** means the third Business Day of each calendar month, with respect to Interest Amounts payable in respect of the immediately preceding month.

(g)      <u>Definitions</u>

For purposes of this Part 3.4.5 of Schedule B, the following definitions will apply:

"**Party A**" means Deutsche Bank AG, acting through its London Branch.

**3.5    Dealer:        HSBC Bank USA, N.A.**

**3.5.1    Transaction:** JPM ID#46 - Symphony HS7, JPM ID#47c – Symphony HS6, JPM
ID#47b – Symphony HS5, JPM ID#48 - Opus HS8_Long – (Short), JPM ID#49a -
Encore HS8_A_Long–(Short) – LSS, JPM ID#49b - Encore HS8_B_Long–(Short) –
LSS

(a)    Eligible Collateral

"**Eligible Collateral**" means all (I) Additional Trust Collateral and (II) Swapped Collateral.

**(I) "Additional Trust Collateral"** means:

**[JPM ID#46 - Symphony HS7, JPM ID#48 - Opus HS8_Long – (Short), JPM ID#49a -
Encore HS8_A_Long–(Short) – LSS, JPM ID#49b - Encore HS8_B_Long–(Short) – LSS]**
Those securities and money market investments listed below, or such other securities and
investments as Party B and Party A may agree, with notice to the OC Custodian, from
time to time, in each case as deposited in or credited to the Custodial Account:

(a)    CAD denominated debt obligations of or guaranteed by the Government of Canada
or of a Canadian province having a short-term rating of at least "R-1(middle)" by
DBRS, in each case having a remaining term to maturity of less than 35 days and in
respect of which no withholding tax is exigible by any governmental authority;

(b)    CAD denominated debt obligations of or guaranteed by a bank governed by the
*Bank Act* (Canada) having a short-term rating of at least "R-1(middle)" by DBRS, in
each case having a remaining term to maturity of less than 35 days and in respect of
which no withholding tax is exigible by any governmental authority; and

(c)    any other investment which has been approved by Party A and satisfies the Rating
Agency Condition.

**[JPM 47b – Symphony HS5; 47c – Symphony HS6]** Those securities and money market
investments listed below, or such other securities and investments as Party A and Party B
may agree, with notice to the OC Custodian, from time to time, in each case as deposited in
or credited to the Custodial Account:

(a)    CAD denominated debt obligations of or guaranteed by the Government of Canada
or of a Canadian province having a short-term rating of at least "R-1(middle)" by
DBRS, in each case having a remaining term of maturity of less than 6 months and in
respect of which no withholding tax is exigible by any governmental authority;

(b)    CAD denominated debt obligations of or guaranteed by a bank governed by the
*Bank Act* (Canada) having a short-term rating of at least "R-1(middle)" by DBRS, in
each case having a remaining term of maturity of less than 6 months and in respect
of which no withholding tax is exigible by any governmental authority; and

(c)     any other investment which has been approved by Party A and satisfies the Rating Agency Condition.

(II) "**Swapped Collateral**" means all Eligible Collateral subject to the applicable Total Return Swap Agreement including, without limitation, all Issuer Certificates and Substitute Collateral**.**

(b)     Other Eligible Support

The following items will qualify as "**Other Eligible Support**":  Cash

"**Cash**" shall mean the lawful currency of Canada.

(c)     Interest Rate

The "**Interest Rate**" payable in respect of Other Eligible Support in the form of Cash held by Party A at any time shall be the rate paid by Party A at such time in respect of institutional deposit accounts of similar size.

(d)     Interest Period

The "**Interest Period**" means the period from (and including) the last Business Day on which any Interest Amount was transferred (or, if no Interest Amount has yet been transferred, the first Business Day on which Other Eligible Support in the form of Cash was transferred to or received by Party A) to (but excluding) the Business Day on which the current Interest Amount is to be transferred.

(e)     Interest Amount

The "**Interest Amount**" means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Other Eligible Support in the form of Cash held by Party A on that day, determined by Party A for each such day as follows:

(x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 365.

(f)    <u>Interest Payment Date</u>

The "**Interest Payment Date**" means the third Business Day after Party A receives, or is deemed to receive, any interest, dividends or other amounts paid or deemed to be paid in respect of instruments purchased with Other Eligible Support in the form of Cash; provided that, notwithstanding anything in the foregoing to the contrary, the Interest Payment Date will occur not less frequently than monthly.

(g)    <u>Definitions</u>

For purposes of this Part 3.5.1 of Schedule B, the following definitions will apply:

"**Custodial Account**" means the account established by the OC Custodian for the benefit of Party B and subject to an OC Control Agreement among, *inter alios,* Party A, Party B and the Collateral Agent as follows: **[NTD: To be completed once account details are finalized].**

**[JPM 46 - Symphony HS7]** "**Issuer Certificates**" means, collectively, as purchased by Party B and deposited in or credited to the Custodial Account on or prior to March 29, 2006, (i) those Asset-Backed Certificates, Series 2005-TC2 of Bear Stearns Asset Backed Securities I Trust 2005-TC2, (ii) those Asset-Backed Certificates, Series 2005-11 of GSAA Home Equity Trust 2005-11, and (iii) those Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2005-KS8 of RASC Series 2005 KS8 Trust.

**[JPM 47b – Symphony HS5]** "**Issuer Certificates**" means, collectively, as purchased by Party B and deposited in or credited to the Custodial Account on or prior to August 12, 2005, (i) those Class A-1 Floating Rate Notes due 2015 of Eaton Vance CDO VI, LTD. and Eaton Vance CDO VI, Corp., and (ii) those Class A-1 First Priority Senior Secured Floating Rate Notes due 2035 of Alesco Preferred Funding VI, Ltd. and Alesco Preferred Funding VI, Inc.

**[JPM 47c – Symphony HS6]** "**Issuer Certificates**" means, collectively, as purchased by Party B and deposited in or credited to the Custodial Account on or prior to August 26, 2005, (i) those Class A Floating Rate Notes due 2016 of AMMC CLO III, Limited and AMMC CLO III, Corp., (ii) those Class S Floating Rate Notes due 2013 of Overture CDO I (Delaware) Corp., (iii) those Class A3 Mortgage Pass-Through Certificates, Series 2005-WF2 of Structured Asset Securities Corporation and (iv) those Class A2D Asset-Backed Pass-Through Certificates, Series 2005-WCW2 of Park Place Securities Inc.

**[JPM 48 - Opus HS8_Long – (Short)]** - "**Issuer Certificates**" means, collectively, as purchased by Party B and deposited in or credited to the Custodial Account on or prior to June 30, 2006, (i) the Senior Secured Term Notes of Stone Tower Credit Funding I Ltd. and (ii) the Floating Rate Class A-1 Senior Notes of Preferred Term Securities XXII, Ltd.

**[JPM 49a - Encore HS8_A_Long–(Short) – LSS]** - "**Issuer Certificates**" means, as purchased by Party B and deposited in or credited to the Custodial Account on or prior to June 30, 2006, the Class A-5-1 Student Loan Asset Backed Certificates due 2033 of The National Collegiate Student Loan Trust 2005-3 and NCF Grantor Trust 2005-3.

**[JPM 49b - Encore HS8_A_Long–(Short) – LSS ]** "**Issuer Certificates**" means, collectively, as purchased by Party B and deposited in or credited to the Custodial Account on or prior to June 30, 2006, (i) the Class A-5-1 Student Loan Asset Backed Certificates due 2033 of The National Collegiate Student Loan Trust 2005-3 and NCF Grantor Trust 2005-3 and (ii) the Asset-Backed Pass-Through Certificates, Series 2005-W4, Class A-2D Certificates of Argent Securities Inc.

"**Party A**" means HSBC Bank USA, National Association.

"**Substitute Collateral**" means those securities and investments that may be included pursuant to an effective Notice of Addition (as defined in the applicable Total Return Swap Agreement) delivered by Party A and deposited in or credited to the Custodial Account.

### 3.5.2    Transaction:   JPM ID#68 - NCLCT (BCO–LSS) 2006

(a)    <u>Eligible Collateral</u>

"**Eligible Collateral**" means Permitted Collateral.

"**Permitted Collateral**" means securities that, as of the date of transfer thereof:

> (A)    are short-term debt obligations of ABN AMRO Bank N.V., Canada Branch or HSBC Bank USA, National Association, Toronto Branch, as applicable, comprising a certificate of deposit, term deposit or similar instrument and having a tenor of approximately 35 days;

> (B)    are Series A, Class A asset-backed commercial paper notes of Performance Trust;

> (C)    satisfy the Collateral Criteria; or

> (D)    are otherwise agreed by Party A, Party B and the Rating Agency,

<u>provided</u>, <u>however</u>, that securities falling within (A) above shall only constitute Permitted Collateral for as long as the obligors listed in (A)'s long-term senior unsecured debt obligations are rated at least "AA (Low)" by DBRS (or the equivalent DBRS rating from time to time) or, if Party A is not rated by DBRS, "Aa3" by Moody's and "AA-" by S&P.

(b)    <u>Other Eligible Support</u>

The following items will qualify as "**Other Eligible Support**":  Cash

"**Cash**" shall mean the lawful currency of Canada.

(c)    <u>Interest Rate</u>

The "**Interest Rate**" in respect of Other Eligible Support in the form of Cash (for the avoidance of doubt, this shall not include any securities described in sub-paragraph (A) of the definition of "Permitted Collateral"), the Interest Rate for any day will be the rate

notified to the parties by the Calculation Agent (being the rate then applicable to cash balances in the Custody Account).

(d)      Interest Period

The "**Interest Period**" means the period from (and including) the last Business Day on which any Interest Amount was transferred (or, if no Interest Amount has yet been transferred, the first Business Day on which Other Eligible Support in the form of Cash was transferred to or received by Party A) to (but excluding) the Business Day on which the current Interest Amount is to be transferred.

(e)      Interest Amount

The "**Interest Amount**" means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Other Eligible Support in the form of Cash held by Party A on that day, determined by Party A for each such day as follows:

    (x) the amount of that Cash on that day; multiplied by

    (y) the Interest Rate in effect for that day; divided by

    (z) 365.

(f)      Interest Payment Date

The "**Interest Payment Date**" means the third Business Day after Party A receives, or is deemed to receive, any interest, dividends or other amounts paid or deemed to be paid in respect of instruments purchased with Other Eligible Support in the form of Cash; provided that, notwithstanding anything in the foregoing to the contrary, the Interest Payment Date will occur not less frequently than monthly.

(g)      Definitions

For purposes of this Part 3.5.2 of Schedule B, the following definitions will apply:

"**Calculation Agent**" means HSBC Bank USA, National Association, Toronto Branch.

"**CDS Confirmation**" means the credit default swap confirmation dated as of the date of this Master Security Agreement between Party A and Party B, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Collateral Criteria**" shall be satisfied in respect of an issue of securities if the relevant securities:

    (A)   are denominated in CAD;

    (B)   are issued (and, if applicable, guaranteed) by an entity that is incorporated or organised in Canada;

(C)   are not issued by Party B;

(D)   if they have a tenor of 365 days or more, have a long-term rating of "AAA" from the Rating Agency (and for this purpose, a rating that has been placed under review or on "negative watch" for possible downgrade shall be deemed to be reduced by one notch);

(E)   if they have a tenor of less than 365 days, have a short-term rating of "R 1 (High)" from the Rating Agency (and for this purpose, a rating that has been placed under review or on "negative watch" for possible downgrade shall be deemed to be reduced by one notch);

(F)   if they have a tenor of less than 365 days and are not asset-backed securities, are issued by an issuer having a senior unsecured long-term debt rating of at least "A (High)" from the Rating Agency (and for this purpose, a rating that has been placed under review or on "negative watch" for possible downgrade shall be deemed to be reduced by one notch);

(G)   have a maturity date falling on or prior to the Scheduled Termination Date (as defined in the CDS Confirmation);

(H)   if they have a tenor of 365 days or more, were not issued at a discount to their par value;

(I)   if they have a tenor of 365 days or more, are interest bearing on a floating rate basis;

(J)   are redeemable at maturity at 100% of their par value;

(K)   if they are asset-backed securities, the underlying assets are either (i) residential mortgages, (ii) student loans, (iii) credit cards, (iv) prime home equity loans or (v) prime auto loans.  No collateralised debt obligations or securities backed by, or referencing, collateralised debt obligations (including tranches thereof) shall constitute Permitted Collateral;

(L)   if they are asset-backed securities, each of the persons responsible for the management or collection of the underlying assets or for making allocations or distributions to holders of the asset-backed securities has a long-term rating of at least "A (Low)" from the Rating Agency (and for this purpose, a rating that has been placed under review or on "negative watch" for possible downgrade shall be deemed to be reduced by one notch);

(M)   are securities in respect of which Party B will be entitled to receive interest payments without withholdings or deductions for or on account of tax; and

(N)  are securities in respect of which the transfer thereof to the Party A satisfies the Rating Agency Condition.

"**Custody Account**" means the account established by the OC Custodian for the benefit of Party B and subject to an OC Control Agreement among, *inter alios,* Party A, Party B and the Collateral Agent as follows: **[NTD: To be completed once account details are finalized].**

"**Party A**" means HSBC Bank USA, National Association.

### 3.5.3    Transaction:   JPM ID#50 – HSBC – HSBC LSS (STARTS) 2005-2

(a) **"Eligible Collateral"** means: Canadian Dollar instruments, investment property or other property consisting of:

(i)  commercial paper having, at the time of the investment or contractual commitment to invest therein, a rating from DBRS of R-1 (high) or, if approved by DBRS, R-1 (middle);

(ii) investments in money market funds rated R-1 (high) or, if approved by DBRS R-1 (middle), by DBRS or which otherwise satisfy the Rating Agency Condition;

(iii) any other investment which satisfies the Rating Agency Condition;

*provided, however*, that (1) Eligible Collateral must be a readily marketable security not subject to any transfer restrictions, or have an unconditional demand, put or redemption right exercisable by Party B which permits Party B to redeem all of the outstanding principal balance of such Eligible Collateral at par at any time and (2) no income to be received from such Eligible Collateral is or will be subject to deduction or withholding for or on account of any withholding tax or similar tax and (3) the ownership of an interest in such Eligible Collateral will not subject Party B to any net income tax in any jurisdiction unless, in case of clause (2) or (3) of this proviso, the payor is required to make "gross-up" payments that indemnify Party B for the full amount of such withholding, income or similar taxes such that the net amount actually received by Party B shall equal the full amount Party B would have received had no such withholding been required.

(b)    Other Eligible Support

The following items will qualify as "**Other Eligible Support**":  Cash

"**Cash**" shall mean the lawful currency of Canada.

(c)    Interest Rate

The "**Interest Rate**" payable in respect of Other Eligible Support in the form of Cash held by Party A at any time shall be the rate paid by Party A at such time in respect of institutional deposit accounts of similar size.

(d)    Interest Period

The "**Interest Period**" means the period from (and including) the last Business Day on which any Interest Amount was transferred (or, if no Interest Amount has yet been transferred, the first Business Day on which Other Eligible Support in the form of Cash was transferred to or received by Party A) to (but excluding) the Business Day on which the current Interest Amount is to be transferred.

(e)    Interest Amount

The "**Interest Amount**" means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Other Eligible Support in the form of Cash held by Party A on that day, determined by Party A for each such day as follows:

(x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 365.

(f)    Interest Payment Date

The "**Interest Payment Date**" means the third Business Day after Party A receives, or is deemed to receive, any interest, dividends or other amounts paid or deemed to be paid in respect of instruments purchased with Other Eligible Support in the form of Cash; provided that, notwithstanding anything in the foregoing to the contrary, the Interest Payment Date will occur not less frequently than monthly.

(g)    Definitions:

For purposes of this Part 3.5.3 of Schedule B, the following definitions will apply:

"**Party A**" means HSBC Bank USA, National Association.


**3.5.4    Transaction:    JPM ID#51 – HSBC-HSBC (STARTS) 2004-2**

(a) **"Eligible Collateral"** means:

(A) Canadian Dollar instruments, investment property or other property consisting of:

(i) obligations of or fully guaranteed by the Government of Canada;

(ii) time deposits or certificates of deposit of any depository institution incorporated under the laws of Canada or any province thereof and subject to supervision and examination by federal or provincial banking or depositary institution authorities; *provided, however*, that at the time of the investment or contractual commitment to invest therein, the certificates of deposit or short-term deposits of such depositary institution shall have a credit rating from DBRS and S&P of R-1 (middle) and A-1+, respectively;

(iii) commercial paper having, at the time of the investment or contractual commitment to invest therein, a rating from DBRS of R-1 (middle) and from S&P of A-1+;

(iv) bankers' acceptances issued by any depository institution described in clause (a)(ii) above;   and

(v) investments in money market funds rated AAA-m or AAA-mg by S&P and R-1 (middle) by DBRS or which otherwise satisfy the Rating Agency Condition;

(B) Canadian Dollar demand deposits in the name of Party B in any depository institution or trust company referred to in clause (a)(ii) above; and

*provided, however*, that (1) Eligible Collateral must be a readily marketable security not subject to any transfer restrictions, or have an unconditional demand, put or redemption right exercisable by Party B which permits Party B to redeem all of the outstanding principal balance of such Eligible Collateral at par at any time and (2) no income to be received from such Eligible Collateral is or will be subject to deduction or withholding for or on account of any withholding tax or similar tax and (3) the ownership of an interest in such Eligible Collateral will not subject Party B to any net income tax in any jurisdiction unless, in case of clause (2) or (3) of this proviso, the payor is required to make "gross-up" payments that indemnify Party B for the full amount of such withholding, income or similar taxes such that the net amount actually received by Party B shall equal the full amount Party B would have received had no such withholding been required.

(b)    Other Eligible Support

 The following items will qualify as "**Other Eligible Support**":  Cash

"**Cash**" shall mean the lawful currency of Canada.

 (c)    Interest Rate

The "**Interest Rate**" payable in respect of Other Eligible Support in the form of Cash held by Party A at any time shall be the rate paid by Party A at such time in respect of institutional deposit accounts of similar size.

(d)    Interest Period

The "**Interest Period**" means the period from (and including) the last Business Day on which any Interest Amount was transferred (or, if no Interest Amount has yet been transferred, the first Business Day on which Other Eligible Support in the form of Cash was transferred to or received by Party A) to (but excluding) the Business Day on which the current Interest Amount is to be transferred.

(e)    Interest Amount

The "**Interest Amount**" means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Other Eligible Support in the form of Cash held by Party A on that day, determined by

Party A for each such day as follows:

(x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 365.

(f)    <u>Interest Payment Date</u>

The "**Interest Payment Date**" means the third Business Day after Party A receives, or is deemed to receive, any interest, dividends or other amounts paid or deemed to be paid in respect of instruments purchased with Other Eligible Support in the form of Cash; provided that, notwithstanding anything in the foregoing to the contrary, the Interest Payment Date will occur not less frequently than monthly.

(g)    <u>Definitions:</u>

For purposes of this Part 3.5.4 of Schedule B, the following definitions will apply:

"**Party A**" means HSBC Bank USA, National Association.

**3.6     Dealer:          Merrill Lynch International and Merrill Lynch Capital Services, Inc.**

**3.6.1    Transaction:   JPM ID#24 - Opus ML1, JPM ID#25 - CCLT (ML LSS) 2006-1, JPM
ID#26 - NCLCT (ML-LSS) 2006, JPM ID#27 - NCLCT (ML-LSS II) 2006, JPM
ID#28 - Aria ML2_Long-(Short), JPM ID#29 - Opus ML4, JPM ID#30 - Symphony
ML4, JPM ID#31 - Aria ML4, JPM ID#32 - Encore ML4 - LSS, JPM ID#33 - CCLT
(ML6 L/S) 2006-1, JPM ID#34 - NCLCT (ML-LSS IV) 2006, JPM ID#35 - CCLT (ML
LSS-2) 2006-1, JPM ID#36 - Encore ML3_Long–(Short) – LSS**

(a)     Eligible Collateral

"**Eligible Collateral**" means all (I) Underlying Securities, and (II) Substitute Eligible
Collateral.

(I)     "**Underlying Securities**" means:

**[JPM 24 – Opus ML1, JPM 25 – CCLT (ML LSS) 2006-1, JPM 26 – NCLCT (ML-LSS) 2006,
JPM 28 - Aria ML2_Long-(Short), JPM 29 – Opus ML4, JPM 30 - Symphony ML4, JPM 31 –
Aria ML4, JPM 32 - Encore ML4 - LSS, JPM 36 - Encore ML3_Long–(Short) – LSS]** CAD
cash, USD cash, CAD time deposits and USD time deposits held in the Custodial Account**;**

**[JPM 27 - NCLCT (ML-LSS II) 2006]** USD 42,998,901 of Class A1 Notes due 2020 issued by
MC Funding Ltd and MC Funding 2006-1 LLC (CUSIP: 552686AA5), and CAD cash, USD
cash, CAD time deposits and USD time deposits held in the Custodial Account;

**[JPM 33 - CCLT (ML6 L/S) 2006-1]** USD 120,000,000 Class A-1A Notes due 2021 issued by
Grayson CLO Ltd. (CUSIP: 389669AA0) and CAD cash, USD cash, CAD time deposits and
USD time deposits held in the Custodial Account;

**[JPM 34 - NCLCT (ML-LSS IV) 2006]** USD 131,250,000 Class A-1A Notes due 2021 issued
by Grayson CLO Ltd. (CUSIP: 389669AA0) and CAD cash, USD cash, CAD time deposits
and USD time deposits held in the Custodial Account;

**[JPM 35 - CCLT (ML LSS-2) 2006-1]** USD 235,000,000 Class A-1A Notes due 2021 issued by
Grayson CLO Ltd. (CUSIP: 389669AA0) and CAD cash, USD cash, CAD time deposits and
USD time deposits held in the Custodial Account;

(II)    "**Substitute Eligible Collateral**" shall mean all "Eligible Collateral" as defined in
and subject to the applicable Total Return Swap Agreement from time to time,
including, without limitation, initially the Underlying Securities.

(b)     Other Eligible Support

The following items will qualify as "**Other Eligible Support**":  Cash

"**Cash**" shall mean the lawful currency of Canada or the lawful currency of the United
States of America.

(c)     <u>Interest Rate</u>

The "**Interest Rate**" will be, in respect of Other Eligible Support in the form of Cash, for any day, shall be such rate as provided by the OC Custodian or any financial institution with which the OC Custodian deposits Cash it holds as agent for the Secured Party in compliance with the Custodial Agreement.

(d)     <u>Interest Period</u>

The "**Interest Period**" means the period from (and including) the last Business Day on which an Interest Amount was transferred (or, if no Interest Amount has yet been transferred, the Business Day on which Other Eligible Support in the form of Cash was transferred to or received by Party A) to (but excluding) the Business Day on which the current Interest Amount is to be transferred.

(e)     <u>Interest Amount</u>

The "**Interest Amount**" means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Other Eligible Support in the form of Cash held by Party A on that day, determined by Party A for each such day as follows:

(x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 365.

(f)     <u>Interest Payment Date</u>

The "**Interest Payment Date**" means the second Business Day of each calendar month with respect to Interest Amounts payable in respect of the immediately preceding month.

(g)     <u>Definitions</u>

For purposes of this Part 3.6.1 of Schedule B, the following definitions will apply:

"**Custodial Account**" means the account established by the OC Custodian for the benefit of Party B and subject to an OC Control Agreement among, *inter alios*, Party A, Party B and the Collateral Agent as follows: **[NTD: To be completed once account details are finalized].**

"**Custodial Agreement**" means the Custodial and Control Agreement, dated as of the date of this Master Security Agreement among Party A, the OC Custodian, Party B and certain other parties thereto, as the same may be amended or otherwise supplemented from time to time.

"**Party A**" means: [JPM 29 - Opus ML4, JPM 30 - Symphony ML4, JPM 31 - Aria ML4, JPM 32 - Encore ML4 - LSS]: Merrill Lynch Capital Services, Inc.; [JPM 24 - Opus ML1, JPM ID 25 - CCLT (ML LSS) 2006-1, JPM ID 26 - NCLCT (ML-LSS) 2006, JPM ID 27 - NCLCT (ML-LSS

II) 2006, JPM 28 - Aria ML2_Long-(Short), JPM ID 33 - CCLT (ML6 L/S) 2006-1, JPM ID 34 - NCLCT (ML-LSS IV) 2006, JPM ID 35 - CCLT (ML LSS-2) 2006-1, JPM ID 36 - Encore ML3_Long–(Short) – LSS]: Merrill Lynch International.

### 3.6.2  Transaction:  JPM ID#185 - NCLCT (Morningside) Series 2005

(a)      Eligible Collateral

"**Eligible Collateral**" means (I) USD cash, CAD cash and CAD time deposits and USD time deposits held at the Custodial Account, (II) Eligible Investments, and (III) in the event that a Guarantor Downgrade has occurred and Party A has elected to replace all Eligible Collateral then on deposit in the Custodial Account, Commercial Paper.

(b)      Other Eligible Support

The following items will qualify as "**Other Eligible Support**":  Cash

"**Cash**" shall mean the lawful currency of Canada or the lawful currency of the United States of America.

(c)      Interest Rate

The "**Interest Rate**" will be, in respect of Other Eligible Support in the form of Cash, for any day, shall be such rate as provided by the OC Custodian or any financial institution with which the OC Custodian deposits Cash it holds as agent for Party B in compliance with the Custodial Agreement.

(d)      Interest Period

The "**Interest Period**" means the period from (and including) the last Business Day on which an Interest Amount was transferred (or, if no Interest Amount has yet been transferred, the Business Day on which Other Eligible Support in the form of Cash was transferred to or received by Party A) to (but excluding) the Business Day on which the current Interest Amount is to be transferred.

(e)      Interest Amount

The "**Interest Amount**" means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Other Eligible Support in the form of Cash held by Party A on that day, determined by Party A for each such day as follows:

(x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 365.

(f)    <u>Interest Payment Date</u>

The "**Interest Payment Date**" means the second Business Day of each calendar month with respect to Interest Amounts payable in respect of the immediately preceding month.

(g)    <u>Definitions</u>

For purposes of this Part 3.6.2 of Schedule B, the following definitions will apply:

"**Commercial Paper**" means USD denominated commercial paper rated R-1 (high) by the Rating Agency that is approved by the Rating Agency and Party B, each of whose approval not to be unreasonably withheld or delayed.

"**Credit Support Provider**" means Merrill Lynch & Co., Inc.

"**Custodial Account**" means the account established by the OC Custodian for the benefit of Party B and subject to an OC Control Agreement among, *inter alios,* Party A, Party B and the Collateral Agent as follows: [**NTD: To be completed once account details are finalized**].

"**Eligible Investments**" means, at any particular date,

(A)    USD denominated book-based securities, negotiable instruments or securities represented by instruments in bearer or registered form which is evidence of any of:

I.    direct obligations of, or obligations fully guaranteed as to the timely payment of principal and interest by, the United States of America or any agency or instrumentality of the United States of America, the obligations of which are expressly backed by the full faith and credit of the United States of America;

II.    direct obligations of, or obligations fully guaranteed as to the timely payment of principal and interest by, the banks or trust companies chartered or licensed under the laws of the United States of America or any state thereof; provided that, at the time of the investment or contractual commitment to invest therein, the short-term debt rating of such bank or trust company shall be at least A-1+ from S&P and P-1 from Moody's, or if the Rating Agency rates such bank or trust company, at least R-1 (high) by the Rating Agency;

III.    commercial paper (other than extendible commercial paper) and any other asset-backed securities having, at the time of the investment or contractual commitment to invest therein, a rating of at least A-1+ from S&P and P-1 from Moody's, or if the Rating Agency rates such bank or trust company, at least R-1 (high) by the Rating Agency;

IV.    demand and time deposits in certificates of deposit of, or bankers' acceptances by, any bank or trust company referred to in (II) above;

V.    any security rated by any two of S&P, Moody's or Fitch at AAA by S&P, Aaa by Moody's and AAA by Fitch, or if the Rating Agency rates such security, having a rating of AAA by the Rating Agency;

in each case maturing not later than the Final Payment Date; or

(B)    any other USD denominated book-based securities, negotiable instruments or securities represented by instruments in bearer or registered form as may be agreed upon by Party A and Party B and approved in writing by the Rating Agency.

"**Final Payment Date**" means March 12, 2012.

"**Guarantor Downgrade**" means the Guarantor Rating of the Credit Support Provider of Party A is downgraded below (i) A+ by S&P or (ii) AA(low) by the Rating Agency.

"**Guarantor Rating**" means, (1) if the long term, senior unsecured debt rating of Party A's Credit Support Provider (or other similar rating) is provided by Moody's, such Moody's rating, (2) if the short-term debt rating applicable to Party A's Credit Support Provider is provided by Moody's, such Moody's rating, (3) if the long term, senior unsecured debt rating of Party A's Credit Support Provider is provided by S&P, such S&P rating and (4) if a long-term senior unsecured debt rating of Party A's Credit Support Provider (or other similar ratings) is provided by the Rating Agency, such rating by the Rating Agency.

"**Party A**" means Merrill Lynch International.

**3.7    Dealer:    Swiss Re Financial Products Corporation**

**3.7.1    Transaction:   JPM ID#21 - CCLT (Banff) 2006-1, JPM ID#22 - CCLT (Galibier) 2006-1, JPM ID#23 – Coastal Mountain Base Trust Series 2006-1**

(a)    Eligible Collateral

"**Eligible Collateral**" means:

(A)    All of the Directed Investments (as defined in Exhibit I (*Investment Guidelines*) of the applicable Par Swap).

(B)    Such other collateral as agreed to by the Party A and Party B from time to time but subject always to satisfaction of the Rating Agency Condition.

(b)    Other Eligible Support

The following items will qualify as "**Other Eligible Support**":  Cash

"**Cash**" shall mean the lawful currency of Canada.

(c)    Interest Rate

The "**Interest Rate**" payable in respect of Other Eligible Support in the form of Cash held by Party A at any time shall be the rate paid by Party A at such time in respect of institutional deposit accounts of similar size.

(d)    Interest Period

The "**Interest Period**" means the period from (and including) the last Business Day on which any Interest Amount was transferred (or, if no Interest Amount has yet been transferred, the first Business Day on which Other Eligible Support in the form of Cash was transferred to or received by Party A) to (but excluding) the Business Day on which the current Interest Amount is to be transferred.

(e)    Interest Amount

The "**Interest Amount**" means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Other Eligible Support in the form of Cash held by Party A on that day, determined by Party A for each such day as follows:

(x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 365.

(f)    Interest Payment Date

The **"Interest Payment Date"** means the second Business Day of each calendar month, with respect to Interest Amounts payable in respect of the immediately preceding month.

(g)    Definitions

For purposes of this Part 3.7.1 of Schedule B, the following definitions will apply:

"**Par Swap**" means the applicable par and basis swap transaction entered into under the Novation Confirmation between Party A and Party B dated as of the date of this Master Security Agreement, replacing each of the following: **[JPM 21 - CCLT (Banff) 2006-1: May 30, 2006]**, **[JPM 22 - CCLT (Galibier) 2006-1: September 14, 2006]**, and **[JPM 23 - Coastal Mountain Base Trust Series 2006-1: October 20, 2006]**.

"**Party A**" means Swiss Re Financial Products Corporation.

**3.8    Dealer:        UBS AG**

**3.8.1    Transaction:   JPM ID#39 - NCLCT (MT-LSS) 2005, JPM ID#40 - Opus UB1, JPM ID#41 - Encore UB2 – LSS, JPM ID#42 - CCLT (PML – M2) 2006 - 1**

**Each of the trades referenced below will be amended to reflect a reconfiguration of the UBS trades.**

(a)    Eligible Collateral

"**Eligible Collateral**" means Eligible Money Market Instruments.

"**Eligible Money Market Instruments**" means (a) any CAD denominated debt obligations of or guaranteed by the Government of Canada or of a Canadian province having a long-term rating of at least "AA(low)" (or its equivalent) by DBRS and a short-term rating of at least "R-1(middle)" (or its equivalent) by DBRS, in each case having a remaining term to maturity of less than 35 days and in respect of which no withholding tax is exigible by any governmental authority; (b) any CAD denominated debt obligations of or guaranteed by a bank governed by the *Bank Act* (Canada) having a long-term rating of at least "AA(low)" (or its equivalent) by DBRS and a short-term rating of at least "R-1(middle)" (or its equivalent) by DBRS, in each case having a remaining term to maturity of less than 35 days and in respect of which no withholding tax is exigible by any governmental authority; and (c) any other investment which has been approved in writing by Party A and satisfies the Rating Agency Condition (provided that the Valuation Percentage for any such other investment will be the percentage specified by Party A in its written consent).

(b)    Other Eligible Support

The following items will qualify as "**Other Eligible Support**":  Cash

"**Cash**" shall mean the lawful currency of Canada.

(c)    Interest Rate

The "**Interest Rate**" will be CAD-BA-CDOR (as defined in the 2000 ISDA Definitions) with a designated maturity of one month plus 0.0525% for the first CAD 200,000,000 of CAD Cash.  Any cash in excess of 200,000,000 CAD held under the Agreement will be subject to an Interest Rate of at least CAD-BA-CDOR with a designated maturity of one month plus any additional spread that Party A agrees to pay acting in good faith in light of the commercial circumstances.

(d)    Interest Period

The "**Interest Period**" means the period from (and including) the last Business Day on which any Interest Amount was transferred (or, if no Interest Amount has yet been transferred, the first Business Day on which Other Eligible Support in the form of Cash was transferred to or received by Party A) to (but excluding) the Business Day on which the current Interest Amount is to be transferred.

(e)      Interest Amount

The "**Interest Amount**" means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Other Eligible Support in the form of Cash held by Party A on that day, determined by Party A for each such day as follows:

(x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 365.

(f)      Interest Payment Date

The "**Interest Payment Date**" means the 20th calendar day of each calendar quarter-end, provided that in the event that an Interest Payment Date does not fall on a Business Day, then the Interest Payment Date shall be the next Business Day.

(g)      Definitions

For purposes of this Part 3.8.1 of Schedule B, the following definitions will apply:

"**Party A**" means UBS AG.

**3.9      Dealer:          Royal Bank of Canada**

**3.9.1    Transaction:    JPM ID#81 – Constellation Credit Linked Certificate Trust (MPL-CDN) Series 2006-1**

(a)      Eligible Collateral

"**Eligible Collateral**" means:

(A)      Credit Card Receivables-Backed Floating Rate Class A Notes, Series 2006-2 (CUSIP: 14161ZAD02) which must be rated AAA by DBRS; and

(B)      Such other collateral as Party A and Party B may agree; provided that, such collateral satisfies the Rating Agency Condition and is either rated AAA by DBRS or AAA and Aaa by both S&P and Moody's.

(b)      Other Eligible Support

The following items will qualify as "**Other Eligible Support**":  Cash

"**Cash**" shall mean the lawful currency of Canada.

(c)    <u>Interest Rate</u>

The **"Interest Rate"** will be with respect to Other Eligible Support in the form of Cash, for any day for such day which appears on the relevant Bloomberg Screen.

Relevant Rate: CAD-BA-CDOR
Reset Rate: Each Business Day
Designated Maturity: Overnight

(d)    <u>Interest Period</u>

The **"Interest Period"** means the period from (and including) the last Business Day on which any Interest Amount was transferred (or, if no Interest Amount has yet been transferred, the first Business Day on which Other Eligible Support in the form of Cash was transferred to or received by Party A) to (but excluding) the Business Day on which the current Interest Amount is to be transferred.

(e)    <u>Interest Amount</u>

The **"Interest Amount"** means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Other Eligible Support in the form of Cash held by Party A on that day, determined by Party A for each such day as follows:

(x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 365.

(f)    <u>Interest Payment Date</u>

The **"Interest Payment Date"** means the second Business Day of each calendar month, with respect to Interest Amounts payable in respect of the immediately preceding month.

(g)    <u>Definitions</u>

For purposes of this Part 3.9.1 of this Schedule B, the following definitions will apply:

**"Party A"** means Royal Bank of Canada.

## <u>Schedule C</u>

**FORMS OF OC CONTROL AGREEMENTS**

**CIBC MELLON GLOBAL SECURITIES SERVICES COMPANY**
**in its capacity as issuer trustee of the**
**MASTER ASSET VEHICLE [I]/[II]**
**as MAV**

**and**

**[BANK OF AMERICA, N.A./MERRILL LYNCH INTERNATIONAL/MERRILL**
**LYNCH CAPITAL SERVICES]**
**as the Dealer**

**and**

**BNY TRUST COMPANY OF CANADA**
**as Collateral Agent**

**and**

**BNY TRUST COMPANY OF CANADA**

**as Custodian**

---

**CUSTODIAL AND CONTROL AGREEMENT**

**[Date]**

---

## CUSTODIAL AND CONTROL AGREEMENT

Custodial and control agreement dated as of **[date]** among CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle **[I]/[II]]** (in such capacity, the "**MAV**"), **[Bank of America, N.A./Merrill Lynch International/Merrill Lynch Capital Services] (**the "**Dealer**"), BNY Trust Company of Canada, in its capacity as Collateral Agent and BNY Trust Company of Canada, in its capacity as Custodian under this Agreement;

**RECITALS:**

(a)     The Collateral (as defined below) is at present held by the Custodian in the Securities Accounts (as defined below);

(b)     Pursuant to the Master Security Agreement (as defined below), the MAV has granted the Dealer a first priority security interest in the Collateral held in each of the Securities Accounts (the "**Dealer's Security Interest**") securing the payment and performance by the MAV of its obligations to the Dealer;

(c)     Pursuant to the Master Security Agreement and subject to the Dealer's Security Interest, the MAV has granted the Collateral Agent a security interest in substantially all of the property and assets of the MAV, including the Collateral (the "**Collateral Agent's Security Interest**" and, together with the Dealer's Security Interest, the "**Security Interests**") as security for the payment and performance of all obligations of the MAV to the Secured Creditors;

(d)     Pursuant to the Master Security Agreement, the Dealer's Security Interest in the Collateral has priority over the Collateral Agent's Security Interest in the Collateral;

(e)     It is intended that upon the occurrence of certain events the Collateral may cease to be subject to the Dealer's Security Interest but will at all times remain subject to the Collateral Agent's Security Interest; and

(f)     The parties are entering into this Agreement to perfect the Security Interests as required by the Master Security Agreement.

In consideration of the foregoing and other good and valuable consideration, the receipt and adequacy of which are acknowledged, the parties agree as follows.

**Section 1     Defined Terms.**

As used in this Agreement, the following terms have the following meanings:

**"Account Property"** means, with respect to a Securities Account, all of the credit balances, securities, Cash, security entitlements, other financial assets and other items or property (or their value) standing to the credit from time to time of such Securities Account, and all other rights and benefits accruing to or arising in connection with such property and such Securities Account.

**"Administration Agreement"** means the Administration and Management Agreement dated [●] between the Administrator and the MAV, as amended, modified, restated, replaced or supplemented from time to time, together with any schedules, exhibits, supplements and attachments and all documents incorporated by reference.

"**Administrator**" means BlackRock (Institutional) Canada, Ltd. in its capacity as attorney-in-fact, administrator and asset manager to the MAV pursuant to the Administration Agreement, and its successors and permitted assigns in such capacity.

"**Agent**" means any person appointed by the Custodian to assist in providing services under this Agreement, other than a Sub-custodian, including agents, nominees and service providers,  and includes affiliates and subsidiaries of the Custodian, in each case appointed in accordance with the terms of this Agreement;

**"Agreement"** means this custodial and control agreement as it may be amended, modified, restated, replaced or supplemented from time to time.

"**Authorized Signatory**" means any person, whether or not an officer or employee of the Administrator, the Dealer or the Collateral Agent, duly authorized by the Administrator, the Dealer or the Collateral Agent, respectively, to give notices, entitlement orders or other instructions on behalf of the MAV, the Dealer or the Collateral Agent, respectively, such persons to be designated in a certificate which contains a specimen signature of each such person.

"**Bank of New York**" means The Bank of New York Mellon and its successors and assigns.

"**Bank of New York Downgrade Event**" means a withdrawal, suspension or reduction by a rating agency of a Bank of New York Rating.

"**Bank of New York Rating**" means any of the following ratings of Bank of New York:  (i) a short term senior unsecured debt rating by DBRS Limited of R-1(middle), (ii)  a short term rating by S&P of 'A-1+'; (iii) a short term rating by Fitch of 'F1+', (iv) a short term rating by Moody's of 'P-1', (v) a long term senior unsecured debt rating by DBRS Limited of AA(low) (vi) a long term

unsecured debt rating by S&P of 'AA-', (vii) a long term unsecured debt rating by Fitch of 'AA-', and (viii) a long term unsecured debt rating by Moody's of 'Aa3'.

"**Business Day**" means a day on which commercial banks and foreign exchange markets are generally open to settle payments and are open for general business in the Cities of New York, New York, Toronto, Ontario and London, United Kingdom.

"**Cash**" means Canadian Dollars and United States Dollars.

"**CIBC Mellon**" means CIBC Mellon Trust Company.

"**CIBC Mellon Downgrade Event**" means a withdrawal, suspension or reduction by a rating agency of any CIBC Mellon Rating.

"**CIBC Mellon Rating**" means any of the following ratings of CIBC Mellon: (a)(i) a bank financial strength rating of B-', and (ii) a long-term issuer rating of 'Aa2', in each case as provided by Moody's, and (b) any other rating issued by a rating agency on or following the date hereof as at the date of initial issuance.

"**Collateral**" means the Account Property in the Securities Accounts, which on the date of this Agreement consists of the Account Property described on Schedule "A", together with all replacements of and substitutions for and increases and additions to the Account Property, all certificates and instruments evidencing or representing any Account Property, all stock powers of attorney applicable to any Account Property and all money or other property payable or paid on account of any return or repayment of principal or capital in respect of the Account Property or distributed in respect of the Account Property.

"**Collateral Agent**" means BNY Trust Company of Canada in its capacity as collateral agent pursuant to the terms of the Omnibus Agreement or any successor to the trust and custody business thereof or any permitted assigns thereof in such capacity appointed pursuant to the Omnibus Agreement.

"**Collateral Agent's Notice of Exclusive Control**" means a written notice that the Collateral Agent is exercising exclusive control of the Securities Accounts and the Collateral.

"**Collateral Agent's Security Interest**" has the meaning specified in the recitals to this Agreement.

**"Controlling Party"** with respect to the Securities Accounts and the Collateral means, (i) prior to the receipt by the Custodian of a Collateral Agent's Notice of Exclusive Control in accordance with Section 7(2) and after exclusive control reverts to the Dealer in accordance with Section 7(3), the Dealer alone; and (ii) upon receipt by the Custodian of a Collateral Agent's Notice of Exclusive Control and until exclusive control reverts to the Dealer in accordance with Section 7(3), the Collateral Agent alone

**"Corporate Action"** means any conversion privileges, subscription rights, warrants, put and call options or other rights or options available in connection with any securities which form part of the Collateral, including those relating to the reorganization, recapitalization, takeover, consolidation, amalgamation, merger, liquidation, filing for or declaration of bankruptcy, plans of arrangement of any corporation or association;

**"Custodian"** means BNY Trust Company of Canada in its capacity as custodian of the Securities Accounts and the Collateral in accordance with this Agreement and its successors and permitted assigns in accordance with this Agreement in such capacity.

**"Dealer's Notice of Exclusive Control"** means a written notice that the Dealer is exercising exclusive control of the Securities Accounts and the Collateral.

**"Dealer's Security Interest"** has the meaning specified in the recitals to this Agreement.

**"Declaration of Trust"** means the declaration of trust dated ●, 2008 providing for the establishment by CIBC Mellon Global Securities Services Company, a company incorporated under the laws of the Province of Nova Scotia, of Master Asset Vehicle [I][II] as a trust under the laws of the Province of Ontario, as it may be amended, modified, restated, replaced or supplemented from time to time to the extent permitted thereby, and together with any schedules, exhibits, supplements and attachments and all documents incorporated by reference.

**"Depository"** means any authorized domestic or foreign depository or clearing or settlement agency or system, including a transnational book-based system, and shall include CDS Clearing and Depository Services Inc., Euroclear, The Depository Trust Company and the Treasury/Reserve Automated Debt Entry System maintained at The Federal Reserve Bank of New York for receiving and delivering securities, and their respective successors and assigns.

"**Eligible Institution**" means a financial institution (i) that has the Required Rating or (ii) whose obligations in favour of the MAV are covered by a guarantee or indemnity satisfactory to the Rating Agency provided by a financial institution or financial institutions that has or have the Required Rating, or in each case under clause (i) and (ii) above, as applicable, each such financial institution has otherwise been approved by the Rating Agency pursuant to the satisfaction of the Rating Agency Condition. For purposes of this Agreement, CIBC Mellon shall be deemed to be an Eligible Institution until a CIBC Mellon Downgrade Event occurs, whereupon CIBC Mellon shall cease to be an Eligible Institution for purposes of this Agreement.

"**Eligible Deposit Account**" means a securities account with an Eligible Institution. Any securities account with a financial institution that ceases to be an Eligible Institution for purposes of this Agreement pursuant to the definition thereof shall thereupon cease to be an Eligible Deposit Account for purposes of this Agreement and the provisions of Section 14(2) of this Agreement shall apply.

"**Income Distributions**" means with respect to Collateral, all interest and other payments and distributions of cash or other property with respect to such Collateral, other than on account of principal.

"**Indenture Trustee**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Issuer Trustee**" means CIBC Mellon Global Securities Services Company in its capacity as the issuer trustee of Master Asset Vehicle [I][II] under the Declaration of Trust or any successor to the trust or custodial business thereof serving in such capacity or permitted assign thereof in accordance with the terms of the Declaration of Trust.

"**Majority Secured Creditors**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Master Security Agreement**" means the master security agreement dated [●] by and among, *inter alios,* the MAV, certain swap counterparties of the MAV as Dealers and the Collateral Agent, as amended, modified, restated, replaced or supplemented from time to time and together with any schedules, exhibits, supplements and attachments and all documents incorporated by reference.

"**Notice of Exclusive Control**" means a Collateral Agent's Notice of Exclusive Control or a Dealer's Notice of Exclusive Control.

"**Omnibus Agreement**" means the omnibus agreement dated [●], 2008 by and among, *inter alios,* the MAV, certain swap counterparties of the MAV as Dealers and the Collateral Agent, as amended, modified, restated, replaced or supplemented from time to time, together with any schedules, exhibits, supplements and attachments and all documents incorporated by reference.

"**Permitted Custodian**" means an Eligible Institution that is authorized to provide custodial services.  For purposes of this Agreement, the Custodian shall be deemed to be a Permitted Custodian; provided that, upon occurrence of a Bank of New York Downgrade Event, the Custodian shall cease to be a Permitted Custodian for purposes of this Agreement and the provisions of Section 16 of this Agreement shall apply.

"**Rating Agency**" means DBRS Limited and any successor to its credit ratings business and any replacement credit rating agency that may be engaged by the MAV.

"**Rating Agency Condition**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Required Rating**" means (i) a short term senior unsecured debt rating by DBRS Limited of not less than R-1 (middle) and an equivalent rating by any one of the following rating agencies of (x) a short term rating by S&P of not less than 'A-1+'; (y) a short term rating by Fitch of not less than 'F1+'or (z) a short term rating by Moody's of not less than 'P-1', or (ii) if no short term senior unsecured debt rating is available, a long term senior unsecured debt rating by DBRS Limited of not less than AA(low) and an equivalent rating by any one of the following rating agencies of (A) a long term rating by S&P of not less than 'AA-'; (B) a long term rating by Fitch of not less than 'AA-'; or (C) a long term rating by Moody's of not less than 'Aa3'.

"**Secured Creditors**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Securities Accounts**" means the securities accounts established and maintained by or on behalf of the Custodian in the name of the MAV and in which the Collateral is from time to time held, identified on Schedule "A", any substitute or replacement securities accounts maintained by or on behalf of the Custodian for the MAV and any securities account maintained by or on behalf of the Custodian for the MAV into which property from any such securities account is transferred.

"**Securities Transfer Act**" means the *Securities Transfer Act, 2006* (Ontario), as that statute is now enacted or as the same may from time to time be amended, re-enacted or replaced and includes any regulation under that statute.

"**Security Interests**" has the meaning specified in the recitals to this Agreement.

"**Sub-custodian**" means a financial institution that is appointed by the Custodian in accordance with this Agreement to provide custodial services with respect to any of the Collateral and the related Securities Accounts.

"**Transaction Documents**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Wrapped Collateral**" means Collateral described in Schedule "B" and which has been deposited into a segregated Securities Account as noted on Schedule "B".

"**Wrap Swap**" has the meaning specified in Schedule A of the Omnibus Agreement.

**Section 2    Interpretation.**

(1)    Terms defined in the Securities Transfer Act and used but not otherwise defined in this Agreement have the same meanings.  For greater certainty, the terms "**entitlement order**", "**financial asset**", "**securities account**", "**securities intermediary**", "**securities intermediary's jurisdiction**", "**security**" and "**security entitlement**" have the meanings given to them in the Securities Transfer Act.

(2)    In this Agreement the words **"including"**, **"includes"** and **"include"** mean **"including (or includes or include) without limitation"**.  The expression **"Section"** and any other subdivision followed by a number means and refers to the specified Section or other subdivision of this Agreement.

(3)    Words importing the singular number only include the plural and vice versa.

(4)    The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenient reference only and do not affect its interpretation.

(5)    The schedules attached to this Agreement form an integral part of it for all purposes of it.

**Section 3          Appointment of the Custodian.**

The Dealer, with the full and unqualified approval of the MAV and the Collateral Agent, hereby appoints the Custodian as custodian, and the Custodian hereby accepts its appointment and agrees to maintain and to operate each of the Securities Accounts and to deal with the Collateral in accordance with the terms of this Agreement.

**Section 4          The Issuer Trustee.**

The Issuer Trustee has established Master Asset Vehicle [I][II] pursuant to the Declaration of Trust and its liability under this Agreement is limited as provided in the Declaration of Trust.  The provisions regarding liability set out in subsections 6.7(a), (b), (c) and (d) of the Declaration of Trust are hereby incorporated by reference in this Agreement.

**Section 5          The Administrator and the MAV.**

The MAV has authorized the Administrator to act as its attorney-in-fact in respect of all of its rights and obligations under this Agreement whether expressed as a right or an obligation of the MAV. Unless otherwise advised in writing by the MAV, the Custodian, the Collateral Agent and the Dealer may assume without enquiry that (i) the Administrator is acting on behalf of the MAV, and (ii) such action taken by the Administrator has been duly authorized and approved by all necessary action on the part of the Issuer Trustee pursuant to an effective delegation and such action will bind the Issuer Trustee and the MAV for all purposes hereof with the same effect as if undertaken by the MAV directly.  Until notified in writing by the Issuer Trustee of any change in the appointment of the Administrator as the administrator and attorney-in-fact of the MAV, the Custodian, the Collateral Agent and the Dealer shall be entitled to rely on the authority of the Administrator as the administrator and attorney-in-fact of the MAV.

**Section 6          The Collateral Agent**

(1)       BNY Trust Company of Canada has been appointed as the Collateral Agent pursuant to Section 7.1(a)(i) of the Omnibus Agreement and its liability under this Agreement is limited as provided in the Omnibus Agreement.

(2)       The Collateral Agent is a party to this Agreement in its capacity as agent for the Secured Creditors and may act on its own pursuant to the authority it has in such capacity under the Omnibus Agreement and the Master Security Agreement and shall act in accordance with any directions provided by the applicable Secured Creditors who at the time such directions are given constitute the Majority Secured Creditors (provided that for the purposes of this Agreement, the Dealer shall be deemed not to be an "LSS CDS Counterparty" for the "Majority Secured Creditors" definition).

(3)     BNY Trust Company of Canada has agreed to assume the obligations of the Collateral Agent under this Agreement in its capacity as Collateral Agent as appointed pursuant to the Omnibus Agreement. BNY Trust Company of Canada in such capacity expressly does not assume the responsibilities of any other service provider in relation to this Agreement or any Transaction Document, notwithstanding that it or an affiliate or related party may be appointed in another capacity under such document.

## Section 7     Control of the Securities Accounts

(1)     Until the Collateral Agent has delivered a Collateral Agent's Notice of Exclusive Control to the Custodian, the Dealer shall have exclusive control over the Securities Accounts and the Collateral and the Custodian agrees to comply only with entitlement orders and other instructions originated by the Dealer and not by any other person with respect to the Securities Accounts and the Collateral, without any need for the further consent of the MAV, the Collateral Agent or any other person.  Notwithstanding the foregoing, the Dealer may instruct the Custodian to accept entitlement orders from the Administrator in accordance with Section 7(4) and the MAV may provide joint instructions in accordance with Section 8.

(2)     If at any time the Collateral Agent delivers a Collateral Agent's Notice of Exclusive Control to the Custodian (with copies to the Dealer and the MAV) the Collateral Agent shall have exclusive control over the Securities Accounts and the Collateral and the Custodian agrees (i) to promptly cease complying with any entitlement orders or other instructions originated by the Dealer relating to the Securities Accounts and the Collateral, and (ii) to comply only with entitlement orders and other instructions originated by the Collateral Agent and not by any other person with respect to the Securities Accounts and the Collateral, without any need for further consent of the MAV, the Dealer or any other person, until the Collateral Agent provides a notice giving exclusive control over the Collateral and the Securities Accounts to the Dealer as the Controlling Party in accordance with Section 7(3). Notwithstanding the foregoing, the Collateral Agent may instruct the Custodian to accept entitlement orders from the Administrator in accordance with Section 7(4) and the MAV may provide joint instructions in accordance with Section 8.

(3)     If at any time while the Collateral Agent has control of the Securities Accounts and the Collateral, (a) it is determined by a court of competent jurisdiction that the Collateral Agent was not entitled to take exclusive control of the Collateral pursuant to the Transaction Documents, or (b) the Collateral Agent and the Dealer agree that the Collateral Agent was not entitled to take exclusive control of the Collateral pursuant to the Transaction

Documents, the Collateral Agent shall in each such instance provide a written notice to the Custodian (with copies to the Dealer and the MAV) instructing the Custodian with effect from the date of such notice that the Dealer shall have exclusive control over the Securities Accounts as the Controlling Party in accordance with and subject to all the provisions of this Agreement.

(4)    In connection with certain obligations of the Administrator under the Omnibus Agreement:

(i)    The Controlling Party may provide written instructions to the Custodian, (with copies to the MAV, the Administrator and the Collateral Agent), authorizing the Custodian to accept entitlement orders from the Administrator with respect to the Securities Accounts and the Collateral, to the extent specified by the Controlling Party in such written instructions, and until the Controlling Party has revoked such instructions by delivering a Notice of Exclusive Control in accordance with Section 7(5), the Custodian agrees to comply with entitlement orders and other instructions originated by the Administrator or the Controlling Party, with respect to the Securities Accounts and the Collateral, without any need for the further consent of the Controlling Party or any other person, until the Controlling Party has revoked such instruction by delivering a Notice of Exclusive Control in accordance with Section 7(5); and

(ii)    The Dealer, as the Controlling Party on the date of this Agreement, and acting in accordance with Section 7(4)(i) of this Agreement, instructs the Custodian to comply with all entitlement orders and other instructions originated by the Administrator or the Dealer, with respect to the Securities Accounts and the Collateral, from the date of this Agreement until the instructions in this Section 7(4)(ii) are revoked by delivery of a Notice of Exclusive Control in accordance with Section 7(5).

(5)    If, at any time after the Controlling Party has provided written instructions to the Custodian in accordance with Section 7(4), the Custodian receives a Notice of Exclusive Control from the Controlling Party, the Custodian shall, after receipt of such notice, promptly cease complying with any entitlement orders or other instructions relating to the Securities Accounts and the Collateral originated by the Administrator.  Upon receipt by the Custodian of such a Notice of Exclusive Control, the Controlling Party shall have exclusive control over the Securities Accounts and the Collateral in accordance with this Agreement and the Custodian agrees to comply only with entitlement

orders and other instructions originated by the Controlling Party and not by any other person, with respect to the Securities Accounts and the Collateral, without any need for the further consent of the Administrator, the MAV or any other person.

(6)     The Custodian will not comply with any entitlement orders or other instructions originated by the Administrator or the MAV with respect to any Securities Account or the Collateral except as provided in Section 7(4) and Section 8 of this Agreement.  If an entitlement order or other instruction originated by the Administrator conflicts with any entitlement order or other instruction originated by the Controlling Party, the Custodian will comply with the entitlement order or other instruction originated by the Controlling Party.

(7)     Each of the Collateral Agent and the Dealer shall provide a copy of any notice provided by it under this Section 7 to the Rating Agency promptly.

## Section 8     Instructions with Respect to Income Distributions.

(1)     The parties to this Agreement agree and acknowledge that all Income Distributions received in the Securities Accounts other than Income Distributions on Wrapped Collateral received in the Securities Accounts set out on Schedule "B", shall be transferred (i) as soon as practicable after receipt to the account set out on Schedule "C", and (ii) without duplication, on the effective date of termination of this Agreement. The MAV, the Dealer and the Collateral Agent hereby instruct the Custodian to complete such transfers. Notwithstanding any other provision of this Agreement to the contrary, the parties to this Agreement agree that such instructions may not be altered except with ten (10) days prior written notice to the Rating Agency and by joint written instructions from the MAV, the Dealer and the Collateral Agent to the Custodian, while the Dealer is the Controlling Party, and by joint written instructions from the MAV and the Collateral Agent to the Custodian, while the Collateral Agent is the Controlling Party.

(2)     The parties to this Agreement agree and acknowledge that all Income Distributions received on Wrapped Collateral in the Securities Accounts set out on Schedule "B" shall be transferred (i) as soon as practicable after receipt to the account set out on Schedule "D" and (ii) without duplication, on the effective date of termination of this Agreement. The MAV, the Dealer and the Collateral Agent hereby instruct the Custodian to complete such transfers. Notwithstanding any other provision of this Agreement to the contrary, the parties to this Agreement agree that such instructions may not be altered except by joint written instructions from the MAV, the Dealer and the Collateral Agent to the Custodian, while the Dealer is the Controlling Party,

and by joint written instructions from the MAV and the Collateral Agent to the Custodian, while the Collateral Agent is the Controlling Party. The Dealer agrees to cooperate to provide any such joint instructions upon the termination of the relevant Wrap Swap applicable to the Wrapped Collateral.

(3)    The Collateral Agent shall provide a copy of any joint notice provided under Section 8(2) to the Rating Agency promptly.

**Section 9        The Securities Accounts.**

(1)    At the date of this Agreement the Securities Accounts are the securities accounts identified in Schedule "A". The Custodian and the MAV will notify the Dealer and the Collateral Agent of any change in the Securities Accounts or the information on such schedule.

(2)    The parties agree that each Securities Account is a securities account, each item of Collateral credited to each of the Securities Accounts is a financial asset for purposes of the Securities Transfer Act and any other similar law applicable in any other relevant jurisdiction and each other right of the MAV, the Dealer and the Collateral Agent against the Custodian arising out of the Securities Accounts is a financial asset.

(3)    The Custodian acknowledges and agrees that for purposes of the Securities Transfer Act and any other similar law applicable in any other relevant jurisdiction, the Custodian is the securities intermediary for the Securities Accounts and that Ontario is the securities intermediary's jurisdiction for each of the Securities Accounts and each agreement between the MAV and the Custodian with respect to a Securities Account is hereby amended to include this provision.

(4)    To the extent it is within the control of the Custodian, the Custodian will ensure that all certificated securities or other financial assets represented by a certificate held in the Securities Accounts are either (i) in bearer form, or (ii) in registered form in a freely negotiable form and are not registered in the name of the MAV, payable to the order of the MAV or specially endorsed to the MAV by an effective endorsement.

(5)    To the extent it is within the control of the Custodian, the Custodian will ensure that all uncertificated securities or other financial assets that are not represented by a certificate (other than instruments) held in the Securities Accounts are not registered in the name of the MAV or an agent for the MAV (other than the Custodian) in the register of the issuer.

(6)    To the extent it is within the control of the Custodian, the Custodian will ensure that all instruments held in the Securities Accounts are either (i)

specially endorsed by an effective endorsement to the Custodian or in blank, or (ii) in the form of a transferable credit, delivered to the Custodian with the relevant transfer document completed in favour of the Custodian, or (iii) for credits that are not in transferable form, delivered to the Custodian with the relevant assignment of proceeds document completed in favour of the Custodian.

(7)     The Custodian will not enter into any agreement with any other person relating to the Securities Accounts and/or any financial assets in any of them under which it agrees to comply with entitlement orders made by such other person.

(8)     The Custodian will notify the Collateral Agent, the Dealer, the MAV and the Rating Agency promptly if any other person claims that it has a property interest in any of the Collateral.

(9)     The Custodian agrees that it will not advance any margin or any other credit to the MAV or lend, pledge or hypothecate the Securities Accounts or any Collateral in the Securities Accounts and it will not permit any financial institution at which it maintains any Securities Account to advance any margin or any other credit or lend, pledge or hypothecate the Securities Accounts or any Collateral in any such Securities Accounts.

(10)     The Custodian agrees that it will not dispose of any Collateral in the Securities Accounts (other than pursuant to instructions given to it in accordance with this Agreement) and will not permit any financial institutions at which it maintains any Securities Accounts to dispose of any Collateral in any such Securities Accounts.

**Section 10     Representations and Warranties of the Custodian.**

The Custodian represents and warrants that:

(1)     the Custodian is a corporation duly incorporated, organized and subsisting under its governing statute, with the power, authority and right to enter into and deliver this Agreement and perform its obligations under this Agreement;

(2)     on the date of this Agreement, the Custodian is a Permitted Custodian;

(3)     this Agreement constitutes a valid and binding agreement of the Custodian, enforceable against the Custodian in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and other laws of general application limiting the enforcement of creditors' rights generally and to the

fact that specific performance is an equitable remedy available only in the discretion of the court;

(4)     the Custodian has established and maintains the Securities Accounts described in Schedule "A" and each of the Securities Accounts is a segregated account in the name of Master Asset Vehicle [I][II] and shall be maintained as a segregated account in the name of Master Asset Vehicle [I][II];

(5)     no Securities Account is or will be a margin account and the Custodian has not advanced any margin or any other credit to the MAV and has not pledged or hypothecated any financial assets in any of the Securities Accounts;

(6)     Schedule "E" contains the most recent statements produced by the Custodian in the ordinary course of its business regarding the Collateral in each of the Securities Accounts at the statements' date.  The Custodian does not know of any inaccuracy in the statements;

(7)     there is no entitlement order or any other right of any person binding upon or which at any time in the future may become binding upon the Custodian to sell, transfer, or in any other way dispose of or encumber any of the Collateral other than under the terms of this Agreement;

(8)     the Custodian does not know of any lien on, claim to or interest in any Securities Account or the Collateral, except for the claims and interests of the Dealer, the Collateral Agent and the MAV; and

(9)     other than the agreements set out on Schedule "F" to this Agreement that have been terminated and replaced by this Agreement, there are no other agreements that the Custodian has entered into with any party relating to the Securities Accounts or any financial assets in any of them.  The Custodian has not entered into any agreement with any other person relating to the Securities Accounts and/or any financial assets in any of them under which it has agreed or will agree to comply with entitlement orders made by such other person.

**Section 11    Representations and Warranties of the MAV.**

The MAV represents and warrants that:

(1)     it has no margin loans outstanding in any of the Securities Accounts as of the date of this Agreement, and it will not request the Custodian to extend any new credit to the MAV secured by any of the Securities Accounts or any of the Collateral;

(2)    the MAV does not know of any lien on, claim to or interest in any of the Securities Accounts or the Collateral, except for the claims and interests of the Dealer, the Collateral Agent or the MAV; and

(3)    other than the agreements set out on Schedule "F" to this Agreement that have been terminated and replaced by this Agreement, there are no other agreements that the MAV has entered into relating to the Securities Accounts or any financial assets in any of them.

**Section 12    Priority of Security Interests.**

The Custodian acknowledges the Security Interests granted to the Dealer and to the Collateral Agent in the Collateral held in the Securities Accounts.    The Custodian waives any security interest, lien, encumbrance, claim or right of set-off it may have, now or in the future, whether by agreement, operation of law or otherwise, against the Securities Accounts and the Collateral held in each Securities Account.

**Section 13    Acknowledgements.**

(1)    The Custodian acknowledges that the MAV is the entitlement holder with respect to the Securities Account.

(2)    Each of the other parties acknowledges and agrees that the Custodian is entitled to rely on the accuracy of the recitals to this Agreement.

(3)    Each of the other parties acknowledges and agrees that the Custodian is not a guarantor of the MAV and shall not be held responsible for any decline in the market value of the Collateral in each Securities Account and has no obligation to notify any other party of any such decline or, except as set out in this Agreement, to take any action with regard to the Collateral in each Securities Account.

**Section 14    Custodian's Duties and Responsibilities.**

(1)    The Custodian agrees that it shall only delegate any of its duties with respect to any of the Collateral or the Securities Accounts to Sub-custodians that satisfy the requirements for a Permitted Custodian.    The Custodian shall require any Sub-Custodian appointed in accordance with this Section 14(1) to notify the Custodian if such Sub-custodian no longer satisfies the requirements for a Permitted Custodian, and upon such notification, or when the Custodian otherwise becomes aware of any such Sub-custodian ceasing to satisfy the requirements for a Permitted Custodian, the Custodian shall promptly replace such Sub-custodian with a replacement Sub-custodian that satisfies the requirements for a permitted Custodian, and the Custodian shall promptly cause any Collateral held at any such Sub-Custodian to be

transferred to the replacement Sub-Custodian appointed in accordance with this Section 14(1).  For the avoidance of doubt, if any other party to this Agreement is entitled to provide (or permit another party to provide) instructions to the Custodian explicitly instructing the Custodian to retain a Sub-custodian, each such party to this Agreement agrees that it shall only provide (or permit another party to provide) instructions to retain a Sub-custodian if the designated Sub-custodian satisfies the requirements for a Permitted Custodian.

(2)    The Custodian agrees that all Collateral shall be held in Securities Accounts that are Eligible Deposit Accounts at all times.  If a Securities Account is no longer an Eligible Deposit Account, subject to Section 16 of this Agreement, the Custodian shall promptly notify the Rating Agency and promptly cause any Collateral held in any such account to be transferred to a Securities Account that is an Eligible Deposit Account.

(3)    The Custodian shall ensure that the Collateral in each of the Securities Accounts is at all times kept segregated in the books and records of the Custodian from any property and assets of the Custodian and any other person;

(4)    The Custodian shall maintain in current electronic form, records and files related to the Collateral.  The Custodian shall provide the Administrator and the Dealer with daily twenty-four (24) hour read-only access to all electronic records and files relating to the Collateral and transactions in the Securities Accounts through an electronic information delivery system, subject to maintenance requirements and to interruptions in the information delivery system, or in power supply, or any other event or factor beyond the reasonable control of the Custodian;

(5)    The Custodian agrees that it shall:

(i)    make notations on its records and files related to the Collateral, provided that the Custodian currently offers this service to its clients, indicating that the MAV is the beneficial owner of the Collateral and that the Collateral is subject to the Security Interests, and the Custodian shall require that any Sub-custodian holding any Collateral on behalf of the Custodian (where permitted in accordance with the terms of this Agreement) shall acknowledge that the MAV is the beneficial owner of the Collateral and that the Collateral is subject to the Security Interests; and

     (ii)     advise any person who makes inquiries regarding the possession or control by the Custodian of the Collateral that the Custodian is in possession of the Collateral as custodian of the MAV and the Dealer or other Controlling Party at the relevant time, that the MAV is the beneficial owner of the Collateral and that the Custodian has no beneficial ownership interest in the Collateral;

(6)     At any reasonable time, and subject to any reasonable requirements the Custodian may impose, the Custodian shall make the Collateral, together with the Custodian's related records and files, available to (i) the MAV, (ii) the Dealer, while it is the Controlling Party, (iii) the Collateral Agent, and (iv) the Rating Agency, and each of their respective representatives at the relevant time for examination and audit;

(7)     The Custodian will send copies of all statements and confirmations concerning the Securities Accounts and the Collateral or make electronic copies available promptly to the MAV, the Dealer and the Collateral Agent. The MAV consents to the release and disclosure of such information to the Dealer and the Collateral Agent.

(8)     The Custodian will promptly notify the Dealer, the MAV and the Collateral Agent and the Rating Agency if any other person asserts any lien, encumbrance or other claim against any of the Securities Accounts or the Collateral and promptly notify the Dealer, the MAV and the Collateral Agent of any loss, destruction of or damage to any of the Collateral.

(9)     Subject to Section 14(2), the Custodian will not change the name or the account number of any of the Securities Accounts without the prior written consent of the MAV and the Controlling Party at the relevant time and ten (10) Business Days prior written notice to the Collateral Agent (if it is not the Controlling Party at the time) and the Rating Agency.

(10)     The Custodian shall not accept any entitlement orders or other instructions regarding, and not otherwise deal with, any of the Securities Accounts or the Collateral other than in accordance with the terms and conditions of this Agreement.

(11)     If the Custodian selects or uses Agents or Sub-custodians it shall be liable for the actions or failure to act of any such Agents or Sub-custodians in respect of the Collateral and/or the Securities Accounts in accordance with the terms of this Agreement, provided that the Custodian shall not be liable for any losses or damages arising as a result of the insolvency of any Sub-custodian except to the extent of the Custodian's negligence in its selection or retention of any

such Sub-custodian, and in no event shall the Custodian be liable for the action or failure to act of any Sub-custodian, or for the insolvency of any Sub-custodian, which it has been explicitly instructed to retain by a party entitled to give such instructions in accordance with Section 7 of this Agreement.  In no event shall a Depository be deemed to be an Agent or Sub-custodian of the Custodian.

(12)   If any losses or damages arise as a result of the action or failure to act of any Sub-custodian which the Custodian has been explicitly instructed to retain by the Dealer, then the Dealer shall indemnify the MAV against all direct losses attributable to the action or failure to act of any Sub-custodian which it explicitly instructed the Custodian to retain, provided that the Dealer shall not be liable for any losses or damages arising as a result of the insolvency of any such Sub-custodian except to the extent of the Dealer's negligence in its selection or retention of any such Sub-custodian, and the Dealer shall pay such amounts directly to the Custodian on behalf of the MAV to be deposited in the appropriate Securities Account.  For greater certainty, the Dealer shall only indemnify such direct losses and shall not have any responsibility or liability whatsoever for any indirect, consequential or other losses attributable to the action or failure to act of any Sub-custodian which it explicitly instructed the Custodian to retain.   The Dealer shall not have any responsibility or liability whatsoever for any direct, indirect, consequential or other losses attributable to the action or failure to act of any Sub-custodian which the MAV, the Administrator, the Collateral Agent or any other person explicitly instructed the Custodian to retain, and any such losses or damages shall be the responsibility of the MAV.

(13)   The Custodian shall notify the Dealer, the MAV and the Collateral Agent of notices received from an issuer or the relevant Depository with respect to any Corporate Actions and any similar rights or discretionary actions with respect to Securities or other contracts or instruments held in the Securities Accounts and the date or dates by which such rights must be exercised or such action must be taken. Absent actual receipt of such notice, the Custodian shall have no liability for failing to so notify the Dealer, the MAV and the Collateral Agent. The Custodian must receive written instructions from the applicable Controlling Party at least two (2) Business Days prior to the last scheduled date specified for action in a notice of Corporate Actions or notice of similar rights or discretionary actions, in order to take any action relating to, or to exercise any rights with respect to, any Corporate Actions or any similar rights or discretionary actions.

(14)   The Custodian shall send to the MAV, the Dealer and the Collateral Agent any documents (including proxies, proxy statements, annual reports, solicitations and other communications relating to the Securities which relate

to voting) received by the Custodian relating to the exercise of voting rights. All voting rights with respect to Securities held in the Securities Accounts, however registered, shall be exercised pursuant to written instructions of the applicable Controlling Party. In the event that no instructions are received in time to be implemented, the Custodian will take no action and if a default option exists, the Custodian shall be deemed to have been provided with instructions to accept the default option.

**Section 15    Rights of the Custodian.**

(1)    The Custodian is entitled to rely upon (i) any Collateral Agent's Notice of Exclusive Control that it believes in good faith to be originated by the Collateral Agent, (ii) any Dealer's Notice of Exclusive Control that it believes in good faith to be originated by the Dealer, and (iii) any entitlement order, notice or other instruction that it believes in good faith to be originated by the Controlling Party or, to the extent applicable pursuant to Section 7(4) or Section 8 of this Agreement, by the Administrator or the MAV, with respect to the Collateral and each Securities Account. Provided that if the Custodian requests that the Administrator, the Collateral Agent or the Dealer furnish a certificate designating Authorized Signatories, the Custodian shall be deemed to act in good faith and shall be fully protected in acting upon the notices, entitlement orders or other instructions of such Authorized Signatories on behalf of the MAV, the Administrator, the Collateral Agent or the Dealer respectively, as designated on such certificate or replacement certificate.

(2)    The Custodian has no obligation to (i) determine whether or not the rights of the Dealer or the Collateral Agent under the Master Security Agreement are enforceable, or (ii) investigate or determine whether or not the Collateral Agent in the case of a Collateral Agent's Notice of Exclusive Control or the Dealer in the case of a Dealer's Notice of Exclusive Control, or the Controlling Party at the relevant time with respect to each Securities Account, is entitled to give any entitlement order, notice or other instruction, or (iii) determine whether an event of default exists under any agreement between any of the MAV, the Dealer and the Collateral Agent, or, (iv) determine if any entitlement orders and other instructions of the MAV or the Administrator (authorised in accordance with this Agreement) are provided strictly in accordance with the provisions of the Administration Agreement or the Omnibus Agreement or any other appropriate Transaction Document (except this Agreement).

(3)    Subject to Section 7(3) of this Agreement, the Custodian will not be liable to the Dealer for complying with a Collateral Agent's Notice of Exclusive Control in accordance with Section 7(2) of this Agreement.

(4)     Subject to Section 7(5) of this Agreement, the Custodian will not be liable to the Controlling Party for complying with entitlement orders and other instructions originated by the Administrator pursuant to written instructions provided to the Custodian by the Controlling Party in accordance with Section 7(4)of this Agreement.

(5)     The Dealer will pay the usual and customary fees and expenses and other charges payable on each Securities Account and shall indemnify and hold harmless the Custodian, its officers, directors, employees, and agents against all claims, liabilities, and expenses arising out of this Agreement (including reasonable legal fees and disbursements), except to the extent the claims, liabilities, or expenses arise from or are in connection with dishonesty, bad faith, gross negligence, wilful misconduct or reckless disregard of a right, duty or obligation by the Custodian.  The MAV shall not have any liability for the payment of fees and expenses and other charges payable on each Securities Account pursuant to the respective account agreements for each Securities Account. This Section 15(5) will survive the termination of this Agreement.  For greater certainty, the Dealer agrees and acknowledges that its indemnity obligations contained in this Section 15(5) shall survive any removal of the Dealer as the Controlling Party, pursuant to the provisions of this Agreement, and that such indemnity obligations shall continue in full force and effect after such removal, in accordance with their terms.

(6)     The Custodian shall not have recourse to the Collateral and the Securities Accounts.  None of the MAV, the Dealer and the Collateral Agent shall be obliged or required to take any further steps against the Custodian beyond the requirements of this Agreement to recover any sums in respect of the Collateral and the Securities Account.  The obligations of the Dealer under Section 15(5) of this Agreement are solely the obligations of the Dealer.  No recourse for the payment of any obligation of the Dealer shall be had against the Collateral and the Securities Account, or the MAV, the Collateral Agent, the Issuer Trustee, the Administrator or any incorporator, affiliate, shareholder, director, officer, representative, employee, manager, member, beneficiary or agent of any of them.

(7)     Notwithstanding any prior termination of this Agreement, the Custodian shall not acquiesce, petition or otherwise invoke or cause the MAV to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the MAV under any bankruptcy, insolvency or similar law or, appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the MAV or any substantial part of its property, or ordering the winding up or liquidation of the affairs of the MAV.

**Section 16    Loss of Permitted Custodian Status of the Custodian.**

(1)    During the term of this Agreement, in the event the Custodian ceases to be a Permitted Custodian, the Custodian shall forthwith notify the Dealer, the Collateral Agent, the MAV and the Rating Agency of such event.

(2)    Upon receiving notification that the Custodian has ceased to be a Permitted Custodian, the Controlling Party shall, with ten (10) Business Days prior written notice to the Rating Agency, and with the consent of the MAV, which is not to be unreasonably withheld, designate in writing a replacement custodian that satisfies the requirements for a Permitted Custodian (provided that if the Dealer is the Controlling Party at the relevant time, such replacement custodian is satisfactory to the Collateral Agent).  Such replacement custodian shall agree in writing to perform the duties of the Custodian under this Agreement and to become a party to this Agreement in place of the Custodian (or to enter into a substantially similar agreement that is reasonably satisfactory to the MAV, the Dealer and the Collateral Agent and subject to satisfaction of the Rating Agency Condition) and the relevant agreement entered into by the replacement custodian shall apply to the Collateral and any securities accounts opened by the replacement Custodian in connection with the Collateral, upon delivery of the Collateral to the replacement Custodian.  The Custodian shall deliver the Collateral to the replacement Custodian so designated by the Controlling Party in accordance with written instructions of the Controlling Party and upon such delivery, the delivering Custodian shall have no further obligations under this Agreement, except to the extent of any liability in respect of obligations arising prior to the date of such delivery.

**Section 17    Termination.**

(1)    Except as set out in Section 17(2) and Section 17(3) below, the obligations of the Custodian under this Agreement will continue in effect until the Dealer and the Collateral Agent jointly notify the Custodian, with a copy to the Rating Agency, of termination of this Agreement in writing, unless in accordance with Section 7(2) the Collateral Agent has become the Controlling Party with respect to the Securities Accounts, in which case the Collateral Agent acting alone may notify the Custodian, with a copy to the Rating Agency, of termination of this Agreement in writing.  The termination of this Agreement will not terminate any Securities Account unless specifically agreed by the Dealer and if different, the Controlling Party at the relevant time.

(2)    The Custodian shall not resign from its duties under this Agreement at any time unless the Custodian provides 60 days written notice to the Dealer, the Collateral Agent, the MAV and the Rating Agency.  Upon receipt of such

09-16709-mg   Doc 6-17   Filed 11/10/09   Entered 11/10/09 21:09:02   Appendix I to
Exhibit B (Part 1)   Pg 102 of 256
- 22 -

written notice, the Controlling Party shall, with ten (10) Business Days prior written notice to the Rating Agency, and with the consent of the MAV, which is not to be unreasonably withheld, designate in writing a replacement custodian that satisfies the requirements for a Permitted Custodian (provided that if the Dealer is the Controlling Party at the relevant time, such replacement custodian is satisfactory to the Collateral Agent).   Such replacement custodian shall agree in writing to perform the duties of the Custodian under this Agreement and to become a party to this Agreement in place of the Custodian (or to enter into a substantially similar agreement that is reasonably satisfactory to the MAV, the Dealer and the Collateral Agent and subject to the satisfaction of the Rating Agency Condition) and the relevant agreement entered into by the replacement custodian shall apply to the Collateral and any securities accounts opened by the replacement Custodian in connection with the Collateral, upon delivery of the Collateral to the replacement Custodian.  For greater certainty, no such resignation shall take effect until a replacement custodian is appointed in accordance with the terms of this Agreement. On or before the effective date of such resignation, the Custodian shall deliver the Collateral to the replacement custodian so designated by the Controlling Party in accordance with written instructions of the Controlling Party and upon such delivery, the resigning Custodian shall have no further obligations under this Agreement, except to the extent of any liability in respect of obligations arising prior to the date of such delivery.

(3)     The Custodian may be removed as custodian under this Agreement upon not less than ten (10) Business Days written notice from the Controlling Party, with a copy to the Rating Agency, following any breach by the Custodian of its obligations under this Agreement. Upon such written notice, the Controlling Party shall, with the consent of the MAV, which is not to be unreasonably withheld designate in writing a replacement custodian that satisfies the requirements for a Permitted Custodian (provided that if the Dealer is the Controlling Party at the relevant time, such replacement custodian is satisfactory to the Collateral Agent).  Such replacement custodian shall agree in writing to perform the duties of the Custodian under this Agreement and to become a party to this Agreement in place of the Custodian (or to enter into a substantially similar agreement that is reasonably satisfactory to the MAV, the Dealer and the Collateral Agent and subject to satisfaction of the Rating Agency Condition) and the relevant agreement entered into by the replacement custodian shall apply to the Collateral and any securities accounts opened by the replacement Custodian in connection with the Collateral, upon delivery of the Collateral to the replacement Custodian.  On or before the effective date of such removal, the Custodian shall deliver the Collateral to the replacement Custodian so

designated by the Controlling Party in accordance with written instructions of the Controlling Party, and upon such delivery, the removed Custodian shall have no further obligations under this Agreement, except to the extent of any liability in respect of obligations arising prior to the date of such delivery.

**Section 18   Governing Law.**

(1)   This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable in the Province of Ontario.

(2)   Each party to this Agreement irrevocably attorns and submits to the non-exclusive jurisdiction of the courts of the Province of Ontario situated in the City of Toronto, and waives objection to the venue of any proceeding in such court or that such court provides an inconvenient forum.

(3)   Each party to this Agreement irrevocably consents to the service of any and all process in any such action or proceeding by the delivery of copies of such process to them as provided in Section 23 of this Agreement.  Nothing in this Section 18 affects the right of the Collateral Agent or the Dealer to serve process in any manner permitted by law.

**Section 19   Conflict with Other Agreements.**

In the event of any conflict between the provisions of this Agreement and the provisions of the Omnibus Agreement which cannot be resolved by both provisions being complied with, the parties to this Agreement agree that the provisions contained in the Omnibus Agreement will prevail to the extent of such conflict, and the provisions of this Agreement shall be deemed to be amended to the extent necessary to eliminate such conflict and to exercise the intentions set out in the relevant provisions of the Omnibus Agreement, provided that in no event shall any such conflict be resolved in a manner which adversely affects the rights of the Custodian without the prior consent of the Custodian.  In the event of a conflict between this Agreement and any other agreement between any of the Collateral Agent, the Dealer, the Custodian and the MAV with respect to any Securities Account or the Collateral, whether now existing or later entered into, the terms of this Agreement will prevail.

**Section 20   Amendments.**

This Agreement may only be amended, supplemented or otherwise modified by written agreement executed by the Custodian, the Dealer, the Collateral Agent and the MAV, upon ten (10) Business Days prior written notice of the proposed amendment, supplement or other modification to the Rating Agency by the Collateral Agent.

**Section 21     Severability.**

If any term, provision, covenant or condition of this Agreement, or its application to any party or any circumstance, is held to be unenforceable, invalid or illegal (in whole or in part) for any reason in any relevant jurisdiction, the remaining terms, provisions, covenants and conditions of this Agreement, as modified by the deletion from this Agreement of such unenforceable, invalid or illegal portion, will continue in full force and effect, and such unenforceability, invalidity or illegality will not otherwise affect the remaining terms, provisions, covenants and conditions of this Agreement, so long as (i) this Agreement as so modified continues to express, without material change, the original intentions of the parties as to its subject matter, and (ii) the deletion of such portion of this Agreement will not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realisation of the benefits that would otherwise have been conferred upon the parties under this Agreement, it being agreed that the deletion of Section 18 would have such an effect.  The parties will endeavour in good faith negotiations to replace the unenforceable, invalid or illegal provision with a valid provision, the effect of which comes as close as possible to that of such deleted provision.

**Section 22     Successors and Assigns.**

This Agreement is binding upon and enures to the benefit of the parties and their respective successors and permitted assigns. Neither the MAV nor the Custodian may assign or transfer any of their respective rights or obligations under this Agreement without the prior written consent of the Dealer and the Collateral Agent and ten (10) Business Days prior written notice to the Rating Agency.  The Dealer and the Collateral Agent may assign or transfer their respective rights or obligations under this Agreement in accordance with the Omnibus Agreement (including, for greater certainty, with respect to the Collateral Agent, any successor Collateral Agent appointed in accordance with the Omnibus Agreement) and with ten (10) Business Days notice to the Rating Agency.

**Section 23     Notices.**

Unless expressly stated otherwise, the procedure for delivering and effectiveness of all communications and notices pursuant to this Agreement shall be governed by the following provisions:

(1)     all communications and notices pursuant to this Agreement shall be by fax or letter delivered by hand or by electronic mail.  Each such communication or notice shall be made to the relevant party at the fax number or address or electronic address and, in the case of a communication or notice by fax or letter, marked for the attention of, or (in the case of a communication by electronic mail) made to such person or department from time to time specified in writing by the recipient party to the others for such purpose.  The initial fax number, electronic mail address and person or department so

specified by each party and the Rating Agency are set out in Schedule "G"
Notice Details) to this Agreement.  All communications or notices delivered
verbally by telephone shall only be binding if followed immediately by a
confirmation in writing by fax, letter or electronic mail;

(2)   A communication or notice shall be deemed received (if by fax) when an
acknowledgement of receipt is received, (if by electronic mail) when made or
(if by letter) when delivered, in each case in the manner required by this
Section 23.  However, if a communication is received after business hours on
any Business Day or on a day which is not a Business Day in the place of
receipt, it shall be deemed to be received and become effective at the opening
of business on the next Business Day in the place of receipt.  Every
communication or notice shall be irrevocable save in respect of any manifest
error in it.

### Section 24     Counterparts.

This Agreement may be executed in any number of counterparts (including
counterparts by facsimile) and all such counterparts taken together shall be deemed
to constitute one and the same instrument.

### Section 25     Time of the Essence.

Time is of the essence of this Agreement.

### Section 26     Remedies Cumulative.

The right and remedies of the parties are cumulative and are in addition to,
and not in substitution for, any other rights and remedies available at law or in
equity or otherwise.  No single or partial exercise by a party of any right or remedy
precludes or otherwise affects the exercise of any other right or remedy to which
that party may be entitled.

**CIBC MELLON GLOBAL
SECURITIES SERVICES COMPANY,
in its capacity as issuer trustee of
MASTER ASSET VEHICLE [I]/[II]**

By: _____

Name:

Title:

By: _____

      Name:

      Title:


**[NAME OF DEALER]**

By: _____

      Name:

      Title:


**BNY    TRUST    COMPANY    OF
CANADA, as COLLATERAL AGENT**

By: _____

      Name:

      Title:


**BNY    TRUST    COMPANY    OF
CANADA, as CUSTODIAN**

By: _____

      Name:

      Title:

## SCHEDULE "A"

### Securities Accounts and Collateral

**[To be completed]**

## SCHEDULE "B"

### Wrapped Collateral

[To be completed]

# SCHEDULE "C"

## Collection Account for Income Distributions to the MAV

**[To be completed]**

## SCHEDULE "D"

### Collection Account for Income Distributions to the Dealer

**[To be completed]**

## SCHEDULE "E"

## Account Statement

**[To be completed]**

## SCHEDULE "F"

## Terminated Custodial Agreements

**[To be completed]**

## SCHEDULE "G"

### Notice Details

**[To be completed]**

    (i)     to the Dealer at:

**[insert Dealer's address]**

Attention:   ●
Telephone:  ●
Facsimile:   ●
E-mail:      ●

    (ii)    to the Collateral Agent at:

**[insert Collateral Agent's address]**

Attention:   ●
Telephone:  ●
Facsimile:   ●
E-mail:      ●

    (iii)   to the Custodian at:

**[insert Custodian's address]**

Attention:   ●
Telephone:  ●
Facsimile:   ●
E-mail:      ●

    (iv)   to the MAV at:

**[insert MAV's address at CIBC Mellon Global Securities Services Company, c/c Administrator] [NTD: Notice information to match that contained in the Omnibus Agreement.]**

Attention:   ●
Telephone:  ●
Facsimile:   ●
E-mail:

- 2 -

(v)    to the Rating Agency at:

**[insert DBRS's address]**

Attention:    ●
Telephone:    ●
Facsimile:    ●
E-mail:

**CIBC MELLON GLOBAL SECURITIES SERVICES COMPANY**
**in its capacity as issuer trustee of the**
**MASTER ASSET VEHICLE [I]/[II],**

**as MAV**


**and**


**UBS AG**
**as the Dealer**


**and**


**BNY TRUST COMPANY OF CANADA**
**as Collateral Agent**


**and**


**BNY TRUST COMPANY OF CANADA**

**as Custodian**

---

**CUSTODIAL AND CONTROL AGREEMENT**

**[Date]**

---

## CUSTODIAL AND CONTROL AGREEMENT

Custodial and control agreement dated as of **[date]** among CIBC Mellon Global Securities Services Company, in its capacity as issuer trustee of Master Asset Vehicle **[I]/[II]]** (in such capacity, the "**MAV**"), UBS AG **(**the "**Dealer**"), BNY Trust Company of Canada, in its capacity as Collateral Agent and BNY Trust Company of Canada, in its capacity as Custodian under this Agreement;

**RECITALS:**

(a)    The Collateral (as defined below) is at present held by the Custodian in the Securities Accounts (as defined below);

(b)    Pursuant to the Master Security Agreement (as defined below), the MAV has granted the Dealer a first priority security interest in the Collateral held in each of the Securities Accounts (the "**Dealer's Security Interest**") securing the payment and performance by the MAV of its obligations to the Dealer;

(c)    Pursuant to the Master Security Agreement and subject to the Dealer's Security Interest, the MAV has granted the Collateral Agent a security interest in substantially all of the property and assets of the MAV, including the Collateral (the "**Collateral Agent's Security Interest**" and, together with the Dealer's Security Interest, the "**Security Interests**") as security for the payment and performance of all obligations of the MAV to the Secured Creditors;

(d)    Pursuant to the Master Security Agreement, the Dealer's Security Interest in the Collateral has priority over the Collateral Agent's Security Interest in the Collateral;

(e)    It is intended that upon the occurrence of certain events the Collateral may cease to be subject to the Dealer's Security Interest but will at all times remain subject to the Collateral Agent's Security Interest; and

(f)    The parties are entering into this Agreement to perfect the Security Interests as required by the Master Security Agreement.

In consideration of the foregoing and other good and valuable consideration, the receipt and adequacy of which are acknowledged, the parties agree as follows.

**Section 1     Defined Terms.**

As used in this Agreement, the following terms have the following meanings:

5393458 v21

**"Account Property"** means, with respect to a Securities Account**,** all of the credit balances, securities, Cash, security entitlements, other financial assets and other items or property (or their value) standing to the credit from time to time of such Securities Account, and all other rights and benefits accruing to or arising in connection with such property and such Securities Account.

**"Administration Agreement"** means the Administration and Management Agreement dated [●] between the Administrator and the MAV, as amended, modified, restated, replaced or supplemented from time to time, together with any schedules, exhibits, supplements and attachments and all documents incorporated by reference.

"**Administrator**" means BlackRock (Institutional) Canada, Ltd. in its capacity as attorney-in-fact, administrator and asset manager to the MAV pursuant to the Administration Agreement, and its successors and permitted assigns in such capacity.

"**Agent**" means any person appointed by the Custodian to assist in providing services under this Agreement, other than a Sub-custodian, including agents, nominees and service providers,  and includes affiliates and subsidiaries of the Custodian, in each case appointed in accordance with the terms of this Agreement;

**"Agreement"** means this custodial and control agreement as it may be amended, modified, restated, replaced or supplemented from time to time.

"**Authorized Signatory**" means any person, whether or not an officer or employee of the Administrator, the Dealer or the Collateral Agent, duly authorized by the Administrator, the Dealer or the Collateral Agent, respectively, to give notices, entitlement orders or other instructions on behalf of the MAV, the Dealer or the Collateral Agent, respectively, such persons to be designated in a certificate which contains a specimen signature of each such person.

"**Bank of New York**" means The Bank of New York Mellon and its successors and assigns.

"**Bank of New York Downgrade Event**" means a withdrawal, suspension or reduction by a rating agency of a Bank of New York Rating.

"**Bank of New York Rating**" means any of the following ratings of Bank of New York:  (i) a short term senior unsecured debt rating by DBRS Limited of R-1(middle), (ii) a short term rating by S&P of 'A-1+'; (iii) a short term rating by Fitch of 'F1+', (iv) a short term rating by Moody's of 'P-1', (v) a long term senior unsecured debt rating by DBRS Limited of AA(low) (vi) a long term

unsecured debt rating by S&P of 'AA-', (vii) a long term unsecured debt rating by Fitch of 'AA-', and (viii) a long term unsecured debt rating by Moody's of 'Aa3'.

"**Business Day**" means a day on which commercial banks and foreign exchange markets are generally open to settle payments and are open for general business in the Cities of New York, New York, Toronto, Ontario, and London, United Kingdom.

"**Cash**" means Canadian Dollars and United States Dollars.

"**CIBC Mellon**" means CIBC Mellon Trust Company.

"**CIBC Mellon Downgrade Event**" means a withdrawal, suspension or reduction by a rating agency of any CIBC Mellon Rating.

"**CIBC Mellon Rating**" means any of the following ratings of CIBC Mellon: (a)(i) a bank financial strength rating of 'B-', and (ii) a long-term issuer rating of 'Aa2', in each case as provided by Moody's, and (b) any other rating issued by a rating agency on or following the date hereof as at the date of initial issuance.

"**Collateral**" means the Account Property in the Securities Accounts, which on the date of this Agreement consists of the Account Property described on Schedule "A", together with all replacements of and substitutions for and increases and additions to the Account Property, all certificates and instruments evidencing or representing any Account Property, all stock powers of attorney applicable to any Account Property and all money or other property payable or paid on account of any return or repayment of principal or capital in respect of the Account Property or distributed in respect of the Account Property.

"**Collateral Agent**" means BNY Trust Company of Canada in its capacity as collateral agent pursuant to the terms of the Omnibus Agreement or any successor to the trust and custody business thereof or any permitted assigns thereof in such capacity appointed pursuant to the Omnibus Agreement.

"**Collateral Agent's Notice of Exclusive Control**" means a written notice that the Collateral Agent is exercising exclusive control of the Securities Accounts and the Collateral.

"**Collateral Agent's Security Interest**" has the meaning specified in the recitals to this Agreement.

"**Controlling Party**" with respect to the Securities Accounts and the Collateral, means, (i) prior to the receipt by the Custodian of a Collateral Agent's Notice of Exclusive Control in accordance with Section 7(3) and after exclusive control reverts to the Dealer in accordance with Section 7(4), the Dealer alone; and (ii) upon receipt by the Custodian of a Collateral Agent's Notice of Exclusive Control and until exclusive control reverts to the Dealer in accordance with Section 7(4), the Collateral Agent alone.

"**Corporate Action**" means any conversion privileges, subscription rights, warrants, put and call options or other rights or options available in connection with any securities which form part of the Collateral, including those relating to the reorganization, recapitalization, takeover, consolidation, amalgamation, merger, liquidation, filing for or declaration of bankruptcy, plans of arrangement of any corporation or association;

"**Custodian**" means BNY Trust Company of Canada in its capacity as custodian of the Securities Accounts and the Collateral in accordance with this Agreement and its successors and permitted assigns in accordance with this Agreement in such capacity.

"**Dealer's Notice of Exclusive Control**" means a written notice that the Dealer is exercising exclusive control of the Securities Accounts and the Collateral.

"**Dealer's Security Interest**" has the meaning specified in the recitals to this Agreement.

"**Declaration of Trust**" means the declaration of trust dated ●, 2008 providing for the establishment by CIBC Mellon Global Securities Services Company, a company incorporated under the laws of the Province of Nova Scotia, of Master Asset Vehicle [I][II] as a trust under the laws of the Province of Ontario, as it may be amended, modified, restated, replaced or supplemented from time to time to the extent permitted thereby, and together with any schedules, exhibits, supplements and attachments and all documents incorporated by reference.

"**Depository**" means any authorized domestic or foreign depository or clearing or settlement agency or system, including a transnational book-based system, and shall include CDS Clearing and Depository Services Inc., Euroclear, The Depository Trust Company and the Treasury/Reserve Automated Debt Entry System maintained at The Federal Reserve Bank of New York for receiving and delivering securities, and their respective successors and assigns;

"**Eligible Institution**" means a financial institution (i) that has the Required Rating or (ii) whose obligations in favour of the MAV are covered by a guarantee or indemnity satisfactory to the Rating Agency provided by a financial institution or financial institutions that has or have the Required Rating, or in each case under clause (i) and (ii) above, as applicable, each such financial institution has otherwise been approved by the Rating Agency pursuant to the satisfaction of the Rating Agency Condition.  For purposes of this Agreement, CIBC Mellon shall be deemed to be an Eligible Institution until a CIBC Mellon Downgrade Event occurs, whereupon CIBC Mellon shall cease to be an Eligible Institution for purposes of this Agreement.

"**Eligible Deposit Account**" means a securities account with an Eligible Institution.  Any securities account with a financial institution that ceases to be an Eligible Institution for purposes of this Agreement pursuant to the definition thereof shall thereupon cease to be an Eligible Deposit Account for purposes of this Agreement and the provisions of Section 14(2) of this Agreement shall apply.

"**Income Distributions**" means with respect to Collateral, all interest and other payments and distributions of cash or other property with respect to such Collateral, other than on account of principal.

"**Indenture Trustee**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Issuer Trustee**" means CIBC Mellon Global Securities Services Company in its capacity as the issuer trustee of Master Asset Vehicle [I][II] under the Declaration of Trust or any successor to the trust or custodial business thereof serving in such capacity or permitted assign thereof in accordance with the terms of the Declaration of Trust.

"**Majority Secured Creditors**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Master Security Agreement**" means the master security agreement dated [●] by and among, *inter alios,* the MAV, certain swap counterparties of the MAV as Dealers and the Collateral Agent, as amended, modified, restated, replaced or supplemented from time to time and together with any schedules, exhibits, supplements and attachments and all documents incorporated by reference.

"**Notice of Exclusive Control**" means a Collateral Agent's Notice of Exclusive Control or a Dealer's Notice of Exclusive Control.

"**Omnibus Agreement**" means the omnibus agreement dated [●], 2008 by and among, *inter alios,* the MAV, certain swap counterparties of the MAV as Dealers and the Collateral Agent, as amended, modified, restated, replaced or supplemented from time to time, together with any schedules, exhibits, supplements and attachments and all documents incorporated by reference.

"**Permitted Custodian**" means an Eligible Institution that is authorized to provide custodial services.  For purposes of this Agreement, the Custodian shall be deemed to be a Permitted Custodian; provided that, upon occurrence of a Bank of New York Downgrade Event, the Custodian shall cease to be a Permitted Custodian for purposes of this Agreement and the provisions of Section 16 of this Agreement shall apply.

"**Rating Agency**" means DBRS Limited and any successor to its credit ratings business and any replacement credit rating agency that may be engaged by the MAV.

"**Rating Agency Condition**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Required Rating**" means (i) a short term senior unsecured debt rating by DBRS Limited of not less than R-1 (middle) and an equivalent rating by any one of the following rating agencies of (x) a short term rating by S&P of not less than 'A-1+'; (y) a short term rating by Fitch of not less than 'F1+'or (z) a short term rating by Moody's of not less than 'P-1', or (ii) if no short term senior unsecured debt rating is available, a long term senior unsecured debt rating by DBRS Limited of not less than AA(low) and an equivalent rating by any one of the following rating agencies of (A) a long term rating by S&P of not less than 'AA-'; (B) a long term rating by Fitch of not less than 'AA-'; or (C) a long term rating by Moody's of not less than 'Aa3'.

"**Secured Creditors**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Securities Accounts**" means the securities accounts established and maintained by or on behalf of the Custodian in the name of the MAV and in which the Collateral is from time to time held, identified on Schedule "A", any substitute or replacement securities accounts maintained by or on behalf of the Custodian for the MAV and any securities account maintained by or on behalf of the Custodian for the MAV into which property from any such securities account is transferred.

"**Securities Transfer Act**" means the *Securities Transfer Act, 2006* (Ontario), as that statute is now enacted or as the same may from time to time be amended, re-enacted or replaced and includes any regulation under that statute.

"**Security Interests**" has the meaning specified in the recitals to this Agreement.

"**Sub-custodian**" means a financial institution that is appointed by the Custodian in accordance with this Agreement to provide custodial services with respect to any of the Collateral and the related Securities Accounts.

"**Transaction Documents**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Wrapped Collateral**" means Collateral described in Schedule "B" and which has been deposited into a segregated Securities Account as noted on Schedule "B".

"**Wrap Swap**" has the meaning specified in Schedule A of the Omnibus Agreement.

## Section 2    Interpretation.

(1)    Terms defined in the Securities Transfer Act and used but not otherwise defined in this Agreement have the same meanings. For greater certainty, the terms "**entitlement order**", "**financial asset**", "**securities account**", "**securities intermediary**", "**securities intermediary's jurisdiction**", "**security**" and "**security entitlement**" have the meanings given to them in the Securities Transfer Act.

(2)    In this Agreement the words **"including"**, **"includes"** and **"include"** mean **"including (or includes or include) without limitation"**. The expression **"Section"** and any other subdivision followed by a number means and refers to the specified Section or other subdivision of this Agreement.

(3)    Words importing the singular number only include the plural and vice versa.

(4)    The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenient reference only and do not affect its interpretation.

(5)    The schedules attached to this Agreement form an integral part of it for all purposes of it.

**Section 3        Appointment of the Custodian.**

The Dealer, with the full and unqualified approval of the MAV and the Collateral Agent, hereby appoints the Custodian as custodian, and the Custodian hereby accepts its appointment and agrees to maintain and to operate each of the Securities Accounts and to deal with the Collateral in accordance with the terms of this Agreement.

**Section 4        The Issuer Trustee.**

The Issuer Trustee has established Master Asset Vehicle [I][II] pursuant to the Declaration of Trust and its liability under this Agreement is limited as provided in the Declaration of Trust.  The provisions regarding liability set out in subsections **[6.7(a), (b), (c) and (d)]** of the Declaration of Trust are hereby incorporated by reference in this Agreement.

**Section 5        The Administrator and the MAV.**

The MAV has authorized the Administrator to act as its attorney-in-fact in respect of all of its rights and obligations under this Agreement whether expressed as a right or an obligation of the MAV. Unless otherwise advised in writing by the MAV, the Custodian, the Collateral Agent and the Dealer may assume without enquiry that (i) the Administrator is acting on behalf of the MAV, and (ii) such action taken by the Administrator has been duly authorized and approved by all necessary action on the part of the Issuer Trustee pursuant to an effective delegation and such action will bind the Issuer Trustee and the MAV for all purposes hereof with the same effect as if undertaken by the MAV directly.  Until notified in writing by the Issuer Trustee of any change in the appointment of the Administrator as the administrator and attorney-in-fact of the MAV, the Custodian, the Collateral Agent and the Dealer shall be entitled to rely on the authority of the Administrator as the administrator and attorney-in-fact of the MAV.

**Section 6        The Collateral Agent.**

(1)        BNY Trust Company of Canada has been appointed as the Collateral Agent pursuant to Section 7.1(a)(i) of the Omnibus Agreement and its liability under this Agreement is limited as provided in the Omnibus Agreement.

(2)        The Collateral Agent is a party to this Agreement in its capacity as agent for the Secured Creditors and may act on its own pursuant to the authority it has in such capacity under the Omnibus Agreement and the Master Security Agreement, and shall act in accordance with any directions provided by the applicable Secured Creditors who at the time such directions are given constitute the Majority Secured Creditors (provided that for the purposes of this Agreement, the Dealer shall be deemed not to be an "LSS CDS Counterparty" for the "Majority Secured Creditors" definition).

(3)     BNY Trust Company of Canada has agreed to assume the obligations of the
Collateral Agent under this Agreement in its capacity as Collateral Agent as
appointed pursuant to the Omnibus Agreement.   BNY Trust Company of
Canada in such capacity expressly does not assume the responsibilities of any
other service provider in relation to this Agreement or any Transaction
Document, notwithstanding that it or an affiliate or related party may be
appointed in another capacity under such document.

**Section 7     Control of the Securities Accounts.**

(1)     Except as otherwise provided in this Agreement and until the Dealer or the
Collateral Agent has delivered a Notice of Exclusive Control to the
Custodian, the Custodian agrees to comply with entitlement orders and other
instructions originated by the MAV or the Administrator with respect to each
of the Securities Accounts and the Collateral, without any need for the further
consent of the Dealer, the Collateral Agent or any other person

(2)     If the Dealer delivers a Dealer's Notice of Exclusive Control to the Custodian
(with copies to the Collateral Agent, the MAV and the Administrator), the
Dealer shall have exclusive control over the Securities Accounts and the
Collateral and the Custodian agrees (i) to promptly cease complying with any
entitlement orders or other instructions originated by the MAV or the
Administrator relating to the Securities Accounts and the Collateral, and (ii)
to comply only with entitlement orders and other instructions originated by
the Dealer and not by any other person with respect to the Securities
Accounts and the Collateral, without any need for the further consent of the
MAV, the Administrator, the Collateral Agent or any other person, until the
Collateral Agent delivers a Collateral Agent's Notice of Exclusive Control to
the Custodian in accordance with Section 7(3) or the Dealer provides a notice
of cessation of exclusive control in accordance with Section 7(5)**.**

(3)     If at any time the Collateral Agent delivers a Collateral Agent's Notice of
Exclusive Control to the Custodian (with copies to the Dealer, the MAV and
the Administrator) the Collateral Agent shall have exclusive control over the
Securities Accounts and the Collateral and the Custodian agrees (i) to
promptly cease complying with any entitlement orders or other instructions
originated by the Dealer, the MAV or the Administrator relating to the
Securities Accounts and the Collateral, and (ii) to comply only with
entitlement orders and other instructions originated by the Collateral Agent
and not by any other person with respect to the Securities Accounts and the
Collateral, without any need for further consent of the Dealer, the MAV, the
Administrator or any other person, until the Collateral Agent provides a
notice giving exclusive control over the Collateral and the Securities Accounts
to the Dealer as the Controlling Party in accordance with Section 7(4).

(4)    If at any time while the Collateral Agent has control of the Securities Accounts and the Collateral, (a) it is determined by a court of competent jurisdiction that the Collateral Agent was not entitled to take exclusive control of the Collateral pursuant to the Transaction Documents, or (b) the Collateral Agent and the Dealer agree that the Collateral Agent was not entitled to take exclusive control of the Collateral pursuant to the Transaction Documents, the Collateral Agent shall in each such instance provide a written notice to the Custodian (with copies to the Dealer and the MAV) instructing the Custodian with effect from the date of such notice that the Dealer shall have exclusive control over the Collateral and the Securities Accounts as the Controlling Party in accordance with and subject to all the provisions of this Agreement.

(5)    At any time when a Controlling Party has delivered a Notice of Exclusive Control and has exclusive control of the Securities Accounts and the Collateral, the Controlling Party may deliver a written notice to the Custodian (with copies to the MAV, the Administrator and the Dealer or the Collateral Agent as applicable) that it has ceased to require exclusive control over the Securities Accounts and the Collateral. Upon the Custodian receiving such notice of cessation of exclusive control from the Controlling Pary: (i) the MAV and the Administrator will have those rights with respect to the Securities Accounts and Collateral that they had prior to the delivery of the relevant Notice of Exclusive Control, and (ii) until such time as it receives another Notice of Exclusive Control, the Custodian will act on entitlement orders and other instructions originated by the MAV or the Administrator with respect to the Securities Accounts and Collateral in accordance with Section 7(1).

(6)    If an entitlement order or other instruction originated by the MAV or by the Administrator pursuant to Section 7(1) conflicts with any entitlement order or other instruction originated by the applicable Controlling Party at any time, the Custodian will comply with the entitlement order or other instruction originated by such Controlling Party.

(7)    Each of the Collateral Agent and the Dealer shall provide a copy of any notice provided by it under this Section 7 to the Rating Agency promptly.

**Section 8    Instructions with Respect to Income Distributions.**

(1)    The parties to this Agreement agree and acknowledge that all Income Distributions received in the Securities Accounts, other than Income Distributions on Wrapped Collateral received in the Securities Accounts set out on Schedule "B", shall be transferred (i) as soon as practicable after receipt to the account set out on Schedule "C", and (ii) without duplication,

on the effective date of termination of this Agreement. The MAV, the Dealer and the Collateral Agent hereby instruct the Custodian to complete such transfers. Notwithstanding any other provision of this Agreement to the contrary, the parties to this Agreement agree that such instructions may not be altered except with ten (10) days prior written notice to the Rating Agency and by joint written instructions from the MAV, the Dealer and the Collateral Agent to the Custodian, while the Dealer is the Controlling Party, and by joint written instructions from the MAV and the Collateral Agent to the Custodian, while the Collateral Agent is the Controlling Party.

(2)     The parties to this Agreement agree and acknowledge that all Income Distributions on Wrapped Collateral received in the Securities Accounts, as set out on Schedule "B", shall be transferred (i) as soon as practicable after receipt to the account set out on Schedule "D" and (ii) without duplication, on the effective date of termination of this Agreement. The MAV, the Dealer and the Collateral Agent hereby instruct the Custodian to complete such transfers. Notwithstanding any other provision of this Agreement to the contrary, the parties to this Agreement agree that such instructions may not be altered except by joint written instructions from the MAV, the Dealer and the Collateral Agent to the Custodian, while the Dealer is the Controlling Party, and by joint written instructions from the MAV and the Collateral Agent to the Custodian, while the Collateral Agent is the Controlling Party. The Dealer agrees to cooperate to provide any such joint instructions upon the termination of the relevant Wrap Swap applicable to the Wrapped Collateral.

(3)     The Collateral Agent shall provide a copy of any joint notice provided under Section 8(2) to the Rating Agency promptly.

**Section 9     The Securities Accounts.**

(1)     At the date of this Agreement the Securities Accounts are the securities accounts identified in Schedule "A". The Custodian and the MAV will notify the Dealer and the Collateral Agent of any change in the Securities Accounts or the information on such schedule.

(2)     The parties agree that each Securities Account is a securities account, each item of Collateral credited to each of the Securities Accounts is a financial asset for purposes of the Securities Transfer Act and any other similar law applicable in any other relevant jurisdiction and each other right of the MAV, the Dealer and the Collateral Agent against the Custodian arising out of the Securities Accounts is a financial asset.

(3)     The Custodian acknowledges and agrees that for purposes of the Securities Transfer Act and any other similar law applicable in any other relevant

jurisdiction, the Custodian is the securities intermediary for the Securities Accounts and that Ontario is the securities intermediary's jurisdiction for each of the Securities Accounts and each agreement between the MAV and the Custodian with respect to a Securities Account is hereby amended to include this provision.

(4)     To the extent it is within the control of the Custodian, the Custodian will ensure that all certificated securities or other financial assets represented by a certificate held in the Securities Accounts are either (i) in bearer form, or (ii) in registered form in a freely negotiable form and are not registered in the name of the MAV, payable to the order of the MAV or specially endorsed to the MAV by an effective endorsement.

(5)     To the extent it is within the control of the Custodian, the Custodian will ensure that all uncertificated securities or other financial assets that are not represented by a certificate (other than instruments) held in the Securities Accounts are not registered in the name of the MAV or an agent for the MAV (other than the Custodian) in the register of the issuer.

(6)     To the extent it is within the control of the Custodian, the Custodian will ensure that all instruments held in the Securities Accounts are either (i) specially endorsed by an effective endorsement to the Custodian or in blank, or (ii) in the form of a transferable credit, delivered to the Custodian with the relevant transfer document completed in favour of the Custodian, or (iii) for credits that are not in transferable form, delivered to the Custodian with the relevant assignment of proceeds document completed in favour of the Custodian.

(7)     The Custodian will not enter into any agreement with any other person relating to the Securities Accounts and/or any financial assets in any of them under which it agrees to comply with entitlement orders made by such other person.

(8)     The Custodian will notify the Collateral Agent, the Dealer, the MAV and the Rating Agency promptly if any other person claims that it has a property interest in any of the Collateral.

(9)     The Custodian agrees that it will not advance any margin or any other credit to the MAV or lend, pledge or hypothecate the Securities Accounts or any Collateral in the Securities Accounts and it will not permit any financial institution at which it maintains any Securities Account to advance any margin or any other credit or lend, pledge or hypothecate the Securities Accounts or any Collateral in any such Securities Accounts.

(10)    The Custodian agrees that it will not dispose of any Collateral in the Securities Accounts (other than pursuant to instructions given to it in accordance with this Agreement) and will not permit any financial institutions at which it maintains any Securities Account to dispose of any Collateral in any such Securities Account.

**Section 10    Representations and Warranties of the Custodian.**

The Custodian represents and warrants that:

(1)    the Custodian is a corporation duly incorporated, organized and subsisting under its governing statute, with the power, authority and right to enter into and deliver this Agreement and perform its obligations under this Agreement;

(2)    on the date of this Agreement, the Custodian is a Permitted Custodian;

(3)    this Agreement constitutes a valid and binding agreement of the Custodian, enforceable against the Custodian in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and other laws of general application limiting the enforcement of creditors' rights generally and to the fact that specific performance is an equitable remedy available only in the discretion of the court;

(4)    the Custodian has established and maintains the Securities Accounts described in Schedule "A" and each of the Securities Accounts is a segregated account in the name of Master Asset Vehicle [I][II]and shall be maintained as a segregated account in the name of Master Asset Vehicle [I][II];

(5)    no Securities Account is or will be a margin account and the Custodian has not advanced any margin or any other credit to the MAV and has not pledged or hypothecated any financial assets in any of the Securities Accounts;

(6)    Schedule "E" contains the most recent statements produced by the Custodian in the ordinary course of its business regarding the Collateral in each of the Securities Accounts at the statements' date.  The Custodian does not know of any inaccuracy in the statements;

(7)    there is no entitlement order or any other right of any person binding upon or which at any time in the future may become binding upon the Custodian to sell, transfer, or in any other way dispose of or encumber any of the Collateral other than under the terms of this Agreement;

(8)     the Custodian does not know of any lien on, claim to or interest in any Securities Account or the Collateral, except for the claims and interests of the Dealer, the Collateral Agent and the MAV; and

(9)     other than the agreements set out on Schedule "F" to this Agreement that have been terminated and replaced by this Agreement, there are no other agreements that the Custodian has entered into with any party relating to the Securities Accounts or any financial assets in any of them.  The Custodian has not entered into any agreement with any other person relating to the Securities Accounts and/or any financial assets in any of them under which it has agreed or will agree to comply with entitlement orders made by such other person.

**Section 11     Representations and Warranties of the MAV.**

The MAV represents and warrants that:

(1)     it has no margin loans outstanding in any of the Securities Accounts as of the date of this Agreement, and it will not request the Custodian to extend any new credit to the MAV secured by any of the Securities Accounts or any of the Collateral;

(2)     the MAV does not know of any lien on, claim to or interest in any of the Securities Accounts or the Collateral, except for the claims and interests of the Dealer, the Collateral Agent or the MAV; and

(3)     other than the agreements set out on Schedule "F" to this Agreement that have been terminated and replaced by this Agreement, there are no other agreements that the MAV has entered into relating to the Securities Accounts or any financial assets in any of them.

**Section 12     Priority of Security Interests.**

The Custodian acknowledges the Security Interests granted to the Dealer and to the Collateral Agent in the Collateral held in the Securities Accounts.  The Custodian waives any security interest, lien, encumbrance, claim or right of set-off it may have, now or in the future, whether by agreement, operation of law or otherwise, against the Securities Accounts and the Collateral held in each Securities Account.

**Section 13     Acknowledgements.**

(1)     The Custodian acknowledges that the MAV is the entitlement holder with respect to the Securities Account.

(2)     Each of the other parties acknowledges and agrees that the Custodian is entitled to rely on the accuracy of the recitals to this Agreement.

(3)     Each of the other parties acknowledges and agrees that the Custodian is not a guarantor of the MAV and shall not be held responsible for any decline in the market value of the Collateral in each Securities Account and has no obligation to notify any other party of any such decline or, except as set out in this Agreement, to take any action with regard to the Collateral in each Securities Account.

**Section 14    Custodian's Duties and Responsibilities.**

(1)     The Custodian agrees that it shall only delegate any of its duties with respect to any of the Collateral or the Securities Accounts to Sub-custodians that satisfy the requirements for a Permitted Custodian.    The Custodian shall require any Sub-Custodian appointed in accordance with this Section 14(1) to notify the Custodian if such Sub-custodian no longer satisfies the requirements for a Permitted Custodian, and upon such notification, or when the Custodian otherwise becomes aware of any such Sub-custodian ceasing to satisfy the requirements for a Permitted Custodian, the Custodian shall promptly replace such Sub-custodian with a replacement Sub-custodian that satisfies the requirements for a permitted Custodian, and the Custodian shall promptly cause any Collateral held at any such Sub-Custodian to be transferred to the replacement Sub-Custodian appointed in accordance with this Section 14(1).    For the avoidance of doubt, if any other party to this Agreement is entitled to provide (or permit another party to provide) instructions to the Custodian explicitly instructing the Custodian to retain a Sub-custodian, each such party to this Agreement agrees that it shall only provide (or permit another party to provide) instructions to retain a Sub-custodian if the designated Sub-custodian satisfies the requirements for a Permitted Custodian.

(2)     The Custodian agrees that all Collateral shall be held in Securities Accounts that are Eligible Deposit Accounts at all times.    If a Securities Account is no longer an Eligible Deposit Account, subject to Section 16 of this Agreement, the Custodian shall promptly notify the Rating Agency and promptly cause any Collateral held in any such account to be transferred to a Securities Account that is an Eligible Deposit Account.

(3)     The Custodian shall ensure that the Collateral in each of the Securities Accounts is at all times kept segregated in the books and records of the Custodian from any property and assets of the Custodian and any other person;

(4)     The Custodian shall maintain in current electronic form, records and files related to the Collateral.    The Custodian shall provide the Administrator and the Dealer with daily twenty-four (24) hour read-only access to all electronic

records and files relating to the Collateral and transactions in the Securities Accounts through an electronic information delivery system, subject to maintenance requirements and to interruptions in the information delivery system, or in power supply, or any other event or factor beyond the reasonable control of the Custodian;

(5)    The Custodian agrees that it shall:

(i)    make notations on its records and files related to the Collateral, provided that the Custodian currently offers this service to its clients, indicating that the MAV is the beneficial owner of the Collateral and that the Collateral is subject to the Security Interests, and the Custodian shall require that any Sub-custodian holding any Collateral on behalf of the Custodian (where permitted in accordance with the terms of this Agreement) shall acknowledge that the MAV is the beneficial owner of the Collateral and that the Collateral is subject to the Security Interests; and

(ii)    advise any person who makes inquiries regarding the possession or control by the Custodian of the Collateral that the Custodian is in possession of the Collateral as custodian of the MAV and the Dealer or other Controlling Party at the relevant time, that the MAV is the beneficial owner of the Collateral and that the Custodian has no beneficial ownership interest in the Collateral;

(6)    At any reasonable time, and subject to any reasonable requirements the Custodian may impose, the Custodian shall make the Collateral, together with the Custodian's related records and files, available to (i) the MAV, (ii) the Dealer, while it is the Controlling Party, (iii) the Collateral Agent, and (iv) the Rating Agency, and each of their respective representatives at the relevant time for examination and audit;

(7)    The Custodian will send copies of all statements and confirmations concerning the Securities Accounts and the Collateral or make electronic copies available promptly to the MAV, the Dealer and the Collateral Agent. The MAV consents to the release and disclosure of such information to the Dealer and the Collateral Agent.

(8)    The Custodian will promptly notify the MAV, the Dealer and the Collateral Agent and the Rating Agency if any other person asserts any lien, encumbrance or other claim against any of the Securities Accounts or the

Collateral and promptly notify the MAV, the Dealer and the Collateral Agent of any loss, destruction of or damage to any of the Collateral.

(9)    Subject to Section 14(2), the Custodian will not change the name or the account number of any of the Securities Accounts without the prior written consent of the MAV and the Controlling Party at the relevant time and ten (10) Business Days prior written notice to the Collateral Agent (if it is not the Controlling Party at the time) and the Rating Agency.

(10)    The Custodian shall not accept any entitlement orders or other instructions regarding, and not otherwise deal with, any of the Securities Accounts or the Collateral other than in accordance with the terms and conditions of this Agreement.

(11)    If the Custodian selects or uses Agents or Sub-custodians it shall be liable for the actions or failure to act of any such Agents or Sub-custodians in respect of the Collateral and/or the Securities Accounts in accordance with the terms of this Agreement, provided that the Custodian shall not be liable for any losses or damages arising as a result of the insolvency of any Sub-custodian except to the extent of the Custodian's negligence in its selection or retention of any such Sub-custodian, and in no event shall the Custodian be liable for the action or failure to act of any Sub-custodian, or for the insolvency of any Sub-custodian, which it has been explicitly instructed to retain by a party entitled to give such instructions in accordance with Section 7 of this Agreement.  In no event shall a Depository be deemed to be an Agent or Sub-custodian of the Custodian.

(12)    If any losses or damages arise as a result of the action or failure to act of any Sub-custodian which the Custodian has been explicitly instructed to retain by the Dealer, then the Dealer shall indemnify the MAV against all direct losses attributable to the action or failure to act of any Sub-custodian which it explicitly instructed the Custodian to retain, provided that the Dealer shall not be liable for any losses or damages arising as a result of the insolvency of any such Sub-custodian except to the extent of the Dealer's negligence in its selection or retention of any such Sub-custodian, and the Dealer shall pay such amounts directly to the Custodian on behalf of the MAV to be deposited in the appropriate Securities Account.  For greater certainty, the Dealer shall only indemnify such direct losses and shall not have any responsibility or liability whatsoever for any indirect, consequential or other losses attributable to the action or failure to act of any Sub-custodian which it explicitly instructed the Custodian to retain.    The Dealer shall not have any responsibility or liability whatsoever for any direct, indirect, consequential or other losses attributable to the action or failure to act of any Sub-custodian which the MAV, the Administrator, the Collateral Agent or any other person

explicitly instructed the Custodian to retain, and any such losses or damages shall be the responsibility of the MAV.

(13)    The Custodian shall notify the Dealer, the MAV and the Collateral Agent of notices received from an issuer or the relevant Depository with respect to any Corporate Actions and any similar rights or discretionary actions with respect to Securities or other contracts or instruments held in the Securities Accounts and the date or dates by which such rights must be exercised or such action must be taken. Absent actual receipt of such notice, the Custodian shall have no liability for failing to so notify the Dealer, the MAV and the Collateral Agent.  The Custodian must receive written instructions from (i) the MAV, prior to the applicable Controlling Party taking exclusive control of the Collateral and the Securities Accounts, or (ii) the applicable Controlling Party, when either the Dealer or the Collateral Agent takes exclusive control of the Collateral and the Securities Accounts, at least two (2) Business Days prior to the last scheduled date specified for action in a notice of Corporate Actions or notice of similar rights or discretionary actions, in order to take any action relating to, or to exercise any rights with respect to, any Corporate Actions or any similar rights or discretionary actions.

(14)    The Custodian shall send to the MAV, the Dealer and the Collateral Agent any documents (including proxies, proxy statements, annual reports, solicitations and other communications relating to the Securities which relate to voting) received by the Custodian relating to the exercise of voting rights. All voting rights with respect to Securities held in the Securities Accounts, however registered, shall be exercised pursuant to written instructions of (i) the MAV, prior to the applicable Controlling Party taking exclusive control of the Collateral and the Securities Accounts, or (ii) the applicable Controlling Party, when either the Dealer or the Collateral Agent takes exclusive control of the Collateral and the Securities Accounts.  In the event that no instructions are received in time to be implemented, the Custodian will take no action and if a default option exists, the Custodian shall be deemed to have been provided with instructions to accept the default option.

## Section 15    Rights of the Custodian.

(1)    The Custodian is entitled to rely upon (i) any Collateral Agent's Notice of Exclusive Control that it believes in good faith to be originated by the Collateral Agent, (ii) any Dealer's Notice of Exclusive Control or notice of cessation of control that it believes in good faith to be originated by the Dealer, and (iii) any entitlement order, notice or other instruction that it believes in good faith to be originated by the MAV or the Administrator in accordance with Section 7(1) or Section 8 or by the Controlling Party, with respect to the Collateral and each Securities Account.  Provided that if the

Custodian requests that the Administrator, the Collateral Agent or the Dealer furnish a certificate designating Authorized Signatories, the Custodian shall be deemed to act in good faith and shall be fully protected in acting upon the notices, entitlement orders or other instructions of such Authorized Signatories on behalf of the MAV, the Administrator, the Collateral Agent or the Dealer respectively, as designated on such certificate or replacement certificate.

(2)    The Custodian has no obligation to (i) determine whether or not the rights of the Dealer or the Collateral Agent under the Master Security Agreement are enforceable, or (ii) investigate or determine whether or not the Collateral Agent in the case of a Collateral Agent's Notice of Exclusive Control or the Dealer in the case of a Dealer's Notice of Exclusive Control, or the Controlling Party at the relevant time, with respect to each Securities Account, is entitled to give any entitlement order, notice or other instruction, or (iii) determine whether an event of default exists under any agreement between any of the MAV, the Dealer and the Collateral Agent, or (iv) determine if any entitlement orders and other instructions of the MAV or the Administrator (authorised in accordance with this Agreement) are provided strictly in accordance with the provisions of the Administration Agreement or the Omnibus Agreement or any other appropriate Transaction Document (except this Agreement).

(3)    Subject to Section 7(4) of this Agreement, the Custodian will not be liable to the Dealer for complying with a Collateral Agent's Notice of Exclusive Control in accordance with Section 7(3) of this Agreement.

(4)    Subject to Section 7(2), Section 7(3) and Section 7(6), the Custodian will not be liable to the Controlling Party for complying with entitlement orders and other instructions originated by the MAV or the Administrator in accordance with Section 7(1) or Section 7(5) of this Agreement.

(5)    The Dealer will pay the usual and customary fees and expenses and other charges payable on each Securities Account and shall indemnify and hold harmless the Custodian, its officers, directors, employees, and agents against all claims, liabilities, and expenses arising out of this Agreement (including reasonable legal fees and disbursements), except to the extent the claims, liabilities, or expenses arise from or are in connection with dishonesty, bad faith, gross negligence, wilful misconduct or reckless disregard of a right, duty or obligation by the Custodian. The MAV shall not have any liability for the payment of fees and expenses and other charges payable on each Securities Account pursuant to the respective account agreements for each Securities Account. This Section 15(5) will survive the termination of this Agreement. For greater certainty, the Dealer agrees and acknowledges that

its indemnity obligations contained in this Section 15(5) shall survive any removal of the Dealer as the Controlling Party, pursuant to the provisions of this Agreement, and that such indemnity obligations shall continue in full force and effect after such removal, in accordance with their terms.

(6)    The Custodian shall not have recourse to the Collateral and the Securities Accounts.  None of the MAV, the Dealer and the Collateral Agent shall be obliged or required to take any further steps against the Custodian beyond the requirements of this Agreement to recover any sums in respect of the Collateral and the Securities Account.  The obligations of the Dealer under Section 15(5) of this Agreement are solely the obligations of the Dealer.  No recourse for the payment of any obligation of the Dealer shall be had against the Collateral and the Securities Account, or the MAV,  the Collateral Agent, the Issuer Trustee, the Administrator or any incorporator, affiliate, shareholder, director, officer, representative, employee, manager, member, beneficiary or agent of any of them.

(7)    Notwithstanding any prior termination of this Agreement, the Custodian shall not acquiesce, petition or otherwise invoke or cause the MAV to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the MAV under any bankruptcy, insolvency or similar law or, appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the MAV or any substantial part of its property, or ordering the winding up or liquidation of the affairs of the MAV.

## Section 16    Loss of Permitted Custodian Status of the Custodian.

(1)    During the term of this Agreement, in the event the Custodian ceases to be a Permitted Custodian, the Custodian shall forthwith notify the Dealer, the Collateral Agent, the MAV and the Rating Agency of such event.

(2)    Upon receiving notification that the Custodian has ceased to be a Permitted Custodian, the Controlling Party shall, with ten (10) Business Days prior written notice to the Rating Agency and with the consent of the MAV, which is not to be unreasonably withheld, designate in writing a replacement custodian that satisfies the requirements for a Permitted Custodian (provided that if the Dealer is the Controlling Party at the relevant time, such replacement custodian is satisfactory to the Collateral Agent).  Such replacement custodian shall agree in writing to perform the duties of the Custodian under this Agreement and to become a party to this Agreement in place of the Custodian (or to enter into a substantially similar agreement that is reasonably satisfactory to the MAV, the Dealer and the Collateral Agent and subject to satisfaction of the Rating Agency Condition) and the relevant

agreement entered into by the replacement custodian shall apply to the Collateral and any securities accounts opened by the replacement Custodian in connection with the Collateral, upon delivery of the Collateral to the replacement Custodian.   The Custodian shall deliver the Collateral to the replacement Custodian so designated by the Controlling Party in accordance with written instructions of the Controlling Party and upon such delivery, the delivering Custodian shall have no further obligations under this Agreement, except to the extent of any liability in respect of obligations arising prior to the date of such delivery.

## Section 17    Termination.

(1)     Except as set out in Section 17(2) and Section 17(3) below, the obligations of the Custodian under this Agreement will continue in effect until the Dealer and the Collateral Agent jointly notify the Custodian, with a copy to the Rating Agency, of termination of this Agreement in writing, unless in accordance with Section 7(4) the Collateral Agent has become the Controlling Party with respect to the Securities Accounts, in which case the Collateral Agent acting alone may notify the Custodian, with a copy to the Rating Agency, of termination of this Agreement in writing.  The termination of this Agreement will not terminate any Securities Account unless specifically agreed by the Dealer and if different, the Controlling Party at the relevant time.

(2)     The Custodian shall not resign from its duties under this Agreement at any time unless the Custodian provides 60 days written notice to the Dealer, the Collateral Agent, the MAV and the Rating Agency.  Upon receipt of such written notice, the Controlling Party shall, with ten (10) Business Days prior written notice to the Rating Agency and with the consent of the MAV, which is not to be unreasonably withheld, designate in writing a replacement custodian that satisfies the requirements for a Permitted Custodian (provided that if the Dealer is the Controlling Party at the relevant time, such replacement custodian is satisfactory to the Collateral Agent).   Such replacement custodian shall agree in writing to perform the duties of the Custodian under this Agreement and to become a party to this Agreement in place of the Custodian (or to enter into a substantially similar agreement that is reasonably satisfactory to the MAV, the Dealer and the Collateral Agent and subject to satisfaction of the Rating Agency Condition) and the relevant agreement entered into by the replacement custodian shall apply to the Collateral and any securities accounts opened by the replacement Custodian in connection with the Collateral, upon delivery of the Collateral to the replacement Custodian.  For greater certainty, no such resignation shall take effect until a replacement custodian is appointed in accordance with the terms of this Agreement. On or before the effective date of such resignation,

the Custodian shall deliver the Collateral to the replacement custodian so designated by the Controlling Party in accordance with written instructions of the Controlling Party and upon such delivery, the resigning Custodian shall have no further obligations under this Agreement, except to the extent of any liability in respect of obligations arising prior to the date of such delivery.

(3)     The Custodian may be removed as custodian under this Agreement upon not less than ten (10) Business Days written notice from the Controlling Party, with a copy to the Rating Agency, following any breach by the Custodian of its obligations under this Agreement. Upon such written notice, the Controlling Party shall, with the consent of the MAV, which is not to be unreasonably withheld, designate in writing a replacement custodian that satisfies the requirements for a Permitted Custodian (provided that if the Dealer is the Controlling Party at the relevant time, such replacement custodian is satisfactory to the Collateral Agent).  Such replacement custodian shall agree in writing to perform the duties of the Custodian under this Agreement and to become a party to this Agreement in place of the Custodian (or to enter into a substantially similar agreement that is reasonably satisfactory to the MAV, the Dealer and the Collateral Agent and subject to satisfaction of the Rating Agency Condition) and the relevant agreement entered into by the replacement custodian shall apply to the Collateral and any securities accounts opened by the replacement Custodian in connection with the Collateral, upon delivery of the Collateral to the replacement Custodian. On or before the effective date of such removal, the Custodian shall deliver the Collateral to the replacement Custodian so designated by the Controlling Party in accordance with written instructions of the Controlling Party and upon such delivery, the removed Custodian shall have no further obligations under this Agreement, except to the extent of any liability in respect of obligations arising prior to the date of such delivery.

## Section 18    Governing Law.

(1)     This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable in the Province of Ontario.

(2)     Each party to this Agreement irrevocably attorns and submits to the non-exclusive jurisdiction of the courts of the Province of Ontario situated in the City of Toronto, and waives objection to the venue of any proceeding in such court or that such court provides an inconvenient forum.

(3)    Each party to this Agreement irrevocably consents to the service of any and all process in any such action or proceeding by the delivery of copies of such process to them as provided in Section 23 of this Agreement. Nothing in this Section 18 affects the right of the Collateral Agent or the Dealer to serve process in any manner permitted by law.

## Section 19    Conflict with Other Agreements.

In the event of any conflict between the provisions of this Agreement and the provisions of the Omnibus Agreement which cannot be resolved by both provisions being complied with, the parties to this Agreement agree that the provisions contained in the Omnibus Agreement will prevail to the extent of such conflict, and the provisions of this Agreement shall be deemed to be amended to the extent necessary to eliminate such conflict and to exercise the intentions set out in the relevant provisions of the Omnibus Agreement, provided that in no event shall any such conflict be resolved in a manner which adversely affects the rights of the Custodian without the prior consent of the Custodian. In the event of a conflict between this Agreement and any other agreement between any of the Collateral Agent, the Dealer, the Custodian and the MAV with respect to any Securities Account or the Collateral, whether now existing or later entered into, the terms of this Agreement will prevail.

## Section 20    Amendments.

This Agreement may only be amended, supplemented or otherwise modified by written agreement executed by the Custodian, the Dealer, the Collateral Agent and the MAV, upon ten (10) Business Days prior written notice of the proposed amendment, supplement or other modification to the Rating Agency by the Collateral Agent.

## Section 21    Severability.

If any term, provision, covenant or condition of this Agreement, or its application to any party or any circumstance, is held to be unenforceable, invalid or illegal (in whole or in part) for any reason in any relevant jurisdiction, the remaining terms, provisions, covenants and conditions of this Agreement, as modified by the deletion from this Agreement of such unenforceable, invalid or illegal portion, will continue in full force and effect, and such unenforceability, invalidity or illegality will not otherwise affect the remaining terms, provisions, covenants and conditions of this Agreement, so long as (i) this Agreement as so modified continues to express, without material change, the original intentions of the parties as to its subject matter, and (ii) the deletion of such portion of this Agreement will not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realisation of the benefits that would otherwise have been conferred upon the parties under this Agreement, it being agreed that the deletion of Section 18 would have such an effect. The parties will endeavour in good faith negotiations to replace

the unenforceable, invalid or illegal provision with a valid provision, the effect of which comes as close as possible to that of such deleted provision.

## Section 22    Successors and Assigns.

This Agreement is binding upon and enures to the benefit of the parties and their respective successors and permitted assigns. Neither the MAV nor the Custodian may assign or transfer any of their respective rights or obligations under this Agreement without the prior written consent of the Dealer and the Collateral Agent and ten (10) Business Days prior written notice to the Rating Agency. The Dealer and the Collateral Agent may assign or transfer their respective rights or obligations under this Agreement in accordance with the Omnibus Agreement (including, for greater certainty, with respect to the Collateral Agent, any successor Collateral Agent appointed in accordance with the Omnibus Agreement) and with ten (10) Business Days notice to the Rating Agency.

## Section 23    Notices.

Unless expressly stated otherwise, the procedure for delivering and effectiveness of all communications and notices pursuant to this Agreement shall be governed by the following provisions:

(1)    all communications and notices pursuant to this Agreement shall be by fax or letter delivered by hand or by electronic mail. Each such communication or notice shall be made to the relevant party at the fax number or address or electronic address and, in the case of a communication or notice by fax or letter, marked for the attention of, or (in the case of a communication by electronic mail) made to such person or department from time to time specified in writing by the recipient party to the others for such purpose. The initial fax number, electronic mail address and person or department so specified by each party and the Rating Agency are set out in Schedule "G" (Notice Details) of this Agreement. All communications or notices delivered verbally by telephone shall only be binding if followed immediately by a confirmation in writing by fax, letter or electronic mail;

(2)    A communication or notice shall be deemed received (if by fax) when an acknowledgement of receipt is received, (if by electronic mail) when made or (if by letter) when delivered, in each case in the manner required by this Section 23. However, if a communication is received after business hours on any Business Day or on a day which is not a Business Day in the place of receipt, it shall be deemed to be received and become effective at the opening of business on the next Business Day in the place of receipt. Every communication or notice shall be irrevocable save in respect of any manifest error in it.

**Section 24    Counterparts.**

This Agreement may be executed in any number of counterparts (including counterparts by facsimile) and all such counterparts taken together shall be deemed to constitute one and the same instrument.

**Section 25    Time of the Essence.**

Time is of the essence of this Agreement.

**Section 26    Remedies Cumulative.**

The right and remedies of the parties are cumulative and are in addition to, and not in substitution for, any other rights and remedies available at law or in equity or otherwise.  No single or partial exercise by a party of any right or remedy precludes or otherwise affects the exercise of any other right or remedy to which that party may be entitled.

**CIBC MELLON GLOBAL
SECURITIES SERVICES COMPANY,
in its capacity as issuer trustee of
MASTER ASSET VEHICLE [I]/[II]**

By: _____

    Name:

    Title:

**[NAME OF DEALER]**

By: _____

    Name:

    Title:

**BNY    TRUST    COMPANY    OF
CANADA, as COLLATERAL AGENT**

By: _____

    Name:

    Title:

- 26 -

**BNY    TRUST    COMPANY    OF
CANADA, as CUSTODIAN**

By: _____

    Name:

    Title:

## SCHEDULE "A"

## Securities Accounts and Collateral

**[To be completed]**

## SCHEDULE "B"

## Wrapped Collateral

**[To be completed]**

## SCHEDULE "C"

### Collection Account for Income Distributions to the MAV

**[To be completed]**

# SCHEDULE "D"

## Collection Account for Income Distributions to the Dealer

**[To be completed]**

# SCHEDULE "E"

## Account Statement

**[To be completed]**

## SCHEDULE "F"

## Terminated Custodial Agreements

**[To be completed]**

## SCHEDULE "G"

### Notice Details

**[To be completed]**

    (i)     to the Dealer at:

**[insert Dealer's address]**

Attention:    ● 
Telephone:    ● 
Facsimile:    ● 
E-mail:    ●

    (ii)    to the Collateral Agent at:

**[insert Collateral Agent's address]**

Attention:    ● 
Telephone:    ● 
Facsimile:    ● 
E-mail:    ●

    (iii)   to the Custodian at:

**[insert Custodian's address]**

Attention:    ● 
Telephone:    ● 
Facsimile:    ● 
E-mail:    ●

    (iv)   to the MAV at:

**[insert MAV's address at CIBC Mellon Global Securities Services Company, c/c Administrator] [NTD: Notice information to match that contained in the Omnibus Agreement.]**

Attention:    ● 
Telephone:    ● 
Facsimile:    ● 
E-mail:    ●

- 2 -

(v)      to the Rating Agency at:

**[insert DBRS's address]**

Attention:    ●
Telephone:    ●
Facsimile:    ●
E-mail:       ●

**CIBC MELLON GLOBAL SECURITIES SERVICES COMPANY**
**in its capacity as issuer trustee of the**
**MASTER ASSET VEHICLE [I]/[II]**
**as MAV**


**and**


**SWISS RE FINANCIAL PRODUCTS CORPORATION**
**as the Dealer**


**and**


**BNY TRUST COMPANY OF CANADA**
**as Collateral Agent**


**and**


**BNY TRUST COMPANY OF CANADA**

**as Custodian**


---

**CUSTODIAL AND CONTROL AGREEMENT**

**[Date]**

---

## CUSTODIAL AND CONTROL AGREEMENT

Custodial and control agreement dated as of **[date]** among CIBC Mellon Global Securities Services Company, in its capacity as issuer trustee of Master Asset Vehicle **[I]/[II]] (**in such capacity, the **"MAV"**), Swiss Re Financial Products Corporation **(**the **"Dealer"**), BNY Trust Company of Canada, in its capacity as Collateral Agent and BNY Trust Company of Canada, in its capacity as Custodian under this Agreement;

**RECITALS:**

(a)    The Collateral (as defined below) is at present held by the Custodian in the Securities Account (as defined below);

(b)    Pursuant to the Master Security Agreement (as defined below), the MAV has granted the Dealer a first priority security interest in the Collateral held in the Securities Account (the "**Dealer's Security Interest**") securing the payment and performance by the MAV of its obligations to the Dealer;

(c)    Pursuant to the Master Security Agreement and subject to the Dealer's Security Interest, the MAV has granted the Collateral Agent a security interest in substantially all of the property and assets of the MAV, including the Collateral (the "**Collateral Agent's Security Interest**" and, together with the Dealer's Security Interest, the "**Security Interests**") as security for the payment and performance of all obligations of the MAV to the Secured Creditors;

(d)    Pursuant to the Master Security Agreement, the Dealer's Security Interest in the Collateral has priority over the Collateral Agent's Security Interest in the Collateral;

(e)    It is intended that upon the occurrence of certain events the Collateral may cease to be subject to the Dealer's Security Interest but will at all times remain subject to the Collateral Agent's Security Interest; and

(f)    The parties are entering into this Agreement to perfect the Security Interests as required by the Master Security Agreement.

In consideration of the foregoing and other good and valuable consideration, the receipt and adequacy of which are acknowledged, the parties agree as follows.

**Section 1      Defined Terms.**

As used in this Agreement, the following terms have the following meanings:

**"Account Property"** means, with respect to a Securities Account**,** all of the credit balances, securities, Cash, security entitlements, other financial assets and other items or property (or their value) standing to the credit from time to time of such Securities Account, and all other rights and benefits accruing to or arising in connection with such property and such Securities Account.

"**Administration Agreement**" means the Administration and Management Agreement dated [●] between the Administrator and the MAV, as amended, modified, restated, replaced or supplemented from time to time, together with any schedules, exhibits, supplements and attachments and all documents incorporated by reference.

"**Administrator**" means BlackRock (Institutional) Canada, Ltd. in its capacity as attorney-in-fact, administrator and asset manager to the MAV pursuant to the Administration Agreement, and its successors and permitted assigns in such capacity.

"**Agent**" means any person appointed by the Custodian to assist in providing services under this Agreement, other than a Sub-custodian, including agents, nominees and service providers, and includes affiliates and subsidiaries of the Custodian, in each case appointed in accordance with the terms of this Agreement.

**"Agreement"** means this custodial and control agreement as it may be amended, modified, restated, replaced or supplemented from time to time.

"**Authorized Signatory**" means any person, whether or not an officer or employee of the Administrator, the Dealer or the Collateral Agent, duly authorized by the Administrator, the Dealer or the Collateral Agent, respectively, to give notices, entitlement orders or other instructions on behalf of the MAV, the Dealer or the Collateral Agent, respectively, such persons to be designated in a certificate which contains a specimen signature of each such person.

"**Bank of New York**" means The Bank of New York Mellon and its successors and assigns.

"**Bank of New York Downgrade Event**" means a withdrawal, suspension or reduction by a rating agency of a Bank of New York Rating.

"**Bank of New York Rating**" means any of the following ratings of Bank of New York:  (i) a short term senior unsecured debt rating by DBRS Limited of R-1(middle), (ii) a short term rating by S&P of 'A-1+'; (iii) a short term rating by Fitch of 'F1+', (iv) a short term rating by Moody's of 'P-1', (v) a long term senior unsecured debt rating by DBRS Limited of AA(low) (vi) a long term

unsecured debt rating by S&P of 'AA-', (vii) a long term unsecured debt rating by Fitch of 'AA-', and (viii) a long term unsecured debt rating by Moody's of 'Aa3'.

"**Business Day**" means a day on which commercial banks and foreign exchange markets are generally open to settle payments and are open for general business in the Cities of New York, New York, Toronto, Ontario and London, United Kingdom.

"**Cash**" means Canadian Dollars and United States Dollars.

"**CIBC Mellon**" means CIBC Mellon Trust Company.

"**CIBC Mellon Downgrade Event**" means a withdrawal, suspension or reduction by a rating agency of any CIBC Mellon Rating.

"**CIBC Mellon Rating**" means any of the following ratings of CIBC Mellon: (a)(i) a bank financial strength rating of 'B-', and (ii) a long-term issuer rating of 'Aa2', in each case as provided by Moody's, and (b) any other rating issued by a rating agency on or following the date hereof as at the date of initial issuance.

"**Collateral**" means the Account Property in the Securities Account, which on the date of this Agreement consists of the Account Property described on Schedule "A", together with all replacements of and substitutions for and increases and additions to the Account Property, all certificates and instruments evidencing or representing any Account Property, all stock powers of attorney applicable to any Account Property and all money or other property payable or paid on account of any return or repayment of principal or capital in respect of the Account Property or distributed in respect of the Account Property.

"**Collateral Agent**" means BNY Trust Company of Canada in its capacity as collateral agent pursuant to the terms of the Omnibus Agreement or any successor to the trust and custody business thereof or any permitted assigns thereof in such capacity appointed pursuant to the Omnibus Agreement.

"**Collateral Agent's Notice of Exclusive Control**" means a written notice that the Collateral Agent is exercising exclusive control of the Securities Account and the Collateral.

"**Collateral Agent's Security Interest**" has the meaning specified in the recitals to this Agreement.

**"Controlling Party"** with respect to the Securities Account and the Collateral, means, (i) prior to the receipt by the Custodian of a Collateral Agent's Notice of Exclusive Control in accordance with Section 7(2) and after exclusive control reverts to the Dealer in accordance with Section 7(3), the Dealer alone; and (ii) upon receipt by the Custodian of a Collateral Agent's Notice of Exclusive Control and until exclusive control reverts to the Dealer in accordance with Section 7(3), the Collateral Agent alone.

**"Corporate Action"** means any conversion privileges, subscription rights, warrants, put and call options or other rights or options available in connection with any securities which form part of the Collateral, including those relating to the reorganization, recapitalization, takeover, consolidation, amalgamation, merger, liquidation, filing for or declaration of bankruptcy, plans of arrangement of any corporation or association;

**"Custodian"** means BNY Trust Company of Canada in its capacity as custodian of the Securities Account and the Collateral in accordance with this Agreement and its successors and permitted assigns in accordance with this Agreement in such capacity.

**"Dealer's Notice of Exclusive Control"** means a written notice that the Dealer is exercising exclusive control of the Securities Accounts and the Collateral.

**"Dealer's Security Interest"** has the meaning specified in the recitals to this Agreement.

**"Declaration of Trust"** means the declaration of trust dated ●, 2008 providing for the establishment by CIBC Mellon Global Securities Services Company, a company incorporated under the laws of the Province of Nova Scotia, of Master Asset Vehicle [I][II] as a trust under the laws of the Province of Ontario, as it may be amended, modified, restated, replaced or supplemented from time to time to the extent permitted thereby, and together with any schedules, exhibits, supplements and attachments and all documents incorporated by reference.

**"Depository"** means any authorized domestic or foreign depository or clearing or settlement agency or system, including a transnational book-based system, and shall include CDS Clearing and Depository Services Inc., Euroclear, The Depository Trust Company and the Treasury/Reserve Automated Debt Entry System maintained at The Federal Reserve Bank of New York for receiving and delivering securities, and their respective successors and assigns.

"**Eligible Institution**" means a financial institution (i) that has the Required Rating or (ii) whose obligations in favour of the MAV are covered by a guarantee or indemnity satisfactory to the Rating Agency provided by a financial institution or financial institutions that has or have the Required Rating, or in each case under clause (i) and (ii) above, as applicable, each such financial institution has otherwise been approved by the Rating Agency pursuant to the satisfaction of the Rating Agency Condition.  For purposes of this Agreement, CIBC Mellon shall be deemed to be an Eligible Institution until a CIBC Mellon Downgrade Event occurs, whereupon CIBC Mellon shall cease to be an Eligible Institution for purposes of this Agreement.

"**Eligible Deposit Account**" means a securities account with an Eligible Institution.  Any securities account with a financial institution that ceases to be an Eligible Institution for purposes of this Agreement pursuant to the definition thereof shall thereupon cease to be an Eligible Deposit Account for purposes of this Agreement and the provisions of Section 15(2) of this Agreement shall apply.

"**Income Distributions**" means with respect to Collateral, all interest and other payments and distributions of cash or other property with respect to such Collateral, other than on account of principal.

"**Indenture Trustee**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Issuer Trustee**" means CIBC Mellon Global Securities Services Company in its capacity as the issuer trustee of Master Asset Vehicle [I][II] under the Declaration of Trust or any successor to the trust or custodial business thereof serving in such capacity or permitted assign thereof in accordance with the terms of the Declaration of Trust.

"**Majority Secured Creditors**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Master Security Agreement**" means the master security agreement dated [●] by and among, *inter alios,* the MAV, certain swap counterparties of the MAV as Dealers, and the Collateral Agent, as amended, modified, restated, replaced or supplemented from time to time and together with any schedules, exhibits, supplements and attachments and all documents incorporated by reference.

"**Notice of Exclusive Control**" means a Collateral Agent's Notice of Exclusive Control or a Dealer's Notice of Exclusive Control.

"**Omnibus Agreement**" means the omnibus agreement dated [●], 2008 by and among, *inter alios,* the MAV, certain swap counterparties of the MAV as Dealers and the Collateral Agent, as amended, modified, restated, replaced or supplemented from time to time, together with any schedules, exhibits, supplements and attachments and all documents incorporated by reference.

"**Par Swap**" means the swap under the ISDA Master Agreement between the Dealer and the MAV, dated as of ● and attached to this Agreement as Exhibit "A", which shall be automatically terminated upon the Dealer becoming a Breaching Dealer pursuant to the Omnibus Agreement.

"**Permitted Custodian**" means an Eligible Institution that is authorized to provide custodial services.  For purposes of this Agreement, the Custodian shall be deemed to be a Permitted Custodian; provided that, upon occurrence of a Bank of New York Downgrade Event, the Custodian shall cease to be a Permitted Custodian for purposes of this Agreement and the provisions of Section 16 of this Agreement shall apply.

"**Rating Agency**" means DBRS Limited and any successor to its credit ratings business and any replacement credit rating agency that may be engaged by the MAV.

"**Rating Agency Condition**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Required Rating**" means (i) a short term senior unsecured debt rating by DBRS Limited of not less than R-1 (middle) and an equivalent rating by any one of the following rating agencies of (x) a short term rating by S&P of not less than 'A-1+'; (y) a short term rating by Fitch of not less than 'F1+'or (z) a short term rating by Moody's of not less than 'P-1', or (ii) if no short term senior unsecured debt rating is available, a long term senior unsecured debt rating by DBRS Limited of not less than AA(low) and an equivalent rating by any one of the following rating agencies of (A) a long term rating by S&P of not less than 'AA-'; (B) a long term rating by Fitch of not less than 'AA-'; or (C) a long term rating by Moody's of not less than 'Aa3'.

 "**Secured Creditors**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Securities Account**" means the securities account established and maintained by or on behalf of the Custodian in the name of the MAV and in which the Collateral is from time to time held, identified on Schedule "A", any substitute or replacement securities account maintained by or on behalf of the Custodian for the MAV and any securities account maintained by or on

behalf of the Custodian for the MAV into which property from any such securities account is transferred.

"**Securities Transfer Act**" means the *Securities Transfer Act, 2006* (Ontario), as that statute is now enacted or as the same may from time to time be amended, re-enacted or replaced and includes any regulation under that statute.

"**Security Interests**" has the meaning specified in the recitals to this Agreement.

"**Sub-custodian**" means a financial institution that is appointed by the Custodian in accordance with this Agreement to provide custodial services with respect to any of the Collateral and the related Securities Accounts.

"**Transaction Documents**" has the meaning specified in Schedule A of the Omnibus Agreement.

**Section 2    Interpretation.**

(1)    Terms defined in the Securities Transfer Act and used but not otherwise defined in this Agreement have the same meanings.  For greater certainty, the terms "**entitlement order**", "**financial asset**", "**securities account**", "**securities intermediary**", "**securities intermediary's jurisdiction**", "**security**" and "**security entitlement**" have the meanings given to them in the Securities Transfer Act.

(2)    In this Agreement the words "**including**", "**includes**" and "**include**" mean "**including (or includes or include) without limitation**".  The expression "**Section**" and any other subdivision followed by a number means and refers to the specified Section or other subdivision of this Agreement.

(3)    Words importing the singular number only include the plural and vice versa.

(4)    The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenient reference only and do not affect its interpretation.

(5)    The schedules attached to this Agreement form an integral part of it for all purposes of it.

**Section 3    Appointment of the Custodian.**

The Dealer, with the full and unqualified approval of the MAV and the Collateral Agent, hereby appoints the Custodian as custodian, and the Custodian hereby accepts its appointment and agrees to maintain and to operate each of the

Securities Accounts and to deal with the Collateral in accordance with the terms of
this Agreement.

**Section 4      The Issuer Trustee.**

The Issuer Trustee has established Master Asset Vehicle [I][II] pursuant to the
Declaration of Trust and its liability under this Agreement is limited as provided in
the Declaration of Trust.  The provisions regarding liability set out in subsections
6.7(a), (b), (c) and (d) of the Declaration of Trust are hereby incorporated by
reference in this Agreement.

**Section 5      The Administrator and the MAV.**

The MAV has authorized the Administrator to act as its attorney-in-fact in
respect of all of its rights and obligations under this Agreement whether expressed
as a right or an obligation of the MAV.  Unless otherwise advised in writing by the
MAV, the Custodian, the Collateral Agent and the Dealer may assume without
enquiry that (i) the Administrator is acting on behalf of the MAV, and (ii) such
action taken by the Administrator has been duly authorized and approved by all
necessary action on the part of the Issuer Trustee pursuant to an effective delegation
and such action will bind the Issuer Trustee and the MAV for all purposes hereof
with the same effect as if undertaken by the MAV directly.  Until notified in writing
by the Issuer Trustee of any change in the appointment of the Administrator as the
administrator and attorney-in-fact of the MAV, the Custodian, the Collateral Agent
and the Dealer shall be entitled to rely on the authority of the Administrator as the
administrator and attorney-in-fact of the MAV.

**Section 6      The Collateral Agent**

(1)      BNY Trust Company of Canada has been appointed as the Collateral Agent
         pursuant to Section 7.1(a)(i) of the Omnibus Agreement and its liability under
         this Agreement is limited as provided in the Omnibus Agreement.

(2)      The Collateral Agent is a party to this Agreement in its capacity as agent for
         the Secured Creditors and may act on its own pursuant to the authority it has
         in such capacity under the Omnibus Agreement and the Master Security
         Agreement and shall act in accordance with any directions provided by the
         applicable Secured Creditors who at the time such directions are given
         constitute the Majority Secured Creditors (provided that for the purposes of
         this Agreement, the Dealer shall be deemed not to be an "LSS CDS
         Counterparty" for the "Majority Secured Creditors" definition).

(3)      BNY Trust Company of Canada has agreed to assume the obligations of the
         Collateral Agent under this Agreement in its capacity as Collateral Agent as
         appointed pursuant to the Omnibus Agreement.  BNY Trust Company of
         Canada in such capacity expressly does not assume the responsibilities of any

other service provider in relation to this Agreement or any Transaction Document, notwithstanding that it or an affiliate or related party may be appointed in another capacity under such document.

### Section 7    Control of the Securities Account

(1)    Until the Collateral Agent has delivered a Collateral Agent's Notice of Exclusive Control to the Custodian, the Dealer shall have exclusive control over the Securities Account and the Collateral and the Custodian agrees to comply only with entitlement orders and other instructions originated by the Dealer and not by any other person with respect to the Securities Account and the Collateral, without any need for the further consent of the MAV, the Collateral Agent or any other person.  Notwithstanding the foregoing, the Dealer may instruct the Custodian to accept entitlement orders from the Administrator in accordance with Section 7(4) and the MAV may provide joint instructions in accordance with Section 9.

(2)    If at any time the Collateral Agent delivers a Collateral Agent's Notice of Exclusive Control to the Custodian (with copies to the Dealer and the MAV) the Collateral Agent shall have exclusive control over the Securities Accounts and the Collateral and the Custodian agrees (i) to promptly cease complying with any entitlement orders or other instructions originated by the Dealer relating to the Securities Accounts and the Collateral, and (ii) to comply only with entitlement orders and other instructions originated by the Collateral Agent and not by any other person with respect to the Securities Accounts and the Collateral, without any need for further consent of the MAV, the Dealer or any other person, until the Collateral Agent provides a notice giving exclusive control over the Collateral and the Securities Accounts to the Dealer as the Controlling Party in accordance with Section 7(3). Notwithstanding the foregoing, the Collateral Agent may instruct the Custodian to accept entitlement orders from the Administrator in accordance with Section 7(4) and the MAV may provide joint instructions in accordance with Section 9.

(3)    If at any time while the Collateral Agent has control of the Securities Account and the Collateral, (a) it is determined by a court of competent jurisdiction that the Collateral Agent was not entitled to take exclusive control of the Collateral pursuant to the Transaction Documents, or (b) the Collateral Agent and the Dealer agree that the Collateral Agent was not entitled to take exclusive control of the Collateral pursuant to the Transaction Documents, the Collateral Agent shall in each such instance provide a written notice to the Custodian (with copies to the Dealer and the MAV) instructing the Custodian with effect from the date of such notice that the Dealer shall have exclusive

control over the Securities Account as the Controlling Party in accordance
with and subject to all the provisions of this Agreement.

(4)    In connection with certain obligations of the Administrator under the
Omnibus Agreement:

(i)    The Controlling Party may provide written instructions to the
Custodian, (with copies to the MAV, the Administrator and the
Collateral Agent), authorizing the Custodian to accept
entitlement orders from the Administrator with respect to the
Securities Account and the Collateral, to the extent specified by
the Controlling Party in such written instructions, and until the
Controlling Party has revoked such instructions by delivering a
Notice of Exclusive Control in accordance with Section 7(5), the
Custodian agrees to comply with entitlement orders and other
instructions originated by the Administrator or the Controlling
Party, with respect to the Securities Account and the Collateral,
without any need for the further consent of the Controlling
Party or any other person, until the Controlling Party has
revoked such instruction  by delivering a Notice of Exclusive
Control in accordance with Section 7(5); and

(ii)    The Dealer, as the Controlling Party on the date of this
Agreement, and acting in accordance with Section 7(4)(i) of this
Agreement, instructs the Custodian to comply with all
entitlement orders and other instructions originated by the
Administrator or the Dealer, with respect to the Securities
Accounts and the Collateral, from the date of this Agreement
until the instructions in this Section 7(4)(ii) are revoked by
delivery of a Notice of Exclusive Control in accordance with
Section 7(5).

(5)    If, at any time after the Controlling Party has provided written instructions to
the Custodian in accordance with Section 7(4), the Custodian receives a
Notice of Exclusive Control from the Controlling Party, the Custodian shall,
after receipt of such notice, promptly cease complying with any entitlement
orders or other instructions relating to the Securities Account and the
Collateral originated by the Administrator.  Upon receipt by the Custodian of
such a Notice of Exclusive Control, the Controlling Party shall have exclusive
control over the Securities Account and the Collateral in accordance with this
Agreement and the Custodian agrees to comply only with entitlement orders
and other instructions originated by the Controlling Party and not by any
other person, with respect to the Securities Accounts and the Collateral,

without any need for the further consent of the Administrator, the MAV or any other person.

(6)    The Custodian will not comply with any entitlement orders or other instructions originated by the Administrator or the MAV with respect to the Securities Account or the Collateral except as provided in Section 7(4) and Section 9 of this Agreement.  If an entitlement order or other instruction originated by the Administrator conflicts with any entitlement order or other instruction originated by the Controlling Party, the Custodian will comply with the entitlement order or other instruction originated by the Controlling Party

(7)    Each of the Collateral Agent and the Dealer shall provide a copy of any notice provided by it under this Section 7 to the Rating Agency promptly.

**Section 8    Instructions With Respect to the PAR Swap.**

(1)    While the Dealer is the Controlling Party of the Securities Account, the Dealer may exercise rights of replacement under the Par Swap by giving the Custodian written instructions to transfer certain Securities and/or cash out of the Securities Account against the delivery into the Securities Account of replacement Securities and/or cash in accordance with the Par Swap.  Upon receipt of such written instructions from the Dealer, the Custodian shall effect such substitution pursuant to such written instructions without further inquiry.

(2)    While the Dealer is the Controlling Party of the Securities Account, the Dealer may exercise rights of purchasing and/or selling and settling purchases and/or sales of Securities in the Securities Account under the Par Swap by giving the Custodian written instructions to deliver Securities to settle a sale of the same, or to settle a purchase of Securities with cash in the Securities Account in accordance with the Par Swap.  The Custodian shall effect such purchases and/or sales and settlements of purchases and/or sales pursuant to such written instructions without further inquiry.

(3)    While the Dealer is the Controlling Party of the Securities Account, the Dealer may provide written instructions with respect to Corporate Actions or similar rights or discretionary actions, as set out in Section 15(13) of this Agreement, in accordance with the Par Swap.  Upon receipt of such written instructions from the Dealer, the Custodian shall effect such Corporate Action or similar right or discretionary action pursuant to such written instructions without further inquiry.

(4)    While the Dealer is the Controlling Party of the Securities Account, the Dealer may provide written instructions relating to the exercise of voting rights, as

set out in Section 15(14) of this Agreement, in accordance with the Par Swap. Upon receipt of such written instructions from the Dealer, the Custodian shall exercise voting rights pursuant to such written instructions without further inquiry.

**Section 9      Instructions with Respect to Income Distributions.**

(1)      The parties to this Agreement agree and acknowledge that all Income Distributions received in the Securities Accounts set out on Schedule "A" are payable to the Dealer pursuant to the Par Swap applicable to the Collateral and shall be transferred (i) as soon as practicable after receipt to the account set out on Schedule "B" and (ii) without duplication, on the effective date of termination of this Agreement.  The MAV, the Dealer and the Collateral Agent hereby instruct the Custodian to complete such transfers. Notwithstanding any other provision of this Agreement to the contrary, the parties to this Agreement agree that such instructions may not be altered except with ten (10) days prior written notice to the Rating Agency and by joint written instructions from the MAV, the Dealer and the Collateral Agent to the Custodian, while the Dealer is the Controlling Party, and by joint written instructions from the MAV and the Collateral Agent to the Custodian, while the Collateral Agent is the Controlling Party.  The Dealer agrees to cooperate to provide any such joint instructions upon the termination of the Par Swap applicable to the Collateral.

(2)      The Collateral Agent shall provide a copy of any joint notice provided under Section 9(1) to the Rating Agency promptly

**Section 10      The Securities Account.**

(1)      At the date of this Agreement the Securities Account is the securities account identified in Schedule "A".  The Custodian and the MAV will notify the Dealer and the Collateral Agent of any change in the Securities Account or the information on such schedule.

(2)      The parties agree that the Securities Account is a securities account, each item of Collateral credited to the Securities Account is a financial asset for purposes of the Securities Transfer Act and any other similar law applicable in any other relevant jurisdiction and each other right of the MAV, the Dealer and the Collateral Agent against the Custodian arising out of the Securities Account is a financial asset.

(3)      The Custodian acknowledges and agrees that for purposes of the Securities Transfer Act and any other similar law applicable in any other relevant jurisdiction, the Custodian is the securities intermediary for the Securities Account and that Ontario is the securities intermediary's jurisdiction for the

Securities Account and each agreement between the MAV and the Custodian with respect to a Securities Account is hereby amended to include this provision.

(4)     To the extent it is within the control of the Custodian, the Custodian will ensure that all certificated securities or other financial assets represented by a certificate held in the Securities Account are either (i) in bearer form, or (ii) in registered form in a freely negotiable form and are not registered in the name of the MAV, payable to the order of the MAV or specially endorsed to the MAV by an effective endorsement.

(5)     To the extent it is within the control of the Custodian, the Custodian will ensure that all uncertificated securities or other financial assets that are not represented by a certificate (other than instruments) held in the Securities Account is not registered in the name of the MAV or an agent for the MAV (other than the Custodian) in the register of the issuer.

(6)     To the extent it is within the control of the Custodian, the Custodian will ensure that all instruments held in the Securities Account are either (i) specially endorsed by an effective endorsement to the Custodian or in blank, or (ii) in the form of a transferable credit, delivered to the Custodian with the relevant transfer document completed in favour of the Custodian, or (iii) for credits that are not in transferable form, delivered to the Custodian with the relevant assignment of proceeds document completed in favour of the Custodian.

(7)     The Custodian will not enter into any agreement with any other person relating to the Securities Account and/or any financial assets in any of them under which it agrees to comply with entitlement orders made by such other person.

(8)     The Custodian will notify the Collateral Agent, the Dealer, the MAV and the Rating Agency promptly if any other person claims that it has a property interest in any of the Collateral.

(9)     The Custodian agrees that it will not advance any margin or any other credit to the MAV or lend, pledge or hypothecate the Securities Account or any Collateral in the Securities Account and it will not permit any financial institution at which it maintains the Securities Account to advance any margin or any other credit or lend, pledge or hypothecate the Securities Account or any Collateral in any such Securities Account.

(10)    The Custodian agrees that it will not dispose of any Collateral in the Securities Accounts (other than pursuant to instructions given to it in

accordance with this Agreement) and will not permit any financial institutions at which it maintains any Securities Account to dispose of any Collateral in any such Securities Account.

## Section 11    Representations and Warranties of the Custodian.

The Custodian represents and warrants that:

(1)    the Custodian is a corporation duly incorporated, organized and subsisting under its governing statute, with the power, authority and right to enter into and deliver this Agreement and perform its obligations under this Agreement;

(2)    on the date of this Agreement, the Custodian is a Permitted Custodian;

(3)    this Agreement constitutes a valid and binding agreement of the Custodian, enforceable against the Custodian in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and other laws of general application limiting the enforcement of creditors' rights generally and to the fact that specific performance is an equitable remedy available only in the discretion of the court;

(4)    the Custodian has established and maintains the Securities Account described in Schedule "A" and the Securities Account is a segregated account in the name of Master Asset Vehicle [I][II] and shall be maintained as a segregated account in the name of Master Asset Vehicle [I][II];

(5)    no Securities Account is or will be a margin account and the Custodian has not advanced any margin or any other credit to the MAV and has not pledged or hypothecated any financial assets in the Securities Account;

(6)    Schedule "C" contains the most recent statements produced by the Custodian in the ordinary course of its business regarding the Collateral in the Securities Account at the statements' date.  The Custodian does not know of any inaccuracy in the statements;

(7)    there is no entitlement order or any other right of any person binding upon or which at any time in the future may become binding upon the Custodian to sell, transfer, or in any other way dispose of or encumber any of the Collateral other than under the terms of this Agreement;

(8)    the Custodian does not know of any lien on, claim to or interest in the Securities Account or the Collateral, except for the claims and interests of the Dealer, the Collateral Agent and the MAV; and

(9)     other than the agreements set out on Schedule "D" to this Agreement that have been terminated and replaced by this Agreement, there are no other agreements that the Custodian has entered into with any party relating to the Securities Account or any financial assets in the Securities Account. The Custodian has not entered into any agreement with any other person relating to the Securities Account and/or any financial assets in the Securities Account under which it has agreed or will agree to comply with entitlement orders made by such other person.

## Section 12     Representations and Warranties of the MAV.

The MAV represents and warrants that:

(1)     it has no margin loans outstanding in the Securities Account as of the date of this Agreement, and it will not request the Custodian to extend any new credit to the MAV secured by the Securities Account or any of the Collateral;

(2)     the MAV does not know of any lien on, claim to or interest in the Securities Account or the Collateral, except for the claims and interests of the Dealer, the Collateral Agent or the MAV; and

(3)     other than the agreements set out on Schedule "D" to this Agreement that have been terminated and replaced by this Agreement, there are no other agreements that the MAV has entered into relating to the Securities Account or any financial assets in the Securities Account.

## Section 13     Priority of Security Interests.

The Custodian acknowledges the Security Interests granted to the Dealer and to the Collateral Agent in the Collateral held in the Securities Account. The Custodian waives any security interest, lien, encumbrance, claim or right of set-off it may have, now or in the future, whether by agreement, operation of law or otherwise, against the Securities Account and the Collateral held in the Securities Account.

## Section 14     Acknowledgements.

(1)     The Custodian acknowledges that the MAV is the entitlement holder with respect to the Securities Account.

(2)     Each of the other parties acknowledges and agrees that the Custodian is entitled to rely on the accuracy of the recitals to this Agreement.

(3)     Each of the other parties acknowledges and agrees that the Custodian is not a guarantor of the MAV and shall not be held responsible for any decline in the market value of the Collateral in the Securities Account and has no obligation to notify any other party of any such decline or, except as set out in this

Agreement, to take any action with regard to the Collateral in the Securities Account.

**Section 15    Custodian's Duties and Responsibilities.**

(1)    The Custodian agrees that it shall only delegate any of its duties with respect to any of the Collateral or the Securities Account to Sub-custodians that satisfy the requirements for a Permitted Custodian.  The Custodian shall require any Sub-Custodian appointed in accordance with this Section 15(1) to notify the Custodian if such Sub-custodian no longer satisfies the requirements for a Permitted Custodian, and upon such notification, or when the Custodian otherwise becomes aware of any such Sub-custodian ceasing to satisfy the requirements for a Permitted Custodian, the Custodian shall promptly replace such Sub-custodian with a replacement Sub-custodian that satisfies the requirements for a permitted Custodian, and the Custodian shall promptly cause any Collateral held at any such Sub-Custodian to be transferred to the replacement Sub-Custodian appointed in accordance with this Section 15(1).  For the avoidance of doubt, if any other party to this Agreement is entitled to provide (or permit another party to provide) instructions to the Custodian explicitly instructing the Custodian to retain a Sub-custodian, each such party to this Agreement agrees that it shall only provide (or permit another party to provide) instructions to retain a Sub-custodian if the designated Sub-custodian satisfies the requirements for a Permitted Custodian.

(2)    The Custodian agrees that all Collateral shall be held in a Securities Account that is an Eligible Deposit Account at all times.  If a Securities Account is no longer an Eligible Deposit Account, subject to Section 17 of this Agreement, the Custodian shall promptly notify the Rating Agency and promptly cause any Collateral held in any such account to be transferred to a Securities Account that is an Eligible Deposit Account.

(3)    The Custodian shall ensure that the Collateral in each of the Securities Accounts is at all times kept segregated in the books and records of the Custodian from any property and assets of the Custodian and any other person;

(4)    The Custodian shall maintain in current electronic form, records and files related to the Collateral.  The Custodian shall provide the Administrator and the Dealer with daily twenty-four (24) hour read-only access to all electronic records and files relating to the Collateral and transactions in the Securities Accounts through an electronic information delivery system, subject to maintenance requirements, and to interruptions in the information delivery

system, or in power supply, or any other event or factor beyond the reasonable control of the Custodian;

(5)     The Custodian agrees that it shall:

> (i)     make notations on its records and files related to the Collateral, provided that the Custodian currently offers this service to its clients, indicating that the MAV is the beneficial owner of the Collateral and that the Collateral is subject to the Security Interests, and the Custodian shall require that any Sub-custodian holding any Collateral on behalf of the Custodian (where permitted in accordance with the terms of this Agreement) shall acknowledge that the MAV is the beneficial owner of the Collateral and that the Collateral is subject to the Security Interests; and

> (ii)     advise any person who makes inquiries regarding the possession or control by the Custodian of the Collateral that the Custodian is in possession of the Collateral as custodian of the MAV and the Dealer or other Controlling Party at the relevant time, that the MAV is the beneficial owner of the Collateral and that the Custodian has no beneficial ownership interest in the Collateral;

(6)     At any reasonable time, and subject to any reasonable requirements the Custodian may impose, the Custodian shall make the Collateral, together with the Custodian's related records and files, available to (i) the MAV, (ii) the Dealer, while it is the Controlling Party, (iii) the Collateral Agent, and (iv) the Rating Agency, and each of their respective representatives at the relevant time for examination and audit;

(7)     The Custodian will send copies of all statements and confirmations concerning the Securities Account and the Collateral or make electronic copies available promptly to the MAV, the Dealer and the Collateral Agent. The MAV consents to the release and disclosure of such information to the Dealer and the Collateral Agent.

(8)     The Custodian will promptly notify the Dealer, the MAV and the Collateral Agent and the Rating Agency if any other person asserts any lien, encumbrance or other claim against the Securities Account or the Collateral and promptly notify the Dealer, the MAV and the Collateral Agent of any loss, destruction of or damage to any of the Collateral.

(9)     Subject to Section 15(2), the Custodian will not change the name or the account number of the Securities Account without the prior written consent of the MAV and the Controlling Party at the relevant time and ten (10) Business Days prior written notice to the Collateral Agent (if it is not the Controlling Party at the time) and the Rating Agency.

(10)    The Custodian shall not accept any entitlement orders or other instructions regarding, and not otherwise deal with, the Securities Account or the Collateral other than in accordance with the terms and conditions of this Agreement.

(11)    If the Custodian selects or uses Agents or Sub-custodians it shall be liable for the actions or failure to act of any such Agents or Sub-Custodians in respect of the Collateral and/or the Securities Account in accordance with the terms of this Agreement, provided that the Custodian shall not be liable for any losses or damages arising as a result of the insolvency of any Sub-custodian except to the extent of the Custodian's negligence in its selection or retention of any such Sub-custodian, and in no event shall the Custodian be liable for the action or failure to act of any Sub-custodian, or for the insolvency of any Sub-custodian, which it has been explicitly instructed to retain by a party entitled to give such instructions in accordance with Section 7 of this Agreement.  In no event shall a Depository be deemed to be an Agent or Sub-custodian of the Custodian.

(12)    If any losses or damages arise as a result of the action or failure to act of any Sub-custodian which the Custodian has been explicitly instructed to retain by the Dealer, then the Dealer shall indemnify the MAV against all direct losses attributable to the action or failure to act of any Sub-custodian which it explicitly instructed the Custodian to retain, provided that the Dealer shall not be liable for any losses or damages arising as a result of the insolvency of any such Sub-custodian except to the extent of the Dealer's negligence in its selection or retention of any such Sub-custodian, and the Dealer shall pay such amounts directly to the Custodian on behalf of the MAV accordingly. For greater certainty, the Dealer shall only indemnify such direct losses and shall not have any responsibility or liability whatsoever for any indirect, consequential or other losses attributable to the action or failure to act of any Sub-custodian which it explicitly instructed the Custodian to retain.   The Dealer shall not have any responsibility or liability whatsoever for any direct, indirect, consequential or other losses attributable to the action or failure to act of any Sub-custodian which the MAV, the Administrator, the Collateral Agent or any other person explicitly instructed the Custodian to retain, and any such losses or damages shall be the responsibility of the MAV.

(13)     The Custodian shall notify the Dealer, the MAV and the Collateral Agent of notices received from an issuer or the relevant Depository with respect to any Corporate Actions and any similar rights or discretionary actions with respect to Securities or other contracts or instruments held in the Securities Account and the date or dates by which such rights must be exercised or such action must be taken. Absent actual receipt of such notice, the Custodian shall have no liability for failing to so notify the Dealer, the MAV and the Collateral Agent.  The Custodian must receive written instructions from the applicable Controlling Party at least two (2) Business Days prior to the last scheduled date specified for action in a notice of Corporate Actions or notice of similar rights or discretionary actions, in order to take any action relating to, or to exercise any rights with respect to, any Corporate Actions or any similar rights or discretionary actions.

(14)     The Custodian shall send to the MAV, the Dealer and the Collateral Agent any documents (including proxies, proxy statements, annual reports, solicitations and other communications relating to the Securities which relate to voting) received by the Custodian relating to the exercise of voting rights. All voting rights with respect to Securities held in the Securities Account, however registered, shall be exercised pursuant to written instructions of the applicable Controlling Party.  In the event that no instructions are received in time to be implemented, the Custodian will take no action and if a default option exists, the Custodian shall be deemed to have been provided with instructions to accept the default option.

**Section 16     Rights of the Custodian.**

(1)     The Custodian is entitled to rely upon (i) any Collateral Agent's Notice of Exclusive Control that it believes in good faith to be originated by the Collateral Agent, (ii) any Dealer's Notice of Exclusive Control that it believes in good faith to be originated by the Dealer, and (iii) any entitlement order, notice or other instruction that it believes in good faith to be originated by the Controlling Party or to the extent applicable pursuant to Section 7(4) or Section 9 of this Agreement by the Administrator or the MAV, with respect to the Collateral and the Securities Account.  Provided that if the Custodian requests that the Administrator, the Collateral Agent or the Dealer furnish a certificate designating Authorized Signatories, the Custodian shall be deemed to act in good faith and shall be fully protected in acting upon the notices, entitlement orders or other instructions of such Authorized Signatories on behalf of the MAV, the Administrator, the Collateral Agent or the Dealer respectively, as designated on such certificate or replacement certificate.

(2)     The Custodian has no obligation to (i) determine whether or not the rights of the Dealer or the Collateral Agent under the Master Security Agreement are

enforceable, or (ii) investigate or determine whether or not the Collateral Agent in the case of a Collateral Agent's Notice of Exclusive Control or the Dealer in the case of a Dealer's Notice of Exclusive Control, or the Controlling Party at the relevant time with respect to the Securities Account, is entitled to give any entitlement order, notice or other instruction, or (iii) determine whether an event of default exists under any agreement between any of the MAV, the Dealer and the Collateral Agent, or (iv) determine if any entitlement orders and other instructions of the MAV or the Administrator (authorised in accordance with this Agreement) are provided strictly in accordance with the provisions of the Administration Agreement or the Omnibus Agreement or any other appropriate Transaction Document (except this Agreement).

(3)     Subject to Section 7(3) of this Agreement, the Custodian will not be liable to the Dealer for complying with a Collateral Agent's Notice of Exclusive Control in accordance with Section 7(2) of this Agreement.

(4)     Subject to Section 7(5) of this Agreement, the Custodian will not be liable to the Controlling Party for complying with entitlement orders and other instructions originated by the Administrator pursuant to written instructions provided to the Custodian by the Controlling Party in accordance with Section 7(4) of this Agreement.

(5)     The Dealer will pay the usual and customary fees and expenses and other charges payable on the Securities Account and shall indemnify and hold harmless the Custodian, its officers, directors, employees, and agents against all claims, liabilities, and expenses arising out of this Agreement (including reasonable legal fees and disbursements), except to the extent the claims, liabilities, or expenses arise from or are in connection with dishonesty, bad faith, gross negligence, wilful misconduct or reckless disregard of a right, duty or obligation by the Custodian.  The MAV shall not have any liability for the payment of fees and expenses and other charges payable on the Securities Account pursuant to the account agreement for the Securities Account.  This Section 16(5) will survive the termination of this Agreement.  For greater certainty, the Dealer agrees and acknowledges that its indemnity obligations contained in this Section 16(5) shall survive any removal of the Dealer as the Controlling Party, pursuant to the provisions of this Agreement, and that such indemnity obligations shall continue in full force and effect after such removal, in accordance with their terms.

(6)     The Custodian shall not have recourse to the Collateral and the Securities Accounts.  None of the MAV, the Dealer and the Collateral Agent shall be obliged or required to take any further steps against the Custodian beyond the requirements of this Agreement to recover any sums in respect of the

Collateral and the Securities Account.  The obligations of the Dealer under Section 16(5) of this Agreement are solely the obligations of the Dealer.  No recourse for the payment of any obligation of the Dealer shall be had against the Collateral and the Securities Account, or the MAV,  the Collateral Agent, the Issuer Trustee, the Administrator or any incorporator, affiliate, shareholder, director, officer, representative, employee, manager, member, beneficiary or agent of any of them.

(7)    Notwithstanding any prior termination of this Agreement, the Custodian shall not acquiesce, petition or otherwise invoke or cause the MAV to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the MAV under any bankruptcy, insolvency or similar law or, appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the MAV or any substantial part of its property, or ordering the winding up or liquidation of the affairs of the MAV.

## Section 17    Loss of Permitted Custodian Status of the Custodian.

(1)    During the term of this Agreement, in the event the Custodian ceases to be a Permitted Custodian, the Custodian shall forthwith notify the Dealer, the Collateral Agent, the MAV and the Rating Agency of such event.

(2)    Upon receiving notification that the Custodian has ceased to be a Permitted Custodian, the Controlling Party shall, with ten (10) Business Days prior written notice to the Rating Agency and with the consent of the MAV, which is not to be unreasonably withheld, designate in writing a replacement custodian that satisfies the requirements for a Permitted Custodian (provided that if the Dealer is the Controlling Party at the relevant time, such replacement custodian is satisfactory to the Collateral Agent).   Such replacement custodian shall agree in writing to perform the duties of the Custodian under this Agreement and to become a party to this Agreement in place of the Custodian (or to enter into a substantially similar agreement that is reasonably satisfactory to the MAV, the Dealer and the Collateral Agent and subject to satisfaction of the Rating Agency Condition) and the relevant agreement entered into by the replacement custodian shall apply to the Collateral and any securities account opened by the replacement Custodian in connection with the Collateral, upon delivery of the Collateral to the replacement Custodian.   The Custodian shall deliver the Collateral to the replacement Custodian so designated by the Controlling Party in accordance with written instructions of the Controlling Party and upon such delivery, the delivering Custodian shall have no further obligations under this Agreement, except to the extent of any liability in respect of obligations arising prior to the date of such delivery.

**Section 18     Termination.**

(1)     Except as set out in Section 18(2) and Section 18(3) below, the obligations of the Custodian under this Agreement will continue in effect until the Dealer and the Collateral Agent jointly notify the Custodian, with a copy to the Rating Agency, of termination of this Agreement in writing, unless in accordance with Section 7(2) the Collateral Agent has become the Controlling Party with respect to the Securities Account, in which case the Collateral Agent acting alone may notify the Custodian, with a copy to the Rating Agency, of termination of this Agreement in writing.  The termination of this Agreement will not terminate the Securities Account unless specifically agreed by the Dealer and if different, the Controlling Party at the relevant time.

(2)     The Custodian shall not resign from its duties under this Agreement at any time unless the Custodian provides 60 days written notice to the Dealer, the Collateral Agent, the MAV and the Rating Agency.  Upon receipt of such written notice, the Controlling Party shall, with ten (10) Business Days prior written notice to the Rating Agency and with the consent of the MAV, which is not to be unreasonably withheld, designate in writing a replacement custodian that satisfies the requirements for a Permitted Custodian, (provided that if the Dealer is the Controlling Party at the relevant time, such replacement custodian is satisfactory to the Collateral Agent).  Such replacement custodian shall agree in writing to perform the duties of the Custodian under this Agreement and to become a party to this Agreement in place of the Custodian (or to enter into a substantially similar agreement that is reasonably satisfactory to the MAV, the Dealer and the Collateral Agent and subject to the satisfaction of the Rating Agency Condition) and the relevant agreement entered into by the replacement custodian shall apply to the Collateral and any securities accounts opened by the replacement Custodian in connection with the Collateral, upon delivery of the Collateral to the replacement Custodian.  For greater certainty, no such resignation shall take effect until a replacement custodian is appointed in accordance with the terms of this Agreement. On or before the effective date of such resignation, the Custodian shall deliver the Collateral to the replacement custodian so designated by the Controlling Party in accordance with written instructions of the Controlling Party and upon such delivery, the resigning Custodian shall have no further obligations under this Agreement, except to the extent of any liability in respect of obligations arising prior to the date of such delivery.

(3)     The Custodian may be removed as custodian under this Agreement upon not less than ten (10) Business Days written notice from the Controlling Party, with a copy to the Rating Agency, following any breach by the Custodian of

its obligations under this Agreement. Upon such written notice, the Controlling Party shall with the consent of the MAV, which is not to be unreasonably withheld, designate in writing a replacement custodian that satisfies the requirements for a Permitted Custodian (provided that if the Dealer is the Controlling Party at the relevant time, such replacement custodian is satisfactory to the Collateral Agent).  Such replacement custodian shall agree in writing to perform the duties of the Custodian under this Agreement and to become a party to this Agreement in place of the Custodian (or to enter into a substantially similar agreement that is reasonably satisfactory to the MAV, the Dealer and the Collateral Agent and subject to the satisfaction of the Rating Agency Condition) and the relevant agreement entered into by the replacement custodian shall apply to the Collateral and any securities accounts opened by the replacement Custodian in connection with the Collateral, upon delivery of the Collateral to the replacement Custodian. On or before the effective date of such removal, the Custodian shall deliver the Collateral to the replacement Custodian so designated by the Controlling Party in accordance with written instructions of the Controlling Party, and upon such delivery, the removed Custodian shall have no further obligations under this Agreement, except to the extent of any liability in respect of obligations arising prior to the date of such delivery.

## Section 19    Governing Law.

(1)    This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable in the Province of Ontario.

(2)    Each party to this Agreement irrevocably attorns and submits to the non-exclusive jurisdiction of the courts of the Province of Ontario situated in the City of Toronto, and waives objection to the venue of any proceeding in such court or that such court provides an inconvenient forum.

(3)    Each party to this Agreement irrevocably consents to the service of any and all process in any such action or proceeding by the delivery of copies of such process to them as provided in Section 24 of this Agreement.  Nothing in this Section 19 affects the right of the Collateral Agent or the Dealer to serve process in any manner permitted by law.

## Section 20    Conflict with Other Agreements.

In the event of any conflict between the provisions of this Agreement and the provisions of the Omnibus Agreement which cannot be resolved by both provisions being complied with, the parties to this Agreement agree that the provisions contained in the Omnibus Agreement will prevail to the extent of such conflict, and

the provisions of this Agreement shall be deemed to be amended to the extent necessary to eliminate such conflict and to exercise the intentions set out in the relevant provisions of the Omnibus Agreement, provided that in no event shall any such conflict be resolved in a manner which adversely affects the rights of the Custodian without the prior consent of the Custodian.  In the event of a conflict between this Agreement and any other agreement between any of the Collateral Agent, the Dealer, the Custodian and the MAV with respect to the Securities Account or the Collateral, whether now existing or later entered into, the terms of this Agreement will prevail.

### Section 21   Amendments.

This Agreement may only be amended, supplemented or otherwise modified by written agreement executed by the Custodian, the Dealer, the Collateral Agent, and the MAV, upon ten (10) Business Days prior written notice of the proposed amendment, supplement or other modification to the Rating Agency by the Collateral Agent.

### Section 22   Severability.

If any term, provision, covenant or condition of this Agreement, or its application to any party or any circumstance, is held to be unenforceable, invalid or illegal (in whole or in part) for any reason in any relevant jurisdiction, the remaining terms, provisions, covenants and conditions of this Agreement, as modified by the deletion from this Agreement of such unenforceable, invalid or illegal portion, will continue in full force and effect, and such unenforceability, invalidity or illegality will not otherwise affect the remaining terms, provisions, covenants and conditions of this Agreement, so long as (i) this Agreement as so modified continues to express, without material change, the original intentions of the parties as to its subject matter, and (ii) the deletion of such portion of this Agreement will not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realisation of the benefits that would otherwise have been conferred upon the parties under this Agreement, it being agreed that the deletion of Section 19 would have such an effect.  The parties will endeavour in good faith negotiations to replace the unenforceable, invalid or illegal provision with a valid provision, the effect of which comes as close as possible to that of such deleted provision.

### Section 23   Successors and Assigns.

This Agreement is binding upon and enures to the benefit of the parties and their respective successors and permitted assigns. Neither the MAV nor the Custodian may assign or transfer any of their respective rights or obligations under this Agreement without the prior written consent of the Dealer and the Collateral Agent and ten (10) Business Days prior written notice to the Rating Agency.  The Dealer and the Collateral Agent may assign or transfer their respective rights or obligations under this Agreement in accordance with the Omnibus Agreement

(including, for greater certainty, with respect to the Collateral Agent, any successor Collateral Agent appointed in accordance with the Omnibus Agreement) and with ten (10) Business Days notice to the Rating Agency.

**Section 24    Notices.**

Unless expressly stated otherwise, the procedure for delivering and effectiveness of all communications and notices pursuant to this Agreement shall be governed by the following provisions:

(1)    all communications and notices pursuant to this Agreement shall be by fax or letter delivered by hand or by electronic mail. Each such communication or notice shall be made to the relevant party at the fax number or address or electronic address and, in the case of a communication or notice by fax or letter, marked for the attention of, or (in the case of a communication by electronic mail) made to such person or department from time to time specified in writing by the recipient party to the others for such purpose. The initial fax number, electronic mail address and person or department so specified by each party and the Rating Agency are set out in Schedule "E" (Notice Details) of this Agreement. All communications or notices delivered verbally by telephone shall only be binding if followed immediately by a confirmation in writing by fax, letter or electronic mail;

(2)    A communication or notice shall be deemed received (if by fax) when an acknowledgement of receipt is received, (if by electronic mail) when made or (if by letter) when delivered, in each case in the manner required by this Section 24. However, if a communication is received after business hours on any Business Day or on a day which is not a Business Day in the place of receipt, it shall be deemed to be received and become effective at the opening of business on the next Business Day in the place of receipt. Every communication or notice shall be irrevocable save in respect of any manifest error in it.

**Section 25    Counterparts.**

This Agreement may be executed in any number of counterparts (including counterparts by facsimile) and all such counterparts taken together shall be deemed to constitute one and the same instrument.

**Section 26    Time of the Essence.**

Time is of the essence of this Agreement.

**Section 27    Remedies Cumulative.**

The right and remedies of the parties are cumulative and are in addition to, and not in substitution for, any other rights and remedies available at law or in

- 26 -

equity or otherwise.  No single or partial exercise by a party of any right or remedy precludes or otherwise affects the exercise of any other right or remedy to which that party may be entitled.


**CIBC MELLON GLOBAL
SECURITIES SERVICES COMPANY,
in its capacity as issuer trustee of
MASTER ASSET VEHICLE [I]/[II]**

By: _____

    Name:

    Title:


By: _____

    Name:

    Title:


**SWISS RE FINANCIAL PRODUCTS
CORPORATION**

By: _____

    Name:

    Title:


**BNY TRUST COMPANY OF
CANADA, as COLLATERAL AGENT**

By: _____

    Name:

    Title:

- 27 -

**BNY TRUST COMPANY OF CANADA, as CUSTODIAN**

By: _____

     Name:

     Title:

# EXHIBIT "A"

# PAR SWAP

**(see attached)**

## SCHEDULE "A"

### Securities Account and Collateral

**[To be completed]**

## SCHEDULE "B"

### Collection Account for Income Distributions to the Dealer

**[To be completed]**

# SCHEDULE "C"

## Account Statement

**[To be completed]**

# SCHEDULE "D"

## Terminated Custodial Agreements

**[To be completed]**

## SCHEDULE "E"

### Notice Details

**[To be completed]**

    (i)    to the Dealer at:

**[insert Dealer's address]**

Attention:    ●
Telephone:    ●
Facsimile:    ●
E-mail:    ●

    (ii)    to the Collateral Agent at:

**[insert Collateral Agent's address]**

Attention:    ●
Telephone:    ●
Facsimile:    ●
E-mail:    ●

    (iii)    to the Custodian at:

**[insert Custodian's address]**

Attention:    ●
Telephone:    ●
Facsimile:    ●
E-mail:    ●

    (iv)    to the MAV at:

**[insert MAV's address at CIBC Mellon Global Securities Services Company, c/c Administrator] [NTD: Notice information to match that contained in the Omnibus Agreement.]**

Attention:    ●
Telephone:    ●
Facsimile:    ●
E-mail:

- 2 -

(v)      to the Rating Agency at:

**[insert DBRS's address]**

Attention:    ●
Telephone:    ●
Facsimile:    ●
E-mail:

**CIBC MELLON GLOBAL SECURITIES SERVICES COMPANY**
**in its capacity as issuer trustee of the**
**MASTER ASSET VEHICLE [I]/[II]**
**as MAV**


**and**


**[DEUTSCHE BANK AG, LONDON BRANCH/HSBC BANK USA, NATIONAL**
**ASSOCIATION]**
**as the Dealer**


**and**


**BNY TRUST COMPANY OF CANADA**
**as Collateral Agent**


**and**


**RBC DEXIA INVESTOR SERVICES TRUST**

**as Intermediary**

---

**SECURITIES ACCOUNT CONTROL AGREEMENT**

**[Date]**

---

# SECURITIES ACCOUNT CONTROL AGREEMENT

Securities account control agreement dated as of **[date]** among CIBC Mellon Global Securities Services Company, in its capacity as issuer trustee of Master Asset Vehicle **[I]/[II]]** (in such capacity, the **"MAV")**, **[Deutsche Bank AG, London branch/HSBC Bank USA, National Association] (**the **"Dealer")**, BNY Trust Company of Canada, in its capacity as Collateral Agent and RBC Dexia Investor Services Trust, in its capacity as Intermediary under this Agreement;

**RECITALS:**

(a)     The Collateral (as defined below) is at present held by the Intermediary in the Securities Accounts (as defined below);

(b)     Pursuant to the Master Security Agreement (as defined below), the MAV has granted the Dealer a first priority security interest in the Collateral held in each of the Securities Accounts (the "**Dealer's Security Interest**") securing the payment and performance by the MAV of its obligations to the Dealer;

(c)     Pursuant to the Master Security Agreement and subject to the Dealer's Security Interest, the MAV has granted the Collateral Agent a security interest in substantially all of the property and assets of the MAV, including the Collateral (the "**Collateral Agent's Security Interest**" and, together with the Dealer's Security Interest, the "**Security Interests**") as security for the payment and performance of all obligations of the MAV to the Secured Creditors;

(d)     Pursuant to the Master Security Agreement, the Dealer's Security Interest in the Collateral has priority over the Collateral Agent's Security Interest in the Collateral;

(e)     It is intended that upon the occurrence of certain events the Collateral may cease to be subject to the Dealer's Security Interest but will at all times remain subject to the Collateral Agent's Security Interest; and

(f)     The parties are entering into this Agreement to perfect the Security Interests as required by the Master Security Agreement.

In consideration of the foregoing and other good and valuable consideration, the receipt and adequacy of which are acknowledged, the parties agree as follows.

**Section 1     Defined Terms.**

As used in this Agreement, the following terms have the following meanings:

"**Account Property**" means, with respect to a Securities Account, all of the credit balances, securities, Cash, security entitlements, other financial assets and other items or property (or their value) standing to the credit from time to time of such Securities Account, and all other rights and benefits accruing to or arising in connection with such property and such Securities Account.

"**Administration Agreement**" means the Administration and Management Agreement dated [●] between the Administrator and the MAV, as amended, modified, restated, replaced or supplemented from time to time, together with any schedules, exhibits, supplements and attachments and all documents incorporated by reference.

"**Administrator**" means BlackRock (Institutional) Canada, Ltd. in its capacity as attorney-in-fact, administrator and asset manager to the MAV pursuant to the Administration Agreement, and its successors and permitted assigns in such capacity.

"**Agent**" means any person appointed by the Intermediary to assist in providing services under this Agreement, other than a Sub-custodian, including agents, nominees and service providers,  and includes affiliates and subsidiaries of the Intermediary, in each case appointed in accordance with the terms of this Agreement;

"**Agreement**" means this securities account control agreement as it may be amended, modified, restated, replaced or supplemented from time to time.

"**Ancillary Agreements**" has the meaning specified in Section 13(5)(ii) of this Agreement.

"**Authorized Signatory**" means any person, whether or not an officer or employee of the Administrator, the Dealer or the Collateral Agent, duly authorized by the Administrator, the Dealer or the Collateral Agent, respectively, to give notices, entitlement orders or other instructions on behalf of the MAV, the Dealer or the Collateral Agent, respectively, such persons to be designated in a certificate which contains a specimen signature of each such person.

"**Business Day**" means a day on which commercial banks and foreign exchange markets are generally open to settle payments and are open for general business in the Cities of New York, New York, Toronto, Ontario and London, United Kingdom.

"**Cash**" means Canadian Dollars and United States Dollars.

"**Collateral**" means the Account Property in the Securities Accounts, which on the date of this Agreement consists of the Account Property described on Schedule "A", together with all replacements of and substitutions for and increases and additions to the Account Property, all certificates and instruments evidencing or representing any Account Property, all stock powers of attorney applicable to any Account Property and all money or other property payable or paid on account of any return or repayment of principal or capital in respect of the Account Property or distributed in respect of the Account Property.

"**Collateral Agent**" means BNY Trust Company of Canada in its capacity as collateral agent pursuant to the terms of the Omnibus Agreement or any successor to the trust and custody business thereof or any permitted assigns thereof in such capacity appointed pursuant to the Omnibus Agreement.

"**Collateral Agent's Notice of Exclusive Control**" means a written notice that the Collateral Agent is exercising exclusive control of the Securities Accounts and the Collateral.

"**Collateral Agent's Security Interest**" has the meaning specified in the recitals to this Agreement.

"**Controlling Party**" with respect to the Securities Accounts and the Collateral, means, (i) prior to the receipt by the Intermediary of a Collateral Agent's Notice of Exclusive Control in accordance with Section 7(2) and after exclusive control reverts to the Dealer in accordance with Section 7(3), the Dealer alone; and (ii) upon receipt by the Intermediary of a Collateral Agent's Notice of Exclusive Control and until exclusive control reverts to the Dealer in accordance with Section 7(3), the Collateral Agent alone.

"**Custody Agreement**" means the custodian agreement made on ● between the MAV, the Dealer, the Collateral Agent and the Intermediary in relation to the Securities Accounts and the Collateral.

"**Dealer's Notice of Exclusive Control**" means a written notice that the Dealer is exercising exclusive control of the Securities Accounts and the Collateral.

"**Dealer's Security Interest**" has the meaning specified in the recitals to this Agreement.

"**Declaration of Trust**" means the declaration of trust dated ●, 2008 providing for the establishment by CIBC Mellon Global Securities Services Company, a company incorporated under the laws of the Province of Nova Scotia, of Master Asset Vehicle [I][II] as a trust under the laws of the Province

of Ontario, as it may be amended, modified, restated, replaced or supplemented from time to time to the extent permitted thereby, and together with any schedules, exhibits, supplements and attachments and all documents incorporated by reference.

"**Depository**" means any of the following depositories, clearing or settlement agencies or systems: CDS Clearing and Depository Services Inc., Euroclear, The Depository Trust Company and the Federal Reserve Bank of New York, and their respective successors and assigns.

"**Eligible Institution**" means a financial institution (i) that has the Required Rating or (ii) whose obligations in favour of the MAV are covered by a guarantee or indemnity satisfactory to the Rating Agency provided by a financial institution or financial institutions that has or have the Required Rating, or in each case under clause (i) and (ii) above, as applicable, each such financial institution has otherwise been approved by the Rating Agency pursuant to the satisfaction of the Rating Agency Condition.  For purposes of this Agreement, RBC Dexia shall be deemed to be an Eligible Institution; provided that, upon occurrence of a RBC Dexia Downgrade Event, RBC Dexia shall cease to be (i) an Eligible Institution for purposes of this Agreement and (ii) a Permitted Custodian for purposes of this Agreement, and the provisions of Section 16 of this Agreement shall apply.

"**Eligible Deposit Account**" means a securities account with an Eligible Institution.

"**Governmental Entity**" means (i) any international, multinational, national, federal, provincial, state, municipal, local or other governmental or public department, central bank, court, commission, board, bureau, agency or instrumentality, domestic or foreign, (ii) any subdivision or authority of any of the above, (iii) any stock exchange and (iv) any quasi-governmental or private body exercising any regulatory, expropriation or taxing authority under or for the account of any of the above.

"**Income Distributions**" means with respect to Collateral, all interest and other payments and distributions of cash or other property with respect to such Collateral, other than on account of principal.

"**Indenture Trustee**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Intermediary**" means RBC Dexia Investor Services Trust in its capacity as custodian of the Securities Accounts and the Collateral in accordance with the terms and conditions of this Agreement and the Custody Agreement and its

successors and permitted assigns in accordance with this Agreement and the Custody Agreement in such capacity.

"**Issuer Trustee**" means CIBC Mellon Global Securities Services Company in its capacity as the issuer trustee of Master Asset Vehicle [I][II] under the Declaration of Trust or any successor to the trust or custodial business thereof serving in such capacity or permitted assign thereof in accordance with the terms of the Declaration of Trust.

"**Majority Secured Creditors**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Master Security Agreement**" means the master security agreement dated [●] by and among, *inter alios,* the MAV, certain swap counterparties of the MAV as Dealers and the Collateral Agent, as amended, modified, restated, replaced or supplemented from time to time and together with any schedules, exhibits, supplements and attachments and all documents incorporated by reference.

"**Notice of Exclusive Control**" means a Collateral Agent's Notice of Exclusive Control or a Dealer's Notice of Exclusive Control.

"**Omnibus Agreement**" means the omnibus agreement dated [●], 2008 by and among, *inter alios,* the MAV, certain swap counterparties of the MAV as Dealers and the Collateral Agent, as amended, modified, restated, replaced or supplemented from time to time, together with any schedules, exhibits, supplements and attachments and all documents incorporated by reference.

"**Permitted Custodian**" means an Eligible Institution that is authorized to provide custodial services.

"**Rating Agency**" means DBRS Limited and any successor to its credit ratings business and any replacement credit rating agency that may be engaged by the MAV.

"**Rating Agency Condition**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Required Rating**" means (i) a short term senior unsecured debt rating by DBRS Limited of not less than R-1 (middle) and an equivalent rating by any one of the following rating agencies of (x) a short term rating by S&P of not less than 'A-1+'; (y) a short term rating by Fitch of not less than 'F1+'or (z) a short term rating by Moody's of not less than 'P-1', or (ii) if no short term senior unsecured debt rating is available, a long term senior unsecured debt rating by DBRS Limited of not less than AA(low) and an equivalent rating by

any one of the following rating agencies of (A) a long term rating by S&P of not less than 'AA-'; (B) a long term rating by Fitch of not less than 'AA-'; or (C) a long term rating by Moody's of not less than 'Aa3'.

"**RBC Dexia**" means RBC Dexia Investor Services Trust.

"**RBC Dexia Downgrade Event**" means a withdrawal, suspension or reduction by the relevant rating agency of an RBC Dexia Rating.

"**RBC Dexia Limited**" means RBC Dexia Investor Services Limited.

"**RBC Dexia Rating**" means any of the following ratings of RBC Dexia Limited: (i) a short term rating by S&P of 'A-1', (ii) a short term rating by Fitch of 'F1+', (iii) a long term rating by S&P of 'AA-' and (iv) a long term rating by Moody's of 'Aa3'.

 "**Secured Creditors**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Securities Accounts**" means the securities accounts established under the terms of the Custody Agreement and maintained by or on behalf of the Intermediary in accordance with this Agreement and the Custody Agreement in the name of the MAV and in which the Collateral is from time to time held, identified on Schedule "A", any substitute or replacement securities accounts maintained by or on behalf of the Intermediary for the MAV and any securities account maintained by or on behalf of the Intermediary for the MAV into which property from any such securities account is transferred.

"**Securities Transfer Act**" means the *Securities Transfer Act, 2006* (Ontario), as that statute is now enacted or as the same may from time to time be amended, re-enacted or replaced and includes any regulation under that statute.

"**Security Interests**" has the meaning specified in the recitals to this Agreement.

"**Settlement Amounts**" has the meaning specified in Section 9(9) of this Agreement.

"**Sub-custodian**" means a financial institution that is appointed by the Intermediary in accordance with this Agreement to provide custodial services with respect to any of the Collateral and the related Securities Accounts.

"**Transaction Documents**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Wrapped Collateral**" means Collateral described in Schedule "B" and which has been deposited into a segregated Securities Account as noted on Schedule "B".

"**Wrap Swap**" has the meaning specified in Schedule A of the Omnibus Agreement.

## Section 2    Interpretation.

(1)    Terms defined in the Securities Transfer Act and used but not otherwise defined in this Agreement have the same meanings.  For greater certainty, the terms "**entitlement order**", "**financial asset**", "**securities account**", "**securities intermediary**", "**securities intermediary's jurisdiction**", "**security**" and "**security entitlement**" have the meanings given to them in the Securities Transfer Act.

(2)    In this Agreement the words "**including**", "**includes**" and "**include**" mean "**including (or includes or include) without limitation**".  The expression "**Section**" and any other subdivision followed by a number means and refers to the specified Section or other subdivision of this Agreement.

(3)    Words importing the singular number only include the plural and vice versa.

(4)    The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenient reference only and do not affect its interpretation.

(5)    The schedules attached to this Agreement form an integral part of it for all purposes of it.

## Section 3    The Intermediary.

The Intermediary agrees to maintain and to operate each of the Securities Accounts and to deal with the Collateral in accordance with the terms of this Agreement and the Custody Agreement. **[NTD:  Appointment language shall be in the revised Custody Agreement.]**

## Section 4    The Issuer Trustee.

The Issuer Trustee has established Master Asset Vehicle **[I][II]** pursuant to the Declaration of Trust and its liability under this Agreement is limited as provided in the Declaration of Trust.  The provisions regarding liability set out in subsections 6.7(a), (b), (c) and (d) of the Declaration of Trust are hereby incorporated by reference in this Agreement.

**Section 5      The Administrator and the MAV.**

The MAV has authorized the Administrator to act as its attorney-in-fact in respect of all of its rights and obligations under this Agreement whether expressed as a right or an obligation of the MAV. Unless otherwise advised in writing by the MAV, the Intermediary, the Collateral Agent and the Dealer may assume without enquiry that (i) the Administrator is acting on behalf of the MAV, and (ii) such action taken by the Administrator has been duly authorized and approved by all necessary action on the part of the Issuer Trustee pursuant to an effective delegation and such action will bind the Issuer Trustee and the MAV for all purposes hereof with the same effect as if undertaken by the MAV directly.  Until notified in writing by the Issuer Trustee of any change in the appointment of the Administrator as the administrator and attorney-in-fact of the MAV, the Intermediary, the Collateral Agent and the Dealer shall be entitled to rely on the authority of the Administrator as the administrator and attorney-in-fact of the MAV.

**Section 6      The Collateral Agent**

(1)    BNY Trust Company of Canada has been appointed as the Collateral Agent pursuant to Section 7.1(a)(i) of the Omnibus Agreement and its liability under this Agreement is limited as provided in the Omnibus Agreement.

(2)    The Collateral Agent is a party to this Agreement in its capacity as agent for the Secured Creditors and may act on its own pursuant to the authority it has in such capacity under the Omnibus Agreement and the Master Security Agreement and shall act in accordance with any directions provided by the applicable Secured Creditors who at the time such directions are given constitute the Majority Secured Creditors (provided that for the purposes of this Agreement, the Dealer shall be deemed not to be an "LSS CDS Counterparty" for the "Majority Secured Creditors" definition).

(3)    BNY Trust Company of Canada has agreed to assume the obligations of the Collateral Agent under this Agreement in its capacity as Collateral Agent as appointed pursuant to the Omnibus Agreement.  BNY Trust Company of Canada in such capacity expressly does not assume the responsibilities of any other service provider in relation to this Agreement or any Transaction Document, notwithstanding that it or an affiliate or related party may be appointed in another capacity under such document.

**Section 7      Control of the Securities Accounts**

(1)    Until the Collateral Agent has delivered a Collateral Agent's Notice of Exclusive Control to the Intermediary, the Dealer shall have exclusive control over the Securities Accounts and the Collateral and the Intermediary agrees to comply only with entitlement orders and other instructions originated by the Dealer and not by any other person with respect to the Securities

Accounts and the Collateral, without any need for the further consent of the MAV, the Collateral Agent or any other person**.**  Notwithstanding the foregoing, the Dealer may instruct the Intermediary to accept entitlement orders from the Administrator in accordance with Section 7(4) [and the MAV may provide joint instructions in accordance with Section 8] **[NTD square bracketed portion not required for HSBC]**

(2)    If at any time the Collateral Agent delivers a Collateral Agent's Notice of Exclusive Control to the Intermediary (with copies to the Dealer and the MAV) the Collateral Agent shall have exclusive control over the Securities Accounts and the Collateral and the Intermediary agrees (i) to promptly cease complying with any entitlement orders or other instructions originated by the Dealer relating to the Securities Accounts and the Collateral, and (ii) to comply only with entitlement orders and other instructions originated by the Collateral Agent and not by any other person with respect to the Securities Accounts and the Collateral, without any need for further consent of the MAV, the Dealer or any other person, until the Collateral Agent provides a notice giving exclusive control over the Collateral and the Securities Accounts to the Dealer as the Controlling Party in accordance with Section 7(3). Notwithstanding the foregoing, the Collateral Agent may instruct the Intermediary to accept entitlement orders from the Administrator in accordance with Section 7(4) [and the MAV may provide joint instructions in accordance with Section 8.]**[NTD:  square bracketed portion not required for HSBC]**

(3)    If at any time while the Collateral Agent has control of the Securities Accounts and the Collateral, (a) it is determined by a court of competent jurisdiction that the Collateral Agent was not entitled to take exclusive control of the Collateral pursuant to the Transaction Documents, or (b) the Collateral Agent and the Dealer agree that the Collateral Agent was not entitled to take exclusive control of the Collateral pursuant to the Transaction Documents, the Collateral Agent shall in each such instance provide a written notice to the Intermediary (with copies to the Dealer and the MAV) instructing the Intermediary with effect from the date of such notice that the Dealer shall have exclusive control over the Securities Accounts as the Controlling Party in accordance with and subject to all the provisions of this Agreement.

(4)    In connection with certain obligations of the Administrator under the Omnibus Agreement:

        (i)    The Controlling Party may provide written instructions to the Intermediary, (with copies to the MAV, the Administrator and the Collateral Agent), authorizing the Intermediary to accept

entitlement orders from the Administrator with respect to the Securities Accounts and the Collateral and until the Controlling Party has revoked such instructions by delivery of a Notice of Exclusive Control in accordance with Section 7(5), the Intermediary agrees to comply with entitlement orders and other instructions originated by the Administrator or the Controlling Party, with respect to the Securities Accounts and the Collateral, without any need for the further consent of the Controlling Party or any other person, until the Controlling Party has revoked such instruction  by delivery of a Notice of Exclusive Control in accordance with Section 7(5); and

(ii)    The Dealer, as the Controlling Party on the date of this Agreement, and acting in accordance with Section 7(4)(i) of this Agreement, instructs the Intermediary to comply with all entitlement orders and other instructions originated by the Administrator or the Dealer, with respect to the Securities Accounts and the Collateral, from the date of this Agreement until the instructions in this Section 7(4)(ii) are revoked by delivery of a Notice of Exclusive Control in accordance with Section 7(5).

(5)    If, at any time after the Controlling Party has provided written instructions to the Intermediary in accordance with Section 7(4), the Intermediary receives a Notice of Exclusive Control from the Controlling Party, the Intermediary shall, after receipt of such notice, promptly cease complying with any entitlement orders or other instructions relating to the Securities Accounts and the Collateral originated by the Administrator.  Upon receipt by the Intermediary of such a Notice of Exclusive Control, the Controlling Party shall have exclusive control over the Securities Accounts and the Collateral in accordance with this Agreement and the Intermediary agrees to comply only with entitlement orders and other instructions originated by the Controlling Party and not by any other person, with respect to the Securities Accounts and the Collateral, without any need for the further consent of the Administrator, the MAV or any other person.

(6)    The Intermediary will not comply with any entitlement orders or other instructions originated by the Administrator or the MAV with respect to any Securities Account or the Collateral except as provided in Section 7(4) and Section 8 of this Agreement.  If an entitlement order or other instruction originated by the Administrator conflicts with any entitlement order or other instruction originated by the Controlling Party, the Intermediary will comply with the entitlement order or other instruction originated by the Controlling Party.

(7)    Each of the Collateral Agent and the Dealer shall provide a copy of any notice provided by it under this Section 7 to the Rating Agency promptly.

**Section 8    Instructions with Respect to Income Distributions.**

(1)    The parties to this Agreement agree and acknowledge that all Income Distributions received in the Securities Accounts other than Income Distributions on Wrapped Collateral received in the Securities Account set out on Schedule "B", shall be transferred (i) as soon as practicable after receipt to the account set out on Schedule "C", and (ii) without duplication, on the effective date of termination of this Agreement.  The MAV, the Dealer and the Collateral Agent instruct the Intermediary to complete such transfers.  Notwithstanding any other provision of this Agreement to the contrary, the parties to this Agreement agree that such instructions may not be altered except with ten (10) days prior written notice to the Rating Agency and by joint written instructions from the MAV, the Dealer and the Collateral Agent to the Intermediary, while the Dealer is the Controlling Party, and by joint written instructions from the MAV and the Collateral Agent to the Intermediary, while the Collateral Agent is the Controlling Party.

(2)    The parties to this Agreement agree and acknowledge that all Income Distributions received on Wrapped Collateral in the Securities Accounts set out on Schedule "B" shall be transferred (i) as soon as practicable after receipt to the account set out on Schedule "D" and (ii) without duplication, on the effective date of termination of this Agreement.  The MAV, the Dealer and the Collateral Agent hereby instruct the Intermediary to complete such transfers.  Notwithstanding any other provision of this Agreement to the contrary, the parties to this Agreement agree that such instructions may not be altered except by joint written instructions from the MAV, the Dealer and the Collateral Agent to the Intermediary, while the Dealer is the Controlling Party, and by joint written instructions from the MAV and the Collateral Agent to the Intermediary, while the Collateral Agent is the Controlling Party.  The Dealer agrees to cooperate to provide any such joint instructions upon the termination of the relevant Wrap Swap applicable to the Wrapped Collateral.

**(3)    [For HSBC only][The parties to this Agreement agree and acknowledge that the Dealer and the MAV are parties to Wrap Swaps consisting of total return swap agreements and interest rate swap agreements relating to the Collateral in the Securities Accounts set out on Schedule ● and consequently certain Income Distributions received on the Collateral in the Securities Accounts set out on Schedule ● are payable to the Dealer and certain Income Distributions received on the Collateral in the Securities Accounts set out on Schedule ● are payable to the MAV, in accordance with the relevant Wrap Swaps.   The Dealer shall provide written**

**instructions to the Intermediary, with copies to the Rating Agency, to transfer applicable Income Distributions relating to the Collateral in the Securities Accounts set out on Schedule ● to the MAV account set out on Schedule ●, in accordance with the relevant Wrap Swaps agreements. The Dealer agrees that it shall provide written instructions to the Intermediary, with copies to the Rating Agency, to transfer applicable Income Distributions relating to the Collateral in the Securities Accounts set out on Schedule ● to the Dealer's account set out on Schedule ●, in accordance with the relevant Wrap Swaps.**

(4)     The Collateral Agent shall provide a copy of any joint notice provided under Section 8(2) to the Rating Agency promptly.  **[The Dealer shall provide a copy of any notice or joint notice provided under this Section 8 to the MAV, the Collateral Agent and the Rating Agency promptly.]**

**Section 9     The Securities Accounts.**

(1)     At the date of this Agreement the Securities Accounts are the securities accounts identified in Schedule "A".  The Intermediary and the MAV will notify the Dealer and the Collateral Agent of any other change in the Securities Accounts or the information on such schedule.

(2)     The parties agree that each Securities Account is a securities account, each item of Collateral credited to each of the Securities Accounts is a financial asset for purposes of the Securities Transfer Act and any other similar law applicable in any other relevant jurisdiction and each other right of the MAV, the Dealer and the Collateral Agent against the Intermediary arising out of the Securities Accounts is a financial asset.

(3)     The Intermediary acknowledges and agrees that for purposes of the Securities Transfer Act and any other similar law applicable in any other relevant jurisdiction, the Intermediary is the securities intermediary for the Securities Accounts and that Ontario is the securities intermediary's jurisdiction for each of the Securities Accounts and each agreement between the MAV and the Intermediary with respect to a Securities Account is hereby amended to include this provision.

(4)     To the extent it is within the control of the Intermediary, the Intermediary will ensure that all certificated securities or other financial assets represented by a certificate held in the Securities Accounts are either (i) in bearer form, or (ii) in registered form in a freely negotiable form and are not registered in the name of the MAV, payable to the order of the MAV or specially endorsed to the MAV by an effective endorsement.

(5)    To the extent it is within the control of the Intermediary, the Intermediary will ensure that all uncertificated securities or other financial assets that are not represented by a certificate (other than instruments)  held in the Securities Accounts are not registered in the name of the MAV or an agent for the MAV (other than the Intermediary) in the register of the issuer.

(6)    To the extent it is within the control of the Intermediary, the Intermediary will ensure that all instruments held in the Securities Accounts are either (i) specially endorsed by an effective endorsement to the Intermediary or in blank, or (ii) in the form of a transferable credit, delivered to the Intermediary with the relevant transfer document completed in favour of the Intermediary, or (iii) for credits that are not in transferable form, delivered to the Intermediary with the relevant assignment of proceeds document completed in favour of the Intermediary.

(7)    The Intermediary will not enter into any agreement with any other person relating to the Securities Accounts and/or any financial assets in any of them under which it agrees to comply with entitlement orders made by such other person.

(8)    The Intermediary will notify the Collateral Agent, the Dealer, the MAV and the Rating Agency promptly if any other person claims that it has a property interest in any of the Collateral.

(9)    The Intermediary agrees that it will not advance any margin or any other credit to the MAV, except that the Intermediary may advance funds to the MAV, by way of temporary overdraft for trade settlement purposes (the "**Settlement Amounts**") in accordance with the Custody Agreement.  If the Controlling Party or any other person entitled to give such instructions in accordance with Section 7 of this Agreement provides an entitlement order or instructions requiring the Intermediary to advance credit on any Securities Account for Settlement Amounts, such party shall (i) liquidate all or any portion of any asset purchased under such entitlement order or instructions and apply the proceeds to eliminate the Settlement Amounts; or, (ii) take such other steps as they deem reasonably required in the circumstances to eliminate the Settlement Amounts, including without limitation, collecting from and applying any cash held in such Securities Account against any Settlement Amounts owing and/or disposing of any assets of the MAV in any such Securities Account and applying any proceeds of such disposal to the payment of any Settlement Amount owing, and such party shall (y) promptly provide the Rating Agency with a copy of the entitlement order or instructions given to the Custodian to eliminate the Settlement Amounts, and (z) shall notify the Rating Agency promptly of any shortfall that ensues upon completion of the entitlement order or instructions given to the Custodian to

eliminate the Settlement Amounts.  The Controlling Party or any other person entitled to give such instructions in accordance with Section 7 of this Agreement will, to the extent practicable, choose assets in priority from those most likely to return proceeds at least at par to those which are less likely to return par and will otherwise exercise commercially reasonable efforts to avoid incurring a shortfall after the amounts realized are applied to payment of the Settlement Amounts.

(10)    The Intermediary agrees that it will not lend, pledge or hypothecate the Securities Account or any Collateral in the Securities Accounts and it will not permit any financial institution at which it maintains any Securities Account to lend, pledge or hypothecate the Securities Accounts or any Collateral in any such Securities Accounts.

(11)    The Intermediary agrees that it will not dispose of any Collateral in the Securities Accounts (other than pursuant to instructions given to it in accordance with this Agreement) and it will not permit any financial institutions at which it maintains any Securities Accounts to dispose of any Collateral in any such Securities Accounts.

## Section 10    Representations and Warranties of the Intermediary.

The Intermediary represents and warrants that:

(1)    the Intermediary is a trust company duly incorporated, organized and subsisting under its governing statute, with the power, authority and right to enter into and deliver this Agreement and perform its obligations under this Agreement;

(2)    on the date of this Agreement, the Intermediary is a Permitted Custodian;

(3)    this Agreement constitutes a valid and binding agreement of the Intermediary, enforceable against the Intermediary in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and other laws of general application limiting the enforcement of creditors' rights generally and to the fact that specific performance is an equitable remedy available only in the discretion of the court;

(4)    the Intermediary has established and maintains the Securities Accounts described in Schedule "A" and each of the Securities Accounts is a segregated account in the name of Master Asset Vehicle [I][II] and shall be maintained as a segregated account in the name of Master Asset Vehicle [I][II];

(5)    no Securities Account is or will be a margin account and the Intermediary has not advanced any margin or any other credit to the MAV except Settlement

Amounts in accordance with Section 9(9) of this Agreement and has not pledged or hypothecated any financial assets in any of the Securities Accounts;

(6)    Schedule "E" contains the most recent statements produced by the Intermediary in the ordinary course of its business regarding the Collateral in each of the Securities Accounts at the statements' date.  The Intermediary does not know of any inaccuracy in the statements;

(7)    The Intermediary does not know of any entitlement order or any other right of any person binding upon or which at any time in the future may become binding upon the Intermediary to sell, transfer, or in any other way dispose of or encumber any of the Collateral other than under the terms of this Agreement;

(8)    the Intermediary does not know of any lien on, claim to or interest in any Securities Account or the Collateral, except for the claims and interests of the Dealer, the Collateral Agent and the MAV; and

(9)    other than the Custody Agreement and this Agreement, there are no other agreements that the Intermediary has entered into with any party relating to the Securities Accounts or any financial assets in any of them.    The Intermediary has not entered into any agreement with any other person relating to the Securities Accounts and/or any financial assets in any of them under which it has agreed or will agree to comply with entitlement orders made by such other person.

**Section 11    Representations and Warranties of the MAV.**

The MAV represents and warrants that:

(1)    it has no margin loans outstanding in any of the Securities Accounts as of the date of this Agreement, and it will not request the Intermediary to extend any new credit to the MAV secured by any of the Securities Accounts or any of the Collateral;

(2)    the MAV does not know of any lien on, claim to or interest in any of the Securities Accounts or the Collateral, except for the claims and interests of the Dealer, the Collateral Agent or the MAV; and

(3)    other than the Custody Agreement and this Agreement, there are no other agreements that the MAV has entered into relating to the Securities Accounts or any financial assets in any of them.

**Section 12    Priority of Security Interests.**

The Intermediary acknowledges the Security Interests granted to the Dealer and to the Collateral Agent in the Collateral held in the Securities Accounts. The Intermediary waives any security interest, lien, encumbrance, claim or right of set-off it may have, now or in the future, whether by agreement, operation of law or otherwise, against the Securities Accounts and the Collateral held in each Securities Account.

**Section 13    Acknowledgements.**

(1)    The Intermediary acknowledges that the MAV is the entitlement holder with respect to the Securities Accounts.

(2)    Each of the other parties acknowledges and agrees that the Intermediary is entitled to rely on the accuracy of the recitals to this Agreement.

(3)    Each of the other parties hereto acknowledges and agrees that the Intermediary is not a guarantor of the MAV and shall not be held responsible for any decline in the market value of the Collateral in each Securities Account and has no obligation to notify any other party hereto of any such decline or, except as set out in this Agreement, to take any action with regard to the Collateral in each Securities Account.

(4)    The Controlling Parties acknowledge that no investment shall be made if such investment would cause any Collateral to be held by a Sub-custodian outside of Canada or the United States of America.

(5)    Each of the other parties hereto acknowledges and agrees that,

(i)    subject as provided herein, the Intermediary may be obliged to comply with any applicable law, rule, regulation or order of a Governmental Entity in connection with the Collateral. The Intermediary agrees to provide the MAV, the Dealer, the Collateral Agent and the Rating Agency with notice and the details of any such demand promptly after the receipt thereof by the Intermediary; and

(ii)    the Intermediary is not a party to any of the Master Security Agreement, the Administration Agreement, the Omnibus Agreement or the Declaration of Trust (collectively, the "**Ancillary Agreements**"), and as such, the Intermediary has no responsibility or obligation of any kind or nature in respect of the Ancillary Agreements, other than in relation to those provisions of the Ancillary Agreements that have been imported into this Agreement by reference herein.

**Section 14    Intermediary's Duties and Responsibilities.**

(1)    The Intermediary agrees that, in respect of any of its duties in relation to the Collateral held outside of Ontario or any Securities Account that is maintained on behalf of the Intermediary with an Eligible Institution located outside of Ontario, it shall only delegate any such duties with respect to any such Collateral or the Securities Accounts to Sub-custodians that satisfy the requirements for a Permitted Custodian. The Intermediary shall at all times monitor any Sub-Custodian appointed in accordance with this Section 14(1) and upon any Sub-custodian ceasing to satisfy the requirements for a Permitted Custodian or if any Sub-custodian delegates its custodial and safekeeping duties to a third party, the Intermediary shall promptly replace such Sub-Custodian with a replacement sub-custodian that satisfies the requirements for a Permitted Custodian and promptly cause any Collateral held at any such Sub-Custodian to be transferred to a replacement Sub-Custodian appointed in accordance with this Section 14(1); provided that if the Intermediary is unable to appoint a replacement Sub-Custodian that satisfies the requirements for a Permitted Custodian in accordance with this Section 14(1), the Intermediary shall resign in accordance with Section 17(2) of this Agreement.  No other party to this Agreement is entitled to provide (or permit another party to provide) instructions to the Intermediary instructing the Intermediary to retain a Sub-custodian, and each party to this Agreement agrees that only the Custodian shall have the right to retain Sub-custodians.

(2)    The Intermediary agrees that all Collateral shall be held in Securities Accounts that are Eligible Deposit Accounts at all times.  If a Securities Account is no longer an Eligible Deposit Account, subject to the terms of Section 16 of this Agreement, the Intermediary shall promptly notify the Rating Agency and promptly cause any Collateral held in any such account to be transferred to a Securities Account that is an Eligible Deposit Account.

(3)    The Intermediary shall ensure that the Collateral in each of the Securities Accounts is at all times kept segregated in the books and records of the Intermediary from any property and assets of the Intermediary and any other person;

(4)    **[Language for HSBC Only:** The Intermediary shall maintain in current electronic form, records and files related to the Collateral.  The Intermediary shall provide the Administrator and the Dealer with daily twenty-four (24) hour read-only access to all electronic records and files relating to the Collateral and transactions in the Securities Accounts through an electronic information delivery system, subject to maintenance requirements, and to interruptions in the information delivery system, or in power supply, or any other event or factor beyond the reasonable control of the Intermediary;

[**Language for DB Only:** The Intermediary shall maintain in current electronic form, records and files related to the Collateral. The Intermediary shall provide the Administrator with daily twenty-four (24) hour read-only access, and the Dealer with daily twenty-four (24) hour access to all electronic records and files relating to the Collateral and transactions in the Securities Accounts through an electronic information delivery system, subject to maintenance requirements, and to interruptions in the information delivery system, or in power supply, or any other event or factor beyond the reasonable control of the Intermediary;

(5)     The Intermediary agrees that it shall:

(i)     make notations on its records and files related to the Collateral, provided that the Intermediary currently offers this service to its clients, indicating that the MAV is the beneficial owner of the Collateral and that the Collateral is subject to the Security Interests, and the Intermediary shall require that any Sub-custodian holding any Collateral on behalf of the Intermediary (where permitted in accordance with the terms of this Agreement) shall acknowledge that the MAV is the beneficial owner of the Collateral and that the Collateral is subject to the Security Interests; and

(ii)    advise any person who makes inquiries regarding the possession or control by the Intermediary of the Collateral that the Intermediary is in possession of the Collateral as custodian of the MAV and the Dealer or other Controlling Party at the relevant time, that the MAV is the beneficial owner of the Collateral and and that the Intermediary has no beneficial ownership interest in the Collateral;

(6)     During regular business hours and upon reasonable notice to the Intermediary, and subject to any other reasonable requirements the Intermediary may impose, including security requirements, the Intermediary shall make the Collateral, together with the Intermediary's related records and files, available to (i) the MAV, (ii) the Dealer, while it is the Controlling Party, (iii) the Collateral Agent, and (iv) the Rating Agency, and each of their respective representatives at the relevant time for examination and audit;

(7)     The Intermediary will send copies of all statements and confirmations concerning the Securities Accounts and the Collateral or make electronic copies available promptly to the MAV, the Dealer and the Collateral Agent. The MAV consents to the release and disclosure of such information to the Dealer and the Collateral Agent.

(8)    The Intermediary will promptly notify the Dealer, the MAV, the Collateral Agent and the Rating Agency if any other person asserts any lien, encumbrance or other claim against any of the Securities Accounts or the Collateral and promptly notify the Dealer, the MAV, the Collateral Agent and the Rating Agency of any loss, destruction of or damage to any of the Collateral.

(9)    Subject to Section 14(2), the Intermediary will not change the name or the account number of any of the Securities Accounts without the prior written consent of the MAV and the Controlling Party at the relevant time and ten (10) Business Days prior written notice to the Collateral Agent (if it is not the Controlling Party at the time) and the Rating Agency.

(10)    The Intermediary shall not accept any entitlement orders or other instructions regarding, and not otherwise deal with, any of the Securities Accounts or the Collateral other than in accordance with the terms and conditions of this Agreement and the Custody Agreement.

(11)    If the Intermediary selects or uses Agents or Sub-custodians it shall be liable for the actions or failure to act of any such Agents or Sub-custodians in respect of the Collateral and/or the Securities Accounts in accordance with the terms of this Agreement, subject only to limitations on liability set out in the Custody Agreement.  In no event shall a Depository be deemed to be an Agent or Sub-custodian of the Intermediary.

**Section 15    Rights of the Intermediary.**

(1)    The Intermediary is entitled to rely upon (i) any Collateral Agent's Notice of Exclusive Control that it believes in good faith to be originated by the Collateral Agent, (ii) any Dealer's Notice of Exclusive Control that it believes in good faith to be originated by the Dealer, and (iii) any entitlement order, notice or other instruction that it believes in good faith to be originated by the Controlling Party or, to the extent applicable pursuant to Section 7(4) or Section 8 of this Agreement, by the Administrator or the MAV, with respect to the Collateral and each Securities Account.    Provided that if the Intermediary requests that the Administrator, the Collateral Agent or the Dealer furnish a certificate designating Authorized Signatories, the Intermediary shall be deemed to act in good faith and shall be fully protected in acting upon the notices, entitlement orders or other instructions of such Authorized Signatories on behalf of the MAV, the Administrator, the Collateral Agent or the Dealer respectively, as designated on such certificate or replacement certificate.

(2)    The Intermediary has no obligation to (i) determine whether or not the rights of the Dealer or the Collateral Agent under the Master Security Agreement

are enforceable, or (ii) investigate or determine whether or not the Collateral Agent in the case of a Collateral Agent's Notice of Exclusive Control or the Dealer in the case of a Dealer's Notice of Exclusive Control, or the Controlling Party at the relevant time with respect to each Securities Account, is entitled to give any entitlement order, notice or other instruction; or (iii) determine whether an event of default exists under any agreement between any of the MAV, the Dealer and the Collateral Agent; or, (iv) determine if any entitlement orders and other instructions of the MAV or the Administrator (authorised in accordance with this Agreement) are provided strictly in accordance with the provisions of the Administration Agreement or the Omnibus Agreement or any other appropriate Transaction Document (except this Agreement and the Custody Agreement).

(3)     Subject to Section 7(3) of this Agreement, the Intermediary will not be liable to the Dealer for complying with a Collateral Agent's Notice of Exclusive Control in accordance with Section 7(2) of this Agreement.

(4)     Subject to Section 7(5) of this Agreement, the Intermediary will not be liable to the Controlling Party for complying with entitlement orders and other instructions originated by the Administrator pursuant to written instructions provided to the Intermediary by the Controlling Party in accordance with Section 7(4) of this Agreement.

(5)     The Dealer will pay the usual and customary fees and expenses and other charges payable on each Securities Account pursuant to the respective account agreements for each Securities Account and shall indemnify and hold harmless the Intermediary, its officers, directors, employees, and Agents against all claims, liabilities, and expenses arising out of this Agreement (including reasonable legal fees and disbursements), except to the extent the claims, liabilities, or expenses are caused by the bad faith, negligence, or wilful misconduct of the Intermediary. The MAV shall not have any liability for the payment of fees and expenses and other charges payable on each Securities Account pursuant to the Custody Agreement and any account agreement for each respective Securities Account. For greater certainty, the Dealer agrees and acknowledges that its indemnity obligations contained in this Section 15(5) shall survive any removal of the Dealer as the Controlling Party, pursuant to the provisions of this Agreement, and that such indemnity obligations shall continue in full force and effect after such removal, in accordance with their terms. This Section 15(5) will survive the termination of this Agreement.

(6)     The Dealer shall indemnify the MAV against all direct losses incurred by it attributable to entitlement orders or other instructions provided by the Dealer that require the Intermediary to advance Settlement Amounts, and the Dealer

shall pay such amounts directly to the Intermediary on behalf of the MAV to be deposited in the appropriate Securities Accounts. For greater certainty, the Dealer shall only indemnify such direct losses and shall not have any responsibility or liability whatsoever for any indirect, consequential or other losses attributable to entitlement orders or other instructions provided by the Dealer that require the Intermediary to advance Settlement Amounts. The Dealer shall not have any responsibility or liability whatsoever for any direct, indirect, consequential or other losses attributable to entitlement orders or other instructions provided by the MAV, the Administrator, the Collateral Agent or any other person that require the Intermediary to advance Settlement Amounts.

(7)     The Intermediary shall not have recourse to the Collateral and the Securities Accounts. None of the MAV, the Dealer and the Collateral Agent shall be obliged or required to take any further steps against the Intermediary beyond the requirements of this Agreement to recover any sums in respect of the Collateral and the Securities Account. The obligations of the Dealer under Section 15(5) of this Agreement are solely the obligations of the Dealer. No recourse for the payment of any obligation of the Dealer shall be had against the Collateral and the Securities Account, or the MAV, the Collateral Agent, the Issuer Trustee, the Administrator or any incorporator, affiliate, shareholder, director, officer, representative, employee, manager, member, beneficiary or agent of any of them.

(8)     Notwithstanding any prior termination of this Agreement, the Intermediary shall not acquiesce, petition or otherwise invoke or cause the MAV to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the MAV under any bankruptcy, insolvency or similar law or, appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the MAV or any substantial part of its property, or ordering the winding up or liquidation of the affairs of the MAV.

**Section 16      Loss of Permitted Custodian Status of the Intermediary.**

(1)     During the term of this Agreement, in the event the Intermediary ceases to be a Permitted Custodian, the Intermediary shall forthwith notify the Dealer, the Collateral Agent, the MAV and the Rating Agency of such event.

(2)     Upon receiving notification that the Intermediary has ceased to be a Permitted Custodian, the Controlling Business Party shall, with ten (10) Business Days prior written notice to the Rating Agency, and with the consent of the MAV, which is not to be unreasonably withheld, designate in writing a replacement intermediary that satisfies the requirements for a Permitted Custodian

(provided that if the Dealer is the Controlling Party at the relevant time, such replacement intermediary is satisfactory to the Collateral Agent). Such replacement intermediary, (i) shall agree in writing to perform the duties of the Intermediary under this Agreement and to become a party to this Agreement in place of the Intermediary (or to enter into a substantially similar agreement that is reasonably satisfactory to the MAV, the Dealer and the Collateral Agent and subject to satisfaction of the Rating Agency Condition), and (ii) shall enter into a replacement Custody Agreement (that is reasonably satisfactory to the MAV, the Dealer and the Collateral Agent and subject to satisfaction of the Rating Agency Condition), and such agreements entered into by the replacement intermediary shall apply to the Collateral and any securities accounts opened by the replacement intermediary in connection with the Collateral, upon delivery of the Collateral to the replacement intermediary. The Intermediary shall deliver the Collateral to the replacement intermediary so designated by the Controlling Party in accordance with written instructions of the Controlling Party and upon such delivery, the delivering Intermediary shall have no further obligations under this Agreement, except to the extent of any liability in respect of obligations arising prior to the date of such delivery.

## Section 17   Termination.

(1)     Except as set out in Section 17(2) and Section 17(3) below, the obligations of the Intermediary under this Agreement will continue in effect until the Dealer and the Collateral Agent jointly notify the Intermediary, with prior written notice to the Rating Agency, of termination of this Agreement in writing, unless in accordance with Section 7(2) the Collateral Agent has become the Controlling Party with respect to the Securities Accounts, in which case the Collateral Agent acting alone may notify the Intermediary of termination of this Agreement in writing. The termination of this Agreement will not terminate any Securities Account unless specifically agreed by the Dealer and if different, the Controlling Party at the relevant time.

(2)     The Intermediary shall not resign from its duties under this Agreement at any time unless the Intermediary provides 90 days written notice to the Dealer, the Collateral Agent, the MAV and the Rating Agency, provided that such notice period is subject to (i) automatic extension pending the appointment of a replacement intermediary by a court of competent jurisdiction, if the Controlling Party applies to a court of competent jurisdiction for the appointment of a replacement intermediary within 90 days of such notice of resignation, as set out below or (ii) extension at the sole discretion of the Intermediary subject to the appointment of a replacement intermediary in accordance with the next sentence. Upon receipt of such written notice, the Controlling Party shall, with ten (10) Business Days prior written notice to the

Rating Agency, and with the consent of the MAV, which is not to be unreasonably withheld, designate in writing a replacement intermediary that satisfies the requirements for a Permitted Custodian (provided that if the Dealer is the Controlling Party at the relevant time, such replacement intermediary is also satisfactory to the Collateral Agent). If the relevant parties cannot agree upon a satisfactory designated replacement intermediary, the Controlling Party may apply within 90 days of the notice of resignation to a court of competent jurisdiction for a replacement intermediary to be appointed at the expense of the Dealer if it is the relevant Controlling Party, and at the expense of the MAV if the Collateral Agent is the Controlling Party, and the effective date of the resignation of the Intermediary shall be extended until delivery of the Collateral to the replacement intermediary appointed by the relevant court. Such replacement intermediary, (i) shall agree in writing to perform the duties of the Intermediary under this Agreement and to become a party to this Agreement in place of the Intermediary (or to enter into a substantially similar agreement that is reasonably satisfactory to the MAV, the Dealer and the Collateral Agent and subject to satisfaction of the Rating Agency Condition), and (ii) shall enter into a replacement Custody Agreement (that is reasonably satisfactory to the MAV, the Dealer and the Collateral Agent and subject to satisfaction of the Rating Agency Condition), and such agreements entered into by the replacement intermediary shall apply to the Collateral and any securities accounts opened by the replacement intermediary in connection with the Collateral, upon delivery of the Collateral to the replacement intermediary. The Intermediary shall deliver the Collateral to the replacement intermediary in accordance with written instructions of the Controlling Party and upon such delivery, the resignation shall be effective and the resigning Intermediary shall have no further obligations under this Agreement, except to the extent of any liability in respect of obligations arising prior to the date of such delivery.

(3)    The Intermediary may be removed as Intermediary under this Agreement upon not less than ten (10) Business Days written notice from the Controlling Party, with a copy to the Rating Agency, following any breach by the Intermediary of its obligations under this Agreement. Upon such written notice, the Controlling Party shall, with the consent of the MAV which is not to be unreasonably withheld, designate in writing a replacement intermediary that satisfies the requirements for a Permitted Custodian (provided that if the Dealer is the Controlling Party at the relevant time, such replacement intermediary is satisfactory to the Collateral Agent). Such replacement intermediary, (i) shall agree in writing to perform the duties of the Intermediary under this Agreement and to become a party to this Agreement in place of the Intermediary (or to enter into a substantially

similar agreement that is reasonably satisfactory to the MAV, the Dealer and the Collateral Agent and subject to satisfaction of the Rating Agency Condition), and (ii) shall enter into a replacement Custody Agreement (that is reasonably satisfactory to the MAV, the Dealer and the Collateral Agent and subject to satisfaction of the Rating Agency Condition), and such agreements entered into by the replacement intermediary shall apply to the Collateral and any securities accounts opened by the replacement intermediary in connection with the Collateral, upon delivery of the Collateral to the replacement intermediary.  On or before the effective date of such removal, the Intermediary shall deliver the Collateral to the replacement Intermediary so designated by the Controlling Party in accordance with the written instructions of the Controlling Party and, upon such delivery, the removed Intermediary shall have no further obligations under this Agreement, except to the extent of any liability in respect of obligations arising prior to the date of such delivery.

## Section 18    Governing Law.

(1)    This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable in the Province of Ontario.

(2)    Each party to this Agreement irrevocably attorns and submits to the non-exclusive jurisdiction of the courts of the Province of Ontario situated in the City of Toronto, and waives objection to the venue of any proceeding in such court or that such court provides an inconvenient forum.

(3)    Each party to this Agreement irrevocably consents to the service of any and all process in any such action or proceeding by the delivery of copies of such process to them as provided in Section 23 of this Agreement.  Nothing in this Section 18 affects the right of the Collateral Agent or the Dealer to serve process in any manner permitted by law.

## Section 19    Conflict with Other Agreements.

In the event of any conflict between the provisions of this Agreement and the provisions of the Omnibus Agreement which cannot be resolved by both provisions being complied with, the parties to this Agreement agree that the provisions contained in the Omnibus Agreement will prevail to the extent of such conflict, and the provisions of this Agreement shall be deemed to be amended to the extent necessary to eliminate such conflict and to exercise the intentions set out in the relevant provisions of the Omnibus Agreement, provided that in no event shall any such conflict be resolved in a manner which adversely affects the rights of the Intermediary without the prior consent of the Intermediary.  In the event of a conflict between this Agreement and any other agreement between any of the

Collateral Agent, the Dealer, the Intermediary and the MAV with respect to any Securities Account or the Collateral (including for greater certainty, the Custody Agreement), whether now existing or later entered into, the terms of this Agreement will prevail.

## Section 20    Amendments.

This Agreement may only be amended, supplemented or otherwise modified by written agreement executed by the Intermediary, the Dealer, the Collateral Agent, and the MAV, upon ten (10) Business Days prior written notice of the proposed amendment, supplement or other modification to the Rating Agency by the Collateral Agent.

## Section 21    Severability.

If any term, provision, covenant or condition of this Agreement, or its application to any party or any circumstance, is held to be unenforceable, invalid or illegal (in whole or in part) for any reason in any relevant jurisdiction, the remaining terms, provisions, covenants and conditions of this Agreement, as modified by the deletion from this Agreement of such unenforceable, invalid or illegal portion, will continue in full force and effect, and such unenforceability, invalidity or illegality will not otherwise affect the remaining terms, provisions, covenants and conditions of this Agreement, so long as (i) this Agreement as so modified continues to express, without material change, the original intentions of the parties as to its  subject matter, and (ii) the deletion of such portion of this Agreement will not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realisation of the benefits that would otherwise have been conferred upon the parties under this Agreement, it being agreed that the deletion of Section 18 would have such an effect.  The parties will endeavour in good faith negotiations to replace the unenforceable, invalid or illegal provision with a valid provision, the effect of which comes as close as possible to that of such deleted provision.

## Section 22    Successors and Assigns.

This Agreement is binding upon and enures to the benefit of the parties and their respective successors and permitted assigns. Neither the MAV nor the Intermediary may assign or transfer any of their respective rights or obligations under this Agreement without the prior written consent of the Dealer and the Collateral Agent and ten (10) Business Days prior written notice to the Rating Agency.  The Dealer and the Collateral Agent may assign or transfer their respective rights or obligations under this Agreement in accordance with the Omnibus Agreement (including, for greater certainty, with respect to the Collateral Agent, any successor Collateral Agent appointed in accordance with the Omnibus Agreement) and with ten (10) Business Days notice to the Rating Agency.

**Section 23    Notices.**

Unless expressly stated otherwise, the procedure for delivering and effectiveness of all communications and notices pursuant to this Agreement shall be governed by the following provisions:

(1)    [**Additional language for DB only:  With the exception of trade settlement instructions which may be provided electronically through the Intermediary's secure access channel known as Viewfinder,**  ]all communications and notices pursuant to this Agreement shall be by fax or letter delivered by hand or by electronic mail.  Each such communication or notice shall be made to the relevant party at the fax number or address or electronic address and, in the case of a communication or notice by fax or letter, marked for the attention of, or (in the case of a communication by electronic mail) made to such person or department from time to time specified in writing by the recipient party to the others for such purpose.  The initial fax number, electronic mail address and person or department so specified by each party and the Rating Agency are set out in Schedule "F" (Notice Details) to this Agreement.  All communications or notices delivered verbally by telephone shall only be binding if followed immediately by a confirmation in writing by fax, letter or electronic mail;

(2)    A communication or notice shall be deemed received (if by fax) when an acknowledgement of receipt is received, (if by electronic mail) when made or (if by letter) when delivered, in each case in the manner required by this Section 23.  However, if a communication is received after business hours on any Business Day or on a day which is not a Business Day in the place of receipt, it shall be deemed to be received and become effective at the opening of business on the next Business Day in the place of receipt.  Every communication or notice shall be irrevocable save in respect of any manifest error in it.

**Section 24    Entire Agreement.**

Subject to Section 13(5)(ii) of this Agreement, this Agreement, and the provisions of the Custody Agreement and the Ancillary Agreements  incorporated by reference in this Agreement constitute the entire agreement between the parties with respect to the transactions contemplated in such agreements and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties

**Section 25    Counterparts.**

This Agreement may be executed in any number of counterparts (including counterparts by facsimile) and all such counterparts taken together shall be deemed to constitute one and the same instrument.

**Section 26    Time of the Essence.**

Time is of the essence of this Agreement.

**Section 27    Remedies Cumulative.**

The right and remedies of the parties are cumulative and are in addition to, and not in substitution for, any other rights and remedies available at law or in equity or otherwise.  No single or partial exercise by a party of any right or remedy precludes or otherwise affects the exercise of any other right or remedy to which that party may be entitled.

**CIBC MELLON GLOBAL
SECURITIES SERVICES COMPANY,
in its capacity as issuer trustee of
MASTER ASSET VEHICLE [I]/[II]**

By: _____

Name:

Title:

By: _____

Name:

Title:

**[NAME OF DEALER]**

By: _____

Name:

Title:

**BNY    TRUST    COMPANY    OF
CANADA, as COLLATERAL AGENT**

By: _____

Name: George A. Bragg

- 28 -

Title: Vice President

**RBC DEXIA INVESTOR SERVICES
TRUST, as INTERMEDIARY**

By: _____

Name:

Title:

## SCHEDULE "A"

## Securities Accounts and Collateral

**[To be completed]**

## SCHEDULE "B"

## Wrapped Collateral

**[To be completed]**

## SCHEDULE "C"

## Collection Account for Income Distributions to the MAV

**[To be completed]**

# SCHEDULE "D"

## Collection Account for Income Distributions to the Dealer

**[To be completed]**

# SCHEDULE "E"

## Account Statement

**[To be completed]**

## SCHEDULE "F"

### Notice Details

**[To be completed]**

    (i)      to the Dealer at:

**[insert Dealer's address]**

Attention:   ●
Telephone:  ●
Facsimile:   ●
E-mail:      ●

    (ii)     to the Collateral Agent at:

**[insert Collateral Agent's address]**

Attention:   ●
Telephone:  ●
Facsimile:   ●
E-mail:      ●

    (iii)    to the Intermediary at:

**[insert Intermediary's address]**

Attention:   ●
Telephone:  ●
Facsimile:   ●
E-mail:      ●

    (iv)    to the MAV at:

**[insert MAV's address at CIBC Mellon Global Security Services Company, c/c Administrator] [NTD: Notice information to match that contained in the Omnibus Agreement.]**

Attention:   ●
Telephone:  ●
Facsimile:   ●
E-mail:

## <u>Schedule D</u>

**FORM OF CA CONTROL AGREEMENT**

**CIBC MELLON GLOBAL SECURITIES SERVICES COMPANY**
**in its capacity as issuer trustee of the**
**MASTER ASSET VEHICLE [I]/[II],**

**as MAV**


**and**


**BNY TRUST COMPANY OF CANADA**
**as Collateral Agent**


**and**


**CIBC MELLON TRUST COMPANY**

**as Custodian**

---

**SECURITIES ACCOUNTS CONTROL AGREEMENT**

**[Date]**

---

## SECURITIES ACCOUNTS CONTROL AGREEMENT

Securities accounts control agreement dated as of **[date]** among CIBC Mellon Global Securities Services Company, in its capacity as issuer trustee of Master Asset Vehicle **[I]/[II]]** (in such capacity, the "**MAV**")**,** BNY Trust Company of Canada, in its capacity as Collateral Agent and CIBC Mellon Trust Company, in its capacity as Custodian under this Agreement;

**RECITALS:**

(a)     Pursuant to the Master Security Agreement (as defined below) the MAV has granted the Collateral Agent a security interest in each of the Securities Accounts (as defined below) and the Collateral (as defined below) in each respective Securities Account (the "**Security Interest**") as security for the payment and performance of all obligations of the MAV to the Secured Creditors (as defined below); and

(b)     The parties are entering into this Agreement to perfect the Security Interest as required by the Master Security Agreement.

In consideration of the foregoing and other good and valuable consideration, the receipt and adequacy of which are acknowledged, the parties agree as follows.

**Section 1     Defined Terms.**

As used in this Agreement, the following terms have the following meanings:

"**Account Property**" means, with respect to a Securities Account**,** all of the credit balances, securities, Cash, security entitlements, other financial assets and other items or property (or their value) standing to the credit from time to time of such Securities Account, and all other rights and benefits accruing to or arising in connection with such property and such Securities Account.

"**Administration Agreement**" means the Administration and Management Agreement dated [●] between the Administrator and the MAV, as amended, modified, restated, replaced or supplemented from time to time, together with any schedules, exhibits, supplements and attachments and all documents incorporated by reference.

"**Administrator**" means BlackRock (Institutional) Canada, Ltd. in its capacity as attorney-in-fact, administrator and asset manager to the MAV pursuant to the Administration Agreement, and its permitted successors and assigns in such capacity.

"**Agent**" means any person appointed by the Custodian to assist in providing services under this Agreement and the Custodial Services Agreement, other

than a Sub-custodian, including agents, nominees and service providers, and includes affiliates and subsidiaries of the Custodian, in each case appointed in accordance with the terms of this Agreement and the Custodial Services Agreement;

"**Agreement**" means this securities accounts control agreement as it may be amended, modified, restated, replaced or supplemented from time to time.

"**Authorized Signatory**" means any person, whether or not an officer or employee of the Administrator or the Collateral Agent, duly authorized by the Administrator or the Collateral Agent, respectively, to give notices, entitlement orders or other instructions on behalf of the MAV or the Collateral Agent, respectively, such persons to be designated in a certificate which contains a specimen signature of each such person.

"**Bank of New York**" means The Bank of New York Mellon and its successors and assigns.

"**Business Day**" means a day on which commercial banks and foreign exchange markets are generally open to settle payments and are open for general business in the Cities of New York, New York, Toronto, Ontario and London, United Kingdom.

"**Cash**" means Canadian Dollars and United States Dollars.

"**CIBC**" means Canadian Imperial Bank of Commerce and its successors and assigns.

"**CIBC Mellon**" means CIBC Mellon Trust Company.

"**CIBC Mellon Downgrade Event**" means a withdrawal, suspension or reduction by a rating agency of any CIBC Mellon Rating.

"**CIBC Mellon Rating**" means any of the following ratings of CIBC Mellon: (a)(i) a bank financial strength rating of 'B-', and (ii) a long-term issuer rating of 'Aa2', in each case as provided by Moody's, and (b) any other rating issued by a rating agency on or following the date hereof as at the date of initial issuance.

"**Collateral**" means the Account Property in the Securities Accounts, which on the date of this Agreement consists of the Account Property described on Schedule "A", together with all replacements of and substitutions for and increases and additions to the Account Property, all certificates and instruments evidencing or representing any Account Property, all stock powers of attorney applicable to any Account Property and all money or

other property payable or paid on account of any return or repayment of principal or capital in respect of the Account Property or distributed in respect of the Account Property.

"**Collateral Agent**" means BNY Trust Company of Canada in its capacity as collateral agent pursuant to the terms of the Omnibus Agreement or any successor to the trust and custody business thereof or any permitted assigns thereof in such capacity appointed pursuant to the Omnibus Agreement.

"**Collections Account**" means the Securities Account described in Schedule "B".

"**Corporate Action**" means any conversion privileges, subscription rights, warrants, put and call options or other rights or options available in connection with any securities which form part of the Collateral, including those relating to the reorganization, recapitalization, takeover, consolidation, amalgamation, merger, liquidation, filing for or declaration of bankruptcy, plans of arrangement of any corporation or association;

"**CSA Accounts**" means the securities accounts established and maintained by the Custodian in the name of the MAV and identified on Schedule "I".

"**Custodial Services Agreement**" means the custodial services agreement dated [●], 2008 among the MAV, CIBC Mellon Global Securities Services Company in its capacity as issuer trustee of Master Asset Vehicle Trust **[I]/[II]**, the Custodian, Canadian Imperial Bank of Commerce and The Bank of New York Mellon, as amended, modified, restated, replaced or supplemented from time to time, together with any schedules, exhibits, supplements and attachments and all documents incorporated by reference.

"**Custodian**" means CIBC Mellon Trust Company in its capacity as the custodian of the Securities Accounts and the Collateral pursuant to this Agreement and the Custodial Services Agreement and any successor custodian appointed pursuant to the Custodial Services Agreement and their respective successors and permitted assigns in such capacity.

"**Declaration of Trust**" means the declaration of trust dated ●, 2008 providing for the establishment by CIBC Mellon Global Securities Services Company, a company incorporated under the laws of the Province of Nova Scotia, of Master Asset Vehicle [I][II] as a trust under the laws of the Province of Ontario, as it may be amended, modified, restated, replaced or supplemented from time to time to the extent permitted thereby, and together with any schedules, exhibits, supplements and attachments and all documents incorporated by reference.

"**Depository**" means any authorized domestic or foreign depository or clearing or settlement agency or system, including a transnational book-based system, and shall include CDS Clearing and Depository Services Inc., Euroclear, The Depository Trust Company and the Treasury/Reserve Automated Debt Entry System maintained at The Federal Reserve Bank of New York for receiving and delivering securities, and their respective successors and assigns;

"**Eligible Institution**" means a financial institution (i) that has the Required Rating or (ii) whose obligations in favour of the MAV are covered by a guarantee or indemnity satisfactory to the Rating Agency provided by a financial institution or financial institutions that has or have the Required Rating, or in each case under clause (i) and (ii) above, as applicable, each such financial institution has otherwise been approved by the Rating Agency pursuant to the satisfaction of the Rating Agency Condition.

"**Eligible Deposit Account**" means a securities account with an Eligible Institution.

"**Excluded Accounts**" means the securities accounts established and maintained by the Custodian in the name of the MAV and identified on Schedule "C". **[NTD: Will include Ineligible Asset Payment Accounts and, CIBC payment accounts]**

"**Income Distributions**" means with respect to Collateral, all interest and other payments and distributions of cash or other property with respect to such Collateral, other than on account of principal.

"**Indemnitor Downgrade Event**" means, on any day, if any of CIBC or Bank of New York does not have the Required Rating on such day, a withdrawal, suspension or reduction by a rating agency of any then-current rating of CIBC or Bank of New York provided by such rating agency.

"**Indenture Trustee**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Issuer Trustee**" means CIBC Mellon Global Securities Services Company in its capacity as the issuer trustee of Master Asset Vehicle [I][II] under the Declaration of Trust or any successor to the trust or custodial business thereof serving in such capacity or permitted assign thereof in accordance with the terms of the Declaration of Trust.

"**Majority Secured Creditors**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Master Security Agreement**" means the master security agreement dated [●] by and among, *inter alios,* the MAV, certain swap counterparties of the MAV, as Dealers, and the Collateral Agent, as amended, modified, restated, replaced or supplemented from time to time and together with any schedules, exhibits, supplements and attachments and all documents incorporated by reference.

"**Notice of Exclusive Control**" means a written notice that the Collateral Agent is exercising exclusive control of the Securities Accounts and the Collateral, in the form attached to this Agreement as Schedule "H".

"**Omnibus Agreement**" means the omnibus agreement dated [●], 2008 by and among, *inter alios,* the MAV, certain swap counterparties of the MAV as Dealers and the Collateral Agent, as amended, modified, restated, replaced or supplemented from time to time, together with any schedules, exhibits, supplements and attachments and all documents incorporated by reference.

"**Permitted Custodian**" means an Eligible Institution that is authorized to provide custodial services.  For purposes of this Agreement, CIBC Mellon shall be deemed to be a Permitted Custodian until the earlier to occur of (i) a CIBC Mellon Downgrade Event and (ii) an Indemnitor Downgrade Event, whereupon CIBC Mellon shall cease to be a Permitted Custodian for purposes of this Agreement and section 15(3) of this Agreement shall apply.

"**Rating Agency**" means DBRS Limited and any successor to its credit ratings business and any replacement credit rating agency that may be engaged by the MAV.

"**Rating Agency Condition**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Required Rating**" means (i) a short term senior unsecured debt rating by DBRS Limited of not less than R-1 (middle) and an equivalent rating by any one of the following rating agencies of (x) a short term rating by S&P of not less than 'A-1+'; (y) a short term rating by Fitch of not less than 'F1+'or (z) a short term rating by Moody's of not less than 'P-1', or (ii) if no short term senior unsecured debt rating is available, a long term senior unsecured debt rating by DBRS Limited of not less than AA(low) and an equivalent rating by any one of the following rating agencies of (A) a long term rating by S&P of not less than 'AA-'; (B) a long term rating by Fitch of not less than 'AA-'; or (C) a long term rating by Moody's of not less than 'Aa3'.

"**Secured Creditors**" has the meaning specified in Schedule A of the Omnibus Agreement.

"**Securities Accounts**" means the securities accounts established and maintained by or on behalf of the Custodian in the name of the MAV and in which the Collateral is from time to time held, identified on Schedule "A", any substitute or replacement securities accounts maintained by or on behalf of the Custodian for the MAV and any securities account maintained by or on behalf of the Custodian for the MAV into which property from any such securities account is transferred, except the Excluded Accounts listed in Schedule "C".

"**Securities Transfer Act**" means the *Securities Transfer Act, 2006* (Ontario), as that statute is now enacted or as the same may from time to time be amended, re-enacted or replaced and includes any regulation made under that statute.

"**Security Interest**" has the meaning specified in the recitals to this Agreement.

"**Sub-custodian**" means a financial institution that is appointed by the Custodian in accordance with this Agreement and the Custodial Services Agreement to provide custodial services with respect to any of the Collateral and the related Securities Accounts.

"**Transaction Documents**" has the meaning specified in Schedule A of the Omnibus Agreement.

**Section 2    Interpretation.**

(1)    Terms defined in the Securities Transfer Act and used but not otherwise defined in this Agreement have the same meanings.  For greater certainty, the terms "**entitlement order**", "**financial asset**", "**securities account**", "**securities intermediary**", "**securities intermediary's jurisdiction**", "**security**" and "**security entitlement**" have the meanings given to them in the Securities Transfer Act.

(2)    In this Agreement the words "**including**", "**includes**" and "**include**" mean "**including (or includes or include) without limitation**".  The expression "**Section**" and any other subdivision followed by a number means and refers to the specified Section or other subdivision of this Agreement.

(3)    Words importing the singular number only include the plural and vice versa.

(4)    The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenient reference only and do not affect its interpretation.

(5)     The schedules attached to this Agreement form an integral part of it for all purposes of it.

**Section 3        The Issuer Trustee.**

The Issuer Trustee has established Master Asset Vehicle [I][II] pursuant to the Declaration of Trust and its liability under this Agreement is limited as provided in the Declaration of Trust.  The provisions regarding liability set out in subsections 6.7(a), (b), (c) and (d) of the Declaration of Trust are hereby incorporated by reference in this Agreement.

**Section 4        The Administrator and the MAV.**

The MAV has authorized the Administrator to act as its attorney-in-fact in respect of all of its rights and obligations under this Agreement whether expressed as a right or an obligation of the MAV. Unless otherwise advised in writing by the MAV, the Custodian and the Collateral Agent may assume without enquiry that (i) the Administrator is acting on behalf of the MAV, and (ii) such action taken by the Administrator has been duly authorized and approved by all necessary action on the part of the Issuer Trustee pursuant to an effective delegation and such action will bind the Issuer Trustee and the MAV for all purposes hereof with the same effect as if undertaken by the MAV directly.  Until notified in writing by the Issuer Trustee of any change in the appointment of the Administrator as the administrator and attorney-in-fact of the MAV, the Custodian and the Collateral Agent shall be entitled to rely on the authority of the Administrator as the administrator and attorney-in-fact of the MAV.

**Section 5        The Collateral Agent.**

(1)     BNY Trust Company of Canada has been appointed as the Collateral Agent pursuant to Section 7.1(a)(i) of the Omnibus Agreement and its liability under this Agreement is limited as provided in the Omnibus Agreement.

(2)     The Collateral Agent is a party to this Agreement in its capacity as agent for the Secured Creditors, and may act on its own pursuant to the authority it has in such capacity under the Omnibus Agreement and the Master Security Agreement, and shall act in accordance with any directions provided by the applicable Secured Creditors who at the time such directions are given constitute the Majority Secured Creditors

(3)     BNY Trust Company of Canada has agreed to assume the obligations of the Collateral Agent under this Agreement in its capacity as Collateral Agent as appointed pursuant to the Omnibus Agreement.  BNY Trust Company of Canada in such capacity expressly does not assume the responsibilities of any other service provider in relation to this Agreement or any Transaction

Document, notwithstanding that it or an affiliate or related party may be appointed in another capacity under such document.

**Section 6    Control of the Securities Accounts by the Collateral Agent.**

(1)    Except as otherwise provided in this Agreement and until the Collateral Agent has delivered a Notice of Exclusive Control to the Custodian, the Custodian agrees to comply with entitlement orders and other instructions originated by the MAV or the Administrator, with respect to each of the Securities Accounts and the Collateral, without any need for the further consent of the Collateral Agent or any other person.

(2)    If at any time the Collateral Agent delivers a Notice of Exclusive Control to the Custodian (with a copy to the MAV) the Collateral Agent shall have exclusive control over the Securities Accounts and the Collateral and the Custodian agrees (i) to promptly cease complying with any entitlement orders or other instructions originated by the MAV relating to the Securities Accounts and the Collateral, and (ii) to comply only with entitlement orders and other instructions originated by the Collateral Agent and not by any other person, with respect to the Securities Accounts and the Collateral, without any need for further consent of the MAV or any other person, until the Collateral Agent provides a notice of cessation of exclusive control in accordance with Section 6(3).

(3)    At any time after the Collateral Agent has delivered a Notice of Exclusive Control, the Collateral Agent may deliver a written notice to the Custodian (with a copy to the MAV) that it has ceased to require exclusive control over the Securities Accounts and the Collateral.  Upon the Custodian receiving such notice of cessation of exclusive control from the Collateral Agent: (i) the MAV and the Administrator will have those rights with respect to the Securities Accounts and the Collateral that it had prior to the delivery of the relevant Notice of Exclusive Control, and (ii) until such time as it receives another Notice of Exclusive Control, the Custodian will act on entitlement orders and other instructions originated by the MAV or the Administrator with respect to the Securities Accounts and Collateral in accordance with Section 6(1).

(4)    If an entitlement order or other instruction originated by the MAV or by the Administrator pursuant to Section 6(1) conflicts with any entitlement order or other instruction originated by the Collateral Agent at any time, the Custodian will comply with the entitlement order or other instruction originated by the Collateral Agent.

(5)    The Collateral Agent may give an entitlement order or other instruction to liquidate all or part of the Collateral at any time and effect distributions of

proceeds from the liquidation of Collateral in accordance with the Omnibus Agreement and the Master Security Agreement at any time.

(6)    The Collateral Agent shall provide a copy of any notice provided under this Section 6 to the Rating Agency promptly.

### Section 7    Instructions with Respect to Income Distributions.

(1)    The parties to this Agreement agree and acknowledge that all Income Distributions received in the Securities Accounts (which exclude the Excluded Accounts listed in Schedule "C") other than (a) Income Distributions on Collateral in the Securities Accounts set out on Schedule "J", and (b) Income Distributions on the CSA Accounts set out on Schedule "I", shall be transferred (i) as soon as practicable after receipt to the Collection Account set out on Schedule "B" and (ii) without duplication, on the effective date of termination of this Agreement.  The MAV and the Collateral Agent hereby instruct the Custodian to complete such transfers. Notwithstanding any other provision of this Agreement to the contrary, the parties to this Agreement agree that such instructions may not be altered except with ten (10) days prior written notice to the Rating Agency and by joint written instructions from the MAV and the Collateral Agent to the Custodian.

(2)    The parties to this Agreement agree and acknowledge that all Income Distributions received on Collateral in the CSA Accounts set out on Schedule "I" shall be transferred (i) as soon as practicable after receipt to the respective account(s) set out on Schedule "D" and (ii) without duplication, on the effective date of termination of this Agreement.  The MAV and the Collateral Agent hereby instruct the Custodian to complete such transfers. Notwithstanding any other provision of this Agreement to the contrary, the parties to this Agreement agree that such instructions may not be altered except by joint written instructions from the MAV and the Collateral Agent to the Custodian.

(3)    The Collateral Agent shall provide a copy of any joint notice provided under this Section 7 to the Rating Agency promptly.

### Section 8    The Securities Accounts.

(1)    At the date of this Agreement the Securities Accounts are the securities accounts identified in Schedule "A".  The Custodian and the MAV will notify the Collateral Agent of any change in the Securities Accounts or the information on such schedule.

(2)    The parties agree that each Securities Account is a securities account, each item of Collateral credited to each of the Securities Accounts is a financial asset for purposes of the Securities Transfer Act and any other similar law

applicable in any other relevant jurisdiction and each other right of the MAV and the Collateral Agent against the Custodian arising out of each of the Securities Accounts is a financial asset.

(3)     The Custodian acknowledges and agrees that, for purposes of the Securities Transfer Act and any other similar law applicable in any other relevant jurisdiction, the Custodian is the securities intermediary for the Securities Accounts and that Ontario is the securities intermediary's jurisdiction for each of the Securities Accounts and each agreement between the MAV and the Custodian with respect to a Securities Account is hereby amended to include this provision.

(4)     To the extent it is within the control of the Custodian, the Custodian will ensure that all certificated securities or other financial assets represented by a certificate held in the Securities Accounts are either (i) in bearer form, or (ii) in registered form in a freely negotiable form and are not registered in the name of the MAV, payable to the order of the MAV or specially endorsed to the MAV by an effective endorsement.

(5)     To the extent it is within the control of the Custodian, the Custodian will ensure that all uncertificated securities or other financial assets that are not represented by a certificate (other than instruments) held in the Securities Accounts are not registered in the name of the MAV or an agent for the MAV (other than the Custodian or a nominee of the Custodian or a Sub-custodian appointed by the Custodian in accordance with Section 13(1) of this Agreement) in the register of the issuer.

(6)     To the extent it is within the control of the Custodian, the Custodian will ensure that all instruments held in the Securities Accounts are either (i) specially endorsed by an effective endorsement to the Custodian, or a Sub-custodian (appointed by the Custodian in accordance with Section 13(1) of this Agreement), or in blank, or (ii) in the form of a transferable credit with the relevant transfer document completed in favour of the Custodian, or a Sub-custodian (appointed by the Custodian in accordance with Section 13(1) of this Agreement), or (iii) for credits that are not in transferable form, delivered to the Custodian with the relevant assignment of proceeds document completed in favour of the Custodian or a Sub-custodian (appointed by the Custodian in accordance with Section 13(1) of this Agreement).

(7)     The Custodian will not enter into any agreement with any other person relating to the Securities Accounts and/or any financial assets in any of them under which it agrees to comply with entitlement orders made by such other person.

(8)    The Custodian will notify the Collateral Agent, the MAV and the Rating Agency promptly if any other person claims that it has a property interest in any of the Collateral.

(9)    Except with respect to overdrafts provided in accordance with the Custodial Services Agreement the Custodian agrees that it will not advance any margin or any other credit to the MAV or lend, pledge or hypothecate the Securities Accounts or any Collateral in the Securities Accounts and it will not permit any financial institution at which it maintains any Securities Account to advance any margin or any other credit or lend, pledge or hypothecate the Securities Accounts or any Collateral in any such Securities Account.

(10)    The Custodian agrees that it will not dispose of any Collateral in the Securities Accounts (other than pursuant to instructions from the MAV or the Collateral Agent in accordance with this Agreement) and will not permit any financial institutions at which it maintains any Securities Account to dispose of any Collateral in any such Securities Account.

**Section 9        Representations and Warranties of the Custodian.**

The Custodian represents and warrants that:

(1)    the Custodian is a corporation duly incorporated, organized and subsisting under its governing statute, with the power, authority and right to enter into and deliver this Agreement and perform its obligations under this Agreement;

(2)    on the date of this Agreement, the Custodian is a Permitted Custodian;

(3)    this Agreement constitutes a valid and binding agreement of the Custodian, enforceable against the Custodian in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and other laws of general application limiting the enforcement of creditors' rights generally and to the fact that specific performance is an equitable remedy available only in the discretion of the court;

(4)    the Custodian has established and at the effective date of the Custodial Services Agreement maintains the Securities Accounts described in Schedule "A" and each of the Securities Accounts is a segregated account recorded in the records of the custodian as held for Master Asset Vehicle [I][II] and shall be maintained as a segregated account recorded in the records of the custodian as held for Master Asset Vehicle [I][II];

(5)    no Securities Account is or will be a margin account and the Custodian has not advanced any margin or any other credit to the MAV except with respect

to overdrafts provided in accordance with the Custodial Services Agreement and has not pledged or hypothecated any financial assets in any of the Securities Accounts except for liens contemplated by Section 11 of this Agreement;

(6)     Schedule "E" contains the most recent statements produced by the Custodian in the ordinary course of its business regarding the Collateral in each of the Securities Accounts at the statements' date.  The Custodian does not know of any inaccuracy in the statements;

(7)     to the best of its knowledge, there is no entitlement order or any other right of any person binding upon or which at any time in the future may become binding upon the Custodian to sell, transfer, or in any other way dispose of or encumber any of the Collateral other than under the terms of this Agreement and the Custodial Services Agreement;

(8)     the Custodian does not know of any lien on, claim to or interest in any Securities Account or the Collateral, except for the claims and interests of the Collateral Agent or the MAV and the claims of the Custodian for its usual and customary fees, expenses and overdraft advances in accordance with Section 11 of this Agreement; and

(9)     to the best of its knowledge other than the agreements set out on  Schedule "F" to this Agreement, if any, and the applicable Transaction Documents, there are no other agreements that the Custodian has entered into with any party relating to the Securities Accounts or any financial assets in any of them.  The Custodian has not entered into any agreement with any other person relating to the Securities Accounts and/or any financial assets in them under which it has agreed or will agree to comply with entitlement orders made by such other person.

**Section 10     Representations and Warranties of the MAV.**

The MAV represents and warrants that:

(1)     it has no margin loans outstanding in any of the Securities Accounts as of the date of this Agreement, and, except with respect to overdrafts provided in accordance with the Custodial Services Agreement, it will not request the Custodian to extend any new credit to the MAV secured by any of the Securities Accounts or any of the Collateral;

(2)     the MAV does not know of any lien on, claim to or interest in any of the Securities Accounts or the Collateral, except for the claims and interests of the Collateral Agent or the MAV and the Custodian's rights in respect of the Collateral held in each Securities Account to satisfy the obligations in respect

of the payment of overdrafts provided in accordance with section 7.1 of the Custodial Services Agreement; and

(3)    other than the agreements set out on Schedule "F" to this Agreement, if any, there are no other agreements that the MAV has entered into relating to the Securities Accounts or any financial assets in any of them.

## Section 11    Priority of Security Interests.

The Custodian acknowledges the Security Interest granted to the Collateral Agent in the Collateral held in the Securities Accounts. Subject to liens in favour of the Collateral Agent on behalf of the Secured Creditors under the Master Security Agreement, the Custodian waives any security interest, lien, encumbrance, claim or right of set-off it may have, now or in the future, whether by agreement, operation of law or otherwise, against the Securities Accounts or the Collateral held in each Securities Account, except that the Custodian will retain its rights in respect of the Collateral held in each Securities Account to satisfy the obligations in respect of the payment of overdrafts provided in accordance with section 7.1 of the Custodial Services Agreement.

## Section 12    Acknowledgements.

(1)    Except as set out in Section 11 of this Agreement, the Custodian acknowledges that the Custodian has not acquired and will not acquire any right, title or interest in the Collateral on its own behalf and that the MAV is the entitlement holder with respect to the Securities Account.

(2)    Each of the other parties acknowledges and agrees that the Custodian is entitled to rely on the accuracy of the recitals to this Agreement.

(3)    Each of the other parties acknowledges and agrees that the Custodian is not a guarantor of the MAV and shall not be held responsible for any decline in the market value of the Collateral in each Securities Account and has no obligation to notify any other party of any such decline or, except as set out in this Agreement or the Custodial Services Agreement, to take any action with regard to the Collateral in each Securities Account.

(4)    The Custodian and the MAV agree that they shall not allow any amendments to the Custodial Services Agreement without the prior written consent of the Collateral Agent and satisfaction of the Rating Agency Condition.

(5)    The MAV and the Collateral Agent agree that the Custodian shall not be bound by any amendments to the Omnibus Agreement that have a materially adverse effect on the Custodian's recourse for payment as a "Service Provider", as defined in Schedule A to the Omnibus Agreement, pursuant to the Omnibus Agreement and the Master Security Agreement.

**Section 13    Custodian's Duties and Responsibilities.**

(1)    The Custodian agrees that it shall only delegate any of its duties with respect to any of the Collateral or the Securities Accounts to Sub-Custodians that satisfy the requirements for a Permitted Custodian.  The Custodian shall require any Sub-Custodian appointed in accordance with this Section 13(1) to notify the Custodian if such Sub-custodian no longer satisfies the requirements for a Permitted Custodian.  Upon such notification or when the Custodian otherwise becomes aware of any such Sub-custodian ceasing to satisfy the requirements for a Permitted Custodian, the Custodian shall promptly cause any Collateral held at any such Sub-Custodian to be transferred to another Sub-Custodian appointed in accordance with this Section 13(1).

(2)    The Custodian agrees that all Collateral shall be held in Securities Accounts that are Eligible Deposit Accounts at all times.  If a Securities Account is no longer an Eligible Deposit Account, subject to the terms of Section 15 of this Agreement, the Custodian shall promptly notify the Rating Agency and the MAV and the MAV shall promptly cause any Collateral held in any such account to be transferred to a Securities Account that is an Eligible Deposit Account.

(3)    The Custodian shall ensure that the Collateral in each Securities Account is at all times kept segregated in the books and records of the Custodian from any property and assets of the Custodian and any other person, in accordance with the Custodial Services Agreement, including, without limitation, Section 5.1(b) thereof and the MAV hereby authorizes the Custodian to carry out all duties and responsibilities attributed to the Custodian in this Agreement;

(4)    The Custodian shall maintain records and files related to the Securities Accounts in accordance with the Custodial Services Agreement, including, without limitation, Section 9.2 of the Custodial Services Agreement.  The Custodian shall provide the Administrator with daily twenty-four (24) hour read-only access to all electronic records and files relating to the Collateral and transactions in the Securities Accounts through an electronic information delivery system, subject to maintenance requirements, and to interruptions in the information delivery system, or in power supply, or any other event or factor beyond the reasonable control of the Custodian and other reasonable technology licensing terms;

(5)    The Custodian agrees that it shall:

    (i)    make notations on its records and files related to the Collateral, provided that the Custodian currently offers this service to its clients, indicating that the MAV is the beneficial owner of the

Collateral and that the Collateral is subject to the Security Interest, and the Custodian shall require that any Sub-custodian holding any Collateral on behalf of the Custodian (where permitted in accordance with the terms of this Agreement) shall acknowledge that the MAV is the beneficial owner of the Collateral and that the Collateral is subject to the Security Interest; and

(ii)    advise any person who makes inquiries regarding the possession or control by the Custodian of the Collateral that the Custodian is in possession of the Collateral as custodian of the MAV and the Collateral Agent at the relevant time and that the MAV is the beneficial owner of the Collateral, subject to the Security Interest;

(6)    The Custodian shall make the Securities Accounts and the Custodian's related records and files, available to the MAV and the Collateral Agent and its representatives and the Rating Agency for examination and audit, in accordance with Section 9.1 of the Custodial Services Agreement;

(7)    The Custodian will send copies of all statements and confirmations concerning the Securities Accounts and the Collateral or make electronic copies available promptly to the MAV and the Collateral Agent.  The MAV consents to the release and disclosure of such information to the Collateral Agent and each Secured Creditor.

(8)    The Custodian will promptly notify the Collateral Agent, the MAV and the Rating Agency if any other person asserts any lien, encumbrance or other claim against any of the Securities Accounts or the Collateral and promptly notify the Collateral Agent and the MAV of any loss, destruction of or damage to any of the Collateral.

(9)    Subject to Section 13(2), the Custodian will not change the name or the account number of any of the Securities Accounts without the prior written consent of the MAV and the Collateral Agent at the relevant time and ten (10) Business Days prior written notice to the Rating Agency.

(10)    The Custodian shall not accept any entitlement orders or other instructions regarding, and not otherwise deal with, any of the Securities Accounts or the Collateral other than in accordance with the terms and conditions of this Agreement.

(11)    If the Custodian selects or uses Agents or Sub-custodians it shall be liable for the actions or failure to act of any such Agents or Sub-custodians in respect of

the Collateral and/or Securities Accounts in accordance with the terms of this Agreement, subject only to limitations on liability set out in the Custodial Services Agreement. In no event shall a Depository be deemed to be an Agent or Sub-custodian of the Custodian.

(12)   The Custodian shall notify the MAV and the Collateral Agent of notices received from an issuer or the relevant Depository with respect to any Corporate Actions and any similar rights or discretionary actions with respect to Securities or other contracts or instruments held in the Securities Accounts and the date or dates by which such rights must be exercised or such action must be taken, in accordance with Section 5.1(e) of the Custodial Services Agreement. All Corporate Actions and any similar rights or discretionary actions with respect to securities or other contracts or instruments held in the Securities Account shall be exercised pursuant to written instructions of (i) the MAV, prior to the Collateral Agent taking exclusive control of the Collateral and the Securities Accounts, or (ii) the Collateral Agent, when the Collateral Agent takes exclusive control of the Collateral and the Securities Accounts.

(13)   The Custodian shall send to the MAV and the Collateral Agent any documents (including proxies, proxy statements, annual reports, solicitations and other communications relating to the Securities which relate to voting) received by the Custodian relating to the exercise of voting rights. All voting rights with respect to securities held in the Securities Accounts, however registered, shall be exercised pursuant to written instructions of (i) the MAV, prior to the Collateral Agent taking exclusive control of the Collateral and the Securities Accounts, or (ii) the Collateral Agent, when the Collateral Agent takes exclusive control of the Collateral and the Securities Accounts. In the event that no instructions are received in time to be implemented, the Custodian will take no action and if a default option exists, the Custodian shall be deemed to have been provided with instructions to accept the default option.

## Section 14   Rights of the Custodian.

(1)   The Custodian is entitled to rely upon (i) any Notice of Exclusive Control or notice of cessation of exclusive control that it believes in good faith to be originated by the Collateral Agent, and (ii) any entitlement order or other notice or instruction that it believes in good faith to be originated by the MAV or the Administrator in accordance with Section 6(1) and  Section 7 or by the Collateral Agent, with respect to each Securities Account and the Collateral. Provided that if the Custodian requests that the Collateral Agent or the Administrator furnish a certificate designating Authorized Signatories, the Custodian shall be deemed to act in good faith and shall be fully protected in

acting upon the notices, entitlement orders or other instructions of such Authorized Signatories on behalf of the Collateral Agent or the MAV respectively, as designated on such certificate or replacement certificate.

(2)    The Custodian has no obligation to (i) determine whether or not the rights of the Collateral Agent, under the Master Security Agreement are enforceable, (ii) investigate or determine whether or not the Collateral Agent with respect to each Securities Account is entitled to give any entitlement order, Notice of Exclusive Control, notice of cessation of exclusive control or other notice or instruction, or (iii) determine whether an event of default exists under any agreement between the MAV and the Collateral Agent, or (iv) determine if any entitlement orders and other instructions of the MAV or the Administrator or the Collateral Agent are provided strictly in accordance with the provisions of the Administration Agreement or the Omnibus Agreement or any other applicable Transaction Document (except this Agreement and the Custodial Services Agreement).

(3)    Subject to Section 6(2)  and Section 6(4) of this Agreement, the Custodian will not be liable to the Collateral Agent for complying with entitlement orders or other instructions from the MAV or the Administrator.

(4)    The MAV will pay the usual and customary fees and expenses and other charges payable on each Securities Account in accordance with the Custodial Services Agreement.  Subject to Section 11 of this Agreement with respect to overdrafts, the Custodian shall be a "Service Provider" as defined in Schedule A to the Omnibus Agreement and its recourse for payment of such amounts shall be subject to Article 6 of the Omnibus Agreement and the Master Security Agreement.

(5)    Notwithstanding any prior termination of this Agreement, the Custodian shall not acquiesce, petition or otherwise invoke or cause the MAV to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the MAV under any bankruptcy, insolvency or similar law or, appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the MAV or any substantial part of its property, or ordering the winding up or liquidation of the affairs of the MAV.

**Section 15    Loss of Permitted Custodian Status of the Custodian.**

(1)    During the term of this Agreement, in the event the Custodian ceases to be a Permitted Custodian, the Custodian shall forthwith notify the Collateral Agent, the MAV and the Rating Agency of such event.

(2)     Upon receiving notification that the Custodian has ceased to be a Permitted Custodian, the MAV shall, with ten (10) Business Days prior written notice to the Rating Agency and subject to Section 15(3) of this Agreement, designate in writing a replacement custodian that satisfies the requirements for a Permitted Custodian, provided that such replacement Custodian is satisfactory to the Collateral Agent.  Such replacement custodian, (i) shall agree in writing to perform the duties of the Custodian under this Agreement and to become a party to this Agreement in place of the Custodian (or to enter into a substantially similar agreement that is reasonably satisfactory to the MAV and the Collateral Agent and subject to satisfaction of the Rating Agency Condition), and (ii) such replacement custodian shall enter into a replacement Custodial Agreement that is reasonably satisfactory to the MAV and the Collateral Agent and subject to satisfaction of the Rating Agency Condition, and such agreements entered into by the replacement custodian shall apply to the Collateral and any securities accounts opened by the replacement Custodian in connection with the Collateral, upon delivery of the Collateral to the replacement Custodian.  The Custodian shall deliver the Collateral to the replacement Custodian so designated by the MAV in accordance with written instructions of the Controlling Party and upon such delivery, the delivering Custodian shall have no further obligations under this Agreement, except to the extent of any liability in respect of obligations arising prior to the date of such delivery.

(3)     Notwithstanding any other provision of this Agreement, in the event that CIBC Mellon ceases to be a Permitted Custodian for purposes of this Agreement pursuant to the definition thereof, unless CIBC Mellon is then acceptable to the Rating Agency pursuant to satisfaction of the Rating Agency Condition, the MAV, upon prior written notice to the Rating Agency, shall appoint a replacement custodian satisfactory to the Collateral Agent, acting reasonably, and that satisfies the requirements of a Permitted Custodian, within 30 days thereafter.  Notwithstanding the foregoing, the MAV shall as promptly as practicable cause the transfer of all Collateral held in a Securities Account with CIBC Mellon to a replacement securities account that is an Eligible Deposit Account in accordance with the applicable provisions of this Agreement.

(4)     The provisions of this Section 15 shall prevail over the provisions of the Custodial Services Agreement with respect to termination and replacement of the Custodian.  For greater certainty, any requirement for a notice period with respect to termination and replacement of the Custodian under the Custodial Services Agreement shall not apply to the replacement of the Custodian in accordance with this Section 15 and the Custodian hereby waives compliance by the MAV with the requirement for a notice period of

sixty (60) days with respect to termination and replacement of the Custodian in Section 14.1(a) of the Custodial Services Agreement.  The Custodian may be terminated or replaced in accordance with this Section 15 without any penalty or additional payment to it by any other party to this Agreement.

## Section 16    Termination.

(1)    Except as set out in Section 16(2) and Section 16(3) below, the obligations of the Custodian under this Agreement will continue in effect until the MAV and the Collateral Agent jointly notify the Custodian, with a copy to the Rating Agency, of termination of this Agreement in writing.  The termination of this Agreement will not terminate any Securities Account unless specifically agreed by the MAV at the relevant time.

(2)    The Custodian shall not resign from its duties under the Custodial Services Agreement unless the Custodian resigns from its duties under this Agreement simultaneously and provides 60 days written notice to the Collateral Agent, the MAV and the Rating Agency.  Upon receipt of such written notice, the MAV shall, with ten (10) Business Days prior written notice to the Rating Agency, designate in writing a replacement custodian that satisfies the requirements for a Permitted Custodian, provided that such replacement Custodian is satisfactory to the Collateral Agent.  Such replacement custodian, (i) shall agree in writing to perform the duties of the Custodian under this Agreement and to become a party to this Agreement in place of the Custodian (or to enter into a substantially similar agreement that is reasonably satisfactory to the MAV and the Collateral Agent and subject to satisfaction of the Rating Agency Condition), and (ii) such replacement custodian shall enter into a replacement Custodial Agreement that is reasonably satisfactory to the MAV and the Collateral Agent and subject to satisfaction of the Rating Agency Condition, and such agreements entered into by the replacement custodian shall apply to the Collateral and any securities accounts opened by the replacement Custodian in connection with the Collateral, upon delivery of the Collateral to the replacement Custodian. For greater certainty, no such resignation shall take effect until a replacement custodian is appointed in accordance with the terms of this Agreement. On or before the effective date of such resignation, the Custodian shall deliver the Collateral to the replacement custodian so designated by the MAV as such replacement Custodian may direct in writing and upon such delivery, the resigning Custodian shall have no further obligations under this Agreement, except to the extent of any liability in respect of obligations arising prior to the date of such delivery.   In the event that no such replacement Custodian is appointed within 90 days of such notice of resignation, the Custodian shall have the right at the expense of the MAV to apply to a court of competent jurisdiction for such replacement Custodian to be appointed and the effective

date of the resignation of the Custodian shall be the date such replacement Custodian's appointment becomes effective.

(3)     The Custodian may be removed as custodian under this Agreement upon not less than ten (10) Business Days' written notice from the MAV or the Collateral Agent, with a copy to the Rating Agency, following any breach by the Custodian of its obligations under this Agreement. Upon such written notice, the MAV shall designate in writing a replacement custodian that satisfies the requirements for a Permitted Custodian, provided that such replacement Custodian is satisfactory to the Collateral Agent.    Such replacement custodian, (i) shall agree in writing to perform the duties of the Custodian under this Agreement and to become a party to this Agreement in place of the Custodian (or to enter into a substantially similar agreement that is reasonably satisfactory to the MAV and the Collateral Agent and subject to satisfaction of the Rating Agency Condition), and (ii) such replacement custodian shall enter into a replacement Custodial Agreement that is reasonably satisfactory to the MAV, and the Collateral Agent and subject to satisfaction of the Rating Agency Condition, and such agreements entered into by the replacement custodian shall apply to the Collateral and any securities accounts opened by the replacement Custodian in connection with the Collateral, upon delivery of the Collateral to the replacement Custodian. On or before the effective date of such removal, the Custodian shall deliver the Collateral to the replacement Custodian so designated by the MAV as such replacement Custodian may direct in writing and upon such delivery, the removed Custodian shall have no further obligations under this Agreement, except to the extent of any liability in respect of obligations arising prior to the date of such delivery.

(4)     The provisions of this Section 16 shall prevail over the provisions of the Custodial Services Agreement with respect to termination and replacement of the Custodian.    For greater certainty, any requirement for a notice period with respect to termination and replacement of the Custodian under the Custodial Services Agreement shall not apply to the replacement of the Custodian in accordance with this Section 16 and the Custodian hereby waives compliance with the requirement for a notice period of sixty (60) days with respect to termination and replacement of the Custodian in Section 14.1(a) of the Custodial Services Agreement.    The Custodian may be terminated or replaced in accordance with this Section 16 without any penalty.

**Section 17    Governing Law.**

(1)    This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable in the Province of Ontario.

(2)    Each party to this Agreement irrevocably attorns and submits to the non-exclusive jurisdiction of the courts of the Province of Ontario situated in the City of Toronto, and waives objection to the venue of any proceeding in such court or that such court provides an inconvenient forum.

(3)    Each party to this Agreement irrevocably consents to the service of any and all process in any such action or proceeding by the delivery of copies of such process to them as provided in Section 22 of this Agreement.  Nothing in this Section affects the right of the Collateral Agent to serve process in any manner permitted by law.

**Section 18    Conflict with Other Agreements.**

In the event of any conflict between the provisions of this Agreement and the provisions of the Omnibus Agreement which cannot be resolved by both provisions being complied with, the parties to this Agreement agree that the provisions contained in the Omnibus Agreement will prevail to the extent of such conflict, and the provisions of this Agreement shall be deemed to be amended to the extent necessary to eliminate such conflict and to exercise the intentions set out in the relevant provisions of the Omnibus Agreement, provided that in no event shall any such conflict be resolved in a manner which adversely affects the rights of the Custodian under this Agreement without the prior consent of the Custodian.  In the event of a conflict between this Agreement and any other agreement between any of the Collateral Agent, the Custodian and the MAV with respect to any Securities Account or the Collateral (including, for greater certainty, the Custodial Services Agreement), whether now existing or later entered into, the terms of this Agreement will prevail.

**Section 19    Amendments.**

This Agreement may only be amended, supplemented or otherwise modified by written agreement executed by the Custodian, the MAV and the Collateral Agent, upon ten (10) Business Days prior written notice of the proposed amendment, supplement or other modification to the Rating Agency by the Collateral Agent.

**Section 20    Severability.**

If any term, provision, covenant or condition of this Agreement, or its application to any party or any circumstance, is held to be unenforceable, invalid or illegal (in whole or in part) for any reason in any relevant jurisdiction, the remaining

terms, provisions, covenants and conditions of this Agreement, as modified by the deletion from this Agreement of such unenforceable, invalid or illegal portion, will continue in full force and effect, and such unenforceability, invalidity or illegality will not otherwise affect the remaining terms, provisions, covenants and conditions of this Agreement, so long as (i) this Agreement as so modified continues to express, without material change, the original intentions of the parties as to its subject matter, and (ii) the deletion of such portion of this Agreement will not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realisation of the benefits that would otherwise have been conferred upon the parties under this Agreement, it being agreed that the deletion of Section 17 would have such an effect. The parties will endeavour in good faith negotiations to replace the unenforceable, invalid or illegal provision with a valid provision, the effect of which comes as close as possible to that of such deleted provision.

**Section 21    Successors and Assigns.**

This Agreement is binding upon and enures to the benefit of the parties and their respective successors and permitted assigns. Neither the MAV nor the Custodian may assign or transfer any of their respective rights or obligations under this Agreement without the prior written consent of the Collateral Agent and ten (10) Business Days prior written notice to the Rating Agency. The Collateral Agent may assign or transfer its rights or obligations under this Agreement in accordance with the Omnibus Agreement (including, for greater certainty, any successor Collateral Agent appointed in accordance with the Omnibus Agreement) and with ten (10) Business Days notice to the Rating Agency.

**Section 22    Notices.**

Unless expressly stated otherwise, the procedure for delivering and effectiveness of all communications and notices pursuant to this Agreement shall be governed by the following provisions:

(1)    all communications and notices pursuant to this Agreement shall be by fax or letter delivered by hand or by electronic mail. Each such communication or notice shall be made to the relevant party at the fax number or address or electronic address and, in the case of a communication or notice by fax or letter, marked for the attention of, or (in the case of a communication by electronic mail) made to such person or department from time to time specified in writing by the recipient party to the others for such purpose. The initial fax number, electronic mail address and person or department so specified by each party and the Rating Agency are set out in Schedule "G" (Notice Details) to this Agreement. All communications or notices delivered verbally by telephone shall only be binding if followed immediately by a confirmation in writing by fax, letter or electronic mail;

(2)    A communication or notice shall be deemed received (if by fax) when an acknowledgement of receipt is received, (if by electronic mail) when made or (if by letter) when delivered, in each case in the manner required by this Section 22.  However, if a communication is received after business hours on any Business Day or on a day which is not a Business Day in the place of receipt, it shall be deemed to be received and become effective at the opening of business on the next Business Day in the place of receipt.  Every communication or notice shall be irrevocable save in respect of any manifest error in it.

**Section 23    Counterparts.**

This Agreement may be executed in any number of counterparts (including counterparts by facsimile) and all such counterparts taken together shall be deemed to constitute one and the same instrument.

**Section 24    Time of the Essence.**

Time is of the essence of this Agreement.

**Section 25    Remedies Cumulative.**

The right and remedies of the parties are cumulative and are in addition to, and not in substitution for, any other rights and remedies available at law or in equity or otherwise.  No single or partial exercise by a party of any right or remedy precludes or otherwise affects the exercise of any other right or remedy to which that party may be entitled.

**CIBC MELLON GLOBAL
SECURITIES SERVICES COMPANY
in its capacity as issuer trustee of
MASTER ASSET VEHICLE [I]/[II]**

By: _____

    Name:

    Title:

By  _____

    Name:

    Title:

**BNY    TRUST    COMPANY    OF
CANADA, as COLLATERAL AGENT**

By: _____
    Name:  George A. Bragg
    Title:  Vice President


By: _____

    Name:

    Title:

**CIBC MELLON TRUST COMPANY,
as CUSTODIAN**

By: _____

    Name:

    Title:


By: _____

    Name:

    Title:

## SCHEDULE "A"

## Securities Accounts

**[To be completed]**

## SCHEDULE "B"

## Collection Accounts

**[To be completed]**

**SCHEDULE "C"**

**Excluded Accounts**

**[To be completed]**

**[NTD:    Will include Ineligible Asset Payment Accounts and, CIBC payment
accounts]**

## SCHEDULE "D"

### Accounts for Income Distributions on CSA Accounts

**[To be completed]**

## SCHEDULE "E"

## Account Statements


**[To be completed]**

## SCHEDULE "F"

## Terminated Custodial and Control Agreements

**[To be completed]**

## SCHEDULE "G"

### Notice Details

**[To be completed]**

to the Collateral Agent at:

**[insert Collateral Agent's address]**

Attention:     ●
Telephone:    ●
Facsimile:     ●
E-mail:        ●

to the Custodian at:

**[insert Custodian's address]**

Attention:     ●
Telephone:    ●
Facsimile:     ●
E-mail:        ●

to the MAV at:

**[insert MAV's address at CIBC Mellon Global Securities Services Company, c/c Administrator] [NTD: Notice information to match that contained in the Omnibus Agreement.]**

Attention:     ●
Telephone:    ●
Facsimile:     ●
E-mail:        ●

- 2 -

## SCHEDULE "H"

### Notice of Exclusive Control

**[To be provided.]**

**SCHEDULE "I"**

**CSA Accounts**

**[To be provided]**

- 4 -

## SCHEDULE "J"

### MAV Income Accounts

**[To be provided] [NTD: The schedule shall include the Collection Account and
any other relevant account to be confirmed.]**

**Schedule E**

**THE DEALERS**

1.    **LSS CDS Counterparties**

   Citibank, N.A.
   Deutsche Bank AG
   HSBC Bank USA, National Association
   Merrill Lynch International
   Merrill Lynch Capital Services, Inc.
   Swiss Re Financial Products Corporation
   Royal Bank of Canada
   UBS AG

2.    **Unlevered CDS Counterparties**

   Bank of America, N.A.
   Deutsche Bank AG
   HSBC Bank USA, National Association
   Merrill Lynch International
   Royal Bank of Canada