**POSTING VERSION: Subject to minor revisions
/ Schedules subject to updating**

## ADMINISTRATION AND MANAGEMENT AGREEMENT
### (MAV2)

ADMINISTRATION AND MANAGEMENT AGREEMENT (this "Agreement"), dated
[   ], 2008, between BlackRock (Institutional) Canada Ltd. ("BlackRock Canada" and, in its capacity as
the administrator and asset manager, and its successors and permitted assigns, the "Administrator") and
CIBC Mellon Global Securities Services Company, an unlimited liability company existing under the
laws of the Province of Nova Scotia, in its capacity as issuer trustee of Master Asset Vehicle II (in such
capacity, "MAV2"), a trust established pursuant to the laws of the Province of Ontario.

W I T N E S S E T H :

In consideration of the mutual promises and agreements herein contained and other good
and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed by
and between the parties hereto as follows:

Section 1.        Definitions and Interpretations.

Section 1.1        Definitions.  Except as otherwise expressly provided herein or unless the
context otherwise requires, capitalized terms not otherwise defined herein shall have the meanings
specified in (i) the Omnibus Agreement (the "Omnibus Agreement"), dated as of the Closing Date by and
among the Unlevered CDS Counterparties, the LSS CDS Counterparties, the Lenders, the Collateral
Agent, the Administrative Agent, the Valuation Agent, the Spread/Loss Trigger Calculation Agent, the
Administrator, MAV2 and the Indenture Trustee and, (ii) if not defined in the Omnibus Agreement, the
Note Indenture (the "Indenture"), dated as of the Closing Date between MAV2, BNY Trust Company of
Canada, as indenture trustee and BNY Trust Company of Canada, as collateral agent.

"Acquisition Cost" means, (i) for each Managed Asset acquired on the Closing Date, the
figure expressed as a dollar amount or percentage of par as of the date specified, each as set forth in the
Monitor's Implementation Report, as supplemented or amended prior to the Closing Date, and (ii) for
each Managed Asset acquired after the Closing Date, the price paid for such Asset (net of accrued interest
and discount) as the context may require. For purposes of this definition, the Acquisition Cost of any
amortizing Managed Asset shall be determined by application of its most recently reported pool factor
indicating the percentage of par.

"Administered Satellite Trust" means a Satellite Trust other than a Non-Administered
Satellite Trust.

"Advisory Committee" means a committee consisting of representatives of Noteholders,
as appointed in accordance with the Indenture, the role of which, for purposes of this Agreement, is set
forth in Annex A hereto.

"AMA Transaction Documents" means the Transaction Documents, the Included Underlying Documents, the CIBC Omnibus Agreement, the Ineligible Asset Documents and any other document entered into by MAV2 in accordance with Section 3(c)(ii), as the foregoing may be amended, supplemented or modified from time to time in accordance with this Agreement, the Omnibus Agreement, the CIBC Omnibus Agreement and the Ineligible Asset Documents.

"BlackRock" means BlackRock Financial, together with its Affiliates, including BlackRock Canada.

"BlackRock Change of Control" means any of the following events (provided, for the avoidance of doubt, that no BlackRock Change of Control will be deemed to have occurred solely as a result of a sale or other disposition by Merrill Lynch & Co, Inc. or Bank of America Corporation, or their respective Affiliates, or by The PNC Financial Services, Group, Inc. or its Affiliates, of any or all of their holdings of securities issued by BlackRock, Inc. to any person):

(i)    any "person" (as defined in section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), excluding for this purpose (A) BlackRock, Inc. or any subsidiary of BlackRock, Inc. and (B) any employee benefit plan of BlackRock, Inc., any subsidiary of BlackRock, Inc. or any person or entity organized, appointed or established by BlackRock, Inc. for or pursuant to the terms of any such plan that acquires beneficial ownership of voting securities of BlackRock, Inc., becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of BlackRock, Inc. representing more than fifty percent (50%) of the combined voting power of BlackRock, Inc.'s then outstanding securities; provided, however, that no BlackRock Change of Control will be deemed to have occurred as a result of a change in ownership percentage resulting solely from an acquisition of securities by BlackRock, Inc. or an exchange of voting securities for nonvoting securities by any person; or

(ii)    persons who as of the Closing Date constitute the board (the "Incumbent Directors") of BlackRock, Inc. cease for any reason, including without limitation, as a result of a tender offer, proxy contest, merger or similar transaction, to constitute at least a majority of the Board, provided that any person becoming a director of BlackRock, Inc. subsequent to the Closing Date shall be considered an Incumbent Director if such person's election or nomination for election was approved by a vote of at least fifty percent (50%) of the Incumbent Directors; but provided further, that any such person whose initial assumption of office is in connection with an actual or threatened election contest relating to the election of members of the Board or other actual or threatened solicitation of proxies or consents by or on behalf of a "person" (as defined in Section 13(d) and 14(d) of the Exchange Act) other than the Board, including by reason of agreement intended to avoid or settle any such actual or threatened contest or solicitation, shall not be considered an Incumbent Director; or

(iii)    consummation of a reorganization, merger or consolidation or sale or other disposition of at least eighty percent (80%) of the assets of BlackRock, Inc. (a "Business Combination"), in each case, unless, following such Business Combination, all or substantially all of the individuals and entities who were the beneficial owners of outstanding voting securities of BlackRock, Inc. immediately prior to such Business Combination beneficially own, directly or indirectly, more than fifty percent (50%) of the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors of the company resulting from such Business Combination (including, without

limitation, a company that, as a result of such transaction, owns BlackRock, Inc. or all or substantially all of BlackRock, Inc.'s assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership immediately prior to such Business Combination of the outstanding voting securities of BlackRock, Inc.

"BlackRock Financial" means BlackRock Financial Management, Inc., and its successors and permitted assigns.

"Cause" has the meaning set forth in Section 13(b).

"Controlling Class Majority" means greater than 50% of the aggregate outstanding principal amount of the Controlling Class.

"Controlling Class Supermajority" means 66 2/3% or more of the aggregate outstanding principal amount of the Controlling Class.

"Credit Risk Asset" means any Managed Asset, other than a Defaulted Asset, that the Administrator determines, in its commercially reasonable judgment, (i) has declined or has a significant risk of declining in credit quality since the later of the Closing Date and the date of acquisition thereof by MAV2 and, in each case, with lapse of time, has a significant risk of suffering an event of default or termination event thereunder or a writedown in the par amount thereof (or, with respect to a counterparty, a significant risk of nonperformance unless such counterparty is required to post collateral or other credit support upon its downgrade and the counterparty has fully complied with such requirement), (ii) has declined or has a significant risk of declining in market value from its market value as of the later of the Closing Date and the date of acquisition thereof by MAV2, or (iii) has a current market value that is materially higher than BlackRock's commercially reasonable assessment of intrinsic value; provided that clauses (ii) and (iii) shall not apply to Whole Loan Programs.

"Dealer Managed Collateral" means, collectively, (i) all Assets of MAV2 that constitute Original Collateral of any Dealer and proceeds thereof and includes Assets which the Administrator reinvests pursuant to Section 4.5 (*Original Collateral Default*), Section 4.12 (*Reinvestment of Matured Original Collateral*) and Section 4.13 (*Mechanics of Investing Matured Original Collateral*) of the Omnibus Agreement and (ii) CIBC Swap Collateral (as defined in the CIBC Omnibus).

"Defaulted Asset" means any Managed Asset in respect of which the Administrator has received notice or as to which a Responsible Officer of the Administrator has actual knowledge that:

(a)    there has occurred and is continuing, without giving effect to any applicable grace period, any default with respect to the payment of interest, principal or other amount, provided, however, that (i) a payment default of up to three Business Days (or such shorter period as may be set out in the relevant document for such Managed Asset) (the "Cure Period") with respect to which the Administrator reasonably believes that such payment default resulted solely from administrative or technical reasons shall not cause an asset to be classified as a Defaulted Asset during such Cure Period

and (ii) a Managed Asset shall not be classified as a Defaulted Asset if such payment default has been cured within the Cure Period;

(b)     such Managed Asset has had bankruptcy, insolvency or receivership proceedings initiated by or against its obligor and, in the case of any involuntary proceedings relating to such obligor, such involuntary proceedings remain unstayed and undismissed for 45 days, or which has an obligor which has been adjudged to be bankrupt or insolvent (and such judgment remains in force);

(c)     such Managed Asset ranks pari passu with or is subordinated to another obligation of the same obligor and such other obligation (i) satisfies the criteria in paragraph (a) above, (ii) is a full recourse obligation and unsecured by the obligor and (iii) does not constitute a trade debt which the obligor is disputing in good faith; or

(d)     a Distressed Exchange has become binding upon the holders of such asset generally, for the purposes of which "Distressed Exchange" means any distressed exchange or other debt restructuring where the issuer of such Managed Asset has offered the relevant class of holders of the Managed Asset generally a new obligation or package of obligations which, in the reasonable judgment of the Administrator either (i) amounts to a diminished financial obligation, or (ii) has the purpose of helping the obligor of such Managed Asset avoid default.

Nothing in this definition shall require any employee (including any portfolio manager or credit analyst) of the Administrator to obtain, use, share or otherwise distribute (X) any information that it would be prohibited from obtaining, using, sharing or otherwise distributing by virtue of the internal policies applicable to the Administrator relating to confidential communications, or (Y) material non-public information with or to any other Person.

"Delegee" means any person that has been subcontracted by a Direct Service Provider to provide services under this Agreement, provided such Delegee has been appointed in accordance with the provisions of this Agreement and, with respect to any person that is not an Affiliate of the Administrator, such subcontracting has been consented to in accordance with Section 7.5 (*Certain matters regarding the Administrator and Service Providers*) of the Omnibus Agreement (for the avoidance of doubt, Tao Admin. Corp. has been approved).

"Direct Service Provider" means the Administrator or any Affiliate of the Administrator that is providing services to MAV2 under this Agreement, provided such Direct Service Provider has been appointed in accordance with the provisions of this Agreement and, with respect to any delegation to a Delegee that is not an Affiliate of the Administrator, such delegation has been consented to in accordance with Section 7.5 (*Certain matters regarding the Administrator and Service Providers*) of the Omnibus Agreement (for the avoidance of doubt, Tao Admin. Corp. has been approved).

"EI Rating Agency" means any of DBRS, S&P, Moody's or Fitch.

"Eligibility Criteria" means the criteria set forth in Annex B attached hereto, as such criteria may be amended from time to time pursuant hereto and in accordance with the Omnibus Agreement.

"Eligible Investments" has the meaning set forth in Annex B attached hereto, as such Annex B may be amended from time to time pursuant hereto and in accordance with the Omnibus Agreement and, where the context requires, means Eligible Investments that are assets of MAV2.

"Excluded Underlying Documents" means the agreements relating to Whole Loan Programs to which MAV2 or any Satellite Trust is a party that are listed on Schedule B-2 hereto or as may be entered into by Tao Admin. Corp. and consented to by the Administrator from time to time in accordance with the Tao Administration Agreement.

"Fee Basis Amount" means, in respect of each Due Period, the aggregate principal or funded amount, as applicable, of (without duplication) (a) the Managed Assets, including Eligible Investments owned or entered into by MAV2, (b) the Dealer Managed Collateral, (c) any Original Collateral that is transferred to an OC Transfer Sub-Account for any period that it is held in such account pursuant to Section 4.2(c) of the Omnibus Agreement and (d) the assets held by the Satellite Trusts and in Whole Loan Programs including swap transactions not constituting Swap Transactions, in each case, on the first day of such Due Period. For the avoidance of doubt, the determination of the principal or funded amount of the assets held by Satellite Trusts and the Whole Loan Programs shall be determined regardless of whether MAV2 has transferred any of its original interest in such Satellite Trust through a transfer of the related certificate or interest, unless the whole of the interest in the Satellite Trust, the Whole Loan Program or the assets have been disposed of and neither of the Administrator or Tao Admin Corp. have any further engagement or responsibility in respect of such assets.

"Hedging Agreement" means (a) any Managed Asset Swap or (b) Existing Interest Rate Hedge.

"Included Underlying Documents" means the agreements to which MAV2 or any Administered Satellite Trust is a party that are not Excluded Underlying Documents, as set forth in Schedule B-1 hereto or as may be entered into from time to time in accordance with the AMA Transaction Documents.

"Indemnified Taxes" means any tax imposed under the provisions of Part XIII of the Income Tax Act (Canada), as amended from time to time.

"Indemnity Allocation Principles" means the general principles by which the Administrator will allocate the obligations of the MAV Indemnifying Party under Section 11 and other indemnification obligations under Section 6 among MAV2, MAV1 and MAV3 and among the relevant priorities of payments provided under the documents to which MAV2, MAV1 or MAV3 is a party, namely (i) the asset or the program, or the circumstances affecting the asset or the program, to which the indemnity claim is specifically attributable, (ii) the class of notes or the circumstances affecting the class of notes to which the indemnity claim is specifically attributable or (iii) the issuer of the note to which the

5

indemnity claim is specifically attributable, as applicable; provided that, to the extent any claim is specifically attributable to a class of Subordinated Notes (or any program funded by a class of Subordinated Notes), the relevant indemnification obligation shall be allocated to the senior notes issued in the program to which such Subordinated Notes relate.

"Investment Advisers Act" means the U.S. Investment Advisers Act of 1940, as amended.

"Issuer Trustee" means CIBC Mellon Global Securities Services Company or any successor to the trust or custodial business thereof or permitted assign or replacement thereof in accordance with the terms of the Declaration of Trust.

"Managed Assets" means, collectively,

(i) all Assets of MAV2, excluding:

(a)     (1) Hedging Agreements (but Managed Assets shall include all payments payable by a counterparty under such Hedging Agreements to MAV2) and (2) Swap Agreements (and, for the avoidance of doubt, Transactions thereunder) (but Managed Assets shall include all payments payable by a Dealer to MAV2 under a Swap Agreement, including Termination Payments payable by a Dealer to MAV2 upon the early termination of a Transaction under a Swap Agreement, except for any Termination Payment that would constitute Matured Original Collateral or Wrap Swap Proceeds which instead shall constitute Original Collateral of such Dealer);

(b)     Original Collateral; and

(c)     CIBC Swap Collateral (as defined under the CIBC Omnibus Agreement);

unless and until,

(X)     in the case of CIBC Swap Collateral, the date on which all amounts owing to CIBC by MAV2 under the Credit Default Swap Documents (as defined under CIBC Omnibus Agreement) have been fully satisfied, and

(Y)     in the case of each Dealer and its Original Collateral (or the relevant portion thereof), the date on which: such Original Collateral ceases to be Original Collateral of the relevant Dealer pursuant to Sections 4.1 (*Dealer Default under a Swap Agreement*), 4.6 (*Early termination of all of the Transactions under a Dealer's Swap Agreement*), 4.7 (*Early termination of some (but not all) of the Transactions under a*

*Dealer's Swap Agreement*) or 4.8 (*Release of    Collateral*)    of    the
Omnibus Agreement; and

(d)         Unfunded Commitments; and

(ii)        any proceeds of the Managed Assets referred to in (i) above, including any
proceeds from reinvestment of the proceeds of such Managed Assets.

"MAV Indemnifying Party" has the meaning set forth in Section 11(d).

"MAV1 AMA" means the Administration and Management Agreement, dated as of the
date hereof, between BlackRock Canada and MAV1.

"MAV3 AMA" means the Administration and Management Agreement, dated as of the
date hereof, between BlackRock Canada and MAV3.

"Monitor's Implementation Report" means the report of the Monitor filed with the Court
(including, without limitation, any schedules or appendices thereto) in connection with the motion for
entry of the Plan Implementation Order approving, authorizing and directing, *inter alia*, the various
procedures in connection with the implementation of the Plan.

"Monitor's Reports" means the reports of the Monitor filed from time to time with the
Court (including, without limitation, any schedules or appendices thereto).

"Non-Administered Satellite Trust" means a Satellite Trust party to the Tao
Administration Agreement.

"Par Sale Asset" means (i) any Managed Asset sold in an arm's-length transaction at a
price (net of accrued interest and discount) at or above its Acquisition Cost, or (ii) a Transaction under a
Swap Agreement, a TRS or a Repurchase Agreement (as defined in Annex B attached hereto) terminated
or novated (subject to the counterparty's consent, unless such counterparty is a Defaulting Party or
Affected Party as defined in the relevant Swap Agreement (in which case such Transaction shall not
constitute a Par Sale Asset)) with either (A) no Termination Payment to the counterparty (or any payment
to the party to whom the Transaction is being novated) by MAV2 or (B) a Termination Payment payable
by the counterparty (or any payment by the party to whom the Transaction is being novated) to MAV2;
provided that the sale price of a particular Asset described in clause (i) above shall be considered
collectively with the termination value of any related hedge in respect of a proposed sale for purposes of
determining satisfaction of this definition of Par Sale Asset and, for greater certainty, the liquidation of
any collateral specifically supporting a Transaction under a Swap Agreement will be considered
separately unless it is disposed of concurrently with the termination or novation of the Transaction under
the related Swap Agreement; provided, further, that the termination of any Transaction under a Swap
Agreement described in clause (ii) above that is a Transaction where MAV2 bought credit protection (a
"short"), can only be effected with a concurrent termination of any related transaction in which MAV2

7

sold credit protection (a "<u>long</u>"), considered collectively for purposes of determining satisfaction with respect to this definition of Par Sale Asset.

"<u>Plan Implementation Order</u>" means the order of the Court dated December [   ], 2008, approving, authorizing and directing, *inter alia*, various procedures in connection with the implementation of the Plan.

"<u>Rating Agency</u>" means DBRS Limited, together with any other rating agency that may be engaged by MAV2 to rate one or more classes of Notes with notice to the Administrator and any successor rating agency, and for greater certainty, where "Rating Agency" is used herein, such reference shall be deemed to be a reference to all such rating agencies, not any one of them (unless there is only one).

"<u>Sale Proceeds</u>" means all proceeds or payments (net of accrued interest or discount) received with respect to any Managed Asset or Hedging Agreement as a result of any sale, termination, novation or other disposition of such Managed Asset, and any Termination Payment (but not any Unpaid Amounts) or other amount payable to MAV2 on the early termination of any Transaction under a Swap Agreement or a Hedging Agreement, in whole or in part pursuant to Section 3(g) or on the novation to a third party of any Transaction under a Swap Agreement, in each case, net of any reasonable amounts expended by the Administrator and its Affiliates and/or the Collateral Agent in their respective good faith determination in connection with any such sale, termination, novation or other disposition.

"<u>Tao Administration Agreement</u>" means the administration agreement, dated as of the date hereof, among Tao Admin Corp., MAV1, MAV2 and MAV3, and CIBC Mellon Global Securities Services Company, as trustee for the Non-Administered Satellite Trusts, pursuant to which Tao Admin Corp. and its successors and permitted assigns will provide administrative services to the Non-Administered Satellite Trusts.

"<u>Tao Replacement Event</u>" means (i) Tao Admin Corp. has been terminated or has resigned in accordance with the Tao Administration Agreement, (ii) a replacement has not been appointed in accordance with the Tao Administration Agreement and (iii) the Administrator has determined in its reasonable judgment that funds will be available for the payment of the fees payable to the administrator under the Tao Administration Agreement for the expected remaining term of such agreement.

"<u>Traditional Asset Hedging Agreement</u>" means an agreement entered into on or prior to the Closing Date between a counterparty and a Satellite Trust or MAV2 to hedge currency, basis, timing of cash-flow or interest rate risk in respect of any Traditional Asset.

"<u>Traditional Asset Program</u>" means a program in respect of which MAV2 has an interest through, or constituting, one or more Traditional Assets.

"<u>Whole Loan Programs</u>" means the programs set forth on <u>Schedule C</u> hereto and the assets related thereto.

Section 1.2    <u>Construction</u>.  In this Agreement, unless otherwise specified:

(a)    words denoting the singular include the plural and vice versa and words denoting any gender include all genders;

(b)    the terms "including", "include" and "includes" shall mean "including without limitation", "include, without limitation" and "includes, without limitation", respectively;

(c)    any reference to a statute shall mean the statute in force as at the date hereof, unless otherwise expressly provided;

(d)    the use of headings is for convenience of reference only and shall not affect the construction of this Agreement;

(e)    when calculating the period of time within which or following which any act is to be done or step taken, the date which is the reference day in calculating such period shall be excluded. If the last day of such period is not a Business Day, the period shall end on the next succeeding day that is a Business Day;

(f)    any dollar amounts are expressed in Canadian Dollars unless otherwise specified;

(g)    references to "this Agreement" shall mean and include all annexes, schedules, exhibits, supplements and attachments hereto and all documents incorporated herein by reference, from time to time, each of which shall form an integral part hereof; and

(h)    the principles set forth in this Agreement as applicable to Transactions under Swap Agreements also shall apply *mutatis mutandis* to other swap transactions to which MAV2 or a Satellite Trust is a party (except to the extent otherwise provided with respect to Hedging Agreements; <u>provided</u> that, with respect to the definition of Managed Assets, such other swap transactions shall not be excluded).

Section 1.3    <u>Accounting Principles</u>.  Except as otherwise stated herein, any calculation or financial reporting to be made hereunder shall be made in accordance with GAAP.

Section 2.    <u>General</u>.

(a)    Subject to the terms set forth herein, BlackRock Canada agrees to act as the Administrator to each of MAV2 and the Administered Satellite Trusts with respect to the administration and management of its assets and to perform, or supervise and arrange for the performance of, the activities set forth in Section 3 hereunder and the other duties that have been expressly delegated to the Administrator in the other AMA Transaction Documents and shall have full

9

power and authority to perform any of the foregoing and any actions incidental thereto. To the extent necessary or appropriate to perform such duties, the Administrator shall have and is hereby granted the power and authority to execute and deliver all necessary and appropriate documents and instruments on behalf of MAV2 and each Administered Satellite Trust with respect thereto.

(b)     Subject to the AMA Transaction Documents, MAV2 hereby appoints, and each Administered Satellite Trust by its execution of the acknowledgment substantially in the form attached hereto as Annex C irrevocably appoints, the Administrator as such entity's attorney-in-fact during the term of this Agreement, such appointment being coupled with an interest, with full authority in the place and stead of and in the name of such entity, from time to time in the Administrator's discretion or as required by this Agreement to take such actions on behalf of such entity as the Administrator may deem necessary or advisable to comply with or effect the purposes of this Agreement and the other AMA Transaction Documents, including, without limitation, to execute any documents, instruments or other certificates in connection therewith, to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts or moneys due and to become due in connection with Managed Assets, the Hedging Agreements, the Traditional Asset Hedging Agreements and Swap Agreements or otherwise owed thereto, to receive, endorse, and collect any drafts or other instruments, documents and chattel paper in connection therewith, and to file any claims or take any action or institute any proceedings which the Administrator may deem to be necessary or desirable for the collection thereof or to ensure or enforce compliance with the terms and conditions of this Agreement and the other AMA Transaction Documents.

(c)     Each of MAV2 and the Administrator acknowledges the appointment by MAV2 of the Administrator as its agent in respect of its rights and obligations under the Tao Administration Agreement pursuant to Section 2.10 and its duties under Section 2.3 thereof. In furtherance of the Administrator's supervisory role with respect to the Tao Administration Agreement provided under Section 2.3 thereunder, MAV2 requests the Administrator, and the Administrator hereby agrees, to provide the services specifically set forth in Section 3(a) and Section 3(b) hereunder in respect of the Non-Administered Satellite Trusts and Whole Loan Programs.  Further, upon the occurrence of a Tao Replacement Event, the Administrator agrees to act as the administrator under the Tao Administration Agreement in respect of the Non-Administered Satellite Trusts and Whole Loan Programs in accordance with the terms thereunder, except that the provisions of this Agreement in respect of the Administrator's standard of care, including Section 3(c), and indemnity and limitation of liability, including Section 11, shall govern and supersede the analogous provisions of the Tao Administration Agreement.

Section 3.     Duties of the Administrator.

(a)     Administration Duties.   The Administrator agrees to provide the following administrative services all in accordance with and subject to the applicable AMA Transaction Documents:

(i)     administering MAV2 and the Administered Satellite Trusts (including tax compliance), with the assistance of one or more third parties, as appropriate (the fees and expenses of such third parties to be paid or reimbursed, as applicable, by MAV2 and the Administered Satellite Trusts to the extent provided in Section 6(b));

10

(ii)   using commercially reasonable efforts to monitor the compliance by the administrator of the Non-Administered Satellite Trusts and Whole Loan Programs with its material obligations under the Tao Administration Agreement;

(iii)   using commercially reasonable efforts to procure Additional Loans in accordance with Section 2.9(a) of the Omnibus Agreement;

(iv)   maintaining financial records for MAV2 and the Administered Satellite Trusts, with the assistance of one or more third parties, as appropriate (the fees and expenses of such third parties to be paid or reimbursed, as applicable, by MAV2 and the Administered Satellite Trusts as provided in Section 6(b));

(v)   overseeing of (A) the preparation of financial statements for MAV2, (B) the arrangement for auditing of annual financial statements, in each case, as required pursuant to any AMA Transaction Document, and (C) the arrangement to post such financial statements to a dedicated website available to Noteholders, Lenders, Dealers and the Rating Agency on a quarterly basis (the fees and expenses incurred in respect of such preparation, auditing and posting to be paid or reimbursed, as applicable, by MAV2 or the Administered Satellite Trusts as provided in Section 6(b));

(vi)   acting as Valuation Agent and Spread/Loss Trigger Calculation Agent in accordance with the Omnibus Agreement;

(vii)   presenting performance summaries with respect to the Managed Assets and Hedging Agreements to Noteholders, Dealers, Lenders and the Rating Agency on a quarterly basis;

(viii)   providing monthly portfolio reports (including valuations) posted to a dedicated website available to Noteholders, Lenders, Dealers and the Rating Agency;

(ix)   (A) performing the duties expressly assigned to it as Administrator under the AMA Transaction Documents, (B) subject to the cooperation of the Issuer Trustee, the Indenture Trustee, the trustees of the Satellite Trusts, the Collateral Agent, the Custodians and other Service Providers and to the extent necessary and possible, facilitating the execution of MAV2's and the Administered Satellite Trusts' obligations under the AMA Transaction Documents and (C) subject to the cooperation of the Issuer Trustee, the Indenture Trustee, the trustees of the Satellite Trusts, the Collateral Agent, the Custodians and other Service Providers and to the extent necessary and possible, overseeing MAV2's and the Administered Satellite Trusts' compliance with the AMA Transaction Documents; provided, for the avoidance of doubt, that in respect of clauses (B) and (C), the Administrator shall not be responsible for actions of third parties, including without limitation the Indenture Trustee, the Issuer Trustee (except to the extent directed by the Administrator), the trustees of the Satellite Trusts, the Collateral

11

Agent, the Custodians and any other Service Providers in respect of their obligations, whether on behalf of MAV2, an Administered Satellite Trust or otherwise, under the relevant AMA Transaction Documents, provided that, for the avoidance of doubt, MAV2 and the Satellite Trusts shall not be third parties for this purpose;

(x)    managing MAV2's and, to the extent applicable, the Administered Satellite Trusts' relationship with the Rating Agency (including seeking satisfaction of the Rating Agency Condition and giving notice to the Rating Agency, when required hereunder or under any of the other AMA Transaction Documents, reporting on the Managed Assets in a manner satisfactory to the Rating Agency, and, in connection with the Rating Recognition Procedure, providing the relevant documents and reports to DBRS and otherwise satisfying the requirements set forth in the definition of Rating Recognition Procedure in Annex B hereto), Custodians, trustees and other Service Providers;

(xi)    subject to the cooperation of the Issuer Trustee, the Indenture Trustee, the trustees of the Satellite Trusts, the Collateral Agent, the Custodians and other Service Providers and to the extent necessary and possible, using commercially reasonable efforts to oversee MAV2's and the Administered Satellite Trusts' compliance in all material  respects  with applicable Canadian and U.S. laws, which, for greater certainty, includes using commercially reasonable efforts to direct any relevant third party service providers to MAV2 and the Administered Satellite Trusts to take action to cause MAV2 and the Administered Satellite Trusts to so comply; provided that the Administrator shall not be liable for  any actions or inactions taken  in reliance upon advice  of counsel received  in accordance with Section 3(j);

(xii)    (A) consulting with counsel and advising the Collateral Agent upon becoming aware of any of the following circumstances: (i) any movement of material tangible collateral to a jurisdiction outside of Canada, excluding collateral that is in the possession of the Dealers or the Collateral Agent or that is subject to a Control Agreement; (ii) the acquisition of any certificated securities or instruments, following the transfer of Assets in connection with the Plan, that are registered in the name of MAV2 and that have not previously been delivered to the Dealers or the Collateral Agent; (iii) the replacement of any CA Custodian or OC Custodian; or (iv) the existence of any Collateral that is cash or investment property that is not held by a Custodian that has entered into a CA Control Agreement or OC Control Agreement on the Closing Date; and (B) using commercially reasonable efforts to cooperate with the Collateral Agent in respect of any additional actions that the Collateral Agent determines to take, or is directed to take, in order to maintain the perfection and to preserve the priority of the Security Interests in accordance with Section 7.1(a)(iv) (*The Collateral Agent; Authorisation and Action*) and Section 10.1(i) (*Additional Security Perfection and Protection of Security Interests*) of the Omnibus Agreement;

(xiii)    using commercially reasonable efforts to cooperate with the Monitor to effect the transactions relating to MAV2, the Administered Satellite Trust and the Non-Administered Satellite Trusts contemplated under the Plan; and

1335339.29-New York Server 7A - MSW

(xiv)   subject to the cooperation of the Issuer Trustee, the Indenture Trustee, the trustees of the Satellite Trusts, the Collateral Agent, the Custodians and other Service Providers, and to the extent necessary and possible, taking all necessary and appropriate action to enable each of MAV2 and the Administered Satellite Trusts to exercise or enforce its rights and to perform its obligations under the AMA Transaction Documents as the Administrator may consider necessary or advisable in its discretion (for greater clarity, subject to the standard of care set forth in Section 3(c)), provided such action is not an action explicitly reserved for Dealers, Lenders or Noteholders, a group of Secured Creditors or another Service Provider under the AMA Transaction Documents and does not violate the AMA Transaction Documents.

(b)   Asset Management Duties.  The Administrator agrees to provide the following asset management services in respect of the Managed Assets and, to the extent specified herein, the Swap Agreements, Hedging Agreements and Traditional Asset Hedging Agreements and Original Collateral to the extent provided in the Omnibus Agreement, all in accordance with and subject to the applicable AMA Transaction Documents:

(i)   directing the investment and reinvestment of proceeds from the Managed Assets (including Eligible Investments) in Eligible Investments in accordance with the Eligibility Criteria or, in the case of Original Collateral, to the extent provided for in the Omnibus Agreement; provided that proceeds arising from the Managed Assets subject to the CIBC Omnibus Agreement shall be managed and reinvested in accordance with the second last paragraph of Section 3(g);

(ii)   overseeing the management of assets of the Non-Administered Satellite Trusts and Whole Loan Programs by Tao Admin. Corp. and providing instructions to Tao Admin. Corp. or taking appropriate actions (including authorizing the disposition of assets and termination of Traditional Asset Hedging Agreements) in connection therewith in accordance with the Tao Administration Agreement and the applicable Traditional Asset Documents;

(iii)   to the extent relevant information is reported by the Dealers or is otherwise provided to the Administrator in accordance with the AMA Transaction Documents, presenting performance and valuation summaries of the Transactions under Swap Agreements, Hedging Agreements and the Dealer Managed Collateral to Noteholders, Dealers and Lenders;

(iv)   in its discretion, arranging for sales, terminations or novations, as the case may be, of Par Sale Assets at a price consistent with the definition of Par Sale Asset, and of Credit Risk Assets, Defaulted Assets and other Managed Assets (in each case in accordance with, and only as permitted pursuant to Section 3(g) and Section 3(d)(x)); provided that any sales, terminations or novations, as the case may be, of any Assets that are part of a Dealer's Original Collateral or that are Transactions under a Swap Agreement shall in each case be subject to the relevant Dealer's prior consent (unless the counterparty thereunder is a Defaulting Party or Affected Party as defined in such Swap Agreement);

(v)    in its discretion, arranging for sales, terminations or novations, as the case may be, of assets of the Administered Satellite Trusts and Non-Administered Satellite Trusts and Whole Loan Programs, in each case in accordance with the Included Underlying Documents and Excluded Underlying Documents, as applicable;

(vi)    to the extent permitted under the Omnibus Agreement, the CIBC Omnibus Agreement, this Agreement including the Eligibility Criteria, and the applicable Traditional Asset Documents, and to the extent reasonably feasible, managing MAV2's interest rate risk and currency risk and providing direction to MAV2 to enter into or terminate Hedging Agreements where deemed necessary or advisable by the Administrator and to the extent reasonably feasible, determining the terms of any new Hedging Agreements, and to the extent necessary or appropriate to perform such duties, executing and delivering all necessary and appropriate documents and instruments on behalf of MAV2 with respect thereto;

(vii)    to the extent permitted under the Omnibus Agreement, the CIBC Omnibus Agreement, this Agreement including the Eligibility Criteria, the applicable Traditional Asset Documents, Included Underlying Documents and Excluded Underlying Documents, and to the extent reasonably feasible, managing the Administered Satellite Trusts', Non-Administered Satellite Trusts' and Whole Loan Programs' interest rate risk, basis risk, timing of cash-flow risk and currency risk and providing direction to the Administered Satellite Trusts and to Tao Admin. Corp. as administrator for the Non-Administered Satellite Trusts and Whole Loan Programs to enter into or terminate Hedging Agreements where deemed necessary or advisable by the Administrator and to the extent reasonably feasible, determining the terms of any new Traditional Asset Hedging Agreements, and to the extent necessary or appropriate to perform such duties, executing and delivering all necessary and appropriate documents and instruments on behalf of the Administered Satellite Trusts and directing Tao Admin. Corp. as administrator for the Non-Administered Satellite Trusts and Whole Loan Programs with respect thereto;

(viii)    to the extent permitted under any AMA Transaction Documents and reasonably feasible, executing trades for acquisitions or entries into, and sales, terminations or novations, as the case may be, of assets or directing the Issuer Trustee or any issuer trustee of an Administered Satellite Trust or Tao Admin. Corp. as Administrative Agent for any Non-Administered Satellite Trust or Whole Loan Program or any custodian in connection therewith; and

(ix)    to the extent required under any AMA Transaction Documents, including to the extent required pursuant to Sections 4.8 (*Release of Collateral*) and 4.9 (*Liquidation of Collateral*) of the Omnibus Agreement or Section 3.1 (*Avoidance of Credit Support Default*) of the CIBC Omnibus Agreement, taking any and all actions necessary for the liquidation of all Original Collateral or CA-Held Collateral or a portion thereof in accordance with Section 4.9 (*Liquidation of Collateral*) of the Omnibus Agreement or necessary for the liquidation of all CIBC Swap Collateral or a portion thereof in accordance with Section 3.1 (*Avoidance of Credit Support Default*) of the CIBC Omnibus Agreement, as applicable.

14

(c)    (i)    The Administrator shall, subject to and in accordance with the terms and conditions hereof (including Section 11) and of the other AMA Transaction Documents, perform its obligations hereunder and exercise its discretion with reasonable care and in good faith, and, without limiting the foregoing, in its capacity as Administrator, using a degree of skill, diligence and attention no less than that which (i) BlackRock (A) exercises with respect to comparable assets that it manages for itself and its Affiliates and (B) exercises with respect to comparable assets that it manages for others, and, in either case, in a manner similar to practices and procedures followed by reasonable and prudent institutional managers of assets of the nature and character of the Managed Assets and Swap Agreements and (ii) in respect of its administrative duties, including with respect to any delegation pursuant to Section 19 hereunder, a reasonably prudent person would exercise in comparable circumstances in the administration of vehicles similar to MAV2, except as expressly restricted or provided otherwise in this Agreement or the other AMA Transaction Documents.  To the extent consistent with the foregoing, the Administrator may follow BlackRock's customary standards, policies and procedures in performing its duties under the AMA Transaction Documents and hereunder.  In performing its duties and functions hereunder, the Administrator shall act in a manner consistent with the provisions of the AMA Transaction Documents.

(ii)    The Administrator shall not be bound by any amendment, supplement or other modification to the AMA Transaction Documents unless (x) the Administrator has received 10 Business Days' prior written notice thereof and a copy of such proposed amendment, supplement or other modification from the relevant parties and (y) if such amendment, supplement or other modification affects the Administrator's rights or obligations, the Administrator has provided its prior written consent thereto. Notwithstanding anything to the contrary herein, MAV2 shall not enter into any additional agreements or other documents after the Closing Date without the prior consent of the Administrator (such consent not to be unreasonably withheld or delayed). The Administrator's consent pursuant to this Section 3(c)(ii) shall constitute waiver of the requirement for 10 Business Days' prior notice.

(iii)    Subject to satisfaction of any applicable requirements set forth in Section 11 of the Omnibus Agreement, including any applicable consents thereto and notices thereof, this Agreement may be amended from time to time by written agreement signed by the parties hereto.

(d)    On behalf of MAV2, the Administrator, subject to and in accordance with the provisions of the AMA Transaction Documents, may or may direct MAV2 or any Administered Satellite Trust (or, for any Non-Administered Satellite Trust and Whole Loan Programs, the administrator under the Tao Administration Agreement subject to and in accordance with the Excluded Underlying Documents) to (x) dispose of an asset or other securities received in respect thereof in the open market or otherwise, or (y) acquire one or more assets or other securities and may, in each case subject to and in accordance with the provisions of the AMA Transaction Documents and Excluded Underlying Documents, as applicable, take or require MAV2, any Administered Satellite Trust  or any Non-Administered Satellite Trust (or the administrator under the Tao Administration Agreement) to take the following actions with respect to a Managed Asset, Hedging Agreement, Traditional Asset Hedging Agreement, underlying asset of an Administered Satellite Trust or Non-Administered Satellite Trust or a Swap Agreement, to the extent set forth below:

15

(i)    retain such Managed Asset; or

(ii)    sell, terminate, novate or otherwise dispose of such
Managed Asset, Hedging Agreement or Traditional Asset Hedging Agreement in the
open market or otherwise in accordance with Sections 4.8 (*Release of Collateral*) and 4.9
(*Liquidation of Collateral*) of the Omnibus Agreement and Section 3(g) hereof; or

(iii)    if applicable, tender such Managed Asset pursuant to an
offer, provided that the third to last paragraph of Section 3(g) is satisfied or the Rating
Agency Condition is satisfied, unless such Managed Asset is a Defaulted Asset or subject
to a mandatory tender or compulsory acquisition; or

(iv)    if applicable, and upon satisfaction of the Rating Agency
Condition, consent to any proposed amendment, modification or waiver with respect to a
Managed Asset, Hedging Agreement, Traditional Asset Hedging Agreement or
underlying asset of an Administered Satellite Trust or Non-Administered Satellite Trust
or document pertaining thereto; provided that satisfaction of the Rating Agency
Condition is not required with respect to an Ineligible Asset; or

(v)    retain or dispose of any securities or other property (if
other than cash) received pursuant to an offer, provided that, unless such Managed Asset
is a Defaulted Asset, the third to last paragraph of Section 3(g) is satisfied or the Rating
Agency Condition is satisfied; or

(vi)    upon satisfaction of the Rating Agency Condition, waive
any default with respect to any Defaulted Asset, Hedging Agreement or Traditional Asset
Hedging Agreement or any underlying asset with advance or contemporaneous written
notice to the Rating Agency, the Dealers and the Lenders; provided that satisfaction of
the Rating Agency Condition is not required with respect to an Ineligible Asset; or

(vii)    vote to accelerate the maturity of any Defaulted Asset or
negotiate the restructuring of a Credit Risk Asset or Defaulted Asset, in each case, with
advance or contemporaneous written notice to the Rating Agency, the Dealers and the
Lenders; provided that notice to the Rating Agency is not required for an Ineligible Asset;
or

(viii)    pursuant to and in accordance with Section 4.5 (*Original
Collateral Default*), Section 4.12 (*Reinvestment of Matured Original Collateral*) and
Section 4.13 (*Mechanics of investing Matured Original Collateral*) of the Omnibus
Agreement, reinvest Matured Original Collateral, Wrap Swap Proceeds and Returned
Other Posted Support;

(ix)    exercise any other rights or remedies with respect to such
asset as provided in the related underlying instruments or take any other action consistent

16

with the terms of the AMA Transaction Documents and Excluded Underlying Documents; or

(x)    with respect to any Swap Agreement,

(1)    modify or agree to modify where the consent of MAV2 is required under the AMA Transaction Documents, the reference obligations in respect of Transactions under any Swap Agreement (or one or more Transactions thereunder) if deemed advisable by the Administrator (with the consent of the applicable Dealer and/or portfolio manager, if applicable, where such consent is required under the AMA Transaction Documents) with the prior consent of the Required Lenders and the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS Counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) (such consent to be obtained in accordance with Article 11 of the Omnibus Agreement), and satisfaction of the Rating Agency Condition, provided that no such consents or other requirements shall be required in the case of Transactions where the portfolio manager for such transaction has discretion to modify such reference obligations; or

(2)    designate an Early Termination Date pursuant to the terms of any Swap Agreement.

(e)    The Administrator shall take commercially reasonable actions on behalf of MAV2 in connection with effecting any redemption of or payment on the Notes required in accordance with the AMA Transaction Documents.

(f)    In the performance of its duties under this Agreement, the Administrator shall at all times conform to, and act in accordance with, any requirements imposed on it by (i) the provisions of the Investment Advisers Act, and of any rules or regulations in force thereunder; (ii) the provisions of any applicable law, including applicable Canadian Securities Laws; and (iii) subject to Section 3(c) in respect of any required consent of the Administrator to amendments, the provisions of the AMA Transaction Documents, as amended from time to time in accordance with the AMA Transaction Documents.

(g)    In performing its duties hereunder, the Administrator may:

(i)    subject to Section 3(b)(iv), sell, terminate or novate Managed Assets, Hedging Agreements and Transactions under Swap Agreements that in each case are Par Sale Assets;

(ii)    subject to Section 3(b)(iv) and satisfaction of the conditions in the third to last paragraph of this Section 3(g), in its discretion, sell, terminate or novate Managed Assets where deemed necessary or advisable by the

17

Administrator in connection with a Managed Asset that is a Credit Risk Asset or a
Defaulted Asset;

(iii)    subject to Section 3(b)(iv) and satisfaction of the
conditions in the third to last paragraph of this Section 3(g) , sell Managed Assets where
deemed advisable by the Administrator in its discretion in connection with portfolio
diversification or to otherwise improve the risk/reward characteristics of the portfolio of
Managed Assets; provided that such discretionary sales in any one year (with the first
year beginning on the Closing Date) shall not exceed 5% of the aggregate par amount (as
defined in the Omnibus Agreement)of Managed Assets as of the first Business Day of
such year;

(iv)    subject to Section 3(b)(iv) and satisfaction of the
conditions in the third to last paragraph of this Section 3(g), terminate or novate
Transactions under Swap Agreements where deemed advisable by the Administrator in
its discretion; provided that such discretionary terminations or novations in any one year
(with the first year beginning on the Closing Date) shall not exceed 5% of the notional
amount of Transactions under Swap Agreements as of the first Business Day of such year;

(v)    in respect of a Traditional Asset Program that has declined
in par amount to 10% or less of its balance at the Closing Date, subject to both the terms
of the relevant Traditional Asset Documents, Included Underlying Documents and
Excluded Underlying Documents and satisfaction of the conditions set forth in the third
to last paragraph of this Section 3(g), and, if in the Administrator's commercially
reasonable judgment, taking into consideration the expenses of administering the
program, the income received from such program and the value of such program, the
continued holding of such program is uneconomic for MAV2, terminate, sell or otherwise
dispose of the assets in such program; or

(vi)    to the extent any reinvestment made by the Administrator
did not satisfy the definition of Eligible Investments as of the Trade Date, sell, terminate
or otherwise dispose of any asset in which such reinvestment was made;

provided, that the Administrator may sell, terminate or novate any Managed Asset, Transaction under a
Swap Agreement or asset in a Traditional Asset Program at any price and for any reason if (i) it has
obtained the consent of the Majority Secured Creditors (other than for these purposes where Royal Bank
of Canada is both an LSS CDS Counterparty and a Lender, Royal Bank of Canada in its capacity as LSS
CDS Counterparty) and the Required Lenders with respect to such sale, termination or novation and (ii)
the Rating Agency Condition has been satisfied with respect to such sale, termination or novation; and
provided, further, for the avoidance of doubt, that any sale, termination or novation pursuant to (ii), (iii),
(iv), (v) or (vi)  above may be made for a price (net of accrued interest and discount) below Acquisition
Cost, or with a termination payment or payment to third party on novation payable by MAV2. The
Administrator will provide advance or contemporaneous written notice to the Rating Agency, the Dealers,
the Lenders  and the Advisory Committee of any sales, terminations, novations or dispositions under
clause (ii), (iii), (iv), (v) and (vi) above and will provide notice to the Rating Agency within ten (10)
Business Days, the Dealers, the Lenders and the Advisory Committee of any sales, terminations or
novations under clause Section 3(g)(i) above.

18

All of the payments on Managed Assets and all Sale Proceeds from any Managed Asset sold pursuant to this Section 3(g) shall be reinvested, at the Administrator's sole discretion, in one or more Eligible Investments; provided that such reinvestment satisfies the Eligibility Criteria. For the avoidance of doubt, Sale Proceeds in connection with the termination or novation of a Hedging Agreement or a Transaction under a Swap Agreement, except to the extent the Omnibus Agreement expressly provides that any such payment is to continue to constitute Original Collateral of a Dealer, shall be reinvested in Eligible Investments.

With respect to dispositions of Credit Risk Assets pursuant to clause (ii) and other assets pursuant to clauses (iii), (iv) or (v) above and, unless the Rating Agency Condition is satisfied, Sections 3(d)(iii) and 3(d)(v), the Administrator will not effect any such sales, terminations or novations without the consent of the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS Counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty), the Required Lenders and satisfaction of the Rating Agency Condition unless the realized losses since the Closing Date in respect of such sale (being the difference between Acquisition Cost and Sale Proceeds, when aggregated with all other such realized losses of Credit Risk Assets pursuant to clause (ii) and sales pursuant to clauses (iii), (iv) and (v) above  and, unless the Rating Agency Condition is satisfied, Sections 3(d)(iii) and 3(d)(v)), do not exceed 50% of the original principal amount of Class B Notes and Class C Notes.

Notwithstanding anything to the contrary in this Section 3(g), funds on deposit in the Collections Account (as defined in the CIBC Omnibus Agreement) and Managed Assets arising from CIBC Swap Collateral shall be managed and reinvested as Category I Investments and Category IIA Investments (as such terms are defined in the Eligibility Criteria) by the Administrator; provided that (i) the Concentration Limits set forth in Section 3(b)(i) of the Eligibility Criteria and (ii) the preceding paragraphs of this Section 3(g) shall not be applicable thereto.

The Administrator shall reinvest proceeds of Original Collateral in the circumstances described in Section 4.5 (*Original Collateral Default*), Section 4.12 (*Reinvestment of Matured Original Collateral*) and Section 4.13 (*Mechanics of Investing Matured Original Collateral*) of the Omnibus Agreement in accordance with such sections. For the avoidance of doubt, such reinvestments are not Managed Assets and are not otherwise subject to this Section 3(g).

(h)    Under no circumstances shall the Administrator or any of its Affiliates be deemed an obligor or guarantor or otherwise deemed to be responsible for payment from its own funds of principal, interest, dividends or other amounts due on the Managed Assets, the Transactions under Swap Agreements, the Hedging Agreements, the Traditional Asset Hedging Agreements, the Eligible Investments, the Notes, or any obligations of MAV2 or any Satellite Trust under any Excluded Underlying Document or Included Underlying Document, or for collections and other loan servicing or the oversight of collections and other loan servicing of any Managed Assets, or the underlying portfolio of any thereof; provided that the Administrator shall be responsible for the oversight of the administrator under the Tao Administration Agreement (and any replacement agreement entered into with any consents required under the Omnibus Agreement) in respect of the performance of its obligations under the Excluded Underlying Documents as provided under Section 3(a)(ii). If the Administrator or any of its Affiliates, following communications with the Advisory Committee and satisfaction of the Rating Agency Condition, agrees to undertake any servicing or oversight of servicing in respect of the collections or other loan servicing of the Managed Assets (other than as provided in the preceding proviso), such servicing arrangement shall be separate from the Administrator's duties as Administrator hereunder and MAV2 shall separately compensate the Administrator or such Affiliate therefor as may be agreed. The Administrator or its Affiliates may directly or indirectly (including, without limitation, through ownership

interest in a joint venture or other arrangements) receive compensation from an issuer of or obligor under a Managed Asset or underlying asset in respect thereof, in addition to the amounts payable to it pursuant to this Agreement, in connection with the servicing of, or provision of asset management or administrative functions in respect of, such Managed Asset or related underlying asset undertaken at its sole option and discretion. Such compensation of the Administrator or its Affiliates may be payable from (and to that extent reduce) amounts that otherwise may have been payable to MAV2 by such issuer or obligor.

(i)     In connection with the performance of its duties hereunder, the Administrator shall periodically (and at its discretion) consult with the Advisory Committee with regard to Managed Assets, Swap Agreements and Hedging Agreements as further described in <u>Annex A</u> hereto. For the avoidance of doubt, the Administrator shall have complete discretion with respect to the Co-Owned Assets in accordance with the Co-Ownership Agreement, subject to the restrictions provided in the AMA Transaction Documents including Section 3(c) and Section 3(g) hereof.

(j)     When deemed necessary by the Administrator for the proper performance of its duties hereunder, the Administrator may seek legal, tax, accounting or other advice, as well as employ services from third parties (the reasonable fees and expenses of such advisors and other third parties to be paid or reimbursed, as applicable, by MAV2 as provided in Section 6(b)); <u>provided</u> that, to the extent any such third party is a Delegee that is not an Affiliate of the Administrator, the employment thereof shall be subject to Section 7.5 (*Certain matters regarding the Administrator and Service Providers*) of the Omnibus Agreement (for the avoidance of doubt, Tao Admin. Corp. has been approved). As an example, for the avoidance of doubt, the Administrator shall be entitled from time to time as reasonably required by it to retain counsel to assist it in understanding and interpreting the AMA Transaction Documents and Excluded Underlying Documents in order to ensure that it fulfills its duties and obligations in accordance with the requirements of such documents. To the extent any advice for which the Administrator will seek reimbursement from MAV2 pursuant to this Section 3(j) and Section 6(b) is provided to the Administrator in the form of (i) a legal opinion or memorandum of law and in either case on the Counsel's letterhead or (ii) an accounting opinion or memorandum and in either case on the accounting firm's letterhead, such opinion or memorandum shall also be addressed to and provided to MAV2; <u>provided</u> that in the case of clause (i), if Counsel providing the legal opinion or memorandum of law determines that there exists an actual or potential conflict of interest between the Administrator and the Issuer Trustee or between the Administrator and MAV2 in respect of the matters addressed in such opinion or memorandum, the Administrator will be entitled to invoke attorney-client privilege and will not be required to address or provide the applicable opinion or memorandum to MAV2. In connection with taking or omitting to take any action hereunder, the Administrator shall not be liable for any action taken or omitted to be taken by it in accordance with such legal, tax, accounting or other advice or any opinion of counsel.

(k)     BlackRock Canada will use all commercially reasonable efforts to employ two full time individuals (in addition to the individual currently employed) in the active conduct of its business in Canada by the date that is four months following the Closing Date (absent any extraordinary circumstances beyond the control of BlackRock Canada). Those employees, together with the current employee, will perform a significant portion of their duties for BlackRock Canada in Canada. BlackRock Canada will use all commercially reasonable efforts to continue to maintain a physical office in Canada and employ not less than three full time individuals in the active conduct of its business in Canada during the term of this Agreement; provided, however, in the event of an employee departure, there may be fewer than three employees of BlackRock Canada involved in the active conduct of the

20

business in Canada.  BlackRock Canada will use commercially reasonable efforts to replace as soon as practicable a departing employee which results in there being fewer than three full time individuals in the active conduct of BlackRock Canada's business in Canada.  At least one of the employees of BlackRock Canada will be available to interact with the Issuer Trustee, the Advisory Committee, the Noteholders, the Dealers, the Lenders, auditors and counsel engaged on behalf of MAV2, Tao Admin. Corp. and Canadian government and regulatory bodies.  Such employee will be knowledgeable with respect to the Administrator's services, capability and infrastructure and the obligations of BlackRock Canada hereunder and will oversee BlackRock Canada's performance of its obligations hereunder; provided, however, that if such employee should cease to be an employee of BlackRock Canada, BlackRock Canada shall be afforded a reasonable period of time to retain and/or train a replacement employee with respect to such matters.  No more than one of the initial three employees shall be performing solely clerical work.  BlackRock Canada's employees resident in Canada, as well as any employees of BlackRock Canada or its Affiliates resident in the United States, who are providing securities advisory or trading services to MAV2 on behalf of BlackRock Canada will be appropriately registered with the Ontario Securities Commission and BlackRock Canada shall be entitled to rely upon the advice of its counsel regarding appropriate registrations to be made with Ontario Securities Commission in respect of such employees.  For greater certainty, MAV2 and BlackRock Canada acknowledge and agree that, pursuant to Section 19, BlackRock Canada will delegate its obligations and duties under this Agreement to BlackRock Financial and, potentially, its Affiliates, provided that such delegation does not result in a breach of BlackRock Canada's obligations under this Section 3(k).

      Section 4.    <u>Brokerage</u>.  The Administrator shall use reasonable efforts to obtain the best execution for all orders placed with respect to the Managed Assets and Swap Agreements, including the Eligible Investments, and any Hedging Agreements, considering all directions, guidelines and any other circumstances, it being understood that the Administrator shall not necessarily be obtaining the best price available with respect to any particular transaction.  In pursuit of the objective of obtaining best execution, the Administrator may take into consideration all factors it reasonably believes to be relevant, including, without limitation, price, the size of the transaction, the nature of the market for such security or transaction, the time constraints of the transaction, general market trends, the reputation and experience of the broker dealer involved and research and other brokerage services furnished to the Administrator or its Affiliates by brokers and dealers that are not Affiliates of the Administrator.  Such services may be used by the Administrator or its Affiliates in connection with its other advisory activities or investment operations.  The Administrator and its Affiliates may also engage in "client cross" transactions in which the Administrator or an Affiliate causes a transaction to be effected between MAV2 and another account advised by the Administrator or such Affiliate without the Administrator or any of its Affiliates receiving any compensation for such transaction.  Such "client cross" transactions will be conducted in a manner that is fair and equitable to MAV2 and the other accounts involved.  The Administrator may aggregate sales and purchase orders of securities placed with respect to the Managed Assets and Swap Agreements, including Eligible Investments, and any Hedging Agreements with similar orders being made simultaneously for other accounts managed by the Administrator or with accounts of the Affiliates of the Administrator, if in the Administrator's reasonable judgment such aggregation would result in an overall benefit to MAV2, taking into consideration the availability of purchasers or sellers, the selling or purchase price, brokerage commissions and other expenses.  In the event that a sale or purchase of any Managed Asset, including an Eligible Investment, or Hedging Agreement (in accordance with the terms of the AMA Transaction Documents) occurs as part of any aggregate sales or purchase orders, the Administrator (and any of its Affiliates involved in such transactions) shall use reasonable efforts to allocate the executions among the accounts in a manner fair and equitable for all accounts involved.

      In addition to the foregoing and subject to the provisions of Section 3, the limitations of Section 8 and the objective of obtaining best execution and to the extent permitted by applicable law, the

Administrator may direct MAV2 to acquire or enter into, as applicable, any and all of the Managed Assets or Hedging Agreements from, or sell, novate or terminate Managed Assets or Hedging Agreements or Transactions under Swap Agreements to, or with, without limitation, the Issuer Trustee, the Indenture Trustee, the Collateral Agent, any Dealer, any Lender,  or any of their Affiliates.

Section 5.      Additional Activities of the Administrator.  Nothing herein shall prevent the Administrator or any of its Affiliates from engaging in other businesses, or from rendering services of any kind to MAV2 and its Affiliates, the Satellite Trusts, the Issuer Trustee, the Indenture Trustee, the Collateral Agent, the holders of the Notes, Dealers, Lenders or any other person or entity to the extent permitted by applicable law.  Unless the Administrator determines in its reasonable judgment that such purchase or sale is appropriate, the Administrator may refrain from directing the purchase or sale hereunder of loans or securities issued by, or the termination, novation or entry into swap transactions where the counterparties (or the issuers of reference obligations) are (i) persons of which the Administrator, its Affiliates or any of its or their officers, directors or employees are directors or officers, (ii) persons for which the Administrator or any of its Affiliates act as financial adviser or underwriter or (iii) persons about which the Administrator or any of its Affiliates has information that the Administrator deems confidential or non-public or otherwise might prohibit it from trading such loans or securities in accordance with applicable law. For greater certainty, nothing in this Section 5 shall be understood to derogate from the standard of care set forth in Section 3(c).

Section 6.      Compensation; Expenses; Tax Indemnity.

(a)      In consideration of the administrative and asset management services to be provided hereunder as Administrator (and as Valuation Agent and Spread/Loss Trigger Calculation Agent under the Omnibus Agreement), MAV2 hereby agrees to pay the Administrator a fee equal to 0.05% per annum of the Fee Basis Amount, to be paid quarterly in advance on the Closing Date and each Payment Date thereafter (calculated as of the 5th Business Day prior to the Closing Date and the 5th Business Day before each Payment Date thereafter). To the extent the nature of the Administrator's engagement or its obligations hereunder is altered with the consent of the Required Lenders, such changes require the agreement of the Administrator and satisfaction of the Rating Agency Condition, which could include an increase in the fee payable to the Administrator by MAV2.

(b)  The Administrator (or the relevant Delegee, as applicable) shall bear all overhead expenses, including employee compensation, employee benefits and office expenses, incurred in connection with its duties (including any delegation thereof) hereunder. MAV2 shall bear all other expenses of the Administrator incurred in connection with its services hereunder, including, without limitation, fees of any non-affiliated third party engaged by the Administrator to perform the custodian, cash and collateral administration and trust administration services, including in connection with any amendments to the Included Underlying Documents and the Excluded Underlying Documents, in respect of MAV2 and each Satellite Trust, any costs incurred in enforcing the rights of MAV2 and the Administered Satellite Trusts pursuant to Section 3(a)(xiv) and any legal, tax and accounting expenses incurred in connection with the Administrator's performance of its duties hereunder; provided that MAV2 shall bear such portion attributable to it, as reasonably determined by the Administrator, of expenses incurred in connection with (i) the Administrator's collective performance of its duties pursuant to the MAV1 AMA and the MAV3 AMA and this Agreement and (ii) any third party service provider's collective performance of services to MAV2 and, as applicable, MAV1 and/or MAV3.  The Administrator shall also make reasonable efforts to allocate expenses relating to the Class A-1 Notes, Class A-2 Notes, Class B Notes, Class C Notes, Class S Notes and Class X Tracking Notes, collectively,

on the one hand, and to each respective Series of IA Tracking Notes, on the other hand, to the assets supporting such respective categories, in accordance with the relevant indenture.   For the avoidance of doubt, MAV2 shall bear all fees and expenses of the administrator under the Tao Administration Agreement and other third parties acting on behalf of MAV2 to hold collateral and distribute funds, including the Issuer Trustee, the Indenture Trustee, any custodian, collateral agent or similar parties in accordance with the relevant AMA Transaction Documents governing the engagement and duties of such third parties and any listing agent or rating agency, if engaged, and the Administrator shall be authorized to enter into and replace agreements on behalf of MAV2 with such parties and other Service Providers and to renew and negotiate fee arrangements relating thereto. The Administrator agrees to provide to MAV2 the benefits of any discounts it receives in connection with any expenses allocated to MAV2.

(c)    (i)    The amounts payable hereunder are exclusive of any sales, goods and services, value added or similar taxes ("Sales Taxes"). MAV2 will be responsible for and shall pay to any Direct Service Provider any Sales Taxes payable in respect of the provision of any services contemplated by this Agreement . MAV2 will indemnify and save harmless any Direct Service Provider and Delegee for all liabilities, losses, costs, expenses or damages in respect of Sales Taxes, including any interest and penalties with respect thereto arising in respect of the services provided under this Agreement, except for the interest and penalties caused by the conduct of the Direct Service Provider or Delegee. Each Direct Service Provider shall provide to MAV2 its GST registration number and any other information that is reasonably required by MAV2 to claim refund or rebate of goods and services tax.

(ii)    In the event that any amount contemplated by this Agreement is paid or credited to a Direct Service Provider or a Delegee and is subject to Indemnified Taxes, and the Direct Service Provider or Delegee requires the payer to pay such additional amounts (the "Additional Amounts")as are necessary in order that the aggregate net amount received by such Direct Service Provider or Delegee, as the case may be (including with respect to any such Indemnified Tax arising with respect to any payment under this Section 6(c)(ii)) is equal to the amount that would have been received thereby in the absence of any Indemnified Taxes:

(A)    if MAV2 is the payer, MAV2 shall pay such Additional Amounts to the    Direct   Service Provider or Delegee; or

(B)    if the payer is not MAV2, MAV2 shall indemnify and save harmless the payer for all liabilities, losses, costs, expenses or damages in respect of such Additional Amounts.

MAV2 acknowledges that where a Direct Service Provider is a non-resident of Canada and amounts subject to Indemnified Taxes are paid or credited to it as contemplated by this Agreement, the Direct Service Provider requires the payment of Additional Amounts in respect of such amounts.  Without duplicating the foregoing, MAV2 will indemnify and save harmless any Direct Service Provider or Delegee for all liabilities, losses, costs, expenses or damages in respect of Indemnified Taxes arising in respect of the services provided by them as contemplated by this Agreement.  Notwithstanding any of the foregoing, in the case of any Direct Service Provider or Delegee that is an Affiliate of the

23

Administrator, no Additional Amount shall be payable by MAV2 in respect of any amount paid or credited as contemplated by this Agreement in excess of the amount that would have been payable if the amount actually paid or credited were paid or credited by a resident of Canada for purposes of the Canada-United States Tax Convention (1980) (the "<u>Treaty</u>") to a resident of the United States for the purposes of the Treaty.

(iii)    Where Indemnified Taxes can be reduced or eliminated by the making of a claim (a "<u>Claim</u>") under an applicable double taxation treaty, the Direct Service Provider or Delegee, as the case may be, shall complete, sign and authorize all such forms and take other reasonable action as may be reasonable and necessary in order to make such Claim.  Where an amount has been paid under this Section 6(c), the Direct Service Provider or Delegee, as the case may be, shall make reasonable efforts (with such cooperation from MAV2 or other person as the Direct Service Provider or Delegee, as the case may be, reasonably requests) to obtain repayment of the tax to which such payment relates from the relevant tax authority in the jurisdiction of the tax so withheld or deducted, if the Direct Service Provider or Delegee, as the case may be, reasonably believes that it is entitled to such repayment (any such cash repayment a "<u>Refund</u>").  In the event the Direct Service Provider or Delegee, as the case may be, receives a Refund, the Direct Service Provider or Delegee, as the case may be, shall reimburse the party (or parties in proportion to their payments) that made the payment to which such Refund relates in an amount (aggregate amount if more than one paying party) equal to the amount of the Refund that the Direct Service Provider or Delegee, as the case may be, actually receives.

(iv)    Any amount payable in respect of Sales Taxes or Indemnified Taxes by MAV2 will be paid by MAV2 on the applicable payment date, solely to the extent funds are available for such purpose in accordance with the Omnibus Agreement.

(v)    In the event that any amount paid or credited to a Direct Service Provider or a Delegee is subject to Indemnified Taxes, or Additional Amounts become payable, as a result of a change in law, a change in the interpretation of existing law or a change in the administrative practices of the Canada Revenue Agency after the date of this Agreement, then the Administrator agrees to use commercially reasonable efforts to restructure the manner in which the administrative and asset management services are being provided hereunder in order to reduce MAV2's exposure to Indemnified Taxes and/or Additional Amounts; <u>provided</u> however that the Administrator shall not be required to incur any material cost or expense in connection with such restructuring and, for the avoidance of doubt, should such restructuring result in any material cost or expense to the Administrator or any Affiliate, MAV2 agrees to indemnify the Administrator or such Affiliate for any such cost or expense as Expenses pursuant to Section 11.

Section 7.    <u>Services Not Exclusive</u>.    Nothing in this Agreement shall prevent the Administrator, any of its Affiliates or any stockholder, director, officer, employee, partner, member or manager of the Administrator or any of its Affiliates from acting as asset manager or administrator for any Person other than MAV2, or from engaging in any other lawful activity, and shall not in any way limit or restrict the Administrator, any Affiliates or any stockholder, director, officer, employee, partner,

member or manager of the Administrator or any of its Affiliates from buying, selling or trading any securities for its or their own accounts or for the accounts of others for whom it or they may be acting; provided, that the Administrator will undertake no activities that, in its reasonable judgment, are likely to adversely affect MAV2 or the performance of its obligations under this Agreement. For greater certainty, nothing in this Section 7 shall be understood to derogate from the standard of care set forth in Section 3(c).

Section 8.    Conflicts of Interest.

(a)    In addition to the requirements of the AMA Transaction Documents, the Administrator shall not enter into on behalf of MAV2, or direct MAV2 to engage in, any transaction (other than an agency cross transaction permitted under clause (b) of this Section 8) that would require MAV2's consent pursuant to Section 206(3) of the Investment Advisers Act and the rules and regulations promulgated thereunder, if they were applicable, unless such transaction is approved (i) by the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS Counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) and Required Lenders, with prior written notice to the Rating Agency, or (ii) in another manner elected by the Administrator that is permitted pursuant to the Investment Advisers Act, the Ontario Securities Act or other applicable Canadian Securities Laws or other applicable laws.

(b)    The Administrator shall not purchase or direct MAV2 to purchase any asset for inclusion in the Managed Assets from the Administrator or any Affiliate of the Administrator or any account or portfolio for which the Administrator or any such Affiliate serves as investment adviser, or sell or direct MAV2 to sell any Managed Asset to the Administrator or any such Affiliate or any account or portfolio for which the Administrator or any such Affiliate serves as investment adviser unless such transaction is effected in compliance with all applicable requirements under the Investment Advisers Act, the Ontario Securities Act and other applicable Canadian Securities Laws.  The Administrator shall not engage in or direct MAV2 to engage in any agency cross transaction that would require MAV2's consent pursuant to Section 206(3) of the Investment Advisers Act and the rules and regulations promulgated thereunder, if they were applicable, unless such transaction is effected in compliance with Rule 206(3)-2 under the Investment Advisers Act.  For purposes of this clause (b), an "agency cross transaction" has the meaning assigned in Rule 206(3)-2(b) under the Investment Advisers Act to the term "agency cross transaction for an advisory client."  The Administrator hereby advises MAV2 that with respect to agency cross transactions, the Administrator or any other person relying on Rule 206(3)-2 shall act as broker for, receive commissions from, and have a potentially conflicting division of loyalties and responsibilities regarding both parties to such transactions.  MAV2 hereby gives its written consent prospectively authorizing the Administrator and any other person relying on Rule 206(3)-2 to effect agency cross transactions for MAV2, provided that to the extent required by law, such agency cross transactions shall be approved in the same manner as principal transactions as described in Section 8(a).  Such consent may be revoked at any time by written notice from MAV2 to the Administrator or such other person relying on Rule 206(3)-2, as applicable.  To the extent that MAV2's consent with respect to any particular transaction is required by law, no such transaction may be effected except in compliance with the provisions of clause (a) of this Section 8.  The Administrator shall (and shall use commercially reasonable efforts to cause any other person relying on Rule 206(3)-2 under the Investment Advisers Act with respect to agency cross transactions for MAV2 to) provide to MAV2 the reports specified in Rule 206(3)-2(a)(3) under the Investment Advisers Act.

In addition to the foregoing, the Administrator may direct MAV2 to enter into or purchase Eligible Investments issued by issuers managed or advised by the Administrator or one or more of its Affiliates in compliance with all applicable requirements under the Investment Advisers Act, the Ontario Securities Act and any other applicable Canadian Securities Laws and the applicable provisions of the AMA Transaction Documents. Such Eligible Investments entered into or purchased by MAV2 may also include securities of an issuer or obligor, or securities sponsored or serviced by companies, for which the Administrator or an Affiliate has acted as underwriter, agent, placement agent, initial purchaser or dealer or for which the Administrator or an Affiliate has acted as lender or provided other commercial or investment banking services. The Administrator will direct MAV2 to acquire such Eligible Investments in compliance with any applicable requirements under the Investment Advisers Act, the Ontario Securities Act and any other applicable U.S. or Canadian law, including applicable Canadian Securities Laws.

(c)    Transactions between MAV2 and another account for which the Administrator is acting as the investment manager or in a similar capacity will generally be treated as "client cross" transactions that do not require MAV2's consent pursuant to Section 206(3) of the Investment Advisers Act and the rules and regulations promulgated thereunder unless the Administrator has a proprietary interest in such other account that is so significant that the transaction must be treated as requiring MAV2's consent pursuant to Section 206(3) of the Investment Advisers Act and such rules and regulations. For the avoidance of doubt, the Administrator will not receive any additional fees as compensation for effecting such "client cross" transactions.

Section 9.    Records.  The Administrator shall maintain appropriate books of account and records relating to services performed hereunder, and such books of account and records shall be accessible for inspection by the Issuer Trustee, each of the Dealers and Lenders and the independent accountants appointed by MAV2 pursuant to the AMA Transaction Documents upon prior written notice and at a time acceptable to the Administrator in its reasonable judgment during normal business hours.

Section 10.    Obligations of the Administrator.

(a)    Unless otherwise specifically required by any provision of this Agreement or any of the other AMA Transaction Documents or by applicable law, the Administrator shall, in accordance with Section 3(c) of this Agreement (which is in no way limited by the following), use its commercially reasonable efforts to ensure that no action is taken by it that would (i) not be permitted under MAV2's or, if applicable, the applicable Satellite Trust's constituent documents, (ii) violate any law, rule or regulation of any governmental body or agency of the United States or Canada having jurisdiction over MAV2 or the applicable Satellite Trust, the violation of which has or should reasonably be expected to have a material adverse effect on MAV2, the Managed Assets, taken as a whole, the Satellite Trusts or any holders of the Notes, (iii) require registration with a regulatory authority or qualification by prospectus of MAV2, the Satellite Trusts, the Notes of MAV2 or any pool of Managed Assets under any applicable laws of the United States or Canada, (iv) cause MAV2 or the Satellite Trusts to violate the terms of the AMA Transaction Documents or any other agreement contemplated thereby, or (v) adversely affect the interests of the holders of the Notes in any material respect (other than as permitted under this Agreement or the other AMA Transaction Documents). The Administrator covenants that it shall comply in all material respects with all laws and regulations applicable to it in connection with the performance of its duties under this Agreement and the other AMA Transaction Documents.

(b)    If the Administrator is ordered to take any action by MAV2, which the Administrator determines, in its good faith judgment would have one or more of the consequences set forth in Section 10(a)(i) through (v) above, the Administrator shall promptly notify MAV2, the Advisory Committee, the Rating Agency, the Issuer Trustee, the Indenture Trustee, the Lenders and the Secured Creditors and will not take such action unless MAV2 again requests the Administrator to take such action and notice of such further request has been provided to MAV2, the Rating Agency, the Issuer Trustee, the Indenture Trustee, the Lenders and the Secured Creditors, such action has been consented to in writing by the holders of the Notes in accordance with the Trust Indenture, the Required Lenders and the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS Counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) (and, in the case of Section 10(a)(iv) above, such greater percentage of Secured Creditors as required under the applicable AMA Transaction Document) and the Rating Agency Condition has been satisfied.  Notwithstanding any such request, the Administrator need not take such action unless arrangements satisfactory to it are made to insure or indemnify the Administrator from any liability it may incur as a result of such action. Notwithstanding anything contained in this Agreement to the contrary, any insurance or indemnification provided for in this Section 10 which is payable by MAV2 shall be payable out of the assets of MAV2 in accordance with the other AMA Transaction Documents.

(c)    MAV2 and the Administrator agree that it is in their mutual interest to resolve grievances and disputes by agreement.  If a grievance or dispute arises under this Agreement, the parties will make all reasonable efforts to resolve the grievance or dispute by mutual agreement.  If a grievance or dispute cannot be resolved informally by mutual agreement among the relevant parties at the lowest possible level, the grievance or dispute shall be referred up the respective chain of command of each party in an attempt to resolve the matter.  This will be done in an expeditious manner.  The Administrator shall continue  performance of the services required by this Agreement pending resolution of any grievance or dispute.  The parties agree to take all reasonable steps to resolve grievances and disputes among themselves before commencing legal proceedings. Nothing in this provision shall postpone or delay the exercise of resignation, termination or removal of rights pursuant to the notice periods prescribed by Section 13, including, for greater certainty, MAV2's right to terminate this Agreement or remove the Administrator (and Valuation Agent and Spread/Loss Trigger Calculation Agent under the Omnibus Agreement) for Cause.

Section 11.    Liability; Indemnity.

(a)    None of the Administrator, its Affiliates, Delegees or any stockholder, director, officer, employee, partner, member or manager of the Administrator, any of its Affiliates or Delegees will be liable for any error of judgment or mistake of law or for any loss suffered by MAV2, any Noteholder, any other party to the AMA Transaction Documents or otherwise in connection with the Administrator's performance of this Agreement or of its duties in any capacity under any other AMA Transaction Document, except a loss resulting from acts or omissions constituting fraud, willful misconduct, bad faith or gross negligence on the part of the Administrator or its Affiliates or Delegees in the performance by any of them of their duties or from reckless disregard by any of them of the duties under this Agreement or of the duties in any capacity under any other AMA Transaction Document; provided that, notwithstanding anything contained in this Agreement or any other AMA Transaction Document to the contrary (other than the exception set out in the immediately following sentence), the total aggregate amount of all such losses for which the Administrator and its Affiliates and Delegees shall be liable in connection with the AMA Transaction Documents (for this purpose, such term including all documents included in the definitions of such term in this Agreement, the MAV1 AMA and the MAV3 AMA), the Excluded Underlying Documents(for this purpose, such term including all

documents included in the definitions of such term in this Agreement, the MAV1 AMA and the MAV3 AMA), the letter agreements, dated the date hereof, between BlackRock Canada and MAV1, BlackRock Canada and MAV2 and BlackRock Canada and MAV3 and the letter agreements regarding BlackRock Financial's guarantee of BlackRock Canada's performance, dated the date hereof, between BlackRock Financial and MAV1, BlackRock Financial and MAV2 and BlackRock Financial and MAV3 (such aggregate amount, the "Liability Cap Amount") shall in no event exceed $30,000,000 (which, for the avoidance of doubt, shall be denominated in Canadian Dollars), excluding any losses arising from the fraud or willful misconduct of the Administrator or its Affiliates.  The limitation on the aggregate amount of all losses for which the Administrator and its Affiliates and Delegees shall be liable set forth in the proviso to the immediately preceding sentence shall not apply in respect of any loss suffered by MAV2 arising solely by virtue of BlackRock Canada's failure to comply with its duties and obligations set out in Section 3(k) hereof during the period commencing on the date which is four months after the Closing Date and ending on the date which is 12 months after the Closing Date where such failure results from the fraud, willful misconduct, bad faith or gross negligence of BlackRock Canada, or reckless disregard of its obligations under Section 3(k) hereof.

(b)    Notwithstanding anything in this Agreement or any other AMA Transaction Document to the contrary, the Administrator and its Affiliates shall not be liable for any consequential, incidental, exemplary, punitive, special or indirect losses or damages, regardless of whether the likelihood of such losses or damages was known by it.

(c)    Without limitation of the foregoing and notwithstanding anything in this Agreement or any other AMA Transaction Document to the contrary, the Administrator, its Affiliates and their respective directors, officers, agents or employees (i) shall not be liable for losses, delays, failure, errors, interruption or loss of data occurring directly or indirectly by reason of circumstances beyond their reasonable control, including without limitation acts of God; action or inaction of civil or military authority; public enemy; war; terrorism; riot; fire; flood; sabotage; epidemics; labour disputes; civil commotion; interruption, loss or malfunction of utilities, transportation, computer or communications capabilities; insurrection; elements of nature; or non-performance by a third party except for one of its Affiliates or a Delegee; (ii) shall not be under any duty or obligation to inquire into nor shall they be liable for the validity or invalidity, authority or lack thereof, or truthfulness or accuracy or lack thereof, of any instruction, direction, notice, instrument or other information reasonably believed by them to be genuine; (iii) may rely conclusively and act or refrain from acting in reliance on any information supplied by the Collateral Agent, the Administrative Agent, Index Spread Determination Agent or any other authorized representative of MAV2 or the administrative agent or the collateral agent in respect of the MAV2 Credit Facility; (iv) shall not be liable for any damages arising out of any action or omission to act by any prior service provider of MAV2 or any Satellite Trust or predecessor in interest thereof (including without limitation, any party provided a release in connection with the approval of the Plan) or for any failure to discover any such error or omission; (v) shall not be liable for any indebtedness or any other payment obligation of MAV2; and (vi) may consult with Counsel, independent accountants and other experts selected by them, by MAV2 or by one or more Secured Creditors and shall not be liable for any action taken or omitted to be taken by them in accordance with their advice.  The Administrator, its Affiliates and Delegees may rely on the information provided in the Monitor's Reports (including without limitation the Monitor's Implementation Report) and in the Schedules to the various AMA Transaction Documents (for example, lists of assets), and shall incur no liability as a result of such reliance, including without limitation, in the event that any such information may be incorrect or incomplete.  As set out in the Plan Implementation Order, the Administrator, its Affiliates and Delegees shall incur no liability as a result of any such reliance, including, without limitation, in the event that any such information may be incorrect or incomplete as a result of the failure of any Person (including, without limitation, any sponsor

28

or financial institution) to (i) produce information required in order to provide advice or (ii) any inaccuracies or deficiencies in any such information provided to the Administrator, its Affiliates and Delegees.

(d)    MAV2 (in such case, the "MAV Indemnifying Party") shall indemnify and hold harmless the Administrator, its Affiliates, Delegees and any stockholder, director, officer, employee, partner, member or manager of the Administrator, its Affiliates or Delegees (such parties collectively in such case, the "BlackRock Indemnified Parties") from and against any and all losses, and shall reimburse each such BlackRock Indemnified Party for all reasonable fees and expenses (including reasonable fees and expenses of counsel) (collectively, the "Expenses", and any and all such losses and Expenses, collectively the "Liabilities") as such Expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, "Actions"), caused by, or arising out of or in connection with, (i) MAV2's issuance of the Notes and any other notes issued by MAV2, (ii) the transactions and agreements contemplated by the Information Statement, this Agreement or the other AMA Transaction Documents or the Excluded Underlying Documents, including, without limitation, acting as Valuation Agent, Spread Loss Trigger Calculation Agent or Administrator or in a similar capacity in respect of any satellite or other trust under any Included Underlying Document in accordance with Section 3(h) and acting to oversee the administrator appointed under any Excluded Underlying Document and any other capacity under any AMA Transaction Document or Excluded Underlying Document, (iii) any untrue statement of a material fact or omission of any material fact required to be stated in the Information Statement or necessary to make the statements in the Information Statement, in light of the circumstances under which they were made, not misleading, except with respect to information provided by the Administrator or BlackRock in writing for use therein describing the Administrator or BlackRock or their respective businesses, and/or (iv) any action taken by, or any failure to act by, such BlackRock Indemnified Party (in each case, regardless of the capacities in which such BlackRock Indemnified Party is engaged); provided, that no BlackRock Indemnified Party shall be indemnified for any Liabilities it incurs as a result of any acts or omissions by any BlackRock Indemnified Party arising by reason of its (A) fraud, (B) willful misconduct, (C) bad faith, (D) gross negligence or (E) reckless disregard of its obligations and duties.

(e)    Notwithstanding anything contained herein to the contrary, the obligations of the MAV Indemnifying Party under this Section 11 shall be payable solely out of the respective assets of the MAV Indemnifying Party in accordance with the AMA Transaction Documents and shall survive termination of this Agreement; provided that the Administrator shall be entitled to allocate such obligations of the MAV Indemnifying Party under this Section 11 in accordance with the Indemnity Allocation Principles.

(f)    With respect to any Action made or threatened against a BlackRock Indemnified Party, or compulsory process or request or other notice of any liability served upon a BlackRock Indemnified Party, for which such BlackRock Indemnified Party is or may be entitled to indemnification under this Section 11, such BlackRock Indemnified Party shall (or with respect to BlackRock Indemnified Parties that are stockholders, directors, officers, employees, partners, members or managers of the Administrator or any of its Affiliates or Delegees, the Administrator shall cause such BlackRock Indemnified Party to):

(i)    give written notice to the MAV Indemnifying Party of such Action within 10 Business Days after such BlackRock Indemnified Party's receipt of actual notice that such Action is made or threatened, which notice to the MAV Indemnifying Party shall specify in reasonable detail the nature of the Action made or threatened and the amount of the Action made or threatened; provided, that the failure of any BlackRock Indemnified Party to provide such notice to the MAV Indemnifying Party shall not relieve the MAV Indemnifying Party of its obligations under this Section 11 unless the MAV Indemnifying Party is materially prejudiced or otherwise forfeits rights or defenses by reason of such failure;

(ii)    at the MAV Indemnifying Party's reasonable third party expense (for greater clarity, with respect to costs related to indemnified claims), provide the MAV Indemnifying Party such information and cooperation with respect to such Action as the MAV Indemnifying Party may reasonably require, including, but not limited to, making appropriate personnel available to the MAV Indemnifying Party at such reasonable times as the MAV Indemnifying Party may request, provided that to the extent that the BlackRock Indemnified Party is subsequently determined not to have been entitled to indemnification hereunder, the BlackRock Indemnified Party shall repay to the MAV Indemnifying Party any such expense borne by the MAV Indemnifying Party;

(iii)    at the MAV Indemnifying Party's reasonable third party expense (for greater clarity, with respect to costs related to indemnified claims), cooperate and take all such commercially reasonable steps as the MAV Indemnifying Party may reasonably request to preserve and protect any defense to such Action;

(iv)    in the event suit is brought with respect to such Action, upon reasonable prior notice, afford to the MAV Indemnifying Party the right, which the MAV Indemnifying Party may exercise in its sole discretion and at its expense, to participate in the investigation, defense and settlement of such Action;

(v)    neither release or settle any such Action or make any admission with respect thereto (other than routine or incontestable admissions or factual admissions the failure to make which would expose such BlackRock Indemnified Party to unindemnified liability) nor permit a default judgment nor consent to the entry of any judgment in respect thereof, in each case without the prior written consent of the MAV Indemnifying Party, so long as the MAV Indemnifying Party shall have advised such BlackRock Indemnified Party that such BlackRock Indemnified Party is entitled to be indemnified hereunder with respect to such Action; and

(vi)    upon reasonable prior notice, afford to the MAV Indemnifying Party the right, in its sole discretion and at its sole expense, to assume the defense of such Action, including, but not limited to, the right to designate counsel reasonably acceptable to the BlackRock Indemnified Party and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of such Action; provided, that if the MAV Indemnifying Party assumes the defense of such Action, it shall not be liable for any fees and expenses of counsel for any BlackRock Indemnified Party

incurred thereafter in connection with such Action except that if such BlackRock Indemnified Party reasonably determines that counsel designated by the MAV Indemnifying Party has a conflict of interest between the MAV Indemnifying Party and the BlackRock Indemnified Party, such MAV Indemnifying Party shall pay the reasonable fees and disbursements of one counsel (in addition to any local counsel) separate from its own counsel for all BlackRock Indemnified Parties in connection with any one action or separate, but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; provided, further, that prior to entering into any final settlement or compromise, such MAV Indemnifying Party shall seek the written consent of the BlackRock Indemnified Party and shall not enter into any such final settlement or compromise without the written consent of such BlackRock Indemnified Party, which consent shall not be unreasonably withheld, as to the terms of settlement or compromise, unless such settlement or compromise includes a release of such BlackRock Indemnified Party from all Liabilities arising out of such Action and does not impose any liability or obligation on such BlackRock Indemnified Party or make any findings adverse to such BlackRock Indemnified Party. If a BlackRock Indemnified Party does not consent to the settlement or compromise within a reasonable time under the circumstances, the MAV Indemnifying Party shall not thereafter be obligated to indemnify the BlackRock Indemnified Party for any amount in excess of such proposed settlement or compromise.

(g)    In the event that any BlackRock Indemnified Party waives its right to indemnification hereunder, the MAV Indemnifying Party shall not be entitled to appoint counsel to represent such BlackRock Indemnified Party nor shall the MAV Indemnifying Party reimburse such BlackRock Indemnified Party for any costs of counsel to such BlackRock Indemnified Party.

(h)    Nothing in this Agreement is intended to, or shall, constitute a waiver of any legal rights or remedies that the holders of the Notes and MAV2 may otherwise have under any applicable law, except as may be otherwise restricted in the AMA Transaction Documents.

Section 12.    Release under the Plan; Other Conditions Precedent.

(a)    MAV2 agrees and acknowledges that BlackRock has not had any responsibility for the administration of MAV2 or any Existing Conduit or Satellite Trust (or any other vehicle existing prior to and including the time of closing on the Closing Date, which may become subject to BlackRock's administration in connection with the Plan after the time of closing on the Closing Date) or management of the Managed Assets or Original Collateral or any Swap Agreements or Hedging Agreements (or any other asset existing prior to and including the time of closing on the Closing Date, which may become subject to BlackRock's management in connection with the Plan after time of closing on the Closing Date) prior to and including the time of closing on the Closing Date, and does not have any responsibility or liability associated with the transfer and novation of assets (including swap transactions) and assumption of liabilities in connection with the restructuring under the Plan. The effectiveness of this Agreement and the obligations of the Administrator hereunder are conditioned upon BlackRock being a "Released Party" in connection with the Plan and thereby being released and discharged from all claims and demands in respect of any act or omission existing on or prior to the Closing Date on the same terms as those applicable to the other "Released Parties" under the Plan.

1335339.29-New York Server 7A - MSW

(b) The effectiveness of this Agreement and the obligations of the Administrator hereunder shall be further conditioned upon:

(i) all necessary approvals of the Plan by the affected creditors (and security holders) have been obtained and the Plan has been approved, sanctioned and confirmed by a court of competent jurisdiction pursuant to the applicable provisions of the CCAA under a final, binding and non-appealable order satisfactory to the Administrator, acting reasonably;

(ii) the closing of the transactions provided for in the Plan has been completed to the satisfaction of the Administrator, acting reasonably;

(iii) the Administrator, on behalf of itself and the other BlackRock Indemnified Parties (as defined in Section 11 hereof) shall have obtained the benefit of a perfected security interest in all present and future assets of MAV2 securing all of the present and future obligations of MAV2 to the Administrator and the BlackRock Indemnified Parties hereunder including compensation, expense reimbursement obligations and indemnity obligations under Section 6 hereof, and indemnity obligations under Section 11 hereof, all in accordance with the terms of the Omnibus Agreement and the Master Security Agreement;

(iv) delivery of an opinion of Goodmans LLP, counsel to the Pan-Canadian Investors Committee for Third-Party Structured Asset-Backed Commercial Paper, in form and substance reasonably acceptable to the Administrator as to (A) no contravention of law in respect of MAV2 with respect to this Agreement, (B) the creation and perfection of the security interests in favor of the Collateral Agent for the benefit of the Secured Creditors, (C) certain Canadian securities law matters relating to the issuance of the Notes and (D) enforceability against MAV2 of the Omnibus Agreement, the Master Security Agreement, the Margin Funding Facility Agreement, the Indenture, the Ineligible Asset Note Indenture, the Tao Administration Agreement and the Swap Agreements;

(v) delivery of an opinion of Fasken Martineau DuMoulin LLP or its agency Nova Scotia counsel, McInnes Cooper, counsel to the Issuer Trustee, in form and substance reasonably acceptable to the Administrator as to (A) the formation and constitution of MAV2, (B) due authorization, execution and delivery, power and authority, no consents or authorizations, no conflict with the Declaration of Trust, and (C) due authorization, execution and delivery by MAV2 with respect to this Agreement, the Omnibus Agreement, the Master Security Agreement and the Margin Funding Facility Agreement and other AMA Transaction Documents;

(vi) delivery of opinions of external and internal counsel to the Administrator and BlackRock in form and substance reasonably acceptable to MAV2, the Lenders and the Rating Agency with respect to due authorization, execution and delivery,

power and authority, enforceability, no consents or authorizations and no contravention of law in respect of the Administrator;

(vii)   delivery of an opinion of Torys LLP, special US counsel to MAV2, reasonably acceptable to the Administrator in form and substance with respect to (A) US legal matters, including US securities law (US Securities Act of 1933 and US Investment Company Act of 1940) and (B) enforceability of this Agreement against MAV2 under New York law;

(viii)   (A) delivery of an opinion of external or internal counsel to each of the following acting on behalf of MAV2: the Indenture Trustee and Collateral Agent with respect to customary corporate matters in connection with the Indentures, the Master Security Agreement, the Margin Funding Facility Agreement and the Omnibus Agreement; and (B) delivery of an opinion of internal counsel to each of the following providing facilities to MAV2: Citibank, N.A., Deutsche Bank AG, HSBC, Merrill Lynch Capital, Merrill Lynch International, Swiss Re, UBS AG and Bank of America with respect to with respect to customary corporate matters in connection with the Margin Funding Facility Agreement and/or the Omnibus Agreement, in each case, in form and substance reasonably acceptable to the Administrator;

(ix)   BlackRock Financial and the Administrator being named as an addressee on all legal opinions delivered on the Closing Date;

(x)   the Administrator shall have received such opinions of local counsel or other confirmation satisfactory to it that all security registrations required under applicable law have been filed or will be filed concurrently on the Closing Date;

(xi)   any reference to activities of the Administrator in the Monitor's Implementation Report or any Monitor Reports delivered on or before the implementation of the Plan shall be, in form and substance, satisfactory to the Administrator; and

(xii)   the Plan and the Plan Implementation Order shall be, in form and substance, satisfactory to the Administrator.

(c)   The Administrator shall deliver a certificate on the Closing Date confirming satisfaction or waiver of the conditions set forth in paragraphs (a) and (b) above, other than in respect of paragraph (b)(vi), as to which, together with all other items set forth under paragraphs (a) and (b) above, satisfaction by MAV2 shall be conclusively deemed to have occurred by its execution of this Agreement.

Section 13.    <u>Duration and Termination</u>.

(a)    Subject to the provisions of Section 12 above, this Agreement shall become effective on the date first set forth above and shall continue in effect until the earlier to occur of (i) the last to occur of the final distribution on (A) the Notes in accordance with the Indenture, (B) any additional indebtedness incurred under the CIBC Omnibus Agreement and (C) the Ineligible Asset Tracking Notes under the Ineligible Asset Note Indenture and (ii) termination pursuant to the provisions of paragraph (b) set forth below.

(b)    The Administrator may terminate this Agreement or otherwise resign as Administrator hereunder and concurrently resign as Valuation Agent and Spread/Loss Trigger Calculation Agent under the Omnibus Agreement at any time without penalty upon giving sixty days' written notice to MAV2, the Rating Agency, the Dealers and the Lenders.  MAV2 may terminate this Agreement or remove the Administrator hereunder and concurrently as Valuation Agent and Spread/Loss Trigger Calculation Agent under the Omnibus Agreement for Cause upon ten Business Days' written notice; provided, that (1) such termination or removal has been approved by the holders of Notes constituting a Controlling Class Supermajority and (2) notice of such termination or removal shall have been given to all holders of the Notes, the Dealers, the Lenders and the Rating Agency; provided, further, that in the case of an event described in clauses (ii) and (iii) below, the Administrator will be automatically removed upon the occurrence of such event without any requirement of notice to or consent of any person.  For purposes of this Agreement, "Cause" shall mean any one of the following events:

(i)    any violation by the Administrator of any provision of this Agreement or other AMA Transaction Document applicable to it which violation (a) constitutes gross negligence, bad faith or willful misconduct or a reckless disregard by it of its duties under this Agreement, (b) has a material adverse effect on the holders of the Notes taken as a whole and (c) if capable of being cured, is not cured within 10 Business Days of the Administrator becoming aware or receiving notice from MAV2 or the Indenture Trustee of such violation;

(ii)    the occurrence of an act by the Administrator that constitutes fraud or criminal activity in the performance of its obligations under this Agreement, or the indictment of the Administrator for, or the indictment of any of its executive officers having responsibility over the management of the Administrator (without having been suspended or removed from management duties) for a criminal offense materially related to its primary business of managing collateral or investments or its investment advisory activities;

(iii)    the Administrator or BlackRock Financial is wound up or dissolved or there is appointed over it or all or substantially all of its assets a receiver, administrator, administrative receiver, trustee or similar officer; or the Administrator or BlackRock Financial (w) ceases to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of or enters into any composition or arrangement with, its creditors generally; (x) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Administrator or BlackRock Financial, as applicable, or of all or substantially all of its properties or assets, or authorizes such an application or consent, or

proceedings seeking such appointment are commenced without such authorization, consent or application against the Administrator or BlackRock Financial, as applicable, and continue undismissed for 60 consecutive days; (y) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Administrator or BlackRock Financial, as applicable, without such authorization, application or consent and are approved as properly instituted and remain undismissed for 60 consecutive days or result in adjudication of bankruptcy or insolvency or (z) permits or suffers all or substantially all of its properties or assets to be sequestered or attached by court order and the order remains undismissed for 60 consecutive days; or

(iv)    if, after the first anniversary of the Closing Date, (A) BlackRock Canada shall cease to maintain a physical office in Canada and shall have failed, within 60 days thereof, to re-establish a physical office in Canada, or (B) if BlackRock Canada shall have breached any of its other obligations under Section 3(k) of this Agreement and, on the 60th day after the Issuer Trustee (on behalf of MAV2), any Dealer, Lender or Noteholder has given notice of such breach to BlackRock Canada, such breach has not been cured in all material respects.

(c)    The holders of Notes constituting the Controlling Class Supermajority may remove the Administrator hereunder (together with its capacity as Valuation Agent and Spread/Loss Trigger Calculation Agent under the Omnibus Agreement) effective (subject to Section 13(d) below) upon any Payment Date following the fourth anniversary of the Closing Date; provided, that notice of such removal must be provided to the Administrator at least sixty (60) (but no more than ninety (90)) Business Days' prior to such Payment Date; provided, further, that MAV2 shall pay to the Administrator on such Payment Date a make-whole amount equal to the fees that would have been payable to the Administrator pursuant to Section 6(a) on such Payment Date and the following three (3) Payment Dates assuming the Fee Basis Amount remained the amount it was on the Payment Date on which such removal occurred.  The Administrator shall notify the Rating Agency, the Dealers and the Lenders as soon as reasonably practicable after its receipt of the notice set forth in the first proviso of the immediately preceding sentence.

(d)    Notwithstanding anything to the contrary herein, no resignation of the Administrator or removal of the Administrator under this Agreement or termination of this Agreement by MAV2 shall be effective unless (i) a successor administrator has, pursuant to a written agreement, effectively assumed all of the Administrator's future duties and obligations hereunder and (ii) the successor administrator has been approved by the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS Counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty), the Required Lenders and the holders of Notes constituting a Controlling Class Majority and notice of the meeting of Noteholders to consider such matter has been provided to the Rating Agency; provided, that in the event that a successor administrator shall not have been appointed within 90 days after the date of notice of resignation or of the termination or removal of the Administrator by MAV2 (or within 60 days following a removal under clause (iii) of the definition of "Cause"), (A) the Administrator shall be entitled to appoint a successor administrator and assign its rights and obligations under this Agreement to such successor on or after such 90th day (or 60th day, as the case may be) so long as such assignment (x) shall not result in MAV2

or the relevant pool of Managed Assets, including Eligible Investments, and Swap Agreements, being required to obtain any registration, license or permit under applicable laws of the United States and Canada, and (y) such successor is legally qualified and has the capacity to act as Administrator under this Agreement, and is not objected to in writing by (1) the holders of Notes constituting a Controlling Class Majority and (2) the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS Counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) or Required Lenders within 30 days following such appointment by the Administrator and notice thereof to the holders of the Notes, the Rating Agency, the Dealers and the Lenders, or (B) in lieu of such an appointment by the Administrator or if the successor administrator appointed by the Administrator is disapproved, the Administrator, the Indenture Trustee or MAV2 may petition any court of competent jurisdiction for the appointment of a successor administrator, which appointment shall not be subject to any Noteholder or other Secured Creditor consent or approval, provided that nothing in this Section 13(d) shall be construed as preventing any interested Secured Creditor from making submissions to the court regarding any proposed successor administrator.

Section 14.    No Partnership or Joint Venture.  MAV2 and the Administrator are not partners or joint venturers with each other, and nothing herein shall be construed to make them such partners or joint venturers or impose any liability as such on any of them. The Administrator's relation to MAV2 shall be deemed to be that of an independent contractor and shall, unless otherwise provided herein or in the AMA Transaction Documents or authorized by MAV2 from time to time, have no authority to act for or represent MAV2 in any way or otherwise be deemed an agent of MAV2.

Section 15.    Representations, Warranties and Covenants.

(a)    MAV2 hereby repeats for the benefit of the Administrator its representations, warranties and covenants provided in Sections 9 and 10 of the Omnibus Agreement as of the date hereof.

(b)    The Issuer Trustee hereby agrees and acknowledges, solely in its capacity as Issuer Trustee of MAV2 and not in its personal capacity and without personal liability, that it will exercise commercially reasonable efforts to cooperate with the Administrator to facilitate the execution of MAV2's obligations under the AMA Transaction Documents.

(c)    BlackRock Canada hereby represents and warrants to MAV2 as follows as of the date hereof:

(i)    It is a corporation duly organized, validly existing and in good standing under the laws of the Province of New Brunswick and has full power and authority to own its assets and to transact the business in which it is currently engaged and is duly qualified and in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under this Agreement and the provisions of the AMA Transaction Documents applicable to it would require, such qualification, except for those jurisdictions in which the failure to be so qualified, authorized or licensed would not have a material adverse effect on the business, operations, assets or financial condition of BlackRock Canada or on the ability of BlackRock Canada to perform its obligations

1335339.29-New York Server 7A - MSW

under, or on the validity or enforceability of, this Agreement and the provisions of the AMA Transaction Documents applicable to BlackRock Canada.

(ii)     It has full power and authority to execute, deliver and perform this Agreement and all obligations required hereunder and under the provisions of the AMA Transaction Documents applicable to it, and has taken all necessary action to authorize this Agreement on the terms and conditions hereof and the execution, delivery and performance of this Agreement and the performance of all obligations imposed on it hereunder and under the terms of the AMA Transaction Documents.  No consent of any other person, including, without limitation, shareholders and creditors of BlackRock Canada, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority that has not been obtained is required by BlackRock Canada in connection with the execution, delivery, performance, validity or enforceability of this Agreement or the provisions of the AMA Transaction Documents applicable to BlackRock Canada or the obligations required hereunder or thereunder.  This Agreement has been, and each instrument and document required hereunder or under the terms of the other AMA Transaction Documents shall be, executed and delivered by a duly authorized officer of BlackRock Canada.

(iii)     The execution, delivery and performance of this Agreement, and the terms of the other AMA Transaction Documents applicable to BlackRock Canada and the agreements required hereunder or under the terms of the other AMA Transaction Documents, does not violate or conflict with (A) to the knowledge of BlackRock Canada, any provision of any existing law or regulation binding on BlackRock Canada, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on BlackRock Canada, or (B) the constituent documents of, or any securities issued by, BlackRock Canada or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which BlackRock Canada is a party or by which BlackRock Canada or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of BlackRock Canada or its ability to perform its obligations under this Agreement, and does not result in or require the creation or imposition of any lien on any of its material property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.

(iv)     There is no charge, investigation, action, suit or proceeding before or by any court pending or, to the best knowledge of BlackRock Canada, overtly threatened that, if determined adversely to BlackRock Canada, would have a material adverse effect upon the performance by BlackRock Canada of its duties under, or on the validity or enforceability of, this Agreement or the provisions of the AMA Transaction Documents applicable to BlackRock Canada thereunder.

(v)     It is a registered investment counsel and portfolio manager (non-Canadian Advisor) under the Ontario Securities Act and a registered portfolio manager and investment counsel (foreign) under the Alberta Securities Act and it is not required to register as an investment adviser under the Investment Advisers Act,

and is in compliance in all material respects with all applicable regulations under such acts.

(vi)    It is not in violation of its constating documents or in breach or violation of or in default under any contract or agreement to which it is a party or by which it or any of its assets may be bound, or, to the knowledge of BlackRock Canada,  any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over BlackRock Canada or its properties, the breach or violation of which or default under which would have a material adverse effect on the performance by BlackRock Canada of its duties under, or on the validity or enforceability of this Agreement or the provisions of the AMA Transaction Documents applicable to BlackRock Canada, or the performance by BlackRock Canada of its duties hereunder or thereunder.

(vii)    BlackRock as a whole has policies and procedures in place applicable to BlackRock Canada to address conflicts of interest in respect of its clients in accordance with applicable law.

(viii)    BlackRock as a whole has in place disaster recovery procedures and customary insurance coverage appropriate for and applicable to its businesses and entities, including BlackRock Canada.

(ix)    On the Closing Date, BlackRock Canada and BlackRock Financial together hold less than 10% of all notes issued by MAV2 by principal balance.

(x)    It has an office located in Canada with one full-time senior employee engaged in the active conduct of its business in Canada.

(d)    Notwithstanding anything to the contrary herein, the representations, warranties and covenants of MAV2 set forth in any AMA Transaction Document are solely the obligations of MAV2 and not of the Administrator. The Administrator is responsible solely for its own representations, warranties and covenants and duties expressly set forth with respect to the Administrator (in its capacity as administrator and asset manager, or as Spread/Loss Trigger Calculation Agent or Valuation Agent) herein and in the other AMA Transaction Documents.

Section 16.    Notice.

(a)    All communications and notices pursuant to this Agreement shall be by fax or letter delivered by hand or by electronic mail.  Each such communication or notice shall be made to the relevant party at the fax number or address or electronic address and, in the case of a communication or notice by fax or letter, marked for the attention of, or (in the case of a communication by electronic mail) made to such person or department from time to time specified in writing by the recipient party to the others for such purpose.  The initial fax number, address, electronic address and person or department so specified by each party are set out in Schedule A hereto.  All communications

or notices delivered verbally by telephone shall only be binding if followed immediately by a confirmation in writing by fax, electronic mail or letter.

(b)    A communication or notice shall be deemed received (if by fax) when an acknowledgement of receipt is received, (if by electronic mail) when made or (if by letter) when delivered, in each case in the manner required by this Section 16.  However, if a communication is received after 5:00 pm on any Business Day or on a day which is not a Business Day, it shall be deemed to be received and become effective at the opening of business on the next day which is a Business Day. Subject to Section 5 of the Omnibus Agreement, every communication or notice shall be irrevocable except in respect of any manifest error in it.

(c)    To the extent the Rating Agency Condition and/or any notification requirement (in the case of Noteholders, Dealers, Lender or any other party) in respect of a particular subject matter is satisfied pursuant to any AMA Transaction Document (other than this Agreement), any notice in respect of such subject matter to be provided hereunder shall not separately be required.

Section 17.    Costs and Expenses.  Except as may otherwise be agreed in writing, the costs and expenses (including the fees and disbursements of counsel and accountants) incurred by each party in connection with the negotiation and preparation of and the execution of this Agreement, the other AMA Transaction Documents and all matters incident thereto, shall be borne by MAV2; provided that the Administrator's costs and expenses in connection therewith shall be borne proportionately by principal amount of notes issued on the Closing Date among MAV2, MAV1 and MAV3 and be paid on the Closing Date.

Section 18.    Governing Law, Submission to Jurisdiction; Venue; Etc.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.  Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdictions of (i) the courts of the State of New York sitting in the Borough of Manhattan and of the United States District Courts for the Southern District of New York, and any appellate court from any thereof, and (ii) the courts of the Province of Ontario, Canada, in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of this Agreement (each a "Proceeding"), and each party hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such Proceeding may be heard and determined in such courts.  With respect to any such Proceeding, each party hereto hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, (i) any objection which it may now or hereafter have to the laying of venue in accordance with this Section 18, (ii) the defense of an inconvenient forum in contravention of this Section 18, and (iii) any right to trial by jury.  In the event that any provision of this Agreement or the application thereof to any person or in any circumstance shall be determined to be invalid, unlawful or unenforceable to any extent, the remainder shall be unaffected and shall continue to be valid and may be enforced to the fullest extent permitted by law.

**THE PARTIES HERETO IRREVOCABLY CONSENT TO THE SERVICE OF ANY AND ALL PROCESS IN ANY ACTION OR PROCEEDING BY THE MAILING OR DELIVERY OF COPIES OF SUCH PROCESS TO EACH SUCH PARTY AT THE ADDRESS REFERRED TO IN SECTION 16.  THE PARTIES HERETO AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.**

MAV2 hereby appoints CT Corporation System, with offices currently at 111 Eighth Avenue, New York, New York 10011, and the Administrator hereby appoints BlackRock Financial, with its offices currently at 40 East 52nd Street, New York, NY 10022, in each case, as its designee, appointee and agent to receive and accept for and on its behalf service of any and all legal process, summons, notices and documents that may be served in any action, suit or proceeding brought against it in any court of the State of New York or in the United States District Court for the Southern District of New York.

Section 19.    <u>Assignments; Delegation</u>.

(a)    This Agreement and the obligations and duties of the Administrator hereunder may be assigned or delegated in whole or in part by the Administrator only to the extent set forth below.

(b)    Any assignment of this Agreement to any person by the Administrator (other than in connection with (1) a change of control of the Administrator covered in Section 19(c), (2) a BlackRock Change of Control that does not result in a significant change in the personnel carrying out the Administrator's duties under this Agreement or (3) an assignment to an Affiliate of the Administrator) shall be deemed null and void unless (i) advance notice of such proposed assignment has been provided to MAV2, the holders of the Notes, the Issuer Trustee, the Collateral Agent, the Indenture Trustee, the Dealers and the Lenders, (ii) the Rating Agency Condition in respect of all Notes that are then rated has been satisfied and (iii) such assignment is consented to in writing in advance by the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS Counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) and Required Lenders in accordance with Section 7.5 of the Omnibus Agreement; <u>provided</u>, that, any "actual assignment" (for the avoidance of doubt, an "actual assignment" of this Agreement is an assignment not arising from a change of control or BlackRock Change of Control) by the Administrator to a non-Affiliate shall be subject to satisfaction of the Rating Agency Condition; <u>provided</u>, <u>further</u>, that the Administrator shall be permitted to assign any or all of its rights to any of its Affiliates, so long as (v) advance notice is provided to the Rating Agency, MAV2, the holders of the Notes, the Issuer Trustee, the Collateral Agent, the Indenture Trustee, the Dealers and the Lenders, (w) such an assignment does not constitute an "assignment" as defined under the Investment Advisers Act and the rules and regulations thereunder (as if they were applicable), (x) such assignment shall not result in MAV2 or its pool of assets, including the Managed Assets (including Eligible Investments), Swap Agreements and the Hedging Agreements, being required to register as an "investment company" under the Investment Company Act, (y) such Affiliate or subsidiary of such Affiliate (1) is able to professionally and competently perform the duties imposed upon the Administrator under this Agreement, (2) is legally qualified and has the capacity to act as Administrator under this Agreement, (3) is not a non-resident of Canada for purposes of the *Income Tax Act* (Canada), (4) otherwise complies with this Agreement, and (5) such Affiliate's or subsidiary's obligations hereunder are fully guaranteed by BlackRock Financial to the same extent as those of the Administrator before the event occurred, and (z) such an assignment shall not result in MAV2 or any Satellite Trust being required to obtain any registration, license or permit under, or being in violation of, applicable laws of the United States and Canada; <u>provided</u>, <u>further</u>, that upon such assignment by the Administrator to such Affiliate, "BlackRock Canada" or "Administrator" as used herein shall be deemed to mean such Affiliate. Any permitted assignment in accordance with this paragraph (b) shall bind the assignee hereunder in the same manner as the Administrator is bound, and the assignee shall execute and deliver to MAV2, the Collateral Agent, the Lenders and the Dealers a counterpart of this Agreement naming such assignee as Administrator, Valuation Agent and Spread/Loss Trigger Calculation Agent and acknowledging release of the Administrator. Upon the execution and delivery of such a counterpart by the assignee, the

Administrator shall be released from all obligations arising thereafter as Administrator pursuant to this Agreement.  For greater certainty, no assignment will release the Administrator in respect of liabilities arising prior to such assignment.

(c)    Notwithstanding the above, any corporation, partnership or limited liability company into which the Administrator may be merged, amalgamated, arranged or converted or with which it may be consolidated, or any corporation, partnership or limited liability company resulting from any merger, amalgamation, arrangement, conversion or consolidation to which the Administrator shall be a party, or any corporation, partnership or limited liability company succeeding to all or substantially all of the collateral management business of the Administrator, shall be the successor to the Administrator without any further action by the Administrator, MAV2, the Issuer Trustee or any other person or entity so long as (i) the Administrator provides notice to the Rating Agency, the Dealers and the Lenders at least 10 Business Days prior to the consummation of such transaction, (ii) the successor entity is an Affiliate of BlackRock and is not a non-resident of Canada for purposes of the *Income Tax Act* (Canada) and (iii) the Administrator's obligations hereunder are fully assumed by such successor and such obligations are fully guaranteed by BlackRock Financial to the same extent as those of the Administrator before the event occurred; provided, that the Administrator shall comply with the requirements of the Investment Advisers Act and any applicable Canadian regulations regarding investment advisors in each instance, including with respect to any change of control.

(d)    The Administrator may delegate any of its obligations or duties hereunder and MAV2 acknowledges that the Administrator intends to delegate to BlackRock Financial; provided that the delegation shall not breach BlackRock Canada's obligations under Section 3(k) hereof; provided, further that the Administrator shall provide advance notice of its proposed delegation (other than any delegation to an Affiliate of the Administrator and except as permitted under the AMA Transaction Documents and any software licensing or other similar agreement) to MAV2, the Issuer Trustee, the Indenture Trustee, the Collateral Agent, the Dealers, the Lenders and the Rating Agency; provided, further, that any delegation to any Person that is not an Affiliate of the Administrator (other than Tao Admin Corp., together with their successors and permitted assigns) shall be  approved in accordance with Section 7.5 of the Omnibus Agreement; provided, further, that no delegation of obligations or duties by the Administrator shall relieve the Administrator from any liability hereunder except as specifically provided herein.

(e)    This Agreement shall not be assigned by MAV2 without the prior written consent of the Administrator other than (i) in the case of assignment by MAV2 to an entity which is a successor thereto permitted under the AMA Transaction Documents, in which case such successor organization shall be bound hereunder and by the terms of said assignment in the same manner as MAV2 is bound thereunder and (ii) as collateral security to the Collateral Agent pursuant to the Master Security Agreement.  In the event of any assignment by MAV2 pursuant to clause (i), MAV2 shall use its best efforts to cause its successor to execute and deliver to the Administrator such documents as the Administrator shall consider reasonably necessary to effect fully such assignment.

(f)    Subject to this Section 19, all services hereunder are to be furnished through the medium of any trustees, officers, employees or delegates of the Administrator or its Affiliates as the Administrator deems appropriate in order to fulfill its obligations hereunder.

41

Section 20.    Written Disclosure Statement.  MAV2 acknowledges receipt of Part II of BlackRock Financial's Form ADV no later than 48 hours prior to the date of execution of this Agreement. BlackRock Canada shall provide MAV2, at no expense to MAV2, annually with a copy of BlackRock Financial's Form ADV, Part II within seven days of receipt of a written request therefor from MAV2.

Section 21.    Survival of Representations, Warranties and Indemnities.  Each representation and warranty made or deemed to be made herein or pursuant hereto, and each indemnity provided for hereby, together with the provisions of Section 11, Section 22 and Section 23, and this Section 21 shall survive the execution and delivery and any termination or assignment of this Agreement or the resignation or removal of the Administrator.

Section 22.    Limited Recourse.  The Administrator hereby acknowledges and agrees that the obligations of MAV2 hereunder shall be solely the obligations of MAV2, and the Administrator shall not have any recourse to the Issuer Trustee, the Indenture Trustee, or holders of securities or Affiliates of MAV2 with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby.  Notwithstanding any other provision of this Agreement to the contrary, recourse in respect of any obligations of MAV2 hereunder shall be limited to the assets of MAV2 available for the payment therefor pursuant to the Omnibus Agreement, the CIBC Omnibus Agreement and the Ineligible Asset Note Indenture and on the exhaustion thereof all obligations of and claims against MAV2 arising from this Agreement or any transactions contemplated hereby shall be extinguished and shall not thereafter revive.  The obligations of the Issuer Trustee hereunder are binding upon the Issuer Trustee in its capacity as issuer trustee of MAV2 only, and, except where liability is expressly imposed on the Issuer Trustee hereunder, recourse shall not be had to the property of the Issuer Trustee, except in its capacity as issuer trustee, but only to the assets and property of MAV2.

Section 23.    Non-Petition.  The Administrator hereby agrees that it will not institute against MAV2, or voluntarily join in any institution against MAV2 of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, fraudulent preference or fraudulent conveyance proceedings, or other proceedings under any bankruptcy or similar law of the United States or Canada or any political subdivision of either thereof, or under any similar law of any other jurisdiction in connection with any obligations owing to it for a period of one year (or, if longer, the applicable preference period then in effect) and one day following the date on which MAV2 has made all payments payable by it in respect of all notes issued by MAV2.  Notwithstanding anything herein to the contrary, nothing shall preclude, or be deemed to estop, the Administrator (i) from taking any action in (A) any case or proceeding voluntarily filed or commenced by MAV2 or (B) any involuntary bankruptcy or insolvency proceeding filed or commenced by a person other than the Administrator or an Affiliate of the Administrator, or (ii) from commencing against MAV2 or any of its properties any legal action that is not a bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding, fraudulent preference or fraudulent conveyance proceedings.

Section 24.    Acts and Obligations of MAV2; Issuer Trustee.

(a)    MAV2 shall act at all times in respect of this Agreement through the Issuer Trustee or any agent (or permitted delegee of such agent) (other than the Administrator), attorney or representative thereof. The Administrator shall be entitled to assume that any Responsible Officer of the Issuer Trustee executing documents on behalf of MAV2 is authorized to do so unless the Administrator has actual knowledge to the contrary.

(b)    It is expressly understood and agreed by the parties hereto that: (i) this Agreement is executed and delivered by the Issuer Trustee, not individually or personally but in its capacity as trustee of Master Asset Vehicle II in the exercise of the powers and authority conferred and vested in it; (ii) each of the representations, warranties, undertakings, covenants, indemnities, agreements and other obligations herein made on the part of MAV2 is made and intended not as personal representations, undertakings, covenants, indemnities, agreements and other obligations by the Issuer Trustee but is made and intended for the purpose of binding only the property and assets of Master Asset Vehicle II; (iii) nothing herein contained shall be construed as creating any liability on the Issuer Trustee in its personal capacity, the beneficiaries or any incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Issuer Trustee or any predecessor or successor of the Issuer Trustee, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto; (iv) under no circumstances shall the Issuer Trustee in its personal capacity, the beneficiaries or any incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Issuer Trustee or any predecessor or successor of the Issuer Trustee be personally liable for the payment of any indebtedness or expenses of Master Asset Vehicle II or be liable for the breach or failure of any representation, warranty, undertaking, covenant, indemnity, agreement or other obligation made or undertaken by Master Asset Vehicle II under this Agreement or any other AMA Transaction Document, other than in respect of its own fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of its obligations and duties; (v) except as otherwise specifically provided in the AMA Transaction Documents, no property or assets of the Issuer Trustee, whether owned beneficially by it in its personal capacity or otherwise than in its capacity as issuer trustee of Master Asset Vehicle II, will be subject to levy, execution or other enforcement procedures with regard to any of the representations, warranties, covenants, undertakings, indemnities, agreements and other obligations of the Issuer Trustee or MAV2 under such written instrument; and (vi) no recourse may be had or taken, directly or indirectly, against the Issuer Trustee in its personal capacity, the beneficiaries or any incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Issuer Trustee or any predecessor or successor of the Issuer Trustee with regard to the representations, warranties, undertakings, covenants, indemnities, agreements and other obligations of MAV2 or the Issuer Trustee or any beneficiary, incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Issuer Trustee or any predecessor or successor of the Issuer Trustee under such written instrument other than in respect of such Person's own fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of its obligations and duties.

(c)    It is the intention of the parties hereto that the limitation of liability conferred by Section 24(b) above on the beneficiaries, incorporators, Affiliates, shareholders, directors, officers, representatives, employees, managers, members, advisors, agents or successors and assigns of the Issuer Trustee and of any beneficiaries of MAV2 shall be enforceable by each such Person as fully and effectively as if it is a party to this Agreement or any other AMA Transaction Document and notwithstanding any law that otherwise might deprive it of the benefit of Section 24(b) due to lack of privity or want of consideration.

Section 25.    Counterparts.  This Agreement may be executed in counterparts and by facsimile and any other means of electronic communication, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

Section 26.    Severability.  In case any provision in this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

43

[SIGNATURE PAGE FOLLOWS]

1335339.29-New York Server 7A - MSW

IN WITNESS WHEREOF, the parties hereto have caused the foregoing instrument to be executed as of the day and the year first above written.

BLACKROCK (INSTITUTIONAL) CANADA, LTD.

By: _____
     Name:
     Title:

CIBC MELLON GLOBAL SECURITIES SERVICES COMPANY, in its capacity as Issuer Trustee of MASTER ASSET VEHICLE II

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

**POSTING VERSION: Subject to minor revisions
/ Schedules subject to updating**


SCHEDULE A


**ADDRESSES**


**CIBC Mellon Global Securities Services Company**,
as Issuer Trustee of **Master Asset Vehicle II**
320 Bay Street
P.O. Box 1
Toronto, Ontario M5H 4A6
Attn:    ●
e-mail: ●


**BlackRock (Institutional) Canada Ltd.**
TD Company Trust Tower - 161 Bay Street
Toronto, ON M5J2S1
Attn:    ●
e-mail: ●

with a copy to:


BlackRock Financial Management, Inc., as Delegee:
BlackRock Financial Management, Inc.
●

and

BlackRock Financial Management, Inc.
40 East 52nd Street
New York, NY 10022
Attn: ●
Email: ●

and

BlackRock Financial Management, Inc.
40 East 52nd Street
New York, NY 10022
Attn:    ●
e-mail: ●

and

BlackRock Financial Management, Inc.
100 Bellevue Parkway

Wilmington, DE 19809
Attn:    ●
e-mail: ●

and

BlackRock Financial Management, Inc.
40 East 52nd Street
New York, NY 10022
Attn: ●
e-mail: ●

**DBRS**

As set forth in Schedule B to the Omnibus Agreement


**Dealers; Lenders**

As set forth in Schedule B to the Omnibus Agreement

1335339.29-New York Server 7A - MSW

SCHEDULE B-1

INFORMATION SUBJECT TO CONFIDENTIALITY RESTRICTIONS

SCHEDULE B-2

INFORMATION SUBJECT TO CONFIDENTIALITY RESTRICTIONS

1335339.29-New York Server 7A - MSW

SCHEDULE C


INFORMATION SUBJECT TO CONFIDENTIALITY RESTRICTIONS

1335339.29-New York Server 7A - MSW

ANNEX A

ADVISORY COMMITTEE

The purpose of the Advisory Committee with respect to MAV2 is to provide a forum for consultation regarding actions to be taken by, the Administrator with respect to the management of the assets held by MAV2. The Advisory Committee shall be entitled, from time to time during the term of this Agreement, and in accordance with the AMA Transaction Documents, to provide such advice to the Administrator as the Advisory Committee may deem advisable.

The Administrator, in its discretion and subject to its duties under the AMA Transaction Documents, may seek the advice of the Advisory Committee with respect to matters falling within the scope of its duties, power and authority under this Agreement.

A regular meeting of the Administrator and the Advisory Committee shall be held on a quarterly basis in [January, April, July and October] of each year, beginning in [January 2009].  A summary of the matters discussed during such regular meetings and any other meeting between the Administrator and the Advisory Committee during the relevant period shall be included in the summaries to be provided pursuant to Section 3(a)(vii).

For the avoidance of doubt, the Advisory Committee does not exercise any control over the administration or management of MAV2 or the assets managed by the Administrator and does not itself have any voting or approval rights in respect thereof.

1335339.29-New York Server 7A - MSW

**POSTING VERSION:**
Subject to minor revisions /
Schedules subject to updating

ANNEX B


ELIGIBILITY CRITERIA


MASTER ASSET VEHICLE II


Section 1. Defined Terms


Except as otherwise specified in this Annex or unless the context otherwise requires, capitalized terms not otherwise defined in this Annex have the meanings provided for under the agreement to which this Annex is an annex and in this Annex the following terms have the meanings set forth in this section:

"ABS" means Canadian Dollar denominated Automobile Loan Securities and Credit Card Loan Securities issued by an Approved ABS Issuer.


"Aggregate Collateral" means the sum of (i) the Par Amount of all Original Collateral and CA-Held Collateral and (ii) the amount of all Unfunded Commitments.


"Approved ABS Issuer" means any of the issuers set out in Section 1 of Schedule 1 to this Annex and such other ABS issuers as may be approved by the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) and Required Lenders from time to time.


"Approved Category II B-2 Issuer" means any of the issuers set out in Section 2 of Schedule 1 to this Annex and such other issuers as may be approved by the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) and Required Lenders from time to time.


"Approved Federal Agency Debt" means CAD Federal Agency Debt that is either:


i)      listed in Section 3 of Schedule 1 to this Annex, or

ii)     in respect of which MAV2  has received the prior consent of each of the LSS CDS Counterparties to its inclusion as a Category I A Investment, which consent shall be conditional upon the LSS CDS Counterparty's determination that such debt is zero risk weighted from a credit perspective for capital adequacy purposes under the laws, regulations, rules, policies or guidelines implementing the Basel Accords that are applicable to it or its Affiliates and under any internal models adopted pursuant to such laws, regulations, rules, policies or guidelines.

"<u>Approved Federal Guaranteed Debt</u>" means CAD Federal Guaranteed Debt that is either:

i)        listed in Section 4 of Schedule 1 to this Annex, or

ii)       in respect of which MAV2 has received the prior consent of each of the LSS CDS Counterparties to its inclusion as a Category I A Investment, which consent shall be conditional upon the LSS CDS Counterparty's determination that such debt is zero risk weighted from a credit perspective for capital adequacy purposes under the laws, regulations, rules, policies or guidelines implementing the Basel Accords that are applicable to it or its Affiliates and under any internal models adopted pursuant to such laws, regulations, rules, policies or guidelines.

"<u>Approved Issuer</u>" means any Approved ABS Issuer or Approved Category II B-2 issuer.

"<u>Automobile Loan Security</u>" means any security issued by an Approved ABS Issuer that entitles the holder thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of such securities) on the cash flow (or proceeds of disposition of the vehicle) from retail installment sale loans made to finance the acquisition of automobiles, sport utility vehicles, light trucks and recreational vehicles that generally have the following characteristics: (1) the loans may have varying contractual maturities; (2) the loans are obligations of numerous retail borrowers and accordingly represent a diversified pool of obligor credit risk; (3) the borrowers under the loans are prime quality; (4) the repayment stream on such loans is primarily determined by a contractual payment schedule, with early repayment on such loans predominantly dependent upon the disposition of the underlying vehicle; and (5) the loans are not made pursuant to a dealer floor plan.

"<u>Bank</u>" means a Canadian bank on Schedule I or II, or an authorized foreign bank on Schedule III, to the *Bank Act (Canada)*, as listed from time to time on the web site of the Office of the Superintendent of Financial Institutions (Canada).

"<u>Bankers' Acceptance</u>" means a Canadian Dollar denominated time draft of an issuer drawn on and accepted by a Bank or an Approved Category II B-2 Issuer.

"<u>Basel Accords</u>" means the banking supervision accords on recommended banking laws and regulations issued by the Basel Committee on Banking Supervision.

"<u>CAD Federal Agency Debt</u>" means Canadian Dollar denominated debt obligations issued by an agency of the Government of Canada or an entity wholly-owned by the Government of Canada where:

i)       such agency is then expressly stated to be an agent of the Government of Canada in applicable Canadian law for purposes, *inter alia*, of issuing Canadian Dollar denominated debt of the Government of Canada, which debt as such carries the full faith and credit of the Government of Canada and constitutes a direct unconditional obligation of the Government of Canada, or

ii)      the obligations of such agency or other entity are, throughout their terms, fully, expressly, unconditionally and irrevocably guaranteed as to timely payment of principal and interest in full by the Government of Canada.

"CAD Federal Guaranteed Debt" means Canadian Dollar denominated debt obligations issued by an issuer that are, throughout their terms, fully, expressly, unconditionally and irrevocably guaranteed as to timely payment of principal and interest in full by the Government of Canada.

"CAD Government of Canada Bonds" means Canadian Dollar denominated debt obligations issued by the Government of Canada that carry the full faith and credit of the Government of Canada and constitute direct unconditional obligations of the Government of Canada.

"CAD Provincial Agency Debt" means Canadian Dollar denominated debt obligations issued by an agency of the government of a Province or by an entity wholly-owned by the government of a Province where:

i)      such agency is then expressly stated to be an agent of the government of such Province in applicable law of such Province for purposes, *inter alia*, of issuing Canadian Dollar denominated debt of the Province, which debt as such carries the full faith and credit of the government of such Province and constitutes a direct unconditional obligation of the government of such Province, or

ii)      the obligations of such agency or other entity are, throughout their terms, fully, expressly, unconditionally and irrevocably guaranteed as to timely payment of principal and interest in full by the government of the Province of which such agency is an agent.

"CAD Provincial Government Bonds" means Canadian Dollar denominated debt obligations issued by the government of a Province that carry the full faith and credit of the government of such Province and constitute direct unconditional obligations of the government of such Province.

"CAD Provincial Guaranteed Debt" means Canadian Dollar debt obligations issued by an issuer that are, throughout their terms, fully, expressly, unconditionally and irrevocably guaranteed as to timely payment of principal and interest in full by the government of a Province.

"Category I Investments" means, collectively, Category I A Investments and Category I B Investments.

"Category I A Investments" means:

i)      CAD Government of Canada Bonds,

ii)      USD Federal US Debt,

iii)      Approved Federal Agency Debt, and

iv)      Approved Federal Guaranteed Debt,

the maturity date of which on the Trade Date for the particular investment is not later than the earlier of (i) seven years from the Trade Date for the particular investment and (ii) December 20, 2016.

"Category I B Investments" means CAD Government of Canada Bonds the maturity date of which on the Trade Date for the particular investment is not later than the later of (i) the next Determination Date under the Indenture and (ii) 90 days from the Trade Date for the particular investment.

"Category II Investments" means, collectively, Category II A Investments, Category II B-1 Investments, Category II B-2 Investments and Category II B-3 Investments.

"Category II A Investments" means:

i)     CAD Government of Canada Bonds,

ii)    CAD Provincial Government Bonds issued by a Province that has a credit rating of AAA (long term) and R-1 (high) (short term), or the equivalent ratings, from DBRS and at least one other EI Rating Agency (or is otherwise in compliance with the Rating Recognition Procedure) or, if such Province has only long term debt obligations outstanding, a credit rating of AAA (long term), or the equivalent rating, from DBRS and at least one other EI Rating Agency (or is otherwise in compliance with the Rating Recognition Procedure),

iii)   CAD Federal Guaranteed Debt,

iv)    CAD Provincial Guaranteed Debt where the Province that is the guarantor of such debt has a credit rating of AAA (long term) and R-1 (high) (short term), or the equivalent ratings, from DBRS and at least one other EI Rating Agency (or is otherwise in compliance with the Rating Recognition Procedure) or, if such Province has only long term debt obligations outstanding, a credit rating of AAA (long term), or the equivalent rating, from DBRS and at least one other EI Rating Agency (or is otherwise in compliance with the Rating Recognition Procedure),

v)     CAD Federal Agency Debt, and

vi)    CAD Provincial Agency Debt where the Province of which the issuer is an agent has a credit rating of AAA (long term) and R-1 (high) (short term), or the equivalent ratings, from DBRS and at least one other EI Rating Agency (or is otherwise in compliance with the Rating Recognition Procedure) or, if such Province has only long term debt obligations outstanding, a credit rating of AAA (long term), or the equivalent rating, from DBRS and at least one other EI Rating Agency (or is otherwise in compliance with the Rating Recognition Procedure),

where, in each case, the maturity date of the debt obligation on the Trade Date for the particular investment is not later than the earlier of (a) seven years from the Trade Date for the particular investment and (b) December 20, 2016.

"Category II B-1 Investments" means:

i)        CAD Provincial Government Bonds issued by a Province that has a credit rating of AA (long term), or the equivalent rating, from DBRS and at least one other EI Rating Agency (or is otherwise in compliance with the Rating Recognition Procedure) and of at least R-1 (middle) (short term) from DBRS and a credit rating of P-1 from Moody's, A-1+ from S&P or F1+ from Fitch (or is otherwise in compliance with the Rating Recognition Procedure), or, if such Province has only long term debt obligations outstanding, a credit rating of AA (long term), or the equivalent rating, from DBRS and at least one other EI Rating Agency (or is otherwise in compliance with the Rating Recognition Procedure),

ii)       CAD Provincial Guaranteed Debt where the Province that is the guarantor of such debt has a credit rating of AA (long term), or the equivalent rating, from DBRS and at least one other EI Rating Agency (or is otherwise in compliance with the Rating Recognition Procedure) and of at least R-1 (middle) (short term) from DBRS and a credit rating of P-1 from Moody's, A-1+ from S&P or F1+ from Fitch (or is otherwise in compliance with the Rating Recognition Procedure), or, if such Province has only long term debt obligations outstanding, a credit rating of AA (long term), or the equivalent rating, from DBRS and at least one other EI Rating Agency (or is otherwise in compliance with the Rating Recognition Procedure), and

iii)     CAD Provincial Agency Debt where the Province of which the issuer is an agent has a credit rating of AA (long term), or the equivalent rating, from DBRS and at least one other EI Rating Agency (or is otherwise in compliance with the Rating Recognition Procedure) and of at least R-1 (middle) (short term) from DBRS and a credit rating of P-1 from Moody's, A-1+ from S&P or F1+ from Fitch (or is otherwise in compliance with the Rating Recognition Procedure), or, if such Province has only long term debt obligations outstanding, a credit rating of AA (long term), or the equivalent rating, from DBRS and at least one other EI Rating Agency (or is otherwise in compliance with the Rating Recognition Procedure),

where, in each case, the maturity date of the debt obligation on the Trade Date for the particular investment is not later than the earlier of (a) 365 days from the Trade Date for the particular investment and (b) December 20, 2016.

"Category II B-2 Investments" means:

i)        Canadian Dollar denominated demand or time deposits, certificates of deposit or other short term debt obligations of a Bank or an Approved Category II B-2 Issuer,

ii)       Bankers' Acceptances,

iii)     Canadian Dollar denominated asset backed commercial paper of an issuer sponsored by a Bank or an Approved Category II B-2 Issuer that has the benefit of explicit, direct, global style liquidity support by such Bank or such Approved Category II B-2 Issuer, and

iv)     United States Dollar denominated demand or time deposits, certificates of deposit or other term debt obligations of a Bank or an Approved Category II B-2 Issuer,

where, in each case:

    a.    the Bank or Approved Category II B-2 Issuer that is the issuer of the obligation or, in the case of Bankers' Acceptances, the Bank or the Approved Category II B-2 Issuer that is the acceptor of such Bankers' Acceptances or, in the case of asset backed commercial paper, the Bank or the Approved Category II B-2 Issuer that is the global style liquidity provider, has a credit rating of at least AA (low) (long term), or the equivalent rating, from DBRS and at least one other EI Rating Agency (or is otherwise in compliance with the Rating Recognition Procedure) and a credit rating of R-1 (high) (short term) from DBRS and a credit rating of P-1 from Moody's, A-1+ from S&P or F1+ from Fitch (or is otherwise in compliance with the Rating Recognition Procedure),

    b.    the obligation, other than Bankers' Acceptances, that is the investment is itself rated by DBRS and at least one other EI Rating Agency (or is otherwise in compliance with the Rating Recognition Procedure), and

    c.    the maturity date of the investment on the Trade Date therefor is not later than the later of (i) the next Determination Date under the Indenture and (ii) 90 days from the Trade Date of the particular investment.

"Category II B-3 Investments" means:

i)    fully collateralized Canadian Dollar denominated Repurchase Agreements where:

    a.    the financial instruments that are the subject matter of the Repurchase Agreement, which themselves must be Eligible Investments for MAV2, are deposited with a Permitted Custodian pursuant to a control agreement that is in favour of the Collateral Agent,

    b.    the Repurchase Agreement has a defined termination date on the Trade Date for the particular investment of not later than the later of (i) the next Determination Date under the Indenture and (ii) 90 days from the Trade Date for the particular investment,

    c.    the collateral that constitutes the security for the benefit of MAV2 consists of Canadian Dollar denominated debt obligations that are themselves rated and have a credit rating of AAA (long term), or the equivalent rating, if the debt obligations are long term, or a credit rating of R-1 (high), or the equivalent rating, if the debt obligations are short term, from at least two EI Rating Agencies, and

    d.    the Repurchase Agreement is entered into with a Bank or an Approved Category II B-2 Issuer or a broker or dealer that is affiliated with a Bank or an Approved Category II B-2 Issuer and such Bank, Approved Category II B-2 Issuer or affiliated broker or dealer has a credit rating of not less than AA (low) (long term), or the equivalent rating, from DBRS and at least one other EI Rating Agency (or is otherwise in compliance with the Rating Recognition Procedure)

and a credit rating of any two of the following: R-1(high) (short term) from DBRS, P-1 from Moody's, A-1+ from S&P or F1+ from Fitch, and

ii)     fully collateralized Canadian Dollar denominated TRSs where:

a.     the assets that are the subject matter of the TRS are themselves Eligible Investments for MAV2,

b.     all collateral held for the benefit of MAV2 is held by a Permitted Custodian of MAV2 pursuant to a control agreement that is in favour of the Collateral Agent,

c.     the TRS Agreement in respect of the TRS has a defined termination date for the TRS on the Trade Date of the TRS of not later than the later of (i) the next Determination Date under the Indenture and (ii) 90 days from the Trade Date for the particular investment,

d.     the collateral that constitutes the security for the benefit of MAV2 consists of Canadian Dollar denominated debt obligations that are themselves rated and have a credit rating of AAA (long term), or the equivalent rating, if the debt obligations are long term, or a credit rating of R-1 (high), or the equivalent rating, if the debt obligations are short term, from at least two EI Rating Agencies,

e.     the TRS Agreement is entered into with a Bank or an Approved Category II B-2 Issuer or a broker or dealer that is affiliated with a Bank or an Approved Category II B-2 Issuer and such Bank, Approved Category II B-2 Issuer or affiliated broker or dealer has a credit rating of not less than AA (low) (long term), or the equivalent rating, from DBRS and at least one other EI Rating Agency (or is otherwise in compliance with the Rating Recognition Procedure) and a credit rating of any two of the following: R-1(high) (short term) from DBRS, P-1 from Moody's, A-1+ from S&P or F1+ from Fitch,

f.     the TRS Agreement permits the rehypothecation of the collateral held for the benefit of MAV2 in favour of the Secured Creditors, and

g.     the TRS Agreement provides that the TRS always terminates at par.

"Category III Investments" means:

i)     ABS (a) the issuers of which are Approved ABS Issuers, (b) that is an obligation that has a credit rating of AAA (long term), or the equivalent rating, from DBRS and at least one other EI Rating Agency (or is otherwise in compliance with the Rating Recognition Procedure) and is rated AAA (long term), or the equivalent rating, by every rating agency that is rating the ABS, (c) that is not on a Credit Watch by any of the rating agencies that is rating the ABS and (d) the maturity date or expected maturity date of which ABS is not later than the earlier of (A) the date that is five years from the Trade Date for the particular investment and (B) December 20, 2016,

ii)     fully collateralized Canadian Dollar denominated Repurchase Agreements where:

a.      the financial instruments that are the subject matter of the agreement, which must themselves be Eligible Investments for MAV2, are deposited with a Permitted Custodian pursuant to a control agreement that is in favour of the Collateral Agent,

b.      the Repurchase Agreement has a defined termination date on the Trade Date for the particular investment of not later than the earlier of (i) five years from the Trade Date for the particular investment and (ii) December 20, 2016,

c.      the collateral that constitutes the security for the benefit of MAV2 consists of Canadian Dollar denominated debt obligations that are themselves rated and have a credit rating of AAA (long term), or the equivalent rating, if the debt obligations are long term, or a credit rating of R-1 (high), or the equivalent rating, if the debt obligations are short term, from at least two EI Rating Agencies,

d.      the Repurchase Agreement requires that, if the issuer of the collateral or the debt instruments that are then collateral themselves are no longer rated at least AA (long term), or the equivalent rating, by at least two EI Rating Agencies, the party with whom MAV2 is contracting would be required to replace such collateral at the cost of such party with collateral that satisfies the requirement in clause c. immediately above,

e.      the Repurchase Agreement is entered into with a Bank or an Approved Category II B-2 Issuer or a broker or dealer that is affiliated with a Bank or an Approved Category II B-2 Issuer and such Bank, Approved Category II B-2 Issuer or affiliated broker or dealer has a credit rating of not less than AA (low) (long term), or the equivalent rating, from DBRS and at least one other EI Rating Agency (or is otherwise in compliance with the Rating Recognition Procedure) and a credit rating of any two of the following: R-1(high) (short term) from DBRS, P-1 from Moody's, A-1+ from S&P or F1+ from Fitch,

f.      the Repurchase Agreement requires that if the credit rating of the party with whom MAV2  is contracting falls below the credit rating required by clause e. immediately above the transaction pursuant to the Repurchase Agreement would be terminated with no payment by MAV2 to the party with whom MAV2 is contracting and the repurchase of the financial instruments that are the subject matter of the agreement by the party with whom MAV2 is contracting at the full price payable to MAV2 under the agreement,

g.      the Repurchase Agreement requires that exposure on the collateral would be required to be marked to market daily and collateralized and would apply market standard valuation percentages (haircuts) at the time as determined by the Administrator to be reasonable, and

h.      the Repurchase Agreement permits optional early termination by MAV2 if any person for whom the Repurchase Agreement itself forms collateral, for an obligation of MAV2 owed to that person, or the Administrator, in accordance with the Omnibus Agreement, is liquidating the collateral represented by the Repurchase Agreement,

9

iii)     fully collateralized Canadian Dollar denominated TRSs where:

a.     the assets that are the subject matter of the TRS are themselves Eligible Investments for MAV2,

b.     all collateral held for the benefit of MAV2 is held by a Permitted Custodian of MAV2 pursuant to a control agreement in favour of the Collateral Agent,

c.     the TRS Agreement in respect of the TRS has a defined termination date for the TRS on the Trade Date of the TRS of not later than the earlier of (i) five years from the Trade Date for the particular investment and (ii) December 20, 2016,

d.     the collateral that constitutes the security for the benefit of MAV2 consists of Canadian Dollar denominated debt obligations that are themselves rated and have a credit rating of AAA (long term), or the equivalent rating, if the debt obligations are long term, or a credit rating of R-1 (high), or the equivalent rating, if the debt obligations are short term, from at least two EI Rating Agencies,

e.     the TRS Agreement requires that, if the issuer of the collateral or the debt instruments that are then collateral themselves are no longer rated at least AA (long term), or the equivalent rating, by at least two EI Rating Agencies, the party with whom MAV2 is contracting would be required to replace such collateral at the cost of such party with collateral that satisfies the requirement in clause c. immediately above,

f.     the TRS Agreement is entered into with a Bank or an Approved Category II B-2 Issuer or a broker or dealer that is affiliated with a Bank or an Approved Category II B-2 Issuer and such Bank, Approved Category II B-2 Issuer or affiliated broker or dealer has a credit rating of not less than AA (low) (long term), or the equivalent rating, from DBRS and at least one other EI Rating Agency (or is otherwise in compliance with the Rating Recognition Procedure) and a credit rating of any two of the following: R-1(high) (short term) from DBRS, P-1 from Moody's, A-1+ from S&P or F1+ from Fitch,

g.     the TRS Agreement requires that if the credit rating of the party with whom MAV2 is contracting falls below the credit rating required by clause f. immediately above the transaction pursuant to the TRS Agreement would be wound up with no payment by MAV2 to the party with whom MAV2 is contracting,

h.     the TRS Agreement requires the party with whom MAV2 is contracting to enter into a one-way Credit Support Annex in favour of MAV2 which requires that exposure on the collateral be marked to market daily and collateralized and would apply market standard valuation percentages (haircuts) at the time as determined by the Administrator to be reasonable,

i.     the TRS Agreement permits the rehypothecation of the collateral held for the benefit of MAV2 in favour of the Secured Creditors,

j.     the TRS Agreement permits optional early termination by MAV2 if any person for whom the TRS itself forms collateral, for an obligation of MAV2 owed to that person, or the Administrator, in accordance with the Omnibus Agreement, is liquidating the collateral represented by the TRS, and

k.     the TRS Agreement provides that the TRS always terminates at par for MAV2.

"Credit Card Security" means any security issued by an Approved ABS Issuer that entitles the holder thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the securities) primarily on the cash flow from balances outstanding under revolving credit card or charge card accounts, generally having the following characteristics: (1) the accounts have standardized payment terms and require minimum monthly payments; (2) the balances are obligations of numerous borrowers and accordingly represent a diversified pool of obligor credit risk; (3) the borrowers under the credit cards are prime quality; and (4) the repayment stream on such balances does not depend upon a contractual payment schedule, with early repayment depending primarily on interest rates, availability of credit against a maximum credit limit, individual choice and general economic matters.

"Eligibility Criteria" means the terms and provisions of this Annex.

"Eligible Investments" means investments that at the Trade Date therefor are of the type, and otherwise satisfy the criteria set out in this Annex, for the investment of the particular type of Managed Assets and, for further certainty, comply with the restrictions set out in sections 3 and 6 below.

"Managed Asset Swap" means a swap transaction entered into for purposes of hedging interest rate risk between MAV2 and a Managed Asset Swap Provider and includes, unless the context otherwise requires, both an interest rate swap transaction that is a Senior Managed Asset Swap and an interest rate swap transaction that is a Subordinated Managed Asset Swap.

"MFF Advance" means an advance in cash or satisfied through the delivery of Category I B Investments made by a Lender or the cash proceeds from Additional Loans.

"Non-Standard Security" means a security that permits payments of interest only, permits payment of interest in kind or provides for something other than regular payments in cash of interest and payment of principal in cash on maturity or in accordance with a repayment schedule or through cash-flow amortization, or that is a principal protected note, index or credit linked note or other structured issues.

"Original Cash" means assets of MAV2 consisting of approximately $534,852,249 that were held at the Closing Date in the form of cash or cash equivalents.

"Par Amount" has the meaning given to the term "par amount" in the Omnibus Agreement.

"Permitted Unhedged USD Debt" means USD Federal US Debt, USD Federal US Agency Debt and investments specified in clause iv) of the definition of Category II B-2 Investments, the outstanding

principal amount of which at the Trade Date for any investment in such debt does not exceed (i) the aggregate outstanding amount of United States Dollar denominated Notes minus (ii) the Par Amount of all unhedged United States Dollar denominated Traditional Assets of MAV2.

"Province" means a Province of Canada.

"Rating Recognition Procedure" means, with respect to a security issued or guaranteed by an issuer that DBRS does not rate publicly, but which is rated publicly by at least two other EI Rating Agencies (at the level required for such category of Eligible Investments as specified in this Annex B), (i) the Administrator has provided one Business Days' advance written notice to DBRS (by email to the following email addresses: surveillance@dbrs.com and mav@dbrs.com or such alternative email addresses as are provided by DBRS to the Administrator for the purposes of this procedure) of the intention to acquire such security, and (ii) the Administrator has not received an objection from DBRS in respect thereof within one Business Day.  In support of the Rating Recognition Procedure, the Administrator shall provide to DBRS public offering documents and monthly surveillance reports related to the investments acquired pursuant to the Rating Recognition Procedure, and shall execute and maintain a letter of engagement relating to the monitoring of such investments in a form satisfactory to DBRS.

"Repurchase Agreement" means an agreement, in the form of a Global Master Repurchase Agreement (GMRA), Master Repurchase Agreement (MRA) or other industry standard repurchase agreement, providing for the sale by a party to MAV2 of securities for cash and an agreement by such party to repurchase such securities at a later date for cash.

"Senior Managed Asset Swap" means (i) a Managed Asset Swap for hedging interest rate risk in respect of Category I Investments or Category II Investments, (ii) a Repurchase Agreement that is a Category II B-3 Investment, or (iii) a TRS that is a Category II B-3 Investment, in each case, entered into between MAV2 and a Managed Asset Swap Provider.

"Subordinated Managed Asset Swap" means (i) a Managed Asset Swap for hedging interest rate risk in respect of Category III Investments, (ii) a Repurchase Agreement that is a Category III Investment, or (iii) a TRS that is a Category III Investment, in each case, entered into between MAV2 and a Managed Asset Swap Provider.

"Trade Date" in relation to an investment means the trade date of such investment.

"Traditional Assets" means:

i)      the interest(s) held by MAV2 in any Satellite Trust, as specified in Schedule K (*Satellite Trusts*) to the Omnibus Agreement (other than MAV2's interest in the Satellite Trust that is a party to the Synthetic CLN),

ii)     MAV2's entitlement to any amounts on deposit in the MAV2 Trust Distribution Account (as defined in each of the Securitisation Agreements),

iii)    the Co-Owned Traditional Assets of MAV2, and

12

iv)     the interest(s) held by MAV2 in any other Asset as specified in Part II of Schedule V
(*Traditional Assets*) to the Omnibus Agreement.

"TRS" means a total return swap that is documented pursuant to a TRS Agreement and is a
transaction pursuant to which (i) MAV2 is the total return payer, paying the cash flows and appreciation on
a reference obligation that itself is an Eligible Investment owned by MAV2, and receiving from the third
party with which it is contracting a floating rate plus any depreciation on the reference obligation, and (ii)
on termination, the reference obligation is sold to the third party against payment to MAV2 of the Par
Amount thereof.

"TRS Agreement" means a total return swap agreement in the form of a 1992 ISDA Master
Agreement (Multicurrency – Cross Border) or the 2002 ISDA Master Agreement, together with an annex in
the form of the 1994 ISDA Credit Support Annex (Bilateral Form Subject to New York Law) and the
confirmation evidencing the transaction entered into, providing for a total return swap by the parties thereto
where MAV2 is the total return payer.

"USD Federal US Agency Debt" means United States Dollar denominated debt obligations of the
Federal Home Loan Bank, so long as such Person is an agency of the Government of the United States of
America or an entity wholly-owned by the Government of the United States of America where:

i)      such agency is then expressly stated to be an agent of the Government of the United
States of America in applicable legislation of the United States of America for purposes,
*inter alia*, of issuing United States Dollar denominated debt of the Government of the
United States of America, which debt as such carries the full faith and credit of the
Government of the United States of America and constitutes a direct unconditional
obligation of the Government of the United States of America, or

ii)     the obligations of such agency or other entity are, throughout their terms, fully, expressly,
unconditionally and irrevocably guaranteed as to timely payment of principal and interest
in full by the Government of the United States of America.

"USD Federal US Debt" means United States Dollar denominated debt obligations issued by the
Government of the United States of America that carry the full faith and credit of the Government of the
United States of America and constitutes a direct unconditional obligation of the Government of the United
States of America.

Section 2. Eligible Investments

a)      Each investment and reinvestment of cash proceeds of, or forming part of, the Managed Assets,
including principal payments, recoveries, interest and Sale Proceeds in respect of such Managed
Assets, made by the Administrator on behalf of MAV2 shall be made in the category or categories
of Eligible Investments authorized for such proceeds in this Annex B. The requirement that an
investment qualify as an Eligible Investment is a requirement that applies as at the Trade Date for
the particular investment and if an investment that is owned by MAV2 at any time after the Trade
Date for the investment ceases to qualify as an Eligible Investment, MAV2 may continue to hold
the particular investment without being considered to be in breach of the Eligibility Criteria by
reason simply of holding it.

b)      Subject to compliance with the additional restrictions set out in Sections 3 and 6 below, the following are the categories of the Eligible Investments and criteria for Eligible Investments in which the Managed Assets or other Assets of MAV2 of different types shall be invested, other than on a temporary basis pending investment when they are held in Canadian Dollar or United States Dollar accounts:

      i)      if, pursuant to Sections **[4.12 [(*Reinvestment of Matured Original Collateral*)] and 4.13 [(*Mechanics of Investing Matured Original Collateral*)]]** of the Omnibus Agreement, Assets of MAV2 are to be reinvested in accordance with or consistent with the Eligibility Criteria, such Assets shall be invested (and proceeds of any such investment shall only be reinvested) in any of the following:

            a.      Category I Investments,

            b.      Category II Investments,

          provided that the maturity date of the Category I or Category II Investment on the Trade Date for the particular investment is not later than the later of (i) the next Determination Date under the Indenture and (ii) 90 days from the Trade Date for the particular investment;

      ii)      the Free Original Collateral, to the extent (A.) not required to be placed in the Reserve Account and (B.) not comprising Income Distributions required to be placed in the Collection Account, in each case in accordance with the Omnibus Agreement, shall be invested (and proceeds of any such investment shall only be reinvested) in any of the following:

            a.      Category I Investments,

            b.      Category II Investments,

            c.      Category III Investments;

      iii)      the Original Cash shall be invested (and the proceeds of any such investment shall only be reinvested) in Category I Investments;

      iv)      the MFF Advances shall, if received in cash, be invested (and the proceeds of any such investment shall only be reinvested) in Category I B Investments and, if received in the form of Category I B Investments, on maturity the proceeds thereof shall be reinvested (and the proceeds of any such reinvestment shall only be reinvested) in Category I B Investments;

      v)      assets in the Reserve Account shall be invested (and the proceeds of any such investment shall only be reinvested) in any of the following:

            a.      Category I Investments,

            b.      Category II A Investments,

14

    c.     Category II B-2 Investments,

provided that, if on the proposed Trade Date for the particular investment the Index Spread in respect of any Matrix Portfolio linked to any LSS CDS is equal to or greater than 70% of the Trigger Spread in respect of such Matrix Portfolio, further investments of the assets in the Reserve Account may not be made in Category II A or Category II B-2 Investments, but MAV2 shall not be obligated to sell or otherwise dispose of any assets in the Reserve Account that are then invested in Category II A or Category II B-2 Investments;

vi)    the Traditional Assets in the form of cash on the Closing Date and the proceeds of Traditional Assets shall be invested (and proceeds of any such investment shall only be reinvested) in any of the following:

    a.     Category I Investments,

    b.     Category II Investments,

    c.     Category III Investments;

vii)    assets in the Collection Account shall be invested (and proceeds of any such investment shall only be reinvested) in any of the following:

    a.     Category I Investments, the maturity date of which on the Trade Date is not later than the earlier of (i) 35 days from the Trade Date for the particular investment and (ii) the next Determination Date under the Indenture,

    b.     Category II Investments, the maturity date of which on the Trade Date is not later than the earlier of (i) 35 days from the Trade Date for the particular investment and (ii) the next Determination Date under the Indenture.

Section 3. Additional Restrictions

a)    MAV2 shall not be required to dispose of any Managed Assets which are not in compliance with the restrictions in Section 3(b) on the Closing Date, or on any other date where the non-compliance did not result from the acquisition of a particular investment that did not satisfy the Eligibility Criteria at the Trade Date for it, but MAV2 may not acquire any additional obligations of a Bank, Approved Issuer, Dealer or Province, respectively, whether on the maturity or otherwise of a Managed Asset or an Asset referred to in Section 2(b)(i) of this Annex, if the acquisition would not be permitted on the applicable Trade Date in accordance with the restrictions in Section 3(b).

For purposes of this Section 3, the following shall be included in the numerator when calculating compliance with the concentration limit in respect of a Person:

    a.     obligations in respect of Unfunded Commitments under the Margin Funding Facility Agreement of such Person, any Affiliate of such Person, and any other Person whose obligations in respect of Unfunded Commitments are guaranteed by such first mentioned Person or its Affiliates,

15

      b.       debt obligations of or guaranteed by such Person or its Affiliates,

      c.       Banker's Acceptances accepted by such Person or its Affiliates,

      d.       TRSs and Repurchase Agreements with such Person or its Affiliates,

      e.       obligations under the Wrap Swaps,

      f.       obligations of such Person or its Affiliates as the provider of explicit, direct, global style liquidity in respect of asset backed commercial paper, and

      g.       Other Posted Support held by such Person or its Affiliate under or in connection with any Swap Agreement, and

for further certainty, the denominator for calculating compliance with the concentration limit in respect of such Person shall be the Aggregate Collateral of MAV2 except that, for purposes of Section 3(b)(i)(C.), it shall be the Funded Assets of MAV2.

b)     The following concentration restrictions shall apply as of the applicable Trade Date in respect of any investment of the Managed Assets and any Assets referred to in Section 2(b)(i) of this Annex:

     i)      no more than (A.) 5% of the Aggregate Collateral of MAV2 shall consist of obligations of any one Bank, Approved Issuer or Dealer, (B.) no more than 3.25% of the Aggregate Collateral of MAV2 shall consist of the obligations of any one Province, and (C.) no more than 50% of the Funded Assets of MAV2 may be held at any time in obligations of Banks, respectively, provided that for purposes of determining compliance with this subclause (C.), obligations in respect of the Unfunded Commitments under the Margin Funding Facility Agreement of any Dealer or its Affiliates shall not be taken into account and shall be excluded from the numerator when calculating compliance with this limit;

     ii)     there is no limit on the amount of Managed Assets or Assets referred to in Section 2(b)(i) of this Annex of MAV2 that may be held in the form of CAD Government of Canada Bonds, CAD Federal Agency Debt or CAD Federal Guaranteed Debt;

     iii)    for further certainty, if, at the time when the concentration restrictions in this Section 3(b) are being tested, an obligation of a Bank, an Approved Issuer or a Dealer qualifies as Approved Federal Guaranteed Debt, such obligation shall be treated at such time as CAD Federal Guaranteed Debt for purposes of such test and not as an obligation of the Bank, Approved Issuer or Dealer;

     iv)    the percentage of Funded Assets constituting Category III Investments, Traditional Assets and Unlevered CDSs shall not exceed the percentages set forth below in respect of the applicable time period:

| | |
|---|---|
| Years 0 through 5 after the Closing Date: | 25% |
| Commencing in Year 6 after the Closing | |

Date and in the subsequent
years after the Closing Date:            30%

provided that if on the Trade Date, and so long as, the Index Spread in respect of any
Matrix Portfolio linked to any LSS CDS is equal to or greater than 70% of the Trigger
Spread in respect of the applicable Matrix Portfolio, then no further investment in
Category III Investments may be made, but MAV2  shall not be obliged to sell or
otherwise dispose of any assets then invested in Category III Investments.

c)    The following other restrictions shall apply in respect of any investment of the Managed Assets and
any Assets referred to in Section 2(b)(i) of this Annex:

i)    if on any date and for so long as the Index Spread in respect of any Matrix Portfolio
linked to any LSS CDS is equal to or greater than 70%  of the Trigger Spread in respect of
such Matrix Portfolio, and, if such event occurs, unless and until a period of 90
consecutive days shall have elapsed after such event ends during which such Index
Spread is less than 70% of such Trigger Spread, the maturity date on the Trade Date of
any Eligible Investment then made with the proceeds of any asset shall be not later than
the later of (i) the next Determination Date under the Indenture and (ii) 90 days from the
Trade Date for the particular investment;

ii)    an Eligible Investment may be purchased only if its Market Spread is equal to or less than
the Maximum Spread.  For the purposes of this Section 3(c) (ii) the following terms have
the meanings set forth in this section:

"BA Rate" means the average rate for settlement (expressed as an annual percentage
rate), rounded to the nearest one-hundred-thousandth of one per cent (with .000005 per
cent being rounded upwards) for Canadian Dollar bankers acceptances for a period equal
to the relevant tenor (or the term most closely comparable to such relevant tenor) which
appears on the Reuters Screen CDOR Page (or any Successor Source, as of 10:00 am,
Toronto time, on the Trade Date for the particular investment, provided that if such rate
does not appear on the Reuters Screen CDOR Page on such day, the BA Rate will be the
average of the bid rates (expressed and rounded as set forth above) for Canadian Dollar
bankers acceptances for a period equal to the relevant tenor (or a term as closely as
possible comparable to such relevant tenor) for same day settlement as quoted by such
Banks as named in Schedule I to the *Bank Act* (Canada) as may quote such a rate as of
10:00 am, Toronto time, on the Trade Date for the particular investment; provided that if
such rate cannot be determined, the BA Rate for such relevant tenor will be the CAD
Prime Rate on the Trade Date for the particular investment,

"CAD Prime Rate" means, for any day, a rate per annum equal to the rate of interest most
recently quoted in the *Report on Business* section of *The Globe and Mail* as the Canadian
Prime, provided that if such rate ceases to be published in the *Report on Business* section
of *The Globe and Mail*, CAD Prime Rate will thereafter mean for any day, a rate per
annum equal to the rate of interest most recently posted by the Bank of Canada on its
website under *Rates and Statistics – Interest Rates* as the *Weekly (Wednesday) Series –
V121796: Prime business ('prime rate')* or any substitute or replacement reference or
quotation thereof provided from time to time by the Bank of Canada,

"CAD Swap Rate" means the swap rate for Canadian Dollar swap transactions with a maturity of the relevant tenor, interpolated if necessary to reflect the relevant tenor, expressed as a percentage, which appears on the Reuters Screen ISDAFIX6 Page as of 11:00 a.m., Toronto time, on the Trade Date for the particular investment.  If such rate does not appear on the Reuters Screen ISDAFIX6 Page, the rate will be the BA Rate for the relevant tenor,

"Discount Margin" means the difference between the yield for that particular asset and the base index rate, which for a Canadian Dollar denominated asset with a maturity of 365 days or less is the BA Rate, for a Canadian Dollar denominated asset with a maturity greater than 365 days is the CAD Swap Rate, and for a United States Dollar denominated asset with a maturity of 365 days or less is LIBOR and for a United States Dollar denominated asset with a maturity greater than 365 days is the USD Swap Rate.  For an asset with prepayment risk, a market acceptable prepayment estimate will be applicable,

"LIBOR" means the average rate of interest (expressed as an annual percentage rate) for a term equal to the relevant tenor (or the term most closely comparable to such relevant tenor), rounded to the nearest hundredth-thousandth of one percent (with 0.000005 per cent being rounded upwards) that appears as such on the Telerate Screen Page 3750 with respect to United States Dollars at 11:00 a.m. (London time) on the Trading Day of the relevant asset; provided that if such rate cannot be determined, LIBOR for such relevant tenor will be the USD Prime Rate on the first day of such relevant tenor,

"Market Spread" is the Discount Margin as computed on Bloomberg LLP or, if Bloomberg LLP ceases to provide information to enable such computation to be made, another market recognized third party financial information service selected by the Administrator acting reasonably,

"Maximum Spread" is equal to 70% of the then current on-the-run 5 year CDX.NA.IG index (the "Index"), provided that, if such Index ceases to be published, the 70% level will be determined based on continuing quotes in respect of the last published Index,

"relevant tenor" means, in respect of a particular investment, the period of time from the Trade Date of such particular investment to its maturity or expected maturity,

"USD Prime Rate" means, at the date for its determination, the rate that is the arithmetic mean of the rates of interest publicly announced by each of Bank of America, N.A., Citibank, N.A., Wells Fargo Bank N.A. and J.P. Morgan & Co., or such of them as are then announcing such rate, as its United States Dollar prime rate or base lending rate as in effect for that day. Each change in the prime rate or base lending rate of any bank so announced by such bank will be effective as of the effective date of the announcement or, if no effective date is specified, as of the date of the announcement,

"USD Swap Rate" means the rate for United States Dollar swaps with a maturity of the relevant tenor, interpolated if necessary to reflect the relevant tenor, expressed as a percentage, which appears on the Reuters Screen ISDAFIX1 Page as of 11:00 a.m., New York City time, on the day that is two U.S. Government Securities Business Days (as defined in the 2006 ISDA Definitions) preceding the Trade Date for the particular

investment.  If such rate does not appear on the Reuters Screen ISDAFIX1 Page, the rate will be LIBOR for the relevant tenor;

iii)    any Category III Investment that is ABS held by MAV2  must not exceed $250 million in aggregate principal of a particular pool of assets under the relevant ABS programme;

iv)    the Category III Investments in which MAV2  may invest do not include any ABS that is in respect of subprime credit cards or subprime auto loans and shall not create direct or indirect exposure to US resident retail borrowers.  For this purpose, "subprime credit cards" and "subprime auto loans" means extensions of credit which are not prime by reason of the borrower's credit history or lack thereof, the borrower's low income or high debt to income ratio, high loan value relative to any securing property or in respect of credit cards where borrowings equal or exceed applicable credit limits;

v)    no investment shall be made in a Non-Standard Security;

vi)    with respect to credit ratings:

a.    all required credit ratings shall be as to payment of both principal and interest and not any type of special or limited rating,

b.    unsolicited ratings shall not qualify as a credit rating for purposes of this Annex,

c.    where both the issuer or guarantor of the investment, or the global liquidity provider in the case of investments that are asset backed commercial paper, and the obligation that is the investment itself has a credit rating, in order for the investment to satisfy the credit rating requirement for an Eligible Investment, the credit rating of the investment itself must be no less than the credit rating of the issuer or the guarantor of the investment or of the global liquidity provider in the case of investments that are asset-backed commercial paper,

d.    the issuer of an investment is not required to have a credit rating if the obligation that is the investment itself has the required credit rating,

e.    in the case of investments in Category I Investments, Category II A Investments or Category II B-1 Investments, if the investment itself does not have a credit rating, but the issuer or guarantor of the obligation that is the investment has a credit rating, the credit rating requirement for an Eligible Investment will be satisfied if:

i.    the credit rating of the issuer or guarantor satisfies the requirements of the Eligibility Criteria, is a current credit rating and is a credit rating in respect of unsecured obligations,

ii.    the obligation of the issuer or guarantor in respect of the investment constitutes an unconditional obligation, throughout the obligation's term, to make timely payments of interest and principal in full, and

iii.    the obligation that is the investment itself is not subordinated, postponed or recourse limited and ranks at least pari passu with all unsecured indebtedness of the issuer and, if the required credit rating is that of a guarantor, pari passu with all unsecured indebtedness of the guarantor, and

f.    in the case of investments that are Repurchase Agreements or TRSs, the parties with whom MAV2 is contracting must have the credit ratings specified therefor in the definition of Category II B-3 Investments or the definition of Category III Investments, as applicable, and the collateral that constitutes the security for the benefit of MAV2 must have the credit ratings specified therefor in the definition of Category II B-3 Investments or the definition of Category III Investments, as applicable;

vii)    under no circumstances is an investment in, or in respect of, or providing exposure directly or indirectly to a corporate entity or other commercial enterprise, other than a regulated financial institution of the kind contemplated as the issuer or, in the case of Bankers' Acceptances, the acceptor or, in the case of asset backed commercial paper, the global style liquidity provider, of the investments that are Category I Investments or Category II Investments, considered to be an Eligible Investment;

viii)    at the Trade Date for any particular investment denominated in United States Dollars, the aggregate Eligible Investments denominated in United States Dollars shall not exceed the amount of the Permitted Unhedged USD Debt;

ix)    for further certainty, no investment shall be made in any Notes, Ineligible Asset Tracking Notes or any notes issued by MAV1 or MAV3; and

x)    after the Closing Date, no investment shall be made if such investment would be held by a custodian outside of Canada or the United States of America.

Section 4. <u>Treatment of Credit Watch for Credit Ratings and Ratings Downgrading</u>

a)    For greater certainty, where reference is made to a credit rating, such credit rating shall not be subject to a Credit Watch and if an issuer, a guarantor, an acceptor (in the case of a Banker's Acceptance), a global liquidity provider (in the case of asset backed commercial paper) or a proposed counterparty to a TRS or Repurchase Agreement is on a Credit Watch by a rating agency, that rating agency's credit rating of such issuer, guarantor, acceptor, liquidity provider or counterparty, or of a security or other instrument or obligation issued, guaranteed, accepted or liquidity backed by such entity, shall for purposes of this Annex be considered to be one notch lower than the credit rating from such rating agency held.

b)    For further certainty, MAV2 is not required to sell an Eligible Investment the credit rating of which is, or the credit rating of the issuer, guarantor, acceptor or global style liquidity provider of which is, downgraded after the Trade Date for such particular investment, although the Administrator may elect to sell any Assets as contemplated by the Administration Agreement.

Section 5.  Equivalent Ratings

For purposes of determining what credit ratings issued by the EI Rating Agencies are equivalent, the credit ratings set out on Schedule 2 to this Annex as equivalent shall apply.

Section 6.  Hedging

a)    Not less than 70% of the fixed rate assets in Category I A Investments invested in CAD Government of Canada Bonds, and all other fixed rate assets invested in Category I or Category II Investments, having a maturity date on the Trade Date for the particular investment later than the later of (i) the next Determination Date under the Indenture and (ii) 90 days from the Trade Date for the particular investment, and all fixed rate assets invested in Category III Investments shall, in each case, as a condition of their acquisition, be subject to mandatory interest rate hedging pursuant to a Managed Asset Swap which, on an asset-by-asset basis, hedges the interest rate risk of such Asset.

b)    Each counterparty to a Managed Asset Swap shall enter into a one-way Credit Support Annex in favour of MAV2  in a form approved by the Majority Secured Creditors, which shall provide, at a minimum: (i) for posting of collateral to MAV2  for full exposure based on daily mark-to-market calculations; (ii) for eligible collateral to be securities in Category I, Category II A and Category II B-1 with market standard valuation percentages (haircuts); and (iii) if the counterparty is downgraded below A+, or the equivalent rating from DBRS and at least one other E1 Rating Agency (or such ratings otherwise in compliance with the Rating Recognition Procedure), it will be required to assign the Managed Asset Swap at its expense to a third party that has a rating of at least AA (low), or the equivalent rating, from at least two EI Rating Agencies.

Section 7.  Rating Agency Condition Requirement

Any amendment of Schedule 1 to this Annex and, for further certainty, any addition of Approved ABS Issuers, Approved Category II B-2 Issuers, Approved Federal Agency Debt or Approved Federal Guaranteed Debt in accordance with the consent provisions that are part of those defined terms, shall require that the Rating Agency Condition in respect of all Notes that are then rated be satisfied in respect of such amendment or addition.

Section 8.  Agreed Standard Forms of Repurchase Agreements

The Administrator on behalf of MAV2 may agree with the Majority Secured Creditors (other than for these purposes where Royal Bank of Canada is both an LSS CDS counterparty and a Lender, Royal Bank of Canada in its capacity as LSS CDS Counterparty) and Required Lenders a standard form or standard forms of terms that reflect the terms required under this Annex for the Repurchase Agreements to be used for Repurchase Agreements entered into by MAV2 as Eligible Investments. The agreement of such a standard form or standard forms of terms shall require that the Rating Agency Condition in respect of all Notes that are then rated be satisfied in respect of such agreement.

Schedule 1 to ANNEX B

APPROVED ISSUERS LIST

1.      Approved ABS Issuers

**Auto Loan Programs**
Canadian Capital Auto Receivables Asset Trust
Windsor Auto Trust

**Credit Cards**
Algonquin Credit Card Trust
Broadway Credit Card Trust
Canadian Credit Card Trust
CARDS II Trust
Eagle Credit Card Trust
Glacier Credit Card Trust
Gloucester Credit Card Trust
Golden Credit Card Trust
Master Credit Card Trust
SCORE Trust
York Receivables Trust III

2.      Approved Category II B-2 Issuers

CDP Financial Inc. for medium term notes
Public Sector Pension Investment Board
PSP Capital Inc.
The Fédération des caisses Desjardins du Québec
Ontrea Inc. for Series A and B debentures
OMERS Administration Corp.
OMERS Realty Trust for Series C and D debentures
Borealis Finance Trust
Manulife Financial Corporation
Sun Life Financial Inc.

3.      Approved Federal Agency Debt

4.      Approved Federal Guaranteed Debt

Canadian Dollar denominated debt obligations of the following issuers that are, throughout their terms, fully, expressly, unconditionally and irrevocably guaranteed as to timely payment of principal and interest in full by the Government of Canada:

Canada Housing Trust

Schedule 2 to ANNEX B

EQUIVALENT CREDIT RATINGS

| A. SHORT TERM | | | |
|---|---|---|---|
| Moody's | S&P | Fitch | DBRS |
| P-1 | A-1+ | F1+ | R-1(high) or R-1(middle) |
| P-1 | A-1 | F1 | R-1(low) |
| P-2 | A-2 | F2 | R-2(high) / R-2(middle) / R-2(low) |
| P-3 | A-3 | F3 | R-3(high) / R-3(middle) / R-3(low) |
| Non Prime (NP) | B | B | R-4 |
| | C | C | R-5 |
| | D | D | D |
| | | | |
| B. LONG TERM | | | |
| Moody's | S&P | Fitch | DBRS |
| Aaa | AAA | AAA | AAA |
| Aa1 | AA+ | AA+ | AA(high) |
| Aa2 | AA | AA | AA |
| Aa3 | AA- | AA- | AA(low) |
| A1 | A+ | A+ | A(high) |
| A2 | A | A | A |
| A3 | A- | A- | A(low) |
| Baa1 | BBB+ | BBB+ | BBB(high) |
| Baa2 | BBB | BBB | BBB |
| Baa3 | BBB- | BBB- | BBB(low) |
| Ba1 | BB+ | BB+ | BB(high) |
| Ba2 | BB | BB | BB |
| Ba3 | BB- | BB- | BB(low) |
| B1 | B+ | B+ | B(high) |
| B2 | B | B | B |
| B3 | B- | B- | B(low) |
| Caa1 | CCC+ | CCC+ | CCC(high) |

| Caa2 | CCC  | CCC  | CCC      |
|------|------|------|----------|
| Caa3 | CCC- | CCC- | CCC(low) |
| Ca   | CC   | CC   | CC       |

ANNEX C

FORM OF ADMINISTERED SATELLITE TRUST ACKNOWLEDGMENT

[Letterhead of Issuer Trustee of relevant Administered Satellite Trust]

Reference is hereby made to the Administration And Management Agreement (the "Administration and Management Agreement"), dated [    ], 2008, between BlackRock (Institutional) Canada, Ltd. ("BlackRock Canada" and, in its capacity as the administrator and asset manager, and its successors and permitted assigns, the "Administrator")  and CIBC Mellon Global Securities Services Company, in its capacity as issuer trustee of Master Asset Vehicle II ("MAV2"), pursuant to which the Administrator shall perform certain administrative and asset management functions for [name of Administered Satellite Trust].  Capitalized terms not otherwise defined herein shall have the meanings specified in the Administration and Management Agreement.

By its execution and the acknowledgment of this letter, [name of issuer trustee of Administered Satellite Trust], on behalf of [name of Administered Satellite Trust], hereby agrees to be bound by the Administration and Management Agreement and irrevocably appoints the Administrator as its attorney-in-fact during the term of the Administration and Management Agreement, such appointment being coupled with an interest, with full authority in the place and stead of and in the name of such entity, from time to time in the Administrator's discretion or as required by the Administration and Management Agreement to take such actions on behalf of [name of Administered Satellite Trust] as the Administrator may deem necessary or advisable to comply with or effect the purposes of the Administration and Management Agreement and the other AMA Transaction Documents, including, without limitation, to execute any documents, instruments or other certificates in connection therewith, to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts or moneys due and to become due in connection with Managed Assets, the Hedging Agreements, the Traditional Asset Hedging Agreements and Swap Agreements or otherwise owed thereto, to receive, endorse, and collect any drafts or other instruments, documents and chattel paper in connection therewith, and to file any claims or take any action or institute any proceedings which the Administrator may deem to be necessary or desirable for the collection thereof or to ensure or enforce compliance with the terms and conditions of this Agreement and the other AMA Transaction Documents.

Further, [name of issuer trustee of Administered Satellite Trust], on behalf of [name of Administered Satellite Trust], hereby agrees that any party to an AMA Transaction Document shall be entitled to rely on the acknowledgments set forth in this letter without any further inquiry.

Sincerely,
[NAME OF ISSUER TRUSTEE],
in its capacity as issuer trustee for
[name of Administered Satellite Trust]

_____
Name:
Title:

_____

53

Name:
Title:

1335339.29-New York Server 7A - MSW