POSTING VERSION: Subject to minor revisions / Schedules subject to updating

## ADMINISTRATION AND MANAGEMENT AGREEMENT
### (MAV3)

ADMINISTRATION AND MANAGEMENT AGREEMENT (this "Agreement"), dated [   ], 2008, between BlackRock (Institutional) Canada Ltd. ("BlackRock Canada" and, in its capacity as the administrator and asset manager, and its successors and permitted assigns, the "Administrator") and CIBC Mellon Global Securities Services Company, an unlimited liability company existing under the laws of the Province of Nova Scotia, in its capacity as issuer trustee of Master Asset Vehicle III (in such capacity, "MAV3"), a trust established pursuant to the laws of the Province of Ontario.

W I T N E S S E T H :

In consideration of the mutual promises and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed by and between the parties hereto as follows:

Section 1.    Definitions and Interpretations.

Section 1.1    Definitions.  Except as otherwise expressly provided herein or unless the context otherwise requires, capitalized terms not otherwise defined herein shall have the meanings specified in the Traditional and Ineligible Asset Tracking Note Trust Indenture, dated as of [      ] 2008 (the "Indenture") between MAV3 and BNY Trust Company of Canada, in its capacity as the Collateral Agent (the "Collateral Agent") and the Indenture Trustee (the "Indenture Trustee").

"Acquisition Cost" means, (i) for each Managed Asset acquired on the Closing Date, the figure expressed as a dollar amount or percentage of par as of the date specified, each as set forth in the Monitor's Implementation Report, as supplemented or amended prior to the Closing Date, and (ii) for each Managed Asset acquired after the Closing Date, the price paid for such Asset (net of accrued interest and discount) as the context may require.  For purposes of this definition, the Acquisition Cost of any amortizing Managed Asset shall be determined by application of its most recently reported pool factor indicating the percentage of par.

"Administrator Payment Date" means the 1st day of each March, June, September and December; provided that the first such date shall be the Closing Date.

"Administered Satellite Trust" means a Satellite Trust other than a Non-Administered Satellite Trust.

"Advisory Committee" means a committee consisting of representatives of Noteholders, as appointed in accordance with the Indenture, the role of which, for the purposes of this Agreement, is set forth in Annex A hereto.

"AMA Transaction Documents" means the Trust Documents, the Security Documents, the Included Underlying Documents and any other document entered into by MAV3 in accordance with Section 3(c)(ii), as the foregoing may be amended, supplemented or modified from time to time in accordance with this Agreement.

"Assets" means, with respect to any person, any property, assets and undertakings of such person of every kind, real and personal, tangible and intangible, and wherever situate, whether now

owned or hereafter acquired (and, includes any capital interests in any other person owned by such person).

"BlackRock" means BlackRock Financial, together with its Affiliates, including BlackRock Canada.

"BlackRock Change of Control" means any of the following events (provided, for the avoidance of doubt, that no BlackRock Change of Control will be deemed to have occurred solely as a result of a sale or other disposition by Merrill Lynch & Co, Inc. or Bank of America Corporation, or their respective Affiliates, or by The PNC Financial Services, Group, Inc. or its Affiliates, of any or all of their holdings of securities issued by BlackRock, Inc. to any person):

(i)      any "person" (as defined in section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), excluding for this purpose (A) BlackRock, Inc. or any subsidiary of BlackRock, Inc. and (B) any employee benefit plan of BlackRock, Inc., any subsidiary of BlackRock, Inc. or any person or entity organized, appointed or established by BlackRock, Inc. for or pursuant to the terms of any such plan that acquires beneficial ownership of voting securities of BlackRock, Inc., becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of BlackRock, Inc. representing more than fifty percent (50%) of the combined voting power of BlackRock, Inc.'s then outstanding securities; provided, however, that no BlackRock Change of Control will be deemed to have occurred as a result of a change in ownership percentage resulting solely from an acquisition of securities by BlackRock, Inc. or an exchange of voting securities for nonvoting securities by any person; or

(ii)      persons who as of the Closing Date constitute the board (the "Incumbent Directors") of BlackRock, Inc. cease for any reason, including without limitation, as a result of a tender offer, proxy contest, merger or similar transaction, to constitute at least a majority of the Board, provided that any person becoming a director of BlackRock, Inc. subsequent to the Closing Date shall be considered an Incumbent Director if such person's election or nomination for election was approved by a vote of at least fifty percent (50%) of the Incumbent Directors; but provided further, that any such person whose initial assumption of office is in connection with an actual or threatened election contest relating to the election of members of the Board or other actual or threatened solicitation of proxies or consents by or on behalf of a "person" (as defined in Section 13(d) and 14(d) of the Exchange Act) other than the Board, including by reason of agreement intended to avoid or settle any such actual or threatened contest or solicitation, shall not be considered an Incumbent Director; or

(iii)      consummation of a reorganization, merger or consolidation or sale or other disposition of at least eighty percent (80%) of the assets of BlackRock, Inc. (a "Business Combination"), in each case, unless, following such Business Combination, all or substantially all of the individuals and entities who were the beneficial owners of outstanding voting securities of BlackRock, Inc. immediately prior to such Business Combination beneficially own, directly or indirectly, more than fifty percent (50%) of the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors of the company resulting from such Business Combination (including, without limitation, a company that, as a result of such transaction, owns BlackRock, Inc. or all or substantially all of BlackRock, Inc.'s assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership immediately prior to such Business Combination of the outstanding voting securities of BlackRock, Inc.

"BlackRock Financial" means BlackRock Financial Management, Inc., and its successors and permitted assigns.

2

"Canadian Securities Laws" means all applicable Canadian securities laws in each of the provinces and territories of Canada including the respective rules and regulations made thereunder together with all applicable published national and local instruments, policy statements, rulings, blanket orders and notices of the Canadian securities commissions.

"Cause" has the meaning set forth in Section 13(b).

"Closing Date" means [      ], 2008.

"Defaulted Asset" means any Managed Asset, in respect of which the Administrator has received notice or as to which a Responsible Officer of the Administrator has actual knowledge that:

(a)      there has occurred and is continuing, without giving effect to any applicable grace period, any default with respect to the payment of interest, principal or other amount provided, however, that (i) a payment default of up to three Business Days (or such shorter period as may be set out in the relevant document for such Managed Asset) (the "Cure Period") with respect to which the Administrator reasonably believes that such payment default resulted solely from administrative or technical reasons shall not cause an asset to be classified as a Defaulted Asset during such Cure Period and (ii) a Managed Asset shall not be classified as a Defaulted Asset if such payment default has been cured within the Cure Period;

(b)      such Managed Asset has had bankruptcy, insolvency or receivership proceedings initiated by or against its obligor and, in the case of any involuntary proceedings relating to such obligor, such involuntary proceedings remain unstayed and undismissed for 45 days, or which has an obligor which has been adjudged to be bankrupt or insolvent (and such judgment remains in force);

(c)      such Managed Asset ranks pari passu with or is subordinated to another obligation of the same obligor and such other obligation (i) satisfies the criteria in paragraph (a) above, (ii) is a full recourse obligation and unsecured by the obligor and (iii) does not constitute a trade debt which the obligor is disputing in good faith; or

(d)      a Distressed Exchange has become binding upon the holders of such asset generally, for the purposes of which "Distressed Exchange" means any distressed exchange or other debt restructuring where the issuer of such Managed Asset has offered the relevant class of holders of the Managed Asset generally a new obligation or package of obligations which, in the reasonable judgment of the Administrator either (i) amounts to a diminished financial obligation, or (ii) has the purpose of helping the obligor of such Managed Asset avoid default.

Nothing in this definition shall require any employee (including any portfolio manager or credit analyst) of the Administrator to obtain, use, share or otherwise distribute (X) any information that it would be prohibited from obtaining, using, sharing or otherwise distributing by virtue of the internal policies applicable to the Administrator relating to confidential communications, or (Y) material non-public information with or to any other Person.

"Delegee" means any person that has been subcontracted by a Direct Service Provider to provide services under this Agreement, provided such Delegee has been appointed in accordance with the provisions of this Agreement and, with respect to any person that is not an Affiliate of the Administrator, satisfies the Rating Agency Condition (for the avoidance of doubt, the Rating Agency Condition has been satisfied for Tao Admin. Corp. and Newshore Financial Services Inc.).

"Direct Service Provider" means the Administrator or any Affiliate of the Administrator that is providing services to MAV3 under this Agreement, provided such Direct Service Provider has been appointed in accordance with the provisions of this Agreement and, with respect to any delegation to a Delegee that is not an Affiliate of the Administrator, satisfies the Rating Agency Condition (for the avoidance of doubt, the Rating Agency Condition has been satisfied for Tao Admin. Corp. and Newshore Financial Services Inc.).

"Excluded Administration Agreement" means (i) the administration agreement, dated as of the date hereof, among Tao Admin Corp., the Issuer Trustee, as trustee of MAV1, MAV2 and MAV3, and CIBC Mellon Global Securities Services Company, as trustee for the Non-Administered Satellite Trusts, and (ii) the administration agreement, dated as of the date hereof, between Newshore Financial, Services Inc. and the Issuer Trustee, as trustee of MAV3, in each case, pursuant to which either Tao Admin. Corp. or Newshore Financial, Services Inc. and their respective successors and permitted assigns will provide administrative services in respect of the Non-Administered Satellite Trusts and the Whole Loan Programs.

"Excluded Underlying Documents" means the agreements relating to Whole Loan Programs to which MAV3 or any Satellite Trust is a party that are listed on Schedule B-2 hereto or as may be entered into by Newshore Financial Services Inc. or Tao Admin. Corp. and consented to by the Administrator from time to time in accordance with an Excluded Administration Agreement.

"Fee Basis Amount" means, in respect of each Administrator Payment Date, the aggregate principal or funded amount, as applicable, of (without duplication) (a) the Managed Assets, including Eligible Investments owned or entered into by MAV3 and (b) the assets held by the Satellite Trusts and in Whole Loan Programs including swap transactions not constituting Swap Transactions, in each case, on the fifth day preceding such Administrator Payment Date. For the avoidance of doubt, the determination of the principal or funded amount of the assets held by Satellite Trusts and the Whole Loan Programs shall be determined regardless of whether MAV3 has transferred any of its original interest in such Satellite Trust through a transfer of the related certificate or interest, unless the whole of the interest in the Satellite Trust, the Whole Loan Programs or the assets have been disposed of and none of the Administrator, Tao Admin Corp. or Newshore Financial Services, Inc. has any further engagement or responsibility in respect of such assets.

"Included Underlying Documents" means the agreements to which MAV3 or any Administered Satellite Trust is a party that are not Excluded Underlying Documents, as set forth in Schedule B-1 hereto or as may be entered into from time to time in accordance with the AMA Transaction Documents.

"Indemnified Taxes" means any tax imposed under the provisions of Part XIII of the Income Tax Act (Canada), as amended from time to time.

"Indemnity Allocation Principles" means the general principles by which the Administrator will allocate the obligations of the MAV Indemnifying Party under Section 11 and other indemnification obligations under Section 6 among MAV3, MAV1 and MAV2 and among the relevant priorities of payments provided under the documents to which MAV3, MAV1 or MAV2 is a party, namely (i) the asset or the program, or the circumstances affecting the asset or the program, to which the indemnity claim is specifically attributable, (ii) the class of notes or the circumstances affecting the class of notes to which the indemnity claim is specifically attributable or (iii) the issuer of the note to which the indemnity claim is specifically attributable, as applicable; provided that, to the extent any claim is specifically attributable to a class of Subordinated Notes (or any program funded by a class of

4

Subordinated Notes), the relevant indemnification obligation shall be allocated to the senior notes issued in the program to which such Subordinated Notes relate.

"Information Statement" means the Notice of Proceedings and Meeting and Information Statement with respect to the Plan, dated as of March 20, 2008.

"Investment Advisers Act" means the U.S. Investment Advisers Act of 1940, as amended.

"Issuer Trustee" means CIBC Mellon Global Securities Services Company or any successor to the trust or custodial business thereof or permitted assign or replacement thereof in accordance with the terms of the Declaration of Trust.

"Managed Assets" means, collectively,

(i)    all Assets of MAV3, excluding Traditional Asset Hedging Agreements (but Managed Assets shall include all payments payable by a counterparty under such Traditional Asset Hedging Agreements to MAV3) and:

(ii)    any proceeds of the Managed Assets referred to in (i) above, including any proceeds from reinvestment of the proceeds of such Managed Assets.

"MAV Indemnifying Party" has the meaning set forth in Section 11(d).

"MAV1" means the Issuer Trustee in its capacity as issuer trustee of the Master Asset Vehicle I, a trust constituted under the laws of the Province of Ontario.

"MAV1 AMA" means the Administration and Management Agreement, dated as of the date hereof, between BlackRock Canada and MAV1.

"MAV2" means the Issuer Trustee in its capacity as issuer trustee of the Master Asset Vehicle II, a trust constituted under the laws of the Province of Ontario.

"MAV2 AMA" means the Administration and Management Agreement, dated as of the date hereof, between BlackRock Canada and MAV2.

"Monitor's Implementation Report" means the report of the Monitor filed with the Court (including, without limitation, any schedules or appendices thereto) in connection with the motion for entry of the Plan Implementation Order approving, authorizing and directing, *inter alia*, the various procedures in connection with the implementation of the Plan.

"Monitor's Reports" means the reports of the Monitor filed from time to time with the Court (including, without limitation, any schedules or appendices thereto).

"Non-Administered Satellite Trust" means a Satellite Trust party to an Excluded Administration Agreement.

"Par Sale Asset" means any Managed Asset that can be sold in an arm's length transaction at a price (net of accrued interest and discount) at or above its Acquisition Cost; provided that the sale price of a particular Managed Asset shall be considered collectively with the termination value of any related hedge in respect of a proposed sale for purposes of determining satisfaction of this definition of Par Sale Asset.

"Plan Implementation Order" means the order of the Court dated December [  ], 2008, approving, authorizing and directing, *inter alia*, various procedures in connection with the implementation of the Plan.

"Rating Agency" means DBRS Limited, together with any other rating agency that may be engaged by MAV3 to rate one or more classes of Notes with notice to the Administrator and any successor rating agency, and for greater certainty, where "Rating Agency" is used herein, such reference shall be deemed to be a reference to all such rating agencies, not any one of them (unless there is only one).

"Sale Proceeds" means all proceeds or payments (net of accrued interest or discount) received with respect to any Managed Asset as a result of any sale, termination, novation or other disposition of such Managed Assets or Traditional Asset Hedging Agreement pursuant to Section 3(g), net of any reasonable amounts expended by the Administrator and its Affiliates and/or the Collateral Agent in their respective good faith determination in connection with any such sale, termination or other disposition.

"Satellite Trusts" means, collectively, each trust entity specified in Schedule B-3 (Satellite Trusts) of this Agreement.

"Tao/Newshore Replacement Event" means (i) Tao Admin. Corp. or Newshore Financial, Services Inc., as applicable, has been terminated or has resigned in accordance with the relevant Excluded Administration Agreement, (ii) a replacement has not been appointed in accordance with such Excluded Administration Agreement and (iii) the Administrator has determined in its reasonable judgment that funds will be available for the payment of the fees payable to the administrator under such Excluded Administration Agreement for the expected remaining term of such agreement.

"Traditional Asset Hedging Agreement" means an agreement entered into between a counterparty and a Satellite Trust or MAV3 to hedge currency, basis, timing of cash-flow or interest rate risk in respect of any Traditional Asset.

"Unrated Asset Support" means assets securing Classes of Notes that are not rated.

"Voting Class Majority" means greater than 50% of the aggregate outstanding principal amount of the Voting Class.

"Voting Class Supermajority" means greater than 66 2/3% of the aggregate outstanding principal amount of the Voting Class.

"Whole Loan Programs" means the programs set forth on Schedule C hereto and the assets related thereto.

Section 1.2    Construction.  In this Agreement, unless otherwise specified:

(a)    words denoting the singular include the plural and vice versa and words denoting any gender include all genders;

(b)    the terms "including", "include" and "includes" shall mean "including without limitation", "include, without limitation" and "includes, without limitation", respectively;

(c)    any reference to a statute shall mean the statute in force as at the date hereof, unless otherwise expressly provided;

(d)    the use of headings is for convenience of reference only and shall not affect the construction of this Agreement;

(e)    when calculating the period of time within which or following which any act is to be done or step taken, the date which is the reference day in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period shall end on the next succeeding day that is a Business Day;

(f)    any dollar amounts are expressed in Canadian Dollars unless otherwise specified;

(g)    references to "this Agreement" shall mean and include all annexes, schedules, exhibits, supplements and attachments hereto and all documents incorporated herein by reference, from time to time, each of which shall form an integral part hereof; and

(h)    the principles set forth in this Agreement as applicable to Transactions under Swap Agreements also shall apply *mutatis mutandis* to other swap transactions to which MAV3 or a Satellite Trust is a party (except to the extent otherwise provided with respect to Hedging Agreements; <u>provided</u> that, with respect to the definition of Managed Assets, such other swap transactions shall not be excluded).

Section 1.3    <u>Accounting Principles</u>.  Except as otherwise stated herein, any calculation or financial reporting to be made hereunder shall be made in accordance with GAAP.  Where the character or amount of any asset or liability or item of revenue or expense or amount of equity is required to be determined, or any consolidation or other accounting computation is required to be made for the purpose of this Agreement, that determination or calculation will, to the extent applicable and except as otherwise specified in this Agreement or as otherwise agreed in writing by the parties, be made in accordance with generally accepted accounting principles applied on a consistent basis.

Section 2.    <u>General</u>.

(a)    Subject to the terms set forth herein, BlackRock Canada agrees to act as the Administrator to each of MAV3 and the Administered Satellite Trusts with respect to the administration and management of its assets and to perform, or supervise and arrange for the performance of, the activities set forth in Section 3 hereunder and the other duties that have been expressly delegated to the Administrator in the other AMA Transaction Documents and shall have full power and authority to perform any of the foregoing and any actions incidental thereto.  To the extent necessary or appropriate to perform such duties, the Administrator shall have and is hereby granted the power and authority to execute and deliver all necessary and appropriate documents and instruments on behalf of MAV3 and each Administered Satellite Trust with respect thereto.

(b)    Subject to the AMA Transaction Documents, MAV3 hereby appoints,  and each Administered Satellite Trust by its execution of the acknowledgment substantially in the form attached hereto as <u>Annex C</u> irrevocably appoints, the Administrator as such entity's attorney-in-fact during the term of this Agreement, such appointment being coupled with an interest, with full authority in the place and stead of and in the name of such entity, from time to time in the Administrator's discretion or as required by this Agreement to take such actions on behalf of such entity as the Administrator may deem necessary or advisable to comply with or effect the purposes of this Agreement and the other AMA

Transaction Documents, including, without limitation, to execute any documents, instruments or other certificates in connection therewith, to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts or moneys due and to become due in connection with Managed Assets and the Traditional Asset Hedging Agreements or otherwise owed thereto, to receive, endorse, and collect any drafts or other instruments, documents and chattel paper in connection therewith, and to file any claims or take any action or institute any proceedings which the Administrator may deem to be necessary or desirable for the collection thereof or to ensure or enforce compliance with the terms and conditions of this Agreement and the other AMA Transaction Documents.

(c)    Each of MAV3 and the Administrator acknowledge the appointment by MAV3 of the Administrator as its agent in respect of its rights and obligations under each Excluded Administration Agreement.  In furtherance of the Administrator's supervisory role with respect to each Excluded Administration Agreement, MAV3 requests the Administrator, and the Administrator hereby agrees, to provide the services specifically set forth in Section 3(a) and Section 3(b) hereunder in respect of the Non-Administered Satellite Trusts and Whole Loan Programs.  Further, upon the occurrence of a Tao/Newshore Replacement Event, the Administrator agrees to act as the administrator under the relevant Excluded Administration Agreement in respect of the Non-Administered Satellite Trusts and Whole Loan Programs in accordance with the terms of such Excluded Administration Agreement except that the provisions of this Agreement in respect of the Administrator's standard of care, including Section 3(c), and indemnity and limitation of liability, including Section 11, shall govern and supersede the analogous provisions of such Excluded Administration Agreement.

Section 3.    <u>Duties of the Administrator</u>.

(a)    <u>Administration Duties</u>.    The Administrator agrees to provide the following administrative services all in accordance with and subject to the applicable AMA Transaction Documents:

(i)   administering MAV3 and the Administered Satellite Trusts (including tax compliance), with the assistance of one or more third parties, as appropriate, (the fees and expenses of such third parties to be paid or reimbursed, as applicable, by MAV3 and the Administered Satellite Trusts to the extent provided in Section 6(b));

(ii)   using commercially reasonable efforts to monitor the compliance by the administrators of the Non-Administered Satellite Trusts and Whole Loan Programs with their material obligations under the Excluded Administration Agreements;

(iii)   maintaining financial records for MAV3 and the Administered Satellite Trusts, with the assistance of one or more third parties, as appropriate (the fees and expenses of such third parties to be paid or reimbursed, as applicable, by MAV3 and the Administered Satellite Trusts as provided in Section 6(b));

(iv)   overseeing of (A) the preparation of financial statements for MAV3, (B) the arrangement for auditing of annual financial statements, in each case, as required pursuant to any AMA Transaction Document, and (C) the arrangement to post such financial statements to a dedicated website available to Noteholders and the Rating Agency on a quarterly basis (the fees and expenses incurred in respect of such preparation, auditing and posting to be paid or reimbursed, as applicable, by MAV3 or the Administered Satellite Trusts as provided in Section 6(b));

8

(v)    presenting performance summaries with respect to the Managed Assets and Hedging Agreements to Noteholders and the Rating Agency on a quarterly basis;

(vi)    providing monthly portfolio reports (including valuations) posted to a dedicated website available to Noteholders and the Rating Agency;

(vii)    (A) performing the duties expressly assigned to it as Administrator under the AMA Transaction Documents, (B) subject to the cooperation of the Issuer Trustee, the Indenture Trustee, the trustees of the Satellite Trusts, the Collateral Agent, the Custodians and other Service Providers and to the extent necessary and possible, facilitating the execution of MAV3's and the Administered Satellite Trusts' obligations under the AMA Transaction Documents and (C) subject to the cooperation of the Issuer Trustee, the Indenture Trustee, the trustees of the Satellite Trusts, the Collateral Agent, the Custodians and other Service Providers and to the extent necessary and possible, overseeing MAV3's and the Administered Satellite Trusts' compliance with the AMA Transaction Documents; provided, for the avoidance of doubt, that in respect of clauses (B) and (C), the Administrator shall not be responsible for actions of third parties, including without limitation the Indenture Trustee, the Issuer Trustee (except to the extent directed by the Administrator), the trustees of the Satellite Trusts, the Collateral Agent, the Custodians and any other Service Providers in respect of their obligations, whether on behalf of MAV3, an Administered Satellite Trust or otherwise, under the relevant AMA Transaction Documents, provided that, for the avoidance of doubt, MAV3 and the Satellite Trusts shall not be third parties for this purpose;

(viii)    managing MAV3's and, to the extent applicable, the Administered Satellite Trusts' relationship with the Rating Agency (including seeking satisfaction of the Rating Agency Condition and giving notice to the Rating Agency, when required hereunder or under any of the other AMA Transaction Documents and reporting on the Managed Assets in a manner satisfactory to the Rating Agency), Custodians, trustees and other Service Providers;

(ix)    subject to the cooperation of the Issuer Trustee, the Indenture Trustee, the trustees of the Satellite Trusts, the Collateral Agent, the Custodians and other Service Providers and to the extent necessary and possible, using commercially reasonable efforts to oversee MAV3's and the Administered Satellite Trusts' compliance in all material respects with applicable Canadian and U.S. laws, which, for greater certainty, includes using commercially reasonable efforts to direct any relevant third party service providers to MAV3 and the Administered Satellite Trusts to take action to cause MAV3 and the Administered Satellite Trusts to so comply; provided that the Administrator shall not be liable for any actions or inactions taken in reliance upon advice of counsel received in accordance with Section 3(j);

(x)    (A) consulting with counsel and advising the Collateral Agent upon becoming aware of any of the following circumstances: (i) any movement of material tangible collateral to a jurisdiction outside of Canada, excluding collateral that is in the possession of the Collateral Agent or that is subject to a Control Agreement; or (ii) the acquisition of any certificated securities or instruments, following the transfer of Assets in connection with the Plan, that are registered in the name of MAV3 and that have not previously been delivered to the Collateral Agent; or (iii) the replacement of any Custodian; or (iv) the existence of any assets of MAV3 that are cash or investment

property that are not held by a Custodian that has entered into a Custodial and Control
Agreement; and (B) using commercially reasonable efforts to cooperate with the
Collateral Agent in respect of any additional actions that the Collateral Agent determines
to take, or is directed to take, in order to maintain the perfection and to preserve the
priority of the Security Interests in accordance with Section 8.2(h) of the Indenture;

(xi)   using commercially reasonable efforts to cooperate with
the Monitor to effect the transactions relating to MAV3, the Administered Satellite Trusts
and the Non-Administered Satellite Trusts contemplated under the Plan; and

(xii)   subject to the cooperation of the Issuer Trustee, the
Indenture Trustee, the trustees of the Satellite Trusts, the Collateral Agent, the Custodians
and other Service Providers and to the extent necessary and possible, taking all necessary
and appropriate action to enable each of MAV3 and the Administered Satellite Trusts to
exercise or enforce its rights and to perform its obligations under the AMA Transaction
Documents as the Administrator may consider necessary or advisable in its discretion (for
greater clarity, subject to the standard of care set forth in Section 3(c)), provided such
action is not an action explicitly reserved for Noteholders, a group of Specified Creditors
or another Service Provider under the AMA Transaction Documents and does not violate
the AMA Transaction Documents.

(b)    Asset Management Duties.  The Administrator agrees to provide the
following asset management services in respect of the Managed Assets, all in accordance with and subject
to the applicable AMA Transaction Documents:

(i)   directing the investment and reinvestment of proceeds
from the Managed Assets (including Eligible Investments) in Eligible Investments in
accordance with the Indenture;

(ii)   overseeing the management of assets of the Non-
Administered Satellite Trusts and Whole Loan Programs and providing instructions to the
administrators thereof or taking appropriate actions (including authorizing the disposition
of assets and termination of Traditional Asset Hedging Agreements) in connection
therewith in accordance with the Excluded Administration Agreements and the applicable
Excluded Underlying Documents;

(iii)   monitoring performance of the Managed Assets and
presenting performance and valuation summaries with respect to the Managed Assets to
Noteholders;

(iv)   in its discretion, arranging for sales, terminations or
novations, as the case may be, of Par Sale Assets at a price consistent with the definition
of Par Sale Asset and of Defaulted Assets, and other sales in each case in accordance
with Section 3(g);

(v)   in its discretion, arranging for sales, terminations or
novations, as the case may be, of assets of the Administered Satellite Trusts, Non-
Administered Satellite Trusts and Whole Loan Programs, in each case in accordance with
the Included Underlying Documents and Excluded Underlying Documents, as applicable;

(vi)   to the extent permitted under the applicable AMA Transaction Documents, this Agreement and the applicable Excluded Underlying Documents and to the extent reasonably feasible, managing MAV3's, the Administered Satellite Trusts', the Non-Administered Satellite Trusts' and the Whole Loan Programs' interest rate risk, basis risk, timing of cash-flow risk and currency risk and providing direction to MAV3 and the Administered Satellite Trusts or Tao Admin. Corp or Newshore Financial Services Inc. as administrators for the Non-Administered Satellite Trusts and Whole Loan Programs to enter into or terminate Traditional Asset Hedging Agreements where deemed necessary or advisable by the Administrator and to the extent reasonably feasible, determining the terms of any new Traditional Asset Hedging Agreements, and, to the extent necessary or appropriate to perform such duties, executing and delivering all necessary and appropriate documents and instruments on behalf of MAV3 and the Administered Satellite Trusts and directing Tao Admin. Corp. and Newshore Financial Services Inc. as administrators for the Non-Administered Satellite Trusts and Whole Loan Programs with respect thereto; and

(vii)   to the extent permitted under any AMA Transaction Documents and reasonably feasible, executing trades for acquisitions or entries into, and sales, terminations or novations, as the case may be, of assets or directing the Issuer Trustee or any issuer trustee of an Administered Satellite Trust or administrator for any Non-Administered Satellite Trust or Whole Loan Program or any custodian in connection therewith.

(c)    (i)   The Administrator shall, subject to and in accordance with the terms and conditions hereof (including Section 11) and of the other AMA Transaction Documents, perform its obligations hereunder and exercise its discretion with reasonable care and in good faith, and, without limiting the foregoing, in its capacity as Administrator, using a degree of skill, diligence and attention no less than that which (i) BlackRock (A) exercises with respect to comparable assets that it manages for itself and its Affiliates and (B) exercises with respect to comparable assets that it manages for others, and, in either case, in a manner similar to practices and procedures followed by reasonable and prudent institutional managers of assets of the nature and character of the Managed Assets and (ii) in respect of its administrative duties, including with respect to any delegation pursuant to Section 19 hereunder, a reasonably prudent person would exercise in comparable circumstances in the administration of vehicles similar to MAV3, except as expressly restricted or provided otherwise in this Agreement or the other AMA Transaction Documents.  To the extent consistent with the foregoing, the Administrator may follow BlackRock's customary standards, policies and procedures in performing its duties under the AMA Transaction Documents and hereunder.  In performing its duties and functions hereunder, the Administrator shall act in a manner consistent with the provisions of the AMA Transaction Documents.

(ii)   The Administrator shall not be bound by any amendment, supplement or other modification to the AMA Transaction Documents unless (x) the Administrator has received 10 Business Days' prior written notice thereof and a copy of such proposed amendment, supplement or other modification from the relevant parties and (y) if such amendment, supplement or other modification affects the Administrator's rights or obligations, the Administrator has provided its prior written consent thereto. Notwithstanding anything to the contrary herein, MAV3 shall not enter into any additional agreement or other documents after the Closing Date without the prior consent of the Administrator (such consent not to be unreasonably withheld or delayed). The Administrator's consent pursuant to this Section 3(c)(ii) shall constitute waiver of the requirement for 10 Business Days' prior notice.

1363421.20-New York Server 7A - MSW

(iii)    Subject to satisfaction of any applicable requirements in Section 8.3(i) of the Indenture, including any applicable consents thereto and notices thereof, this Agreement may be amended from time to time by written agreement signed by the parties hereto.

(d)    On behalf of MAV3, the Administrator, subject to and in accordance with the provisions of the AMA Transaction Documents, may or may direct MAV3 or any Administered Satellite Trust (or, for any Non-Administered Satellite Trust and Whole Loan Programs, the administrator under an Excluded Administration Agreement subject to and in accordance with the Excluded Underlying Documents) to (x) dispose of an asset or other securities received in respect thereof in the open market or otherwise, or (y) acquire one or more assets or other securities and may, in each case subject to and in accordance with the provisions of the AMA Transaction Documents or Excluded Underlying Documents, as applicable, take or require MAV3, any Administered Satellite Trust or any Non-Administered Satellite Trust (or the administrator under an Excluded Administration Agreement) to take the following actions with respect to a Managed Asset, Traditional Asset Hedging Agreement, underlying asset of an Administered Satellite Trust or Non-Administered Satellite Trust, to the extent set forth below:

(i)    retain such Managed Asset; or

(ii)    sell, terminate, novate or otherwise dispose of such Managed Asset or Traditional Asset Hedging Agreement in the open market or otherwise in accordance with Section 3(g); or

(iii)    if applicable, tender such Managed Asset pursuant to an offer, provided that the Rating Agency Condition is satisfied, unless such Managed Asset is a Defaulted Asset or subject to a mandatory tender or compulsory acquisition; or

(iv)    if applicable, and upon satisfaction of the Rating Agency Condition, consent to any proposed amendment, modification or waiver with respect to a Managed Asset, Traditional Asset Hedging Agreement or underlying asset of an Administered Satellite Trust or Non-Administered Satellite Trust or document pertaining thereto; provided that satisfaction of the Rating Agency Condition is not required with respect to Unrated Asset Support; or

(v)    retain or dispose of any securities or other property (if other than cash) received pursuant to an offer, provided that, unless such Managed Asset is a Defaulted Asset, the last paragraph of Section 3(g) is satisfied or the Rating Agency Condition is satisfied; or

(vi)    upon satisfaction of the Rating Agency Condition, waive any default with respect to any Defaulted Asset, Traditional Asset Hedging Agreement or any underlying asset with advance or contemporaneous written notice to the Rating Agency; provided that satisfaction of the Rating Agency Condition is not required with respect to Unrated Asset Support; or

(vii)    vote to accelerate the maturity of any Defaulted Asset or negotiate the restructuring of a Defaulted Asset, in each case, with advance or contemporaneous written notice to the Rating Agency; provided that notice to the Rating Agency is not required for Unrated Asset Support; or

1363421.20-New York Server 7A - MSW

(viii)   exercise any other rights or remedies with respect to such asset as provided in the related underlying instruments or take any other action consistent with the terms of the AMA Transaction Documents and Excluded Underlying Documents.

(e)    The Administrator shall take commercially reasonable actions on behalf of MAV3 in connection with effecting any redemption of or payment on the Notes required in accordance with the AMA Transaction Documents.

(f)    In the performance of its duties under this Agreement, the Administrator shall at all times conform to, and act in accordance with, any requirements imposed on it by (i) the provisions of the Investment Advisers Act, and of any rules or regulations in force thereunder; (ii) the provisions of any applicable law, including applicable Canadian Securities Laws; and (iii) subject to Section 3(c) in respect of any required consent of the Administrator to amendments, the provisions of the AMA Transaction Documents, as amended from time to time in accordance with the AMA Transaction Documents.

(g)    In performing its duties hereunder, the Administrator may:

(i)    subject to Section 3(b)(iv), sell, terminate or novate Managed Assets that are Par Sale Assets;

(ii)    subject to Section 3(b)(iv), in its discretion, sell Managed Assets where deemed necessary or advisable by the Administrator in connection with a Managed Asset that is a Defaulted Asset;

(iii)    in respect of a program constituting Traditional Assets that has declined in par amount to 10% or less of its balance at the Closing Date, subject to both the terms of the relevant Included Underlying Documents and Excluded Underlying Documents and satisfaction of the conditions set forth in the last paragraph of this Section 3(g), and, if in the Administrator's commercially reasonable judgment, taking into consideration the expenses of administering the program, the income received from such program and the value of such program, the continued holding of such program is uneconomic for MAV3, terminate, sell or otherwise dispose of the assets in such program; or

(iv)    to the extent any reinvestment made by the Administrator did not satisfy the definition of Eligible Investments as set forth in the Indenture as of the trade date, sell, terminate or otherwise dispose of any asset in which such reinvestment was made;

provided, for the avoidance of doubt, that any sale pursuant to (ii), (iii) or (iv) above may be made for a price (net of accrued interest and discount) below Acquisition Cost.  The Administrator will provide advance or contemporaneous written notice to the Rating Agency and the Advisory Committee of any sales, terminations, novations or dispositions under clause (ii), (iii) and (iv) above and will provide notice to the Rating Agency, within ten (10) Business Days, and the Advisory Committee of any sales, terminations or novations under clause Section 3(g)(i) above.

All of the payments on Managed Assets and all Sale Proceeds from any Managed Asset sold pursuant to this Section 3(g) shall be reinvested, at the Administrator's sole discretion, in one or more Eligible Investments in accordance with the Indenture.

(h)    Under no circumstances shall the Administrator or any of its Affiliates be deemed an obligor or guarantor or otherwise deemed to be responsible for payment from its own funds of principal, interest, dividends or other amounts due on the Managed Assets, the Traditional Asset Hedging Agreements, the Eligible Investments, the Notes, or any obligations of MAV3 or any Satellite Trust under any Excluded Underlying Document or Included Underlying Document, or for collections and other loan servicing or the oversight of collections and other loan servicing of any Managed Assets, or the underlying portfolio of any thereof; provided that the Administrator shall be responsible for the oversight of the administrators under the Excluded Administration Agreements (and any replacement agreements entered into with any consents required under the AMA Transaction Documents) in respect of the performance of its obligations under the Excluded Underlying Documents as provided under Section 3(a)(ii).  If the Administrator or any of its Affiliates, following satisfaction of the Rating Agency Condition, agrees to undertake any servicing or oversight of servicing in respect of the collections or other loan servicing of the Managed Assets (other than as provided in the preceding proviso), such servicing arrangement shall be separate from the Administrator's duties as Administrator hereunder and MAV3 shall separately compensate the Administrator or such Affiliate therefor as may be agreed.  The Administrator or its Affiliates may directly or indirectly (including, without limitation, through ownership interest in a joint venture or other arrangements) receive compensation from an issuer of or obligor under a Managed Asset or underlying asset in respect thereof, in addition to the amounts payable to it pursuant to this Agreement, in connection with the servicing of, or provision of asset management or administrative functions in respect of, such Managed Asset or related underlying asset undertaken at its sole option and discretion.  Such compensation of the Administrator or its Affiliates may be payable from (and to that extent reduce) amounts that otherwise may have been payable to MAV3 by such issuer or obligor.

(i)    In connection with the performance of its duties hereunder, the Administrator shall periodically (and at its discretion) consult with the Advisory Committee with regard to Managed Assets and Traditional Asset Hedging Agreements as further described in Annex A hereto.

(j)    When deemed necessary by the Administrator for the proper performance of its duties hereunder, the Administrator may seek legal, tax, accounting or other advice, as well as employ services from third parties (the reasonable fees and expenses of such advisors and other third parties to be paid or reimbursed, as applicable, by MAV3 as provided in Section 6(b)). As an example, for the avoidance of doubt, the Administrator shall be entitled from time to time as reasonably required by it to retain counsel to assist it in understanding and interpreting the AMA Transaction Documents and Excluded Underlying Documents in order to ensure that it fulfills its duties and obligations in accordance with the requirements of such documents. To the extent any advice for which the Administrator will seek reimbursement from MAV3 pursuant to this Section 3(j) and Section 6(b) is provided to the Administrator in the form of (i) a legal opinion or memorandum of law and in either case on the Counsel's letterhead or (ii) an accounting opinion or memorandum and in either case on the accounting firm's letterhead, such opinion or memorandum shall also be addressed to and provided to MAV3; provided that in the case of clause (i), if Counsel providing the legal opinion or memorandum of law determines that there exists an actual or potential conflict of interest between the Administrator and the Issuer Trustee or between the Administrator and MAV3 in respect of the matters addressed in such opinion or memorandum, the Administrator will be entitled to invoke attorney-client privilege and will not be required to address or provide the applicable opinion or memorandum to MAV3.  In connection with taking or omitting to take any action hereunder, the Administrator shall not be liable for any action taken or omitted to be taken by it in accordance with such legal, tax, accounting or other advice or any opinion of counsel.

(k)    BlackRock Canada will use all commercially reasonable efforts to employ two full time individuals (in addition to the individual currently employed) in the active conduct of its

business in Canada by the date that is four months following the Closing Date (absent any extraordinary circumstances beyond the control of BlackRock Canada). Those employees, together with the current employee, will perform a significant portion of their duties for BlackRock Canada in Canada. BlackRock Canada will use all commercially reasonable efforts to continue to maintain a physical office in Canada and employ not less than three full time individuals in the active conduct of its business in Canada during the term of this Agreement; provided, however, in the event of an employee departure, there may be fewer than three employees of BlackRock Canada involved in the active conduct of the business in Canada. BlackRock Canada will use commercially reasonable efforts to replace as soon as practicable a departing employee which results in there being fewer than three full time individuals in the active conduct of BlackRock Canada's business in Canada. At least one of the employees of BlackRock Canada will be available to interact with the Issuer Trustee, the Advisory Committee, the Noteholders, auditors and counsel engaged on behalf of MAV3, Tao Admin. Corp., Newshore Financial Services Inc. and Canadian government and regulatory bodies. Such employee will be knowledgeable with respect to the Administrator's services, capability and infrastructure and the obligations of BlackRock Canada hereunder and will oversee BlackRock Canada's performance of its obligations hereunder; provided, however, that if such employee should cease to be an employee of BlackRock Canada, BlackRock Canada shall be afforded a reasonable period of time to retain and/or train a replacement employee with respect to such matters. No more than one of the initial three employees shall be performing solely clerical work. BlackRock Canada's employees resident in Canada, as well as any employees of BlackRock Canada or its Affiliates resident in the United States, who are providing securities advisory or trading services to MAV3 on behalf of BlackRock Canada will be appropriately registered with the Ontario Securities Commission and BlackRock Canada shall be entitled to rely upon the advice of its counsel regarding appropriate registrations to be made with Ontario Securities Commission in respect of such employees. For greater certainty, MAV3 and BlackRock Canada acknowledge and agree that, pursuant to Section 19, BlackRock Canada will delegate its obligations and duties under this Agreement to BlackRock Financial and, potentially, its Affiliates, provided that such delegation does not result in a breach of BlackRock Canada's obligations under this Section 3(k).

Section 4.    Brokerage. The Administrator shall use reasonable efforts to obtain the best execution for all orders placed with respect to the Managed Assets, including the Eligible Investments, and any Traditional Asset Hedging Agreements, considering all directions, guidelines and any other circumstances, it being understood that the Administrator shall not necessarily be obtaining the best price available with respect to any particular transaction. In pursuit of the objective of obtaining best execution, the Administrator may take into consideration all factors it reasonably believes to be relevant, including, without limitation, price, the size of the transaction, the nature of the market for such security or transaction, the time constraints of the transaction, general market trends, the reputation and experience of the broker dealer involved and research and other brokerage services furnished to the Administrator or its Affiliates by brokers and dealers that are not Affiliates of the Administrator. Such services may be used by the Administrator or its Affiliates in connection with its other advisory activities or investment operations. The Administrator and its Affiliates may also engage in "client cross" transactions in which the Administrator or an Affiliate causes a transaction to be effected between MAV3 and another account advised by the Administrator or such Affiliate without the Administrator or any of its Affiliates receiving any compensation for such transaction. Such "client cross" transactions will be conducted in a manner that is fair and equitable to MAV3 and the other accounts involved. The Administrator may aggregate sales and purchase orders of securities placed with respect to the Managed Assets, including Eligible Investments, and any Traditional Asset Hedging Agreements with similar orders being made simultaneously for other accounts managed by the Administrator or with accounts of the Affiliates of the Administrator, if in the Administrator's reasonable judgment such aggregation would result in an overall benefit to MAV3, taking into consideration the availability of purchasers or sellers, the selling or purchase price, brokerage commissions and other expenses. In the event that a sale or purchase of any Managed Asset, including an Eligible Investment, or Traditional Asset Hedging Agreement (in

15

accordance with the terms of the AMA Transaction Documents) occurs as part of any aggregate sales or purchase orders, the Administrator (and any of its Affiliates involved in such transactions) shall use reasonable efforts to allocate the executions among the accounts in a manner fair and equitable for all accounts involved.

In addition to the foregoing and subject to the provisions of Section 3, the limitations of Section 8 and the objective of obtaining best execution and to the extent permitted by applicable law, the Administrator may direct MAV3 to acquire or enter into, as applicable, any and all of the Managed Assets or Traditional Asset Hedging Agreements from, or sell, novate or terminate Managed Assets or Traditional Asset Hedging Agreements to, or with, without limitation, the Issuer Trustee, the Indenture Trustee, the Collateral Agent or any of its Affiliates.

Section 5.    Additional Activities of the Administrator.  Nothing herein shall prevent the Administrator or any of its Affiliates from engaging in other businesses, or from rendering services of any kind to MAV3 and its Affiliates, the Satellite Trusts, the Issuer Trustee, the Indenture Trustee, the Collateral Agent,  the holders of the Notes or any other person or entity to the extent permitted by applicable law.  Unless the Administrator determines in its reasonable judgment that such purchase or sale is appropriate, the Administrator may refrain from directing the purchase or sale hereunder of loans or securities issued by, or the termination, novation or entry into swap transactions where the counterparties (or the issuers of reference obligations) are (i) persons of which the Administrator, its Affiliates or any of its or their officers, directors or employees are directors or officers, (ii) persons for which the Administrator or any of its Affiliates act as financial adviser or underwriter or (iii) persons about which the Administrator or any of its Affiliates has information that the Administrator deems confidential or non-public or otherwise might prohibit it from trading such loans or securities in accordance with applicable law.  For greater certainty, nothing in this Section 5 shall be understood to derogate from the standard of care set forth in Section 3(c).

Section 6.    Compensation; Expenses; Tax Indemnity.

(a)    In consideration of the administrative and asset management services to be provided hereunder as Administrator, MAV3 hereby agrees to pay the Administrator a fee equal to 0.05% per annum of the Fee Basis Amount, to be paid quarterly in advance on the Closing Date and each Administrator Payment Date thereafter (calculated as of the 5th Business Day prior to the Closing Date and the 5th Business Day before each Administrator Payment Date thereafter).

(b)    The Administrator (or the relevant Delegee, as applicable) shall bear all overhead expenses, including employee compensation, employee benefits and office expenses, incurred in connection with its duties (including any delegation thereof) hereunder.  MAV3 shall bear all other expenses of the Administrator incurred in connection with its services hereunder, including, without limitation, fees of any non-affiliated third party engaged by the Administrator to perform the custodian, cash and collateral administration and trust administration services, including in connection with any amendments to the Included Underlying Documents and the Excluded Underlying Documents, in respect of MAV3 and each Satellite Trust, any costs incurred in enforcing the rights of MAV3 and the Administered Satellite Trusts pursuant to Section 3(a)(xii) and any legal, tax and accounting expenses incurred in connection with the Administrator's performance of its duties hereunder; provided that MAV3 shall bear such portion attributable to it, as reasonably determined by the Administrator, of expenses incurred in connection with (i) the Administrator's collective performance of its duties pursuant to the MAV1 AMA and the MAV2 AMA and this Agreement and (ii) any third party service provider's collective performance of services to MAV3 and, as applicable, MAV1 and/or MAV2. The Administrator shall also make reasonable efforts to allocate expenses relating to particular assets and classes of notes to such classes in accordance with the indenture. For the avoidance of doubt, MAV3 shall bear all fees and

16

expenses of the administrators under the Excluded Administration Agreements and other third parties acting on behalf of MAV3 to hold collateral and distribute funds, including the Issuer Trustee, the Indenture Trustee, any custodian, collateral agent or similar parties in accordance with the relevant AMA Transaction Documents governing the engagement and duties of such third parties and any listing agent or rating agency, if engaged, and the Administrator shall be authorized to enter into and replace agreements on behalf of MAV3 with such parties and other Service Providers and to renew and negotiate fee arrangements relating thereto.  The Administrator agrees to provide to MAV3 the benefits of any discounts it receives in connection with any expenses allocated to MAV3.

(c)    (i)    The amounts payable hereunder are exclusive of any sales, goods and services, value added or similar taxes ("Sales Taxes").  MAV3 will be responsible for and shall pay to any Direct Service Provider any Sales Taxes payable in respect of the provision of any services contemplated by this Agreement.  MAV3 will indemnify and save harmless any Direct Service Provider and Delegee for all liabilities, losses, costs, expenses or damages in respect of Sales Taxes, including any interest and penalties with respect thereto arising in respect of the services provided under this Agreement, except for the interest and penalties caused by the conduct of the Direct Service Provider or Delegee.  Each Direct Service Provider shall provide to MAV3 its GST registration number and any other information that is reasonably required by MAV3 to claim refund or rebate of goods and services tax.

(ii)    In the event that any amount contemplated by this Agreement is paid or credited to a Direct Service Provider or a Delegee and is subject to Indemnified Taxes, and the Direct Service Provider or Delegee requires the payer to pay such additional amounts (the "Additional Amounts") as are necessary in order that the aggregate net amount received by such Direct Service Provider or Delegee, as the case may be (including with respect to any such Indemnified Tax arising with respect to any payment under this Section 6(c)(ii)) is equal to the amount that would have been received thereby in the absence of any Indemnified Taxes:

(A)    if MAV3 is the payer, MAV3 shall pay such Additional Amounts to the Direct Service Provider or Delegee; or

(B)    if the payer is not MAV3, MAV3 shall indemnify and save harmless the payer for all liabilities, losses, costs, expenses or damages in respect of such Additional Amounts.

MAV3 acknowledges that where a Direct Service Provider is a non-resident of Canada and amounts subject to Indemnified Taxes are paid or credited to it as contemplated by this Agreement, the Direct Service Provider requires the payment of Additional Amounts in respect of such amounts.  Without duplicating the foregoing, MAV3 will indemnify and save harmless any Direct Service Provider or Delegee for all liabilities, losses, costs, expenses or damages in respect of Indemnified Taxes arising in respect of the services provided by them as contemplated by this Agreement.  Notwithstanding any of the foregoing, in the case of any Direct Service Provider or Delegee that is an Affiliate of the Administrator, no Additional Amount shall be payable by MAV3 in respect of any amount paid or credited as contemplated by this Agreement in excess of the amount that would have been payable if the amount actually paid or credited were paid or credited by a resident of Canada for purposes of  the Canada-United States Tax Convention (1980) (the "Treaty") to a resident of the United States for the purposes of the Treaty.

(iii)   Where Indemnified Taxes can be reduced or eliminated by the making of a claim (a "Claim") under an applicable double taxation treaty, the Direct Service Provider or Delegee, as the case may be, shall complete, sign and authorize all such forms and take other reasonable action as may be reasonable and necessary in order to make such Claim. Where an amount has been paid under this Section 6(c), the Direct Service Provider or Delegee, as the case may be, shall make reasonable efforts (with such cooperation from MAV3 or other person as the Direct Service Provider or Delegee, as the case may be, reasonably requests) to obtain repayment of the tax to which such payment relates from the relevant tax authority in the jurisdiction of the tax so withheld or deducted, if the Direct Service Provider or Delegee, as the case may be, reasonably believes that it is entitled to such repayment (any such cash repayment a "Refund"). In the event the Direct Service Provider or Delegee, as the case may be, receives a Refund, the Direct Service Provider or Delegee, as the case may be, shall reimburse the party (or parties in proportion to their payments) that made the payment to which such Refund relates in an amount (aggregate amount if more than one paying party) equal to the amount of the Refund that the Direct Service Provider or Delegee, as the case may be, actually receives.

(iv)   Any amount payable in respect of Sales Taxes or Indemnified Taxes by MAV3 will be paid by MAV3 on the applicable payment date, solely to the extent funds are available for such purpose in accordance with the Indenture.

(v)   In the event that any amount paid or credited to a Direct Service Provider or a Delegee is subject to Indemnified Taxes, or Additional Amounts become payable, as a result of a change in law, a change in the interpretation of existing law or a change in the administrative practices of the Canada Revenue Agency after the date of this Agreement, then the Administrator agrees to use commercially reasonable efforts to restructure the manner in which the administrative and asset management services are being provided hereunder in order to reduce MAV3's exposure to Indemnified Taxes and/or Additional Amounts; provided however that the Administrator shall not be required to incur any material cost or expense in connection with such restructuring and, for the avoidance of doubt, should such restructuring result in any material cost or expense to the Administrator or any Affiliate, MAV3 agrees to indemnify the Administrator or such Affiliate for any such cost or expense as Expenses pursuant to Section 11.

Section 7.   Services Not Exclusive.   Nothing in this Agreement shall prevent the Administrator, any of its Affiliates or any stockholder, director, officer, employee, partner, member or manager of the Administrator or any of its Affiliates from acting as asset manager or administrator for any Person other than MAV3, or from engaging in any other lawful activity, and shall not in any way limit or restrict the Administrator, any Affiliates or any stockholder, director, officer, employee, partner, member or manager of the Administrator or any of its Affiliates from buying, selling or trading any securities for its or their own accounts or for the accounts of others for whom it or they may be acting; provided, that the Administrator will undertake no activities that, in its reasonable judgment, are likely to adversely affect MAV3 or the performance of its obligations under this Agreement. For greater certainty, nothing in this Section 7 shall be understood to derogate from the standard of care set forth in Section 3(c).

Section 8.   Conflicts of Interest.

(a)   In addition to the requirements of the AMA Transaction Documents, the Administrator shall not enter into on behalf of MAV3, or direct MAV3 to engage in, any transaction

18

(other than an agency cross transaction permitted under clause (b) of this Section 8) that would require MAV3's consent pursuant to Section 206(3) of the Investment Advisers Act and the rules and regulations promulgated thereunder, if they were applicable, unless such transaction is approved (i) by the Advisory Committee, with prior written notice to the Rating Agency, or (ii) in another manner elected by the Administrator that is permitted pursuant to the Investment Advisers Act, the Ontario Securities Act or other applicable Canadian Securities Laws or other applicable laws.

(b)     The Administrator shall not purchase or direct MAV3 to purchase any asset for inclusion in the Managed Assets from the Administrator or any Affiliate of the Administrator or any account or portfolio for which the Administrator or any such Affiliate serves as investment adviser, or sell or direct MAV3 to sell any Managed Asset to the Administrator or any such Affiliate or any account or portfolio for which the Administrator or any such Affiliate serves as investment adviser unless such transaction is effected in compliance with all applicable requirements under the Investment Advisers Act, the Ontario Securities Act and other applicable Canadian Securities Laws.  The Administrator shall not engage in or direct MAV3 to engage in any agency cross transaction that would require MAV3's consent pursuant to Section 206(3) of the Investment Advisers Act and the rules and regulations promulgated thereunder, if they were applicable, unless such transaction is effected in compliance with Rule 206(3)-2 under the Investment Advisers Act.  For purposes of this clause (b), an "agency cross transaction" has the meaning assigned in Rule 206(3)-2(b) under the Investment Advisers Act to the term "agency cross transaction for an advisory client."  The Administrator hereby advises MAV3 that with respect to agency cross transactions, the Administrator or any other person relying on Rule 206(3)-2 shall act as broker for, receive commissions from, and have a potentially conflicting division of loyalties and responsibilities regarding both parties to such transactions.  MAV3 hereby gives its written consent prospectively authorizing the Administrator and any other person relying on Rule 206(3)-2 to effect agency cross transactions for MAV3, provided that to the extent required by law, such agency cross transactions shall be approved in the same manner as principal transactions as described in Section 8(a).  Such consent may be revoked at any time by written notice from MAV3 to the Administrator or such other person relying on Rule 206(3)-2, as applicable.  To the extent that MAV3's consent with respect to any particular transaction is required by law, no such transaction may be effected except in compliance with the provisions of clause (a) of this Section 8.  The Administrator shall (and shall use commercially reasonable efforts to cause any other person relying on Rule 206(3)-2 under the Investment Advisers Act with respect to agency cross transactions for MAV3 to) provide to MAV3 the reports specified in Rule 206(3)-2(a)(3) under the Investment Advisers Act.

In addition to the foregoing, the Administrator may direct MAV3 to enter into or purchase Eligible Investments issued by issuers managed or advised by the Administrator or one or more of its Affiliates in compliance with all applicable requirements under the Investment Advisers Act, the Ontario Securities Act and any other applicable Canadian Securities Laws and the applicable provisions of the AMA Transaction Documents.  Such Eligible Investments entered into or purchased by MAV3 may also include securities of an issuer or obligor, or securities sponsored or serviced by companies, for which the Administrator or an Affiliate has acted as underwriter, agent, placement agent, initial purchaser or dealer or for which the Administrator or an Affiliate has acted as lender or provided other commercial or investment banking services.  The Administrator will direct MAV3 to acquire such Eligible Investments in compliance with any applicable requirements under the Investment Advisers Act, the Ontario Securities Act and any other applicable U.S or Canadian law, including applicable Canadian Securities Laws.

(c)     Transactions between MAV3 and another account for which the Administrator is acting as the investment manager or in a similar capacity will generally be treated as "client cross" transactions that do not require MAV3's consent pursuant to Section 206(3) of the Investment Advisers Act and the rules and regulations promulgated thereunder unless the Administrator

has a proprietary interest in such other account that is so significant that the transaction must be treated as requiring MAV3's consent pursuant to Section 206(3) of the Investment Advisers Act and such rules and regulations. For the avoidance of doubt, the Administrator will not receive any additional fees as compensation for effecting such "client cross" transactions.

Section 9.    <u>Records</u>.  The Administrator shall maintain appropriate books of account and records relating to services performed hereunder, and such books of account and records shall be accessible for inspection by the Issuer Trustee and the independent accountants appointed by MAV3 pursuant to the AMA Transaction Documents upon prior written notice and at a time acceptable to the Administrator in its reasonable judgment during normal business hours.

Section 10.    <u>Obligations of the Administrator</u>.

(a)    Unless otherwise specifically required by any provision of this Agreement or any of the other AMA Transaction Documents or by applicable law, the Administrator shall, in accordance with Section 3(c) of this Agreement (which is in no way limited by the following), use its commercially reasonable efforts to ensure that no action is taken by it that would (i) not be permitted under MAV3's or, if applicable, the applicable Satellite Trust's constituent documents, (ii) violate any law, rule or regulation of any governmental body or agency of the United States or Canada having jurisdiction over MAV3 or the applicable Satellite Trust, the violation of which has or should reasonably be expected to have a material adverse effect on MAV3, the Managed Assets, taken as a whole, the Satellite Trusts, or any holders of the Notes, (iii) require registration with a regulatory authority or qualification by prospectus of MAV3, the Satellite Trusts, the Notes of MAV3 or any pool of Managed Assets under any applicable laws of the United States or Canada, (iv) cause MAV3 or the Satellite Trusts to violate the terms of the AMA Transaction Documents or any other agreement contemplated thereby, or (v) adversely affect the interests of the holders of the Notes in any material respect (other than as permitted under this Agreement or the other AMA Transaction Documents). The Administrator covenants that it shall comply in all material respects with all laws and regulations applicable to it in connection with the performance of its duties under this Agreement and the other AMA Transaction Documents.

(b)    If the Administrator is ordered to take any action by MAV3, which the Administrator determines, in its good faith judgment would have one or more of the consequences set forth in Section 10(a)(i) through (v) above, the Administrator shall promptly notify MAV3, the Noteholders, the Rating Agency, the Issuer Trustee and the Indenture Trustee and need not take such action unless MAV3 again requests the Administrator to take such action and notice of such further request has been provided to MAV3, the Rating Agency, the Issuer Trustee and the Indenture Trustee, such action has been consented to in writing by the holders of the Notes in accordance with the Trust Indenture and the Rating Agency Condition has been satisfied.  Notwithstanding any such request, the Administrator need not take such action unless arrangements satisfactory to it are made to insure or indemnify the Administrator from any liability it may incur as a result of such action. Notwithstanding anything contained in this Agreement to the contrary, any insurance or indemnification provided for in this Section 10 which is payable by MAV3 shall be payable out of the assets of MAV3 in accordance with the other AMA Transaction Documents.

(c)    MAV3 and the Administrator agree that it is in their mutual interest to resolve grievances and disputes by agreement.  If a grievance or dispute arises under this Agreement, the parties will make all reasonable efforts to resolve the grievance or dispute by mutual agreement.  If a grievance or dispute cannot be resolved informally by mutual agreement among the relevant parties at the lowest possible level, the grievance or dispute shall be referred up the respective chain of command of each party in an attempt to resolve the matter.  This will be done in an expeditious manner.  The Administrator shall continue  performance of the services required by this Agreement pending resolution

of any grievance or dispute. The parties agree to take all reasonable steps to resolve grievances and disputes among themselves before commencing legal proceedings. Nothing in this provision shall postpone or delay the exercise of resignation, termination or removal of rights pursuant to the notice periods prescribed by Section 13, including, for greater certainty, MAV3's right to terminate this Agreement or remove the Administrator for Cause.

       Section 11.   Liability; Indemnity.

       (a)   None of the Administrator, its Affiliates, Delegees or any stockholder, director, officer, employee, partner, member or manager of the Administrator, any of its Affiliates or Delegees will be liable for any error of judgment or mistake of law or for any loss suffered by MAV3, any Noteholder, any other party to the AMA Transaction Documents or otherwise in connection with the Administrator's performance of this Agreement or of its duties in any capacity under any other AMA Transaction Document, except a loss resulting from acts or omissions constituting fraud, willful misconduct, bad faith or gross negligence on the part of the Administrator or its Affiliates or Delegees in the performance by any of them of their duties or from reckless disregard by any of them of the duties under this Agreement or of the duties in any capacity under any other AMA Transaction Document; provided that, notwithstanding anything contained in this Agreement or any other AMA Transaction Document to the contrary (other than the exceptions set out in the immediately following sentence), the total aggregate amount of all such losses for which the Administrator and its Affiliates and Delegees shall be liable in connection with the AMA Transaction Documents, (for this purpose, such term including all documents included in the definitions of such term in this Agreement, the MAV1 AMA and the MAV2 AMA), the Excluded Underlying Documents (for this purpose, such term including all documents included in the definitions of such term in this Agreement, the MAV1 AMA and the MAV2 AMA), the letter agreements, dated the date hereof, between BlackRock Canada and MAV1, BlackRock Canada and MAV2 and BlackRock Canada and MAV3 and the letter agreements regarding BlackRock Financial's guarantee of BlackRock Canada's performance, dated the date hereof, between BlackRock Financial and MAV1, BlackRock Financial and MAV2 and BlackRock Financial and MAV3 (such aggregate amount, the "Liability Cap Amount") shall in no event exceed $30,000,000 (which, for the avoidance of doubt, shall be denominated in Canadian Dollars), excluding any losses arising from the fraud or willful misconduct of the Administrator or its Affiliates. The limitation on the aggregate amount of all losses for which the Administrator and its Affiliates and Delegees shall be liable set forth in the proviso to the immediately preceding sentence shall not apply in respect of any loss suffered by MAV3 arising solely by virtue of BlackRock Canada's failure to comply with its duties and obligations set out in Section 3(k) hereof during the period commencing on the date which is four months after the Closing Date and ending on the date which is 12 months after the Closing Date where such failure results from the fraud, willful misconduct, bad faith or gross negligence of BlackRock Canada, or reckless disregard of its obligations under Section 3(k) hereof.

       (b)   Notwithstanding anything in this Agreement or any other AMA Transaction Document to the contrary, the Administrator and its Affiliates shall not be liable for any consequential, incidental, exemplary, punitive, special or indirect losses or damages, regardless of whether the likelihood of such losses or damages was known by it.

       (c)   Without limitation of the foregoing and notwithstanding anything in this Agreement or any other AMA Transaction Document to the contrary, the Administrator, its Affiliates and their respective directors, officers, agents or employees (i) shall not be liable for losses, delays, failure, errors, interruption or loss of data occurring directly or indirectly by reason of circumstances beyond its reasonable control, including without limitation acts of God; action or inaction of civil or military authority; public enemy; war; terrorism; riot; fire; flood; sabotage; epidemics; labour disputes; civil commotion; interruption, loss or malfunction of utilities, transportation, computer or communications

capabilities; insurrection; elements of nature; or non-performance by a third party except for one of its Affiliates or a Delegee; (ii) shall not be under any duty or obligation to inquire into nor shall they be liable for the validity or invalidity, authority or lack thereof, or truthfulness or accuracy or lack thereof, of any instruction, direction, notice, instrument or other information reasonably believed by them to be genuine; (iii) may rely conclusively and act or refrain from acting in reliance on any information supplied by the Collateral Agent, the Administrative Agent or any other authorized representative of MAV3 or the administrative agent or the collateral agent in respect of the MAV2 Credit Facility; (iv) shall not be liable for any damages arising out of any action or omission to act by any prior service provider of MAV3 or any Satellite Trust or predecessor in interest thereof (including without limitation, any party provided a release in connection with the approval of the Plan) or for any failure to discover any such error or omission; (v) shall not be liable for any indebtedness or any other payment obligations of MAV3; and (vi) may consult with counsel, independent accountants and other experts selected by them or by MAV3 and shall not be liable for any action taken or omitted to be taken by them in accordance with their advice. The Administrator, its Affiliates and Delegees may rely on the information provided in the Monitor's Reports (including without limitation the Monitor's Implementation Report) and in the Schedules to the various AMA Transaction Documents (for example, lists of assets), and shall incur no liability as a result of such reliance, including without limitation, in the event that any such information may be incorrect or incomplete.  As set out in the Plan Implementation Order, the Administrator, its Affiliates and Delegees shall incur no liability as a result of any such reliance, including, without limitation, in the event that any such information may be incorrect or incomplete as a result of the failure of any Person (including, without limitation, any sponsor or financial institution) to (i) produce information required in order to provide advice or (ii) any inaccuracies or deficiencies in any such information provided to the Administrator, its Affiliates and Delegees.

(d)    MAV3 (in such case, the "<u>MAV Indemnifying Party</u>") shall indemnify and hold harmless the Administrator, its Affiliates, Delegees and any stockholder, director, officer, employee, partner, member or manager of the Administrator, its Affiliates or Delegees (such parties collectively in such case, the "<u>BlackRock Indemnified Parties</u>") from and against any and all losses, and shall reimburse each such BlackRock Indemnified Party for all reasonable fees and expenses (including reasonable fees and expenses of counsel) (collectively, the "<u>Expenses</u>", and any and all such losses and Expenses, collectively the "<u>Liabilities</u>") as such Expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, "<u>Actions</u>"), caused by, or arising out of or in connection with, (i) MAV3's issuance of the Notes and any other notes issued by MAV3, (ii) the transactions and agreements contemplated by the Information Statement, this Agreement or the other AMA Transaction Documents or the Excluded Underlying Documents, including, without limitation, acting as Administrator or in a similar capacity in respect of any satellite or other trust under any Included Underlying Document in accordance with Section 3(h) and acting to oversee the administrator appointed under any Excluded Underlying Document and any other capacity under any AMA Transaction Document or Excluded Underlying Document, (iii) any untrue statement of a material fact or omission of any material fact required to be stated in the Information Statement or necessary to make the statements in the Information Statement, in light of the circumstances under which they were made, not misleading, except with respect to information provided by the Administrator or BlackRock in writing for use therein describing the Administrator or BlackRock or their respective businesses, and/or (iv) any action taken by, or any failure to act by, such BlackRock Indemnified Party (in each case, regardless of the capacities in which such BlackRock Indemnified Party is engaged); <u>provided</u>, that no BlackRock Indemnified Party shall be indemnified for any Liabilities it incurs as a result of any acts or omissions by any BlackRock Indemnified Party arising by reason of its (A) fraud, (B) willful misconduct, (C) bad faith, (D) gross negligence or (E) reckless disregard of its obligations and duties.

(e)    Notwithstanding anything contained herein to the contrary, the obligations of the MAV Indemnifying Party under this Section 11 shall be payable solely out of the respective assets of the MAV Indemnifying Party in accordance with the AMA Transaction Documents and shall survive termination of this Agreement; provided that the Administrator shall be entitled to allocate such obligations of the MAV Indemnifying Party under this Section 11 in accordance with the Indemnity Allocation Principles.

(f)    With respect to any Action made or threatened against a BlackRock Indemnified Party, or compulsory process or request or other notice of any liability served upon a BlackRock Indemnified Party, for which such BlackRock Indemnified Party is or may be entitled to indemnification under this Section 11, such BlackRock Indemnified Party shall (or with respect to BlackRock Indemnified Parties that are stockholders, directors, officers, employees, partners, members or managers of the Administrator or any of its Affiliates or Delegees, the Administrator shall cause such BlackRock Indemnified Party to):

(i)    give written notice to the MAV Indemnifying Party of such Action within 10 Business Days after such BlackRock Indemnified Party's receipt of actual notice that such Action is made or threatened, which notice to the MAV Indemnifying Party shall specify in reasonable detail the nature of the Action made or threatened and the amount of the Action made or threatened; provided, that the failure of any BlackRock Indemnified Party to provide such notice to the MAV Indemnifying Party shall not relieve the MAV Indemnifying Party of its obligations under this Section 11 unless the MAV Indemnifying Party is materially prejudiced or otherwise forfeits rights or defenses by reason of such failure;

(ii)    at the MAV Indemnifying Party's reasonable third party expense (for greater clarity, with respect to costs related to indemnified claims), provide the MAV Indemnifying Party such information and cooperation with respect to such Action as the MAV Indemnifying Party may reasonably require, including, but not limited to, making appropriate personnel available to the MAV Indemnifying Party at such reasonable times as the MAV Indemnifying Party may request, provided that to the extent that the BlackRock Indemnified Party is subsequently determined not to have been entitled to indemnification hereunder, the BlackRock Indemnified Party shall repay to the MAV Indemnifying Party any such expense borne by the MAV Indemnifying Party;

(iii)    at the MAV Indemnifying Party's reasonable third party expense (for greater clarity, with respect to costs related to indemnified claims), cooperate and take all such commercially reasonable steps as the MAV Indemnifying Party may reasonably request to preserve and protect any defense to such Action;

(iv)    in the event suit is brought with respect to such Action, upon reasonable prior notice, afford to the MAV Indemnifying Party the right, which the MAV Indemnifying Party may exercise in its sole discretion and at its expense, to participate in the investigation, defense and settlement of such Action;

(v)    neither release or settle any such Action or make any admission with respect thereto (other than routine or incontestable admissions or factual admissions the failure to make which would expose such BlackRock Indemnified Party to unindemnified liability) nor permit a default judgment nor consent to the entry of any judgment in respect thereof, in each case without the prior written consent of the MAV Indemnifying Party, so long as the MAV Indemnifying Party shall have advised such

BlackRock Indemnified Party that such BlackRock Indemnified Party is entitled to be indemnified hereunder with respect to such Action; and

(vi)    upon reasonable prior notice, afford to the MAV Indemnifying Party the right, in its sole discretion and at its sole expense, to assume the defense of such Action, including, but not limited to, the right to designate counsel reasonably acceptable to the BlackRock Indemnified Party and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of such Action; provided, that if the MAV Indemnifying Party assumes the defense of such Action, it shall not be liable for any fees and expenses of counsel for any BlackRock Indemnified Party incurred thereafter in connection with such Action except that if such BlackRock Indemnified Party reasonably determines that counsel designated by the MAV Indemnifying Party has a conflict of interest between the MAV Indemnifying Party and the BlackRock Indemnified Party, such MAV Indemnifying Party shall pay the reasonable fees and disbursements of one counsel (in addition to any local counsel) separate from its own counsel for all BlackRock Indemnified Parties in connection with any one action or separate, but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; provided, further, that prior to entering into any final settlement or compromise, such MAV Indemnifying Party shall seek the written consent of the BlackRock Indemnified Party and shall not enter into any such final settlement or compromise without the written consent of such BlackRock Indemnified Party, which consent shall not be unreasonably withheld, as to the terms of settlement or compromise, unless such settlement or compromise includes a release of such BlackRock Indemnified Party from all Liabilities arising out of such Action and does not impose any liability or obligation on such BlackRock Indemnified Party or make any findings adverse to such BlackRock Indemnified Party.  If a BlackRock Indemnified Party does not consent to the settlement or compromise within a reasonable time under the circumstances, the MAV Indemnifying Party shall not thereafter be obligated to indemnify the BlackRock Indemnified Party for any amount in excess of such proposed settlement or compromise.

(g)    In the event that any BlackRock Indemnified Party waives its right to indemnification hereunder, the MAV Indemnifying Party shall not be entitled to appoint counsel to represent such BlackRock Indemnified Party nor shall the MAV Indemnifying Party reimburse such BlackRock Indemnified Party for any costs of counsel to such BlackRock Indemnified Party.

(h)    Nothing in this Agreement is intended to, or shall, constitute a waiver of any legal rights or remedies that the holders of the Notes and MAV3 may otherwise have under any applicable law, except as may be otherwise restricted in the AMA Transaction Documents.

Section 12.    Release under the Plan; Other Conditions Precedent.

(a)    MAV3 agrees and acknowledges that BlackRock has not had any responsibility for the administration of MAV3 or any Existing Conduit or Satellite Trust (or any other vehicle existing prior to and including the time of closing on the Closing Date, which may become subject to BlackRock's administration in connection with the Plan after the time of closing on the Closing Date) or management of the Managed Assets or Original Collateral or any Swap Agreements or Hedging Agreements (or any other asset existing prior to and including the time of closing on the Closing Date, which may become subject to BlackRock's management in connection with the Plan after time of closing on the Closing Date) prior to and including the time of closing on the Closing Date, and does not have any responsibility or liability associated with the transfer and novation of assets (including swap

24

transactions) and assumption of liabilities in connection with the restructuring under the Plan. The effectiveness of this Agreement and the obligations of the Administrator hereunder are conditioned upon BlackRock being a "Released Party" in connection with the Plan and thereby being released and discharged from all claims and demands in respect of any act or omission existing on or prior to the Closing Date on the same terms as those applicable to the other "Released Parties" under the Plan.

    (b) The effectiveness of this Agreement and the obligations of the Administrator hereunder shall be further conditioned upon:

     (i) all necessary approvals of the Plan by the affected creditors (and security holders) have been obtained and the Plan has been approved, sanctioned and confirmed by a court of competent jurisdiction pursuant to the applicable provisions of the CCAA under a final, binding and non-appealable order satisfactory to the Administrator, acting reasonably;

     (ii) the closing of the transactions provided for in the Plan has been completed to the satisfaction of the Administrator, acting reasonably;

     (iii) the Administrator, on behalf of itself and the other BlackRock Indemnified Parties (as defined in Section 11 hereof) shall have obtained the benefit of a perfected security interest in all present and future assets of MAV3 securing all of the present and future obligations of MAV3 to the Administrator and the BlackRock Indemnified Parties hereunder including compensation, expense reimbursement obligations and indemnity obligations under Section 6 hereof, and indemnity obligations under Section 11 hereof, all in accordance with the terms of the applicable AMA Transaction Documents;

     (iv) delivery of an opinion of Goodmans LLP, counsel to the Pan-Canadian Investors Committee for Third-Party Structured Asset-Backed Commercial Paper, in form and substance reasonably acceptable to the Administrator as to (A) no contravention of law in respect of MAV3 with respect to this Agreement, (B) the creation and perfection of the security interests in favor of the Collateral Agent for the benefit of the Specified Creditors, (C) certain Canadian securities law matters relating to the issuance of the Notes, and (D) enforceability against MAV3 of the Indenture, the Ineligible Asset Note Indenture and each Excluded Administration Agreement;

     (v) delivery of an opinion of Fasken Martineau DuMoulin LLP or its agency Nova Scotia counsel, McInnes Cooper, counsel to the Issuer Trustee, in form and substance reasonably acceptable to the Administrator as to (A) the formation and constitution of MAV3, (B) due authorization, execution and delivery, power and authority, no consents or authorizations, no conflict with the Declaration of Trust, and (C) due authorization, execution and delivery by MAV3 with respect to this Agreement and other AMA Transaction Documents;

     (vi) delivery of opinions of external and internal counsel to the Administrator and BlackRock in form and substance reasonably acceptable to MAV3 and the Rating Agency with respect to due authorization, execution and delivery, power and authority, enforceability, no consents or authorizations, and no contravention of law in respect of the Administrator;

(vii)   delivery of an opinion of Torys LLP, special US counsel to MAV3, reasonably acceptable to the Administrator in form and substance with respect to (A) US legal matters, including US securities law (US Securities Act of 1933 and US Investment Company Act of 1940) and (B) enforceability of this Agreement against MAV3 under New York law;

(viii)   delivery of an opinion of counsel to each of the following acting on behalf of, or providing facilities to, MAV3: Indenture Trustee and Collateral Agent, in form and substance reasonably acceptable to the Administrator with respect to customary corporate matters in connection with the Indentures;

(ix)   BlackRock Financial and the Administrator being named as an addressee on all legal opinions delivered on the Closing Date;

(x)   the Administrator shall have received such opinions of local counsel or other confirmation satisfactory to it that all security registrations required under applicable law have been filed or will be filed concurrently on the Closing Date;

(xi)   any reference to activities of the Administrator in the Monitor's Implementation Report or any Monitor Reports delivered on or before the implementation of the Plan shall be, in form and substance, satisfactory to the Administrator; and

(xii)   the Plan and the Plan Implementation Order shall be, in form and substance, satisfactory to the Administrator.

(c)   The Administrator shall deliver a certificate on the Closing Date confirming satisfaction or waiver of the conditions set forth in paragraphs (a) and (b) above, other than in respect of paragraph (b)(vi), as to which, together with all other items set forth under paragraphs (a) and (b) above, satisfaction by MAV3 shall be conclusively deemed to have occurred by its execution of this Agreement.

Section 13.    <u>Duration and Termination</u>.

(a)   Subject to the provisions of Section 12 above, this Agreement shall become effective on the date first set forth above and shall continue in effect until the earlier to occur of (i) the final distribution on the Notes in accordance with the Indenture and (ii) termination pursuant to the provisions of paragraph (b) set forth below.

(b)   The Administrator may terminate this Agreement or otherwise resign as Administrator hereunder at any time without penalty upon giving sixty days' written notice to MAV3 and the Rating Agency.  MAV3 may terminate this Agreement or remove the Administrator hereunder for Cause upon ten Business Days' written notice; <u>provided</u>, that (1) such termination or removal has been approved by the holders of Notes constituting a Voting Class Supermajority and (2) notice of such termination or removal shall have been given to all holders of the Notes and the Rating Agency; <u>provided</u>, <u>further</u>, that in the case of an event described in clauses (ii) and (iii) below, the Administrator will be automatically removed upon the occurrence of such event without any requirement of notice to or consent of any person.  For purposes of this Agreement, "<u>Cause</u>" shall mean any one of the following events:

(i)   any violation by the Administrator of any provision of this Agreement or other AMA Transaction Document applicable to it which violation (a)

26

constitutes gross negligence, bad faith or willful misconduct or a reckless disregard by it of its duties under this Agreement, (b) has a material adverse effect on the holders of the Notes taken as a whole and (c) if capable of being cured, is not cured within 10 Business Days of the Administrator becoming aware or receiving notice from MAV3 or the Indenture Trustee of such violation;

(ii)    the occurrence of an act by the Administrator that constitutes fraud or criminal activity in the performance of its obligations under this Agreement, or the indictment of the Administrator for, or the indictment of any of its executive officers having responsibility over the management of the Administrator (without having been suspended or removed from management duties) for a criminal offense materially related to its primary business of managing collateral or investments or its investment advisory activities;

(iii)    the Administrator or BlackRock Financial is wound up or dissolved or there is appointed over it or all or substantially all of its assets a receiver, administrator, administrative receiver, trustee or similar officer; or the Administrator or BlackRock Financial (w) ceases to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of or enters into any composition or arrangement with, its creditors generally; (x) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Administrator or BlackRock Financial, as applicable, or of all or substantially all of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Administrator or BlackRock Financial, as applicable, and continue undismissed for 60 consecutive days; (y) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Administrator or BlackRock Financial, as applicable, without such authorization, application or consent and are approved as properly instituted and remain undismissed for 60 consecutive days or result in adjudication of bankruptcy or insolvency or (z) permits or suffers all or substantially all of its properties or assets to be sequestered or attached by court order and the order remains undismissed for 60 consecutive days; or

(iv)    if, after the first anniversary of the Closing Date, BlackRock Canada shall cease to maintain a physical office in Canada and shall have failed, within 60-days thereof, to re-establish a physical office in Canada , or (B) if BlackRock Canada shall have breached any of its other obligations under Section 3(k) of this Agreement and, on the 60th day after the Issuer Trustee (on behalf of MAV3), any Noteholder has given notice of such breach to BlackRock Canada, such breach has not been cured in all material respects.

(c)    The holders of Notes constituting the Voting Class Supermajority may remove the Administrator hereunder effective (subject to Section 13(d) below) upon any Payment Date following the fourth anniversary of the Closing Date; provided, that notice of such removal must be provided to the Administrator at least sixty (60) (but no more than ninety (90)) Business Days' prior to such Payment Date; provided, further, that MAV3 shall pay to the Administrator on such Payment Date a make-whole amount equal to the fees that would have been payable to the Administrator pursuant to

1363421.20-New York Server 7A - MSW

Section 6(a) on such Payment Date and the following three (3) Payment Dates assuming the Fee Basis Amount remained the amount it was on the Payment Date on which such removal occurred.  The Administrator shall notify the Rating Agency as soon as reasonably practicable after its receipt of the notice set forth in the first proviso of the immediately preceding sentence.

(d)     Notwithstanding anything to the contrary herein, no resignation of the Administrator or removal of the Administrator under this Agreement or termination of this Agreement by MAV3 shall be effective unless (i) a successor administrator has, pursuant to a written agreement, effectively assumed all of the Administrator's future duties and obligations hereunder and (ii) the successor administrator has been approved by the holders of Notes constituting a Voting Class Majority and notice of the meeting of Noteholders to consider such matter has been provided to the Rating Agency; provided, that in the event that a successor administrator shall not have been appointed within 90 days after the date of notice of resignation or of the termination or removal of the Administrator by MAV3 (or within 60 days following a removal under clause (iii) of the definition of "Cause"), (A) the Administrator shall be entitled to appoint a successor administrator and assign its rights and obligations under this Agreement to such successor on or after such 90th day (or 60th day, as the case may be) so long as such assignment (x) shall not result in MAV3 or the relevant pool of Managed Assets, including Eligible Investments, being required to obtain any registration, license or permit under applicable laws of the United States and Canada, and (y) such successor is legally qualified and has the capacity to act as Administrator under this Agreement, and is not objected to in writing by the holders of Notes constituting a Voting Class Majority within 30 days following such appointment by the Administrator and notice thereof to the holders of the Notes and the Rating Agency, or (B) in lieu of such an appointment by the Administrator or if the successor administrator appointed by the Administrator is disapproved, the Administrator or the Indenture Trustee or MAV3 may petition any court of competent jurisdiction for the appointment of a successor administrator, which appointment shall not be subject to any Noteholder consent or approval, provided that nothing in this Section 13(d) shall be construed as preventing any interested Secured Creditor from making submissions to the court regarding any proposed successor administrator.

Section 14.     No Partnership or Joint Venture.  MAV3 and the Administrator are not partners or joint venturers with each other, and nothing herein shall be construed to make them such partners or joint venturers or impose any liability as such on any of them.  The Administrator's relation to MAV3 shall be deemed to be that of an independent contractor and shall, unless otherwise provided herein or in the AMA Transaction Documents or authorized by MAV3 from time to time, have no authority to act for or represent MAV3 in any way or otherwise be deemed an agent of MAV3.

Section 15.     Representations, Warranties and Covenants.

(a)     MAV3 hereby repeats for the benefit of the Administrator its representations, warranties and covenants provided in the Indenture as of the date hereof.

(b)     The Issuer Trustee hereby agrees and acknowledges, solely in its capacity as Issuer Trustee of MAV3 and not in its personal capacity and without personal liability, that it will exercise commercially reasonable efforts to cooperate with the Administrator to facilitate the execution of MAV3's obligations under the AMA Transaction Documents. The Administrator hereby agrees and acknowledges that it will exercise commercially reasonable efforts to cooperate with the other Service Providers to facilitate the execution of MAV3's obligations under the AMA Transaction Documents.

(c)     BlackRock Canada hereby represents and warrants to MAV3 as follows as of the date hereof:

(i)    It is a corporation duly organized, validly existing and in good standing under the laws of the Province of New Brunswick and has full power and authority to own its assets and to transact the business in which it is currently engaged and is duly qualified and in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under this Agreement and the provisions of the AMA Transaction Documents applicable to it would require, such qualification, except for those jurisdictions in which the failure to be so qualified, authorized or licensed would not have a material adverse effect on the business, operations, assets or financial condition of BlackRock Canada or on the ability of BlackRock Canada to perform its obligations under, or on the validity or enforceability of, this Agreement and the provisions of the AMA Transaction Documents applicable to BlackRock Canada.

(ii)    It has full power and authority to execute, deliver and perform this Agreement and all obligations required hereunder and under the provisions of the AMA Transaction Documents applicable to it, and has taken all necessary action to authorize this Agreement on the terms and conditions hereof and the execution, delivery and performance of this Agreement and the performance of all obligations imposed on it hereunder and under the terms of the AMA Transaction Documents.  No consent of any other person, including, without limitation, shareholders and creditors of BlackRock Canada, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority that has not been obtained is required by BlackRock Canada in connection with the execution, delivery, performance, validity or enforceability of this Agreement or the provisions of the AMA Transaction Documents applicable to BlackRock Canada or the obligations required hereunder or thereunder.  This Agreement has been, and each instrument and document required hereunder or under the terms of the other AMA Transaction Documents shall be, executed and delivered by a duly authorized officer of BlackRock Canada.

(iii)    The execution, delivery and performance of this Agreement, and the terms of the other AMA Transaction Documents applicable to BlackRock Canada and the agreements required hereunder or under the terms of the other AMA Transaction Documents, does not violate or conflict with (A) to the knowledge of BlackRock Canada, any provision of any existing law or regulation binding on BlackRock Canada, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on BlackRock Canada, or (B) the constituent documents of, or any securities issued by, BlackRock Canada or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which BlackRock Canada is a party or by which BlackRock Canada or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of BlackRock Canada or its ability to perform its obligations under this Agreement, and does not result in or require the creation or imposition of any lien on any of its material property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.

(iv)    There is no charge, investigation, action, suit or proceeding before or by any court pending or, to the best knowledge of BlackRock Canada, overtly threatened that, if determined adversely to BlackRock Canada, would have a material adverse effect upon the performance by BlackRock Canada of its duties

29

under, or on the validity or enforceability of, this Agreement or the provisions of the AMA Transaction Documents applicable to BlackRock Canada thereunder.

(v)    It is a registered investment counsel and portfolio manager (non-Canadian Advisor) under the Ontario Securities Act and a registered portfolio manager and investment counsel (foreign) under the Alberta Securities Act and it is not required to register as an investment adviser under the Investment Advisers Act, and is in compliance in all material respects with all applicable regulations under such acts.

(vi)    It is not in violation of its constating documents or in breach or violation of or in default under any contract or agreement to which it is a party or by which it or any of its assets may be bound, or, to the knowledge of BlackRock Canada, any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over BlackRock Canada or its properties, the breach or violation of which or default under which would have a material adverse effect on the performance by BlackRock Canada of its duties under, or on the validity or enforceability of this Agreement or the provisions of the AMA Transaction Documents applicable to BlackRock Canada, or the performance by BlackRock Canada of its duties hereunder or thereunder.

(vii)    BlackRock as a whole has policies and procedures in place applicable to BlackRock Canada to address conflicts of interest in respect of its clients in accordance with applicable law.

(viii)    BlackRock as a whole has in place disaster recovery procedures and customary insurance coverage appropriate for and applicable to its businesses and entities, including BlackRock Canada.

(ix)    On the Closing Date, BlackRock Canada and BlackRock Financial together hold less than 10% of all notes issued by MAV3 by principal balance.

(x)    It has an office located in Canada with one full-time senior employee engaged in the active conduct of its business in Canada.

(d)    Notwithstanding anything to the contrary herein, the representations, warranties and covenants of MAV3 set forth in any AMA Transaction Document are solely the obligations of MAV3 and not of the Administrator. The Administrator is responsible solely for its own representations, warranties and covenants and duties expressly set forth with respect to the Administrator (in its capacity as administrator and asset manager, or as Spread/Loss Trigger Calculation Agent or Valuation Agent) herein and in the other AMA Transaction Documents.

Section 16.    Notice.

(a)    All communications and notices pursuant to this Agreement shall be by fax or letter delivered by hand or by electronic mail.  Each such communication or notice shall be made to the relevant party at the fax number or address or electronic address and, in the case of a communication or notice by fax or letter, marked for the attention of, or (in the case of a communication by electronic mail) made to such person or department from time to time specified in writing by the recipient party to the others for such purpose.  The initial fax number, address, electronic address and person or department so specified by each party are set out in Schedule A hereto.  All communications or notices delivered

verbally by telephone shall only be binding if followed immediately by a confirmation in writing by fax, electronic mail or letter.

(b)     A communication or notice shall be deemed received (if by fax) when an acknowledgement of receipt is received, (if by electronic mail) when made or (if by letter) when delivered, in each case in the manner required by this Section 16.  However, if a communication is received after 5:00 pm on any Business Day or on a day which is not a Business Day, it shall be deemed to be received and become effective at the opening of business on the next day which is a Business Day.  Every communication or notice shall be irrevocable except in respect of any manifest error in it.

(c)     To the extent the Rating Agency Condition and/or any notification requirement (in the case of Noteholders or any other party) in respect of a particular subject matter is satisfied pursuant to any AMA Transaction Document (other than this Agreement), any notice in respect of such subject matter to be provided hereunder shall not separately be required.

Section 17.    Costs and Expenses.  Except as may otherwise be agreed in writing, the costs and expenses (including the fees and disbursements of counsel and accountants) incurred by each party in connection with the negotiation and preparation of and the execution of this Agreement, the other AMA Transaction Documents and all matters incident thereto, shall be borne by MAV3; provided that the Administrator's costs and expenses in connection therewith shall be borne proportionately by principal amount of notes issued on the Closing Date among MAV3, MAV2 and MAV1 and be paid on the Closing Date.

Section 18.    Governing Law, Submission to Jurisdiction; Venue; Etc.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.  Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdictions of (i) the courts of the State of New York sitting in the Borough of Manhattan and of the United States District Courts for the Southern District of New York, and any appellate court from any thereof, and (ii) the courts of the Province of Ontario, Canada, in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of this Agreement (each a "Proceeding"), and each party hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such Proceeding may be heard and determined in such courts.  With respect to any such Proceeding, each party hereto hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, (i) any objection which it may now or hereafter have to the laying of venue in accordance with this Section 18, (ii) the defense of an inconvenient forum in contravention of this Section 18, and (iii) any right to trial by jury.  In the event that any provision of this Agreement or the application thereof to any person or in any circumstance shall be determined to be invalid, unlawful or unenforceable to any extent, the remainder shall be unaffected and shall continue to be valid and may be enforced to the fullest extent permitted by law.

**THE PARTIES HERETO IRREVOCABLY CONSENT TO THE SERVICE OF ANY AND ALL PROCESS IN ANY ACTION OR PROCEEDING BY THE MAILING OR DELIVERY OF COPIES OF SUCH PROCESS TO EACH SUCH PARTY AT THE ADDRESS REFERRED TO IN SECTION 16.  THE PARTIES HERETO AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.**

MAV3 hereby appoints CT Corporation System, with offices currently at 111 Eighth Avenue, New York, New York 10011, and the Administrator hereby appoints BlackRock Financial, with its offices currently at 40 East 52nd Street, New York, NY 10022, in each case, as its designee, appointee

and agent to receive and accept for and on its behalf service of any and all legal process, summons, notices and documents that may be served in any action, suit or proceeding brought against it in any court of the State of New York or in the United States District Court for the Southern District of New York.

Section 19.    Assignments; Delegation.

(a)    This Agreement and the obligations and duties of the Administrator hereunder may be assigned or delegated in whole or in part by the Administrator to the extent set forth below.

(b)    Any assignment of this Agreement to any person by the Administrator (other than in connection with (1) a change of control of the Administrator covered in Section 19(c), (2) a BlackRock Change of Control that does not result in a significant change in the personnel carrying out the Administrator's duties under this Agreement or (3) an assignment to an Affiliate of the Administrator) shall be deemed null and void unless (i)  advance notice of such proposed assignment has been provided to MAV3, the holders of the Notes, the Issuer Trustee, the Collateral Agent and the Indenture Trustee, (ii) the Rating Agency Condition in respect of all Notes that are then rated has been satisfied and (iii) such assignment is consented to in writing in advance by the Voting Class Majority; provided that any "actual assignment" (for the avoidance of doubt, an "actual assignment" of this Agreement is an assignment not arising from a change of control or BlackRock Change of Control) by the Administrator to a non-Affiliate shall be subject to satisfaction of the Rating Agency Condition; provided, further, that the Administrator shall be permitted to assign any or all of its rights to any of its Affiliates, so long as (v) advance notice is provided to the Rating Agency, MAV3, the holders of the Notes, the Issuer Trustee, the Collateral Agent and the Indenture Trustee, (w) such an assignment does not constitute an "assignment" as defined under the Investment Advisers Act and the rules and regulations thereunder (as if they were applicable), (x) such assignment shall not result in MAV3 or its pool of assets, including the Managed Assets (including Eligible Investments) and the Traditional Asset Hedging Agreements being required to register as an "investment company" under the Investment Company Act, (y) such Affiliate or subsidiary of such Affiliate (1) is able to professionally and competently perform the duties imposed upon the Administrator under this Agreement, (2) is legally qualified and has the capacity to act as Administrator under this Agreement, (3) is not a non-resident of Canada for purposes of the *Income Tax Act* (Canada), (4) otherwise complies with this Agreement, and (5) such Affiliate's or subsidiary's obligations hereunder are fully guaranteed by BlackRock Financial to the same extent as those of the Administrator before the event occurred, and (z) such an assignment shall not result in MAV3 or any Satellite Trust being required to obtain any registration, license or permit under, or being in violation of, applicable laws of the United States and Canada; provided, further, that upon such assignment by the Administrator to such Affiliate, "BlackRock Canada" or "Administrator" as used herein shall be deemed to mean such Affiliate. Any permitted assignment in accordance with this paragraph (b) shall bind the assignee hereunder in the same manner as the Administrator is bound, and the assignee shall execute and deliver to MAV3 and the Collateral Agent a counterpart of this Agreement naming such assignee as Administrator, Valuation Agent and Spread/Loss Trigger Calculation Agent and acknowledging release of the Administrator. Upon the execution and delivery of such a counterpart by the assignee, the Administrator shall be released from all obligations arising thereafter as Administrator pursuant to this Agreement.  For greater certainty, no assignment will release the Administrator in respect of liabilities arising prior to such assignment.

(c)    Notwithstanding the above, any corporation, partnership or limited liability company into which the Administrator may be merged, amalgamated, arranged or converted or with which it may be consolidated, or any corporation, partnership or limited liability company resulting from any merger, amalgamation, arrangement, conversion or consolidation to which the Administrator shall be a party, or any corporation, partnership or limited liability company succeeding to all or substantially all of the collateral management business of the Administrator, shall be the successor to the Administrator

32

without any further action by the Administrator, MAV3, the Issuer Trustee or any other person or entity so long as (i) the Administrator provides notice to the Rating Agency at least 10 Business Days prior to the consummation of such transaction, (ii) the successor entity is an Affiliate of BlackRock and is not a non-resident of Canada for purposes of the *Income Tax Act* (Canada) and (iii) the Administrator's obligations hereunder are fully assumed by such successor and such obligations are fully guaranteed by BlackRock Financial to the same extent as those of the Administrator before the event occurred; provided, that the Administrator shall comply with the requirements of the Investment Advisers Act and any applicable Canadian regulations regarding investment advisors in each instance, including with respect to any change of control.

(d)    The Administrator may delegate any of its obligations or duties and MAV3 acknowledges that the Administrator intends to delegate to BlackRock Financial; provided that the delegation shall not breach BlackRock Canada's obligations under Section 3(k) hereof; provided, further that the Administrator shall provide advance notice of its proposed delegation (other than any delegation to an Affiliate of the Administrator and except as permitted under the AMA Transaction Documents and any software licensing or other similar agreement) to MAV3, the Issuer Trustee, the Indenture Trustee, the Collateral Agent and the Rating Agency; provided, that no delegation of obligations or duties by the Administrator shall relieve the Administrator from any liability hereunder except as specifically provided herein..

(e)    This Agreement shall not be assigned by MAV3 without the prior written consent of the Administrator other than (i) in the case of assignment by MAV3 to an entity which is a successor thereto permitted under the AMA Transaction Documents, in which case such successor organization shall be bound hereunder and by the terms of said assignment in the same manner as MAV3 is bound thereunder and (ii) as collateral security to the Collateral Agent pursuant to the Master Security Agreement.  In the event of any assignment by MAV3 pursuant to clause (i), MAV3 shall use its best efforts to cause its successor to execute and deliver to the Administrator such documents as the Administrator shall consider reasonably necessary to effect fully such assignment.

(f)    Subject to this Section 19, all services hereunder are to be furnished through the medium of any trustees, officers, employees or delegates of the Administrator or its Affiliates as the Administrator deems appropriate in order to fulfill its obligations hereunder.

Section 20.    Written Disclosure Statement.  MAV3 acknowledges receipt of Part II of BlackRock Financial's Form ADV no later than 48 hours prior to the date of execution of this Agreement. BlackRock Canada shall provide MAV3, at no expense to MAV3, annually with a copy of BlackRock Financial's Form ADV, Part II within seven days of receipt of a written request therefor from MAV3.

Section 21.    Survival of Representations, Warranties and Indemnities.  Each representation and warranty made or deemed to be made herein or pursuant hereto, and each indemnity provided for hereby, together with the provisions of Section 11, Section 22 and Section 23, and this Section 21 shall survive the execution and delivery and any termination or assignment of this Agreement or the resignation or removal of the Administrator.

Section 22.    Limited Recourse.  The Administrator hereby acknowledges and agrees that the obligations of MAV3 hereunder shall be solely the obligations of MAV3, and the Administrator shall not have any recourse to the Issuer Trustee, the Indenture Trustee, or holders of securities or Affiliates of MAV3 with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby.  Notwithstanding any other provision of this Agreement to the contrary, recourse in respect of any obligations of MAV3 hereunder shall be limited to the assets of MAV3 available for the payment therefor pursuant to the Indenture and on the exhaustion

thereof all obligations of and claims against MAV3 arising from this Agreement or any transactions contemplated hereby shall be extinguished and shall not thereafter revive. The obligations of the Issuer Trustee hereunder are binding upon the Issuer Trustee in its capacity as issuer trustee of MAV3 only, and, except where liability is expressly imposed on the Issuer Trustee hereunder, recourse shall not be had to the property of the Issuer Trustee, except in its capacity as issuer trustee, but only to the assets and property of MAV3.

Section 23.    Non-Petition. The Administrator hereby agrees that it will not institute against MAV3, or voluntarily join in any institution against MAV3 of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, fraudulent preference or fraudulent conveyance proceedings, or other proceedings under any bankruptcy or similar law of the United States or Canada or any political subdivision of either thereof, or under any similar law of any other jurisdiction in connection with any obligations owing to it for a period of one year (or, if longer, the applicable preference period then in effect) and one day following the date on which MAV3 has made all payments payable by it in respect of all notes issued by MAV3. Notwithstanding anything herein to the contrary, nothing shall preclude, or be deemed to estop, the Administrator (i) from taking any action in (A) any case or proceeding voluntarily filed or commenced by MAV3 or (B) any involuntary bankruptcy or insolvency proceeding filed or commenced by a person other than the Administrator or an Affiliate of the Administrator, or (ii) from commencing against MAV3 or any of its properties any legal action that is not a bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding, fraudulent preference or fraudulent conveyance proceedings.

Section 24.    Acts and Obligations of MAV3; Issuer Trustee.

(a)    MAV3 shall act at all times in respect of this Agreement through the Issuer Trustee or any agent (or permitted delegee of such agent) (other than the Administrator), attorney or representative thereof. The Administrator shall be entitled to assume that any Responsible Officer of the Issuer Trustee executing documents on behalf of MAV3 is authorized to do so unless the Administrator has actual knowledge to the contrary.

(b)    It is expressly understood and agreed by the parties hereto that: (i) this Agreement is executed and delivered by the Issuer Trustee, not individually or personally but in its capacity as trustee of Master Asset Vehicle III in the exercise of the powers and authority conferred and vested in it; (ii) each of the representations, warranties, undertakings, covenants, indemnities, agreements and other obligations herein made on the part of MAV3 is made and intended not as personal representations, undertakings, covenants, indemnities, agreements and other obligations by the Issuer Trustee but is made and intended for the purpose of binding only the property and assets of Master Asset Vehicle III; (iii) nothing herein contained shall be construed as creating any liability on the Issuer Trustee in its personal capacity, the beneficiaries or any incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Issuer Trustee or any predecessor or successor of the Issuer Trustee, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto; (iv) under no circumstances shall the Issuer Trustee in its personal capacity, the beneficiaries or any incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Issuer Trustee or any predecessor or successor of the Issuer Trustee be personally liable for the payment of any indebtedness or expenses of Master Asset Vehicle III or be liable for the breach or failure of any representation, warranty, undertaking, covenant, indemnity, agreement or other obligation made or undertaken by Master Asset Vehicle III under this Agreement or any other AMA Transaction Document, other than in respect of its own fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of its obligations and duties; (v) except as otherwise specifically provided in the AMA Transaction Documents, no property or assets of the Issuer Trustee,

34

whether owned beneficially by it in its personal capacity or otherwise than in its capacity as issuer trustee of Master Asset Vehicle III, will be subject to levy, execution or other enforcement procedures with regard to any of the representations, warranties, covenants, undertakings, indemnities, agreements and other obligations of the Issuer Trustee or MAV3 under such written instrument; and (vi) no recourse may be had or taken, directly or indirectly, against the Issuer Trustee in its personal capacity, the beneficiaries or any incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Issuer Trustee or any predecessor or successor of the Issuer Trustee with regard to the representations, warranties, undertakings, covenants, indemnities, agreements and other obligations of MAV3 or the Issuer Trustee or any beneficiary, incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Issuer Trustee or any predecessor or successor of the Issuer Trustee under such written instrument other than in respect of such Person's own fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of its obligations and duties.

(c)    It is the intention of the parties hereto that the limitation of liability conferred by Section 24(b) above on the beneficiaries, incorporators, Affiliates, shareholders, directors, officers, representatives, employees, managers, members, advisors, agents or successors and assigns of the Issuer Trustee and of any beneficiaries of MAV1 shall be enforceable by each such Person as fully and effectively as if it is a party to this Agreement or any other AMA Transaction Document and notwithstanding any law that otherwise might deprive it of the benefit of Section 24(b) due to lack of privity or want of consideration.

Section 25.    <u>Counterparts</u>.  This Agreement may be executed in counterparts and by facsimile and any other means of electronic communication, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

Section 26.    <u>Severability</u>.  In case any provision in this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

[SIGNATURE PAGE FOLLOWS]

1363421.20-New York Server 7A - MSW

IN WITNESS WHEREOF, the parties hereto have caused the foregoing instrument to be executed as of the day and the year first above written.

BLACKROCK (INSTITUTIONAL) CANADA, LTD.

By: _____
     Name:
     Title:

CIBC MELLON GLOBAL SECURITIES SERVICES COMPANY, in its capacity as Issuer Trustee of MASTER ASSET VEHICLE III

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

**POSTING VERSION: Subject to minor revisions
/ Schedules subject to updating**

SCHEDULE A

ADDRESSES

**CIBC Mellon Global Securities Services Company**,
as Issuer Trustee of **Master Asset Vehicle III**
320 Bay Street
P.O. Box 1
Toronto, Ontario M5H 4A6
Attn: ●
e-mail: ●

**BlackRock (Institutional) Canada Ltd.**
TD Company Trust Tower - 161 Bay Street
Toronto, ON M5J2S1
Attn:    ●
e-mail: ●

with a copy to:

BlackRock Financial Management, Inc., as Delegee:
BlackRock Financial Management, Inc.
●

and

BlackRock Financial Management, Inc.
40 East 52nd Street
New York, NY 10022
Attn: ●
Email: ●

and

BlackRock Financial Management, Inc.
40 East 52nd Street
New York, NY 10022
Attn:    ●
e-mail: ●

and

BlackRock Financial Management, Inc.
100 Bellevue Parkway
Wilmington, DE 19809
Attn:    ●
e-mail: ●

and

BlackRock Financial Management, Inc.
40 East 52nd Street
New York, NY 10022
Attn: ●
e-mail: ●

**Rating Agency**
DBRS Limited
181 University Avenue
Suite 700
Toronto, Ontario M5H 2M7
Attention: Head of Securitization
[E-mail:]
Facsimile No.: 416.593.5904

**Indenture Trustee**
**BNY Trust  Company of Canada**
Suite 1101
4 King Street West
Toronto, ON M5H 1B6
Attn:    Senior Trust Officer
[E-mail:]
Facsimile: 416.643.5570

1363421.20-New York Server 7A - MSW

SCHEDULE B-1

INFORMATION SUBJECT TO CONFIDENTIALITY RESTRICTIONS

1363421.20-New York Server 7A - MSW

SCHEDULE B-2

INFORMATION SUBJECT TO CONFIDENTIALITY RESTRICTIONS

1363421.20-New York Server 7A - MSW

SCHEDULE B-3


INFORMATION SUBJECT TO CONFIDENTIALITY RESTRICTIONS

1363421.20-New York Server 7A - MSW

SCHEDULE C

INFORMATION SUBJECT TO CONFIDENTIALITY RESTRICTIONS

1363421.20-New York Server 7A - MSW

ANNEX A

ADVISORY COMMITTEE

The purpose of the Advisory Committee with respect to MAV3 is to provide a forum for consultation regarding actions to be taken by, the Administrator with respect to the management of the assets held by MAV3. The Advisory Committee shall be entitled, from time to time during the term of this Agreement, and in accordance with the AMA Transaction Documents, to provide such advice to the Administrator as the Advisory Committee may deem advisable.

The Administrator, in its discretion and subject to its duties under the AMA Transaction Documents, may seek the advice of the Advisory Committee with respect to matters falling within the scope of its duties, power and authority under this Agreement.

A regular meeting of the Administrator and the Advisory Committee shall be held on a quarterly basis in [January, April, July and October] of each year, beginning in [April 2009]. A summary of the matters discussed during such regular meetings and any other meeting between the Administrator and the Advisory Committee during the relevant period shall be included in the summaries to be provided pursuant to Section 3(a)(v).

For the avoidance of doubt, the Advisory Committee does not exercise any control over the administration or management of MAV3 or the assets managed by the Administrator and does not itself have any voting or approval rights in respect thereof.

1363421.20-New York Server 7A - MSW

ANNEX C

FORM OF ADMINISTERED SATELLITE TRUST ACKNOWLEDGMENT

[Letterhead of Issuer Trustee of relevant Administered Satellite Trust]

Reference is hereby made to the Administration And Management Agreement (the "Administration and Management Agreement"), dated [    ], 2008, between BlackRock (Institutional) Canada, Ltd. ("BlackRock Canada" and, in its capacity as the administrator and asset manager, and its successors and permitted assigns, the "Administrator")  and CIBC Mellon Global Securities Services Company, in its capacity as issuer trustee of Master Asset Vehicle III ("MAV3"), pursuant to which the Administrator shall perform certain administrative and asset management functions for [name of Administered Satellite Trust].  Capitalized terms not otherwise defined herein shall have the meanings specified in the Administration and Management Agreement.

By its execution and the acknowledgment of this letter, [name of issuer trustee of Administered Satellite Trust], on behalf of [name of Administered Satellite Trust], hereby agrees to be bound by the Administration and Management Agreement and irrevocably appoints the Administrator as its attorney-in-fact during the term of the Administration and Management Agreement, such appointment being coupled with an interest, with full authority in the place and stead of and in the name of such entity, from time to time in the Administrator's discretion or as required by the Administration and Management Agreement to take such actions on behalf of [name of Administered Satellite Trust] as the Administrator may deem necessary or advisable to comply with or effect the purposes of the Administration and Management Agreement and the other AMA Transaction Documents, including, without limitation, to execute any documents, instruments or other certificates in connection therewith, to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts or moneys due and to become due in connection with Managed Assets, the Hedging Agreements, the Traditional Asset Hedging Agreements and Swap Agreements or otherwise owed thereto, to receive, endorse, and collect any drafts or other instruments, documents and chattel paper in connection therewith, and to file any claims or take any action or institute any proceedings which the Administrator may deem to be necessary or desirable for the collection thereof or to ensure or enforce compliance with the terms and conditions of this Agreement and the other AMA Transaction Documents.

Further, [name of issuer trustee of Administered Satellite Trust], on behalf of [name of Administered Satellite Trust], hereby agrees that any party to an AMA Transaction Document shall be entitled to rely on the acknowledgments set forth in this letter without any further inquiry.

Sincerely,
[NAME OF ISSUER TRUSTEE],
in its capacity as issuer trustee for
[name of Administered Satellite Trust]

_____
Name:
Title:

_____

Name:
Title:

1363421.20-New York Server 7A - MSW