POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

## <u>MCAP CO-OWNERSHIP AGREEMENT</u>

THIS AGREEMENT made as of _____, 2009,

BETWEEN:

> **CIBC MELLON TRUST COMPANY**, a trust company existing under the laws of Canada,
>
> (the "**Custodian**"),

- and -

> **CIBC MELLON GLOBAL SECURITIES SERVICES COMPANY**, an unlimited liability company incorporated under the laws of Province of Nova Scotia ("**CIBC Mellon**")

- and -

> **CIBC MELLON GLOBAL SECURITIES SERVICES COMPANY**, in its capacity as trustee of Master Asset Vehicle I,
>
> (in such capacity, "**MAV1**"),

- and -

> **CIBC MELLON GLOBAL SECURITIES SERVICES COMPANY**, in its capacity as trustee of Master Asset Vehicle II,
>
> (in such capacity, "**MAV2**" and, together with MAV1, the "**Co-Owners**")

**WHEREAS** the Ontario Superior Court of Justice issued an Order dated June 5, 2008 (the "**Sanction Order**") in connection with the restructuring of third party asset backed commercial paper in accordance with a plan under the *Companies' Creditors Arrangement Act* (the "**Plan**");

**AND WHEREAS** in accordance with the Sanction Order and in connection with the implementation of the Plan, MAV1 and MAV2 have purchased all of the assets and assumed all of the assumed liabilities previously held by Rocket (as defined below) relating to the MCAP Program (as defined below) from Rocket pursuant to the Transfer Agreement (as defined below);

**AND WHEREAS** MAV1, MAV2, the Custodian and CIBC Mellon desire to enter into this Agreement to establish the terms and conditions on which the Co-Owners, the Custodian and CIBC Mellon will hold their interests in the Assets (as defined below) and the Assumed Liabilities (as defined below) and the terms and conditions on which the Co-Owners will govern their affairs in respect of the Assets and the Assumed Liabilities;

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 2 -

**NOW THEREFORE THIS AGREEMENT WITNESSES** that in consideration of the premises and the covenants and agreements of the parties herein contained and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged by each of the parties), the parties hereby covenant and agree as follows:

## ARTICLE 1
## INTERPRETATION

### 1.1    Definitions

Unless the context otherwise requires, all capitalized terms used in this Agreement (including the recitals hereto) or in any certificate or other document made or delivered pursuant hereto not otherwise defined therein, shall have the following meanings:

"**Affiliate**" means with respect to a party to this Agreement, that party's affiliated companies within the meaning of the *Business Corporations Act* (Ontario) ("**OBCA**"); and with respect to the Co-Ownership Service Providers, Affiliate shall be deemed, for the purposes of this Agreement only, to include each of them, The Bank of New York Mellon and Canadian Imperial Bank of Commerce, and each of their respective affiliates within the meaning of the OBCA.

"**Applicable Laws**" means the *Income Tax Act* (Canada), as amended and/or restated from time to time and the regulations thereunder, and any tax or other legislation and any regulations, policies or administrative practices of any applicable domestic or foreign regulatory authority, as may from time to time apply to the CIBC Mellon Account or the provision of services hereunder.

"**Asset Administrator**" has the meaning set out in Section 2.7.

"**Asset Originator**" means MCAP Commercial LP.

"**Assets**" means the Co-Owners' rights, titles, interests, agreements, charges and proceeds accruing to and from the assets set out in Schedule A but excluding, for greater certainty, the MAV1 Trust Distribution Account, as that term is defined in the Securitization Agreement, and the MAV2 Trust Distribution Account, as that term is defined in the Securitization Agreement.

"**Assumed Liabilities**" means the Co-Owners' debts, liabilities, obligations, indemnities, claims, commitments, demands and expenses set out or arising under the documents listed in Schedule C.

"**Authorized Instructions**" means written directions and instructions from an Authorized Party delivered to the Custodian and includes a Co-Owner Direction.

"**Authorized Party**" means the Co-Owners or an Asset Administrator and any Person or entity properly identified in accordance with Section 4.1(g).

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 3 -

"**BlackRock**" has the meaning set out in Section 2.7.

"**BNY"** means BNY Trust Company of Canada.

"**Business Day**" means a day on which commercial banks and foreign exchange markets are generally open to settle payments and are open for general business in: Toronto, Ontario, New York, New York, London, United Kingdom and Montreal, Quebec.

"**CIBC Mellon**" has the meaning set out in the recitals hereto, and shall include any successor or permitted assigns of CIBC Mellon.

"**CIBC Mellon Account**" means the custodial account maintained by the Custodian on behalf of the Co-Owners bearing the number ● in which the Assets will be held for the benefit of the Co-Owners and in accordance with the provisions of this Agreement.

"**Co-Owner Direction**" has the meaning set out in Section 2.8(d).

"**Co-Owners**" has the meaning set out in the recitals hereto, and shall include any successors or permitted assigns of the Co-Owners.

"**Co-Ownership Interest**" means, at any time, (i) in respect of an Asset, an undivided co-ownership interest in and to such Asset, and (ii) with respect to an Assumed Liability, the undivided several obligations of each Co-Owner with respect to such Assumed Liability, each with the attributes determined hereunder.

"**Co-Ownership Service Providers**" means the Custodian and CIBC Mellon and their successors and permitted assigns.

"**Custodian**" has the meaning set out in the recitals hereto, and shall include any successor to substantially all of the business thereof or any permitted assign of the Custodian in such capacity.

"**DBRS**" means DBRS Limited or any successor to the credit ratings business thereof.

"**Decisions**" has the meaning set out in Section 2.5.

"**Encumbrance**" means any encumbrance, lien, charge, hypothec, pledge, mortgage, title retention agreement, security interest of any nature, adverse claim, exception, reservation, option, right of pre-emption, privilege or any contract to create any of the foregoing, and, collectively, the "**Encumbrances**".

"**Fitch**" means Fitch Ratings Ltd. or any successors to the credit rating business thereof.

"**Governmental Authority**" means any international tribunal, agency, body commission or other authority, any government, executive, parliament, legislature or local authority, or any governmental entity, ministry, department or agency or regulatory authority, court, tribunal, commission or board of or within Canada, or any other foreign jurisdiction, or any political subdivision of any thereof or any authority having jurisdiction therein or any

POSTING VERSION: Subject to minor revisions /
Schedules subject to updating

- 4 -

quasi governmental or private body exercising any regulatory, expropriation or taxing authority under or for the account of any of the above.

"**Liabilities**" means the debts, liabilities, obligations, claims, Encumbrances, commitments, demands and expenses of any nature or kind, whether known or unknown, accrued or unaccrued, absolute, contingent or otherwise and whether due or to become due, of any Person.

"**MCAP MAV 1 RACSA**" means the related asset creditor security agreement dated as of the date hereof between MAV1 and BNY, in its capacity as MCAP RACSA Collateral Agent.

"**MCAP MAV 2 RACSA**" means the related asset creditor security agreement dated as of the date hereof between MAV 2 and BNY, in its capacity as MCAP RACSA Collateral Agent.

"**MCAP Program**" means the program related to the Third Amended and Restated Commercial Mortgage Purchase Agreement dated on or around the date hereof between MCAP Commercial LP, CIBC Mellon Global Securities Services Company, in its separate capacities as trustee of each of MAV1, MAV2 and Master Asset Vehicle III, and CIBC Mellon Trust Company, as custodian, as such agreement may be amended, renewed, restated, replaced or otherwise modified from time to time.

"**MCAP RACSA**" means, as the context requires, either the MCAP MAV 1 RACSA or the MCAP MAV 2 RACSA, as the case may be.

"**MCAP RACSA Collateral Agent**" means BNY, in its capacity as collateral agent of the Secured Parties, (as that term is defined in each of the MCAP MAV 1 RACSA and the MCAP MAV 2 RACSA, as applicable) pursuant to either of the MCAP MAV 1 RACSA or the MCAP MAV 2 RACSA.

"**Moody's**" means Moody's Investors Service, Inc. or any successor to the credit ratings business thereof.

"**Newco**" means Tao Admin Corp., or any successor or permitted assigns in such capacity.

"**Person**" means a natural person, partnership, limited partnership, limited liability company, corporation, joint stock company, trust, unincorporated association, joint venture or other entity or Governmental Authority, and pronouns have a similarly extended meaning.

"**Proportionate Interest**" means, in the case of MAV1, 67.1420947069245% and, in the case of MAV 2 32.8579052930755%.

"**Rating Agency**" means DBRS, for so long as it is providing a rating to one or more classes of notes issued by either of the Co-Owners, together with any other rating agency that may be engaged by the Co-Owners, or any successor to the credit ratings business of

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 5 -

such rating agency, and for greater certainty, where "Rating Agency" is used, such reference shall be deemed to be a reference to such rating agencies, not to any one of them (unless there is only one).

"**Rating Agency Condition**" shall mean with respect to any proposed action and as a condition precedent to any such action being taken, that (i) prior written notice describing such proposed action in reasonable detail has been given to the Rating Agency and (ii) the Rating Agency has confirmed in writing that taking such action will not result in a withdrawal or reduction of its then current rating of the relevant class or classes, as applicable, of notes issued by either of the Co-Owners.

"**Rating Agency Requirements**" means any specified requirements of the Rating Agency under the Securitization Agreement.

"**Required Rating**" means (i) a short term senior unsecured debt rating by DBRS of not less than R-1 (middle) and an equivalent rating by any one of the following rating agencies of (x) a short term rating by S&P of not less than 'A-1+'; (y) a short term rating by Fitch of not less than 'F1+'or (z) a short term rating by Moody's of not less than 'P-1', or (ii) if no short term senior unsecured debt rating is available, a long term senior unsecured debt rating by DBRS of not less than AA(low) and an equivalent rating by any one of the following rating agencies of (A) a long term rating by S&P of not less than 'AA-'; (B) a long term rating by Fitch of not less than 'AA-'; or (C) a long term rating by Moody's of not less than 'Aa3'.

"**Requirements of Law**" means any law, treaty, rule or regulation, or determination or administrative practice of an arbitrator or Governmental Authority, whether federal, provincial or local (including any consumer protection law or tax legislation), and, when used with respect to any Person, the certificate of incorporation and by-laws or other charter constating or governing documents of such Person.

"**Rocket**" means 6932819 Canada Inc., in its capacity as trustee of Rocket Trust.

"**S&P**" means Standard and Poor's Rating Service, a Division of The McGraw-Hill Companies, Inc., or any successor to the credit ratings business thereof.

"**Securitization Agreement**" means the third amended and restated commercial mortgage purchase agreement between MCAP Commercial LP, the Co-Owners and the Custodian dated the date hereof, as such agreement may be amended, renewed, restated, replaced or otherwise modified from time to time.

"**Tax Obligations**" means the responsibility for payment of Taxes, and for the withholding of taxes, certification, reporting and filing requirements, claims for exemptions or refunds, and other related expenses in connection with this Agreement, whether imposed directly upon the Co-Owners or upon a Co-Ownership Service Provider (acting in such capacity) in respect of this Agreement, or upon any of the Assets, but for greater certainty, excludes any tax obligation imposed on the Custodian or CIBC Mellon or any sub-custodian, in each case, in its personal capacity.

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 6 -

"**Taxes**" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings and liabilities with respect thereto imposed by any Governmental Authority.

"**Transfer**" means any transfer, whether by way of sale, exchange, transfer, assignment, gift, pledge, encumbrance, hypothecation, alienation, grant of a security interest or any realization thereunder, or other transaction, whether voluntary or involuntary, by which a Co-Ownership Interest or any security or other interest therein, passes from a Co-Owner to another Person or to such Co-Owner in a different capacity, whether or not for value.

"**Transfer Agreement**" means, the transfer and assumption agreement entered into as of the date hereof between the Co-Owners and Rocket pursuant to which Rocket has Transferred all of its assets relating to the MCAP Program to the Co-Owners and the Co-Owners have assumed the assumed liabilities previously held by Rocket relating to the MCAP Program.

"**Transferee**" has the meaning set out in Section 2.4.

"**Trustee**" means CIBC Mellon Global Securities Services Company, in its capacity as the trustee of Master Asset Vehicle I and Master Asset Vehicle II, as applicable under their respective declarations of trust or any successor to the trust or custodial business thereof serving in such capacity or permitted assign thereof in accordance with the terms of the respective declarations of trust of such trusts, as applicable.

**1.2**    **References, Etc.**

The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The term "including" means "including without limitation".

**1.3**    **Articles, Sections, Etc.**

The division of this Agreement into articles, sections, clauses and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement. Unless something in the subject matter or context is inconsistent therewith, references herein to articles, sections, clauses, schedules and other subdivisions are to the specific articles, sections, clauses, schedules and other subdivisions in or to this Agreement unless otherwise specified.

**1.4**    **Number and Gender**

Words importing the singular number shall include the plural and vice versa and words importing the masculine gender shall include the feminine and neutral genders and vice versa.

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 7 -

1.5        **Currency**

Unless expressly provided otherwise, all amounts expressed herein in terms of money refer to the lawful currency of Canada and all payments to be made hereunder shall be made in such currency, unless expressly provided otherwise.

1.6        **Calculation of Days**

Unless otherwise specified in this Agreement, time periods within or following which a payment is to be made or other action is to be taken hereunder shall be calculated by including the day on which the period commences and excluding the day on which the period ends.

1.7        **Business Days**

Unless otherwise specified in this Agreement, whenever any payment to be made or other action to be taken hereunder is required to be made or taken on a day other than a Business Day, such payment shall be made or action taken on the next following Business Day.

1.8        **Computation of Time Period**

Unless otherwise specified in this Agreement, in the computation of a period of time from a specified date to a later date, the word "from" means "from and including" and the words "to" and "until" mean "to but excluding".

1.9        **Time of the Essence**

Time shall be of the essence of this Agreement.

1.10       **Accounting Principles**

As used in this Agreement and in any certificate or other document made or delivered pursuant hereto, accounting terms not defined in this Agreement or in any such certificate or other document, and accounting terms partly defined in this Agreement or in any such certificate or other document to the extent not defined, shall have the respective meanings given to them under generally accepted accounting principles in Canada or regulatory accounting principles, as applicable, as of the date hereof, provided that to the extent of any conflict between generally accepted accounting principles and regulatory accounting principles, the meanings given under generally accepted accounting principles shall prevail. To the extent that the definitions of accounting terms in this Agreement or in any such certificate or other document are inconsistent with the meanings of such terms under generally accepted accounting principles or regulatory accounting principles, the definitions contained in this Agreement or in any such certificate or other document shall prevail.

1.11       **Severability**

In the event that one or more provisions in this Agreement shall be invalid, illegal or unenforceable in any respect under any applicable law, the validity, legality and enforceability

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 8 -

of the remaining provisions hereof shall not be affected or impaired thereby. Each of the provisions of this Agreement is hereby declared to be separate and distinct.

**1.12        Governing Law**

(a)        This Agreement will be governed by, interpreted and enforced in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein.

(b)        The parties hereto irrevocably attorn and submit to the non-exclusive jurisdiction of any court of competent jurisdiction of the Province of Ontario sitting in Toronto, Ontario in any action or proceeding arising out of or relating to this Agreement. The parties hereto irrevocably waive objection to the venue of any action or proceeding in such court or that such court provides an inconvenient forum.

(c)        The parties hereto hereby irrevocably consent to the service of any and all process in any such action or proceeding by the delivery of copies of such process to parties hereto as provided under Section 5.1.

**1.13        Schedules**

The following Schedules are annexed hereto and are incorporated by reference in this Agreement:

| | | |
|---|---|---|
| Schedule A | – | Matters Relating to the Assets |
| Schedule B | – | Agreement to be Bound |
| Schedule C | – | Assumed Liabilities |
| Schedule D | – | MAV1/BlackRock Administration and Management Agreement |
| Schedule E | – | MAV2/BlackRock Administration and Management Agreement |
| Schedule F | – | Newco Administration and Management Agreement |

**1.14        Entire Agreement and Paramountcy**

Except as specifically stated otherwise herein, this Agreement, the MCAP MAV 1 RACSA and the MCAP MAV 2 RACSA set forth the entire understanding of the parties relating to the subject matter hereof, and all prior understandings, written and oral, are superseded hereby.

**ARTICLE 2**
**MATTERS RELATING TO THE CO-OWNERSHIP INTERESTS**

**2.1        Acquisition of Assets; Assumption of Obligations**

The parties hereto acknowledge that Rocket has Transferred, as of the date hereof and pursuant to the Transfer Agreement, all of the assets previously held by Rocket relating to

the MCAP Program to the Co-Owners to be deposited with the Custodian. The Assets, or evidence thereof if any part of the Assets is intangible or in such a form that physical possession by the Custodian in the CIBC Mellon Account is not practical, shall be held by the Custodian, as custodian, agent, nominee and bare trustee of the Co-Owners, in accordance with the terms of this Agreement. The rights and entitlements of each Co-Owner in respect of each Asset shall be determined in accordance with its Proportionate Interest and this Agreement.

The parties hereto acknowledge that, as of the date hereof and pursuant to the Transfer Agreement, in consideration for Rocket transferring the Assets, each Co-Owner has assumed its respective Proportionate Interest of the Assumed Liabilities previously held by Rocket relating to the MCAP Program. As of the date hereof, each Co-Owner shall be solely and exclusively liable for each Assumed Liability to the extent of its Proportionate Interest in respect of such Assumed Liability, and shall, subject to funds available therefor pursuant to the Securitization Agreement, pay and perform and discharge when due, such Proportionate Interest in such Assumed Liabilities.

## 2.2    Ownership by Co-Owners

The Co-Ownership Interests of each Co-Owner in and to the Assets at any particular time shall be held as a tenant in common with the other Co-Owners at such time, and not as a joint tenant with the other Co-Owners.

## 2.3    Co-Owners Bound by Agreement; No Action by Individual Co-Owners

The rights and obligations of each Co-Owner with respect to its interest in the Assets and the Assumed Liabilities shall be governed exclusively by, and may be exercised only in accordance with, this Agreement and the documents governing the related Asset and Assumed Liability (including any obligations to give any notice to a rating agency or complying with any Rating Agency Requirements). Except as expressly provided herein, no Co-Owner shall have the right to take any action in its own name or on its own behalf or instruct or direct the Custodian as to any matter whatsoever or make Decisions relating to the Assets, the Assumed Liabilities or the CIBC Mellon Account, or to demand any payment from any Asset Originator or the Custodian, and shall not have the right to claim or demand possession of and shall not be entitled to receive, take any action to terminate the custody of, as applicable, or to require any sale, partition or other dealing in, any of the Assets or the Assumed Liabilities, and will not authorize or purport to authorize any assignee or transferee of any of its Co-Ownership Interests to do so.

## 2.4    Transfers of Co-Ownership Interests

(a)    Subject to paragraph (b) of this Section 2.4, the Co-Owners shall be permitted to Transfer any of their respective Co-Ownership Interests in the Assets to, and have their related Co-Ownership Interests in the Assumed Liabilities assumed by, any Person.

(b)    Except with respect to a Transfer pursuant to paragraph (c) of this Section 2.4, the following shall be conditions precedent to any Transfer of a Co-Ownership Interest becoming effective: (i) the Person to whom the relevant Co-Ownership Interest is Transferred (the "**Transferee**") shall, if it is not already a party to and bound by this Agreement, execute and

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 10 -

deliver an instrument or instruments in writing in the form set out in Schedule B whereby the Transferee agrees to be bound by the provisions hereof as if the Transferee were an original party to this Agreement, (ii) the Transfer shall be made in compliance with all applicable securities laws, (iii) the Transfer is permitted under the terms of the MCAP MAV 1 RACSA or the MCAP MAV 2 RACSA, as applicable, and (iv) the Transfer is permitted under the related Securitization Agreement, the documents governing the Assumed Liabilities, and the related documents thereto, as the case may be, including any applicable Rating Agency Requirements. Each such Transferee shall have the same rights and shall be subject to the same obligations and restrictions as the other Co-Owners under this Agreement.

(c)    The Custodian hereby acknowledges that the Co-Owners have Transferred their respective Co-Ownership Interests in each of the Assets to BNY as the MCAP RACSA Collateral Agent pursuant to each of the MCAP MAV 1 RACSA and the MCAP MAV 2 RACSA, as applicable, as security for the payment of the Secured Obligations (as defined in each of the MCAP MAV 1 RACSA and the MCAP MAV 2 RACSA). The Custodian further acknowledges that the MCAP RACSA Collateral Agent may realize upon its security in accordance with the terms of the MCAP MAV 1 RACSA or the MCAP MAV 2 RACSA, as applicable, by way of Transfer of any or all of the Co-Ownership Interests (which shall include the assumption of the Assumed Liabilities related to any Asset Transferred) without needing to obtain the consent of the Custodian. For greater certainty, the foregoing does not require a purchaser of a Purchased Mortgage (as defined in the Securitization Agreement) to assume any Assumed Liabilities, other than Assumed Liabilities under such Purchased Mortgage and owing to other parties thereto.

## 2.5    Decisions of the Co-Owners

The Co-Owners shall retain and shall be entitled to exercise, to the extent of their respective Proportionate Interests in each Asset and Assumed Liability, all decision-making authority under this Agreement and any agreement referred to in Schedule A or Schedule C in respect of such Asset or Assumed Liability, respectively, and to give proxies, with full discretion, to exercise such decision-making authority in respect of consents, waivers, amendments, notices and ratifications permitted or required, declare defaults, amortization events, termination events, servicer termination events or such other similar events, and exercise any remedies provided, under such agreement and to take all other necessary action in respect thereof (collectively, "**Decisions**").    All Decisions in respect of an Asset or an Assumed Liability, or in respect of any Decision that must be made in respect of this Agreement, shall require the approval of each Co-Owner.    Each Co-Owner agrees to act in a reasonable and timely manner in making any and all Decisions.

## 2.6    Disputes

Subject to Section 3.4, if a Co-Owner objects to any matter in connection with this Agreement and delivers notice of such dispute pursuant to Section 5.1 to the other Co-Owner(s) and such objection cannot be resolved by mutual agreement within thirty (30) days of the delivery of such notice, the issue shall be resolved by way of arbitration pursuant to the *Arbitration Act, 1991* (Ontario), as amended from time to time and as provided in this Section, and the decision of the arbitral tribunal shall be final and binding between the parties and shall not be subject to appeal. The following provisions shall govern any arbitration:

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 11 -

(a)     a single arbitrator shall be appointed by agreement between the parties or, in default of such agreement within ten (10) Business Days after written request for arbitration by any party to the other party, appointed in accordance with the provisions of the *Arbitration Act, 1991* (Ontario);

(b)     unless otherwise agreed to by the parties, the arbitration shall be held in the City of Toronto;

(c)     the language of the arbitration shall be English and the arbitration shall be governed by the substantive and procedural law of Ontario;

(d)     the cost of the arbitration shall be borne by the arbitrating parties as determined by the arbitrator;

(e)     insofar as it does not conflict with the provisions of this Article, the *Arbitration Act, 1991* (Ontario) shall be applicable to arbitration held under this Section and the arbitrator shall have jurisdiction to do all acts and make such orders as provided in the *Arbitration Act, 1991* (Ontario);

(f)     submission to arbitration pursuant to the provisions of this Section and the obtaining of the decision of an arbitrator on the matters and claims in dispute shall be a condition precedent to the bringing of any action at law or suit in equity with respect to this Agreement; and

(g)     the arbitration must be complete, and a decision rendered, within ninety (90) days of the submission of the dispute to arbitration.

## 2.7     <u>Delegation of Rights</u>

The Co-Owners may jointly delegate the exercise of their respective rights or obligations under this Agreement to a third party (an "**Asset Administrator**", as the context requires), including in respect of Decisions and the giving of Co-Owner Directions. Pursuant to the administration and management agreement entered into as of the date hereof between MAV1 and BlackRock (Institutional) Canada, Ltd. (together with its permitted successors and assigns, "**BlackRock**"), as the Asset Administrator (attached hereto as Schedule D), and the administration and management agreement entered into as of the date hereof between MAV2 and BlackRock, as Asset Administrator (attached hereto as Schedule E), such rights or obligations in respect of matters set out in such agreements have been initially delegated to BlackRock. Pursuant to the administration and management agreement entered into as of the date hereof among, *inter alia*, MAV1, MAV2 and Newco, as the Asset Administrator (attached hereto as Schedule F), such rights or obligations in respect of certain other matters set out in such agreement, have been initially delegated to Newco.

## 2.8     <u>Acceptance by Custodian; Appointment of Custodian; Co-Owner Directions</u>

(a)     Subject to the terms and conditions hereof, the Custodian hereby acknowledges delivery and deposit of all of the Co-Owners' present and future right, title and interest in, to and

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

under the Assets to be held by it as custodian, agent, nominee and bare trustee for and on behalf of the Co-Owners.

(b)    Each Co-Owner hereby authorizes, empowers and instructs the Custodian to hold and possess the Assets as its custodian, agent, nominee and bare trustee, for and on its behalf as a tenant in common.

(c)    Except to the extent specifically provided for in the MCAP MAV 1 RACSA and the MCAP MAV2 RACSA, no expenditures incurred by or on behalf of the Co-Owners shall form the subject of an encumbrance against the Assets. The Custodian shall not, and shall not purport to, transfer, assign, hypothecate, pledge or otherwise dispose of or encumber any of the Assets except as expressly permitted by the provisions of this Agreement.

(d)    Unless otherwise provided herein, any decision or exercise of discretion contemplated to be taken or made by the Custodian herein shall only be taken or made, and where an action is specifically directed to be taken or not taken by the Custodian under this Agreement, taken or not taken, as the case may be, in the manner, at the times, in the circumstances, for the purposes and to the extent set forth herein, in each such instance by delivery to the Custodian of a written direction signed by each Co-Owner (a "**Co-Owner Direction**"). It is understood and agreed by all parties that the Custodian shall have no independent authority to contract on behalf of, or waive any rights of, the Co-Owners and that any provision in this Agreement which purports to confer decision-making authority or discretion to the Custodian shall not confer, and shall not be interpreted as conferring, discretion upon the Custodian for any purposes hereof or thereof. The Custodian shall not be liable to any Person in respect of any action or determination taken or not taken on the basis of a Co-Owner Direction.  Each Co-Owner agrees to act in a reasonable and timely manner in executing and delivering a Co-Owner Direction.

**2.9**        **Appointment of CIBC Mellon**

The Custodian appoints CIBC Mellon as its agent hereunder to provide such custodial administrative services as it may designate from time to time including:

(a)    receiving all Authorized Instructions and notices from a Co-Owner or any Asset Administrator;

(b)    receiving all fees payable to the Custodian in connection with this Agreement; and

(c)    executing all documents that the Custodian may enter into pursuant to, or in connection with this Agreement.

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 13 -

## ARTICLE 3
## REPRESENTATIONS, WARRANTIES AND COVENANTS

### 3.1    Representations and Warranties of the Co-Owners

Each Co-Owner hereby represents and warrants to each other party hereto, and acknowledges that each other party hereto is relying on such representations and warranties in entering into this Agreement that on the date hereof:

(a)    **Organization; Good Standing.** Such Co-Owner has been duly and validly formed and is validly subsisting under the laws of its jurisdiction of formation. The Co-Owner has taken all action to authorize the execution and delivery of this Agreement by such Co-Owner and the performance by such Co-Owner of its obligations hereunder.

(b)    **Binding Obligation.** This Agreement has been duly executed and delivered by such Co-Owner and is a legal, valid and binding obligation of such Co-Owner, enforceable against such Co-Owner in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization or other similar laws affecting the rights of creditors generally from time to time in effect, and (ii) general principles of equity.

(c)    **No Conflict.** The execution and delivery by such Co-Owner of this Agreement, the performance by such Co-Owner of this Agreement and the fulfilment of the terms hereof applicable to such Co-Owner, will not (i) conflict with or violate any Requirements of Law applicable to such Co-Owner, (ii) conflict with, or result in any breach of any of the material terms and provisions of, or constitute (with or without notice or lapse of time or both) a material default under, any indenture, contract, agreement, mortgage, deed of trust or other instrument to which such Co-Owner is a party or by which it or its properties are bound or any order, writ, judgment, award, injunction or decree binding on such Co-Owner or affecting its property, or (iii) conflict with or violate any of the provisions of its declaration of trust.

(d)    **No Proceedings.** There are no actions, suits, proceedings or investigations pending or, to the knowledge of such Co-Owner, threatened against or affecting such Co-Owner or any of its undertakings and assets at law, or in equity or before any Governmental Authority or arbitrator (i) asserting the invalidity of this Agreement, (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement, (iii) seeking any determination or ruling that, in the reasonable judgment of such Co-Owner, would materially and adversely affect the performance by the Co-Owner of its obligations under this Agreement, or (iv) seeking any determination or ruling that would materially and adversely affect the validity or enforceability of this Agreement.

(e)    **Consents and Approvals.** All material authorizations, consents, orders or approvals of or registrations or declarations with any Governmental Authority

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 14 -

required to be obtained, effected or given by such Co-Owner in connection with the execution and delivery by such Co-Owner of this Agreement and the performance of the transactions contemplated by this Agreement by such Co-Owner have been obtained, effected or given and are in full force and effect.

(f)     **Not a Non-Resident.** Such Co-Owner is not a non-resident of Canada within the meaning of the *Income Tax Act* (Canada).

(g)     **No Default.** No default has occurred and is outstanding under any agreement, instrument, indenture or trust deed to which such Co-Owner is a party which could have a material adverse effect on such Co-Owner or its ability to perform its obligations hereunder.

**3.2          Representations and Warranties of the Custodian**

The Custodian hereby represents and warrants to each of the Co-Owners, and acknowledges that the Co-Owners are relying on such representations and warranties in entering into this Agreement that on the date hereof and on an ongoing basis:

(a)     **Organization.** The Custodian is validly existing under the laws of Canada and has the corporate power and capacity to own the Assets, to enter into this Agreement and to perform its obligations hereunder and thereunder.

(b)     **Binding Obligation.** This Agreement has been duly authorized, executed and delivered by the Custodian and is a legal, valid and binding obligation of the Custodian, enforceable against the Custodian in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization or other similar laws affecting the rights of creditors generally from time to time in effect, and (ii) general principles of equity.

(c)     **No Encumbrance.** Other than as provided for hereunder, the execution and delivery of this Agreement by the Custodian will not result in the creation or imposition of any Encumbrance on any of the Assets by the Custodian.

(d)     **No Conflict.** The execution and delivery by the Custodian of this Agreement, the performance by the Custodian of this Agreement and the fulfilment of the terms hereof and thereof applicable to the Custodian, will not (i) conflict with or violate any applicable Requirements of Law applicable to the Custodian, (ii) conflict with, or result in any breach of any of the material terms and provisions of, or constitute (with or without notice or lapse of time or both) a material default under, any indenture, contract, agreement, mortgage, deed of trust or other instrument to which the Custodian is a party or by which it or its properties are bound or any order, writ, judgment, award, injunction or decree binding on the Custodian or affecting its property, or (iii) conflict with or violate any of the provisions of its constating documents, or of any resolutions of its securityholders or constating body.

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 15 -

(e) **No Proceedings.** There are no actions, suits, proceedings or investigations pending or, to the knowledge of the Custodian, threatened against or affecting the Custodian or any of its undertakings and assets at law, or in equity or before any Governmental Authority or arbitrator (i) asserting the invalidity of this Agreement, (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement, (iii) seeking any determination or ruling that, in the reasonable judgment of the Custodian, would materially and adversely affect the performance by the Custodian of its obligations under this Agreement, or (iv) seeking any determination or ruling that would materially and adversely affect the validity or enforceability of this Agreement.

(f) **Consents and Approvals.** All authorizations, consents, orders or approvals of or registrations or declarations with any applicable Governmental Authority required to be obtained, effected or given by the Custodian in connection with the execution and delivery by the Custodian of this Agreement and the performance of the obligations by the Custodian contemplated hereunder have been obtained, effected or given and are in full force and effect.

**3.3        Survival of Representations and Warranties**

The representations and warranties set forth herein shall not merge on the completion of the execution and delivery of this Agreement, but shall survive and continue in full force and effect without limitation of time.

**3.4        Covenants of the Co-Owners**

Each Co-Owner covenants and agrees with the other Co-Owner and the Custodian that it shall:

(a) **Preserve Existence.** Preserve and maintain its existence, rights and privileges and qualify and remain qualified to do business in each of the jurisdictions in which the failure to do so would have a material adverse effect on the ability of such Co-Owner to comply with its obligations hereunder.

(b) **Comply with the Law.** Comply with all Requirements of Law applicable to it where the failure to do so would have a material adverse effect on the ability of such Co-Owner to comply with its obligations hereunder.

(c) **No Amendments.** Not take any steps to amend the MCAP MAV 1 RACSA, the MCAP MAV 2 RACSA, the administration and management agreement entered into as of the date hereof between MAV1 and BlackRock, the administration and management agreement entered into as of the date hereof between MAV2 and BlackRock, and the administration and management agreement entered into as of the date hereof among, *inter alia*, MAV1, MAV2 and Newco, if such amendment would materially adversely affect the ability of such Co-Owner to make any representation and warranty or perform any covenant set out herein.

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 16 -

(d)    **No Petition.** Notwithstanding any prior termination of this Agreement, no Co-Owner shall, prior to the date which is one year and one day (or such longer period as is applicable under the bankruptcy, insolvency or similar law of any relevant jurisdiction) after the amounts to be distributed in respect of the Assets pursuant to the Securitization Agreement have been distributed to the Co-Owners and all of the Assumed Liabilities have been satisfied or written off, acquiesce, petition or otherwise invoke or cause the Custodian to invoke the process of any court or Governmental Authority for the purpose of commencing or sustaining a case against any Co-Owner under any bankruptcy, insolvency or similar law or, except as provided in the MCAP RACSA, appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of any Co-Owner or any substantial part of its property, or ordering the winding up or liquidation of the affairs of any Co-Owner.

## ARTICLE 4
## THE CUSTODIAN

**4.1**        **Certain Matters Affecting the Custodian**

(a)    The Custodian undertakes to perform such duties and only such duties as are specifically set forth in this Agreement. The Custodian shall exercise the authority, rights and powers that it has under this Agreement and use the same degree of care and skill in their exercise as a prudent Person would exercise or use under the circumstances acting in a fiduciary capacity.

(b)    Subject to Section 4.1(a), no provision of this Agreement shall be construed to relieve the Custodian from liability for its own grossly negligent action, its own grossly negligent failure to act or its own wilful misconduct; provided, however, that:

(i)    the Custodian, in its capacity as Custodian or otherwise, shall not be liable for an error of judgment made, or for any act done or step taken or omitted to be taken, or for any mistake of fact or law made in good faith by an officer, employee or agent of the Custodian unless it shall be proved that the Custodian was grossly negligent; and

(ii)    the Custodian shall not be charged with knowledge of any fact relevant to the performance of its duties hereunder unless a responsible officer of the Custodian in such capacity obtains actual knowledge of such fact.

(c)    The Custodian shall not be required to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its authority, rights or powers. Before acting to institute any action or proceeding, the Custodian shall be entitled to be paid its reasonable costs and expenses (including legal fees) by the Co-Owners in accordance with the terms of the applicable fee schedules entered into by the Custodian and each Co-Owner.

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 17 -

(d)      Except for actions expressly authorized by this Agreement, the Custodian shall take no action reasonably likely to impair the interests of the Co-Owners in the Assets or to impair the value of the Assets.

(e)      The Custodian and each of the Co-Owners hereby acknowledges that the Custodian's appointment by the Co-Owners as custodian, agent, nominee and bare trustee pursuant to this Agreement is and is intended to be, a limited appointment in the capacity of a custodian, agent, nominee and bare trustee of independent status acting in the ordinary course of its business and there are no implied duties or obligations except as expressly provided herein. The Custodian and each of the Co-Owners acknowledges that the Custodian's role in the transactions herein provided for is limited to the functions specified in this Agreement and, unless expressly stated to the contrary or otherwise required by the context, all references in this Agreement to the Custodian shall mean the Custodian acting as custodian, agent, nominee and bare trustee for and on behalf of the Co-Owners. Without limiting the generality of Section 2.8, the Custodian and each of the Co-Owners acknowledges that the Custodian does not have and will not exercise or purport to exercise any general power or general authority to conclude, enter into or vary contracts ancillary to this Agreement in the name of or on behalf of the Co-Owners. The Custodian shall be under no duty or obligation to question any Authorized Instruction, to review any Assets held in the CIBC Mellon Account, to make any suggestions with respect to the investment and reinvestment of the assets in the CIBC Mellon Account, or to evaluate or question the performance of the Co-Owners or the Asset Administrator. The Custodian shall have no duty or responsibility under any agreement to which it is not an express party to notwithstanding that express or implied reference is made to such agreement herein. The Co-Ownership Service Providers shall be fully protected in acting in accordance with Authorized Instructions given in accordance with this Agreement.

(f)      The Custodian may rely on and shall be protected in acting on, or in refraining from acting in accordance with, any Co-Owner Direction, in respect of a particular Asset, presented to it pursuant to this Agreement by the proper party or parties.

(g)      Each Co-Owner shall furnish the Co-Ownership Service Providers with a written list of the names, signatures and extent of authority of all Persons authorized to direct either or both of the Co-Ownership Service Providers and otherwise act on behalf of the Co-Owners (including an Asset Administrator) with respect to this Agreement. The Co-Owners shall cause the Asset Administrator to furnish the Co-Ownership Service Providers with a written list of the names and signatures of the Person or Persons who are authorized to represent the Asset Administrator in dealing with the Co-Ownership Service Providers in connection with this Agreement. The Co-Ownership Service Providers, their agents and sub-custodians shall be entitled to rely upon and shall be fully protected in giving effect to instructions received from Person(s) so identified until the Co-Ownership Service Providers receive written notice from the Co-Owners or the Asset Administrator, as applicable, of a change of the identity or authority of such Person(s). Notwithstanding Section 5.1, all directions and instructions to the Co-Ownership Service Providers given pursuant to this Agreement from an Authorized Party shall be forwarded to CIBC Mellon in writing, by facsimile transmission, or electronic transmission or such other means of transmission as may be agreed upon by CIBC Mellon and each of the Co-Owners respectively.

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 18 -

Unless otherwise expressly provided therein, each Authorized Instruction shall continue in full force and effect until superseded or cancelled by another Authorized Instruction.

Any Authorized Instructions shall, as against the Co-Owner that provided such Authorized Instructions and in favour of the Co-Ownership Service Providers, be conclusively deemed to be Authorized Instructions for the purposes of this Agreement notwithstanding any error in the transmission thereof or that such Authorized Instructions may not be genuine, provided that the Co-Ownership Service Providers, acting reasonably and in good faith, believe such Authorized Instructions to be genuine. The Co-Ownership Service Providers may in their discretion decline to act upon any Authorized Instructions (i) that are insufficient or incomplete; (ii) that are not received by the Co-Ownership Service Providers in sufficient time to give effect to such Authorized Instructions; or (iii) where the Co-Ownership Service Providers have reasonable grounds for concluding that the same have not been accurately transmitted or are not genuine. If the Co-Ownership Service Providers decline to give effect to any Authorized Instructions for any reason set out in the preceding sentence, they shall notify the relevant Co-Owner and the Asset Administrator forthwith after they so decline.

(h)    The Custodian may consult with counsel with respect to any questions as to any of the provisions hereof or its duties hereunder, and any opinion of counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such opinion.

(i)    The Custodian shall be under no obligation to exercise any of the rights or powers vested in it by this Agreement or to institute, conduct or defend any litigation hereunder or in relation hereto, at the request, order or direction of any of the Co-Owners, pursuant to the provisions of this Agreement, unless such Persons shall have offered to the Custodian reasonable security or indemnity against the costs, expenses and liabilities which may be incurred therein or thereby which is reasonably satisfactory to the Custodian.

(j)    The Custodian shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it under this Agreement.

(k)    The Custodian shall not be bound to verify the accuracy or completeness of or to make any investigation whatsoever into the facts of matters stated in any Co-Owner Direction.

(l)    The Custodian may exercise the powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys or a custodian, provided that the Custodian remains responsible for the acts and omissions of such agent, attorney or custodian unless the Rating Agency Condition has been satisfied in connection with such appointment, and unless and to the extent that the Custodian was negligent in its selection or continued retention of such agent, attorney or custodian.  Notwithstanding the foregoing, the Co-Ownership Service Providers shall not be responsible or liable for any losses or damages suffered by the Co-Owners arising as a result of the insolvency of any such agent, attorney or custodian except to the extent of the Custodian's negligence in its selection or continued retention of such agent, attorney or custodian, and in no event is a Co-Ownership Service Provider responsible for the acts or omissions of any such agent, attorney or custodian which it has been instructed by a Co-Owner Direction to retain.

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 19 -

(m)    The Custodian shall not be required to make any initial or periodic examination of any documents or records related to the Assets.

## 4.2         Authorized Powers and Duties

The Custodian is authorized to and agrees to perform the following duties with respect to the CIBC Mellon Account in accordance with the provisions of this Agreement:

(a)    **Deliver Information Received.** Use reasonable efforts to submit or cause to be submitted to the Co-Owners and the Asset Administrator, for appropriate action, all information actually received by the Custodian from the Asset Originator, as the case may be, regarding Assets held in the CIBC Mellon Account. Notwithstanding the foregoing, the Custodian and any of its sub-custodians and its agents shall be under no duty to investigate, participate in or take affirmative action concerning attendance at meetings, voting, subscription, conversion or other rights attaching to or derived from the Assets held in the CIBC Mellon Account or concerning any merger, consolidation, reorganization, receivership, bankruptcy or insolvency proceedings, compromise or arrangement or the deposit of any Assets in connection therewith or otherwise, except in accordance with a Co-Owner Direction, and upon such indemnity and provision for fees and expenses as the Custodian, or any of its respective sub-custodians or agents may require.

The powers described in this Section 4.2 may be exercised by the Custodian with or without a Co-Owner Direction, but where the Custodian acts on a Co-Owner Direction, the Custodian shall be fully protected as described in Section 4.1.

## 4.3         Eligibility Requirements for Custodian

The Custodian hereunder shall at all times be a financial institution authorized to provide custodial services (i) that has the Required Rating or (ii) whose obligations in favour of the Co-Owners are covered by a guarantee or indemnity satisfactory to the Rating Agency provided by a financial institution or financial institutions that has or have the Required Rating, or in each case under clause (i) and (ii) above, as applicable, each such financial institution has otherwise been approved by the Rating Agency pursuant to the satisfaction of the Rating Agency Condition.   If at any time the Custodian shall cease to be eligible in accordance with the provisions of this Section 4.3, the Custodian shall resign immediately in the manner and with the effect specified in Section 4.4.

## 4.4         Resignation or Removal of Custodian

(a)    Subject to the provisions of Section 4.4(e), the Custodian may at any time tender its resignation by giving 60 days written notice thereof to the Co-Owners, the Asset Administrator and the Rating Agency. Upon receiving such notice, the Co-Owners shall promptly seek to retain a successor Custodian and, subject to acceptance by the Co-Owners of the resignation of the resigning Custodian, shall appoint such Person by written instrument, subject to the Rating Agency Condition, in duplicate, one copy of which instrument shall be delivered to the resigning Custodian and one copy to the successor Custodian. If no successor Custodian shall have been so appointed or shall have accepted an appointment within 30 days after the giving of such notice of

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 20 -

resignation, either Co-Owner shall petition any court of competent jurisdiction for the appointment of a successor Custodian.

(b)    If at any time the Custodian shall be in material breach of its obligations hereunder, or shall cease to be eligible in accordance with the provisions of Section 4.3 and shall fail to resign after receiving a written request to do so from the Co-Owners or, if at any time the Custodian shall be legally unable to act, or commits any act of bankruptcy, including the making of an assignment or filing of notice of intention to make any proposal for the benefit of some or all of its creditors under applicable bankruptcy or insolvency law, or if a receiver of the Custodian or of its property shall be appointed, or any public officer shall take charge or control of the Custodian or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then the Co-Owners may remove the Custodian and promptly appoint a successor Custodian, subject to the Rating Agency Condition, by written instrument, in duplicate, one copy of which instrument shall be delivered to the Custodian so removed and one copy to the successor Custodian.

(c)    Subject to the Rating Agency Condition, the Custodian may also be removed for any other reason at any time upon delivery of a Co-Owner Direction.

(d)    If a delay in obtaining a Co-Owner Direction with respect to the termination of the Custodian would reasonably be expected to have a material adverse effect on the interests of either of the Co-Owners or an Asset Administrator, the Asset Administrator, as agent for and on behalf of the Co-Owners shall, unless such delay is corrected, promptly elicit offers to become the Custodian (on a sealed bid basis) from at least three Persons, who are not Affiliates of one another and who satisfy the requirements of Section 4.3, subject to the Rating Agency Condition. Each such offer shall specify an annual fee that the offeror is prepared to accept as full compensation for the assumption of the obligations of the Custodian hereunder. The Asset Administrator shall, within fifteen Business Days from the date that the last of such offers is submitted to it, select the Person, from among those Persons submitting offers, who is prepared to immediately accept the appointment as Custodian and whose specified servicing fee as set forth in the offer is the lowest annual amount therefor.

(e)    Any resignation or removal of the Custodian and appointment of the successor Custodian pursuant to any of the provisions of this Section 4.4 shall not become effective until acceptance of appointment by the successor Custodian as provided in Section 4.5.

## 4.5        Successor Custodian

(a)    Any successor Custodian appointed as provided in Section 4.4 hereof shall execute, acknowledge and deliver to the Co-Owners and the Asset Administrator and to its predecessor Custodian an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor Custodian shall become effective and such successor Custodian shall have all the authority, rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as Custodian herein. The predecessor Custodian shall deliver to the successor Custodian all documents or copies thereof, at the expense of the predecessor Custodian, and statements held by it hereunder, and the predecessor Custodian shall execute and deliver such instruments and do such other things as may reasonably be required for the successor Custodian to

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 21 -

have all such authority, rights, power, duties and obligations, including with respect to the conveyance of the Assets. The Co-Owners shall immediately give notice thereof to the Rating Agency.

(b)      No successor Custodian shall accept appointment as provided in this Section 4.5 unless at the time of such acceptance such successor Custodian shall be eligible under the provisions of Section 4.3 hereof and legally able to act as such.

## 4.6      Merger, Amalgamation or Consolidation of Custodian

Any Person into which the Custodian may be merged or converted or with which it may be consolidated or amalgamated, or any Person resulting from any merger, conversion, amalgamation or consolidation to which the Custodian shall be a party, shall be the successor of the Custodian hereunder, provided such Person shall be eligible under the provisions of Section 4.3 hereof and legally able to act as such, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

## 4.7      Maintenance of Office or Agency

The Custodian will maintain at its expense in the City of Toronto, an office or offices or agency or agencies where notices and demands to or upon the Custodian contemplated under this Agreement may be served. The Custodian initially designates its office as set out on the signature page of this Agreement as its office for such purpose. The Custodian will give prompt written notice to Co-Owners and their Asset Administrator of any change in the location of any such office or agency.

## 4.8      Accounts and Records.

The Custodian shall keep records with respect to the CIBC Mellon Account and such records as directly relate to the CIBC Mellon Account shall be open to inspection during reasonable business hours by Persons duly authorized by the Co-Owners upon prior written notice and provided that such inspection shall be conducted in the presence of a representative of the Custodian. To the extent the Custodian is legally obligated to permit any Persons other than those authorized by the Co-Owners to have such access, the Co-Owners agree, upon notice from the Custodian, that the Custodian shall provide such Persons with access to such records.

## 4.9      Reports

The Custodian shall at the request of the Co-Owners or any other creditors in connection with the MCAP Program, or on such other basis as agreed to in writing by the Custodian and the Co-Owners, and within ninety (90) days after termination of this Agreement, furnish to the Co-Owners a written statement of account setting forth all allocations, investments, receipts, disbursements and other transactions effected by them during such period.

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 22 -

**4.10        Compensation**

The Co-Owners shall pay to the Custodian for services under this Agreement the fees as agreed from time to time in writing by the Custodian and each of the Co-Owners.  Such compensation may be changed from time to time by written consent of CIBC Mellon and the relevant Co-Owner and on 10 days advance notice to the Rating Agency.

**4.11        Tax Obligations**

Tax Obligations are the obligations of the Co-Owners and not the Co-Ownership Service Providers.  The Co-Owners shall cause the Asset Administrator to notify the Co-Ownership Service Providers in writing of any Tax Obligations if and to the extent that the Asset Administrator requires assistance from the Co-Ownership Service Providers with such Tax Obligation. The Co-Ownership Service Providers shall use reasonable efforts to assist the Asset Administrator, to the extent the Asset Administrator has provided necessary information, with respect to any Tax Obligations and the Co-Ownership Service Providers shall be entitled to reasonable fees and expenses with respect to any such assistance they provide.  If Applicable Law imposes an obligation upon any of the Co-Ownership Service Providers or any sub-custodian for any Taxes or other Tax Obligations in respect of this Agreement, the Co-Owners shall cause the Asset Administrator to inform the Co-Ownership Service Providers in writing of such Tax Obligations, shall direct the Co-Ownership Service Providers with respect to the performance of such Tax Obligations and shall provide the Co-Ownership Service Providers with the necessary funds and all information required by the Co-Ownership Service Providers to fund, pay or meet such Tax Obligations.

**4.12        Indemnity**

In addition to and without derogation from any other indemnity afforded to any of them hereunder or otherwise by law (but without duplication of recovery), the Co-Owners shall each indemnify and hold harmless, to the extent of their respective Proportionate Interest, the Co-Ownership Service Providers from any loss, damage or expense, including reasonable counsel fees and expenses, arising in connection with this Agreement (except to the extent caused by gross negligence, wilful misconduct, fraud or lack of good faith).

**4.13        Calculation of Market Values**

In the event that the Co-Ownership Service Providers calculate market values, they shall rely on various data sources in so calculating. The Co-Ownership Service Providers shall not be liable for any loss, damage or expense arising as a result of an error in such data sources.

POSTING VERSION: Subject to minor revisions /
Schedules subject to updating

- 23 -

# ARTICLE 5
# GENERAL

## 5.1         Notices

All notices, consents and other communications provided for hereunder shall, unless otherwise stated herein, be in writing (including telecopied or e-mailed) and faxed, mailed, e-mailed or delivered to each party hereto at their respective addresses set forth on the signature pages hereof or, in each case, at such other address as shall be designated by such party by notice delivered to the other parties hereto. All such notices and communications shall be effective, in the case of written notice, on the Business Day it is delivered, and, in the case of notice by e-mail or telecopy, when e-mailed or telecopied and receipt confirmed back, in each case addressed as aforesaid.

## 5.2         Amendments

No amendment or waiver of any provision of this Agreement nor consent to any departure therefrom shall be effective in whole or in part unless the Rating Agency Condition has been satisfied, the amendment or waiver will not materially adversely affect the rights of Master Asset Vehicle III under the Securitization Agreement without its prior consent and the amendment or waiver is consented to in writing by each of the parties hereto, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No party to this Agreement is bound by any amendment to the MCAP MAV 1 RACSA or the MCAP MAV 2 RACSA, as applicable, which in any way materially adversely affects their rights or obligations unless they have expressly consented to the amendment.

## 5.3         Enurement

This Agreement shall be binding upon and shall enure to the benefit of the parties hereto and their respective successors and permitted assigns.

## 5.4         Termination of Co-Ownership Arrangement

The co-ownership arrangement created under this Agreement and the respective obligations of the Co-Owners created under this Agreement shall terminate on the day following the date on which all amounts to be distributed in respect of the Assets have been distributed to the Co-Owners and all of the Assumed Liabilities have been satisfied or written off.

## 5.5         Delivery of Assets

The Custodian agrees, after payment of all amounts owing to the Custodian hereunder, to deliver the assets of the CIBC Mellon Account, if any, as soon as practicable after termination of the Agreement to, or as instructed in writing by the Co-Owners or the Asset Administrator. All taxes and other expenses incident to the transfer resulting from such termination shall be paid by the Co-Owners.

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 24 -

## 5.6        **Relationships**

The relationship of co-owners of the Co-Owners shall be solely the relationship that arises from the rights and obligations created under this Agreement. The Custodian and each Co-Owner expressly disclaim any intention to create a relationship of partnership or joint venture. Each of the parties hereto covenants with the others that it will not, at any time, allege or claim that a partnership or joint venture exists between them, or any of them with respect to the property referred to herein.

## 5.7        **No Waiver, Cumulative Remedies**

No failure by a party to exercise and no delay by any party in exercising any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by applicable law.

## 5.8        **Further Assurances**

Each party agrees to do and perform from time to time, at the Co-Owners' expense in an amount equal to each Co-Owner's respective Proportionate Interest in respect of the Asset or Assumed Liability at issue, any and all acts and execute and deliver any and all further instruments required or reasonably requested by any other party hereto to more fully effect the purposes of this Agreement including the execution and delivery of any instrument required or reasonably requested by any other party hereto to vest in a Co-Owner the respective undivided Co-Ownership Interests of such Co-Owner in the Assets and the Assumed Liabilities.

## 5.9        **Trustees**

(a)        It is expressly understood and agreed by the parties hereto that: (a) this Agreement is executed and delivered by the Trustee, not individually or personally but in its capacity as trustee of each of Master Asset Vehicle I and Master Asset Vehicle II in the exercise of the powers and authority conferred and vested in it; (b) each of the representations, warranties, undertakings, covenants, indemnities, agreements and other obligations herein made on the part of each of Master Asset Vehicle I and Master Asset Vehicle II is made and intended not as personal representations, undertakings, covenants, indemnities, agreements and other obligations by the Trustee but is made and intended for the purpose of binding only the property and assets of each of Master Asset Vehicle I and Master Asset Vehicle II; and (c) nothing herein contained shall be construed as creating any liability on the Trustee in its personal capacity, the beneficiaries or any incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Trustee or any predecessor or successor of the Trustee, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto; (d) under no circumstances shall the Trustee in its personal capacity, the beneficiaries or any incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Trustee or any predecessor or successor of the Trustee, be personally liable

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 25 -

for the payment of any indebtedness or expenses of each of Master Asset Vehicle I and Master Asset Vehicle II or be liable for the breach or failure of any representation, warranty, undertaking, covenant, indemnity, agreement or other obligation made or undertaken by each of Master Asset Vehicle I and Master Asset Vehicle II under this Agreement, other than in respect of its own fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of its obligations and duties; (e) except as otherwise specifically provided in the MCAP MAV1 RACSA or the MCAP MAV2 RACSA, as applicable, no property or assets of the Trustee, whether owned beneficially by it in its personal capacity or otherwise than in its capacity as issuer trustee of each of Master Asset Vehicle I and Master Asset Vehicle II, will be subject to levy, execution or other enforcement procedures with regard to any of the representations, warranties, covenants, undertakings, indemnities, agreements and other obligations of the Trustee or each of Master Asset Vehicle I and Master Asset Vehicle II under such written instrument; and (f) no recourse may be had or taken, directly or indirectly, against the Trustee in its personal capacity, the beneficiaries or any incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Trustee or any predecessor or successor of the Trustee with regard to the representations, warranties, undertakings, covenants, indemnities, agreements and other obligations of each of Master Asset Vehicle I and Master Asset Vehicle II or the Trustee or any beneficiary, incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Trustee or any predecessor or successor of the Trustee under such written instrument other than in respect of such Person's own fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of its obligations and duties.

(b)    It is the intention of the parties hereto that the limitation of liability conferred by Section 5.9(a) on the beneficiaries, incorporators, Affiliates, shareholders, directors, officers, representatives, employees, managers, members, advisors, agents or successors and assigns of the Trustee and of any beneficiaries of the Co-Owners shall be enforceable by each such Person as fully and effectively as if it is a party to this Agreement and notwithstanding any law that otherwise might deprive it of the benefit of Section 5.9(a) due to lack of privity or want of consideration.

(c)    Any reference in this Agreement to either of the Co-Owners means, unless the context otherwise requires, the Trustee in its capacity as trustee of each of the Co-Owners and where any reference is made in this Agreement to an act to be performed by, an appointment to be made by, an obligation or liability of, an asset or right of, a discharge or release to be provided by, a proceeding to be taken by or against, or a covenant, representation or warranty (other than relating to the constitution or existence of the Co-Owners) by or with respect to the Co-Owners, such reference: (i) shall be construed and applied for all purposes as if it referred to an act to be performed by, a certificate or written order to be delivered by, an appointment to be made by, an obligation or liability of, an asset or right of, a discharge or release to be provided by, a proceeding to be taken by or against, or a covenant, representation or warranty (other than relating to the constitution or existence of the Co-Owners) by or with respect to, the Trustee solely in its capacity as trustee of each of the Co-Owners; and (ii) shall include any such act, appointment, discharge, release, suit or proceeding made, provided or taken by any agent, attorney or representative from time to time appointed by the Trustee to act on behalf of either of the Co-Owners.

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 26 -

5.10          **Force Majeure**

Notwithstanding any other provision of this Agreement, each Co-Owner agrees that the Co-Ownership Service Providers shall not be responsible or liable for the failure of the Co-Ownership Service Providers to perform under this Agreement or for any loss, damage or expense to the CIBC Mellon Account resulting from any event beyond the reasonable control of the Co-Ownership Service Providers or its agent or sub-custodians, including but not limited to nationalization, strikes, expropriation, devaluation, seizure, or other similar action by any Governmental Authority, *de facto* or *de jure*; or enactment, promulgation, imposition or enforcement by any such governmental authority of currency restrictions, exchange controls, levies or other charges affecting the assets of the CIBC Mellon Account; or the breakdown, failure or malfunction of any utilities or telecommunications systems; or any order or regulation of any banking or securities industry including changes in market rules and market conditions affecting the execution or settlement of transactions; or any other similar or third-party event; or acts of war, terrorism, insurrection or revolution; or acts of God. This Section shall survive the termination of this Agreement.

5.11          **Counterparts**

This Agreement may be executed in two or more counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same instrument. For all purposes of this Agreement and all other documents and agreements contemplated hereby, the signature of any party hereto or thereto, evidenced by a telecopy showing such signature or other electronically transmitted version of such signature shall constitute conclusive proof for all purposes of the signature of such Person to such documents and agreements to the same extent in all respects as a copy of such documents and agreements showing the original signature of such party.

**[The remainder of this page has been intentionally left blank.]**

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 27 -

     IN WITNESS WHEREOF the parties have executed this Agreement on the date first above written.

**CIBC MELLON TRUST COMPANY**

_____
Name:


_____
Name:


320 Bay Street
P.O. Box 1
Toronto, Ontario
M5H 4A6

Attention:    Senior Vice President, Client
             Relationship Management
Facsimile:    ●

**CIBC MELLON GLOBAL
SECURITIES SERVICES COMPANY**

_____
Name:


_____
Name:


320 Bay Street
P.O. Box 1
Toronto, Ontario
M5H 4A6

Attention:    Senior Vice President, Client
             Relationship Management
Facsimile:    ●

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

- 28 -

**CIBC MELLON GLOBAL
SECURITIES SERVICES COMPANY,**
in its capacity as trustee of **MASTER
ASSET VEHICLE I**

_____

Name:

_____

Name:

| Address: | 320 Bay Street |
| | P.O. Box 1 |
| | Toronto, Ontario |
| | M5H 4A6 |

Attention:    Senior Vice President, Client
Relationship Management
Facsimile No.: ●

**CIBC MELLON GLOBAL
SECURITIES SERVICES COMPANY,**
in its capacity as trustee of **MASTER
ASSET VEHICLE II**

_____

Name:

_____

Name:

| Address: | 320 Bay Street |
| | P.O. Box 1 |
| | Toronto, Ontario |
| | M5H 4A6 |

Attention:    Senior Vice President, Client
Relationship Management
Facsimile No.: ●

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

## SCHEDULE A
## MATTERS RELATING TO THE ASSETS

| Asset |
|---|
| Third amended and restated commercial mortgage purchase agreement between MCAP Commercial LP, the Co-Owners, CIBC Mellon Global Securities Services Company in its capacity as trustee of Master Asset Vehicle III and CIBC Mellon Trust Company dated the date hereof (the "MCAP MPA") |
| Nominee agreement between MCAP Commercial LP, MCAP Financial Corporation and Rocket (subsequently assigned to the Co-Owners) dated February 10, 2004 (the "Nominee Agreement") |
| The Purchased Assets (as defined under the MCAP MPA) |
| The program accounts (the Cash Collateral Accounts, the Collections Accounts and the Provision Account, and for greater certainty, shall not include the MAV1 Trust Distribution Account and the MAV2 Trust Distribution Account, all as defined in the MCAP MPA) |

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

**SCHEDULE B**
**AGREEMENT TO BE BOUND**

TO:    THE OTHER PARTIES TO THE CO-OWNERSHIP AGREEMENT REFERRED TO
       BELOW

The undersigned hereby acknowledges and confirms that the undersigned has:

1.              received a copy of the co-ownership agreement (the "**Co-Ownership**
**Agreement**") dated as of ⬤ between CIBC Mellon Global Securities Services Company, in its
capacity as trustee of Master Asset Vehicle 1 ("**MAV1**"), CIBC Mellon Global Securities
Services Company, in its capacity as trustee of Master Asset Vehicle 2 ("**MAV2**, and together
with MAV1, the "**Co-Owners**" and each, individually, a "**Co-Owner**"), and CIBC Mellon Trust
Company (the "**Custodian**"), as amended to the date hereof;

2.              read and understood fully the provisions of the Co-Ownership Agreement; and

3.              proposes to acquire a Co-Ownership Interest in accordance with the provisions of
the Co-Ownership Agreement in the Assets and Assumed Liabilities specified in Schedule A and
Schedule C, respectively, (the "**Transferred Interests**") from ⬤ (the "**Assignor**").

              The undersigned hereby covenants and agrees to be bound by the Co-Ownership
Agreement, as the same may be amended from time to time in accordance with the provisions
thereof, as an owner of an undivided co-ownership interest in the Transferred Interests, in the
same Proportionate Interest previously held by the Assignor in such Transferred Interests, in the
same manner and to the same extent as if the undersigned had been an original party to the Co-
Ownership Agreement and the undersigned hereby makes the representations and warranties
contained in Section 3.1 of the Co-Ownership Agreement in respect of itself to each Co-Owner.

              Unless otherwise defined in this Agreement, all terms used above that are defined
in the Co-Ownership Agreement have the respective meanings given to them in the Co-
Ownership Agreement.

DATED the day of ⬤ day of ⬤, ⬤.

_____

**[Name and signature of party to be bound]**

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

## SCHEDULE C
## ASSUMED LIABILITIES

| Assumed Liability |
|---|
| The obligations under the subordinated loan agreement between Rocket (subsequently assigned to the Co-Owners) and MCAP Commercial LP dated October 5, 2005 |
| The obligations under the subordinated loan agreement between Rocket (subsequently assigned to the Co-Owners) and Cadim Tach (Canada) Inc. dated October 5, 2005 |
| The obligations under the amended and restated Loan Agreement between the Co-Owners, CIBC Mellon Global Securities Services Company in its capacity as trustee of Master Asset Vehicle III and CIBC Mellon Trust Company dated the date hereof |
| The obligations under the MCAP MPA |

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

**SCHEDULE D**
**MAV1/BLACKROCK ADMINISTRATION AND MANAGEMENT AGREEMENT**

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

**SCHEDULE E**
**MAV2/BLACKROCK ADMINISTRATION AND MANAGEMENT AGREEMENT**

POSTING VERSION:  Subject to minor revisions /
Schedules subject to updating

## SCHEDULE F
## NEWCO ADMINISTRATION AND MANAGEMENT AGREEMENT