POSTING VERSION: Subject to minor revisions / updating
MAV1 ISDA SCHEDULE

**SCHEDULE**
**to the**
**1992 ISDA Master Agreement**
**dated as of January [●], 2009**

between

each entity listed on Annex A attached hereto (severally and not jointly) (each, a **"Designated Party"** and each Designated Party, **"Party A"**)

and

CIBC Mellon Global Securities Services Company (or any successor to the trust or custodial business thereof or permitted assign or replacement thereof in accordance with the terms of the Declaration of Trust), in its capacity as issuer trustee of Master Asset Vehicle I (**"Party B"**)

For the avoidance of doubt, upon execution of this Agreement, including this Schedule, Party B and each Designated Party shall be deemed to have executed a single ISDA Master Agreement identical to this Agreement (including this Schedule and the Credit Support Annex annexed to this Schedule at Annex B (the **"Dealer CSA"**)) with the only parties to such single ISDA Master Agreement being Party B and such Designated Party (a **"Single Entity Agreement"**) and with the only differences between this Agreement and each such Single Entity Agreement being as set forth on Annex A to this Schedule and Appendix A to the Dealer CSA in respect of the relevant Designated Party. References throughout this Agreement to "Party A" shall refer only to the relevant Designated Party in respect of the Single Entity Agreement between such Designated Party and Party B. Party B shall have recourse under any Single Entity Agreement only to the assets of the relevant Designated Party (and, if applicable, its Credit Support Provider) deemed to have executed such Single Entity Agreement; in no event shall Party B or any of its Affiliates have recourse, whether by set-off or otherwise, to the assets of any other Designated Party or to or against the direct or indirect owners or Affiliates of any other Designated Party with respect to amounts owed or liabilities incurred under such Single Entity Agreement.

Capitalized terms used but not otherwise defined in this Agreement shall have the meanings ascribed thereto in Schedule A (*Master Definitions*) to the omnibus agreement dated January [●], 2009 between, *inter alios*, each of the Designated Parties, Party B, the Collateral Agent and the Administrator (the **"Omnibus Agreement"**). In the event of any inconsistency or conflict between the terms of this Agreement and the terms of the Omnibus Agreement, the terms of the Omnibus Agreement shall prevail.

**Part 1. Termination Provisions**

In this Agreement:

(a)      **"Specified Entity"** means in relation to Party A and Party B for the purpose of:

Section 5(a)(v), Not Applicable
Section 5(a)(vi), Not Applicable
Section 5(a)(vii), Not Applicable
Section 5(b)(iv), Not Applicable

(b)      **"Specified Transaction"** means "none" in respect of Party A and its Credit Support Provider and means "none" in respect of Party B, and, accordingly, the "Default under

Specified Transaction" provisions of Section 5(a)(v) will not apply to Party A or any Credit Support Provider of Party A and will not apply to Party B.

(c)     The **"Failure to Pay or Deliver"** provisions of Section 5(a)(i) will apply to Party A and will apply to Party B; provided that the failure by Party B to pay all or a portion of any Cash Settlement Amount under any LSS CDS on a date prior to the occurrence of the Second Spread/Loss Trigger Event pursuant to Section 4.3(b)(ii)(C) of the Omnibus Agreement shall not constitute a Failure to Pay under Section 5(a)(i) until such Cash Settlement Amount becomes due and payable in accordance with Section 4.3(b)(ii)(C) of the Omnibus Agreement.

(d)     The **"Breach of Agreement"** provisions of Section 5(a)(ii) will not apply to Party A and will not apply to Party B.

(e)     The **"Credit Support Default"** provisions of Section 5(a)(iii) will apply to Party A with respect to all Credit Support Documents applicable to Party A.

The **"Credit Support Default"** provisions of Section 5(a)(iii) will apply to Party B to the extent expressly provided herein with respect to any Credit Support Documents applicable to Party B.

(f)     The **"Misrepresentation"** provisions of Section 5(a)(iv) will apply to Party A and its Credit Support Provider, and will not apply to Party B.

(g)     The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and its Credit Support Provider but will not apply to Party B; provided that, with respect to Party A, an Event of Default shall not occur under Sections 5(a)(vi)(1) or 5(a)(vi)(2) if, as demonstrated to the reasonable satisfaction of Party B, the event or condition referred to in Section 5(a)(vi)(1) or the failure to pay referred to in Section 5(a)(vi)(2) is caused by an error or omission of an administrative or operational nature and: (i) sufficient funds or assets were available to Party A to enable it to make the relevant payment or delivery when due, and such payment or delivery is made within three Business Days following receipt of written notice from an interested party of such failure to pay; or (ii) Party A was precluded from paying, or was unable to pay, using reasonable means, through the Office through which it was acting for purposes of the relevant Specified Indebtedness, by reason of any event or circumstance, including, without limitation, any natural, technological, political or governmental (which for greater certainty includes an act of state) or similar event or circumstance occurring after a Transaction is entered into, or an Illegality beyond its reasonable control.

For purposes of Section 5(a)(vi):

**"Specified Indebtedness"** will have the meaning specified in Section 14 of this Agreement but will exclude: (i) deposits received in the ordinary course of Party A's banking business to the extent repayment of such deposits is prevented by governmental or regulatory action unless such action is taken in an insolvency situation; and (ii) any insurance policy coverage obligations entered into in the ordinary course of Party A's business.

**"Threshold Amount"** shall mean the greater of three per cent. of the shareholders' equity of: (i) Party A; or (ii) its Credit Support Provider.

(h)     The **"Bankruptcy"** provisions of Section 5(a)(vii) will apply to Party A and its Credit
Support Provider and will apply to Party B; provided, that, for purposes of applying
Section 5(a)(vii) to Party B: (i) Section 5(a)(vii)(2) shall not apply; (ii) Section
5(a)(vii)(3) shall not apply to any assignment, arrangement or composition that is
effected by or pursuant to the Transaction Documents; (iii) Section 5(a)(vii)(4) shall not
apply to a proceeding instituted, or a petition presented, by a Secured Creditor or any
Affiliates of a Secured Creditor; (iv) Section 5(a)(vii)(6) shall not apply to any
appointment that is effected by or pursuant to the Transaction Documents, or any
appointment to which Party B has not yet become subject; (v) Section 5(a)(vii)(7) shall
not apply to the extent the relevant action is taken pursuant to the Transaction
Documents; (vi) Section 5(a)(vii)(8) shall apply only to the extent of any event which has
an effect analogous to any of the events specified in clauses (1), (3), (4), (5) (6) or (7) of
Section 5(a)(vii), in each case as modified in this Part 1(h); and (vii) Section 5(a)(vii)(9)
shall apply only with respect to Section 5(a)(vii)(1).

(i)     The **"Merger Without Assumption"** provisions of Section 5(a)(viii) will apply to Party
A and will apply to Party B.

(j)     The **"Credit Event Upon Merger"** provisions of Section 5(b)(iv) will not apply to Party
A or its Credit Support Provider and will not apply to Party B.

(k)     The **"Automatic Early Termination"** provision of Section 6(a) will not apply to Party A
and will not apply to Party B.

(l)     **Payments on Early Termination**.  For the purpose of Section 6(e) of this Agreement:

Second Method and Market Quotation will apply, except that the process for determining
the Market Quotation will be modified as follows.

    (i)     In seeking quotations, the determining party shall send copies of the
Confirmation for each Terminated Transaction to each Reference Market-maker
and: (A) in the case of an early termination pursuant to Part 1(p)(iii), to the
relevant Unwinding Lender (other than a Breaching Lender); and (B) in the case
of an early termination other than pursuant to Part 1(p)(iii), to each Lender (other
than a Breaching Lender).  Each Reference Market-maker shall have 24 hours
from the receipt of such Confirmation to provide a quotation which must remain
actionable for at least one hour after the time designated for receipt of such
quotation by the determining party, as specified in its quotation solicitation.  The
determining party shall seek firm, actionable quotations and, in calculating the
Market Quotation with respect to any Terminated Transaction, it shall ignore any
quotations that it determines in good faith are not firm and actionable quotations.
The determining party shall seek quotations by no later than 12:00 noon on the
fifth Business Day following the relevant Early Termination Date (or later, if
agreed between Party A and Party B).

    (ii)    Subject to Part 1(l)(iv) below, in respect of any early termination of a LSS CDS
or an Unlevered CDS, the determining party shall submit notice of the Market
Quotations (or, if the Market Quotation cannot be determined in accordance with
this Agreement, the determining party's Loss) determined with respect to any
Early Termination Date and each Terminated Transaction (such notice, a **Lender
Quotation Notice**), in the case of an early termination pursuant to Part 1(p)(iii),

to the relevant Unwinding Lender  or, in the case of an early termination other than pursuant to Part 1(p)(iii), the relevant Lenders, as the case may be, as soon as reasonably practicable after such determination (but in no event later than 30 minutes after receipt of the last quotation from a Reference Market-maker or, if Market Quotation cannot be determined, within 24 hours of the determination of the determining party's Loss).

(iii)    Following delivery of such Lender Quotation Notice, the relevant Unwinding Lender (in the case of an early termination pursuant to Part 1(p)(iii)) or each of the relevant Lenders (in the case of an early termination other than pursuant to Part 1(p)(iii)), as the case may be, shall have 30 minutes to respond to the determining party with a quotation in respect of the Terminated Transaction that would result in a lower Termination Payment payable by Party B than the corresponding Market Quotation specified in the Lender Quotation Notice in respect of such Terminated Transaction (each, a **Lender Quotation**) and such Lender Quotation must be firm and actionable for one hour after the time designated for receipt of such quotation by the determining party, as specified in its quotation solicitation.

(iv)    The determining party shall only be obligated to seek a Lender Quotation from a Lender to the extent that it (A) is not a Breaching Lender and (B) satisfies all of the criteria which the determining party applies generally at the time in deciding whether to enter into transactions of the nature of the Terminated Transaction(s) including (without limitation) credit and other internal policies of such determining party.

(v)    Whether or not the determining party elects to action the Lender Quotation (which it may decide in its sole discretion), the lowest such Lender Quotation provided in respect of a Terminated Transaction, if any, shall be deemed to be the Market Quotation and, accordingly, the Termination Payment in respect of the relevant Terminated Transaction, except that if the determining party attempts to action such Lender Quotation and it is rescinded by the relevant Lender, then such Lender Quotation shall be deemed not to have been provided.

(vi)    For the purposes of this Part 1(l): (A) the relevant Unwinding Lender (other than a Breaching Lender) shall be the Lender in respect of which a Terminal Unwind Event has occurred and the corresponding Terminated Transactions in respect of such Unwinding Lender shall be those Terminated Transactions with a notional amount equal to the applicable Unwind Percentage of the notional amount of the Existing Transactions immediately preceding the relevant Terminal Unwind Event; and (B) in respect of early terminations other than pursuant to Part 1(p)(iii), a Lender Quotation Notice shall, subject to Part 1(l)(iv), be delivered to each Lender (other than a Breaching Lender) and the quotation in respect of each such Terminated Transaction which would result in the lowest Termination Payment payable by Party B in respect of such Terminated Transaction shall be deemed to be the Market Quotation determined and, accordingly, the Termination Payment in respect of the relevant Terminated Transaction except that if the determining party attempts to action the Lender Quotation and it is rescinded by the relevant Lender, then such Lender Quotation shall be deemed not to have been provided.

(vii)    If no Lender Quotation is obtained in accordance with the above procedures, then the Market Quotation in respect of the relevant Terminated Transaction shall be the Market Quotation obtained in accordance with this Agreement (as modified by Part 1(l)(i) above) or, if the Market Quotation cannot be determined in accordance with this Agreement, the determining party's Loss.

(viii)    The determining party shall submit the amount due with respect to any Early Termination Date, together with the statement of calculations required under Section 6(d)(i) (including the Settlement Amounts with respect to each Terminated Transaction), to the other party and each Lender by no later than 12:00 noon on the fifth Business Day following such Early Termination Date (or later, if agreed between Party A and Party B).

(m)    "**Termination Currency**" means Canadian Dollars.

(n)    Failure to comply with paragraphs (i), (ii) or (iii) below shall be an Additional Termination Event in respect of which Party A shall be the sole Affected Party and all Transactions shall be Affected Transactions:

    (i)    **First ratings downgrade of Party A**. If Party A (or, if applicable, its Credit Support Provider) does not satisfy the Required Ratings I (such event a "**Ratings Event**"), then, within 30 calendar days after such event and at its own cost, Party A will do one of the following:

        1.    make a Permitted Transfer; or

        2.    procure an Eligible Guarantee; or

        3.    both of the following, to the extent applicable:

            (A)    take the actions necessary upon the occurrence of a Ratings Event as set forth in the Confirmations for any LSS CDSs, Unlevered CDSs or Wrap Swaps; and

            (B)    at its own expense, post collateral in accordance with the terms of the Dealer CSA, if required thereunder; or

        4.    take such other action acceptable to Party B in respect of which the Rating Agency Condition is satisfied.

    Party A shall also notify the Administrator and the Rating Agency of such Ratings Event within two Business Days of its occurrence, provided that failure to provide such notification shall not constitute an Event of Default or a Termination Event with respect to Party A.

    (ii)    **Second ratings downgrade of Party A**. If Party A (or, if applicable, its Credit Support Provider) does not satisfy the Required Ratings II (such event a "**Second Ratings Event**"), then, within 10 Business Days after such event and at its own cost, Party A will do one of the following (or, in the case of Existing Interest Rate Hedges, any of items (1), (2) or (4) below):

1.    make a Permitted Transfer; or

2.    procure an Eligible Guarantee; or

3.    both of the following, to the extent applicable:

    (A)    take the actions necessary upon the occurrence of a Ratings Event as set forth in the Confirmations for any LSS CDSs or Unlevered CDSs; and

    (B)    terminate any Wrap Swaps under this Agreement with the parties making all the payments and/or deliveries thereunder that would otherwise have been required to have been made on the Termination Date of each such Wrap Swap, with no further amounts payable under Section 6(e) with respect to such termination; or

4.    take such other action acceptable to Party B in respect of which the Rating Agency Condition is satisfied.

Party A shall also notify the Administrator and the Rating Agency of such Second Ratings Event within two Business Days of its occurrence, provided that failure to provide such notification shall not constitute an Event of Default or a Termination Event with respect to Party A.

If any of the provisions under Part 1(n)(i)(1), (2) or (4) or Part 1(n)(ii)(1), (2), (3) or (4) is satisfied at any time, all amounts (or the equivalent thereof, as appropriate), if any, previously transferred by Party A pursuant to Part 1(n)(i)(3)(B) will be returned to Party A as soon as reasonably practicable after effecting such alternative.  If Party A does not timely take any of the measures required by Part 1(n)(i) and Part 1(n)(ii) above, such failure shall not be or give rise to an Event of Default, but shall constitute an Additional Termination Event with Party A as the sole Affected Party and all Transactions shall be Affected Transactions.

(iii)    **Failure to transfer Other Posted Support**.    If Party A does not transfer Other Posted Support in accordance with Part 5(l) below..

(o)    Each of the following shall be an Additional Termination Event in respect of which Party B shall be the sole Affected Party and all Transactions shall be Affected Transactions:

(i)    **Failure to Satisfy Eligibility Criteria.**

Failure by Party B to satisfy the Eligibility Criteria set forth in the Administration Agreement in connection with the reinvestment of Collateral, determined as of the date of purchase (i.e. the 'trade date'), of such reinvestment, if:

(A)    such failure is not remedied on or before the thirtieth Business Day after notice of such failure is given to the Administrator; and

(B)    such failure can reasonably be expected to have a Material Adverse Effect on Party A's rights and obligations under the Transaction Documents,

provided that the parties hereto acknowledge that:

(1)    this Part 1(o)(i) shall not apply to any failure to satisfy the Eligibility Criteria in respect of the reinvestment of the Original Collateral of any Dealer, except and solely to the extent that both of (i) and (ii), following, apply: (i) the Eligibility Criteria apply to such reinvestment, pursuant to Section 4.11 (*Reinvestment of Matured Original Collateral*) or 4.12 (*Mechanics of Investing Matured Original Collateral*) of the Omnibus Agreement; and (ii) the failure to satisfy the Eligibility Criteria in respect of such reinvestment is not caused by an act or failure to act of, or by inaccurate or incomplete information provided by, such Dealer or its OC Custodian; and

(2)    to the extent that the exception in Subclause (1) above applies with respect to any part of the Original Collateral of any Dealer, whether a failure to satisfy the Eligibility Criteria (determined as of the date described above in this Part 1(o)(i)) in connection with the reinvestment of the proceeds of such Original Collateral has a Material Adverse Effect on Party A shall be determined as if such Original Collateral were part of CA-Held Collateral (and any such failure will be considered to affect each Dealer accordingly).

(ii)    **Failure to Comply with Certain Other Obligations.**

Party B fails to comply with or observe a Material Covenant if: (x) such failure is not remedied on or before the thirtieth Business Day after notice of such failure is given to Party B; (y) such failure has a Material Adverse Effect on Party A's rights and obligations under the Transaction Documents; and (z) the Majority Secured Creditors have consented to the designation of an Early Termination Date with respect to all Transactions under all Swap Agreements.

(p)    Each of the following shall also be an Additional Termination Event in respect of which Party B shall be the sole Affected Party and the Transaction (or portion thereof) subject to such exercise shall be the sole Affected Transaction:

(i)    **Original Collateral Default.**

(A)    Party A may designate an Early Termination Date in respect of any Transaction (or portion thereof) pursuant to Section 4.4(a) of the Omnibus Agreement.

(B)    Early terminations of less than all of a Transaction shall be governed by the terms of Part 1(q) and for the purposes thereof, **"Partial Unwind Notional Amount"** shall be equal to the product of the Notional Amount

of the Transaction and the fraction determined in accordance with Section 4.4(a)(ii) of the Omnibus Agreement.

(ii) **Liquidation of Collateral pursuant to Section 4.8 (*Liquidation of Collateral*) of the Omnibus Agreement.**

(A) If, pursuant to Section 4.8(b) of the Omnibus Agreement, the Administrator notifies Party A that an Unlevered CDS and/or its related Wrap Swap (or any portion each thereof) or an Existing Interest Rate Hedge is to be liquidated, Party A shall designate an Early Termination Date in respect of such Transaction (or the specified portion thereof) within five Business Days of receipt of such notice from the Administrator.

(B) Early terminations of less than all of a Transaction shall be governed by the terms of Part 1(q) and for the purposes thereof, "**Partial Unwind Notional Amount**" shall mean, in respect of the Existing Transaction, an amount determined by the Administrator in accordance with Section 4.8(b) of the Omnibus Agreement.

(iii) **Partial Early Termination upon a Terminal Unwind Event**

(A) On any day on which a Terminal Unwind Event occurs with respect to one or more Lenders in accordance with the terms of the Omnibus Agreement, an Early Termination Date shall occur automatically with respect to each Transaction (or portion thereof) on such Terminal Unwind Event Date or BNL Notice Date, as the case may be, in accordance with Sections 2.8 (*Avoiding Terminal Unwind Events*) or 4.2 (*Lender Default*), as applicable, of the Omnibus Agreement.

(B) Early terminations of less than all of a Transaction shall be governed by the terms of Part 1(q) and for the purposes thereof, "**Partial Unwind Notional Amount**" shall mean, in respect of each Existing Transaction and each Unwinding Lender, an amount equal to the Unwind Percentage of such Lender subject to a Terminal Unwind Event multiplied by the Notional Amount of each outstanding Transaction immediately preceding the relevant Terminal Unwind Event Date or BNL Notice Date, as the case may be.

(q) **Partial Early Terminations**

On the designation of an Early Termination Date of less than all of a Transaction pursuant to Part 1(p), such Transaction (the "**Existing Transaction**") shall be automatically split into two Transactions with the notional amount with respect to one Transaction (a "**Partial Unwind Transaction**") being an amount equal to the relevant Partial Unwind Notional Amount and with the notional amount with respect to the other Transaction (a "**Continuing Transaction**") being an amount equal to the Notional Amount of the Existing Transaction at the time immediately preceding the relevant Early Termination Date less the Partial Unwind Notional Amount, respectively, but each otherwise having the same terms as the Existing Transaction at the time immediately preceding the designation of an Early Termination Date. Each Continuing Transaction

shall continue in full force and effect with the same terms. Each Partial Unwind Transaction shall constitute a Terminated Transaction for all purposes of this Agreement and the termination payment with respect to the Partial Unwind Transaction shall be determined in accordance with the provisions of Section 6(e)(ii)(1) with Party B as the sole Affected Party.

(r)     **Affiliate Transactions**.  In the event that: (A) Party A and any Affiliate of Party A have both entered into Single Entity Agreements as "Designated Parties" with Party B; and (B) an Event of Default or Termination Event (other than a Tax Event or Illegality) occurs under the Single Entity Agreement between such Affiliate and Party B (the "**Affected Agreement**"), such Event of Default or Termination Event under the Affected Agreement shall (unless it would otherwise constitute an Event of Default hereunder) constitute an Additional Termination Event under this Agreement, in respect of which the Affected Party shall be the Defaulting Party or Affected Party under the Affected Agreement (or Party A, where the Defaulting Party or Affected Party under the Affected Agreement is Party A's Affiliate) and the Affected Transactions hereunder shall be any Transaction that forms a Paired Transaction with any Transaction under the Affected Agreement (in the case where an Event of Default has occurred under the Affected Agreement) or any Affected Transaction under the Affected Agreement (in the case where a Termination Event has occurred under the Affected Agreement), in each case under the Affected Agreement.

For the purposes of this Part 1(r), "**Paired Transaction**" means: (i) with respect to an Unlevered CDS or an LSS CDS under the Affected Agreement, any related Wrap Swap entered into under this Agreement in respect of the Allocated Collateral for such Unlevered CDS or an LSS CDS; and (ii) with respect to a Wrap Swap under the Affected Agreement, any Unlevered CDS or an LSS CDS under this Agreement, the Allocated Collateral of which is referenced by such Wrap Swap.

(s)     **Conditions Precedent**.

Section 2(a)(iii)(1) shall be deemed to be amended with respect to the obligations of Party A by the addition of the words "or an Additional Termination Event under Part 1(o)(i) (*Failure to Satisfy Eligibility Criteria*)" after the words "Potential Event of Default".

(t)     **Transfers to avoid certain Termination Events subject to Rating Agency Condition**

Any transfer of a party's rights and obligations under this Agreement in respect of any Affected Transaction pursuant to Section 6(b)(ii) and any action agreed upon by the parties pursuant to Section 6(b)(iii) shall be subject to and conditioned upon satisfaction of the Rating Agency Condition, and any such purported transfer made without satisfying the Rating Agency Condition shall be null and void *ab initio*.

(u)     **Amendments to Payments on Early Termination**

The provisions of Section 6(e) and the calculation of Payments on Early Termination thereunder with respect to an Early Termination Date designated with respect to Termination Events under Sections 5(b)(i), 5(b)(ii) and 5(b)(iii) will be further modified with respect to Party A to the extent specified on Annex A hereto.

**Part 2.  Tax Representations.**

(a)      **Payer Representation**. For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on:

    (i)      the accuracy of any representation made by the other party pursuant to Section 3(f);

    (ii)      the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and

    (iii)      the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) of this Agreement by reason of material prejudice to its legal or commercial position.

(b)      **Payee Representations**.

For the purpose of Section 3(f) of this Agreement, Party A makes to Party B and Party B makes to Party A the representations set out for such purpose in respect of such parties on Annex A and on Annex B, respectively, hereto.

**Part 3.  Agreement to Deliver Documents.**

For the purpose of Section 4(a)(i) and 4(a)(ii) of this Agreement, Party A and Party B each agrees to deliver the following documents to the other as applicable:

(a)      Tax forms, documents or certificates to be delivered are: in accordance with Section 4(a)(iii) or, if different, as specified on Annex A hereto.

(b)      Other documents to be delivered are:

| PARTY REQUIRED TO DELIVER DOCUMENT | FORM/ DOCUMENT/ CERTIFICATE | DATE BY WHICH TO BE DELIVERED | COVERED BY SECTION 3(d) REPRESENTATION |
|---|---|---|---|
| Party A | Certified copy of the resolution of the Board of Directors (or equivalent authorizing document), if available, setting forth the authority of each signatory to this Agreement and each Credit Support Document and the authority of such party to enter into the Transactions contemplated and performance of its obligations hereunder | Upon execution of this Agreement | Yes |
| Party A and Party B | Incumbency certificate (or, if available the current authorized signature book or equivalent authorizing documentation) setting forth the names, titles, authority and specimen signatures of the persons authorized to execute this Agreement, each Credit Support Document and all Confirmations in respect of Transactions contemplated hereunder, and solely in the case of Party B, only to the extent, without duplication, not already provided for in this Part 3(b) | Upon execution of this Agreement, and as reasonably requested in connection with the execution and delivery of Confirmations (including Novation Confirmations) in respect of Transactions entered into hereunder or novated to become Transactions hereunder | Yes |
| Party A and Party B | Duly executed copy of the Credit Support Documents listed with respect to such party in Part 4(f) hereof | Upon execution of this Agreement | No |
| Party B | Certified copies of the Declaration of Trust and of the organisational documents of the Issuer Trustee | Upon execution of this Agreement and promptly upon any amendment, modification, restatement, replacement or other supplement thereto | No |

| PARTY REQUIRED TO DELIVER DOCUMENT | FORM/ DOCUMENT/ CERTIFICATE | DATE BY WHICH TO BE DELIVERED | COVERED BY SECTION 3(d) REPRESENTATION |
|---|---|---|---|
| Party B | Duly executed copy of the Transaction Documents in effect as of the date hereof | Upon the execution of this Agreement and promptly upon any amendment, modification, restatement, replacement or supplement thereto | No |
| Party A | An opinion of internal counsel to Party A as to customary corporate matters in form and substance reasonably satisfactory to Party B | Upon execution of this Agreement | No |
| Party B | An opinion of counsel to Party B as to (i) customary matters relating to the formation and existence of Party B, (ii) the enforceability of this Agreement against Party B; and (iii) as to the perfection of security and related matters following the Posting or transfer of Collateral under the Master Security Agreement, each in form and substance reasonably satisfactory to Party A | Upon execution of this Agreement | No |
| Party B | Copies of each report, notice or other similar communication required to be delivered to any Noteholder under any Transaction Document from time to time | On the date required under such Transaction Document, as applicable | No |
| Party A and Party B | Custody Agreement or similar documentation, if any, in respect of the Collateral to be posted and maintained under the Master Security Agreement and the Omnibus Agreement | Upon execution of this Agreement and promptly upon any amendment, modification, restatement, replacement or other supplement thereto | No |

**Part 4. Miscellaneous**

(a)    Addresses for Notices:

Address for notices of communications to Party A: as set out on Annex A hereto.

Address for notices or communications to Party B:

**Administrator**

As set forth in Schedule B (*Notice Details*) of the Omnibus Agreement.

With a mandatory copy to:

**CIBC Mellon Global Securities Services Company** in its capacity as issuer trustee of Master Asset Vehicle I:

320 Bay Street
P.O. Box 1
Toronto, Ontario
M5H 4A6

Attention:  Senior Vice-President, Client Relationship Management
Telephone: (416) 643 5000
Fax: (416) 643 6360

(b)     **Process Agent**.  For the purpose of Section 13(c) of this Agreement:

Party A appoints as its Process Agent: as set out on Annex A hereto.

Party B appoints as its Process Agent: Not applicable.

(c)     **Offices**.  The provisions of Section 10(a) will apply to this Agreement.

(d)     **Multibranch Party**.  For the purpose of Section 10(c) of this Agreement:

Party A: as specified on Annex A hereto.

Party B is not a Multibranch Party.

(e)     **Calculation Agent**.  The Calculation Agent is Party A, unless otherwise agreed to by the parties and specified in a Confirmation.  The failure of Party A to perform its obligations as Calculation Agent hereunder shall not be construed as an Event of Default or Termination Event; provided, that for so long as any such failure is continuing, Party B shall be permitted to designate an independent third party which is a leading dealer for the relevant Transaction type to act as substitute Calculation Agent, whose calculations and determinations will be binding absent manifest error.

(f)     **Credit Support Document**.  With respect to Party A: the Dealer CSA, any additional document specified as such on Annex A hereto and each Eligible Guarantee procured pursuant to Part 1(n)(i)(2) or Part 1(n)(ii)(2), subject to any replacement of any guarantee pursuant to Part 4(g) below.

With respect to Party B: the Dealer CSA (but solely with respect to Party B's obligations under paragraphs 3(b), 6(d) and 8(d) thereof).

(g)     **Credit Support Provider**.

(i)        With respect to Party A, the person, if any, set out for such purpose on Annex A hereto and any provider of an Eligible Guarantee procured pursuant to Part 1(n)(i)(2) or Part 1(n)(ii)(2), provided that, in each case: subject to giving prior written notification to Party B and the Rating Agency, Party A may (at its own cost) following a merger or consolidation of Party A or its Credit Support Provider with another entity (by purchase or sale of shares or assets or otherwise), replace any Eligible Guarantee or any guarantee specified on Annex A with a guarantee of another of its Affiliates which satisfies the Required Ratings I and which replacement guarantee in all material respects is no less beneficial for Party B than the terms of the guarantee immediately before such replacement, as determined by Party B, acting in a commercially reasonable manner.

(ii)       With respect to Party B, none.

(h)       **Governing Law and Jurisdiction**.  The provisions of Sections 13(a) and 13(b)(i) are hereby revised as follows:

Section 13(a) is hereby deleted in its entirety and replaced with the following:

"***Governing Law***.  This Agreement will be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein (exclusive of its conflict of laws provisions)."

Section 13(b)(i) is deleted in its entirety and replaced by the following:

"(i)       submits to the non-exclusive jurisdiction of the courts of the Province of Ontario; and"

(i)       **Netting of Payments**.  Sub-paragraph (ii) of Section 2(c) of this Agreement will apply to all Transactions under this Agreement (in each case starting from the date of this Agreement).

(j)       "**Affiliate**" will have the meaning specified in Section 14 of this Agreement; except in respect of Sections 3(c) and 6(b)(ii) of this Agreement, in which case "Affiliate" shall mean "none".  For the avoidance of doubt, none of the Administrator, any Noteholder or Lender nor any affiliate of any of them is an "Affiliate" of Party B.

## Part 5. Other Provisions

(a)       Additional Representations.

(i)       **Non Reliance, etc**. Each party will be deemed to represent to the other party on the date that it enters into a Transaction or an amendment to any Transaction (including any Partial Early Termination effected pursuant to Part 1(q)) that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

1.       **Principal**. It is acting as principal and not as agent or fiduciary for the other party hereto.

2.  **Non-Reliance**. It is acting for its own account and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction, it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered to be investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction;

3.  **Assessment and Understanding**. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of that Transaction. It is also capable of assuming, and assumes, all financial risks associated with that Transaction; and

4.  **Status of Parties**. The other party is not acting as a fiduciary for or adviser to it in respect of that Transaction.

(ii)  **Additional Representation of Party B**. Party B represents to Party A on and as of the date hereof and at all times until the termination of this Agreement that it is an "eligible contract participant" as such term is defined in Section 1a(12) of the Commodity Exchange Act, as amended.

(iii)  For all purposes of this Agreement, including, without limitation, Section 3 and Section 5(a)(iv) of this Agreement, Party A makes to Party B and Party B makes to Party A the representations set out for such purpose in respect of such parties on Annex A hereto (if any).

(iv)  Section 3 of this Agreement is hereby amended by adding to the end thereof the following Subparagraph (g):

(g)  **Bankruptcy Code Representation**.  The parties intend that (i) all Transactions (being a single integrated agreement) constitute a "forward contract" within the meaning of the United States Bankruptcy Code (the "**Bankruptcy Code**") or a "swap agreement" within the meaning of the Bankruptcy Code; (ii) all payments made or to be made by one party to the other party, pursuant to his Agreement constitutes "settlement payments" within the meaning of the Bankruptcy Code; (iii) all transfers of credit support by one party to the other party under this Agreement constitute "margin payments" within the meaning of the Bankruptcy Code; and (iv) this Agreement constitutes a "master netting agreement" within the meaning of the Bankruptcy Code.

(b)  **Change of Account**. Section 2(b) of this Agreement is hereby amended by the addition of the following after the word "delivery" in the first line thereof:

"to another account in the same legal and tax jurisdiction as the original account".

(c)     **Consent to Recording**. Each party (i) consents to the recording of the telephone conversations of trading and marketing personnel of the parties and their Affiliates in connection with this Agreement or any potential transaction, (ii) agrees to obtain any necessary consent for and to give notice of such recording to such personnel of it and its Affiliates, and (iii) agrees that recordings may only be used in connection with the resolution of a dispute with respect to a Transaction and may be offered as evidence in any Proceedings relating to this Agreement to establish matters pertinent to this Agreement or any Transaction, subject to applicable rules of evidence and discovery.

(d)     **Severability**. If any term, provision, covenant or condition of this Agreement, or the application thereof to either party or any circumstance, is held to be unenforceable, invalid or illegal (in whole or in part) for any reason in any relevant jurisdiction, the remaining terms, provisions, covenants and conditions of this Agreement, as modified by the deletion from this Agreement of such unenforceable, invalid or illegal portion, will continue in full force and effect, and such unenforceability, invalidity, or illegality will not otherwise affect the remaining terms, provisions, covenants and conditions of this Agreement, so long as (i) this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof, and (ii) the deletion of such portion of this Agreement will not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realisation of the benefits that would otherwise have been conferred upon the parties hereunder, it being agreed that the deletion of Section 1(c), or any portion of Sections 2, 5, 6 or 13 of this Agreement (or any definition or provision in Section 14 of this Agreement to the extent it relates to or is used in or in connection with any such Section) would have such an effect.    The parties will endeavour in good faith negotiations to replace the unenforceable, invalid or illegal provision with a valid provision, the economic effect of which comes as close as possible to that of such deleted provision.    Nothing in the foregoing shall limit either party's right to designate an Early Termination Date as a result of an event described in Section 5(b)(i) of this Agreement.

(e)     **Transfers**. Section 7 is hereby amended to read in its entirety as follows:

"Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party unless: (x) the prior written consent of the other party is obtained; and (y) the Rating Agency Condition has been satisfied, except that:

(i)     a party may transfer all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e);

(ii)     Party A may make a Permitted Transfer; and

(iii)     Party B shall assign its rights hereunder to the Collateral Agent under the Master Security Agreement as collateral security pursuant to such Master Security Agreement.

Party B shall, at Party A's written request and cost, take any reasonable steps required to be taken by it to effect a Permitted Transfer.    In making any determination for the purposes of the definition of Permitted Transfer, Party B shall act in a commercially reasonable manner."

(f)     **Notice of Certain Events or Circumstances**.  Each party agrees, upon learning of the occurrence or existence of any event or condition that constitutes (or that with the giving of notice or passage of time or both would constitute) an Event of Default or Termination Event with respect to such party, to give the other party and the Rating Agency prompt notice of such event or condition (or, in lieu of giving notice of such event or condition in the case of an event or condition that with the giving of notice or passage of time or both would constitute an Event of Default or Termination Event with respect to such party, to cause such event or condition to cease to exist before becoming an Event of Default or Termination Event, as relevant); provided that failure to provide notice of such event or condition pursuant to this Part 5(f) shall not itself constitute an Event of Default or a Termination Event.

(g)     **Canadian Insolvency Status**.  The parties acknowledge and agree that this Agreement, all Transactions entered into hereunder and all related agreements in respect of financial collateral will constitute "eligible financial contracts" for the purposes of the Bankruptcy and Insolvency Act (Canada), the CCAA, the Winding-up and Restructuring Act (Canada) and analogous legislation in effect from time to time in Canada.

(h)     **Equivalency Clause**.  For the purpose of disclosure pursuant to the Interest Act (Canada), the yearly rate of interest to which any rate of interest payable under this Agreement that is calculated on any basis other than a full calendar year may be determined by multiplying such rate by a fraction the numerator of which is the actual number of days in the calendar year in which such yearly rate of interest is to be ascertained and the denominator of which is the number of days comprising such other basis.

(i)     **Administrator**.  Party A acknowledges that the Administrator may exercise all rights, powers, privileges and remedies of Party B hereunder for, on behalf of and in the name of Party B in accordance with the terms of the Administration Agreement and pursuant to the terms of the Omnibus Agreement, and the Administrator and such entity's affiliates, associates, directors, officers, agents, employers, and employees, shall have no liability to Party A hereunder. Party A shall be entitled to rely, and shall be fully protected in relying, upon any writing, notice, consent, certificate, facsimile, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the Administrator or its officers and employees for and on behalf of Party B.

(j)     **Amendment to Notice Provisions.**

    (i)     Section 12(a) is hereby amended by: (A) deleting the words "(except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) and (B) deleting clause "(ii)" thereof and replacing it with the following: "(ii) if sent by email, on the date it is delivered;".

    (ii)     Section 12(b) is hereby amended by deleting the word "telex" and replacing it with the words "email details".

(k)     **Tax Event and Illegality.**

(i)     The definition of Tax Event in Section 5(b)(ii), is hereby modified by adding the following provision at the end thereof:

"provided, however, that for purposes of clarification, the parties acknowledge that the introduction or proposal of legislation shall not, in and of itself, give rise to a presumption that a Tax Event has occurred."

(ii)     The definition of the term "Indemnifiable Tax" is amended by adding the following provisions at the end thereof:

"Notwithstanding the foregoing, "Indemnifiable Tax" also means any Tax imposed in respect of a payment under this Agreement by reason of a Change in Tax Law by a government or taxing authority of a Relevant Jurisdiction of the party making such payment, unless the other party is incorporated, organized, managed and controlled or considered to have its seat in such jurisdiction, or is acting for purposes of this Agreement through a branch or office located in such jurisdiction."

(iii)     For the purpose of Section 5(b)(i), the obligation of either party to comply with any directive, direction or similar order of any applicable governmental agency or authority (whether or not having the force of law) which specifically prohibits its performance under this Agreement shall be deemed to be an "Illegality". The Affected Party shall deliver a copy of any such directive, direction or similar order to the party that is not the Affected Party, unless both parties are Affected Parties with respect to such directive, direction or similar order.

(l)     **Obligation to Transfer Other Posted Support**

Upon the occurrence of a Ratings Event and if such Ratings Event is continuing, Party A shall transfer any Other Posted Support then held by it to an OC Custodian within 10 Business Days after notice from Party B.

(m)     **Limitation of Liability**.

(i)     It is expressly understood and agreed by each Designated Party that: (a) this Agreement is executed and delivered by the Issuer Trustee, not individually or personally but in its capacity as trustee of Master Asset Vehicle I in the exercise of the powers and authority conferred and vested in it; (b) each of the representations, warranties, undertakings, covenants, indemnities, agreements and other obligations herein made on the part of the MAV is made and intended not as personal representations, undertakings, covenants, indemnities, agreements and other obligations by the Issuer Trustee but is made and intended for the purpose of binding only the property and assets of Master Asset Vehicle I; and (c) nothing herein contained shall be construed as creating any liability on the Issuer Trustee in its personal capacity, the beneficiaries or any incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Issuer Trustee or any predecessor or successor of the Issuer Trustee, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under

the parties hereto; (d) under no circumstances shall the Issuer Trustee in its personal capacity, the beneficiaries or any incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Issuer Trustee or any predecessor or successor of the Issuer Trustee be personally liable for the payment of any indebtedness or expenses of Master Asset Vehicle I or be liable for the breach or failure of any representation, warranty, undertaking, covenant, indemnity, agreement or other obligation made or undertaken by the MAV under this Agreement or any other Transaction Document, other than in respect of its own fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of its obligations and duties; (e) except as otherwise specifically provided in this Agreement, no property or assets of the Issuer Trustee, whether owned beneficially by it in its personal capacity or otherwise than in its capacity as issuer trustee of Master Asset Vehicle I, will be subject to levy, execution or other enforcement procedures with regard to any of the representations, warranties, covenants, undertakings, indemnities, agreements and other obligations of the Issuer Trustee or the MAV under such written instrument; and (f) no recourse may be had or taken, directly or indirectly, against the Issuer Trustee in its personal capacity, the beneficiaries or any incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Issuer Trustee or any predecessor or successor of the Issuer Trustee with regard to the representations, warranties, undertakings, covenants, indemnities, agreements and other obligations of the MAV or the Issuer Trustee or any beneficiary, incorporator, Affiliate, shareholder, director, officer, representative, employee, manager, member, advisor or agent of the Issuer Trustee or any predecessor or successor of the Issuer Trustee under such written instrument other than in respect of such Person's own fraud, wilful misconduct, bad faith, gross negligence or reckless disregard of its obligations and duties.

(ii)     It is the intention of the parties hereto that the limitation of liability conferred by the foregoing paragraph on the beneficiaries, incorporators, Affiliates, shareholders, directors, officers, representatives, employees, managers, members, advisors, agents or successors and assigns of the Issuer Trustee and on any beneficiaries of the MAV shall be enforceable by each such Person as fully and effectively as if it is a party to this Agreement or any Transaction Document and notwithstanding any law that otherwise might deprive it of the benefit of the foregoing paragraph due to lack of privity or want of consideration.

(n)     **Computations of Interest.**

(i)     Unless otherwise stated, all computations of interest shall be made on the basis of a year of 365 or 366 days, as the case may be, taking into account the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest is payable.

(ii)     For purposes of the Interest Act (Canada): (A) the principle of deemed reinvestment of interest does not apply to any interest calculation under this Agreement; and (B) the rates of interest stipulated in this Agreement are intended to be nominal rates and not effective rates or yields.

(iii)  **"Default Rate"** means, for a particular date, a rate per annum equal to the sum of: (A) the BA Rate for a one month period beginning on such date; plus (B) one per cent.

(o)  **Waiver of Set-off**.  Without affecting the provisions of this Agreement, the Master Security Agreement or the Omnibus Agreement expressly permitting set-off or requiring the calculation of certain net payment amounts (including Sections 2(c) and 6 of this Agreement and Paragraph 8 of the Dealer CSA and set-off rights with respect to Other Posted Support under the Master Security Agreement and the Omnibus Agreement), each of Party A and Party B irrevocably waives any and all other rights it may have to set-off, net, recoup or (subject to Section 2(a)(iii)) otherwise withhold or suspend or condition payment or performance of any obligations between Party A and Party B hereunder, or against any obligations between Party A and Party B under any other agreements or otherwise outside of this Agreement.  In connection with such waiver, Section 6(e) of this Agreement shall be amended by deleting the following sentence: "The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off."

(p)  **WAIVER OF JURY TRIAL**.  EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY CREDIT SUPPORT DOCUMENT. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY OR ANY CREDIT SUPPORT PROVIDER OF SUCH OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH PARTY WOULD NOT, IN THE EVENT OF SUCH A SUIT, ACTION OR PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND TO PROVIDE FOR ANY CREDIT SUPPORT DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**[SIGNATURE PAGES FOLLOW]**

## SIGNATORIES

### MASTER ASSET VEHICLE I

By: **CIBC MELLON GLOBAL SECURITIES SERVICES COMPANY** acting in its capacity as Issuer Trustee of Master Asset Vehicle I, without personal liability

By: _____

    Name:
    Title:

By: _____

    Name:
    Title:

**BANK OF AMERICA, N.A.**
(in its capacity as a Designated Party)


By: _____
    Name:
    Title:


By: _____
    Name:
    Title:


**CITIBANK, N.A.**
(in its capacity as a Designated Party)


By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

**DEUTSCHE BANK AG**
(in its capacity as a Designated Party)


By: _____
        Name:
        Title:


By: _____
        Name:
        Title:


**HSBC BANK USA, NATIONAL
ASSOCIATION**
(in its capacity as a Designated Party)


By: _____
        Name:
        Title:


By: _____
        Name:
        Title:

**MERRILL LYNCH CAPITAL
SERVICES, INC.**
(in its capacity as a Designated Party)


By: _____
    Name:
    Title:


By: _____
    Name:
    Title:


**MERRILL LYNCH INTERNATIONAL**
(in its capacity as a Designated Party)


By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

**ROYAL BANK OF CANADA**
(in its capacity as a Designated Party)


By: _____
Name:
Title:


By: _____
Name:
Title:


**SWISS RE FINANCIAL PRODUCTS
CORPORATION**
(in its capacity as a Designated Party)


By: _____
Name:
Title:


By: _____
Name:
Title:


**UBS AG**
(in its capacity as a Designated Party)


By: _____
Name:
Title:


By: _____
Name:
Title:

## ANNEX A

## PART 1

### Citibank, N.A.

**For the purposes of this Annex A Part 1, Party A is Citibank, N.A. in its capacity as credit derivative swap counterparty and not in any other capacity and Party B is the MAV.**

1.    **Tax Representations**

For the purposes of Part 2(b) of the Schedule, Party A makes to Party B and Party B makes to Party A the following tax representations:

(a)    Party A Payee Representations:

For the purpose of Section 3(f) of this Agreement, Party A makes the following representations to Party B:

(i)    Party A is a national banking association duly organized and validly existing under the laws of the United States.

(ii)    Party A's U.S. taxpayer identification number is 13-5266470. It is "exempt" within the meaning of Treasury Regulation sections 1.6041-3(p) and 1.6049-4(c) from information reporting on Form 1099 and backup withholding.

(iii)    In respect of each Transaction that Party A enters into under this Agreement through an Office that is located in Canada, Party A makes the following representation to Party B:

Party A is an authorized foreign bank within the meaning of section 2 of the Bank Act (Canada) and each payment received or to be received by it in connection with each such Transaction will be in respect of its Canadian banking business within the meaning of the Income Tax Act (Canada).

(iv)    In respect of each Transaction that Party A enters into under this Agreement through an Office that is not located in Canada, Party A makes the following representations to Party B:

Party A is fully eligible for the benefits of the **Business Profits"** or **"Industrial and Commercial Profits"** provision, as the case may be, the **"Interest"** provision or **"Other Income"** provision (if any) of the income tax convention between Canada and the United States with respect to any payment described in such provisions and received or to be received by it in connection with each such Transaction and no such payment is attributable to a trade or business carried on by it through a permanent establishment in Canada.

(b)    Party B Payee Representations:

For the purpose of Section 3(f) of this Agreement, Party B makes the following representations to Party A:

(i)    Party B is a trust formed and existing under the laws of the Province of Ontario, Canada and is not a non-resident of Canada for the purposes of the Income Tax Act (Canada).

(ii)     Each payment received or to be received by Party B in connection with this Agreement will not be effectively connected with the conduct of a trade or business in the United States.

(iii)    Party B is fully eligible for the benefits of the **"Business Profits"** or **"Industrial and Commercial Profits"** provision, as the case may be, the **"Interest"** provision or **"Other Income"** provision (if any) of the income tax convention between Canada and the United States with respect to any payment described in such provisions and received or to be received by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the United States.

2.      **Tax Documents**

For the purposes of Part 3(a) of the Schedule and Section 4(a) of the Agreement, the following tax forms, documents or certificates are to be delivered:

(a)     Promptly upon execution of this Agreement; and promptly upon learning that any form previously provided by Party A has become obsolete or incorrect, Party A shall deliver to Party B a completed and executed IRS Form W-9;

(b)     As required under Section 4(a)(i) of the Agreement, promptly upon execution of this Agreement; and promptly upon learning that any form previously provided by Party B has become obsolete or incorrect, Party B shall deliver to Party A: (i) an IRS Form W-8BEN, (ii) and IRS Form W-8ECI, (iii) an IRS Form W-8EXP and/or (iv) an IRS Form W-8IMY, as appropriate.

3.      **Addresses for Notice**

For the purposes of Part 4(a) of the Schedule and Section 12(a) of the Agreement, the following is the address for notices of communications to Party A:

Capital Markets Documentation Unit
388 Greenwich Street, 17th Floor
New York, New York, 10013

Attention: Director, Derivatives Operations

With a mandatory copy to:

Citibank, N.A. Legal Department
Derivatives Product Group
388 Greenwich Street, 17th Floor
New York, New York, 10013

Attention: Senior Deputy General Counsel, Citi Markets and Banking
Facsimile No.: (646) 291 1959
Telephone No.: (212) 816 5984

With a mandatory copy to:

Shearman & Sterling LLP
599 Lexington Avenue

New York, NY 10022

Attention: Douglas P. Bartner, Partner
E-mail: dbartner@shearman.com
Telephone: (212) 848 8190
Facsimile: (646) 848 8190

4.    **Process Agent**. For the purposes of Part 4(b) of the Schedule and Section 13(c) of the Agreement, Party A appoints the following Process Agent in Ontario:

Citibank Canada
123 Front Street West, 17th Floor
Toronto, Ontario, M5J 2M3
Canada

Attention: Vice President, Legal Department
Fax: (416) 947-4123

5.    **Multibranch Party Information**

For the purposes of Part 4(d) of the Schedule and Section 10(c) of the Agreement, Party A is a Multibranch Party and may act through its Canadian Office or its Offices in the United States, or such other Office as may be agreed to by the parties in connection with a Transaction.

6.    **Credit Support Documents**

In addition to the documents set forth as such in Part 4(f) of the Schedule with respect to Party A, the following documents shall further constitute **"Credit Support Documents"** with respect to Party A: Not applicable.

7.    **Credit Support Provider**

For the purposes of Part 4(g) of the Schedule, **"Credit Support Provider"** means in relation to Party A: Not applicable.

8.    **Amendments to Payments on Early Termination**

If Party A is the sole Affected Party or the sole Burdened Party, as the case may be, in respect of a Termination Event specified in Section 5(b)(i), Section 5(b)(ii) or Section 5(b)(iii), and, in any such case, the basis for the occurrence of such Termination Event is not a law of Canada or any Province of Canada or a directive, direction or similar order of any applicable governmental agency or authority each thereof (whether or not having force of law), or the promulgation of, or any change in, the interpretation of any such law by, or an action taken by or brought before, a court, tribunal, regulatory authority or taxing authority of Canada or any Province of Canada, then notwithstanding the provisions of Section 6(e), any Termination Payment owed to Party A in respect of a Terminated Transaction (excluding, for the avoidance of doubt, any Unpaid Amounts) shall be deemed to be zero, provided that any Unpaid Amounts shall remain payable in accordance with the provisions of the Omnibus Agreement.

**ANNEX A**

**PART 2**

**Deutsche Bank AG**

**For all purposes of this Annex A Part 2, Party A is Deutsche Bank AG and Party B is the MAV**

1.    **Tax Representations**

For the purposes of Part 2(b) of the Schedule, Party A makes to Party B and Party B makes to Party A the following tax representations:

(a)    Party A Payee Representations: None.

(b)    Party B Payee Representations:

For the purpose of Section 3(f) of this Agreement, Party B makes the following representations to Party A:

(i)    Party B is a trust formed and existing under the laws of the Province of Ontario, Canada and is not a non-resident of Canada for the purposes of the Income Tax Act (Canada).

(ii)    Party B is fully eligible for the benefits of the **"Business Profits"** or **"Industrial and Commercial Profits"** provision, as the case may be, the **"Interest"** provision or **"Other Income"** provision (if any) of the income tax convention between Canada and Germany with respect to any payment described in such provisions and received or to be received by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in Germany.

2.    **Tax Documents**

For the purposes of Part 3(a) of the Schedule and Section 4(a) of the Agreement, the following tax forms, documents or certificates are to be delivered:  Not applicable

3.    **Addresses for Notice**

For the purposes of Part 4(a) of the Schedule and Section 12(a) of the Agreement, the following is the address for notices of communications to Party A:

For purposes of all notices:

      Deutsche Bank AG, London Branch
      Floor 03
      Winchester House, 1 Great Winchester Street
      London, United Kingdom
      Attention: John Pipilis
      Telephone: +44(20)754-58478
      E-mail: john.pipilis@db.com

With a mandatory copy to:

      Deutsche Bank AG, New York Branch

60 Wall Street
New York, NY 10005
Attn: Mr. Ken Brougher / Ms. Julia Robinson
Telephone: +1(212)250-5672
E-mail: ken.brougher@db.com / julia.robinson@db.com

With a mandatory copy to:

London Derivatives Documentation
Telephone: +44 207 547 1815
Facsimile: +44 207 545 1913
Email: SD.CC@db.com

With copies to the following addresses for purposes of notices to be delivered under Sections 5 and 6:

Deutsche Bank AG, Head Office
Theodor-Heuss-Allee
60486 Frankfurt
Germany
Attention: Legal Department
Facsimile: +49 69 910 36097

Deutsche Bank AG, New York Branch
60 Wall Street
New York, NY 10005
Attn: Legal Department – General Counsel
Telephone: +1(212) 250-8200
Facsimile: +1(212) 797-4568

Deutsche Bank AG, New York Branch
60 Wall Street
New York, NY 10005
Attention: Ernest Goodrich, Jr. / Christian Artmann
Telephone: +1(212) 250-7636 / +1(212) 250-7471
E-mail: chip.goodrich@db.com / christian.artmann@db.com

All other notices to Party A shall be sent directly to the Office through which Party A is acting for the relevant Transaction, using the address and contact particulars specified in the Confirmation of that Transaction or otherwise notified.

4.     **Process Agent**

For the purposes of Part 4(b) of the Schedule and Section 13(c) of the Agreement, Party A appoints the following Process Agent in Ontario:

Deutsche Bank AG, Canada Branch
199 Bay Street, Suite 4700
Commerce Court West, Box 263
Toronto, ON M5L 1E9
Phone: (416) 682-8422
Fax: (416) 915-7288
Attention: Paul M. Jurist

5.      **Multibranch Party Information**

For the purposes of Part 4(d) of the Schedule and Section 10(c) of the Agreement, Party A is not a
Multibranch Party.

6.      **Credit Support Documents**

In addition to the documents set forth as such in Part 4(f) of the Schedule with respect to Party A, the
following documents shall further constitute **"Credit Support Documents"** with respect to Party A: Not
applicable.

7.      **Credit Support Provider**

For the purposes of Part 4(g) of the Schedule, **"Credit Support Provider"** means in relation to Party A:
Not applicable.

8.      **OC Custodian**

For the purposes of the Schedule B to the Master Security Agreement, **"OC Custodian"** means RBC
Dexia, or any replacement custodian agreed to by Party A and Party B.

9.      **Amendments to Payments on Early Termination**

If Party A is an Affected Party in respect of a Termination Event specified in Section 5(b)(i), Section
5(b)(ii) or Section 5(b)(iii) where: (xx) such Termination Event occurs as a result of actions taken or
omissions made by Party A and (yy) the basis for the occurrence of such Termination Event is not a law
of Canada or any Province of Canada or a directive, direction or similar order of any applicable
governmental agency or authority each thereof (whether or not having force of law), or the promulgation
of, or any change in, the interpretation of any such law by, or an action taken by or brought before, a
court, tribunal, regulatory authority or taxing authority of Canada or any Province of Canada, then
notwithstanding the provisions of Section 6(e), any Termination Payment owed to Party A in respect of
a Terminated Transaction (excluding, for the avoidance of doubt, any Unpaid Amounts) shall be deemed
to be zero, provided that any Unpaid Amounts shall remain payable in accordance with the provisions of
the Omnibus Agreement.

# ANNEX A

## PART 3

### HSBC Bank USA, National Association

**For all purposes of this Annex A Part 3, Party A is HSBC Bank USA, National Association and Party B is the MAV**

1.    **Tax Representations**

For the purposes of Part 2(b) of the Schedule, Party A makes to Party B and Party B makes to Party A the following tax representations:

(a)    Party A Payee Representations:

For the purpose of Section 3(f) of this Agreement, Party A makes the following representations to Party B:

(i)    Party A is a corporation duly incorporated and validly existing under the laws of the State of Delaware, United States.

(ii)    Party A is fully eligible for the benefits of the "**Business Profits**" or "**Industrial and Commercial Profits**" provision, as the case may be, the "**Interest**" provision or "**Other Income**" provision (if any) of the income tax convention between Canada and the United States with respect to any payment described in such provisions and received or to be received by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in Canada.

(b)    Party B Payee Representations:

For the purpose of Section 3(f) of this Agreement, Party B makes the following representations to Party A:

(i)    Party B is a trust formed and existing under the laws of the Province of Ontario, Canada and is not a non-resident of Canada for the purposes of the Income Tax Act (Canada).

(ii)    Party B is fully eligible for the benefits of the "**Business Profits**" or "**Industrial and Commercial Profits**" provision, as the case may be, the "**Interest**" provision or "**Other Income**" provision (if any) of the income tax convention between Canada and the United States with respect to any payment described in such provisions and received or to be received by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the United States.

2.    **Tax Documents**

For the purposes of Part 3(a) of the Schedule and Section 4(a) of the Agreement, the following tax forms, documents or certificates are to be delivered:  As required under Section 4(a) of the Agreement, promptly upon execution of this Agreement; and promptly upon learning that any form previously provided by Party B has become obsolete or incorrect, Party B shall deliver to Party A: (i) an IRS Form W-8BEN, (ii) and IRS Form W-8ECI, (iii) an IRS Form W-8EXP and/or (iv) an IRS Form W-8IMY, as appropriate.

3.    **Addresses for Notice**

For the purposes of Part 4(a) of the Schedule and Section 12(a) of the Agreement, the following is the
address for notices of communications to Party A:

All notices or communications to Party A shall, with respect to a particular Transaction, be sent to the
address, telex number, or facsimile number reflected in the Confirmation of that Transaction, and any
notice for purposes of Section 5 and 6 of the Agreement shall be sent to:

HSBC Bank USA, National Association
452 5th Avenue, New York, NY 10018
Attention: Derivatives Operations
Phone: (212) 525 5529
Fax: (212) 525 0673
Email: operations.scp@us.hsbc.com

With mandatory copies to:

HSBC Bank USA, National Association
452 5th Avenue, New York, NY 10018
Attention: Legal Department/General Counsel
Facsimile No: (212) 525 6994

Attention: Global Structured Credit Products, Myles Bae / Wallace Kim
Telephone: (212) 525 3197
Fax: (646) 366 6114
Email: myles.m.bae@us.hsbc.com / wallace.kim@us.hsbc.com


4.    **Process Agent**

For the purposes of Part 4(b) of the Schedule and Section 13(c) of the Agreement, Party A appoints the
following Process Agent in Ontario:

HSBC Bank USA, National Association, Toronto Branch
70 York Street, 4th Floor
Toronto, Ontario M5J 1S9

Attention: Gabriella King,
Global Corporate Banking, Financial Institutions Group
Telephone: (416) 868 8456
Fax: (416) 868 3817

With mandatory copies to:

HSBC Bank USA, National Association
452 5th Avenue, New York, NY 10018
Attention: Legal Department/General Counsel
Facsimile No: (212) 525 6994

HSBC Bank USA, National Association
452 5th Avenue, New York, NY 10018

Attention:        Myles Bae and Wallace Kim
                  Global Structured Credit Products
Telephone: (212) 525 3197
Fax: (646) 366 6114
Email: myles.m.bae@us.hsbc.com / wallace.kim@us.hsbc.com

5.      **Multibranch Party Information**

For the purposes of Part 4(d) of the Schedule and Section 10(c) of the Agreement, Party A is not a
Multibranch Party.

6.      **Credit Support Documents**

In addition to the documents set forth as such in Part 4(f) of the Schedule with respect to Party A, the
following documents shall further constitute **"Credit Support Documents"** with respect to Party A: Not
applicable.

7.      **Credit Support Provider**

For the purposes of Part 4(g) of the Schedule, **"Credit Support Provider"** means in relation to Party A:
Not applicable.

8.      **OC Custodian**

For the purposes of the Schedule B to the Master Security Agreement, **"OC Custodian"** means RBC
Dexia, or any replacement custodian agreed to by Party A and Party B.

9.      **Amendments to Payments on Early Termination**

If Party A is an Affected Party in respect of a Termination Event specified in Section 5(b)(i), Section
5(b)(ii) or Section 5(b)(iii) and, in any case, the basis for the occurrence of such Termination Event is
not a law of Canada or any Province of Canada or a directive, direction or similar order of any
applicable governmental agency or authority each thereof (whether or not having force of law), or the
promulgation of, or any change in, the interpretation of any such law by, or an action taken by or
brought before, a court, tribunal, regulatory authority or taxing authority of Canada or any Province of
Canada, then notwithstanding the provisions of Section 6(e), any Termination Payment owed to Party A
in respect of a Terminated Transaction (excluding, for the avoidance of doubt, any Unpaid Amounts)
shall be deemed to be zero, provided that any Unpaid Amounts shall remain payable in accordance with
the provisions of the Omnibus Agreement.

# ANNEX A

# PART 4

# UBS AG

**For all purposes of this Annex A Part 4, Party A is UBS AG and Party B is the MAV**

1.    **Tax Representations**

(a)    Party A Payee Representations.

For the purpose of Section 3(f) of this Agreement, Party A makes the following representations to Party B:

(i)    Party A is a national banking association duly created or organized and validly existing under the laws of Switzerland;

(ii)    In respect of each Transaction that Party A enters into under this Agreement through an Office that is located in Canada,  Party A makes the following representation to Party B:

Party A is an authorized foreign bank within the meaning of section 2 of the Bank Act (Canada) and each payment received or to be received by it in connection with each such Transaction will be in respect of its Canadian banking business within the meaning of the Income Tax Act (Canada);

(iii)    In respect of each Transaction that Party A enters into under this Agreement through an Office that is not located in Canada, Party A makes the following representations to Party B:

Party A is fully eligible for the benefits of the "**Business Profits**" or "**Industrial and Commercial Profits**" provision, as the case may be, the "**Interest**" provision or the "**Other Income**" provision (if any) of the income tax convention between Canada and Switzerland with respect to any payment described in such provisions and received or to be received by it in connection with each such Transaction and no such payment is attributable to a trade or business carried on by it through a permanent establishment in Canada.

(b)    Party B Payee Representations.

For the purpose of Section 3(f) of this Agreement, Party B makes the following representations to Party A:

(i)    Party B is a trust formed and existing under the laws of the Province of Ontario, Canada and is not a non-resident of Canada for the purposes of the Income Tax Act (Canada);

(ii)    No payment received or to be received by Party B under this Agreement will be effectively connected with Party B's conduct of a trade or business within the United States;

(iii)    Party B is a "non-U.S. branch of a foreign person" for purposes of section 1.1441-4(a)(3)(ii) of the United States Treasury Regulations and a "foreign person" for purposes of section 1.6041-4(a)(4) of the United States Treasury Regulations.

(iv)    Party B is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits" provision, as the case may be, the "Interest" provision or the "Other Income" provision (if any) of the income tax convention between Canada and Switzerland with respect to any payment described in such provisions and received or to be received by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in Switzerland.

(v)    In respect of each Transaction that Party A enters into under this Agreement through an Office that is located in the United States, Party B makes the following representations to Party A:

Party B is fully eligible for the benefits of the "**Business Profits**" or "**Industrial and Commercial Profits**" provision, as the case may be, the "**Interest**" provision or the "**Other Income**" provision (if any) of the income tax convention between Canada and the United States with respect to any payment described in such provisions and received or to be received by it in connection with each such Transaction and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the United States;

(vi)    In respect of each Transaction that Party A enters into under this Agreement through an Office that is located in the United Kingdom, Party B makes the following representations to Party A:

Party B is fully eligible for the benefits of the "**Business Profits**" or "**Industrial and Commercial Profits**" provision, as the case may be, the "**Interest**" provision or the "**Other Income**" provision (if any) of the income tax convention between Canada and the United Kingdom with respect to any payment described in such provisions and received or to be received by it in connection with each such Transaction and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the United Kingdom.

2.    **Tax Documents**

For the purposes of Part 3(a) of the Schedule and Section 4(a) of the Agreement, the following tax forms, documents or certificates are to be delivered:  Promptly upon execution of this Agreement and promptly upon learning that any form previously provided by Party B has become obsolete or incorrect, Party B shall deliver to Party A an IRS Form W-8BEN.

3.    **Addresses for Notice**

For the purposes of Part 4(a) of the Schedule and Section 12(a) of the Agreement, the following is the address for notices of communications to Party A:

UBS AG, Stamford Branch
677 Washington Boulevard
Stamford, CT 06901
Attention: Legal Affairs
Facsimile: (203) 719-0680

With a mandatory copy to:

UBS AG, Stamford Branch

677 Washington Boulevard
Stamford, CT 06901

Attention:  Risk Control – Documentation
Facsimile: (203) 719-5627

4.  **Process Agent**

For the purposes of Part 4(b) of the Schedule and Section 13(c) of the Agreement, Party A appoints the following Process Agent in Ontario:

UBS AG, Canada Branch
161 Bay Street
BCE Place, Suite 4100
Toronto, Ontario
M5J 2S1

5.  **Multibranch Party Information**

For the purposes of Part 4(d) of the Schedule and Section 10(c) of the Agreement, Party A is a Multibranch Party and may act through the following Offices: 1. UBS AG, Canada Branch; 2. UBS AG, London Branch and 3. UBS AG, Stamford Branch.

6.  **Credit Support Documents**

In addition to the documents set forth as such in Part 4(f) of the Schedule with respect to Party A, the following documents shall further constitute "**Credit Support Documents**" with respect to Party A: Not applicable.

7.  **Credit Support Provider**

For the purposes of Part 4(g) of the Schedule, "**Credit Support Provider**" means in relation to Party A: Not applicable.

8.  **OC Custodian**

For the purposes of the Schedule B to the Master Security Agreement, "**OC Custodian**" means BNY Trust Company of Canada, or any replacement custodian agreed to by Party A and Party B.

9.  **Amendments to Payments on Early Termination**

If (1) either Party A or Party B is the sole Affected Party with respect to a Termination Event specified in Section 5(b)(i), and the basis for the occurrence of such Termination Event is not a law of Canada or any Province of Canada or a directive, direction or similar order of any applicable governmental agency or authority each thereof (whether or not having force of law), or the promulgation of, or any change in, the interpretation of any such law by a court, tribunal, or regulatory authority of Canada or any Province of Canada, or (2) any payment by either Party A or Party B under this Agreement (including, for greater certainty, any payment under the Dealer CSA) will be subject to withholding tax, or there is a substantial likelihood that any such payment will be subject to withholding tax on the payment date thereof, and (xx) the party obligated to make the relevant payment provides notice to the other party (in such capacity, the "**Payee**") that it proposes to terminate this Agreement and (yy) the Payee consents to such termination within two Business Days of receipt of the notice contemplated in sub-clause (xx) above,

then, in the case of either (1) or (2) above, the provisions of Section 6(e), any Termination Payment owed to Party A in respect of a Terminated Transaction (excluding, for the avoidance of doubt, any Unpaid Amounts) shall be deemed to be zero, provided that any Unpaid Amounts shall remain payable in accordance with the provisions of the Omnibus Agreement.  If, however, the Payee does not provide the consent contemplated in sub-clause (2)(yy) above, the Payee agrees it shall receive the relevant payment from the other party net of the applicable withholding tax; provided, that, such payment by the other party of an amount less than the full amount due and payable on the aforementioned payment date shall not constitute an Event of Default or Termination Event under this Agreement.

# ANNEX A

## PART 5

### Swiss Re Financial Products Corporation

**For all purposes of this Annex A Part 5, Party A is Swiss Re Financial Products Corporation and Party B
is the MAV**

1.　　**Tax Representations**

For the purposes of Part 2(b) of the Schedule, Party A makes to Party B and Party B makes to Party A
the following tax representations:

(a)　　Party A Payee Representations:

For the purpose of Section 3(f) of this Agreement, Party A makes the following representations
to Party B:

(i)　　Party A is a corporation duly incorporated and validly existing under the laws of the State
of Delaware, United States.

(ii)　　Party A is fully eligible for the benefits of the "**Business Profits**" or "**Industrial and
Commercial Profits**" provision, as the case may be, the "Interest" provision or "**Other
Income**" provision (if any) of the income tax convention between Canada and the United
States with respect to any payment described in such provisions and received or to be
received by it in connection with this Agreement and no such payment is attributable to a
trade or business carried on by it through a permanent establishment in Canada.

(b)　　Party B Payee Representations:

For the purpose of Section 3(f) of this Agreement, Party B makes the following representations
to Party A:

(i)　　Party B is a trust formed and existing under the laws of the Province of Ontario, Canada
and is not a non-resident of Canada for the purposes of the Income Tax Act (Canada).

(ii)　　Each payment received or to be received by Party B in connection with this Agreement
will not be treated as effectively connected with the conduct of a trade or business in the
United States by Party B.

(iii)　　Party B is (a) a "**non-U.S. branch of a foreign person**" as that term is used in U.S.
Treasury Regulation Section 1.1441-4(3)(ii) (or any applicable successor provision) and
(b) a "**foreign person**" as that term is used in U.S. Treasury Regulation Section 1.6041-
4(a)(4) (or any applicable successor provision).

(iv)　　Party B is fully eligible for the benefits of the "**Business Profits**" or "**Industrial and
Commercial Profits**" provision, as the case may be, the "**Interest**" provision or "**Other
Income**" provision (if any) of the income tax convention between Canada and the United
States with respect to any payment described in such provisions and received or to be
received by it in connection with this Agreement and no such payment is attributable to a
trade or business carried on by it through a permanent establishment in the United States.

2. **Tax Documents**

For the purposes of Part 3(a) of the Schedule and Section 4(a) of the Agreement, the following tax forms, documents or certificates are to be delivered:

(a)     Promptly upon the request by Party B, Party A shall deliver to Party B an IRS Form W-9.

(b)     Promptly upon execution of this Agreement; and promptly upon learning that any form previously provided by Party B has become obsolete or incorrect, Party B shall deliver to Party A an IRS Form W-8BEN.

3. **Addresses for Notice**

For the purposes of Part 4(a) of the Schedule and Section 12(a) of the Agreement, the following is the address for notices of communications to Party A:

Swiss Re Financial Products Corporation
55 East 52nd Street
New York, New York 10055

Attention:  Structured Credit
Telephone:  (212) 407-7295 / (212) 407-7315
Facsimile:  (917) 368-4440

<u>With a mandatory copy to:</u>

Swiss Re Financial Products Corporation
55 East 52nd Street
New York, New York 10055

Attention:  Legal
Telephone:  (212) 317-5043 / (212) 317-5436
Facsimile:  (917) 368-4440

<u>With a mandatory copy to:</u>

Swiss Re Financial Products Corporation
55 East 52nd Street
New York, New York 10055

Attention:  Operations
Telephone:  (212) 317-5308
Fax:  (212) 317-5531

4. **Process Agent**

For the purposes of Part 4(b) of the Schedule and Section 13(c) of the Agreement, Party A appoints the following Process Agent in Ontario:

152928 Canada Inc.
c/o Stikeman Elliott LLP
5300 Commerce Court West

199 Bay Street
Toronto, Ontario  M5L 1B9

Attention: President and William A. Scott

5.     **Multibranch Party Information**

For the purposes of Part 4(d) of the Schedule and Section 10(c) of the Agreement, Party A is not a Multibranch Party.

6.     **Credit Support Documents**

In addition to the documents set forth as such in Part 4(f) of the Schedule with respect to Party A, the following documents shall further constitute "**Credit Support Documents**" with respect to Party A: the Guarantee of Swiss Reinsurance Company (the "**Guarantor**"), substantially in the form attached hereto as Exhibit A.

7.     **Credit Support Provider**

For the purposes of Part 4(g) of the Schedule, "**Credit Support Provider**" means in relation to Party A: the Guarantor.

8.     **OC Custodian**

For the purposes of the Schedule B to the Master Security Agreement, "**OC Custodian**" means BNY Trust Company of Canada or any replacement custodian agreed to by Party A and Party B.

9.     **Amendments to Payments on Early Termination**

If (1) a Termination Event occurs under Section 5(b)(i), and the basis for the occurrence of such Termination Event is not a law of Canada or any Province of Canada or a directive, direction or similar order of any applicable governmental agency or authority each thereof (whether or not having force of law), or the promulgation of, or any change in, the interpretation of any such law by, or an action taken by or brought before, a court, tribunal, regulatory authority or taxing authority of Canada or any Province of Canada, or (2) any payment by either Party A or Party B under this Agreement will be subject to withholding tax, or there is a substantial likelihood that any such payment will be subject to withholding tax on the payment date thereof, and (xx) the party obligated to make the relevant payment provides notice to the other party (in such capacity, the "**Payee**") that it proposes to terminate this Agreement and (yy) the Payee consents to such termination, then, in the case of either (1) or (2) above, notwithstanding the provisions of Section 6(e), any Termination Payment owed to Party A in respect of a Terminated Transaction (excluding, for the avoidance of doubt, any Unpaid Amounts) shall be deemed to be zero, provided that any Unpaid Amounts shall remain payable in accordance with the provisions of the Omnibus Agreement.  If, however, the Payee does not provide the consent contemplated in sub-clause (2)(yy) above, the Payee agrees it shall, subject to satisfaction of the Rating Agency Condition, receive the relevant payment from the other party net of the applicable withholding tax; provided, that, such payment by the other party of an amount less than the full amount due and payable on the aforementioned payment date shall not constitute an Event of Default or Termination Event under this Agreement.

# ANNEX A

## PART 6

### Merrill Lynch International

**For all purposes of this Annex A Part 6, Party A is Merrill Lynch International and Party B is the MAV**

1.    **Tax Representations**

For the purposes of Part 2(b) of the Schedule, Party A makes to Party B and Party B makes to Party A the following tax representations:

(a)    Party A Payee Representations:

For the purpose of Section 3(f) of this Agreement, Party A makes the following representations to Party B:

(i)    Party A is a company established and validly existing under the laws of England and Wales.

(ii)    Party A is fully eligible for the benefits of the "**Business Profits**" or "**Industrial and Commercial Profits**" provision, as the case may be, the "**Interest**" provision or "**Other Income**" provision (if any) of the income tax convention between Canada and the United Kingdom with respect to any payment described in such provisions and received or to be received by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in Canada.

(b)    Party B Payee Representations:

For the purpose of Section 3(f) of this Agreement, Party B makes the following representations to Party A:

(i)    Party B is a trust formed and existing under the laws of the Province of Ontario, Canada and is not a non-resident of Canada for the purposes of the Income Tax Act (Canada).

(ii)    Party B is fully eligible for the benefits of the "**Business Profits**" or "**Industrial and Commercial Profits**" provision, as the case may be, the "**Interest**" provision or "**Other Income**" provision (if any) of the income tax convention between Canada and the United Kingdom with respect to any payment described in such provisions and received or to be received by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the United Kingdom.

2.    **Tax Documents**

For the purposes of Part 3(a) of the Schedule and Section 4(a) of the Agreement, the following tax forms, documents or certificates are to be delivered:  Not applicable

3.    **Addresses for Notice**

For the purposes of Part 4(a) of the Schedule and Section 12(a) of the Agreement, the following is the address for notices of communications to Party A:

Merrill Lynch International
Merrill Lynch Financial Centre
2 King Edward Street
London
EC1A 1HQ

Attention:  Manager, Fixed Income Settlements
Facsimile No.: 44-20-7995-0616
Telephone No.: 44-20-7995-7126

With a mandatory copy to:

Merrill Lynch & Co., Inc.
Merrill Lynch World Headquarters
4 World Financial Center, 7th Floor,
New York, New York 10080

Attention:  Global Credit Derivatives
Facsimile No.:  212 449-3247
Telephone No.: 212 449-9001

Additionally, a copy of all notices pursuant to Sections 5, 6 and 7 of the Agreement as well as any changes to Party B's address, telephone number or facsimile number shall be sent to:

GMI Counsel
Merrill Lynch World Headquarters
4 World Financial Centre, 7th Floor
New York, NY 10080

Attention: Swaps Legal
Facsimile No.: (212) 449-6993

4.    **Process Agent**

For the purposes of Part 4(b) of the Schedule and Section 13(c) of the Agreement, Party A appoints the following Process Agent in Ontario:

Merrill Lynch Canada Inc.
181 Bay Street, Suite 400
Toronto, ON  M5J 2V8, Canada

Telephone: (416) 369-2818
Facsimile: (416) 369-8705

5.    **Multibranch Party Information**

For the purposes of Part 4(d) of the Schedule and Section 10(c) of the Agreement, Party A is not a Multibranch Party.

6.      **Credit Support Documents**

In addition to the documents set forth as such in Part 4(f) with respect to Party A, the following documents shall further constitute **"Credit Support Documents"** with respect to Party A: the Guarantee of Merrill Lynch & Co, Inc. (the **"Guarantor"**), substantially in the form attached hereto as Exhibit B.

7.      **Credit Support Provider**

For the purposes of Part 4(g) of the Schedule, **"Credit Support Provider"** means in relation to Party A: the Guarantor.

8.      **OC Custodian**

For the purposes of the Schedule B to the Master Security Agreement, **"OC Custodian"** means BNY Trust Company of Canada, or any replacement custodian agreed to by Party A and Party B.

9.      **Amendments to Payments on Early Termination**

If a Termination Event occurs under Section 5(b)(i), Section 5(b)(ii) or Section 5(b)(iii), and, in any case, the basis for the occurrence of such Termination Event is not a law of Canada or any Province of Canada or a directive, direction or similar order of any applicable governmental agency or authority each thereof (whether or not having force of law), or the promulgation of, or any change in, the interpretation of any such law by, or an action taken by or brought before, a court, tribunal, regulatory authority or taxing authority of Canada or any Province of Canada, then notwithstanding the provisions of Section 6(e), any Termination Payment owed to Party A in respect of a Terminated Transaction (excluding, for the avoidance of doubt, any Unpaid Amounts) shall be deemed to be zero, provided that any Unpaid Amounts shall remain payable in accordance with the provisions of the Omnibus Agreement.

## ANNEX A

## PART 7

### Merrill Lynch Capital Services, Inc.

**For all purposes of this Annex A Part 7, Party A is Merrill Lynch Capital Services, Inc. and Party B is the MAV**

1.     **Tax Representations**

For the purposes of Part 2(b) of the Schedule, Party A makes to Party B and Party B makes to Party A the following tax representations:

(a)     Party A Payee Representations.

For the purpose of Section 3(f) of this Agreement, Party A makes the following representations to Party B:

(i)     Party A is a corporation duly incorporated and validly existing under the laws of the State of Delaware, United States.

(ii)     Party A is fully eligible for the benefits of the "**Business Profits**" or "**Industrial and Commercial Profits**" provision, as the case may be, the "**Interest**" provision or "**Other Income**" provision (if any) of the income tax convention between Canada and the United States with respect to any payment described in such provisions and received or to be received by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in Canada.

(b)     Party B Payee Representations.

For the purpose of Section 3(f) of this Agreement, Party B makes the following representations to Party A:

(i)     Party B is a trust formed and existing under the laws of the Province of Ontario, Canada and is not a non-resident of Canada for the purposes of the Income Tax Act (Canada).

(ii)     Party B is a "non-U.S. branch of a foreign person" for purposes of section 1.1441-4(a)(3)(ii) of the United States Treasury Regulations and a "foreign person" for purposes of section 1.6041-4(a)(4) of the United States Treasury Regulations.

(iii)     Party B is not (i) a bank that has entered into this Agreement in the ordinary course of its trade or business of making loans, as described in section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended (the "**Code**"), (ii) a 10% shareholder of Party A within the meaning of Code section 871(h)(3)(B), or (iii) a controlled foreign corporation with respect to Party A within the meaning of Code section 881(c)(3)(C).

(iv)     Party B is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits" provision, as the case may be, the "Interest" provision or "Other Income" provision (if any) of the income tax convention between Canada and the United States with respect to any payment described in such provisions and received or to be

received by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the United States.

2.    **Tax Documents**

For the purposes of Part 3(a) of the Schedule and Section 4(a) of the Agreement, the following tax forms, documents or certificates are to be delivered:

(a)    Promptly upon execution of this Agreement; and promptly upon learning that any form previously provided by Party A has become obsolete or incorrect, Party A shall deliver to Party B a completed and executed IRS Form W-9;

(b)    Promptly upon execution of this Agreement; and promptly upon learning that any form previously provided by Party B has become obsolete or incorrect, Party B shall deliver to Party A an IRS Form W-8BEN.

3.    **Addresses for Notice**

For the purposes of Part 4(a) of the Schedule and Section 12(a) of the Agreement, the following is the address for notices of communications to Party A:

Merrill Lynch World Headquarters
2 World Financial Center, 6th Floor
New York, New York 10281

Attention: Swap Group
Facsimile No.: (917) 778-0836
Telephone No.: (212) 236-8709

Additionally, a copy of all notices pursuant to Sections 5, 6 and 7 of the Agreement as well as any changes to Party B's address, telephone number or facsimile number shall be sent to:

GMI Counsel
Merrill Lynch World Headquarters
4 World Financial Centre, 12th Floor
New York, NY 10080

Attention: Swaps Legal
Facsimile No.: (212) 449-6993

4.    **Process Agent**

For the purposes of Part 4(b) of the Schedule and Section 13(c) of the Agreement, Party A appoints the following Process Agent in Ontario:

Merrill Lynch Canada Inc.
181 Bay Street, Suite 400
Toronto, ON M5J 2V8, Canada

Phone: (416) 369-2818
Facsimile: (416) 369-8705

5.    **Multibranch Party Information**

For the purposes of Part 4(d) of the Schedule and Section 10(c) of the Agreement, Party A is not a Multibranch Party.

6.    **Credit Support Documents**

In addition to the documents set forth as such in Part 4(f) of the Schedule with respect to Party A, the following documents shall further constitute "**Credit Support Documents**" with respect to Party A: the Guarantee of Merrill Lynch & Co, Inc. (the "**Guarantor**"), substantially in the form attached hereto as Exhibit B.

7.    **Credit Support Provider**

For the purposes of Part 4(g) of the Schedule, "**Credit Support Provider**" means in relation to Party A: the Guarantor.

8.    **OC Custodian**

For the purposes of the Schedule B to the Master Security Agreement, "**OC Custodian**" means BNY Trust Company of Canada, or any replacement custodian agreed to by Party A and Party B.

9.    **Amendments to Payments on Early Termination**

If a Termination Event occurs under Section 5(b)(i), Section 5(b)(ii) or Section 5(b)(iii), and, in any case, the basis for the occurrence of such Termination Event is not a law of Canada or any Province of Canada or a directive, direction or similar order of any applicable governmental agency or authority each thereof (whether or not having force of law), or the promulgation of, or any change in, the interpretation of any such law by, or an action taken by or brought before, a court, tribunal, regulatory authority or taxing authority of Canada or any Province of Canada, then notwithstanding the provisions of Section 6(e), any Termination Payment owed to Party A in respect of a Terminated Transaction (excluding, for the avoidance of doubt, any Unpaid Amounts) shall be deemed to be zero, provided that any Unpaid Amounts shall remain payable in accordance with the provisions of the Omnibus Agreement.

# ANNEX A

## PART 8

### Bank of America, N.A.

**For all purposes of this Annex A Part 8, Party A is Bank of America, N.A. and Party B is the MAV**

1.    **Tax Representation**

For the purposes of Part 2(b) of the Schedule, Party A makes to Party B and Party B makes to Party A the following tax representations:

(a)    Party A Payee Representations:

For the purpose of Section 3(f) of this Agreement, Party A makes the following representations to Party B:

(i)    Party A is a national banking association duly organized and validly existing under the laws of the United States.

(ii)    Party A is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits" provision, as the case may be, the "Interest" provision or the "Other Income" provision (if any) of the income tax convention between Canada and the United States with respect to any payment described in such provisions and received or to be received by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in Canada.

(b)    Party B Payee Representations:

For the purpose of Section 3(f) of this Agreement, Party B makes the following representations to Party A:

(i)    Party B is a trust formed and existing under the laws of the Province of Ontario, Canada and is not a non-resident of Canada for the purposes of the *Income Tax Act* (Canada).

(ii)    Party B is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits" provision, as the case may be, the "Interest" provision or the "Other Income" provision (if any) of the income tax convention between Canada and the United States with respect to any payment described in such provisions and received or to be received by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the United States.

(iii)    In respect of each Transaction that Party A enters into under this Agreement through an Office that is located in the United Kingdom, Party B makes the following representations to Party A:

Party B is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits" provision, as the case may be, the "Interest" provision or the "Other Income" provision (if any) of the income tax convention between Canada and the United Kingdom with respect to any payment described in such provisions and received or to be received by it in connection with each such Transaction and no such payment is

attributable to a trade or business carried on by it through a permanent establishment in the United Kingdom.

2.    **Tax Documents**

For the purposes of Part 3(a) of the Schedule and Section 4(a) of the Agreement, the following tax forms, documents or certificates are to be delivered:  Promptly upon execution of this Agreement; and promptly upon learning that any form previously provided by Party B has become obsolete or incorrect, Party B shall deliver to Party A an IRS Form W-8BEN.

3.    **Addresses for Notice**

For the purposes of Part 4(a) of the Schedule and Section 12(a) of the Agreement, the following is the address for notices of communications to Party A:

Bank of America, N.A.
Sears Tower
233 South Wacker Drive, Suite 2800
Chicago, Illinois 60606

Attention: Swap Operations
Telephone No.: 312-234-2732
Facsimile No.: 866-255-1444

With a mandatory copy to:

Bank of America, N.A.
One Bryant Park, NY1-100-05-01
New York, New York 10036
Attention: Client Integration Group
Facsimile No.: 212-548-8622

Address for financial statements to Party A:

Bank of America, N.A.
Hearst Tower
214 North Tryon Street, NC1-027-19-01
Charlotte, North Carolina, 28255

Attention: Michael Tregidga
Capital Markets Credit Risk/Structured Finance

4.    **Process Agent**

For the purposes of Part 4(b) of the Schedule and Section 13(c) of the Agreement, Party A appoints the following Process Agent in Ontario:

Bank of America, N.A.
Simcoe Place
200 Front Street W, Mail Stop 102-604-27-17
Toronto, Ontario
Canada  M5V 3L2

Attention:  Compliance Executive

5.    **Multibranch Party Information**

For the purposes of Part 4(d) of the Schedule and Section 10(c) of the Agreement, Party A is a
Multibranch Party and may act through its Charlotte, North Carolina, Chicago, Illinois, San Francisco,
California, New York, New York, Boston, Massachusetts or London, England Office, or such other
Office as may be agreed to by the parties in connection with a Transaction.

6.    **Credit Support Documents**

In addition to the documents set forth as such in Part 4(f) of the Schedule with respect to Party A, the
following documents shall further constitute **"Credit Support Documents"** with respect to Party A: Not
applicable.

7.    **Credit Support Provider**

For the purposes of Part 4(g) of the Schedule, **"Credit Support Provider"** means in relation to Party A:
Not applicable.

8.    **OC Custodian**

For the purposes of the Schedule B to the Master Security Agreement, **"OC Custodian"** means BNY
Trust Company of Canada, or any replacement custodian agreed to by Party A and Party B.

9.    **Amendments to Payments on Early Termination**

If Party A is the sole Affected Party in respect of a Termination Event specified in Section 5(b)(i),
5(b)(ii) or 5(b)(iii), or if both parties are Affected Parties in respect of a Termination Event specified in
Section 5(b)(ii), and, in either case, the basis for the occurrence of such Termination Event is not a law
of Canada or any Province of Canada or a directive, direction or similar order of any applicable
governmental agency or authority each thereof (whether or not having force of law), or the promulgation
of, or any change in, the interpretation of any such law by, or an action taken by or brought before, a
court, tribunal, regulatory authority or taxing authority of Canada or any Province of Canada, then
notwithstanding the provisions of Section 6(e), any Termination Payment owed to Party A in respect of
a Terminated Transaction (excluding, for the avoidance of doubt, any Unpaid Amounts) shall be deemed
to be zero, provided that any Unpaid Amounts shall remain payable in accordance with the provisions of
the Omnibus Agreement.

# ANNEX A

## PART 9

### Royal Bank of Canada

**For all purposes of this Annex A Part 9, Party A is Royal Bank of Canada and Party B is the MAV**

1. **Tax Representations**

   For the purposes of Part 2(b) of the Schedule, Party A makes to Party B and Party B makes to Party A the following tax representations:

   (a)    Party A Payee Representations:

   For the purpose of Section 3(f) of this Agreement, Party A makes the following representations to Party B:

   Party A is duly incorporated and validly existing under the *Bank Act* (Canada) and is not a non-resident of Canada for purposes of the *Income Tax Act* (Canada).

   (b)    Party B Payee Representations:

   For the purpose of Section 3(f) of this Agreement, Party B makes the following representations to Party A:

   Party B is a trust formed and existing under the laws of the Province of Ontario, Canada and is not a non-resident of Canada for the purposes of the *Income Tax Act* (Canada).

2. **Tax Documents**

   For the purposes of Part 3(a) of the Schedule and Section 4(a) of the Agreement, the following tax forms, documents or certificates are to be delivered:  Not applicable.

3. **Addresses for Notice**

   For the purposes of Part 4(a) of the Schedule and Section 12(a) of the Agreement, the following is the address for notices of communications to Party A:

   A copy of notices or communications to Party A shall, with respect to a particular Transaction, be sent to the address, telex number, or facsimile number reflected in the Confirmation of that Transaction, and any notice for purposes of Section 5 and Section 6 of the Agreement shall be sent to:

   Royal Bank of Canada
   2nd Floor, Royal Bank Plaza
   200 Bay Street
   Toronto, Ontario
   Canada M5J 2W7

   Attention:        Managing Director, Global Middle Office

   Telephone No.: (416) 842-4767
   Facsimile No.:  (416) 842-4839
   Email:              notices@rbccm.com

4.    **Process Agent**

For the purposes of Part 4(b) of the Schedule and Section 13(c) of the Agreement, Party A appoints the following Process Agent in Ontario:  Not applicable.

5.    **Multibranch Party Information**

For the purposes of Part 4(d) of the Schedule and Section 10(c) of the Agreement, Party A is not a Multibranch Party..

6.    **Credit Support Documents"**

In addition to the documents set forth as such in Part 4(f) of the Schedule with respect to Party A, the following documents shall further constitute "Credit Support Documents" with respect to Party A: Not applicable.

7.    **Credit Support Provider**

For the purposes of Part 4(g) of the Schedule, "Credit Support Provider" means in relation to Party A: Not applicable.

8.    **OC Custodian**

For the purposes of the Schedule B to the Master Security Agreement, "OC Custodian" means BNY Trust Company of Canada, or any replacement custodian agreed to by Party A and Party B.

9.    **Amendments to Payments on Early Termination**

If a Termination Event occurs under Section 5(b)(i), Section 5(b)(ii) or Section 5(b)(iii), and, in any case, the basis for the occurrence of such Termination Event is not a law of Canada or any Province of Canada or a directive, direction or similar order of any applicable governmental agency or authority each thereof (whether or not having force of law), or the promulgation of, or any change in, the interpretation of any such law by, or an action taken by or brought before, a court, tribunal, regulatory authority or taxing authority of Canada or any Province of Canada, then notwithstanding the provisions of Section 6(e), any Termination Payment owed to Party A in respect of a Terminated Transaction (excluding, for the avoidance of doubt, any Unpaid Amounts) shall be deemed to be zero, provided that any Unpaid Amounts shall remain payable in accordance with the provisions of the Omnibus Agreement.

## EXHIBIT A

### Guarantee of Swiss Reinsurance Company

To: [_____] (the "Beneficiary") counterparty to Credit Default Swaps and Par and Basis Swaps Transactions
dated [___] January 2009

1.      The undersigned, SWISS REINSURANCE COMPANY, a Swiss company (the "Guarantor"), hereby
absolutely and unconditionally guarantees the prompt payment as and when due of all obligations of its
indirect, wholly-owned subsidiary SWISS RE FINANCIAL PRODUCTS CORPORATION, a Delaware
corporation ("THE GUARANTEED SUBSIDIARY") under, in connection with or ancillary to (i) an
ISDA Master Agreement, dated as of [___] January 2009, (ii) the schedule thereto dated as of [___]
January 2009, (iii) the credit default swaps and par and basis swap transactions thereunder, each dated
[___] January 2009 and (iv) the credit support annex thereto, each between the Beneficiary and the
GUARANTEED SUBSIDIARY as the same may be amended  from time to time (collectively, the
"Rated Swap") which Guarantee supports the issuance of the Rated Swap.  In this Guarantee these
obligations are referred to as the "Guaranteed Obligations".   This Guarantee is given solely for the
benefit of, and is enforceable only by, the Beneficiary or any trustee as assignee of the Beneficiary to
which this Guarantee has been validly assigned in accordance with applicable law and who is acting as
trustee for the investors in the Rated Swap.

2.      This Guarantee constitutes a Guarantee of payment and not of collection and is not conditional or
contingent upon any attempts to collect from, or pursue or exhaust any rights or remedies against, THE
GUARANTEED SUBSIDIARY.  A demand for payment may at the Beneficiary's option be made in
writing addressed to the Chief Financial Officer of the Guarantor. This Guarantee is not however
dependent in any way on the manner of the demand for payment.  Delay in making a claim will not
affect the Guarantor's obligations under this Guarantee unless the relevant legal limitation period has
expired.

3.      This Guarantee constitutes, and is intended by the Guarantor to constitute, an unlimited non-accessory
undertaking („unbeschränkte, nicht akzessorische Verpflichtung") within the meaning of Article 111 of
the Swiss Code of Obligations (‚CO') and is not a mere surety („Bürgschaft") within the meaning of
Article 492 et seq of the CO.

4.      Notwithstanding any reference to the obligations of THE GUARANTEED SUBSIDIARY, the
Guarantor's obligations under this Guarantee are its absolute and independent obligations as a primary
obligor.  Payment of a claim hereunder or, if applicable, delivery of collateral is required as soon as the
Guaranteed Obligations are due and payable.

5.      To the extent that any event or circumstance would give rise to any legal or equitable discharge, defence
or other rights of the Guarantor under this Guarantee, but which event or circumstance would not give
rise to any discharge, defence or rights of THE GUARANTEED SUBSIDIARY under the Rated Swap,
the Guarantor hereby fully waives, subject to paragraph 7 below, such discharge, defence, or rights and
the Guarantor's liability hereunder shall continue as if such event or circumstance had not arisen.

6.      The Guarantor further agrees, subject to paragraph 7 below, that to the extent that any event or
circumstance gives rise to any legal or equitable discharge, defence or other rights available to both the
Guarantor under the Guarantee and THE GUARANTEED SUBSIDIARY under the Rated Swap, the
Guarantor hereby agrees to waive such discharge, defence or other rights against the Beneficiary, until
such time as all the Guaranteed Obligations in relation to the same event or circumstance have been fully
met as required to protect investors in the Rated Swap.

7.      Notwithstanding any other provision of this Guarantee, the Guarantor will have the right, prior to making any payment under this Guarantee, to (a) assert such rights of offset as are set forth in the Rated Swap to the extent that such rights relate to amounts due and payable by the Beneficiary to THE GUARANTEED SUBSIDIARY and not to amounts which are subject to dispute; and (b) defend manifestly fraudulent claims under this Guarantee made by the Beneficiary.

8.      This Guarantee will continue in full force and effect in relation to all Guaranteed Obligations until all the Guaranteed Obligations have been satisfied in full.

9.      For the avoidance of doubt, all Guaranteed Obligations entered into by THE GUARANTEED SUBSIDIARY during the term of this Guarantee shall be honoured in accordance with this Guarantee and shall be binding on the Guarantor and its successors and assigns.

10.     This Guarantee may be amended only as necessary to reflect changes to the Guaranteed Obligations which are validly agreed to by the Beneficiary in accordance with the terms of the Rated Swap, including any requirement to obtain the consent of some or all of the investors in the Rated Swap.

11.     If any payment by THE GUARANTEED SUBSIDIARY is avoided, recaptured or reduced as a result of insolvency or any similar event affecting creditors rights generally having occurred in respect of THE GUARANTEED SUBSIDIARY, the Guarantor's liability under this Guarantee shall continue as if the avoided, recaptured or reduced payment had not occurred.

12.     Upon payment by the Guarantor to the Beneficiary of any amount due under this Guarantee, the Guarantor shall be entitled to require the assignment to it of the rights of the Beneficiary against THE GUARANTEED SUBSIDIARY to the extent satisfied by such payment, and the Beneficiary will take at the Guarantor's expense such steps as the Guarantor may reasonably require to implement such assignment. The Guarantor shall not exercise any rights against THE GUARANTEED SUBSIDIARY which it may acquire in consequence of such payment and assignment unless and until all the Guaranteed Obligations to the Beneficiary shall have been paid in full.

13.     This Guarantee is governed and will be construed in accordance with Swiss law.  The exclusive place of jurisdiction for any legal proceeding hereunder shall be Zurich, Switzerland.

IN WITNESS WHEREOF, the Guarantor has caused this Guarantee to be executed in its name as of the __th day of January, 2009

SWISS REINSURANCE COMPANY

By:_____

Name:

Title:

　　Date:

## EXHIBIT B

**Guarantee of Merrill Lynch & Co., Inc. in favour of Merrill Lynch International**

### GUARANTEE OF MERRILL LYNCH & CO., INC.

FOR VALUE RECEIVED, receipt of which is hereby acknowledged, MERRILL LYNCH & CO., INC., a corporation duly organized and existing under the laws of the State of Delaware ("ML & Co."), hereby unconditionally guarantees to CIBC Mellon Global Securities Services Company in its capacity as trustee of Master Asset Vehicle I (the "Trust"), the due and punctual payment of any and all amounts payable by Merrill Lynch International, a corporation organized under the laws of England ("MLI"), under the terms of the ISDA Master Agreement between the Trust and MLI, dated as of January [●], 2009 (the "Agreement"), including, in case of default, interest on any amount due, when and as the same shall become due and payable, whether on the scheduled payment dates, at maturity, upon declaration of termination or otherwise, according to the terms thereof.  In case of the failure of MLI punctually to make any such payment, ML & Co. hereby agrees to make such payment, or cause such payment to be made, promptly upon demand made by the Trust to ML & Co.; provided, however that delay by the Trust in giving such demand shall in no event affect ML & Co.'s obligations under this Guarantee.  This Guarantee shall remain in full force and effect or shall be reinstated (as the case may be) if at any time any payment guaranteed hereunder, in whole or in part, is rescinded or must otherwise be returned by the Trust upon the insolvency, bankruptcy or reorganization of MLI or otherwise, all as though such payment had not been made.

ML & Co. hereby agrees that its obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement; the absence of any action to enforce the same; any waiver or consent by the Trust concerning any provisions thereof; the rendering of any judgment against MLI or any action to enforce the same; or any other circumstances that might otherwise constitute a legal or equitable discharge of a guarantor or a defense of a guarantor.  ML & Co. covenants that this Guarantee will not be discharged except by complete payment of the amounts payable under the Agreement.  This Guarantee shall continue to be effective if MLI merges or consolidates with or into another entity, loses its separate legal identity or ceases to exist.

ML & Co. hereby waives diligence; its right of set-off; presentment; its right of subrogation until the guaranteed obligations are paid in full; protest; notice of protest, acceleration, and dishonor, filing of claims with a court in the event of insolvency or bankruptcy of MLI; all demands whatsoever, except as noted in the first paragraph hereof; and any right to require a proceeding first against MLI.

ML & Co. hereby certifies and warrants that this Guarantee constitutes the valid obligation of ML & Co. and complies with all applicable laws.

This Guarantee shall be governed by, and construed in accordance with, the laws of the State of New York.

This Guarantee may be terminated at any time by notice by ML & Co. to the Trust given in accordance with the notice provisions of the Agreement, effective upon receipt of such notice by the Trust or such later date as may be specified in such notice; provided, however, that this Guarantee shall continue in full force and effect with respect to any payment obligation of MLI under the Agreement entered into prior to the effectiveness of such notice of termination.

This Guarantee becomes effective concurrent with the effectiveness of the Agreement, according to its terms.

IN WITNESS WHEREOF, ML & Co. has caused this Guarantee to be executed in its corporate name by its duly authorized representative.

MERRILL LYNCH & CO., INC.

By:_____
    Name:
    Title:
    Date:

## EXHIBIT C

### Guarantee of Merrill Lynch & Co, Inc. in favour of Merrill Lynch Capital Services, Inc.

#### GUARANTEE OF MERRILL LYNCH & CO., INC.

FOR VALUE RECEIVED, receipt of which is hereby acknowledged, MERRILL LYNCH & CO., INC., a corporation duly organized and existing under the laws of the State of Delaware ("ML & Co."), hereby unconditionally guarantees to CIBC Mellon Global Securities Services Company in its capacity as trustee of Master Asset Vehicle I (the "Trust"), the due and punctual payment of any and all amounts payable by Merrill Lynch Capital Services, Inc. a corporation organized under the laws of the State of Delaware ("MLCS"), under the terms of the ISDA Master Agreement between the Trust and MLCS, dated as of January [●], 2009 (the "Agreement"), including, in case of default, interest on any amount due, when and as the same shall become due and payable, whether on the scheduled payment dates, at maturity, upon declaration of termination or otherwise, according to the terms thereof. In case of the failure of MLCS punctually to make any such payment, ML & Co. hereby agrees to make such payment, or cause such payment to be made, promptly upon demand made by the Trust to ML & Co.; provided, however that delay by the Trust in giving such demand shall in no event affect ML & Co.'s obligations under this Guarantee. This Guarantee shall remain in full force and effect or shall be reinstated (as the case may be) if at any time any payment guaranteed hereunder, in whole or in part, is rescinded or must otherwise be returned by the Trust upon the insolvency, bankruptcy or reorganization of MLCS or otherwise, all as though such payment had not been made.

ML & Co. hereby agrees that its obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement; the absence of any action to enforce the same; any waiver or consent by the Trust concerning any provisions thereof; the rendering of any judgment against MLCS or any action to enforce the same; or any other circumstances that might otherwise constitute a legal or equitable discharge of a guarantor or a defense of a guarantor. ML & Co. covenants that this Guarantee will not be discharged except by complete payment of the amounts payable under the Agreement. This Guarantee shall continue to be effective if MLCS merges or consolidates with or into another entity, loses its separate legal identity or ceases to exist.

ML & Co. hereby waives diligence; its right of set-off; presentment; its right of subrogation until the guaranteed obligations are paid in full; protest; notice of protest, acceleration, and dishonor, filing of claims with a court in the event of insolvency or bankruptcy of MLCS; all demands whatsoever, except as noted in the first paragraph hereof; and any right to require a proceeding first against MLCS.

ML & Co. hereby certifies and warrants that this Guarantee constitutes the valid obligation of ML & Co. and complies with all applicable laws.

This Guarantee shall be governed by, and construed in accordance with, the laws of the State of New York.

This Guarantee may be terminated at any time by notice by ML & Co. to the Trust given in accordance with the notice provisions of the Agreement, effective upon receipt of such notice by the Trust or such later date as may be specified in such notice; provided, however, that this Guarantee shall continue in full force and effect with respect to any payment obligation of MLCS under the Agreement entered into prior to the effectiveness of such notice of termination.

This Guarantee becomes effective concurrent with the effectiveness of the Agreement, according to its terms.

IN WITNESS WHEREOF, ML & Co. has caused this Guarantee to be executed in its corporate name by its duly authorized representative.

MERRILL LYNCH & CO., INC.

By:_____
    Name:
    Title:
    Date:

**ANNEX B**

**Form of Dealer CSA**

[***TO BE INSERTED***]