UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x    **FOR PUBLICATION**

In re                                                      :

                                                           :

METCALFE & MANSFIELD ALTERNATIVE    :    Chapter 15
INVESTMENTS, ET AL.                              :    Case No. 09-16709 (MG)
                                                           :    Jointly Administered

            Debtors in Foreign Proceedings.    :

-------------------------------------------------------------x

**CORRECTED MEMORANDUM OPINION GRANTING RECOGNITION OF
FOREIGN MAIN PROCEEDING AND ENFORCING CANADIAN AMENDED
SANCTION ORDER AND PLAN IMPLEMENTATION ORDER**

*A P P E A R A N C E S:*

ALLEN & OVERY LLP
*Attorneys for the Foreign Representative*
1221 Avenue of the Americas
New York, NY  10022
By:    Ken Coleman, Esq.
         Amélie Baudot, Esq.
         Rowena White, Esq.

**MARTIN GLENN**
**United States Bankruptcy Judge**

## I.  INTRODUCTION

The petitions in this chapter 15 case were filed on November 10, 2009.  Ernst &

Young Inc. is the court-appointed monitor ("Monitor") and authorized foreign

representative of Metcalfe & Mansfield Alternative Investments II Corp., and the other

foreign petitioners (together, "Metcalfe" or "Petitioners").  The Petitioners are debtors in

proceedings (the "Canadian Proceedings") under Canada's Companies' Creditors

Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA"), commenced on

March 17, 2008 and pending before the Ontario Superior Court of Justice (Commercial

List) ("Ontario Court").  The Canadian Proceedings were initiated by the Pan-Canadian

Investors Committee for the Third-Party Structured Asset-Backed Commercial Paper

("Investors Committee") in order to effect the restructuring of all outstanding third-party

(non-bank sponsored) Asset Backed Commercial Paper ("ABCP") obligations, estimated

to have a face value at the time of commencement of approximately CAN$ 32 billion.

The ABCP restructuring is said to be the largest restructuring in Canadian history.

The Amended Sanction Order and Plan Implementation Order (the "Canadian

Orders") were entered by the Ontario Court on June 5, 2008 and affirmed on appeal by

unanimous decision of the Ontario Court of Appeal on August 18, 2008.  On September

19, 2008, the Canada Supreme Court denied review.  The Plan Implementation Order

became effective on January 12, 2009.  The Plan approved by the Ontario Court was first

approved by an overwhelming vote of ABCP Noteholders (96% in number and value of

all Noteholders present and voting).  On January 21, 2009, new Plan Notes and cash were

distributed to existing Noteholders, and assets of the Conduits (described below) were

transferred to newly created Master Asset Vehicles securing the new Plan Notes.  In May

2009, additional cash was distributed to Noteholders.  The Ontario Court has also granted

the Monitor's motion to make a final cash distribution to the Noteholders.

The Monitor seeks recognition of the Canadian Proceedings as a foreign main

proceeding under Bankruptcy Code § 1517, and also seeks an order enforcing the

Canadian Orders in the United States.  Notice of the filing of the chapter 15 petitions and

of the relief being sought has been given by mail, email and publication.  The deadline

for filing objections in this Court was December 16, 2009.  No objection to the requested

relief was timely filed. One untimely submission was filed on December 21, 2009.[1]

(ECF # 26.) The Court held the recognition hearing on December 23, 2009.

It is clear that the Canadian Proceedings should be recognized as a foreign main

proceeding. The only issue here arises from the inclusion in the Canadian Orders of a

very broad third-party non-debtor release and injunction. During the initial hearing in

this case on November 23, 2009, the Court requested that the Monitor's counsel brief

whether this Court could properly enter an order enforcing the third-party non-debtor

release and injunction. On December 17, 2009, the Monitor's counsel filed a

Supplemental Memorandum of Law in Support of Chapter 15 Petitions for Recognition

of Foreign Proceedings and Related Relief (ECF # 24) addressing the issue raised by the

Court.

For the reasons that follow, the Court concludes the Canadian Orders—including

the non-debtor release and injunction—should be enforced in the United States. This

---

[1]    The submission (not denominated as an objection) was filed by Michael Miles, M.Sc., who
purports to be the "Chairperson of the Retail ABCP Owners Committee." Referring to himself, Miles
states "I am a former owner of Canadian Non Bank Asset Backed Commercial Paper and Chairperson of
the Canadian Retail ABCP Owners' Committee." The membership and status of the "Committee" is not
described. Neither Miles nor anyone purporting to act on behalf of the Committee appeared at the
December 23, 2009 recognition hearing. The submission acknowledges that the "[Plan] included a deal in
which approximately 1800 'retail' owners such as myself . . . had our losses repaid in compensation for
voting to support restructuring. One of the provisions of this deal was that it gave blanket immunity from
lawsuits to all Companies or individuals involved in the manufacture, credit rating, sale or restructuring of
Canadian ABCP." Thus, Miles appears to acknowledge that the Plan approved by the Ontario Court, which
he apparently supported, included non-debtor release and injunction provisions.
        Miles points to recent action by Canadian securities regulators announcing fines against certain
financial institutions that marketed ABCP, and ongoing investigations of others (including US institutions
that would obtain the benefit of the non-debtor release and injunction). Miles asserts that the release and
injunction "would deny the right of ABCP owners to file a lawsuit in U.S. courts against international and
U.S. banks who were the asset providers to the Canadian Non Bank ABCP trusts sold to both Canadian and
American-affiliated investors." The submission concludes by requesting "that you closely review the
request by [the Monitor] to ensure that the benefit of US Security law (which is more stringent that [*sic*]
that in Canada) remain available to potential plaintiffs."
        The Canadian Orders and the relief sought from this Court have no effect on any police or
regulatory actions brought by securities regulators in Canada or the United States. The enforceability of the
non-debtor release and injunction on private civil actions in the United States is the focus of this decision.

opinion discusses only the issues raised by the inclusion of the third-party non-debtor release and injunction.

## II.  BACKGROUND

An understanding of the Canadian ABCP market, the various players in the market, how the market nearly collapsed, how the restructuring Plan sought to address these problems and the roles played by third-party non-debtors in the Plan, is helpful in considering the issues raised by the requested relief.  The uncontroverted facts described below are taken from the Verified Petition for Recognition of Foreign Proceedings and Enforcement of Canadian Order Relating to the Restructuring of the Canadian Asset-Backed Commercial Paper Market (ECF # 2).

### A.  Investors Purchase ABCP Notes

There are 47 series of ABCP affected by the Plan.  The money paid by investors to acquire ABCP was used to purchase a portfolio of financial assets that would support and collateralize repayment of each series of ABCP.  The assets that "backed" ABCP were sold to the Conduits by various financial institutions (the "Asset Providers").  These assets can be divided into two general categories: (i) exclusively "traditional" securitized assets such as residential and commercial mortgages, credit card receivables and auto-loans, and (ii) collateralized debt obligations ("CDOs"), which are not specific to one type of debt but are a type of asset-backed security and structured credit product.  Most of the CDOs were synthetic, thus gaining credit exposure to a portfolio of fixed income assets (without owning those assets) through the use of credit default swaps.

The assets that backed the ABCP were generally long or medium-term assets while the ABCP were short-term obligations of the Issuer Trustees, thus resulting in an

inherent timing mismatch between the cash generated by the underlying long-term assets and the cash needed to repay maturing ABCP. Before mid-August 2007, the timing mismatch was addressed by reinvesting or "rolling" existing ABCP at maturity. New ABCP was continually being sold thus generating funds to repay maturing ABCP where investors required payment. The Asset Providers (all beneficiaries of the non-debtor release and injunction provisions) include: Bank of America, N.A., Canadian Imperial Bank of Commerce, Citbank, N.A., Deutsche Bank AG, HSBC Bank USA, N.A., Merrill Lynch International, Royal Bank of Canada, Royal Bank of Scotland, Swiss Re Financial Products Corporation, UBS AG and Wachovia Bank N.A. and their respective affiliates. The Issuer Trustees also entered into back-up liquidity arrangements with third-party lenders ("Liquidity Providers") who agreed to provide funds to repay maturing ABCP in certain circumstances.

Certain of the Asset Providers also entered into derivative contracts with the Conduits. The vast majority of underlying assets were derivative contracts in the form of credit default swaps. A credit default swap is a contract under which one party (the "Protection Buyer") seeks to protect itself against a defined credit event or pool of credit events. The Protection Buyer pays fees to another party (the "Protection Seller") who undertakes to pay the Protection Buyer if a credit event occurs. A number of the Conduits assumed the role of Protection Seller under credit default swaps with an Asset Provider acting as Protection Buyer.

Of the CAN$26 billion in credit default swaps underlying the ABCP, approximately CAN$17.4 billion were "Leveraged Super Senior" ("LSS") swaps. These swaps are leveraged because the amount of credit protection sold is greater than the

amount of collateral posted as security.  The LSS swaps contain triggering events that entitle the Protection Buyer to make margin calls for additional collateral from the Protection Seller to ensure that the Protection Buyer continues to have sufficient security. Most of the triggers in the LSS swaps were mark-to-market triggers based on the market value of the swap.  The mark-to-market triggers required the Protection Seller to post additional collateral based on an increase in the amount the Protection Buyer would have to pay a third party to enter into a replacement swap that would preserve the economic value of the current swap for the Protection Buyer.

The majority of the financial assets held by each Conduit that entered into LSS swaps were pledged to the Asset Providers as security.  Therefore, if a secured swap was declared to be in default, the Asset Provider had the right to terminate the swap and satisfy any termination payment by enforcing its security through seizing and liquidating the collateral.  When market conditions were sufficiently depressed, the Noteholders were at risk of significant losses because the value of the assets that supported their notes would first be used to meet any shortfalls incurred by the Asset Providers.

The ABCP market froze during the week of August 13, 2007.  The crisis was largely triggered by market sentiment, as news spread of defaults on U.S. sub-prime mortgages.  Investors in Canadian ABCP lost confidence because of a perceived lack of transparency in the market.  Noteholders and potential new investors feared that the assets backing the ABCP might include substantial exposure to sub-prime mortgages or other overvalued assets.  Investors thus stopped buying new ABCP, and Noteholders stopped "rolling" their existing ABCP.  As ABCP became due, the Conduits were unable to fund repayments through new issuances or replacement notes.  The trustees of some

Conduits made requests to Liquidity Providers, who took the position that the conditions

for funding had not been met.  With no new investment, no reinvestment, and no liquidity

funding available, coupled with the timing mismatch between the short-term ABCP and

the longer-term underlying assets, payments due on the ABCP could not be made.

On August 14, 2007, in response to this crisis and in order to prevent the

destruction of value that a forced liquidation of the underlying assets would cause,

representatives of the largest Noteholders and six of the Asset Providers signed an

agreement establishing a 60-day standstill period (the "Montréal Accord").  During this

period, the 10 relevant stakeholders focused on the restructuring and set up the

foundation for the Plan.  The Montréal Accord provided that all outstanding ABCP would

be converted into floating rate term notes maturing at the same time as the corresponding

assets.  It also allowed for the modification of the margin provisions under the LSS swaps

to reduce the risk of margin calls.  Shortly after signing the Montréal Accord, the

Investors Committee led the restructuring process with the help of the Monitor and J.P.

Morgan, as financial advisor.

**B.  The Conduits Could Not Meet Their Liabilities**

The Issuer Trustees are either the original or replacement trustees of the Conduits,

which issued the ABCP pursuant to trust indentures and through commercial paper

placement agents such as financial institutions and broker-dealers, and were therefore

liable for amounts owing on the ABCP.  The Issuer Trustees had an obligation to

administer the trust and maintain proper records.  Each Issuer Trustee was also the legal

owner of the assets held for each series in the Conduit of which it is the trustee, and was

the debtor (to the extent of the assets held in the Conduit) with respect to the ABCP

issued by that Conduit.  Since mid-August 2007, the Issuer Trustees had insufficient

liquidity to make payments on the maturing ABCP. Each remained unable to meet its liabilities to the investors represented on the Investors Committee and to the other holders of each series of ABCP as those obligations became due.

### C. A Plan Is Negotiated

Notwithstanding the fact that each Issuer Trustee is a separate legal entity and each series of notes is backed only by the assets relating to that series, the ABCP market suffered from common problems and required a common solution. Accordingly, the Monitor, the Investors Committee and other key market participants, believed that one comprehensive Plan best addressed the needs of the ABCP market as a whole. The Plan provides for market-wide transparency in the assets underlying the restructured notes, and a greater opportunity for investors to realize payment of what was due to them under the ABCP. The following is a summary of the key provisions of the Plan.

#### 1. Restructured Margin Call Triggers

The risks caused by mark-to-market triggers in the LSS swaps are, under the Plan, reduced as the Asset Providers agreed to restructure the LSS transactions concurrently with Plan implementation. Specifically, the Asset Providers agreed to change the triggers under the LSS swaps from mark-to-market triggers to more remote spread loss triggers which will reduce the likelihood of margin calls and any consequential forced liquidation of assets to fund termination payments. The spread loss triggers, under the Plan, are based on six uniform and verifiable indices of spreads and losses. The change in the triggers also increases transparency, predictability and certainty.

#### 2. The Master Asset Vehicles

While the change in the triggers reduced the risk for Noteholders, it increases the risk of the Asset Providers. The Asset Providers required further collateral, beyond the

existing assets in the Conduits, to be available through margin funding facilities. In order to address this need for additional security, the Plan transfers all of the assets of the ABCP series backed by synthetic assets into two MAVs ("MAV1" and "MAV2"). The pooling of assets into those two MAVs provides for cross-collateralization making collateral calls less likely. The collateral also includes non-levered synthetic assets. Under the Plan, all of the assets of the ABCP series backed solely by traditional assets were transferred to a third MAV ("MAV3"). In MAV1, additional margin funding is provided by the Noteholders participating in that vehicle themselves, through "self-funding." This involves the assumption of additional risk by these Noteholders. Some may be required to post collateral and there may be some impact on their capital. MAV2 is supported by a third-party margin funding facility, in effect a standby line of credit. The Asset Providers as well as several Canadian banks agreed to provide a large portion of the funding needed for this margin funding facility at a favorable interest rate.

The Noteholders participating in MAV1 or MAV2 have transferred ABCP (other than the ABCP for which the underlying assets are traditional assets) to the applicable MAV in exchange for a combination of Class A-1 Notes, Class A-2 Notes, Class B Notes, Class C Notes, and ineligible asset tracking notes (collectively referred to as the "Plan Notes"). The different categories of Plan Notes were designed to permit the highest possible credit ratings in the Class A-1 Notes. All Noteholders had the option of participating in MAV1, provided that they met certain financial criteria or posted collateral, as required by the Asset Providers. Investors in MAV1 agreed to self-fund for their entire holdings. An investor could also participate as a margin funding lender in MAV2 for part of its holdings, again subject to certain criteria.

Noteholders have exchanged or have been deemed to have exchanged the affected ABCP owned by them for Plan Notes.  The Plan Notes were distributed to Noteholders through the existing securities structure.

### 3.  Matching Assets and Liabilities

Under the Plan, all ABCP was replaced by Plan Notes that have maturities and interest rates appropriately tied to the underlying assets.

### 4.  Classification of Creditors

The Plan had a single class of creditors for voting purposes, being all investors in ABCP, and treated all ABCP holders equitably by accounting for the differing risks and corresponding interests across all of the ABCP.

### 5.  Claims Procedure

The Plan approved by the Noteholders and the Ontario Court provided for the exchange of all ABCP for Plan Notes, and for all Noteholders to receive their Plan Notes through the established mechanisms in Canada for distribution of securities to beneficial holders of record.  No proof of claim was required to be filed, but investors were required to confirm the amount of their particular holdings by submitting a voter confirmation form (in the event they had previously disclosed their holdings to the Monitor) or a voter identification form to the Monitor, and to vote in person or by proxy at the meeting.

### 6.  A Global Release

The Plan and the Sanction Order provide each participant in the Canadian ABCP market, including the Asset Providers, the Sponsors, the Issuer Trustees, the Conduits, and the Investors Committee (collectively, the "Released Parties"), with a release that protects them from liability and actions on account of any and all past, present and future claims, rights, interests, actions, rights of indemnity, liabilities, demands, duties, injuries,

damages, expenses, fees or causes of action of whatsoever kind or nature in any way related to the third-party ABCP market in Canada. The jurisdiction of the Ontario Court to grant the release and injunction provisions was the central issue decided by the Ontario Court and, on the appeal, by the Ontario Court of Appeal. The Canadian Supreme Court denied review. The Ontario Court and the Ontario Court of Appeal decided that under the CCAA, the Ontario Court had jurisdiction and properly exercised its power and discretion in approving the non-debtor release and injunction provisions in the Plan and Sanction Order.

The Verified Petition explains that the comprehensive releases were included because the Asset Providers, whose participation was viewed as vital to the restructuring, made them a condition for their participation. They required comprehensive releases in return for their agreement to: (i) enter into the new LSS swaps whose terms are more favorable to the investors; (ii) provide margin funding facility support at rates significantly below the cost another third party would charge for such funding in the marketplace; and (iii) disclose information concerning the synthetic assets to create transparency, facilitate the restructuring and assist investors in assessing the Plan. The entire restructuring was premised on these key concessions that served to shift the risk from the investors to the Asset Providers to protect more fully the investors from the negative effects of volatile credit markets.

In addition, the Asset Providers required assurances that no claims would remain after Plan implementation that could lead to claims against them for contribution and indemnity. The Monitor argues that indemnity or contribution claims would undermine the finality and certainty that the releases are intended to give. Therefore, the Asset

Providers required a release of all parties who might be sued by the investors, because such parties might then claim against the Asset Providers.

The Plan specifies that the releases (a) do not stay, release, discharge, bar, enjoin or otherwise interfere with any powers or remedies of, or proceedings or investigations by, any regulatory or self-regulatory body having jurisdiction (pursuant to any applicable statute, regulation, rule or, in the case of the Investment Industry Regulatory Organization of Canada, contract) over any party that would otherwise be released concerning such party's involvement in the creation, issue, sale or rating of any Affected ABCP, provided that (b) the releases would be effective to release and enjoin the making of any order or award to compensate or make restitution to an aggrieved person or company or to pay general or punitive damages to any other person or company.  In addition, the Plan provided an exception from the releases with respect to particularized claims ("Excepted Claims") against a specific party by a Noteholder that suffered damages as a direct result of purchasing specific ABCP in reliance on express fraudulent misrepresentations by that party, provided the Noteholder served and filed an initial pleading in a proceeding to pursue the Excepted Claim by a specified date that was approximately ten weeks after the date of the Sanction Order.  The Monitor states that no pleadings for Excepted Claims were served or filed within the specified time period.

### 7.  An Injunction against Proceedings against Non-Debtors

In addition to the global release, the Plan and the Sanction Order also provide for an injunction against proceedings against the Released Parties. The Monitor argues that the comprehensive restructuring of the ABCP market involved a variety of parties whose interests are so intertwined with the Issuer Trustees that it would have been impossible to grant an injunction affecting the Issuer Trustees without extending that injunction to

certain non-debtors including the Investors Committee, the Asset Providers, and the

Liquidity Providers.  The injunction provided under the Plan was subject to the same

exceptions for regulatory proceedings and Excepted Claims described above with respect

to the global releases.

### D.  Request for Assistance in Carrying Out Canadian Orders

The Canadian Orders specifically include provisions requesting aid, recognition

and assistance by U.S. courts in carrying out the terms of the orders.  *See* Sanction Order

¶ 31; Implementation Order ¶ 50.

### E.  Canadian Courts Determine that the Ontario Court Had Jurisdiction to Enter the Non-Debtor Release and Injunction Provisions

A review of the written decisions by the Ontario Court (*see* Supplemental

Declaration of Ken Coleman in Support of Petitions for Recognition of Foreign

Proceedings and Related Relief, dated November 20, 2009, Exhibit C (ECF # 17)), and

the Ontario Court of Appeal (*see id.*, Exhibit B; *ATB Financial v. Metcalfe & Mansfield

Alternative Investments II Corp.*, 2008 CarswellOnt 4811), show that the jurisdiction of

the Ontario Court to issue the third-party non-debtor release and injunction provisions

was the principle disputed legal issue in the Canadian Proceedings.  Both courts issued

lengthy, reasoned written decisions upholding the jurisdiction of the Ontario Court under

the CCAA to approve the non-debtor release and injunction provisions.  More than 30

parties appealed the Ontario Court decision approving those provisions.  The Ontario

Court of Appeal framed the issues as follows:

> [Appellants] raise an important point regarding the
> permissible scope of a restructuring under the *Companies'
> Creditors Arrangement Act*, R.S.C. 1985, c. C-36 as
> amended ('CCAA'):  can the court sanction a Plan that
> calls for creditors to provide releases to third parties who
> are themselves solvent and not creditors of the debtor

> company?  They also argue that, if the answer to this
> question is yes, the application judge erred in holding that
> this Plan, with its particular releases (which bar some
> claims even in fraud), was fair and reasonable and therefore
> in sanctioning it under the CCAA.

*Id.*, Exhibit B, at 7 ¶ 3.

In its lengthy decision, the Court of Appeal decided "the CCAA permits the inclusion of third party releases in a plan of compromise or arrangement to be sanctioned by the court where those releases are reasonably connected to the proposed restructuring."  *Id.*, Exhibit B at 13 ¶ 43.  The Court of Appeal held that the Ontario Court had jurisdiction over the parties and the matter before it and correctly decided that the non-debtor release and injunction were properly included in the Plan.  *Id.*, Exhibit B at 27 ¶ 105 ("For all of the foregoing reasons, then, I conclude that the application judge had the jurisdiction and legal authority to sanction the Plan as put forward.")  The Court of Appeal also concluded that "[w]hether a plan of compromise or arrangement is fair and reasonable is a mixed question of fact and law, and one on which the application judge exercises a large measure of discretion."  *Id.*, Exhibit B at 27 ¶ 107.  The Court of Appeal concluded that the application judge made findings supported by the record that the Plan here is fair and reasonable.  As already mentioned, the Canadian Supreme Court denied review from the decision of the Ontario Court of Appeal.

### III.  DISCUSSION

The Monitor argues that the third-party non-debtor release and injunction provisions included in the Plan and Sanction Order should be enforced in the United States because, if this were a plenary case under chapter 11, such provisions would pass muster under the rigorous standards for release and injunction provisions established by

the Second Circuit in *SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285 (2d Cir. 1992); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005); and *In re Johns-Manville Corp.*, 517 F.3d 52 (2d Cir. 2008) ("*Manville*"), *rev'd on other grounds sub nom. Travelers Indemnity Co. v. Bailey*, 129 S. Ct. 2195 (2009).  Additionally, the Monitor argues that whether or not a bankruptcy court within the Second Circuit could issue non-debtor release and injunction provisions in a plenary case under chapter 11, the provisions included in the Canadian Orders should be enforced in the United States pursuant to law applicable to enforcement of foreign judgments, the principles of international comity, and the public policy embodied in chapter 15 of the Bankruptcy Code.

The Second Circuit imposes significant limitations on bankruptcy courts ordering non-debtor releases and injunctions in confirmed chapter 11 plans.  In *Metromedia*, the court concluded that a third-party non-debtor release "is proper only in rare cases."  416 F.3d at 141.  The court emphasized that:

> [A] nondebtor release is a device that lends itself to abuse. By it, a nondebtor can shield itself from liability to third parties.  In form, it is a release; in effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code.  The potential for abuse is heightened when releases afford blanket immunity.

*Id.* at 142.  The court held that "[a] nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to success of the plan . . . ."  *Id.* at 143.

The Monitor argues that the rigorous standard established in *Metromedia* would be satisfied in this case, and that the standard applied by the Ontario Court and the Ontario Court of Appeal was equally rigorous.  That may well be so, but the subsequent

decision in *Manville* raises a question whether meeting the *Metromedia* standard is enough. *Metromedia* did not address the jurisdictional issue considered by the Second Circuit panel in *Manville*.[2] But Second Circuit law on approval of a non-debtor release is now uncertain after the Supreme Court's reversal in *Manville*.

In *Manville*, the Second Circuit panel concluded that a bankruptcy court only has jurisdiction to issue a non-debtor release where the released claims "directly affect the *res* of the bankruptcy estate." 517 F.3d at 66. In reaching its conclusion, the panel relied heavily on the Fifth Circuit's decision in *Matter of Zale Corp.*, 62 F.3d 746 (5th Cir. 1995), which rejected use of a non-debtor release as exceeding the bankruptcy court's "related to" jurisdiction under 28 U.S.C. § 1334:

> Those cases in which courts have upheld "related to" jurisdiction over third-party actions do so because the subject of the third-party dispute is property of the estate, or because the dispute over the asset would have an effect on the estate. Conversely, courts have held that a third-party action does not create "related to" jurisdiction when the asset in question is not property of the estate and the dispute has no effect on the estate. Shared facts between the third-party action and a debtor-creditor conflict do not in and of themselves suffice to make the third-party action "related to" the bankruptcy.

*Zale*, 62 F.3d at 753.

The Supreme Court reversed the *Manville* panel decision on the grounds that the court had impermissibly permitted a collateral attack on a final judgment of the bankruptcy court issued many years before. 129 S. Ct. at 2206. The Supreme Court's disposition was to "reverse the judgment of the Court of Appeals and remand for further proceedings consistent with this opinion." *Id.* at 2207. It is unclear whether the circuit

---

[2]     In *Metromedia*, the court stated that "[a]ppellants' sole argument—and the only argument that we consider—is that these nondebtor releases were unauthorized by the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, at least on the findings made by the bankruptcy court." 416 F.3d at 141.

panel's decision remains binding law in this Circuit on other issues decided by the panel—specifically on the jurisdictional limits on a bankruptcy court's power to approve a third-party non-debtor release and injunction. Even if the circuit panel decision is not binding, it may nevertheless be persuasive with respect to the jurisdictional issue.

Although the Monitor argues that the *Manville* standard has been satisfied here, it is far from clear that the third-party non-debtor release and injunction provisions here would be consistent with the jurisdictional limits *Manville* imposes on a bankruptcy court. No claims have so far been asserted against Asset Providers in the U.S., but it is not clear that any direct claims of investors against Asset Providers seeking to establish liability based solely on the Asset Providers' conduct could properly be released in a plenary chapter 11 case under the *Manville* standard.[3] But, whatever the precise limits of a bankruptcy court's jurisdiction to approve a third-party non-debtor release and injunction in a plenary chapter 11 case, the important point for present purposes is that the jurisdictional limits derive from the scope of bankruptcy court "related to" jurisdiction under 28 U.S.C. § 1334, and the prudential limits courts have applied in chapter 11 cases under the Bankruptcy Code. This Court is not being asked to approve such provisions in a plenary case; rather, the Court is being asked to order enforcement of provisions approved by the Canadian courts. The correct inquiry, therefore, is whether the foreign orders should be enforced in the United States in this chapter 15 case. As explained below, principles of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of the third-party

---

[3]     For example, during argument on December 23, 2009, the Court asked whether the non-debtor release would bar claims against a U.S.-based Asset Provider that, in its capacity as a fund manager or advisor, negligently or recklessly purchased or recommended the purchase of ABCP to its clients. The Monitor's counsel responded that the release would bar such claims. Such claims would not appear to affect the *res* of the bankruptcy estate.

non-debtor release and injunction provisions included in the Canadian Orders, even if

those provisions could not be entered in a plenary chapter 11 case.

### A.  Principles of Comity in Chapter 15 Cases Support Enforcement of the Canadian Orders

A determination whether to grant recognition of foreign proceedings and

enforcement of foreign court orders is a core proceeding in a chapter 15 case.  28 U.S.C.

§ 157(b)(2)(P) ("Core proceedings include but are not limited to— . . . (P) recognition of

foreign proceedings and other matters under chapter 15 of title 11.")  Chapter 15

specifically contemplates that the court should be guided by principles of comity and

cooperation with foreign courts in deciding whether to grant the foreign representative

additional post-recognition relief.  *In re Atlas Shipping A/S*, 404 B.R. 726, 738 (Bankr.

S.D.N.Y. 2009).  Section 1509 of the Bankruptcy Code requires that if the court grants

recognition under § 1517, it "shall grant comity or cooperation to the foreign

representative."  11 U.S.C. § 1509(b)(3).  Here, the Monitor asks the Court to provide

"additional assistance" under § 1507, specifically an order enforcing the Canadian Orders

in the United States.  Section 1507 directs the court to consider comity in granting

additional assistance to the foreign representative:

> (a) Subject to the specific limitations stated elsewhere in
> this chapter the court, if recognition is granted, may
> provide additional assistance to a foreign representative
> under this title or under other laws of the United States.
> (b) In determining whether to provide additional assistance
> under this title or under other laws of the United States, the
> court shall consider whether such additional assistance,
> consistent with the principles of comity, will reasonably
> assure -
>> (1) just treatment of all holders of claims against or
>> interests in the debtor's property;

> (2) protection of claim holders in the United States
> against prejudice and inconvenience in the
> processing of claims in such foreign proceeding;
> (3) prevention of preferential or fraudulent
> dispositions of property of the debtor;
> (4) distribution of proceeds of the debtor's property
> substantially in accordance with the order
> prescribed by this title; and
> (5) if appropriate, the provision of an opportunity
> for a fresh start for the individual that such foreign
> proceeding concerns.

11 U.S.C. § 1507.  The non-debtor release and injunction provisions included in the

Canadian Orders treat all claimants in the Canadian Proceedings similarly.  No objections

have been lodged that inclusion of these provisions adversely affects any claimant's

treatment against any of the debtors' property.

While recognition of the foreign proceeding turns on the objective criteria under §

1517, "relief [post-recognition] is largely discretionary and turns on subjective factors

that embody principles of comity."  *In re Bear Stearns High-Grade Structured Credit*

*Strategies Master Fund, Ltd.,* 389 B.R. 325, 333 (S.D.N.Y. 2008) (citing §§ 1507, 1521,

and 1525).  "Once a case is recognized as a foreign main proceeding, chapter 15

specifically contemplates that the court will exercise its discretion consistent with

principles of comity."  *Atlas Shipping*, 404 B.R. at 738; *see generally* Allan L. Gropper,

*Current Devs. in Int'l Insolvency Law: A United States Perspective,* 15 J. BANKR. L. &

PRAC. 2, Art. 3, at 3–5 (Apr. 2006).

Section 1506, nevertheless, places a limitation on recognition if doing so is

manifestly contrary to U.S. public policy:

> Nothing in this chapter prevents the court from refusing to
> take an action governed by this chapter if the action would
> be manifestly contrary to the public policy of the United
> States.

11 U.S.C. § 1506.  But this public policy exception is narrowly construed.  *See In re Ephedra Prods. Liab. Litig.,* 349 B.R. 333 (S.D.N.Y. 2006).  *Ephedra* involved a chapter 15 proceeding in which the foreign representative moved to recognize and enforce in the United States a claims resolution procedure ordered by an Ontario court, even though the procedure arguably deprived parties of the constitutional right to a jury trial.  *Id.* at 334–35.  In recognizing the order, the district court ruled that the public policy exception embodied in § 1506 should be "narrowly interpreted, as the word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States."  *Id.* at 336 (citing H.R.REP. NO. 109-31(I) at 109, *reprinted in* 2005 U.S.C.C.A.N. 88, 172).

The relief granted in the foreign proceeding and the relief available in a U.S. proceeding need not be identical.  A U.S. bankruptcy court is not required to make an independent determination about the propriety of individual acts of a foreign court.  *See In re Bd. of Dirs. of Multicanal S.A.*, 307 B.R. 384, 391 (Bankr. S.D.N.Y. 2004) (noting that neither case law nor section 304 (the statutory predecessor to chapter 15) require a determination that the foreign proceeding is identical to the U.S. proceeding).  The key determination required by this Court is whether the procedures used in Canada meet our fundamental standards of fairness.  *See Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB*, 773 F.2d 452, 457 (2d Cir. 1985).

While Second Circuit case law places narrow constraints on bankruptcy court approval of third-party non-debtor release and injunction provisions, the use of such provisions is not entirely precluded.  The Second Circuit decision in *Metromedia*, 416 F.3d at 142, and the Ontario Court of Appeal decision in *Metcalfe*, *see* Supplemental

20

Declaration of Ken Coleman in Support of Petitions for Recognition of Foreign

Proceedings and Related Relief, dated November 20, 2009, Exhibit B (ECF # 17), at 19–

20 ¶¶ 69–73, both reflect similar sensitivity to the circumstances justifying approving

such provisions.  To the extent that *Manville*, 517 F.3d at 65, 66, identifies an additional

jurisdictional limitation, it is a function of the jurisdictional limits placed on U.S.

bankruptcy courts by Congress.  *Id.* at 65 (recognizing "the jurisdictional predicate

necessary to enjoin third-party non-debtor claims"); *id*. at 66 (concluding that "a

bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that

directly affect the *res* of the bankruptcy estate").  The Canadian statute, on the other

hand, was interpreted in *Metcalfe* to grant jurisdiction to its courts to approve such relief

in appropriate circumstances.  Therefore, the Court concludes that § 1506 does not

preclude giving comity to the Canadian Orders in this case.

### B.  The Canadian Orders Are Entitled to Recognition as a Matter of Comity

U.S. courts apply general comity principles in determining whether to recognize

and enforce a foreign judgment.  *See Hilton v. Guyot*, 159 U.S. 113, 166 (1895); *Odd-*

*Bjorn Huse v. Huse-Sporem, A.S. (In re Birting Fisheries, Inc.)*, 300 B.R. 489, 502 (9th

Cir. BAP 2003); *Pariente v. Scott Meredith Literary Agency, Inc.*, 771 F. Supp. 609, 615

(S.D.N.Y. 1991).  In *Hilton v. Guyot*, the Supreme Court held that if the foreign forum

provides "a full and fair trial abroad before a court of competent jurisdiction, conducting

the trial upon regular proceedings, after due citation or voluntary appearance of the

defendant, and under a system of jurisprudence likely to secure an impartial

administration of justice between the citizens of its own country and those of other

countries, and there is nothing to show either prejudice in the court, or in the system of

laws under which it is sitting," the judgment should be enforced and not "tried afresh."

*Hilton*, 159 U.S. at 202–03.  "[W]hen the foreign proceeding is in a sister common law

jurisdiction with procedures akin to our own, comity should be extended with less

hesitation, there being fewer concerns over the procedural safeguards employed in those

foreign proceedings."  *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, *Inc.*, 238 B.R. 25, 66

(Bankr. S.D.N.Y. 1999), *aff'd*, 238 B.R. 699 (S.D.N.Y. 2002) (internal quotation marks

and citations omitted).  The U.S. and Canada share the same common law traditions and

fundamental principles of law.  Canadian courts afford creditors a full and fair

opportunity to be heard in a manner consistent with standards of U.S. due process.  U.S.

federal courts have repeatedly granted comity to Canadian proceedings.  *United Feature*

*Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 212 (S.D.N.Y.

2002) ("There is no question that bankruptcy proceedings in Canada—a sister common

law jurisdiction with procedures akin to our own—are entitled to comity under

appropriate circumstances.") (internal quotation marks and citations omitted); *Tradewell,*

*Inc. v. American Sensors Elecs., Inc.*, No. 96 Civ. 2474(DAB), 1997 WL 423075, at *1

n.3 (S.D.N.Y. 1997) ("It is well-settled in actions commenced in New York that

judgments of the Canadian courts are to be given effect under principles of comity.")

(internal quotation marks and citation omitted); *Cornfeld v. Investors Overseas Servs.,*

*Ltd.*, 471 F. Supp. 1255, 1259 (S.D.N.Y. 1979) ("The fact that the foreign country

involved is Canada is significant.  It is well-settled in New York that the judgments of the

Canadian courts are to be given effect under principles of comity.  Trustees in bankruptcy

appointed by Canadian courts have been recognized in actions commenced in the United

States.  More importantly, Canada is a sister common law jurisdiction with procedures

akin to our own, and thus there need be no concern over the adequacy of the procedural

safeguards of Canadian proceedings.") (internal quotation marks and citations omitted).

As explained above, the issue of the jurisdiction of the Ontario Court to enter the

Plan and Sanction Order, and in particular the third-party non-debtor release and

injunction provisions, was contested and fully litigated in the Canadian Courts.  The

Ontario Court concluded that it had jurisdiction to enter the relief; the Ontario Court of

Appeal confirmed the jurisdictional grounding of the Plan and Sanction Order; and the

Supreme Court of Canada denied review.  In these circumstances, principles for

recognition of foreign judgments strongly support the exercise of this Court's discretion

to give *res judicata* effect to the Canadian Orders.

    1.  *U.S. Courts May Give Res Judicata Effect to Foreign Judgments on
       the Basis of Comity*

U.S. courts may give *res judicata* effect to foreign judgments on the basis of

comity.[4]  *Diorinou v. Mezitis*, 237 F.3d 133, 139, 143 (2d Cir. 2001); *see also*

*Paramedics Electromedicina Comercial, Ltda v. GE Medical Sys. Info. Techs., Inc.,* 369

F.3d 645, 654 (2d Cir. 2004); *In re Parmalat Sec. Litig.*, 493 F. Supp. 2d 723, 737 n.74

(S.D.N.Y. 2007); *In re Telecom Argentina S.A.*, No. 06 Civ. 2352, 2006 WL 3378687, at

*5 (S.D.N.Y. Nov. 20, 2006) ("*res judicata* applies to bar [creditors] from raising . . .

objections for the first time in the Bankruptcy Court").

---

4      Foreign judgments are treated differently from the decisions of other State courts.  In the case of foreign judgments, *res judicata* is discretionary.  However, under domestic law, the principle of *res judicata* will prevent collateral attack on a judgment of another State based on an issue that has been litigated in the rendering court, including issues concerning the jurisdiction of the rendering court.  *See, e.g., Durfee Et Ux v. Duke*, 375 U.S. 106, 111 (1963) ("while it is established that a court in one State, when asked to give effect to the judgment of a court in another State, may constitutionally inquire into the foreign court's jurisdiction to render that judgment . . . a judgment is entitled to full faith and credit—even as to questions of jurisdiction—when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment").

2.  *The Decisions of the Canadian Courts Finding Jurisdiction Should Be Recognized*

In deciding whether to enforce a foreign judgment, a court in the United States may scrutinize the basis for the assertion of jurisdiction by the foreign court.  *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 482 cmt. c. ("*Lack of jurisdiction over defendant.*  The most common ground for refusal to recognize or enforce a foreign judgment is lack of jurisdiction to adjudicate in respect of the judgment debtor.  If the rendering court did not have jurisdiction over the defendant under the laws of its own state, the judgment is void and will not be recognized or enforced in any other state. Even if the rendering court had jurisdiction under the laws of its own state, a court in the United States asked to recognize a foreign judgment should scrutinize the basis for asserting jurisdiction in the light of international concepts of jurisdiction to adjudicate."). Whether jurisdiction was challenged in the foreign court is relevant but not necessarily decisive in deciding whether to enforce a foreign judgment, although a renewed challenge to jurisdiction is generally precluded.  *Id.* ("If the defendant appeared in the foreign court to challenge the jurisdiction of the court and failed to prevail, it is not clear whether such determination will be considered *res judicata* by a court in the United States asked to recognize the resulting judgment."); *Id.* at § 482 rn.3 ("[i]f the defendant challenged the jurisdiction of the rendering court in the first action and the challenge was unsuccessful or was not carried to conclusion . . . a renewed challenge to jurisdiction of the rendering court is generally precluded").  The justifications for giving *res judicata* effect to the Canadian Courts' carefully reasoned determination that the Ontario Court had jurisdiction, and for giving effect to the Plan and Implementation Order, under principles of international comity, are particularly strong in this case.

24

## IV.  CONCLUSION

The Canadian Proceedings were the result of near-cataclysmic turmoil in the Canadian commercial paper market following the onset of the global financial crisis.  The far-reaching Plan was adopted with near-unanimous creditor support, approved by the Ontario Court, and then affirmed on appeal by the Ontario Court of Appeal in the face of a jurisdictional challenge to the inclusion of third-party non-debtor release and injunction provisions.  There is no basis for this Court to second-guess the decisions of the Canadian courts.  Principles of comity in chapter 15 cases support enforcement of the Canadian Orders in the United States whether or not the same relief could be ordered in a plenary case under chapter 11.  Therefore, the Court will enter an order recognizing this case as a foreign main proceeding and enforcing the Canadian Orders.

Dated:     January 5, 2010
           New York, New York


                          _____/s/Martin Glenn_____
                               MARTIN GLENN
                          United States Bankruptcy Judge